**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT )<br><br>Plaintiff,<br><br>v.<br><br>ONESTA IP, LLC<br><br>Defendant. | CIVIL ACTION NO. 6:25-cv-00581<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT MISUSE,
NONINFRINGEMENT, AND INVALIDITY**

Plaintiff, Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), by and through its undersigned counsel, hereby files this Complaint against Defendant, Onesta IP, LLC ("Onesta"), and in support thereof alleges the following:

**NATURE OF THE ACTION**

1.      This is an action for declaratory judgment of misuse, noninfringement, and invalidity of U.S. Patent Nos. 8,854,381 (the "'381 Patent") and 8,443,209 (the "'209 Patent").

2.      Defendant, Onesta IP, LLC ("Onesta"), purports to assert both the '209 Patent and the '381 Patent against BMW AG in the Munich Regional Court I.

3.      Onesta has two pending lawsuits in this District, Nos. 1:25-cv-00586 and 1:25-cv-00587 (the "Onesta WDTX Litigations"), involving, *inter alia*, the '381 Patent.

4.      But rather than filing suit against BMW AG in a proper jurisdiction such as a U.S. District Court, Onesta undertook extraterritorial forum shopping in apparent hopes of litigating

the issue of infringement of U.S. patents in a court without the procedural, jurisdictional, and constitutional guarantees that can only be properly vindicated in a U.S. tribunal.

5.      Through this Declaratory Judgment action BMW AG seeks to protect itself and its downstream supply chain U.S. customers from Onesta's allegations of infringement and its unprecedented attempt to adjudicate U.S. patents in a foreign court.

**RELATED CASES**

**The German Onesta-BMW Cases**

6.      On or about October 9, 2025, Onesta filed suit in the Munich Regional Court I in Munich, Germany against BMW AG alleging infringement of the '381 and '209 Patents, as well as EP 2 473 920 B1 ("EP920 Patent").

7.      Onesta's complaint against BMW AG has resulted in three cases, each associated with one asserted patent: Case Nos. 21 O 13056/25, 21 O 12768/25, and 21 O 13057/25 (collectively, the "German Onesta-BMW Cases"), corresponding to the '381 Patent, the '209 Patent, and the EP920 Patent, respectively.

8.      In the German Onesta-BMW Case concerning the '381 Patent, Onesta asserts that BMW AG infringes claims 1-6 and 15-20 of the '381 Patent.

9.      In the German Onesta-BMW Case concerning the '209 Patent, Onesta asserts that BMW AG infringes claims 1, 5-6, 8, 10, 11, 13, and 15-18 of the '209 Patent.

**Investigation No. 337-TA-1450 (I.T.C.)**

10.     On or about April 18, 2025, Onesta filed the Complaint that led to Investigation No. 337-TA-1450 at the U.S. International Trade Commission ("ITC"), which Complaint alleges infringement of, *inter alia*, the '381 Patent. That Complaint names NVIDIA Corporation; Qualcomm Incorporated; OnePlus Technology (Shenzhen) Co., Ltd.; and Nothing Technology Limited as proposed respondents.

11.     The '381 Patent is no longer at issue in Investigation No. 337-TA-1450 (I.T.C.).

**The Onesta WDTX Litigations: Case Nos. 1:25-cv-00586 and 1:25-cv-00587**

12.     On or about April 17, 2025, Onesta filed Case Nos. 1:25-cv-00586 and 1:25-cv-00587, the Onesta WDTX Litigations, in this District.

13.     Case No. 1:25-cv-00586 names NVIDIA Corporation ("NVIDIA") as the defendant.

14.     Case No. 1:25-cv-00587 names Qualcomm Inc. ("Qualcomm"); Nothing Technology Limited; and OnePlus Technology (Shenzhen) Co., Ltd. as defendants.

15.     The Onesta WDTX Litigations concern, *inter alia*, allegations of infringement of the '381 Patent.

16.     The Onesta WDTX Litigations are both assigned to Judge Albright of this District.

17.     The Onesta WDTX Litigations are currently stayed in favor of Investigation No. 337-TA-1450 (I.T.C.).

**IPR2023-00687 (P.T.A.B.)**

18.     On or about March 7, 2023, Realtek Semiconductor Corp. filed a Petition for Inter Partes Review of U.S. Patent No. 8,854,381 in Case No. IPR2023-00687 (P.T.A.B.), alleging unpatentability of claims 15-20 of the '381 Patent.

19.     On or about October 25, 2023, the Patent Trial and Appeal Board issued a DECISION Granting Institution of *Inter Partes* Review in Case No. IPR2023-00687 (P.T.A.B.), finding the Petitioner in that case had "demonstrated a reasonable likelihood of prevailing in establishing that at least one of claims 15–20 of the '381 patent is unpatentable."

20.     On or about June 26, 2024, the Patent Trial and Appeal Board issued a TERMINATION Due to Settlement After Institution of Trial in Case No. IPR2023-00687 (P.T.A.B.).

**Investigation No. 337-TA-1318 (I.T.C.)**

21.     On or about May 5, 2022, Advanced Micro Devices, Inc. and ATI Technologies ULC filed the Complaint that led to Investigation No. 337-TA-1318 at the ITC, which Complaint alleges infringement of, *inter alia*, the '381 Patent. That Complaint names TCL Industries Holdings Co. Ltd.; TCL Industries Holdings (H.K.) Limited; TCL Electronics Holdings Limited; TCL Technology Group Corporation; TTE Corporation; TCL Holdings (BVI) Limited; TCL King Electrical Appliances (Huizhou) Co. Ltd.; Shenzhen TCL New Technologies Co., Ltd.; TCL MOKA International Limited; TCL Smart Device (Vietnam) Co., Ltd.; Manufacturas Avanzadas SA de CV; TCL Electronics Mexico, S de RL de CV; TCL Overseas Marketing Ltd.; and Realtek Semiconductor Corp as proposed respondents.

22.     On or about July 7, 2023, Administrative Law Judge Cameron Elliot of the ITC issued an INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND in Investigation No. 337-TA-1318 finding, *inter alia*, that "Respondents have proven the invalidity of claims 15-17 of U.S. Patent No. 8,854,381."

**Case No. 2:22-cv-00134 (E.D.T.X.)**

23.     On or about May 5, 2022, Advanced Micro Devices, Inc. and ATI Technologies ULC filed Case No. 2:22-cv-00134 (E.D.T.X.) against TCL Industries Holdings Co. Ltd.; TCL Industries Holdings (H.K.) Limited; TCL Electronics Holdings Limited; TCL Technology Group Corporation, TTE Corporation; TCL Holdings (BVI) Limited; TCL King Electrical Appliances

(Huizhou) Co. Ltd.; Shenzhen TCL New Technologies Co., Ltd.; TCL MOKA International Limited; TCL Smart Device (Vietnam) Co., Ltd; Manufacturas Avanzadas SA de CV; TCL Electronics Mexico, S de RL de CV; TCL Overseas Marketing Ltd.; and Realtek Semiconductor Corp. as defendants.

24.    Case No. 2:22-cv-00134 (E.D.T.X.) concerned, *inter alia*, allegations of infringement of the '381 Patent.

## THE PARTIES

### BMW AG

25.    Plaintiff BMW AG is a company organized and existing under the laws of Germany with a principal place of business at Petuelring 130, 80809 Munich, Germany.

26.    BMW AG is a global leader in automotive innovation, luxury, and engineering.

### Onesta

27.    Defendant Onesta is a Delaware limited liability company and has a principal place of business located at 230 Sugartown Road, Suite 100, Wayne, PA 19087.

28.    Onesta is a patent management and licensing company.

29.    Onesta does not manufacture or sell any product that practices any claim of the '381 patent.

30.    Onesta does not manufacture or sell any product that practices any claim of the '209 patent.

31.    Onesta does not manufacture or sell any products.

## JURISDICTION AND VENUE

32.    This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, and under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201-2202.

34.     Onesta is subject to this Court's personal jurisdiction under due process and/or the Texas Long Arm Statute due at least to Onesta's filing of the Onesta WDTX Litigations in this District. In addition, Onesta is subject to this Court's personal jurisdiction because Onesta has directed and continues to direct acts to this District, including acts pertaining to the Patents-in-Suit including asserting infringement of at least the '381 patent and in particular asserting that certain Qualcomm products infringe one or more claims of the '381 patent. In addition, upon information and belief, Onesta has targeted others in Texas and in this forum with licensing demands. For example, upon information and belief, Onesta addressed offers to license one or more of its patents to NVIDIA Corporation and Qualcomm Inc., both of which are located in this District.

35.     An actual, definite, concrete, and justiciable case or controversy exists between BMW AG and Onesta with respect to the '381 Patent.

36.     An actual, definite, concrete, and justiciable case or controversy exists between BMW AG and Onesta with respect to the '209 Patent.

37.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400 because Onesta has purposefully directed enforcement activities toward at least the defendants in the Onesta WDTX Litigations in this District and Onesta is subject to the exercise of personal jurisdiction over it in this District and thus resides in it. Among things, Onesta has attempted to license and/or enforce one or more of the Patents-in-Suit in this District or otherwise get BMW AG and the defendants in the Onesta WDTX Litigations to cease-and-desist certain actions allegedly taking place in this District.

**PATENTS-IN-SUIT**

38.    On October 7, 2014, the USPTO issued the '381 Patent, entitled "Processing unit that enables asynchronous task dispatch." A true and correct copy of the '381 Patent is attached hereto as Exhibit 1.

39.    On May 14, 2013, the United States Patent and Trademark Office ("USPTO") issued the '209 Patent, entitled "Throttling computational units according to performance sensitivity." A true and correct copy of the '209 Patent is attached hereto as Exhibit 2.

40.    Onesta purports to be the owner of each of the Patents-in-Suit.

**COUNT I: DECLARATORY JUDGMENT OF MISUSE OF U.S. PATENT NO. 8,854,381**

41.    BMW AG realleges, and incorporates fully herein, each preceding paragraph.

42.    Onesta has alleged in the Munich Regional Court I that BMW AG vehicles fitted with Qualcomm Snapdragon-System-on-Chip (SoC) with an integrated Adreno-GPU infringe claims 1–6, and 15–20 of the '381 Patent.

43.    Onesta's assertion of the '381 Patent in Germany seeks relief in Germany from the Munich Regional Court I.

44.    28 U.S.C. § 1338(a) expressly grants U.S. district courts original jurisdiction over patent disputes, to the exclusion of the state courts.

45.    28 U.S.C. § 1400(b) governs venue in civil actions for patent infringement and states: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

46.    There is no provision of the Patent Act, 35 U.S.C. §§ 1 *et seq.*, that provides for a patentholder to seek adjudication of infringement of a U.S. patent in a court outside of the United States.

47.    There is no provision of the Patent Act, 35 U.S.C. §§ 1 *et seq.*, that provides for a patentholder to seek relief in the first instance outside of the United States for alleged infringement of a U.S. patent.

48.    Onesta's attempt to seek adjudication of alleged infringement of the '381 Patent outside of the United States constitutes an improper broadening of the physical, temporal, and/or adjudicative scope of the exclusionary rights of the '381 Patent.

49.    Onesta has not accused BMW AG of infringing the '381 Patent in any U.S. District Court.

50.    Onesta's Complaint that led to the German Onesta-BMW Cases was filed on or about October 9, 2025.

51.    Onesta's Complaint that led to the German Onesta-BMW Cases seeks damages for alleged infringement of the '381 Patent from April 14, 2018 to the present.

52.    35 U.S.C. § 286, first paragraph, states: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

53.    Onesta's attempt to seek damages from a foreign court for alleged infringement of the '381 Patent occurring more than six years prior to filing a complaint or counterclaim for patent infringement constitutes an improper broadening of the physical, temporal, and/or adjudicative scope of the exclusionary rights of the '381 Patent.

54.    Onesta's attempt to seek damages from a foreign court for alleged infringement of the '381 Patent occurring more than six years prior to filing a complaint or counterclaim for patent infringement in a U.S. District Court constitutes an improper broadening of the physical, temporal, and/or adjudicative scope of the exclusionary rights of the '381 Patent.

55.     Onesta purports to be the sole owner of the '381 Patent.

56.     Advanced Micro Devices, Inc. ("AMD") was the prior owner of the '381 Patent prior to assignment to Onesta, which, on information and belief, occurred on or about November 8, 2024.

57.     A document purporting to be a Patent Transfer Agreement between Onesta and AMD dated August 19, 2024, which was filed as Public Exhibit 13 to Onesta's Complaint in 337-TA-1450 (I.T.C.) is attached hereto as Exhibit 3.

58.     Onesta filed a declaration by Darryll Judice dated April 18, 2025 as Public Exhibit 14 to Onesta's Complaint in 337-TA-1450 (I.T.C.), which is attached hereto as Exhibit 4. Darryll Judice is an employee of AMD.

59.     Activities of AMD form all or part of the basis of Onesta's economic domestic industry assertions in 337-TA-1450 (I.T.C.).

60.     Products of AMD form all or part of the basis of Onesta's technical domestic industry assertions in 337-TA-1450 (I.T.C.).

61.     AMD agreed to support Onesta's assertion of the '381 Patent at the ITC.

62.     On information and belief, AMD and Onesta have acted in concert to assert of the '381 Patent against one or more of Qualcomm, NVIDIA, and BMW AG.

63.     On information and belief, AMD is financially interested in Onesta's assertions of the '381 patent against one or more of Qualcomm, NVIDIA, and BMW AG.

64.     On information and belief, AMD has some level of influence over Onesta's assertions of the '381 patent against one or more of Qualcomm, NVIDIA, and BMW AG.

65.     Qualcomm is a competitor of AMD in at least the United States multi-core GPU market to which the '381 Patent pertains.

66.    On information and belief, AMD directed, controlled, or actively supported Onesta's assertion of the '381 Patent against Qualcomm.

67.    NVIDIA is a competitor of AMD in at least the United States multi-core GPU market to which the '381 Patent pertains.

68.    On information and belief, AMD directed, controlled, or actively supported Onesta's assertion of the '381 Patent against NVIDIA.

69.    On information and belief, AMD directed, controlled, or actively supported Onesta's assertion of the '381 Patent against BMW AG.

70.    Onesta's assertion of the '381 Patent, at least as to claims 15-17, against BMW AG, Qualcomm, and NVIDIA (separately or together), is objectively baseless. In Investigation No. 337-TA-1318, the ITC found claims 15-17 of the '381 Patent to be invalid and in IPR2023-00687 the PTAB found claims 15-20 of the '381 Patent to be more likely than not invalid. Assertion of these claims, which have been twice found unpatentable or likely unpatentable, by Onesta is objectively unreasonable and baseless.

71.    The assertion of the '381 Patent against BMW AG, Qualcomm, and NVIDIA (separately or together) is an attempt to use governmental process to interfere with the business operations and relationships of each such company.

72.    On information and belief, Onesta's assertion of at least claims 15-17 of the '381 Patent against BMW AG, Qualcomm, and NVIDIA has caused BMW AG, Qualcomm, and NVIDIA to incur expenses in connection with preparing a defense in connection to those allegations.

73.    Onesta's assertion of the '381 Patent against BMW AG in Germany has had an anticompetitive effect. By way of non-limiting example, the German Onesta-BMW Cases put

undue pressure on BMW AG and its suppliers, as well as any other entity located in Germany, to take a license to the '381 Patent to avoid the expense, burden, and disparate procedural protections of litigating a U.S. patent in German courts. Moreover, the German Onesta-BMW Cases unfairly affect the head unit and processing unit markets in the United States by threatening barriers to access not contemplated or granted by the Patent Act, and to be imposed and enforced in the first instance on the alleged basis of a U.S. patent by a foreign adjudicative body.

74.     On information and belief, Onesta's assertion of the '381 Patent against BMW AG in Germany has foreclosed, at least in part, competition in the United States multi-core GPU market to which the '381 Patent pertains, as well as competition in the head unit and processing unit markets in the United States. Moreover, Onesta's assertion of the '381 Patent against BMW AG in Germany places improper licensing pressure on at least Qualcomm and/or BMW AG, which may result in improperly increased prices for consumers. For at least those reasons, Onesta's assertion of the '381 Patent against BMW AG in Germany is contrary to public policy.

75.     On information and belief, injunction by a German court of the sale of Qualcomm and/or BMW products accused of infringement would result in a reduction of practical alternative products to AMD multi-core GPUs forming the basis of domestic industry in 337-TA-1450 (I.T.C.). Thus, on information and belief, injunction by a German court of the sale of Qualcomm and/or BMW products accused of infringement would result in reduced consumer choice, increased prices, or barriers to entry not contemplated by the Patent Act, 35 U.S.C. §§ 1 *et seq.*

76.     Onesta has misused the '381 Patent rendering it unenforceable.

77.    An actual and justiciable controversy requiring declaratory relief exists between Onesta and BMW AG regarding the enforceability of the '381 Patent.

## COUNT II: DECLARATORY JUDGMENT OF MISUSE OF U.S. PATENT NO 8,443,209

78.    BMW AG realleges, and incorporates fully herein, each preceding paragraph.

79.    Onesta has alleged in the Munich Regional Court I that BMW AG vehicles fitted with Qualcomm Snapdragon-System-on-Chip (SoC) with an integrated Adreno-GPU infringe claims 1, 5, 6, 8, 10, 11, 13, 15–18 of the '209 Patent. An actual and justiciable controversy requiring declaratory relief exists between Onesta and BMW AG regarding alleged infringement of the '209 Patent.

80.    Onesta's assertion of the '209 Patent in Germany seeks relief in Germany from the Munich Regional Court I.

81.    28 U.S.C. § 1338(a) expressly grants U.S. district courts original jurisdiction over patent disputes, to the exclusion of the state courts.

82.    28 U.S.C. § 1400(b) governs venue in civil actions for patent infringement and states: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

83.    There is no provision of the Patent Act, 35 U.S.C. §§ 1 *et seq.*, that provides for a patentholder to seek adjudication of infringement of a U.S. patent in a court outside of the United States.

84.    There is no provision of the Patent Act, 35 U.S.C. §§ 1 *et seq.*, that provides for a patentholder to seek relief in the first instance outside of the United States for alleged infringement of a U.S. patent.

85.     Onesta's attempt to seek adjudication of alleged infringement of the '209 Patent outside of the United States constitutes an improper broadening of the physical, temporal, and/or adjudicative scope of the exclusionary rights of the '209 Patent.

86.     Onesta has not accused BMW AG of infringing the '209 Patent in any U.S. District Court.

87.     Onesta's Complaint that led to the German Onesta-BMW Cases was filed on or about October 9, 2025.

88.     Onesta's Complaint that led to the German Onesta-BMW Cases seeks damages for alleged infringement of the '209 Patent from May 14, 2013 to the present.

89.     35 U.S.C. § 286, first paragraph, states: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

90.     Onesta's attempt to seek damages from a foreign court for alleged infringement of the '209 Patent occurring more than six years prior to filing a complaint or counterclaim for patent infringement constitutes an improper broadening of the physical, temporal, and/or adjudicative scope of the exclusionary rights of the '209 Patent.

91.     Onesta's attempt to seek damages from a foreign court for alleged infringement of the '209 Patent occurring more than six years prior to filing a complaint or counterclaim for patent infringement in a U.S. District Court constitutes an improper broadening of the physical, temporal, and/or adjudicative scope of the exclusionary rights of the '209 Patent.

92.     Onesta purports to be the sole owner of the '209 Patent.

93.     Advanced Micro Devices, Inc. ("AMD") was the prior owner of the '209 Patent prior to assignment to Onesta.

94.    Onesta filed a declaration by Darryll Judice, an employee of AMD, dated April 18, 2025 as Exhibit 14 to Onesta's Complaint in 337-TA-1450 (I.T.C.). Darryll Judice is an employee of AMD.

95.    A true and correct public copy of Darryll Judice's April 18, 2025 declaration filed as Exhibit 14 to Onesta's Complaint in 337-TA-1450 (I.T.C.) is attached as Exhibit 4.

96.    Activities of AMD form all or part of the basis of Onesta's economic domestic industry assertions in 337-TA-1450 (I.T.C.).

97.    Products of AMD form all or part of the basis of Onesta's technical domestic industry assertions in 337-TA-1450 (I.T.C.).

98.    AMD agreed to support Onesta's assertion of the '209 Patent at the ITC.

99.    On information and belief, AMD and Onesta have acted in concert to assert of the '209 Patent against one or more of Qualcomm, NVIDIA, and BMW AG.

100.    On information and belief, AMD is financially interested in Onesta's assertions of the '209 patent against one or more of Qualcomm, NVIDIA, and BMW AG.

101.    On information and belief, AMD has some level of influence over Onesta's assertions of the '209 patent against one or more of Qualcomm, NVIDIA, and BMW AG.

102.    Qualcomm is a competitor of AMD in at least the United States multi-core GPU market to which the '209 Patent pertains.

103.    On information and belief, AMD directed, controlled, or actively supported Onesta's assertion of the '209 Patent against Qualcomm.

104.    NVIDIA is a competitor of AMD in at least the United States multi-core GPU market to which the '209 Patent pertains.

105.    On information and belief, AMD directed, controlled, or actively supported Onesta's assertion of the '209 Patent against NVIDIA.

106.    On information and belief, AMD directed, controlled, or actively supported Onesta's assertion of the '209 Patent against BMW AG.

107.    Onesta's assertion of the '209 Patent against BMW AG in Germany has had an anticompetitive effect. By way of non-limiting example, the German Onesta-BMW Cases put undue pressure on BMW AG and its suppliers, as well as any other entity located in Germany, to take a license to the '209 Patent to avoid the expense, burden, and disparate procedural protections of litigating a U.S. patent in German courts. Moreover, the German Onesta-BMW Cases unfairly affect the head unit and processing unit markets in the United States by threatening barriers to access not contemplated or granted by the Patent Act, and to be imposed and enforced in the first instance on the alleged basis of a U.S. patent by a foreign adjudicative body.

108.    On information and belief, Onesta's assertion of the '209 Patent against BMW AG in Germany has foreclosed, at least in part, competition in the United States multi-core GPU market to which the '209 Patent pertains, as well as competition in the head unit and processing unit markets in the United States. Moreover, Onesta's assertion of the '209 Patent against BMW AG in Germany places improper licensing pressure on at least Qualcomm and/or BMW AG, which may result in improperly increased prices for consumers. For at least those reasons, Onesta's assertion of the '209 Patent against BMW AG in Germany is contrary to public policy.

109.    On information and belief, injunction by a German court of the sale of Qualcomm and/or BMW products accused of infringement would result in a reduction of practical alternative products to AMD multi-core GPUs forming the basis of domestic industry in 337-

TA-1450 (I.T.C.). Thus, on information and belief, injunction by a German court of the sale of Qualcomm and/or BMW products accused of infringement would result in reduced consumer choice, increased prices, or barriers to entry not contemplated by the Patent Act, 35 U.S.C. §§ 1 *et seq.*

110.    Onesta has misused the '209 Patent rendering it unenforceable.

111.    An actual and justiciable controversy requiring declaratory relief exists between Onesta and BMW AG regarding the enforceability of the '209 Patent.

## COUNT III: DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 8,854,381

112.    BMW AG realleges, and incorporates fully herein, each preceding paragraph.

113.    In one or more of the German Onesta-BMW Cases, Onesta alleges that BMW vehicles equipped with Qualcomm Snapdragon-System-on-Chip (SoC) with integrated Adreno GPU, including the BMW i4 allegedly equipped with a radio control unit called Head Unit High 5 (HU-H5, also known as 65-12-5-B59-1D4), which allegedly uses the Qualcomm Snapdragon SoC SA8155P with integrated Adreno 640, infringe claims 1-6 and 15-20 of the '381 Patent.

114.    Exemplary Claim 1 of the '381 Patent recites:

| Limitation | Claim Language |
|---|---|
| 1[pre] | An apparatus comprising: |
| [1.a] | a plurality of engines associated with a first processing unit and |
| [1.1.a] | configured to receive, from a scheduling module associated with a second processing unit, a plurality of tasks and to |
| [1.1.b] | load state data associated with each of the plurality of tasks; and |
| [1.2] | a shader core associated with the first processing unit and configured to receive the plurality of tasks from at least one of the plurality of engines and |
| [1.3] | to execute a first task from the plurality of tasks while executing a second task from the plurality of tasks based on respective state data associated with each of the first and second tasks. |

115.    BMW AG has not infringed, and is not infringing, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '381 Patent because it has not engaged in any of the acts constituting patent infringement as set forth in 35 U.S.C. § 271.

116.    None of BMW AG's employees, contractors, agents, customers, or any other entity or individual associated with BMW AG has ever used any BMW vehicle or component thereof in a manner that infringes any claim of the '381 Patent.

117.    By way of example, BMW vehicles and components thereof do not satisfy at least limitation 1.3. The accused BMW vehicles and components thereof do not comprise a shader cord associated with a first processing unite that executes a first task from the plurality of tasks while executing a second task from the plurality of tasks based on respective state data associated with each of the first and second tasks, as required by limitation 1.3 of Claim 1 of the '381 Patent.

118.    All of the claims of the '381 Patent either recite a limitation corresponding to or similar to limitation 1.3, or depend from a claim that recites this limitation. Dependent claims cannot be infringed if the independent claim from which they depend is not infringed. Therefore, BMW AG does not infringe and has not infringed any claim of the '381 Patent for at least the same reason as described above for Claim 1.

119.    Based on the foregoing, an actual controversy has arisen and now exists between BMW AG and Onesta regarding BMW AG's alleged infringement of the '381 Patent that warrants issuance of a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that BMW AG has not infringed any claim of the '381 Patent.

120.    A judicial determination is necessary and appropriate so that BMW AG may ascertain its rights regarding the '381 Patent, including its rights to manufacture, use, offer to sell, sell, and/or import BMW vehicles or components thereof.

121.    BMW AG is entitled to a declaration that it has not and does not infringe any claim of the '381 Patent. Accordingly, BMW AG seeks a judgment declaring that the claims of the '381 Patent are not infringed by any BMW vehicle or component thereof as Onesta alleges.

## COUNT IV: DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 8,443,209

122.    BMW AG realleges, and incorporates fully herein, each preceding paragraph.

123.    In one or more of the German Onesta-BMW Cases, Onesta alleges that BMW vehicles equipped with Qualcomm Snapdragon-System-on-Chip (SoC) with integrated Adreno GPU, including the BMW i4 allegedly equipped with a radio control unit called Head Unit High 5 (HU-H5, also known as 65-12-5-B59-1D4), which allegedly uses the Qualcomm Snapdragon SoC SA8155P with integrated Adreno 640, infringe claims 1, 5-6, 8, 10, 11, 13, and 15-18 of the '209 Patent.

124.    Exemplary Claim 1 of the '209 Patent (after certificates of correction) recites:

| Limitation | Claim Language |
|---|---|
| 1[pre] | A method comprising: |
| [1.1] | accessing performance data indicative of performance sensitivity of each of a plurality of computational units of a computer system to a change in performance capability; |
| [1.2] | determining a subset of one or more of the computational units among the plurality of the computational units that are least sensitive to the change in performance capability based on the performance data; and |
| [1.3] | limiting performance of the subset of the plurality of computational units in the computer system. |

125.    BMW AG has not infringed, and is not infringing, directly or indirectly, literally or under the doctrine of equivalents, any claim of the '209 Patent because it has not engaged in any of the acts constituting patent infringement as set forth in 35 U.S.C. § 271.

126.    None of BMW AG's employees, contractors, agents, customers, or any other entity or individual associated with BMW AG has ever used any BMW vehicle or component thereof in a manner that infringes any claim of the '209 Patent.

127.    In addition and by way of example, BMW vehicles and components thereof do not satisfy at least limitations 1.1, 1.2, and 1.3. The accused BMW vehicles and components thereof do not access or comprise data indicative of performance sensitivity of each of a plurality of computational units of a computer system to a change in performance capability, as required by limitation 1.1 of Claim 1 of the '209 Patent. The accused BMW vehicles and components thereof do not determine a subset of one or more of the computational units among the plurality of the computational units that are at least sensitive to the change in performance capability based on the performance data, as required by limitation 1.2 of Claim 1 of the '209 Patent. And the accused BMW vehicles and components thereof do not limit performance of the subset of the plurality of computational units in the computer system, as required by limitation 1.3 of Claim 1 of the '209 Patent.

128.    All of the claims of the '209 Patent either recite a limitation corresponding to or similar to at least one of limitations 1.1, 1.2, and 1.3, or depend from a claim that recites such limitations. Dependent claims cannot be infringed if the independent claim from which they depend is not infringed. Therefore, BMW AG does not infringe and has not infringed any claim of the '209 Patent for at least the same reason as described above for Claim 1.

129.    Based on the foregoing, an actual controversy has arisen and now exists between BMW AG and Onesta regarding BMW AG's alleged infringement of the '209 Patent that warrants issuance of a declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq.* and Fed. R. Civ. P. 57 that BMW AG has not infringed any claim of the '209 Patent.

130.    A judicial determination is necessary and appropriate so that BMW AG may ascertain its rights regarding the '209 Patent, including its rights to manufacture, use, offer to sell, sell, and/or import BMW vehicles or components thereof.

131.    BMW AG is entitled to a declaration that it has not and does not infringe any claim of the '209 Patent. Accordingly, BMW AG seeks a judgment declaring that the claims of the '209 Patent are not infringed by any BMW vehicle or component thereof as Onesta alleges.

## COUNT V: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 8,854,381

132.    BMW AG realleges, and incorporates fully herein, each preceding paragraph.

133.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of invalidity.

134.    The claims of the '381 Patent are invalid at least as anticipated and/or obvious under 35 U.S.C. §§ 102 and/or 103 because each and every element of those claims was publicly disclosed in one or more references prior to the earliest priority date of the '381 Patent.

135.    By way of example and without limiting the grounds of invalidity that will be asserted in this action, Claims 15-20 of the '381 Patent are invalid under at least 35 U.S.C. § 103 over at least one of U.S. Pat. No. 8,151,095 to Wilt (attached as Exhibit 5); U.S. Pat. No. 8,319,774 to Jiao et al. ("Jiao") (attached as Exhibit 6); and WO 00/62182 to Stuttard et al. ("Stuttard") (attached as Exhibit 7) for the reasons stated in the Patent Trial and Appeal Board's

DECISION Granting Institution of Inter Partes Review dated October 25, 2023 in Case

No. IPR2023-00687 (attached as Exhibit 8), which is incorporated herein by reference.

136.    By way of further example and without limiting the grounds of invalidity that will

be asserted in this action, Claim 1 of the '381 patent is invalid under 35 U.S.C. § 102 as

anticipated by Stuttard and/or under 35 U.S.C. § 103 as obvious in view of Stuttard either alone

or in combination with one or more additional references, as demonstrated below.

137.    Limitation 1[pre] of the '381 Patent ("An apparatus comprising:") is taught by at

least the following disclosures of Stuttard:



*Stuttard at Fig. 1.*

"For example, the specific graphics system 3 includes an embedded processing unit (EPU) 8
for controlling the overall function of the graphics processor and for interfacing with the host
system. The system includes a processing core 10 which processes the graphical data for
output to the display screen via a video output interface 14. Local memory 12 is provided for

the graphics system 3."

*Stuttard at page 4, lines 26-35.*

138.    Limitations 1[a], 1.1.a, and 1.1.b of the '381 Patent ("a plurality of engines associated with a first processing unit and configured to receive, from a scheduling module associated with a second processing unit, a plurality of tasks and to load state data associated with each of the plurality of tasks; and") are taught by at least the following disclosures of Stuttard:



FIG. 2(b)

*Stuttard at Fig. 2B.*

"processing core 10 includes a number of control units: thread manager 102, array controller 104, channel controller 108, a binning unit 1069 per block and a microcode store 105. These control units control the operation of a number of processing blocks 106 which perform the graphics processing itself."

*Stuttard at page 8, lines 2-7.*

"A detailed description will now be given of the thread manager 102, which as mentioned above with reference to Figure 4, comprises a cache memory unit 1024 for storing instructions fetched for each thread."

*Stuttard at page 23, lines 3-6.*

"At a given time, only one thread is executing, and the scheduling of the time multiplexing between threads is determined by the dynamic conditions of the program execution. This scheduling is performed by a thread scheduler in the thread manager 102, which ensures that each processor block 106 is kept busy as much as possible. The switching from one thread to another involves a state saving and restoring overhead. Therefore, the priority of threads is used to reduce the number of thread switches, thereby reducing the associated overheads."

*Stuttard at page 23, lines 18-28.*

"One of the processing blocks 106 is shown in more detail in Figure 8. The processing block 106 includes an array of processor elements 1061 which are arranged to operate in parallel on respective data, items but carrying out the same instruction (SIMD). Each processor element 1061 includes a processor unit 1061a, a PE register file 1061b and a PE memory unit 1061c."

*Stuttard at page 17, lines 28-34.*

139.    Limitations 1.2 and 1.3 of the '381 Patent ("a shader core associated with the first processing unit and configured to receive the plurality of tasks from at least one of the plurality of engines and to execute a first task from the plurality of tasks while executing a second task from the plurality of tasks based on respective state data associated with each of the first and second tasks.") are taught by at least the following disclosures of Stuttard:



## FIG. 1

*Stuttard at Fig. 1.*



*Stuttard at Fig. 2B (partly reproduced).*

"One of the processing blocks 106 is shown in more detail in Figure 8. The processing block 106 includes an array of processor elements 1061 which are arranged to operate in parallel on respective data, items but carrying out the same instruction (SIMD). Each processor element 1061 includes a processor unit 1061a, a PE register file 1061b and a

PE memory unit 1061c. The PE memory unit 1063c is used to store data items for processing by the processor unit 1061a. Each processor unit 1061a can transfer data to and from its PE memory unit 1061c via the PE register file 1061b. The processor unit 1061a also uses the PE register file 1061b to store data which is being processed. Transfer of data items between the processor unit 1061a and the memory unit 1061c is controlled by the array controller 104. Each of the processing elements is provided with a data input from the mathematical expression evaluator (MEE) 1062. The MEE operates to evaluate a mathematical expression for each of the PEs. The mathematical expression can be a linear, bi-linear, cubic, quadratic or more complex expression depending upon the particular data processing application concerned."

*Stuttard at page 17, line 28 to page 18, line 16.*



*Stuttard at Fig. 4.*

"In the example shown in Figure 4, the thread manager includes one thread processor 1026 for each thread. The thread processors 1026 control the issuance of core instructions from the thread manager so as to maintain processing of simultaneously active program threads, so that each the processing blocks 106 can be active for as much time as possible."

*Stuttard at page 11, lines 26 to 33.*

140.    By way of further example and without limiting the grounds of invalidity that will be asserted in this action, Claim 1 of the '381 patent is invalid under 35 U.S.C. § 102 as

anticipated by Jiao and/or under 35 U.S.C. § 103 as obvious in view of Jiao either alone or in

combination with one or more additional references, as demonstrated below.

141.    Limitation 1[pre] of the '381 Patent ("An apparatus comprising:") is taught by at

least the following disclosures of Jiao:

"Embodiments of the present disclosure are directed to graphics processing systems, comprising: a plurality of execution units, wherein one of the execution units is configurable to process a thread corresponding to a rendering context, wherein the rendering context comprises a plurality of constants with a priority level; a constant buffer configurable to store the constants of the rendering context into a plurality of slot in a physical storage space; and an execution unit control unit configurable lo assign the thread to one of the execution units; a constant buffer control unit providing a translation table for the rendering context to map the corresponding constants into the slots of the physical storage space. Comparable methods are also disclosed"

*Jiao at Abstract.*

"FIG. 1 is a block diagram of an embodiment of a graphics processor system 100 in which embodiments of CB systems and methods (collectively, constant buffer (CB) system 200) are implemented. As is described further below, the CB system 200 is incorporated in each execution unit of a computational core. In some implementations, the graphics processor system 100 may be configured as a computer system. The graphics processor system 100 may comprise a display device 102 driven by a display interface unit (DIU) 104 and local memory 106 (e.g., which may comprise a display buffer, frame buffer, texture buffer, command buffer, etc.)."

*Jiao at 4:49-61.*

"Reference is now made to FIG. 2, which is a block diagram that illustrates an exemplary processing environment in which an embodiment of a CB system 200 is implemented. In particular, the GPU 114 is shown, and includes a graphics processor 202. The graphics processor 202 comprises the compiler 115, a multiple execution unit (EU). Computational core 204 (also known as a software programmable core processing unit) that, in one embodiment, comprises the CB system 200 distributed among one or more execution units. The graphics processor 202 also comprises an execution unit pool (EUP) control and vertex/stream cache unit 206 (herein, EU pool control unit 206) and a graphics pipeline with fixed function logic 208 (e.g., including a triangle set-up unit (TSU), span-tile generator (STG), etc.) as explained below. The computational core 204 comprises a pool of multiple execution units to meet the computing requirements imposed by shader tasks associated with various shader programs, including a vertex shader, geometry shader, and/or pixel shader. processing data for the graphics pipeline 208. As the functionality of the CB system 200 in one embodiment is implemented largely through cooperation with one or more shaders of the computational core 204, a general description of an embodiment of a graphics processor 202 is described, followed by the particulars of certain embodiments of the CB system 200."

*Jiao at 5:33-57.*

"Having described components that generate tasks for execution units in the computational core 204, reference is now made to FIG. 4, which is a block diagram showing an example graphics processor 202. While not all components for graphics processing are shown, the components shown in FIG. 4 should be sufficient for one having ordinary skill in the art to understand the general functions and architecture related to such graphics processors. At the center of the programmable processing environment is the computational core 204, which processes various instructions and includes the CB system 200. Various types of shader programs can be executed or mapped to the computational core 204, including the vertex shader 304, geometry shader 306, and pixel shader 310. That computational core 204, for multi-issue processors, is capable of processing multiple instructions within a single clock cycle."

*Jiao at 6:49-64.*



**FIG. 1**

*Jiao at Fig. 1.*



**FIG. 2**

*Jiao at Fig. 2.*



*Jiao at Fig. 4.*

142.    Limitations 1[a], 1.1.a, and 1.1.b of the '381 Patent ("configured to receive, from a scheduling module associated with a second processing unit, a plurality of tasks and to load state data associated with each of the plurality of tasks; and a plurality of engines associated with a first processing unit and") are taught by at least the following disclosures of Jiao:

> "Embodiments of the present disclosure are directed to graphics processing systems, comprising: a plurality of execution units, wherein one of the execution units is configurable to process a thread corresponding to a rendering context, wherein the rendering context comprises a plurality of constants with a priority level; a constant buffer configurable to store the constants of the rendering context into a plurality of slot in a physical storage space; and an execution unit control unit configurable lo assign the thread to one of the execution units; a constant buffer control unit providing a translation table for the rendering context to map the corresponding constants into the slots of the physical storage space. Comparable methods are also disclosed"

*Jiao at Abstract.*

> "Each object or group of objects may have specific visual properties related to the appearance of surfaces (e.g., materials, reflectance, shape, textures, etc.) and/or operations related to the same (e.g., required transformations) which may collectively be referred to as a rendering context for this object or group of objects. When rendering an object or group of objects for a given rendering context, a shader utilizes a constant data pool (e.g., context-specific constants stored in a constant buffer)."

*Jiao at 1:50-58.*

> "The BIU 118 is coupled to a chipset 122 (e.g., northbridge chipset) or switch. The chipset 122 comprises interface electronics to strengthen signals from a central processing unit (CPU) 126 (also referred to herein as a host processor) and to separate signals to and from a system memory 124 from those signals going to and from input/output (I/O) devices (not shown). Although a PCIE bus protocol is described, other manners of connection and/or communication between the host processor 126 and the GPU 114 may be implemented in some embodiments (e.g., PCI, proprietary high-speed bus, etc.).The system memory 124 also comprises driver software 128, which communicates instruction sets or commands through the use of the CPU 126 to registers in the GPU 114, and an applications programming interface (API) space 130, from which constants are either memory mapped or constant buffer mapped by a compiler 115 in the GPU 114, as explained further below."

*Jiao at 5:7-23.*

> "The graphics processor 202 also comprises an execution unit pool (EUP) control and vertex/stream cache unit 206 (herein, EU pool control unit 206) and a graphics pipeline with fixed function logic 208 (e.g., including a triangle set-up unit (TSU), span-tile generator (STG), etc.) as explained below. The computational core 204 comprises a pool of multiple

execution units to meet the computing requirements imposed by shader tasks associated with various shader programs, including a vertex shader, geometry shader, and/or pixel shader. processing data for the graphics pipeline 208. As the functionality of the CB system 200 in one embodiment is implemented largely through cooperation with one or more shaders of the computational core 204, a general description of an embodiment of a graphics processor 202 is described, followed by the particulars of certain embodiments of the CB system 200."

*Jiao at 5:42-57.*

"FIG. 3 is a block diagram that illustrates an embodiment of the logical graphics pipeline 208. Additional or fewer components to those shown in FIG. 3 may also be included in some embodiments. For instance, each module described below may have its own internal register or registers, not shown, used by a module co-located with the register or shared with different modules. Additionally, various caches (e.g., depth or z-cache, color or D-cache, texture or T-cache, etc.) may be implemented according to well-known pipeline architectures. Specifically, the components illustrated in FIG. 3 comprise principle components of a graphics pipeline 208 that cooperate, in whole or in part, with the CB system 200. The first component is designated as an input assembler 302, which essentially fetches (or generally receives) all vertex data from the memory 312 using index buffers, and assembles primitives for further processing in the computational core 204. Memory 306 comprises local memory 106, among other memory subsystems such as the stream and vertex cache of the pool control unit 206 (e.g., the latter used as a source of vertex data for assembling geometry primitives). The primitives, once assembled, are passed to the vertex shader 304. The vertex shader 304, as is known. processes vertices. By performing operations such as transformations. skinning, and lighting. Constants for performing one or more of the aforementioned computations are provided by a constant buffer of the constant buffer system 200, as pre-loaded by special commands generated during compilation by compiler 115. Thereafter, the vertex shader 3 04 passes data to the geometry shader 306.

The geometry shader 306 receives, as inputs. vertices for a full primitive. and is capable of outputting multiple vertices that form a single topology, such as a triangle strip. a line strip, point list. etc. The geometry shader 306 also receives constants from the constant buffer of the constant buffer system 200, and may be further configured to perform various algorithms, such as tessellation, shadow volume generation, etc. The geometry shader 306 then outputs information to a rasterizer 308, which is responsible for clipping, primitive setup, and determining when and/or how to invoke the pixel shader 310. The pixel shader 310 is invoked for each pixel covered by the primitive that is output by the rasterizer 308. The pixel shader 310 also receives constants from the constant buffer of the constant buffer system 200, and operates to perform interpolations and other operations that collectively determine pixel colors for output to a write-back unit in memory 312. The functioning operation of the various components illustrated in FIG. 3 are orchestrated through a set of state registers configuring fixed function graphics hardware units and the computational core 204, as is described below.

Having described components that generate tasks for execution units in the computational core 204, reference is now made to FIG. 4, which is a block diagram showing an example graphics processor 202. While not all components for graphics processing are shown, the components shown in FIG. 4 should be sufficient for one having ordinary skill in the art to

understand the general functions and architecture related to such graphics processors. At the center of the programmable processing environment is the computational core 204, which processes various instructions and includes the CB system 200. Various types of shader programs can be executed or mapped to the computational core 204, including the vertex shader 304, geometry shader 306, and pixel shader 310. That computational core 204, for multi-issue processors, is capable of processing multiple instructions within a single clock cycle."

*Jiao at 6:1-64.*

"Also included in FIG. 4 is the EU pool control unit 206, which also includes a vertex cache and/or a stream cache. As shown in FIG. 4, the texture filtering unit 402 provides texel data to the computational core 204 (inputs A and B). For some embodiments, the texel data is provided as 512-bit data. The pixel packer 404 provides pixel shader inputs to the computational core 204 (inputs C and D), also in 512-bit data format.

Additionally, the pixel packer 404 requests pixel shader tasks from the EU pool control unit 206, which provides an assigned EU number and a thread number to the pixel packer 404."

*Jiao at 7:2-12.*

"The command stream processor 406 provides triangle vertex indices to the EU pool control unit 206. In the embodiment of FIG. 4, the indices are 256-bils. The EU pool control unit 206 assembles vertex shader inputs from the stream cache and sends data to the computational core 204 (input E). The EU pool control unit 206 also assembles geometry shader inputs and provides those inputs to the computational core 204 (input F). In general, the EU pool control unit 206 controls the respective inflow and outflow to the computational core 204."

*Jiao at 7:19-27.*

"The graphics pipeline 208 comprises fixed-function graphics processing functionality. Responsive to a command from the driver software 128, such as to draw a triangle, vertex information is passed to vertex shader 304 in the computational core 204 to implement vertex transformations. In particular, objects are transformed from object space to workspace and/or screen space as triangles. The triangles are passed from the computational core 204 to a triangle set-up unit (TSU) 412 in the graphics pipeline 208, which assembles primitives, and also performs known tasks such as bounding box generation, culling, edge function generation, and triangle level rejections, among other known functions. The TSU 412 passes data to a span and tile generation unit of the graphics pipeline 208, which provides tile generation functionality, whereby the data objects are segmented into tiles (e.g., 8x8, 16x16, etc.) and passed to another fixed function unit configured to performs depth (e.g., Z-value) processing, such as high level (e.g., where fewer bits are consumed than similar processing at a lower level) rejection of Z-values. The Z-values are passed back to the pixel shader 310 in the computational core 204 for the performance of pixel shader functionality based on received texture and pipelined data. The computational core 204 outputs processed values to destination units located in the graphics pipeline 208. The destination units are configured to perform alpha testing and stencil testing before values in various caches need to be updated."

Jiao at 7:56-8:14. "The computational core 204 comprises an execution unit pool (EUP) 414, which in one embodiment comprises one or more execution units (EUs) 420a through 420h (collectively referred to herein as EUs 420). Each of the EUs 420 includes control logic and local memory, as described further below, and each EU 420 is capable of processing multiple instructions within a single clock cycle. Thus, the EU pool 414, at its peak, can process multiple threads simultaneously or substantially simultaneously. While eight (8) EUs 420 are shown or implied in FIG. 4 (labeled EUO through EU7), it should be appreciated that the number of EUs need not be limited to eight, but may be greater or fewer in number for some embodiments. Each of the execution units 420 comprises an embodiment of the CB system 200, as explained further below. In some embodiments, fewer than all of the execution units 420 may incorporate the CB system 200. Further, in some embodiments, components of the CB system 200 may be distributed among one or more components of the graphics processor 202, including logic in the EU pool control unit 206."

*Jiao at 8:15-34.*

"The execution unit flow of the EU pool 414 generally comprises several levels, including a rendering context level. thread or task level, and an instruction or execution level. At any given time, there may be multiple (e.g., two are described as a non-limiting example in the present disclosure) rendering contexts allowed in each execution unit 420, with the contexts identified by the use of a one bit flag or other mechanisms. The rendering context (or rendering context information) is passed from the EU pool control unit 206 before tasks belonging to this context are commenced. The rendering context information may include shader type, number of input/output registers, instruction starting address, output mapping table, Vertex identifier, and constants in a respective constant buffer. Each execution unit 420 of the EU pool 414 may store a plurality of tasks or threads (e.g., in Some embodiments, thirty-two threads) at the same time."

*Jiao at 8:65-9:14.*

"The rendering context (or rendering context information) is passed from the EU pool control unit 206 before tasks belonging to this context are commenced. The rendering context information may include shader type, number of input/output registers, instruction starting address, output mapping table, Vertex identifier, and constants in a respective constant buffer. Each execution unit 420 of the EU pool 414 may store a plurality of tasks or threads (e.g., in Some embodiments, thirty-two threads) at the same time."

*Jiao at 9:5-13.*

"The EU pool control unit 206 functions as a global scheduler for the tasks and assigns appropriate threads in the execution units 420 using a data-driven approach (e.g., vertex, pixel, geometry packets in the input).

For instance, the EU pool control unit 206 assigns a thread to one of the empty thread slots in the respective execution unit 420 of the EU pool 414. Data fed by a vertex cache or other component or module (depending on the shader type) is placed in a common register buffer,

after which execution of a thread may commence."

*Jiao at 9:15-24.*

"In general, an embodiment of the graphics processor 202 utilizes programmable vertex 304, geometry 306, and pixel shaders 310. Rather than implementing the functions or operations of these components as separate fixed function units with different designs and instruction sets. The operations are instead executed by the pool 414 of execution units 420a, 420b ... 420n with a unified instruction set. Each of these execution units 420 is identical in design and configurable for programmed operation. In one embodiment, each execution unit 420 is capable of multi-threaded operations simultaneously. As various shader tasks are generated by the vertex shader 304, geometry shader 306, and pixel shader 310, they are delivered lo the respective execution units 420 to be carried out."

*Jiao at 9:25-38.*

"As individual tasks are generated, the EU pool control unit 206 handles the assigning of those tasks to available threads within the various execution units 420. As tasks are completed, the EU pool control unit 206 further manages the release of the relevant threads. In this regard, the EU pool control unit 206 is responsible for assigning vertex shader, geometry shader, and pixel shader tasks to threads of the various execution units 420, and also, performs an associated "bookkeeping of the tasks and threads. Specifically, the EU pool control unit 206 maintains a resource table of threads and memories for all execution units 420. The EU pool control unit 206 particularly knows which threads have been assigned tasks and are occupied, which threads have been released after thread termination, how many common register file memory registers are occupied, and how much free space is available for each execution unit."

*Jiao at 9:39-54.*

"FIGS. 9A and 9B comprise tables used by or integrated with the EU pool control logic 605. The EUP constant address table 900 of FIG. 9A comprises twelve (12)-bit memory addresses 902 for constant blocks located in memory and provides the address for constant data loading from the memory 106 to on-chip constant buffers 510 located in EUs 420 of computational core 204. When a new constant update is received from the command stream processor (CSP) 406 or pixel packer 404, the EU pool control logic 605 checks if the secondary context of the corresponding shader stage is available to take the constant update."

*Jiao at 14:12-23.*



**FIG. 3**

*Jiao at Fig. 3.*



Jiao at Fig. 4.

143.    Limitations 1.2 and 1.3 of the '381 Patent ("a shader core associated with the first

processing unit and configured to receive the plurality of tasks from at least one of the plurality

of engines and to execute a first task from the plurality of tasks while executing a second task

from the plurality of tasks based on respective state data associated with each of the first and

second tasks.") are taught by at least the following disclosures of Jiao:



Jiao at Fig. 4.

"These further transformations from eye space may include the use of programmable shader programs, such as a vertex shader, pixel shader, and/or geometry shader, to be executed in a pool of parallel, multi-threaded execution units forming a computational core of a graphics processing unit (GPU). A shader generally refers to a program used in 3-dimensional (3D) computer graphics that may be used to determine the final surface properties of an object or image. Each object or group of objects may have specific visual properties related to the appearance of surfaces (e.g., materials, reflectance, shape, textures, etc.) and/or operations related to the same (e.g., required transformations) which may collectively be referred to as a rendering context for this object or group of objects. When rendering an object or group of objects for a given rendering context, a shader utilizes a constant data pool (e.g., context-specific constants stored in a constant buffer)."

*Jiao at 1:43-58.*

"Disclosed herein are various embodiments of constant buffer (CB) systems and methods (herein, also collectively constant buffer system(s) or CB system(s)) implemented in each execution unit of a multi- threaded, parallel computational core of a graphics processing unit (GPU). A CB system enables the updating of a constant buffer with new context data related to a new rendered object while current or existing context data in the buffer is being used by shader program threads rendering a previous object. Such updating of the constant buffer occurs without stalling the computational core execution units for reload of constants. That is, as compared to existing systems that flush the constant buffer with each rendering context change (flush the "old" constants entirely from the buffer lo make room lo load new constants), the CB system enables the simultaneous processing of constants using the same or different shader from more than one rendering context."

*Jiao at 3:31-47.*

"Thus, unlike conventional systems, changes to constants in the preferred embodiments do not impose a penalty in speed and efficiency. In particular, the below described CB systems enable updates or changes to constants to occur while enabling execution of previous constants. That is, execution of shader programs with constants of a different context occurs in simultaneous paths, with one path corresponding to the previous context constants and at least one other path corresponding to the new context constants. The updating or replacement of constants through implementation of the Various CB system embodiments enables a smooth procedure of constant replacement in shader execution blocks, which may result in an improvement in computational efficiency."

*Jiao at 3:48-60*

"At the center of the programmable processing environment is the computational core 204, which processes various instructions and includes the CB system 200. Various types of shader programs can be executed or mapped to the computational core 204, including the vertex shader 304, geometry shader 306, and pixel shader 310. That computational core 204, for multi-issue processors, is capable of processing multiple instructions within a single clock cycle. As shown in FIG. 4, the relevant components of the graphics processor 202 comprise the computational core 204, a texture filtering unit 402, a pixel packer 404, a command stream

processor 406, a write-back unit 408, and a texture address generator 410. Also included in FIG. 4 is the EU pool control unit 206, which also includes a vertex cache and/or a stream cache. As shown in FIG. 4, the texture filtering unit 402 provides texel data to the computational core 204 (inputs A and B). For some embodiments, the texel data is provided as 512-bit data. The pixel packer 404 provides pixel shader inputs to the computational core 204 (inputs C and D), also in 512-bit data format.

Additionally, the pixel packer 404 requests pixel shader tasks from the EU pool control unit 206, which provides an assigned EU number and a thread number to the pixel packer 404. Since pixel packers and texture filtering units are known in the art, further discussion of these components is omitted here."

*Jiao at 6:56-7:14.*

"The computational core 204 comprises an execution unit pool (EUP) 414, which in one embodiment comprises one or more execution units (EUs) 420a through 420h (collectively referred to herein as EUs 420). Each of the EUs 420 includes control logic and local memory, as described further below, and each EU 420 is capable of processing multiple instructions within a single clock cycle. Thus, the EU pool 414, at its peak, can process multiple threads simultaneously or substantially simultaneously. While eight (8) EUs 420 are shown or implied in FIG. 4 (labeled EU0 through EU7), it should be appreciated that the number of EUs need not be limited to eight, but may be greater or fewer in number for some embodiments. Each of the execution units 420 comprises an embodiment of the CB system 200, as explained further below. In some embodiments, fewer than all of the execution units 420 may incorporate the CB system 200. Further, in some embodiments, components of the CB system 200 may be distributed among one or more components of the graphics processor 202, including logic in the EU pool control unit 206."

*Jiao at 8:15-34.*

"The execution unit flow of the EU pool 414 generally comprises several levels, including a rendering context level, thread or task level, and an instruction or execution level. At any given time, there may be multiple (e.g., two are described as a non-limiting example in the present disclosure) rendering contexts allowed in each execution unit 420. with the contexts identified by the use of a one bit flag or other mechanisms. The rendering context (or rendering context information) is passed from the EU pool control unit 206 before tasks belonging to this context are commenced. The rendering context information may include shader type. number of input/ output registers, instruction starting address, output mapping table. vertex identifier, and constants in a respective constant buffer. Each execution unit 420 of the EU pool 414 may store a plurality of tasks or threads (e.g., in some embodiments, thirty-two threads) at the same time. In one embodiment, each thread fetches an instruction according to a program counter."

*Jiao at 8:65-9:14.*

"The EU pool control unit 206 functions as a global scheduler for the tasks and assigns appropriate threads in the execution units 420 using a data-driven approach (e.g., vertex,

pixel, geometry packets in the input). For instance, the EU pool control unit 206 assigns a thread to one of the empty thread slots in the respective execution unit 420 of the EU pool 414. Data fed by a vertex cache or other component or module (depending on the shader type) is placed in a common register buffer, after which execution of a thread may commence."

*Jiao at 9:15-24.*

"In general, an embodiment of the graphics processor 202 utilizes programmable vertex 304, geometry 306, and pixel shaders 310. Rather than implementing the functions or operations of these components as separate fixed function units with different designs and instruction sets. The operations are instead executed by the pool 414 of execution units 420a, 420b ... 420n with a unified instruction set. Each of these execution units 420 is identical in design and configurable for programmed operation. In one embodiment, each execution unit 420 is capable of multi-threaded operations simultaneously. As various shader tasks are generated by the vertex shader 304, geometry shader 306, and pixel shader 310, they are delivered lo the respective execution units 420 to be carried out."

*Jiao at 9:25-38.*

"As individual tasks are generated, the EU pool control unit 206 handles the assigning of those tasks to available threads within the various execution units 420. As tasks are completed, the EU pool control unit 206 further manages the release of the relevant threads. In this regard, the EU pool control unit 206 is responsible for assigning vertex shader, geometry shader, and pixel shader tasks to threads of the various execution units 420, and also, performs an associated "bookkeeping of the tasks and threads. Specifically, the EU pool control unit 206 maintains a resource table of threads and memories for all execution units 420. The EU pool control unit 206 particularly knows which threads have been assigned tasks and are occupied, which threads have been released after thread termination, how many common register file memory registers are occupied, and how much free space is available for each execution unit."

*Jiao at 9:39-54.*

"When a thread completes its assigned task(s), the execution unit 420 running the thread sends an appropriate signal to the EU pool control unit 206. The EU pool control unit 206, in turn, updates its resource table to mark the thread as free and to add the amount of total thread common register file space back to the available space. When all threads are busy or all the common register file memory has been allocated (or there is too little register space remaining to accommodate an additional thread), then the execution unit 420 is considered full and the EU pool control unit 206 will not assign any additional or new threads to that execution unit."

*Jiao at 9:65-10:8.*

"Any process descriptions or blocks in flow diagrams described herein should be understood as representing modules, segments, or portions of code which include one or more executable instructions for implementing specific logical functions or steps in the process. and alternate implementations are included within the scope of the embodiments of the disclosed systems and methods in which functions may be executed out of order from that shown or discussed,

including substantially concurrently or in reverse order, depending on the functionality involved, as would be understood by those reasonably skilled in the art."

*Jiao at 14:47-57.*

144.    As alleged above, an actual controversy has arisen and now exists between BMW AG and Onesta regarding BMW AG's alleged infringement of the '381 Patent.

145.    A judicial determination is necessary and appropriate so that BMW AG may ascertain its rights regarding the '381 Patent, including its rights to manufacture, use, offer to sell, sell, and/or import BMW vehicles or components thereof.

146.    BMW AG is entitled to a declaration that the claims of the '381 Patent are invalid under one or more of the provisions of 35 U.S.C. § 101 *et seq.*, including §§ 102, 103, and 112. Accordingly, BMW AG seeks a judgment declaring that the claims of the '381 Patent are invalid.

## COUNT VI: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 8,443,209

147.    BMW AG realleges, and incorporates fully herein, each preceding paragraph.

148.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of invalidity.

149.    The claims of the '209 Patent are invalid at least as anticipated and/or obvious under 35 U.S.C. §§ 102 and/or 103 because each and every element of those claims was publicly disclosed in one or more references prior to the earliest priority date of the '209 Patent.

150.    By way of example and without limiting the grounds of invalidity that will be asserted in this action, Claim 1 of the '209 Patent is invalid under 35 U.S.C. § 102 as anticipated by U.S. Pat. No. 7,921,313 to Ghiasi et al. ("Ghiasi") (attached as Exhibit 9), and/or is invalid

under 35 U.S.C. § 103 as obvious in view of Ghiasi, either alone or in combination with one or more additional references, as demonstrated by at least the following disclosures of Ghiasi:

151.    Limitation 1[pre] of the '209 Patent ("A method comprising:") is taught by at least the following disclosures of Ghiasi:

"[T]he instructions when executing on the computing system perform the method comprising..."

*Ghiasi at Abstract.*

152.    Limitation 1[a] of the '209 Patent ("accessing performance data indicative of performance sensitivity of each of a plurality of computational units of a computer system to a change in performance capability") is taught by at least the following disclosures of Ghiasi:

". . . instructions for collecting performance data about a work load executing on each processor within a plurality of processors of the computing system; instructions for calculating processor and memory intensity of the workload on each processor within the plurality of processors based on the collected performance data; . . . "

*Ghiasi at 12:12-18.*

"instructions for reducing processor frequencies one processor at a time within the plurality of processors until a total power is below the maximum power allocated for all the processors, wherein the one processor at a time is selected by choosing a processor that experiences a least performance loss at a next lower frequency; and instructions for selecting an operating voltage for each processor within the plurality of processors based on the selected frequency for the processor such that the selected voltage is a minimum voltage allowed for correct operation of the processor at the selected frequency."

*Ghiasi at 12:36-46.*

FIG. 8 is a flowchart illustrating the operation of a power management system for providing an initial, performance sensitive setting in accordance with an exemplary embodiment of the present invention. The operation of FIG. 8 is performed for all processors on all nodes. Operation begins in response to a change in maximum power, Pmax, (block 800) or expiration of a timer, the period of which is T, (block 801) that triggers periodic readjustment of the voltage and frequency.

*Ghiasi at 10:43-50.*



*FIG. 8*

*Ghiasi at Fig. 8.*

153.    Limitation 1[b] of the '209 Patent ("determining a subset of one or more of the computational units among the plurality of the computational units that are least sensitive to the change in performance capability based on the performance data; and") is taught by at least the following disclosures of Ghiasi:

"...instructions for reducing processor frequencies one processor at a time within the plurality of processors until a total power is below the maximum power allocated for all the processors, wherein the one processor at a time is selected by choosing a processor that experiences a least performance loss at a next lower frequency;"

*Ghiasi at 12:36-41.*

"FIG. 7 depicts an overall structure of a frequency and voltage scheduling power management system in accordance with an exemplary embodiment of the present invention. FIG. 7 provides a simplified view showing only a single processor of an SMP data processing system or a single node of a cluster even though the power management system schedules frequency and voltage across all processors and nodes. However, the power limit is global. The system uses power status and measurement data to determine the value of the limit and to monitor compliance with it."

*Ghiasi at 8:19-28.*

"Node 700 receives incoming work into work pool 710. Processing engine 720 receives work from work pool 710 and outputs completed work. Processing engine 720 may re-dispatch work to work pool 710 with a cycle having a small time scale, t. Node 700 may be, for example, a single processor in a symmetric multiprocessing system (SMP) system, a logical

partition within a logically partitioned data processing, a data processing system within a server cluster, or the like. Possible workloads may include, for example, middleware running transactions, a media service with different numbers of types of streams, or high performance computing jobs."

*Ghiasi at 8:29-39.*

"In accordance with an exemplary embodiment of the present invention, processing engine 720 also reads performance counters from the processor(s) within node 700 and provides the performance counters to scheduler 750. Changes to frequency and voltage are sent from scheduler 750 to processing engine 720, which includes a mechanism 722 for adjusting frequency and voltage of the processor(s) of node 700. Scheduler 750 includes predictive model 752 for predicting whether the processing environment of node 700 is CPU-intensive or memory-intensive and, thus, whether and what change in frequency and voltage may be necessary or desired."

*Ghiasi at 8:40-51.*



*Ghiasi at Fig. 7.*

"If the total power of all processors is not less than the maximum power in block 902, the power management system selects a node (block 904), selects a processor on the selected node (block906), and drops the selected processor to a next lower frequency (block 908). Thereafter, operation returns to block 902. The selection is done by choosing the node and processor that experiences the least performance loss at the next lower frequency."

*Ghiasi at 11:4-14.*



**FIG. 9**

*Ghiasi* at Fig. 9.

154.    Limitation 1[c] of the '209 Patent ("limiting performance of the subset of the plurality of computational units in the computer system.") is taught by at least the following disclosures of Ghiasi:

> "If the total power of all processors is not less than the maximum power in block 902, the power management system selects a node (block 904), selects a processor on the selected node (block906), and drops the selected processor to a next lower frequency (block 908). Thereafter, operation returns to block 902. The selection is done by choosing the node and processor that experiences the least performance loss at the next lower frequency."

*Ghiasi* at 11:4-14.



**FIG. 9**

*Ghiasi at Fig. 9.*

155.    As alleged above, an actual controversy has arisen and now exists between BMW AG and Onesta regarding BMW AG's alleged infringement of the '209 Patent.

156.    A judicial determination is necessary and appropriate so that BMW AG may ascertain its rights regarding the '209 Patent, including its rights to manufacture, use, offer to sell, sell, and/or import BMW vehicles or components thereof.

157.    BMW AG is entitled to a declaration that the claims of the '209 Patent are invalid under one or more of the provisions of 35 U.S.C. § 101 *et seq.*, including §§ 101, 102, 103, and 112. Accordingly, BMW AG seeks a judgment declaring that the claims of the '209 Patent are invalid.

## **DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, BMW AG demands a trial by jury on all issues triable of right by a jury.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff BMW AG prays for the following judgment and relief against Defendant Onesta:

A.    A declaration that Onesta has misused the '381 Patent rendering it unenforceable;

B.    A declaration that Onesta has misused the '209 Patent rendering it unenforceable;

C.    A declaration that BMW AG has not infringed, and is not infringing, any claim of the '381 Patent;

D.    A declaration that BMW AG has not infringed, and is not infringing, any claim of the '209 Patent;

E.    A declaration that the '381 Patent is invalid;

F.    A declaration that the '209 Patent is invalid;

G.    A declaration that this is an exceptional case and an award of BMW AG's costs and attorneys' fees in accordance with 35 U.S.C. § 285 or other applicable law; and

H.    An award of such other and further relief as the Court deems just and proper.

Dated: December 15, 2025

Respectfully submitted,

/s/ Lionel M. Lavenue

Lionel M. Lavenue (VA Bar No. 49005)
lionel.lavenue@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
Telephone:    (571) 203-2750
Facsimile:    (202) 408-4400

J. Derek McCorquindale (VA Bar No. 77048)
(*pro hac vice* pending)
derek.mccorquindale@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
Telephone:    (571) 203-2768
Facsimile:    (202) 408-4400

Matthew C. Berntsen (MA Bar No. 678533)
matthew.berntsen@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
Two Seaport Lane
Sixth Floor
Boston, MA 02210-2001
Telephone:    (617) 646-1618
Facsimile:    (617) 646-1666

Joseph M. Myles (DC Bar No. 1672505)
joseph.myles@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue NW
Washington, DC 20001-4413
Telephone:    (202) 408-4372
Facsimile:    (202) 408-4400

*Attorneys for Plaintiff*
*Bayerische Motoren Werke Aktiengesellschaft*