# **<u>EXHIBIT E</u>**

**DECLARATION OF PROFESSOR MARGO A. BAGLEY**

## I.    Background and Qualifications

1.    I am an Asa Griggs Candler Professor of Law at Emory University School of Law. I returned to Emory in 2016 after spending a decade on the faculty of the University of Virginia School of Law where I was most recently the Hardy Cross Dillard Professor of Law. In 2022, I was the Hieken Visiting Professor in Patent Law at Harvard Law School, and in 2025 was the Herchel Smith Visiting Fellow at the University of Cambridge (UK). I have also been a Visiting Professor at Washington and Lee University School of Law, and a faculty lecturer at the Max Planck Institute's Munich Intellectual Property Law Center (Germany) since 2012. I have taught U.S. and International Patent Law courses at universities and institutes in China, Cuba, Israel, and Singapore.

2.    I have taught U.S. and international & comparative patent law courses every year for the past twenty-five years; international patent law often multiple times in a year. My students have included foreign patent attorneys, patent office personnel, and judges from countries across the globe. Between 2009 and 2013, I also lectured on International Patent Law & Policy to groups of Chinese regional patent enforcement officials in a joint State Intellectual Property Office of China (now CNIPA)/ Cardozo Law School program.

3.    I have co-taught patent bar review courses to persons preparing to take the United States Patent and Trademark Office (USPTO) registration examination to become patent agents/attorneys for the past twenty-one years, seventeen with the Patent Law Institute (PLI), and four prior to that with BARBRI. I am registered to practice before the USPTO and admitted to the practice of law in the State of Georgia. Prior to joining the Emory Law School faculty in 1999, I was a patent attorney and associate with the intellectual property law firm of Finnegan, Henderson,

Farabow, Garrett & Dunner, LLP, and before that with the general practice law firm of Smith, Gambrell & Russell, LLP, where my practice included U.S. and foreign patent prosecution, litigation, and transactional matters.

4.      I am a member of the Scientific Advisory Board of the Max Planck Institute for Innovation and Competition (2024-2027), as well as the Innovation Board of the EU-funded Blue Remediomics project (2023-2026). I served on both the National Academies Committee on Advancing Commercialization from the Federal Laboratories (2021), and on the National Academies Committee on University Management of Intellectual Property: Lessons from a Generation of Experience, Research, and Dialogue (2011).

5.      I have also served as a member of the U.S. DARPA (Defense Advanced Research Projects Agency) ELSI (Ethical, Legal, and Societal Issues) Team for the BRACE (Bio-Inspired Restoration of Aged Concrete Edifices) project (2021-2024). In addition, I am a McDonald Distinguished Senior Fellow in Law and Religion at Emory Law, a Harvard Law School Berkman Klein Faculty Affiliate, and a member of the Board of the Global IP Alliance (GLIPA).

6.      I have served as a consultant to the United Nations (UN) World Intellectual Property Organization (WIPO), the UN Convention on Biological Diversity (CBD), the UN Food and Agriculture Organization Secretariat for the International Treaty on Plant Genetic Resources for Food and Agriculture, and as an expert technical advisor to the African Union Commission in several WIPO matters. I served for seven years as the Friend of the Chair in the WIPO Intergovernmental Committee on Intellectual Property and Genetic Resources, Traditional Knowledge and Folklore and was previously a expert advisor to the Government of Mozambique in WIPO matters. I also served as a member of the first Ad Hoc Technical Expert Group on Digital Sequence Information on Genetic Resources for the CBD and its Nagoya Protocol.

7.      I am a co-director of the Harvard University Global Access in Action Program as well as a co-director of the Diversity Pilots Initiative. I also served as a Senior Fellow with the Center for International Governance Innovation's International Law Research Program (Canada). I have advised the governments of Nigeria and Zambia on patent legislation proposals and helped draft implementing regulations for the industrial property law of Namibia, additionally conducting training for select patent office personnel and judges. I have conducted an expert assessment of certain comparative patent law questions for the Japanese Patent Office and the Japanese Institute of Intellectual Property. I also served as a United States Department of Commerce, Commercial Law Development Program (CLDP) Advisor to the Workshop on Practical Approaches to IP Utilization and Protection in Africa (Tanzania).

8.      I am a member of the American Law Institute, the American Bar Association, the American Intellectual Property Law Association, and the International Association for the Advancement of Teaching and Research in Intellectual Property. I am a frequent speaker, in the U.S. and abroad, on patent law topics and have published numerous articles, book chapters, and monographs on patent law issues. I have also published three books on international patent law with co-authors: Margo A. Bagley and Rochelle C. Dreyfuss, Advanced Introduction to International Patent Law (Elgar Publishing 2025), Patent Law In Global Perspective (Ruth L. Okediji and Margo A. Bagley eds., Oxford University Press 2014), and Margo A. Bagley, Ruth L. Okediji and Jay A. Erstling, International Patent Law & Policy (West Publishing 2013).

9.      I graduated from Emory University School of Law in 1996, third in my class, with a J.D. degree with distinction. I graduated from the University of Wisconsin-Madison with a B.S. in Chemical Engineering in 1986, and I worked in industry for several years before attending law school, first with the Procter & Gamble Company then with the Coca-Cola Company. I am a co-

inventor on three U.S. patents, one for reduced fat peanut butter and two for bedding technology, as well as on several foreign industrial design registrations. A copy of my curriculum vitae is attached as Exhibit 46 and includes a list of publications I have authored since 1996.

10.    I have given testimony in the *AU New Haven, LLC and Trelleborg Coated Systems US, Inc. v. YKK Corp., et al.* litigation, a case which was pending within the last four years. My hourly billing rate is $890.00. My compensation is not dependent upon the opinions I express nor upon the outcome of this litigation.

11.    Other than preparing this declaration, I have no ties to the parties to this action. The views expressed in this declaration reflect my independent understanding and assessment of international and comparative patent law and practice. A list of international treaties, foreign statutes, and other materials relied on in my declaration is provided in the Table of Exhibits. In forming my opinions, I have considered the documents and information identified, discussed, and cited in this declaration. I have also relied upon my knowledge, education, and years of experience.

## II.    Scope of Work

12.    For this declaration, I have been informed by counsel for Bayerische Motoren Werke AG ("BMW") of the following facts, which I have been asked to apply for this declaration.

13.    I understand that Onesta IP, LLC ("Onesta") filed suit against BMW in the Munich Regional Court I ("the Munich court") asserting two U.S. patents and the German portion of one European patent.

14.    I understand that Onesta is a patent assertion entity headquartered in the U.S. and that BMW is headquartered in Munich, Germany.

15.    I understand that, in its Munich filing, Onesta argued international jurisdiction of the Munich court based on Article 4 of the Brussels I Regulation (recast), specifically relying on

the decision by the Court of Justice of the European Union ("CJEU"), in case C-339/22 of February 25, 2025, *BSH v. Electrolux* ("BSH/Electrolux").

16.    I have been asked, by counsel for BMW, to describe the origins and features of the international patent system and comparative systems relating specifically to the adjudication of foreign patent infringement in relation to issues in this action. I also intend to provide testimony on these topics if requested.

17.    I have been asked, by counsel for BMW, to describe information on patent jurisdictional statutes, injunctive relief potentially available, the customer suit exception in U.S. law, and the doctrine of patent misuse available in the United States for the related Munich dispute.

## III.    Territoriality and Harmonization

18.    Patents are territorial in nature. The laws governing patents and the rights they provide are determined by, administered by, and enforced by the country granting the patent. While countries can choose to cede that authority to another entity, doing so is itself an exercise of national sovereignty.

19.    Territoriality is deeply embedded in the U.S. patent system. As explained by the U.S. Supreme Court:

> The patent laws are authorized by that article in the Constitution which provides that Congress shall have power to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries. The power thus granted is *domestic in its character*, and necessarily confined within the limits of the United States.[1]

---

[1] *Brown v. Duchesne*, 60 U.S. 183, 195 (1856) (emphasis added).

20.     As such, the patent laws implementing this constitutional goal are likewise territorial. 35 U.S.C. § 154(a)(1) states: "Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention *throughout the United States* or importing the invention *into the United States* . . . or importing *into the United States*, products made by [a patented] process."[2]

21.     An expression of this territoriality is that U.S. courts, specifically the U.S. District Courts, have exclusive jurisdiction to decide civil actions for patent infringements and invalidity. 28 U.S.C. § 1338 stipulates that U.S. District Courts have exclusive original jurisdiction over patent litigation:

28 U.S.C. § 1338 - Patents, plant variety protection, copyrights, mask works, designs, trademarks, and unfair competition

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks.

22.     Reinforcing that expression of territoriality, the Court of Appeals for the Federal Circuit has exclusive jurisdiction over appeals of patent claims from district courts. Accordingly, 28 U.S.C. § 1295(a)(1) provides:

28 U.S. Code § 1295 - Jurisdiction of the United States Court of Appeals for the Federal Circuit(a) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

(1) of an appeal from a final decision of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court of the Northern Mariana Islands, in any civil action arising under, or in any civil action in which

---

[2] 35 U.S.C. § 154(a)(1) (emphasis added).

a party has asserted a compulsory counterclaim arising under, any Act of Congress relating to patents or plant variety protection;

23.    This reflects the legislative principle, articulated by the U.S. Supreme Court in *Brown v. Duchesne*, that U.S. patent rights are enforceable exclusively in U.S. courts.[3]

24.    The concept of incentivizing inventors to create and disclose their inventions through the grant of exclusive rights did not originate with the U.S. Constitution. The Venetian Patent Act of 1474 is widely considered to have established the first patent system.[4] The British Statute of Monopolies in 1623[5] later formed the basis for scores of patent laws throughout the world, largely as a result of British colonization.

25.    However, these rights were granted by nation states and generally did not extend across national borders, leaving inventors vulnerable to having third parties in other countries appropriate their inventions and compete with them in those countries. Such inventors often were unable to obtain patent protection in other countries due to absolute novelty laws that limited foreign patenting by preventing an applicant from obtaining a patent in a second country if one had been obtained in a first country. Such discrimination against foreigners furthered domestic policy goals and economic protectionism because foreign patent owners could charge the domestic population supra-competitive prices, generating revenue that would then flow out of the country, enriching the patent owner's country instead of the patent-granting country.[6]

26.    This tension between incentivizing invention disclosure and protecting domestic economies came to a head in 1872 when many inventors, fearing the pirating of their inventions

---

[3] The Court of Appeals for the Federal Circuit mirrored this principle by affording comity to foreign courts regarding the enforcement of foreign patent rights in *Voda v. Cordis*, 476 F.3d 887 (Fed. Cir. 2007).
[4] See Ex. 1: Margo A. Bagley et al., *International Patent Law and Policy* 3-7 (West 2013).
[5] Statute of Monopolies, 1623, 21 Jac. 1, c. 3, §6.
[6] See Ex. 2: R. Carl Moy, *The History of the Patent Harmonization Treaty: Economic Self-Interest as an Influence*, 26 J. Marshall L. Rev. 457, 473-75 (1993) (noting that "[i]nternational patent transactions . . . reallocate wealth *away* from the granting country and *into* the country of the patent owner.") (emphasis in original).

by third parties from other countries, were reluctant to display their creations at the World's Fair to be held in Vienna, Austria in 1873.[7] This, along with other developing concerns, led several countries to meet and ultimately adopt the first multilateral patent treaty, the 1883 Paris Convention for the Protection of Industrial Property,[8] a treaty which still provides the foundation for international patent law today.

27.    Key features for inventors in the Paris Convention included: provisions on the right of priority (allowing an applicant twelve months within which to file patent applications in other member countries and have the later applications treated as if they were filed on the date of filing of the first application), national treatment (foreign applicants could not be treated less favorably than domestic applicants), independence of patents (a patent could not be invalidated in a second country simply because it was invalidated in a first country), and limitations on patent forfeiture.[9] Out of approximately 195 countries in the world, 181 are party to the Paris Convention, the most recent being Ethiopia in 2025.

28.    The 1970 Patent Cooperation Treaty (PCT)[10] was the next major multilateral patent treaty. It extended the Paris Convention right of priority from 12 months to 30 months, giving inventors important time and valuable information (an international search report and written opinion on patentability) to determine in which countries to enter the national stage at the end of the priority period. After the PCT, a series of more minor patent related procedural treaties were adopted. These comprise the 1971 Strasbourg Agreement Concerning the International Patent

---

[7] Ex. 1: Margo A. Bagley et al., *International Patent Law and Policy* 3-7 (West 2013).
[8] Ex 3: Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, 13 U.S.T. 1, 828 U.N.T.S. 107, as revised at the Stockholm Revision Conference, July 14, 1967, 21 U.S.T. 1538, 828 U.N.T.S. 303.  In addition to patents, the Paris Convention also contained provisions relating to industrial designs, trademarks, utility models, and unfair competition.
[9] See Ex. 3: Paris Convention, *supra* note 8, arts. 4–5.
[10] Ex. 4: Patent Cooperation Treaty, June 19, 1970, 28 U.S.T. 7645, 1160 U.N.T.S. 231 (entered into force Jan. 24, 1978).

Classification,[11] for organizing patent documents by technology area; the 1977 Budapest Treaty on the International Recognition of the Deposit of Microorganisms for the Purposes of Patent Procedure,[12] which facilitates the disclosure and patenting of biological inventions; and the 2000 Patent Law Treaty,[13] which eased the requirements for applicants to enter the national stage in member countries.

29.     These procedural treaties all required countries with patent systems to give up some sovereign decision-making ability in the area of patents to further harmonization goals.  But the biggest yielding of patent sovereignty for most countries came in 1994, with the Agreement on Trade Related Aspects of Intellectual Property (TRIPS), an annex to the agreements creating the World Trade Organization (WTO).[14]

30.     The procedural treaties mentioned above are all administered by WIPO, a UN organization that works to promote intellectual property protection globally. But TRIPS is administered by the WTO, an organization that governs the multilateral system of trade. The WTO ushered in a binding dispute settlement procedure to allow member states to bring actions against other members that are not in compliance with their TRIPS obligations and receive monetary and trade reparations for such violations.[15] This was a significant difference to the procedural treaties which lacked meaningful compliance measures.

---

[11] Ex. 14: Strasbourg Agreement Concerning the International Patent Classification, opened for signature 24 March 1971, 1160 U.N.T.S. 483.

[12] Ex. 5: Budapest Treaty on the International Recognition of the Deposit of Microorganisms for the Purposes of Patent Procedure, opened for signature 28 April 1977, 1861 U.N.T.S. 361.

[13] See Ex. 6: Patent Law Treaty, June 1, 2000, T.I.A.S. No. 13–1218.

[14] See Ex. 7: Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1869 U.N.T.S. 299 (1994) ("Agreement on Trade-Related Aspects of Intellectual Property Rights") [hereinafter "TRIPS Agreement"].

[15] Ex. 8: *Dispute Settlement*, WORLD TRADE ORG., https://www.wto.org/english/tratop_e/dispu_e/dispu_e.htm (last visited Dec. 11, 2025).

31.     TRIPS is not, however, a harmonization treaty, though it has done much to enhance the harmonization of patent laws throughout the world. Instead, TRIPS set minimum standards of protection that member countries[16] must provide to all qualifying subject matter, but allows countries to provide different and stronger protection to patents above the floor it sets, if they so choose. The TRIPS floor for protection includes the availability of patents for inventions in all areas of technology with limited exceptions, a minimum twenty-year from filing patent term, minimum rights to prevent making, using, selling, offering to sell, or importing the patented product, within or into the covered territory, without the patent owner's permission, and explicit enforcement provisions including the availability of judicial proceedings.[17]

*a. Patent office work-sharing initiatives have not led to judicial work-sharing*

32.     Importantly, none of these treaties - the Paris Convention, PCT, Budapest Treaty, Strausburg Convention, PLT, nor even TRIPS - result in patents; they only facilitate multi-country filing or set minimum standards of patent protection. In other words, they help inventors obtain patents in multiple countries and ensure those rights will receive certain basic protections in those countries. Even more importantly for purposes of this declaration, none of them even discuss, let alone have provisions relating to, the courts of one country asserting jurisdiction to adjudicate infringement or validity of foreign patents.

33.     For several years, the USPTO has had a strategic policy of promoting international harmonization with respect to obtaining and enforcing patent rights. As stated on its website:

---

[16] U.N.-designated Least Developed Countries (LDCs) received extended transition periods within which to comply with most of their TRIPS obligations. Ex. 7: TRIPS Agreement Art. 66.1.
[17] Ex. 7: TRIPS Agreement Arts. 27, 28, 33, 41-49.

As innovators seek to tap into global markets, it is imperative that the international patent system provide consistent, cost-effective avenues *to obtain reliable patent rights in multiple jurisdictions*. The passage of the AIA [America Invents Act of 2011], enables the USPTO to lead on a vision of an IP world in which national and regional patent systems are harmonized in pursuit of creating an optimal environment for technological innovation and diffusion.[18]

34.    To achieve this objective the USPTO has been an initiator and/or participant in numerous work-sharing initiatives that allow participating patent offices to rely on the work of other offices in determining patentability faster and more efficiently. Such initiatives include participation in the IP5 group of the five largest IP offices, responsible for over 90% of the patents that are issued worldwide and which received over 3 million patent applications in 2023.[19] Important IP5 work-sharing initiatives include Global Dossier, which gathers and makes accessible the file histories of patents and applications from the IP5 and other offices, and Patent Prosecution Highways, bilateral agreements that enable an applicant who obtains an allowable (patentable) claim in a first office, to obtain an expedited review of her application in a second office.  The second office relies to some extent on the search and examination work done by the first office in allowing the claim, thus expediting the examination and grant process in the second office.

---

[18] See Ex. 9: *Harmonization: The Time is Now*, U.S. PATENT & TRADEMARK OFFICE, https://www.uspto.gov/learning-and-resources/ip-policy/harmonization (last updated Oct. 31, 2019) (emphasis added).

[19] Ex. 11: About IP5 Co-operation, https://www.fiveipoffices.org/about. The five offices are the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the National Intellectual Property Administration of the People's Republic of China (CNIPA), and the United States Patent and Trademark Office (USPTO).

35.     But this willingness to share patent prosecution information and even rely on the work product of other patent offices has not extended to a policy push, or even a stated interest, in having other jurisdictions adjudicate U.S. patent rights. In addition, even though the Federal Circuit for a time evinced a strong interest in global meetings of judges to share best practices, this was not for the purpose of preparing courts to adjudicate the patent rights of other countries, as the Federal Circuit's *Voda v. Cordis* decision, discussed below, makes clear. The Federal Circuit Bar Association has continued to encourage global gatherings on IP topics with its "Global Series" of events.[20]   However, the objective of those convenings is stated to be "address topics of global significance at a senior level of discussion" in order to "respond in real time to emerging challenges."[21]

> b.   *Courts tend to be willing to adjudicate foreign patent coverage in contract matters, rarely in infringement matters*

36.     In *Voda v. Cordis*, the Federal Circuit articulated in no uncertain terms its position that U.S. courts should not adjudicate claims of infringement of foreign patents.[22] There, it reversed a district court decision assuming supplemental jurisdiction to adjudicate infringement of European, Canadian, British, French, and German patents as an abuse of discretion, even though the patents were all related to the asserted U.S. patent through a PCT filing that had designated Canada and the EPO.[23]

37.     The court began by noting that "the Constitution may authorize district courts to hear infringement claims based on foreign patents" but that there must be a statutory basis for such

---

[20] See Ex. 10: Federal Circuit Bar Association, *Bench & Bar: Global Series*, https://fedcirbar.org/programs/global-series/.
[21] *Id.*
[22] *Voda v. Cordis Corp.*, 476 F.3d 887 (Fed. Cir. 2007).
[23] *Id.*

subject matter jurisdiction. It then explained that supplemental jurisdiction under 28 U.S.C. §1367(a) could, in theory, be authorized over foreign patent infringement claims as included within the general jurisdiction of state courts having inherent powers to entertain "transitory causes of action arising under the laws of foreign sovereigns."[24] However, such supplemental jurisdiction was only authorized for claims "so related" to claims in the action on which original jurisdiction was based that they form part of the same Article III case or controversy. And that relatedness requirement can only be met if the claims derive from a common nucleus of operative fact.

38.    Because the district court did not engage in an analysis of whether a common nucleus of operative fact was indeed present, the court did not rule on that point. Instead, it concluded that the district court abused its discretion by exercising jurisdiction without considering comity, judicial economy, convenience, fairness and other exceptional circumstances as required by 28 U.S.C. §1367(c). It then analyzed each of those considerations, discussing the Paris Convention, PCT, and TRIPS Agreement as patent treaties to which the U.S. was a contracting party, and noting that while none of them contained jurisdiction stripping provisions, none of them "contemplate nor allow" courts of one nation to adjudicate patents of other sovereigns.[25]

39.    The court quoted from its prior decision in *Stein Assoc., Inc. v. Heat & Control, Inc.* that "only a British court, applying British law, can determine validity and infringement of British patents."[26] It also noted that asserting jurisdiction was not supported by considerations of comity and would risk interfering with the sovereign authority of other nations without necessarily providing benefits to judicial economy nor convenience. It also could prejudice the rights of

---

[24] *Id.* at 894.
[25] *Id.* at 903.
[26] *Id.* at 890 (citing *Stein Assocs., Inc. v. Heat & Control, Inc.*, 748 F.2d 653, 658 (Fed. Cir. 1984)).

foreign governments, none of which had expressed any willingness to have U.S. courts assert such jurisdiction over their patents.

40.    *Voda* stands for the proposition that U.S. courts *should not* adjudicate foreign infringement, and that they *cannot* absent systemic change. Based on its reasoning on comity, *Voda* also implies the inverse: foreign courts should not adjudicate U.S. domestic patent infringement.

41.    The remote possibilities for future jurisdiction the court recognized were: 1) if the U.S. joins a new international patent treaty providing for that outcome or 2) in the rare case that events during litigation "alter a district court's conclusions regarding comity, judicial economy, convenience, or fairness."[27] The first is unlikely to happen in the foreseeable future, and it is difficult to envision facts that would allow a district court to conclude that the requirements for the second are met in a given case.

42.    Outside of the European context discussed below, courts around the globe appear aligned with the Federal Circuit in avoiding adjudication of the infringement or validity of foreign patents. But a number of courts, including the Federal Circuit, have been willing to allow the adjudication of issues other than patent infringement in relation to foreign patents, particularly in the context of licensing disputes.

43.    In *Warner & Swasey Co. v. Salvagnini Transferica*, the Federal Circuit upheld dismissal of a complaint based on the straightforward interpretation of a choice of forum clause in a licensing agreement. [28] The parties had agreed to allow all suits brought by the U.S. licensee alleging breach to be brought in Vicenza, Italy, and all suits by the Italian licensor alleging breach

---

[27] *Id.* at 905. The concerns raised by the court in *Voda* are no less compelling today than they were then and in fact may be even more so in light of the deterioration in global patent harmonization taking place, as discussed *infra*.
[28] *Warner & Swasey Co. v. Salvagnini Transferica S.P.A.*, 806 F2d. 1045 (Fed. Cir. 1986).

to be brought in Cleveland, Ohio, even though that meant an Italian court could be adjudicating coverage of a U.S. patent.

44.     Similarly, in a post *Voda* case, *Fairchild Semiconductor Corp. v. Third Dimension Semiconductor, Inc.*, the District Court for the District of Maine was willing to adjudicate coverage of a Chinese patent on a diversity jurisdiction basis because of a license agreement forum selection clause.[29] The judge emphasized that this did not amount to a direct challenge to validity, nor would there be any declaration of infringement or non-infringement, only a decision on whether the licensee's products were "covered by" the Chinese patent as the dispute "remains primarily one of contractual interpretation.[30] The court concluded:

> Agreement on forum should not be considered an affront to any particular nation's courts, particularly when there is no challenge to patent validity . . . At the end of the day, this is a contractual dispute between two American companies licensing semiconductor technology, who voluntarily chose United States courts for their license disputes. Their choice of forum should be honored.[31]

45.     On the other side of the pond, a UK court in *Celltech Chiroscience Ltd. v. Medimmune, Inc*. assessed whether a U.S. patent covered a particular product pursuant to a license agreement with a forum selection clause expressly conferring jurisdiction on the English courts. The court indicated that this was a contractual issue between two parties, and that applying U.S. patent law principles (such as file wrapper estoppel and the doctrine of equivalents) was necessary to determine whether royalties were owed.[32]

---

[29] *Fairchild Semiconductor Corp. v. Third Dimension Semiconductor, Inc.*, 589 F. Supp.2d 84 (2008).
[30] *Id.* at 94.
[31] *Id.* at 99-100.
[32] Ex. 12: *Celltech Chiroscience Ltd. v. MedImmune Inc.*, [2002] E.W.H.C. 2167 (Ch. Patents Ct.) (Eng. & Whales), available at http:// www.bailii.org/ew/cases/EWHC/Patents/2002/2167.html.

46.    In each of these cases the parties, as licensor and licensee, were not strangers to each other, and had agreed at arm's length to adjudicate breach of contract claims in a particular forum. Giving effect to such contractual provisions is standard practice and the presence of a patent did not change the calculus.

47.    One outlier, however, appears to be Japan, though still not involving adjudication of patent infringement by a foreign court. In the 2003 *K.K. Coral Corp. v. Marine Bio K.K.* case,[33] the Tokyo District court concluded that it had international jurisdiction in a declaratory judgement of unfair competition action, to assess infringement of a U.S. patent owned by a Japanese company. The court noted that any decision it reached on infringement or validity would only apply between the parties. It then applied U.S. law, the U.S. Supreme Court's *Festo* decision,[34] to conclude the patent claims were not infringed under the doctrine of equivalence, and instructed the patent owner to stop sending notices to plaintiff's customers that the plaintiff was infringing the patent.[35]

48.    Despite the broad jurisdictional stance articulated in this case, as translated, I am not aware of more recent Japanese court decisions overriding territorial limitations and actually adjudicating U.S. patent infringement or validity, nor commentary suggesting this is viewed as a normal activity by Japanese courts. As such, I would describe *K.K. Coral Corp.* as an exceptional case that is unlikely to be repeated.

## IV.    Harmonization: Convergence and Divergence

49.    Territoriality works well for nation-states as it enables them to effectuate important domestic policy goals for innovation advancement and societal well-being through the patent system. Patents are widely recognized as policy tools, a fact which has stymied many

---

[33] Ex. 13: *K.K. Coral Corp. v. Marine Bio K.K.*, Hesei 02 (Wa) 1943 (D. Tokyo Oct. 16, 2003).
[34] *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).
[35] *Id.*

harmonization efforts, as most countries have historically been reluctant to relinquish the sovereign right to determine patentability requirements that can be used as levers to control the amount and type of patenting within their borders.

50.    But territoriality is not ideal for multinational corporations. The costs of obtaining and maintaining patent protection in multiple jurisdictions can be prohibitive but necessary for exploiting valuable inventions. Territoriality means that the patents these entities obtain are independent, and patentability criteria, enforcement, and procedural rules vary from country to country, which can result in some of those patent claims being invalidated in one country and not another, and/or found infringed in one country and not another. Thus, it is not surprising that there has been a strong push for patent law harmonization, particularly from industry patentees.

a.    *Acceleration Within Europe*

51.    The problems inherent in territoriality have been particularly acute in Europe, where common market and free movement of goods goals conflict with the national sovereignty basis of territorial patents. This has been viewed by some as putting Europe at a disadvantage in relation to, for example, the U.S., where the cost to obtain patent protection for a similar sized market is significantly less.[36]

52.    The patent system in Europe is complex. The European Union (EU) has existed to facilitate cooperative integration since its founding in 1951.[37] Its current 27 Member States[38] have agreed to cede a tremendous amount of sovereignty in many areas, including aspects of IP, in order

---

[36] See Ex. 15: *A Patent Mess: Patent Costs are Higher in Europe than Elsewhere*, The Economist, (Jun. 24, 2009), https://www.economist.com/news/2009/07/24/a-patent-mess.

[37] See Ex. 17: Facts and Figures on the European Union, https://european-union.europa.eu/principles-countries-history/facts-and-figures-european-union_en. Earlier names included the European Community and European Economic Community.

[38] *Id.* The Member States are Austria, Belgium, Bulgaria, Croatia, Cyprus, Czech Republic (Czechia), Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, and Sweden.

to have a common market and other cooperation benefits. For example, the decisions of the CJEU supersede their highest member State court decisions on patent matters within its area of competence.[39] These EU countries also retain national patent offices that grant patents for their jurisdictions.[40] And they have all joined the Convention on the Grant of European Patents (EPC) and the European Patent Organization, of which the European Patent Office (EPO) is the executive arm.[41]

53.     The EPO is not part of the EU; it exists separately in international law.[42] All 27 EU members are contracting Parties to the EPC, along with an additional 12 non-EU countries bringing total EPO membership to 39.[43] Moreover, one extension state and six validation states, while not able to participate in the decision-making processes of the EPO, allow EPO-issued European patents to be validated and have effect in their jurisdictions.[44] All of these countries have ceded a certain amount of sovereignty to benefit from the patent-granting efficiencies of the EPC system.

54.     The EPC was signed in 1973 and entered into force in 1977. It does not create a comprehensive European patent system, only a European patent *granting* system. It allows an applicant from any country to file a single application that can become a "European patent", a bundle of national patents that become valid in each designated EPO member, extension, and validation country after the patent owner completes certain registration formalities.[45]  From that point on, each country must treat the European patent as equivalent to a national patent, granting

---

[39] See Declaration of Professor Matthias Leistner ("Leistner Dec.") ¶¶ 41 & 45, attached as Ex. F to the Motion..
[40] *Id.* at ¶ 36.
[41] The European Patent Organization is the governing body for the EPC and does much of its work through the EPO.
[42] See Leistner Dec. ¶ 37.
[43] Namely Albania, North Macedonia, Iceland, Liechtenstein, Monaco, Montenegro, Norway, San Marino, Serbia, Switzerland and Turkey.
See Ex. 18: EPO, EPO at a Glance, https://www.epo.org/en/about-us/at-a-glance. The Extension state is Bosnia and Herzegovina (which is expected to become an EPO member in due course), and the validation states are Morocco, Moldova, Cambodia, Tunisia, Vietnam, and Laos.
[45] See Leistner Dec. ¶ 37.

the patent owner the same rights as would be conferred by a national patent. An applicant may still apply for patent protection in each individual EPC member country,[46] but all EPC contracting states are required to bring their national patent laws into compliance with the EPC, leading to a significant increase in patent law harmonization across Europe.

55.     The EPC was negotiated alongside another European agreement, the Community Patent Convention (CPC), which was intended to create a centralized system for the issuance and enforcement of a single unitary patent within the EU.[47] However, when talks stalled on the CPC, the parties decided to move forward with the EPC and continue to work on the CPC separately. After more than 40 years, and rising levels of discontent over the costly inefficiencies of the European patent litigation regime, the EU was finally able to move forward with a unitary patent package.

56.     The Unitary Patent Agreement comprises a Unitary Patent and a Unified Patent Court (UPC). Under this system, which came into force on June 1, 2023, patent examination remains with the EPO.[48] However, applicants now have a choice of requesting a regular European bundle patent or a European patent with unitary effect or Unitary Patent (UP) which will be enforceable in a single UPC judicial system governed by the Unified Patent Court Agreement.[49]

57.     While this regime is available to all EU Member States, not all have chosen to participate.[50] Some countries have chosen not to join because they object to the fact that the prosecution of the UP can only be conducted in English, French, or German. Also, the departure of the United Kingdom (UK) from the EU makes the UPC less attractive for some. It is also unclear

---

[46] *Id.* at ¶ 36.
[47] See Ex. 19: Vincenzo Di Cataldo, *From the European Patent to a Community Patent*, 8 COLUM. J. EUR. L. 19 (2002).
[48] See Leistner Dec. ¶ 40.
[49] *Id.*
[50] See *id.*

what long-term effect the *BSH/Electrolux* decision, discussed at length in the Leistner Declaration,[51] will have on the popularity of the UPC.[52]

> b. *Deterioration of Patent Harmonization Globally*

58.     Although patent harmonization has accelerated in Europe, the opposite appears to be happening globally. While patent offices largely continue to cooperate in work-sharing projects, and WIPO members meet to discuss and even adopt new agreements,[53] there has been for several years, a metaphorical "chill" in the air. The WTO, which administers the TRIPS Agreement, has not had a functioning dispute settlement appellate body to handle appeals from panel decisions regarding Member State violations of TRIPS provisions since 2019.[54]  Moreover, the past few years have revealed disturbing ways in which patents and IP rights more broadly are being used to inflict economic harm on other countries for geopolitical purposes.

59.     For example, the U.S. cooperates with China in a variety of patent work-sharing initiatives including the IP5 alliance of the five largest IP offices, bilateral patent prosecution highway agreements, and more. But outside of these rights-obtainment projects, the relationship is far more complex and strained due to China's ambitions to usurp U.S. leadership by any means necessary. Its goal, according to one scholar, is to "dominate technology markets by 2049."[55]

---

[51] See *id.* ¶¶ 46-58.
[52] Ex. 21: Marianne Schaffner & Matilde Grammont, *EU Courts Can Overreach in Foreign Patent Disputes: The Arm is Very Long and Not Confined to Infringement*, Gowling WLG (May 19, 2025) (noting that the BSH/Electrolux decision "also undermines to an extent the business case for litigating in the UPC"). Nevertheless, the BSH/Electrolux decision is being employed by UPC courts to extend their long-arm jurisdiction. See Leistner Dec. ¶¶ 63-68.
[53] In 2024, WIPO member states adopted two new IP treaties in a kind of horse-trade: the WIPO Treaty on Intellectual Property, Genetic Resources and Associated Traditional Knowledge, and the Riyadh Design Law Treaty. It is unclear if either agreement will ever come into effect as both require a minimum of fifteen ratifications
[54] See Ex. 22: WTO, Appellate Body, https://www.wto.org/english/tratop_e/dispu_e/appellate_body_e.htm.
[55] Ex. 23: Kal Raustiala, *Innovation in the Information Age: The United States, China, and the Struggle over Intellectual Property in the 21st Century*, 58 COLUM. J. TRANSNATL. L. 531, 550 (2020).

60.     A 2011 report from the U.S. International Trade Commission stated that if China complied with its then-current international obligations to protect and enforce IP rights, 2.1 million jobs could be created in the United States, with "[t]he most direct jobs impact in high-tech, innovative industries."[56] But China's goal is not to create jobs in the U.S. benefitting the U.S. economy, its goal is to create jobs in, and benefits for, China, and it has evolved to view intellectual property as a tool for economic growth and geopolitical dominance.

61.     According to U.S. Defense Department officials, "The breadth and depth of Chinese malfeasance with regard not only to our technology, but also to our larger economy and our nation, is significant and intentional."[57] China's efforts are not directed at the U.S. alone. According to the European Chamber of Commerce: "[A] longstanding feature of China's industrial policy is that foreign companies are often pushed to transfer technology as the price of market entry . . . . the Chinese authorities' ultimate aim is to absorb these technologies, . . . as domestic companies begin to catch up technologically, market access for foreign companies will become increasingly difficult."[58]

62.     It seems likely that if China seeks to weaken foreign companies vis a vis Chinese companies, impacting those companies' ability to sell in the U.S. market through injunctive relief determinations during adjudication of foreign patents could also be a useful tactic. A U.S. Department of Defense report notes that the range of "coercive and intrusive" Chinese industrial policy levers include foreign ownership restrictions that require technology transfers, adverse

---

[56] Ex. 25: U.S. Int'l Trade Comm'n, *China: Effects of Intellectual Property Infringement and Indigenous Innovation Policies on the U.S. Economy*, Inv. No. 332-519, USITC Pub. 4226, xx, xxiii (May 2011).

[57] Ex. 27: Lisa Ferdinando, *DoD Officials: Chinese Actions Threaten U.S. Technological, Industrial Base*, DOD News (Jun. 21, 2018), available at https://www.war.gov/News/News-Stories/Article/Article/1557188/DOD-officials-chinese-actions-threaten-us-technological-industrial-base/#:~:text=China%2C%20she%20said%2C%20is%20using,%2D%20and%20short%2Dterm%20impacts.

[58] Ex. 28: *How China's Economic Aggression Threatens the Technologies and Intellectual Property of the United States and the World*, White House Office of Trade and Manufacturing Policy, pp. 5-6 (Jun. 2018).

administrative decisions and licensing processes, and discriminatory patent right restrictions.[59] While the instant action does not involve adjudication of infringement by a Chinese court, it is logical that a decision to allow a German court to adjudicate infringement of a U.S. patent without the U.S. joining a treaty to that effect, would empower courts in China and other jurisdictions to do the same.

63.    Another example of a devolution in IP harmonization globally is evident in fallout from Russia's 2022 invasion of Ukraine. In response to Russia's actions, various IP offices, including the USPTO and the EPO cut ties and ended cooperation with Russia's patent-granting agency Rospatent, as well as with the Eurasian Patent Organization.[60]

64.    In response to these actions and to a variety of economic sanctions imposed against it, Russia issued Decree 299, setting the remuneration rate for patent infringement to 0% and effectively eliminating patent protection for rights held by entities in "unfriendly" countries.[61] This has allowed Russian companies to use inventions patented by holders from any of 48 countries designated as "unfriendly," including the U.S., EU members, and more.[62]

65.    The rise in aggression, nationalism, and protectionism, and the willingness of countries to weaponize IP systems, suggests that global patent harmonization is not at a stage where allowing foreign courts to adjudicate infringement of U.S. patents is a next logical step.

**V.    Procedural Differences with Substantive Impacts**

---

[59] *Id.*

[60] See Ex. 29: USPTO Statement on Engagement with Russia, the Eurasian Patent Organization, and Belarus, U.S. Patent and Trademark Office (March 10, 2022) https://www.uspto.gov/about-us/news-updates/uspto-statement-engagement-russia-and-eurasian-patent-organization. The Eurasian Patent Organization grants patents for Armenia, Azerbaijan, Belarus, Kazakhstan, Kyrgyzstan, Russia, Tajikistan, and Turkmenistan.

[61] Decree of the Government of the Russian Federation from March 6, 2022, No. 299 "On amendments to Paragraph 2 of the Methodology for determining the amount of compensation paid to the patent holder at the time of decision to use an invention, utility model, or industrial design without their consent, and the procedure for its payment."

[62] Ex. 31: *The Kremlin's Intellectual Property Cold War: Legalizing Patent Theft with Decree 299*, K&L Gates IP Law Watch (Mar. 28, 2022).

66.     There are several procedural differences between patent infringement litigation in U.S. and German courts that could affect liability determinations: procedure often affects substance.[63] A few key differences are highlighted below in relation to inter partes adjudication, expert witnesses, juries, discovery rules, and remedies.

a.   *Inter Partes Adjudication of Patent Defenses*

67.     Unlike the U.S., where a district court will decide both infringement and invalidity in the same action, Germany has a bifurcated system in which patent infringement is normally adjudicated in a separate court and action than patent validity.[64]

68.     However, it is my understanding that the Munich court in the present action would be expected to accept jurisdiction over not only the infringement claim but also the invalidity and misuse claims on an *inter partes* (with the results applicable only to the parties to the action) basis.[65]  But a decision by a foreign court on the validity and infringement of a U.S. patent could be expected to have effects beyond the parties to the action. It could harm U.S. consumers who could be unfairly deprived of access to the defendant's products if the patent was in fact invalid but was enforced by the foreign court. It could also impact the U.S. economy more broadly as, beyond consumers, other market employers and employees could be affected. As explained by the U.S Supreme Court:

> [Patents] ... are matters concerning far more than the interests of the adverse parties.
>
> The possession and assertion of patent rights are "issues of great moment to the public."
>
> A patent by its very nature is affected with a public interest. As recognized by the

---

[63] Also, it is worth noting that allowing this case to proceed in Germany may be viewed as a "green light" to other countries to adjudicate infringement of U.S. patents. Such countries may have patent infringement adjudication regimes that diverge from the U.S. system even further than that of Germany.

[64] Ex. 32: WIPO, An International Guide to Patent Case Management for Judges, Ch. 5: Germany, p. 190 (2025).

[65] Leistner Dec. ¶¶ 82, 86, 91.

Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies . . . are kept within their legitimate scope.[66]

69.     The specter of the Munich court adjudicating infringement and validity of a U.S. patent is troubling for reasons beyond the potential effect on competitive and economic conditions in the United States. It also would seemingly create a situation where U.S. sovereignty in relation to patents is treated with less respect and deference than that of EU Member States.

70.     This is because an EU Member State court like the Munich Regional Court, is prohibited from adjudicating the validity of another Member State patent even on an *inter partes* basis.[67] And due to the German bifurcated system, the Munich court is prohibited from adjudicating the validity of a German patent on that basis as well.[68] The Munich court could only assess the probability of success in a EU member State's (including Germany's) invalidation proceeding for purposes of deciding whether to continue or suspend the infringement proceeding.[69]

71.     This would result in "different treatment of U.S. patents compared to European bundle patents" and "may even arguably constitute a violation of Art. 3(1) TRIPS which guarantees equal treatment of foreign patents to national patents" for WTO members.[70] It would also be inefficient vis a vis adjudication in a U.S. court as a decision on the invalidity of Onesta's

---

[66] *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 815-816 (1945).

[67] See Leistner Dec. ¶ 49; *id.* at ¶¶ 28-30.

[68] See, e.g., Leistner Dec. ¶ 93 ("The Munich Regional Court . . . could never issue a decision on the validity of a German patent, not even with *inter partes* effect.").

[69] Leistner Dec. ¶ 49.

[70] Leistner Dec. ¶ 98.

U.S. patents by the Munich court would leave Onesta free to continue asserting the patents against other parties.

> b. *Expert Testimony*

72.    In U.S. patent litigation, parties are allowed to introduce expert witness testimony to aid the court in understanding technical and other matters at issue in the case. This sometimes results in what is known as the "battle of the experts," with a judge or jury able to assess the credibility and persuasiveness of each sides' experts in formulating a final decision on disputed matters.

73.    In German patent litigation, there is no battle of the experts. Rather, the court may appoint a single expert, with input from the parties, to aid the court in understanding aspects of the case.[71] This may seem like a superfluous procedural limitation, but it can have substantive impacts affecting the outcome of the case. The famous *Improver* litigation in Germany and the UK[72] provides a helpful illustration of the problem.

74.    The *Improver* cases involved infringement of a European patent covering a depilatory (hair removal) device: Epilady® sold by the plaintiff patentee, and "Smooth & Silky" (S&S) sold by the defendant, Remington. The question for both courts was non-literal infringement, as the S&S device used a rubber rod instead of a helical spring (as specified in the claim) to remove hair.

---

[71] Ex. 34: WIPO, An International Guide to Patent Case Management for Judges, Ch. 5: Germany, p. 199 (2025). While parties are allowed to proffer expert opinions, those are considered only as part of the submissions of the parties. Only the opinion of an expert duly appointed by a court is considered a "formal 'means of evidence' and heard in court." *Id.*

[72] There was a third case in the Netherlands that was very similar to the German case (infringement was found) and also did not allow for a battle of the experts. See Ex. 1: Margo A. Bagley et al., *International Patent Law and Policy* 680-95 (West 2013).

75.     Evaluating the identical claim language, under effectively the same legal standard - EPC Article 69 and its Protocol- the two courts came to divergent conclusions, with the German court finding infringement[73] and the UK court finding no infringement.[74]

76.     It appears likely that the role of expert witnesses was a key determinant in each case. In the UK action, the judge discussed the conflicting testimony of both parties' expert witnesses at length and then explained that, in applying the prevailing precedent, he found the testimony of the defendant's witness more compelling than that of the plaintiff's witness, leading to a non-infringement holding.[75] He explained:

> In my judgment the difference between the experts depends upon how one construes the equivalents clause. . . . If this means: "whatever contrary impression the skilled man may be given by the language of the claims read in the context of the rest of the description, all references in the claims to hardware are deemed to include any other hardware which would in any circumstances function in the same way" then I think Dr. Sharpe must be right. In my judgment, however, the clause does not have so wide an effect. . . . I accept Dr. Laming's reasons for thinking that a skilled man would not understand it in this sense.[76]

77.     In the German case, there was only a single, court-appointed expert,[77] who opined in favor of the plaintiff's position. The court stated:

> After the expert opinion, the court is convinced that a person skilled in the art . . . was capable of arriving at the disputed embodiment in this sense. . . . In view of the undisputed

---

[73] See *id.*
[74] See *id.*
[75] *Id.*
[76] *Id.*
[77] See *id.*

technical knowledge of the expert, . . . the court does not see any reason not to follow the logic of the expert in that a person skilled in the art will actually understand the teaching of the patent in suit in this way.

78.     These disparate results indicate a potential harm from the German court's procedural rule regarding a single court-appointed expert. If the German court's expert favors the technical infringement view of the plaintiff, that could disadvantage a defendant and possibly lead to a different outcome than would be obtained in a U.S. court even if the German court is ostensibly applying U.S. law to determine infringement.

### c.  *Limited Discovery*

79.     Unlike the United States, where discovery can be extensive and include broad document production, depositions, and detailed use of prosecution history, German patent litigation operates under a significantly more restricted discovery regime.[78] The claimant must present all facts establishing infringement as early as possible and preferably within the complaint, which is a marked difference from the U.S. pleading standard, which simply requires plausibility. This requirement for early proof of the case is why German proceedings are often referred to as "front-loaded."[79] Unlike the United States, there are very few ways for parties to discover facts that are not publicly available.[80]

80.     These procedural differences could result in substantive differences in litigation outcomes; with less access to information in the possession of the adverse party in a German proceeding, and less factual information for a court to evaluate, there is a non-trivial risk that a

---

[78] Ex. 38: Michael J. Summersgill et al., *The Rising Threat of German Patent Litigation: Are You Ready?*, 37 INTELL. PROP. & TECH. L. J. 1, 3 (Jan. 2025).
[79] *Id.*
[80] *Id.*

case in Munich could reach a different result than one litigated in the U.S., which operates with a more fulsome discovery process.

81.     Germany also almost entirely excludes prosecution history from claim construction. It is generally not admissible to use the files of granted patents as interpretation materials.[81] While it is true that German courts similarly start with the claim terms and the specification, the German courts' ability to incorporate the limitations on claim scope negotiated during prosecution and evident in the file history is considerably constrained. The prosecution history only comes into play in limited circumstances, such as to show the understanding of the skilled person.[82] This is a stark difference from the U.S., where prosecution history is treated as a core component of claim construction and considered part of the intrinsic record of the patent, almost as critical to understanding the claim terms as the patent specification itself. While the German court will likely apply U.S. law on the use of prosecution history, its lack of familiarity with its application under U.S. law could frustrate the accurate determination of key issues in the case.

82.     Germany also does not recognize the broad prosecution history estoppel (also called file wrapper estoppel) available to U.S. defendants.[83] In the U.S., prosecution history estoppel would prohibit a patent owner from using the doctrine of equivalents for subject matter surrendered during prosecution.[84] When a court finds that prosecution history estoppel applies and that judgment becomes final, it has an erga omnes effect, such that later defendants can generally invoke the judgment against the patent owner through issue preclusion.

---

[81] Ex. 39: WIPO, An International Guide to Patent Case Management for Judges: Germany § 5.5.1 (2025), https://www.wipo.int/patent-judicial-guide/en/full-guide/germany/5.5.1.
[82] Ex. 40: Joel Nägerl et. al., *The interplay of patent prosecution and litigation in Germany*, IAM (Oct. 12, 2017) https://www.iam-media.com/global-guide/iam-yearbook/2018/article/the-interplay-of-patent-prosecution-and-litigation-in-germany#:~:text=The.
[83] *Id.*
[84] See *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).

83.     Furthermore, it is my understanding that the Munich court will follow the Rome II Regulations on choice of law.[85] In that case, the Munich court will apply U.S. substantive law and German procedural law. But the contours of substantive versus procedural can be a challenging distinction.[86] Therefore when considering U.S. patent law for the first time, what aspects the German court will deem substantive versus procedural is anything but guaranteed. As noted above, that conclusion could have significant substantive impacts on the litigation of a U.S. patent in a German court.

d.  *Absence of Juries* (not serving as triers of fact)

84.     In the United States, parties to a patent infringement action are entitled to a jury trial consistent with the Seventh Amendment and longstanding federal practice.[87] [88] [89] This structural difference means that factual determinations in Germany are made by specialized judicial panels rather than a jury, a stark contrast to the U.S. system. As a result, allowing adjudication of U.S. patents by a German court would necessarily deprive the parties of their fundamental Constitutional right to a jury trial on fundamental questions such as infringement, validity, and possibly even damages.

e.  *Injunctive Relief*

85.     I have been asked to describe information on the injunctive relief potentially available in the United States in patent cases for the related Munich case. So, while the following

---

[85] Leistner Dec. ¶¶ 29–32.
[86] See, e.g., *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945); *Hanna v. Plumer*, 380 U.S. 460 (1965).
[87] U.S. Const. amend. VII; *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996) ("[T]here is no dispute that infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago.").
[88] *See Markman*, 517 U.S. at 391 (holding that claim construction, while a mongrel practice, is a question of law for the judge to decide).
[89] See Ex. 41: WIPO, An International Guide to Patent Case Management for Judges: Germany § 5.6.1 (2025), https://www.wipo.int/patent-judicial-guide/en/full-guide/germany/5.6.

does describe important distinctions between German and U.S. adjudication of these issues, it includes more detail regarding U.S. law than I would normally provide to a U.S. court.

86.    Injunctive relief inherently plays an important role in the patent system because patents grant the right to exclude. However, in *eBay Inc. v. MercExchange, L.L.C.*,[90] the Supreme Court rejected any general rule that courts issue permanent injunctions following a judgment of patent infringement. Rather, it reiterated that, under well-established principles of equity, a party must satisfy the traditional four-part test to be granted such relief. A movant must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[91]

87.    Patentees may also seek injunctive relief in the early stages of litigation in the form of a preliminary injunction. Importantly, preliminary injunctions are not meant to be remedial; "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[92] As such "[a] preliminary injunction is an extraordinary remedy never awarded as of right."[93]

88.    "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the [movant] must show a likelihood of success on the merits rather than actual success."[94] To demonstrate that a preliminary injunction is warranted, a movant must show: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable

---

[90] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).
[91] *Id.* at 391.
[92] *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).
[93] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).
[94] *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1148 n.3 (Fed. Cir. 2011) (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, (4) and that an injunction is in the public interest.[95]

89.    In particular, a movant must establish the existence of both of the first two factors—a likelihood of success on the merits and a likelihood of irreparable harm—to be entitled to a preliminary injunction; simple assertions are insufficient.[96] A "substantial question" regarding validity or non-infringement will defeat the movant's ability to demonstrate a likelihood of success on the merits.[97] As with permanent injunctions, *eBay* similarly abrogated any presumption of irreparable harm in the preliminary injunction context.[98] As the Federal Circuit has explained, bare assertions that the movant has suffered irreparable harm are never sufficient to justify a preliminary injunction; the movant must demonstrate that money damages would be inadequate.[99]

90.    While the same test applies to patent assertion entities, Justice Kennedy, in his concurrence in *eBay*, discussed some important considerations for injunctions requested by such entities. He stated:

> An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees. For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent. When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue

---

[95] *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009) (citing *Winter*, 555 U.S. at 20.
[96] *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).
[97] *Titan Tire Corp.*, 566 F.3d at 1376.
[98] *Robert Bosch LLC*, 659 F.3d at 1148.
[99] *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.*, 967 F.3d 1339, 1349 (Fed. Cir. 2020).

leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest.[100]

91.    This requirement of irreparable harm effectively reserves injunctive relief for patent owners that can demonstrate that money-damages are inadequate to cure their harm. Consequently, patent assertion entities that neither sell a product on the market nor developed their own inventions, whose business lies in licensing activities, are extremely unlikely to obtain an injunction. Indeed, to my knowledge, there appears to be no U.S. court decision subsequent to *eBay v. MercExchange* that has granted a preliminary or permanent injunction to a patent assertion entity such as Onesta—which to my understanding purchased its patents from a third party for the specific purpose of assertion and licensing.

92.    The public interest is an important consideration in injunction analysis. As Justice Kennedy noted, with respect to patent assertion entities, an injunction may not serve the public interest. While the public does have an interest in the enforcement of valid patents, this can be outweighed "[i]f a patentee's failure to practice a patented invention frustrates an important public need for the invention, [then] a court need not enjoin infringement of the patent."[101]

93.    Some courts have found that the public interest weighed against issuing an injunction when the movant could not show that the "injunction would serve any purpose other than to increase its leverage in negotiations for a higher licensing fee."[102] Conversely, courts have found that the public interest can weigh in favor of issuing an injunction for research institutions, which may not always practice their patented inventions, where they produce enormous benefits

---

[100] *Id.* at 396–97 (J. Kennedy, concurring) (citations omitted).
[101] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547 (Fed. Cir. 1995); accord *Hybritech, Inc. v. Abbott Lab*., 4 USPQ2d 1001, 1987 WL 123997 (C.D. Cal.1987) (concluding that the public interest required that injunction not stop supply of medical test kits that the patentee itself was not marketing), aff'd, 849 F.2d 1446 (Fed.Cir.1988).
[102] *Ricoh Co. v. Quanta Computer, Inc.*, No. 06-CV-462-BBC, 2010 WL 1607908, at *4 (W.D. Wis. Apr. 19, 2010).

to society through their research.[103] Courts have also found that issuing an injunction can be against the public interest when it would deny consumers access to a product with a far greater number of non-infringing features than infringing ones.[104]

94.     In my opinion, it would be difficult for a foreign court to accurately assess the impact of an injunction on the public interest in the U.S. as effectively as a U.S. court for several reasons. Federal judges within the United States are uniquely positioned to evaluate whether an injunction serves the public interest compared to judges sitting in a foreign tribunal because they are inherently members of the U.S. public. They also are U.S. government officials charged with upholding and interpreting U.S. law and the U.S. Constitution, its goals and purposes. They are appointed by the President and confirmed by the Senate. It is their duty to consider and protect the interests of the United States, its people, and its system of justice.

95.     The same cannot be said of foreign judges, who, rightly, owe duties to their country and its citizens. They take no oath regarding the U.S. Constitution or its laws and have no similar conception of the day-to-day realities of American life. Nor have they been entrusted by the U.S. President or Congress with the proper interpretation and administration of U.S. laws.

96.     In terms of the differences regarding a permanent injunction, it is my understanding that German courts, in proceedings on the merits, grant an injunction upon a finding of patent infringement, and a refusal to do so on grounds of proportionality is the rare exception.

97.     In terms of the differences in standards for issuing preliminary relief, it is my understanding that the German equivalent of a preliminary injunction is called "einstweilige

---

[103] *Commonwealth Sci. & Indus. Rsch. Organisation v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 607 (E.D. Tex. 2007).
[104] *See Apple Inc. v. Samsung Elecs. Co. Ltd.*, 735 F.3d 1352, 1372-73 (Fed. Cir. 2013) (explaining that it was proper for the District Court to consider "the prospect that an injunction would have the effect of depriving the public of access to a large number of non-infringing features").

Verfügung". German courts grant such "preliminary injunctions" when the following conditions are met: (1) "Verfügungsanspruch" (claim entitlement): a high likelihood of infringement and a high likelihood of validity of the asserted patent; and (2) "Verfügungsgrund" (grounds for injunction): urgency requiring the patentee to act swiftly after learning of the infringement – usually within one month.[105]

98.     German courts decide on a summary basis and can issue preliminary injunctions very quickly. There is no full merits analysis, but courts consider proportionality and balance of interests (e.g., risk of irreparable harm, market disruption).[106] Importantly, German law makes no distinction between patent assertion entities and other patent owners with respect to injunctive relief.[107]

99.     So, while the first factor, i.e., a likelihood of success on the merits, is substantially similar, the issuance of a preliminary injunction in Germany does not require a showing of irreparable harm, neither for a permanent nor a preliminary injunction. The issuance of an injunction also lacks a similar analysis of the balance of equities and the public interest. These fundamental differences within the German system would exacerbate the difficulties and potential unfairness associated with a German court applying complex U.S. law on injunctive relief.

100.    Furthermore, any decision on an injunction within the U.S. is immediately appealable to the Federal Circuit—the court empowered to provide uniformity to the U.S. patent system,[108]—which can immediately address the grant or denial of an injunction in a case. That critical right to an immediate interlocutory appeal to the Federal Circuit would be absent from any

---

[105] Ex. 42: Thomas Kühnen, Handbuch der Patentverletzung § D.IV.1, ¶¶ 572–573 (17th ed. Carl Heymanns 2025) (machine translation).
[106] *Id.*
[107] *Id.*
[108] See *Voda*, 486 F.3d at 901.

foreign tribunal's decision on an injunction based on U.S. patents, leaving the U.S. public's interests vulnerable to the decision of a foreign court with no direct relationship to the U.S. public.

101.    Yet the foreign court decision can affect the economic and competitive landscape in the United States as well as national security and consumer choice concerns, without an assessment of the validity of the U.S. patent even being made by either the USPTO or a U.S. court. The German Court could simply order BMW to not sell certain products in the United States. A decision of this magnitude does not affect only the parties to the dispute. It can have much wider-ranging effects and should only be made by a U.S. court.

   *f.  Why it Matters*

102.    As of 2025, the United States' stance across a range of areas is unabashedly territorial, protectionist, and nationalistic, as expressed in the following statements taken from the November 2025 *National Security Strategy of the United States of America*:

> The world's fundamental political unit is and will remain the nation-state. It is natural and just that all nations put their interests first and guard their sovereignty. . . .  We stand for the sovereign rights of nations, against the sovereignty-sapping incursions of the most intrusive transnational organizations. . . . . The United States will unapologetically protect our own sovereignty. . . . The United States will chart our own course in the world and determine our own destiny, free of outside interference. . . . From military alliances to trade relations and beyond, the United States will insist on being treated fairly by other countries.

> We want to protect this country, its people, its territory, its economy, and its way of life from military attack and hostile foreign influence, whether espionage, predatory trade practices . . . or any other threat to our nation.  [W]e want to protect our intellectual

property from foreign theft. . . . We want to halt and reverse the ongoing damage that foreign actors inflict on the American economy. . . .[109]

103.    This is the current position of the U.S. government, and it does not appear favorable to the notion of foreign courts adjudicating U.S. patent rights and determining what can or cannot be sold in U.S. markets based on those patent rights. If the Munich court is allowed to adjudicate infringement and validity of a U.S. patent, a party that is determined by that court to be an infringer may be enjoined from distributing products in the U.S. by that foreign court.

104.    Such an injunction could affect not only the availability of certain products, but also the pricing of related or substitute products, the employment of American workers who would otherwise be engaged in producing or distributing such products, and even the health of Americans based on the nature of the product and the availability (or lack thereof) of reasonable substitutes. While this current case may involve automobiles, a future case could involve life-saving medications. Such a foreign injunction could thus have implications for the U.S. economy and national security if such a decision were weaponized by a foreign government as part of a larger warfare strategy.

105.    The importance of IP to the U.S. economy is significant and growing. According to the USPTO report:

The IP-intensive industries play a significant role in the U.S. economy in terms of both output—measured as gross domestic product (GDP)—and employment. In 2019, the group of IP-intensive industries accounted for $7.8 trillion in GDP . . . IP-intensive industries also helped to indirectly support an additional 15.5 million jobs. These jobs are

---

[109] Ex. 43: *National Security Strategy of the United States of America*, at 3-10 (White House Nov. 2025), https://www.whitehouse.gov/wp-content/uploads/2025/12/2025-National-Security-Strategy.pdf.

in non-IP-intensive industries that supply goods and services (i.e., the supply chain) as intermediate inputs to IP-intensive industries. When combined with directly supported employment, IP-intensive industries provide 63 million jobs, or 44% of national employment.[110]

106.    If U.S. patent rights are vulnerable to being adjudicated by foreign courts, impacts to the U.S. economy, and possibly even to the volume of patent infringement litigation in the U.S. following those court decisions seems likely. Especially for a country like Germany with a court system that has long been a top venue for patent infringement in Europe due to its patentee friendly features like lower cost, faster decisions, a bifurcated system, and ease of obtaining injunctions.[111] One might expect savvy multinational patent holders to see the attractiveness of simply adjudicating all of their claims in favorable foreign courts and bypassing U.S. courts entirely.

107.    Moreover, based on the *Voda v. Cordis* decision, U.S. courts are not going to begin adjudicating infringement of foreign patents anytime soon. So, allowing foreign courts to adjudicate the infringement of U.S. patents would create a one-way street, with the U.S. market being affected from time to time with such decisions but foreign markets not being affected by similar decisions from U.S. courts. In fact, there would not even be the threat of such U.S. decisions to militate against judicial overreach by foreign tribunals due to fear of U.S. tit-for-tat retaliation.[112]

---

[110] Ex. 26: Andrew A. Toole et. al., *Intellectual property and the U.S. economy: Third edition*, USPTO, 3-5 (2022). The study reports that out of 210 industries considered . . . 70 are utility patent–intensive and 87 are design patent–intensive. Id. at 2

[111] Ex. 33: Roland Küppers and Eugen Reismann, *Global Patent Litigation: How And Where to Win, Germany*, Bloomberg, (2025).

[112] Consider also the fact that in this case, the only foreign patents to be adjudicated are U.S. patents. But if a future case involved the assertion of several foreign patents all of whose laws must be identified and applied by the German court, there could be the added danger of the intricacies of U.S. law being more likely to be "lost in the shuffle" of all of the different foreign laws, or a conclusion of "guilt by association" if the other foreign patents were deemed infringed. That could mean an increased danger of injustice to the U.S. and its consumers and economy.

## VI.    Patent Misuse

108.    I have been asked to prepare additional background information on the doctrine of patent misuse available in the United States in patent cases for the related Munich dispute.

109.    A few general points: The U.S., unlike Germany, operates under a common law system, which is characterized by the development of legal principles through judicial decisions rather than solely by codified statutes. Precedent plays a central role: when courts resolve novel questions—known as issues of first impression—their decisions become part of the law of that court's jurisdiction. The applicability of those decisions can be expanded or nullified by the appellate courts. If an appellate court affirms the reasoning of the lower court, the decision becomes the law of the circuit; in patent cases, that means it becomes a law applicable to the entire U.S. because of the Federal Circuit's nationwide jurisdiction over patent disputes.

110.    The development of U.S. jurisprudence is performed in the context of actual cases or controversies before the courts. U.S. courts are not permitted to issue advisory opinions. It is critical that novel legal questions—such as the applicability of the patent misuse doctrine to a foreign filing for infringement of a U.S. patent to benefit from legal rules not available in U.S. litigation—are decided by a court empowered to develop the law within the U.S. This process is a fundamental principle of the U.S.'s common law system. A foreign court, operating under different legal standards, would have no case law directly on point to guide its decision making when presented with a novel legal question, furthermore, the foreign court's decision would have no binding authority in any U.S. jurisdiction, creating a danger of inconsistent judgments on, and enforcement of, U.S. patent law. A foreign judgment on a novel patent question could also threaten the Federal Circuit's ability to finally decide the issue with binding authority over the entire United States.

111.    With that in mind, I have been asked to outline the contours and requirements of the doctrine of patent misuse as it may be relevant in this case. Patent misuse is an affirmative, equitable defense that renders a patent unenforceable until the misuse is cured.  It is a long-standing doctrine in U.S. law but has been refined over the years through judicial decisions and statutory amendments.[113] It remains, however, a viable defense to patent infringement.

112.    The Federal Circuit has explained that patent misuse occurs when a patentee "has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect."[114]  Misuse does not require a violation of antitrust law, and is in fact broader than antitrust, but the analysis often parallels antitrust principles. Patent misuse renders the patent unenforceable only so long as the misuse persists; once purged, the patent may be enforced.[115]

113.    Because U.S. patents are strictly territorial, a court could decide that the act of filing a suit outside the U.S. that alleges infringement of U.S. patents is considered as misuse if it represents an improper attempt to extend the U.S. patent's scope extraterritorially or if it causes anticompetitive harm affecting U.S. commerce (e.g., delaying a competitor's global operations that impact the U.S. market). This would be a question of first impression and, as noted above, should be decided in the first instance by a U.S. court.

114.    Because no U.S. court has decided the question—whether filing a claim for infringement of a U.S. patent in a foreign court constitutes patent misuse—predicting an outcome is challenging. This is the classic scenario in common law systems, where a court creates new law by establishing precedent—a core task, both familiar to and reserved for a U.S. court. The court could reasonably conclude that such a filing creates a new category of *per se* misuse with

---

[113] See, e.g., *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1329–30 (Fed. Cir. 2010).
[114] *Windsurfing Int'l Inc. v. AMF Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986).
[115] See *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997).

inherently anticompetitive effects. If the party bringing the suit abroad misled the foreign court on the applicable U.S. laws, that fact would quite likely weigh in favor of finding patent misuse. This would be particularly true if the party was seeking remedies that expanded the physical or temporal scope of a patent under U.S. law through, e.g., seeking remedies not available in the U.S.

115.    Certain practices are deemed *per se* patent misuse because they are inherently anticompetitive. These include requiring licensees to pay royalties beyond the expiration of the patent,[116] and certain types of tying arrangements. Specifically, where the patentee has market power and either 1) requires royalties on non-patented, staple products[117] or 2) coercively conditions a license on payment of royalties for sales of products that do not use the patented invention.[118] Also, while licensing patents essential to a standard with those that are not essential is not *per se* misuse, the Federal Circuit has indicated that if coercion is present, and the nonessential patents are in a separate market from the essential patents, that could constitute *per se* misuse as a type of forced tying arrangement.[119] For other assertions of misuse, a rule of reason analysis must be employed.

116.    The inquiry for the rule-of-reason analysis for patent misuse focuses on whether the challenged practice imposes an unreasonable restraint on competition.[120] Courts require:

·    Identification of the relevant product and geographic market.

·    Evidence that the practice forecloses competition or creates significant barriers to entry.

---

[116] *Brulotte v. Thys Co.*, 379 U.S. 29, 32 (1964) ("[A] patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se."); but see *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 453–54 (2015) (suggesting ways to structure agreements to avoid *Brulotte* while still achieving the goals sought to be obtained through post-expiration royalties).
[117] *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45–46 (2006); see also 35 U.S.C. §271(d)(5).
[118] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 135–36 (1969).
[119] *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1194 (Fed. Cir. 2005).
[120] See *Princo Corp.*, 616 F.3d at 1328–29.

· Proof that the restraint derives its force from the patent, not from independent business considerations.[121]

117. For example, in the *Virginia Panel Corp. v. MAC Panel Co.* case, the Federal Circuit held that sending infringement notices and threatening suit did not constitute misuse because the patentee acted in good faith and did not broaden the patent's scope.[122] Conversely, in *TransWeb, LLC v. 3M Innovative Properties Co.*, the court found anticompetitive effect where fraudulent patent enforcement aimed to exclude competitors from a distinct market for fluorinated filter media, noting that litigation costs incurred to resist such enforcement constituted antitrust injury.[123]

118. To establish a claim of patent misuse, the litigant must allege: 1) Specific conduct that extends the patent beyond its lawful scope and 2) facts showing either per se misuse or anticompetitive effect under rule-of-reason analysis.[124]

119. In addition to patent misuse, there is also a concept of "sham litigation" under the antitrust laws, which applies when a lawsuit is both objectively baseless and subjectively intended to interfere with a competitor's business relationships through the use of governmental process as an anticompetitive weapon.[125] Normally, a litigant is immune from antitrust liability for petitioning the government, including a court in a patent infringement case, by what is known as

---

[121] See e.g., *id*. at 1326; <u>*Monsanto Co. v. McFarling*</u>, 363 F.3d 1336, 1341 (Fed. Cir. 2004); and *Windsurfing Int'l Inc. v. AMF Inc.*, 782 F.2d 995, 1001-1002 (Fed. Cir. 1986).

[122] *Virginia Panel Corp.*, 133 F.3d at 870.

[123] *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1307–11 (Fed. Cir. 2016).

[124] *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l Inc.*, No. 05 C 4088, 2005 WL 3557947, at *3 (N.D. Ill. Dec. 26, 2005).

[125] See *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998).

*Noerr-Pennington* immunity.[126] This doctrine protects a litigant's Constitutional right under the First Amendment to petition the government for relief.

120.    In *Professional Real Estate Investors Inc. v. Columbia Pictures Industries, Inc*., the U.S. Supreme Court articulated a two-part test for establishing the sham litigation exception to *Noerr-Pennington* immunity. First, the suit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."[127] Second, the litigant must have a subjective intent to use the litigation process—not its outcome—as an anticompetitive weapon.[128] If both prongs are met, *Noerr-Pennington* immunity no longer shields the defendant against whom the sham exception is asserted, and a claim that the lawsuit itself is a violation of the antitrust laws (with the goal of unlawfully restraining competition) can proceed.[129]

## VII.    Customer-Suit Exception

121.    The U.S. also has a customer-suit exception, where a district court could choose to stay a case against a customer until a lawsuit with overlapping issues involving the manufacturer of technology used/purchased by the customer has been resolved.[130]

## VIII.    Conclusion

122.    To conclude, patent rights are territorial, and according to the Federal Circuit, "[t]erritoriality is always of concern in intellectual property disputes."[131]

---

[126] The name comes from two U.S. Supreme Court cases, *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).
[127] *Pro. Real Est. Invs.*, 508 U.S. at 60.
[128] *Id.*
[129] *Id.* at 61.
[130] *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081-82 (Fed. Cir. 1989)
[131] *Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*, 816 F.3d 1366, 1371 (2016).

123.    While Europe has been achieving greater harmonization in the patent realm, globally, patent harmonization efforts have stagnated or in some case deteriorated, and IP is being weaponized geopolitically in unexpected ways.

124.    Patent law in the United States has always been affected with a "public interest"[132] and the concerns regarding the potential adjudication of infringement of a U.S. patent by a German court in my opinion, counsel away from allowing such an action to proceed.

125.    A British jurist, Mr. Justice Aldous, sums it up well:

For myself I would not welcome the task of having to decide whether a person had infringed a foreign patent. Although patent actions appear on their face to be disputes between two parties, in reality they also concern the public. A finding of infringement is a finding that a monopoly granted by the state is to be enforced. The result is invariably that the public have to pay higher prices than if the monopoly did not exist. If that be the proper result, then that result should, I believe, come about from a decision of a court situated in the state where the public have to pay the higher prices. One only has to imagine a decision of this court that the German public should pay to a British company substantial sums of money to realize the difficulties that might arise. I believe that, if the local courts are responsible for enforcing and deciding questions of validity and infringement, the conclusions reached are likely to command the respect of the public. Also a conclusion that a patent is infringed or not infringed involves in this country a decision on validity as in this country no man can infringe an invalid patent. In the present case the plaintiffs admit the validity of the patent and therefore there is no dispute upon the matter. However, it will be implicit in the judgment of this court that there has been

---

[132] *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806 (1945).

infringement, and that, between the parties, the patent is valid. Thus, I believe it is at least convenient that infringement, like validity, is decided in the state in which it arises[133]

126.    These concerns apply with equal force to the possibility of a German court adjudicating infringement and validity of a U.S. patent.

127.    In my opinion, such an exercise of jurisdiction would set a precedent for numerous future decisions having the ability to negatively affect the national sovereignty, security, economic wellbeing, and policy objectives of the United States of America. Avoiding such an outcome seems prudent.

## IX.    Attestation

128.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 15, 2025

Prof. Margo A. Bagley

---

[133] Ex. 45: *Plastus Kreative AB v. Minnesota Mining and Manufacturing Co.*, [1995] R.P.C. 438 (Eng. Ch. 1994).

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | Bagley International Textbook: Margo A. Bagley et al., *International Patent Law and Policy* (West 2013). |
| Exhibit 2 | Carl Moy Article: R. Carl Moy, *The History of the Patent Harmonization Treaty: Economic Self-Interest as an Influence*, 26 J. Marshall L. Rev. 457 (1993). |
| Exhibit 3 | Paris Convention: Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, 13 U.S.T. 1, 828 U.N.T.S. 107, as revised at the Stockholm Revision Conference, July 14, 1967, 21 U.S.T. 1538, 828 U.N.T.S. 303. |
| Exhibit 4 | Patent Cooperation Treaty: Patent Cooperation Treaty, June 19, 1970, 28 U.S.T. 7645, 1160 U.N.T.S. 231 (entered into force Jan. 24, 1978). |
| Exhibit 5 | Budapest Treaty: Budapest Treaty on the International Recognition of the Deposit of Microorganisms for the Purposes of Patent Procedure, opened for signature 28 April 1977, 1861 U.N.T.S. 361. |
| Exhibit 6 | Patent Law Treaty: Patent Law Treaty, June 1, 2000, T.I.A.S. No. 13–1218. |
| Exhibit 7 | TRIPS Agreement: Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1869 U.N.T.S. 299 (1994). |
| Exhibit 8 | WTO Dispute Settlement: *Dispute Settlement*, WORLD TRADE ORG. |
| Exhibit 9 | USPTO Harmonization: *Harmonization: The Time is Now*, U.S. PATENT & TRADEMARK OFFICE. |
| Exhibit 10 | FCBA Global Series: Federal Circuit Bar Association, *Bench & Bar: Global Series*. |
| Exhibit 11 | IP5 Co-operation: About IP5 Co-operation. |
| Exhibit 12 | Celltech Decision: *Celltech Chiroscience Ltd. v. MedImmune Inc.*, [2002] E.W.H.C. 2167 (Ch. Patents Ct.) (Eng. & Whales). |
| Exhibit 13 | K.K. Coral Corp. Decision: *K.K. Coral Corp. v. Marine Bio K.K.*, Hesei 02 (Wa) 1943 (D. Tokyo Oct. 16, 2003). |
| Exhibit 14 | Strasbourg Agreement: Strasbourg Agreement Concerning the International Patent Classification, opened for signature 24 March 1971, 1160 U.N.T.S. 483. |

| Exhibit 15 | Economist Article: *A Patent Mess: Patent Costs are Higher in Europe than Elsewhere*, The Economist (Jun. 24, 2009). |
| Exhibit 16 | Reserved |
| Exhibit 17 | EU Facts: Facts and Figures on the European Union. |
| Exhibit 18 | EPO Glance: EPO, EPO at a Glance. |
| Exhibit 19 | Di Cataldo Article: Vincenzo Di Cataldo, From the European Patent to a Community Patent, 8 Colum. J. Eur. L. 19 (2002). |
| Exhibit 20 | Reserved |
| Exhibit 21 | Marianne Schaffner Article: Marianne Schaffner & Matilde Grammont, EU Courts Can Overreach in Foreign Patent Disputes: The Arm is Very Long and Not Confined to Infringement, Gowling WLG (May 19, 2025). |
| Exhibit 22 | WTO Appellate Body: WTO, Appellate Body. |
| Exhibit 23 | Kal Raustiala Article: Kal Raustiala, Innovation in the Information Age: The United States, China, and the Struggle over Intellectual Property in the 21st Century, 58 Colum. J. Transnatl. L. 531 (2020). |
| Exhibit 24 | Reserved |
| Exhibit 25 | ITC China Article: U.S. Int'l Trade Comm'n, China: Effects of Intellectual Property Infringement and Indigenous Innovation Policies on the U.S. Economy, Inv. No. 332-519, USITC Pub. 4226 (May 2011). |
| Exhibit 26 | USPTO Report: Andrew A. Toole et al., Intellectual property and the U.S. economy: Third edition, USPTO (2022). |
| Exhibit 27 | Chinese Threaten Article: Lisa Ferdinando, DoD Officials: Chinese Actions Threaten U.S. Technological, Industrial Base, DOD News (Jun. 21, 2018). |
| Exhibit 28 | China Aggression Article: How China's Economic Aggression Threatens the Technologies and Intellectual Property of the United States and the World, White House Office of Trade and Manufacturing Policy (Jun. 2018). |
| Exhibit 29 | USPTO 2022 Statement: USPTO Statement on Engagement with Russia, the Eurasian Patent Organization, and Belarus, U.S. Patent and Trademark Office (March 10, 2022). |
| Exhibit 30 | Reserved |
| Exhibit 31 | Kremlin Article: The Kremlin's Intellectual Property Cold War: Legalizing Patent Theft with Decree 299, K&L Gates IP Law Watch (Mar. 28, 2022). |

| Exhibit 32 | WIPO Guide Germany 5.2: WIPO, An International Guide to Patent Case Management for Judges, Ch. 5: Germany (2025). |
| Exhibit 33 | Roland Küppers Article: Roland Küppers and Eugen Reismann, Global Patent Litigation: How And Where to Win, Germany, Bloomberg (2025). |
| Exhibit 34 | WIPO Guide Germany 5.4.1.3.1: World Intellectual Property Society, An International Guide to Patent Case Management for Judges, Ch. 5: Germany (2025). |
| Exhibit 35 | Reserved |
| Exhibit 36 | Reserved |
| Exhibit 37 | Reserved |
| Exhibit 38 | Summersgill Article: Michael J. Summersgill et al., The Rising Threat of German Patent Litigation: Are You Ready?, 37 Intell. Prop. & Tech. L. J. 1, 3 (Jan. 2025). |
| Exhibit 39 | WIPO Guide Germany 5.5.1: World Intellectual Property Organization, An International Guide to Patent Case Management for Judges: Germany § 5.5.1 (2025). |
| Exhibit 40 | IAM Article Nagerl: Joel Nägerl et. al., The interplay of patent prosecution and litigation in Germany, IAM (Oct. 12, 2017). |
| Exhibit 41 | WIPO Guide Germany 5.6.1: World Intellectual Property Organization, Patent Judicial Guide: Germany § 5.6.1 (2025). |
| Exhibit 42 | Kuhnen Treatise: Thomas Kühnen, Handbuch der Patentverletzung § D.IV.1 (17th ed. Carl Heymanns 2025). |
| Exhibit 43 | U.S. National Security Strategy: National Security Strategy of the United States of America (White House Nov. 2025). |
| Exhibit 44 | Reserved |
| Exhibit 45 | Plastus Decision: Plastus Kreative AB v. Minnesota Mining and Manufacturing Co., [1995] R.P.C. 438 (Eng. Ch. 1994). |
| Exhibit 46 | Bagley CV 2025. |

# EXHIBIT 1

# INTERNATIONAL PATENT LAW AND POLICY

■  ■  ■

By

## Margo A. Bagley

*University of Virginia School of Law*

## Ruth L. Okediji

*William L. Prosser Professor of Law*

*University of Minnesota Law School*

## Jay A. Erstling

*William Mitchell College of Law*

*Former Director, Office of the PCT, WIPO*

## AMERICAN CASEBOOK SERIES®

**WEST**®

Mat #41441480

This publication was created to provide you with accurate and authoritative information concerning the subject matter covered; however, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

Nothing contained herein is intended or written to be used for the purpose of 1) avoiding penalties imposed under the federal Internal Revenue Code, or 2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

*American Casebook Series* is a trademark registered in the U.S. Patent and Trademark Office.

© 2013 LEG, Inc. d/b/a West Academic Publishing
    610 Opperman Drive
    St. Paul, MN 55123
    1–800–313–9378
West, West Academic Publishing, and West Academic are trademarks of West Publishing Corporation, used under license.

Printed in the United States of America
**ISBN:** 978–0–314–28787–8

# CHAPTER 1

## THE HISTORICAL CONTEXT FOR GLOBAL PATENT COOPERATION

∎ ∎ ∎

## A. THE NATURE AND SOURCES OF INTERNATIONAL PATENT LAW

### 1. THE HISTORY OF PATENT LAW: A BRIEF OVERVIEW

The idea of affording special privileges to inventors to stimulate innovation and enhance public welfare dates back thousands of years. The conceptual roots of modern laws granting exclusive rights to the creators of useful inventions can be traced to ancient Greece, where rulers of certain city-states granted special protection to the producers of novel recipes. A reference to patents can also be found in Aristotle's *Politics*, written in the fourth century B.C. It mentions a proposal made by prominent Greek architect Hippodamus of Miletus calling for the establishment of an incentive system designed to reward inventors of articles beneficial to the state. However, it was not until eighteen centuries later during the Renaissance that the first patent law was enacted in Venice, Italy. The Venetian Patent Law of 1474, reproduced below, established the first modern patent system designed to regularize the previously discretionary patent grant practices of the Venetian Republic during the early fifteenth century.

#### VENETIAN PATENT LAW OF THE 19TH MARCH 1474

Guilio Mandich, *Venetian Patents (1450-1550)*, 30 J. PAT. OFF. SOC'Y 166, 177 (1948)

BE IT ENACTED that, by the authority of this Council, every person who shall build any new and ingenious device in this City, not previously made in our Commonwealth, shall give notice of it to the office of our General Welfare Board when it has been reduced to perfection so that it can be used and operated. It being forbidden to every other person in any of our territories and towns to make any further device conforming with and similar to said one, without the consent and license of the author, for the term of 10 years. And if anybody builds it in violation hereof, the aforesaid author and inventor shall be entitled to have him summoned before any Magistrate of this City, by which Magistrate the said infringer shall be constrained to pay him hundred ducats; and the device shall be destroyed at once.

3

This rudimentary legislation contained important elements of patent law that have endured until today, including requirements that the invention be new, useful, and that the inventor have an exclusive right in relation to the device for a limited duration.

The Venetian model of a formal patent system quickly spread northward, fueled by the opening of new European trade routes. Beginning in the mid-sixteenth century in Great Britain, patents quickly became an instrument of mercantilist trade policy: foreign artisans were induced to introduce new skills and technologies to Britain through the promise of special privileges. However, with the ascension of King James I to the throne in the early seventeenth century, the British patent scheme, still highly informal and discretionary, became less of an incentive system aimed at stimulating innovation and more of a tool used to bestow acts of favoritism on loyal supporters of the Crown. During the subsequent reign of Queen Elizabeth I, the considerable trade-restraining effects associated with this practice led to the enactment of the *Statute of Monopolies* of 1623 by the British Parliament. Among other privileges, the Statute declared patents illegal, except for grants to "the true and first" inventor of "new manufactures," provided the exclusive rights were not used to break the law or primarily to raise prices and obstruct trade. The provisions of the *Statute of Monopolies* quickly became a model for the North American colonies, where a similar patent statute was enacted in Massachusetts in 1641, followed by Connecticut in 1672 and South Carolina in 1691. The British statute is reproduced in part below:

## STATUTE OF MONOPOLIES OF 1623

### 21 Jac. 1, c. 3, §6

Provided also, that any declaration before mentioned shall not extend to any letters patents and grants of privilege for the term of fourteen years or under, hereafter to be made, of the sole working or making of any manner of new manufactures within this realm to the true and first inventor and inventors of such manufactures, which others at the time of making such letters patents and grants shall not use, so as also they be not contrary to the law nor mischievous to the state by raising prices of commodities at home, or hurt of trade, or generally inconvenient: the same fourteen years to be accounted from the date of the first letters patents or grant of such privilege hereafter to be made, but that the same shall be of such force as they should be if this act had never been made, and of none other.

The next significant event in the evolution of modern patent law was the inclusion of the Intellectual Property Clause in Article I, Section 8 of the U.S. Constitution, whereby the Congress was given the power "[t]o promote the Progress of Science and useful Arts, by securing for limited

times to authors and inventors the exclusive Right to their respective Writings and Discoveries." The Intellectual Property Clause became the foundation for the first federal U.S. patent law—the Patent Act of 1790—which rested on the premise that creators have rightful claim to an exclusionary property interest in their innovations. To ensure that patented inventions were new and "useful," the Act required that two government officials (selected from the secretary of state, the secretary of war, and the attorney general) approve the patent and that the attorney general conduct a formal examination of the approved inventions. Like the English Statute of Monopolies, the Act afforded creators fourteen years of protection.

In France, where, similarly to Great Britain, the patent system had been utilized since the sixteenth century both to attract skilled artisans and to protect established manufacturers, the opinion of the general public had traditionally gravitated toward rejection of the exclusionary effects of patent protection. Nevertheless, the turbulent events surrounding the French Revolution and the passage of a new constitution witnessed the enactment of the first French patent statute, the Patent Act of 1791, and signaled a break with old customs. The Act, conceptually grounded in the Declaration of the Rights of Man (1789), was based on the notion that inventors possessed a natural right to the fruits of their creative endeavors. Importantly, the wide influence on the European continent of the ideals surrounding the French Revolution, along with the significant expansion in inter-European trade, led to the proliferation of formal patent systems across Western European nations. In the early to mid-nineteenth century, patent statutes were adopted by Spain (1826), Portugal (1837), Austria-Hungary (1852), and Italy (1859).

Despite strong arguments put forth about the relationship between the protection of intellectual property, liberty and economic prosperity, the establishment of patent protection regimes across Europe in the nineteenth century proved controversial. For example, in Holland, where a codified patent law was enacted as early as 1817, a strong anti-patent movement led to the complete (but ultimately temporary) abolition of patent protection in 1869. This anti-patent movement was still strong in some European countries (e.g., Germany) even as the intensification of cross-border trade led major industrializing nations in 1872 to begin talks on the first multilateral intellectual property treaty—the Paris Convention for the Protection of Industrial Property (1883)—which remains the foundation of international patent law to this day.

## 2. EARLY HARMONIZATION EFFORTS: THE PARIS CONVENTION FOR THE PROTECTION OF INDUSTRIAL PROPERTY

The elimination of barriers to international trade was the primary rationale for a treaty for the protection of patents. Developments in the mid-nineteenth century, most importantly the growth of cross-border commerce, soon revealed that the patchwork of early patent laws of major industrializing countries did not provide sufficient international protection for inventors. First, as we will discuss in detail in section 1.C, *infra*, intellectual property protection and the associated rights have historically been territorial in nature. Accordingly, the rights afforded under domestic patent systems were limited in scope by national boundaries. Second, still influenced by mercantilist trade policies, many early patent laws effectively excluded foreign persons from seeking patent protection in other countries. For example, under the French Patent Act of 1791 patent owners forfeited their patent if the goods were imported into, and not manufactured within, France. Because similar provisions were included in several of the earliest patent statutes, innovators needing protection in multiple jurisdictions were often forced to select specific countries in which to apply for a patent, while abandoning the possibility of protection in others. In 1872, these concerns led representatives of the major industrializing nations to gather in Vienna to discuss the possibility of an international agreement that would harmonize basic standards of patent protection and effectively eliminate existing discriminatory practices.

The catalyst for the formal commencement of negotiations for the first multilateral patent treaty was an international exhibition promoting new inventions that was sponsored by the Austro-Hungarian Empire in Vienna in 1873. At the time, applicants seeking international patent protection were hampered by the wide diversity in national laws and by the need to file multiple applications in order to avoid the possibility that the publication of an application in one country would destroy the invention's novelty in others. As a result, foreign inventors were reluctant to exhibit their inventions in Vienna for fear of inadequate legal protection. In response, the Austro-Hungarian government, urged on by the U.S., convened the Vienna Congress for Patent Reform, which emphasized the need for nations to adopt effective patent systems and urged governments "to bring about an international understanding upon patent protection as soon as possible." The French government heeded the call, and convened an International Congress on Industrial Property in Paris in 1878. That Congress determined to create "uniform legislation" in the field of industrial property. It was followed by another Congress in 1880 to debate a draft text. Finally, the Diplomatic Conference in Paris adopted the Paris Convention for the Protection of Industrial Property on March 20, 1883.

The battle to craft the Paris Convention was not easily won. Despite the enthusiasm of the United States, the Austro-Hungarian Empire, and France, a strong anti-patent mood permeated the negotiations. Germany, which at the time had recently abolished its patent law, led the anti-patent movement. Switzerland and Holland also were among the Convention's strongest opponents. Even among the pro-patent countries, a philosophical divide marked the debate, with countries such as the United States that viewed patents as a private property right on one side and countries that viewed patents as an instrument of public policy, which included most of Continental Europe, on the other.

### HEINRICH KRONSTEIN & IRENE TILL, A REEVALUATION OF THE INTERNATIONAL PATENT CONVENTION
12 Law & Contemp. Probs. 765, 766–776 (1947)

The creative period of the [Paris] Union was between 1872 and 1881. During this period the negotiations on the international patent convention were the battlefield for three opposing philosophies: (1) the anti-patent movement, aimed at the destruction of the patent system; (2) the recognition of patents as private property; [and] (3) the recognition of patents as an instrument of public policy. Certainly the issue of patents *versus* no-patents had to be disposed of first. The fight on this point marked the first battle between the [pro-patent] United States and the newly organized Germany of Bismarck.

The initial invitation for an international conference on patent rights came from the Austrian Government in 1872. . . .

. . . .

The organizers of the conference were fully aware that, in a competitive business economy, the world could not live half with patents and half without patents. The invitation to the conference sets forth the interdependence among national patent systems in the following classical statement:

> We live no longer in the day of Industrial action, which is strictly confined and is removed from foreign competition, and where slow communication prevents or delays the utilization of inventions. We live at a time of liberal Customs policy; Steam and Electricity have newly united once isolated seats of industry in a way undreamt of; and the mutual exchange of goods shows today a magnitude which a generation ago one could not have imagined. Under such altered relations the Patent granted for an invention in one country becomes in fact a restriction unprofitable and obstructive, if the same invention without limitation or increase in price, becomes in an adjoining country common property. The artisan who in the one country must work with the auxil-

It should, indeed, surprise no one that routine tinkering with a patent paradigm launched in Venice in the fifteenth century and refined by the United Kingdom in the seventeenth century cannot answer the hard questions raised by new technologies and the new modes of producing them. There are major challenges for which past experiences give only untested and untrustworthy hypotheses, with no convincing empirical studies on the horizon to resolve the doubts. . . .

————————

## 1. INDEPENDENCE VERSUS TERRITORIALITY

One clear result of deep harmonization of patent law is the elimination of geopolitical boundaries as a basis for different patent law rules. The excerpt above by Professors Reichman and Cooper Dreyfuss reflects important considerations for limiting the harmonization process, despite claims of asserted gains by proponents. As noted earlier, patent law has historically been territorial in nature, with sovereign states granting patents and providing means for patentees to enforce their rights only within their borders. While national sovereignty and international comity concerns have contributed to the current system, territoriality was a natural consequence of disagreement on the scope, duration, or even desirability of patents at the time that many countries were establishing their patent systems in the late eighteenth and nineteenth centuries. Even today, there remains a lack of the necessary consensus to create a system in which the filing of a single application would result in a globally valid patent that could be asserted in a single forum regardless of where infringement occurred. If a person wants to obtain patent protection for an invention in multiple countries, she, with some exceptions, has to apply separately for a patent in each country of interest, and the exclusionary rights provided generally would not extend beyond the country's borders.

While the territoriality principle is still the foundational basis of today's patent law, there are a growing number of exceptions. For example, the current U.S. patent statute allows for extraterritorial reach in certain circumstances, such as provisions relating to products assembled abroad from components made in and shipped from the U.S. for the purpose of avoiding infringement, and products made abroad by a process patented in the U.S. *See* 35 U.S.C. § 271(f)–(g) (Supp. IV 2010). However, the primary infringement provision, 35 U.S.C. § 271(a) (2006), is explicitly territorial and defines an infringer as someone who, without authorization, "makes, uses, offers to sell, or sells any patented invention, *within the United States* or imports *into the United States* any patented invention during the term of the patent."

Even in the European Union (EU), which has eliminated territorial restrictions in numerous areas in order to create a common European market, territoriality in patent matters is still alive and well. The Brus-

sels Convention, along with the Lugano Convention and the Brussels Regulation, provides EU-wide rules on jurisdiction and recognition of judgments and also embodies notions of patent territoriality. Article 16(4) of the Brussels Convention provides:

> The following courts shall have exclusive jurisdiction, regardless of domicile: . . .

> In proceedings concerned with the registration or validity of patents, trademarks, designs, or other similar rights required to be deposited or registered, the courts of the Contracting State in which the deposit or registration has been applied for, has taken place or is under the terms of an international convention deemed to have taken place.

*See* Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters art. 16(4), Mar. 1, 2002.

As will be discussed further in Chapter 10, *infra*, some patent-holders have sought to use other sections of the Brussels Convention to expand the territorial limits of national courts' jurisdiction over actions alleging infringement of a foreign patent. Nevertheless, because the issue of validity is invariably intertwined with that of infringement, Article 16(4) still imposes territorial limits over such endeavors.

While hesitant to part with the degree of sovereignty over patent matters that would be necessary to establish a truly global patent system, many countries have been willing to take incremental steps in that direction under increasing pressure from multinational corporations that are frustrated by inefficient and redundant territory-based patent systems. As will be discussed in later Chapters, several multilateral treaties currently exist that allow an applicant to file one application with a central office and obtain patent protection in multiple countries. However, the patents granted from such centralized systems still must be separately enforced in each individual country in which infringement has occurred.

Not surprisingly, many patent owners would prefer not only a single global patent application process, but also a single global forum for resolving patent infringement disputes without the need for parallel or serial litigation. In the absence of a global patent court in which such actions could be brought, patentees have attempted to have domestic courts adjudicate the infringement of foreign patents along with domestic ones, with mixed results. The following case illustrates the U.S. approach to territoriality in this context.

## VODA v. CORDIS CORP.

United States Court of Appeals, Federal Circuit
476 F.3d 887 (Fed. Cir. 2007)

■ GAJARSA, Circuit Judge:

### I. BACKGROUND

The plaintiff-appellee Voda is a resident of Oklahoma City, Oklahoma. The defendant-appellant Cordis is a U.S.-based entity incorporated in Florida. . . . The patents at issue relate generally to guiding catheters for use in interventional cardiology. . . . Voda's [three] U.S. patents stem from a common continuation-in-part ("CIP") application filed in October 1992. . . . The foreign patents issued from a common Patent Cooperation Treaty ("PCT") application. [The PCT application, which designated the European Patent Office ("EPO") and Canada as recipients, eventually generated European, British, French, German, and Canadian patents.]

Voda sued Cordis U.S. in the United States District Court for the Western District of Oklahoma alleging infringement of his three U.S. patents. . . . Cordis U.S. answered by asserting noninfringement and invalidity of the U.S. patents.

Voda then moved to amend his complaint to add claims of infringement of the European, British, Canadian, French, and German foreign patents. Voda's amended complaint alleges that "Cordis [U.S.] has commenced and continues acts of making, selling, offering for sale and selling at least the XB guiding catheter, which is covered by [the several foreign patents] without Dr. Voda's authority. Such acts constitute infringement, under corresponding foreign law of [these several foreign patents]." Cordis U.S. has admitted that "the XB catheters have been sold domestically and internationally since 1994. . . ."

. . . .

### 1. AUTHORIZATION

Section 1367(a) [of Title 28 on Judiciary and Judicial Procedure] provides the statutory authority for district courts to exercise supplemental jurisdiction over certain claims outside their original jurisdiction.

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

> . . .

In this case, it is undisputed that the district court has original federal question jurisdiction over Voda's U.S. patent infringement claims. In addition, § 1367(a) appears to authorize supplemental jurisdiction over foreign law claims in certain limited circumstances. Specifically, § 1367(a) provides the statutory authority for federal courts to exercise supplemental jurisdiction over claims that are outside the limited original jurisdiction of federal district courts, including those within the general jurisdiction of state courts. Therefore, because the "inherent powers" of state courts "permit them to entertain transitory causes of action arising under the laws of foreign sovereigns," § 1367 supplemental jurisdiction appears to include foreign law claims. Therefore, the § 1367(a) issue we discuss here is whether Voda's claims of foreign patent infringement "form part of the same case or controversy under Article III."

. . . .

a. TREATIES AS THE "SUPREME LAW OF THE LAND"

Article VI of the Constitution proclaims that "all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." The Supreme Court has accordingly stated that "a treaty ratified by the United States is not only the law of this land, *see* U.S. Const., Art. II, § 2, but also an agreement among sovereign powers." . . .

The United States entered into Articles 13 through 30 of the Paris Convention for the Protection of Industrial Property ("Paris Convention") on September 5, 1970 and Articles 1 through 12 of the Paris Convention on August 25, 1973. Article 4 *bis* of the Paris Convention states that U.S. patents "shall be independent of patents obtained for the same invention in other countries" and that the "foregoing provision is to be understood in an unrestricted sense, . . . both as regards the grounds for nullity and forfeiture." In addition, Article 2(3) of the Paris Convention states that the "provisions of the laws of each of the countries of the Union relating to judicial and administrative procedure and to jurisdiction, . . . which may be required by the laws on industrial property are expressly reserved." The Paris Convention thus clearly expresses the independence of each country's sovereign patent systems and their systems for adjudicating those patents. Nothing in the Paris Convention contemplates nor allows one jurisdiction to adjudicate the patents of another, and as such, our courts should not determine the validity and infringement of foreign patents. Accordingly, while the Paris Convention contains no express jurisdictional-stripping statute, we relied on it in *Stein Associates, Inc. v. Heat & Control, Inc.*, 748 F.2d 653 (Fed. Cir. 1984)] to hold that "[o]nly a British court, applying British law, can determine validity and infringement of British patents." . . .

Subsequently, the United States adopted the Patent Cooperation Treaty ("PCT") on January 24, 1978. As with the Paris Convention, the

text of the PCT maintains the independence of each country's patents. Article 27(5) states: "Nothing in this Treaty and the Regulations is intended to be construed as prescribing anything that would limit the freedom of each Contracting State to prescribe such substantive conditions of patentability as it desires."

On January 1, 1995, the United States joined the World Trade Organization, which through Article II § 2 binds all of its members to the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"). The Agreement on TRIPS contains several provisions regarding the enforcement of patents. Article 41 § 1 of the Agreement on TRIPS specifies that each country "shall ensure that enforcement procedures as specified in this Part are available under their law so as to permit effective action against any act of infringement of intellectual property rights." In addition, § 4 states that "[p]arties to a proceeding shall have an opportunity for review by a judicial authority of final administrative decisions and, subject to jurisdictional provisions in a Member's law concerning the importance of a case," and § 5 states "[i]t is understood that this Part does not . . . affect the capacity of Members to enforce their law in general." *See also id.*, art. 41–49. Like the Paris Convention, nothing in the PCT or the Agreement on TRIPS contemplates or allows one jurisdiction to adjudicate patents of another.[8] Canada, France, Germany, and the United Kingdom, which are the foreign sovereigns concerned in this case, are parties to each of these treaties. . . .

Voda asserts and one of the amicus curiae briefs suggests that these international treaties evince a trend of harmonization of patent law and thus, that allowing the exercise of supplemental jurisdiction over Voda's foreign patent infringement claims furthers the harmonization goals underlying the treaties. Regardless of the strength of the harmonization trend, however, we as the U.S. judiciary should not unilaterally decide either for our government or for other foreign sovereigns that our courts will become the adjudicating body for any foreign patent with a U.S. equivalent "so related" to form "the same case or controversy." . . . Permitting our district courts to exercise jurisdiction over infringement claims based on foreign patents in this case would require us to define the legal boundaries of a property right granted by another sovereign and then determine whether there has been a trespass to that right. . . .

---

[8] While the European Patent Convention ("EPC") states nothing of our government's intent because the United States is not a party, it may inform us on how other sovereigns treat foreign patent adjudication. Regarding claims "to the right to the grant of a European patent," the EPC has enumerated rules specifying courts of exclusive jurisdiction. European Patent Convention, Protocol on Recognition, art. 1–8, October 5, 1973. None of the treaties entered into by the United States contain such language. Moreover, while there have been working parties and draft agreements and statutes, even the members of the EPC have not yet agreed on a centralized European patent court. *See* European Patent Office, "Legislative Initiatives in European Patent Law" (July 26, 2006), *available at* http://patlaw-reform.european-patent-office.org/epla/.

### b. COMITY AND RELATIONS BETWEEN SOVEREIGNS

"Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states."

> Comity, in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

. . . .

In this case, these considerations of comity do not support the district court's exercise of supplemental jurisdiction over Voda's foreign patent infringement claims. First, Voda has not identified any international duty, and we have found none, that would require our judicial system to adjudicate foreign patent infringement claims. As discussed *supra* . . . , while the United States has entered into the Paris Convention, the PCT, and the Agreement on TRIPS, nothing in those treaties contemplates or allows one jurisdiction to adjudicate the patents of another. Second, . . . Voda has not shown that it would be more convenient for our courts to assume the supplemental jurisdiction at issue. Third, with respect to the rights of our citizens, Voda has not shown that foreign courts will inadequately protect his foreign patent rights. Indeed, we see no reason why American courts should supplant British, Canadian, French, or German courts in interpreting and enforcing British, Canadian, European, French, or German patents.

Fourth, assuming jurisdiction over Voda's foreign patent infringement claims could prejudice the rights of the foreign governments. None of the parties or amicus curiae have demonstrated that the British, Canadian, French, or German governments are willing to have our courts exercise jurisdiction over infringement claims based on their patents. *Cf.* 28 U.S.C. § 1338(a) (granting federal courts exclusive jurisdiction of claims relating to U.S. patents).

. . . .

The territorial limits of the rights granted by patents are similar to those conferred by land grants. A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude. . . . Therefore, a patent right to exclude only arises from the legal right granted and recognized by the sovereign within whose territory the right is located. It would be incongruent to allow the sovereign power of one to be infringed or limited by another sovereign's extension of its jurisdiction . . .

. . . .

In addition, as a rule of statutory construction, the Supreme Court "ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *Empagran,* 542 U.S. at 164; *cf. Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 60 (1978) ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in [civil actions against tribal officers] cautions that we tread lightly in the absence of clear indications of legislative intent."). As discussed, there is no explicit statutory direction indicating that the district courts should or may exercise supplemental jurisdiction over claims arising under foreign patents, and the Paris Convention, PCT, and Agreement on TRIPS neither contemplate nor allow the extraterritorial jurisdiction of our courts to adjudicate patents of other sovereign nations. We have also noted the territorially limited nature of patent rights. . . . Therefore, the principle that we should "avoid unreasonable interference with the sovereign authority of other nations" applies analogously here . . . .

We would risk such interference by exercising supplemental jurisdiction over Voda's foreign patent infringement claims. Patents and the laws that govern them are often described as complex. Indeed, one of the reasons cited for why Congress established our court was because it "felt that most judges didn't understand the patent system and how it worked." . . . As such, Cordis U.S. and one of the amicus curiae assert, and Voda does not dispute, that the foreign sovereigns at issue in this case have established specific judges, resources, and procedures to "help assure the integrity and consistency of the application of their patent laws." Therefore, exercising jurisdiction over such subject matter could disrupt their foreign procedures. . . .

Accordingly, comity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictate in this case that the district court decline the exercise of supplemental jurisdiction under § 1367(c).

---

### NOTES AND QUESTIONS

1. Do you agree with the Federal Circuit's argument that global patent harmonization efforts are an insufficient basis to assert jurisdiction over foreign patents? What policy justifications can you adduce in support of the court's approach? What policy reasons can be leveled against it?

2. According to the Federal Circuit, nothing in international treaties such as the Paris Convention, the Patent Cooperation Treaty (PCT), or the TRIPS Agreement "contemplates or allows one jurisdiction to adjudicate patents of another." However, none of these agreements contain "jurisdictional

stripping" provisions either, choosing instead to leave such decisions up to individual countries.

--------

In *Voda*, the U.S. Court of Appeals for the Federal Circuit (CAFC) rejected a district court's assertion of supplemental jurisdiction to adjudicate infringement of several foreign patents. In the following case, the Tokyo District Court takes a fundamentally different approach to the question of a foreign court's ability to adjudicate infringement of a foreign patent in the context of an unfair competition action.

## K.K. CORAL CORP. V. MARINE BIO K.K.

Hesei 02 (Wa) 1943 (D. Tokyo Oct. 16, 2003)

[Summary by Dr. Shoichi Okuyama, AIPPI Journal, January 2004]

In an unfair competition case between Japanese companies concerning the dissemination of false information, a three-judge panel presided by Judge Ryoichi Mimura found no infringement on a US patent in view of the opinion expressed in the Festo US Supreme Court decision.

FACTS

A Japanese company called Coral Corporation produces and exports to the US a product containing coral fossil powder as health food. Another Japanese company called Marine Bio has US patent No. 4,540,584.[2] Marine Bio sent Coral's US dealer a warning e-mail and letter stating that the sale of the Coral product infringed on the US patent in question. Based on the Japanese Unfair Competition Prevention Law that defines announcing false information as an act of unfair competition[3] and prohibits it, Coral sued Marine Bio seeking a declaration that Defendant is not entitled to obtain an injunctive order against Plaintiff and its US customers based on the US patent with respect to the sale of the coral fossil powder product in the US. Plaintiff also sought an injunction order against Defendant to prevent Defendant from announcing and spreading notices from Japan to Plaintiff's US customers that Plaintiff's and the customers' sale in the US of the powder constitutes infringement on the US patent. Plaintiff also sought a damages award.

--------

[2] The main claim of US patent No. 4,540,584 reads:

"1. A mineral supplement, comprising: coral sand as an effective component in an amount sufficient to provide calcium carbonate and other minerals as a mineral supplement for humans; wherein said coral sand is in the form of a fine powder of a particle size passing about 150 to 500 mesh."

[3] Section 2(1) provides as an act of unfair competition: an act of announcing or disseminating a false fact which harms goodwill of another person who is in a competitive relationship."

Plaintiff argued that the US patent was invalid and not infringed. In reply, Defendant argued that a Japanese court does not have international jurisdiction concerning declaratory judgment as to injunction based on a US patent, and that even if a Japanese court accepts such international jurisdiction, the enforceability of injunction orders in the US is doubtful and Plaintiff therefore lacked proper legal interest in bringing a suit before a Japanese court. Defendant also asserted that there was a literal or doctrine of equivalents infringement on its US patent.

HELD

As to the issue of international jurisdiction, the court noted that:

Concerning international jurisdiction, no general rules exist that have been internationally accepted, and international customary law has not sufficiently matured. Whether or not our country has international jurisdiction over a given case should be determined logically in the light of fairness between parties and for the idea of proper and expeditious court proceedings. For lawsuits brought before a court in our country, if any of venues provided in the Japanese Code of Civil Procedure exists in our country, unless there exist special circumstances that would make court proceedings in Japan violate fairness between parties and the idea of proper and expeditious court proceedings, our country should accept international jurisdiction over such a case.

When we look at the present case, Defendant is a Japanese corporation having its headquarters in Japan, and a normal venue exists in Japan for Defendant. Therefore, unless we have any special circumstances mentioned above, international jurisdiction should be acknowledged in Japan.

Defendant pointed out that territorialism is applicable to patents and argued that international jurisdiction should be denied in Japan for each claim mentioned above. However, the principle of territorialism for a patent means that the establishment, transfer, and effectiveness, etc. of a patent in a given country is determined by the laws of that country and the patent is effective only within the territory of the country, and relates to effects of the patent under substantive laws. It has nothing to do with international jurisdiction concerning litigation related to a patent.

A claim for injunction is based on proprietary rights of a private person, and therefore, such claim should be dealt with as an ordinary lawsuit concerning a claim under private law. The question of international jurisdiction that may exist in Japan should be decided in view of the above. If a normal venue for De-

fendant exists in Japan, international jurisdiction should be acknowledged in Japan. Certainly, the requirements for establishment of a patent and its effectiveness are governed by laws of each country in view of its economic policies, and to this extent, are related to policy decisions made in each country. This point should not be a reason for denying international jurisdiction in a country other than the country in which the patent is registered, while it may be considered in determining what law governs a lawsuit for injunction.

Also, in a lawsuit for denying the establishment of a patent or for invalidating a patent, sole jurisdiction is generally considered to exist in a country in which the patent is registered. In a lawsuit for injunction based on a patent, it is often possible under statutes or case law to use the invalidity of the patent as a defense against claims raised by the patentee. In such a case, even if the patentee's claim for injunction is denied because such a defense has a basis, the finding of invalidity concerning that patent, as an opinion in the decision for such lawsuit, is binding to the parties only, and the patent is never invalidated with effects on third parties in general. Thus, the allowability of invalidity defense cannot be a reason for denying international jurisdiction in countries other than the country of patent registration, and even if the other party puts up a defense of patent invalidity in a lawsuit for injunction, it does not prevent a court of a country other than the registration country from hearing such a case.

In the present case in which the existence of rights to obtain injunction based on a US patent is disputed, while it is clearly provided in US statutes that it is possible to assert a defense of patent invalidity in a lawsuit for injunctive relief (35 USC § 282(2)), the determination of invalidity of the patent in this lawsuit does not directly make the patent invalid for all third parties.

Based on the above reasoning and finding no disadvantages for Defendant in having Japanese court proceedings as compared with carrying out litigation before a US court, the court concluded that a Japanese court may have international jurisdiction in the present lawsuit. Also, the court held that even if an injunction order for a country in which the patent is registered is granted by a Japanese court, such order should be acknowledged and enforced by a court of that country, and therefore, Plaintiff has proper standing to bring the present law suit before the court.

Then, the court considered the question of infringement. The court decided that the law governing this was US law and considered literal infringement under the all element rule. Using the element-by-element analysis, the court found no literal infringement. For the doctrine of

equivalents infringement, the court applied the opinion of the *Festo* US Supreme Court decision (*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 62 U.S.P.Q. 2d 1705, 1713, 122 S. Ct. 1831 (2002)). The court noted the rebuttable presumption and the three instances in which the presumption may be overcome as provided in *Festo*. Looking at the prosecution history of the US patent, the court noted that an original main claim was narrowed by the insertion of a numerical range of about 150 to 500 mesh in order to avoid the prior art that taught a range of 20 to 60 mesh for coal sand. The lower limit of the range was clearly to avoid the prior art, but the court found that Defendant failed to show any reasons for the upper limit of 500 mesh and rebut the *Festo* presumption. Plaintiffs product contained a powder of about 5000 mesh, and no doctrine of equivalents infringement was found. The court declared that Defendant was not entitled to obtain injunction orders for the sale in the US of the coral fossil powder based on US patent No. 4,540,584.

The court then considered at length if acts committed by Defendant fell under Section 2(1)(xix) of the Japanese Unfair Competition Prevention Law. The court pointed out five points against Defendant: (1) Defendant was not a proprietor or licensee of the US patent in question when it sent the warning email and letter, (2) While Plaintiff acted immediately in response to the first warning and informed Defendant that its products fell outside the scope of the US patent, Defendant sent the second warning showing an excerpt of a Japanese court decision in an unrelated case, (3) Defendant pointed out in the second warning that Plaintiff did not have sufficient financial strength to support expensive US litigation, (4) those at the US dealer which received the warning twice were upset about the course of events and informed Plaintiff their intention to terminate business with Plaintiff, and (5) Defendant started no patent infringement litigation, and found that the acts of Defendant were acts of unfair competition under the Japanese Unfair Competition Prevention Law.

In conclusion, the court ordered Defendant not to announce or spread notices from within Japan to Plaintiff's US customers that Plaintiff's and the customers' sale in the US of the powder constitutes infringement on the US patent. The court also awarded damages of about 3 million yen (about US$ 28,000) to Plaintiff, but rejected Plaintiffs claim for a declaration that Defendant is not entitled to injunction orders against the Plaintiffs US dealer as the dealer was not a party in the present lawsuit. The court did not consider the question of validity of the US patent at issue.

---

### NOTES AND QUESTIONS

1. Which court's approach to jurisdiction over foreign patents is more persuasive, the CAFC's in *Voda* or the Tokyo District Court in *K.K Coral*?

Does the decision of the Tokyo court suggest that it would assert jurisdiction in all cases (thus providing a convenient forum for patentees to litigate infringement of multiple foreign patents in a single action), or are there circumstances under which adjudication of a foreign patent would be considered inappropriate by the court?

2. One of the Federal Circuit's arguments in *Voda* was that global patent harmonization efforts are an insufficient basis to assert jurisdiction over foreign patents. Should this view still hold even if uniform patent rights eventually exist at the global level?

3. According to the Tokyo District Court, its adjudication of the infringement of a US patent was appropriate because even if the patent was held to be invalid by the court, such a holding would only apply to the parties to the litigation and would not affect third parties. Do you agree that such adjudication has no effect on third parties? Consider the following statement by a UK Patents Court judge, Mr. Justice Aldous, in *Plastus Kreative AB v. Minnesota Mining and Manufacturing Co*., [1995] R.P.C. 438 (Eng.):

> For myself I would not welcome the task of having to decide whether a person had infringed a foreign patent. Although patent actions appear on their face to be disputes between two parties, in reality they also concern the public. A finding of infringement is a finding that a monopoly granted by the state is to be enforced. The result is invariably that the public have to pay higher prices than if the monopoly did not exist. If that be the proper result, then that result should, I believe, come about from a decision of a court situated in the state where the public have to pay the higher prices. One only has to imagine a decision of this court that the German public should pay to a British company substantial sums of money to realize the difficulties that might arise. I believe that, if the local courts are responsible for enforcing and deciding questions of validity and infringement, the conclusions reached are likely to command the respect of the public.

Are these concerns persuasive? Do they change your view regarding the correctness of the Tokyo District Court's decision to adjudicate infringement of a US patent? Why or why not?

4. In *Voda,* the Federal Circuit discouraged, but did not abrogate, a court's discretionary right to adjudicate issues concerning a foreign patent. In a post-*Voda* case, *Fairchild Semiconductor Corp. v. Third Dimension Semiconductor, Inc., 589 F. Supp. 2d 84 (D. Me. 2008)*, a U.S. district court in Maine chose to exercise jurisdiction in a license dispute over the scope of a Chinese patent. While noting that *Voda* "seems vehement that a United States court should almost always decline to hear a dispute about foreign patents," the court distinguished *Voda* as being based on supplemental jurisdiction, whereas the case at issue rested on diversity jurisdiction. It also concluded that any balancing of forum non conveniens factors should be "heavily

weighted in favor of the exercise of jurisdiction." Notwithstanding, U.S. court adjudication of foreign patent infringement claims is likely to be rare.

## 2. THE INTERNATIONAL PATENT SYSTEM AND DEVELOPING COUNTRIES

Despite its eventful history, the design of the international patent system has seldom been more economically, politically, and socially significant, as well as contentious, than it is today.

Since the end of World War II, and in the context of the post-colonial environment immediately following, the underlying economic and legal rationale of the "pro-property" view of patents which had become embedded in the international patent system has been met with deep skepticism in many developing and least-developed countries. As you learned earlier in this Chapter, antagonism toward the view of patents as property was, of course, evident in some developed countries during the early days of their own industrial and economic growth, but this was largely resolved by the conclusion of the Paris Convention. The new international "patent-divide" first emerged formally in 1961, when Brazil proposed a draft resolution before the United Nations General Assembly (U.N.G.A.) requesting a report on the role of patents in the transfer of technology to under-developed countries. The draft Brazilian Resolution among other things stated that "access to experience in the field of applied science and technology is essential to accelerate the economic development of under-developed countries and to enlarge the over-all productivity of their economies", and "in practice, access to this knowledge and experience is often limited by patents and similar arrangements designed to protect the right of ownership and exploitation of inventors of new processes, techniques and products." Finally, the draft Resolution stated that "it is in the best interest of all countries that the international patent system be applied in such a way as to reconcile the legitimate claims of patent-holders with the needs and requirements of the economic development of under-developed countries." *See* Draft Resolution, U.N.Doc A/C.2/L.565 (Nov. 8, 1961).

As finally adopted, the Resolution retained only the first and last statements. The Resolution also omitted language that had been in the draft about the failure of foreign patent owners to locally manufacture the patented product or process, restrictive provisions often contained in licensing agreements, and the effect of royalties paid for the use of foreign patents on the balance of payments of developing countries. *See* G.A. Res. 1713 (XVI), 16 U.N. GAOR, Supp. (No. 17) at 20, U.N. Doc. A/5100 (1962). The Resolution requested, among other things, a study of the effects of patents on developing countries. Many of the issues raised by the ensuing seminal report—compulsory licenses, technology transfer, and working requirements—remain controversial today. *See* United Nations, *The Role*

case, *Yokohama Rubber Company v. Yonex*, 2077 Hanrei Jiho 123, (IP High Ct. June. 29, 2009). Arguing equivalents infringement thus remains a viable option for patentees litigating in Japan.

————————

## 3. PURPOSIVE CONSTRUCTION

Recall that the EPO examines a single application that becomes a bundle of national patents in European Patent Convention (EPC) contracting states. Currently, there is no single court to adjudicate infringement of a European patent; a patentee generally must pursue actions in each jurisdiction in which infringement is occurring. Under the EPC, claim construction for infringement purposes is a national matter but is guided by EPC Article 69 and the Protocol on the Interpretation of Article 69. Article 69 of the EPC provides that "[t]he extent of the protection conferred by a European patent or a European patent application shall be determined by the terms of the claims. Nevertheless, the description and drawings shall be used to interpret the claims." The Protocol further states that:

> Article 69 should not be interpreted as meaning that the extent of the protection conferred by a European patent is to be understood as that defined by the strict, literal meaning of the wording used in the claims, the description and drawings being employed only for the purpose of resolving an ambiguity found in the claims. Nor should it be taken to mean that the claims serve only as a guideline and that the actual protection conferred may extend to what, from a consideration of the description and drawings by a person skilled in the art, the patent proprietor has contemplated. On the contrary, it is to be interpreted as defining a position between these extremes which combines ***a fair protection for the patent proprietor with a reasonable degree of legal certainty for third parties***.

(Emphasis added).

A primary reason for the creation of the Protocol derived from the different approaches to infringement taken by the national courts at the time of the drafting of the EPC. In particular, the UK was perceived as taking a strict, literal approach to the construction of claims (which would tend to result in fewer findings of infringement), while Germany leaned toward the opposite extreme of using the claims as a guideline (tending to result in more findings of infringement).

Despite the admonition in the Protocol, European courts, particularly in the UK and Germany, continued to diverge in their approaches to claim construction, creating marked uncertainty for patentees since a patent might be found valid and infringed in one jurisdiction and valid and

not infringed in another jurisdiction. Just such a situation occurred in the *Epilady/Improver* series of cases, where a UK court diverged from German and Dutch courts on the question of infringement. The UK and German decisions that follow illustrate some of the challenges faced by patentees suing for infringement of European patents with no centralized patent court system.

## IMPROVER CORP. V. REMINGTON CONSUMER PRODS. LTD.

[1990] F.S.R. 181 (Pat. Ct.) (UK, 1989)

■ HOFFMANN J.:

This is an action for infringement of a European patent for an electrically powered cosmetic device for removing hair. The commercial embodiment of the plaintiff's invention is called "Epilady" and the defendant's device is called "Smooth & Silky." The defences are, first, that Smooth & Silky does not infringe the claims of the patent and secondly, that the patent is invalid for obviousness and insufficiency. In my judgment the patent in suit is valid but the defendant's device does not infringe. The action is therefore dismissed.

The Invention

Depilation means the removal of hair by the root, as opposed to shaving which leaves the root behind. The advantage of depilation is that the hair takes much longer to regenerate. Various methods have been used in the past for cosmetic depilation, but none was completely satisfactory. . . .

Epilady was invented by two Israelis in 1982. It consists of a small electric motor in a hand-held plastic housing to which is attached a helical steel spring held by its ends and stiffened by a guide wire to form a loop. The arcuate form of the spring causes the gaps between the windings to open on its convex side but to be pressed together on the concave side. When the spring is held close to the skin and rotated by the motor at about 6,000 revolutions per minute, hairs enter the gaps on its convex side and are gripped between the windings as the rotational movement brings them round to the concave side. The effect is to pluck them out of the skin.

Marketing of Epilady began in June 1986. It was an enormous commercial success. In the first two years over 5.8 million devices were made, generating a gross retail turnover in excess of US $340,000,000.

The Patent in Suit

The patent in suit is European Patent (UK) no. 0101656. . . .

The basic description of the patent in suit declares that—

"There is thus provided in accordance with an embodiment of the present invention an electrically powered depilatory device

including a hand held portable housing, motor apparatus disposed in the housing, and a helical spring composed of a plurality of adjacent windings arranged to be driven by the motor apparatus in rotational sliding motion relative to skin bearing hair to be removed, the helical spring including an arcuate hair engaging portion arranged to define a convex side whereat the windings are spread apart, and a concave side corresponding thereto whereat the windings are pressed together, the rotational motion of the helical spring producing continuous motion of the windings from a spread apart orientation at the convex side to a pressed together orientation at the concave side and for the engagement and plucking of hair from the skin, whereby the surface velocities of the windings relative to the skin greatly exceed the surface velocity of the housing relative thereto." . . .

The description ends, however, with the following general statement, which I shall later refer to as the "equivalents clause":

"It will be evident to those skilled in the art that the invention is not limited to the details of the foregoing illustrative embodiments, and that the present invention may be embodied in other specific forms without departing from the essential attributes thereof, and it is therefore desired that the present embodiments be considered in all respects as illustrative and not restrictive, reference being made to the appended claims, rather than to the foregoing description, *and all variations which come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.*"

Claim 1 reads as follows:

an electrically powered depilatory device comprising:

a hand held portable housing (2);

motor means (4, 4') disposed in said housing; and

a helical spring (24) comprising a plurality of adjacent windings arranged to be driven by said motor means in rotational sliding motion relative to skin bearing hair to be removed, said helical spring (24) including an arcuate hair engaging portion arranged to define a convex side whereat the windings are spread apart and a concave side corresponding thereto whereat the windings are pressed together, the rotational motion of the helical spring (24) producing continuous motion of the windings from a spread apart orientation at the convex side to a pressed together orientation on the concave side and for the engagement and plucking of hair from the skin of the subject, where by the surface velocities of the

windings relative to the skin greatly exceed the surface velocity of the housing relative thereto....

### Smooth & Silky

Smooth & Silky also consists of a small electric motor in a hand held housing but the element attached to the motor and used to extract the hair is not a helical metal spring. Instead it is a cylindrical rod of elastomerised synthetic rubber held by its ends to form an arc subtending about 60°. I shall for convenience call it "the rubber rod." A number of parallel radial slits have been cut into the rubber. The arcuate form of the rod causes the slits to open on its convex side but to be pressed together on the concave side. When the rod is held close to the skin and rapidly rotated by the motor, hairs enter the gaps on its convex side and are gripped between the walls of the slits as the rotational movement brings them round to the concave side. The effect is to pluck them out of the skin. . . .

Mr. Gross has been granted a patent [covering the Smooth & Silky device] in the United States [U.S. 4,726,375] . . . .

Dr. Laming, a distinguished design engineer called as an expert witness by the defendants, said that Mr. Gross's specification contained nothing which distinguished Smooth & Silky from Epilady by function. The difference lay in their respective forms.

### Infringement

The question of infringement turns upon a short but undoubtedly difficult point of construction, namely whether the rubber rod is a "helical spring" as that expression is used in the claims of the patent in suit. The proper approach to the interpretation of patents registered under the Patents Act 1949 was explained by Lord Diplock in *Catnic Components Ltd. v. Hill & Smith Ltd.*[1982] R.P.C. 183, 242. The language should be given a "purposive" and not necessarily a literal construction. If the issue was whether a feature embodied in an alleged infringement which fell outside the primary, literal or acontextual meaning of a descriptive word or phrase in the claim ("a variant") was nevertheless within its language as properly interpreted, the court should ask itself the following three questions:

(1) Does the variant have a material effect upon the way the invention works? If yes, the variant is outside the claim. If no—

(2) Would this (i.e. that the variant had no material effect) have been obvious at the date of publication of the patent to a reader skilled in the art. If no, the variant is outside the claim. If yes—

(3) Would the reader skilled in the art nevertheless have understood from the language of the claim that the patentee intended that strict

compliance with the primary meaning was an essential requirement of the invention. If yes, the variant is outside the claim.

On the other hand, a negative answer to the last question would lead to the conclusion that the patentee was intending the word or phrase to have not a literal but a figurative meaning (the figure being a form of synecdoche or metonymy) denoting a class of things which included the variant and the literal meaning, the latter being perhaps the most perfect, best-known or striking example of the class. . . .

In the end, therefore, the question is always whether the alleged infringement is covered by the language of the claim. … It is worth noticing that Lord Diplock's first two questions, although they cannot sensibly be answered without reference to the patent, do not primarily involve questions of construction: whether the variant would make a material difference to the way the invention worked and whether this would have been obvious to the skilled reader are questions of fact. The answers are used to provide the factual background against which the specification must be construed. It is the third question which raises the question of construction and Lord Diplock's formulation makes it clear that on this question the answers to the first two questions are not conclusive. Even a purposive construction of the language of the patent may lead to the conclusion that although the variant made no material difference and this would have been obvious at the time, the patentee for some reason was confining his claim to the primary meaning and excluding the variant. If this were not the case, there would be no point in asking the third question at all.

. . . Section 125 of the Patents Act 1977, which is declared by section 139(7) to be framed to have as nearly as practicable the same effect as Article 69 of the European Patent Convention, says that the invention shall be taken to be that specified in a claim, as interpreted by the description and drawings. Section 125(3) applies to English patents the Protocol on the Interpretation of Article 69 which, if I may paraphrase, says that Article 69 and section 125(1) mean what they say: the scope of the invention must be found in the language of the claims. Extrinsic material such as the description can be used to interpret those claims but cannot provide independent support for a cause of action which the language of the claim, literally or figuratively construed, simply cannot bear. On the other hand, the claims should not be interpreted literally but in a way which "combines a fair protection for the patentee with a reasonable degree of certainty for third parties."

Dillon L.J. said in his judgment at the interlocutory injunction stage of this action that Lord Diplock's speech in *Catnic* indicated the same approach to construction as that laid down by the Protocol. . . . I regard it as binding upon me. I must therefore ask Lord Diplock's three questions to ascertain whether "helical spring" should be interpreted to mean a class

of bendy, slitty rods of which a close-coiled helical spring in its primary sense is a striking and elegant example but which includes the defendant's rubber rod.

*(1) Does the variant have a material effect on the way the invention works?*

The answer to this question depends upon the level of generality at which one describes the way the invention works. At one extreme, if one says that the invention works by gripping and pulling hair, there is obviously no difference; the same would be true of a pair of tweezers. At the other extreme, if one says that it works by gripping hairs between metal windings of circular cross-section wound in a continuous spiral around a hollow core, there obviously is a difference. . . . It seems to me that the right approach is to describe the working of the invention at the level of generality with which it is described in the claim of the patent. As I have said, Dr. Laming agreed that there was no difference between the descriptions in Mr. Gross's patent and the patent in suit of the way the inventions worked. The differences lay entirely in the descriptions of the hardware. In my judgment, at the appropriate level of description, the rubber rod works in the same way as the helical spring and the differences I have mentioned, so far as they exist, are not material.

*(2) Would it have been obvious to a man skilled in the art that the variant would work in the same way?*

. . . Dr. Laming and Dr. Sharp, the eminent engineer called as an expert by the plaintiff, agreed that it would have been obvious to the skilled man that the attributes which enabled the helical spring to function in the way described in the specification were that it was capable of rotating, capable of transmitting torque along its length to resist the forces involved in plucking hairs, *bendy* (to form an arc) and *slitty* (to entrap hairs by the opening and closing effect of rotation). They also agreed that it would have been obvious that any rod which had these qualities in sufficient degree and did not have other defects such as overheating or falling to bits would in principle work in the same way and that the rubber rod plainly belonged to that class. On this evidence the second question must in my judgment be answered yes.

. . .

*(3) Would the skilled reader nevertheless have understood that the patentee intended to confine his claim to the primary meaning of a helical spring?*

This brings one to the question of construction. Since the question is what the skilled reader would have understood, I set out the views of the rival experts.

Dr. Sharpe placed considerable emphasis on what I have called the equivalents clause. He said in his report:

> it would have been obvious to me that all the inventor wanted a helical spring for was as a convenient rotating bent beam in which slits formed by the adjacent windings would open and close as it rotated. It would then have been equally obvious to me that he could not have intended to exclude equivalents like the [rubber] rod . . . in thinking of equivalents I fell driven by the last paragraph of the specification before the claims [the equivalents clause] to think that the inventor was trying to make me think of equivalents for the helical spring . . . some other element that would do the same job.

. . .

Dr. Laming, on the other hand, said that a helical spring was a very specific engineering concept. It meant a bar or wire of uniform cross-section wound into a helix. This definition was also accepted by Dr. Sharpe, although he suggested that the rubber rod could also be regarded as a helical spring in a more literal sense because it was springy and had torque stresses running through it in a helical pattern. I do not think it would occur to the ordinary skilled man to think of the rubber rod as a helical spring. Dr. Laming thought that in the context of the specification the skilled man would also not understand a helical spring to mean a *genus* of bendy, slitty rods. The references to prior art did not suggest that the function of a helical spring was simply to be a bendy slitty rod. In the patents in which they had been used, they were plainly essential features. Dr. Laming said:

> My opinion is that there is no way of interpreting the [plaintiff's] specification such that anything other than a helical spring (as defined above) is intended. The simple reason for this is, in my view, that the inventor had in mind what he regarded as a novel use of a familiar and readily available engineering component and saw the nub and centre of the invention as that use.

> I have now read the European Patent several times and it is clear that nothing other than a helical spring is referred to. If there were alternatives to a helical spring which the inventor or draftsman of the patent had in mind he did not indicate anywhere that such alternative might be used. This stands in contrast to suggested alternatives with regard to e.g. alternative drive arrangements suggested in Column 6. . . .

> The flexibility conferred on the helical spring by its essential features is obtained for the elastomeric rod by quite other means—by its being made of a material of very low elastic modu-

lus, a material about 30,000 times more flexible than the steel of the spring. The difference of material is inherent in the difference between the two devices: the helical spring, if made of the elastomeric material, would be useless spaghetti; and the arcuate rod made of steel would be an undriveably rigid bar. . . .

If the [plaintiff's] specification contained anywhere such words as "or any other configuration of an elastic member or members whereby rotation of the member or members causes a spread apart orientation at one position and a pressed together orientation at another position or point in the cycle" then at least one might be led to think about alternatives to the helical spring. Whether I would have thought of an elastomeric rod in such a case is hard to say in hindsight but the likelihood is made less by consideration of the Figures 9–14 which show possible configurations which the patentee had in mind. Except possibly for the first (Fig. 9) these configurations could not be adopted by an elastomeric rod without some internal wire guide, and in that case, the friction developed between elastomer and guide would in my opinion be prohibitive.

On this last point Dr. Sharpe agreed.

Dealing with the equivalents clause, Dr. Laming said:

It is true that [in the equivalents clause] reference is made to embodiment 'in other specific forms' and it asks there for reference to be made 'to the appended claims rather than the foregoing description.' But what follows is a series of claims in which the variations are all on such matters as the angle subtended by the arcuate portion (claims 2, 3 and 18), the degree of opening of the windings (claims 5 to 8), various mechanical drive options (claims 13 and 14) and different surface speeds (claims 19 and 20). A constant feature of all the claims is the specification of a helical spring which itself is the only type of element mentioned in the text of the specification and shown in the figures.

In my judgment the difference between the experts depends upon how one construes the equivalents clause. The first part of the clause merely says that the description should not be used to restrict the meaning of the language used in the claims. That is not the question here. What matters is the final words: "*and all variations which come within the meaning and range of equivalency of the claims are therefore intended to be embraced therein.*" If this means: "whatever contrary impression the skilled man may be given by the language of the claims read in the context of the rest of the description, all references in the claims to hardware are deemed to include any other hardware which would in any circumstances function in the same way" then I think Dr. Sharpe must be right. In my judgment, however, the clause does not have so wide an effect. The

words I have quoted say that the variation must still come within the *meaning* of the claims and the reference to "range of equivalency" means in my judgment no more than "don't forget that the claims must be interpreted in accordance with *Catnic* and the Protocol."

Thus interpreted, I do not think that "helical spring" can reasonably be given a wide generic construction and I accept Dr. Laming's reasons for thinking that a skilled man would not understand it in this sense. The rubber rod is not an approximation to a helical spring. It is a different thing which can in limited circumstances work in the same way. Nor can the spring be regarded as "inessential" or the change from metal spring to rubber rod as a minor variant. In Catnic Lord Diplock asked rhetorically whether there was any reason why the patentee should wish to restrict his invention to a support angled at precisely 90° C, thereby making avoidance easy. In this case I think that a similar question would receive a ready answer. It would be obvious that the rubber had problems of hysteresis which might be very difficult to overcome. The plaintiff's inventors had done no work on rubber rods. Certainly the rubber rod cannot be used in the loop configuration which is the plaintiff's preferred embodiment. On the other hand, drafting the claim in wide generic terms to cover alternatives like the rubber rod might be unacceptable to the patent office. I do not think that the hypothetical skilled man is also assumed to be skilled in patent law and he would in my judgment be entitled to think that patentee had good reasons for limiting himself, as he obviously appeared to have done, to a helical coil. To derive a different meaning solely from the equivalents clause would in my view be denying third parties that reasonable degree of certainty to which they are entitled under the Protocol.

### The German decisions

The patent in suit is being litigated in a number of countries but the only one in which the action has come to trial is in Germany, where the *Landgericht* of Düsseldorf found in favour of the plaintiff. This naturally causes me concern because the *Landgericht* was interpreting the same patent according to the same Protocol and came to a different conclusion. It seems to me that the reason for the difference between me and my colleagues in Düsseldorf is that, having answered what I have labelled as Lord Diplock's first two questions in the same way as I have, they treated those answers as concluding the matter in favour of the plaintiff and did not find it necessary to ask the third question at all. The specification, they said, conveyed to the expert "the understanding that the configuration of the hair engaging portion as helical spring has to be understood functionally" and that the expert to whom the patent was directed would have "no difficulties in perceiving and understanding this meaning of the teaching of the invention." This does seem to me with respect to be an in-

terpretation closer to treating the language of the claims as a "guideline" than the median course required by the Protocol. . . .

It may be said that the expert evidence before the *Landgericht* at the trial was different, but I doubt whether this could have been so. There was no real difference between the views of Dr. Sharpe and Dr. Laming on questions of engineering: the difference lay in the approach to construction, which is really a question of law.

———————

### NOTES AND QUESTIONS

1. In the *Improver* case, the court had to determine if a rubber rod-based depilatory device infringes a helical-spring-based depilatory device. Is the court assessing literal infringement, infringement under the doctrine of equivalents, or something else?

2. Despite concluding that use of the variant (rubber rod) instead of a helical spring would have no material effect on the way the invention worked (Protocol Question 1) and that this fact would have been obvious to a man skilled in the art (Protocol Question 2), the court still finds no infringement. Why? What evidence/argument do you think was most persuasive to the court? Do you agree with decision of non-infringement?

3. In *Phillips v. AWH*, the CAFC noted the danger of courts reading limitations from the specification into the claim instead of simply reading the claims in light of the specification. Did the UK court get this balance right or did it improperly limit the claims based on the specification? Can the line "between construing terms and importing limitations" really be "discerned with reasonable certainty and predictability" as stated in *Phillips*, p. 652 *supra*?

———————

The following decision involves adjudication of infringement of the same European Epilady patent by the same device before a German appeals court.

### GERMANY: EUROPEAN PATENT CONVENTION, ART.69 (1); PROTOCOL ON INTERPRETATION—"EPILADY GERMANY II"
#### 24 IIC 838 (1993)

The plaintiffs accuse the defendant of infringement of European Patent 0101656. . . .

In June 1988, the defendant started distributing an electrically driven depilatory device, placing it into circulation in the Federal Republic of Germany under the designation, "Lady Remington Liberty". This device operates by means of an arcuate roll of rubber-like plastic, the smooth outer surface of which features a plurality of radial, spaced apart cuts

which are distributed over the circumference of the roll and penetrate the plastic element partially only. By means of the motor, this roll is driven in a rotational motion about its longitudinal axis, so that the cuts open to form gaps at the convex side, and so that the side walls thereof are firmly pressed together when the cuts rotate to the concave side of the arcuate roll.

The plaintiffs asserted that the rubber roll provided with radial slits and used as hair-engaging element in the disputed depilatory device constitutes an equivalent to the helical spring provided by the invention. . . .

The defendant's admissible appeal is not successful on the merits. . . .

The starting point of the teaching of the patent in suit is the finding, which is known for instance from the state of the art mentioned in the patent specification, that a coil spring (helical spring) cannot only be used according to its actual purpose as a power unit, but, owing to its largely unlimited flexibility and to the gaps and clamping means resulting from the adjacent windings, is also suited to catch, clamp and pluck hairs out of the skin. This is rendered clear by the patent specification describing prior known hand-driven devices by correspondingly drawing attention to their mode of functioning. This, however, equally also applies to the subsequently described motor-driven depilatory device according to U.S. Patent 4,079,741, as the pertinent person skilled in the art easily recognizes even without express indication. According to the findings of the court's expert in the opinion of September 28, this person is an experienced college-educated engineer or a constructionally interested, academically trained engineer with a university degree. His knowledge must be of a certain scope, and he must be capable of fully recognizing and judging basic correlations. About the, as such atypical, use of a coil spring and the operation possible therewith, namely introduction of the hair into the gap, clamping of the hair by rotational or forward motion of movable windings and plucking of the hair, the teaching according to the patent in suit does not intend to change anything. This cannot be doubted in view of the description of U.S. Patent 4,079,741. Insofar, it is not the operation or the depilatory results achievable that are objected to, but solely the complex and expensive construction which makes the device unsuitable for home use. Only if said operation is too slow, as in the case of the known hand-operated or hand-driven devices, does it become inefficient and painful for the user. The court's expert did not express any doubts insofar, either; he also emphasizes that a coil spring in the described atypical use was already known as a suitable plucking means, and that the inventor was looking for a more efficient use of the known coil spring solution.

Accordingly, it is the object of the teaching of the patent in suit to suggest a motor-driven depilatory device with the described operation, so that efficient hair removal is ensured. In addition, however, the device

according to its size, complexity, production costs and convenience of use should be suited for home use in such a way as is already the case for the electrical razor.

The solution according to the patent in suit (claim 1) makes use of the finding which is already revealed by Swiss Patent 268 696, i.e. that a coil spring is an elastic element which opens gaps on bending at the convex side and closes at the concave side, in a device which operates by motor-driven rotational motion of the windings of the spring, namely by a rotational motion which is quicker than the velocity at which the depilatory device is moved by the user's hand over the areas of the skin to be depilated. . . .

Patent claim 1 describes this solution of the problem of the patent by the following features:

The electrically powered depilatory device comprises

    1. a hand held portable housing,

    2. motor means positioned in said housing,

    3. a helical spring comprising a plurality of adjacent windings,

    4. the windings are arranged to be driven by said motor means in rotational sliding motion relative to skin bearing hair to be removed,

    5. said spring includes a hair engaging portion which

    a) is arcuate,

    b) defines a convex side whereat the windings are spread apart and

    c) defines a concave side corresponding to said convex side whereat the windings are pressed together,

    6. the rotational motion of the spring produces a continuous motion of the windings from a spread apart orientation at the convex side to a pressed together orientation at the concave side and for engagement with the hair and for plucking of hair from the skin of the subject,

    7. the surface velocity of the windings relative to the skin greatly exceeds the surface velocity of the housing relative thereto

The depilatory device, "Lady Remington Liberty", introduced in the German market by the defendant makes use of the teaching of the patent in suit as just explained.

The depilatory device distributed by the defendant fulfils features 1 and 2 literally. Features 3 to 7, however, are not given literally since the

disputed embodiment uncontestedly does not feature a helical spring. The disputed embodiment instead has a massive roll-shaped body of a flexible and elastic rubber-like plastic material, featuring radial spaced apart cuts on its circumferential surface. This arcuate and motor-driven rubber roll is, however, a replacement means equivalent to the coil spring of the patent, so that features 3 to 7 of patent claim 1 are given in equivalent form.

First of all, the court . . . has no doubts that the disputed embodiment is identical in effect to a device making use of the wording of claim 1 of the patent in suit. The roll of the disputed embodiment unites a plurality of adjacent elements, namely the areas separated by the cuts (cf. feature 3); these areas are arranged to be driven by the motor means in rotational motion relative to skin-bearing hair to be removed (cf. feature 4). The roll comprises a hair-engaging portion which is arcuate, defines a convex side whereat the elements are spread apart and a concave side corresponding to the convex side whereat the elements are pressed together (cf. feature 5). The rotational motion of the roll produces a continuous motion of the elements from a spread apart orientation at the convex side to a pressed together orientation at the concave side for engagement with the hair and for plucking of hair from the skin of the subject (cf. feature 6). The surface velocity of the roll relative to the skin greatly exceeds the surface velocity of the housing relative to the skin (cf. feature 7). The disputed embodiment thus achieves that a hair that has reached the spaced apart areas of the roll is approached ever more closely by the walls of these areas as a consequence of the rotational movement, which walls then clamp the hair and pluck it out. With respect to the principle and success of the desired hair removal, which is efficient and suited for home use, the hair undergoes the same treatment as with a device using the wording of the patent in suit. In conjunction with this, reference can also be made to the description of the patent in suit, according to which wedge-shaped slits (gaps) are instrumental for the depilatory effect of the device. For, wedge-shaped gaps are also featured by the roll of the disputed embodiment. The fact that these—due to the different orientation and depth of their gaps in comparison with the inclined windings of a common coil spring—may move the hair differently before plucking it, namely bend it first, as to be seen from the private expert opinion, is therefore irrelevant for the question of identical effect. . . .

When evaluating the scope of protection of claim 1 of the patent in suit, however, the argument cannot be limited to the identity of effect only which, by the way, was also found, for example, by the British court (Justice Hoffmann) which had also dealt with the patent in suit and the disputed device. For the purpose of fairly delimiting the actual improvement of the field of technical knowledge achieved by an inventor on the basis of Art. 69(1) EPC and the Protocol on Interpretation, the protected invention will only be considered to be used if a person skilled in the art, on the basis of reflections progressing from the meaning of the patent

claims, i.e. the invention described therein, could find out, with the help of his professional knowledge at the priority date, the modified means used with the disputed embodiment as a means being identical in effect for solving the problem underlying the invention; . . .

After the expert opinion, the court is convinced that a person skilled in the art—owing to the content of the claims of the patent in suit—was capable of arriving at the disputed embodiment in this sense.

The starting point for this conclusion is that a person skilled in the art will recognize by virtue of his professional knowledge that in the patent—in any case as far as the basic teaching of claim 1 is concerned—it is not a matter of the use of a "helical spring" as such. For, it is . . . used contrary to its common application or, as the expert also expressed, atypically. This fact was not sufficiently recognized in the court's judgment in the proceedings for issue of a preliminary injunction since it was only convincingly shown in the expert opinion; moreover, this fact was also given too little weight in the British court decision, which has already been mentioned, in this case probably mainly owing to the fact that the case was judged on the basis of the *Catnic* decision which was prior to Art. 69 EPC, and also owing to the additional fact that patent claim 1, which is of primary interest, was not placed in the foreground of consideration. The knowledge that, in the patent, the coil spring does not act as a power unit as usual, automatically results in the fact that those criteria of a helical spring are sought in order to determine why it is proposed in the patent. With this, however, a person skilled in the art in the field of interest here, and with the education mentioned by the expert and the skills resulting therefrom, will easily recognize that the coil spring is only proposed for the reason that it is an elastic cylindrical body which may be quickly rotated in the arcuate state and, above all, for the reason that it features—by virtue of its windings and their sides (walls) facing each other and separating the windings—means that stretch the surface of the body to form gaps at the convex side, while at the concave side they result in clamping areas with the help of which the hairs that entered the gaps may be clamped and plucked. In this way, to a person skilled in the art, the instruction of claim 1 of the patent in suit reads in a functional respect: Take a cylinder-shaped elastic element comprising separated walls of areas of material, to the effect that gaps will form on the convex side and clamping areas will form of the concave side if it is bent, and select—according to material and quality—an element that may be rotated at high speed when bent. If evaluated as a whole, the expert based his written opinion on this understanding. In view of the undisputed technical knowledge of the expert, both with respect to the technical field of interest here and with respect to his experience in patent litigation matters, the court does not see any reason not to follow the logic of the expert in that a person skilled in the art will actually understand the teaching of the patent in suit in this way. Moreover, the court's expert also confirmed

this on inquiry of the defendant and the court. The basic thesis that a person skilled in the art will not interpret the coil spring as a spring, but as an elastic body with gaps is convincing, as it is obvious that the helical spring is not used as a spring per se, and as its use in accordance with the teaching of the patent in suit—and also, however, with the state of the art to be seen from the Swiss patent specification, for example—requires the abstraction by a person skilled in the art that this spring is an elastic element which opens at the convex side and closes at the concave side when bent, and which is furthermore so stable that it may be driven at relatively high speed. This abstraction therefore was professional knowledge in view of the state of the art, and it was rendered obvious by the claims of the patent in suit, respectively, if seen in the light of the description.

However, if the patent in suit conveyed this knowledge, it was also obvious to use a roll with cuts as in the accused embodiment as a hair-plucking element. . . . As opposed thereto, however, it is recognizably unimportant whether the body be completely hollow, feature a core or be massive, which is why a person skilled in the art could easily think of applying a massive roll with cuts. To produce the arcuate cut hair-plucking element of rubber or rubber-like plastic material could already be considered possible by a person skilled in the art for the reason that the wording of the patent in suit (claim 1) does not stipulate a certain material, but the question of the material is left open to the expert choice of a designing engineer proceeding on the basis of the patent in suit. Rubber-like plastic material is known to be a preferred material in conjunction with the use of an elastic, bendable element. . . .

The court also considers, as an indication of this finding, the history of the origin of the disputed embodiment as it is described in the British court decision which has been mentioned several times. The starting point was a device according to the patent with a metal coil spring. It was found that the use of this device was annoying because it plucked too many hairs at a time, but the principle of depilation according to the patent was not criticized. This points to the fact that the designing engineer of the disputed embodiment, having proceeded from the starting point assumed above, must have actually thought about what the "helical spring" really meant in the device presented to him. It further suggests that even though only metal coil springs had been used in the prior art, except for the so-called disk solutions, that fact did not actually represent an obstacle to a deviation therefrom.

Finally, it is also undisputed that it cannot be claimed that the disputed embodiment results in an obvious way from prior art (cf. in this respect Federal Supreme Court, 1986 GRUR 803, 806 – *Moulded Curbstone*). Insofar, it is sufficient to refer to the statements of the court's expert under No. 3 of his written expert opinion as the defendant had de-

clared through its attorney during the oral proceedings that the so-called *Moulded Curbstone* objection was not raised.

––––––––––––––––

## NOTES AND QUESTIONS

1. In the UK *Improver* decision, the court concluded that the patent was valid, but was not infringed because the patentee intended to limit the scope of the invention to the use of a helical spring and did not contemplate any equivalent such as a rubber rod for hair removal. The German court, interpreting the same patent and the same EPC Article 69, reached the contrary conclusion that the defendant's rubber rod-based device did infringe claims in the patent. In a third decision, a court in the Hague also found infringement under a similar rationale as the German court. *See Improver Corp. v. Beska B.V. & Remington Products Inc.,* [Court of Appeals, the Hague], 20 Feb. 1992, 24 IIC 832 (1992) (Neth.). One possible reason for the different results can be traced to the language of EPC Article 69. The three official EPC languages are English, French, and German. The German word for "terms" in Article 69 is "Inhalt" which is perceived as having a broader meaning than the corresponding English and French words. Apparently the legislators were aware of the different meanings but were unable to agree on either narrowing the German or broadening the French and English. Because no one language dominates, all three versions are valid. For more on this topic *see* Christian von Drathen, *Patent Scope in English and German Law under the European Patent Convention 1973 and 2000*, 39 IIC 384 (2008); and Edward Armitage, *Interpretation of European Patents (Art. 69 and the Protocol on the Interpretation)*, 14 IIC 811 (1983).

2. Another difference between UK and German court proceedings concerns the use of experts. In the UK, each party can present expert witness testimony such as Lord Justice Hoffman considered in *Improver* (UK). However, in Germany, there generally is a single, court-appointed expert (parties are asked to propose a suitable expert) to assist the court as occurred in the German *Improver* case. Do you think the lack of a "battle of the experts" made any difference in the German *Improver* case outcome?

3. As noted in Chapter 2, EPC 2000 came into effect in May of 2008, and amended the Protocol on Article 69 to include a new Article 2, which states:

Equivalents

For the purpose of determining the extent of protection conferred by a European patent, due account shall be taken of any element which is equivalent to an element specified in the claims.

This new provision explicitly instructs courts to look beyond the literal claim language in determining infringement, allowing for a broadened scope of protection. While Germany has long accepted the DOE, the UK traditionally has been hostile to it. As further explained by Lord Hoffman:

There is often discussion about whether we have a European doctrine of equivalents and, if not, whether we should. It seems to me that both the doctrine of equivalents in the United States and the pith and marrow doctrine in the United Kingdom were born of despair. The courts felt unable to escape from interpretations which "unsparing logic" appeared to require and which prevented them from according the patentee the full extent of the monopoly which the person skilled in the art would reasonably have thought he was claiming. The background was the tendency to literalism which then characterised the approach of the courts to the interpretation of documents generally and the fact that patents are likely to attract the skills of lawyers seeking to exploit literalism to find loopholes in the monopoly they create. . . . If literalism stands in the way of construing patent claims so as to give fair protection to the patentee, there are two things that you can do. One is to adhere to literalism in construing the claims and evolve a doctrine which supplements the claims by extending protection to equivalents. That is what the Americans have done. The other is to abandon literalism. That is what the House of Lords did in the *Catnic* case . . . .

Since the *Catnic* case we have article 69 which, as it seems to me, firmly shuts the door on any doctrine which extends protection outside the claims. I cannot say that I am sorry because the *Festo* litigation suggests, with all respect to the courts of the United States, that American patent litigants pay dearly for results which are no more just or predictable than could be achieved by simply reading the claims. . . .

Although article 69 prevents equivalence from extending protection outside the claims, there is no reason why it cannot be an important part of the background of facts known to the skilled man which would affect what he understood the claims to mean. That is no more than common sense. It is also expressly provided by the new article 2 added to the Protocol by the Munich Act revising the EPC, dated 29 November 2000.

*Kirin-Amgen Inc. v. Hoechst Marion Roussel Ltd.,* [2004] UKHL 46, [2005] 1 All E.R. 667 (Eng.), para. 41–42, 46, 49. Do you agree with Lord Hoffman's criticism of the DOE? Do you agree with his interpretation of Article 2 to the Protocol on Article 69?

––––––––––––––

## NOTE ON POST-*IMPROVER* DEVELOPMENTS IN THE UK

The *Improver* questions can still inform the purposive construction of claims. However, in its 2003–2004 session, the House of Lords began to wean lower courts and litigants from their heavy reliance on the three Protocol/*Improver* questions in *Kirin-Amgen Inc. v. Hoechst Marion Roussel Ltd.*, [2004] UKHL 46. In so doing, it also provided a mini-treatise on patent claim

# **<u>EXHIBIT 2</u>**

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 89 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

26 J. Marshall L. Rev. 457

**John Marshall Law Review**
Spring, 1993

**The Harmonization of International Patent Law**
R. Carl Moy [a]

Copyright (c) 1993 by the John Marshall Law School; R. Carl Moy

# THE HISTORY OF THE PATENT HARMONIZATION TREATY: ECONOMIC SELF-INTEREST AS AN INFLUENCE

## TABLE OF CONTENTS

INTRODUCTION    458
I. THE PATENT HARMONIZATION TREATY    463
  A. Procedural History    463
  B. Structure of the Treaty    466
  C. The Diplomatic Conference    467
II. PRIOR HARMONIZATION EFFORTS    471
  A. International Patenting Prior to the Formation of Multilateral Agreements    472
  1. The protection of national wealth from foreign patenting    473
  2. The protection of domestic industry from uneven international patenting    476
  B. The Paris Convention    478
  1. Patent owners vs. the national interest    479
  2. The agreement to foster increased foreign patenting    481
  3. The failure to stem protectionist provisions    483
  4. The selection of national treatment    484
  C. Multilateral Negotiations Subsequent to the Original Paris Convention    487
III. ANALYSIS    489
  A. Evaluating the Patent Harmonization Treaty    489
  B. Evaluating Industry's Advice    492
IV. CONCLUSION    495

**\*458  INTRODUCTION**

The United States has recently seen increasing efforts to harmonize [1] its law of patents with those of foreign countries. Extensive intellectual-property provisions exist, for example, in the North American Free Trade Agreement. [2] The Uruguay-Round negotiations concerning the General Agreement on Tariffs and Trade ("GATT") have, for the first time, produced a comprehensive set of intellectual-property provisions in the context of that agreement, albeit in draft form. [3] Discussions of the merits of harmonization are appearing frequently in legal literature. [4]

**\*459**  As a part of these efforts, the United States is now poised to decide whether to accept the Patent Harmonization Treaty. [5] Negotiations concerning the treaty have taken place before the World Intellectual Property Organization ("WIPO") [6] since 1983. [7] A draft text has been produced. [8] The Paris Union has discussed the draft at  **\*460**  the first part of a diplomatic conference, [9] with the second and probably final part of the conference likely to take place soon. [10] Legislation has been introduced nationally that would, in effect, commit the United States to implement a signed treaty. [11]

Much of this activity has come at the insistence of patent-owning industry. [12] United States industry is relying increasingly on foreign sales. [13] It has attributed lost profits on those sales to inadequate patent protection in foreign countries. [14] Patent harmonization is seen as a means of strengthening the patent protection that **461** foreign countries provide. [15]

The interests of the United States as a whole, however, are not necessarily those of its patent-owning industries. Certainly, the nation does have a clear interest in preserving the health of its industry. At the same time, it is also interested in preserving the overall balance between incentive and cost that the patent system represents. [16] In fact, where the two conflict, reason suggests this latter, broader set of interests should outweigh the narrower interests of industry.

This conflict raises a troubling problem in deciding whether to accept the Patent Harmonization Treaty. Simply put, industry's enthusiasm for the treaty may not be enough. If industry's interests can differ from those of the United States, industry may well favor a particular international patenting agreement that is nevertheless harmful to the country as a whole. Consequently, relying on industry's advice to adopt such a treaty would be unwise.

The history of the negotiations over the Patent Harmonization Treaty makes this problem particularly vexing. The treaty has been negotiated by a small number of people outside the United States. [17] Most attending on behalf of the United States have been closely associated with industry. [18] Few others in the United States have followed the negotiations in detail, even among the patent **462** bar. [19] For these reasons, decisionmakers in the United States have comparatively little information with which to analyze the Patent Harmonization Treaty.

How, then, shall the United States decide whether to adopt the Patent Harmonization Treaty? What questions shall we ask? Whose answers shall we trust? What sources of information can provide us with the background needed for these inquiries?

The following article offers a framework in which to ask, and begin to answer, these questions. It focuses on the international community's past efforts to harmonize the law of patents. It asserts not only that history provides context, but also, that the same history yields lessons directly applicable to many of the treaty's basic issues.

Section I discusses the immediate history of WIPO's efforts to obtain the Patent Harmonization Treaty and summarizes the steps that have been taken to date before that organization. In addition, it also states the current procedural posture of the treaty negotiations.

Section II places this immediate history in larger context. The international community has been grappling with the problems of foreign patenting for over a century. [20] Many of those problems predate the first international patenting agreement, the Paris Convention. [21] The article summarizes those problems.

In addition, this section describes the approach to international patenting embodied in the convention and the difficulties that the international community has encountered in using that approach. Section II suggests that an economic analysis explains the events under consideration. In contrast to a purely domestic scenario, international activity permits greater freedom to select the costs and benefits that an individual national economy will receive from patenting. The behavior of national governments is consistent with a desire simultaneously to receive large national benefits and to incur small costs. In contrast, the behavior of international, patent-owning **463** industry is consistent with a predominant desire to obtain benefits and a relative insensitivity to cost. Many of the historical divisions between international industry and national government continue to exist today. Consequently, they are present in the negotiations over the Patent Harmonization Treaty.

Section III outlines a set of inquiries to evaluate the Patent Harmonization Treaty. Fundamentally, we must discern the national interests of the United States and how the treaty will affect them. Given industry's large role in designing the treaty, coupled with its historical disinterest in the costs of patenting, particular attention must be placed on the increased domestic costs that the Patent Harmonization Treaty will impose on the United States.

In addition, Section III provides a means of intelligently weighing industry's enthusiasm for the treaty. Where industry's interests coincide with those of the nation, industry's view of the treaty is entitled to significant weight. In contrast, where industry's support for the treaty is colored by that group's disinclination to consider cost, industry's advice must be regarded skeptically. Finally, Section III suggests new ways to judge the law-making adequacy of the negotiations over the Patent Harmonization

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 91 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Treaty. Given the differing views of the various domestic constituencies that patenting affects, issues of representation become critical.

## I. THE PATENT HARMONIZATION TREATY

### A. Procedural History

The immediate history of the Patent Harmonization Treaty is related to two developments that occurred in the late 1970's. During that period, the European Patent Office ("EPO"), the Japanese Patent Office ("JPO"), and the United States Patent and Trademark Office ("PTO") began exploring ways to coordinate their operations. [22] In addition, during the late 1970's the patent systems of many western European countries underwent fundamental change. **\*464** The member countries of the European Community had already committed themselves to harmonizing their national patent laws, first via the Strassbourg Convention of 1963, [23] and again in 1973 via the European Patent Convention ("EPC"). [24] For some countries, these agreements committed the signors to make numerous, basic changes in how they approached patenting. [25] By the late 1970's, these changes were on the verge of becoming reality.

One such harmonization-driven change was Germany's removal of a grace period [26] from its patent laws. Prior to harmonization, the German patent system contained a grace period for certain types of pre-filing disclosures. [27] The substantive provisions of the Strassbourg Convention and the EPC, however, did not contain a **\*465** grace period. [28] Thus, when Germany implemented the Strassbourg Convention via its Patent Act of 1980, it was forced to remove the grace period provisions from its national law. [29]

At least some interests regretted this change. [30] As a result, they began pressing for developments that would restore a grace period to the German system. [31] In particular, WIPO agreed to convene a committee of experts to study the possibility of obtaining a multilateral treaty that would call for the use of a grace period. [32] The strategy was apparently to obtain an agreement encompassing countries beyond the EC, and then to press for a corresponding amendment to the European Patent Convention. [33]

In 1983, these two efforts coalesced into the process of negotiating at the Patent Harmonization Treaty. The experts meeting before WIPO soon realized that the specifics of a grace period also brought into play other, related issues of patent law, both procedural and substantive. [34] Thus, in order to be successful at defining a grace period, the subject matter under discussion in the WIPO negotiations could not be circumscribed narrowly. In addition, the ongoing nature of the discussions between the EPO, JPO, and USPTO apparently increased the willingness of those entities to include procedural questions within the negotiations before WIPO.

 **\*466** WIPO therefore terminated the work of its initial committee of experts after that body had met for one session. To replace the committee, WIPO created a second committee whose mandate extended beyond the issue of harmonizing national provisions relating to a grace period, and into the broader question of harmonizing patent law generally. [35] This second committee of experts has now met on eleven occasions. [36] As one might expect, it initially continued the former committee's consideration of a grace period, and additionally considered related procedural and substantive issues. [37] Throughout the course of its meetings, the committee's activities have expanded to include numerous other issues relating to patenting. [38] The product of its efforts is the Draft Proposal of the Patent Harmonization Treaty, which WIPO published in November of 1990. [39]

### B. Structure of the Treaty

Presently, the Patent Harmonization Treaty is structured as a Special Agreement under the Paris Convention. [40] Twenty four of the treaty's thirty nine articles address substantive issues of patent law. The other articles relate to procedural or administrative treaty matters. [41] Furthermore, a number of the articles are now **\*467** presented in alternative forms that are to be the subject of further negotiations. [42]

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 92 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

The scope of the treaty is wide. It addresses, at least in broad terms, virtually the entire field of patent law. Included are detailed provisions relating to questions such as statutory subject matter, [43] novelty, [44] obviousness, [45] and the rights conferred by patenting [46]—matters that are now governed by other, different provisions in the patent law of the United States. [47] In addition, however, the Patent Harmonization Treaty also addresses legal questions that the United States has never committed to statute, such as the proper definition of the doctrine of equivalents [48] and the role of the specification in construing claim scope. [49] By any objective measure, the treaty is clearly a comprehensive attempt to fix the law of patents into a definite, particularized set of legal standards, to a degree far beyond anything the United States has previously attempted. [50]

### C. The Diplomatic Conference

Obviously, WIPO has no power to accept treaties on behalf of the member states of the Paris Union. Both conceptually and practically, the work of WIPO's second committee of experts has been only preliminary to the creation of the Patent Harmonization Treaty. The committee's task has been to define a proposed treaty in sufficient detail that the Paris Union has a realistic chance of agreeing on a final text through the formal mechanism of a diplomatic  **\*468**  conference. [51]

In October of 1989, WIPO decided the draft treaty had progressed to the point where a diplomatic conference could be held in June 1991 to consider the matter. [52] Supporters hoped the text of the treaty could be agreed upon and signed at that time. [53] During the Spring of 1991, however, various events upset those hopeful plans. WIPO's committee had held its meetings in Geneva, Switzerland, making the negotiations inaccessible to many interested persons. [54] In addition, WIPO has pushed the committee of experts to complete a draft treaty quickly. [55] This effort outstripped the ability of the interest groups in the United States to consult their constituencies meaningfully prior to the negotiations. [56] Indeed, the pace of negotiations arguably outstripped even WIPO's ability to inform the public through its own publications. [57]

 **\*469**  As a consequence, several members of the Paris Union were in fact less willing to make concessions than their negotiating delegations had indicated during the meetings of the committee. [58] Perhaps the most prominent example of such unwillingness involved the United States' position on changing to a "first-to-file" priority rationale. In a move not widely noted at the time, the Commissioner of Patents and Trademarks had indicated to the committee of experts in 1987 that the United States would be willing to consider changing its national law of patents in such a manner. [59] Subsequent drafts of the treaty incorporated that offer of change. [60] In early 1991, however, the PTO realized that the relevant groups inside the United States did not strongly support such a change. [61] Therefore, the United States proposed that the treaty include an alternative provision that would allow the United States to retain its first-to-invent priority rationale, but make other, hopefully offsetting changes in its laws. [62]

The net effect of these late movements away from consensus was to prevent the Paris Union from finalizing the treaty at the June 1991 session of the diplomatic conference. [63]  The Paris Union  **\*470**  therefore extended the conference to include a second, future session. [64] Originally unscheduled, [65] that second session was to be held in the summer of 1993. [66] Changes associated with the new presidential administration, however, have rendered the United States unable to fully participate by that date. During the preparation of this paper, WIPO therefore postponed the second session of the diplomatic conference indefinitely. [67]

### \*471  II. PRIOR HARMONIZATION EFFORTS

The facts set out in the foregoing section are, to many, the complete history of the Patent Harmonization Treaty. In reality, however, the treaty is only the latest in a long series of international agreements that have addressed foreign patenting. Many such agreements exist already. [68] Generally speaking, all involve patent harmonization to some extent: they provide for the coordination, between countries, of national legal provisions relating to patents. [69] Patent harmonization is therefore an old concept and not a new one. [70]

Common sense suggests that this prior history is relevant to the Patent Harmonization Treaty. The basic structure of international patenting transactions remains unchanged from at least the 1800's: an inventor seeking foreign patent rights must enter the legal

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 93 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

system of that foreign country and submit to its requirements for patenting. [71] Patent systems remain instruments of national policy. [72] For these reasons, the basic problems of international patenting, **\*472** and the general concerns that affect their resolution, should be largely unchanged. [73]

The following discussion therefore examines the history of multilateral efforts to address foreign patenting. The examination is general; its purpose is not to review that history in full detail. [74] Rather, the examination uses history to test certain assertions regarding the motivations and systematic behavior of the participants.

### A. International Patenting Prior to the Formation of Multilateral Agreements

The national patent systems that existed prior to the Paris Convention often contained widely varying legal rules. [75] The United States, for example, examined patent applications substantively, [76] while many European countries did not. [77] Most countries published the technical disclosures of patent applications upon grant, some held the disclosures in secret until after the patent expired, [78] while still others published the disclosure immediately **\*473** upon filing. [79] Generally speaking, the variation between national provisions at the time appears to have been substantially larger than exists today. [80]

These variations in national patent practices created procedural obstacles to the international assertion of patent rights. [81] In those countries that published patent disclosures immediately upon filing, for example, the mere act of applying for patent disclosed the invention publicly. At the same time, other countries conditioned patentability on absolute novelty worldwide. [82] Applying for a patent in one country could thus create an absolute barrier to obtaining a valid patent in another. [83]

These procedural obstacles to patenting generally appear to have arisen inadvertently. There also existed at this time, however, another category of obstacles that national governments had erected purposefully. The obstacles in this second category were essentially protectionist. [84] By the late 1800's European and United States scholars had explored the economics of patenting extensively. [85] As explained below, many granting sovereigns had begun to manipulate their national patent laws to enrich themselves in relation to their trading partners.

### 1. The protection of national wealth from foreign patenting

Patent systems are large-scale governmental intrusions into the free-market economy. They involve manipulating social costs and benefits to increase the national wealth. [86] Perhaps the most **\*474** significant cost of such systems is the higher prices imposed on consumers of the patented advance. [87] If the patented technology has some economic value [88] the patent owner is able to impose single-source pricing on it—a price that is higher than would exist in a truly competitive market. [89]

Patent systems exist because this social cost of higher prices is presumed to result in an increased pace of invention. [90] Higher prices transfer increased amounts of money from consumers of the patented technology to producers. Knowing this, inventors will strive to invent patentable technology more vigorously. Some will succeed who otherwise would have failed. The sophistication of the country's industrial base thus increases, and new technology becomes available to consumers. According to the presumption, the social benefits of this increased rate of invention are large enough to more than offset the costs of patenting. [91]

In a purely domestic economy the national effects of these costs and benefits are linked together relatively tightly. Each unit of increased cost imposed on domestic consumers provides a unit of increased revenue to domestic industry. Evaluating such a patent system therefore involves, in large part, estimating the amount of increased invention that will actually result from a given increase in expected revenue. [92] In addition, the increased resources diverted to a domestic patent owner are not wholly lost to the domestic economy. Rather, the domestic patent owner generally will reinvest all or a part of those resources, thereby mitigating the cost of patenting to some degree. [93]

Case 6:25-cv-00581-ADA   Document 7-6   Filed 12/15/25   Page 94 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

International patenting, on the other hand, de-couples the national effects of patenting. Assume that an inventor exploits the advance through patenting, not in his or her own country, but in a **\*475** foreign country. In that situation industry domestic to the inventor's own country receives increased profits from patenting, but domestic consumers do not pay the associated higher prices. Instead, the higher prices are imposed on consumers in the foreign country. [94] International patent transactions therefore reallocate wealth away from the granting country and into the country of the patent owner. [95]

Prior to the Paris Convention many countries had acted on this basic economic truth. Their national laws included numerous, varied provisions that curtailed the domestic patent rights of foreign nationals. Some countries, for example, had adopted compulsory-licensing provisions. [96] By their very nature, compulsory licenses lower the cost of the patented advance closer to multiple-source pricing. [97] In addition, if the compulsory license is given to a domestic entity a portion of the foreign trade is prevented outright. [98] Both these mechanisms reduce the amount of wealth that flows out of the country into the hands of the foreign patent owner.

Another type of protectionist provision motivated by the same economic calculation was the widespread presence of national working requirements. [99] Generally, these provisions required patent **\*476** owners to supply domestic demand for the patented technology through domestic production. The failure to do so resulted in the patent becoming invalid or unenforceable. Facially neutral with regard to nationality, working requirements had an obviously greater, purposeful impact on patent owners who were foreign. [100] In essence, foreign patentees were required to either abandon their patent rights or behave as if they were domestic entities.

## 2. The protection of domestic industry from uneven international patenting

In addition to increased prices, patents impose another social cost that is relevant to international patenting: they retard further research in the patented technology. [101] Patents commonly dominate inventions that remain to be discovered and patented themselves. [102] Once a patent issues, therefore, every person other than the patent owner has a reduced expectation of return from further research in the areas of technology that the patent dominates. [103] Rationally, then, researchers will reduce their inventive efforts in technology that is dominated by another's patent. [104] If competition **\*477** spurs the speed of research, [105] this reduction in competition will slow industrial development over time. The issue in a purely domestic economy is optimally balancing the initial incentive to the original patent owner with the detriment to future researchers. [106]

With international patenting, however, the problem becomes more complex. The teachings of an issued patent can travel beyond the borders of the granting sovereign and into other countries. [107] Corresponding patent rights in such other countries may, or may not, exist. [108] In countries where they do not, the public learns of the advance and yet is free from the economic impediment of dominating patent rights. Technological development therefore continues unabated. In countries where dominant patent rights do exist, in contrast, only the holder of the dominant patent is fully motivated to continue researching. Over time, this risks reducing the industrial sophistication of the patenting country in comparison to that of the non-patenting country. [109]

**\*478** These economic considerations spurred a number of countries to act during the early period of international patenting. Primary among those actions were national provisions that caused domestic patents to expire as soon as any corresponding foreign patent expired. [110] In operation, these provisions freed domestic industry from the constraining effects of patenting as soon as the industry in another country became free.

In total, these various protectionist provisions inflicted immense difficulties on patent owners. [111] Often, one simply could not obtain patent rights in a foreign country. Even if a foreign patent could be obtained, many times its continued existence depended on the patent owner rapidly initiating manufacture in that foreign country. This could be disadvantageous for many different reasons. [112]

## B. The Paris Convention

Prior to the Paris Convention essentially no international agreements addressed the obstacles to international patenting set out in the preceding section. [113] Instead, patent owners who wished to assert patent rights in foreign countries were forced to rely on their own resources. As a practical matter, they were forced to restrict the number of countries in which they sought patent protection.

In 1883, a decade-long process of negotiation culminated in a number of countries signing the Paris Convention. [114] Although the creation of the convention was an act of international diplomacy, the participants in the negotiations included not only representatives of national governments, but representatives of industrial interests as well. [115] It appears, in fact, that the negotiations began **\*479** primarily at the insistence of industrial interests. [116]

As the following discussion details, the Paris Convention addressed a portion of the obstacles to international patenting. At the same time, other obstacles remained unresolved. [117] This partial failure raises an immediate question: Why was agreement on those issues not reached? Many causes doubtlessly contributed. [118] At the same time, however, the pattern of successes and failures suggests that the different economic interests of the various parties to the negotiations was a significant cause. In particular, agreement appears to have been possible only where the economic interests of national government and industry coincided. [119]

### 1. Patent owners vs. the national interest

It is axiomatic that the interests of national government will tend to be national in scope. With regard to patenting, these interests will include the full range of social costs and benefits of a patent system: the potential benefits of an increased rate of innovation, for example, as well as the costs of higher consumer prices, the costs of administering the patent system, and the costs borne by other endeavors from whom the increased resources spent on patenting have been diverted. [120]

This focus on both the costs and the benefits of patenting should also hold true with regard to transactions of international patenting. A national government will be concerned with the increased incentive that patent rights in foreign countries bestow upon its domestic industry. [121] Government will also be concerned with the domestic costs of awarding patents to foreigners: the loss of national wealth from importation of patented goods, and the potential stunting of domestic industry via international patenting that is uneven. [122]

**\*480** Industry's view of patenting, in contrast, is potentially quite different. Industry will be concerned with how patenting affects its own, private interests. [123] Those interests will in all liklihood be very different from the interests of society as a whole. [124] For example, patent systems rely entirely on the incentive of increased profits to spur innovative activity. Patenting therefore bestows large private benefits on industry. [125] At the same time, the social costs of patenting are generally spread throughout society. They therefore impose private costs on industry to a much lesser degree. [126]

This observation is very significant. Unless one views inventors as entitled to monopoly profits naturally, patent systems must be seen as societal mechanisms for providing an optimal amount of incentive to invent. [127] To determine that amount of incentive, one must consider more than industry's narrow, private interests. The result of that broader calculation need not coincide with industry's preferences. Thus, society can prefer rules of patent law that industry would not choose. Stated conversely, industry can prefer rules of patent law that are adverse to society. The differences of position between the two groups should be systematic. [128]

For the same reasons, industry and national governments should also have systematically different interests with regard to **\*481** international patenting. [129] If they behave rationally according to economic criteria, national governments will be interested in obtaining agreements that maximize the wealth of their individual countries. These will be agreements whose operation bestows on the particular national economy both large benefits and small costs from international patenting. [130] Industry, in contrast, will seek the private benefits of increased international patenting [131] but will be relatively unconcerned with any associated

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 96 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

social costs. In particular, industry will be largely unconcerned with whether a disproportionate share of such costs falls on any particular national economy, including that of its own country. [132]

In essence, because the parties to an international sale of a patented item each belong to a different national economy, their private costs and gains become social costs and gains for the countries involved. For example, where a national of the country under consideration holds a foreign patent, the sale of goods under that patent transfers wealth out of the foreign country into the hands of the patent-owning national. The national's private gain is thus a social gain for the national's own country. Conversely, where a country has granted one of its patents to a foreigner, the domestic sale of goods under the patent impoverishes domestic consumers and enriches the foreign patentee. The consumer's private cost is thus a social cost to the granting country. The outlook of national government differs from that of its patent-owning industry because the nation participates in both import and export transactions, while industry is largely preoccupied with exports.

### 2. The agreement to foster increased foreign patenting

The structure of the Paris Convention is consistent with the operation of these economic interests. Foreign patenting, for example, **\*482** is crucial to the objectives of both industry and national government. Patents provide the market power that yields increased profits to industry. If such increased profits are to be had on foreign sales, industry must obtain foreign patents. Those same increased profits on foreign sales, moreover, appear to be the major mechanism by which countries enrich themselves through international patenting. [133] National government is thus interested in seeing its citizens obtain as many foreign patents as possible. Additionally, foreign patents are needed to constrain the industrial development of competing countries while an advance is subject to domestic patent rights.

For these reasons, one would expect easy agreement in the Paris Convention to increase the general availability of foreign patenting. The interests of national governments are more or less the same on this particular issue. [134] In addition, the self interests of national governments and industry generally coincide.

The original text of the Paris Convention shows such easy agreement on this issue through the concept of foreign priority:

> Any one who shall have regularly deposited an application for a patent of invention ... in one of the contracting States, shall enjoy for the purpose of making the deposit in the other States ... a right of priority under the periods hereinafter determined.

> In consequence, the deposit subsequently made in one of the other States of the Union, before the expiration of [this] period cannot be invalidated by acts performed in the interval, especially by another deposit, by the publication of the invention or by its working by a third **\*483** party.... [135]

As a result of this provision, an inventor could establish a date of filing in all member countries via an initial filing in a single country. The act of applying for patent rights on the same invention in several foreign countries was therefore made much easier. [136]

### 3. The failure to stem protectionist provisions

As to protectionist provisions, the economic interests of national government and patent owners appear to diverge. National government is critically interested in retaining the freedom to impose protectionist provisions. By definition, these provisions reduce the outflow of national wealth to foreign patentees. They are an important means of minimizing the domestic costs of international patenting.

Industry, in contrast, will be generally opposed to protectionist provisions. Protectionist provisions reduce the market power of industry's foreign patents. Industry will therefore object to their presence in the patent systems of foreign countries and will

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 97 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

seek their abolition. In addition, because others pay the private costs of increased patents on imports, industry has little reason to favor protectionist provisions in the domestic patent system of its own country.

Under an economic analysis, therefore, patent-owning industry will seek broad prohibitions against protectionist measures. In contrast, each national government will seek to preserve at least those protectionist provisions that operate to the country's own net benefit. Based upon these fundamentally different interests one would expect difficulty in achieving any agreement to eradicate protectionist provisions generally.

The historical course of negotiations over the Paris Convention is consistent with this analysis as well. The original text of the Paris Convention contained conspicuously little with regard to the two most widespread protectionist measures, working requirements and compulsory licenses:

> The introduction by the patentee into countries where the patent has been granted, of articles manufactured in any other of the States of the Union, shall not entail forfeiture.

> The patentee, however, shall be subject to the obligation of working his patent conformably to the laws of the country into which he has **\*484** introduced the patented articles. [137]

The text did require signatories to permit importation. At the same time, it specifically allowed the continued existence of national working requirements generally. It did not mention compulsory licenses at all. [138]


### 4. The selection of national treatment

In addition to the principle of foreign priority, the Paris Convention also adopted the principle of national treatment. "The subjects or citizens of each of the contracting States shall enjoy, in all other States of the Union, so far as concerns patents for inventions, ... the advantages that the respective laws thereof at present accord, or shall thereafter accord to subjects or citizens." [139] Stated simply, national treatment requires each government to apply the same provisions to both its own citizens and foreign nationals. [140] It has been described, along with the principle of foreign priority, as a fundamental tenet of the convention. [141]

The Paris Union's agreement to provide for national treatment stands in apparent opposition to the economic analysis suggested in this article. At least in theory, national treatment prevents governments from employing the most effective tool for reducing the domestic cost of international patenting: expressly denying domestic patent rights to foreign inventors. [142] In addition, the Paris Union consciously selected national treatment over the competing principle of reciprocity. [143] Under reciprocity, each government need **\*485** award to foreign inventors only those patent rights that the foreign inventor's own government awards to non-nationals. [144] Reciprocity would thus seem a favorite of national governments: under it, the cost of awarding domestic patents to foreigners is tied directly to the benefits that domestic industry receives from patenting in foreign markets. [145]

What, then, does the Paris Union's selection of national treatment imply? Does it invalidate the assertion that economic self-interest explains the Paris Convention's substantive provisions? More broadly, does it show the Paris Union to have adopted an internationalist, free-trade approach to foreign patenting?

When examined carefully, the adoption of national treatment probably does not support these suppositions. Reasons completely apart from a free-trade rationale can cause government to favor national treatment over reciprocity. A country applying reciprocity, for example, must be expert in the patent laws of every foreign country. Reciprocity thus risks large administrative costs. [146]

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 98 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

In addition, a deeper examination shows that national treatment still permits government many forms of protectionist behavior in patenting. [147] Still possible, for example, are provisions that are facially neutral with regard to nationality, but which impact foreigners disproportionately. Working requirements and compulsory licenses are examples of two such provisions; [148] the restrictions in United States law against proof of invention by foreign activities are another. [149]

Another, more subtle type of protectionist provision permitted under national treatment involves reducing the domestic costs of patenting generally. The loss of domestic wealth to foreign patentees can occur only when domestic patenting results in valuable **486** rights. Thus, government can reduce the outflow of wealth to foreigners by simply reducing the economic value of the domestic patent rights that are available. Indeed, the loss can be reduced to zero by refusing to grant domestic patents altogether. [150]

The Swiss patent system provides a historical example of a national government employing this latter technique. [151] Switzerland progressed through the industrial revolution without a patent system. [152] The economic rationale behind this decision was sound: without domestic patents Swiss consumers paid no increased prices for new technology. Switzerland thus minimized the outflow of its wealth to importers. Indeed, refusing to issue patents removed all the social costs of patenting from the domestic Swiss economy. [153] At the same time, Switzerland continued to receive most of the benefits of patenting. True, Swiss industry could not expect patent profits from introducing new technology into the domestic Swiss economy. The absence of domestic patents, however, gave Swiss industry free access to all the new technology that others developed. In addition, Swiss industry held patents in foreign countries, [154] thus earning patent profits from exports and receiving an incentive to invent in that way. In fact, because the the Swiss economy was small, the incentive that Swiss industry received from patented exports was arguably greater than the incentive that dominating the domestic Swiss economy via patenting might have supplied. [155]

National treatment provided no obstacle to this strategy. The original Paris Convention did not commit its members to provide any minimum rights to patentees. [156] Thus Switzerland could, and in fact did, adhere to the Paris Convention even though it had no **487** patent system whatsoever. [157] Its denial of patent rights equally to domestic nationals and foreigners satisfied the requirement of national treatment. Additionally, adhering to the Paris Convention guaranteed Swiss inventors national treatment from foreign governments, thereby ensuring Swiss industry access to patent profits on its exports. [158] In fact, Switzerland did not find it in her interest to enact a national patent system until Germany threatened her with retaliatory tariff action. [159]

## C. Multilateral Negotiations Subsequent to the Original Paris Convention

Subsequent negotiations to revise the Paris Convention have continued to follow this pattern. [160] It has been increasingly possible to harmonize the procedural requirements of patenting. [161] At **488** the same time, agreement to limit the use of national patent provisions for protectionist purposes has not progressed very far. The Paris Union has repeatedly revisited the issues of working requirements and compulsory licensing since 1883. [162] The resulting provisions place very few restrictions on national governments that wish to use these mechanisms. Compulsory licenses can be granted as soon as three years after the patent issues. The patent can be revoked for failure to work two years thereafter. [163] Perhaps more significant, even today the Paris Convention contains virtually no requirements that national governments grant any other minmum rights to patent holders. [164] Indeed, the Convention still does not even require that national governments enact patent systems at all. [165]

This reluctance to forego protectionism has shown itself outside the Paris Convention as well. The substantive standards in Chapter II of the Patent Cooperation Treaty are expressly non-binding; [166] the patent standards to be added to GATT are in sharp dispute. [167] Even the one exception to this trend, the binding substantive **489** standards in the EPC, [168] is anomalous: the EPC exists only among a small number of countries that are party to a broad, prior commitment to internationalism amongst themselves. [169]

## III. ANALYSIS

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 99 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

The nature of the Patent Harmonization Treaty becomes clear when viewed in light of the foregoing history. Despite the practically continuous efforts of patent owners, the international community has never agreed to provide meaningful minimum standards of patent protection to patentees. The treaty is another effort to obtain those standards. Included in it are virtually all the substantive provisions that patent owners have sought historically and been denied.

Additionally, the interest groups that are at odds over the treaty remain essentially unchanged from prior harmonization efforts. International, patent-owning industry continues to seek broad substantive rights in all countries.[170] Governments continue to seek the freedom to impose national laws that favor domestic development.[171]

In short, the Patent Harmonization Treaty is simply the newest vehicle in an ongoing debate. That debate existed long before the treaty was proposed. It will likely continue long after the treaty is either signed or abandoned.

## A. Evaluating the Patent Harmonization Treaty

This context suggests a number of analyses that might be useful in evaluating the Patent Harmonization Treaty. First, implementing  **\*490**  the treaty will require the United States to change its domestic patent laws.[172] As with all such proposed changes, we must analyze their purely domestic effect. Amending the law to change the rights of patent owners inevitably alters the balance between the social costs and benefits of patenting. We must therefore discern whether the changes required by the Patent Harmonization Treaty would improve the balance in the United States, or at least not damage it unacceptably.

The debate over prior-user rights illustrates this point. Prior-user rights, in the form under consideration, except prior users of a patented advance from the patent owner's control.[173] They currently do not exist in the United States. Introducing them would necessarily reduce the profits that holders of United States patents could expect from commercial exploitation of their patent rights. This should directly reduce the incentive benefit of patenting.[174]

At the same time, however, awarding rights to a prior user by definition creates a multiple-supplier market for the patented technology. Prior-user rights are thus a specific form of compulsory license. In general, they should drive the price of the patented technology down and decrease the social costs of patenting. From a purely domestic viewpoint, therefore, evaluating prior-user rights should involve calculating whether this decrease in social cost acceptably offsets the decrease in incentive benefit.

In addition to domestic considerations, however, evaluating the Patent Harmonization Treaty will require us to analyze the treaty's effect on the flow of wealth across our national borders. Strong patent rights transfer increased amounts of wealth outside the country to foreign patentees, while weak patent rights transfer smaller amounts. Changing the economic rights of patent holders in the United States will inevitably change the size of this transfer.

 **\*491**  Prior-user rights again provide an illustration. The treaty calls for prior-user rights to be awarded only to prior users who are active domestically.[175] Such rights would thus remove wealth from patent owners, a class of persons in which foreign nationals can be numerically commonplace, and transfer it to domestic industry and consumers. Prior-user rights therefore protect domestic wealth from the incursions of foreign patentees.[176] The interest in minimizing outflow of the nation's wealth to foreigners argues for their introduction even apart from purely domestic concerns.

As a still further issue the wealth-transfer effect of foreign patents suggests in fact that the United States examine carefully the basic assumption that increased patent harmonization is in the national interest. At least three major variables affect the losses that a country will suffer from foreign patenting: the size of the country's economy; the strength of the rights that the country's patent laws give to patentees; and the overall number of patents that the country grants to patentees who are foreign. The United States does not appear to fare well by any of these criteria. Its economy represents 30% of the world's consumption—by far the largest economy of any single country in the world. At the same time, United States patent laws provide patent owners with some of the strongest patent rights in existence.[177] The United States currently grants 45% of its patents to foreigners, the highest percentage at any time in its history.[178]

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 100 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Taken together, these factors virtually assure that open international patenting will inflict a substantial loss of economic wealth **\*492** on the United States. They suggest, in fact, that the United States may well suffer the largest such losses of any country in the world. [179]

Put plainly, then, there are substantial reasons why the United States might lose, rather than gain, from a general increase in the amount of international patenting. The national interest may thus favor resisting patent harmonization. At the very least, we should submit to patent harmonization only after comparing carefully what we will gain with what we will lose.


## B. Evaluating Industry's Advice

Historical context also suggests how to evaluate industry's enthusiasm for the Patent Harmonization Treaty. Industry's enthusiasm should be suspect to the extent that it is the result of industry's own peculiar subset of interests in patenting. In particular, history and reason suggest that we should carefully examine whether industry has considered the social costs that increased international patenting will impose domestically. If industry's calculus excludes those costs its advice is not sound.

A concrete example will illustrate how this evaluation might operate. The Patent Harmonization Treaty has been described, from the viewpoint of the United States, as a bargained-for exchange. The United States is offering to change its theory of priority from the current rationale of first-to-invent to the rationale of first-to-file. In return, the European Community will provide inventors a grace period prior to filing. [180]

Industry's endorsement of this bargain is understandable. A grace period would be more hospitable to inventors than Europe's **\*493** current rule of absolute novelty. [181] Marginally more European patents would issue to inventors under such a rule, thereby increasing somewhat the overall expectation within United States industry of profit from patenting in Europe. [182]

At the same time, offering to adopt first-to-file priority will impose increased costs on the United States. The United States' first-to-invent provisions effectively discriminate against foreign inventors in the race to obtain United States patents. [183] Because few other provisions in United States patent law have this effect, [184] first-to-invent priority may well be the major means by which the United States protects itself against the outflow of its wealth to foreign patentees. [185] Changing to first-to-file priority will thus increase the outflow of wealth from the United States, perhaps significantly.

Industry's enthusiasm for the basic bargain of the Patent Harmonization Treaty must therefore be viewed skeptically. Exchanging a European grace period for first-to-file may provide the United States economy with a net gain. Industry, however, will not bear most of the costs that increased foreign patenting will inflict on the United States. Industry would probably support the treaty even if its operation would provide society with a clear net loss.

Historical context also raises other issues. If the interests of industry and the nation are in fact different, adherence to proper **\*494** lawmaking processes becomes critical. Whether the treaty reflects the overall will of the United States, for example, should depend heavily on whether the various constituencies have been represented adequately. Yet, from the record it appears that industry has had a disproportionate role in defining the treaty before WIPO. Nearly all of the nongovernmental participants in the WIPO negotiations have been from industrial and related interests. [186] One author has even suggested that industrial interests should control the debate within WIPO over patent harmonization. [187]

Industry's narrow interests, in fact, may have already influenced how the United States is approaching international patenting generally. The Federal government has relied on several advisory committees in this area [188]—advisory committees whose memberships have been drawn heavily from patent-owning industry. [189] The government's recent statements of policy reflect precisely the limited outlook that one would expect of industry. [190] Much attention has been paid to the increased revenues that industry could expect from stronger intellectual property rights abroad. [191] In contrast, little or no attention has been paid to the costs that any concessions will impose on the United States. Indeed, many of the documents prepared by the government and its advisory committees do not reveal an awareness that increased international patenting will inflict any domestic costs. Observers can therefore wonder whether the flaws of the Patent Harmonization Treaty exist in **\*495** other international agreements that have been negotiated recently, such as NAFTA and the TRIPs portion of GATT.

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 101 of 520

## IV. CONCLUSION

The Patent Harmonization Treaty is one of the most recent events in a historical series of international negotiations relating to patenting. In those negotiations, patent owners have sought to increase their rights generally. National governments, in contrast, have tended to seek arrangements that provide net gains to their individual economies. Typically these objectives have been in opposition. As a result, international patenting agreements have not progressed very far, despite efforts that have now spanned more than a century.

One can wonder whether the United States has been aware of this history in negotiating the Patent Harmonization Treaty. With regard to substantive, as opposed to procedural patent provisions, precious little of what occurred in the negotiations to date has been an altruistic exercise in international cooperation. Rather, the various parties have consistently sought terms of agreement that further their own self-interests. Certainly this has been true of the national governments; it has been equally true of private industry.

Knowing this, one would expect the United States to have carefully measured the cost of each concession it has offered. Yet, this does not appear to be the case. No significant study appears to have preceded, for example, either the United States' offer to switch to first-to-file priority or its later, more limited offer of compromise. [192]

More fundamentally, given the self-interested behavior of the parties one would expect the United States to have demanded high quality, representative input into the negotiations. Yet this may not have happened either. Patent-owning industry has had a large role in defining the United States's position on the Patent Harmonization Treaty. Whether that industry has acted in the national interest, rather than its own, is questionable. In any event, domestic United States industry appears to grasp the implications of international patenting much less well than do foreign interests in the WIPO negotiations.

## Footnotes

[a]    Assistant Professor, William Mitchell College of Law; Of Counsel, Merchant, Gould, Smith, Edell, Welter & Schmidt. P.A. The author wishes to thank Amelia Buharin, James Chiapetta, and Daniel Schulte for their research assistance.

[1]    Generally speaking, the harmonization of legal systems refers to coordinating the various rules of law in the subject systems to the point where they express common, minimum principles. In this sense, harmonization can be contrasted with the more exacting ideal of "unification" of the law which, in its pristine form, refers to the use of the same legal rules in each system. See generally 2 DAVID RENE, THE INTERNATIONAL UNIFICATION OF PRIVATE LAW, INTERNATIONAL ENCYCLOPEDIA OF COMPARATIVE LAW, ch. 5, 34-35 (1971).

[2]    PAUL HASTINGS, JANOFSKY & WALKER, NORTH AMERICAN FREE TRADE AGREEMENT: SUMMARY AND ANALYSIS 83-89 (1993). If adopted, the North American Free Trade Agreement ("NAFTA") would create a free-trade zone comprising the United States, Mexico, and Canada. All three governments have signed the agreement, but it has yet to be ratified.

The intellectual property provisions of NAFTA have been reprinted in 5 WORLD INTELL.PROP.REP. 284 (1992). For an analysis of these provisions, see Seth D. Greenstein, Examination of I.P. Provisions of North American Free Trade Agreement, 6 WORLD INTELL.PROP.REP. 344 (1992).

[3]    In part, due to the insistence of United States negotiators, the member nations of GATT have resolved to negotiate substantive intellectual-property provisions for inclusion into that agreement during the Uruguay Round. See generally DONALD K. DUVALL, UNFAIR COMPETITION AND THE ITC 553-68 (1992). The present text of GATT treats intellectual property matters only peripherally. Id. at 555.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 102 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

The Director-General of GATT, Arthur Dunkel, has produced a draft agreement in an effort to conclude the Uruguay Round of negotiations. Draft Final Act for Uruguay Round, GATT Doc. No. MTN.TNC/w/Fa (Dec. 20, 1991). See Alan S. Gutterman, The North-South Split Regarding the Protection of Intellectual Property Rights, 28 WAKE FOREST L.REV. 89, 108-11 (1993). The intellectual-property provisions of that agreement have been reprinted at 5 WORLD INTELL.PROP.REP. 42 (1992). They have been the subject of considerable controversy. See, e.g., Mid-April Deadline Set for Talks; TRIPs Document Gets Poor Reviews, 6 WORLD INTELL.PROP.REP. 41 (1992); Proposed TRIPs Text Would Limit Use of Special 301, USTR Counsel Says, 6 WORLD INTELL.PROP.REP. 102 (1992).

For general discussions of the intellectual property negotiations of the Uruguay Round, which are referred to by the acronym TRIPs, see generally John Richards, Trade Related Intellectual Property Issues (TRIPS), 72 J.PAT. & TRADEMARK OFF.SOC'Y 906 (1990); Otto A. Stamm, GATT Negotiations for the Protection of New Technologies, 73 J.PAT. & TRADEMARK OFF.SOC'Y 680 (1991); Symposium, Trade Related Aspects of Intellectual Property, 22 VAND.J.TRANSNAT'L.L. 223, 689 (pts. 1 & 2) (1989); GATT OR WIPO? NEW WAYS IN THE INTERNATIONAL PROTECTION OF INTELLECTUAL PROPERTY, 11 IIC STUDIES (Frederick Beier & Gerhard Schricker eds. 1991).

[4]    E.g., Blake R. Wiggs, Canada's First-to-File Experience—Should the U.S. Make the Move?, 73 J.PAT. & TRADEMARK OFF.SOC'Y. 493 (1991); Lisa M. Brownlee, Trade Secret Use of Patentable Inventions, Prior User Rights and Patent Harmonization, 72 J.P.T.O.S. 523 (1990); Charles R.B. Macedo, First-to-File: Is American Adoption of the International Standard Worth the Price?, 1988 COLUM.BUS.L.REV. 543 (1988); Ned L. Conley, First-to-Invent: A Superior System for the United States, 22 ST. MARY'S L.J. 779 (1991).

[5]    See generally History of the Preparations of the Patent Law Treaty, WIPO Doc. PLT/DC/5 (Dec. 21, 1990) [hereinafter History], reprinted in Records of the Diplomatic Conference for the Conclusion of a Treaty Supplementing the Paris Convention as Far as Patents are Concerned, WIPO, Diplomatic Conference, pt. 1 (1991) [hereinafter Records]. For discussions of the Patent Harmonization Treaty overall, see Edward G. Fiorito, Harmonization of U.S. and Worldwide Patent Laws, 73 J.PAT. & TRADEMARK OFF.SOC'Y 83 (1991); Jochen Pagenberg, The WIPO Patent Harmonization Treaty, 19 AIPLA Q.J. 1 (1991)); William Fryer III, Patent Law Harmonization: The Current Situation and Alternatives Available, 72 J.PAT. & TRADEMARK OFF.SOC'Y 242, 298 (pts. 1 & 2) (1990).

The treaty is known officially as the "Patent Law Treaty." See, e.g., History, supra. Those in the United States, however, have referred to it most commonly as the "Patent Harmonization Treaty." This article adopts the latter useage.

[6]    Generally speaking, WIPO is the organization that administers the various forms of the Convention for the International Protection of Industrial Property ("Paris Convention") and agreements subsidiary thereto. See INTERNATIONAL TREATIES ON INTELLECTUAL PROPERTY (Marshall A. Leaffer, ed. 1990). It is the creation of the countries that have adhered to the Paris Convention, who together comprise the Paris Union. WIPO replaced the United International Bureau for the Protection of Intellectual Property ("BIRPI") in 1967. Id. at 563-64; see also The Convention Establishing the World Intellectual Property Organization, WIPO Pub. No. 251, reprinted in Leaffer, supra at 566.

[7]    The treaty has been negotiated in a series of sessions before WIPO of the "Committee of Experts on the Harmonization of Certain Provisions of Law for the Protection of Inventions." See generally History, supra note 5, at ¶ 4. In general, eleven preparatory sessions have been held, including an initial meeting limited to the consideration of issues relating to the use of a "grace period" before filing. See infra notes 30-36. The following is a list of those sessions along with citations to the Notes summarizing each that have appeared in WIPO's monthly publication, INDUSTRIAL PROPERTY:

| | | |
|---|---|---|
| Prior meeting on grace period | | 1984 INDUS.PROP. 313 |
| 1st | Session | 1985 INDUS.PROP. 267 |
| 2nd | Session | 1986 INDUS.PROP. 309 |
| 3rd | Session | 1987 INDUS.PROP. 204 |
| 4th | Session | 1988 INDUS.PROP. 179 |
| 5th | Session, | |
| | part 1 | 1988 INDUS.PROP. 358 |
| | part 2 | 1989 INDUS.PROP. 53 |

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 103 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

| 6th | Session | 1989 INDUS.PROP. 269 |
|-----|---------|----------------------|
| 7th | Session | 1990 INDUS.PROP. 140 |
| 8th | Session, | |
| | part 1 | 1990 INDUS.PROP. 297 |
| | part 2 | 1991 INDUS.PROP. 41 |

8   Draft Treaty Supplementing the Paris Convention for the Protection of Industrial Property As Far As Patents Are Concerned (Patent Law Treaty), WIPO Doc. No. PLT/DC/3 (Dec. 21, 1990) [hereinafter PLT], reprinted in Records, supra note 5, at 11-53. WIPO has suggested various modifications to this proposal. They are summarized in Observations of the International Bureau Following the First Part (1991) of the Diplomatic Conference, WIPO Doc. No. PLT/DC/69 (Jan. 29, 1993). See also Memorandum of the Director General: Continuation of the Diplomatic Conference for the Conclusion of a Treaty Supplementing the Paris Convention as Far as Patents Are Concerned, WIPO Doc. No. P/A/ XIX/3 (1992) [hereinafter Memorandum of the Director General]; Report Adopted by the Assembly, WIPO Doc. No. P/A/XIX/4 (1992).

9   The first part of the diplomatic conference occurred in June 1991. Those proceedings are summarized in 1991 INDUS.PROP. 360. See also Results of The First Part (1991) of the Diplomatic Conference, WIPO 2d pt., Doc. No. PLT/DC/INF/5 (Jan. 29, 1993). See discussion infra notes 52-67.

10   See infra notes 64-67.

11   S. 2605, 102d Cong., 2d Sess. (1992); H.R. 4978, 102d Cong., 2d Sess. (1992); See also 138 CONG.REC. S5226-01 (introducing S. 2605); 44 PTCJ 3 (May 7, 1992) (summarizing testimony at the joint hearing on S. 2605 and H.R. 4978). Both bills failed to become legislation. As of this writing, however, the bills are expected to be reintroduced before the second part of the diplomatic conference. See infra note 67.

12   Joint Hearings on S. 2605 and H.R. 4978 Before the Senate Subcommittee on Patents, Copyrights and Trademarks and the House Subcommittee on Intellectual Property and Judicial Administration of the House and Senate Committees on the Judiciary, 102d Cong., 2d Sess. (statement of Robert Armitage on behalf of the National Association of Manufacturers) (Apr. 30, 1992); Position Statement by Intellectual Property Owners, Inc. on S. 2605 and H.R. 4978, The Patent Harmonization Act of 1992, June 25, 1992. See also First-to-file Does Not Win Approval by ABA House of Delegates, but Is Approved at National Association of Manufacturers meeting, 45 PAT.TRADEMARK & COPYRIGHT J. 323-24 (Feb. 18, 1993). The various advisory committees that assisted the United States in formulating its policies toward trade negotiations in the 1980's included heavy representation from industry. See infra notes 188-89.

13   See, e.g., Office of the United States Trade Representation, Administration Statement on International Trade Policy 2 (Sept. 23, 1985) (reporting growth of imports and exports, as percentage of total GNP, from 9% in 1950, to 13% in 1970, to 21% in 1985).

14   E.g., U.S.I.T.C., Foreign Protection of Intellectual Property Rights and the Effect on U.S. Industry and Trade, U.S.I.T.C.Pub. 2065, 4-1 (Feb. 1988) [hereinafter U.S.I.T.C. Survey]; Beier & Schricker, supra note 3 (assertion by joint group of United States, Japanese, and European business entities). See generally U.S.I.T.C. Survey, at 4-3 (calculating losses for all forms of intellectual property, based on survey results, at $23 billion); Statement of Secretary of Commerce Malcolm Baldridge on the Proposed "Intellectual Property Rights Improvement Act of 1986," reprinted in United States Dept. of Commerce News (Apr. 7, 1986) (reporting losses as "from $8 billion to $20 billion in sales"); Task Force on Intellectual Property, Summary of the Phase I Recommendations to the Advisory Committee for Trade Negotiations 2 (Oct. 1985) [hereinafter Phase I Recommendations].

15   See, e.g., Phase I Recommendations, supra note 14, at 2-3; Statement on International Trade Policy, supra note 13, at 12; Statement on Intellectual Property Rights, supra note 14, at 4-5.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 104 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

16    For general discussions of balancing costs and benefits in patenting, see FRITZE MALCHUP, AN ECONOMIC REVIEW OF THE PATENT SYSTEM, PATENT STUDY NO. 15 OF THE SUBCOMM. ON PATENTS, TRADEMARKS AND COPYRIGHT OF THE COMMITTEE ON THE JUDICIARY OF THE UNITED STATES SEN., 86th Cong., 2d Sess. 21-24 (1958); Edmund W. Kitch, The Nature and Function of the Patent System, 20 J.L. & ECON. 265 (1977); ERICH KAUFER, THE ECONOMICS OF THE PATENT SYSTEM 19 (1989).

17    The negotiations have occurred in Geneva. An exact listing of the persons who have appeared at the WIPO negotiations appears in the various Notes, published in INDUSTRIAL PROPERTY, that summarize each meeting. Only fifty-five persons have attended any of the WIPO negotiations as representatives of United States' interests. In addition, their attendance has been highly sporadic. Only seven persons have attended the negotiations regularly. For a more complete analysis of the attendance of U.S. experts at the WIPO negotiations, see R. Carl Moy, Essay: Patent Harmonization, Protectionism, and Legislation, 74 J.PAT & TRADEMARK OFF.SOC'Y. 777, 793-803 (1992).

18    Of the United States experts at the WIPO negotiations who were not employees of the United States Patent and Trademark Office ("PTO"), nearly all were either employees of large corporations or members of large law firms. See generally Moy, supra note 17, at 800-01. This is due in part to the PTO's apparent decision not to include private individuals in the United States' official delegations to the negotiations. Id. at n. 87. Although a number of PTO employees have attended, there is reason to question whether, with regard to the WIPO negotiations, they represent an independent viewpoint. Id. at 800-01. Cf. PAUL J. QUIRK, INDUSTRY INFLUENCE IN FEDERAL REGULATORY AGENCIES (1981) (discussing concept of agency "capture" by special-interest groups).

19    See Remarks of Kirk, 1991 AIPLA BULL., at 442-43 (noting lack of input to the PTO from other sources prior to the diplomatic conference).

20    The international community had begun to address patenting issues at least as early as the middle decades of the 1800's. See 1 STEPHEN P. LADAS, PATENTS, TRADEMARKS AND RELATED RIGHTS—NATIONAL AND INTERNATIONAL PROTECTION 59-68 (1975); EDITH T. PENROSE, THE ECONOMICS OF THE INTERNATIONAL PATENT SYSTEM 42-59 (1951); Heinrich Kronstein & Irene Till, A Reevaluation of the International Patent Convention, 12 J.L. & CONTEMP.PROB. 765 (1948).

21    The Paris Convention came into being in 1883. See generally Arpad Bogsch, The First Hundred Years of the Paris Convention for the Protection of Industrial Property, 1983 INDUS.PROP. 187; Frederick Beier, One Hundred Years of International Cooperation—the Role of the Paris Convention in the Past Present, and Future, 15 IIC 1 (1984).

22    See Annual Report of the Commissioner of Patents and Trademarks, 1983, at 14; Michael Kirk, WIPO's Involvement in International Developments, 50 ALB.L.REV. 601, 602 (1986). Two influences appear to have driven these activities. First, the Patent Cooperation Treaty ("PCT") entered into force on January 24, 1978. E.g., Leaffer, supra note 6, at 76. Chapter I of that treaty sets out the procedures for filing an application for patent in relatively high detail. Id. at 76, 79-105. Thus, the opportunities for cooperation between national patent offices increased.

At the same time, inventors were seeking patent protection in foreign countries with increasing frequency. Because of the requirements of the Paris Convention, many of these new, foreign-origin applications were largely duplicative of one another. See, e.g., 35 U.S.C. § 119 Paris Convention, art. 4(D)(3), reprinted in Leaffer, supra note 6, at 22 (allowing the receiving country to require the foreign applicant to produce a copy of the priority application). Generally speaking, one goal of the national offices was to eliminate the duplicative administrative work that occurred in handling essentially duplicate patent filings.

23    Strassbourg Convention of 1963, reprinted in GERALD PATERSON, THE EUROPEAN PATENT SYSTEM 701 (1992) (requiring the adoption of similar rules of substantive patent law).

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 105 of 520

24    European Patent Convention, reprinted in Leaffer, supra note 6, at 143 (creating a single examination proceeding to obtain national patents in member countries).

25    The Strassbourg Convention defines the substantive law of patents in relatively complete detail. One author asserts that its creation was driven by the desire of members of the European Community to preclude the use of national patent laws as barriers to trade. PATERSON, supra note 23, at 16 (1992) (noting that, prior to the formation of the Strassbourg Convention, "the existence of separate national patents for the same invention was seen as a mechanism whereby trade barriers could be maintained, contrary to the newly emerging European interest in a common market ...").

The EPC took effect on October 7, 1977. Leaffer, supra note 6, at 141. Driven by that event, a number of European countries passed patent statutes with substantial new provisions. E.g., Law No. 78-742 of July 13, 1978, translation as amended reprinted in 3 WIPO, INDUSTRIAL PROPERTY LAWS AND TREATIES, France, 2-001 (1993) (moving from registration system to an examination system); Patents Act 1977, reprinted in 3 WIPO, INDUSTRIAL PROPERTY LAWS AND TREATIES, United Kingdom, 2-001 (1993). Professor Ullrich, for example, asserts that France had no obviousness standard for patents until that time. Beier & Schricker, supra note 3, at 133 n. 11. For a discussion of the changes in British patent law, see CHARTERED INSTITUTE OF PATENT AGENTS, C.I.P.A. GUIDE TO THE PATENTS ACTS (1990).

26    Generally speaking, the term "grace period" refers to the time interval prior to filing for patent during which a patent system will excuse various public disclosures and/or commercialization of the invention. See generally Grace Period for Public Disclosure of an Invention Before Filing an Application, WIPO Doc. No. GP/CE/I/2 Rev. (1984) (general study), reprinted in 1984 INDUS.PROP. 314. The time period in the United States is currently one year, 35 U.S.C. § 102(b), although it has varied during history. E.g., Patent Act of 1839, ch. 88, § 7, 5 Stat. 353, 354 (providing two-year grace period); Patent Act of Aug. 5, 1939, ch. 450, § 1, 53 Stat. 1212 (providing current grace period of one year).

As an alternative, a national patent system may refuse to excuse any such activities prior to filing. E.g., Patent Act of 1836, ch. 357, § 6, 5 Stat. 117, 119. Patent systems incorporating this latter standard are said to operate under the principle of "absolute novelty."

27    See section two, Law of Jan. 2, 1968, translation reprinted in JUGEN VON UEXKULL, GERMAN PATENT LAW, UTILITY MODEL LAW, AND TRADEMARK LAW 11 (1968) (6-month grace period for acts based on invention of applicant).

28    Article 52 of the EPC, for example, requires that patentable inventions be new. Article 54 defines "new" to mean anything that "does not form part of the state of the art," i.e., everything not "made available to the public ... before the date of filing." The EPC thus adopts the requirement of absolute novelty.

29    Compare, e.g., the provision cited supra note 27 with sections one and three of the German Patent Act of December 16, 1980, translation reprinted in Beier, supra note 21.

30    For example, the Association for the Protection of Industrial Property (AIPPI) and the International Federation of Patent Agents (FICPI) passed resolutions in support of a general grace period. 1984 INDUS.PROP. at 320. Beier, supra note 21, at 19.

31    Joint Hearings on S. 2605 and H.R. 4978 Before the Senate Subcommittee on Patents, Copyrights and Trademarks and the House Subcommittee on Intellectual Property and Judicial Administration of the House and Senate Committees on the Judiciary, 102d Cong., 2d Sess. (1992) (statement of Harold Wegner) [hereinafter Wegner]. As of this writing, the transcript of this hearing has not been published.

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 106 of 520

32    See generally WIPO, Meeting Note on the First Session of the Committee on Experts on the Grace Period for Public Disclosure of an Invention Before Filing an Application, 1984 INDUS.PROP. 313, and the documents cited therein.

33    Cf. 1984 INDUS.PROP. at 324 (asserting international treaty on grace period to be "preferable" because it would create "momentum for changing national laws"). The operation of the grace period provision in the Patent Harmonization Treaty is strikingly similar to the operation of the pre-EPC provision in the German national patent law. Compare the sources cited supra notes 7 and 27.

34    WIPO History, supra note 5, ¶ 3.

35    Id. ¶ 4.

36    See the sources cited supra note 7.

37    This new committee initially considered the additional issues of naming the inventor, whether an oath should be required, and the requisites for establishing a filing date. Note on the First Session, 1985 INDUS.PROP. 267.

38    By WIPO's own count, the committee considered new issues in the following pattern: 2d session, four; 3d session, three; 4th session, six; 5th session, part 1, one; 5th session, part 2, three; 6th session, five. Many new issues appear to have been considered at the 7th and later sessions. WIPO appears to have abandoned from that point on the practice of reporting the prior history of the issues under negotiation. It is not clear whether WIPO originally contemplated covering as many issues as the treaty now does.

39    See supra note 8.

40    WIPO History, supra note 5. Article 19 of the Paris Convention permits the members of the Paris Union to enter into special agreements, to further the convention itself, provided they are not inconsistent with the convention. The European Patent Convention is an example of such an agreement. See generally Beier, supra note 21, at 13-14.

41    See Appendix A for a list of articles from the Basic Proposal

Of these articles, WIPO has now proposed omitting numbers 10, 19, 22, 24, 25 and 26 from the treaty. Memorandum of the Director, supra note 8, at ¶¶ 7-8; Observations of the International Bureau Following the First Part (1991) of the Diplomatic Conference, WIPO, Doc. PLT/DC/69 (Jan. 29, 1993) [hereinafter Observations]. It has also proposed removing the preamble.

The two stated reasons for this recommendation are that the articles are controversial, and that they overlap with provisions proposed in the TRIP's negotiations in GATT. Memorandum of the Director, supra note 8, ¶¶ 7-8. The sufficiency of this latter justification, however, appears to be questionable. The GATT negotiations are at a standstill. In addition, the draft intellectual property provisions of GATT have drawn considerable criticism. See supra note 3. Thus, it is very uncertain whether the intellectual property provisions in the current GATT draft will ever become effective. See, e.g., Gutterman, supra note 3, at 111.

42    PLT, supra note 8, arts. 8-10, 19-20, 22, 24-26.

43    Id. art. 10.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 107 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

44      Id. arts. 11(2), 12, 13.

45      Id. art. 11(3).

46      E.g., PLT, supra note 8, arts. 19, 20.

47      For a discussion of the specific differences, see Richard C. Wilder, An Overview of Changes to the Patent Laws of the United States After the Patent Law Treaty, 26 J. MARSHALL L.REV. 497 (1993).

48      PLT, supra note 8, art. 21(1).

49      Id. art. 21(2).

50      On the degree to which the United States patent law is currently defined by statute, see Pasquale J. Federico, Commentary on the New Patent Act, at 1-10, reprinted in Title 35, U.S.C.A. (1954 ed.) ("While patents are creatures of statute, the entire body of patent law is much fuller than the statute itself, including a vast amount of case material....").

        The Patent Harmonization Treaty is also to be accompanied by regulations that amplify and define the language of the treaty itself. PLT, supra note 8, art. 29. Thirteen such regulations are currently proposed, although the treaty contemplates that additional regulations can be added by a three-fourths vote of the Assembly of the Paris Union. Id. art. 29.

51      See, e.g. General Rules of Procedure, WIPO Doc. No. 399(E) Rev. 3, at 25-26 (1990).

52      WIPO, Note on the First Part of the Diplomatic Conference for the Conclusion of a Treaty Supplementing the Paris Convention as Far as Patents Are Concerned, 1991 INDUS.PROP. 360 [hereinafter Note on the First Part of the Diplomatic Conference].

        On its face, it may appear odd for WIPO to decide that the Patent Harmonization Treaty would be ready for the Paris Union's full consideration two years in advance. At this point it may be useful to note that the intellectual-property negotiations of GATT, see supra note 3, have taken place concurrently with WIPO's work on the Patent Harmonization Treaty. The negotiations have addressed many of the same issues. See supra note 41.

        This other, rival regime for patent harmonization poses threats to WIPO. If comprehensive patent-harmonization provisions are finalized in GATT before the Patent Harmonization Treaty comes into being WIPO risks losing much of the institutional control it now holds over international patent matters. See generally Beier & Schricker, supra note 3, at 18-30, 75-92. WIPO therefore has considerable reason to push the negotiations over the Patent Harmonization Treaty to a rapid conclusion. See infra note 55. Indeed, some of WIPO's interests favor creation of the Patent Harmonization Treaty independent of whether that treaty is sound as a matter of international patent policy.

53      It is clear that WIPO originally thought the Paris Union would finalize the treaty at this conference. See Note on the First Part of the Diplomatic Conference, supra note 52, at 360.

54      As noted supra note 18, the USPTO has not included private-sector representatives in the official delegations of the United States to the negotiations. It apparently decided to rely on interested persons attending the negotiations independently.

55      See Kirk, supra note 22, at 605 (describing WIPO as "pushing" the harmonization negotiations "on a fast track"). WIPO's Committee of Experts met from July 1985 to November 1990 at an average of once every five months.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 108 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

56    See, e.g., Minutes of the 1991 Midwinter Meeting of the Council of the ABA Section of Patent, Trademark and Copyright Law, ABA-PTC, 1990-91 ANNUAL REPORT 23, 25 (reporting statement by William Brunet that the short time period between WIPO's issuance of the draft treaty and the scheduled beginning of the diplomatic conference "presents a timing problem"); see also Fryer, supra note 5, at 246 (noting lack of time to prepare for WIPO meeting and need for interest groups to act "immediately").

57    The Committee appears to have set the topics for each meeting no earlier than the preceding meeting. See, e.g., Note on the Third Session, 1987 INDUS.PROP. 204, 207-08; Note on the Fourth Session, 1988 INDUS.PROP. 174, 183, 185-86; Note on the Second Part of the Fifth Session, 1989 INDUS.PROP. 52, 59-60, 62. WIPO's International Bureau, moreover, which acted as Secretariat at the negotiations, often did not publish summaries of meetings for two to three months. See generally WIPO's Meeting Notes supra note 7. It appears, in fact, that the International Bureau of WIPO at times placed items on the agenda for a meeting and issued explanatory reports only after the conclusion of the last preceding meeting. See, e.g., Note on the Second Session, supra note 7, at 311.

58    See, e.g., Harry Manbeck, Commissioner of Patents and Trademarks, Address to the First Part of the Diplomatic Conference (June 19, 1991), excerpt reprinted in BNA PAT. TRADEMARK & COPYRIGHT DAILY, Sept. 4, 1991 [hereinafter Manbeck Speech]. Gutterman, supra note 3, at 107.

59    International Developments/Patents: U.S. Offers to Adopt First-to-File as Part of a Balanced Package of Reforms, 33 BNA PAT.TRADEMARK & COPYRIGHT.J. 581 (1987). See Note on the Third Session, 1987 INDUS.PROP. 204, 205 (noting U.S. delegation's statement that it would be "favorably inclined to consider" changing priority rule).

60    E.g., Draft Treaty on the harmonization of Certain Provisions in Laws for the Protection of Inventions, WIPO Doc. No. HL/CE/IV/2, art. 301 (1987), reprinted in 1988 INDUS.PROP. 179, 187-88 (draft treaty for discussion at fourth negotiating session).

61    See, e.g., Kirk, supra note 19, at 442 (observing that, as of January 1991, "no organized support" beyond a "few individuals" was being shown in favor of adopting a first-to-file priority system in the United States). Letter of Hon. Harry Manbeck, Comm'r. of Patents, to Arpad Bogsch, Dir. General of WIPO, Feb. 22, 1991, reprinted in 5 WORLD INTELL.PROP. 93-94 (1991) (asserting lack of support for a first-to-file system in the private sector in the United States).

62    Draft Articles 9, 11, and 13, The United States of America, Doc. PLT/DC/6 (Mar. 1, 1991), reprinted in Records, supra note 5. See generally USPTO Proposes First-to-Invent Option in Harmonization Treaty, 5 WORLD INTELL.PROP. 93 (1991); Kirk, supra note 19, at 442 (discussing substance of proposal).

63    See Note on the First Part of the Diplomatic Conference, supra note 52, at 360. This document reports that Paris Union Assembly decided, in April 1991, to shorten the duration of the June 1991, session of the diplomatic conference and continue the conference into a second part. WIPO abandoned its attempts to finalize the treaty in 1991 at this time. See also WIPO Postpones Decision on U.S. Proposal to Change International Patent Law, BNA PAT.TRADEMARK & COPYRIGHT DAILY, May 1, 1991 (discussing WIPO's decision to postpone consideration of the United States' proposed amendments to the Paris Convention).

For reports of the generally divisive effects of these late developments, see, e.g., Manbeck Speech, supra note 58; Joint Hearings on S. 2605 and H.R. 4978 Before the Senate Subcommittee on Patents, Copyrights and Trademarks and the House Subcommittee on Intellectual Property and Judicial Administration of the House and Senate Committees on the Judiciary, 138 CONG.REC. D487 (statement of the Hon. Harry Manbeck, Commissioner of Patents and Trademarks) (daily ed. Apr. 30, 1992) [hereinafter Manbeck Statement] (describing reaction of foreign delgations to United States proposal); William J. & Michael N. Meller, Report on Diplomatic Conference for Patent Harmonization Treaty, BNA PAT.TRADEMARK & COPYRIGHT DAILY, Sept. 4, 1991.

Some foreign interest groups, however, were receptive to the alternative U.S. proposal. See, e.g., International Federation of Industrial Property Counsel, FICPI Position Paper for the Diplomatic Conference for the Conclusion of a Treaty

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 109 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Supplementing the Paris Convention as Far as Patents Are Concerned (Patent Law Harmonization Treaty), at 1-2 (May 6, 1991) [hereinafter FICPI Position Paper]; Remarks of Bardehle at the Spring-Stated Meeting of the AIPLA (May 2, 1991), 1991 AIPLA BULL. 633, 636 (July-Sept. 1991).

64    See, e.g., Note on the First Part of the Diplomatic Conference, supra note 52.

65    Id.

66    See Memorandum of the Director General, supra note 8 for a description of the rescheduled second session.

67    Report of the Assembly, Twentieth Session (10th Extraordinary) WIPO Doc. No. P/A/xx/1 (Apr. 5, 1993). Those in the United States who favor harmonization have labored during the interim to create a consensus in favor of the treaty. The Intellectual Property Section of the American Bar Association, for example, was asked at both its 1991 and 1992 annual meetings to adopt a number of resolutions in favor of harmonization. Action taken on resolutions at the Annual Meeting in Atlanta, Georgia—August 1991, 10 PTC Newsletter, No. 1, 3 (1991); Action taken on resolutions at the Annual Meeting in San Francisco, California—August 1992, 11 PTC Newsletter, No. 1, 9 (1992). The Advisory Commission on Patent Law Reform addressed several of the specifics of harmonization in its September 1992 Report to the Secretary of Commerce. Report to the Commissioner, 41-72 (1992). The leadership of the American Intellectual Property Law Association continues to support harmonization strongly. See, e.g., 1991 Annual Meeting Report of the Harmonization Committee, 1991 AIPLA BULL. 128 (Oct.-Nov. 1991).

Perhaps the most important of these efforts is the legislation that was introduced in Congress during 1992, and which will probably be reintroduced in 1993. See supra note 11. Generally speaking, that legislation seeks to place the United States on record as favoring the Patent Harmonization Treaty.

The odd structure of the legislation shows that the pro-harmonization forces in the United States are at this time concerned primarily with resistance that is domestic, and not foreign. The legislation does not simply authorize representatives of the United States to pursue negotiations. Rather, it seeks to commit the United States, in advance, to adopt what are considered to be the major concessions in substantive patent law that harmonization would involve. E.g., S. 2605, 102d Cong., 1st Sess., § 2 (1991) (amending Title 35 U.S.C. to incorporate first-to-file priority). The effective date of the legislation will be tied to the date on which Japan and Europe adhere to the treaty. Thus, a major concern among pro-harmonization forces in the United States at this time clearly is convincing foreign delegations that the United States wants to harmonize.

68    The first and most notable is the Paris Convention, but others, such as the Patent Cooperation Treaty, 28 T.I.A.S. 7645 (1970), and the European Patent Convention, reprinted in PATERSON, supra note 23, at 499, are also well known.

69    See supra note 1 for a definition of harmonization.

70    PENROSE, supra note 20, at 49 (noting that "[t]he dream of many [who participated in the creation of the Paris Convention] was complete uniformity of the laws protecting industrial property in all nations."); Beier, supra note 21, at 5; EMERSON STRINGHAM, PATENTS AND GEBRAUCHMUSTER IN INTERNATIONAL LAW 45-62 (1935).

71    See generally WIPO, General Information, 15-16 (1992); William R. Cornish, The International Relations of Intellectual Property, 52 CAMBRIDGE L.J. 46, 47-48 (1993). One alternate structure is agreement to rely on an extra-national process for the grant of national patents. An example of this structure is the reliance, by the member countries of the EPC, on the granting procedure before the European Patent Office. See European Patent Convention, art. 64, reprinted in Leaffer, supra note 6, at 167 ("A European patent shall ... confer on its proprietor, ... in each Contracting State in respect of which it is granted, the same rights as would be conferred by a national patent granted in that State."). The provisions of Chapter II of the Patent Cooperation Treaty have this same general structure, although they not binding as yet. Another structure involves agreement to rely on initial grant and liability determinations that are both extra-national. The Community Patent Convention, reprinted in 1 MARY VITORIA ET. AL., ENCYCLOPEDIA OF UNITED

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 110 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

KINGDOM & EUROPEAN PATENT LAW 5001 (1990), is an example of such an agreement, although it is not in force. The United States has never been party to any such agreement.

[72]    See, e.g., PENROSE, supra note 20, at 88-89; Beier, supra note 21, at 9; Cornish, supra note 71, at 47-48. The assertion results from the fact that national patent systems remain the creation of individual national governments. See generally Beier & Schricker, supra note 3, at 136-38.

[73]    It is certainly true that the amount of international trade has increased greatly since the 1800's. See, e.g., infra notes 12-15. How this trend should affect the debate over international patenting, however, is unclear. Increasing international trade has doubtless made it increasingly important that we resolve the issues of international patenting correctly. Yet international trade includes both imports and exports. As the following discussion demonstrates, the mere fact that international trade has increased therefore does not determine, per se, which resolution of the issues is proper.

[74]    Sources discussing this history in the English language are extremely sparse. Almost no original documents exist in that language prior to 1900. See, e.g., REPORT OF THE COMMISSIONERS APPOINTED TO REVISE THE STATUTES RELATING TO PATENTS, TRADE AND OTHER MARKS, AND TRADE AND COMMERICAL NAMES UNDER ACT OF CONGRESS APPROVED JUNE 4, 1898, S.Misc. 20, 56th Cong., 2d Sess. (1902). Later summaries include PENROSE, supra note 20, at 42-57; LADAS, supra note 20, at 59-68: Beier, supra note 21, at 1; STRINGHAM, supra note 69 at 45-62; ULF ANDERFELT, INTERNATIONAL PATENT LEGISLATION AND DEVELOPING COUNTRIES 65-92 (1971). Kronstein & Till, supra note 20. The literature in French and German is apparently much more extensive.

[75]    See generally PENROSE, supra note 20, at 1-18. For a modern discussion of these divergencies from the viewpoint of a patent lawyer, see LADAS, supra note 20, at 20-27.

[76]    The United States instituted its system of examining patent applications substantively in 1836. The move was in reaction to the high frequency with which patents issued under the prior registration system were being invalidated in court actions.

[77]    See, e.g., CHARLES S. WHITMAN, PATENT LAWS AND PRACTICE OF OBTAINING LETTERS PATENT FOR INVENTIONS (1871). The French system was the most notable example of such a registration system. Id. at 152; LADAS, supra note 20, at 23-24. Italy examined only applications for inventions that related to beverages and food. WHITMAN, supra, at 165.

[78]    Austria and the Netherlands, for example. WHITMAN, supra note 77, at 63-64, 174.

[79]    This was certainly the practice of countries that awarded patents via registration. See supra note 77. In addition, England and Germany advertised pending applications prior to grant. LADAS, supra note 20, at 23-24.

[80]    The improved situation today may be due to the normalizing influence of the harmonization agreements that have already been put into place. PENROSE, supra note 20, at 1.

[81]    See LADAS, supra note 20, at 22.

[82]    Ladas lists these countries as including France, Spain, Sweden, and Italy. Id. at 22-23.

Case 6:25-cv-00581-ADA   Document 7-6   Filed 12/15/25   Page 111 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

83  PENROSE, supra note 20, at 69-70; LADAS, supra note 20, at 26. Ladas asserts that filing applications simultaneously in multiple countries was the only means of assuring the issuance of corresponding foreign patents.

84  E.g., Fritze Malchup & Edith Penrose, The Patent Controversy in the Ninetheenth Century, 10 J.ECON.HIST. 1, 28-29 (1950); PENROSE, supra note 20, at 88-89; ANDERFELT, supra note 74, at 99-100. Cf. Beier, supra note 21, at 9. As to the general validity of this dual categorization of patenting obstacles, see, e.g., LADAS, supra note 20, at 20.

85  This literature is summarized in Patent Controversy. Malchup & Penrose, supra note 84, at 9-10. The economic analyses of patenting in the 1800's were said to compare favorably with the literature on the subject offered as recently as the 1950's. Id.

86  E.g., Paul Heald, Federal Intellectual Property and the Economics of Preemption, 76 IOWA L.REV. 959, 962 (1991). See, e.g., VICTOR ABRAMSON, THE PATENT SYSTEM: ITS ECONOMIC AND SOCIAL BASIS, PATENT STUDY NO. 26 OF THE SUBCOMM. ON PATENTS, TRADEMARKS AND COPYRIGHT OF THE COMMITTEE ON THE JUDICIARY OF THE UNITED STATES SEN., 86th Cong., 2d Sess., 6 (1958) (reports in this set are hereinafter referred to individually as Patent Study No. ----). MALCHUP, supra note 16, at 58.

87  The result is society's underutilization of the advance. E.g., ANDERFELT, supra note 74, at 58. MALCHUP, supra note 16, at 60-62.

88  Of course, technology is not necessarily valuable merely because it has been patented. See, e.g., DONALD CHISUM, PATENTS § 4.02 (1992) (economic rationale for minimal utility requirement in the United States); SCM Corp. v. Xerox Corp., 645 F.2d 1195 (2d Cir.1981) (relation of patent rights to market power in antitrust context). The text means to restrict the discussion to those patented advances that consumers find desireable over pre-existing technology.

89  E.g., RICHARD POSNER, ECONOMIC ANALYSIS OF LAW 195-99 (2d ed. 1977); Kitch, supra note 16, at 266-67; MALCHUP, supra note 16, at 58-60.

90  See, e.g., MALCHUP, supra note 16, at 44-45; PENROSE, supra note 20, at 94.

91  PENROSE, supra note 20, at 55, 76-79; RAYMOND VERNON, THE INTERNATIONAL PATENT SYSTEM AND FOREIGN POLICY, PATENT STUDY NO. 5, 6 (1957).

92  E.g., MALCHUP, supra note 16, at 63-66; Richard P. Merges & Richard R. Nelson, On the Complex Economics of Patent Scope, 90 COLUM.L.REV. 839, 878-80 (1990).

93  See PENROSE, supra note 20, at 145-60. Cf. MALCHUP, supra note 16, at 79.

94  Cf. MALCHUP, supra note 16, at 79. In addition, the probability that the patent owner will reinvest the proceeds from patenting into the economy of the granting country is in all likelihood reduced. See, e.g., VERNON, supra note 91, at 7. The mitigating influence on the cost patenting discussed supra note 93, is thus removed. See e.g., PENROSE, supra note 20, at 145-60. Cf. ANDERFELT, supra note 72, at 80-81.

95  MALCHUP, supra note 16, at 55; PENROSE, supra note 20, at 95-96. See also ANDERFELT, supra note 74, at 127-29; VERNON, supra note 91, at 12-13.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 112 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

96    E.g., LADAS, supra note 20, at 26; MALCHUP, supra note 16, at 5. See generally FREDRIK NEUMEYER, COMPULSORY LICENSING OF PATENTS UNDER SOME NON-AMERICAN SYSTEMS, Patent Study No. 19 (1959). PENROSE, supra note 20, at 164-69.

97    E.g., MALCHUP, supra note 16, at 73-74. VERNON, supra note 91, at 13. The difference is roughly the cost of the royalty. Most systems require that the royalty be assessed at a level that is reasonable. The inherent indeterminacy of this standard, coupled with the fact that its calculation is ultimately in the hands of the granting nations' government, exposes foreign patentees to obvious risks. For a discussion of the effects of compulsory licensing in an international context, see PENROSE, supra note 20, at 152-68.

98    Penrose asserts, for example, that this consideration motivated England's introduction of compulsory licensing in its Patents Act of 1910. PENROSE, supra note 20, at 82 n. 58. See also Kronstein & Till, supra note 20, at 778.

99    E.g., ANDERFELT, supra note 74, at 65-66, 99-100. VERNON, supra note 91, at 3; Montgomery, International Aspects of Patent Legislation, 31 J.POL.ECON. 90, 93-94 (1928). France appears to have been the most notable example. The laws of that country not only required the invention be worked domestically; they also forbade the importation of any product covered by a French patent. Thus, French demand could be supplied only by domestic French production. E.g., PENROSE, supra note 20, at 75.

Ladas does not classify working requirements as protectionist measures. See generally LADAS, supra note 20. His work has been criticized, however, as unsophisticated in economic matters.

100    E.g., ANDERFELT, supra note 74, at 65-66; MALCHUP, supra note 16, at 17 n. 92; VERNON, supra note 91, at 35-36; PENROSE, supra note 20, at 143. A domestic inventor will either already have production facilities that are located domestically or, generally speaking, be able to arrange for the construction of facilities more easily than will a foreign inventor.

101    E.g., Kitch, supra note 16; Merges & Nelson, supra note 92; Mark F. Grady & Jay I. Alexander, Patent Law and Rent Dissipation, 78 VA.L.REV. 305 (1992); MALCHUP, supra note 16, at 63-64; KAUFER, supra note 16.

102    The ability of patents to be related in dominant-subservient relationships is well known. See, e.g., Kitch, supra note 16, at 268-69. Such patents are related in one of three ways: a patent to the generic invention may dominate a later-discovered specie; a patent to a subcombination may dominate later-discovered combinations that incorporate the subcombination; and a patent to a product may dominate later-discovered methods of making and/or using the product.

103    The owner of the dominating patent will extract royalties from the inventor of the improvement, thus forcing the newcomer to share his or her profits. See, e.g., PENROSE, supra note 20, at 101-03. In addition, in countries that do not provide for compulsory licensing, the newcomer risks being denied commercial use of the technology altogether by the dominant patent owner's refusal to deal. A number of countries ameliorate this latter effect by giving compulsory licenses to owners of subservient, or "dependent," patents. See, e.g., NEUMEYER, supra note 96, at 28-30.

104    Penrose cites as an example the stagnation of Britain's incandascent lamp industry in the 1800's after the initial grant of broad patents to a domestic entity. PENROSE, supra note 20. Merges & Nelson assert that the effect has recurred in a number of industries. Merges & Nelson, supra note 92, at 884-908. As a more recent example, a large United States manufacturer of health-care devices is reported to have moved a portion of its research facilities to Europe in response to another entity's dominant patent in this country. Thomas Burton, Aid for Racing Hearts Could Also be a Boon to a Pacemaker Firm, WALL ST. J., Jan. 12, 1993, at A1, A8.

105    Interestingly, lawyer-scholars active in the area have been unable to agree whether competition in research is economically efficient. Compare Kitch, supra note 16, at 276, with Merges & Nelson, supra note 92, at 871-78. The

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 113 of 520

sources cited in the preceding footnote support the narrower proposition, made in the text, that competition increases the speed with which invention occurs.

In any event, it would appear that the proposition in the text can be accepted as true for present purposes, inasmuch as patent systems reflect the general attempt to increase the speed of innovation by fostering competitive research. E.g., MALCHUP, supra note 16, at 50-52. See generally WILLIAM G. SHEPHERD, THE ECONOMICS OF INDUSTRIAL ORGANIZATION 145-51 (2d ed. 1985).

[106]  See generally supra note 101.

[107]  This can be due to any of a number of reasons, such as a national of one country gaining access to a copy of a patent granted in another, or because of international commerce in the patented good itself. See generally ANDERFELT, supra note 74, at 136-37; VERNON, supra note 91, at 17; PENROSE, supra note 20, at 100. Knowledge of the technology embodied in patented inventions appears to have traveled internationally routinely in the 1800's, particularly in Europe. With the common-language filings of the Patent Cooperation Treaty and the European Patent Convention, the availability of such foreign-patent teachings is probably far greater today. This ability to obtain technical information without granting national rights to the inventor seriously undercuts any attempt to rely on the traditional rationale of fostering disclosure in the context of international patenting.

[108]  During the early time period under discussion, the time-wise duration of national patents varied greatly between countries. E.g., LADAS, supra note 20, at 24-25.

[109]  See ANDERFELT, supra note 74, at 137-39; Kronstein & Till, supra note 20, at 774; PENROSE, supra note 20, at 133-35. This fact casts serious doubt on the viability of Kitch's prospect theory of patenting. Kitch, supra note 16. Kitch's theory relies on the efficiencies that arguably arise from placing control of technological development in the hands of a single firm. It has been attacked with the argument that competitive research is more efficient. Merges & Nelson, supra note 92.

At a more basic level, because the rights conferred by national patents are territorially limited, national patents do not provide the single-firm control over the patented technology upon which Kitch's theory depends. Instead, multi-firm competition to develop improvements is largely inescapable. Any attempt to rely on Kitch's prosect theory would therefore be largely futile. See generally PENROSE, supra note 20.

[110]  See, e.g., LADAS, supra note 20, at 27-28. The United States had such a provision until 1897, when it was replaced by the predecessor of Title 35, U.S.C. § 102(d) (1987). CHISUM, supra note 88, § 6.04[1].

[111]  E.g., ANDERFELT, supra note 74, at 65-66; LADAS, supra note 20, at 26-28.

[112]  See, e.g., ANDERFELT, supra note 74, at 138; PENROSE, supra note 20, at 107-08. See LADAS, supra note 20, at 29.

[113]  Only two bilateral treaties regarding patents existed prior to the formation of the Paris Convention. LADAS, supra note 20, at 45-46.

[114]  See sources cited supra note 74. The process involved congresses at two major industrial conferences, the International Exhibition of Vienna in 1873 and the Paris Exhibition of 1878. In addition, the negotiators convened a third congress in Paris in 1880.

[115]  E.g., ANDERFELT, supra note 74, at 66-69. The large presence of industrial interests during the negotiations has been detailed by various writers. E.g., PENROSE, supra note 20, at 45-57; Beier, supra note 21, at 2-3. Beier asserts that this influence has continued. Id. at 13.

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 114 of 520

116    E.g., PENROSE, supra note 20.

117    See infra notes 133-38. As to the results of the Paris Convention, Malchup states: "Only a few of the irksome problems of foreign patenting were solved and no progress was made toward the establishment of an 'international patent.' " MALCHUP, supra note 16, at 18.

118    For a general discussion of the difficulties of harmonizing substantive patent law, see LADAS, supra note 20, at 13-16.

119    Scholars in the field of negotiation theory agree that negotiated agreements are possible generally only where the parties have compatible interests. See generally ROGER FISHER & WILLIAM URY, GETTING TO YES 73 (1981); HOWARD RAIFFA, THE ART AND SCIENCE OF NEGOTIATION 45 (1982).

120    See, e.g., MALCHUP, supra note 16, at 63-65, for a review of the social costs and benefits of patenting.

121    See generally VERNON, supra note 91, at 14; PENROSE, supra note 20, at 114-15.

122    See PENROSE, supra note 20, at 114 (noting that "[t]he question ... is whether the gain to any particular economy from obtaining patents in other countries is likely to offset the costs of granting domestic patents to foreign non-resident patentees").

123    E.g. MALCHUP, supra note 16, at 56-62. Malchup presents a summary of the concepts of private vs. social costs and benefits. Id. at 56-58.

124    Id.

125    See, e.g., id., at 58; PENROSE, supra note 20, at 126. Of course, the statement in the text applies not to all industry, but to those industrial entities that expect to obtain significant patent rights. Firms that intend to seek patents more aggressively will therefore tend to weigh the benefits of patenting more strongly than will nonpatenting firms. Patent-seeking firms may be more prevalent in some industries than others. See generally Merges & Nelson, supra note 92.

126    Of the various social costs identified by Malchup, only the costs of faster obsolescence and dominating patent rights appear to result in private costs that are concentrated in industry. MALCHUP, supra note 16, at 64. Of particular note, the costs associated with single-source pricing over the patented advance appear to be widely diffused throughout society. Kitch asserts that the courts have viewed such output restrictions as the main cost of patenting. Kitch, supra note 16, at 282.

127    That is, the amount of incentive at which the social gains from further induced invention begins to fall short of offsetting the associated increase in social costs. See, e.g., PENROSE, supra note 20, at 94-95.

128    This proposition is a basic one that has been repeatedly understood in the scholarly literature, although not always considered worthy of express statement. See, e.g., ANDERFELT, supra note 74, at 99; PENROSE, supra note 20, at 91, 126. It is expressly stated here in recognition of the fact that some members of the patent bar either disagree or have not considered the matter in depth.

129    See generally ANDERFELT, supra note 74, at 76-77; Beier, supra note 21, at 13-20.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 115 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

130    See, e.g., PENROSE, supra note 20, at 114-15, 119-20, 123.

131    Again, to the extent that the individual industrial entities expect to receive significant patent rights in foreign countries. E.g., PENROSE, supra note 20, at 115. See supra note 125.

This factor can explain why independent inventors and small businesses have such small enthusiasm for the Patent Harmonization Treaty. See, e.g., 138 CONG.REC. H7370-72 (daily ed. Aug. 4, 1992) (statement of Rep. Bentley). Obtaining and enforcing patents in foreign countries is notoriously difficult. Large corporations with heavy R & D expenditures and extensive foreign sales can generally overcome these difficulties. Independent inventors and small companies, in contrast, are generally less able to do so. Because these groups are less likely to obtain the benefits of increased foreign patenting the associated costs may become relatively more significant to them.

132    Cf. PENROSE, supra note 20, at 131 (concluding that some form of international patenting is necessary to prevent stronger industrial countries from forcing weaker industrial countries to accept oppressive patent agreements).

133    See, e.g., PENROSE, supra note 20, at 113-14, 119-20. Foreign patents owned by entities domestic to a particular country can be counted as additions to that country's national wealth. See, e.g., MALCHUP, supra note 16, at 55.

134    This statement is subject to at least one major caveat. Some countries may have few domestic inventors and thus be less likely to obtain foreign patents even in an "open patenting" regime. Undeveloped and less developed countries present particular examples. Such countries may well conclude that the gains from a greater freedom to patent internationally are, from their national perspective, at best hypothetical. See, e.g., PENROSE, supra note 20, at 96, 115-17. Anderfelt's work explores various implications of this problem. See also Douglas F. Greer, The Case Against the Patent System in Developing Countries, 8 J.INT'L.L. & ECON. 223 (1973) (concluding that the costs which less developed countries incurr from international patenting outweigh the potential gains which such countries will receive); Gutterman, supra note 3, at 89. There are indications, however, that this issue was not present in the initial negotiations over the Paris Convention. ANDERFELT, supra note 74, at 92 (asserting that original negotiations included only industrialized countries and those with no national patent systems). More recently, increasing numbers of less developed countries have become signatory to the Paris Convention. E.g., ANDERFELT, supra note 74, at 92-97; Beier, supra note 21, at 14-15. This has led to the increasing occurrance of "north-south" splits in international patenting issues, as developing countries act on their main interest of stopping the outflow of wealth to foreign patentees. E.g., EC Officials Express Concern over Unresolved TRIPs Issues, 5 WORLD INTELL.PROP.REP. 215 (1991) (describing "clear north-south split" over the patentability of pharmaceuticals). See generally ANDERFELT, supra note 74, at 133-35; Beier, supra note 21, at 14-20.

135    Convention for the Protection of Industrial Property, Paris, Mar. 20, 1883, art. 4, 1 T.S. 80, 82. The provisions relating to industrial models, designs, and trademarks are omitted. Originally six months, the period of priority for inventions is now one year. Stockholm Revision, art. 4(c), 21 U.S.T. 1629, 1632.

136    See generally PENROSE, supra note 20, at 67-71, 90; LADAS, supra note 20, at 93.

137    PLT, supra note 8, art. 5.

138    For discussions of the effect of this article in its initial form, see PENROSE, supra note 20, at 74-87.

139    PLT, supra note 8, art. 2. See generally Beier & Schricker, supra note 3, at 83-87; PENROSE, supra note 20, at 64-67.

140    E.g., Beier & Schricker, supra note 3, at 83; PENROSE, supra note 20, at 64-65, Beier, supra note 21, at 9.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 116 of 520

THE HISTORY OP THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

141    See, e.g., PENROSE, supra note 20, at 66; Beier, supra note 29, at 84; ANDERFELT, supra note 74, at 70; LADAS, supra note 20, at 265; VERNON, supra note 91, at 2.

142    Although such provisions were no longer widespread by the 1870's, at an earlier time it was apparently common for national governments to refuse patents to foreigners outright. See LADAS, supra note 20, at 27. The United States patent had such a provision in its laws from 1793 to 1836. See Moy, supra note 17, at 789 n. 42. Canada, as another example, had such a provision until the early 1870's. See, e.g., Annual Report of the Commissioner of Patents, 1873, at 13-14.

National treatment also leads, by short extension, to the abolition of provisions that link the expiration of domestic and foreign patents. See generally LADAS, supra note 20, at 505-07; PENROSE, supra note 20, at 71-74. Although not in the Paris Convention originally, this prohibition appeared in the Washington Revision of 1911. E.g., PENROSE, supra note 20, at 72.

143    PENROSE, supra note 20, at 64; Beier, supra note 21, at 8-10; LADAS, supra note 20, at 269-70.

144    E.g., Beier, supra note 21, at 8; Bogsch, supra note 21, at 196-97; William R. Cornish, The Canker of Reciprocity, 10 EUR.INTELL.PROP.J. 99 (1980).

145    Elements in France, for example, objected to the use of national treatment in the convention. PENROSE, supra note 20, at 65-66. Various authors assert that the United States has historically pressed for reciprocity with the most vigor of any country in the Paris Union. Id. at 66; ANDERFELT, supra note 74, at 73 n. 26; LADAS, supra note 20, at 270. The United States has recently made reciprocity the basis of protection for foreign nationals in the Semi-Conductor Chip Protection Act. 17 U.S.C. §§ 902(a), 914.

146    E.g., MALCHUP, supra note 16, at 138; LADAS, supra note 20, at 269; Bogsch, supra note 21, at 197; M. Osterag, International Unions for the Protection of Literary, Industrial, and Artistic Property, 25 MICH.L.REV. 107, 110-11 (1926).

147    Indeed, national treatment appears to have been the norm in national patent laws even prior to the Paris Convention. LADAS, supra note 20, at 27-28, 47-48.

148    See supra notes 96-100. Strict working requirements, in fact, can have very nearly the same effect as refusing to grant patents to foreign inventors altogether. PENROSE, supra note 20, at 111, n. 2.

149    Moy, supra note 17, at 788.

150    Cf. Bogsch, supra note 21, at 196-97. This can also be done selectively by refusing to grant patents in particular technologies. Switzerland did so for a time, for example, with regard to process technology. ERIC SCHIFF, INDUSTRIALIZATION WITHOUT NATIONAL PATENTS 85-87 (1971); PENROSE, supra note 20, at 124. Modern examples include the exclusion of pharmaceuticals and food products from patentable subject matter in the patent laws of various countries. See generally Gutterman, supra note 3, at 125-36.

151    There are at least several sources that discuss, in the English language, the development of the Swiss patent system during the 1800's and early 1900's. Schiff, supra note 150, at 85-126; Penrose, supra note 20, at 16-17, 120-24; Kaufer, supra note 16, at 9-10, 48; Kronstein & Till, supra note 20, at 774-79.

152    See SCHIFF, supra note 150, at 85-95.

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

Case 6:25-cv-00581-ADA     Document 7-6     Filed 12/15/25     Page 117 of 520

153    PENROSE, supra note 20, at 122.

154    E.g., PENROSE, supra note 20, at 121; SCHIFF, supra note 150, at 103-04. In some countries, Swiss inventors "took out more patents per head of the domestic population than did inventors of any other nation." SCHIFF, supra note 150, at 90.

155    Cf. ANDERFELT, supra note 74, at 129-31; SCHIFF, supra note 150, at 100; PENROSE, supra note 20, at 117-24 (discussing importance of foreign patenting to countries with small domestic economies).

156    E.g., Beier, supra note 21, at 11.

157    PENROSE, supra note 20, at 65. The Netherlands also adhered to the Paris Convention without a national patent system. E.g., ANDERFELT, supra note 74, at 71; Beier, supra note 21, at 10-11.

158    PENROSE, supra note 20, at 121.

159    PENROSE, supra note 20, at 16-17; Kronstein & Till, supra note 20, at 778-79. Recognizing the existence of this mechanism raises interesting questions about the current Japanese patent system. That system has been criticized as failing to provide meaningful rights, particularly to foreign inventors. E.g., Hearing on the Effect of the Japanese Patent System on American Business Before the Subcommittee on Foreign Commerce and Tourism of the Committee on Commerce, Science, and Transportation, United States Senate, 100th Cong., 2d Sess. (June 24, 1988); Hearing on Japanese Patent Policy Before the Subcommittee on Foreign Commerce and Tourism of the Committee on Commerce, Science, and Transportation, United States Senate, 101st Cong., 1st Sess. (Feb. 28, 1989). The provisions of the Patent Harmonization Treaty that place maximum time limits on examination, for example, Basic Proposal, art. 16, are commonly regarded as being directed against the Japanese.

The current Japanese economy has several qualities that are similar to the economy that apparently existed in Switzerland in the second half of the 1800's: a relatively high degree of industrialization; a significant reliance on the export of manufactured, and hence potentially patentable, goods; a propensity for obtaining patents in foreign countries; and an overall size that represents a small domestic market in relation to the export market. See generally SCHIFF, supra note 149, at 90-101. In addition, at least some segments of Swiss industry feared that they were less innovative than foreign entities, and thus at risk of being dominated by foreign-owned patent rights, an accusation that some United States industrialists have leveled at Japan. E.g., Id. at 92; PENROSE, supra note 20, at 16, 123-24.

Japan may thus be benefiting from trade distortions that are the result of a general absence of a domestic patent system, much as Switzerland did in the late 1800's. See generally SCHIFF, supra note 150, at 101-06. For discussions of the relationship between substantive Japanese patent law and Japan's national trade interests, see Carter Mackley, The Role of the Patent System in Technology Transfer: The Japanese Experience, 26 COLUM.J.TRANSNAT'L.L. 131 (1987); Guntram Rahn, The Role of Industrial Property in Economic Development: The Japanese Experience, 14 IIC 449 (1983).

160    E.g., Beier, supra note 21, at 12 (asserting pattern of attempts to include minimum standards in revisions to the Paris Convention).

161    See STRINGHAM, supra note 70, at 126-30. Article 4 of the convention, for example, has expanded massively, and now treats numerous procedural cases in relatively minute detail. Stockholm Revision, arts 4-4 [quater], July 14, 1967, 21 U.S.T. 1629, 1631-36.

162    PENROSE, supra note 20, at 78-87; ANDERFELT, supra note 74, at 72-92; LADAS, supra note 20, at 68-89. Penrose describes these provisions as the "most controversial" in the convention.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 118 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

163  The relevant portions of article 5 now read:

A.—(1) Importation by the patentee into the country where the patent has been granted of articles manufactured in any of the countries of the Union shall not entail forfeiture.

(2) Each country of the Union shall have the right to take legislative measures providing for the grant of compulsory licenses to prevent the abuses which might result from the exercise of the exclusive rights conferred by the patent, for example, failure to work.

(3) Forfeiture of the patent shall not be provided for except in cases where the grant of compulsory licenses would not have been sufficient to prevent the said abuses. No proceedings for forfeiture or revocation of a patent may be instituted before the expiration of two years from the grant of the first compulsory license.

(4) A compulsory license may not be applied for on the ground of failure to work or insufficient working before the expiration of a period of four years from the date of filing of the patent application or three years from the date of grant of the patent, whichever period expires last; it shall be refused if the patentee justifies his inaction by legitimate reasons.

21 U.S.T. 1636-37.

164  See Beier, supra note 21, at 79, 96 (noting that the Paris Convention does not call for the provision of sufficient national laws); Kirk, supra note 22, at 601 (asserting that the Paris Convention provides for essentially no minimum standards).

165  E.g., ANDERFELT, supra note 74, at 95, 114. Anderfelt suggests that changes to article 17 during the Lisbon Revision of 1958 may obligate members of the Paris Union to enact patent systems. Id. at 114. He admits that at least one country did not adopt that interpretation.

166  PLT, supra note 8, art. 64(1).

167  See the authorities cited supra note 3.

168  Arts. 52-74, reprinted in PATERSON, supra note 23, at 523-30. See Beier, supra note 21, at 20.

169  Members of the European Economic Community, who roughly make up the membership of the EPC, are signatory to the Treaty of Rome. See generally Moy, supra note 17, at 808-09 nn. 137-38.

170  The identity of the trade and industry groups that have appeared before WIPO are listed in meeting notes referred to at supra note 7.

171  These differences can be seen in many of the disputes over specific provisions of the treaty. E.g., PLT, supra note 8, art. 10 (fields of technology); Id. art. 19 (rights conferred by the patent); Id. art. 22 (patent term); Id. art. 25 (obligations of the patent owner); Id. art. 26 (remedial measures for violation of art. 25).

Perhaps the clearest indication is in the dispute over the preamble of the treaty. The preamble is to be non-binding. Observations, supra note 41, at 5. Nevertheless, the various parties to negotiations cannot agree whether the Union "recogniz[es] the need to take into consideration the public policy objectives underlying national patent law," and is willing to "tak[e] into account development, technological, and public interest objectives" of its members. Basic Proposal, PLT, supra note 8, at 4. The preamble is one of the provisions of the treaty that the International Bureau has recommended deleting. See supra note 41.

172  See Wilder, supra note 47.

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 119 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

173  Article 20, paragraph 1 of the proposed treaty reads as follows:

Not withstanding Article 19 ["Rights conferred by the Patent"], a patent shall have no effect against any person (hereinafter referred to as the "prior user") who in good faith, for the purposes of his enterprise or business, before the filing date of where priority is claimed, the priority date of the application on which the patent is granted, and within the territory where the patent produces its effect, was using the inventionor was making effective and serious preparations for such use; any such person shall have the right, for the purposes of his enterprise or business, to continue such use or to use the invention as envisaged in such preparations.

PLT, supra note 8, at 41.

174  Joint Hearings on S. 2605 and H.R. 4978, Before the Senate Subcommittee on Patents, Copyrights and Trademarks and the House Subcommittee on Intellectual Property and Judicial Administration of the House and Senate Committees on the Judiciary, 102d Cong., 2d Sess. (statement of Douglas Wyatt) (Apr. 30, 1992).

175  The Patent Harmonization Treaty calls for prior-users rights based upon use "within the territory where the patent produces its effect." PLT, supra note 8, art. 20(1). The legislation previously before Congress would have granted prior-user rights only to those whose use was "in the United States." E.g., S. 2605, § 3(b) (proposing new 35 U.S.C. § 273(a)). This national focus corresponds to nearly identical provisions in the national laws of other countries. E.g., Beier, supra note 29, at 14, 17.

176  Article 4 of the Paris Convention, in fact, has always permitted the award of prior user rights by making the right of foreign priority "subject to the rights of third parties." E.g., PENROSE, supra note 20, at 68 n. 18.

177  E.g., PENROSE, supra note 20, at 1 n. 1; LADAS, supra note 20, at 270. But see VERNON, supra note 91, at 4 (asserting antitrust limitations on patenting in United States to exceed those in foreign countries). The law of antitrust in the United States is less extensive today than 1957, the date of Vernon's writing.

178  USPTO, Patents Issued by the Patent and Trademark Office, U.S. DEPT. OF COMMERCE NEWS RELEASE NO. 92-1 (Feb. 14, 1992). The latest statistics are expected to show a very slight decline in this percentage.

This percentage has increased drastically in the relatively recent past. At the turn of the century, less that 10% of United States patents were being granted to foreign nationals. COMM'R PATS.ANN REP.1970, 11, 26. The percentage was below 20% throughout most of the 1960's. Id. Thus foreign patenting can be said to inflict much greater damage on the United States economy today than in earlier times. See generally VERNON, supra note 91, at 4; Greer, supra note 134, at 228-30.

179  The reevaluation suggested in the text may find historical precedent in the changing negotiating position of England, which went from supporting open international patenting strongly in the 1880's to advocating more protectionist agreements in the early 1900's. Anderfelt suggests that this change was driven by the rest of the industrialized world reaching rough parity with England's development at the end of the Industrial revolution. ANDERFELT, supra note 74. See also PENROSE, supra note 20, at 140-41.

It is important to note that deemphasizing multilateral patent harmonization as a goal does not mean abandoning efforts to improve the rights of United States patentees in foreign countries. Bilateral mechanisms, such as actions under section 301 of the Trade Act of 1930, codified as amended in 19 U.S.C. §§ 1301, 1303, are available to change the behavior of the United States' trading partners. See generally DUVALL, supra note 3, at 591-93. Generally speaking, use of these mechanisms would require the United States to offer fewer commitments to change its own patent laws in return for concessions from foreign governments.

180  E.g. Fiorito, supra note 5, at 88-89; Pagenberg, supra note 5, at 2, 7; Manbeck statement, supra note 63.

181    Inventors who make public disclosures during the grace period will obtain patents that would not be granted otherwise.

182    Of course, this increase will apply to European inventors as well. The fact that European patenting interests also favor the use of a grace period is therefore not surprising. See supra note 30.

183    Moy, supra note 17, at 784-88.

184    United States patent law does not contain, for example, a working requirement, compulsory licensing or prior user rights. It contains no selective exclusion of technological fields from patentable subject matter. 35 U.S.C. § 101. United States procedures for granting patents, moreover, operate with essentially equal efficiency on applications filed by nationals and foreigners. Thus, while the United States' first-to-invent provisions are less than perfectly internationalist, United States patent law as a whole is probably no more protectionist than that of foreign patent systems. See, e.g., Section 24, German Patent Act of 1980, reprinted in Beier, supra note 21, at 22 (setting out compulsory licensing and working requirements); Societa Italiana Brevetti, Bulletin on Patents and Trademarks in Italy, 74 J.PAT. & TRADEMARK OFF.SOC'Y 484 (1992) (discussing compulsory licensing and working requirements in various European countries); Frederick M. Ritchie, So You Want a Commercially Important Patent in Japan!, 74 J.P.T.O.S. 186 (1992). The sources on Japanese patent practices cited supra note 158. Indeed, it may be considerably less so.

185    The protectionist effects of the United States' first-to-file provisions have been noted by foreign interests during the WIPO negotiations. See, e.g., International Federation of Industrial Property Counsel, FICPI Position Paper for the Diplomatic Conference for the Conclusion of a Treaty Supplementing the Paris Convention as Far as Patents Are Concerned (Patent Law Harmonization Treaty), at 1-2 (May 6, 1991) (discussing result as "bias in favor of residents of the U.S.").

186    See Moy, supra note 17, at 793-803.

187    Beier, supra note 21, at 18.

188    The advisory committees that have addressed international patenting issues since 1980 include the Advisory Commission of Patent Law Reform to the Secretary of Commerce, see A Report to the Secretary of Commerce (1992), the Industry Functional Advisory Committee on Intellectual Property Rights for Trade Policy Matters to the Secretary of Commerce (IFAC 3) and the Advisory Committee on International Intellectual Property to the Secretary of State.

189    For example, of the twenty-five members and alternate members of the Advisory Commission on Patent Law Reform, twenty were either employees of large patent-owning entities or private patent lawyers. Similarly, at least 31 of the 38 members of IFAC 3 were closely aligned with patent-owning industry.

190    See, e.g., Administration Statement on International Trade Policy, Sept. 23, 1985; U.S. Trade Representative, Oversight Hearing on Intellectual Property and Trade Before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the Committee on the Judiciary, 101st Cong., 1st Sess. 27-61 (1989) (testimony of Carla Hills).

191    Those efforts have included attempts to obtain greater protection, see Administration Statement on the Protection of U.S. Intellectual Property Rights Abroad, (Apr. 3, 1986); Statement by Secretary of Commerce Malcolm Baldrige on Proposed "Intellectual Property Rights Improvement Act of 1986," (Apr. 7, 1986); Statement by Ambassador Clayton Yeutter Concerning Intellectual Property Rights Protection, (Apr. 7, 1986), as well as efforts to document the amount of the potential gains. E.g., Foreign Intellectual Property Protection and the Effect on U.S. Industry and Trade, U.S.I.T.C.Pub. No. 2065 (1988).

Case 6:25-cv-00581-ADA   Document 7-6   Filed 12/15/25   Page 121 of 520

THE HISTORY OF THE PATENT HARMONIZATION..., 26 J. Marshall L. Rev....

192   See infra note 6.


26 JMARLR 457

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# **EXHIBIT 3**

**T.I.A.S. No. 6923 (U.S. Treaty), 21 U.S.T. 1583 (U.S. Treaty), 1970 WL 104436 (U.S. Treaty)**

UNITED STATES OF AMERICA

Multilateral

**Protection of Industrial Property**

Convention done at Stockholm July 14, 1967;

Ratification advised by the Senate of the United States of America February 28, 1970;
Ratified by the President of the United States of America, except for articles 1 through 12, May 4, 1970;
Ratification of the United States of America deposited May 25, 1970;
Proclaimed by the President of the United States of America August 12, 1970;
Entered into force with respect to the United States of America, except for articles 1 through 12, September 5, 1970.
September 5, 1970.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

Official English Text

**Article 1**

[Establishment of the Union; Scope of Industrial Property] [2]

**Article 2**

[National Treatment for Nationals of Countries of the Union]

**Article 3**

**Article 4**

[A to I. *Patents, Utility Models, Industrial Designs, Marks, Inventors' Certificates:* Right of Priority. - G. *Patents:* Division of the Application]

**Article 4 bis**

**Article 4 ter**

[*Patents:* Mention of the Inventor in the Patent]

**Article 4 quater**

**Article 5**

[A. *Patents:* Importation of Articles; Failure to Work or Insufficient Working; Compulsory Licenses. - B. *Industrial Designs:* Failure to Work; Importation of Articles. - C. *Marks:* Failure to Use; Different Forms; Use by Co-proprietors. -D. *Patents, Utility Models, Marks, Industrial Designs:* Marking]

**Article 5 bis**

**Article 5 ter**

Article 5 quater

Article 5 quinquies

[*Industrial Designs*]

Article 6

Article 6 bis

[*Marks:* Well-Known Marks]

Article 6 ter

Article 6 quater

[*Marks:* Assignment of Marks]

Article 6 quinquies

Article 6 sexies

[*Marks:* Service Marks]

Article 6 septies

Article 7

[*Marks:* Nature of the Goods to which the Mark is Applied]

Article 7 bis

[*Marks:* Collective Marks]

Article 8

[*Trade Names*]

Article 9

Article 10

Article 10 bis

[*Unfair Competition*]

Article 10 ter

Article 11

Article 12

[Special National Industrial Property Services]

Article 13

[Assembly of the Union]

Article 14

[Executive Committee]

Article 15

[International Bureau]

Article 16

[Finances]

Article 17

[Amendment of Articles 13 to 17]

Article 18

[Revision of Articles 1 to 12 and 18 to 30]

Article 19

[Special Agreements]

Article 20

Article 21

[Accession by Countries Outside the Union; Entry Into Force]

Article 22

[Consequences of Ratification or Accession]

Article 23

[Accession to Earlier Acts]

Article 24

[Territories]

Article 25

[Implementation of the Convention on the Domestic Level]

Article 26

[Denunciation]

Article 27

[Application of Earlier Acts]

Article 28

[Disputes]

Article 29

[Signature, Languages, Depositary Functions]

Article 30

[Transitional Provisions]

### BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

### A PROCLAMATION

CONSIDERING THAT:

 **\*1** The Paris Convention for the Protection of Industrial Property was revised at Stockholm on July 14, 1967, the text of which revised Convention, as certified by the Head of the Archives, Royal Ministry for Foreign Affairs, Stockholm, is as follows:

**Paris Convention for the Protection of Industrial Property of March 20, 1883, as revised at Brussels on December 14, 1900, at Washington on June 2, 1911, at The Hague on November 6, 1925, at London on June 2, 1934, at Lisbon on October 31, 1958, [1] and at Stockholm on July 14, 1967**

**Official English Text**

**United International Bureaux for the Protection of Intellectual Property (BIRPI) GENEVA 1968**

**Paris Convention for the Protection of Industrial Property of March 20, 1883, as revised at BRUSSELS on December 14, 1900, at WASHINGTON on June 2, 1911, at THE HAGUE on November 6, 1925, at LONDON on June 2, 1934, at LISBON on October 31, 1958, and at STOCKHOLM on July 14, 1967**

**Article 1**

**[Establishment of the Union; Scope of Industrial Property] [2]**

(1) The countries to which this Convention applies constitute a Union for the protection of industrial property.

(2) The protection of industrial property has as its object patents, utility models, industrial designs, trademarks, service marks, trade names, indications of source or appellations of origin, and the repression of unfair competition.

(3) Industrial property shall be understood in the broadest sense and shall apply not only to industry and commerce proper, but likewise to agricultural and extractive industries and to all manufactured or natural products, for example, wines, grain, tobacco leaf, fruit, cattle, minerals, mineral waters, beer, flowers, and flour.

(4) Patents shall include the various kinds of industrial patents recognized by the laws of the countries of the Union, such as patents of importation, patents of improvement, patents and certificates of addition, etc.

**Article 2**

**[National Treatment for Nationals of Countries of the Union]**

(1) Nationals of any country of the Union shall, as regards the protection of industrial property, enjoy in all the other countries of the Union the advantages that their respective laws now grant, or may hereafter grant, to nationals; all without prejudice to the rights specially provided for by this Convention. Consequently, they shall have the same protection as the latter, and the same legal remedy against any infringement of their rights, provided that the conditions and formalities imposed upon nationals are complied with.

(2) However, no requirement as to domicile or establishment in the country where protection is claimed may be imposed upon nationals of countries of the Union for the enjoyment of any industrial property rights.

(3) The provisions of the laws of each of the countries of the Union relating to judicial and administrative procedure and to jurisdiction, and to the designation of an address for service or the appointment of an agent, which may be required by the laws on industrial property are expressly reserved.

## Article 3

### [Same Treatment for Certain Categories of Persons as for Nationals of Countries of the Union]

Nationals of countries outside the Union who are domiciled or who have real and effective industrial or commercial establishments in the territory of one of the countries of the Union shall be treated in the same manner as nationals of the countries of the Union.

## Article 4

### [A to I. *Patents, Utility Models, Industrial Designs, Marks, Inventors' Certificates:* Right of Priority. - G. *Patents:* Division of the Application]

A. - (1) Any person who has duly filed an application for a patent, or for the registration of a utility model, or of an industrial design, or of a trademark, in one of the countries of the Union, or his successor in title, shall enjoy, for the purpose of filing in the other countries, a right of priority during the periods hereinafter fixed.

(2) Any filing that is equivalent to a regular national filing under the domestic legislation of any country of the Union or under bilateral or multilateral treaties concluded between countries of the Union shall be recognized as giving rise to the right of priority.

(3) By a regular national filing is meant any filing that is adequate to establish the date on which the application was filed in the country concerned, whatever may be the subsequent fate of the application.

B. - Consequently, any subsequent filing in any of the other countries of the Union before the expiration of the periods referred to above shall not be invalidated by reason of any acts accomplished in the interval, in particular, another filing, the publication or exploitation of the invention, the putting on sale of copies of the design, or the use of the mark, and such acts cannot give rise to any third-party right or any right of personal possession. Rights acquired by third parties before the date of the first application that serves as the basis for the right of priority are reserved in accordance with the domestic legislation of each country of the Union.

C. - (1) The periods of priority referred to above shall be twelve months for patents and utility models, and six months for industrial designs and trademarks.

(2) These periods shall start from the date of filing of the first application; the day of filing shall not be included in the period.

(3) If the last day of the period is an official holiday, or a day when the Office is not open for the filing of applications in the country where protection is claimed, the period shall be extended until the first following working day.

(4) A subsequent application concerning the same subject as a previous first application within the meaning of paragraph (2), above, filed in the same country of the Union, shall be considered as the first application, of which the filing date shall be the starting point of the period of priority, if, at the time of filing the subsequent application, the said previous application has

been withdrawn, abandoned, or refused, without having been laid open to public inspection and without leaving any rights outstanding, and if it has not yet served as a basis for claiming a right of priority. The previous application may not thereafter serve as a basis for claiming a right of priority.

D. - (1) Any person desiring to take advantage of the priority of a previous filing shall be required to make a declaration indicating the date of such filing and the country in which it was made. Each country shall determine the latest date on which such declaration must be made.

(2) These particulars shall be mentioned in the publications issued by the competent authority, and in particular in the patents and the specifications relating thereto.

(3) The countries of the Union may require any person making a declaration of priority to produce a copy of the application (description, drawings, etc.) previously filed. The copy, certified as correct by the authority which received such application, shall not require any authentication, and may in any case be filed, without fee, at any time within three months of the filing of the subsequent application. They may require it to be accompanied by a certificate from the same authority showing the date of filing, and by a translation.

(4) No other formalities may be required for the declaration of priority at the time of filing the application. Each country of the Union shall determine the consequences of failure to comply with the formalities prescribed by this Article, but such consequences shall in no case go beyond the loss of the right of priority.

(5) Subsequently, further proof may be required.

Any person who avails himself of the priority of a previous application shall be required to specify the number of that application; this number shall be published as provided for by paragraph (2), above.

E. - (1) Where an industrial design is filed in a country by virtue of a right of priority based on the filing of a utility model, the period of priority shall be the same as that fixed for industrial designs.

(2) Furthermore, it is permissible to file a utility model in a country by virtue of a right of priority based on the filing of a patent application, and vice versa.

F. - No country of the Union may refuse a priority or a patent application on the ground that the applicant claims multiple priorities, even if they originate in different countries, or on the ground that an application claiming one or more priorities contains one or more elements that were not included in the application or applications whose priority is claimed, provided that, in both cases, there is unity of invention within the meaning of the law of the country.

With respect to the elements not included in the application or applications whose priority is claimed, the filing of the subsequent application shall give rise to a right of priority under ordinary conditions.

G. - (1) If the examination reveals that an application for a patent contains more than one invention, the applicant may divide the application into a certain number of divisional applications and preserve as the date of each the date of the initial application and the benefit of the right of priority, if any.

(2) The applicant may also, on his own initiative, divide a patent application and preserve as the date of each divisional application the date of the initial application and the benefit of the right of priority, if any. Each country of the Union shall have the right to determine the conditions under which such division shall be authorized.

H. - Priority may not be refused on the ground that certain elements of the invention for which priority is claimed do not appear among the claims formulated in the application in the country of origin, provided that the application documents as a whole specifically disclose such elements.

I. - (1) Applications for inventors' certificates filed in a country in which applicants have the right to apply at their own option either for a patent or for an inventor's certificate shall give rise to the right of priority provided for by this Article, under the same conditions and with the same effects as applications for patents.

(2) In a country in which applicants have the right to apply at their own option either for a patent or for an inventor's certificate, an applicant for an inventor's certificate shall, in accordance with the provisions of this Article relating to patent applications, enjoy a right of priority based on an application for a patent, a utility model, or an inventor's certificate.

## Article 4 <sup>bis</sup>

### [*Patents:* Independence of Patents Obtained for the Same Invention in Different Countries]

(1) Patents applied for in the various countries of the Union by nationals of countries of the Union shall be independent of patents obtained for the same invention in other countries, whether members of the Union or not.

(2) The foregoing provision is to be understood in an unrestricted sense, in particular, in the sense that patents applied for during the period of priority are independent, both as regards the grounds for nullity and forfeiture, and as regards their normal duration.

(3) The provision shall apply to all patents existing at the time when it comes into effect.

(4) Similarly, it shall apply, in the case of the accession of new countries, to patents in existence on either side at the time of accession.

(5) Patents obtained with the benefit of priority shall, in the various countries of the Union, have a duration equal to that which they would have, had they been applied for or granted without the benefit of priority.

## Article 4 <sup>ter</sup>

### [*Patents:* Mention of the Inventor in the Patent]

The inventor shall have the right to be mentioned as such in the patent.

## Article 4 <sup>quater</sup>

### [*Patents:* Patentability in Case of Restrictions of Sale by Law]

The grant of a patent shall not be refused and a patent shall not be invalidated on the ground that the sale of the patented product or of a product obtained by means of a patented process is subject to restrictions or limitations resulting from the domestic law.

# Article 5

**[A.*Patents:* Importation of Articles; Failure to Work or Insufficient Working; Compulsory Licenses. - B. *Industrial Designs:* Failure to Work; Importation of Articles. - C. *Marks:* Failure to Use; Different Forms; Use by Co-proprietors. -D. *Patents, Utility Models, Marks, Industrial Designs:* Marking]**

A. - (1) Importation by the patentee into the country where the patent has been granted of articles manufactured in any of the countries of the Union shall not entail forfeiture of the patent.

(2) Each country of the Union shall have the right to take legislative measures providing for the grant of compulsory licenses to prevent the abuses which might result from the exercise of the exclusive rights conferred by the patent, for example, failure to work.

(3) Forfeiture of the patent shall not be provided for except in cases where the grant of compulsory licenses would not have been sufficient to prevent the said abuses. No proceedings for the forfeiture or revocation of a patent may be instituted before the expiration of two years from the grant of the first compulsory license.

(4) A compulsory license may not be applied for on the ground of failure to work or insufficient working before the expiration of a period of four years from the date of filing of the patent application or three years from the date of the grant of the patent, whichever period expires last; it shall be refused if the patentee justifies his inaction by legitimate reasons. Such a compulsory license shall be non-exclusive and shall not be transferable, even in the form of the grant of a sub-license, except with that part of the enterprise or good-will which exploits such license.

(5) The foregoing provisions shall be applicable, mutatis mutandis, to utility models.

B. - The protection of industrial designs shall not, under any circumstance, be subject to any forfeiture, either by reason of failure to work or by reason of the importation of articles corresponding to those which are protected.

C. - (1) If, in any country, use of the registered mark is compulsory, the registration may be cancelled only after a reasonable period, and then only if the person concerned does not justify his inaction.

(2) Use of a trademark by the proprietor in a form differing in elements which do not alter the distinctive character of the mark in the form in which it was registered in one of the countries of the Union shall not entail invalidation of the registration and shall not diminish the protection granted to the mark.

(3) Concurrent use of the same mark on identical or similar goods by industrial or commercial establishments considered as co-proprietors of the mark according to the provisions of the domestic law of the country where protection is claimed shall not prevent registration or diminish in any way the protection granted to the said mark in any country of the Union, provided that such use does not result in misleading the public and is not contrary to the public interest.

D. - No indication or mention of the patent, of the utility model, of the registration of the trademark, or of the deposit of the industrial design, shall be required upon the goods as a condition of recognition of the right to protection.

# Article 5 $^{bis}$

**[*All Industrial Property Rights:* Period of Grace for the Payment
of Fees for the Maintenance of Rights; *Patents:* Restoration]**

(1) A period of grace of not less than six months shall be allowed for the payment of the fees prescribed for the maintenance of industrial property rights, subject, if the domestic legislation so provides, to the payment of a surcharge.

(2) The countries of the Union shall have the right to provide for the restoration of patents which have lapsed by reason of non-payment of fees.

### Article 5 <sup>ter</sup>

**[*Patents:* Patented Devices Forming Part of Vessels, Aircraft, or Land Vehicles]**

In any country of the Union the following shall not be considered as infringements of the rights of a patentee:
  1. the use on board vessels of other countries of the Union of devices forming the subject of his patent in the body of the vessel, in the machinery, tackle, gear and other accessories, when such vessels temporarily or accidentally enter the waters of the said country, provided that such devices are used there exclusively for the needs of the vessel;
  2. the use of devices forming the subject of the patent in the construction or operation of aircraft or land vehicles of other countries of the Union, or of accessories of such aircraft or land vehicles, when those aircraft or land vehicles temporarily or accidentally enter the said country.

### Article 5 <sup>quater</sup>

**[*Patents:* Importation of Products Manufactured by a Process Patented in the Importing Country]**

When a product is imported into a country of the Union where there exists a patent protecting a process of manufacture of the said product, the patentee shall have all the rights, with regard to the imported product, that are accorded to him by the legislation of the country of importation, on the basis of the process patent, with respect to products manufactured in that country.

### Article 5 <sup>quinquies</sup>

**[*Industrial Designs*]**

Industrial designs shall be protected in all the countries of the Union.

### Article 6

**[*Marks:* Conditions of Registration; Independence of Protection of Same Mark in Different Countries]**

(1) The conditions for the filing and registration of trademarks shall be determined in each country of the Union by its domestic legislation.

(2) However, an application for the registration of a mark filed by a national of a country of the Union in any country of the Union may not be refused, nor may a registration be invalidated, on the ground that filing, registration, or renewal, has not been effected in the country of origin.

(3) A mark duly registered in a country of the Union shall be regarded as independent of marks registered in the other countries of the Union, including the country of origin.

## Article 6 <sup>bis</sup>

### [*Marks:* Well-Known Marks]

(1) The countries of the Union undertake, ex officio if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration, and to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.

(2) A period of at least five years from the date of registration shall be allowed for requesting the cancellation of such a mark. The countries of the Union may provide for a period within which the prohibition of use must be requested.

(3) No time limit shall be fixed for requesting the cancellation or the prohibition of the use of marks registered or used in bad faith.

## Article 6 <sup>ter</sup>

### [*Marks:* Prohibitions concerning State Emblems, Official Hallmarks, and Emblems of Intergovernmental Organizations]

(1) *(a)* The countries of the Union agree to refuse or to invalidate the registration, and to prohibit by appropriate measures the use, without authorization by the competent authorities, either as trademarks or as elements of trademarks, of armorial bearings, flags, and other State emblems, of the countries of the Union, official signs and hallmarks indicating control and warranty adopted by them, and any imitation from a heraldic point of view.

*(b)* The provisions of subparagraph *(a)*, above, shall apply equally to armorial bearings, flags, other emblems, abbreviations, and names, of international intergovernmental organizations of which one or more countries of the Union are members, with the exception of armorial bearings, flags, other emblems, abbreviations, and names, that are already the subject of international agreements in force, intended to ensure their protection.

*(c)* No country of the Union shall be required to apply the provisions of subparagraph *(b)*, above, to the prejudice of the owners of rights acquired in good faith before the entry into force, in that country, of this Convention. The countries of the Union shall not be required to apply the said provisions when the use or registration referred to in subparagraph *(a)*, above, is not of such a nature as to suggest to the public that a connection exists between the organization concerned and the armorial bearings, flags, emblems, abbreviations, and names, or if such use or registration is probably not of such a nature as to mislead the public as to the existence of a connection between the user and the organization.

(2) Prohibition of the use of official signs and hallmarks indicating control and warranty shall apply solely in cases where the marks in which they are incorporated are intended to be used on goods of the same or a similar kind.

(3) *(a)* For the application of these provisions, the countries of the Union agree to communicate reciprocally, through the intermediary of the International Bureau, the list of State emblems, and official signs and hallmarks indicating control and warranty, which they desire, or may hereafter desire, to place wholly or within certain limits under the protection of this Article, and all subsequent modifications of such list. Each country of the Union shall in due course make available to the public the lists so communicated.

Nevertheless such communication is not obligatory in respect of flags of States.

*(b)* The provisions of subparagraph *(b)* of paragraph (1) of this Article shall apply only to such armorial bearings, flags, other emblems, abbreviations, and names, of international intergovernmental organizations as the latter have communicated to the countries of the Union through the intermediary of the International Bureau.

(4) Any country of the Union may, within a period of twelve months from the receipt of the notification, transmit its objections, if any, through the intermediary of the International Bureau, to the country or international intergovernmental organization concerned.

(5) In the case of State flags, the measures prescribed by paragraph (1), above, shall apply solely to marks registered after November 6, 1925.

(6) In the case of State emblems other than flags, and of official signs and hallmarks of the countries of the Union, and in the case of armorial bearings, flags, other emblems, abbreviations, and names, of international intergovernmental organizations, these provisions shall apply only to marks registered more than two months after receipt of the communication provided for in paragraph (3), above.

(7) In cases of bad faith, the countries shall have the right to cancel even those marks incorporating State emblems, signs, and hallmarks, which were registered before November 6, 1925.

(8) Nationals of any country who are authorized to make use of the State emblems, signs, and hallmarks, of their country may use them even if they are similar to those of another country.

(9) The countries of the Union undertake to prohibit the unauthorized use in trade of the State armorial bearings of the other countries of the Union, when the use is of such a nature as to be misleading as to the origin of the goods.

(10) The above provisions shall not prevent the countries from exercising the right given in paragraph (3) of Article 6 $^{quinquies}$, Section B, to refuse or to invalidate the registration of marks incorporating, without authorization, armorial bearings, flags, other State emblems, or official signs and hallmarks adopted by a country of the Union, as well as the distinctive signs of international intergovernmental organizations referred to in paragraph (1), above.

## Article 6 $^{quater}$

### [*Marks:* Assignment of Marks]

(1) When, in accordance with the law of a country of the Union, the assignment of a mark is valid only if it takes place at the same time as the transfer of the business or goodwill to which the mark belongs, it shall suffice for the recognition of such

validity that the portion of the business or goodwill located in that country be transferred to the assignee, together with the exclusive right to manufacture in the said country, or to sell therein, the goods bearing the mark assigned.

(2) The foregoing provision does not impose upon the countries of the Union any obligation to regard as valid the assignment of any mark the use of which by the assignee would, in fact, be of such a nature as to mislead the public, particularly as regards the origin, nature, or essential qualities, of the goods to which the mark is applied.

### Article 6 <sup>quinquies</sup>

[*Marks:* Protection of Marks Registered in One Country of the Union in the Other Countries of the Union]

A. - (1) Every trademark duly registered in the country of origin shall be accepted for filing and protected as is in the other countries of the Union, subject to the reservations indicated in this Article. Such countries may, before proceeding to final registration, require the production of a certificate of registration in the country of origin, issued by the competent authority. No authentication shall be required for this certificate.

(2) Shall be considered the country of origin the country of the Union where the applicant has a real and effective industrial or commercial establishment, or, if he has no such establishment within the Union, the country of the Union where he has his domicile, or, if he has no domicile within the Union but is a national of a country of the Union, the country of which he is a national.

B. - Trademarks covered by this Article may be neither denied registration nor invalidated except in the following cases:
 1. when they are of such a nature as to infringe rights acquired by third parties in the country where protection is claimed;
 2. when they are devoid of any distinctive character, or consist exclusively of signs or indications which may serve, in trade, to designate the kind, quality, quantity, intended purpose, value, place of origin, of the goods, or the time of production, or have become customary in the current language or in the bona fide and established practices of the trade of the country where protection is claimed;
 3. when they are contrary to morality or public order and, in particular, of such a nature as to deceive the public. It is understood that a mark may not be considered contrary to public order for the sole reason that it does not conform to a provision of the legislation on marks, except if such provision itself relates to public order.

This provision is subject, however, to the application of Article 10 <sup>bis</sup>.

C. - (1) In determining whether a mark is eligible for protection, all the factual circumstances must be taken into consideration, particularly the length of time the mark has been in use.

(2) No trademark shall be refused in the other countries of the Union for the sole reason that it differs from the mark protected in the country of origin only in respect of elements that do not alter its distinctive character and do not affect its identity in the form in which it has been registered in the said country of origin.

D. - No person may benefit from the provisions of this Article if the mark for which he claims protection is not registered in the country of origin.

E. - However, in no case shall the renewal of the registration of the mark in the country of origin involve an obligation to renew the registration in the other countries of the Union in which the mark has been registered.

F. - The benefit of priority shall remain unaffected for applications for the registration of marks filed within the period fixed by Article 4, even if registration in the country of origin is effected after the expiration of such period.

## Article 6 <sup>sexies</sup>

### [*Marks:* Service Marks]

The countries of the Union undertake to protect service marks. They shall not be required to provide for the registration of such marks.

## Article 6 <sup>septies</sup>

### [*Marks:* Registration in the Name of the Agent or Representative of the Proprietor Without the Latter's Authorization]

(1) If the agent or representative of the person who is the proprietor of a mark in one of the countries of the Union applies, without such proprietor's authorization, for the registration of the mark in his own name, in one or more countries of the Union, the proprietor shall be entitled to oppose the registration applied for or demand its cancellation or, if the law of the country so allows, the assignment in his favor of the said registration, unless such agent or representative justifies his action.

(2) The proprietor of the mark shall, subject to the provisions of paragraph (1), above, be entitled to oppose the use of his mark by his agent or representative if he has not authorized such use.

(3) Domestic legislation may provide an equitable time limit within which the proprietor of a mark must exercise the rights provided for in this Article.

## Article 7

### [*Marks:* Nature of the Goods to which the Mark is Applied]

The nature of the goods to which a trademark is to be applied shall in no case form an obstacle to the registration of the mark.

## Article 7 <sup>bis</sup>

### [*Marks:* Collective Marks]

(1) The countries of the Union undertake to accept for filing and to protect collective marks belonging to associations the existence of which is not contrary to the law of the country of origin, even if such associations do not possess an industrial or commercial establishment.

(2) Each country shall be the judge of the particular conditions under which a collective mark shall be protected and may refuse protection if the mark is contrary to the public interest.

(3) Nevertheless, the protection of these marks shall not be refused to any association the existence of which is not contrary to the law of the country of origin, on the ground that such association is not established in the country where protection is sought or is not constituted according to the law of the latter country.

## Article 8

### [*Trade Names*]

A trade name shall be protected in all the countries of the Union without the obligation of filing or registration, whether or not it forms part of a trademark.

## Article 9

### [*Marks, Trade Names:* Seizure, on Importation, etc., of Goods Unlawfully Bearing a Mark or Trade Name]

(1) All goods unlawfully bearing a trademark or trade name shall be seized on importation into those countries of the Union where such mark or trade name is entitled to legal protection.

(2) Seizure shall likewise be effected in the country where the unlawful affixation occurred or in the country into which the goods were imported.

(3) Seizure shall take place at the request of the public prosecutor, or any other competent authority, or any interested party, whether a natural person or a legal entity, in conformity with the domestic legislation of each country.

(4) The authorities shall not be bound to effect seizure of goods in transit.

(5) If the legislation of a country does not permit seizure on importation, seizure shall be replaced by prohibition of importation or by seizure inside the country.

(6) If the legislation of a country permits neither seizure on importation nor prohibition of importation nor seizure inside the country, then, until such time as the legislation is modified accordingly, these measures shall be replaced by the actions and remedies available in such cases to nationals under the law of such country.

## Article 10

### [*False Indications:* Seizure, on Importation, etc., of Goods Bearing
### False Indications as to their Source or the Identity of the Producer]

(1) The provisions of the preceding Article shall apply in cases of direct or indirect use of a false indication of the source of the goods or the identity of the producer, manufacturer, or merchant.

(2) Any producer, manufacturer, or merchant, whether a natural person or a legal entity, engaged in the production or manufacture of or trade in such goods and established either in the locality falsely indicated as the source, or in the region where such locality is situated, or in the country falsely indicated, or in the country where the false indication of source is used, shall in any case be deemed an interested party.

## Article 10 <sup>bis</sup>

### [*Unfair Competition*]

(1) The countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition.

(2) Any act of competition contrary to honest practices in industrial or commercial matters constitutes an act of unfair competition.

(3) The following in particular shall be prohibited:
1. all acts of such a nature as to create confusion by any means whatever with the establishment, the goods, or the industrial or commercial activities, of a competitor;
2. false allegations in the course of trade of such a nature as to discredit the establishment, the goods, or the industrial or commercial activities, of a competitor;
3. indications or allegations the use of which in the course of trade is liable to mislead the public as to the nature, the manufacturing process, the characteristics, the suitability for their purpose, or the quantity, of the goods.

## Article 10 <sup>ter</sup>

### [*Marks, Trade Names, False Indications, Unfair Competition:* **Remedies, Right to Sue**]

(1) The countries of the Union undertake to assure to nationals of the other countries of the Union appropriate legal remedies effectively to repress all the acts referred to in Articles 9, 10, and 10 <sup>bis</sup>.

(2) They undertake, further, to provide measures to permit federations and associations representing interested industrialists, producers, or merchants, provided that the existence of such federations and associations is not contrary to the laws of their countries, to take action in the courts or before the administrative authorities, with a view to the repression of the acts referred to in Articles 9, 10, and 10 <sup>bis</sup>, in so far as the law of the country in which protection is claimed allows such action by federations and associations of that country.

## Article 11

### [*Inventions, Utility Models, Industrial Designs, Marks:* **Temporary Protection at Certain International Exhibitions**]

(1) The countries of the Union shall, in conformity with their domestic legislation, grant temporary protection to patentable inventions, utility models, industrial designs, and trademarks, in respect of goods exhibited at official or officially recognized international exhibitions held in the territory of any of them.

(2) Such temporary protection shall not extend the periods provided by Article 4. If, later, the right of priority is invoked, the authorities of any country may provide that the period shall start from the date of introduction of the goods into the exhibition.

(3) Each country may require, as proof of the identity of the article exhibited and of the date of its introduction, such documentary evidence as it considers necessary.

## Article 12

### [Special National Industrial Property Services]

(1) Each country of the Union undertakes to establish a special industrial property service and a central office for the communication to the public of patents, utility models, industrial designs, and trademarks.

(2) This service shall publish an official periodical journal. It shall publish regularly:
   *(a)* the names of the proprietors of patents granted, with a brief designation of the inventions patented;
   *(b)* the reproductions of registered trademarks.

## Article 13

### [Assembly of the Union]

(1) *(a)* The Union shall have an Assembly consisting of those countries of the Union which are bound by Articles 13 to 17.

*(b)* The Government of each country shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(2) *(a)* The Assembly shall:
   (i) deal with all matters concerning the maintenance and development of the Union and the implementation of this Convention;
   (ii) give directions concerning the preparation for conferences of revision to the International Bureau of Intellectual Property (hereinafter designated as "the International Bureau") referred to in the Convention establishing the World Intellectual Property Organization (hereinafter designated as "the Organization"), due account being taken of any comments made by those countries of the Union which are not bound by Articles 13 to 17;
   (iii) review and approve the reports and activities of the Director General of the Organization concerning the Union, and give him all necessary instructions concerning matters within the competence of the Union;
   (iv) elect the members of the Executive Committee of the Assembly;
   (v) review and approve the reports and activities of its Executive Committee, and give instructions to such Committee;
   (vi) determine the program and adopt the triennial budget of the Union, and approve its final accounts;
   (vii) adopt the financial regulations of the Union;
   (viii) establish such committees of experts and working groups as it deems appropriate to achieve the objectives of the Union;
   (ix) determine which countries not members of the Union and which intergovernmental and international nongovernmental organizations shall be admitted to its meetings as observers;
   (x) adopt amendments to Articles 13 to 17;
   (xi) take any other appropriate action designed to further the objectives of the Union;
   (xii) perform such other functions as are appropriate under this Convention;
   (xiii) subject to its acceptance, exercise such rights as are given to it in the Convention establishing the Organization.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Assembly shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(3) *(a)* Subject to the provisions of subparagraph *(b)*, a delegate may represent one country only.

*(b)* Countries of the Union grouped under the terms of a special agreement in a common office possessing for each of them the character of a special national service of industrial property as referred to in Article 12 may be jointly represented during discussions by one of their number.

(4) *(a)* Each country member of the Assembly shall have one vote.

*(b)* One-half of the countries members of the Assembly shall constitute a quorum.

*(c)* Notwithstanding the provisions of subparagraph *(b)*, if, in any session, the number of countries represented is less than one-half but equal to or more than one-third of the countries members of the Assembly, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the conditions set forth hereinafter are fufilled. The International Bureau shall communicate the said decisions to the countries members of the Assembly which were not represented and shall invite them to express in writing their vote or abstention within a period of three months from the date of the communication. If, at the expiration of this period, the number of countries having thus expressed their vote or abstention attains the number of countries which was lacking for attaining the quorum in the session itself, such decisions shall take effect provided that at the same time the required majority still obtains.

*(d)* Subject to the provisions of Article 17(2), the decisions of the Assembly shall require two-thirds of the votes cast.

*(e)* Abstentions shall not be considered as votes.

(5) *(a)* Subject to the provisions of subparagraph *(b)*, a delegate may vote in the name of one country only.

*(b)* The countries of the Union referred to in paragraph (3)*(b)* shall, as a general rule, endeavor to send their own delegations to the sessions of the Assembly. If, however, for exceptional reasons, any such country cannot send its own delegation, it may give to the delegation of another such country the power to vote in its name, provided that each delegation may vote by proxy for one country only. Such power to vote shall be granted in a document signed by the Head of State or the competent Minister.

(6) Countries of the Union not members of the Assembly shall be admitted to the meetings of the latter as observers.

(7) *(a)* The Assembly shall meet once in every third calendar year in ordinary session upon convocation by the Director General and, in the absence of exceptional circumstances, during the same period and at the same place as the General Assembly of the Organization.

*(b)* The Assembly shall meet in extraordinary session upon convocation by the Director General, at the request of the Executive Committee or at the request of one-fourth of the countries members of the Assembly.

(8) The Assembly shall adopt its own rules of procedure.

## Article 14

### [Executive Committee]

(1) The Assembly shall have an Executive Committee.

(2) *(a)* The Executive Committee shall consist of countries elected by the Assembly from among countries members of the Assembly. Furthermore, the country on whose territory the Organization has its headquarters shall, subject to the provisions of Article 16(7)*(b)*, have an ex officio seat on the Committee.

*(b)* The Government of each country member of the Executive Committee shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* The expenses of each delegation shall be borne by the Government which has appointed it.

(3) The number of countries members of the Executive Committee shall correspond to one-fourth of the number of countries members of the Assembly. In establishing the number of seats to be filled, remainders after division by four shall be disregarded.

(4) In electing the members of the Executive Committee, the Assembly shall have due regard to an equitable geographical distribution and to the need for countries party to the Special Agreements established in relation with the Union to be among the countries constituting the Executive Committee.

(5) *(a)* Each member of the Executive Committee shall serve from the close of the session of the Assembly which elected it to the close of the next ordinary session of the Assembly.

*(b)* Members of the Executive Committee may be re-elected, but only up to a maximum of two-thirds of such members.

*(c)* The Assembly shall establish the details of the rules governing the election and possible re-election of the members of the Executive Committee.

(6) *(a)* The Executive Committee shall:
  (i) prepare the draft agenda of the Assembly;
  (ii) submit proposals to the Assembly in respect of the draft program and triennial budget of the Union prepared by the Director General;
  (iii) approve, within the limits of the program and the triennial budget, the specific yearly budgets and programs prepared by the Director General;
  (iv) submit, with appropriate comments, to the Assembly the periodical reports of the Director General and the yearly audit reports on the accounts;
  (v) take all necessary measures to ensure the execution of the program of the Union by the Director General, in accordance with the decisions of the Assembly and having regard to circumstances arising between two ordinary sessions of the Assembly;
  (vi) perform such other functions as are allocated to it under this Convention.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Executive Committee shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(7) *(a)* The Executive Committee shall meet once a year in ordinary session upon convocation by the Director General, preferably during the same period and at the same place as the Coordination Committee of the Organization.

*(b)* The Executive Committee shall meet in extraordinary session upon convocation by the Director General, either on his own initiative, or at the request of its Chairman or one-fourth of its members.

(8) *(a)* Each country member of the Executive Committee shall have one vote.

*(b)* One-half of the members of the Executive Committee shall constitute a quorum.

*(c)* Decisions shall be made by a simple majority of the votes cast.

*(d)* Abstentions shall not be considered as votes.

*(e)* A delegate may represent, and vote in the name of, one country only.

(9) Countries of the Union not members of the Executive Committee shall be admitted to its meetings as observers.

(10) The Executive Committee shall adopt its own rules of procedure.

## Article 15

### [International Bureau]

(1) *(a)* Administrative tasks concerning the Union shall be performed by the International Bureau, which is a continuation of the Bureau of the Union united with the Bureau of the Union established by the International Convention for the Protection of Literary and Artistic Works. [3]

*(b)* In particular, the International Bureau shall provide the secretariat of the various organs of the Union.

*(c)* The Director General of the Organization shall be the chief executive of the Union and shall represent the Union.

(2) The International Bureau shall assemble and publish information concerning the protection of industrial property. Each country of the Union shall promptly communicate to the International Bureau all new laws and official texts concerning the protection of industrial property. Furthermore, it shall furnish the International Bureau with all the publications of its industrial property service of direct concern to the protection of industrial property which the International Bureau may find useful in its work.

(3) The International Bureau shall publish a monthly periodical.

(4) The International Bureau shall, on request, furnish any country of the Union with information on matters concerning the protection of industrial property.

(5) The International Bureau shall conduct studies, and shall provide services, designed to facilitate the protection of industrial property.

(6) The Director General and any staff member designated by him shall participate, without the right to vote, in all meetings of the Assembly, the Executive Committee, and any other committee of experts or working group. The Director General, or a staff member designated by him, shall be ex officio secretary of these bodies.

(7) *(a)* The International Bureau shall, in accordance with the directions of the Assembly and in cooperation with the Executive Committee, make the preparations for the conferences of revision of the provisions of the Convention other than Articles 13 to 17.

*(b)* The International Bureau may consult with inter-governmental and international non-governmental organizations concerning preparations for conferences of revision.

*(c)* The Director General and persons designated by him shall take part, without the right to vote, in the discussions at these conferences.

(8) The International Bureau shall carry out any other tasks assigned to it.

## Article 16

### [Finances]

(1) *(a)* The Union shall have a budget.

*(b)* The budget of the Union shall include the income and expenses proper to the Union, its contribution to the budget of expenses common to the Unions, and, where applicable, the sum made available to the budget of the Conference of the Organization.

*(c)* Expenses not attributable exclusively to the Union but also to one or more other Unions administered by the Organization shall be considered as expenses common to the Unions. The share of the Union in such common expenses shall be in proportion to the interest the Union has in them.

(2) The budget of the Union shall be established with due regard to the requirements of coordination with the budgets of the other Unions administered by the Organization.

(3) The budget of the Union shall be financed from the following sources:
    (i) contributions of the countries of the Union;
    (ii) fees and charges due for services rendered by the International Bureau in relation to the Union;
    (iii) sale of, or royalties on, the publications of the International Bureau concerning the Union;
    (iv) gifts, bequests, and subventions;
    (v) rents, interests, and other miscellaneous income.

(4) *(a)* For the purpose of establishing its contribution towards the budget, each country of the Union shall belong to a class, and shall pay its annual contributions on the basis of a number of units fixed as follows:

| | |
|---|---:|
| Class I | 25 |
| Class II | 20 |
| Class III | 15 |
| Class IV | 10 |
| Class V | 5 |
| Class VI | 3 |
| Class VII | 1 |

*(b)* Unless it has already done so, each country shall indicate, concurrently with depositing its instrument of ratification or accession, the class to which it wishes to belong. Any country may change class. If it chooses a lower class, the country must announce such change to the Assembly at one of its ordinary sessions. Any such change shall take effect at the beginning of the calendar year following the said session.

*(c)* The annual contribution of each country shall be an amount in the same proportion to the total sum to be contributed to the budget of the Union by all countries as the number of its units is to the total of the units of all contributing countries.

*(d)* Contributions shall become due on the first of January of each year.

*(e)* A country which is in arrears in the payment of its contributions may not exercise its right to vote in any of the organs of the Union of which it is a member if the amount of its arrears equals or exceeds the amount of the contributions due from it for the preceding two full years. However, any organ of the Union may allow such a country to continue to exercise its right to vote in that organ if, and as long as, it is satisfied that the delay in payment is due to exceptional and unavoidable circumstances.

*(f)* If the budget is not adopted before the beginning of a new financial period, it shall be at the same level as the budget of the previous year, as provided in the financial regulations.

(5) The amount of the fees and charges due for services rendered by the International Bureau in relation to the Union shall be established, and shall be reported to the Assembly and the Executive Committee, by the Director General.

(6) *(a)* The Union shall have a working capital fund which shall be constituted by a single payment made by each country of the Union. If the fund becomes insufficient, the Assembly shall decide to increase it.

*(b)* The amount of the initial payment of each country to the said fund or of its participation in the increase thereof shall be a proportion of the contribution of that country for the year in which the fund is established or the decision to increase it is made.

*(c)* The proportion and the terms of payment shall be fixed by the Assembly on the proposal of the Director General and after it has heard the advice of the Coordination Committee of the Organization.

(7) *(a)* In the headquarters agreement concluded with the country on the territory of which the Organization has its headquarters, it shall be provided that, whenever the working capital fund is insufficient, such country shall grant advances. The amount of these advances and the conditions on which they are granted shall be the subject of separate agreements, in each case, between such country and the Organization. As long as it remains under the obligation to grant advances, such country shall have an ex officio seat on the Executive Committee.

*(b)* The country referred to in subparagraph *(a)* and the Organization shall each have the right to denounce the obligation to grant advances, by written notification. Denunciation shall take effect three years after the end of the year in which it has been notified.

(8) The auditing of the accounts shall be effected by one or more of the countries of the Union or by external auditors, as provided in the financial regulations. They shall be designated, with their agreement, by the Assembly.


### Article 17


### [Amendment of Articles 13 to 17]

(1) Proposals for the amendment of Articles 13, 14, 15, 16, and the present Article, may be initiated by any country member of the Assembly, by the Executive Committee, or by the Director General. Such proposals shall be communicated by the Director General to the member countries of the Assembly at least six months in advance of their consideration by the Assembly.

(2) Amendments to the Articles referred to in paragraph (1) shall be adopted by the Assembly. Adoption shall require three-fourths of the votes cast, provided that any amendment to Article 13, and to the present paragraph, shall require four-fifths of the votes cast.

(3) Any amendment to the Articles referred to in paragraph (1) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three-fourths of the countries members of the Assembly at the time it adopted the amendment. Any amendment to the said Articles thus accepted shall bind all the countries which are members of the Assembly at the time the amendment enters into force, or which become members thereof at a subsequent date, provided that any amendment increasing the financial obligations of countries of the Union shall bind only those countries which have notified their acceptance of such amendment.

## Article 18

### [Revision of Articles 1 to 12 and 18 to 30]

(1) This Convention shall be submitted to revision with a view to the introduction of amendments designed to improve the system of the Union.

(2) For that purpose, conferences shall be held successively in one of the countries of the Union among the delegates of the said countries.

(3) Amendments to Articles 13 to 17 are governed by the provisions of Article 17.

## Article 19

### [Special Agreements]

It is understood that the countries of the Union reserve the right to make separately between themselves special agreements for the protection of industrial property, in so far as these agreements do not contravene the provisions of this Convention.

## Article 20

### [Ratification or Accession by Countries of the Union; Entry Into Force]

(1) *(a)* Any country of the Union which has signed this Act may ratify it, and, if it has not signed it, may accede to it. Instruments of ratification and accession shall be deposited with the Director General.

*(b)* Any country of the Union may declare in its instrument of ratification or accession that its ratification or accession shall not apply:
   (i) to Articles 1 to 12, or
   (ii) to Articles 13 to 17.

*(c)* Any country of the Union which, in accordance with subparagraph *(b)*, has excluded from the effects of its ratification or accession one of the two groups of Articles referred to in that subparagraph may at any later time declare that it extends the effects of its ratification or accession to that group of Articles. Such declaration shall be deposited with the Director General.

(2) *(a)* Articles 1 to 12 shall enter into force, with respect to the first ten countries of the Union which have deposited instruments of ratification or accession without making the declaration permitted under paragraph (1)*(b)*(i), three months after the deposit of the tenth such instrument of ratification or accession.

*(b)* Articles 13 to 17 shall enter into force, with respect to the first ten countries of the Union which have deposited instruments of ratification or accession without making the declaration permitted under paragraph (1)*(b)*(ii), three months after the deposit of the tenth such instrument of ratification or accession.

*(c)* Subject to the initial entry into force, pursuant to the provisions of subparagraphs *(a)* and *(b)*, of each of the two groups of Articles referred to in paragraph (1)*(b)*(i) and (ii). and subject to the provisions of paragraph (1)*(b)*, Articles 1 to 17 shall, with respect to any country of the Union, other than those referred to in subparagraphs *(a)* and *(b)*, which deposits an instrument of ratification or accession or any country of the Union which deposits a declaration pursuant to paragraph (1)*(c)*, enter into force three months after the date of notification by the Director General of such deposit, unless a subsequent date has been indicated in the instrument or declaration deposited. In the latter case, this Act shall enter into force with respect to that country on the date thus indicated.

(3) With respect to any country of the Union which deposits an instrument of ratification or accession, Articles 18 to 30 shall enter into force on the earlier of the dates on which any of the groups of Articles referred to in paragraph (1)*(b)* enters into force with respect to that country pursuant to paragraph (2)*(a), (b),* or *(c).*

## Article 21

### [Accession by Countries Outside the Union; Entry Into Force]

(1) Any country outside the Union may accede to this Act and thereby become a member of the Union. Instruments of accession shall be deposited with the Director General.

(2) *(a)* With respect to any country outside the Union which deposits its instrument of accession one month or more before the date of entry into force of any provisions of the present Act, this Act shall enter into force, unless a subsequent date has been indicated in the instrument of accession, on the date upon which provisions first enter into force pursuant to Article 20(2) *(a)* or *(b)*; provided that:
    (i) if Articles 1 to 12 do not enter into force on that date, such country shall, during the interim period before the entry into force of such provisions, and in substitution therefor, be bound by Articles 1 to 12 of the Lisbon Act,
    (ii) if Articles 13 to 17 do not enter into force on that date, such country shall, during the interim period before the entry into force of such provisions, and in substitution therefor, be bound by Articles 13 and 14(3), (4), and (5), of the Lisbon Act.
If a country indicates a subsequent date in its instrument of accession, this Act shall enter into force with respect to that country on the date thus indicated.

*(b)* With respect to any country outside the Union which deposits its instrument of accession on a date which is subsequent to, or precedes by less than one month, the entry into force of one group of Articles of the present Act, this Act shall, subject to the proviso of subparagraph *(a)*, enter into force threee months after the date on which its accession has been notified by the Director General, unless a subsequent date has been indicated in the instrument of accession. In the latter case, this Act shall enter into force with respect to that country on the date thus indicated.

(3) With respect to any country outside the Union which deposits its instrument of accession after the date of entry into force of the present Act in its entirety, or less than one month before such date, this Act shall enter into force three months after the date

on which its accession has been notified by the Director General, unless a subsequent date has been indicated in the instrument of accession. In the latter case, this Act shall enter into force with respect to that country on the date thus indicated.

## Article 22

### [Consequences of Ratification or Accession]

Subject to the possibilities of exceptions provided for in Articles 20(1)*(b)* and 28(2), ratification or accession shall automatically entail acceptance of all the clauses and admission to all the advantages of this Act.

## Article 23

### [Accession to Earlier Acts]

After the entry into force of this Act in its entirety, a country may not accede to earlier Acts of this Convention.

## Article 24

### [Territories]

(1) Any country may declare in its instrument of ratification or accession, or may inform the Director General by written notification any time thereafter, that this Convention shall be applicable to all or part of those territories, designated in the declaration or notification, for the external relations of which it is responsible.

(2) Any country which has made such a declaration or given such a notification may, at any time, notify the Director General that this Convention shall cease to be applicable to all or part of such territories.

(3) *(a)* Any declaration made under paragraph (1) shall take effect on the same date as the ratification or accession in the instrument of which it was included, and any notification given under such paragraph shall take effect three months after its notification by the Director General.

*(b)* Any notification given under paragraph (2) shall take effect twelve months after its receipt by the Director General.

## Article 25

### [Implementation of the Convention on the Domestic Level]

(1) Any country party to this Convention undertakes to adopt, in accordance with its constitution, the measures necessary to ensure the application of this Convention.

(2) It is understood that, at the time a country deposits its instrument of ratification or accession, it will be in a position under its domestic law to give effect to the provisions of this Convention.

## Article 26

### [Denunciation]

(1) This Convention shall remain in force without limitation as to time.

(2) Any country may denounce this Act by notification addressed to the Director General. Such denunciation shall constitute also denunciation of all earlier Acts and shall affect only the country making it, the Convention remaining in full force and effect as regards the other countries of the Union.

(3) Denunciation shall take effect one year after the day on which the Director General has received the notification.

(4) The right of denunciation provided by this Article shall not be exercised by any country before the expiration of five years from the date upon which it becomes a member of the Union.

## Article 27

### [Application of Earlier Acts]

(1) The present Act shall, as regards the relations between the countries to which it applies, and to the extent that it applies, replace the Convention of Paris of March 20, 1883, and the subsequent Acts of revision.

(2) *(a)* As regards the countries to which the present Act does not apply, or does not apply in its entirety, but to which the Lisbon Act of October 31, 1958, applies, the latter shall remain in force in its entirely or to the extent that the present Act does not replace it by virtue of paragraph (1).

*(b)* Similarly, as regards the countries to which neither the present Act, nor portions thereof, nor the Lisbon Act applies, the London Act of June 2, 1934, shall remain in force in its entirety or to the extent that the present Act does not replace it by virtue of paragraph (1).

*(c)* Similarly, as regards the countries to which neither the present Act, nor portions thereof, nor the Lisbon Act, nor the London Act applies, the Hague Act of November 6, 1925, shall remain in force in its entirety or to the extent that the present Act does not replace it by virtue of paragraph (1).

(3) Countries outside the Union which become party to this Act shall apply it with respect to any country of the Union not party to this Act or which, although party to this Act, has made a declaration pursuant to Article 20(1)*(b)*(i). Such countries recognize that the said country of the Union may apply, in its relations with them, the provisions of the most recent Act to which it is party.

## Article 28

### [Disputes]

(1) Any dispute between two or more countries of the Union concerning the interpretation or application of this Convention, not settled by negotiation, may, by any one of the countries concerned, be brought before the International Court of Justice by application in conformity with the Statute of the Court,[4] unless the countries concerned agree on some other method of

settlement. The country bringing the dispute before the Court shall inform the International Bureau; the International Bureau shall bring the matter to the attention of the other countries of the Union.

(2) Each country may, at the time it signs this Act or deposits its instrument of ratification or accession, declare that it does not consider itself bound by the provisions of paragraph (1). With regard to any dispute between such country and any other country of the Union, the provisions of paragraph (1) shall not apply.

(3) Any country having made a declaration in accordance with the provisions of paragraph (2) may, at any time, withdraw its declaration by notification addressed to the Director General.

## Article 29

### [Signature, Languages, Depositary Functions]

(1) *(a)* This Act shall be signed in a single copy in the French language and shall be deposited with the Government of Sweden.

*(b)* Official texts shall be established by the Director General, after consultation with the interested Governments, in the English, German, Italian, Portuguese, Russian and Spanish languages, and such other languages as the Assembly may designate.

*(c)* In case of differences of opinion on the interpretation of the various texts, the French text shall prevail.

(2) This Act shall remain open for signature at Stockholm until January 13, 1968.

(3) The Director General shall transmit two copies, certified by the Government of Sweden, of the signed text of this Act to the Governments of all countries of the Union and, on request, to the Government of any other country.

(4) The Director General shall register this Act with the Secretariat of the United Nations.

(5) The Director General shall notify the Governments of all countries of the Union of signatures, deposits of instruments of ratification or accession and any declarations included in such instruments or made pursuant to Article 20(1)*(c)*, entry into force of any provisions of this Act, notifications of denunciation, and notifications pursuant to Article 24.

## Article 30

### [Transitional Provisions]

(1) Until the first Director General assumes office, references in this Act to the International Bureau of the Organization or to the Director General shall be deemed to be references to the Bureau of the Union or its Director, respectively.

(2) Countries of the Union not bound by Articles 13 to 17 may, until five years after the entry into force of the Convention establishing the Organization, exercise, if they so desire, the rights provided under Articles 13 to 17 of this Act as if they were bound by those Articles. Any country desiring to exercise such rights shall give written notification to that effect to the Director General; such notification shall be effective from the date of its receipt. Such countries shall be deemed to be members of the Assembly until the expiration of the said period.

(3) As long as all the countries of the Union have not become Members of the Organization, the International Bureau of the Organization shall also function as the Bureau of the Union, and the Director General as the Director of the said Bureau.

(4) Once all the countries of the Union have become Members of the Organization, the rights, obligations, and property, of the Bureau of the Union shall devolve on the International Bureau of the Organization.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto, have signed the present Act. DONE at Stockholm, on July 14, 1967.

### FOR SOUTH AFRICA:

T. Schoeman

### FOR ALGERIA:

Not bound by Article 28, paragraph (1).
A. Hacene

### FOR ARGENTINA:

### FOR AUSTRALIA:

### FOR AUSTRIA:

Gottfried H. Thaler

### FOR BELGIUM:

Bon F. Cogels

### FOR BRAZIL:

### FOR BULGARIA:

V. Chivarov

1/11/68 g. The People's Republic of Bulgaria is making a reservation concerning the provisions of Article 28, subparagraph 1, and a statement on the provisions of Article 24 of the Convention, expressed in the note verbale sub. No. 32 of January 11, 1968 of the Bulgarian Embassy at Stockholm presented to the Ministry of Foreign Affairs of the Kingdom of Sweden.

**FOR CAMEROON:**

Ekani

**FOR CANADA:**

**FOR CEYLON:**

**FOR CYPRUS:**

**FOR THE CONGO (BRAZZAVILLE):**

**FOR THE IVORY COAST:**

Bile

**FOR CUBA:**

A. M. González 12/1/68

**FOR DAHOMEY:**

**FOR DENMARK:**

Julie Olsen

**FOR SPAIN:**

J. F. Alcover
Electo J. Garcia Tejedor

**FOR THE UNITED STATES OF AMERICA:**

Eugene M. Braderman

**FOR FINLAND:**

Paul Gustafsson

**FOR FRANCE:**

B. de Menthon

### FOR GABON:

S. F. Oyoué

### FOR GREECE:

J. A. Dracoulis

### FOR HAITI:

### FOR THE UPPER VOLTA:

### FOR HUNGARY:

Esztergályos
12/1/1968 subject to ratification

### FOR INDONESIA:

Ibrahim Jasin

   12th January 1968. In signing this Convention the Government of the Republic of Indonesia, in conformity with Article 28 (1) of the Convention, declares that it does not consider itself bound by the provisions set forth in Article 28 (1) of the said Convention.

### FOR IRAN:

A. Darai

### FOR IRELAND:

Valentin Iremonger 12 January 1968

### FOR ICELAND:

Arni Tryggvason

### FOR ISRAEL:

**Z. Sher**
**G. Gavrieli**


### FOR ITALY:

**Cippico**
**Giorgio Ranzi**


### FOR JAPAN:

**M. Takahashi**
**C. Kawade**


### FOR KENYA:

**M. K. Mwendwa**


### FOR LAOS:


### FOR LEBANON:


### FOR LIECHTENSTEIN:

**Marianne Marxer**


### FOR LUXEMBOURG:

**J. P. Hoffmann**


### FOR MADAGASCAR:

**Ratovondriaka**


### FOR MALAWI:


### FOR MOROCCO:

**H'ssaine**


### FOR MAURITANIA:

FOR MEXICO:


FOR MONACO:

J. M. Notari


FOR NIGER:

A. Wright


FOR NIGERIA:


FOR NORWAY:

Subject to ratification
Jens Evensen
B. Stuevold Lassen


FOR NEW ZEALAND:


FOR UGANDA:


FOR THE NETHERLANDS:

Gerbrandy
W. G. Belinfante


FOR THE PHILIPPINES:

Lauro Baja


FOR POLAND:

M. Kajzer

January 10, 1968 subject to later ratification and with the reservation and the declaration made in the note of January 10, 1968 of the Embassy of the Polish People's Republic of Stockholm.


FOR PORTUGAL:

**Adriano de Carvalho**
**José de Oliveira Ascensão**
**Ruy Alvaro Costa de Morais Serrão**


### FOR THE UNITED ARAB REPUBLIC:


### FOR THE CENTRAL AFRICAN REPUBLIC:

**L. P. Gamba**


### FOR THE DOMINICAN REPUBLIC:


### FOR THE FEDERAL REPUBLIC OF GERMANY:

**Kurt Haertel**


### FOR THE REPUBLIC OF VIET-NAM:


### FOR ROMANIA:


**With the reservation specified in paragraph 2 of Article 28 C. Stanescu Marinete**


### FOR THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND:

**Gordon Grant**
**William Wallace**


### FOR SAN MARINO:


### FOR THE HOLY SEE:

**Gunnar Sterner**


### FOR SENEGAL:

**A. Seck**


### FOR SWEDEN:

**Herman Kling**
**Åke v. Zweigbergk**


#### FOR SWITZERLAND?

**Hans Morf**
**Joseph Voyame**


#### FOR SYRIA:


#### FOR TANZANIA:


#### FOR CHAD:


#### FOR CZECHOSLOVAKIA:


#### FOR TRINIDAD AND TOBAGO:


#### FOR TUNISIA:

**M. Kedadi**


#### FOR TURKEY:


#### FOR THE UNION OF SOVIET SOCIALIST REPUBLICS:


**10/12/67 g. The Union of Soviet Socialist Republics does not consider itself bound by the provisions of paragraph 1, Article 28 of the Stockholm Act of the Paris Convention for the Protection of Industrial Property, regarding the question of settlement of disputes concerning the interpretation and application of the Convention. Maltsev**


#### FOR URUGUAY:


#### FOR YUGOSLAVIA:

**A. Jelić**


#### FOR ZAMBIA:

The Senate of the United States of America by its resolution of February 28, 1970, two-thirds of the Senators present concurring therein, gave its advice and consent to the ratification of the revised Convention;

The revised Convention, except for Articles 1 through 12, was ratified by the President of the United States of America on May 4, 1970;

The United States of America deposited its instrument of ratification of the revised Convention, except for Articles 1 through 12, on May 25, 1970 and notification of such deposit was given on June 5, 1970 by the Director of the United International Bureaux for the Protection of Intellectual Property, in accordance with the provisions of Article 20(1)(a), (b)(i), and Article 29(5);

Pursuant to the provisions of Article 20 of the revised Convention, the provisions of Articles 13 through 30 of the revised Convention entered into force initially on April 26, 1970, and the provisions of Articles 1 through 12 entered into force initially on May 19, 1970; the provisions of the revised Convention, except for Articles 1 through 12, will enter into force for the United States of America on September 5, 1970, three months after the date of notification by the Director of the United International Bureaux for the Protection of Intellectual Property of the deposit of ratification by the United States of America;

NOW, THEREFORE, I, Richard Nixon, President of the United States of America, proclaim and make public the revised Convention, to the end that it shall be observed and fulfilled with good faith on and after September 5, 1970, except for Articles 1 through 12, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed. DONE at the city of Washington this twelfth day of August in the year of our Lord one thousand nine hundred seventy and of the Independence of the United States of America the one hundred ninety-fifth.

RICHARD NIXON
[SEAL]

**By the President:**
WILLIAM P ROGERS
*Secretary of State*

---

### Footnotes

1    TS 379, 411, 579, 834, 941, TIAS 4931; 25 Stat. 1372; 32 Stat. 1936; 38 Stat. 1645; 47 Stat. 1789; 53 Stat. 1748; 13 UST 1.

2    Articles have been given titles to facilitate their identification. There are no titles in the signed (French) text.

     [Footnote added by BIRPI.]

3    331 UNTS 217.

4    TS 993; 59 Stat. 1055.

T.I.A.S. No. 6923

**End of Document**                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# **EXHIBIT 4**

**T.I.A.S. No. 8733 (U.S. Treaty), 28 U.S.T. 7645 (U.S. Treaty), 1978 WL 182123 (U.S. Treaty)**

UNITED STATES OF AMERICA

Multilateral

**Patent Cooperation Treaty, With Regulations**

Patent Cooperation Treaty, With Regulations

Done at Washington June 19, 1970;
Ratification advised by the Senate of the United States of America, with declarations, October 30, 1973;
Ratified by the President of the United States of America, subject to said declarations, November 27, 1973;
Ratification of the United States of America deposited with the Director
General of the World Intellectual Property Organization November 26, 1975;
Proclaimed by the President of the United States of America December 14, 1977;
Date of entry into force with respect to the United States of America, except for chapter II, January 24, 1978.
January 24, 1978.

T.I.A.S. No. 8733

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# **<u>EXHIBIT 5</u>**

# Budapest Treaty on the International Recognition of the Deposit of Microorganisms for the Purposes of Patent Procedure

**Done at Budapest on April 28, 1977,
and amended on September 26, 1980**

## TABLE OF CONTENTS*

*Introductory Provisions*
    Article 1:   Establishment of a Union
    Article 2:   Definitions

*Chapter I: Substantive Provisions*
    Article 3:   Recognition and Effect of the Deposit of Microorganisms
    Article 4:   New Deposit
    Article 5:   Export and Import Restrictions
    Article 6:   Status of International Depositary Authority
    Article 7:   Acquisition of the Status of International Depositary Authority
    Article 8:   Termination and Limitation of the Status of International Depositary Authority
    Article 9:   Intergovernmental Industrial Property Organizations

*Chapter II: Administrative Provisions*
    Article 10:  Assembly
    Article 11:  International Bureau
    Article 12:  Regulations

*Chapter III: Revision and Amendment*
    Article 13:  Revision of the Treaty
    Article 14:  Amendment of Certain Provisions of the Treaty

*Chapter IV: Final Provisions*
    Article 15:  Becoming Party to the Treaty
    Article 16:  Entry Into Force of the Treaty
    Article 17:  Denunciation of the Treaty
    Article 18:  Signature and Languages of the Treaty
    Article 19:  Deposit of the Treaty; Transmittal of Copies; Registration of the Treaty
    Article 20:  Notifications

---

\* This Table of Contents is added for the convenience of the reader. It does not appear in the original (English) text of the Treaty.

# INTRODUCTORY PROVISIONS

### Article 1
### Establishment of a Union

The States party to this Treaty (hereinafter called "the Contracting States") constitute a Union for the international recognition of the deposit of microorganisms for the purposes of patent procedure.

### Article 2
### Definitions

For the purposes of this Treaty and the Regulations:

(i)  references to a "patent" shall be construed as references to patents for inventions, inventors' certificates, utility certificates, utility models, patents or certificates of addition, inventors' certificates of addition, and utility certificates of addition;

(ii)  "deposit of a microorganism" means, according to the context in which these words appear, the following acts effected in accordance with this Treaty and the Regulations; the transmittal of a microorganism to an international depositary authority, which receives and accepts it, or the storage of such a microorganism by the international depositary authority, or both the said transmittal and the said storage;

(iii)  "patent procedure" means any administrative or judicial procedure relating to a patent application or a patent;

(iv)  "publication for the purposes of patent procedure" means the official publication, or the official laying open for public inspection, of a patent application or a patent;

(v)  "intergovernmental industrial property organization" means an organization that has filed a declaration under Article 9(1);

(vi)  "industrial property office" means an authority of a Contracting State or an intergovernmental industrial property organization competent for the grant of patents;

(vii)  "depositary institution" means an institution which provides for the receipt, acceptance and storage of microorganisms and the furnishing of samples thereof;

(viii)  "international depositary authority" means a depositary institution which has acquired the status of international depositary authority as provided in Article 7;

(ix)  "depositor" means the natural person or legal entity transmitting a microorganism to an international depositary authority, which receives and accepts it, and any successor in title of the said natural person or legal entity;

(x)  "Union" means the Union referred to in Article 1;

(xi)  "Assembly" means the Assembly referred to in Article 10;

(xii)  "Organization" means the World Intellectual Property Organization;

(xiii)  "International Bureau" means the International Bureau of the Organization and, as long as it subsists, the United International Bureaux for the Protection of Intellectual Property (BIRPI);

(xiv)  "Director General" means the Director General of the Organization;

(xv)  "Regulations" means the Regulations referred to in Article 12.

# CHAPTER I
# SUBSTANTIVE PROVISIONS

**Article 3**
**Recognition and Effect of the Deposit**
**of Microorganisms**

(1)

*(a)* Contracting States which allow or require the deposit of microorganisms for the purposes of patent procedure shall recognize, for such purposes, the deposit of a microorganism with any international depositary authority. Such recognition shall include the recognition of the fact and date of the deposit as indicated by the international depositary authority as well as the recognition of the fact that what is furnished as a sample is a sample of the deposited microorganism.

*(b)* Any Contracting State may require a copy of the receipt of the deposit referred to in subparagraph *(a)*, issued by the international depositary authority.

(2)  As far as matters regulated in this Treaty and the Regulations are concerned, no Contracting State may require compliance with requirements different from or additional to those which are provided in this Treaty and the Regulations.

**Article 4**
**New Deposit**

(1)

*(a)* Where the international depositary authority cannot furnish samples of the deposited microorganism for any reason, in particular,

   (i)  where such microorganism is no longer viable, or

   (ii)  where the furnishing of samples would require that they be sent abroad and the sending or the receipt of the samples abroad is prevented by export or import restrictions,

that authority shall, promptly after having noted its inability to furnish samples, notify the depositor of such inability, indicating the cause thereof, and the depositor, subject to paragraph (2) and as provided in this paragraph, shall have the right to make a new deposit of the microorganism which was originally deposited.

*(b)* The new deposit shall be made with the international depositary authority with which the original deposit was made, provided that:

   (i)  it shall be made with another international depositary authority where the institution with which the original deposit was made has ceased to have the status of international depositary authority, either entirely or in respect of the kind of microorganism to which the deposited microorganism belongs, or where the international depositary authority with which the original deposit was made discontinues, temporarily or definitively, the performance of its functions in respect of deposited microorganisms;

   (ii)  it may be made with another international depositary authority in the case referred to in subparagraph *(a)*(ii).

*(c)* Any new deposit shall be accompanied by a statement signed by the depositor alleging that the newly deposited microorganism is the same as that originally deposited. If the allegation of the depositor is contested, the burden of proof shall be governed by the applicable law.

*(d)* Subject to subparagraphs *(a)* to *(c)* and *(e)*, the new deposit shall be treated as if it had been made on the date on which the original deposit was made where all the preceding statements concerning the viability of the originally deposited microorganism indicated that the microorganism was viable and where the new deposit was made within three months after the date on which the depositor received the notification referred to in subparagraph *(a)*.

*(e)* Where subparagraph *(b)*(i) applies and the depositor does not receive the notification referred to in subparagraph *(a)* within six months after the date on which the termination, limitation or discontinuance referred to in subparagraph *(b)*(i) was published by the International Bureau, the three–month time limit referred to in subparagraph *(d)* shall be counted from the date of the said publication.

(2)  The right referred to in paragraph (1)(a) shall not exist where the deposited microorganism has been transferred to another international depositary authority as long as that authority is in a position to furnish samples of such microorganism.

**Article 5**
**Export and Import Restrictions**

Each Contracting State recognizes that it is highly desirable that, if and to the extent to which the export from or import into its territory of certain kinds of microorganisms is restricted, such restriction should apply to microorganisms deposited, or destined for deposit, under this Treaty only where the restriction is necessary in view of national security or the dangers for health or the environment.

**Article 6**
**Status of International Depositary Authority**

(1)  In order to qualify for the status of international depositary authority, any depositary institution must be located on the territory of a Contracting State and must benefit from assurances furnished by that State to the effect that the said institution complies and will continue to comply with the requirements specified in paragraph (2). The said assurances may be furnished also by an intergovernmental industrial property organization; in that case, the depositary institution must be located on the territory of a State member of the said organization.

(2)  The depositary institution must, in its capacity of international depositary authority:

   (i)  have a continuous existence;

  (ii)  have the necessary staff and facilities, as prescribed in the Regulations, to perform its scientific and administrative tasks under this Treaty;

 (iii)  be impartial and objective;

 (iv)  be available, for the purposes of deposit, to any depositor under the same conditions;

  (v)  accept for deposit any or certain kinds of microorganisms, examine their viability and store them, as prescribed in the Regulations;

 (vi)  issue a receipt to the depositor, and any required viability statement, as prescribed in the Regulations;

(vii)  comply, in respect of the deposited microorganisms, with the requirement of secrecy, as prescribed in the Regulations;

(viii)  furnish samples of any deposited microorganism under the conditions and in conformity with the procedure prescribed in the Regulations.

(3)  The Regulations shall provide the measures to be taken:

  (i)  where an international depositary authority discontinues, temporarily or definitively, the performance of its functions in respect of deposited microorganisms or refuses to accept any of the kinds of microorganisms which it should accept under the assurances furnished;

 (ii)  in case of the termination or limitation of the status of international depositary authority of an international depositary authority.

**Article 7**
**Acquisition of the Status of International**
**Depositary Authority**

(1)

   (a) A depositary institution shall acquire the status of international depositary authority by virtue of a written communication addressed to the Director General by the Contracting State on the territory of which the depositary institution is located and including a declaration of assurances to the effect that the said institution complies and will continue to comply with the requirements specified in Article 6(2). The said status may be acquired also by virtue of a written communication addressed to the Director General by an intergovernmental industrial property organization and including the said declaration.

*(b)* The communication shall also contain information on the depositary institution as provided in the Regulations and may indicate the date on which the status of international depositary authority should take effect.

(2)

*(a)* If the Director General finds that the communication includes the required declaration and that all the required information has been received, the communication shall be promptly published by the International Bureau.

*(b)* The status of international depositary authority shall be acquired as from the date of publication of the communication or, where a date has been indicated under paragraph (1)*(b)* and such date is later than the date of publication of the communication, as from such date.

(3)  The details of the procedure under paragraphs (1) and (2) are provided in the Regulations.

## Article 8
## Termination and Limitation of the Status of International Depositary Authority

(1)

*(a)* Any Contracting State or any intergovernmental industrial property organization may request the Assembly to terminate, or to limit to certain kinds of microorganisms, any authority's status of international depositary authority on the ground that the requirements specified in Article 6 have not been or are no longer complied with. However, such a request may not be made by a Contracting State or intergovernmental industrial property organization in respect of an international depositary authority for which it has made the declaration referred to in Article 7(1)*(a)*.

*(b)* Before making the request under subparagraph *(a)*, the Contracting State or the intergovernmental industrial property organization shall, through the intermediary of the Director General, notify the reasons for the proposed request to the Contracting State or the intergovernmental industrial property organization which has made the communication referred to in Article 7(1) so that that State or organization may, within six months from the date of the said notification, take appropriate action to obviate the need for making the proposed request.

*(c)* Where the Assembly finds that the request is well founded, it shall decide to terminate, or to limit to certain kinds of microorganisms, the status of international depositary authority of the authority referred to in subparagraph *(a)*. The decision of the Assembly shall require that a majority of two–thirds of the votes cast be in favor of the request.

(2)

*(a)* The Contracting State or intergovernmental industrial property organization having made the declaration referred to in Article 7(1)*(a)* may, by a communication addressed to the Director General, withdraw its declaration either entirely or in respect only of certain kinds of microorganisms and in any event shall do so when and to the extent that its assurances are no longer applicable.

*(b)* Such a communication shall, from the date provided for in the Regulations, entail, where it relates to the entire declaration, the termination of the status of international depositary authority or, where it relates only to certain kinds of microorganisms, a corresponding limitation of such status.

(3)  The details of the procedure under paragraphs (1) and (2) are provided in the Regulations.

## Article 9
## Intergovernmental Industrial Property Organizations

(1)

*(a)* Any intergovernmental organization to which several States have entrusted the task of granting regional patents and of which all the member States are members of the International (Paris) Union for the Protection of Industrial Property may file with the Director General a declaration that it accepts the obligation of recognition provided for in Article 3(1)*(a)*, the obligation concerning the requirements referred to in Article 3(2) and all the effects of the provisions of this Treaty and the Regulations applicable to intergovernmental industrial property organizations. If filed before the entry into force of this Treaty according to Article 16(1), the declaration referred to in the preceding sentence shall become effective on

the date of the said entry into force. If filed after such entry into force, the said declaration shall become effective three months after its filing unless a later date has been indicated in the declaration. In the latter case, the declaration shall take effect on the date thus indicated.

*(b)* The said organization shall have the right provided for in Article 3(1)*(b).*

(2) Where any provision of this Treaty or of the Regulations affecting intergovernmental industrial property organizations is revised or amended, any intergovernmental industrial property organization may withdraw its declaration referred to in paragraph (1) by notification addressed to the Director General. The withdrawal shall take effect:

> (i) where the notification has been received before the date on which the revision or amendment enters into force, on that date;
>
> (ii) where the notification has been received after the date referred to in (i), on the date indicated in the notification or, in the absence of such indication, three months after the date on which the notification was received.

(3) In addition to the case referred to in paragraph (2), any intergovernmental industrial property organization may withdraw its declaration referred to in paragraph (1)*(a)* by notification addressed to the Director General. The withdrawal shall take effect two years after the date on which the Director General has received the notification. No notification of withdrawal under this paragraph shall be receivable during a period of five years from the date on which the declaration took effect.

(4) The withdrawal referred to in paragraph (2) or (3) by an intergovernmental industrial property organization whose communication under Article 7(1) has led to the acquisition of the status of international depositary authority by a depositary institution shall entail the termination of such status one year after the date on which the Director General has received the notification of withdrawal.

(5) Any declaration referred to in paragraph (1)*(a)*, notification of withdrawal referred to in paragraph (2) or (3), assurances furnished under Article 6(1), second sentence, and included in a declaration made in accordance with Article 7(1)*(a)*, request made under Article 8(1) and communication of withdrawal referred to in Article 8(2) shall require the express previous approval of the supreme governing organ of the intergovernmental industrial property organization whose members are all the States members of the said organization and in which decisions are made by the official representatives of the governments of such States.

# CHAPTER II
# ADMINISTRATIVE PROVISIONS

### Article 10
### Assembly

(1)

*(a)* The Assembly shall consist of the Contracting States.

*(b)* Each Contracting State shall be represented by one delegate, who may be assisted by alternate delegates, advisors, and experts.

*(c)* Each intergovernmental industrial property organization shall be represented by special observers in the meetings of the Assembly and any committee and working group established by the Assembly.

*(d)* Any State not member of the Union which is a member of the Organization or of the International (Paris) Union for the Protection of Industrial Property and any intergovernmental organization specialized in the field of patents other than an intergovernmental industrial property organization as defined in Article 2(v) may be represented by observers in the meetings of the Assembly and, if the Assembly so decides, in the meetings of any committee or working group established by the Assembly.

(2)

*(a)* The Assembly shall:

> (i) deal with all matters concerning the maintenance and development of the Union and the implementation of this Treaty;

   (ii)  exercise such rights and perform such tasks as are specially conferred upon it or assigned to it under this Treaty;

   (iii)  give directions to the Director General concerning the preparations for revision conferences;

   (iv)  review and approve the reports and activities of the Director General concerning the Union, and give him all necessary instructions concerning matters within the competence of the Union;

   (v)  establish such committees and working groups as it deems appropriate to facilitate the work of the Union;

   (vi)  determine, subject to paragraph (1)*(d)*, which States other than Contracting States, which intergovernmental organizations other than intergovernmental industrial property organizations as defined in Article 2(v) and which international non–governmental organizations shall be admitted to its meetings as observers and to what extent international depositary authorities shall be admitted to its meetings as observers;

   (vii)  take any other appropriate action designed to further the objectives of the Union;

   (viii)  perform such other functions as are appropriate under this Treaty.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Assembly shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(3)  A delegate may represent, and vote in the name of, one State only.

(4)  Each Contracting State shall have one vote.

(5)

*(a)* One–half of the Contracting States shall constitute a quorum.

*(b)* In the absence of the quorum, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the quorum and the required majority are attained through voting by correspondence as provided in the Regulations.

(6)

*(a)* Subject to Articles 8(1)*(c)*, 12(4) and 14(2)*(b)*, the decisions of the Assembly shall require a majority of the votes cast.

*(b)* Abstentions shall not be considered as votes.

(7)

*(a)* The Assembly shall meet once in every second calendar year in ordinary session upon convocation by the Director General, preferably during the same period and at the same place as the General Assembly of the Organization.

*(b)* The Assembly shall meet in extraordinary session upon convocation by the Director General, either on his own initiative or at the request of one–fourth of the Contracting States.

(8)  The Assembly shall adopt its own rules of procedure.

## Article 11
## International Bureau

(1)  The International Bureau shall:

   (i)  perform the administrative tasks concerning the Union, in particular such tasks as are specifically assigned to it under this Treaty and the Regulations or by the Assembly;

   (ii)  provide the secretariat of revision conferences, of the Assembly, of committees and working groups established by the Assembly, and of any other meeting convened by the Director General and dealing with matters of concern to the Union.

(2)  The Director General shall be the chief executive of the Union and shall represent the Union.

(3)  The Director General shall convene all meetings dealing with matters of concern to the Union.

(4)

*(a)* The Director General and any staff member designated by him shall participate, without the right to vote, in all meetings of the Assembly, the committees and working groups established by the Assembly, and any other meeting convened by the Director General and dealing with matters of concern to the Union.

*(b)* The Director General, or a staff member designated by him, shall be ex officio secretary of the Assembly, and of the committees, working groups and other meetings referred to in subparagraph *(a)*.

(5)

*(a)* The Director General shall, in accordance with the directions of the Assembly, make the preparations for revision conferences.

*(b)* The Director General may consult with intergovernmental and international non–governmental organizations concerning the preparations for revision conferences.

*(c)* The Director General and persons designated by him shall take part, without the right to vote, in the discussions at revision conferences.

*(d)* The Director General, or a staff member designated by him, shall be ex officio secretary of any revision conference.

**Article 12**
**Regulations**

(1) The Regulations provide rules concerning:
  (i) matters in respect of which this Treaty expressly refers to the Regulations or expressly provides that they are or shall be prescribed;
  (ii) any administrative requirements, matters or procedures;
  (iii) any details useful in the implementation of this Treaty.

(2) The Regulations adopted at the same time as this Treaty are annexed to this Treaty.

(3) The Assembly may amend the Regulations.

(4)

*(a)* Subject to subparagraph *(b)*, adoption of any amendment of the Regulations shall require two–thirds of the votes cast.

*(b)* Adoption of any amendment concerning the furnishing of samples of deposited microorganisms by the international depositary authorities shall require that no Contracting State vote against the proposed amendment.

(5) In the case of conflict between the provisions of this Treaty and those of the Regulations, the provisions of this Treaty shall prevail.

# CHAPTER III
# REVISION AND AMENDMENT

**Article 13**
**Revision of the Treaty**

(1) This Treaty may be revised from time to time by conferences of the Contracting States.

(2) The convocation of any revision conference shall be decided by the Assembly.

(3) Articles 10 and 11 may be amended either by a revision conference or according to Article 14.

**Article 14**
**Amendment of Certain Provisions of the Treaty**

(1)

*(a)* Proposals under this Article for the amendment of Articles 10 and 11 may be initiated by any Contracting State or by the Director General.

*(b)* Such proposals shall be communicated by the Director General to the Contracting States at least six months in advance of their consideration by the Assembly.

(2)

*(a)* Amendments to the Articles referred to in paragraph (1) shall be adopted by the Assembly.

*(b)* Adoption of any amendment to Article 10 shall require four–fifths of the votes cast; adoption of any amendment to Article 11 shall require three–fourths of the votes cast.

(3)

*(a)* Any amendment to the Articles referred to in paragraph (1) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three–fourths of the Contracting States members of the Assembly at the time the Assembly adopted the amendment.

*(b)* Any amendment to the said Articles thus accepted shall bind all the Contracting States which were Contracting States at the time the amendment was adopted by the Assembly, provided that any amendment creating financial obligations for the said Contracting States or increasing such obligations shall bind only those Contracting States which have notified their acceptance of such amendment.

*(c)* Any amendment which has been accepted and which has entered into force in accordance with subparagraph *(a)* shall bind all States which become Contracting States after the date on which the amendment was adopted by the Assembly.

# CHAPTER IV
# FINAL PROVISIONS

### Article 15
### Becoming Party to the Treaty

(1)  Any State member of the International (Paris) Union for the Protection of Industrial Property may become party to this Treaty by:

    (i)  signature followed by the deposit of an instrument of ratification, or

    (ii)  deposit of an instrument of accession.

(2)  Instruments of ratification or accession shall be deposited with the Director General.

### Article 16
### Entry Into Force of the Treaty

(1)  This Treaty shall enter into force, with respect to the first five States which have deposited their instruments of ratification or accession, three months after the date on which the fifth instrument of ratification or accession has been deposited.

(2)  This Treaty shall enter into force with respect to any other State three months after the date on which that State has deposited its instrument of ratification or accession unless a later date has been indicated in the instrument of ratification or accession. In the latter case, this Treaty shall enter into force with respect to that State on the date thus indicated.

### Article 17
### Denunciation of the Treaty

(1)  Any Contracting State may denounce this Treaty by notification addressed to the Director General.

(2)  Denunciation shall take effect two years after the day on which the Director General has received the notification.

(3)  The right of denunciation provided for in paragraph (1) shall not be exercised by any Contracting State before the expiration of five years from the date on which it becomes party to this Treaty.

(4)  The denunciation of this Treaty by a Contracting State that has made a declaration referred to in Article 7(1)*(a)* with respect to a depositary institution which thus acquired the status of international depositary authority shall entail the termination of such status one year after the day on which the Director General received the notification referred to in paragraph (1).

### Article 18
### Signature and Languages of the Treaty

(1)

   *(a)* This Treaty shall be signed in a single original in the English and French languages, both texts being equally authentic.

   *(b)* Official texts of this Treaty shall be established by the Director General, after consultation with the interested Governments and within two months from the date of signature of this Treaty, in the other languages in which the Convention Establishing the World Intellectual Property Organization was signed.

   *(c)* Official texts of this Treaty shall be established by the Director General, after consultation with the interested Governments, in the Arabic, German, Italian, Japanese and Portuguese languages, and such other languages as the Assembly may designate.

(2)  This Treaty shall remain open for signature at Budapest until December 31, 1977.

### Article 19
### Deposit of the Treaty; Transmittal of Copies;
### Registration of the Treaty

(1)  The original of this Treaty, when no longer open for signature, shall be deposited with the Director General.

(2)  The Director General shall transmit two copies, certified by him, of this Treaty and the Regulations to the Governments of all the States referred to in Article 15(1), to the intergovernmental organizations that may file a declaration under Article 9(1)*(a)* and, on request, to the Government of any other State.

(3)  The Director General shall register this Treaty with the Secretariat of the United Nations.

(4)  The Director General shall transmit two copies, certified by him, of any amendment to this Treaty and to the Regulations to all Contracting States, to all intergovernmental industrial property organizations and, on request, to the Government of any other State and to any other intergovernmental organization that may file a declaration under Article 9(1)*(a)*.

### Article 20
### Notifications

   The Director General shall notify the Contracting States, the intergovernmental industrial property organizations and those States not members of the Union which are members of the International (Paris) Union for the Protection of Industrial Property of:

   (i)  signatures under Article 18;

   (ii)  deposits of instruments of ratification or accession under Article 15(2);

   (iii)  declarations filed under Article 9(1)*(a)* and notifications of withdrawal under Article 9(2) or (3);

   (iv)  the date of entry into force of this Treaty under Article 16(1);

   (v)  the communications under Articles 7 and 8 and the decisions under Article 8;

   (vi)  acceptance of amendments to this Treaty under Article 14(3);

   (vii)  any amendment of the Regulations;

   (viii)  the dates on which amendments to the Treaty or the Regulations enter into force;

   (ix)  denunciations received under Article 17.

# **EXHIBIT 6**

PATENT LAW TREATY

adopted by the Diplomatic Conference on June 1, 2000

# PATENT LAW TREATY

*TABLE OF CONTENTS*

Article 1        Abbreviated Expressions

Article 2        General Principles

Article 3        Applications and Patents to Which the Treaty Applies

Article 4        Security Exception

Article 5        Filing Date

Article 6        Application

Article 7        Representation

Article 8        Communications;  Addresses

Article 9        Notifications

Article 10       Validity of Patent;  Revocation

Article 11       Relief in Respect of Time Limits

Article 12       Reinstatement of Rights After a Finding of
                   Due Care or Unintentionality by the Office

Article 13       Correction or Addition of Priority Claim;
                   Restoration of Priority Right

Article 14       Regulations

Article 15       Relation to the Paris Convention

Article 16       Effect of Revisions, Amendments and Modifications of
                   the Patent Cooperation Treaty

Article 17       Assembly

Article 18       International Bureau

Article 19       Revisions

Article 20       Becoming Party to the Treaty

Article 21       Entry into Force;  Effective Dates of Ratifications
                   and Accessions

Article 22        Application of the Treaty to Existing Applications
                       and Patents

Article 23        Reservations

Article 24        Denunciation of the Treaty

Article 25        Languages of the Treaty

Article 26        Signature of the Treaty

Article 27        Depositary;  Registration

*Article 1*

*Abbreviated Expressions*

For the purposes of this Treaty, unless expressly stated otherwise:

(i)    "Office" means the authority of a Contracting Party entrusted with the granting of patents or with other matters covered by this Treaty;

(ii)    "application" means an application for the grant of a patent, as referred to in Article 3;

(iii)    "patent" means a patent as referred to in Article 3;

(iv)    references to a "person" shall be construed as including, in particular, a natural person and a legal entity;

(v)    "communication" means any application, or any request, declaration, document, correspondence or other information relating to an application or patent, whether relating to a procedure under this Treaty or not, which is filed with the Office;

(vi)    "records of the Office" means the collection of information maintained by the Office, relating to and including the applications filed with, and the patents granted by, that Office or another authority with effect for the Contracting Party concerned, irrespective of the medium in which such information is maintained;

(vii)    "recordation" means any act of including information in the records of the Office;

(viii)    "applicant" means the person whom the records of the Office show, pursuant to the applicable law, as the person who is applying for the patent, or as another person who is filing or prosecuting the application;

(ix)    "owner" means the person whom the records of the Office show as the owner of the patent;

(x)    "representative" means a representative under the applicable law;

(xi)    "signature" means any means of self-identification;

(xii)    "a language accepted by the Office" means any one language accepted by the Office for the relevant procedure before the Office;

(xiii)    "translation" means a translation into a language or, where appropriate, a transliteration into an alphabet or character set, accepted by the Office;

(xiv)    "procedure before the Office" means any procedure in proceedings before the Office with respect to an application or patent;

(xv)    except where the context indicates otherwise, words in the singular include the plural, and *vice versa*, and masculine personal pronouns include the feminine;

(xvi)    "Paris Convention" means the Paris Convention for the Protection of Industrial Property, signed on March 20, 1883, as revised and amended;

(xvii)    "Patent Cooperation Treaty" means the Patent Cooperation Treaty, signed on June 19, 1970, together with the Regulations and the Administrative Instructions under that Treaty, as revised, amended and modified;

(xviii)    "Contracting Party" means any State or intergovernmental organization that is party to this Treaty;

(xix)    "applicable law" means, where the Contracting Party is a State, the law of that State and, where the Contracting Party is an intergovernmental organization, the legal enactments under which that intergovernmental organization operates;

(xx)    "instrument of ratification" shall be construed as including instruments of acceptance or approval;

(xxi)    "Organization" means the World Intellectual Property Organization;

(xxii)    "International Bureau" means the International Bureau of the Organization;

(xxiii)    "Director General" means the Director General of the Organization.


*Article 2*

*General Principles*


(1)    [*More Favorable Requirements*]  A Contracting Party shall be free to provide for requirements which, from the viewpoint of applicants and owners, are more favorable than the requirements referred to in this Treaty and the Regulations, other than Article 5.

(2)    [*No Regulation of Substantive Patent Law*]  Nothing in this Treaty or the Regulations is intended to be construed as prescribing anything that would limit the freedom of a Contracting Party to prescribe such requirements of the applicable substantive law relating to patents as it desires.

*Article 3*

*Applications and Patents to Which the Treaty Applies*

(1)    [*Applications*]  (a)  The provisions of this Treaty and the Regulations shall apply to national and regional applications for patents for invention and for patents of addition, which are filed with or for the Office of a Contracting Party, and which are:

(i)    types of applications permitted to be filed as international applications under the Patent Cooperation Treaty;

(ii)    divisional applications of the types of applications referred to in item (i), for patents for invention or for patents of addition, as referred to in Article 4G(1) or (2) of the Paris Convention.

(b)    Subject to the provisions of the Patent Cooperation Treaty, the provisions of this Treaty and the Regulations shall apply to international applications, for patents for invention and for patents of addition, under the Patent Cooperation Treaty:

(i)    in respect of the time limits applicable under Articles 22 and 39(1) of the Patent Cooperation Treaty in the Office of a Contracting Party;

(ii)    in respect of any procedure commenced on or after the date on which processing or examination of the international application may start under Article 23 or 40 of that Treaty.

(2)    [*Patents*]  The provisions of this Treaty and the Regulations shall apply to national and regional patents for invention, and to national and regional patents of addition, which have been granted with effect for a Contracting Party.

*Article 4*

*Security Exception*

Nothing in this Treaty and the Regulations shall limit the freedom of a Contracting Party to take any action it deems necessary for the preservation of essential security interests.

*Article 5*

*Filing Date*

(1)    [*Elements of Application*]  (a)  Except as otherwise prescribed in the Regulations, and subject to paragraphs (2) to (8), a Contracting Party shall provide that the filing date of an application shall be the date on which its Office has received all of the following elements, filed, at the option of the applicant, on paper or as otherwise permitted by the Office for the purposes of the filing date:

(i)    an express or implicit indication to the effect that the elements are intended to be an application;

(ii)    indications allowing the identity of the applicant to be established or allowing the applicant to be contacted by the Office;

(iii)    a part which on the face of it appears to be a description.

(b)    A Contracting Party may, for the purposes of the filing date, accept a drawing as the element referred to in subparagraph (a)(iii).

(c)    For the purposes of the filing date, a Contracting Party may require both information allowing the identity of the applicant to be established and information allowing the applicant to be contacted by the Office, or it may accept evidence allowing the identity of the applicant to be established or allowing the applicant to be contacted by the Office, as the element referred to in subparagraph (a)(ii).

(2)    [*Language*]  (a)  A Contracting Party may require that the indications referred to in paragraph (1)(a)(i) and (ii) be in a language accepted by the Office.

(b)    The part referred to in paragraph (1)(a)(iii) may, for the purposes of the filing date, be filed in any language.

(3)    [*Notification*]  Where the application does not comply with one or more of the requirements applied by the Contracting Party under paragraphs (1) and (2), the Office shall, as soon as practicable, notify the applicant, giving the opportunity to comply with any such requirement, and to make observations, within the time limit prescribed in the Regulations.

(4)    [*Subsequent Compliance with Requirements*]  (a)  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) and (2) are not complied with in the application as initially filed, the filing date shall, subject to subparagraph (b) and paragraph (6), be the date on which all of the requirements applied by the Contracting Party under paragraphs (1) and (2) are subsequently complied with.

(b)    A Contracting Party may provide that, where one or more of the requirements referred to in subparagraph (a) are not complied with within the time limit prescribed in the Regulations, the application shall be deemed not to have been filed.  Where the application is deemed not to have been filed, the Office shall notify the applicant accordingly, indicating the reasons therefor.

page 8

(5)    [*Notification Concerning Missing Part of Description or Drawing*]  Where, in establishing the filing date, the Office finds that a part of the description appears to be missing from the application, or that the application refers to a drawing which appears to be missing from the application, the Office shall promptly notify the applicant accordingly.

(6)    [*Filing Date Where Missing Part of Description or Drawing Is Filed*]  (a)  Where a missing part of the description or a missing drawing is filed with the Office within the time limit prescribed in the Regulations, that part of the description or drawing shall be included in the application, and, subject to subparagraphs (b) and (c), the filing date shall be the date on which the Office has received that part of the description or that drawing, or the date on which all of the requirements applied by the Contracting Party under paragraphs (1) and (2) are complied with, whichever is later.

(b)    Where the missing part of the description or the missing drawing is filed under subparagraph (a) to rectify its omission from an application which, at the date on which one or more elements referred to in paragraph (1)(a) were first received by the Office, claims the priority of an earlier application, the filing date shall, upon the request of the applicant filed within a time limit prescribed in the Regulations, and subject to the requirements prescribed in the Regulations, be the date on which all the requirements applied by the Contracting Party under paragraphs (1) and (2) are complied with.

(c)    Where the missing part of the description or the missing drawing filed under subparagraph (a) is withdrawn within a time limit fixed by the Contracting Party, the filing date shall be the date on which the requirements applied by the Contracting Party under paragraphs (1) and (2) are complied with.

(7)    [*Replacing Description and Drawings by Reference to a Previously Filed Application*]  (a)  Subject to the requirements prescribed in the Regulations, a reference, made upon the filing of the application, in a language accepted by the Office, to a previously filed application shall, for the purposes of the filing date of the application, replace the description and any drawings.

(b)    Where the requirements referred to in subparagraph (a) are not complied with, the application may be deemed not to have been filed.  Where the application is deemed not to have been filed, the Office shall notify the applicant accordingly, indicating the reasons therefor.

(8)    [*Exceptions*]  Nothing in this Article shall limit:

(i)    the right of an applicant under Article 4G(1) or (2) of the Paris Convention to preserve, as the date of a divisional application referred to in that Article, the date of the initial application referred to in that Article and the benefit of the right of priority, if any;

(ii)    the freedom of a Contracting Party to apply any requirements necessary to accord the benefit of the filing date of an earlier application to an application of any type prescribed in the Regulations.

*Article 6*

*Application*

(1)    [*Form or Contents of Application*]  Except where otherwise provided for by this Treaty, no Contracting Party shall require compliance with any requirement relating to the form or contents of an application different from or additional to:

(i)    the requirements relating to form or contents which are provided for in respect of international applications under the Patent Cooperation Treaty;

(ii)    the requirements relating to form or contents compliance with which, under the Patent Cooperation Treaty, may be required by the Office of, or acting for, any State party to that Treaty once the processing or examination of an international application, as referred to in Article 23 or 40 of the said Treaty, has started;

(iii)    any further requirements prescribed in the Regulations.

(2)    [*Request Form*]  (a)  A Contracting Party may require that the contents of an application which correspond to the contents of the request of an international application under the Patent Cooperation Treaty be presented on a request Form prescribed by that Contracting Party.  A Contracting Party may also require that any further contents allowed under paragraph (1)(ii) or prescribed in the Regulations pursuant to paragraph (1)(iii) be contained in that request Form.

(b)    Notwithstanding subparagraph (a), and subject to Article 8(1), a Contracting Party shall accept the presentation of the contents referred to in subparagraph (a) on a request Form provided for in the Regulations.

(3)    [*Translation*]  A Contracting Party may require a translation of any part of the application that is not in a language accepted by its Office.  A Contracting Party may also require a translation of the parts of the application, as prescribed in the Regulations, that are in a language accepted by the Office, into any other languages accepted by that Office.

(4)    [*Fees*]  A Contracting Party may require that fees be paid in respect of the application.  A Contracting Party may apply the provisions of the Patent Cooperation Treaty relating to payment of application fees.

(5)    [*Priority Document*]  Where the priority of an earlier application is claimed, a Contracting Party may require that a copy of the earlier application, and a translation where the earlier application is not in a language accepted by the Office, be filed in accordance with the requirements prescribed in the Regulations.

(6)    [*Evidence*]  A Contracting Party may require that evidence in respect of any matter referred to in paragraph (1) or (2) or in a declaration of priority, or any translation referred to in paragraph (3) or (5), be filed with its Office in the course of the processing of the application only where that Office may reasonably doubt the veracity of that matter or the accuracy of that translation.

(7)    [*Notification*]  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) to (6) are not complied with, the Office shall notify the applicant, giving the opportunity to comply with any such requirement, and to make observations, within the time limit prescribed in the Regulations.

(8)    [*Non-Compliance with Requirements*]  (a)  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) to (6) are not complied with within the time limit prescribed in the Regulations, the Contracting Party may, subject to subparagraph (b) and Articles 5 and 10, apply such sanction as is provided for in its law.

(b)    Where any requirement applied by the Contracting Party under paragraph (1), (5) or (6) in respect of a priority claim is not complied with within the time limit prescribed in the Regulations, the priority claim may, subject to Article 13, be deemed non-existent.  Subject to Article 5(7)(b), no other sanctions may be applied.

## Article  7

### Representation

(1)    [*Representatives*]  (a)  A Contracting Party may require that a representative appointed for the purposes of any procedure before the Office:

(i)    have the right, under the applicable law, to practice before the Office in respect of applications and patents;

(ii)    provide, as his address, an address on a territory prescribed by the Contracting Party.

(b)    Subject to subparagraph (c), an act, with respect to any procedure before the Office, by or in relation to a representative who complies with the requirements applied by the Contracting Party under subparagraph (a), shall have the effect of an act by or in relation to the applicant, owner or other interested person who appointed that representative.

(c)    A Contracting Party may provide that, in the case of an oath or declaration or the revocation of a power of attorney, the signature of a representative shall not have the effect of the signature of the applicant, owner or other interested person who appointed that representative.

(2)    [*Mandatory Representation*]  (a)  A Contracting Party may require that an applicant, owner or other interested person appoint a representative for the purposes of any procedure before the Office, except that an assignee of an application, an applicant, owner or other interested person may act himself before the Office for the following procedures:

(i)    the filing of an application for the purposes of the filing date;

(ii)    the mere payment of a fee;

(iii)    any other procedure as prescribed in the Regulations;

(iv)    the issue of a receipt or notification by the Office in respect of any procedure referred to in items (i) to (iii).

(b)    A maintenance fee may be paid by any person.

(3)    [*Appointment of Representative*]  A Contracting Party shall accept that the appointment of the representative be filed with the Office in a manner prescribed in the Regulations.

(4)    [*Prohibition of Other Requirements*]  No Contracting Party may require that formal requirements other than those referred to in paragraphs (1) to (3) be complied with in respect of the matters dealt with in those paragraphs, except where otherwise provided for by this Treaty or prescribed in the Regulations.

(5)    [*Notification*]  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) to (3) are not complied with, the Office shall notify the assignee of the application, applicant, owner or other interested person, giving the opportunity to comply with any such requirement, and to make observations, within the time limit prescribed in the Regulations.

(6)    [*Non-Compliance with Requirements*]  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) to (3) are not complied with within the time limit prescribed in the Regulations, the Contracting Party may apply such sanction as is provided for in its law.

*Article 8*

*Communications;  Addresses*

(1)    [*Form and Means of Transmittal of Communications*]  (a)  Except for the establishment of a filing date under Article 5(1), and subject to Article 6(1), the Regulations shall, subject to subparagraphs (b) to (d), set out the requirements which a Contracting Party shall be permitted to apply as regards the form and means of transmittal of communications.

(b)    No Contracting Party shall be obliged to accept the filing of communications other than on paper.

(c)    No Contracting Party shall be obliged to exclude the filing of communications on paper.

(d)    A Contracting Party shall accept the filing of communications on paper for the purpose of complying with a time limit.

(2)    [*Language of Communications*]  A Contracting Party may, except where otherwise provided for by this Treaty or the Regulations, require that a communication be in a language accepted by the Office.

(3)    [*Model International Forms*]  Notwithstanding paragraph (1)(a), and subject to paragraph (1)(b) and Article 6(2)(b), a Contracting Party shall accept the presentation of the contents of a communication on a Form which corresponds to a Model International Form in respect of such a communication provided for in the Regulations, if any.

(4)    [*Signature of Communications*]  (a) Where a Contracting Party requires a signature for the purposes of any communication, that Contracting Party shall accept any signature that complies with the requirements prescribed in the Regulations.

(b)    No Contracting Party may require the attestation, notarization, authentication, legalization or other certification of any signature which is communicated to its Office, except in respect of any quasi-judicial proceedings or as prescribed in the Regulations.

(c)    Subject to subparagraph (b), a Contracting Party may require that evidence be filed with the Office only where the Office may reasonably doubt the authenticity of any signature.

(5)    [*Indications in Communications*] A Contracting Party may require that any communication contain one or more indications prescribed in the Regulations.

(6)    [*Address for Correspondence, Address for Legal Service and Other Address*]  A Contracting Party may, subject to any provisions prescribed in the Regulations, require that an applicant, owner or other interested person indicate in any communication:

(i)    an address for correspondence;

(ii)    an address for legal service;

(iii)    any other address provided for in the Regulations.

(7)    [*Notification*]  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) to (6) are not complied with in respect of communications, the Office shall notify the applicant, owner or other interested person, giving the opportunity to comply with any such requirement, and to make observations, within the time limit prescribed in the Regulations.

(8)    [*Non-Compliance with Requirements*]  Where one or more of the requirements applied by the Contracting Party under paragraphs (1) to (6) are not complied with within the time limit prescribed in the Regulations, the Contracting Party may, subject to Articles 5 and 10 and to any exceptions prescribed in the Regulations, apply such sanction as is provided for in its law.

### Article 9

### Notifications

(1)    [*Sufficient Notification*]  Any notification under this Treaty or the Regulations which is sent by the Office to an address for correspondence or address for legal service indicated under Article 8(6), or any other address provided for in the Regulations for the purpose of this provision, and which complies with the provisions with respect to that notification, shall constitute a sufficient notification for the purposes of this Treaty and the Regulations.

(2)    [*If Indications Allowing Contact Were Not Filed*]  Nothing in this Treaty and in the Regulations shall oblige a Contracting Party to send a notification to an applicant, owner or other interested person, if indications allowing that applicant, owner or other interested person to be contacted have not been filed with the Office.

(3)    [*Failure to Notify*]  Subject to Article 10(1), where an Office does not notify an applicant, owner or other interested person of a failure to comply with any requirement under this Treaty or the Regulations, that absence of notification does not relieve that applicant, owner or other interested person of the obligation to comply with that requirement.

### Article 10

### Validity of Patent;  Revocation

(1)    [*Validity of Patent Not Affected by Non-Compliance with Certain Formal Requirements*]  Non-compliance with one or more of the formal requirements referred to in Articles 6(1), (2), (4) and (5) and 8(1) to (4) with respect to an application may not be a ground for revocation or invalidation of a patent, either totally or in part, except where the non-compliance with the formal requirement occurred as a result of a fraudulent intention.

(2)    [*Opportunity to Make Observations, Amendments or Corrections in Case of Intended Revocation or Invalidation*]  A patent may not be revoked or invalidated, either totally or in part, without the owner being given the opportunity to make observations on the intended revocation or invalidation, and to make amendments and corrections where permitted under the applicable law, within a reasonable time limit.

(3)    [*No Obligation for Special Procedures*]  Paragraphs (1) and (2) do not create any obligation to put in place judicial procedures for the enforcement of patent rights distinct from those for the enforcement of law in general.


*Article 11*

*Relief in Respect of Time Limits*


(1)    [*Extension of Time Limits*]  A Contracting Party may provide for the extension, for the period prescribed in the Regulations, of a time limit fixed by the Office for an action in a procedure before the Office in respect of an application or a patent, if a request to that effect is made to the Office in accordance with the requirements prescribed in the Regulations, and the request is filed, at the option of the Contracting Party:

(i)    prior to the expiration of the time limit;  or

(ii)    after the expiration of the time limit, and within the time limit prescribed in the Regulations.

(2)    [*Continued Processing*]  Where an applicant or owner has failed to comply with a time limit fixed by the Office of a Contracting Party for an action in a procedure before the Office in respect of an application or a patent, and that Contracting Party does not provide for extension of a time limit under paragraph (1)(ii), the Contracting Party shall provide for continued processing with respect to the application or patent and, if necessary, reinstatement of the rights of the applicant or owner with respect to that application or patent, if:

(i)    a request to that effect is made to the Office in accordance with the requirements prescribed in the Regulations;

(ii)    the request is filed, and all of the requirements in respect of which the time limit for the action concerned applied are complied with, within the time limit prescribed in the Regulations.

(3)    [*Exceptions*]  No Contracting Party shall be required to provide for the relief referred to in paragraph (1) or (2) with respect to the exceptions prescribed in the Regulations.

(4)    [*Fees*]  A Contracting Party may require that a fee be paid in respect of a request under paragraph (1) or (2).

(5)    [*Prohibition of Other Requirements*]  No Contracting Party may require that requirements other than those referred to in paragraphs (1) to (4) be complied with in respect of the relief provided for under paragraph (1) or (2), except where otherwise provided for by this Treaty or prescribed in the Regulations.

(6)    [*Opportunity to Make Observations in Case of Intended Refusal*]  A request under paragraph (1) or (2) may not be refused without the applicant or owner being given the opportunity to make observations on the intended refusal within a reasonable time limit.


*Article 12*

*Reinstatement of Rights After a Finding of Due Care
or Unintentionality by the Office*


(1)    [*Request*]  A Contracting Party shall provide that, where an applicant or owner has failed to comply with a time limit for an action in a procedure before the Office, and that failure has the direct consequence of causing a loss of rights with respect to an application or patent, the Office shall reinstate the rights of the applicant or owner with respect to the application or patent concerned, if:

(i)    a request to that effect is made to the Office in accordance with the requirements prescribed in the Regulations;

(ii)    the request is filed, and all of the requirements in respect of which the time limit for the said action applied are complied with, within the time limit prescribed in the Regulations;

(iii)    the request states the reasons for the failure to comply with the time limit;  and

(iv)    the Office finds that the failure to comply with the time limit occurred in spite of due care required by the circumstances having been taken or, at the option of the Contracting Party, that any delay was unintentional.

(2)    [*Exceptions*]  No Contracting Party shall be required to provide for the reinstatement of rights under paragraph (1) with respect to the exceptions prescribed in the Regulations.

(3)    [*Fees*]  A Contracting Party may require that a fee be paid in respect of a request under paragraph (1).

(4)    [*Evidence*]  A Contracting Party may require that a declaration or other evidence in support of the reasons referred to in paragraph (1)(iii) be filed with the Office within a time limit fixed by the Office.

(5)    [*Opportunity to Make Observations in Case of Intended Refusal*]  A request under paragraph (1) may not be refused, totally or in part, without the requesting party being given the opportunity to make observations on the intended refusal within a reasonable time limit.

*Article 13*

*Correction or Addition of Priority Claim;  Restoration of Priority Right*

(1)    [*Correction or Addition of Priority Claim*]  Except where otherwise prescribed in the Regulations, a Contracting Party shall provide for the correction or addition of a priority claim with respect to an application ("the subsequent application"), if:

(i)    a request to that effect is made to the Office in accordance with the requirements prescribed in the Regulations;

(ii)    the request is filed within the time limit prescribed in the Regulations; and

(iii)    the filing date of the subsequent application is not later than the date of the expiration of the priority period calculated from the filing date of the earliest application whose priority is claimed.

(2)    [*Delayed Filing of the Subsequent Application*]  Taking into consideration Article 15, a Contracting Party shall provide that, where an application ("the subsequent application") which claims or could have claimed the priority of an earlier application has a filing date which is later than the date on which the priority period expired, but within the time limit prescribed in the Regulations, the Office shall restore the right of priority, if:

(i)    a request to that effect is made to the Office in accordance with the requirements prescribed in the Regulations;

(ii)    the request is filed within the time limit prescribed in the Regulations;

(iii)    the request states the reasons for the failure to comply with the priority period;  and

(iv)    the Office finds that the failure to file the subsequent application within the priority period occurred in spite of due care required by the circumstances having been taken or, at the option of the Contracting Party, was unintentional.

(3)    [*Failure to File a Copy of Earlier Application*]  A Contracting Party shall provide that, where a copy of an earlier application required under Article 6(5) is not filed with the Office within the time limit prescribed in the Regulations pursuant to Article 6, the Office shall restore the right of priority, if:

(i)    a request to that effect is made to the Office in accordance with the requirements prescribed in the Regulations;

(ii)    the request is filed within the time limit for filing the copy of the earlier application prescribed in the Regulations pursuant to Article 6(5);

(iii)   the Office finds that the request for the copy to be provided had been filed with the Office with which the earlier application was filed, within the time limit prescribed in the Regulations;  and

(iv)   a copy of the earlier application is filed within the time limit prescribed in the Regulations.

(4)   [*Fees*]  A Contracting Party may require that a fee be paid in respect of a request under paragraphs (1) to (3).

(5)   [*Evidence*]  A Contracting Party may require that a declaration or other evidence in support of the reasons referred to in paragraph (2)(iii) be filed with the Office within a time limit fixed by the Office.

(6)   [*Opportunity to Make Observations in Case of Intended Refusal*]  A request under paragraphs (1) to (3) may not be refused, totally or in part, without the requesting party being given the opportunity to make observations on the intended refusal within a reasonable time limit.

*Article 14*

*Regulations*

(1)   [*Content*]  (a)  The Regulations annexed to this Treaty provide rules concerning:

(i)   matters which this Treaty expressly provides are to be "prescribed in the Regulations";

(ii)   details useful in the implementation of the provisions of this Treaty;

(iii)   administrative requirements, matters or procedures.

(b)   The Regulations also provide rules concerning the formal requirements which a Contracting Party shall be permitted to apply in respect of requests for:

(i)   recordation of change in name or address;

(ii)   recordation of change in applicant or owner;

(iii)   recordation of a license or a security interest;

(iv)   correction of a mistake.

(c)   The Regulations also provide for the establishment of Model International Forms, and for the establishment of a request Form for the purposes of Article 6(2)(b), by the Assembly, with the assistance of the International Bureau.

(2)   [*Amending the Regulations*]  Subject to paragraph (3), any amendment of the Regulations shall require three-fourths of the votes cast.

(3)   [*Requirement of Unanimity*]  (a)  The Regulations may specify provisions of the Regulations which may be amended only by unanimity.

(b)   Any amendment of the Regulations resulting in the addition of provisions to, or the deletion of provisions from, the provisions specified in the Regulations pursuant to subparagraph (a) shall require unanimity.

(c)   In determining whether unanimity is attained, only votes actually cast shall be taken into consideration.  Abstentions shall not be considered as votes.

(4)   [*Conflict Between the Treaty and the Regulations*]  In the case of conflict between the provisions of this Treaty and those of the Regulations, the former shall prevail.


## Article 15

### Relation to the Paris Convention

(1)   [*Obligation to Comply with the Paris Convention*]  Each Contracting Party shall comply with the provisions of the Paris Convention which concern patents.

(2)   [*Obligations and Rights Under the Paris Convention*]  (a)  Nothing in this Treaty shall derogate from obligations that Contracting Parties have to each other under the Paris Convention.

(b)   Nothing in this Treaty shall derogate from rights that applicants and owners enjoy under the Paris Convention.


## Article 16

### Effect of Revisions, Amendments and Modifications of the Patent Cooperation Treaty

(1)   [*Applicability of Revisions, Amendments and Modifications of the Patent Cooperation Treaty*]  Subject to paragraph (2), any revision, amendment or modification of the Patent Cooperation Treaty made after June 2, 2000, which is consistent with the Articles of this Treaty, shall apply for the purposes of this Treaty and the Regulations if the Assembly so decides, in the particular case, by three-fourths of the votes cast.

(2)    [*Non-Applicability of Transitional Provisions of the Patent Cooperation Treaty*] Any provision of the Patent Cooperation Treaty, by virtue of which a revised, amended or modified provision of that Treaty does not apply to a State party to it, or to the Office of or acting for such a State, for as long as the latter provision is incompatible with the law applied by that State or Office, shall not apply for the purposes of this Treaty and the Regulations.


*Article 17*

*Assembly*


(1)    [*Composition*]  (a)  The Contracting Parties shall have an Assembly.

(b)    Each Contracting Party shall be represented in the Assembly by one delegate, who may be assisted by alternate delegates, advisors and experts.  Each delegate may represent only one Contracting Party.

(2)    [*Tasks*]  The Assembly shall:

(i)    deal with matters concerning the maintenance and development of this Treaty and the application and operation of this Treaty;

(ii)    establish Model International Forms, and the request Form, referred to in Article 14(1)(c), with the assistance of the International Bureau;

(iii)    amend the Regulations;

(iv)    determine the conditions for the date of application of each Model International Form, and the request Form, referred to in item (ii), and each amendment referred to in item (iii);

(v)    decide, pursuant to Article 16(1), whether any revision, amendment or modification of the Patent Cooperation Treaty shall apply for the purposes of this Treaty and the Regulations;

(vi)    perform such other functions as are appropriate under this Treaty.

(3)    [*Quorum*]  (a)  One-half of the members of the Assembly which are States shall constitute a quorum.

(b)    Notwithstanding subparagraph (a), if, in any session, the number of the members of the Assembly which are States and are represented is less than one-half but equal to or more than one-third of the members of the Assembly which are States, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the conditions set forth hereinafter are fulfilled.  The International Bureau shall communicate the said decisions to the members of the Assembly which are States and were not represented and shall invite them to express in writing their

vote or abstention within a period of three months from the date of the communication. If, at the expiration of this period, the number of such members having thus expressed their vote or abstention attains the number of the members which was lacking for attaining the quorum in the session itself, such decisions shall take effect, provided that at the same time the required majority still obtains.

(4)    [*Taking Decisions in the Assembly*]  (a)  The Assembly shall endeavor to take its decisions by consensus.

(b)    Where a decision cannot be arrived at by consensus, the matter at issue shall be decided by voting. In such a case:

(i)    each Contracting Party that is a State shall have one vote and shall vote only in its own name;  and

(ii)    any Contracting Party that is an intergovernmental organization may participate in the vote, in place of its Member States, with a number of votes equal to the number of its Member States which are party to this Treaty.  No such intergovernmental organization shall participate in the vote if any one of its Member States exercises its right to vote and *vice versa*.  In addition, no such intergovernmental organization shall participate in the vote if any one of its Member States party to this Treaty is a Member State of another such intergovernmental organization and that other intergovernmental organization participates in that vote.

(5)    [*Majorities*]  (a)  Subject to Articles 14(2) and (3), 16(1) and 19(3), the decisions of the Assembly shall require two-thirds of the votes cast.

(b)    In determining whether the required majority is attained, only votes actually cast shall be taken into consideration.  Abstentions shall not be considered as votes.

(6)    [*Sessions*]  The Assembly shall meet in ordinary session once every two years upon convocation by the Director General.

(7)    [*Rules of Procedure*]  The Assembly shall establish its own rules of procedure, including rules for the convocation of extraordinary sessions.


*Article 18*

*International Bureau*


(1)    [*Administrative Tasks*]  (a)  The International Bureau shall perform the administrative tasks concerning this Treaty.

(b)    In particular, the International Bureau shall prepare the meetings and provide the secretariat of the Assembly and of such committees of experts and working groups as may be established by the Assembly.

(2)    [*Meetings Other than Sessions of the Assembly*]  The Director General shall convene any committee and working group established by the Assembly.

(3)    [*Role of the International Bureau in the Assembly and Other Meetings*]  (a)  The Director General and persons designated by the Director General shall participate, without the right to vote, in all meetings of the Assembly, the committees and working groups established by the Assembly.

(b)  The Director General or a staff member designated by the Director General shall be *ex officio* secretary of the Assembly, and of the committees and working groups referred to in subparagraph (a).

(4)    [*Conferences*]  (a)  The International Bureau shall, in accordance with the directions of the Assembly, make the preparations for any revision conferences.

(b)    The International Bureau may consult with member States of the Organization, intergovernmental organizations and international and national non-governmental organizations concerning the said preparations.

(c)    The Director General and persons designated by the Director General shall take part, without the right to vote, in the discussions at revision conferences.

(5)    [*Other Tasks*]  The International Bureau shall carry out any other tasks assigned to it in relation to this Treaty.


*Article 19*

*Revisions*


(1)    [*Revision of the Treaty*]  Subject to paragraph (2), this Treaty may be revised by a conference of the Contracting Parties.  The convocation of any revision conference shall be decided by the Assembly.

(2)    [*Revision or Amendment of Certain Provisions of the Treaty*]  Article 17(2) and (6) may be amended either by a revision conference, or by the Assembly according to the provisions of paragraph (3).

(3)    [*Amendment by the Assembly of Certain Provisions of the Treaty*]  (a)  Proposals for the amendment by the Assembly of Article 17(2) and (6) may be initiated by any Contracting Party or by the Director General.  Such proposals shall be communicated by the Director General to the Contracting Parties at least six months in advance of their consideration by the Assembly.

(b)    Adoption of any amendment to the provisions referred to in subparagraph (a) shall require three-fourths of the votes cast.

(c)      Any amendment to the provisions referred to in subparagraph (a) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three-fourths of the Contracting Parties which were members of the Assembly at the time the Assembly adopted the amendment.  Any amendment to the said provisions thus accepted shall bind all the Contracting Parties at the time the amendment enters into force, and States and intergovernmental organizations which become Contracting Parties at a subsequent date.


*Article 20*

*Becoming Party to the Treaty*


(1)      [*States*]  Any State which is party to the Paris Convention or which is a member of the Organization, and in respect of which patents may be granted, either through the State's own Office or through the Office of another State or intergovernmental organization, may become party to this Treaty.

(2)      [*Intergovernmental Organizations*]  Any intergovernmental organization may become party to this Treaty if at least one member State of that intergovernmental organization is party to the Paris Convention or a member of the Organization, and the intergovernmental organization declares that it has been duly authorized, in accordance with its internal procedures, to become party to this Treaty, and declares that:

(i)      it is competent to grant patents with effect for its member States;  or

(ii)      it is competent in respect of, and has its own legislation binding on all its member States concerning, matters covered by this Treaty, and it has, or has charged, a regional Office for the purpose of granting patents with effect in its territory in accordance with that legislation.

Subject to paragraph (3), any such declaration shall be made at the time of the deposit of the instrument of ratification or accession.

(3)      [*Regional Patent Organizations*]  The European Patent Organisation, the Eurasian Patent Organization and the African Regional Industrial Property Organization, having made the declaration referred to in paragraph (2)(i) or (ii) in the Diplomatic Conference that has adopted this Treaty, may become party to this Treaty as an intergovernmental organization, if it declares, at the time of the deposit of the instrument of ratification or accession that it has been duly authorized, in accordance with its internal procedures, to become party to this Treaty.

(4)    [*Ratification or Accession*]  Any State or intergovernmental organization satisfying the requirements in paragraph (1), (2) or (3) may deposit:

    (i)    an instrument of ratification if it has signed this Treaty;  or

    (ii)   an instrument of accession if it has not signed this Treaty.


*Article 21*

*Entry into Force;  Effective Dates of Ratifications and Accessions*


(1)    [*Entry into Force of this Treaty*]  This Treaty shall enter into force three months after ten instruments of ratification or accession by States have been deposited with the Director General.

(2)    [*Effective Dates of Ratifications and Accessions*]  This Treaty shall bind:

    (i)    the ten States referred to in paragraph (1), from the date on which this Treaty has entered into force;

    (ii)   each other State, from the expiration of three months after the date on which the State has deposited its instrument of ratification or accession with the Director General, or from any later date indicated in that instrument, but no later than six months after the date of such deposit;

    (iii)  each of the European Patent Organisation, the Eurasian Patent Organization and the African Regional Industrial Property Organization, from the expiration of three months after the deposit of its instrument of ratification or accession, or from any later date indicated in that instrument, but no later than six months after the date of such deposit, if such instrument has been deposited after the entry into force of this Treaty according to paragraph (1), or three months after the entry into force of this Treaty if such instrument has been deposited before the entry into force of this Treaty;

    (iv)   any other intergovernmental organization that is eligible to become party to this Treaty, from the expiration of three months after the deposit of its instrument of ratification or accession, or from any later date indicated in that instrument, but no later than six months after the date of such deposit.

*Article 22*

*Application of the Treaty to Existing Applications and Patents*

(1)    [*Principle*]  Subject to paragraph (2), a Contracting Party shall apply the provisions of this Treaty and the Regulations, other than Articles 5 and 6(1) and (2) and related Regulations, to applications which are pending, and to patents which are in force, on the date on which this Treaty binds that Contracting Party under Article 21.

(2)    [*Procedures*]  No Contracting Party shall be obliged to apply the provisions of this Treaty and the Regulations to any procedure in proceedings with respect to applications and patents referred to in paragraph (1), if such procedure commenced before the date on which this Treaty binds that Contracting Party under Article 21.

*Article 23*

*Reservations*

(1)    [*Reservation*]  Any State or intergovernmental organization may declare through a reservation that the provisions of Article 6(1) shall not apply to any requirement relating to unity of invention applicable under the Patent Cooperation Treaty to an international application.

(2)    [*Modalities*]  Any reservation under paragraph (1) shall be made in a declaration accompanying the instrument of ratification of, or accession to, this Treaty of the State or intergovernmental organization making the reservation.

(3)    [*Withdrawal*]  Any reservation under paragraph (1) may be withdrawn at any time.

(4)    [*Prohibition of Other Reservations*]  No reservation to this Treaty other than the reservation allowed under paragraph (1) shall be permitted.

*Article 24*

*Denunciation of the Treaty*

(1)    [*Notification*]  Any Contracting Party may denounce this Treaty by notification addressed to the Director General.

(2)    [*Effective Date*]  Any denunciation shall take effect one year from the date on which the Director General has received the notification or at any later date indicated in the notification.  It shall not affect the application of this Treaty to any application pending or any patent in force in respect of the denouncing Contracting Party at the time of the coming into effect of the denunciation.

### Article 25

### Languages of the Treaty

(1)    [*Authentic Texts*]  This Treaty is signed in a single original in the English, Arabic, Chinese, French, Russian and Spanish languages, all texts being equally and exclusively authentic.

(2)    [*Official Texts*]  An official text in any language other than those referred to in paragraph (1) shall be established by the Director General, after consultation with the interested parties.  For the purposes of this paragraph, interested party means any State which is party to the Treaty, or is eligible to become party to the Treaty under Article 20(1), whose official language, or one of whose official languages, is involved, and the European Patent Organisation, the Eurasian Patent Organization and the African Regional Industrial Property Organization and any other intergovernmental organization that is party to the Treaty, or may become party to the Treaty, if one of its official languages is involved.

(3)    [*Authentic Texts to Prevail*]  In case of differences of opinion on interpretation between authentic and official texts, the authentic texts shall prevail.

### Article 26

### Signature of the Treaty

The Treaty shall remain open for signature by any State that is eligible for becoming party to the Treaty under Article 20(1) and by the European Patent Organisation, the Eurasian Patent Organization and the African Regional Industrial Property Organization at the headquarters of the Organization for one year after its adoption.

*Article 27*

*Depositary;  Registration*

(1)    [*Depositary*]  The Director General is the depositary of this Treaty.

(2)    [*Registration*]  The Director General shall register this Treaty with the Secretariat of the United Nations.

# **EXHIBIT 7**

**ANNEX 1C**

**AGREEMENT ON TRADE-RELATED ASPECTS OF
INTELLECTUAL PROPERTY RIGHTS**

PART I          GENERAL PROVISIONS AND BASIC PRINCIPLES

PART II         STANDARDS CONCERNING THE AVAILABILITY, SCOPE AND USE OF INTELLECTUAL PROPERTY RIGHTS

    1.    Copyright and Related Rights
    2.    Trademarks
    3.    Geographical Indications
    4.    Industrial Designs
    5.    Patents
    6.    Layout-Designs (Topographies) of Integrated Circuits
    7.    Protection of Undisclosed Information
    8.    Control of Anti-Competitive Practices in Contractual Licences

PART III        ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS

    1.    General Obligations
    2.    Civil and Administrative Procedures and Remedies
    3.    Provisional Measures
    4.    Special Requirements Related to Border Measures
    5.    Criminal Procedures

PART IV         ACQUISITION AND MAINTENANCE OF INTELLECTUAL PROPERTY RIGHTS AND RELATED *INTER-PARTES* PROCEDURES

PART V          DISPUTE PREVENTION AND SETTLEMENT

PART VI         TRANSITIONAL ARRANGEMENTS

PART VII        INSTITUTIONAL ARRANGEMENTS;  FINAL PROVISIONS

**AGREEMENT ON TRADE-RELATED ASPECTS OF
INTELLECTUAL PROPERTY RIGHTS**

*Members,*

    *Desiring* to reduce distortions and impediments to international trade, and taking into account the need to promote effective and adequate protection of intellectual property rights, and to ensure that measures and procedures to enforce intellectual property rights do not themselves become barriers to legitimate trade;

    *Recognizing*, to this end, the need for new rules and disciplines concerning:

    (a)    the applicability of the basic principles of GATT 1994 and of relevant international intellectual property agreements or conventions;

(b)     the provision of adequate standards and principles concerning the availability, scope and use of trade-related intellectual property rights;

(c)     the provision of effective and appropriate means for the enforcement of trade-related intellectual property rights, taking into account differences in national legal systems;

(d)     the provision of effective and expeditious procedures for the multilateral prevention and settlement of disputes between governments;  and

(e)     transitional arrangements aiming at the fullest participation in the results of the negotiations;

*Recognizing* the need for a multilateral framework of principles, rules and disciplines dealing with international trade in counterfeit goods;

*Recognizing* that intellectual property rights are private rights;

*Recognizing* the underlying public policy objectives of national systems for the protection of intellectual property, including developmental and technological objectives;

*Recognizing* also the special needs of the least-developed country Members in respect of maximum flexibility in the domestic implementation of laws and regulations in order to enable them to create a sound and viable technological base;

*Emphasizing* the importance of reducing tensions by reaching strengthened commitments to resolve disputes on trade-related intellectual property issues through multilateral procedures;

*Desiring* to establish a mutually supportive relationship between the WTO and the World Intellectual Property Organization (referred to in this Agreement as "WIPO") as well as other relevant international organizations;

*Hereby agree* as follows:


PART I

GENERAL PROVISIONS AND BASIC PRINCIPLES


*Article 1*

*Nature and Scope of Obligations*

1.      Members shall give effect to the provisions of this Agreement.  Members may, but shall not be obliged to, implement in their law more extensive protection than is required by this Agreement, provided that such protection does not contravene the provisions of this Agreement.  Members shall be free to determine the appropriate method of implementing the provisions of this Agreement within their own legal system and practice.

2.      For the purposes of this Agreement, the term "intellectual property" refers to all categories of intellectual property that are the subject of Sections 1 through 7 of Part II.

3.      Members shall accord the treatment provided for in this Agreement to the nationals of other Members.[1]  In respect of the relevant intellectual property right, the nationals of other Members shall be understood as those natural or legal persons that would meet the criteria for eligibility for protection provided for in the Paris Convention (1967), the Berne Convention (1971), the Rome Convention and the Treaty on Intellectual Property in Respect of Integrated Circuits, were all Members of the WTO members of those conventions.[2]  Any Member availing itself of the possibilities provided in paragraph 3 of Article 5 or paragraph 2 of Article 6 of the Rome Convention shall make a notification as foreseen in those provisions to the Council for Trade-Related Aspects of Intellectual Property Rights (the "Council for TRIPS").

## *Article 2*

### *Intellectual Property Conventions*

1.      In respect of Parts II, III and IV of this Agreement, Members shall comply with Articles 1 through 12, and Article 19, of the Paris Convention (1967).

2.      Nothing in Parts I to IV of this Agreement shall derogate from existing obligations that Members may have to each other under the Paris Convention, the Berne Convention, the Rome Convention and the Treaty on Intellectual Property in Respect of Integrated Circuits.

## *Article 3*

### *National Treatment*

1.      Each Member shall accord to the nationals of other Members treatment no less favourable than that it accords to its own nationals with regard to the protection[3] of intellectual property, subject to the exceptions already provided in, respectively, the Paris Convention (1967), the Berne Convention (1971), the Rome Convention or the Treaty on Intellectual Property in Respect of Integrated Circuits.  In respect of performers, producers of phonograms and broadcasting organizations, this obligation only applies in respect of the rights provided under this Agreement. Any Member availing itself of the possibilities provided in Article 6 of the Berne Convention (1971) or paragraph 1(b) of Article 16 of the Rome Convention shall make a notification as foreseen in those provisions to the Council for TRIPS.

2.      Members may avail themselves of the exceptions permitted under paragraph 1 in relation to judicial and administrative procedures, including the designation of an address for service or the appointment of an agent within the jurisdiction of a Member, only where such exceptions are necessary to secure compliance with laws and regulations which are not inconsistent with the

---

[1] When "nationals" are referred to in this Agreement, they shall be deemed, in the case of a separate customs territory Member of the WTO, to mean persons, natural or legal, who are domiciled or who have a real and effective industrial or commercial establishment in that customs territory.

[2] In this Agreement, "Paris Convention" refers to the Paris Convention for the Protection of Industrial Property;  "Paris Convention (1967)" refers to the Stockholm Act of this Convention of 14 July 1967.  "Berne Convention" refers to the Berne Convention for the Protection of Literary and Artistic Works;  "Berne Convention (1971)" refers to the Paris Act of this Convention of 24 July 1971.  "Rome Convention" refers to the International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organizations, adopted at Rome on 26 October 1961.  "Treaty on Intellectual Property in Respect of Integrated Circuits" (IPIC Treaty) refers to the Treaty on Intellectual Property in Respect of Integrated Circuits, adopted at Washington on 26 May 1989.  "WTO Agreement" refers to the Agreement Establishing the WTO.

[3] For the purposes of Articles 3 and 4, "protection" shall include matters affecting the availability, acquisition, scope, maintenance and enforcement of intellectual property rights as well as those matters affecting the use of intellectual property rights specifically addressed in this Agreement.

provisions of this Agreement and where such practices are not applied in a manner which would constitute a disguised restriction on trade.

## Article 4

### Most-Favoured-Nation Treatment

With regard to the protection of intellectual property, any advantage, favour, privilege or immunity granted by a Member to the nationals of any other country shall be accorded immediately and unconditionally to the nationals of all other Members.  Exempted from this obligation are any advantage, favour, privilege or immunity accorded by a Member:

(a)      deriving from international agreements on judicial assistance or law enforcement of a general nature and not particularly confined to the protection of intellectual property;

(b)      granted in accordance with the provisions of the Berne Convention (1971) or the Rome Convention authorizing that the treatment accorded be a function not of national treatment but of the treatment accorded in another country;

(c)      in respect of the rights of performers, producers of phonograms and broadcasting organizations not provided under this Agreement;

(d)      deriving from international agreements related to the protection of intellectual property which entered into force prior to the entry into force of the WTO Agreement, provided that such agreements are notified to the Council for TRIPS and do not constitute an arbitrary or unjustifiable discrimination against nationals of other Members.

## Article 5

### Multilateral Agreements on Acquisition or Maintenance of Protection

The obligations under Articles 3 and 4 do not apply to procedures provided in multilateral agreements concluded under the auspices of WIPO relating to the acquisition or maintenance of intellectual property rights.

## Article 6

### Exhaustion

For the purposes of dispute settlement under this Agreement, subject to the provisions of Articles 3 and 4 nothing in this Agreement shall be used to address the issue of the exhaustion of intellectual property rights.

## Article 7

### Objectives

The protection and enforcement of intellectual property rights should contribute to the promotion of technological innovation and to the transfer and dissemination of technology, to the

mutual advantage of producers and users of technological knowledge and in a manner conducive to social and economic welfare, and to a balance of rights and obligations.

*Article 8*

*Principles*

1.      Members may, in formulating or amending their laws and regulations, adopt measures necessary to protect public health and nutrition, and to promote the public interest in sectors of vital importance to their socio-economic and technological development, provided that such measures are consistent with the provisions of this Agreement.

2.      Appropriate measures, provided that they are consistent with the provisions of this Agreement, may be needed to prevent the abuse of intellectual property rights by right holders or the resort to practices which unreasonably restrain trade or adversely affect the international transfer of technology.

PART II

STANDARDS CONCERNING THE AVAILABILITY, SCOPE
AND USE OF INTELLECTUAL PROPERTY RIGHTS

SECTION 1:  COPYRIGHT AND RELATED RIGHTS

*Article 9*

*Relation to the Berne Convention*

1.      Members shall comply with Articles 1 through 21 of the Berne Convention (1971) and the Appendix thereto.  However, Members shall not have rights or obligations under this Agreement in respect of the rights conferred under Article *6bis* of that Convention or of the rights derived therefrom.

2.      Copyright protection shall extend to expressions and not to ideas, procedures, methods of operation or mathematical concepts as such.

*Article 10*

*Computer Programs and Compilations of Data*

1.      Computer programs, whether in source or object code, shall be protected as literary works under the Berne Convention (1971).

2.      Compilations of data or other material, whether in machine readable or other form, which by reason of the selection or arrangement of their contents constitute intellectual creations shall be protected as such.  Such protection, which shall not extend to the data or material itself, shall be without prejudice to any copyright subsisting in the data or material itself.

*Article 11*

*Rental Rights*

In respect of at least computer programs and cinematographic works, a Member shall provide authors and their successors in title the right to authorize or to prohibit the commercial rental to the public of originals or copies of their copyright works. A Member shall be excepted from this obligation in respect of cinematographic works unless such rental has led to widespread copying of such works which is materially impairing the exclusive right of reproduction conferred in that Member on authors and their successors in title. In respect of computer programs, this obligation does not apply to rentals where the program itself is not the essential object of the rental.

*Article 12*

*Term of Protection*

Whenever the term of protection of a work, other than a photographic work or a work of applied art, is calculated on a basis other than the life of a natural person, such term shall be no less than 50 years from the end of the calendar year of authorized publication, or, failing such authorized publication within 50 years from the making of the work, 50 years from the end of the calendar year of making.

*Article 13*

*Limitations and Exceptions*

Members shall confine limitations or exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the right holder.

*Article 14*

*Protection of Performers, Producers of Phonograms*
*(Sound Recordings) and Broadcasting Organizations*

1.      In respect of a fixation of their performance on a phonogram, performers shall have the possibility of preventing the following acts when undertaken without their authorization: the fixation of their unfixed performance and the reproduction of such fixation. Performers shall also have the possibility of preventing the following acts when undertaken without their authorization: the broadcasting by wireless means and the communication to the public of their live performance.

2.      Producers of phonograms shall enjoy the right to authorize or prohibit the direct or indirect reproduction of their phonograms.

3.      Broadcasting organizations shall have the right to prohibit the following acts when undertaken without their authorization: the fixation, the reproduction of fixations, and the rebroadcasting by wireless means of broadcasts, as well as the communication to the public of television broadcasts of the same. Where Members do not grant such rights to broadcasting organizations, they shall provide owners of copyright in the subject matter of broadcasts with the possibility of preventing the above acts, subject to the provisions of the Berne Convention (1971).

4.    The provisions of Article 11 in respect of computer programs shall apply *mutatis mutandis* to producers of phonograms and any other right holders in phonograms as determined in a Member's law.  If on 15 April 1994 a Member has in force a system of equitable remuneration of right holders in respect of the rental of phonograms, it may maintain such system provided that the commercial rental of phonograms is not giving rise to the material impairment of the exclusive rights of reproduction of right holders.

5.    The term of the protection available under this Agreement to performers and producers of phonograms shall last at least until the end of a period of 50 years computed from the end of the calendar year in which the fixation was made or the performance took place.  The term of protection granted pursuant to paragraph 3 shall last for at least 20 years from the end of the calendar year in which the broadcast took place.

6.    Any Member may, in relation to the rights conferred under paragraphs 1, 2 and 3, provide for conditions, limitations, exceptions and reservations to the extent permitted by the Rome Convention.  However, the provisions of Article 18 of the Berne Convention (1971) shall also apply, *mutatis mutandis*, to the rights of performers and producers of phonograms in phonograms.


SECTION 2:  TRADEMARKS


*Article 15*

*Protectable Subject Matter*

1.    Any sign, or any combination of signs, capable of distinguishing the goods or services of one undertaking from those of other undertakings, shall be capable of constituting a trademark.  Such signs, in particular words including personal names, letters, numerals, figurative elements and combinations of colours as well as any combination of such signs, shall be eligible for registration as trademarks.  Where signs are not inherently capable of distinguishing the relevant goods or services, Members may make registrability depend on distinctiveness acquired through use.  Members may require, as a condition of registration, that signs be visually perceptible.

2.    Paragraph 1 shall not be understood to prevent a Member from denying registration of a trademark on other grounds, provided that they do not derogate from the provisions of the Paris Convention (1967).

3.    Members may make registrability depend on use.  However, actual use of a trademark shall not be a condition for filing an application for registration.  An application shall not be refused solely on the ground that intended use has not taken place before the expiry of a period of three years from the date of application.

4.    The nature of the goods or services to which a trademark is to be applied shall in no case form an obstacle to registration of the trademark.

5.    Members shall publish each trademark either before it is registered or promptly after it is registered and shall afford a reasonable opportunity for petitions to cancel the registration.  In addition, Members may afford an opportunity for the registration of a trademark to be opposed.

*Article 16*

*Rights Conferred*

1.      The owner of a registered trademark shall have the exclusive right to prevent all third parties not having the owner's consent from using in the course of trade identical or similar signs for goods or services which are identical or similar to those in respect of which the trademark is registered where such use would result in a likelihood of confusion.  In case of the use of an identical sign for identical goods or services, a likelihood of confusion shall be presumed.  The rights described above shall not prejudice any existing prior rights, nor shall they affect the possibility of Members making rights available on the basis of use.

2.      Article 6*bis* of the Paris Convention (1967) shall apply, *mutatis mutandis*, to services.  In determining whether a trademark is well-known, Members shall take account of the knowledge of the trademark in the relevant sector of the public, including knowledge in the Member concerned which has been obtained as a result of the promotion of the trademark.

3.      Article 6*bis* of the Paris Convention (1967) shall apply, *mutatis mutandis*, to goods or services which are not similar to those in respect of which a trademark is registered, provided that use of that trademark in relation to those goods or services would indicate a connection between those goods or services and the owner of the registered trademark and provided that the interests of the owner of the registered trademark are likely to be damaged by such use.

*Article 17*

*Exceptions*

Members may provide limited exceptions to the rights conferred by a trademark, such as fair use of descriptive terms, provided that such exceptions take account of the legitimate interests of the owner of the trademark and of third parties.

*Article 18*

*Term of Protection*

Initial registration, and each renewal of registration, of a trademark shall be for a term of no less than seven years.  The registration of a trademark shall be renewable indefinitely.

*Article 19*

*Requirement of Use*

1.      If use is required to maintain a registration, the registration may be cancelled only after an uninterrupted period of at least three years of non-use, unless valid reasons based on the existence of obstacles to such use are shown by the trademark owner.  Circumstances arising independently of the will of the owner of the trademark which constitute an obstacle to the use of the trademark, such as import restrictions on or other government requirements for goods or services protected by the trademark, shall be recognized as valid reasons for non-use.

2.      When subject to the control of its owner, use of a trademark by another person shall be recognized as use of the trademark for the purpose of maintaining the registration.

*Article 20*

*Other Requirements*

The use of a trademark in the course of trade shall not be unjustifiably encumbered by special requirements, such as use with another trademark, use in a special form or use in a manner detrimental to its capability to distinguish the goods or services of one undertaking from those of other undertakings. This will not preclude a requirement prescribing the use of the trademark identifying the undertaking producing the goods or services along with, but without linking it to, the trademark distinguishing the specific goods or services in question of that undertaking.

*Article 21*

*Licensing and Assignment*

Members may determine conditions on the licensing and assignment of trademarks, it being understood that the compulsory licensing of trademarks shall not be permitted and that the owner of a registered trademark shall have the right to assign the trademark with or without the transfer of the business to which the trademark belongs.

SECTION 3:  GEOGRAPHICAL INDICATIONS

*Article 22*

*Protection of Geographical Indications*

1.      Geographical indications are, for the purposes of this Agreement, indications which identify a good as originating in the territory of a Member, or a region or locality in that territory, where a given quality, reputation or other characteristic of the good is essentially attributable to its geographical origin.

2.      In respect of geographical indications, Members shall provide the legal means for interested parties to prevent:

      (a)      the use of any means in the designation or presentation of a good that indicates or suggests that the good in question originates in a geographical area other than the true place of origin in a manner which misleads the public as to the geographical origin of the good;

      (b)      any use which constitutes an act of unfair competition within the meaning of Article 10*bis* of the Paris Convention (1967).

3.      A Member shall, *ex officio* if its legislation so permits or at the request of an interested party, refuse or invalidate the registration of a trademark which contains or consists of a geographical indication with respect to goods not originating in the territory indicated, if use of the indication in the trademark for such goods in that Member is of such a nature as to mislead the public as to the true place of origin.

4.      The protection under paragraphs 1, 2 and 3 shall be applicable against a geographical indication which, although literally true as to the territory, region or locality in which the goods originate, falsely represents to the public that the goods originate in another territory.

*Article 23*

*Additional Protection for Geographical Indications*
*for Wines and Spirits*

1.      Each Member shall provide the legal means for interested parties to prevent use of a geographical indication identifying wines for wines not originating in the place indicated by the geographical indication in question or identifying spirits for spirits not originating in the place indicated by the geographical indication in question, even where the true origin of the goods is indicated or the geographical indication is used in translation or accompanied by expressions such as "kind", "type", "style", "imitation" or the like.[4]

2.      The registration of a trademark for wines which contains or consists of a geographical indication identifying wines or for spirits which contains or consists of a geographical indication identifying spirits shall be refused or invalidated, *ex officio* if a Member's legislation so permits or at the request of an interested party, with respect to such wines or spirits not having this origin.

3.      In the case of homonymous geographical indications for wines, protection shall be accorded to each indication, subject to the provisions of paragraph 4 of Article 22. Each Member shall determine the practical conditions under which the homonymous indications in question will be differentiated from each other, taking into account the need to ensure equitable treatment of the producers concerned and that consumers are not misled.

4.      In order to facilitate the protection of geographical indications for wines, negotiations shall be undertaken in the Council for TRIPS concerning the establishment of a multilateral system of notification and registration of geographical indications for wines eligible for protection in those Members participating in the system.

*Article 24*

*International Negotiations;  Exceptions*

1.      Members agree to enter into negotiations aimed at increasing the protection of individual geographical indications under Article 23.  The provisions of paragraphs 4 through 8 below shall not be used by a Member to refuse to conduct negotiations or to conclude bilateral or multilateral agreements.  In the context of such negotiations, Members shall be willing to consider the continued applicability of these provisions to individual geographical indications whose use was the subject of such negotiations.

2.      The Council for TRIPS shall keep under review the application of the provisions of this Section;  the first such review shall take place within two years of the entry into force of the WTO Agreement.  Any matter affecting the compliance with the obligations under these provisions may be drawn to the attention of the Council, which, at the request of a Member, shall consult with any Member or Members in respect of such matter in respect of which it has not been possible to find a satisfactory solution through bilateral or plurilateral consultations between the Members concerned. The Council shall take such action as may be agreed to facilitate the operation and further the objectives of this Section.

3.      In implementing this Section, a Member shall not diminish the protection of geographical indications that existed in that Member immediately prior to the date of entry into force of the WTO Agreement.

---

[4] Notwithstanding the first sentence of Article 42, Members may, with respect to these obligations, instead provide for enforcement by administrative action.

4.     Nothing in this Section shall require a Member to prevent continued and similar use of a particular geographical indication of another Member identifying wines or spirits in connection with goods or services by any of its nationals or domiciliaries who have used that geographical indication in a continuous manner with regard to the same or related goods or services in the territory of that Member either (*a*) for at least 10 years preceding 15 April 1994 or (*b*) in good faith preceding that date.

5.     Where a trademark has been applied for or registered in good faith, or where rights to a trademark have been acquired through use in good faith either:

(a)     before the date of application of these provisions in that Member as defined in Part VI;  or

(b)     before the geographical indication is protected in its country of origin;

measures adopted to implement this Section shall not prejudice eligibility for or the validity of the registration of a trademark, or the right to use a trademark, on the basis that such a trademark is identical with, or similar to, a geographical indication.

6.     Nothing in this Section shall require a Member to apply its provisions in respect of a geographical indication of any other Member with respect to goods or services for which the relevant indication is identical with the term customary in common language as the common name for such goods or services in the territory of that Member.  Nothing in this Section shall require a Member to apply its provisions in respect of a geographical indication of any other Member with respect to products of the vine for which the relevant indication is identical with the customary name of a grape variety existing in the territory of that Member as of the date of entry into force of the WTO Agreement.

7.     A Member may provide that any request made under this Section in connection with the use or registration of a trademark must be presented within five years after the adverse use of the protected indication has become generally known in that Member or after the date of registration of the trademark in that Member provided that the trademark has been published by that date, if such date is earlier than the date on which the adverse use became generally known in that Member, provided that the geographical indication is not used or registered in bad faith.

8.     The provisions of this Section shall in no way prejudice the right of any person to use, in the course of trade, that person's name or the name of that person's predecessor in business, except where such name is used in such a manner as to mislead the public.

9.     There shall be no obligation under this Agreement to protect geographical indications which are not or cease to be protected in their country of origin, or which have fallen into disuse in that country.


SECTION 4:  INDUSTRIAL DESIGNS


*Article 25*

*Requirements for Protection*

1.     Members shall provide for the protection of independently created industrial designs that are new or original.  Members may provide that designs are not new or original if they do not significantly differ from known designs or combinations of known design features.  Members may

provide that such protection shall not extend to designs dictated essentially by technical or functional considerations.

2.    Each Member shall ensure that requirements for securing protection for textile designs, in particular in regard to any cost, examination or publication, do not unreasonably impair the opportunity to seek and obtain such protection.  Members shall be free to meet this obligation through industrial design law or through copyright law.

*Article 26*

*Protection*

1.    The owner of a protected industrial design shall have the right to prevent third parties not having the owner's consent from making, selling or importing articles bearing or embodying a design which is a copy, or substantially a copy, of the protected design, when such acts are undertaken for commercial purposes.

2.    Members may provide limited exceptions to the protection of industrial designs, provided that such exceptions do not unreasonably conflict with the normal exploitation of protected industrial designs and do not unreasonably prejudice the legitimate interests of the owner of the protected design, taking account of the legitimate interests of third parties.

3.    The duration of protection available shall amount to at least 10 years.

SECTION 5:  PATENTS

*Article 27*

*Patentable Subject Matter*

1.    Subject to the provisions of paragraphs 2 and 3, patents shall be available for any inventions, whether products or processes, in all fields of technology, provided that they are new, involve an inventive step and are capable of industrial application.[5]   Subject to paragraph 4 of Article 65, paragraph 8 of Article 70 and paragraph 3 of this Article, patents shall be available and patent rights enjoyable without discrimination as to the place of invention, the field of technology and whether products are imported or locally produced.

2.    Members may exclude from patentability inventions, the prevention within their territory of the commercial exploitation of which is necessary to protect *ordre public* or morality, including to protect human, animal or plant life or health or to avoid serious prejudice to the environment, provided that such exclusion is not made merely because the exploitation is prohibited by their law.

3.    Members may also exclude from patentability:

    (a)    diagnostic, therapeutic and surgical methods for the treatment of humans or animals;

    (b)    plants and animals other than micro-organisms, and essentially biological processes for the production of plants or animals other than non-biological and microbiological processes.  However,  Members shall provide for the protection of plant varieties

---

[5] For the purposes of this Article, the terms "inventive step" and "capable of industrial application" may be deemed by a Member to be synonymous with the terms "non-obvious" and "useful" respectively.

either by patents or by an effective *sui generis* system or by any combination thereof. The provisions of this subparagraph shall be reviewed four years after the date of entry into force of the WTO Agreement.

*Article 28*

*Rights Conferred*

1.      A patent shall confer on its owner the following exclusive rights:

   (a)      where the subject matter of a patent is a product, to prevent third parties not having the owner's consent from the acts of:  making, using, offering for sale, selling, or importing[6] for these purposes that product;

   (b)      where the subject matter of a patent is a process, to prevent third parties not having the owner's consent from the act of using the process, and from the acts of:  using, offering for sale, selling, or importing for these purposes at least the product obtained directly by that process.

2.      Patent owners shall also have the right to assign, or transfer by succession, the patent and to conclude licensing contracts.

*Article  29*

*Conditions on Patent Applicants*

1.      Members shall require that an applicant for a patent shall disclose the invention in a manner sufficiently clear and complete for the invention to be carried out by a person skilled in the art and may require the applicant to indicate the best mode for carrying out the invention known to the inventor at the filing date or, where priority is claimed, at the priority date of the application.

2.      Members may require an applicant for a patent to provide information concerning the applicant's corresponding foreign applications and grants.

*Article 30*

*Exceptions to Rights Conferred*

Members may provide limited exceptions to the exclusive rights conferred by a patent, provided that such exceptions do not unreasonably conflict with a normal exploitation of the patent and do not unreasonably prejudice the legitimate interests of the patent owner, taking account of the legitimate interests of third parties.

---

[6] This right, like all other rights conferred under this Agreement in respect of the use, sale, importation or other distribution of goods, is subject to the provisions of Article 6.

*Article 31*

*Other Use Without Authorization of the Right Holder*

Where the law of a Member allows for other use[7] of the subject matter of a patent without the authorization of the right holder, including use by the government or third parties authorized by the government, the following provisions shall be respected:

(a)    authorization of such use shall be considered on its individual merits;

(b)    such use may only be permitted if, prior to such use, the proposed user has made efforts to obtain authorization from the right holder on reasonable commercial terms and conditions and that such efforts have not been successful within a reasonable period of time.  This requirement may be waived by a Member in the case of a national emergency or other circumstances of extreme urgency or in cases of public non-commercial use.  In situations of national emergency or other circumstances of extreme urgency, the right holder shall, nevertheless, be notified as soon as reasonably practicable.  In the case of public non-commercial use, where the government or contractor, without making a patent search, knows or has demonstrable grounds to know that a valid patent is or will be used by or for the government, the right holder shall be informed promptly;

(c)    the scope and duration of such use shall be limited to the purpose for which it was authorized, and in the case of semi-conductor technology shall only be for public non-commercial use or to remedy a practice determined after judicial or administrative process to be anti-competitive;

(d)    such use shall be non-exclusive;

(e)    such use shall be non-assignable, except with that part of the enterprise or goodwill which enjoys such use;

(f)    any such use shall be authorized predominantly for the supply of the domestic market of the Member authorizing such use;

(g)    authorization for such use shall be liable, subject to adequate protection of the legitimate interests of the persons so authorized, to be terminated if and when the circumstances which led to it cease to exist and are unlikely to recur.  The competent authority shall have the authority to review, upon motivated request, the continued existence of these circumstances;

(h)    the right holder shall be paid adequate remuneration in the circumstances of each case, taking into account the economic value of the authorization;

(i)    the legal validity of any decision relating to the authorization of such use shall be subject to judicial review or other independent review by a distinct higher authority in that Member;

(j)    any decision relating to the remuneration provided in respect of such use shall be subject to judicial review or other independent review by a distinct higher authority in that Member;

---

[7] "Other use" refers to use other than that allowed under Article 30.

(k)     Members are not obliged to apply the conditions set forth in subparagraphs (b) and (f) where such use is permitted to remedy a practice determined after judicial or administrative process to be anti-competitive.  The need to correct anti-competitive practices may be taken into account in determining the amount of remuneration in such cases.  Competent authorities shall have the authority to refuse termination of authorization if and when the conditions which led to such authorization are likely to recur;

(l)     where such use is authorized to permit the exploitation of a patent ("the second patent") which cannot be exploited without infringing another patent ("the first patent"), the following additional conditions shall apply:

    (i)     the invention claimed in the second patent shall involve an important technical advance of considerable economic significance in relation to the invention claimed in the first patent;

    (ii)     the owner of the first patent shall be entitled to a cross-licence on reasonable terms to use the invention claimed in the second patent;  and

    (iii)     the use authorized in respect of the first patent shall be non-assignable except with the assignment of the second patent.

*Article 32*

*Revocation/Forfeiture*

An opportunity for judicial review of any decision to revoke or forfeit a patent shall be available.

*Article 33*

*Term of Protection*

The term of protection available shall not end before the expiration of a period of twenty years counted from the filing date.[8]

*Article 34*

*Process Patents:  Burden of Proof*

1.     For the purposes of civil proceedings in respect of the infringement of the rights of the owner referred to in paragraph 1(b) of Article 28, if the subject matter of a patent is a process for obtaining a product, the judicial authorities shall have the authority to order the defendant to prove that the process to obtain an identical product is different from the patented process.  Therefore, Members shall provide, in at least one of the following circumstances, that any identical product when produced without the consent of the patent owner shall, in the absence of proof to the contrary, be deemed to have been obtained by the patented process:

(a)     if the product obtained by the patented process is new;

---

[8] It is understood that those Members which do not have a system of original grant may provide that the term of protection shall be computed from the filing date in the system of original grant.

(b)     if there is a substantial likelihood that the identical product was made by the process and the owner of the patent has been unable through reasonable efforts to determine the process actually used.

2.     Any Member shall be free to provide that the burden of proof indicated in paragraph 1 shall be on the alleged infringer only if the condition referred to in subparagraph (a) is fulfilled or only if the condition referred to in subparagraph (b) is fulfilled.

3.     In the adduction of proof to the contrary, the legitimate interests of defendants in protecting their manufacturing and business secrets shall be taken into account.

## SECTION 6:  LAYOUT-DESIGNS (TOPOGRAPHIES) OF INTEGRATED CIRCUITS

### Article 35

#### Relation to the IPIC Treaty

Members agree to provide protection to the layout-designs (topographies) of integrated circuits (referred to in this Agreement as "layout-designs") in accordance with Articles 2 through 7 (other than paragraph 3 of Article 6), Article 12 and paragraph 3 of Article 16 of the Treaty on Intellectual Property in Respect of Integrated Circuits and, in addition, to comply with the following provisions.

### Article 36

#### Scope of the Protection

Subject to the provisions of paragraph 1 of Article 37, Members shall consider unlawful the following acts if performed without the authorization of the right holder:[9]  importing, selling, or otherwise distributing for commercial purposes a protected layout-design, an integrated circuit in which a protected layout-design is incorporated, or an article incorporating such an integrated circuit only in so far as it continues to contain an unlawfully reproduced layout-design.

### Article 37

#### Acts Not Requiring the Authorization of the Right Holder

1.     Notwithstanding Article 36, no Member shall consider unlawful the performance of any of the acts referred to in that Article in respect of an integrated circuit incorporating an unlawfully reproduced layout-design or any article incorporating such an integrated circuit where the person performing or ordering such acts did not know and had no reasonable ground to know, when acquiring the integrated circuit or article incorporating such an integrated circuit, that it incorporated an unlawfully reproduced layout-design.  Members shall provide that, after the time that such person has received sufficient notice that the layout-design was unlawfully reproduced, that person may perform any of the acts with respect to the stock on hand or ordered before such time, but shall be liable to pay to the right holder a sum equivalent to a reasonable royalty such as would be payable under a freely negotiated licence in respect of such a layout-design.

---

[9] The term "right holder" in this Section shall be understood as having the same meaning as the term "holder of the right" in the IPIC Treaty.

2.      The conditions set out in subparagraphs (a) through (k) of Article 31 shall apply *mutatis mutandis* in the event of any non-voluntary licensing of a layout-design or of its use by or for the government without the authorization of the right holder.

### Article 38

### Term of Protection

1.      In Members requiring registration as a condition of protection, the term of protection of layout-designs shall not end before the expiration of a period of 10 years counted from the date of filing an application for registration or from the first commercial exploitation wherever in the world it occurs.

2.      In Members not requiring registration as a condition for protection, layout-designs shall be protected for a term of no less than 10 years from the date of the first commercial exploitation wherever in the world it occurs.

3.      Notwithstanding paragraphs 1 and 2, a Member may provide that protection shall lapse 15 years after the creation of the layout-design.

### SECTION 7:  PROTECTION OF UNDISCLOSED INFORMATION

### Article 39

1.      In the course of ensuring effective protection against unfair competition as provided in Article 10*bis* of the Paris Convention (1967), Members shall protect undisclosed information in accordance with paragraph 2 and data submitted to governments or governmental agencies in accordance with paragraph 3.

2.      Natural and legal persons shall have the possibility of preventing information lawfully within their control from being disclosed to, acquired by, or used by others without their consent in a manner contrary to honest commercial practices[10] so long as such information:

    (a)      is secret in the sense that it is not, as a body or in the precise configuration and assembly of its components, generally known among or readily accessible to persons within the circles that normally deal with the kind of information in question;

    (b)      has commercial value because it is secret;  and

    (c)      has been subject to reasonable steps under the circumstances, by the person lawfully in control of the information, to keep it secret.

3.      Members, when requiring, as a condition of approving the marketing of pharmaceutical or of agricultural chemical products which utilize new chemical entities, the submission of undisclosed test or other data, the origination of which involves a considerable effort, shall protect such data against unfair commercial use.  In addition, Members shall protect such data against disclosure, except where

---

[10] For the purpose of this provision, "a manner contrary to honest commercial practices" shall mean at least practices such as breach of contract, breach of confidence and inducement to breach, and includes the acquisition of undisclosed information by third parties who knew, or were grossly negligent in failing to know, that such practices were involved in the acquisition.

necessary to protect the public, or unless steps are taken to ensure that the data are protected against unfair commercial use.

## SECTION 8:  CONTROL OF ANTI-COMPETITIVE PRACTICES IN CONTRACTUAL LICENCES

### *Article 40*

1.      Members agree that some licensing practices or conditions pertaining to intellectual property rights which restrain competition may have adverse effects on trade and may impede the transfer and dissemination of technology.

2.      Nothing in this Agreement shall prevent Members from specifying in their legislation licensing practices or conditions that may in particular cases constitute an abuse of intellectual property rights having an adverse effect on competition in the relevant market.  As provided above, a Member may adopt, consistently with the other provisions of this Agreement, appropriate measures to prevent or control such practices, which may include for example exclusive grantback conditions, conditions preventing challenges to validity and coercive package licensing, in the light of the relevant laws and regulations of that Member.

3.      Each Member shall enter, upon request, into consultations with any other Member which has cause to believe that an intellectual property right owner that is a national or domiciliary of the Member to which the request for consultations has been addressed is undertaking practices in violation of the requesting Member's laws and regulations on the subject matter of this Section, and which wishes to secure compliance with such legislation, without prejudice to any action under the law and to the full freedom of an ultimate decision of either Member.  The Member addressed shall accord full and sympathetic consideration to, and shall afford adequate opportunity for, consultations with the requesting Member, and shall cooperate through supply of publicly available non-confidential information of relevance to the matter in question and of other information available to the Member, subject to domestic law and to the conclusion of mutually satisfactory agreements concerning the safeguarding of its confidentiality by the requesting Member.

4.      A Member whose nationals or domiciliaries are subject to proceedings in another Member concerning alleged violation of that other Member's laws and regulations on the subject matter of this Section shall, upon request, be granted an opportunity for consultations by the other Member under the same conditions as those foreseen in paragraph 3.

## PART III

## ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS

## SECTION 1:  GENERAL OBLIGATIONS

### *Article 41*

1.      Members shall ensure that enforcement procedures as specified in this Part are available under their law so as to permit effective action against any act of infringement of intellectual property rights covered by this Agreement, including expeditious remedies to prevent infringements and remedies which constitute a deterrent to further infringements.  These procedures shall be applied in

such a manner as to avoid the creation of barriers to legitimate trade and to provide for safeguards against their abuse.

2.      Procedures concerning the enforcement of intellectual property rights shall be fair and equitable.  They shall not be unnecessarily complicated or costly, or entail unreasonable time-limits or unwarranted delays.

3.      Decisions on the merits of a case shall preferably be in writing and reasoned.  They shall be made available at least to the parties to the proceeding without undue delay.  Decisions on the merits of a case shall be based only on evidence in respect of which parties were offered the opportunity to be heard.

4.      Parties to a proceeding shall have an opportunity for review by a judicial authority of final administrative decisions and, subject to jurisdictional provisions in a Member's law concerning the importance of a case, of at least the legal aspects of initial judicial decisions on the merits of a case.  However, there shall be no obligation to provide an opportunity for review of acquittals in criminal cases.

5.      It is understood that this Part does not create any obligation to put in place a judicial system for the enforcement of intellectual property rights distinct from that for the enforcement of law in general, nor does it affect the capacity of Members to enforce their law in general.  Nothing in this Part creates any obligation with respect to the distribution of resources as between enforcement of intellectual property rights and the enforcement of law in general.

SECTION 2:  CIVIL AND ADMINISTRATIVE PROCEDURES AND REMEDIES

*Article 42*

*Fair and Equitable Procedures*

Members shall make available to right holders[11] civil judicial procedures concerning the enforcement of any intellectual property right covered by this Agreement.  Defendants shall have the right to written notice which is timely and contains sufficient detail, including the basis of the claims.  Parties shall be allowed to be represented by independent legal counsel, and procedures shall not impose overly burdensome requirements concerning mandatory personal appearances.  All parties to such procedures shall be duly entitled to substantiate their claims and to present all relevant evidence.  The procedure shall provide a means to identify and protect confidential information, unless this would be contrary to existing constitutional requirements.

*Article 43*

*Evidence*

1.      The judicial authorities shall have the authority, where a party has presented reasonably available evidence sufficient to support its claims and has specified evidence relevant to substantiation of its claims which lies in the control of the opposing party, to order that this evidence be produced by the opposing party, subject in appropriate cases to conditions which ensure the protection of confidential information.

---

[11] For the purpose of this Part, the term "right holder" includes federations and associations having legal standing to assert such rights.

2.      In cases in which a party to a proceeding voluntarily and without good reason refuses access to, or otherwise does not provide necessary information within a reasonable period, or significantly impedes a procedure relating to an enforcement action, a Member may accord judicial authorities the authority to make preliminary and final determinations, affirmative or negative, on the basis of the information presented to them, including the complaint or the allegation presented by the party adversely affected by the denial of access to information, subject to providing the parties an opportunity to be heard on the allegations or evidence.

*Article 44*

*Injunctions*

1.      The judicial authorities shall have the authority to order a party to desist from an infringement, *inter alia* to prevent the entry into the channels of commerce in their jurisdiction of imported goods that involve the infringement of an intellectual property right, immediately after customs clearance of such goods.  Members are not obliged to accord such authority in respect of protected subject matter acquired or ordered by a person prior to knowing or having reasonable grounds to know that dealing in such subject matter would entail the infringement of an intellectual property right.

2.      Notwithstanding the other provisions of this Part and provided that the provisions of Part II specifically addressing use by governments, or by third parties authorized by a government, without the authorization of the right holder are complied with, Members may limit the remedies available against such use to payment of remuneration in accordance with subparagraph (h) of Article 31.  In other cases, the remedies under this Part shall apply or, where these remedies are inconsistent with a Member's law, declaratory judgments and adequate compensation shall be available.

*Article 45*

*Damages*

1.      The judicial authorities shall have the authority to order the infringer to pay the right holder damages adequate to compensate for the injury the right holder has suffered because of an infringement of that person's intellectual property right by an infringer who knowingly, or with reasonable grounds to know, engaged in infringing activity.

2.      The judicial authorities shall also have the authority to order the infringer to pay the right holder expenses, which may include appropriate attorney's fees.  In appropriate cases, Members may authorize the judicial authorities to order recovery of profits and/or payment of pre-established damages even where the infringer did not knowingly, or with reasonable grounds to know, engage in infringing activity.

*Article 46*

*Other Remedies*

In order to create an effective deterrent to infringement, the judicial authorities shall have the authority to order that goods that they have found to be infringing be, without compensation of any sort, disposed of outside the channels of commerce in such a manner as to avoid any harm caused to the right holder, or, unless this would be contrary to existing constitutional requirements, destroyed. The judicial authorities shall also have the authority to order that materials and implements the predominant use of which has been in the creation of the infringing goods be, without compensation

of any sort, disposed of outside the channels of commerce in such a manner as to minimize the risks of further infringements.  In considering such requests, the need for proportionality between the seriousness of the infringement and the remedies ordered as well as the interests of third parties shall be taken into account.  In regard to counterfeit trademark goods, the simple removal of the trademark unlawfully affixed shall not be sufficient, other than in exceptional cases, to permit release of the goods into the channels of commerce.

## Article 47

### Right of Information

Members may provide that the judicial authorities shall have the authority, unless this would be out of proportion to the seriousness of the infringement, to order the infringer to inform the right holder of the identity of third persons involved in the production and distribution of the infringing goods or services and of their channels of distribution.

## Article 48

### Indemnification of the Defendant

1.    The judicial authorities shall have the authority to order a party at whose request measures were taken and who has abused enforcement procedures to provide to a party wrongfully enjoined or restrained adequate compensation for the injury suffered because of such abuse.  The judicial authorities shall also have the authority to order the applicant to pay the defendant expenses, which may include appropriate attorney's fees.

2.    In respect of the administration of any law pertaining to the protection or enforcement of intellectual property rights, Members shall only exempt both public authorities and officials from liability to appropriate remedial measures where actions are taken or intended in good faith in the course of the administration of that law.

## Article 49

### Administrative Procedures

To the extent that any civil remedy can be ordered as a result of administrative procedures on the merits of a case, such procedures shall conform to principles equivalent in substance to those set forth in this Section.

## SECTION 3:  PROVISIONAL MEASURES

## Article 50

1.    The judicial authorities shall have the authority to order prompt and effective provisional measures:

      (a)    to prevent an infringement of any intellectual property right from occurring, and in particular to prevent the entry into the channels of commerce in their jurisdiction of goods, including imported goods immediately after customs clearance;

(b)      to preserve relevant evidence in regard to the alleged infringement.

2.      The judicial authorities shall have the authority to adopt provisional measures *inaudita altera parte* where appropriate, in particular where any delay is likely to cause irreparable harm to the right holder, or where there is a demonstrable risk of evidence being destroyed.

3.      The judicial authorities shall have the authority to require the applicant to provide any reasonably available evidence in order to satisfy themselves with a sufficient degree of certainty that the applicant is the right holder and that the applicant's right is being infringed or that such infringement is imminent, and to order the applicant to provide a security or equivalent assurance sufficient to protect the defendant and to prevent abuse.

4.      Where provisional measures have been adopted *inaudita altera parte*, the parties affected shall be given notice, without delay after the execution of the measures at the latest.  A review, including a right to be heard, shall take place upon request of the defendant with a view to deciding, within a reasonable period after the notification of the measures, whether these measures shall be modified, revoked or confirmed.

5.      The applicant may be required to supply other information necessary for the identification of the goods concerned by the authority that will execute the provisional measures.

6.      Without prejudice to paragraph 4, provisional measures taken on the basis of paragraphs 1 and 2 shall, upon request by the defendant, be revoked or otherwise cease to have effect, if proceedings leading to a decision on the merits of the case are not initiated within a reasonable period, to be determined by the judicial authority ordering the measures where a Member's law so permits or, in the absence of such a determination, not to exceed 20 working days or 31 calendar days, whichever is the longer.

7.      Where the provisional measures are revoked or where they lapse due to any act or omission by the applicant, or where it is subsequently found that there has been no infringement or threat of infringement of an intellectual property right, the judicial authorities shall have the authority to order the applicant, upon request of the defendant, to provide the defendant appropriate compensation for any injury caused by these measures.

8.      To the extent that any provisional measure can be ordered as a result of administrative procedures, such procedures shall conform to principles equivalent in substance to those set forth in this Section.

SECTION 4:  SPECIAL REQUIREMENTS RELATED TO BORDER MEASURES[12]

*Article 51*

*Suspension of Release by Customs Authorities*

Members shall, in conformity with the provisions set out below, adopt procedures[13] to enable a right holder, who has valid grounds for suspecting that the importation of counterfeit trademark or

---

[12] Where a Member has dismantled substantially all controls over movement of goods across its border with another Member with which it forms part of a customs union, it shall not be required to apply the provisions of this Section at that border.

[13] It is understood that there shall be no obligation to apply such procedures to imports of goods put on the market in another country by or with the consent of the right holder, or to goods in transit.

pirated copyright goods[14] may take place, to lodge an application in writing with competent authorities, administrative or judicial, for the suspension by the customs authorities of the release into free circulation of such goods.  Members may enable such an application to be made in respect of goods which involve other infringements of intellectual property rights, provided that the requirements of this Section are met.  Members may also provide for corresponding procedures concerning the suspension by the customs authorities of the release of infringing goods destined for exportation from their territories.

*Article 52*

*Application*

Any right holder initiating the procedures under Article 51 shall be required to provide adequate evidence to satisfy the competent authorities that, under the laws of the country of importation, there is *prima facie* an infringement of the right holder's intellectual property right and to supply a sufficiently detailed description of the goods to make them readily recognizable by the customs authorities.  The competent authorities shall inform the applicant within a reasonable period whether they have accepted the application and, where determined by the competent authorities, the period for which the customs authorities will take action.

*Article 53*

*Security or Equivalent Assurance*

1.      The competent authorities shall have the authority to require an applicant to provide a security or equivalent assurance sufficient to protect the defendant and the competent authorities and to prevent abuse.  Such security or equivalent assurance shall not unreasonably deter recourse to these procedures.

2.      Where pursuant to an application under this Section the release of goods involving industrial designs, patents, layout-designs or undisclosed information into free circulation has been suspended by customs authorities on the basis of a decision other than by a judicial or other independent authority, and the period provided for in Article 55 has expired without the granting of provisional relief by the duly empowered authority, and provided that all other conditions for importation have been complied with, the owner, importer, or consignee of such goods shall be entitled to their release on the posting of a security in an amount sufficient to protect the right holder for any infringement. Payment of such security shall not prejudice any other remedy available to the right holder, it being understood that the security shall be released if the right holder fails to pursue the right of action within a reasonable period of time.

---

[14] For the purposes of this Agreement:

(a)       "counterfeit trademark goods" shall mean any goods, including packaging, bearing without authorization a trademark which is identical to the trademark validly registered in respect of such goods, or which cannot be distinguished in its essential aspects from such a trademark, and which thereby infringes the rights of the owner of the trademark in question under the law of the country of importation;

(b)       "pirated copyright goods" shall mean any goods which are copies made without the consent of the right holder or person duly authorized by the right holder in the country of production and which are made directly or indirectly from an article where the making of that copy would have constituted an infringement of a copyright or a related right under the law of the country of importation.

*Article 54*

*Notice of Suspension*

The importer and the applicant shall be promptly notified of the suspension of the release of goods according to Article 51.

*Article 55*

*Duration of Suspension*

If, within a period not exceeding 10 working days after the applicant has been served notice of the suspension, the customs authorities have not been informed that proceedings leading to a decision on the merits of the case have been initiated by a party other than the defendant, or that the duly empowered authority has taken provisional measures prolonging the suspension of the release of the goods, the goods shall be released, provided that all other conditions for importation or exportation have been complied with;  in appropriate cases, this time-limit may be extended by another 10 working days.  If proceedings leading to a decision on the merits of the case have been initiated, a review, including a right to be heard, shall take place upon request of the defendant with a view to deciding, within a reasonable period, whether these measures shall be modified, revoked or confirmed.  Notwithstanding the above, where the suspension of the release of goods is carried out or continued in accordance with a provisional judicial measure, the provisions of paragraph 6 of Article 50 shall apply.

*Article 56*

*Indemnification of the Importer*
*and of the Owner of the Goods*

Relevant authorities shall have the authority to order the applicant to pay the importer, the consignee and the owner of the goods appropriate compensation for any injury caused to them through the wrongful detention of goods or through the detention of goods released pursuant to Article 55.

*Article 57*

*Right of Inspection and Information*

Without prejudice to the protection of confidential information, Members shall provide the competent authorities the authority to give the right holder sufficient opportunity to have any goods detained by the customs authorities inspected in order to substantiate the right holder's claims.  The competent authorities shall also have authority to give the importer an equivalent opportunity to have any such goods inspected.  Where a positive determination has been made on the merits of a case, Members may provide the competent authorities the authority to inform the right holder of the names and addresses of the consignor, the importer and the consignee and of the quantity of the goods in question.

*Article 58*

*Ex Officio Action*

Where Members require competent authorities to act upon their own initiative and to suspend the release of goods in respect of which they have acquired *prima facie* evidence that an intellectual property right is being infringed:

(a)    the competent authorities may at any time seek from the right holder any information that may assist them to exercise these powers;

(b)    the importer and the right holder shall be promptly notified of the suspension. Where the importer has lodged an appeal against the suspension with the competent authorities, the suspension shall be subject to the conditions, *mutatis mutandis*, set out at Article 55;

(c)    Members shall only exempt both public authorities and officials from liability to appropriate remedial measures where actions are taken or intended in good faith.

*Article 59*

*Remedies*

Without prejudice to other rights of action open to the right holder and subject to the right of the defendant to seek review by a judicial authority, competent authorities shall have the authority to order the destruction or disposal of infringing goods in accordance with the principles set out in Article 46. In regard to counterfeit trademark goods, the authorities shall not allow the re-exportation of the infringing goods in an unaltered state or subject them to a different customs procedure, other than in exceptional circumstances.

*Article 60*

*De Minimis Imports*

Members may exclude from the application of the above provisions small quantities of goods of a non-commercial nature contained in travellers' personal luggage or sent in small consignments.

SECTION 5:  CRIMINAL PROCEDURES

*Article 61*

Members shall provide for criminal procedures and penalties to be applied at least in cases of wilful trademark counterfeiting or copyright piracy on a commercial scale. Remedies available shall include imprisonment and/or monetary fines sufficient to provide a deterrent, consistently with the level of penalties applied for crimes of a corresponding gravity. In appropriate cases, remedies available shall also include the seizure, forfeiture and destruction of the infringing goods and of any materials and implements the predominant use of which has been in the commission of the offence. Members may provide for criminal procedures and penalties to be applied in other cases of infringement of intellectual property rights, in particular where they are committed wilfully and on a commercial scale.

PART IV

ACQUISITION AND MAINTENANCE OF INTELLECTUAL PROPERTY
RIGHTS AND RELATED *INTER-PARTES* PROCEDURES

*Article 62*

1.      Members may require, as a condition of the acquisition or maintenance of the intellectual property rights provided for under Sections 2 through 6 of Part II, compliance with reasonable procedures and formalities.  Such procedures and formalities shall be consistent with the provisions of this Agreement.

2.      Where the acquisition of an intellectual property right is subject to the right being granted or registered, Members shall ensure that the procedures for grant or registration, subject to compliance with the substantive conditions for acquisition of the right, permit the granting or registration of the right within a reasonable period of time so as to avoid unwarranted curtailment of the period of protection.

3.      Article 4 of the Paris Convention (1967) shall apply *mutatis mutandis* to service marks.

4.      Procedures concerning the acquisition or maintenance of intellectual property rights and, where a Member's law provides for such procedures, administrative revocation and *inter partes* procedures such as opposition, revocation and cancellation, shall be governed by the general principles set out in paragraphs 2 and 3 of Article 41.

5.      Final administrative decisions in any of the procedures referred to under paragraph 4 shall be subject to review by a judicial or quasi-judicial authority.  However, there shall be no obligation to provide an opportunity for such review of decisions in cases of unsuccessful opposition or administrative revocation, provided that the grounds for such procedures can be the subject of invalidation procedures.

PART V

DISPUTE PREVENTION AND SETTLEMENT

*Article 63*

*Transparency*

1.      Laws and regulations, and final judicial decisions and administrative rulings of general application, made effective by a Member pertaining to the subject matter of this Agreement (the availability, scope, acquisition, enforcement and prevention of the abuse of intellectual property rights) shall be published, or where such publication is not practicable made publicly available, in a national language, in such a manner as to enable governments and right holders to become acquainted with them.  Agreements concerning the subject matter of this Agreement which are in force between the government or a governmental agency of a Member and the government or a governmental agency of another Member shall also be published.

2.      Members shall notify the laws and regulations referred to in paragraph 1 to the Council for TRIPS in order to assist that Council in its review of the operation of this Agreement.  The Council shall attempt to minimize the burden on Members in carrying out this obligation and may decide to waive the obligation to notify such laws and regulations directly to the Council if consultations with

WIPO on the establishment of a common register containing these laws and regulations are successful. The Council shall also consider in this connection any action required regarding notifications pursuant to the obligations under this Agreement stemming from the provisions of Article 6*ter* of the Paris Convention (1967).

3.      Each Member shall be prepared to supply, in response to a written request from another Member, information of the sort referred to in paragraph 1. A Member, having reason to believe that a specific judicial decision or administrative ruling or bilateral agreement in the area of intellectual property rights affects its rights under this Agreement, may also request in writing to be given access to or be informed in sufficient detail of such specific judicial decisions or administrative rulings or bilateral agreements.

4.      Nothing in paragraphs 1, 2 and 3 shall require Members to disclose confidential information which would impede law enforcement or otherwise be contrary to the public interest or would prejudice the legitimate commercial interests of particular enterprises, public or private.

## *Article 64*

### *Dispute Settlement*

1.      The provisions of Articles XXII and XXIII of GATT 1994 as elaborated and applied by the Dispute Settlement Understanding shall apply to consultations and the settlement of disputes under this Agreement except as otherwise specifically provided herein.

2.      Subparagraphs 1(b) and 1(c) of Article XXIII of GATT 1994 shall not apply to the settlement of disputes under this Agreement for a period of five years from the date of entry into force of the WTO Agreement.

3.      During the time period referred to in paragraph 2, the Council for TRIPS shall examine the scope and modalities for complaints of the type provided for under subparagraphs 1(b) and 1(c) of Article XXIII of GATT 1994 made pursuant to this Agreement, and submit its recommendations to the Ministerial Conference for approval. Any decision of the Ministerial Conference to approve such recommendations or to extend the period in paragraph 2 shall be made only by consensus, and approved recommendations shall be effective for all Members without further formal acceptance process.

## PART VI

## TRANSITIONAL ARRANGEMENTS

## *Article 65*

### *Transitional Arrangements*

1.      Subject to the provisions of paragraphs 2, 3 and 4, no Member shall be obliged to apply the provisions of this Agreement before the expiry of a general period of one year following the date of entry into force of the WTO Agreement.

2.      A developing country Member is entitled to delay for a further period of four years the date of application, as defined in paragraph 1, of the provisions of this Agreement other than Articles 3, 4 and 5.

3.      Any other Member which is in the process of transformation from a centrally-planned into a market, free-enterprise economy and which is undertaking structural reform of its intellectual property system and facing special problems in the preparation and implementation of intellectual property laws and regulations, may also benefit from a period of delay as foreseen in paragraph 2.

4.      To the extent that a developing country Member is obliged by this Agreement to extend product patent protection to areas of technology not so protectable in its territory on the general date of application of this Agreement for that Member, as defined in paragraph 2, it may delay the application of the provisions on product patents of Section 5 of Part II to such areas of technology for an additional period of five years.

5.      A Member availing itself of a transitional period under paragraphs 1, 2, 3 or 4 shall ensure that any changes in its laws, regulations and practice made during that period do not result in a lesser degree of consistency with the provisions of this Agreement.

*Article 66*

*Least-Developed Country Members*

1.      In view of the special needs and requirements of least-developed country Members, their economic, financial and administrative constraints, and their need for flexibility to create a viable technological base, such Members shall not be required to apply the provisions of this Agreement, other than Articles 3, 4 and 5, for a period of 10 years from the date of application as defined under paragraph 1 of Article 65.  The Council for TRIPS shall, upon duly motivated request by a least-developed country Member, accord extensions of this period.

2.      Developed country Members shall provide incentives to enterprises and institutions in their territories for the purpose of promoting and encouraging technology transfer to least-developed country  Members in order to enable them to create a sound and viable technological base.

*Article 67*

*Technical Cooperation*

        In order to facilitate the implementation of this Agreement, developed country Members shall provide, on request and on mutually agreed terms and conditions, technical and financial cooperation in favour of developing and least-developed country Members.  Such cooperation shall include assistance in the preparation of laws and regulations on the protection and enforcement of intellectual property rights as well as on the prevention of their abuse, and shall include support regarding the establishment or reinforcement of domestic offices and agencies relevant to these matters, including the training of personnel.

PART VII

INSTITUTIONAL ARRANGEMENTS;  FINAL PROVISIONS

*Article 68*

*Council for Trade-Related Aspects of*
*Intellectual Property Rights*

The Council for TRIPS shall monitor the operation of this Agreement and, in particular, Members' compliance with their obligations hereunder, and shall afford Members the opportunity of consulting on matters relating to the trade-related aspects of intellectual property rights.  It shall carry out such other responsibilities as assigned to it by the Members, and it shall, in particular, provide any assistance requested by them in the context of dispute settlement procedures.  In carrying out its functions, the Council for TRIPS may consult with and seek information from any source it deems appropriate.  In consultation with WIPO, the Council shall seek to establish, within one year of its first meeting, appropriate arrangements for cooperation with bodies of that Organization.

*Article 69*

*International Cooperation*

Members agree to cooperate with each other with a view to eliminating international trade in goods infringing intellectual property rights.  For this purpose, they shall establish and notify contact points in their administrations and be ready to exchange information on trade in infringing goods. They shall, in particular, promote the exchange of information and cooperation between customs authorities with regard to trade in counterfeit trademark goods and pirated copyright goods.

*Article 70*

*Protection of Existing Subject Matter*

1.      This Agreement does not give rise to obligations in respect of acts which occurred before the date of application of the Agreement for the Member in question.

2.      Except as otherwise provided for in this Agreement, this Agreement gives rise to obligations in respect of all subject matter existing at the date of application of this Agreement for the Member in question, and which is protected in that Member on the said date, or which meets or comes subsequently to meet the criteria for protection under the terms of this Agreement.  In respect of this paragraph and paragraphs 3 and 4, copyright obligations with respect to existing works shall be solely determined under Article 18 of the Berne Convention (1971), and obligations with respect to the rights of producers of phonograms and performers in existing phonograms shall be determined solely under Article 18 of the Berne Convention (1971) as made applicable under paragraph 6 of Article 14 of this Agreement.

3.      There shall be no obligation to restore protection to subject matter which on the date of application of this Agreement for the Member in question has fallen into the public domain.

4.      In respect of any acts in respect of specific objects embodying protected subject matter which become infringing under the terms of legislation in conformity with this Agreement, and which were commenced, or in respect of which a significant investment was made, before the date of acceptance of the WTO Agreement by that Member, any Member may provide for a limitation of the remedies

available to the right holder as to the continued performance of such acts after the date of application of this Agreement for that Member.  In such cases the Member shall, however, at least provide for the payment of equitable remuneration.

5.      A Member is not obliged to apply the provisions of Article 11 and of paragraph 4 of Article 14 with respect to originals or copies purchased prior to the date of application of this Agreement for that Member.

6.      Members shall not be required to apply Article 31, or the requirement in paragraph 1 of Article 27 that patent rights shall be enjoyable without discrimination as to the field of technology, to use without the authorization of the right holder where authorization for such use was granted by the government before the date this Agreement became known.

7.      In the case of intellectual property rights for which protection is conditional upon registration, applications for protection which are pending on the date of application of this Agreement for the Member in question shall be permitted to be amended to claim any enhanced protection provided under the provisions of this Agreement.  Such amendments shall not include new matter.

8.      Where a Member does not make available as of the date of entry into force of the WTO Agreement patent protection for pharmaceutical and agricultural chemical products commensurate with its obligations under Article 27, that Member shall:

      (a)      notwithstanding the provisions of Part VI, provide as from the date of entry into force of the WTO Agreement a means by which applications for patents for such inventions can be filed;

      (b)      apply to these applications, as of the date of application of this Agreement, the criteria for patentability as laid down in this Agreement as if those criteria were being applied on the date of filing in that Member or, where priority is available and claimed, the priority date of the application;  and

      (c)      provide patent protection in accordance with this Agreement as from the grant of the patent and for the remainder of the patent term, counted from the filing date in accordance with Article 33 of this Agreement, for those of these applications that meet the criteria for protection referred to in subparagraph (b).

9.      Where a product is the subject of a patent application in a Member in accordance with paragraph 8(a), exclusive marketing rights shall be granted, notwithstanding the provisions of Part VI, for a period of five years after obtaining marketing approval in that Member or until a product patent is granted or rejected in that Member, whichever period is shorter, provided that, subsequent to the entry into force of the WTO Agreement, a patent application has been filed and a patent granted for that product in another Member and marketing approval obtained in such other Member.

*Article 71*

*Review and Amendment*

1.      The Council for TRIPS shall review the implementation of this Agreement after the expiration of the transitional period referred to in paragraph 2 of Article 65.  The Council shall, having regard to the experience gained in its implementation, review it two years after that date, and at identical intervals thereafter.  The Council may also undertake reviews in the light of any relevant new developments which might warrant modification or amendment of this Agreement.

2.    Amendments merely serving the purpose of adjusting to higher levels of protection of intellectual property rights achieved, and in force, in other multilateral agreements and accepted under those agreements by all Members of the WTO may be referred to the Ministerial Conference for action in accordance with paragraph 6 of Article X of the WTO Agreement on the basis of a consensus proposal from the Council for TRIPS.

*Article 72*

*Reservations*

Reservations may not be entered in respect of any of the provisions of this Agreement without the consent of the other Members.

*Article 73*

*Security Exceptions*

Nothing in this Agreement shall be construed:

(a)    to require a Member to furnish any information the disclosure of which it considers contrary to its essential security interests;  or

(b)    to prevent a Member from taking any action which it considers necessary for the protection of its essential security interests;

      (i)    relating to fissionable materials or the materials from which they are derived;

      (ii)    relating to the traffic in arms, ammunition and implements of war and to such traffic in other goods and materials as is carried on directly or indirectly for the purpose of supplying a military establishment;

      (iii)    taken in time of war or other emergency in international relations;  or

(c)    to prevent a Member from taking any action in pursuance of its obligations under the United Nations Charter for the maintenance of international peace and security.

# **EXHIBIT 8**



**DISPUTE SETTLEMENT**

# Dispute settlement

Resolving trade disputes is one of the core activities of the WTO. A dispute arises when a member government believes another member government is violating an agreement or a commitment that it has made in the WTO. The WTO has one of the most active international dispute settlement mechanisms in the world. Since 1995, 642 disputes have been brought to the WTO and over 350 rulings have been issued.

**NEWS**



**Members adopt panel report in frozen fries case, EU appeals ruling in steel duties dispute (https://www.wto.org/english/news_e/news25_e/dsb_24nov25_213_e.htm)**

**24 NOVEMBER 2025**

At a meeting of the Dispute Settlement Body (DSB) on 24 November, WTO members adopted a compliance p...

More news on dispute settlement ⟶ (https://www.wto.org/english/news_e/archive_e/dis_arc_e.htm)

# Introduction to dispute settlement in the WTO

- ❑ How does the WTO settle disputes? (../../thewto_e/whatis_e/tif_e/disp1_e.htm) Basic introduction
- ❑ Interactive course (disp_settlement_cbt_e/signin_e.htm) on the WTO dispute settlement system
- ❑ Background briefing note (https://www.wto.org/english/thewto_e/minist_e/mc10_e/briefing_notes_e/brief_disputes_e.htm) on disputes, prepared for the Tenth Ministerial Conference

# Dispute settlement process

- ❑ The Dispute Settlement Understanding (DSU) (https://www.wto.org/english/docs_e/legal_e/28-dsu_e.htm) is the main WTO agreement on settling disputes.
- ❑ Technical explanation (https://www.wto.org/english/docs_e/legal_e/ursum_e.htm#Understanding) of the DSU
- ❑ Rules of Conduct (https://www.wto.org/english/tratop_e/dispu_e/rc_e.htm) on rules and procedures for settling disputes

❏ Working Procedures for Appellate Review
   (https://www.wto.org/english/tratop_e/dispu_e/ab_procedures_e.htm)

## Dispute Settlement Body

The General Council convenes as the Dispute Settlement Body (DSB) (https://www.wto.org/english/tratop_e/dispu_e/dispu_body_e.htm) to deal with disputes between WTO members.

## The Appellate Body

Appeals are handled by the permanent seven-member Appellate Body (https://www.wto.org/english/tratop_e/dispu_e/appellate_body_e.htm) which is set up by the Dispute Settlement Body and broadly represents the range of WTO membership.

## Dispute settlement activity — some figures

As of end-2024, WTO members had submitted 631 requests for consultations, the first stage in the dispute settlement process.

### Requests for consultations (1995 —2024)



❏ More dispute settlement statistics
   (https://www.wto.org/english/tratop_e/dispu_e/dispustats_e.htm)

## Documents

❏ Recent dispute documents
❏ Find disputes documents
   (https://www.wto.org/english/tratop_e/dispu_e/find_dispu_documents_e.htm)

## Interpretation of WTO agreements

The WTO Analytical Index
(https://www.wto.org/english/res_e/booksp_e/analytic_index_e/analytic_index_e.htm) is a
comprehensive guide to the interpretation and application of the WTO agreements by the
Appellate Body, dispute settlement panels and other WTO bodies. It contains extracts of key
pronouncements and findings from tens of thousands of pages of WTO jurisprudence, including
panel reports, Appellate Body reports, arbitral decisions and awards, and decisions of WTO
committees, councils and other WTO bodies.

The WTO Appellate Body Repertory of Reports and Awards
(https://www.wto.org/english/tratop_e/dispu_e/repertory_e/repertory_e.htm) covers the
Appellate Body's rulings in WTO disputes since its establishment in 1995.

## Negotiations to improve dispute settlement procedures

At the Doha Ministerial Conference, in 2001, WTO members agreed to negotiate to improve and
clarify the DSU (https://www.wto.org/english/tratop_e/dispu_e/dispu_negs_e.htm) — the rules
and procedures governing the settlement of WTO disputes.

## Secretariat's informal consultations concerning the panel process

At the request of the Director-General, the Secretariat initiated in 2010 a process of informal
consultations (https://www.wto.org/english/tratop_e/dispu_e/informal_consultations_e.htm)
with a view to exploring whether it is possible to find efficiency gains in the panel process.

**Share**



(http://www.facebook.com/worldtradeorganization) (https://twitter.com/WTO) (http://www.youtube.com/user/WTO) (https://www.instagram.com/worldtradeorganization/) (https://www.wto.org/english/res_e/webcas_e/rss_e.htm)

## Upcoming open hearings

No upcoming open hearings

## Publications on dispute settlement





(https://www.wto.org/english/res_e/publications_e/dispu_settlement_e.htm)

WTO Dispute Settlement: One-Page Case Summaries (1995-2022)

Download ⓘ (https://www.wto.org/english/res_e/publications_e/dispu_settlement_e.htm)

**More publications on dispute settlement ⟶ (https://www.wto.org/english/res_e/publications_e/publsubject_e.htm? pubsubject=CATDISPUTES)**

## Events, workshops and training

❏ **14 December 2018**
   Book launch: Book launch: GATT disputes: 1948-1995 (https://www.wto.org/english/tratop_e/dispu_e/gattdisputes4895_e.htm)

❏ **29 July 2016**
   International Law Today (https://www.wto.org/english/tratop_e/dispu_e/law_day_29_july_e.htm)

❏ **1 June 2015**
   Book launch: A History of Law and Lawyers in the GATT/WTO The Development of the Rule of Law in the Multilateral Trading System (https://www.wto.org/english/thewto_e/20y_e/historylawandlaweyr20y_e.htm)

**Full list ⟶ (https://www.wto.org/english/news_e/events_e/wto_events.htm? bodyCode=DISP)**

# **EXHIBIT 9**



An official website of the United States government

Here's how you know ⌄

USPTO | UNITED STATES PATENT AND TRADEMARK OFFICE ®

Home  >  IP Policy  >  Patent policy  >  Harmonization

# Harmonization

## Harmonization: The Time is Now

The America Invents Act paves the way for greater patent harmonization-the alignment of laws and procedures among intellectual property systems to ensure consistency and clarity of rights for the world's innovators. As innovators seek to tap into global markets, it is imperative that the international patent system provide consistent, cost-effective avenues to obtain reliable patent rights in multiple jurisdictions. The passage of the AIA , enables the USPTO to lead on a vision of an IP world in which national and regional patent systems are harmonized in pursuit of creating an optimal environment for technological innovation and diffusion.

The information below provides information on work the USPTO is participating in, aimed at advancing the call for action to seek more harmonized patent laws among trading partners globally:

Director Kappos outlined the importance of patent law harmonization in the American Bar Association's Intellectual Property Magazine, Landslide, Patent Law Harmonization: The Time is Now, August 2011.

In April 2012 the Director of the USPTO, David Kappos, and USPTO officials undertook a European "road show," visiting six cities in four days to conduct stakeholder outreach events and meet with Heads of offices from several European intellectual property offices. Director Kappos' presentation highlighting the significant changes made by AIA which have set the stage for international substantive patent law harmonization can be found here: An Unparalleled Opportunity for Harmonization(ppt)

On June 14th 2012, Director Kappos called on European leaders to seize the opportunity created by the AIA to harmonize the international patents system. His op-ed published in the European Voice can be found here: Improving the Global Innovation Ecosystem

On June 20th 2012, Director Kappos testified before the Senate Judiciary Committee on international patent issues, including patent law harmonization and the global impacts of the America Invents Act. His testimony can be found here: Director Kappos' Senate Testimony.

## Harmonization Discussions:

### Asia-Pacific Patent Cooperation (APPC)

In an effort to re-energize interest in substantive patent harmonization, the USPTO hosted the "Asia-Pacific Patent Cooperation Forum for the 21st Century", March 7-8, 2011, in Alexandria, VA. The forum

included informal discussions among like-minded economies, including interested developing countries, led by Heads of Offices. Director Kappos' welcoming remarks can be found here: APPC Welcoming Remarks

From the Statement of the Participants at the APPC Forum:

"The time for substantive harmonization is now. We are operating in a global economy, business innovation is happening across borders. The IP system needs to be supportive of this new reality."

**Tegernsee Group**

The Tegernsee Group was formed in July 2011 following the APPC meeting, and is comprised of the Heads of the European, Danish, French, German, Japanese, UK and United States patent offices. Over the course of the last year, patent law experts from these offices prepared a comparative analysis of substantive law applied in each jurisdiction.

On October 4, 2012, the USPTO hosted the third meeting of the Tegernsee Group in Geneva, Switzerland. The Group took note of several studies prepared by its experts on key harmonization issues, including grace period, 18-month publication, treatment of conflicting applications and prior user rights. As an important next step, the Group has agreed to undertake global stakeholder consultations on each topic. The statement that was released at the close of the meeting can be found here.

**IP5**

The IP5, the European Patent Office, the Japan Patent Office, the Korean Intellectual Property Office, the State Intellectual Property Office of China, and the United States Patent and Trademark Office, has agreed to form a Patent Harmonization Expert Panel (PHEP). The PHEP will continue work on a comparative analysis study of the substantive laws which govern the five Offices' practices with an eye on identifying potential areas in which harmonization may be achieved.

The IP5 maintains its commitment toward cooperative efforts on a range of issues including classification, translation, work sharing and the Global Dossier Concept. For more information on the IP5, please visit: http://www.fiveipoffices.org/   .

**Trilateral**

Heads of the United States Patent and Trademark Office, the European Patent Office, and the Japan Patent Office - collectively known as the Trilateral Offices - held their most recent meeting in Kyoto, Japan and celebrated 30 years of cooperation. The Offices confirmed their commitment to improving the quality of examination processes, promoting harmonization of practices among the offices, and exploiting the full potential of work sharing. Further details about the Trilateral Cooperation and their most recent meeting can be found at www.trilateral.net   .

Was this page helpful? 👍 👎

🔗 Share this page    🖨 Print this page

Additional information  about this page

---

## Receive updates from the USPTO

Enter your email to subscribe or update your preferences

| your@email.com | Subscribe |

About the USPTO    •    Search for patents    •    Search for trademarks

---

US Department of Commerce

Accessibility

Privacy Policy

Terms of Use

Financial and Performance Data

Vulnerability Disclosure Policy

Freedom of Information Act

Inspector General

NoFEAR Act

USA.gov

Follow us

# **<u>EXHIBIT 10</u>**

# Federal Circuit Bar Association



(https://fedcirbar.org/)

## Global Series

The Global Series sessions, part of an ongoing dialogue, address topics of global significance at a senior level of discussion. Working closely with government representatives, adjudicators, corporate leaders, litigation leaders, academics, and others in the global community, the Series responds, in real time, to emerging challenges. The on-going Series includes participants from Canada, the United Kingdom, France, Germany, Switzerland, Japan, the Republic of Korea, the United States, the People's Republic of China, Canada, Brazil, and other countries.

2025 Global Series Annual Sponsorship Opportunities (https://fedcirbar-pcdn.content/uploads/2025/01/2025-Series-FINAL.pdf) (https://fedcirbar-p.content/uploads/2025/01/2025-Series-Flyer-FINAL.pdf)

If you would like to become a Global Series sponsor, please contact Jeremy Atkinson (atkinson@fedcirbar.org) and Robert Quinlan (quinlan@fedcirbar.org).




Events (/events)

**What We Do**

Committees (https://fedcirbar.org/committees)
Pro Bono (https://fedcirbar.org/probono)
Publications (https://fedcirbar.org/publications)
Scholarship (https://fedcirbar.org/scholarships)
Sponsorships (https://fedcirbar.org/sponsorships)

**About Us**

Board of Directors (https://fedcirbar.org/board)
Executive Director (https://fedcirbar.org/executive-director)
Frequently Asked Questions (https://fedcirbar.org/faq)
Mission Statement (https://fedcirbar.org/mission)
Who We Are (https://fedcirbar.org/about)

**Get Involved**

Join Today (https://myfcba.fedcirbar.org)
Contact (https://fedcirbar.org/contact)
Events (https://fedcirbar.org/events)
FastCase (https://fedcirbar.org/fastcase)
Law Student Resources (https://fedcirbar.org/lawstudents)

© 2025 Federal Circuit Bar Association. All Rights Reserved. Powered by 321 Web Marketing (https://www.321webmarketing.com/terms-of-use/)

# **<u>EXHIBIT 11</u>**



English (GB)

News   Groups ⌄   Activities ⌄   About IP5 ⌄

Industry Consultation ⌄   Patent statistics ⌄

Events calendar ⌄   Resources ⌄

Delegates area

Search



🏠 ＞ About IP5

# About IP5 co-operation

The five IP offices (IP5) is the name given to a forum of the five largest intellectual property offices in the world that was set up to improve the efficiency of the examination process for patents worldwide.

The members of IP5 are:

- the European Patent Office (EPO)
- the Japan Patent Office (JPO)
- the Korean Intellectual Property Office (KIPO)
- the National Intellectual Property Administration of the People's Republic of China (CNIPA)
- and the United States Patent and Trademark Office (USPTO)

The IP5 Offices together handle about 90 per cent of the world's patent applications, and 95 per cent of all work carried out under the Patent Cooperation Treaty (PCT).

We use cookies

We use cookies on our website to support technical features that enhance your user experience.

We also use analytics. Click for more information.

OK



English (GB)

The IP5 Offices work together closely to improve efficiency and address the growing backlogs in applications worldwide. The heads of the IP5 Offices meet annually to decide on strategy and review progress.

## IP5 vision

In 2023 the IP5 Offices revised the IP5 Vision Statement. The new version embeds sustainability in the IP5 agendas and reflects the Offices' efforts to develop an inclusive innovation ecosystem.

The Five Offices defined their new vision of IP5 co-operation as:

Building a sustainable future by fostering innovation and economic growth through an inclusive and accessible patent system. Promoting patent protection through harmonization of practices and procedures, high-quality and timely search and examination results, worksharing and access to patent information and achieving *an efficient, cost-effective and user-friendly international patent landscape.*

## Better services for users

The work of the IP5 has direct benefits for companies and inventors worldwide. Co-operation is helping the IP5 Offices to improve their services and to make access to the patent system straightforward and legally certain for innovators from all their regions.

## Co-operation with users, other offices and WIPO

The IP5 Offices recognise the importance of open communication with users of the system, including other patent offices. The offices therefore endeavour to bring on board the views of industry, and other offices that share the need for action. The

We use cookies

We use cookies on our website to support technical features that enhance your user experience.

We also use analytics. Click for more information.

# Involvement of examiners

English (GB)

The IP5 attach great importance to the full involvement and commitment of the patent examiners of the five offices in the implementation of IP5 projects.

IP members:     

We use cookies

We use cookies on our website to support technical features that enhance your user experience.

We also use analytics. Click for more information.

# **<u>EXHIBIT 12</u>**

Neutral Citation No: [2002] EWHC 2167 (Patents)

Case No: HC02 04746

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**PATENTS COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 28 October 2002

**Before** :

**THE HONOURABLE MR JUSTICE JACOB**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**Celltech Chiroscience Limited**              **Claimant**
- and -
**MedImmune Inc**              **Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

David Kitchin QC and Daniel Alexander (instructed by Messrs Bird & Bird) for the Claimant
Antony Watson QC and Richard Meade (instructed by Messrs Blair & Co) for the Defendant

Hearing dates : 1st and 2nd October 2002
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of
this Judgment and that copies of this version as handed down may be treated as authentic.

**THE HON MR JUSTICE JACOB**

**Mr Justice Jacob :**

1.      This preliminary point has the oddity that I have to ascertain and apply the US patent law rules as to file wrapper estoppel.   The oddity comes about in this way: Celltech granted MedImmune a patent licence for most countries of the world.  The licence is governed by English law and confers jurisdiction on the English Courts.   Under the licence MedImmune must pay royalties if they sell a product covered by a valid claim of a particular US patent (No.5,859,205, "Adair").   In the US MedImmune sell a product called "Synagis."   Celltech say, and MedImmune denies, that "Synagis" falls within the scope of the Adair patent. Celltech's case depends upon reliance of the "doctrine of equivalents".   MedImmune deny generally that on the facts the doctrine could apply.   But, without prejudice to that general denial, MedImmune say that Celltech are precluded from their contention by virtue of the doctrine of "file wrapper estoppel."

2.      In the US the law as to how the scope of a patent is determined is different from that in Europe.     In Europe the basic rule is set out in Art.69(1) of the European Patent Convention.  It is that:

> "The extent of the protection conferred by a European patent .. shall be determined by the terms of the claims.   Nevertheless, the description and drawings shall be used to interpret the claims."

3.      Art. 69 is supplemented by a Protocol on its interpretation.   The Protocol does not undermine the basic rule but expands on how it is to be applied.  The monopoly conferred is defined by the terms of the claims as properly interpreted using the guidance of the Protocol. There is no express provision in Europe for a doctrine of equivalents.  By this I mean a rule by which there may be infringement even if the accused product falls outside the meaning of the words of the claim when understood in context.      If the issue is whether a feature embodied in an alleged infringement that falls outside the primary, literal or acontextual meaning of a descriptive word or phrase in the claim is nevertheless within its language as properly interpreted, one asks the questions formulated by Hoffmann J in *Improver v Remington*   [1990] FSR 181 at p.189.   The issue remains one of construction - there is no distinct doctrine of equivalents.   I remind myself of this only to ensure that the European approach is firmly put out of my mind when considering the US approach.     It is not a "variant" of Art. 69 and its Protocol.

4.      Thus US patent law, by contrast, does have an explicit rule about equivalents.   To my mind one of the best expositions of the reason for the rule remains that of Judge Learned Hand in *Royal Typewriter v Remington* (1948) 168 f. 2d. 691;  77 USPQ 517 (2d Cir.):

> "After all aids to interpretation have been exhausted and the scope of the claims has been enlarged as far as words can be stretched, on proper occasions courts make them cover more than their meaning can bear.  If they applied the law with inexorable rigidity, they would never do this ….[But] at times they resort to the doctrine of equivalents to temper unsparing logic and prevent an infringer from stealing the benefit of the invention."

5.      The same idea is to be found in Lord Reid's dissenting speech in *van der Lely v Bamfords* [1963] RPC 61 at p.379:

"the principle [of infringement by substitution of a mechanical equivalent for an integer of a claim] is very necessary to prevent sharp practice"

6.      The US also has a further doctrine of patent law going by the name of "prosecution history (colloquially 'file wrapper') estoppel".   This rule is based on the broad notion that a patentee may not go back on anything he has said or represented to the United States Patent and Trademark Office ("USPTO") in the course of prosecution of his patent.

7.      Both rules are judge-made, to be ascertained from the rules laid down in the cases decided by the US Federal Courts.   Of these the paramount court is the Supreme Court.   The Court below that is the US Federal Court of Appeals for the Federal Circuit (the "CAFC"), a special court of appeal for the whole of the US in patent and certain other matters.

8.      Foreign law is treated by our law as a question of fact.   Normally it is proved by evidence from foreign lawyers.   In this case such evidence has been filed.   But counsel agreed that I could read the US cases without the aid of a US lawyer.   Cross-examination would consist of bouncing points of argument off the experts which could just as easily be submitted to me. So it was that I found myself receiving submissions on US case law just as if I were a US District Judge.

9.      In recent years the higher US courts have been much concerned with both the doctrine of equivalents and file wrapper estoppel.   The basic rules as regards equivalents are now that laid down in a pair of Supreme Court cases, *Markman v Westview Instruments* 517 US 370 (1996) and *Warner-Jenkinson v Hilton Davis* 520 US 17 (1996).   *Markman* decided that the construction of a patent claim was a question of law for the court, not a jury question.   That is not to say that expert evidence is not receivable - on the contrary it is.   Most patent claims these days are only intelligible to a lawyer when the background technology (and particularly the jargon of the "trade") has been explained.   *Hilton-Davis* decided that the doctrine of equivalents remained alive and well following the 1952 revision of the US Patent Act.   But it also reined in the doctrine. Justice Thomas, giving the opinion of a unanimous Supreme Court said this:

"We do, however, share the concern of the dissenters below that the doctrine of equivalents, as it has come to be applied since *Graver Tank*, has taken on a life of its own, unbounded by the patents claims.   There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement."

10.      The reining in was achieved by adopting the solution of the late Judge Helen Nies in the CAFC.  Justice Thomas expressed the modern rule thus:

"Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.   It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."

11.      In *Hilton-Davis* the Supreme Court touched upon the question of file wrapper estoppel.   Amongst other things it said:

"Our prior cases have consistently applied prosecution history estoppel only where claims have been amended for a limited set of reasons, and we see no substantial cause for requiring a more rigid rule invoking an estoppel regardless of the reasons for the change."

12.     Notwithstanding that, in the next major case, *Festo v Shoketsu Kinzoku* 234 f.3d 558 (Fed.Cir 2000) the CAFC held that there was a "brightline rule" about file wrapper estoppel. The rule was this:

> (1) any reason for amendment to a patent claim that is related to patentability will give rise to prosecution history estoppel;
> (2) voluntary amendments are treated the same as other amendments for the purpose of prosecution history estoppel; and
> (3) when amendment creates prosecution history estoppel, there is no range of equivalents available for the amended element.

13.     In short if an element of a claim was amended for a patentability reason, the patentee would be confined to the literal meaning of the element.   Since most claims are amended during the course of prosecution (a patent attorney would not be doing his job properly if he went in too narrow) *Festo* might have virtually abolished the doctrine of equivalents.

14.     The brightline *Festo* rule depended upon there having been a disclaiming amendment. Quite apart from that, there was and is also a well-settled further rule called "argument estoppel".  This applies even in the absence of claim amendment.   Where the patentee has made representations to the USPTO about the scope or meaning of the claim or element of a claim, he is estopped from contending for any wider scope.   This rule is stated, for instance in *Texas Instruments v US International Trade Commission* 988 F 2d. 1165 (Fed.Cir. 1993):

> "Amendment of a claim in light of a prior art reference, however, is not the *sine qua non* to establish prosecution history estoppel.  Unmistakable assertions made by the applicant to the Patent and Trademark Office (PTO) in support of patentability, whether or not required to secure allowance of the claim, also may operate to preclude the patentee from asserting equivalency between a limitation of the claim and a substituted structure or process step".

It is to be noted that the test is "unmistakable assertion."

15.     The claim form in this action was issued on 19th October 2000.   The particulars of claim relied upon the US law doctrine of equivalents. *Festo* was decided by the CAFC on 29th November 2000. Claim 1 of the Adair patent was the result of a narrowing amendment made during the prosecution.  So it is hardly surprising that the defence as originally pleaded relied on the *Festo* CAFC brightline rule - claim 1 had been amended. There might well be a knock-out defence.   MedImmune accordingly launched an application for determination of preliminary issues.   By consent Pumfrey J on March 9th 2001 ordered trial of the following preliminary issues:

> "(1)   whether the Claimant is precluded from relying on the US doctrine of equivalents in these proceedings by virtue of the US doctrine of prosecution history estoppel;  and
> (2)   whether as a result the Claimant's claim should be dismissed."

16.     Before those issues could be heard, there were further developments in the US.    The US Supreme Court granted *certiorari* (what we would call permission to appeal) in *Festo*. The hearing of the preliminary point was put off until the judgment in *Festo* was given.    The Supreme Court overruled the CAFC brightline rule.    I must quote a number of passages from the unanimous opinion of the Court given by Justice Kennedy:

> "Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose.    Where the original application once embraced the purported equivalent but the patentee narrowed his claims to obtain the patent or to protects its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question.    The doctrine of equivalents is premised on language's inability to capture the essence of innovation, but a prior application describing the precise element at issue undercuts that premise.    In that instance the prosecution history has established that the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrow claim, and affirmatively chose the latter".
> ……….
> "Based upon its experience the Court of Appeals decided that the flexible-bar rule is unworkable because it leads to excessive uncertainty and burdens legitimate innovation.    For the reasons that follow, we disagree with the decision to adopt the complete bar.
>
> Though prosecution history estoppel can bar challenges to a wide range of equivalents, its reach requires an examination of the subject matter surrendered by the narrowing amendment.    The complete bar avoids this inquiry by establishing a *per se* rule; but that approach is inconsistent with the purpose of applying the estoppel in the first place – to hold the inventor to the representations made during the application process and the inferences that may reasonably be drawn from the amendment.    By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claim.    It does not follow, however, that the amended claim becomes so perfect in its description that no one could devise an equivalent. After amendment, as before, language remains an imperfect fit for invention.    The narrowing amendment may demonstrate what the claim is not; but it may still fail to capture precisely what the claim is.    There is no reason why a narrowing amendment should be deemed to relinquish equivalents unforeseeable at the time of the amendment and beyond a fair interpretation of what was surrendered.    Nor is there any call to foreclose claims of equivalence for aspects of the invention that have only a peripheral relation to the reason the amendment was submitted.    The amendment does not show that the inventor suddenly had more foresight in the drafting of claims than an inventor whose application was granted without amendments having been submitted.    It shows only that he was familiar with the broader text and with the difference between the two.    As a result, there is no more reason for holding the patentee to the literal terms of an amended claim than there is for abolishing the doctrine of equivalents altogether and holding every patentee to the literal terms of the patent.
>
> This view of prosecution history estoppel is consistent with our precedents and respectful of the real practice before the PTO.    While this Court has not weighed the merits of the complete bar against the flexible bar in its prior cases, we have consistently applied the doctrine in a flexible way, not a rigid one.    We have considered what equivalents were surrendered during the prosecution of the patent,

rather than imposing a complete bar that resorts to the very literalism the equivalents rule is designed to overcome".

………

"They do provide, however, that when the court is unable to determine the purpose underlying a narrowing amendment – and hence a rationale for limiting the estoppel to the surrender of particular equivalents -–the court should presume that the patentee surrendered all subject matter between the broader and the narrower language.

Just as *Warner-Jenkinson* held that the patentee bears the burden of proving that an amendment was not made for a reason that would give rise to estoppel, we hold here that the patentee should bear the burden of showing that the amendment does not surrender the particular equivalent in question".

……….

"The patentee, as the author of the claim language, may be expected to draft claims encompassing readily known equivalents. A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim. *Exhibit Supply*, 315 U.S., at 136-137, 62 S.Ct. 513 ("By the amendment [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference"). There are some cases, however, where the amendment cannot reasonably be viewed as surrendering a particular equivalent. The equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question. In those cases the patentee can overcome the presumption that prosecution history estoppel bars a finding of equivalence.

This presumption is not, then, just the complete bar by another name. Rather, it reflects the fact that the interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims. When the patentee has chosen to narrow a claim, courts may presume the amended text was composed with awareness of this rule and that the territory surrendered is not an equivalent of the territory claimed. In those instances, however, the patentee still might rebut the presumption that estoppel bars a claim of equivalence. The patentee must show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent".

17.    Even that decision did not finally determine everything about the two doctrines and their relationship. That appears from what happened next. The Supreme Court remanded the case back to the CAFC for further proceedings consistent with its opinion. On September 20th 2002 the CAFC made an order containing the following passages:

"The Court differed with this court on the scope of equivalents available following a narrowing amendment. Whereas we had held that any narrowing amendment made for reasons related to patentability effects a complete bar to the doctrine of equivalents for the amended claim element, 234 F.3d at 563-64, 56 USPQ2d at 1868, the Court held that a narrowing amendment instead raises a rebuttable presumption that the complete bar applies".

…….

"We must now consider what further action to take in this case.  To help us in that determination, we order the parties to submit briefs on the following issues:

> 1.    Whether rebuttal of the presumption of surrender, including issues of foreseeability, tangentialness, or reasonable expectations of those skilled in the art, is a question of law or one of fact; and what role a jury should play in determining whether a patent owner can rebut the presumption.

> 2.    What factors are encompassed by the criteria set forth by the Supreme Court.

> 3.    If a rebuttal determination requires factual findings, then whether, in this case, remand to the district court is necessary to determine whether Festo can rebut the presumption that any narrowing amendment surrendered the equivalent now asserted, or whether the record as it now stands is sufficient to make those determinations.

> 4.    If remand to the district court is not necessary, then whether Festo can rebut the presumption that any narrowing amendment surrendered the equivalent now asserted".

18.    Even that may not be the end of the story.   For some of the Supreme Court's observations would seem to apply whether or not a claim has been amended.   Perhaps of most significance in this case, even if file wrapper estoppel did not apply, is the observation that "the patentee … may be expected to draft claims encompassing readily known equivalents". Does this apply also to unamended claims?    Suppose, for instance, an unamended claim which says "nailed." And suppose screwed, riveted or glued would do just as well.  Are those equivalents not covered by the doctrine of equivalents?  Putting it another way is it only unforeseeable equivalents which are now covered by the doctrine?  Fortunately I do not have to decide that question under the current application, though it seems that it would otherwise arise because Celltech contend that the equivalent they rely upon is obvious.

19.    Thus prosecution history estoppel along with the doctrine of equivalents has become an elaborate doctrine with many facets.   I am told that most patent litigation in the US currently raises disputes about one or other or both doctrines.   Those who suggest similar doctrines for Europe would do well to bear this in mind - and that the prosecution file may be in any of three languages.

20.    I turn to the facts in this case.   To understand the amendment and what was said to the USPTO about distinguishing the prior art it is necessary to understand some of the background technology.   It is explained well by the two experts who have provided me with evidence that, at least for present purposes, is uncontroversial.   My exposition is largely borrowed, with gratitude, from MedImmune's skeleton argument.   The embellishments are my own.

21.    Antibodies, which are useful for a variety of therapeutic and research purposes, are produced by cells of the human immune system called B lymphocytes.   They are protein molecules. A protein is a long chain of amino acid residues called a polypeptide.   The proteins of living organisms use 20 specific amino acids.   Antibodies are proteins which bind to other proteins foreign to the human body called antigens. A typical antigen would be a virus. Antigen/antibody binding depends on a close and specific physical fit between

particular areas on each.   The antibody "locks on" to part of the antigen, thereby disabling its invasive abilities.   Antigens may be many and varied.   Each particular kind will need a particular kind of antibody to disable it.   When the body is invaded the B lymphocytes set about producing antibodies specific to the invading antigen.   This is why it takes a little while to deal with an infection such as the common cold, and why, when antibodies have built up, it is cured.

22.      Antibodies have a generally "Y" shape, though actually of course the shape is more elaborate than that.  The "Y" is made from two heavy (relatively long) and light (relatively short) chains of amino acid residues.  A heavy chain is about 440, and a light chain about 110 amino acids long.   The Y consists of two identical heavy chains joined together for about 330 amino acids which form the trunk of the Y.   The two tines of the forks (of about 110 amino acids) each have attached to them a light chain.   The trunks of the Y consist of constant regions, that is to say they are the same in different antibodies.  The branches are variable, i.e. different in different antibodies.     In broad terms, the tips of the forks of the "Y", where the variable regions of the heavy and light chains meet, are the parts which make the antibody "fit" with its complementary antigen.   There are three loops at each tip.    It is their shape and composition which make the antibody "fit" the target antigen.    The regions for fitting into the antigen are called "CDRs" (complementarity determining regions).    A helpful schematic diagram shows the general structure of an antibody:

1.  <u>Illustration 1: Structural Domains of an IgG Antibody</u>



23.     Producing human antibodies is difficult.  As a result, researchers have turned to producing antibodies in mice or other rodents.  But mice antibodies themselves provoke an immune reaction in humans (the "HAMA" response).  Researchers have therefore worked for some time on using antibodies which are "humanised", being part mouse and part human. The goal is to arrive at an antibody which is still the right shape for the target antigen and is human enough not to provoke a HAMA response.   In such antibodies, the mouse elements are called "donor" and the human elements are called "acceptor".

24.     There is a standard, conventional means of referring to individual specific amino acids in the protein structures of this kind of antibody.  It is called the Kabat numbering system. It is used to designate a given amino acid position in an antibody by a number.  In the present case, for example, "position 23" is the subject of much of the argument.

25.     Part of Celltech's argument in this case revolves around what are called "conservative substitutions".  As I said earlier, there are 20 amino acids used to make up the chain.  Very generally, amino acids differ from one another in a variety of ways and to different degrees. To replace one amino acid with another which is very similar is said to make a "conservative substitution"  of one for the other.   Such a substitution at a non-critical part of the molecule is unlikely to make a significant difference to its function.    There might be a local slight difference in shape but it does not matter.  In critical areas, such as CDRs, however things are most likely different - even a conservative substitution will very probably make all the difference.

26.     Celltech summarise their invention in "simple terms" in their skeleton argument:

"one takes the human antibody and grafts into it the CDRs and certain other non-CDR residues which are necessary to achieve binding.   Humanised antibodies of the kind described in the patent are therefore designed to combine the best attributes of murine and human antibodies: the important binding elements from the mouse monoclonal antibody are used to target the antigen of interest and, because the remainder of the antibody contains human sequences, the human body is less likely to mount an immune response to it.

Celltech identified a specific set of positions at which it was necessary to ensure that the residue was the relevant murine residue (the so-called "donor" residue) to obtain the desired binding.   This set was described in the US Adair patent [1] and claimed."

27.     Thus just grafting a CDR obtained from a mouse onto an otherwise human antigen is not enough because you do not get desired binding.    You need specified donor (mouse) antibodies at specified positions.  These are  near the CDRs.   Another diagram shows where position 23 is:

Structural Location of Residues in Claim 1 of the U.S. Adair Patent



28. Now what happened during prosecution is that the USPTO cited a prior proposal called Reichmann.  Celltech responded by narrowing their claims and making certain submissions.  On that basis the patent was accepted. Before amendment claims 1 and 2 read:

"1. A CDR-grafted antibody heavy chain having a variable region domain comprising acceptor framework and donor antigen binding regions wherein the framework comprises donor residues at at least one of positions 6, 23 and/or 24, 48 and/or 49, 71 and/or 73, 75 and/or 76 and/or 78 and 88 and/or 91.

2. A CDR-grafted heavy chain according to Claim 1 comprising donor residues at positions 23, 24, 49, 71, 73 and 78, or at positions 23, 24 and 49."

There was also a claim to an antibody containing such a heavy chain.

29. The claims were narrowed to an antibody containing the specified heavy chain. Nothing turns on this.  But the widest form of the heavy chain was narrowed to that in the unamended claim 2.   The relevant bit of the claim as granted reads:

"wherein, according to the Kabat numbering system, in said composite heavy chain: said CDRs comprise donor residues at least at residues 31 to 35, 50 to 58, and 95 to 202;  and amino acid residues 6, 23, 24 and 49 at least are donor residues."

30. So prior to amendment claim 1 was to a number of alternatives.   Claim 2 merely narrowed that number.   It is a true "dependent" claim, that is to say a claim in the form requiring all the features of the claim from which it is dependent <u>and</u> the further features specified in the dependent claim.   In this case, in particular prior to amendment you had to have a donor residue at at least one of  positions 6,23 and 24 (7 possibilities in all).   After

amendment you have to have a donor residue at position 23. The other 6 possibilities were surrendered by the amendment. So were others at other positions.

31. Now it is common ground that the MedImmune product has all the elements of claim 1 of the Adair patent save in relation to position 23. There it has a residue which is not a donor residue in the strict sense, i.e. a residue which is the same as in the mouse antibody. It is an acceptor residue (i.e. one which is the same as in the human antibody). Celltech say that substituting one for the other in that position makes no difference - it is a conservative substitution and, as such within the doctrine of equivalents. MedImmune dispute that as a technical matter but say also that it does not matter because of prosecution history estoppel. The argument is put two ways, as an estoppel arising from the amendment and an estoppel arising from representations.

32. MedImmune say that by virtue of the amendment Celltech narrowed their monopoly from a case where a donor residue was optional, to one where it was mandatory. Accordingly the *Festo* rules apply. Although there is now a flexible bar, Celltech do not fall within any of the limbs referred to by the Supreme Court, namely unforeseeability, peripherality/tangentiality or other reason why the patentee could not reasonably have described the insubstantial substitute.

33. Celltech say that the equivalent in question, namely a conservative substitution, is simply irrelevant to the amendment made. I think they are right on this point. The amendment cut down the number of possibilities claimed. But it did not in any way cut down whether or not the claim covered equivalents of donors. Consider the case of a product which, at position 23, had an equivalent of a donor residue but did not have a donor residue at positions 6 or 24. And suppose it otherwise fell within the unamended claim. The argument for infringement of that claim would have had to be on the doctrine of equivalents. It would be exactly the same as it is now. The amendment is irrelevant.

34. One can look at the same point in another way. *Festo* requires one to examine what is "relinquished" or "surrendered" by the amendment. What was surrendered here is a number of possibilities. Focussing on position 23, 6 possibilities were given up. Prior to amendment an argument lay in relation to all seven possibilities that a conservative substitution would infringe by virtue of the doctrine of equivalents. All that has happened is that 6 of the possibilities have been surrendered. The surrender has no connection, no nexus, with what is alleged to be an equivalent.

35. A good example of this no nexus kind of point is to be found in the carefully reasoned judgment of Judge Breyer (the brother of the Supreme Court Justice) in *Aclara Biosciences v Caliper Technologies* 125 F.Supp.2d 391 (N.D. Cal. 200). This was given whilst the brightline CAFC *Festo* rule prevailed. The claim called for "a plurality of electrodes" to be positioned along a trench and not just at the ends of the trench, which is what the accused device had. Infringement by virtue of the equivalents doctrine was alleged. The defendant pointed out that the claim had been amended during prosecution and relied upon *Festo*, CAFC version. Judge Breyer held that although the amendment had been made, it "did not surrender any subject matter related to where along the trenches the electrodes should be placed." The position is the same here - the amendment did not surrender any subject matter related to an equivalent of a donor residue.

36. Mr Watson QC for MedImmune suggested that the amendment rule was wider - that once a claim had been amended the *Festo* rules applied to all aspects of the claim, even

aspects untouched by and unrelated to the amendment.  I think that is illogical and contrary to the thrust of all the reasoning in *Festo*.   Mr Watson took me to a decision of Chief Judge Marylyn Hall Patel of the US District Court for the Northern District of California dated 21st August 2002 in *Glaxo Wellcome v Impax Laboratories.*    The patent had 5 sets of independent claims.   Four of these were narrowed during prosecution to include the use of a sustained release material called HPMC.   The other set already had that requirement and was not narrowed during prosecution.  The patentee wished to assert that use of an equivalent material, HPC, in a product otherwise covered by the claims, infringed by virtue of the doctrine of equivalents.  The Chief Judge held that amendment estoppel applied to all five sets of claims.   So far as the amended claims are concerned there had plainly been a narrowing based on the inclusion of HPMC.   So the *Festo* rules applied.  And since HPC was an obvious equivalent the patentee was held bound and confined by the amendment.   The Chief Judge took the view that the same applied to claim 1.     Even though it had not in itself been amended, the amendments which had been made focussed attention on HPMC so it could not have a wider ambit in different claims.

37.    I do not think this case assists Mr Watson - it is not an example of the estoppel applying to matter that was not surrendered. Likewise the case where Judge McKenna of the Southern District of New York took an opposite view of the same alleged infringement does not assist Celltech (*Glaxo Wellcome v EON Labs Manufacturing* August 13th 2002).  Judge McKenna held that *Festo* applied because there had been a narrowing amendment.  His view was different from that of Chief Judge Patel because he held that the use of HPC was arguably use of an unforeseeable equivalent.   That, of course, is one of the exceptions to a bar on estoppel after amendment specifically mentioned in *Festo.*

38.    Accordingly, in this case, I hold that file wrapper estoppel does not arise by virtue of the amendment made by combining the features of claim 2 with those of claim 1.   That, however, leaves the separate question of whether or not there is representation estoppel.  For that purpose one has to go into what was said to the USPTO during prosecution in more detail - one does not just have to discern whether there was a narrowing amendment.

39.    As I have said the amendment came about as a result of a citation of Reichmann by the USPTO.   Now Reichmann had an acceptor (i.e. human) residue at position 23. The patentees said this:

"In the present claims 24 and 25 [added by amendment], it is specified that residues 23 and 24 in the heavy chain should be donor residues.  However, as can be seen from [Reichmann] in the recombinant antibody shown there, residues 23 and 24 are acceptor residues."

And they correspondingly amended the claims to make it a requirement that position 23 be a donor antibody residue.

40.    This, to my mind, is saying that an acceptor residue at position 23 is not within the invention.    I do not think there can be any doubt about this.   Moreover further representations of a similar nature were made, for instance:

"looking at the heavy chain Table, it can be seen that in all the successfully "superhumanised" antibodies produced by the applicants, in the heavy chain residues 23, 24, 31 to 25 49 to 58 and 95 to 102 are all donor residues."

41.     And later on in the prosecution process they said this:

"It can thus be seen that Riechmann does not disclose a procedure which leads to an antibody as defined in the present claims.  As far as the heavy chain is concerned, Reichmann does not even mention Kabat residues 23 24 and 49, let alone change them to the rat [i.e. donor] residues."

42.     Exhibit RAB19 (extracts from the prosecution filed) contains this and other material which to my mind shows the patentees insisting that not only that position 23 be occupied by a donor residue but also that it be not an acceptor residue.

43.     The MedImmune product has an acceptor residue at position 23.   In those circumstances it seems to me inconsistent with what was said to the USPTO about the essentiality of position 23 being a donor and not an acceptor to assert infringement by equivalents.  There was an unequivocal assertion to the contrary.

44.     Mr Kitchin QC for Celltech urged upon me that nothing was said to the USPTO about conservative substitutions so there can be no estoppel about asserting that they infringe by the doctrine of equivalents.  He further submitted that Riechmann did not discuss position 23 at all.   And he relied upon the technical evidence of Dr Martin.  He had read the prosecution file and opined that the patentee was surrendering a non-donor residue at position 23 but not conservative substitutions in that position.

45.     I reject all these submissions.   File wrapper estoppel does not require one to consider the cited prior art and work out what might have been said to distinguish it.  One looks at what was said.  It may be just enough to avoid it or it may go further, either by accident or on purpose.   Here it may well be that Reichmann could have been distinguished in a different way - but what the patentee said is that position 23 had to be a rat (i.e. donor) residue and not an acceptor residue.  He cannot now claim that an acceptor residue is within his monopoly even if it is a conservative substitution which would make no difference.   As to Dr Martin's evidence, it misses the point - in particular that the patentee not only surrendered a non-donor residue at position 23 but also pointed out that Reichmann was different because he had an acceptor residue at that position.   I would add this that in any event I am not impressed by the evidence - it states Dr Martin's conclusion having read the file, but does not give his reasons for that conclusion.   He does not deal with what it actually says.

46.     In the result I hold that reliance upon the doctrine of equivalents is precluded by file wrapper estoppel.   I will hear counsel as to the appropriate order.

# **<u>EXHIBIT 13</u>**

| Date | October 16, 2003 | Court | Tokyo District Court |
|------|------------------|-------|----------------------|
| Case number | 2002 (Wa) 1943 | | |

[i] A case in which the court found that the plaintiff's product does not fall within the technical scope of the defendant's U.S. patent right.

[ii] A case in which, with respect to the claim for an injunction alleging that the defendant's act of making or circulating allegations of facts to the plaintiff's customers in the U.S. is an act of business defamation, the court found that the law of Japan is the applicable law ([iv]' The applicable law of a statutory claim that naturally arises between competitors from a legal standpoint due to the occurrence of an act of business defamation is provided by Article 11, paragraph (1) of the Act on General Rules for Application of Laws (Article 17 of the current Act on General Rules for Application of Laws)).

Reference: Section 271(a) and Section 283 of the U.S. patent law with respect to [i] above and Article 11, paragraph (1) of the Act on General Rules for Application of Laws (Article 17 of the current Act on General Rules for Application of Laws) with respect to [ii] above

Number of related rights, etc.: U.S. Patent No. 4540584

Summary of the Judgment

1. In this case, the plaintiff, which manufactures coral fossil powder and sells it as healthy food in Japan and also exports and sells said product in the United States, alleged against the defendant, which is a Japanese corporation that holds a U.S. patent right for an invention of a composition, etc. for promotion of health using coral sand, that the sale of the plaintiff's product in the United States does not constitute infringement of the defendant's U.S. patent right. Based on this allegation, the plaintiff sought a declaratory judgment that the defendant does not have the right to seek an injunction against the plaintiff's sale of the aforementioned plaintiff's product in the United States based on the aforementioned U.S. patent right, and also sought an injunction against the act of making or circulating the allegation that the plaintiff's sale of the plaintiff's product in the United States constitutes infringement of the defendant's U.S. patent right (Article 2, paragraph (1), item (xiv) (currently, item (xv)) of the Unfair Competition Prevention Act) under Article 3, paragraph (1) of said Act.

   In this judgment, the court mainly held as follows and dismissed the claim seeking a declaratory judgment mentioned above but upheld the claim seeking an injunction mentioned above.

(1) Regarding the fulfillment of the technical scope of the defendant's U.S. patent right

by the plaintiff's product

Based on the determination using the method of determining patent infringement under the U.S. patent law, the plaintiff's product does not fulfill Constituent Feature [B] of the defendant's U.S. patent right and thus literal infringement is not established.

In addition, under the method of determining patent infringement under the U.S. patent law, even where literal infringement is not established, if the subject product fulfills a function that is identical with that of a patented invention by a substantially identical method and produces a result that is identical with that of the patented invention, the subject product falls within the technical scope of the patented invention as an equivalent to the patented invention. However, if any of the constituent features of the claims is limited in relation to patentability in the prosecution history, enlargement of the right by the doctrine of equivalents is not permitted in relation to the relevant constituent feature. In this case, the defendant cannot be considered as having proven that coral sand of a particle size outside the range limited by Constituent Feature [B] is not waived through the amendment (U.S. Supreme Court judgment on the Festo case). Therefore, infringement by the doctrine of equivalents is not established for the plaintiff's product.

(2) Regarding the claim for an injunction against the act of business defamation

The act of business defamation alleged by the plaintiff can be considered as being in the legal relationship including foreign affairs-related elements in that it is an action committed by the defendant against the plaintiff's customers in the United States. Therefore, it is necessary to determine the applicable law.

The right to seek an injunction against the act of business defamation is a statutory claim that naturally arises between competitors from a legal standpoint due to the occurrence of an act of business defamation. Application of laws to these is provided by Article 11, paragraph (1) of the Act on General Rules for Application of Laws (Article 17 of the current Act on General Rules for Application of Laws), and law at the place of occurrence of the fact that serves as the cause of the right to claim is the applicable law.

According to the plaintiff's allegation in this case, the place of occurrence of the fact that serves as the cause is the place where the defendant transmitted or sent the email or letter, and the law of Japan is thus the applicable law. Consequently, a determination is to be made on whether the defendant's act falls under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) (currently, item (xv)) of the Unfair Competition Prevention Act.

Judgment rendered on October 16, 2003

2002 (Wa) 1943, Case of Seeking Injunction against Act of Business Defamation

(Date of conclusion of oral argument: June 20, 2003)

Judgment

Plaintiff: Kabushiki Kaisha Coral Corporation

Defendant: Marine Bio Co., Ltd.

Main text

1. The court shall declare that the defendant does not have the right to seek an injunction against the plaintiff's sale of coral fossil powder stated in the Item List attached to this judgment in the United States based on the patent right of U.S. Patent No. 4540584.

2. The defendant shall neither make nor circulate, from Japan to the plaintiff's customers in the United States, the allegation that the plaintiff's act of selling coral fossil powder stated in the Item List attached to this judgment in the United States constitutes infringement of the patent right of U.S. Patent No. 4540584.

3. The defendant shall neither make nor circulate, from Japan to the plaintiff's customers in the United States, the allegation that said customers' act of selling coral fossil powder stated in the Item List attached to this judgment in the United States constitutes infringement of the patent right of U.S. Patent No. 4540584.

4. The defendant shall pay to the plaintiff 2,998,000 yen and the amount accrued thereon at the rate of 5% per annum for the period from February 15, 2002, to the date of completion of the payment.

5. Out of the claims in this action, the claim for a declaratory judgment to the effect that "The court shall declare that the defendant does not have the right to seek an injunction against the sale in the United States of coral fossil powder stated in the Item List attached to this judgment by the plaintiff's customers in the United States based on the patent right of U.S. Patent No. 4540584" shall be dismissed.

6. The plaintiff's other claims shall be dismissed.

7. The court costs shall be divided into three, and the plaintiff shall bear one-third thereof and the defendant shall bear the remaining amount.

8. Paragraphs 2 to 4 of this judgment may be provisionally executed.

Facts and reasons

No. 1 Objects of claims

1. The same as paragraph 1 of the main text.

2. The same as paragraph 2 of the main text.

3. The court shall declare that the defendant does not have the right to seek an injunction against the sale in the United States of coral fossil powder stated in the Item List attached to this judgment by the plaintiff's customers in the United States based on the patent right of U.S. Patent No. 4540584.

4. The same as paragraph 3 of the main text.

5. The defendant shall pay to the plaintiff 18,717,875 yen and the amount accrued thereon at the rate of 5% per annum for the period from February 15, 2002 (date of service of the complaint) to the date of completion of the payment.

No. 2 Answer to the objects of claims

1. Answer before the merits

   The claims pertaining to paragraphs 1, 3, and 4 of the objects of claims shall be dismissed.

2. Answer on the merits

   All the plaintiff's claims shall be dismissed.

No. 3 Outline of the case, etc.

1.(1) The plaintiff is a company which manufactures coral fossil powder by grinding hermatypic coral fossil and sells it as healthy food in Japan and also exports and sells said product in the United States. The defendant company, which is a Japanese corporation, holds a U.S. patent right for an invention of a composition, etc. for promotion of health using coral sand.

   The plaintiff alleges as follows: The aforementioned plaintiff's product does not fall within the technical scope of the defendant's U.S. patent right, and there is a ground for invalidation of said patent right; therefore, the sale of the aforementioned plaintiff's product in the United States does not constitute infringement of the aforementioned U.S. patent right. Based on this allegation, the plaintiff seeks a declaratory judgment that the defendant does not have the right to seek an injunction against the plaintiff's sale of the aforementioned plaintiff's product in the United States based on the aforementioned U.S. patent right (paragraph 1 of the objects of claims), and also seeks a declaratory judgment that the defendant does not have the right to seek an injunction against the sale in the United States of the aforementioned plaintiff's product by the plaintiff's customers in the United States based on the aforementioned U.S. patent right (paragraph 3 of the objects of claims).

   Moreover, regarding the defendant's act of sending to the plaintiff's customers in the United States a warning letter, etc. stating that the aforementioned plaintiff's product infringes the defendant's U.S. patent right, the plaintiff alleges that the aforementioned warnings given by the

2

defendant fall under the act of making or circulating false allegations as prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act and harm the plaintiff's business reputation. Based on this allegation, the plaintiff seeks an injunction against the act of making or circulating the allegation that the plaintiff's sale of the plaintiff's product in the United States constitutes infringement of the U.S. patent right of the defendant's U.S. patent right (paragraph 2 of the objects of claims) and an injunction against the act of making or circulating the allegation that the sale of the plaintiff's product in the United States by the plaintiff's customers constitutes infringement of the defendant's U.S. patent right (paragraph 4 of the objects of claims) under Article 3, paragraph (1) of said Act, as well as compensation for damages (paragraph 5 of the objects of claims) under Article 4 of said Act.

(2) In response to this, as an allegation before the merits, the defendant alleges that the Japanese court is not recognized as having international jurisdiction over the action to seek a declaratory judgment on the non-existence of the right to seek an injunction based on the U.S. patent right as stated in paragraphs 1 and 3 of the objects of claims on the grounds of the principle of territoriality, etc. Furthermore, the defendant also alleges as follows: Even if international jurisdiction of the Japanese court is affirmed, whether the judgment in this action is approved in the United States is unclear; therefore, this action cannot be considered as an effective and appropriate means for solving the dispute, and the aforementioned claims for a declaratory judgment have no benefit. Moreover, the defendant also alleges that as paragraph 3 of the objects of claims is on the issue of the relationship of rights between the defendant and a third party other than the plaintiff, the claim stated in said paragraph also has no benefit of a declaratory judgment in this regard. Regarding paragraph 4 of the objects of claims, the defendant does not deny that the Japanese court has international jurisdiction, but alleges that the claim stated in said paragraph is originally not recognized as having any benefit of an action as said paragraph is on the issue of the relationship of rights between the defendant and a third party other than the plaintiff, in the same manner as paragraph 3 of the objects of claims. As stated in No. 2, 1. above, the defendant seeks a judgment that dismisses this action pertaining to the claims stated in paragraphs 1, 3, and 4 of the objects of claims.

As an allegation on the merits, the defendant alleges that the sale of the plaintiff's product in the United States constitutes infringement of the aforementioned U.S. patent right (literal infringement or infringement by the doctrine of equivalents) as the aforementioned plaintiff's product falls within the technical scope of the defendant's U.S. patent right literally or through application of the doctrine of equivalents and there is no ground for invalidation of said patent right. Based on this allegation, the defendant seeks the dismissal of the plaintiff's claims.

2. Facts on which the decision is premised (facts on which there is no dispute between the parties and facts that can be easily determined by evidence)

(1) Parties, etc.

A. The plaintiff is a stock company which has its head office in Ishigaki-shi, Okinawa and whose principal purpose is to manufacture fine coral fossil powder by grinding hermatypic coral fossil and sell such fine powder as healthy food.

On Yonaguni Island in Okinawa, there is a coral fossil (limestone) mine, which is a result of coral reef having heaved about 40,000 years ago and having become a coral fossil (limestone) mine on shore. The plaintiff has the mining right for this coral fossil (limestone) mine and mines coral fossil blocks. The plaintiff makes some of those blocks into resources for civil engineering and makes the remaining into fine powder at a coral fossil grinding plant established near the mine and manufactures and sells the coral fossil powder stated in the Item List attached to this judgment (product name: "*Donan*"; hereinafter referred to as the "Plaintiff's Product") as healthy food.

The main component of the Plaintiff's Product is calcium carbonate which is a component deriving from coral insects (coelenterate), and the Plaintiff's Product also comprises sodium, potassium, magnesium, manganese, silicon, etc.

There are various types of usage of the Plaintiff's Product, such as adding it together with nutrient sources (vitamin, etc.) to foodstuffs to enhance their nutritional value, not limited to eating it in the original form of powder as a nutrient source.

B. The defendant is a stock company which has its head office in Chiyoda-ku, Tokyo and whose principal purpose is to manufacture and sell healthy food and water quality purifiers, which are made from coral sand obtained from the seabed in the Okinawa region.

C. The plaintiff exports the Plaintiff's Product to a U.S. company, Health Co. net (the current Coral Inc.), and Health Co. net mixes the Plaintiff's Product with other nutritional supplements, such as vitamins, and sells it in the United States as calcium-containing healthy food "Coral Plus." In addition, there is Health Nutrients, Inc., an affiliated company of Health Co. net (Exhibit Ko 2, Exhibit Otsu 13, and the entire import of the oral argument).

(2) Regarding the U.S. patent right of the defendant

A.(A) P, who is the former representative of the defendant, filed patent applications in Japan, the United States, etc. for an invention of food, etc. using coral sand and obtained the following U.S. patent (hereinafter referred to as the "U.S. Patent Right") (Exhibit Ko 3-1).

U.S. Patent No. (USP, NO): 4540584

Date of patent registration: September 10, 1985

Date of expiration of duration of right: December 28, 2003

(20 years from the filing date: Section 154(c)(1) of the U.S. patent law)

Title of the invention: Composition for promotion of health

Filing date: December 28, 1983

Foreign application pertaining to priority: [Japan] Patent Application No. 1982-233889

December 28, 1982

(B) Prosecution history of the U.S. Patent Right (Exhibit Otsu 11)

a. The application for the U.S. Patent Right was originally (as of December 28, 1983) filed as an application consisting of 10 claims, including Claim 1, which is a single independent claim.

b. Claim 1 at the time of the filing defined the invention as a "component for promotion of health comprising coral sand as an effective component." However, the examiner refused Claim 1 by citing many publicly known examples that are published in a periodical titled "Chemical Abstracts" (hereinafter simply referred to as "Chemical Abstracts"). As publicly known examples published in Chemical Abstracts included 20 to 60-mesh coral sand that is used for removing heavy metal from drainage (see pages 2 to 4 of the instructions dated September 13, 1984), the defendant, who is the applicant, amended Claim 1 as stated in the scope of claims of the U.S. Patent Right in B.(C) below in the written amendment submitted on February 13, 1985.

c. The defendant, who is the applicant, alleges a difference from prior art by noting in the part stating opinions in the aforementioned written amendment, that no issue of Chemical Abstracts instructs the use of coral sand powder as a mineral supplement (see page 5 of the written amendment dated February 13, 1985). The defendant also states as follows: "Therefore, no record document suggests the '50 to 500 mesh' requirement. This size is effective for intake of a mineral supplement in the human body" (same as above).

d. The reason for refusal was avoided through the aforementioned amendment, and the U.S. Patent Right was registered.

(C) Former representative P, who was the patentee of the U.S. Patent Right, died on September 16, 2001, and Q, who is P's wife, inherited the U.S. Patent Right after consultation for division of estate held by P's heirs (the entire import of the oral argument).

Q assigned the U.S. Patent Right to the defendant by a document dated December 24, 2002, and said assignment was registered with the United States Patent and Trademark Office on January 6, 2003 (Exhibits Otsu 14-1 to 14-3 and 23-1 to 23-3).

B. Content of the statements in the description of the U.S. Patent Right (hereinafter referred to as the "Description") (Exhibit Ko 3-1)

(A) Abstract

Coral sand obtained from the living skeletons or semi-fossils of hermatypic coral or hidden reef-building coral is ground into about 150 to 500 mesh, and the resulting coral sand powder is provided as drinkables or tablets for promotion of health.

(B) Outline of the invention (lines 48 to 57 in Section 1)

The present invention is based on the discovery that coral sand obtained by grinding living skeletons and semi-fossils of hermatypic coral or hidden reef-building coral (hereinafter referred

to as "hermatypic coral") contains calcium carbonate as a main component and a variety of minerals required by the human body in ecologically chemical portions. That is, the present invention is directed to a composition for promotion of health comprising coral sand as an effective component.

(C) Scope of claims (lines 35 to 40 in Section 4)

[Claim 1] (hereinafter this invention is referred to as the "Patented Invention," and segmented parts thereof are referred to as "Constituent Feature [A]" and "Constituent Feature [B]," respectively)

[A] A mineral supplement, comprising coral sand as an effective component in an amount sufficient to provide calcium carbonate and other minerals as a mineral supplement for humans;

[B] wherein said coral sand is in the form of a fine powder of a particle size passing about 150 to 500 mesh.

([Claim 2] to [Claim 20] are omitted)

(D) Description of the preferred embodiments

a. The composition of the present invention is characterized in that coral sand is contained as an effective component. Coral sand which is obtained from living skeletons and semi-fossils of hermatypic coral contains calcium carbonate ($CaCO_3$) as a main component (about 95%), magnesium, strontium, sodium, potassium, phosphorus, and chlorine, which are important bio-elements, and further essential inorganic vitamin elements, such as iron, copper, manganese cobalt, chromium, and boron (lines 64 to 68 in Section 1).

b. Naturally occurring coral sand is washed to be desalinated, and then the desalinated coral sand is disinfected and dried at temperatures of about 80°C to about 150°C, preferably 90°C to 120°C, and the disinfected and dried coral sand is ground into 150 to 500 mesh, preferably 200 to 450 mesh. This grinding can also be effected either by freeze drying the disinfected and dried coral sand at temperatures of about -180°C to -200°C in a nitrogen atmosphere, or in a state where coral sand has been kneaded together with seawater or fresh water (lines 48 to 57 in Section 2).

(3) Content of an email, etc. which Health Co. net, etc., which are the plaintiff's customers in the United States, received (incidentally, the parties disagree on the sender of the email, etc., as mentioned below)

A. Health Co. net received an email with the following content from Japan on March 2, 2000 (hereinafter the email dated said date is referred to as the "First Warning").

"The product called 'CORAL PLUS' handled by Health Co. net completely infringes U.S. Patent No. 4540584 and other rights of the defendant, and we request you to make a reply within seven days. Otherwise, we will immediately file an action with the U.S. court." (Exhibit Ko 4)

B. Around July 16, 2001, the person in charge at Health Nutrients, Inc., which is an affiliated company of Health Co. net, sent to R, who takes charge of the transaction of the Plaintiff's Product

in the United States, an email that describes the details of a meeting between Health Nutrients, Inc. and the defendant (Exhibit Ko 9-1).

The aforementioned email stated as follows: Health Nutrients, Inc. was shown by the defendant copies of the first one page of the judgment on the action to seek an injunction against the manufacturing and sale of a product rendered by the Naha District Court (1998 (Wa) 429) (Exhibit Ko 9-2) and the Product List attached to said judgment, and was then told that "In said judgment, the court determined that all the coral used for healthy food is protected by the global patent of Marine Bio Co., Ltd. (defendant in this action)" and "Marine Bio (defendant in this action) intends to claim rights against Coral Corporation (plaintiff in this action) because Coral Corporation has continued to ignore its notification of the fact that *Donan* (Plaintiff's Product) of Coral Corporation infringes the U.S. Patent Right, and Marine Bio is also preparing to file an action against Health Nutrients, Inc."

C. Health Co. net received a letter with the following content which is dated November 2, 2001 from Japan (Exhibit Ko 12) (hereinafter the letter dated said date is referred to as the "Second Warning")

The content thereof is as follows.

"We examined patent infringement committed by Coral Corporation (plaintiff in this action) with our patent attorney and consulting lawyer. We then felt sure that if we file an action against Coral Corporation, we would win the case. However, do you know the fact that if we file the action, both you and Coral Corporation will bear the costs of hundreds of thousands of dollars? We are sure that we will win this case, but our investigation revealed that Coral Corporation is never considered as being able to pay court costs and other expenses. Therefore, we would like to give you the advice that it would be a good solution for you to solve the dispute through negotiations with us out of court. As you also know, our company, Marine Bio (defendant in this action), has been a leading company in the domestic and overseas markets for coral and other goods for over about 40 years. We will never betray the trust of any of our customers who have ever conducted transaction with us. This is our company's spirit. We know that you will make a great decision. We look forward to doing much business with you."

No. 4 Issues

1. Issue 1: Defense before the merits (international jurisdiction over the action pertaining to paragraphs 1 and 3 of the objects of claims, existence or absence of the benefit of a declaratory judgment (benefit of an action), and existence or absence of the benefit of an action in relation to the action pertaining to paragraph 4)

2. Issue 2: Whether the sale of the Plaintiff's Product constitutes infringement of the U.S. Patent Right

3. Issue 3: Whether the defendant's act falls under the "act of making or circulating false

allegations" as prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act

4. Issue 4: Damages incurred by the plaintiff

(omitted)

No. 6 Court decision

1. Regarding Issue 1 (Defense before the merits)

(1) Regarding international jurisdiction (see Exhibits Ko 14 to 16)

A. Paragraphs 1 and 3 of the objects of claims are claims for a declaratory judgment on the non-existence of the right to seek an injunction against the act of selling the Plaintiff's Product in the United States based on the U.S. Patent Right. However, the defendant alleges that Japan does not have international jurisdiction over the action pertaining to the aforementioned claims by stating such as that the principle of territoriality is applicable to a patent right as a reason therefor. Therefore, this issue is first considered.

B. There is no internationally approved general rule for international jurisdiction, and international customary law has yet to be sufficiently mature. Therefore, it is reasonable to determine whether Japan is recognized as having international jurisdiction over a specific case based on impartiality between the parties and the principle of appropriateness and promptness of court proceedings in accordance with reason. Where any of the venues provided in the Code of Civil Procedure of Japan exists within Japan in relation to an action filed with the Japanese court, it is reasonable to affirm the international jurisdiction of Japan over said action unless there are special circumstances where reaching a judicial decision in Japan goes against impartiality between the parties or the principle of appropriateness and promptness of court proceedings (see the judgment of the Second Petty Bench of the Supreme Court of October 16, 1981, 1980 (O) 130, Minshu, Vol. 35, No. 7, at 1224, the judgment of the Second Petty Bench of the Supreme Court of June 24, 1996, 1993 (O) 764, Minshu, Vol. 50, No. 7, at 1451, and the judgment of the Third Petty Bench of the Supreme Court of November 11, 1997, 1993 (O) 1660, Minshu, Vol. 51, No. 10, at 4055).

Considering this in relation to this case, the defendant is a Japanese corporation having its head office in Japan, and the general venue for an action against the defendant exists in Japan (Article 4, paragraph (4) of the Code of Civil Procedure). Therefore, it is reasonable to affirm the international jurisdiction of Japan unless there are special circumstances as mentioned above.

C. The defendant alleges that the international jurisdiction of Japan is denied over the action pertaining to the aforementioned claims by stating that the principle of territoriality is applicable to a patent right as a reason therefor. However, the principle of territoriality of a patent right means

that each country's patent right is provided by the law of the relevant country in relation to its establishment, transfer, effect, etc. and that the effect of a patent right is recognized only in the territory of the relevant country (judgment of the Third Petty Bench of the Supreme Court of July 1, 1997, 1995 (O) 1988, Minshu, Vol. 51, No. 6, at 2299), and it is related to the effect of a patent right under substantive law and does not refer to international jurisdiction over an action concerning a patent right.

A claim for an injunction based on a patent right is a claim based on the property right of a private person. Therefore, whether the international jurisdiction of Japan should be affirmed should be determined in accordance with the aforementioned principle, deeming the relevant action as an action pertaining to an ordinary claim under private law. Where the general venue for an action against the defendant exists in Japan, the international jurisdiction of Japan is affirmed. For certain, the requirements for establishment of a patent right and effect thereof are provided by the law of each country from the perspective of the economic policy of the country, and are related to the policy determinations of the country to that extent. However, even if that point is taken into account in determining applicable law for an action to seek an injunction, it does not serve as a reason for denying the international jurisdiction of a country other than the country where said patent right has been registered (see the judgment of the First Petty Bench of the Supreme Court of September 26, 2002, 2000 (Ju) 580, Minshu, Vol. 56, No. 7, at 1551).

D. Incidentally, an action to seek a judgment that denies establishment of a patent right or invalidates a patent right is generally considered as falling under the exclusive jurisdiction of the country where the patent right has been registered. In an action to seek an injunction based on a patent right, the other party is often permitted to argue against the patentee's claim by alleging the invalidity of the relevant patent as a defense under positive law or case law. However, in such a case, even if the patentee's claim for an injunction is dismissed as said defense is deemed to have a reason, the determination that said patent is invalid is effective only between the parties to the action as a determination in the reasons in the judgment on said action to seek an injunction, and it does not invalidate said patent right in relation to third parties. Therefore, permission of said defense does not serve as a reason for denying the international jurisdiction of a country other than the country where said patent right has been registered, and even if the other party makes a defense of patent invalidity in an action to seek an injunction, it also does not serve as a reason for preventing performance of the proceedings of the relevant action at the court of a country other than the country where said patent right has been registered.

This case is one over the existence or non-existence of the right to seek an injunction based on a U.S. patent right. In the United States, it is provided in the statutory form that the other party may allege invalidity of a patent as a defense in an action to seek an injunction (Section 282(2) of the U.S. patent law). However, the relevant patent is not immediately invalidated in relation to

third parties due to a determination in the action that the patent is invalid.

E. This case is an action to seek a declaratory judgment on the non-existence of the right to seek an injunction based on a patent right, and it is also called an action to seek a negative declaratory judgment. However, the aforementioned point concerning an action to seek an injunction is also applicable to this case in the same manner.

Moreover, where the defendant files an action to seek an injunction against the plaintiff's sale of the Plaintiff's Product in the United States based on the U.S. Patent Right, it is considered that Japan, which is the location of the head office of the plaintiff that is the other party, or the United States, which is the country where said patent right has been registered and the act of infringement has been committed, can be recognized as having international jurisdiction over the action. However, in light of the fact that the head office of the defendant which is the patentee is located in Japan and other facts, it is not recognized that there is the circumstance where the defendant suffers more disadvantage from appearing in this action in Japan than from filing and conducting an action to seek an injunction in the United States. In consideration of this point, the plaintiff cannot be considered as having unjustly obtained the international jurisdiction of Japan by filing this action although the plaintiff filed this action to seek a declaratory judgment on the non-existence of the right to seek an injunction in advance of the defendant's filing of an action to seek an injunction.

F. On these bases, in this case, the general venue for an action against the defendant exists in Japan, and there are no special circumstances where reaching a judicial decision in Japan goes against impartiality between the parties or the principle of appropriateness and promptness of court proceedings. Therefore, the international jurisdiction of Japan should be affirmed.

(2) Regarding the existence or absence of the benefit of an action (benefit of a declaratory judgment) (paragraphs 1 and 3 of the objects of claims)

A. Regarding paragraphs 1 and 3 of the objects of claims

(A) Regarding the action to seek a declaratory judgment on the non-existence of the right to seek an injunction based on the U.S. Patent right, the defendant alleges that there is no benefit of a declaratory judgment because it is questionable whether a judgment on said action is approved in the United States.

However, as mentioned above, a country other than the country where a patent right has been registered is also recognized as having international jurisdiction over an action to seek an injunction based on a patent right. Therefore, if the court of a country having international jurisdiction, which is other than the country where the patent right has been registered, renders a judgment, said judgment should be approved and executed in other countries. This does not differ even in the country where the patent right has been registered. As mentioned above, even an action to seek a declaratory judgment on the non-existence of the right to seek an injunction based

on a patent right should be considered in the same manner as an action to seek an injunction in terms of international jurisdiction. Consequently, a declaratory judgment on the non-existence of the right to seek an injunction rendered by the court of a country having international jurisdiction other than the country where the patent right has been registered should be approved by other countries, including the country where the patent right has been registered, in the same manner as a judgment that dismisses an claim for an injunction which was rendered by the court of a country having international jurisdiction.

In that case, as Japan is recognized as having international jurisdiction over the action to seek a declaratory judgment on the non-existence of the right to seek an injunction based on the U.S. Patent Right in this case, if this court renders a judgment on this case and the judgment becomes final and binding, said judgment should be approved by other countries, including the United States, which is the country where the patent right has been registered, and the benefit of a declaratory judgment is not denied due to the reason alleged by the defendant.

Incidentally, regarding the approval and execution of a judgment rendered by a foreign court, the Code of Civil Procedure of Japan provides that a final and binding judgment rendered by a foreign court is valid only if it meets all of the following requirements: [i] the jurisdiction of the foreign court is recognized pursuant to laws and regulations, conventions, or treaties; [ii] the defeated defendant has been served (excluding service by publication or any other service similar thereto) with the requisite summons or order for the commencement of litigation, or has appeared without being so served; [iii] the content of the judgment and the litigation proceedings are not contrary to public policy in Japan; [iv] a guarantee of reciprocity is in place (Article 118 of the Code of Civil Procedure). Although there can be the opinion that a judgment rendered by the Japanese court should be expected to be approved and executed in a foreign country only if the aforementioned requirements provided in the Code of Civil Procedure of Japan are fulfilled, even based on such opinion, in this case, Japan is recognized as having international jurisdiction as mentioned above, the defendant appeared after receiving summons in an appropriate form, and the content of the plaintiff's claims and litigation proceedings under the Code of Civil Procedure of Japan are not contrary to public policy that is generally recognized in the international community. Moreover, a guarantee of reciprocity is in place between Japan and the United States, and the following is provided in the code of civil procedure (revised code) of Nevada (location of Health Co. net, which is the plaintiff's customer) in the United States, which falls under the place of the act of infringement: "17.350 (Filing and status of foreign judgments) An exemplified copy of any foreign judgment may be filed with the clerk of any district court of this state. The clerk shall treat the foreign judgment in the same manner as a judgment of the district court of this state. A judgment so filed has the same effect and is subject to the same procedures, defenses and proceedings for reopening, vacating or staying as a judgment of a district court of this state and

may be enforced or satisfied in like manner." (Exhibit Ko 52). On the other hand, there is a case in which a judgment rendered by the court of Nevada in the United States was approved as valid in Japan (judgment of the Tokyo District Court of December 16, 1991, 1991 (Wa) 6792, Hanrei Times, No. 794, at 246; Exhibit Ko 53).

(B) In addition, as mentioned above, the defendant can also file an action to seek an injunction against the plaintiff's sale of the Plaintiff's Product in the United States based on the U.S. Patent Right with the court in Japan, where a general venue for an action involving the plaintiff exists. However, if a declaratory judgment to the effect that the defendant does not have the right to seek an injunction against said plaintiff's sale based on the U.S. Patent Right is rendered in this case, it is possible to prevent the defendant from receiving a judgment that upholds such injunction at the Japanese court in the future owing to res judicata of said judgment. Therefore, it is also clear that the action pertaining to paragraph 1 of the objects of claims has the benefit of a declaratory judgment in this sense.

B. Regarding paragraph 3 of the objects of claims

(A) Paragraph 3 of the objects of claims is as follows: "The court shall declare that the defendant does not have the right to seek an injunction against the sale in the United States of the Plaintiff's Product by the plaintiff's customers in the United States based on the Patent Right." It seeks a declaratory judgment concerning the legal relationship between the defendant and a third party other than the parties to this action, specifically, between the defendant and the plaintiff's customers in the United States.

It is permitted to file an action to seek a declaratory judgment as an action involving the benefit of an immediate final and binding judgment only if it is necessary and appropriate for the settlement of a dispute with the defendant to make the judgment being final and binding in relation to a certain legal relationship. Regarding an action to seek a declaratory judgment concerning the legal relationship with a third party other than the parties to the action, the benefit of a declaratory judgment is not always denied, and it should be said that the benefit of a declaratory judgment can be affirmed if the legal relationship with said third party directly affects the plaintiff's rights and obligations. However, this case is on a dispute between the plaintiff and the defendant over the issue of whether the Plaintiff's Product falls within the technical scope of the U.S. Patent Right, and this issue should be settled by paragraph 1 of the objects of claims (The court shall declare that the defendant does not have the right to seek an injunction against the plaintiff's sale of the Plaintiff's Product in the United States based on the patent right in question.). In addition, even if a judgment is rendered concerning paragraph 3 of the objects of claims, it does not have any legal effect on the relationship between the defendant and the plaintiff's customers in the United States, and it cannot prevent the defendant from receiving a judgment that upholds an injunction against said customers at the court of the United States, etc. owing to its res judicata.

On these bases, it cannot be said that there is the benefit of an action for the action pertaining to paragraph 3 of the objects of claims.

(B) The plaintiff alleges that there is the benefit of a declaratory judgment because if a declaratory judgment concerning paragraph 3 of the objects of claims becomes final and binding, the plaintiff can freely sell the Plaintiff's Product to the plaintiff's customers in the United States and the business reputation of the plaintiff and its customers is restored. However, as mentioned above, even if a judgment is rendered concerning paragraph 3 of the objects of claims, it does not have any legal effect on the relationship between the defendant and the plaintiff's customers in the United States. Therefore, the circumstance alleged by the plaintiff refers to a mere de facto or reflex effect. Consequently, it cannot be said based on the circumstance alleged by the plaintiff that there is the benefit of an immediate final and binding judgment.

C. On these bases, it should be said that there is the benefit of a declaratory judgment for the action pertaining to paragraph 1 of the objects of claims, but it cannot be said that there is the benefit of a declaratory judgment for the action pertaining to paragraph 3 of the objects of claims. Therefore, the action pertaining to paragraph 3 of the objects of claims should be dismissed as an unlawful one.

(3) Paragraph 4 of the objects of claims

A. The defendant alleges that paragraph 4 of the objects of claims is a claim for the relationship of rights between the defendant and third parties, which are the plaintiff's customers, and that the plaintiff has no standing.

B. However, paragraph 4 of the objects of claims is to seek an injunction against the defendant's act under Article 3, paragraph (1) of the Unfair Competition Prevention Act on the grounds that the defendant's act falls under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) of said Act. Said claim is premised on the allegation that the "defendant's act of making or circulating, from Japan to the plaintiff's customers in the United States, the allegation that the act of selling the Plaintiff's Product in the United States by said customers constitutes infringement of the U.S. Patent Right" falls under the "act of making or circulating false allegations that harm the business reputation of another person" as referred to in Article 2, paragraph (1), item (xiv) of said Act. That is, in this case, the plaintiff alleges that the content of the allegation that the "act of the plaintiff's customers in the United States of selling the Plaintiff's Product in the United States constitutes infringement of the U.S. Patent Right" falls under false allegations that harm the business reputation of the plaintiff, who is a business competitor of the defendant, and that the act of making or circulating such allegation falls under the act of unfair competition that harms the plaintiff's business reputation. Based on these allegations, the plaintiff makes the claim stated in paragraph 4 of the objects of claims.

Therefore, in this case, whether the defendant has committed the act of unfair competition

against the plaintiff should be determined by examining whether the defendant has made or circulated an allegation as mentioned above and whether the aforementioned content of allegation falls under false allegations that harm the plaintiff's business reputation. That is, the plaintiff makes the claim stated in paragraph 4 of the objects of claims, seeking an injunction against the defendant's act of unfair competition against the plaintiff, and does not make the claim in relation to the relationship of rights between the defendant and third parties. Consequently, the defendant's allegation that the plaintiff has no standing for the claim stated in paragraph 4 of the objects of claims is a criticism made without correctly understanding the content of said plaintiff's claim and is thus unacceptable.

2. Regarding Issue 2 (whether the sale of the Plaintiff's Product constitutes infringement of the U.S. Patent Right)

(1) Regarding applicable law

Paragraph 1 of the objects of claims is as follows: "The court shall declare that the defendant does not have the right to seek an injunction against the plaintiff's sale of the Plaintiff's Product in the United States based on the U.S. Patent Right." This is the issue of whether the defendant has the right to seek an injunction against the plaintiff's act in the United States based on the right granted under the U.S. patent law, and it includes foreign affairs-related elements. Therefore, it is necessary to determine applicable law.

A claim for an injunction based on a U.S. patent right differs from a claim based on an act of tort, which is intended to compensate past damages incurred by a victim, in terms of purpose and character, and it should be considered as being based on the monopolistic and exclusive effect of the U.S. patent right. Therefore, the nature of its legal relationship should be determined in accordance with the effect of the patent right. There is no direct provision on applicable law for the effect of a patent right in laws and regulations, etc.; applicable law should be determined based on reason. It is reasonable to understand that a country which has the closest relationship with a patent right is the country where said patent right has been registered, taking into account that [i] a patent right is recognized as a right after going through filing of an application and registration in each country, [ii] many countries adopt the principle of territoriality for a patent right, and according to said principle, a patent right in each country is provided in relation to its establishment, transfer, effect, etc. by the law of the country and the effect of a patent right is recognized only within the territory of the country, and [iii] a country where protection of a patent right is required is the country where the patent right has been registered as long as the effect of a patent right is recognized only within the territory of the country. Therefore, it is reasonable to understand that applicable law is the law of the country where the patent right has been registered, which has the closest relationship with the patent right (see the judgment of the First Petty Bench of the Supreme Court of September 26, 2002, 2000 (Ju) 580, Minshu, Vol. 56, No. 7, at 1551).

14

Therefore, the U.S. patent law is applicable law for the claim stated in paragraph 1 of the objects of claims.

(2) Regarding the provisions of the U.S. patent law

Section 271(a) of the U.S. patent law provides that "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Section 283 of said law also provides that "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

Therefore, in this case, it is determined whether the sale of the Plaintiff's Product constitutes infringement of the U.S. Patent Right and whether the defendant has the right to seek an injunction against the plaintiff in accordance with Section 271(a) and Section 283 of the U.S. patent law.

(3) Method of determining patent infringement under the U.S. patent law

In an infringement action under the U.S. patent law, whether the product subject to a determination concerning establishment or non-establishment of infringement (hereinafter referred to as the "subject product") falls within the technical scope of a patented invention and whether the sale, etc. of the subject product constitutes patent infringement are basically determined by the following method (Exhibit Ko 19 [same as Exhibit Otsu 10], Exhibit Otsu 7, etc., and the entire import of the oral argument).

A. Literal infringement

In the case where the statement of the scope of claims (claims) in the description is segmented into constituent features (elements) and the structure of the subject product is compared with those constituent features in accordance with the following principle, if the subject product fulfills the wording of the constituent features, the subject product falls within the technical scope of the patented invention.

[i] All element rule: As there is no constituent feature that is not important, infringement is established only where the allegedly infringing product fulfills all the constituent features of the claims.

[ii] Element by element: Each constituent feature must be independently compared.

B. Infringement by the doctrine of equivalents

Even where literal infringement is not established, if the subject product fulfills a function that is identical with that of a patented invention by a substantially identical method and produces a result that is identical with that of the patented invention, the subject product falls within the technical scope of the patented invention as an equivalent to the patented invention.

However, if any of the constituent features of the claims is limited in relation to patentability

15

in the prosecution history, enlargement of the right by the doctrine of equivalents is not permitted in relation to the relevant constituent feature.

In this regard, in the U.S. Supreme Court judgment on the Festo case (Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 62 U.S.P.Q. 2d 1705, 1713, 122 S. Ct. 1831 (2002)), the court rules as follows: "Where a constituent feature of a claim is amended for a reason related to patentability and the amendment is intended to narrow the scope of right, the court presumes that the 'patentee surrendered all subject matter between the broader and the narrower language.'" The patentee is obliged to show that the particular equivalent in question has not been surrendered by the amendment. Furthermore, in said judgment, the court rules as follows: "when the court is unable to determine the purpose underlying a narrowing amendment-and hence a rationale for limiting the estoppel to the surrender of particular equivalents-the court should presume that the patentee surrendered all subject matter between the broader and the narrower language." Then, the court cites the following as the cases "where the amendment cannot reasonably be viewed as surrendering a particular equivalent": "(a) The equivalent may have been unforeseeable at the time of the application; (b) the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or (c) there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." The court then holds that the patentee can be immune to the limitation on establishment of equivalence by prosecution history estoppel.

(4) Whether the sale, etc. of the Plaintiff's Product constitutes infringement of the U.S. Patent Right

Whether the Plaintiff's Product falls within the technical scope of the Patented Invention (invention claimed in Claim 1 of the U.S. Patent Right) is determined by the aforementioned determination method.

A. Content of the statements in the Description (Exhibit Ko 3-1; description pertaining to the U.S. Patent Right)

As stated in facts on which the decision is premised (No. 3, 2.(2)B.) above, the following is stated in the Description.

(A) Abstract

Coral sand obtained from living skeletons or semi-fossils of hermatypic coral or hidden reef-building coral is ground into about 150 to 500 mesh, and the resulting coral sand powder is provided as drinkables or tablets for promotion of health.

(B) Outline of the invention (lines 48 to 57 in Section 1)

The present invention is based on the discovery that coral sand obtained by grinding living skeletons and semi-fossils of hermatypic coral or hidden reef-building coral (hereafter referred to as " hermatypic coral") contains calcium carbonate as a main component and a variety of minerals

required by the human body in ecologically chemical proportions. That is, the present invention is directed to a composition for promotion of health comprising coral sand as an effective component.

(C) Scope pf claims (lines 35 to 40 in Section 4)

[Claim 1] (Patented Invention)

A mineral supplement, comprising coral sand as an effective component in an amount sufficient to provide calcium carbonate and other minerals as a mineral supplement for humans; wherein said coral sand is in the form of a fine powder of a particle size passing about 150 to 500 mesh.

(D) Description of the preferred embodiments

a. The composition of the present invention is characterized in that coral sand is contained as an effective component. Coral sand which is obtained from living skeletons and semi-fossils of hermatypic coral contains calcium carbonate ($CaCO_3$) as a main component (about 95%), magnesium, strontium, sodium, potassium, phosphorus, and chlorine, which are important bio-elements, and further essential inorganic vitamin elements such as iron, copper, manganese cobalt, chromium, and boron (lines 64 to 68 in Section 1).

b. Naturally occurring coral sand is washed to be desalinated, and then the desalinated coral sand is disinfected and dried at temperatures of about 80°C to about 150°C, preferably 90°C to 120°C, and the disinfected and dried coral sand is ground into 150 to 500 mesh, preferably 200 to 450 mesh. This grinding can also be effected either by freeze drying the disinfected and dried coral sand at temperatures of about -180°C to -200°C in a nitrogen atmosphere, or in a state where coral sand has been kneaded together with seawater or fresh water (lines 48 to 57 in Section 2).

B. Whether the Plaintiff's Product fulfills Constituent Feature [A]

Regarding fulfillment of Constituent Feature [A], the plaintiff alleges, in relation to the interpretation of "coral sand," that coral sand means natural coral sand taken from the seabed as a raw material and that it is required to be a particle of the size that belongs to the category of "sand" at the stage before being processed into fine powder. Therefore, this point is considered.

(A) In the claims, there is no definition of "coral sand" itself. Therefore, the meaning of coral sand is interpreted by referring to the general meaning of the term stated in dictionaries, the statements in the Description other than the claims, and the prosecution history, etc. (according to Exhibit Ko 19, Exhibit Otus 7, etc., this is also a general method for claim interpretation under the U.S. patent law).

a. The following is stated in the "Outline of the invention" section in the Description (Exhibit Ko 3; description pertaining to the U.S. Patent Right): "The present invention … coral sand obtained by grinding living skeletons and semi-fossils of hermatypic coral or hidden reef-building coral (hereafter referred to as "hermatypic coral") … calcium carbonate as a main component and a

17

variety of minerals required by the human body …" (lines 49 to 55 in Section 1). The following is stated in the "Description of the preferred embodiments" section: "Coral sand obtained by grinding living skeletons and semi-fossils of hermatypic coral or hidden reef-building coral contains calcium carbonate ($CaCO_3$) as a main component (about 95%), magnesium …, which are important bio-elements, and further essential inorganic vitamin elements …" (lines 64 in Section 1 to line 3 in Section 2); "These elements shown in Table 1 above (boron, sodium, magnesium …) which are contained in typical examples of naturally occurring coral sand are accumulated and calcified through life activity of hermatypic coral that is coelenterate. Accordingly, coral sand has an ecologically chemical proportion, unlike food additives such as calcium carbonate and the like obtained purely by chemical treatment" (lines 33 to 39 in Section 2); "The hermatypic coral used as a raw material for preparing coral sand is known to be the leading part in building coral reef because of skeletogenesis or calcification promoted by the action of Zooxanthella or endozoic algae present in its body" (lines 58 to 62 in Section 2). There is no other statement to the effect that coral sand obtained from hermatypic coral fossil is excluded from coral sand in the Description.

Moreover, according to Exhibit Ko 23, there is the following statement in *Iwanami seibutsugaku jiten dai 2 han* (Iwanami biology dictionary, 2nd edition) (first copy published on July 5, 1977 and fifth copy published on November 20, 1981): "*Sangoshō* [coral reef in English; recif corallien in French …]: This term means limestone reef made by the accumulation of the remains of calcareous-secreting organisms, mainly hermatypic coral. Coral reef limestone is formed through the process wherein skeletons of hermatypic coral serve as the core, skeleton pieces of calcareous algae, shellfish, echinus, crustacean, foraminifers, etc. fill in the voids, and the entirety thereof is bonded and solidified by melobesioid algae." (No evidence sufficient to recognize that an explanation different from this is given in a U.S. wordbook or dictionary has been submitted.)

b. Regarding "sand" of coral sand, the Description states it merely as "coral sand" (lines 57 and 64 in Section 1, etc.). In addition, in the "Description of the preferred embodiments" section, coral sand after being ground into 150 to 500 mesh is also described as follows: "The finely divided coral sand powder thus obtained is extremely finely porous and has high solubility in water. The coral sand powder thus obtained…" (lines 3, 5, and 8 in Section 3).

On the other hand, according to Exhibit Otsu 4, "sand" is described as follows in *Kōjien dai 2 han hoteiban* (*Kōjien*, 2nd edition, amended version) (first copy published on December 1, 1976): "Fine particles of rocks; mainly consisting of particles of various kinds of minerals; ordinarily referring to those whose diameter is 2 mm or less and one-sixteenth mm or more." (No evidence sufficient to recognize that an explanation different from this is given in a U.S. wordbook or dictionary has been submitted.)

(B) In light of the above, the term "coral sand" is understood as meaning coral sand, which mainly comprises calcium carbonate and contains minerals, such as boron, sodium, and magnesium, and is obtained in nature, differently from calcium carbonate artificially prepared by chemical synthesis. There is no reason for interpreting "coral sand" particularly as coral sand taken from the seabed.

Moreover, the plaintiff alleges that "coral sand" is required to be a particle that belongs to the category of "sand" at the stage before being processed into fine powder. However, for the Patented Invention, Constituent Feature [B] states that "coral sand is in the form of a fine powder of a particle size passing about 150 to 500 mesh" in the state of a mineral supplement, but in light of the statement concerning "coral sand powder" in the Description, "coral sand" is not required to be in the shape of a particle of a specific size at the stage before being processed into the form of fine powder. Therefore, the term "sand" in Constituent Feature [A] should be understood as having a meaning merely as the generic name of particles obtained by breaking up rocks.

(C) Considering whether the Plaintiff's Product fulfills the requirement of "coral sand" in Constituent Feature [A] on that basis, as stated in the aforementioned facts on which the decision is premised (No. 3, 2.(1)A), the Plaintiff's Product is manufactured by grinding a mass of coral fossil obtained from coral fossil (limestone) mine, which was originally coral reef that heaved on shore. The main component thereof is calcium carbonate, which is a component deriving from coral insects (coelenterate), and the Plaintiff's Product also comprises sodium, potassium, magnesium, manganese, silicon, etc.

Therefore, the Plaintiff's Product is also one obtained by grinding limestone rocks deriving from coral reefs, whose main component is calcium carbonate and which also comprises minerals. Therefore, it does not differ from coral sand obtained in nature in this regard, and it thus fulfills the requirement of "coral sand" in Constituent Feature [A].

C. Whether the Plaintiff's Product fulfills Constituent Feature [B]

(A) Regarding the meaning of "a particle size passing about 150 to 500 mesh" in Constituent Feature [B]

The defendant alleges as follows: Constituent Feature [B] defines coral sand as being "in the form of a fine powder of a particle size passing about 150 to 500 mesh," and the term "mesh" does not directly define the particle diameter of fine powder but defines the range of a "sieve" for selecting the fine powder; the Plaintiff's Product fulfills Constituent Feature [B] as it also passes a sieve of said mesh.

Therefore, the meaning of "a particle size passing about 150 to 500 mesh" in Constituent Feature [B] is considered.

Looking at the prosecution history of the Patent Right, as stated in the aforementioned facts on which the decision is premised (No. 3, 2.(2)A), Claim 1 at the time of the filing of the

application for the U.S. Patent Right defined the invention merely as a "component for promotion of health comprising coral sand as an effective component," and put no limitation on the particle size of coral sand. However, the defendant was notified of the existence of publicly known examples by the examiner and amended the definition in Claim 1 to a "mineral supplement passing about 150 to 500 mesh." The defendant stated, in that written amendment, that "This size is effective for intake of a mineral supplement in the human body" (see page 5 of the written amendment dated February 13, 1985), and in the "Description of the preferred embodiments" section in the Description, the defendant also stated that "(the disinfected and dried coral sand) is ground into 150 to 500 mesh, preferably 200 to 450 mesh " (lines 51 to 52 in Section 2) (2.(2)B.(D) in the aforementioned facts on which the decision is premised). Therefore, it is obvious that the defendant put limitation on the particle size of coral sand that is effective for intake in the human body by the aforementioned numerical values (incidentally, in this regard, the defendant itself also explained as follows on page 13 of Defendant's Brief (6) dated February 28, 2003: "The original Claim 1 was amended to be narrowed down to coral sand of a specific particle size. In particular, the particle size was narrowed down to one passing about 150 to 500 mesh."). If the term "mesh" defines a range of the "sieve" as alleged by the defendant, there will be no meaning of setting the upper limit numerical value (500 mesh), and this is not reasonable.

According to the above, it is reasonable to understand that "about 150 to 500 mesh" in Constituent Feature [B] defines the particle size for which these numerical values are the lower and upper limits.

(B) Regarding the particle size of the Plaintiff's Product

Regarding the particle size of the Plaintiff's Product, on July 17, 2002, which is the date of the second preparatory proceedings, the defendant stated that "The particle size of the product in question is recognized as around 5,000 mesh" (record of said preparatory proceedings). However, after that, on page 14 of Defendant's Brief (6) dated February 28, 2003 and on page 6 of Defendant's Brief (7) dated April 14, 2003, the defendant alleged that the analysis of the Plaintiff's Product revealed the fact that 13% of the Plaintiff's Product are of a particle size included in the range of "about 150 to 500 mesh" stated in Constituent Feature [B]. Then, the defendant alleged as follows: The defendant recognized the particle size of the Plaintiff's Product as being about 5,000 mesh on the date of the second preparatory proceedings only in relation to the Plaintiff's Product stated in Exhibit Ko 6, and the defendant does not recognize that all the other Plaintiff's Products are identical with this. In response to this, the plaintiff alleged on page 2 of the plaintiff's Fifth Brief dated February 28, 2003 that an admission has been established in relation to the point that the particle size of the Plaintiff's Product is "about 5,000 mesh" and that the defendant is not permitted to revoke the admission.

The particle size of the Plaintiff's Product is an extremely important fact in comparing the

Plaintiff's Product with the constituent features of the Patented Invention when determining whether the Plaintiff's Product falls within the technical scope of the U.S. Patent Right, and it should be considered as the fact in issue. Therefore, the admission is established in terms of the aforementioned point. Consequently, the defendant should be considered as not being permitted to revoke the admission unless it proves that the aforementioned admission contradicts reality and is based on a mistake.

On these bases, according to Exhibit Ko 8 (JIS standard specification for sieves: detailed table) and Material [ii] attached to Exhibit Otsu 16 (reference characteristic values for major standard sieves and comparative table), a "particle size passing about 150 to 500 mesh" is one that is converted into "about 100 to 27 μm."

In this regard, the defendant alleges that about 13% of the Plaintiff's Product are of a particle size of about 100 to 27μm in terms of the total different value, and submits Exhibit Otsu 16 (report prepared by the defendant company). However, the defendant alleges that samples used as the subject of experiment in Exhibit Otsu 16 are "Coral Calcium," a coral powder product handled by Health Co. net (current Coral Inc.), which the defendant obtained from its customer, Stauber Performance Ingredients, Inc., USA. However, taking into account the fact that the name of the product under which Health Co. net imported and handled the Plaintiff's Product is "Coral Plus" (Exhibit Ko 2), it should be said that it has not been proven that the aforementioned "Coral Calcium" is a product identical with "Coral Plus," and it is thus doubtful whether the Plaintiff's Product was inspected. Therefore, the experiment result indicated in Exhibit Otsu 16 is unacceptable. In that case, it has not been proved that the aforementioned defendant's admission contradicts reality and is based on a mistake. Therefore, the revocation of the admission is not permitted. Consequently, it should be premised that the particle size of the Plaintiff's Product is about 5,000 mesh, and therefore, the Plaintiff's Product thus does not fulfill Constituent Feature [B].

In addition, according to Exhibit Ko 7 (test report prepared by the Japan Food Research Laboratories), as a result of measurement of particle size distribution of the Plaintiff's Product by the Japan Food Research Laboratories, in terms of particle mass, 0.010% of the Plaintiff's Product has a particle size of 28.012 to 22.908 μm, and over 99.9% thereof has a particle size of 22.908 μm or less and 0.274 μm or more. Over 90% of the whole Plaintiff's Product has a particle size of 10.246μm or less, and the intermediate value is recognized as a product having a particle size of 3 μm (about 5,000 mesh in light of the aforementioned conversion table (Exhibit Otsu 16)). In general, in the case of indicating the particle size of a product in the field to which the Plaintiff's Product belongs, the average value (intermediate value) of the particle size of the product is recognized as the particle size of the product. In that case, the particle size of the Plaintiff's Product is 3 μm (about 5,000 mesh) as mentioned above. Therefore, Constituent Feature [B] is not fulfilled

(incidentally, even if the subject of experiment of the aforementioned Exhibit Otsu 16 is the Plaintiff's Product, over 90% thereof has a particle size of 27 μm or less according to the experiment result of Exhibit Otsu 16 (the total of the difference values of the particle size that exceeds 27 μm is 6.755%; in this regard, the defendant alleges that the total is about 13%, but the defendant is recognized as misreading the table), and the average value is 3.899 μm; therefore, at any rate, the particle size of the Plaintiff's Product does not fulfill Constituent Feature [B]).

D. Regarding establishment or non-establishment of infringement by the doctrine of equivalents

As mentioned above, the Plaintiff's Product does not fulfill Constituent Feature [B], and literal infringement is thus not established.

The defendant alleges that even if literal infringement is not established for the Plaintiff's Product, the Plaintiff's Product falls within the technical scope of the Patented Invention as an equivalent to the structure of the Patented Invention. Therefore, this point is determined.

(A) As mentioned above ((3)B. above), even where literal infringement is not established, if the subject product fulfills a function that is identical with that of a patented invention by a substantially identical method and produces a result that is identical with that of the patented invention, the subject product falls within the technical scope of the patented invention as an equivalent to the patented invention. However, if a constituent feature of the claims is limited in relation to patentability in the prosecution history, enlargement of rights by the doctrine of equivalents is not permitted in relation to said constituent feature.

Considering this in relation to this case, the Description states as follows in relation to coral sand powder: "Coral sand which is obtained from living skeletons and semi-fossils of hermatypic coral contains calcium carbonate ($CaCO_3$) as a main component (about 95%), magnesium, strontium, sodium, potassium, phosphorus, and chlorine, which are important bio-elements, and further essential inorganic vitamin elements such as iron, copper, manganese cobalt, chromium, and boron." (lines 64 to 68 in Section 1); "… may be dissolved in water (the powder dissolves in the form of ions) as it is and the resulting solution can be provided as drinking water. Alternatively, the fine powder of the coral sand may be formulated as granules, tablets, emulsions, pills …, etc. …" (lines 5 to 11 in Section 3); "the coral sand powder per se may also be used as additives to various foodstuffs" (lines 24 to 25 in Section 3). In addition, there are also the following statements: "The composition for promotion of health in accordance with the present invention is useful for replenishing especially calcium. In addition, … can also replenish magnesium, strontium, potassium, phosphorus, copper, etc., which are bio-elements, and further essential inorganic vitamin elements such as iron, manganese, potassium, etc." (lines 26 to 33 in Section 3); "… the composition for promotion of health of the present invention can improve diet wherein acidic foodstuffs are apt to be preferred. In particular, calcium which tends to be lacking in babies and children can be spontaneously replenished and at the same time, the so-called inorganic

vitamin elements can be provided … thus contributing to promotion of health." (line 63 in Section 3 to line 2 in Section 4)

On these bases, the Patented Invention provides a supplement comprising fine coral sand powder that is useful for promotion of health by having calcium and essential minerals or vitamins, etc. be taken into the human body by methods such as dissolving it in water and adding it to foodstuffs.

On the other hand, as stated in the aforementioned facts on which the decision is premised (No. 3, 2.(1)A), there are various types of usage of the Plaintiff's Product, such as adding it together with nutrient sources (vitamin, etc.) to foodstuffs to enhance their nutritional value, not limited to eating it in the original form of powder as a nutrient source. The Plaintiff's Product comprises calcium carbonate, sodium, potassium, magnesium, manganese, and silicon as its components, and these components are considered to be useful for promotion of health.

Therefore, in terms of coral sand powder, the Plaintiff's Product produces a function (effect) and result that are identical with those of the Patented Invention to the extent that it provides a supplement that is useful for promotion of health by having calcium and essential minerals or vitamins, etc. be taken into the human body by methods that are identical with those of the Patented Invention, such as dissolving the Plaintiff's Product in water and adding it to foodstuffs. Therefore, it can be said that there is room to evaluate the Plaintiff's Product as an equivalent to the Patented Invention unless the particle size (about 5,000 mesh) of the Plaintiff's Product causes some sort of significant difference in terms of dissolution of coral powder in water or absorption of calcium and essential minerals or vitamins, etc. into the human body in comparison with the particle size of the coral sand of the Patented Invention, that is, about 150 to 500 mesh.

(B) However, on the other hand, looking at the prosecution history of the U.S. Patent Right, as stated in the aforementioned facts on which the decision is premised (No. 3, 2.(2)A), Claim 1 at the time of the filing of the application for the U.S. Patent Right defined the invention merely as a "component for promotion of health comprising coral sand as an effective component," and put no limitation on the particle size of coral sand. However, the defendant was notified of the existence of publicly known examples of "20 to 60 mesh coral sand that is used for removing heavy metal from drainage" stated in Chemical Abstracts by the examiner, and amended the definition in Claim 1 to [state] a "mineral supplement passing about 150 to 500 mesh." In addition, in the written amendment, the defendant stated that "No record document suggests the '50 to 500 mesh' requirement. This size is effective for intake of a mineral supplement in the human body" (see page 5 of the written amendment dated February 13, 1985). Moreover, in the "Description of the preferred embodiments" section in the Description, the defendant also states that "(the disinfected and dried coral sand) is ground into 150 to 500 mesh, preferably 200 to 450 mesh" (lines 51 to 52 in Section 2) (2.(2)B.(D) in the aforementioned facts on which the decision is

23

premised). Therefore, it is obvious that the defendant put limitation on the particle size of coral sand that is effective for intake in the human body by the aforementioned numerical values (incidentally, in this regard, the defendant itself explained as follows on page 13 of Defendant's Brief (6) dated February 28, 2003: "The original Claim 1 was amended to be narrowed down to coral sand of a specific particle size. In particular, the particle size was narrowed down to one passing about 150 to 500 mesh").

Therefore, if the defendant alleges that coral sand of a particle size outside the range limited by Constituent Feature [B] falls within the technical scope of the Patented Invention through application of the doctrine of equivalents, the defendant is required to positively allege and prove that it has not waived coral sand of a particle size outside said range by the aforementioned amendment. For example, the defendant is required to allege and prove that this case falls under any of the cases where "(a) the equivalent may have been unforeseeable at the time of the application, (b) the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question, or (c) there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question."

In light of the aforementioned prosecution history of the U.S. Patent Right, it is obvious that 150 mesh, which is the lower limit value of the particle size provided by Constituent Feature [B], was newly provided through the amendment in order to avoid the loss of patentability due to conflict with publicly known examples because there was 20 to 60 mesh coral sand as publicly known examples (the defendant also agrees on this point). On the other hand, regarding 500 mesh, which is the upper limit numerical value of the particle size provided by Constituent Feature [B], the reason that said numerical value was newly provided at the time of the amendment is not necessarily clear. In this regard, the defendant alleges as follows: At the time of the filing of the application for the U.S. Patent Right, there was no commercially available machine which could grind into 500 mesh or smaller, and a fine grinding mill called jet mill was introduced after the filing of the application for the U.S. Patent Right; therefore, it was unpredictable that a particle size of 5,000 mesh would become available in the future. However, no evidence that is sufficient to recognize such fact has been submitted. In addition, as mentioned above, taking into account the fact that the defendant stated in the written amendment (on page 5 of the written amendment dated February 13, 1985) that "This size is effective for intake of a mineral supplement in the human body," it is estimated that the particle size of coral sand has some sort of effect on water solubility and intake in the human body. In consideration of the fact that the particle size of the Plaintiff's Product is about 5,000 mesh and the Plaintiff's Product is a fine particle that is about over ten times as small as the Patented Invention, it is impossible to conclude that the rationale underling the provision of the numerical value, 500 mesh, as the upper limit of the particle size

through the amendment has no relationship to a difference from the Plaintiff's Product. Furthermore, it cannot be said that there is a reason suggesting that the defendant could not reasonably be expected to have provided only the lower limit numerical value, 150 mesh, as the particle size without providing the upper limit numerical value, 500 mesh.

On these bases, in this case, the defendant cannot be considered as having proven that coral sand of a particle size outside the range limited by Constituent Feature [B] is not waived through the amendment. Therefore, infringement by the doctrine of equivalents is not established for the Plaintiff's Product.

(5) Summary

On these bases, the Plaintiff's Product does not fall within the technical scope of the Patented Invention. Therefore, the act of selling or otherwise handling the Plaintiff's Product in the United States does not constitute infringement of the U.S. Patent Right.

Consequently, the defendant does not have the right to seek an injunction against the plaintiff's sale of the Plaintiff's Product in the United States based on the U.S. Patent Right without the need of making a determination concerning whether there is a ground for invalidation of the U.S. Patent Right.

Therefore, among the plaintiff's claims in this action, there is a reason for the claim for a declaratory judgment to the same effect (paragraph 1 of the objects of claims).

3. Regarding Issue 3 (whether the defendant's act falls under the "act of making or circulating false allegations" as prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act)

(1) Regarding applicable law, etc. for the claims stated in paragraphs 2, 4, and 5 of the objects of claims

The claims stated in paragraphs 2 and 4 of the objects of claims are to seek an injunction against the defendant's act of making or circulating an allegation to the plaintiff's customers in the United States, deeming said act to fall under the act of business defamation. The claim stated in paragraph 5 of the objects of claims is to seek compensation for damages on the grounds of said act of business defamation.

It is obvious that Japan, where the general venue for an action against the defendant exists, has international jurisdiction over the action pertaining to the aforementioned claims (the defendant also agrees on this point). However, the aforementioned act of business defamation alleged by the plaintiff can be considered as being in the legal relationship including foreign affairs-related elements in that it is an action committed by the defendant against the plaintiff's customers in the United States. Therefore, it is necessary to determine applicable law.

Out of the aforementioned claims, the right to seek an injunction stated in paragraphs 2 and 4 of the objects of claims is a statutory claim that naturally arises between competitors from a legal

standpoint due to the occurrence of an act of business defamation. The right to claim compensation for damages stated in paragraph 5 of the objects of claims is a claim arising from an act of tort. Application of laws to these is provided by Article 11, paragraph (1) of the Act on General Rules for Application of Laws, and law at the place of occurrence of the fact that serves as the cause of the right to claim is applicable law. In this case, the plaintiff alleges that the defendant gave warnings from Tokyo, where its head office is located, to the plaintiff's customers in the United States by email and letter. Based on this allegation, the plaintiff seeks an injunction against the defendant's act of making or circulating allegations from Japan to the plaintiff's customers in the United States and compensation for damages. Therefore, the place of occurrence of the fact that serves as the cause is the place where the defendant transmitted or sent the email or letter, and the law of Japan is thus applicable law. Consequently, a determination is to be made on whether the defendant's act falls under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act.

(2) Regarding the defendant's act against the plaintiff's customers in the United States

The following facts are recognized, comprehensively taking into account the aforementioned facts on which the decision is premised (No. 3, 2.(3)), pieces of evidence mentioned later, and the entire import of the oral argument.

A. On March 2, 2000, the defendant sent an email from Japan to Health Co. net located in the United States while setting the sender as "MARINE BIO CO., LTD <mb-co@mxg.mesh.ne.jp>," the receiver as "<info@healthco.net>," and the subject matter as "Warning" (First Warning).

The content of the email is as follows: "The product called 'CORAL PLUS' handled by Health Co. net completely infringes U.S. Patent No. 4540584 and other rights of the defendant, and we request you to make a reply within seven days. Otherwise, we will immediately file an action with the U.S. court." R, who takes charge of affairs relating to the plaintiff in the United States, copied the content of the aforementioned email and requested the plaintiff to solve the problem at an early date after hearing a patent attorney's opinion because the customer appeared to be very embarrassed (Exhibit Ko 4).

B. The patent attorney commissioned by the plaintiff sent to the defendant a letter dated April 10, 2000. The following content was stated in said letter: "We make a reply in relation to a letter of warning of patent infringement sent to the customer of Kabushiki Kaisha Coral Corporation in the United States (infor@healthco.net) by email on March 2 of this year."; "According to the claims of the U.S. Patent Right, the particle size is between about 150 to 500 mesh, and the product exported by the plaintiff is out of the claims as it is an ultrafine particle whose size is about 5,000 mesh" (Exhibit Ko 5).

C. Furthermore, the aforementioned patent attorney commissioned by the plaintiff sent to the patent attorney commissioned by the defendant a test report prepared by the Japan Food Research

Laboratories (Exhibit Ko 7) showing that the Plaintiff's Product is an ultrafine particle whose size is about 5,000 mesh or smaller, the "JIS standard specification for sieves (detailed table)" (Exhibit Ko 8) as a conversion table for mesh unit, and a sample of the Plaintiff's Product on May 30, 2000.

D. When Health Nutrients, Inc., which is an affiliated company of Health Co. net, had a meeting with the defendant around July 16, 2001, Health Nutrients, Inc. received a warning directly from the defendant.

At the time of the aforementioned warning, the defendant showed to Health Nutrients, Inc. the judgment of the Naha District Court (judgment of the Naha District Court of February 27, 2001, 1998 (Wa) 429). In the case pertaining to said judgment, the plaintiff was Marine Bio Co., Ltd. (defendant in this action), and the defendant was Coral Biotech Inc. (hereinafter referred to as "Coral Biotech"), which was established by the defendant in this action through joint contribution with other companies, such as a gravel association. When withdrawing capital from Coral Biotech, the defendant in this action concluded the following agreement with Coral Biotech: "Coral Biotech shall neither manufacture nor sell goods developed by using the technology of the defendant in this action and goods similar thereto." The defendant in this action alleged that Coral Biotech was manufacturing and selling Somelite, which is a water-purifying agent that is made from coral sand produced in Okinawa, and a mineral water principle, which is a water-purifying agent package that is based on Somelite, in violation of this agreement, and sought an injunction against the manufacturing and sale of the water-purifying agent, etc. Incidentally, Health Nutrients, Inc. was shown by the defendant only part of said judgment, specifically, the section showing the parties to the action, the main text of the judgment showing that the defendant in this action wholly won said case (i.e. "The defendant (Coral Biotech) shall neither manufacture nor sell the goods stated in the attached Goods List"), and part of the outline of the case.

On the same day, Health Nutrients, Inc. sent to R an email describing the receipt of the aforementioned warning from the defendant (Exhibits Ko 9-1, 9-2, and 10).

E. On the 18th of the same month, R sent to the plaintiff's representative the email stated in D. above and a copy of (part of) the judgment, etc. and notified that Health Nutrients, Inc., which is the plaintiff's major customer, wishes to receive the plaintiff's clear reply to the aforementioned email, etc. in writing, and thereby asked for the plaintiff's response (Exhibits Ko 9-1, 9-2, and 10).

F. On October 4, 2001, the plaintiff warned the defendant to immediately suspend the defendant's act by alleging that the defendant's act is a clear fallacy that goes against the fact and falls under the act of unfair competition prescribed in the Unfair Competition Prevention Act in consideration of the result of investigation of the content of the aforementioned judgment of the Naha District Court (Exhibits Ko 11-1 and 11-2).

G. On November 2, 2001, the defendant sent a letter from Japan to Health Co. net and thereby notified it that the plaintiff infringes the U.S. Patent Right (Second Warning) (Exhibits Ko 12-1

and 12-2). The content of said letter is as follows.

"We examined patent infringement committed by Coral Corporation (plaintiff in this action) with our patent attorney and consulting lawyer. We then felt sure that if we file an action against Coral Corporation, we would win the case. However, do you know the fact that if we file the action, both you and Coral Corporation will bear the costs of hundreds of thousands of dollars? We are sure that we will win this case, but our investigation revealed that Coral Corporation is never considered as being able to pay court costs and other expenses. Therefore, we would like to give you the advice that it would be a good solution for you to solve the dispute through negotiations with us out of court. As you also know, our company, Marine Bio (defendant in this action), has been a leading company in the domestic and overseas markets for coral and other goods for over about 40 years. We will never betray the trust of any of our customers who have ever conducted transaction with us. This is our company's spirit. We know that you will make a great decision. We look forward to doing much business with you."

In addition, on the same day, the person in charge at Health Nutrients, Inc. sent a letter (Exhibit Ko 13) to R. The content of said letter is as follows. Said letter stated that the plaintiff cannot be convinced only by the content of the warning sent by the plaintiff to the defendant (Exhibit Ko 11) (see F. above) and that the sales of Health Nutrients, Inc. have been significantly affected as the customers of Health Nutrients, Inc. are concerned about the company being sued by the defendant, thereby requesting the plaintiff to solve the problem at an early date.

"Several month have passed without any action worthy of appreciation taken by Coral Corporation in order to defend us from Marine Bio's strategy. The reputation that use of our coral would cause one to be subject to a legal action by Marine Bio (defendant in this action) has spread to all coral customers in the United States, and our sales have been significantly affected. Why does Coral Corporation (plaintiff in this action) refuse to actually take action to stop Marine Bio (defendant in this action)? Why doesn't the president make a call to talk with T about this problem in order to solve it? If this problem cannot be solved, the president should seek an injunction and drag T before a court. The only reason which I can infer is that T is right and the president is hesitant to push forward this problem. If so, I must destroy coral I purchased from you under effective legal guarantee in order to tell my customers that continuation of business with me would not cause them to be subject to any legal measure. At least a half of shipped coral powder "*Donan*" remains unopened. I would like to ask you for prompt legal assistance. Otherwise, I would like you to purchase this coral back at the price including the amount I paid to you and expenses for sending it back to you."

(3) Whether the defendant's act of sending an email to Health Co. net (First Warning) and sending a letter to Health Co. net (Second Warning) falls under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act is considered on the

premise of the facts mentioned above.

A. Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act provides the act of making or circulating false allegations that harm the business reputation of another person who is a business competitor as one type of acts of unfair competition. This provision prescribes acts, which are intended to assume an advantageous position in competition by putting competitors at a disadvantage by harming their business reputation, which is an important asset for business operators, through citation of false allegations, as acts of unfair competition, and prohibits them because such acts should be considered as typical acts of unfair competition.

In light of such legislative purpose of said provision, the act of giving a warning to a third party, such as a customer of a competitor, or the act of advertising infringement by a competitor, based on the allegation that the competitor commits the act of infringement of a patent right or any other intellectual property right, should be considered as falling under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act if it subsequently becomes obvious that said patent right, etc. is invalid or that the competitor's act does not constitute infringement of said patent right, etc.

However, on the other hand, the act of exercising a patent right or any other intellectual property right is permitted as a justifiable act, and the patentee can exercise rights based on a patent right not only against his/her competitors but also his/her customers because the Patent Act provides, in relation to an invention of a product, not only the act of producing the product but also the act of using or assigning, etc. the product as working of the invention (Article 2, paragraph (3), item (i) of the Patent Act).

Then, the issue is whether the patentee's act of making an allegation concerning infringement of a patent right to a customer of a competitor can fall under the act of unfair competition as the act of making false allegations in the case where the competitor commits an act that is suspected of constituting infringement of the patent right.

In such case, an allegation made by the patentee to the customer of the competitor should be considered to be justifiable as exercise of an intellectual property right if the patentee committed the act of warning as part of exercise of the right on the premise of truly exercising rights based on the patent right against the customer of the competitor. However, it is reasonable to understand that even if such an allegation apparently takes the form of exercise of rights, if the substance thereof is rather intended to damage the competitor's reputation with the customer and gain an advantage in transaction with said customer or in competition in the market, said act of warning is deemed to be an act of unfair competition and the patentee should bear responsibility if the content of said allegation is false in the end. Then, whether said allegation was made truly as part of exercise of rights or was made for the purpose of damaging the business reputation of the competitor and gaining an advantage in competition in the market should not be determined only

based on the format and text of the allegation document, etc., and it is reasonable to determine it by comprehensively considering various circumstances, such as the background to said allegation, time and period of distribution of the allegation document, etc., the number and scope of those to which the allegation document, etc. is distributed, business type and content of business of the customers to which the allegation document, etc. is distributed, the customers' business scale, relationship and form of transaction with the competitor, form of involvement in the relevant allegedly infringing product, capability to respond to a patent infringement action, and action taken in relation to the distribution of the allegation document, etc., as well as subsequent actions, etc. taken by the patentee and the customers.

B. In this case, the following circumstances are recognized: [i] When the defendant gave the First Warning and the Second Warning, the defendant was not the patentee of the U.S. Patent Right, and there is no fact that the defendant had received assignment of the patent right or an exclusive license from P, who was the patentee at the time; [ii] The plaintiff, who had come to know that its customer in the United States received the First Warning from the defendant, immediately (by about one month after the receipt of the warning) told the defendant that the particle size of the Plaintiff's Product differs from that stated in the claims of the U.S. Patent Right, and also sent the result of analysis of particle size and a sample of the Plaintiff's Product; however, two months later, the defendant directly told one of the plaintiff's customers again that the Plaintiff's Product infringes the U.S. Patent Right after showing only part of the aforementioned judgment of the Naha District Court; however, the judgment of the Naha District Court is not related to claims based on a Japanese patent right corresponding to the U.S. Patent Right and is also not on the case concerning a supplement for promotion of health using coral sand powder; and the judgment is originally related to a case that has no relationship with the U.S. Patent Right and the Plaintiff's Product; [iii] The defendant furthermore gave the Second Warning despite receipt of a warning from the plaintiff that requests cessation of a series of the defendant's acts on the grounds that said acts fall under the act of making false allegations; and in the Second Warning, the defendant actively showed to the relevant plaintiff's customer that it is advantageous to make a deal with the defendant by saying that the defendant can win the case without fail if it files an action against the plaintiff and that it is a good solution to make a deal with the defendant because such action costs hundreds of thousands of dollars and the plaintiff does not have sufficient means to pay that amount; [iv] The relevant plaintiff's customer, which received the First Warning and the Second Warning, was upset about the continuation of transaction with the plaintiff, and in particular, after receiving the Second Warning, the plaintiff's customer told the plaintiff that it has no other choice but to stop transaction with the plaintiff if this goes on; [v] There is no fact that the defendant filed an action against the plaintiff or its customers based on the allegation that the Plaintiff's Product infringes the U.S. Patent Right after these warnings.

In light of these circumstances, it is reasonable to recognize that the defendant's act of sending an email and a letter to the plaintiff's customers in the United States was committed for the purpose of damaging the plaintiff's reputation with the customers and gaining an advantage in transaction with said customers or in competition in the U.S. market rather than being committed as part of exercise of rights against the customers.

Therefore, the defendant's act of warning by sending an email or a letter from Japan to the plaintiff's customers in the United States should be considered as falling under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act.

C. The defendant alleges that an allegation to the direct infringer of a patent right does not cause reduction of social reputation and does not constitute an act of business defamation.

However, Health Co. net, which purchases the Plaintiff's Product from the plaintiff and sells or otherwise handles it in the United States or Health Nutrients, Inc., which is an affiliated company of Health Co. net (hereinafter both of these companies are also collectively referred to as "Health Co. net, etc."), can be the customers of the defendant, as well as the plaintiff's customers, in the United States as the distributors of healthy food made from coral sand. Such act of making a false allegation to Health Co. net, etc. should be considered as resulting in harming the plaintiff's reputation, and the defendant's act of making an allegation to these customers is recognized as having been committed for the purpose of damaging the plaintiff's reputation with the customers and gaining an advantage in transaction with said customers or in competition in the U.S. market rather than being committed as part of exercise of rights against these customers, as mentioned above. Therefore, it falls under the act of unfair competition.

Moreover, the defendant also alleges that only a few warnings were given and that a brief and simple means of communication, email, cannot be equated with a formal letter of warning. However, the number of warnings is not a requirement under Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act. In addition, it is not provided that an allegation must be made by a document. An allegation can be made orally or by email, and the means of making an allegation is no object. Therefore, the aforementioned allegation is unacceptable.

Furthermore, the defendant alleges that the defendant's allegation is not a false allegation because the defendant truly believed that the Plaintiff's Product infringes the U.S. Patent Right at the time when it made the allegation. However, as mentioned above, the act of giving a warning to a third party, such as a customer of a competitor, etc. should be considered as falling under the act of unfair competition prescribed in Article 2, paragraph (1), item (xiv) of the Unfair Competition Prevention Act if it subsequently becomes clear that the competitor's act does not constitute infringement of the relevant patent right, etc. The fact that the patentee, etc. believed that the relevant act constitutes infringement of a patent right at the time when the patentee, etc.

gave a warning is not sufficient to deny that the act of making a relevant allegation falls under the act of unfair competition.

In addition, the defendant alleges that even if the defendant was not the patentee of the U.S. Patent Right at the time of giving the aforementioned warnings, the defendant was the substantial owner and only the formal change of the name had not been conducted. However, according to Section 261 of the U.S. patent law, it is clearly provided that "… patents, or any interest therein, shall be assignable in law by an instrument in writing … an assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage." (Exhibit Ko 30), and oral assignment is not effective. The defendant is not recognized as having given the aforementioned warnings in preparation for actually filing an action in light of the fact that a document for change of the name of the U.S. Patent Right was actually exchanged and the change of the name was registered in the Patent and Trademark Office after over one year passed from the death of P, who was the patentee of the U.S. Patent Right, specifically, around December 2002 to January 2003.

As mentioned above, all the defendant's allegations are unacceptable.

D. As mentioned above, the defendant not only made to the plaintiff's customers in the United States an allegation that the plaintiff's sale of the Plaintiff's Product in the United States constitutes infringement of the U.S. Patent Right but also made an allegation that said customers' act of purchasing and selling the Plaintiff's Product manufactured by the plaintiff also constitutes infringement of the U.S. Patent Right. Regarding the latter, the content of the defendant's allegation is also on the grounds that the Plaintiff's Product falls within the technical scope of the Patented Invention. Therefore, the content of the allegation falls under false allegations that harm the plaintiff's business reputation. Therefore, there is a reason for the claims stated in paragraphs 2 and 4 of the objects of claims out of the claims in this action.

E. Moreover, as mentioned above, the defendant directly told one of the plaintiff's customers that the Plaintiff's Product infringes the U.S. Patent Right by showing only part of the judgment of the Naha District Court, which has no relationship with infringement of the U.S. Patent Right, despite the fact that the defendant was notified by the plaintiff that the particle size of the Plaintiff's Product differs from the particle size stated in the claims of the U.S. Patent Right and received the sending of the result of analysis of particle size and a sample of the Plaintiff's Product. In addition, the defendant furthermore gave the Second Warning despite receipt of a warning from the plaintiff that requests cessation of a series of the defendant's act on the grounds that it falls under the act of making false allegations. In light of these facts, it is obvious that the defendant was at least negligent in relation to the aforementioned acts of unfair competition. Therefore, the defendant should be liable for compensation for damages.

4. Regarding Issue 4 (damages incurred by the plaintiff)

(1) According to Exhibits Ko 32, 34 to 36, and 42 to 44 and the entire import of the oral argument, the following facts are recognized.

A. The plaintiff was established in July 1991 for the purpose of conducting the sale of coral-related goods. After that, the plaintiff started selling coral-related goods in Japan, and also started selling them in Taiwan in 1995 and in Hong Kong in 1996. The plaintiff also started expanding its business in the United States in 1998.

B. The plaintiff sold a total of 5,210 kg of the Plaintiff's Product to Health Co. net, etc. through OVERSEAS BUSINESS DEVELOPMENT CO. INC., an agent managed by R, who is the person in charge of the Plaintiff's Product in the United States, and other customers during the period from 1999 to June 2001. Thereby, the plaintiff gained the profits of 5,618,976 yen in total.

The unit price of the Plaintiff's Product is 3,000 yen per kg, and the manufacturing and sale thereof costs 2,075 yen per kg in total, which consists of [i] 114 yen as costs of raw material, [ii] 1,183 yen as manufacturing costs, and [iii] 778 yen as overhead costs. Therefore, profit per kg is 925 yen. The calculation formula is as follows.

[i] Costs of raw material

The amount of the Plaintiff's Product that can be manufactured from a ton of hermatypic coral fossil (unit price is 8,000 yen), which is a raw material, is about 70 kg.

Costs of raw material = 8,000 yen ÷ 70 kg = 114 yen/kg

[ii] Manufacturing costs

Machine consumption costs (336 yen/kg) + machine operational costs (504 yen/kg) + labor costs (321 yen/kg) + packaging costs (22 yen/kg) = 1,183 yen/kg

[iii] Overhead costs

About 60% of the sum of the costs of raw material and the manufacturing costs (114 yen/kg + 1,183 yen/kg) = 778 yen/kg

C. However, as mentioned above, the plaintiff had been unable to continue transaction with Health Co. net (or Health Nutrients, Inc., which is an affiliated company of Health Co. net), which was the major customer in the United States, since July 2001 as the defendant sent to Health Co. net, etc. warnings to the effect that the Plaintiff's Product infringes the U.S. Patent Right.

(2) The plaintiff alleges that it incurred damages from loss of receivable profits due to loss of transaction with Health Co. net in and after July 2001. Therefore, the facts mentioned in (1) above are considered.

A. According to Exhibit Ko 36 and the entire import of the oral argument, it is recognized that a total of 4,900 kg of the Plaintiff's Product was sold through OVEREAS BUSINESS DEVELOPMENT CO. INC during the period from October 2000 to June 2001. However, there is no evidence that is sufficient to recognize that the entirety of this amount of Plaintiff's Product

was sold to Health Co. net, etc. In addition, the sales volume of the Plaintiff's Product on June 30, 2001 was 3,000 kg, showing an extreme increase in comparison with the sales volume before then, specifically, 500 kg on May 17 of the same year, 700 kg on February 22 of the same year, and 700 kg on November 30, 2000. However, no rational reason for this point can be found even through the detailed examination of all the pieces of evidence in this case. Even without the defendant's act of warning, it cannot be easily presumed that the sales volume on June 30, 2001, which showed an extreme increase, continued. Therefore, it is not appropriate to calculate damages incurred by the plaintiff simply based on these numerical values. However, comprehensively taking into account the circumstances, such as the fact that Health Co. net, etc. were the plaintiff's major customers in the United States, without the defendant's act of warning, transaction between the plaintiff and Health Co. net, etc. continued, and the sale of at least around 180 kg per month of the Plaintiff's Product could be expected, and it can be presumptively recognized that the plaintiff could continue transaction with Health Co. net, etc. for at least around one year (according to the average of the total sales volume of 1,900 kg during eight months from October 2000 to May 2001, it is presumptively recognized that about 230 kg of the Plaintiff's Product could be expected to be sold per month through OVERSEAS BUSINESS DEVELOPMENT CO. INC; it is recognized that at least 80% thereof would be sold to Health Co. net (or Health Nutrients, Inc.)). In that case, it is recognized that the plaintiff could gain the profit of at least 166,500 yen per month, by multiplying the sales volume per month by the amount of profit obtained by selling one kg of the Plaintiff's Product, that is, 925 yen.

Therefore, it is reasonable to recognize that the amount of the plaintiff's receivable profits is 1,998,000 yen (166,500 yen x 12 months).

B. It is apparent to this court that the plaintiff delegated its counsel to file this action. Comprehensively considering the nature of this case, the content of the claims, development of the proceedings, and various other circumstances, 1,000,000 yen out of said amount is recognized as damages that have a reasonable cause-and-effect relationship with the defendant's act of unfair competition. Although the plaintiff alleges translation fees for the U.S. patent gazette in question, etc. as damages, deeming them as costs required for the court proceedings, the aforementioned translation fees cannot be recognized as damages in addition to the aforementioned patent attorney's fees.

C. In this case, the plaintiff claims payment of delay damages (5% per annum as prescribed in the Civil Code) in relation to damages for the period after the date of service of the complaint. According to the record, the date of service of the complaint is February 15, 2002.

D. Consequently, there is a reason for the plaintiff's claim for damages to the extent of the total amount of those mentioned in A. and B. above, 2,998,000 yen, and delay damages accrued thereon for the period on and after February 15, 2002.

5. Conclusion

On these bases, there is a reason for the plaintiff's claims in this action to seek a declaratory judgment to the effect that [i] "The court shall declare that the defendant does not have the right to seek an injunction against the plaintiff's sale of the Plaintiff's Product in the United States based on the U.S. Patent Right" (paragraph 1 of the objects of claims), [ii] "The defendant shall neither make nor circulate, from Japan to the plaintiff's customers in the United States, the allegation that the plaintiff's act of selling the Plaintiff's Product in the United States constitutes infringement of the U.S. Patent Right" (paragraph 2 of the objects of claims), and [iii] "The defendant shall neither make nor circulate, from Japan to the plaintiff's customers in the United States, the allegation that said customers' act of selling the Plaintiff's Product in the United States constitutes infringement of the U.S. Patent Right (paragraph 4 of the objects of claims). [iv] The plaintiff's claim for a declaratory judgment to the effect that "The court shall declare that the defendant does not have the right to seek an injunction against the sale in the United States of the Plaintiff's Product by the plaintiff's customers in the United States based on the U.S. Patent Right" (paragraph 3 of the objects of claims) should be dismissed as an unlawful one. There is a reason for [v] the plaintiff's claim for damages (paragraph 5 of the objects of claims) to the extent of seeking payment of 2,998,000 yen and delay damages accrued thereon at the rate of 5% per annum for the period from February 15, 2002, to the date of completion of the payment.

Therefore, the judgment shall be rendered in the form of the main text.

Tokyo District Court, 46th Civil Division

Presiding judge: MIMURA Ryoichi

Judge: AOKI Takayuki

Judge: MATSUOKA Chiho


(Attachment)          Item List

Calcium food (coral fossil powder) "Product name: *Donan*"

# **EXHIBIT 14**

# Strasbourg Agreement Concerning the International Patent Classification

## of March 24, 1971

The Contracting Parties,

Considering that the universal adoption of a uniform system of classification of patents, inventors' certificates, utility models and utility certificates is in the general interest and is likely to establish closer international cooperation in the industrial property field, and to contribute to the harmonization of national legislation in that field,

Recognizing the importance of the European Convention on the International Classification of Patents for Invention, of December 19, 1954, under which the Council of Europe created the International Classification of Patents for Invention,

Having regard to the universal value of this Classification, and to its importance to all countries party to the Paris Convention for the Protection of Industrial Property,

Having regard to the importance to developing countries of this Classification, which gives them easier access to the ever-expanding volume of modern technology,

Having regard to Article 19 of the Paris Convention for the Protection of Industrial Property of March 20, 1883, as revised at Brussels on December 14, 1900, at Washington on June 2, 1911, at The Hague on November 6, 1925, at London on June 2, 1934, at Lisbon on October 31, 1958, and at Stockholm on July 14, 1967,

Agree as follows:

## Article 1
### Establishment of a Special Union; Adoption of an International Classification

The countries to which this Agreement applies constitute a Special Union and adopt a common classification for patents for invention, inventors' certificates, utility models and utility certificates, to be known as the "International Patent Classification" (hereinafter designated as the "Classification").

## Article 2
### Definition of the Classification

(1) *(a)* The Classification comprises:

(i) the text which was established pursuant to the provisions of the European Convention on the International

Classification of Patents for Invention of December 19, 1954 (hereinafter designated as the "European Convention"), and which came into force and was published by the Secretary General of the Council of Europe on September 1, 1968;

(ii) the amendments which have entered into force pursuant to Article 2(2) of the European Convention prior to the entry into force of this Agreement;

(iii) the amendments made thereafter in accordance with Article 5 which enter into force pursuant to the provisions of Article 6.

(b) The Guide and the notes included in the text of the Classification are an integral part thereof.

(2) (a) The text referred to in paragraph (1)(a)(i) is contained in two authentic copies, each in the English and French languages, deposited, at the time that this Agreement is opened for signature, one with the Secretary General of the Council of Europe and the other with the Director General of the World Intellectual Property Organization (hereinafter respectively designated "Director General" and "Organization") established by the Convention of July 14, 1967.

(b) The amendments referred to in paragraph (1)(a)(ii) shall be deposited in two authentic copies, each in the English and French languages, one with the Secretary General of the Council of Europe and the other with the Director General.

(c) The amendments referred to in paragraph (1)(a)(iii) shall be deposited in one authentic copy only, in the English and French languages, with the Director General.

### Article 3
### Languages of the Classification

(1) The Classification shall be established in the English and French languages, both texts being equally authentic.

(2) Official texts of the Classification, in German, Japanese, Portuguese, Russian, Spanish and in such other languages as the Assembly referred to in Article 7 may designate, shall be established by the International Bureau of the Organization (hereinafter designated as the "International Bureau"), in consultation with the interested Governments and either on the basis of a translation submitted by those Governments or by any other means which do not entail financial implications for the budget of the Special Union or for the Organization.

### Article 4
### Use of the Classification

(1) The Classification shall be solely of an administrative character.

(2) Each country of the Special Union shall have the right to use the Classification either as a principal or as a subsidiary system.

(3) The competent authorities of the countries of the Special Union shall include in

(i) patents, inventors' certificates, utility models and utility certificates issued by them, and in applications relating thereto, whether published or only laid open for public inspection by them, and

(ii) notices, appearing in official periodicals, of the publication or laying open of the documents referred to in subparagraph (i)

the complete symbols of the Classification applied to the invention to which the document referred to in subparagraph (i) relates.

(4) When signing this Agreement or when depositing its instrument of ratification or accession:

(i) any country may declare that it does not undertake to include the symbols relating to groups or subgroups of the Classification in applications as referred to in paragraph (3) which are only laid open for public inspection and in notices relating thereto, and

(ii) any country which does not proceed to an examination as to novelty, whether immediate or deferred, and in which the procedure for the grant of patents or other kinds of protection does not provide for a search into the state of the art, may declare that it does not undertake to include the symbols relating to the groups and subgroups of the Classification in the documents and notices referred to in paragraph (3). If these conditions exist only in relation to certain kinds of protection or certain fields of technology, the country in question may only make this reservation to the extent that the conditions apply.

(5) The symbols of the Classification, preceded by the words "International Patent Classification" or an abbreviation thereof to be determined by the Committee of Experts referred to in Article 5, shall be printed in heavy type, or in such a manner that they are clearly visible, in the heading of each document referred to in paragraph (3)(i) in which they are to be included.

(6) If any country of the Special Union entrusts the grant of patents to an intergovernmental authority, it shall take all possible measures to ensure that this authority uses the Classification in accordance with this Article.

## Article 5
### Committee of Experts

(1) A Committee of Experts shall be set up in which each country of the Special Union shall be represented.

(2) *(a)* The Director General shall invite intergovernmental organizations specialized in the patent field, and of which at least one of the member countries is party to this Agreement, to be represented by observers at meetings of the Committee of Experts.

*(b)* The Director General may, and, if requested by the Committee of Experts, shall, invite representatives of other intergovernmental and international non-governmental organizations to participate in discussions of interest to them.

(3) The Committee of Experts shall:

(i) amend the Classification;

(ii) address recommendations to the countries of the Special Union for the purpose of facilitating the use of the Classification and promoting its uniform application;

(iii) assist in the promotion of international cooperation in the reclassification of documentation used for the examination of inventions, taking in particular the needs of developing countries into account;

(iv) take all other measures which, without entailing financial implications for the budget of the Special Union or for the Organization, contribute towards facilitating the application of the Classification by developing countries;

(v) have the right to establish subcommittees and working groups.

(4) The Committee of Experts shall adopt its own Rules of Procedure. These shall allow for the possibility of participation of intergovernmental organizations, referred to in paragraph *(2)(a)*, which can perform substantial work in the development of the Classification, in meetings of its subcommittees and working groups.

(5) Proposals for amendments to the Classification may be made by the competent authority of any country of the Special Union, the International Bureau, any intergovernmental organization represented in the Committee of Experts pursuant to paragraph *(2)(a)* and any other organization specially invited by the Committee of Experts to submit such proposals. The proposals shall be communicated to the International Bureau which shall submit them to the members of the Committee of Experts and to the observers not later than two months before the session of the Committee of Experts at which the said proposals are to be considered.

(6) *(a)* Each country member of the Committee of Experts shall have one vote.

*(b)* The decisions of the Committee of Experts shall require a simple majority of the countries represented and voting.

*(c)* Any decision which is regarded by one-fifth of the countries represented and voting as giving rise to a modification in the basic structure of the Classification or as entailing a substantial work of reclassification shall require a majority of three-fourths of the countries represented and voting.

*(d)* Abstentions shall not be considered as votes.

## Article 6
### Notification, Entry into Force and Publication of Amendments and Other Decisions

(1) Every decision of the Committee of Experts concerning the adoption of amendments to the Classification and recommendations of the Committee of Experts shall be notified by the International Bureau to the competent authorities of the countries of the Special Union. The amendments shall enter into force six months from the date of dispatch of the notification.

(2) The International Bureau shall incorporate in the Classification the amendments which have entered into force. Announcements of the amendments shall be published in such periodicals as are designated by the Assembly referred to in Article 7.

## Article 7
### Assembly of the Special Union

(1) *(a)* The Special Union shall have an Assembly consisting of the countries of the Special Union.

*(b)* The Government of each country of the Special Union shall be represented by one delegate, who may be assisted by alternate delegates, advisors and experts.

*(c)* Any intergovernmental organization referred to in Article 5(2)(a) may be represented by an observer in the meetings of the Assembly, and, if the Assembly so decides, in those of such committees or working groups as may have been established by the Assembly.

*(d)* The expenses of each delegation shall be borne by the Government which has appointed it.

(2) *(a)* Subject to the provisions of Article 5, the Assembly shall:

(i) deal with all matters concerning the maintenance and development of the Special Union and the implementation of this Agreement;

(ii) give directions to the International Bureau concerning the preparation for conferences of revision;

(iii) review and approve the reports and activities of the Director General concerning the Special Union, and give him all necessary instructions concerning matters within the competence of the Special Union;

(iv) determine the program and adopt the triennial budget of the Special Union, and approve its final accounts;

(v) adopt the financial regulations of the Special Union;

(vi) decide on the establishment of official texts of the Classification in languages other than English, French and those listed in Article 3(2);

(vii) establish such committees and working groups as it deems appropriate to achieve the objectives of the Special Union;

(viii) determine, subject to paragraph (1)(c), which countries not members of the Special Union and which intergovernmental and international non-governmental organizations shall be admitted as observers to its meetings, and to those of any committee or working group established by it;

(ix) take any other appropriate action designed to further the objectives of the Special Union;

(x) perform such other functions as are appropriate under this Agreement.

*(b)* With respect to matters which are of interest also to other Unions administered by the Organization, the Assembly shall make its decisions after having heard the advice of the Coordination Committee of the Organization.

(3) *(a)* Each country member of the Assembly shall have one vote.

*(b)* One-half of the countries members of the Assembly shall constitute a quorum.

*(c)* In the absence of the quorum, the Assembly may make decisions but, with the exception of decisions concerning its own procedure, all such decisions shall take effect only if the conditions set forth hereinafter are fulfilled. The International Bureau shall communicate the said decisions to the countries members of the Assembly which were not represented and shall invite them to express in writing their vote or abstention within a period of three months from the date of the communication. If, at the expiration of this period, the number of countries having thus expressed their vote or abstention attains the number of countries which was lacking for attaining the quorum in the session itself, such decisions shall take

effect provided that at the same time the required majority still obtains.

*(d)* Subject to the provisions of Article 11(2), the decisions of the Assembly shall require two-thirds of the votes cast.

*(e)* Abstentions shall not be considered as votes.

*(f)* A delegate may represent, and vote in the name of, one country only.

(4) *(a)* The Assembly shall meet once in every third calendar year in ordinary session upon convocation by the Director General and, in the absence of exceptional circumstances, during the same period and at the same place as the General Assembly of the Organization.

*(b)* The Assembly shall meet in extraordinary session upon convocation by the Director General, at the request of one-fourth of the countries members of the Assembly.

*(c)* The agenda of each session shall be prepared by the Director General.

(5) The Assembly shall adopt its own Rules of Procedure.

### Article 8
### International Bureau

(1) *(a)* Administrative tasks concerning the Special Union shall be performed by the International Bureau.

*(b)* In particular, the International Bureau shall prepare the meetings and provide the secretariat of the Assembly, the Committee of Experts and such other committees or working groups as may have been established by the Assembly or the Committee of Experts.

*(c)* The Director General shall be the chief executive of the Special Union and shall represent the Special Union.

(2) The Director General and any staff member designated by him shall participate, without the right to vote, in all meetings of the Assembly, the Committee of Experts and such other committees or working groups as may have been established by the Assembly or the Committee of Experts. The Director General, or a staff member designated by him, shall be *ex officio* secretary of those bodies.

(3) *(a)* The International Bureau shall, in accordance with the directions of the Assembly, make the preparations for revision conferences.

*(b)* The International Bureau may consult with intergovernmental and international non-governmental organizations concerning preparations for revision conferences.

*(c)* The Director General and persons designated by him shall take part, without the right to vote, in the discussions at revision conferences.

(4) The International Bureau shall carry out any other tasks assigned to it.

## Article 9
## Finances

(1) *(a)* The Special Union shall have a budget.

*(b)* The budget of the Special Union shall include the income and expenses proper to the Special Union, its contribution to the budget of expenses common to the Unions and, where applicable, the sum made available to the budget of the Conference of the Organization.

*(c)* Expenses not attributable exclusively to the Special Union but also to one or more other Unions administered by the Organization shall be considered as expenses common to the Unions. The share of the Special Union in such common expenses shall be in proportion to the interest the Special Union has in them.

(2) The budget of the Special Union shall be established with due regard to the requirements of coordination with the budgets of the other Unions administered by the Organization.

(3) The budget of the Special Union shall be financed from the following sources:

(i) contributions of the countries of the Special Union;

(ii) fees and charges due for services rendered by the International Bureau in relation to the Special Union;

(iii) sale of, or royalties on, the publications of the International Bureau concerning the Special Union;

(iv) gifts, bequests and subventions;

(v) rents, interests and other miscellaneous income.

(4) *(a)* For the purpose of establishing its contribution referred to in paragraph (3)(i), each country of the Special Union shall belong to the same class as it belongs to in the Paris Union for the Protection of Industrial Property, and shall pay its annual contribution on the basis of the same number of units as is fixed for that class in that Union.

*(b)* The annual contribution of each country of the Special Union shall be an amount in the same proportion to the total sum to be contributed to the budget of the Special Union by all countries as the number of its units is to the total of the units of all contributing countries.

*(c)* Contributions shall become due on the first of January of each year.

*(d)* A country which is in arrears in the payment of its contributions may not exercise its right to vote in any organ of the Special Union if the amount of its arrears equals or exceeds the amount of the contributions due from it for the preceding two full years. However, any organ of the Special Union may allow such a country to continue to exercise its right to vote in that organ if, and as long as, it is satisfied that the delay in payment is due to exceptional and unavoidable circumstances.

*(e)* If the budget is not adopted before the beginning of a new financial period, it shall be at the same level as the budget of the previous year, as provided in the financial regulations.

(5) The amount of the fees and charges due for services rendered by the International Bureau in relation to the Special Union shall be established, and shall be reported to the Assembly, by the Director General.

(6) *(a)* The Special Union shall have a working capital fund which shall be constituted by a single payment made by each country of the Special Union. If the fund becomes insufficient, the Assembly shall decide to increase it.

*(b)* The amount of the initial payment of each country to the said fund or of its participation in the increase thereof shall be a proportion of the contribution of that country for the year in which the fund is established or the decision to increase it is made.

*(c)* The proportion and the terms of payment shall be fixed by the Assembly on the proposal of the Director General and after it has heard the advice of the Coordination Committee of the Organization.

(7) *(a)* In the headquarters agreement concluded with the country on the territory of which the Organization has its headquarters, it shall be provided that, whenever the working capital fund is insufficient, such country shall grant advances. The amount of those advances and the conditions on which they are granted shall be the subject of separate agreements, in each case, between such country and the Organization.

*(b)* The country referred to in subparagraph *(a)* and the Organization shall each have the right to denounce the obligation to grant advances, by written notification. Denunciation shall take effect three years after the end of the year in which it was notified.

(8) The auditing of the accounts shall be effected by one or more of the countries of the Special Union or by external auditors, as provided in the financial regulations. They shall be designated, with their agreement, by the Assembly.

### Article 10
### Revision of the Agreement

(1) This Agreement may be revised from time to time by a special conference of the countries of the Special Union.

(2) The convocation of any revision conference shall be decided by the Assembly.

(3) Articles 7, 8, 9 and 11 may be amended either by a revision conference or according to the provisions of Article 11.

### Article 11
### Amendment of Certain Provisions of the Agreement

(1) Proposals for the amendment of Articles 7, 8, 9 and of the present Article may be initiated by any country of the Special Union or by the Director General. Such proposals shall be communicated by the Director General to the countries of the Special Union at least six months in advance of their consideration by the Assembly.

(2) Amendments to the Articles referred to in paragraph (1) shall be adopted by the Assembly. Adoption shall require three-fourths of the votes cast, provided that any amendment to Article 7 and to the present paragraph shall require four-fifths of the votes cast.

(3) *(a)* Any amendment to the Articles referred to in paragraph (1) shall enter into force one month after written notifications of acceptance, effected in accordance with their respective constitutional processes, have been received by the Director General from three-fourths of the countries members of the Special Union at the time the amendment was adopted.

*(b)* Any amendment to the said Articles thus accepted shall bind all the countries which are members of the Special Union at the time the amendment enters into force, provided that any amendment increasing the financial obligations of countries of the Special Union shall bind only those countries which have notified their acceptance of such amendment.

*(c)* Any amendment accepted in accordance with the provisions of subparagraph *(a)* shall bind all countries which become members of the Special Union after the date on which the amendment entered into force in accordance with the provisions of subparagraph *(a)*.

### Article 12
### Becoming Party to the Agreement

(1) Any country party to the Paris Convention for the Protection of Industrial Property may become party to this Agreement by:

(i) signature followed by the deposit of an instrument of ratification, or

(ii) deposit of an instrument of accession.

(2) Instruments of ratification or accession shall be deposited with the Director General.

(3) The provisions of Article 24 of the Stockholm Act of the Paris Convention for the Protection of Industrial Property shall apply to this Agreement.

(4) Paragraph (3) shall in no way be understood as implying the recognition or tacit acceptance, by a country of the Special Union, of the factual situation concerning a territory to which this Agreement is made applicable by another country by virtue of the said paragraph.

### Article 13
### Entry into Force of the Agreement

(1) *(a)* This Agreement shall enter into force one year after instruments of ratification or accession have been deposited by:

(i) two-thirds of the countries party to the European Convention on the date on which this Agreement is opened for signature, and

(ii) three countries party to the Paris Convention for the Protection of Industrial Property, which were not previously party to the European Convention and of which at least one is a country where, according to the most recent annual statistics published by the International Bureau on the date of deposit of its instrument of ratification or accession, more than 40,000 applications for patents or inventors' certificates have been filed.

*(b)* With respect to any country other than those for which this Agreement has entered into force pursuant to subparagraph *(a)*, it shall enter into force one year after the date on which the ratification or accession of that country was notified by the Director General, unless a subsequent date has been indicated in the instrument of ratification or accession. In the latter case, this Agreement shall enter into force with respect to that country on the date thus indicated.

*(c)* Countries party to the European Convention which ratify this Agreement or accede to it shall be obliged to denounce the said Convention, at the latest, with effect from the day on which this Agreement enters into force with respect to those countries.

(2) Ratification or accession shall automatically entail acceptance of all the clauses and admission to all the advantages of this Agreement.

### Article 14
### Duration of the Agreement

This Agreement shall have the same duration as the Paris Convention for the Protection of Industrial Property.

### Article 15
### Denunciation

(1) Any country of the Special Union may denounce this Agreement by notification addressed to the Director General.

(2) Denunciation shall take effect one year after the day on which the Director General has received the notification.

(3) The right of denunciation provided by this Article shall not be exercised by any country before the expiration of five years from the date upon which it becomes a member of the Special Union.

### Article 16
### Signature, Languages, Notification, Depositary Functions

(1) *(a)* This Agreement shall be signed in a single original in the English and French languages, both texts being equally authentic.

*(b)* This Agreement shall remain open for signature at Strasbourg until September 30, 1971.

*(c)* The original of this Agreement, when no longer open for signature, shall be deposited with the Director General.

(2) Official texts shall be established by the Director General, after consultation with the interested Governments, in German, Japanese, Portuguese, Russian, Spanish and such other languages as the Assembly may designate.

(3) *(a)* The Director General shall transmit two copies, certified by him, of the signed text of this Agreement to the Governments of the countries that have signed it and, on request, to the Government of any other country. He shall also transmit a copy, certified by him, to the Secretary General of the Council of Europe.

*(b)* The Director General shall transmit two copies, certified by him, of any amendment to this Agreement to the Governments of all countries of the Special Union and, on request, to the Government of any other country. He shall also transmit a copy, certified by him, to the Secretary General of the Council of Europe.

*(c)* The Director General shall, on request, furnish the Government of any country that has signed this Agreement, or that accedes to it, with a copy of the Classification, certified by him, in the English or French language.

(4) The Director General shall register this Agreement with the Secretariat of the United Nations.

(5) The Director General shall notify the Governments of all countries party to the Paris Convention for the Protection of Industrial Property and the Secretariat General * of the Council of Europe of:

(i) signatures;

(ii) deposits of instruments of ratification or accession;

(iii) the date of entry into force of this Agreement;

(iv) reservations on the use of the Classification;

(v) acceptances of amendments to this Agreement;

(vi) the dates on which such amendments enter into force;

(vii) denunciations received.

### Article 17
### Transitional Provisions

(1) During the two years following the entry into force of this Agreement, the countries party to the European Convention which are not yet members of the Special Union may enjoy, if they so wish, the same rights in the Committee of Experts as if they were members of the Special Union.

(2) During the three years following the expiration of the period referred to in paragraph (1), the countries referred to in the said paragraph may be represented by observers in the meetings of the Committee of Experts and, if the said Committee so decides, in any subcommittee or working group established by it. During the same period they may submit proposals for amendments to the Classification, in accordance with Article 5(5), and shall be notified of the decisions and recommendations of the Committee of Experts, in accordance with Article 6(1).

---

* *Editor's Note:* The English text refers to "Secretariat General" instead of "Secretary General". The French text ("Secrétaire général") seems more correct.

(3) During the five years following the entry into force of this Agreement, the countries party to the European Convention which are not yet members of the Special Union may be represented by observers in the meetings of the Assembly and, if the Assembly so decides, in any committee or working group established by it.

                                 IN WITNESS WHEREOF, the undersigned being duly authorized hereto, have signed this Agreement.

                                 DONE at Strasbourg, on March 24, 1971.

Belgium (J. Lodewyck) ; Denmark (E. Tuxen) ; Finland (E.V. Tuuli) ; Germany (Federal Republic) (R. von Keller, K. Haertel) ; Greece (G. Papoulias — ad referendum) ; Holy See (L. Ganghoffer) ; Italy (P. Archi) ; Liechtenstein (A.F. de Gerliczy-Burian) ; Luxembourg (J.P. Hoffmann) ; Norway (L. Nordstrand) ; Spain (Count of Santovenia, A.F. Mazarambroz y Martín Rabadán)[1] ; Sweden (G. Borggård) ; Switzerland (W. Stamm) ; United Kingdom (E. Armitage) ; United States of America (R. A. Wahl, H. J. Winter) ; Yugoslavia (N. Janković).

*Editor's Note :* The Strasbourg Agreement was also signed within the period provided for in Article 16(5) by the following countries : Austria, September 9, 1971 (H. Laube) ; Brazil, June 28, 1971 (P. Cabral de Mello) ; France, September 20, 1971 (M. de Camaret) ; Iran, June 22, 1971 (H. Pakravan) ; Japan, September 13, 1971 (H. Kitahara) ; Monaco, September 27, 1971 (R. Jung) ; Netherlands, September 22, 1971 (J. G. de Jong).

---

[1] At the time of signature, the Government of Spain declared its intention to take advantage of the possibility available to it under Article 4(4) of the Agreement.

# **EXHIBIT 15**

ADVERTISEMENT



Subscribe | Log in | ☰Q Menu

Weekly edition    The world in brief    World Ahead 2026    War in Ukraine    United States    Middle East    The world economy    Bus

New Articles | Europe's patent regime

# A patent mess

Patent costs are higher in Europe than elsewhere

⬆ Share

Jul 24th 2009    |    1 min read

EUROPE's companies negotiate a costly and tortuous patent regime. Inventors apply to the European Patent Office, with which all 27 members of the European Union and nine other European countries co-operate. Once granted, patents must be validated, translated and annually renewed in all those countries in which a firm wants protection. Litigation is on a national basis, so courts in each country can in effect overturn patents granted by the EPO, or uphold patents which have been invalidated by it. As a result, a new paper estimates that it can cost between four and ten times more to get a patent in Europe than in America. Japan

Already have an account? Log in

---

# Continue with a free trial

Get full access to our independent journalism for free

Free trial

---

## Or create a free account to unlock just this article

Create account

ADVERTISEMENT

Share    Reuse this content

# **EXHIBIT 17**



# Facts and figures on the European Union

Page contents

The EU and its Member States

People, size and open borders

Economy, trade and government finances

Energy and climate

Quality of life, jobs and equality

Tourism, languages and education

## The EU and its Member States

**Founded**: in 1951 after the Second World War by six countries (Belgium, France, Germany, Italy, Luxembourg, and the Netherlands).

**Current Member States**: 27 countries.

**Applicants for future membership**: 9 candidate countries and 1 potential candidate.

**Institutional setup**: the EU has a unique setup of institutions, bodies and agencies who all work for the common interests of the EU and European people. 7 European institutions, 9 EU bodies and over 30 decentralised agencies with specific roles are spread across the EU.

**Elections**: European elections are held every five years to elect new Members of the European Parliament.

## People, size and open borders

**Population**: almost 450 million inhabitants who account for 5.5% of the world's population.

**Population evolution**: experts estimate that the EU population will grow steadily until the year 2026, after which it is projected to fall back to 420 million by 2100.

**Multicultural societies:** around 43 million EU residents are foreign citizens. Almost 14 million of them are citizens of EU Member States other than the one in which they reside. The rest are citizens of non-EU countries. On average, 3.1% of the people who live in an EU country are from another EU country, and 6.4% have the nationality of a non-EU country.

**Geographical size**: 4 million km². Germany has the EU's largest population and France is the largest EU country in terms of area. Malta is the smallest EU country both in terms of inhabitants and surface area.

**Urbanisation**: 39% of the EU population lives in a city, 36% in towns and suburbs, and 25% in rural areas.

**Open borders**: the Schengen area allows people to move around without border checks since 1985. It underpins the EU's free movement principle, thanks to which every EU citizen can travel, work and live in any EU country without special formalities. All EU Member States, except for Cyprus and Ireland, are members of the Schengen area. Bulgaria and Romania joined most recently, in March 2024. 4 non-EU countries (Iceland, Norway, Switzerland and Liechtenstein) are also part of Schengen.



Webtools + © EC-GISCO + © EuroGeographics © UN-FAO for the administrative boundaries | Disclaimer

Sources: Eurostat – 2024 data for population, world population, citizenship of the population, surface area, urban and rural population, 2023 data for population projection

# Economy, trade and government finances

**Single market**: the European Union operates as a single market made up of the 27 EU countries and, with certain exceptions, 4 non-EU countries. This means goods, services, capital and persons can circulate freely, without technical, legal and bureaucratic barriers.

**Single currency**: launched in 1999, the euro is the official currency of 20 EU countries. These countries are known as the euro area. The euro has advanced European integration by enabling people in the euro area to take advantage of the single market. Most EU countries export between 50% and 80% of their goods to other countries in the EU.

**GDP:** as one of the world's biggest economies, GDP or the total value of all goods and services produced in the EU is almost €18 trillion. Germany has the largest share, followed by France and Italy. Services account for 74% of the EU's GDP, and industry for almost all of the rest.

**EU budget**: the EU has its own budget to finance EU priorities and big projects that most EU countries could not finance on their own – either because of the project's size or its cross-border nature. The current long-term budget runs from 2021 until 2027 and amounts to around €2 trillion.

**Debt**: the general government deficit across the EU is equivalent to 3.2% of GDP. Consolidated gross debt in the EU is 81% of GDP, down from its 2020 peak of 90% during the pandemic. Greece, Italy, France, Spain and Belgium have the highest debt, all with ratios of debt to GDP above 100%. Luxembourg, Bulgaria and Estonia have the lowest ratios.

**Trade**: the EU is the world's largest exporter of manufactured goods and services. It accounts for around 14% of the world's trade in goods.

**Trading partners**: the United States is the largest destination for EU exports of goods, while China is the largest origin for goods imports. The EU's leading trade partners for services are the United States and the United Kingdom.



Source: Eurostat – 2024 data for GDP, sectors, intra-EU trade, trading partners for goods, government deficit, consolidated gross debt, share of world trade, 2023 data for trading partners for services

# Energy and climate

**Climate targets**: on its way to become the world's first climate-neutral continent by 2050, the EU is a trailblazer in fighting climate change and greening its economy. It has committed to reducing net greenhouse gas emissions by at least 55% by 2030, compared to 1990 levels.

**Emissions**: over the past decade, greenhouse gas emissions in the EU decreased by 19%.

**Fossil fuels**: almost 70% of all energy in the EU is still produced from coal, oil and gas. The EU is working to reduce its dependency on other countries for fuel imports which currently stands at 58%.

**Renewable energy**: 24.5% of the energy consumed in the EU is already renewable, and this share is constantly growing. Renewable energy sources are now the leading source for electricity generation. Sweden leads among EU countries, with nearly two-thirds of its energy consumption derived from renewable sources, followed by Finland, Denmark and Latvia. Ireland, Malta, Belgium and Luxembourg have the lowest proportions of renewables.

Source: Eurostat - 2024 data for energy, 2023 data for greenhouse gas emissions, fossil fuels, energy dependence, and renewable energy

# Quality of life, jobs and equality

**Life expectancy**: almost 79 years for men, 84 years for women.

**Health**: of the people living in the EU aged 16 or older, 68% say they feel in good or very good health.

**Demographic change**: population ageing has been observed across much of Europe in recent decades. This will have serious implications on pension funds, government revenues and the provision of services such as health and social care. The number of working-age people in the EU relative to the number of older persons fell from 3.8 in 2002 to 2.7 by 2024. This ratio will continue to decrease.

**Unemployment rate**: 5.9%. More than twice as many young people aged 15-24 are unemployed (14.9%).

**Employers**: the service sector is by far the biggest employer in the EU, with a share of 74%. The rest of the workforce is spread between the industry, construction, agriculture, forestry and fisheries sectors.

**Gender equality**: while the EU has made progress in gender equality over the last decades, on average women in the EU still earn 12% less than men. When working, men generally occupy higher positions than women. For example, women

account for slightly more than a third (35%) of managers in the EU. The share of female managers does not reach 50% in any EU country but is higher than 40% in Sweden, Latvia, Poland, Hungary and Bulgaria. Cyprus, Croatia and Italy have the fewest female managers.

**Inflation**: 2.6% (in 2024). Prices of food, drinks and alcohol have increased the most in past years. After a spike in 2022 and 2023, the rate of inflation for transport, housing, water, electricity, gas and other fuels has now gone down significantly.

**Poverty risk**: 93.3 million people in the EU are at risk of poverty or social exclusion. Over one in five Europeans living in a household with dependent children is at risk of poverty or social exclusion. 30% of Europeans living in private households are also unable to cope with an unexpected financial expense. The poverty risk is highest in Bulgaria and Romania, and lowest in Czechia and Slovenia.



**Living standards across the EU: consumption per inhabitant**

| Country | Value |
|---------|-------|
| Bulgaria | 63.3 |
| Hungary | 67.8 |
| Latvia | 75.9 |
| Croatia | 76.9 |
| Slovakia | 77.2 |
| Greece | 79.6 |
| Romania | 80 |
| Estonia | 80.4 |
| Poland | 81.9 |
| Malta | 83.8 |
| Czechia | 84.5 |
| Portugal | 88.4 |
| Spain | 89.2 |
| Slovenia | 89.9 |
| Lithuania | 92.5 |
| EU (base line) | 100 |
| Cyprus | 100.4 |
| Italy | 104. |
| France | 1 |
| Finland | |
| Sweden | |
| Ireland | |
| Germany | |
| Belgium | |
| Austria | |
| Denmark | |
| Netherlands | |
| Luxembourg | |

Actual individual consumption is based on consumption by households and presented as an i

Source: Eurostat – 2024 data for life expectancy, health perception, old age dependency ratio, unemployment, employment sectors, managers, inflation, inflation by category, poverty and social exclusion, household facing unexpected financial expense, 2023 data for gender pay gap, 2022 data for consumption per inhabitant

# Tourism, languages and education

**Tourism**: the EU is the world's leading tourist destination, accounting for 40% of the world's international visitors. Spain, France, Italy and Germany are among most visited destinations in the world, with tourists spending over 430 million nights annually in each of these four countries. EU residents also make nearly 1.2 billion tourism trips in a year for personal or business purposes, either inside their own country or to another EU country. This free movement is facilitated by the EU's open borders.

**Culture and multilingualism**: the EU has a rich cultural and linguistic diversity. The languages spoken in EU countries are an essential part of its cultural heritage. This is why the EU supports multilingualism and has 24 official languages.

**Language learning**: in school, pupils are encouraged to learn new languages from an early age. This promotes contact with people across borders and makes studying abroad easier. 49% of upper secondary pupils in the EU study two or more foreign languages.

**University graduates**: over 4 million graduates every year. The most common fields of study are: business, administration and law; health and welfare; and engineering, manufacturing and construction.

**Student exchanges**: since 1987, student exchanges in the EU are organised through the Erasmus+ programme. In the first year, 3,200 students from 11 European countries participated. Since then, Erasmus+ has allowed 16 million people to live and study in 33 countries in the EU and beyond.



Source: Eurostat – 2024 data for tourist nights, tourism, trips by Europeans, 2023 data for pupils and languages studied, university graduates, fields of university studies, studying abroad

# Related links

Key figures on Europe

Key facts per EU country

Facts and figures about the EU

Facts and figures about the EU in the world

Practical information on living, working and studying in the EU

Browse more EU and country statistics by theme

# EXHIBIT 19

8 Colum. J. Eur. L. 19

**Columbia Journal of European Law**
Winter, 2002

Article

Vincenzo Di Cataldo [a1]

Copyright (c) 2002 by The Parker School of Foreign and Comparative Law, Columbia University; Vincenzo Di Cataldo

## FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT

The European Patent Convention (EPC), also known as the Munich Convention, was signed in Munich, Germany, on October 5, 1973 and became effective on October 7, 1977. [1] The EPC has played a very important role in the recent developments of European intellectual property law and has been an important step towards the harmonization and unification of European patent law. Remarkably, all the European States amended their national patent laws after the enactment of the EPC, which in turn has led to a harmonization among the national patents not easily imagined before its enactment. Fortunately, at least one aspect of European patent law, the rules governing the patent application and examination procedure, finally has a unified set of rules thanks to the EPC.

The EPC was supposed to be only the first step, a provisional tool. As a Convention intending to partially harmonize and partially unify European patent law, the EPC was to be followed by a further step, a more advanced tool. In fact, that tool was crafted not after the work concluded on the EPC, but before. That tool, the second step, was supposed to be the Community Patent Convention (CPC), also known as the Luxembourg Convention, signed in Luxembourg on December 15, 1975. [2] But this second Convention has never become effective. The main reason the two step process of harmonizing and unifying European patent law failed was that the European Commission thought the CPC would be able to accomplish these goals, when in fact, the CPC has proved not at all fit for this task. So, although the EPC itself has accomplished its own goals, the system envisioned from the two interacting Conventions has failed to materialize.

This unfortunate situation has forced Europe into a deadlock that can only be broken by revitalizing the Community Patent. But to achieve this goal, Europe must find a new and different mechanism. The proper tool can only be a new Regulation issued by the European Community. This article will explore the reasons for the present stalemate and explore ways in which to break it.

The EPC was born out of the European Community. Although the EPC was signed in October of 1973, its first drafts date back to the early 1950s. [3] Therefore, the first drafts of the EPC are contemporaries of the first works aimed at creating the European Communities themselves. [4] Some European States not interested in joining the European Economic Community at its inception actively attended, at different **20** times, the talks aimed at developing a European Patent. [5] For this reason, the drafters of the EPC were well aware, especially in the last years of their long-lasting negotiations, they did not wish to create a Convention dependent upon the structure of the European Communities.

The main structure of the EPC is well known. It does not create a single patent system for all of Europe, but only a single granting system. Accordingly, it establishes a European Patent Office (EPO) in Munich, Germany, and provides a set of rules of procedure for the examination of the patent application. Moreover, it contains important, although limited, substantive law covering mostly the criteria for patentability. This result was an outgrowth of the victory, quite unexpected in those days, of the supporters of the "maximum approach" over the supporters of the "minimum approach." The latter thought the EPC should rule only the examination procedure, while the former believed, on the contrary, that the examination procedure itself would only be useful in conjunction with a common nucleus of substantive law covering the conditions for patentability. [6]

Once a patent is granted under the EPC, it does not become a single patent. Rather, it becomes a bundle of national patents, one for each Contracting State that is designated in the patent application. [7] The commonly used language refers to "national

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 324 of 520

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

fractions of the European Patent," but, in fact, there is no single European Patent. Instead, there are multiple national patents collectively referred to as a "European Patent." When used to refer to an already issued patent, the European Patent is nothing more than a subtly misleading term which serves as a moniker for the multiple different national patents.

The various fractions of the European Patent have almost nothing in common. They share only the few substantive rules about the conditions of patentability fixed by the EPC. For the remainder of the substantive law, each individual Contracting State's patent law governs that State's fractional share of the European Patent. For instance, there is nothing in the EPC addressing the law of employed inventors, the law of co-ownership of the invention, or the law of remedies. These points, not of minor importance in the structure of patent law, have been left entirely to the laws of each individual European State.

In addition, the competence for every dispute arising from a European Patent has been given to the national courts of each Contracting State. This competence includes both disputes arising on points governed by individual national laws and disputes arising from points directly regulated by the EPC that must be settled in accordance with the EPCs substantive law.

Notwithstanding its astonishing success, which can be measured by the flow of patent applications, it is easy to identify major problems with the EPC. [8]

 **21**  The first problem is created by the lack of uniform interpretations of the EPC given by the national courts. Each national system tends to harmonize its interpretation of the EPC in accordance with its own national body of law. Each State uses its own mechanisms to unify the legal interpretation of the EPC, namely through the power vested in its own unique court of last instance. But quite strangely, or maybe obviously, there is no mechanism to coordinate the different national interpretations of the EPC on a supranational level. [9],[10]  Only a common patent court, at least one of last instance, something that is not present in the EPC, could perform this task.

This lack of a supranational harmonizing mechanism has given rise to many embarrassing situations where courts of different Contracting States in parallel cases (i.e., in cases relating to the same facts) find differing interpretations for the same text of the EPC. [11]  These cases are not rare at all. The infringement of a European Patent usually occurs simultaneously in different European States. Under the framework of the EPC, the patent holder is forced to bring multiple distinct lawsuits, each having the same plaintiff (the patent holder) and the same defendant (the alleged patent infringer) before national courts in each country where infringement allegedly has occurred.

One of the most recent and widely known examples has been that of the Epilady cases. [12]  The European Patent in these cases covered a hair removal device for women. The patent holder filed many parallel suits against the same alleged infringer, as well as agents and distributors of the alleged infringer, before national courts in the many different European States where the allegedly infringing product was actively sold. The Epilady and the allegedly infringing product were not identical; but the holder of the Epilady patent claimed the defendant's product was equivalent to the Epilady and therefore was infringing on the basis of the equivalence doctrine. [13]  Notwithstanding the availability of some common rules in the EPC on the extent of the protection conferred by the European Patent, [14]  national  **22**  courts of the different States have reached different, often opposite, decisions in the Epilady cases. [15]

From reading the decisions published only in law reviews, it is not easy to decipher which of these cases has been affirmed, has been reversed or has reached a definitive conclusion in a subsequent instance court. Moreover, some of these decisions were handed down in preliminary injunction proceedings. As such, their significance should not be overstated since the decisions may have been reached without a full display of the evidence. In any case, the conflicting decisions arising from these Epilady cases are quite alarming. It should also be noted that most judges in these cases were well aware of the existence of prior decisions made by their foreign counterparts. Although paying lip service, at least by some of the judges, to the obvious need for a uniform interpretation of the EPC, they did not seem particularly concerned by their mutual open dissent. In fact, the varying conclusions reached by the different national courts have been attributed to allegedly different evidence submitted by the parties, [16]  to different procedural laws, [17]  however implausible, or to differing interpretations of the law by the judges, [18]  a more honest and correct explanation. It is self-evident how dangerous and absurd this unfortunate result of differing interpretations of the EPC is for the primary goal of the European Union, namely the free movement of goods.

The second problem with the EPC is its reliance on each Contracting State's national laws to govern important parts of the European Patent. As stated previously, the EPC does not provide a uniform law on many important points (e.g., employed inventors, joint ownership of the European Patent, remedies, etc.). These issues of substantive law are entirely regulated by national laws that are not uniform, and are often quite different. So, from this point of view, the goal of harmonization and unification promoted by the EPC is only partially accomplished.

But the major weakness of the EPC lies not in its failure to completely meet its objectives of partial harmonization and unification; rather it is with the difficulty in amending its law. In practice, the revision of the EPC is governed by unanimity; it  **23**  can only be amended with the consent of all Contracting States. In fact, Article 172 of the EPC provides that it can be amended by a conference, where at least three-fourths of all the Contracting States are represented, with the approval of three-fourths of the represented and voting Contracting States. [19] According to the same Article, in a situation where the three-fourths approval of represented and voting Contracting States is met, the dissenting Contracting States (i.e., the Contracting States that fail to ratify or accede to the revision) shall cease to be parties to the EPC. In theory, this mechanism seems efficient. But thirty years of practice have demonstrated that it does not work. It is unlikely that any Contracting State would promote the expulsion of another State or allow itself to cease to be a party to the EPC. In effect, this causes the amending process of the EPC to be governed by a unanimity rule. [20]

This *de facto* unanimity rule keeps the EPC from undergoing any significant changes. In fact, the EPC has undergone only one minor change in almost 30 years. This amendment, the change to Article 63 of the EPC, was so insignificant that all the Contracting States welcomed it. [21] The revision allows, but does not obligate, the Contracting States to grant supplementary certificates for European Patents under the  **24**  same conditions as those applying for national patents. By all accounts, this rule creates a rather strange result. [22]

It is widely understood that the EPC needs a major overhaul. [23] For instance, many people think that the introduction of a procedure for a centralized reexamination of the patent after the issuance of a grant would be useful. Indeed, the establishment of such a procedure would considerably reduce the importance of the competence problem regarding a judicial review of a European Patent. Furthermore, the European Community Regulation on the Community Trademark, having adopted for the jurisdiction matter a solution quite different from that adopted by the CPC, invites us to reconsider the problem in the patent context. [24] The obvious differences between a patent and a trademark, as to the substance of the exclusive right, do not justify taking a strikingly different approach on this issue.

Likewise, it is widely held that the current law covering the novelty of invention found in the EPC is too severe and could be positively amended by introducing a grace period. The present law found in the EPC, like all European national patent laws, provides that every disclosure of the invention prior to the date of the patent application creates a lack of novelty. [25] , [26] This lack of novelty prevents the grant of a  **25**  valid patent. Therefore, it is widely understood that this law excessively punishes the applicant without serving truly important interests of third parties. Some European judges in prior disclosure cases have tried to avoid the logical consequences of the law if they find themselves uncomfortable with them. But this judicial discretion is not consistent with the spirit of the legal systems of continental Europe. Rather, it would be preferable to amend the law by introducing a grace period similar to that found in United States' patent law. [27] Unfortunately, nobody has ever tried to outline a new text for these and the various other deficiencies found in the EPC.

Above all, the EPC needs an entirely new set of rules for biotechnology inventions. This new field cannot easily be governed by the outdated law found in the EPC, created in a previous era to cover fields that do not have the complex issues found in modern biotechnology. Because of the difficult amending process, it is highly unlikely that the Contracting States would agree to amend the EPC in order to introduce a new body of law covering biotechnology inventions.

The Directive 98/44/EC of the European Parliament and of the Council of July 6, 1998 on the legal protection of biotechnology inventions was not implemented by  **26**  any of the Member States, and the implementation period expired on July 31, 2000. [28] Although the Member States seem to agree today that they all dislike the Directive as it is, they have not been able to agree on possible amendments.

This current deadlock forewarns that any attempt to change the EPC, at least with regard to biotechnology patents, would be in vain. In the context of biotechnology patents under the EPC, the EPO has sought to displace the current law by creating new

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 326 of 520

law. But the EPO is not empowered to amend the EPC. The EPO could only take from Directive 98/44/EC some new rules concerning biotechnology patents and put them in the implementing regulations to the EPC and not in the EPC itself. [29] These implementing regulations can be enacted and amended by the EPO on its own authority. While this has been a useful step, nobody can feel truly satisfied since these rules do not have the force of law.

Notwithstanding these existing problems, the balance of the EPC can be viewed positively if we see it as a provisional tool, as it was envisioned in its early days. It should only be viewed negatively if we regard it as a definitive tool. The unfortunate fact is that the EPC has not been followed by the second step, the CPC.

The main idea of the CPC is quite simple: the European Patent would become a single patent for the States adhering to the EPC and which were also Member States of the European Community. To achieve this goal, the CPC was to provide a set of rules to integrate the law promulgated under the EPC and thus complete the work already started by the EPC. Combining both regimes would create an almost entirely self-sufficient patent system. [30]

The idea of a single patent for the whole European Community was the right idea. It can be said that the legal framework created by combining the EPC and the CPC was an especially good one considering the time in which it was written. [31] The question that must be asked is, "What went wrong?" The mistake was not in the goal of establishing a unified European patent system, but rather in the tools created to accomplish this goal. The mistake was using two interacting Conventions rather than issuing a Regulation.

In the 1970s, the European Community considered itself too weak to issue a Regulation and did not dare impose a Regulation covering patent law on the Member States. The perception then was that this was too sensitive a field for Regulations. The European Community was afraid it would not obtain the political consensus among the Member States if it issued a Regulation on patent law. Trying to circumvent this obstacle, or at least what it felt to be an obstacle, the European Community chose to persuade the Member States to sign a Convention covering patent law. Even though a Convention might be more difficult to negotiate, the idea **\*27** behind adopting the integrated Conventions as opposed to issuing a Regulation was that the States could not object to a Convention after they had signed it.

This strategy proved incorrect. In hindsight, it is easy to say that it would have been wiser to issue a Regulation. But it is interesting to note that there is no trace in the legislative history of a real perception of the future deadlock Europe was creating for itself. Only some concern can be found about the technical complexity of splitting the new system into two Conventions and of coordinating their interaction. [32] No one seems to have thought, or at least written, that the second Convention, the CPC, would take so long, if ever, to become effective.

Immediately after its signing, the CPC faced unsolvable non-strategic problems that have prevented its ratification and its becoming effective. These problems are not *per se* insurmountable; rather they are problems whose settlement has been prevented only by the sometimes, and all too often, resurgent chauvinism of the European States.

The first problem to arise was the competence regarding the validity of Community Patents. The original text of the CPC gave the EPO the exclusive competence to decide on applications for revocation of the patent (Article 55); but the CPC also gave the Member States the authority to grant the competence to decide on the counterclaim of invalidity in infringement suits to their national courts (Article 90). In these cases, the decision of the national court would be binding on that particular State only. This rule is identical to the one found in the EPC, which holds that the findings of a national court regarding the invalidity of a patent is only binding on that particular State. [33] Although the EPC rule is perfectly consistent with the idea of the European Patent as only a bundle of national patents with nothing inherently unique, this same rule found in the CPC is not consistent with the idea of the Community Patent as a unique patent for the whole territory of the European Community.

Some States were not comfortable with the rule found in the CPC and asked for a common court of Community Patents. Other States, namely Denmark and Ireland, replied that their Constitutions did not allow for the creation of a special patent court. [34] After fourteen years of interminable discussions, the Member States agreed on a new text for the CPC, which they signed in Luxembourg on December 15, 1989. [35] This text left the patent validity problem in the first instance to the national courts and created the Community Patent Appeals Court (CoPAC) for the second instance. The creation of CoPAC was very important, but not for the reason then claimed - that the States could not accept another State's national court invalidating a Community Patent

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 327 of 520

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

that would be binding on all the States. CoPACs importance is it ensures that in the second instance the interpretation of the CPC will be unified. Although this may be the proper tool to add to the CPC, it should be noted that **\*28** CoPACs competence only encompasses the problems of patent validity and not other disputes that may arise under the Community Patent. [36]

With this development, it finally seemed likely that the CPC would become effective. But as all this was taking place, the number of Member States of the European Community dramatically increased, from 9 in 1975, when the first version of the CPC was signed, to 12 in 1989, when the second version of the CPC was signed. [37] With this increase in States, everyone expected a new problem, translations, to arise. And it did. So, notwithstanding the signature by all the Member States, the second version of the CPC has not been ratified by all the Member States and consequently has not become effective because the issue of translations has not been resolved.

Some Member States kept asking that the full text of patent applications be translated into all eleven official languages of the European Union. [38] The original text of the CPC provides (Article 14) that the applicant must file the patent application in one of the three official languages of the EPC (English, French and German). However, Article 30 of the 1989 version of the CPC provides that the full text of the specifications found in the patent application be translated into all the official languages of the European Community. [39] This rule has been said to be the "kiss of death" for the CPC because it would cause a dramatic increase in the cost of patent applications, perhaps inducing inventors to avoid filing for Community Patent applications, instead opting for the far less expensive and therefore more attractive national patents. [40], [41] This stalemate persists even though everyone is well aware that **\*29** nobody ever looks at or reads the translations of patent applications. [42] Indeed, it is widely known that when a patent is in dispute or negotiation, everyone reads the text of the patent application in its original language to reach the greatest level of understanding. This is facilitated by the advanced diffusion of language knowledge in Europe. [43]

The text of the CPC, as amended in 1989, addressing translations cannot be thought of as having a serious chance of ratification. The translation of the full text of the specifications of patent applications into all the European Community languages is truly unbearable. If the translation of only the claims of a patent application is considered inadequate, at most the CPC should only require the translation of a short abstract of the specifications of the patent application into all the official European Community languages in addition to the claims. This solution would keep the costs quite low, giving every European Community citizen the opportunity to read the most important part of the patent application in his or her national language. There has been no sign of widespread agreement on this reasonable idea.

The deadlock on this issue seems to stem only from the interests of the patent agents, who in Europe today derive a major part of their income from patent application translations. In addition to the EPC requirement that the patent application be written in one of the three official languages of the EPC, the national laws of the Contracting States require that the applicant submit a translation, generally of the full text of the specifications, in the national language of each State designated in the patent application. But usually the applicant does not seek patent rights in all the Contracting States and accordingly can limit the number of designations, which in turn limits the total cost of translations. Since the Community Patent automatically and unavoidably becomes effective in all the Member States, the obligation to translate the full text of the patent application into all the official languages of the European Community would always be imposed thereby increasing costs to the applicant. Unfortunately, some governments are unable to distinguish between their national interests and the interests of a small group of their citizens, in this case a few hundred patent agents.

In the meantime, the substantive law of the CPC has in part become outdated along with that of the EPC. Like the EPC, the CPC is practically impossible to amend due to the unanimity rule that governs its revision. [44] The history of the last quarter-century gives full evidence of this impossibility.

**\*30** To overcome the obstacles of this proposed integrated two-Convention framework, Europe must start from square one. In so doing, the following points must be carefully considered:

a) Europe needs a Community Patent that is a uniform patent for the whole European Community. This is not simply a need of European industry, but a need of the global economy. The accomplishment of this goal can no longer be delayed.

b) The proper body to accomplish this goal is now the European Community. The reasons that led, beginning in the early 1950s, to the EPC governing a group of European States different from what was the European Community at the time of the EPCs

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 328 of 520

creation are almost now entirely gone. The circle of States adhering to the EPC overlaps almost entirely with the circle of Member States of the European Community/European Union. The small differences that still exist are not worth the cost of maintaining the EPC as a different institution. [45] In addition, Liechtenstein, Norway and Iceland are now part of the European Economic Area, which is something between an anteroom for entry into and a partial surrogate of the European Community. Only Switzerland seems really determined to remain outside of the European Community/European Union. But this should not prevent the integration of Switzerland into the network of a European Community institution, like a Community Patent. [46] Bringing the European Patent within the European Community would guarantee that every State, once admitted, including all the Central and Eastern European States that are now in line for admission, would automatically be subject to the Regulation on the Community Patent. There would be no need to provide for a different forum of negotiation for the inclusion of a new Member State in a patent Convention, whether it is the EPC, the CPC or both. Different forums would only create costs, delays and uncertainties.

Including the European Patent in the European Community framework would have many benefits for Europe. A Regulation on the Community Patent would assure the best coordination with the European Community technology transfer regime that is deeply rooted in the European Community Treaty and is functionally a chapter of patent law. [47] Likewise, with the successes of the new regimes addressing Plant Varieties, which is clearly a specialized patent, and the Community Trademark, both being governed by European Community Regulations, there can be no doubt that the Community Patent would benefit from a similar treatment. [48] Further advances are being made along these same lines with respect to the future, **31** seemingly imminent, Regulation on Community Designs. [49] Furthermore, a new Regulation on the Community Patent should permit a uniform and more coherent regime for the supplementary certificate. [50]

Last but not least, if the EPO is included within the European Community, it will have a stronger stature. In its current form, the EPO is susceptible to undergoing a formal diminution of power causing it to lose its current international status. But if the EPO is integrated into the European Community, it will have a louder voice at international forums where the evolution of world patent law is created and studied. If the EPO were to undergo this transformation, it would have more constructive contacts with the World Trade Organization (WTO), which in turn would lead to a better coordination of the new European patent law with the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS). [51] Likewise, the EPO would have better contacts with the World Intellectual Property Organization (WIPO) and there would be a greater participation of the EPO in the WIPO Patent Treaty discussions that are now ongoing. [52]

c) The proper and correct tool to accomplish these goals is a European Community Regulation on the Community Patent. However European historians judge the choice of using Conventions to regulate patents, the correct tool going forward can only be a European Community Regulation. In the regulatory framework of the European Community, the Regulation is the device specifically used to introduce new common rules applicable to all the Member States. The use and success of the Regulation to create both the Community Trademark and the Plant Varieties regimes confirms that, from a technical point of view, the Regulation can be used for the creation of the Community Patent. From the political perspective, it must be recognized that the European Community is now strong enough to use this tool in the patent field. Additionally, the European Community Regulation on the Community Trademark is a good model framework for a new European Community Regulation on the Community Patent, at least for procedural matters.

It should be underscored why a European Community Regulation is necessary, namely its ability to evolve. A European Community Regulation is not simply the better or "natural" way to create a common law for European Patents; it may be the only way of creating a patent law capable of evolving. This is truly the very core of the problem. It may seem naïve to insist on this point, but no legal system can survive without change. [53] "[T]he law currently in force is no more than a snapshot of **32** a shifting scene at a particular time." [54] And this is particularly true for those parts of a legal system embracing fields subject to a particularly swift pace of change. From this point of view, patent law easily appears as a set of rules in desperate need of constant adjustment to the ceaseless evolution of technology. In this regard, patent law is destined for perennial change more than any other part of the legal system.

As already stated, the birth and explosion of biotechnology in recent years calls for the creation of a new set of rules governing these unique inventions. The EPC desperately needs new rules to cover this field, but there is no hope they can be enacted under the Convention. The European Community has begun discussion on this point with its Directive. [55]

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 329 of 520

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

Nobody can divine the future, but it is improbable a new law for biotechnology inventions will not be enacted in Europe in the near future. Simply put, the high cost of research in this field and the importance of the contributions biotechnology can have on the improvement to quality of life, portends well for achieving a new law in this field. A workable solution to the debate on biotechnology patents could be reached within a reasonable timeframe. In fact, the most acrimonious part of the present debate in Europe has no direct relation to, what should be, the content of the Directive, i.e., the law of biotechnology patents. Rather the debate is particularly heated over the ethical and environmental aspects of the use of biotechnology, which have nothing to do with the issues of substantive law for biotechnology patents. [56] By mixing social issues with legal issues, the goal of reaching a solution for biotechnology patents is further postponed.

One must remember that having a patent does not mean freedom to use the invention. This underlying principle, inherent in all patents, has been forgotten by many in Europe considering biotechnology patents and must resurface. The loud voices in the current debate on biotechnology have different cultural backgrounds (e.g., green party members, church leaders, religious circles, intellectuals, actors and playwrights) and span the political spectrum. They are all engaged positively in the public discourse contributing with passion. Unfortunately, they are often not acquainted with or versed in patent law. These voices seem generally to think, and in fact assume, that the grant of a patent automatically allows the use of the invention or confers on the patent holder some kind of public acknowledgement. We must not understate that granting a patent and allowing the use of the invention are two absolutely different and independent decisions.

The ethical discussions concerning the use of biotechnology involve issues of enormous impact and cannot easily reach a general consensus. They trigger very strong emotions touching deeply rooted and complex motivations where it is difficult to distinguish between rational ideas and irrational fears, however important **\*33** these fears may be. The difficulty of reaching a consensus on this issue even within a single country shows the problem of reaching a consensus for all of Europe. But this debate must go on and explore all sides of the issue. It would be naïve to think it could move easily and quickly towards any common agreement, no matter how small. On the other hand, we cannot postpone the creation of a new biotechnology patent law to wait for the answers raised by the questions in using biotechnology. Doing so would punish all of mankind. The absence of patent protection, or at least the present uncertainty, discourages biotechnology research. We will all miss important improvements in our quality of life (e.g., new diagnostic tests, new vaccines, new drugs, new therapies for genetically-induced diseases, etc.) if biotechnology development is stifled.

Equally important is the discussion of the environmental risks of using biotechnology. This too is a field where heated and emotional passions mingle with irrational fears. However, this is an issue where we should try to avoid irrational feelings and reach a technical consensus on what could be a sufficient degree of safety. Here a form of technical consensus could be reached and amended or renegotiated as our knowledge of the problems increase. But neither the environmental or ethical issues have much to do with the problem of creating a new biotechnology patent law for Europe, nor are the resolutions of the former issues a prerequisite for the latter. We must separate the various problems and find good workable solutions to each of them. A good solution to the biotechnology patent law problem could be more easily and rapidly achieved than a good solution to the ethical and environmental problems found in the same field. Therefore, it should prove easier to create the new rules for biotechnology patents under the framework of the European Community, notwithstanding the current stalemate of the European Community Directive, than inside the EPC or some other international Convention. [57], [58]

In other words, it should be easier to reach the consensus of all the Member States of the European Community's institutions, which are the European Parliament and the European Council, than through the diplomatic channels that preside over the revision of an international Convention. [59] The framework of the European Community's institutions could enhance the debate and help the different voices in finding a common position. Under this framework, there is room enough for negotiations, for changing minds, and for reaching acceptable and fair compromises.

On the contrary, in the diplomatic forum for negotiating an international Convention, the governments of the participating States are usually less willing to change their minds. Governments sometimes will not actively promote changes to Conventions if they fear their parliaments, or significant constituencies, will not approve a change to a Convention or could use that change as political leverage in the national arena, especially when the problem at stake is not a purely technical one. **\*34** It is widely known how difficult, or impossible, it is to amend existing international Conventions. [60]

In the European Community framework, the Member States do not openly oppose each other. They jointly approach the same problem from unbiased viewpoints. Conversely, in the diplomatic context the States are influenced by internal contingencies that often lead to conflicting positions, and thus make the path to a common position much longer and more difficult, if possible at all.

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 330 of 520

Therefore, the European Community framework would be a more efficient forum for the proposed creation of a Community Patent and for the shaping of a new European law governing biotechnology patents. Not because the final solution under this framework could be achieved without the consent of some Member States, but because the European Community offers a more convenient and efficient forum for negotiating. Such negotiations could provide at once the text for a new Directive and the groundwork for the chapter on biotechnology patents in a Regulation for a Community Patent. Concurrently, the European Commission could draft the other chapters of the new Regulation by amending the present versions of the EPC and the CPC to update their law.

Beyond the problems already cited (e.g., the grace period in the novelty rule) the problem of jurisdiction could be revisited as well. Instead of retaining the solution worked out in the 1989 text of the CPC, the text could be redrafted using the model adopted by the Regulation on the Community Trademark. [61]

The CPC does not give patent validity competence to the EPO. Instead the competence is given to the national courts in the first instance and the CoPAC in the second instance. As to infringement, the CPC grants competence to the national courts and has no mechanism to harmonize the varying national jurisprudences. This is in stark contrast to the European Community Regulation on Community Trademark that establishes the so-called Community Trademark Courts. These are national courts, designated by the States in very limited numbers. These courts of first and second instance have exclusive jurisdiction in respect to all acts of trademark infringement committed within the territory of any Member State. [62] The decision of the Community Trademark Court is binding not only on the State where the court is located, but it is also binding on all Member States of the European Community. Therefore, the law avoids the need for parallel actions against the same infringer in each Member State where possible trademark infringement has occurred. It also avoids the possibility of different decisions on the same case by different national judges in parallel lawsuits. One noticeable deficiency in this model is the **\*35** absence of a mechanism to coordinate the interpretations of the Regulation by the different national judges.

In the Community Trademark Regulation, the competence for trademark validity is split between the Community Trademark Courts and the Office for Harmonization in the Internal Market - Trademarks and Designs (OHIM). Any application for the revocation of a Community Trademark must be submitted to OHIM. [63] Furthermore, the Community Trademark Courts have jurisdiction for counterclaims for revocation or declaration of invalidity of a trademark. If the Community Trademark Courts wish, they can request the defendant submit an application for revocation or for declaration of invalidity to OHIM.

This quite complicated set of rules covering trademark in Europe, although not perfect, is preferable to the solution governing patents worked out in the 1989 version of the CPC. The trademark framework, with some improvements, could provide a working model for a new set of competence rules for the Community Patent. In so doing, it is hard to imagine the Member States objecting to this solution since they have already accepted it in the trademark field.

So, with a little luck and a rational approach by the European States and the European Community institutions, the goal of the Community Patent could be accomplished in the near future.

### Footnotes

a1    Vincenzo Di Cataldo is a Professor of Business Law at the Law School of the University of Catania, Italy and was a BNL Visiting Professor of Law at the Columbia University School of Law, Autumn 2000.

1    1065 U.N.T.S. 199, available at http://www.european-patent-office.org/legal/epc.

2    1989 O.J. (L 401) 1. The CPC is also referred to as the Convention for the European Patent for the Common Market.

3      For a history of these works, see J. B. Van Benthem, The European Patent System and European Integration, 24 Int'l Rev. of Indus. Prop. & Copyright L. 435-445 (1993); Otto Bossung, The Return of European Patent Law to the European Union, 27 Int'l Rev. of Indus. Prop. & Copyright L., 287-315 (1996).

4      For a short summary discussing the first works creating the European Communities, see Derrick Wyatt & Alan Dashwood, European Community Law 3-19 (3d ed. 1993).

5      Including, for example, the United Kingdom and Switzerland. The United Kingdom reversed its decision not to join the European Community by joining in 1973; Switzerland still has not joined.

6      Although the phrase "maximum/minimum approach" is widely used, its origin is unclear.

7      A Contracting State is a European State that has ratified the EPC and thereby agrees to be bound by it.

8      A trilateral website EPO-JPO-USPTO, jointly edited by the European Patent Office, the Japanese Patent Office and the United States Patent and Trademark Office presents interesting data about, inter alia, the number of applications filed and granted by each of these offices, at http:// www.european-patent-office.org/tws/sr.htm. The EPO received an average of 80,000 patent applications per year during the 1990s.

9      One can say "strangely" because the need for a mechanism for unifying the differing legal interpretations within each legal system is a widely known problem, and "obviously" because the EPC was intended to be only a first step. The mechanism of unification was left to the second step, the CPC, where it has been inserted, although only after the 1989 revision and only for some points of law. This unification mechanism is the Community Patent of Appeals Court (CoPAC), discussed infra, that acts as the court of second instance only on issues regarding the validity of the patent.

10      Ways for harmonizing national case law are displayed by K. Grabinski, Can and May Determination of the Extent of Protection Conferred by a European Patent in Different Countries Lead to Different Results? in 30 I.I.C. Int'l Rev. of Indus. Prop. & Copyright L., 867 (1999). The only way to accomplish some form of harmonization in the current scheme is if the national judges considered the decisions of other Contracting States' courts as having precedential value, although it would necessarily have to be non-binding.

11      One such example has been the Müller-Hilty cases about a pipe clamp patent. German, French and Swiss courts have decided these cases differently. These cases are about the doctrine of equivalency patent infringement, the same issue as that found in the Epilady cases discussed infra. See M. Franzosi, Three European Cases on Equivalence - Will Europe Adopt Catnic?, in 32 I.I.C. Int'l Rev. of Indus. Prop. & Copyright L., 113 (2001).

12      See supra note 14. It is not certain whether this is an exhaustive list, but if other Epilady cases have occurred in Europe they have not been published in the major European law reviews.

13      See EPC, Article 69, accompanied by a protocol on its interpretation, which is an integral part of the Convention. Unfortunately, neither of these texts directly addresses the problem of equivalence.

14      See K. Grabinski, supra note 3 at 858; D. Stauder, The History of Art. 69(1) EPC and Art. 8(3) of Strasbourg Convention on the Extent of Patent Protection, 23 Int'l Rev. of Indus. Prop. & Copyright L. 311 (1992).

15      Infringement has been affirmed in the United Kingdom by Court of Appeal, August 12, 1988, 21 Int'l Rev. of Indus. Prop. & Copyright L. 561 (1990); in the Netherlands by Gerechtshoftes-Gravenhage, June 29, 1989, 21 Int'l Rev. of Indus. Prop. & Copyright L. 586 (1990); in Belgium by Gerechtshof Antwerpen, June 25, 1990, GRUR Int'l 385 (1992);

in Germany by Oberlandesgerichts Dusseldorf November 21, 1991, GRUR Int'l 242 (1993); and in Italy by Tribunale Milano, May 4, 1992, GRUR Int'l 249 (1993), and 21 Giurisprudenza annotata di diritto industriale, GRUR Int'l 589 (1992). Infringement has been denied on various grounds in the United Kingdom by Patents Court, May 16, 1989, 21 Int'l Rev. of Indus. Prop. & Copyright L. 860 (1990) (the United Kingdom Patents Court has been followed in Hong Kong by the High Court, November 2, 1988, 21 Int'l Rev. of Indus. Prop. & Copyright L. 580 (1990); by the High Court, October 2, 1989 21 Int'l Rev. of Indus. Prop. & Copyright L. 857 (1990); and by the Court of Appeal, September 4, 1990, 24 Int'l Rev. of Indus. Prop. & Copyright L. 388 (1993); although Hong Kong is not a signatory to the EPC, the law of the United Kingdom, which is a signatory, applies in Hong Kong); in Austria by Oberlandesgericht Wien, July 31, 1989, 23 Int'l Rev. of Indus. Prop. & Copyright L. 391 (1992); in the Netherlands by The Hague District Court, November 13, 1989, 21 Int'l Rev. of Indus. Prop. & Copyright L. 589 (1990), and Gerechtshof Den Haag, February 20, 1992, GRUR Int'l 252 (1993); and in Germany by Oberlandesgericht Dusseldorf, October 27, 1988, 21 Int'l Rev. of Indus. Prop. & Copyright L. 572 (1990).

16    Improver Corp. v. Raymond Indus. Ltd., Hong Kong Court of Appeal (1990), *reprinted in* 24 Int'l Rev. of Indus. Prop. & Copyright L. 388, 390 (1993).

17    Improver Corp. v. Raymond Indus. Ltd., Supreme Court (High Court) of Hong Kong (1989), *reprinted in* 21 Int'l Rev. of Indus. Prop. & Copyright L. 857, 859 (1990).

18    Improver Corp. v. Remington Consumer Prods. Ltd., United Kingdom Patents Court (1989), *reprinted in* 21 Int'l Rev. of Indus. Prop. & Copyright L. 860, 866 (1990).

19    EPC, art. 172 - Revision:

(1) This Convention may be revised by a Conference of the Contracting States.

(2) The Conference shall be prepared and convened by the Administrative Council. The Conference shall not be deemed to be validly constituted unless at least three-quarters of the Contracting States are represented at it. In order to adopt the revised text there must be a majority of three-quarters of the Contracting States represented and voting at the Conference. Abstentions shall not be considered as votes.

(3) The revised text shall enter into force when it has been ratified or acceded to by the number of Contracting States specified by the Conference, and at the time specified by that Conference.

(4) Such States as have not ratified or acceded to the revised text of the Convention at the time of its entry into force shall cease to be parties to this Convention as from that time.

20    See Bossung, supra note 3 at 292.

21    The Act revising the text of Article 63 of the EPC dates back to December 17, 1991. The new text is as follows:

Article 63 - Term of the European Patent.

(1) The term of the European Patent shall be 20 years as from the date of filing of the application.

(2) Nothing in the preceding paragraph shall limit the right of a Contracting State to extend the term of a European Patent, or to grant corresponding protection which follows immediately on expiry of the term of the patent, under the same conditions as those applying to national patents:

(a) in order to take account of a state of war or similar emergency conditions affecting that State;

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 333 of 520

(b) if the subject matter of the European Patent is a product or a process of manufacturing a product or a use of a product which has to undergo an administrative authorization procedure required by law before it can be put on the market in that State.

(3) Paragraph 2 shall apply mutatis mutandis to European Patents granted jointly for a group of Contracting States in accordance with Article 142.

(4) A Contracting State that makes provision for extension of the term or corresponding protection under paragraph 2(b) may, in accordance with an agreement concluded with the Organization, entrust to the European Patent Office tasks associated with implementation of the relevant provisions.

[22]    The history of this amendment perfectly shows the inability of the European States to amend the EPC to introduce a common rule directly relating to the European Patent supplementary certificate. In fact, after the United States introduced the Drug Price Competition and Patent Term Restoration Act of 1984, many European countries moved to amend European patent law to match this pattern. A consensus among all the EPC Contracting States proved impossible. Instead, some countries enacted amendments to their national patent laws (France, with Loi n. 90/510 of June 25, 1990, and then Italy, with Legge n. 349 of October 19, 1991). Inevitably, these national amendments were different from one another. The European Commission, well aware of the forced inertia of the EPC, grew alarmed at this disharmonic proliferation of national laws and pushed the European Council to enact two different and consecutive regulations. These regulations, 1768/92, June 18, 1992, for pharmaceuticals, and 1610/96, July 23, 1996, for agrochemicals, do not directly affect the EPC; they simply oblige the Member States to issue supplementary certificates "at the request of the holder of a national or European Patent," in the latter case with limited effect to that national fraction of the European Patent. In order to affirm its competence, it seems the European Community has followed the strange idea born in France that the supplementary certificate "is a separate new intellectual property right which shall come into effect when the basic patent expires." W. A. Hoyng and F. Fink-Hooijer, The Patent Term of Pharmaceuticals and the Legal Possibilities of its Extension, 21 Int'l Rev. of Indus. Prop. & Copyright L. 181 (1990). From this study, which aims at exploring the existing differences in the national laws affecting the European Patent, it is worth noting that neither of the two European Community regulations requires the application for a supplementary certificate be filed at the same time as the national fractions of the same European Patent. Therefore, the European Patent and its supplementary certificates can have different terms of expiration in different Contracting States. In fact, the patent holder could apply for supplementary certificates in different States at different times, causing the various national supplementary certificates to have different expiration dates.

[23]    See E. Armitage, Updating the European Patent Convention, 22 Int'l Rev. of Indus. Prop. & Copyright L. 1 (1991).

[24]    See Council Regulation 40/94, 1994 O.J. (L 11) 1. The full text of this regulation may be found on the official website of the Office for the Harmonization of the Internal Market (OHIM): http:// www.oami.eu.int/en/aspects/reg/reg4094.htm. The solution in this regulation is explored infra.

[25]    Articles 54 and 55 in the EPC state the novelty requirement. The text is as follows:

Article 54 - Novelty.

(1) An invention shall be considered to be new if it does not form part of the state of the art.

(2) The state of the art shall be held to comprise everything made available to the public by means of a written or oral description, by use, or in any other way, before the date of filing of the European Patent application.

(3) Additionally, the content of European Patent applications as filed, of which the dates of filing are prior to the date referred to in paragraph 2 and which were published under Article 93 on or after that date, shall be considered as comprised in the state of the art.

(4) Paragraph 3 shall be applied only in so far as a Contracting State designated in respect of the later application, was also designated in respect of the earlier application as published.

FROM THE EUROPEAN PATENT TO A COMMUNITY PATENT, 8 Colum. J. Eur. L. 19

Case 6:25-cv-00581-ADA    Document 7-6    Filed 12/15/25    Page 334 of 520

(5) The provisions of paragraphs 1 to 4 shall not exclude the patentability of any substance or composition, comprised in the state of the art, for use in a method referred to in Article 52, paragraph 4, provided that its use for any method referred to in that paragraph is not comprised in the state of the art.

Article 55 - Non-prejudicial disclosures.

(1) For the application of Article 54 a disclosure of the invention shall not be taken into consideration if it occurred no earlier than six months preceding the filing of the European Patent application and if it was due to, or in consequence of:

(a) an evident abuse in relation to the applicant or his legal predecessor, or

(b) the fact that the applicant or his legal predecessor has displayed the invention at an official, or officially recognized, international exhibition falling within the terms of the Convention on international exhibitions signed at Paris on November 22, 1928 and last revised on November 30, 1972.

(2) In the case of paragraph 1(b), paragraph 1 shall apply only if the applicant states, when filing the European Patent application, that the invention has been so displayed and files a supporting certificate within the period and under the conditions laid down in the implementing regulations.

26    The national laws of continental Europe governing novelty of invention are traditionally shaped in the same way as the EPC. They draw no distinction between information published by the inventor and by someone unconnected with the inventor. Both sets of laws anticipate the patent application and invalidate the patent.

27    U.S. patent law distinguishes between the lack of novelty for anticipation by third parties, U.S. Patent Act, 35 U.S.C. §§ 101, 102(a), 102(e), 102(g), (2001), and from the statutory bar or loss of right relating to acts of the inventor (U.S. Patent Act, 35 U.S.C. §§ 102(b), 102 (c), 102(d) (2001). If the inventor discloses the invention prior to the filing of the patent application, the inventor has a time limit of one year for filing the patent application. On the other hand, in the national patent laws of Europe and in the EPC, disclosure by the inventor prior to the filing of the patent application is generally considered grounds for invalidity and the loss of the inventor's rights to the invention cannot be avoided. The difference on this point between the European and the Japanese patent systems, on the one hand, and the United States' patent system, on the other, is stressed by R.P. Merges, Patent Law and Policy 224-6 (1997).

28    Directive 98/44/EC, 1998 O.J. (L 213) 13.

29    See the Decision of the Administrative Council of the EPO amending the implementation regulations to the EPC, effective on September 1, 1999, Official Journal of EPO 437 (1999). The document is also published in 30 Int'l Rev. of Indus. Prop. & Copyright L. 785 (1999).

30    However, there are some gaps left to be filled. For example, there is no uniform law on remedies, which has been left entirely at the national level. Likewise, the jurisdiction issue has been addressed in a complicated and inefficient way, as explained infra.

31    From a historical point of view, the drafters of the Conventions have faced the opposite problem. In fact, they have split into two Conventions what had originally been thought of as only one Convention. This splitting occurred when it was definitively clear that not all the Member States of the European Community were ready to subscribe to a Convention on a European Patent.

32    For this textual history of splitting and coordinating see Van Benthem, supra note 3 at 437.

33    This result is the obvious consequence of the general principle of the EPC, set forth in Article 2: "The European Patent shall, in each of the Contracting States for which it is granted, have the effect of and be subject to the same conditions as a national patent granted by that State, unless otherwise provided in this Convention."

34    Although Italy did not respond in this fashion, the same issue is relevant to it as well.

35    See the Agreement Relating to Community Patents - Done at Luxembourg on 15 December 1989, 1989 O.J. (L 401) 1.

36    To analyze this issue, the solution offered by the 1989 text of the CPC must be compared with the solution created by the European Community Regulation on the Community Trademark, which solves an analogous problem in a different way. This analysis is discussed infra.

37    There were six original Member States: Belgium, France, Germany, Italy, Luxembourg and the Netherlands. They became nine in 1973 with the entrance of Denmark, Ireland and the United Kingdom; 10 in 1981 with the entrance of Greece; 12 in 1986 with the entrance of Spain and Portugal; and 15 in 1995 with the entrance of Austria, Finland and Sweden. The current number remains at 15.

38    These are English, French, German (these three also comprise the official languages of the EPC), Spanish, Portuguese, Italian, Greek, Dutch, Danish, Swedish and Finnish. The number of languages will further increase with the admission of new Member States from Central and Eastern Europe that are seen in the near future.

39    EPC, art. 30 - Translation of the Specification of the Community Patent:

1. In addition to the translations prescribed in Article 29(1) the applicant shall file with the European Patent Office, before the end of the period prescribed in the implementing regulations, a translation of the text of the application which forms the basis for the grant of the Community Patent in one of the official languages of each of the Contracting States in which the language of the proceedings is not an official language.

40    See Bossung, supra note 3 at 303 (discussing details about the estimated cost of the translations).

41    This same rule has no significant impact in the near field of trademark law, and in that of design as well, since the application is generally composed of only a few pages. For those applications, imposing a translation in each official language of the European Community does not lead to a prohibitive increase in costs. Therefore, provisions governing the Community Trademark and the Community Patent must depart from each other in some discrete instances. According to the European Community Regulation on the Community Trademark, Articles 115-116, the application for a Community Trademark can be filed in one of the official languages of the European Community. If the application was filed in a language that is not one of the five languages of the Trademark Office (English, French, German, Italian and Spanish), the applicant must also indicate a second language chosen from one of the five official languages. The Trademark Office will arrange to have the application translated into the second language indicated by the applicant and into all the other official languages of the European Community. The Trademark Office will then publish the application in all the official languages of the European Community and the language in which the application was filed shall be the authentic version, provided that language was an official language of the Trademark Office. If it was not, the second language indicated by the applicant will be the authentic version.

42    See Van Benthem, supra note 3 at 441; Bossung, supra note 3 at 305.

43    It is generally understood that average Europeans can read and understand English as a second language, even if they are not always capable of speaking or writing it fluently. Furthermore, English language proficiency is likely even greater in the industrial centers of Europe.

44    The rule governing amending the CPC is very vague. Article 13 of the preamble to the CPC, found in the 1989 text (the same rule was almost identical in Article 100 of the original text), says only that if the majority of the Member States of the European Community asks for the revision of the Convention, the President of the European Council shall summon a conference for the revision. Nothing is stated regarding the necessity of a majority vote for a revision. But in the absence of a special rule, it is clear that unanimity is required.

45    Switzerland, Liechtenstein, Norway and Iceland are Contracting States of the EPC, but still are not members in the European Community.

46    The possibility of an agreement between the European Community and European non-Member States is vaguely referred to in Article 8 of the preamble to the CPC, found in the 1989 text. As to the Community Trademark, the European Community wishes to find some way of coordinating legislation with European non-Member States via the Madrid Protocol relating to the Arrangement de Madrid concerning the international registration of marks, signed in 1989.

47    See the Commission Regulation (EC) No 240/96 of January 31, 1996 on the application of Article 85(3) of the Treaty to certain categories of technology transfer agreements, in the Official Journal of the European Community, L 031, 09.02.96.

48    The Council Regulation (EC) No 2100/94 of July 27, 1994 on Community plant variety rights is published in the Official Journal of the European Community, L 227, 01.09.94, 1. The text, as later amended, can be read in the official website of European Community: http:// europa.eu.int/eurlex/en/lif/dat/1994/en_394R2100. The Council Regulation (EC) No 40/94 of December 20, 1993 on the Community Trademark can be read in the official website of OHIM: http:// oami.eu.int/en/aspects/reg/reg4094.

49    The European Commission is actively working on a European Community Regulation on Community Registered Designs. It will follow the European Community Directive 98/71 on the harmonization of design laws of the Member States.

50    See supra note 21.

51    The Agreement on Trade-Related Aspects of Intellectual Property Rights is published on the official website of the WTO: http:// docsonline.wto.org/gen_search.asp, document symbol LT/UR/A1C/IP/1.

52    The World Intellectual Property Organization (WIPO) is the international organization, headquartered in Geneva, Switzerland, created by the Paris Convention for the Protection of Industrial Property of March 20, 1883, many times revised and amended. WIPO administers this and other Conventions it arranges. The text of the Paris Convention can be found on the official website of WIPO: http://www.wipo.int/treaties/ip/paris/index.html.

53    "All organic structures need to be capable of adapting to changing circumstances." Armitage, supra note 22 (implying that a legal system can be considered, and maybe is, an organic structure).

54    F. K. Beier, The Future of Intellectual Property in Europe, 22 Int'l Rev. of Indus. Prop. & Copyright L., 157 (1991) (alluding mainly to intellectual property law).

55    For the official cite for Directive 98/44/EC, see supra note 27.

56    A bibliography covering the ethical and environmental issues of biotechnology would be immense. Apart from the essays of philosophers, moralists, scientists and environmentalists, the ethical and environmental dilemmas have been known and discussed by most patent scholars since the early 1990s. See, inter alia, Symposium Report - Biotechnology Law, 6 High Technology L. J. 149 (1991); R. H. Walker, Patent Law - Should Genetically Engineered Human Beings be Patentable?, 22 Memphis State Univ. L. Rev. 101 (1991-92); D. Manspeizer, The Cheshire Cat, the March Hare and the Harvard Mouse: Animal Patents Open Up a New, Genetically Engineered Wonderland, 43 Rutgers L. Rev. 417 (1991); K. O'Connor, Patenting Animals and Other Living Things, 65 S. Cal. L. Rev. 596 (1991).

57    It is a different and very intriguing problem whether the best protection for biotechnological inventions can be accomplished with a different kind of exclusive right from that given by the current patent system. In fact, many rules that have already been proposed for biotechnology patents (e.g., Directive 98/44/EC) seem to be quite different from existing patent law, creating a different and possibly new kind of right. The question whether a patent or a different kind of exclusive right could better protect biotechnological inventions still does not negate the need for the protection.

58    For the official cite for Directive 98/44/EC, see supra note 27.

59    See Armitage, supra note 22 at 10.

60    In the field of intellectual property law, there have been astonishing changes in the last few years. The talks for the revision of the Arrangement de Madrid concerning the international registration of marks, signed in 1891, went on for decades and eventually the States accepted that a consensus on a new text could not be achieved. Instead, they signed a new Convention in 1989, which is the Madrid Protocol relating to the Arrangement de Madrid concerning the international registration of marks.

61    For the official citation for the Community Trademark Regulation, see supra note 23.

62    According to Article 91 of the Community Trademark Regulation, "the Member States shall designate in their territories as limited a number as possible of national courts and tribunals of first and second instance." These courts, according to Article 92, "shall have exclusive jurisdiction: a) for all infringement actions, and - if they are permitted under national law - actions in respect of threatened infringement relating to Community Trademarks; b) for actions of declaration of non-infringement, if they are permitted under national law; c) for all actions brought as a result of acts referred to in Article 9(3), second sentence; d) for counterclaims for revocation or for a declaration of invalidity of the Community Trademark pursuant to Article 96."

63    Article 55 of the Regulation grants general competence to OHIM for applications to revoke the rights of the proprietor of a Community Trademark and for applications to declare a trademark invalid.

---

**End of Document**                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# **EXHIBIT 21**

Article   Published   19 May 2025

# EU courts can overreach in foreign patent disputes: the arm is very long and not confined to infringement

25 minute read

**Marianne Schaffner**

Partner

Co-head of IP Group (France)
UPC representative

**Mathilde Grammont**

Senior Associate

UPC representative

In its awaited decision in the *BSH v Electrolux* case (Case C-339/22), the Court of Justice of the European Union (CJEU) ruled on 25 February 2025 that:

- A Member State's court seised of jurisdiction by the defendant's domicile pursuant to Brussels Regulation Article 4.1 may hear claims for patent infringement covering that Member State, other EU Member States, and third States outside the EU, for example the UK and Turkey. The decision is consistent with the Unified Patent Court (UPC) Düsseldorf Local Division's decision in *Fujifilm v Kodak* (28 January 2025).

- When hearing a claim for infringement of a patent to a third State on this basis, the court of an EU Member State may hear and determine a defence raised of invalidity, provided no ruling is made for the amendment of the register in the third State. The reservation of exclusive jurisdiction provided by Brussels Regulation Article 24.4 does not apply in respect of patents to third States. The CJEU's reasoning for interpreting Article 24.4 in this way included its decision in Case C-399/21 *IRnova v FLIR*, a 2022 ruling in a patent entitlement dispute (involving patents granted in China and the US) that Article 24.4 did not apply for reasons including that the provision only operated in respect of EU Member States.

- When hearing a claim for infringement of a patent to another EU Member State (again on the basis of domicile of the defendant), the court still has jurisdiction over the claim for infringement even where the defendant challenges, by way of defence, the validity of that patent to another Member State. However, an actual ruling on the validity of the patent to another Member State is, pursuant to Article 24.4 within the exclusive jurisdiction of

## Related insights



Article   Published   09 December 2025

How to assess patentable subject matter eligibility? *Dusome* continues a trend, SCC to follow

the courts of that other Member State; the court seised of the infringement claim does not have jurisdiction over a counterclaim for revocation.

- Although the dispute in the *BSH v Electrolux* case concerned different designations of a European patent, the provisions of the Brussels Regulation upon which the ruling is founded, the rulings made by the CJEU and the CJEU's supporting reasoning are not limited to European patents.

The CJEU's judgment invites criticism from academia, foreign courts and diplomatic channels. It expansively opens the door to international litigants engaging in forum shopping, imaginative cross-border litigation strategies and obtaining and deploying antisuit injunctions from foreign courts. It also undermines to an extent the business case for litigating in the UPC, which already consistently applied the findings of the CJEU twice (*Mul-T-Lock v. IMC Créations, Paris Local Division*, 21 March 2025, UPC_CFI_702/2024 and *Dainese S.p.A v. Alpinestars S.p.A, Milan Local Division*, 8 April 2025, UPC_CFI_792/2024).

For the full discussion please read on below.

On 25 February 2025, the Court of Justice of the European Union (CJEU) handed down its long-awaited decision in Case C-339/22 *BSH v Electrolux*.

The judgment notably modifies the system of jurisdiction operating in the EU in respect of both intra-EU and international patent disputes. Where the court of an EU Member State is seised of jurisdiction to the defendant's domicile, it may hear and determine claims for infringement of patents to other EU Member States, even where validity is challenged (although no ruling may be made on the validity of a patent for another Member State). Such a court may also hear and determine claims for infringement of patents granted by third States (like the UK, Turkey, the USA and China), and in that context also make determinations on questions of validity raised by way of defence, although no direction may be made to the administrative authority responsible for maintaining the national register of the third State concerned.

The CJEU's judgment is consistent with, but also broader than, [the 30 January 2025 ruling made by the Unified Patent Court (UPC) Düsseldorf Local Division (LD) in *Fujifilm v Kodak*](#).

The *BSH v Electrolux* case reached the CJEU by a reference made by the Svea Court of Appeal, Sweden. BSH Hausgeräte (BSH) had sued the Swedish company Electrolux for infringement of BSH's European patent designations covering Austria, France, Germany, Greece, Italy, the Netherlands, Spain, Sweden, Turkey and the United Kingdom. The claims for infringement of non-Swedish designations of BSH's European patent were made in the Swedish Court pursuant to Brussels Regulation Article 4.1, which provides that, "Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State".

The questions referred to the CJEU concerned the operation of the EU's Brussels Regulation on jurisdiction and the enforcement of judgments in civil and commercial matters. Specifically, the interpretation of Article 24, which provides:

'The following courts of a Member State shall have exclusive jurisdiction, regardless of the domicile of the parties:



 Article  Published  24 November 2025

## Greenwashing and governance: practical pointers for sustainability communications



Article  Published  21 November 2025

## EU Commission proposes major changes to EU AI Act: what businesses need to know

(4) in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, irrespective of whether the issue is raised by way of an action or as a defence, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of an instrument of the Union or an international convention deemed to have taken place.

Without prejudice to the jurisdiction of the European Patent Office (EPO) under the Convention on the Grant of European Patents, signed at Munich on 5October 1973, the courts of each Member State shall have exclusive jurisdiction in proceedings concerned with the registration or validity of any European patent granted for that Member State;'

The questions asked of the CJEU about the interpretation of Article 24.4 were variously directed to the claims made for infringement of patents to other EU Member States and those made in respect of third States. The CJEU's rulings on each are considered in turn below.

# The scope of the Brussels Regulation Article 24.4 exception in a cross-border claim for infringement of a patent of another EU Member State

The CJEU first focused on how Brussels Regulation Article 24.4 operates when a claim for patent infringement is made against a defendant in a court of their Member State of domicile which (pursuant to Article 4.1 of the Brussels Regulation) includes a claim for infringement of a patent granted in another Member State.

The CJEU observed that, as the Advocate General (AG) had opined, it is in the interest of the patentee, who believes that their European patent has been infringed by the same defendant in several Member States, to concentrate all of its infringement actions before one single national court, and to obtain injunctions and overall compensation in one single forum. The CJEU said that the solution had the advantage of avoiding, *inter alia*, the risk of divergent decisions.

We note for the reader that the domicile-based jurisdiction of a court provided by Article 4.1 of the Brussels Regulation is subject to any exclusive jurisdiction set under other provisions. Article 24.4 provides for exclusive jurisdiction in proceedings concerned with the registration or validity of a patent to the courts of the Member State in which the registration has been made (or deemed to have taken place). The exception provided by Article 24.4 is not limited to "European" patents; and it applies to "trade marks, designs or other similar rights required to be deposited or registered" too.

The questions first addressed by the CJEU, although addressed to Article 24.4, went to how an infringement claim made in the court of the defendant's Member

State of domicile (pursuant to Article 4.1) in respect of a patent to a different Member State would be impacted by a challenge to the validity of the asserted patent made by way of defence.

The CJEU ruled that **a Member State's court, when seised pursuant to Article 4.1 of the Brussels Regulation of an action alleging infringement of a patent granted in another Member State, does still have jurisdiction over the claim for infringement** (of a patent for another Member State) even where the defendant challenges, by way of defence, the validity of that patent (to another Member State). However, an actual ruling on the validity of the patent to another Member State is, pursuant to article 24(4) within the exclusive jurisdiction of the courts of that other Member State. (Therefore, the court seised by Article 4.1 would not have jurisdiction to hear a counterclaim for revocation made against a patent of another EU Member State. A counterclaim would need to be filed in the courts of the Member State of the patent).

This ruling is a notable departure from the practice long adopted under the Brussels Regulation and earlier iterations of the EU's system of jurisdiction. The long-standing practice was explained in the CJEU's decision in C-4/03 *GAT v Luk*, which reserved the issue of validity of a patent to the courts of the Member State of grant/designation, whether the issue was raised by way of an action or as a defence. The result was that patent infringement and validity disputes were heard and determined, almost exclusively, in the courts of the Member State of each patent, on a state-by-state basis. The CJEU's ruling in *BSH v Electrolux* overturns the approach explained by the Court in *GAT v Luk*, giving the reservation of exclusive jurisdiction provided by Article 24.4 a much narrower scope.

In Case C-616/10 *Solvay v Honeywell*, the CJEU nuanced the position taken in *GAT v Luk* for preliminary relief. Under Brussels Regulation Article 35, a party may seek, in one Member State, a preliminary injunction having effect in one or more Member States even if another Member State's court has jurisdiction on the substance of the matter. The CJEU in Solvay held that Article 35 would not be outweighed by the exclusive jurisdiction set by Article 24.4 where validity issues were raised because the court seised of the request for a preliminary injunction would not issue a final decision with respect to the validity of the asserted patent. The court seised with the request for a preliminary injunction could nonetheless refuse to issue a preliminary injunction if, in its opinion, a reasonable, non-negligible possibility existed that the patent invoked would be declared invalid by the competent court.

The CJEU's ruling in *BSH v Electrolux* would not seem to impact the approach explained in *Solvay v Honeywell*. Indeed, the Court in *BSH v Electrolux* drew analogy with the reasoning in *Solvay v Honeywell* and explained that the court seised of an infringement action may, where appropriate, stay the proceedings, enabling it to take account, for the purposes of the infringement action, of a decision given by the court seised of the action seeking a declaration of invalidity.

However, the CJEU's ruling in *BSH v Electrolux* now enables cross-border claims for patent infringement and **final** relief. It does so by enabling the bifurcation of patent disputes between, on the one hand, the courts of the defendant's Member State of domicile (which may consider a defence of invalidity but not make a ruling as to invalidity in respect of a patent to another

Member State), and on the other hand, the courts of the Member State of the patent (which have exclusive jurisdiction to determine, definitively, a question of validity or registration of the patent concerned). Questions of invalidity and infringement of the same patent may therefore be addressed by the courts of different Member States. The court seised of the infringement claim pursuant to Article 4.1 is not required automatically to stay the proceedings (under Article 30) where a question of validity arises. Whether the threshold condition of a reasonable, non-negligible possibility of the patent being declared invalid by the court of the other Member State arises would be subject to the assessment of the court hearing the infringement case.

Questions arise as to how this new regime will operate practice, in the context of courts of different Member States operating in different territorial jurisdictions according to different procedural rules and traditions. There is no mechanism provided by the Brussels Regulation by which the court of one Member State may refer an invalidity question to court of the state of grant/designation. It will be up to the defendant to bring a revocation claim before each court, and for the parties to keep the various courts involved informed of proceedings ongoing elsewhere.

The CJEU's decision in *BSH v Electrolux* also provides competition for the UPC. Like the UPC, a court in a Member State can now, pursuant to the Brussels Regulation, hear and determine claims for patent infringement in respect of other Member States, even where invalidity defences are raised. But unlike in the UPC, each validity challenge will be considered separately, according to the laws and practices of the Member State of the patent (or European patent designation) concerned and in the courts of that Member State. Hence a risk for a patentee bringing a claim in the UPC – of a single invalidity determination – is mitigated.

Additionally, although the *BSH v Electrolux* case concerned a European patent, different parallel designations of which were being asserted by BSH in the Swedish court, there is nothing in the CJEU's reasoning to suggest that its interpretation of the Brussels Regulation in the context of cross-border patent disputes would apply differently in the case of different national patents being asserted against the same defendant pursuant to Article 4.1. Nor is there anything else that could provide basis for different treatment of European patents.

The European patent system enables applicants to deploy a single pooled examination process in the European Patent Office for the participating states chosen ("designated") by the applicant, such that a "European patent" is granted consisting of a bundle of national designations. The system – specifically founding treaty the "European Patent Convention" (EPC) - makes no provision for cross-border jurisdiction in respect of questions of infringement or validity of a European patent's different national designations, each of which constitutes a distinct property right governed by the laws of the state for which it is designated (deemed granted). States participating in the EPC include the EU Member States, the EEA States (Iceland, Liechtenstein, Norway), Switzerland and several outside the European single market area including the UK and Turkey.

The jurisdiction of the UPC, on the other hand, is limited by its founding treaty to European patents. Following the CJEU's decision in *BSH v Electrolux*, the scope for cross-border patent infringement litigation in courts of EU Member States

therefore appears broader than in the UPC, and with reduced concentration of validity determination.

# The scope of any exception from domicile-based jurisdiction pursuant to Article 4.1 Brussels Regulation in respect of the validity of a patent to a third State

Even more strategic was a question impacting the jurisdictional reach of courts of EU Member States in respect of patents to third State.

The CJEU was **not** asked to rule on whether, pursuant to the Brussels Regulation, any court of an EU Member State could assert or accept jurisdiction in respect of a claim for infringement of a patent to a state outside the EU.

However, in view of doubts raised by the Swedish court on the subject, the **CJEU expressed the view that** under the general rule laid down in Brussels Regulation Article 4.1, **the courts of the Member State in which the defendant is domiciled have, in principle, jurisdiction in an infringement action brought against that defendant by the holder of a patent granted or validated in a third State. The CJEU ruled that that jurisdiction, by virtue of the general rule, extends to the question of the validity that third State patent raised as a defence in the context of that infringement action.**

The CJEU's rationale for reaching that conclusion drew upon its 8 September 2022 judgment in Case C-399/21 *IRnova v FLIR Systems*, following a different reference from the Svea Court of Appeal, Sweden. That case was a patent entitlement dispute between two Swedish domiciled companies involving inventions that IRnova contended had been made by its employee, at the very least as a co-inventor, and for which protection had been sought by FLIR in international patent applications, subsequently supplemented by European, US and Chinese patent applications. The question that arose was whether Brussels Regulation Article 24.4 operated to reserve the dispute in respect of the patents granted in third States away from the Swedish Court. The CJEU's conclusion was that it had already held, in C-281/02 *Owusu v Jackson*, that the Brussels Regulation applied where there existed an international element to the dispute. The dispute between IRnova and FLIR concerned the existence of a better right to inventions, which fell within the scope of 'civil and commercial matters' for the purposes of the Brussels Regulation. The dispute did not constitute proceedings 'concerned with the registration or validity of patents' and the patents concerned were not granted in a Member State. Therefore the reservation of exclusive validity contained in Article 24.4 did not operate.

In the *BSH v Electrolux* case, the CJEU was asked whether the exception provided by Article 24.4 of the Brussels Regulation confers exclusive jurisdiction

upon the courts of third states in proceedings concerned with the registration or validity of patents to such third States.

The CJEU noted that, as the AG observed, the regime laid down by the Brussels Regulation, like the acts which preceded it, "is a system of jurisdiction internal to the European Union, which pursues objectives specific to it, such as the proper functioning of the internal market and the establishment of an area of freedom, security and social justice".

Against this background, the CJEU ruled that Article 24.4 must be interpreted as "not applying to a court of a third State and, consequently, as not conferring any jurisdiction, whether exclusive or otherwise, on such a court as regards the assessment of the validity of a patent granted or validated by that State".

In other words, the CJEU's reasoning was that, while the Brussels Regulation is a system of jurisdiction internal to the EU, it understands Article 4.1 to operate to confer domicile-based jurisdiction on a court of an EU Member State to hear claims for infringement of a patent for a State **outside** the EU, but Article 24.4 not to "confer" any jurisdiction on the courts of the same third State in respect of the assessment of the validity of that same patent.

The CJEU ruled, therefore, that the court of an EU Member State seised pursuant to Article 4.1 with domicile-based jurisdiction in a claim for infringement of a patent to a third State has jurisdiction to hear and rule upon a defence of invalidity raised in respect of the third State patent, subject to any exception provided elsewhere in the Brussels Regulation or by bilateral convention.

No such exception arose in the present case, in particular because Turkey was not a party to the Lugano Convention and the European Patent Convention "does not contain any provision expressly defining or restricting the jurisdiction of the courts of the parties to that convention in cross-border disputes relating to the European patent".

That said, the CJEU then acknowledged that it was necessary to determine whether the jurisdiction, based on Article 4.1, of a court of a Member State to rule on the issue of the validity of a patent granted or validated in a third State where raised as a defence to an infringement claim, was restricted "by general international law", including "the principle of non-interference, according to which a State may not interfere in cases which essentially come within the national jurisdiction of another State". The grant of a patent is "an exercise of national sovereignty" and so according to the principle of non-interference "only the courts of the third State in which a patent is granted or validated have jurisdiction to declare that patent invalid by a decision that may cause the national register of that State to be amended as regards the existence or content of that patent".

The CJEU said that by contrast, a court of a Member State seised by domicile of the defendant of a claim for infringement of a patent to a third State does have jurisdiction to rule on the issue of validity raised by way of defence "given that the decision of that court sought…is not such as to affect the existence or content of that patent in that third State, or to cause its national register to be amended". That decision "has only inter partes effects, that is to say, a scope limited to the parties to the proceedings". **Under "no circumstances" could the decision of the domicile-seised court include a direction to the**

**administrative authority responsible for maintaining the national register of the third State concerned.**

Therefore, the CJEU ruled that if a court of a Member State is seised, on the basis of Article 4.1, of an action alleging infringement of a patent to a third State and a question as to the validity of that third State patent is raised by way of defence, the court has jurisdiction, also pursuant to Article 4.1, to rule on that defence, provided that the decision does not cause the national register of the third State to be amended.

The CJEU's ruling is consistent with the legal position taken by the UPC LD Düsseldorf in the *Kodak v Fujifilm* case. In that case the UPC, as a court under Brussels Regulation, considered that it had jurisdiction over a claim for infringement of a UK designation of a European patent. As the German designation of the European patent was held invalid by the LD, there was a risk of revocation of the UK designation, hence the LD determined that the claim for infringement of the UK designation could not succeed.

# Enforcement issues, devaluation and other concerns

The CJEU's decision in *BSH v Electrolux* modifies at the highest level the system of jurisdiction operating in the EU in respect of both intra-EU and international patent disputes.

The decision is likely to be viewed by the courts of third States as an exertion of extraterritorial overreach. In particular, it has always been the international norm that the courts of one sovereign state are not competent to adjudicate on a claim for infringement of, or about the validity of, a patent granted by and for the territory of another sovereign state. This is for a number of important reasons.

Patent actions, although appearing on their face to be disputes between two parties, in reality also concern the public. A finding of infringement is a finding that a monopoly granted by the state is to be enforced, invariably with the result that the public have to pay higher prices than if the monopoly did not exist or was found not to be infringed. Different sovereign states have different legal systems with different tests for the assessment of infringement of the patents they award and different tests for the award and quantification of relief preliminary to and following a finding of infringement. For example, when a court in the UK is faced with a request by a patentee for an interim injunction to restrain infringement of a patent to a pharmaceutical product, the court may require, as a condition for the award of the relief sought, an undertaking from the patentee to compensate the NHS in the event the interim relief is later found wrongly to have been granted. On the approach asserted by the CJEU in the BSH case, financial protection for the public health system in the UK could be subverted by a foreign court imposing a preliminary injunction on a foreign domiciled defendant, backed up by coercive financial penalties for non-compliance in the UK.

It is also in the interest of the public that a patent, if invalid according to the laws of the granting state, be removed from the register, rather than shielded by an

inter parties determination in another jurisdiction and left in place for the patentee to enforce against other competitors.

None of these points was recognised by the CJEU, despite the AG recognising that "a state only has the sovereign power to regulate trade in its territory" and therefore the location of the defendant's domicile could not serve as justification for the courts in the state of domicile to interfere in the domestic affairs of a third State. The AG explained that that could be seen as a breach of the principle of sovereign equality, and the Brussels regime must be interpreted consistently with that principle. In legislating the Brussels regime in its modern form, the EU legislature had not meant to impose a comprehensive solution on the issues of disputes closely connected to third states.

Against this background, consequences of the CJEU's ruling will likely include the following:

First, well informed defendants in the EU will be preparing antisuit injunction strategies to counter the threat of courts in EU Member States (or the UPC) asserting jurisdiction in respect of a patent granted by a third State. While intra-EU antisuit injunctions were banned by the CJEU's judgment in Case C-159/02 *Turner v Grovit*, the courts of non-EU (and non-EEA) states are by definition not bound by the CJEU's rulings and remain free to deploy antisuit injunctions to address overreach by foreign courts.

Second, cross-border enforcement in a third State of a judgment of court in the EU awarding relief for patent infringement in respect of that third State would prove extremely challenging. There is no international mechanism for enforcement of such a judgment. The 2019 Hague Convention on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters expressly does not cover intellectual property, reflecting the international norm described above.

In the UK, for example, there is no procedural mechanism for the enforcement a foreign judgment purporting to award an injunction into the UK to restrain patent infringement, and an attempt to enforce a damages award could be expected to be challenged and blocked on jurisdictional grounds. Attempts to coerce compliance by the imposition of punitive financial penalties on the defendant domiciled in the EU Member State could be expected to draw criticism at the diplomatic level aligned with the criticism of courts in China seeking to overreach in respect of patent disputes in the EU.

Third, patentees can be expected to test and push the development of procedural mechanisms available in national courts and the UPC by which a hook domiciled-defendant could secure seisure of the chosen court in respect of infringement claims in other States, against wider defendants and, potentially, wider products/processes than form the subject of the dispute with the hook defendant.

Fourth, the new approach to the interpretation of Brussels Regulation Article 24 enables patentees to claim against a domiciled defendant, in a single court in an EU Member State, for patent infringement on a pan-European (and wider) basis while keeping determination and resolution of validity issues within the courts of the state of each asserted patent. This changes the business case for UPC litigation. The UPC's founding treaty expressly limits the UPC's jurisdiction to

European patents; and UPC validity determination takes the form of a single procedure for UPC states.

A conclusion must be that the CJEU's ruling in *BSH v Electrolux* sets aside widely recognised basic principles of international law to comply with what looks like a political agenda. The Court's justification is internally inconsistent and threatens international dispute. It is unlikely to remain unchallenged, although the UPC already consistently applied the findings of the CJEU twice (*Mul-T-Lock v. IMC Créations, Paris Local Division*, 21 March 2025, UPC_CFI_702/2024 and *Dainese S.p.A v. Alpinestars S.p.A, Milan Local Division*, 8 April 2025, UPC_CFI_792/2024).

For information on this subject, please get in touch with Marianne Schaffner, Mathilde Grammont or Ailsa Carter.

NOT LEGAL ADVICE. Information made available on this website in any form is for information purposes only. It is not, and should not be taken as, legal advice. You should not rely on, or take or fail to take any action based upon this information. Never disregard professional legal advice or delay in seeking legal advice because of something you have read on this website. Gowling WLG professionals will be pleased to discuss resolutions to specific legal concerns you may have.

## Authors





**Marianne Schaffner**
Partner
Co-head of IP Group (France)
UPC representative
Paris

**Mathilde Grammont**
Senior Associate
UPC representative
Paris

 

 

## Related services

Intellectual Property Law | IP Litigation & Strategy | Patents

# **EXHIBIT 22**

 WORLD TRADE ORGANIZATION

**DISPUTE SETTLEMENT: APPELLATE BODY**

# Appellate Body

The Appellate Body was established in 1995 under Article 17 of the Understanding on Rules and Procedures Governing the Settlement of Disputes (DSU (https://www.wto.org/english/docs_e/legal_e/28-dsu_e.htm#17) ). It is a standing body of seven persons that hears appeals from reports issued by panels in disputes brought by WTO Members. The Appellate Body can uphold, modify or reverse the legal findings and conclusions of a panel, and Appellate Body Reports are adopted by the Dispute Settlement Body (DSB (https://www.wto.org/english/tratop_e/dispu_e/dispu_e.htm#dsb) ) unless all members decide not to do so. The Appellate Body has its seat in Geneva, Switzerland.

Currently, the Appellate Body is unable to review appeals given its ongoing vacancies (https://www.wto.org/english/news_e/news19_e/gc_09dec19_e.htm) .  The term of the last sitting Appellate Body member expired on 30 November 2020.

## Introduction

Appeals in the WTO dispute settlement system (https://www.wto.org/english/thewto_e/whatis_e/tif_e/disp1_e.htm#appeals)
This link takes you to the section on disputes in the WTO guide "Understanding the WTO".

**NEWS**

**Disclaimer**
The pages on this web site regarding the Appellate Body and the Appellate Body Secretariat are intended solely for information. These pages do not constitute an authoritative interpretation of the WTO Agreements, including the Understanding on Rules and Procedures Governing the Settlement of Disputes, or the Working Procedures for Appellate Review.

**VIDEOS**

# **EXHIBIT 23**

2020]    *INNOVATION IN THE INFORMATION AGE*    549

Chinese IP practices is intense in Washington and has been for some time.[114]  Given the vast scale of the Chinese market, the United States considers it vital to rein in Chinese copying, and it has exhorted China to bring Chinese rules and practices in line with international standards.[115]  That exhortation has grown tremendously as U.S.-China trade has likewise grown in the years since China began widely opening its economy in the 1990s.[116]  China's comparatively weak enforcement of its IP laws,[117] and the widespread copying and counterfeiting that takes place in China,[118] have long confounded the United States and other Western governments.[119]

American concern has been tied to the scale and scope of copying in China, but also to the Chinese policy of "indigenous innovation"—a policy that American business has seen as a green light for copying.[120]  According to past statements from Beijing, indigenous innovation can include "enhancing original innovation through co-innovation and re-innovation based on the assimilation of imported

114.    Lara Seligman, *Congress to China: 'Stop Stealing Our Stuff'*, FOREIGN POL'Y (July 26, 2019), https://foreignpolicy.com/2019/07/26/congress-to-china-stop-stealing-our-stuff/ [https://perma.cc/F8LD-LJ2A].

115.    *See Dispute Settlement: DS362: China – Measures Affecting the Protection and Enforcement of Intellectual Property Rights*, WTO, https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds362_e.htm [https://perma.cc/U27U-BYX8] (last visited Nov. 24, 2019). Among others, Argentina, Australia, Canada, the European Communities, India, Taiwan, Turkey, and Thailand all joined the suit against China as third parties.

116.    Jacques deLisle, *Of Chinese Walls, Battering Rams, and Building Permits: Five Lessons about International Economic Law from Sino-U.S. Trade and Investment Relations*, 17 U. PA. J. INT'L ECON. L. 513, 515 (1996) ("China's trading relationship with the United States has grown from near-zero levels before 1979 to $40 billion or more in the mid-1990s.").

117.    Chinese enforcement is changing; this issue is discussed below.  While the magnitude of the change is debated, the political dynamics in Washington continue to reflect the view that China is a major pirate nation.

118.    *See* ORG. ECON. CO-OPERATION & DEV. [OECD] & EUR. UNION INTELL. PROP. ORG. [EUIPO], ILLICIT TRADE: TRENDS IN COUNTERFEIT AND PIRATED GOODS 28 (2019), https://euipo.europa.eu/tunnel-web/secure/webdav/guest/document_library/observatory/documents/reports/trends_in_trade_in_counterfeit_and_pirated_goods/trends_in_trade_in_counterfeit_and_pirated_goods_en.pdf [https://perma.cc/L2Q8-AEJ7] (discussing that between 2014 and 2016, more than 75% of all seized counterfeit and pirated goods originated in China or Hong Kong).

119.    Rana, *supra* note 8, at 100–02.  David Orozco notes that at one point, "President Barack Obama personally called China's new president, Xi Jinpin[g], to ask him to take serious steps to investigate and halt any IP thefts against U.S. companies . . . ." David Orozco, *The Knowledge Police*, 43 HOFSTRA L. REV. 417, 417 (2014).

120.    *See* Siyuan An & Brian Peck, *China's Indigenous Innovation Policy in the Context of Its WTO Obligations and Commitments*, 42 GEO. J. INT'L L. 375, 400–02 (2011).

550        *COLUMBIA JOURNAL OF TRANSNATIONAL LAW*        [58:3

technologies"—in other words, innovation through copying.[121]   As high technology becomes ever more critical to economic success, China's technology policies have expanded—and come under continued attack.  China's various joint venture rules, in which foreign firms seeking to enter the Chinese market must work with Chinese firms and often share their IP in the process, are emblematic.[122]  China's "Made in China 2025" program seeks to have China dominate global technology markets by 2049.[123]  For many in the West, the intended path to that outcome runs through their IP.[124]

The United States first raised IP protection as an issue with China in the 1980s, shortly after the resumption of normal diplomatic relations in 1979.[125]  By 1989, the United States was focusing on China in the Special 301 process, and then-U.S. Trade Representative Carla Hills named China to the "priority watch list."[126]  Seeking to improve matters, China entered into an MOU with the United States to create a copyright law.  (China had created a patent law in 1984.)[127]  The MOU declared that

> The U.S. Government and the Chinese Government, acting in the spirit of their Bilateral Agreement on Trade Relations, and wishing to develop further economic and trade relations between both countries on the basis of the principles of equality and mutual benefit as well as nondiscriminatory treatment, and to improve protection of intellectual property rights, have agreed as follows:

---

121.  JAMES MCGREGOR, APCO WORLDWIDE, CHINA'S DRIVE FOR 'INDIGENOUS INNOVATION:' A WEB OF INDUSTRIAL POLITICS 4 (2010), https://www.uschamber.com/sites/default/files/documents/files/100728chinareport_0_0.pdf [https://perma.cc/HL3W-CHCL].

122.  Daniel C.K. Chow, *China's Indigenous Innovation Policies and the World Trade Organization*, 34 NW. J. INT'L L. & BUS. 81, 94–96 (2013).

123.  James McBride & Andrew Chatzky, *Is 'Made in China 2025' a Threat to Global Trade?*, COUNCIL FOREIGN REL. (May 13, 2019), https://www.cfr.org/backgrounder/made-china-2025-threat-global-trade [https://perma.cc/96VM-JFV7].

124.  WAYNE M. MORRISON, CONG. RESEARCH SERV., IF10964, IN FOCUS: THE MADE IN CHINA 2025 INITIATIVE: ECONOMIC IMPLICATIONS FOR THE UNITED STATES 1–2 (2019).

125.  *See generally* Warren Maruyama, *U.S.-China IPR Negotiations: Trade, Intellectual Property, and the Rule of Law in a Global Economy*, *in* CHINESE INTELLECTUAL PROPERTY LAW AND PRACTICE 165 (Mark A. Cohen et al. eds., 1999).

126.  WIPO, *PRC Agrees to Push for Copyright Law That Will Protect Computer Software*, 3 WORLD INTELL. PROP. REP. 151–52 (1989).

127.  Peter K. Yu, *Piracy, Prejudice, and Perspectives: An Attempt to Use Shakespeare to Reconfigure the U.S.-China Intellectual Property Debate*, 19 B.U. INT'L L.J. 1, 9 (2001).

# **EXHIBIT 25**

## Simulated employment effects

A substantial improvement in IPR protection in China could have positive effects on employment in the United States. The simulation analysis suggests different employment effects, depending on the assumptions made about the labor market during the policy implementation period. Two alternate assumptions were implemented to simulate the employment effects—one related to a "fixed employment" assumption and another related to a "flexible employment" assumption. These assumptions, and their corresponding effects when applied to the simulation analysis, are described below.

The fixed employment scenario has usually been employed in simulation analysis involving international trade. In this scenario, the overall U.S. levels of capital and labor are assumed to be fixed. This is done principally to permit a clearer focus on the model's implications for the reallocation of resources between sectors, rather than the implications for overall macroeconomic factors, which are usually beyond the scope of the model's application. This assumption is meant to represent the U.S. economy in a condition close to full employment and full capacity utilization. In this case, labor and capital are reallocated between sectors, and wages and interest rates may change. Under this assumption a policy change creates greater demand for labor and capital in certain IP-intensive sectors but no total change in demand for U.S. labor. Notably, the fixed employment scenario yields employment increases in IP-intensive sectors, such as education and related services; recreational services, which includes motion picture production and recorded music; business services; and software, paper products, and publishing.

Under the flexible employment scenario, increases in demand cause increases in employment and capacity utilization, while wages and returns to capital remain fixed. This assumption is meant to represent the U.S. economy under conditions of high unemployment. The current U.S. economic climate as of 2011 presents a situation of high unemployment, with similar features to that assumed in the flexible employment scenario. Under this scenario, if IPR protection in China improved substantially, U.S. employment could increase by 2.1 million FTEs (full-time equivalent workers). The change in IPR protection in China could thus result in higher employment and increased capacity utilization, drawing resources from currently unemployed labor and capital as well as resources from other sectors. However, it is unclear when China might implement the improvement in IPR protection envisioned in the analysis, and equally unclear whether the United States will face as much excess labor supply then as it does today. Also, while wages are assumed to be constant in the flexible labor and capital scenario, they could reasonably be expected to increase in an economic recovery.

## Effects of China's Indigenous Innovation Policies on the U.S. Economy (Results from Survey and Case Studies)

China is implementing wide-ranging policies designed to boost the country's level of "indigenous innovation," but it is difficult to estimate the effects of such policies on the U.S. economy, particularly because many remain in draft form or are in the process of changing. U.S. firms reported concerns about a number of these policies, especially those involving

> **Many U.S. firms doing business in China expressed concerns about China's evolving indigenous innovation policies, which are likely to affect different sectors in different ways.**

preferential support to Chinese companies, technical standards, government procurement, and technology transfers that seek to absorb foreign technology and apply it to spur Chinese technological advances. Following the January 2011 U.S.-China summit meeting, China agreed to delink its innovation policies from government procurement preferences and made other changes to its indigenous innovation policies, but these changes postdate the Commission survey and are not reflected in it. The Commission used survey results and published data to assess the actual, reported, and potential effects of China's indigenous innovation policies on the U.S. economy and employment.

## Questionnaire results

*Scope of concerns*

U.S. IP-intensive firms that reported concerns with China's indigenous innovation policies accounted for 67.2 percent of the sales of firms in the U.S. IP-intensive economy that are conducting business in China, and 29.0 percent of the number of firms in that category. The firms that reported concern were relatively large; they have higher average sales, research and development (R&D) expenditures, royalty and license fees, and employment than firms that did not report such concerns. The largest share of firms reporting concerns about indigenous innovation policies were in the high-tech and heavy manufacturing and the chemical manufacturing sectors.

*Chief indigenous innovation concerns for U.S. firms*

Based on the questionnaire results, the top policy areas in which U.S. firms identified current problems are (1) preferential support for Chinese firms in the form of tax incentives, subsidies, and preferential lending; and (2) China-specific technical standards. Preferential support for Chinese firms was also identified as the greatest future concern of U.S. firms.

*Reported losses from indigenous innovation*

A small share of U.S. IP-intensive firms that conduct business in China reported that they experienced material losses due to indigenous innovation policies in 2009. Firms reporting that their U.S. employment had been affected by indigenous innovation generally indicated that employment had decreased. With respect to their future outlook, most firms were unsure how their revenues would be affected by indigenous innovation or anticipate that their revenues will fall.

## Case studies

*Wind energy*

**Indigenous innovation policies have reduced U.S. and other foreign firms' market share.** Chinese policies related to indigenous innovation in the wind energy sector include government procurement preferences for domestic firms, high local-content requirements, and R&D incentives and support for Chinese-owned wind energy firms. The policies have dramatically reduced foreign firms' market share in China. In particular, government procurement opportunities have been highly restricted. For example, no foreign firm has won a wind farm concession contract from China's National Development and Reform Commission since 2005. Local-content requirements and R&D support have helped Chinese wind energy companies become global competitors**.**

*Telecommunications equipment (mobile handsets)*

**Chinese preference for homegrown standards presents substantial challenges for U.S. firms.** China's development of the Time Division Synchronous Code Division Multiple Access (or TD-SCDMA) standard has reduced China's reliance on foreign telecommunication technologies and associated royalty payments to foreign firms. In addition, preferential lending and generous lines of credit to Chinese companies have boosted their ability to compete with U.S. companies in third-country markets. U.S. and other foreign firms have experienced dramatic losses in market share in China in the last five years, due in part to the growing domestic success of Chinese firms, facilitated by indigenous innovation policies. U.S. firms must devote significant resources to support multiple product lines in order to accommodate China's homegrown standards. They also face delays in entering China's market while attempting to comply with regulatory requirements—delays that harm their competitive position in the Chinese market.

*Software*

**Standards and government procurement policies limit U.S. market access and require disclosure of intellectual property.** Indigenous innovation policies in the software sector include the introduction of the Multi-Level Protection Scheme and China Compulsory Certification software security standards, and government procurement preferences for domestic firms. Under the standards policies, U.S. firms are barred from competing for software contracts in certain industries deemed critical to China's security; to compete in other industries, they must disclose encryption codes and other key intellectual property. Procurement preferences potentially restrict opportunities for U.S. firms at the central government level; restrictions on government procurement opportunities in software are already in place at the provincial level.

*Automotive*

**Indigenous innovation and other policies limit U.S. market access.** Chinese policies focused on the development of the auto industry have been in place since before the introduction of indigenous innovation policies in 2006; many of the goals advanced by these policies are related to indigenous innovation. Such policies include mandatory joint venture requirements, encouragement of technology transfer, R&D incentives and support available only to domestic firms, and government procurement preferences. Joint venture and technology transfer rules limit foreign companies' flexibility and raise the possibility of loss of intellectual property. Government incentives restricted to domestic

firms make it more difficult for foreign firms to compete in China. Government procurement preferences may also limit U.S. firms' market for fleet sales.

*Civil aircraft and parts*

**Indigenous innovation effects are limited as Chinese firms are far from the technology frontier.** Chinese government efforts to promote the goals of indigenous innovation in the civil aircraft and parts industries include policies strongly favoring joint ventures and contracts with state-owned enterprises, and technology transfer requirements and incentives. The effects of these efforts have been limited so far, as China does not have the technology to rely on indigenous innovation to produce domestic large civil aircraft. The policies' potential effects on the U.S. economy and U.S. firms depend on China's eventual success in acquiring and using foreign civil aviation technology.

# **EXHIBIT 26**





# Intellectual property and the U.S. economy: Third edition



UNITED STATES
PATENT AND TRADEMARK OFFICE



# Intellectual property and the U.S. economy: Third edition

Andrew A. Toole, Ph.D., Chief Economist

Richard D. Miller, Ph.D., Economist

Nicholas Rada, Ph.D., Deputy Chief Economist

## Contents

Executive summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

What is the issue? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

What did the study find? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

How was the study conducted? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  Output and employment in the IP-intensive industries . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.1  Output . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.2  Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2.3  Shares of output and employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3.  Examining IP-intensive employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3.1  Employment by industrial sector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3.2  Employment trends over time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3.3  IP-intensive jobs by state . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  Characteristics of jobs in the IP-intensive industries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

4.1  Average earnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

4.2  Other employment characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5.  Worker characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

6.  Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# Executive summary

## Introduction

In 2012, the Department of Commerce issued a report titled "Intellectual Property and the U.S. Economy: Industries in Focus" (hereafter, the 2012 report). The report identified the industries that rely most heavily on intellectual property (IP)—patents, trademarks, or copyrights—as IP-intensive and estimated their contribution to the U.S. economy. It generated considerable interest and energized other agencies and organizations to produce similar studies investigating the use and impact of IP across countries, industries, and companies. In 2016, the United States Patent and Trademark Office (USPTO) issued an updated report that built on the 2012 report, titled "Intellectual Property and the U.S. Economy: 2016 Update."

This new report builds on the 2012 and 2016 versions by providing an update on the importance of IP-intensive industries to the U.S. economy and a fresh look at the approach used to measure those results.[1] The update continues to focus on measuring the intensity of industrial IP use and the IP-intensive industries' persistent relationship to economic indicators, such as output, employment, and wages. The data are more refined, improving precision in identifying companies within industries and including new industries in the report. While our methodology does not permit us to attribute our findings to IP alone, it provides a useful benchmark to characterize the economic importance of those industries that most intensively use IP protection and to compare the results internationally.

## What is the issue?

The use of *tangible* capital (measurable forms of capital, such as machinery) has long been at the center of creating economic growth. When the agrarian economy dominated, plows and steam engines helped farmers become more productive. During the Industrial Revolution, machinery and factories created new products and economic opportunities. More recently, the digital revolution has brought advanced computing and communications equipment to increase productivity, thereby stimulating economic growth.

In the mid-1990s, spending by companies on *intangible* capital (such as computer software and brand development) began outpacing spending on tangible capital assets in the United States. Companies started investing more in research, development, and the commercialization of intangible assets, than in existing capital to spur growth. IP rights help protect these intangible assets and contribute to economic growth, albeit in ways that are difficult to observe or measure. This study investigates the industries that have been intensive users of IP protections and characterizes the IP-intensive industries' contributions to total U.S. economic output and employment as of 2019.

---

1    The current and previous reports on IP and the U.S. economy do not claim to assess a causal relationship between IP rights and economic performance.

## What did the study find?

Industries in the United States that intensively use IP accounted for 41% of domestic economic activity, or output, in 2019. Output in the IP-intensive industries grew at roughly the same rate as the entire domestic economy during the previous five years, with the exception of the copyright-intensive industries, where output grew at a faster rate than the domestic economy.

Altogether, the IP-intensive industries accounted for 63 million jobs, or 44% of all U.S. employment in 2019. About 33%, or more than 47 million jobs, were directly supported by IP-intensive industries. They also indirectly supported—through the supply of intermediate goods and services—an additional 15.5 million jobs, accounting for the remaining 11% of the total.

States in the Northeast, Mid-Atlantic, Upper Midwest, and West Coast regions generally have the highest concentrations of workers in IP-intensive industries.

This report also finds that, relative to workers in non-IP-intensive industries, workers in IP-intensive industries are more likely to

- earn higher wages, with the highest earnings in the copyright-intensive industries, followed by earnings in the utility patent-intensive industries, design patent-intensive industries, and the trademark-intensive industries;

- work in larger companies (500 employees or more);

- participate in employer-sponsored health insurance;

- participate in employer-sponsored retirement plans;

- have a bachelor's or graduate degree; and

- be veterans.

Finally, the report finds differences in the composition of the workforces in the IP- and non-IP-intensive industries with regard to race and gender.

## How was the study conducted?

In identifying IP-intensive industries, this study considers the relative use across domestic industries of four forms of IP protection: utility patents, design patents, trademarks, and copyrights. For the first three forms of IP protection, we measure use at the industry level as the number of IP rights (such as the number of patents granted or trademarks registered) obtained relative to industry employment. We link each granted IP right to an industry by matching registered domestic rights owners to the National Establishment Time Series (NETS) database, which contains detailed data (including primary industry) on more than 60 million establishments and covers the time period from 1989 to 2016. For each IP right, we construct a measure of industry-level IP intensity that is equal to the number of IP rights obtained during the five-year period ending in 2016 per 1,000 employees. An industry is IP-intensive in a particular IP right if its IP intensity is greater than the IP intensity for the economy as a whole.

We identify copyright-intensive industries by referencing the *Guide on Surveying the Economic Contribution of the Copyright-Based Industries* from the World Intellectual Property Organization (WIPO). We do not include all industries identified in the WIPO report because we use a narrower definition of copyright-intensive industries than WIPO. We define copyright-intensive industries as those primarily responsible for the creation or production of copyrighted materials and exclude several industries, such as book and music stores, associated with only the distribution of copyrighted material.

# 1.    Introduction

Throughout human history, the use of *tangible* capital (measurable forms of physical capital, such as machinery) has greatly contributed to economic growth. Whether it was the introduction of the plow and the steam engine when agriculture dominated the economy, machinery and factories at the end of the 19th century, or advanced computing and communications equipment during the digital revolution, businesses have used tangible capital to increase productivity, thereby stimulating economic growth.[2]

In the mid-1990s, investments in *intangible* capital (such as computer software and brand development) overtook tangible capital investments in the United States.[3] U.S. companies are investing more in innovation—the research, development, and commercialization of intangible assets—than they are in the purchase of existing equipment and machines to spur growth.

IP rights provide incentives for organizations and individuals to develop and pursue commercial opportunities related to their intangible assets. Patents grant the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, thereby giving the patentee the opportunity to reap greater rewards from the underlying innovation. This study considers utility and design patents separately. **Utility patents** protect useful processes, machines, articles of manufacture, and compositions of matter. **Design patents** protect the ornamental design for an article of manufacture (which may relate to its shape/configuration, surface ornamentation, or both), thus allowing companies to further differentiate their products from those of competitors and to improve the odds of commercial success. **Copyrights** incentivize the production of literary and other artistic works by granting authors the exclusive right to engage in the commercialization and distribution of these works. **Trademarks** enhance the value of both patented and unpatented innovations, as well as reputation, by identifying a good's or service's source of origin.

These IP rights protect intangible capital that contribute to economic growth in ways that are difficult to observe and measure.[4] However, we can identify the industries that have been intensive users of IP protections and assess their contributions to U.S. economic output and employment. We show that these IP-intensive industries account for a large portion of economic activity in the United States. Further, IP-intensive industries account for not only a large number of jobs but also jobs that provide a higher level of compensation; workers in IP-intensive industries tend to receive higher wages and have better access to fringe benefits. These workers are also more likely to have full-time positions, work at large companies, and have a demographic profile (e.g., gender, race/ethnicity, and veteran status) that differs significantly from their counterparts in non-IP-intensive industries.

---

2    See Schwab (2016). Schwab is the founder and executive chair of the World Economic Forum.

3    Intangible capital is made up of investments that are intended to increase future company productivity but that are not traditional or tangible physical capital (e.g., intangible capital includes computer software, databases, research and development, design, training, brand equity, and structural and efficiency improvements to the company's organization, as well as the creation of entertainment, literary, or artistic originals) (Sichel 2008; Haskel and Westlake 2018). Corrado and Hulten (2010) show that the investment rate was higher for tangible capital than intangible capital from 1973 to 1994. This relationship reversed so that the investment rate was higher for intangible capital from 1995 to 2007. Lev (2018) extends the Corrado and Hulten assessment a decade, illustrating how the investment rate for intangible capital remained higher than that of tangible capital through 2017. Spulber (2021, 43) finds that in 2018, "over 85 per cent of the value of the S&P 500 corporations is due to intangible assets." In the United Kingdom, intangible capital investments overtook tangible investments in the early 2000s. See Haskel and Westlake (2018, 24-25).

4    We do not include trade secrets in the report due to limited data on the use of trade secrets at the company or industry level.

This report is the third in the "Intellectual Property and the U.S. Economy" series. It updates and expands on previous reports by including design patents and using more comprehensive company-level data than previously available to the USPTO. Specifically, since the publication of the 2016 report, we successfully matched the vast majority of utility patents, design patents, and trademark registrations granted to U.S.-based entities to the National Establishment Time Series (NETS) database. The NETS database includes almost all U.S. business establishments, representing both public and private companies, as well as information on the primary industry for each establishment, among other measures. By linking the individual IP rights with these company-level data, we now have a direct match of IP rights to both public and private companies.[5]

To determine whether an industry is IP-intensive in utility patents, design patents, or trademarks, this study uses counts of granted IP rights adjusted for industry size. Adjusting for industry size is one way to make industries comparable. For each industry, totals for granted utility patents, design patents, and registered trademarks were calculated during a five-year period (2012-16).[6] These totals were divided by the industry's average employment during the same time period to produce the ratio of IP rights to employment. A particular industry is classified as IP-intensive if its ratio is above the overall average across all U.S. industries.

For instance, we identified 10,334 utility patents that domestic companies in the motor vehicle manufacturing industry received from 2012 through 2016. Average employment in that industry was 191,000 workers, yielding an intensity of 54 utility patents per 1,000 workers. Because this intensity is greater than the overall average intensity of the industries considered (roughly 4.25 patents per 1,000 workers), we classify it as patent-intensive.

We identify design patent–intensive and trademark-intensive industries using the same method. In contrast, and consistent with prior reports, copyright-intensive industries are a subset of the industries identified in WIPO's *Guide on Surveying the Economic Contribution of the Copyright-Based Industries* (WIPO 2003). Finally, we classify an industry as IP-intensive if it is intensive in any single category of IP rights.[7]

See Appendix Table A1 for a list of the IP-intensive industries. Out of 210 industries considered, we find that 13 are copyright-intensive, 70 are utility patent–intensive, 87 are design patent–intensive, and 110 are trademark-intensive. There is significant overlap across the industry clusters. For instance, 68 of the utility patent-intensive industries are intensive in at least one other form of IP. The result is similar for design patent–intensive industries, where 81 of the 87 industries are intensive in at least one other form of IP. Even for trademark-intensive industries, nearly 80% (85 out of 110) are intensive in one or more other forms of IP. Overall, 127 industries are IP-intensive.

---

5   This approach is similar to the one employed by the USPTO to match trademark registrations to industries in previous reports (see ESA and USPTO 2012, 2016). It is also similar to the approaches taken in recent studies by the European Patent Office (EPO) and European Union Intellectual Property Office (EUIPO) and the United Kingdom Intellectual Property Office (UKIPO). The joint study by the EPO and EUIPO (2019) matched IP rights owners to the Orbis database of European companies, and the UKIPO (2020) study matched rights holders to the Fame database of British companies. Given the changes in matching individual IP rights to industries, we urge caution in comparing the results of this report to those of the previous two reports.

6   The 2012-2016 time period reflects the availability of the establishment-level NETS database. Because the clusters of IP-intensive industries are relatively stable over time, this time period should not unduly influence the findings presented.

7   For more on the methods, see section 2 of the online supplement at www.uspto.gov/sites/default/files/documents/oce-ip-economy-supplement.pdf.

## 2.    Output and employment in the IP-intensive industries

The IP-intensive industries play a significant role in the U.S. economy in terms of both output—measured as gross domestic product (GDP)—and employment. GDP and employment are two of the most important indicators of overall economic performance. The level and trend in GDP measure the volume and trajectory of the country's total domestic output of goods and services. Higher GDP indicates U.S. industries are producing more, while greater employment means more Americans are earning a living. In this section, we report on the output and employment directly attributable to IP-intensive industries.[8]

### 2.1    Output

In 2019, the group of IP-intensive industries accounted for $7.8 trillion in GDP (Figure 1).[9] By IP type, trademark-intensive industries accounted for nearly $7.0 trillion, while the utility patent–intensive and design patent–intensive industries each accounted for nearly $4.5 trillion. The copyright-intensive industries accounted for a smaller portion of U.S. economic activity, totaling a little under $1.3 trillion. Note that many industries are intensive in more than one type of IP. For this reason, the group total of $7.8 trillion in GDP is smaller than the sum across the individual types of IP.

After adjusting GDP for general price increases (i.e., inflation) in the 2014-2019 period, GDP attributable to the IP-intensive industries increased by roughly 12%, or by an annual rate of 2.3%.[10] Copyright-intensive industries outpaced other IP-intensive industries with respect to GDP growth since 2014—rising by 4.2%. Output in the design patent–intensive, utility patent–intensive, and trademark-intensive industries grew at annual rates of between 2.2% and 2.6%.[11] For comparison purposes, GDP grew by 2.4% per annum between 2014 and 2019, which means



Figure 1: GDP of the IP-intensive industries, 2019

*Note: Individual industry values do not sum to the total value because some industries are cross-classified.*

*Source: USPTO estimates using data from the Bureau of Economic Analysis.*

---

8    Although IP rights can contribute to higher GDP and employment by stimulating investment and innovation (see Verspagen 2006; Park 2007), we do not capture the increased output these innovations may spur in other non-IP-intensive industries.

9    See section 3.1 of the online supplement for a description of how we estimate total output attributed to the IP-intensive industries. Note that individual IP types do not sum to the aggregate IP total because of companies cross-classifying as IP-intensive in the use of multiple types.

10    In constant 2019 dollars, the GDP attributable to the IP-intensive industries was $6.92 trillion in 2014.

11    In constant 2019 dollars, the GDP attributable to utility patent–intensive industries was $3.91 trillion in 2014, to design patent–intensive industries was $4.00 trillion in 2014, to trademark-intensive industries was $6.15 trillion in 2014, and to copyright-intensive industries was $1.05 trillion in 2014.



Figure 2: Total employment supported by IP-intensive industries, 2019

*Note: Individual industry values do not sum to the total value because some industries are cross-classified.*

*Source: USPTO estimates using data from the Bureau of Economic Analysis and Bureau of Labor Statistics.*

that the share of total output accounted for by the copyright-intensive industries was the only share that grew significantly during this period.[12] Before detailing those shares, we will highlight employment in the IP-intensive industries.

## 2.2 Employment

The IP-intensive industries are an important source of employment for the U.S. economy. We measure total employment in these industries as both direct and indirect employment. Direct employment captures all workers in IP-intensive industries, whereas indirect employment captures the employees working in non-IP-intensive industries that depend, at least partially, on final sales in IP-intensive industries.[13]

As illustrated by the dark portions of the bars in Figure 2, direct employment in the IP-intensive industries totaled 47.2 million jobs in 2019. Direct employment across these industries grew by about 7% since 2014. Relative to the U.S. labor market, the share of direct employment in the IP-intensive industries remained stable at 33% between 2014 and 2019.

Similar to earlier reports in this series, this report finds that trademark-intensive industries contributed the most to direct employment—41.6 million jobs in 2019 (up from 38.8 million in 2014), or 88% of all IP-intensive jobs. Copyright-intensive industries accounted for 6.6 million jobs (compared to 5.7 million in 2014). Design patent–intensive industries directly accounted for 21.6 million jobs, which represents an increase of 1.0 million jobs from 2014.

Utility patent–intensive industries directly accounted for 18.2 million jobs in 2019, also a 1-million-job increase over the previous five years.[14] The 2019 result implies a 13% share of direct employment for the utility patent–intensive industries, which is comparable to the 10% of direct employment reported by the European IP offices (EUIPO and EPO, 2019).[15]

---

12  Notably, the utility patent–intensive industries grew at the economy-wide average despite the uncertainty created by court rulings on subject matter eligibility and certain provisions of the America Invents Act, which some contend diminished patent rights.

13  See section 3.2 of the online supplement for a description of how we estimate indirect employment.

14  Our finding that design patent–intensive industries employ more individuals than utility patent–intensive industries does not imply that design patents are more important to the U.S. economy than utility patents. Simply put, we find more industries to be design patent–intensive. For example, 61 industries are both design patent– and utility patent–intensive, which accounts for 87% of the utility patent–intensive industries but only 70% of the design patent–intensive industries.

15  Our employment result for utility patent–intensive industries is much higher than in previous USPTO reports because of the new approach that links utility patents to industries through the companies that own them.

IP-intensive industries also helped to indirectly support an additional 15.5 million jobs. These jobs are in non-IP-intensive industries that supply goods and services (i.e., the supply chain) as intermediate inputs to IP-intensive industries. When combined with directly supported employment, IP-intensive industries provide 63 million jobs, or 44% of national employment.

Just as trademark-intensive industries account for the largest contribution to GDP, they are also the largest employers, supporting more than 56 million jobs, or 90% of all jobs supported by the group of IP-intensive industries. Jobs in design patent–intensive and utility patent–intensive industries each hovered around 30 million, and the copyright-intensive industries supported 8.5 million jobs.

## 2.3    Shares of output and employment

To help place the output (i.e., GDP) and employment numbers attributable to each IP-intensive industry cluster in perspective, we estimate their shares of total U.S. GDP and employment. For instance, as shown in Figure 3, the trademark-intensive industries accounted for 37% of all U.S. domestic output, whereas the copyright-intensive industries accounted for 7%. Notably, IP-intensive industries account for a larger share of national output than national employment, suggesting a high level of labor productivity in these industries.

The output and employment shares are comparable with those of the most recent EUIPO and EPO study (2019). For instance, we attribute 33% of total employment in the United States to IP-intensive industries, whereas the 2019 EUIPO/EPO study found a 29% share for European Union employment. The U.S. GDP share is slightly smaller, 41% versus their 45%, but still comparable. Individually, we find slightly higher shares in the design patent–intensive, utility patent–intensive, and trademark-intensive industries than the EUIPO/EPO reported and a slightly lower share for copyright-intensive industries.



Figure 3: GDP and employment shares of IP-intensive industries, 2019

*Note: Individual industry values do not sum to the total value because some industries are cross-classified.*

*Source: USPTO estimates using data from the Bureau of Economic Analysis and Bureau of Labor Statistics.*

# 3.    Examining IP-intensive employment

IP-intensive industries directly support one-third of all jobs in the U.S. economy.[16] In this section, we use the newly available company-level data to take a closer look at employment by considering how the different IP-intensive industry clusters differ by industrial sector. We also consider how employment in these industry clusters has grown over time, and we compare that growth with employment growth in the non-IP-intensive industries. We find that, outside the copyright-intensive industries, employment in the IP-intensive industries has grown more slowly than overall national employment. Lastly, we show how the IP-intensive shares of employment differ across U.S. states.

## 3.1    Employment by industrial sector

Examining industry employment data at the sector level provides a refined assessment of how dispersed IP-intensive employment is across the economy (see Table 1). Some sectors, such as manufacturing, have long been recognized

Table 1: Distribution of IP-intensive employment across industrial sectors, 2019 (percent)

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive | IP-intensive | Non-IP-intensive |
|---|---|---|---|---|---|---|
| | *– in percent ~* | | | | | |
| Agriculture, Forestry, Fishing and Hunting | 0.0 | 0.0 | 0.1 | 0.0 | 0.1 | 4.7 |
| Mining, Utilities, and Construction | 1.9 | 0.0 | 0.0 | 0.0 | 0.7 | 10.5 |
| Manufacturing | 44.1 | 46.0 | 18.4 | 0.0 | 22.6 | 2.6 |
| Wholesale and Retail Trade | 7.1 | 36.1 | 27.2 | 0.0 | 24.0 | 11.5 |
| Transportation and Warehousing | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.1 |
| Information | 11.9 | 4.4 | 6.4 | 29.6 | 6.4 | 0.0 |
| Finance, Insurance, Real Estate, and Leasing | 5.2 | 3.7 | 10.6 | 0.0 | 9.4 | 5.3 |
| Professional, Technical, Management, and Administrative Services | 19.0 | 9.1 | 24.3 | 63.0 | 21.4 | 13.9 |
| Education and Health Care Services | 10.2 | 0.0 | 5.5 | 0.0 | 8.7 | 22.1 |
| Arts, Entertainment and Recreation | 0.7 | 0.0 | 2.9 | 7.4 | 2.6 | 1.8 |
| Accommodation and Food Services | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 15.0 |
| Other Services | 0.0 | 0.6 | 4.6 | 0.0 | 4.1 | 5.5 |
| **Total** | **100** | **100** | **100** | **100** | **100** | **100** |

*Source: USPTO estimates using data from the Bureau of Labor Statistics' Labor Productivity and Costs Program.*

16    In the sections that follow, we consider only the employment directly attributable to the IP-intensive industries.

as important sources of IP-related jobs. Other sectors are also important for certain types of IP. Indeed, the sector that contributed the most to IP-intensive employment was in the trademark-intensive industries—the wholesale and retail trade sector (11.3 million jobs).[17]

Beyond the manufacturing and the wholesale and retail trade sectors, the professional services sector also has a high concentration of IP-intensive employment. Altogether, these three sectors combine to account for 68% of all IP-intensive employment, compared to 28% of all employment in the non-IP-intensive industries. The heavy emphasis on manufacturing is especially pronounced in the utility patent–intensive and design patent–intensive industries, whereas there is a heavy emphasis on the wholesale and retail trade sector in the design patent–intensive and trademark-intensive industries.

The distribution of employees in the copyright-intensive industries is markedly different from the distributions in the other IP-intensive industries. Of these employees, 63% work in professional service industries, such as computer systems design, specialized design services, and advertising. Another 30% work in the information sector in such fields as publishing, software development, broadcasting, and motion picture and video production.[18]

## 3.2    Employment trends over time

Since 1989, employment in IP-intensive industries may be characterized by three phases of growth (Figure 4). First, in 1989-2000, employment grew by roughly 14% to reach an initial peak in 2000. The next decade brought both the "dot-com" collapse and the 2008 financial crisis, and IP-intensive employment fell back nearly to its 1989 level. The 2010s brought better economic fortune, and IP-intensive employment grew again by 14%, gaining back all the ground it had lost in the previous decade. Job growth was most rapid during this time in the copyright-intensive industries, adding nearly 30% more jobs and far outstripping the 18% gain made by the non-IP-intensive industries.

Figure 4: Indexed employment in IP-intensive industries, 1989-2019



*Source: USPTO estimates using data from the Bureau of Labor Statistics' Labor Productivity and Costs Program.*

17    In 2019, there were 41.63 million employees in the trademark-intensive industries. Of those jobs, 27% (or 11.3 million) were in the wholesale and retail trade sector.

18    Perhaps surprisingly, less than 10% of employees in the copyright-intensive industries work in the arts and entertainment sector. However, both motion picture and music production fall under the information sector, which at least partially explains this counterintuitive result. Reassigning these industries (which account for 8% of copyright-intensive employment) to the arts, entertainment, and recreation sector would increase its share to more than 15.0% and decrease the information sector share to 21.5%.



Figure 5: IP-intensive industries' share of private sector employment by state, 2019

Compared to national average (33.6%)

- 6–51% above
- 3–6% above
- 0–3% above
- Below

*Note: At the national level, 33.6% of private sector employees work in IP-intensive industries. The states with the highest IP-intensive employment shares are shaded in dark blue. Each of these states exceeds the national average by at least 6%. For instance, Utah, with a 37% IP-intensive employment share, exceeds that national average by [(37-33.6)/33.6]=10.1%. The states shaded in the lighter shades of blue also exceed the national average, but by a smaller amount.*

*Source: USPTO estimates using data from the Quarterly Census of Employment and Wages.*

## 3.3    IP-intensive jobs by state

In recent years, policymakers have been interested in promoting geographic diversity in innovation.[19] As illustrated in Figure 5, employment in IP-intensive industries varies widely across the United States. Sixteen states along with the District of Columbia exceeded the national average of 33.6% of private sector employment in IP-intensive industries. With a few exceptions, IP-intensive employment clusters in New England, the upper Midwest, and the West Coast. The top five states in 2019 were Utah (37.0%), Washington (36.7%), New York (35.8%), Massachusetts (35.7%), and Illinois (35.5%).[20] These states were among those with an above-average employment share in IP-intensive industries in 2014. Other states with IP-intensive employment of more than 3% above the national average include New Hampshire, California, Michigan, and Wisconsin. For state rankings in each IP-intensive industry cluster, please refer to Appendix Table A2.

---

19    See division B, title II of the U.S. Innovation and Competition Act of 2021 (S. 1260).

20    The District of Columbia had the highest share of private sector employment in IP-intensive industries at 50.7%.

# 4. Characteristics of jobs in the IP-intensive industries

Job creation is important for policymakers. So too is creating jobs that help raise standards of living by providing workers with suitable compensation. For example, jobs that earn higher incomes *and* are accompanied by fringe benefits, such as retirement and healthcare, provide higher levels of compensation, on average, than jobs with lower incomes or no benefits. Therefore, we explore differences in earnings and fringe benefits across the IP-intensive industry clusters and compare these earnings to those in the non-IP-intensive industries. We also explore differences in other employment characteristics such as employer size and employment type. On average, we find jobs provided by the IP-intensive industries provide higher levels of total compensation than those found in the non-IP-intensive industries. Jobs in the two groups also differ across the other characteristics considered.

## 4.1 Average earnings

In 2019, the average weekly earnings of $1,517 for workers across all IP-intensive industries was 60% higher than weekly earnings for workers in other industries (see Figure 6). Economists refer to this difference as the "earnings premium" for workers in IP-intensive industries. For example,

whereas workers in non-IP-intensive industries earned an average of $947 per week in 2019, those in utility patent-intensive industries earned $1,869 per week, yielding an earnings premium of 97% for utility patent-intensive employees. Workers in trademark-intensive industries earned less on average than those in other IP-intensive industry clusters—but still 60% more than workers in non-IP-intensive industries.

Earnings premiums of IP-intensive jobs, and especially copyright-intensive jobs, have been rising since 1990 (Figure 7). In 2009, the earnings premium in IP-intensive industries stood at 50%, and it grew steadily to reach 60% in 2019. Given that so many of the IP-intensive industries are trademark-intensive, the earnings premium for workers in the trademark-intensive industries has followed a very similar trend over time. Likewise, the design patent–intensive industries tend to have a slightly higher earnings premium than the trademark-intensive industries but have followed a trend over time similar to the aggregate measure.



Figure 6: Average weekly earnings of private wage and salary workers in IP-intensive industries, 2019

*Source: USPTO estimates using data from the Quarterly Census of Employment and Wages.*

Figure 7: Average weekly earnings premiums of workers in IP-intensive industries relative to non-IP-intensive industries, 1990-2019



*Source: USPTO estimates using data from the Quarterly Census of Employment and Wages.*

Historically, the earnings premiums enjoyed by workers in the utility patent- and copyright-intensive industries have been higher than those in the other two IP-intensive industries. By the end of the 1990s, the premium for workers in the utility patent-intensive industries relative to non-IP-intensive industries stood at more than 80%. The bursting of the dot-com bubble led to a retreat in the premium in the early years of the 2000s, but it has since grown steadily (except for the period around the financial crisis) and stood at 97% in 2019.

The earnings premium in the copyright-intensive industries experienced a more extreme version of the trends in the utility patent-intensive industries. After the bursting of the dot-com bubble, earnings in these industries relative to non-IP-intensive industries fell such that the premium stood at "only" 80% in 2004. However, relative earnings have recovered in the past 15 years so that the earnings premium stood at 122% in 2019. Notably, the earnings premiums for the utility patent–intensive, design patent–intensive, and copyright-intensive industries were higher in 2019 than at any time during the previous three decades.

## 4.2    Other employment characteristics

Beyond earnings, other aspects of employment include fringe benefits, such as retirement plans and health insurance, and employment status, such as full-time versus part-time, and self-employment. Full-time employment is typically an indicator of higher job stability and the availability of fringe benefits.[21] Self-employed individuals have more freedom in the type of work they do and when they do it, but they also potentially face unstable income flows and are typically not eligible for fringe benefits.[22]

We also consider employer size. Larger employers typically have more resources to offer richer fringe benefit packages while also offering greater job security and better opportunities for formal training, among other benefits. In this way, employer size can be thought of as a proxy for the other forms of nonwage compensation that we do not specifically include in the analysis.[23] As illustrated in Table 2, these job characteristics vary substantially between IP-intensive and non-IP-intensive industries.[24]

---

21   For example, Buchmueller (1999) finds that employers that offer richer benefits packages to full-time workers make greater use of part-time workers for tasks that require lower levels of skill, so as to avoid providing the same benefits to lower-skilled workers.

22   See Krueger (2018).

23   This is not to discount the benefits of working for a small or medium-sized enterprise. Such companies can offer opportunities (such as increased responsibilities) that larger companies sometimes do not. Whether one prefers the benefits of larger or smaller companies, it is enlightening to see how employment in such environments differs across industries.

24   See section 3.3 of the online supplement for more information on the data and methods used for the analyses in this section.

Table 2: Characteristics of employment in IP-intensive and non-IP-intensive industries, 2019 (percent)

| Characteristic | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive | IP-intensive | Non-IP-Intensive |
|---|---|---|---|---|---|---|
| | *– in percent ~* | | | | | |
| Employer Size | | | | | | |
| Less than 100 employees | 22.6 | 35.5 | 42.3 | 44.0 | 37.4 | 44.2 |
| 100 to 499 employees | 15.8 | 15.5 | 13.7 | 14.5 | 13.6 | 12.8 |
| 500 or more employees | 61.5 | 49.0 | 44.0 | 41.5 | 49.0 | 43.1 |
| Share Self-Employed | 3.3 | 8.6 | 12.0 | 13.5 | 10.2 | 7.9 |
| Share Full-Time | 86.3 | 87.3 | 81.3 | 83.3 | 80.8 | 74.0 |
| Share health insurance | 81.6 | 75.9 | 73.8 | 78.5 | 74.9 | 62.7 |
| Share retirement plan | 49.9 | 41.9 | 39.3 | 38.2 | 42.1 | 36.9 |

*Source: USPTO estimates using data from the 2019 Current Population Survey Annual Social and Economic Supplement.*

Utility patent–intensive and design patent–intensive industries have the highest shares of employees working for large enterprises (i.e., 500 or more employees). This is especially true in the utility patent–intensive industries, where more than 60% of employees work for large employers. The employer size distributions for workers in the trademark- and copyright-intensive industries are similar to the distribution observed for the non-IP-intensive industries.

Overall, a little under 9% of the workforce in the United States was self-employed in 2019. Notably, the prevalence of self-employment varies considerably across the IP-intensive industries. The percentage of self-employed workers in the patent-intensive industries is far less than in the trademark- and copyright-intensive industries. In fact, the self-employment rate among workers in the copyright-intensive industries is 50% higher than in the economy at a whole. Many jobs in the creative and performing arts are performed under contract rather than payroll employment, which likely reflects the nature of artistic and creative work as more individualistic and expressive.[25]

A larger share of workers in the IP-intensive industries are employed full-time (35 or more hours per week) and are covered by employer-provided group health insurance than in non-IP-intensive industries. Likewise, more workers in the IP-intensive industries are covered by employer-provided pensions or other comparable retirement plans. Those working in the utility patent–intensive industries had the highest percentages in each of these categories: 86% worked full-time, 82% were covered by an employer-sponsored group health plan, and 50% participated in a retirement plan at work. The additional fringe benefits (e.g., health insurance coverage and retirement plans) that employees in the IP-intensive industries receive widen the gap in total compensation between themselves and their counterparts in the non-IP-intensive industries, who are less likely to receive fringe benefits and typically earn less in the form of wage or salary income.

---

25    See WIPO (2015), page 40, and Henry et al. (2021)

# 5.    Worker characteristics

The employment characteristics in the previous section describe jobs but not workers. In recent years, there has been a growing interest in the representation of various socioeconomic groups and their production and ownership of IP. To this end, the USPTO has published two reports on the use of the U.S. patent system by women.[26] Identifying active participation in the U.S. IP system for other socioeconomic groups has proven more challenging. The USPTO presently does not collect information from inventors on any socioeconomic characteristics, including gender. For this analysis, we draw on annual employee survey data to determine if there are differences in the socioeconomic composition of workers in the IP-intensive and non-IP-intensive industries. We also assess if such differences exist among the different IP-intensive industry clusters (Table 3).

In 2019, women made up a smaller share of the workforce in IP-intensive industries (43.7%) than in non-IP-intensive industries (54%). This gap was most pronounced in the design patent– and utility patent–intensive industries and could be linked to the fact that significant portions of workers in those industries are employed in manufacturing. The relatively higher share of women working in the non-IP-intensive industries is likely driven by, among other things, the significant share of workers in the healthcare and educational services sectors.[27]

Table 3: Characteristics of workers in IP-intensive and non-IP-intensive industries, 2019 (percent)

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive | IP-intensive | Non-IP-intensive |
|---|---|---|---|---|---|---|
| *- in percent -* | | | | | | |
| Female | 37.0 | 34.3 | 44.3 | 40.9 | 43.7 | 54.0 |
| *Race/Ethnicity* | | | | | | |
| White, Non-Hispanic | 66.3 | 69.5 | 67.4 | 66.7 | 67.6 | 58.4 |
| Black, Non-Hispanic | 9.2 | 8.1 | 8.7 | 7.7 | 8.9 | 13.9 |
| Asian, Non-Hispanic | 11.0 | 6.7 | 8.4 | 14.5 | 8.3 | 5.6 |
| Other, Non-Hispanic | 2.2 | 2.0 | 2.3 | 2.5 | 2.3 | 2.6 |
| Hispanic | 11.4 | 13.8 | 13.3 | 8.6 | 13.0 | 19.5 |
| Veteran Status | 6.1 | 6.3 | 5.3 | 5.4 | 5.3 | 4.4 |
| *Education Level* | | | | | | |
| Less than high school | 3.4 | 5.5 | 3.7 | 0.8 | 3.6 | 8.2 |
| High school diploma | 18.5 | 25.9 | 19.3 | 9.1 | 19.4 | 28.2 |
| Some college or associate degree | 21.8 | 26.3 | 24.0 | 19.8 | 23.4 | 27.0 |
| Bachelor degree | 32.4 | 30.3 | 34.0 | 47.7 | 32.2 | 22.2 |
| Graduate degree | 23.9 | 12.1 | 19.0 | 22.6 | 21.4 | 14.4 |

*Note: Race/ethnicity categories are adopted from the CPS survey. The "Other, Non-Hispanic" race/ethnicity category includes non-Hispanic individuals who identified themselves as an American Indian or Alaskan Native, a Hawaiian or Pacific Islander, or as a mixed-race individual.*

*Source: USPTO estimates using data from the 2019 Current Population Survey (CPS) Annual Social and Economic Supplement.*

---

26   Toole, Myers et al. (2019), and Toole, Saksena et al. (2020) found that, although women continue to be underrepresented with regard to utility patent grants, more women are entering and staying active in the patent system than ever before. In addition, all of the measures for female participation, including the shares of utility patents with at least one female inventor and all utility patent grantees who are women, have increased in recent years.

27   The Bureau of Labor Statistics reports that, in 2019, 30% of workers in the manufacturing sector were women. Meanwhile, women accounted for 75% of the workforce in the education and health care services sector. See www.bls.gov/cps/aa2019/cpsaat17.pdf.

Roughly two-thirds of the workers in the IP-intensive industries are White, a fifth of them are of Asian or Hispanic descent, and a tenth are Black or another race. Representation of Asians and Whites tends to be higher in the IP-intensive industries than outside of them. Asian representation is relatively high in the utility patent–intensive and copyright-intensive industries, where Asians make up 11% and 14.5% of all employees, respectively. Hispanic and Black representation is highest in the non-IP-intensive industries.

Veterans make up a larger share of workers in IP-intensive industries than in non-IP-intensive industries, accounting for 5.3% of all IP-intensive workers. The share of workers who are veterans is highest in the utility patent–intensive and design patent–intensive industries, where it exceeds 6% in each.

Given that workers in IP-intensive industries generally earn more than their counterparts in the non-IP-intensive industries, and in light of the strong positive relationship between educational attainment and subsequent earnings, we would expect that the distribution of educational attainment would differ between the IP-intensive and non-IP-intensive sectors. Our findings confirm these expectations. We see that a larger share of workers in the IP-intensive industries completed at least a four-year undergraduate program (53.6% vs. 36.6%).[28] The share of workers with four-year degrees among those in the copyright-intensive industries is particularly high at more than 70%, while more than half of the workers in the utility patent-intensive industries completed four-year degrees. Workers in the design patent–intensive industries are less likely to have graduated from college (roughly 43% did so), but workers in these industries are still more likely to have a four-year degree than those in non-IP-intensive industries.

## 6.  Conclusions

This report highlights the contributions of IP-intensive industries to output and employment. In 2019, IP-intensive industries accounted for nearly 41% of U.S. GDP and directly accounted for 33% of all U.S. employment. These industries also indirectly accounted for an additional 11% of U.S. employment. Among the IP industry clusters analyzed, trademark-intensive industries contributed the most to national output and employment, followed by the design patent– and utility patent–intensive industries. Employment in IP-intensive industries tended to track with economy-wide upturns and downturns. Notably, by 2019, IP-intensive industries appeared to have recovered employment losses resulting from the dot-com collapse and the Great Recession.

Both the types of jobs and nature of the workforce tend to differ between IP-intensive and non-IP-intensive industries. Employers in IP-intensive industries tend to be large companies, pay higher wages, and are more likely to offer fringe benefits such as retirement and healthcare plans. In terms of workforce composition, women and minorities, except for those of Asian descent, are underrepresented in IP-intensive industries. Notably, veterans make up a larger percentage of workers in IP-intensive industries (5.3%) compared to in non-IP-intensive industries (4.4%).

Although the industry-level analysis presented in this report provides a broad perspective on the relative importance of IP-intensive industries, additional research and analysis at the company-level would help to build an understanding of the

---

28   To generate these numbers, we combine the shares of workers whose highest level of educational attainment is a bachelor's degree or a graduate degree.

microeconomic foundations that drive the use of IP and how IP impacts output and employment. For instance, company-level analyses can model and characterize the decisions to seek IP protection more completely. This type of analysis may, for example, shed light on the reasons for observing a persistent and growing earnings premium for workers in IP-intensive industries.

## References

Buchmueller, Thomas. 1999. "Fringe Benefits and the Demand for Part-Time Workers." *Applied Economics* 31(5): 551-563.

Corrado, Carol, and Charles Hulten. 2010. "How Do You Measure a 'Technological Revolution'?" *American Economic Review* 100 (2): 99-104.

ESA and USPTO (Economic and Statistics Administration and United States Patent and Trademark Office). 2012. "Intellectual Property and the U.S. Economy: Industries in Focus." U.S. Department of Commerce. www.uspto.gov/sites/default/files/news/publications/IP_Report_March_2012.pdf.

ESA and USPTO (Economic and Statistics Administration and United States Patent and Trademark Office). 2016. "Intellectual Property and the U.S. Economy: 2016 Update." www.uspto.gov/sites/default/files/documents/IPandtheUSEconomySept2016.pdf.

EPO and EUIPO (European Patent Office and European Union Intellectual Property Office). 2019. *IPR-Intensive Industries and Economic Performance in the European Union: Industry-Level Analysis Report.* Munich, Germany, and Alicante, Spain: EPO and EUIPO. https://euipo.europa.eu/tunnel-web/secure/webdav/guest/document_library/observatory/documents/IPContributionStudy/IPR-intensive_industries_and_economicin_EU/WEB_IPR_intensive_Report_2019.pdf.

Haskel, Jonathan, and Stan Westlake. 2018. *Capitalism without Capital: The Rise of the Intangible Economy.* Princeton, NJ: Princeton University Press.

Henry, Nick, Victoria Barker, Paul Sissons, Kevin Broughton, Peter Dickinson, Jordan Lazell, and Tim Angus (2021). "Creating Value in Place: Understanding the Role, Contribution and Challenges of Creative Freelance Work." Creative Industries Policy and Evidence Centre Discussion Paper 2021/05. www.pec.ac.uk/assets/publications/Creating-Value-in-Place_-Understanding-the-Role-Contribution-and-Challenges-of-Creative-Freelance-Work.pdf.

Krueger, Alan B. 2018. "Independent Workers: What Role for Public Policy?" *The ANNALS of the American Academy of Political and Social Science* 675(1): 8-25.

Lev, Baruch. 2018. "Intangibles." Unpublished manuscript. Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3218586.

Park, Walter G. 2007. "Chapter 9: Intellectual Property Rights and International Innovation." In *Intellectual Property, Growth, and Trade (Frontiers of Economics and Globalization, Vol. 2)*, ed. Keith E. Maskus. Bingley, UK: Emerald Publishing Limited.

Schwab, Klaus. 2016. "The Fourth Industrial Revolution: What It Means, How to Respond." World Economic Forum Global Agenda, January 14, 2016. www.weforum.org/agenda/2016/01/the-fourth-industrial-revolution-what-it-means-and-how-to-respond/.

Sichel, Daniel E. 2008. "Intangible Capital." In *The New Palgrave Dictionary of Economics*, ed. S. N. Durlauf and L. E. Blume, 391-92. London: Palgrave Macmillan. https://doi.org/10.1057/978-1-349-95121-5_2304-1.

Spulber, Daniel. 2021. "Antitrust and Innovation Competition." Unpublished manuscript.

Toole, Andrew, Amanda Myers, Charles deGrazia, Stefano Breschi, Edoardo Ferrucci, Francesco Lisson, Ernest Miguelez, Valerio Sterzi, and Gianluca Tarasconi. 2019. "Progress and Potential: A Profile of Women Inventors on U.S. Patents." USPTO Office of the Chief Economist IP Data Highlights, No. 2. www.uspto.gov/sites/default/files/documents/Progress-and-Potential-2019.pdf.

Toole, Andrew, Michelle Saksena, Charles deGrazia, Katherine Black, Francesco Lisson, Ernest Miguelez, and Gianluca Tarasconi. 2020. "Progress and Potential: 2020 Update on U.S. Women Inventor-Patentees." USPTO Office of the Chief Economist IP Data Highlights, No. 4. www.uspto.gov/sites/default/files/documents/OCE-DH-Progress-Potential-2020.pdf.

UKIPO (United Kingdom Intellectual Property Office). 2020. "Use of Intellectual Property Rights across UK Industries." www.gov.uk/government/publications/use-of-intellectual-property-rights-across-uk-industries/use-of-intellectual-property-rights-across-uk-industries.

Verspagen, Bart. 2006. "Innovation and Economic Growth." In *The Oxford Handbook of Innovation,* ed. Jan Fagerberg and David C. Mowery. Oxford, UK: Oxford University Press.

WIPO (World Intellectual Property Organization). 2003. *Guide on Surveying the Economic Contribution of the Copyright-Based Industries.* Geneva: WIPO.

WIPO (World Intellectual Property Organization). 2015. *Guide on Surveying the Economic Contribution of the Copyright-Based Industries.* Geneva: WIPO. www.wipo.int/edocs/pubdocs/en/copyright/893/wipo_pub_893.pdf.

# Appendix

Table A1: IP-intensive industries, 2012–2016

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive |
|---|---|---|---|---|
| Fishing, hunting, and trapping | | | ◆ | |
| Support activities for mining | ◆ | | | |
| Animal food manufacturing | | ◆ | ◆ | |
| Grain and oilseed milling | | ◆ | ◆ | |
| Sugar and confectionery product manufacturing | | | ◆ | |
| Fruit and vegetable preserving and specialty food manufacturing | | | ◆ | |
| Dairy product manufacturing | | | ◆ | |
| Seafood product preparation and packaging | | | ◆ | |
| Other food manufacturing | ◆ | ◆ | ◆ | |
| Beverage manufacturing | | | ◆ | |
| Tobacco manufacturing | ◆ | ◆ | ◆ | |
| Fiber, yarn, and thread mills | | | ◆ | |
| Fabric mills | ◆ | ◆ | ◆ | |

Table A1: IP-intensive industries, 2012–2016 (*continued*)

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive |
|---|---|---|---|---|
| Textile and fabric finishing and fabric coating mills | | ◆ | ◆ | |
| Textile furnishings mills | | ◆ | ◆ | |
| Other textile product mills | | ◆ | ◆ | |
| Apparel manufacturing | | ◆ | ◆ | |
| Leather and allied product manufacturing | ◆ | ◆ | ◆ | |
| Other wood product manufacturing | | ◆ | | |
| Pulp, paper, and paperboard mills | ◆ | ◆ | ◆ | |
| Converted paper product manufacturing | ◆ | ◆ | ◆ | |
| Petroleum and coal products manufacturing | ◆ | ◆ | ◆ | |
| Basic chemical manufacturing | ◆ | ◆ | ◆ | |
| Resin, synthetic rubber, and artificial synthetic fibers and filaments manufacturing | ◆ | ◆ | ◆ | |
| Pesticide, fertilizer, and other agricultural chemical manufacturing | ◆ | ◆ | ◆ | |
| Pharmaceutical and medicine manufacturing | ◆ | ◆ | ◆ | |
| Paint, coating, and adhesive manufacturing | ◆ | ◆ | ◆ | |
| Soap, cleaning compound, and toilet preparation manufacturing | ◆ | ◆ | ◆ | |
| Other chemical product and preparation manufacturing | ◆ | ◆ | ◆ | |
| Plastics product manufacturing | ◆ | ◆ | ◆ | |
| Rubber product manufacturing | ◆ | ◆ | ◆ | |
| Clay product and refractory manufacturing | | ◆ | ◆ | |
| Glass and glass product manufacturing | ◆ | ◆ | ◆ | |
| Cement and concrete product manufacturing | | ◆ | | |
| Lime and gypsum product manufacturing | ◆ | ◆ | ◆ | |
| Other nonmetallic mineral product manufacturing | | ◆ | | |
| Alumina and aluminum production and processing | ◆ | ◆ | | |
| Nonferrous metal (except aluminum) production and processing | ◆ | ◆ | ◆ | |
| Forging and stamping | | ◆ | | |
| Cutlery and hand tool manufacturing | ◆ | ◆ | ◆ | |
| Architectural and structural metals manufacturing | | ◆ | | |

Table A1: IP-intensive industries, 2012–2016 (*continued*)

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive |
|---|:---:|:---:|:---:|:---:|
| Boiler, tank, and shipping container manufacturing | ◆ | ◆ | | |
| Hardware manufacturing | ◆ | ◆ | ◆ | |
| Spring and wire product manufacturing | ◆ | ◆ | ◆ | |
| Other fabricated metal product manufacturing | ◆ | ◆ | | |
| Agriculture, construction, and mining machinery manufacturing | ◆ | ◆ | ◆ | |
| Industrial machinery manufacturing | ◆ | ◆ | ◆ | |
| Commercial and service industry machinery manufacturing | ◆ | ◆ | ◆ | |
| Ventilation, heating, air-conditioning, and commercial refrigeration equipment manufacturing | ◆ | ◆ | ◆ | |
| Metalworking machinery manufacturing | ◆ | ◆ | | |
| Engine, turbine, and power transmission equipment manufacturing | ◆ | ◆ | | |
| Other general purpose machinery manufacturing | ◆ | ◆ | ◆ | |
| Computer and peripheral equipment manufacturing | ◆ | ◆ | ◆ | |
| Communications equipment manufacturing | ◆ | ◆ | ◆ | |
| Audio and video equipment manufacturing | ◆ | ◆ | ◆ | |
| Semiconductor and other electronic component manufacturing | ◆ | ◆ | ◆ | |
| Navigational, measuring, electro-medical, and control instruments manufacturing | ◆ | ◆ | ◆ | |
| Manufacturing and reproducing magnetic and optical media | ◆ | ◆ | ◆ | |
| Electric lighting equipment manufacturing | ◆ | ◆ | ◆ | |
| Household appliance manufacturing | ◆ | ◆ | ◆ | |
| Electrical equipment manufacturing | ◆ | ◆ | ◆ | |
| Other electrical equipment and component manufacturing | ◆ | ◆ | ◆ | |
| Motor vehicle manufacturing | ◆ | ◆ | | |
| Motor vehicle parts manufacturing | ◆ | ◆ | | |
| Aerospace product and parts manufacturing | ◆ | ◆ | | |
| Railroad rolling stock manufacturing | ◆ | ◆ | | |
| Ship and boat building | | ◆ | | |
| Other transportation equipment manufacturing | ◆ | ◆ | ◆ | |

Table A1: IP-intensive industries, 2012–2016 (*continued*)

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive |
|---|---|---|---|---|
| Household and institutional furniture and kitchen cabinet manufacturing | | ♦ | ♦ | |
| Office furniture (including fixtures) manufacturing | ♦ | ♦ | ♦ | |
| Other furniture related product manufacturing | ♦ | ♦ | ♦ | |
| Medical equipment and supplies manufacturing | ♦ | ♦ | ♦ | |
| Other miscellaneous manufacturing | ♦ | ♦ | ♦ | |
| Motor vehicle and motor vehicle parts and supplies merchant wholesalers | | ♦ | ♦ | |
| Professional and commercial equipment and supplies merchant wholesalers | ♦ | ♦ | ♦ | |
| Electrical and electronic goods merchant wholesalers | ♦ | ♦ | ♦ | |
| Machinery, equipment, and supplies merchant wholesalers | | ♦ | ♦ | |
| Other durable goods merchant wholesalers | | ♦ | ♦ | |
| Drugs and druggists' sundries merchant wholesalers | ♦ | | | |
| Grocery and related product wholesalers | | | ♦ | |
| Petroleum and petroleum products merchant wholesalers | | ♦ | ♦ | |
| Other nondurable goods merchant wholesalers | | ♦ | ♦ | |
| Health and personal care stores | | | ♦ | |
| Clothing and clothing accessories stores | | | ♦ | |
| Non-store retailers | | ♦ | ♦ | |
| All other retail | | ♦ | ♦ | |
| Newspaper, periodical, book, and directory publishers | | | ♦ | ♦ |
| Software publishers | ♦ | ♦ | ♦ | ♦ |
| Motion picture and video industries | | | ♦ | ♦ |
| Sound recording industries | | | ♦ | ♦ |
| Radio and television broadcasting | ♦ | | ♦ | ♦ |
| Cable and other subscription programming | ♦ | ♦ | ♦ | ♦ |
| Wired and wireless telecommunications carriers (except satellite) | ♦ | | ♦ | |
| Data processing, hosting, and related services | ♦ | ♦ | ♦ | |
| Other information services | ♦ | | | ♦ |
| Nondepository credit intermediation and related activities | ♦ | | ♦ | |
| Other financial investment activities | | ♦ | ♦ | |

Table A1: IP-intensive industries, 2012–2016 (*continued*)

| Sector | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive |
|---|---|---|---|---|
| Securities and commodity contracts intermediation and brokerage | | | ◆ | |
| Funds, trusts, and other financial vehicles | ◆ | ◆ | ◆ | |
| Housing and other real estate | | | ◆ | |
| Machinery and equipment rental and leasing | | ◆ | ◆ | |
| Lessors of nonfinancial intangible assets | ◆ | ◆ | ◆ | |
| Legal services | | | ◆ | |
| Specialized design services | | ◆ | ◆ | ◆ |
| Computer systems design and related services | ◆ | | ◆ | ◆ |
| Management and technical consulting services | | | ◆ | |
| Scientific research and development services | ◆ | ◆ | ◆ | |
| Advertising and related services | | ◆ | ◆ | ◆ |
| Other professional and technical services | | | ◆ | ◆ |
| Office administrative services | | | ◆ | |
| Business support services | | | ◆ | |
| Travel arrangement and reservation services | | | ◆ | |
| Other support services | ◆ | ◆ | ◆ | |
| Junior colleges, colleges, universities, and professional schools | ◆ | | | |
| Other educational services | | | ◆ | |
| Offices of other health practitioners | | | ◆ | |
| Performing arts companies | | | ◆ | ◆ |
| Spectator sports | | | ◆ | |
| Independent artists, writers, and performers | | | ◆ | ◆ |
| Promoters of performing arts and sports and agents for public figures | | | ◆ | |
| Museums, historical sites, zoos, and parks | | | ◆ | |
| Gambling industries | ◆ | | ◆ | |
| Electronic and precision equipment repair and maintenance | | ◆ | ◆ | |
| Other personal services | | | ◆ | |
| Grantmaking, giving, and social advocacy organizations | | | ◆ | |
| Civic, social, professional, and similar organizations | | | ◆ | |

Table A2: Shares of private sector workers in IP-intensive industries in 2019, by state

| State | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive | IP-intensive |
|---|---|---|---|---|---|
| | | | *– in percent –* | | |
| **National Average** | **13.6** | **16.1** | **29.7** | **4.4** | **33.6** |
| Alabama | 14.0 | 18.7 | 25.7 | 3.1 | 31.6 |
| Alaska | 6.1 | 5.8 | 22.2 | 1.5 | 25.3 |
| Arizona | 11.6 | 13.5 | 28.1 | 3.5 | 31.0 |
| Arkansas | 10.4 | 15.7 | 24.4 | 2.3 | 27.5 |
| California | 14.4 | 15.9 | 31.9 | 6.4 | 35.1 |
| Colorado | 13.8 | 15.0 | 31.9 | 5.9 | 34.5 |
| Connecticut | 14.8 | 16.7 | 27.2 | 4.3 | 33.2 |
| Delaware | 11.7 | 10.2 | 28.6 | 2.4 | 29.7 |
| District of Columbia | 15.8 | 6.6 | 44.5 | 10.8 | 50.7 |
| Florida | 8.8 | 11.8 | 28.4 | 3.6 | 30.5 |
| Georgia | 12.7 | 16.0 | 29.2 | 4.8 | 32.3 |
| Hawaii | 4.0 | 6.5 | 22.4 | 2.6 | 23.4 |
| Idaho | 9.0 | 14.6 | 28.1 | 3.0 | 30.2 |
| Illinois | 14.2 | 17.1 | 31.8 | 4.3 | 35.5 |
| Indiana | 17.0 | 21.5 | 27.5 | 2.5 | 34.5 |
| Iowa | 13.2 | 18.5 | 27.6 | 2.7 | 31.2 |
| Kansas | 13.6 | 18.2 | 27.3 | 3.1 | 32.5 |
| Kentucky | 14.5 | 18.6 | 25.7 | 2.3 | 32.2 |
| Louisiana | 10.9 | 13.2 | 24.8 | 2.2 | 28.4 |
| Maine | 9.3 | 13.5 | 25.1 | 2.8 | 29.0 |
| Maryland | 12.9 | 11.9 | 29.8 | 5.6 | 31.7 |
| Massachusetts | 17.3 | 16.3 | 31.2 | 6.0 | 35.7 |
| Michigan | 17.3 | 21.0 | 27.7 | 3.6 | 35.3 |
| Minnesota | 13.1 | 17.4 | 29.8 | 3.9 | 32.4 |
| Mississippi | 11.0 | 17.5 | 23.9 | 1.6 | 28.8 |
| Missouri | 13.6 | 16.8 | 28.0 | 3.7 | 32.4 |

Table A2: Shares of private sector workers in IP-intensive industries in 2019, by state (*continued*)

| State | Utility patent-intensive | Design patent-intensive | Trademark-intensive | Copyright-intensive | IP-intensive |
|---|---|---|---|---|---|
| | | | *– in percent –* | | |
| **National Average** | **13.6** | **16.1** | **29.7** | **4.4** | **33.6** |
| Montana | 6.7 | 10.8 | 24.0 | 2.9 | 25.6 |
| Nebraska | 10.8 | 14.5 | 26.7 | 3.6 | 29.5 |
| Nevada | 7.6 | 10.0 | 24.1 | 2.8 | 25.1 |
| New Hampshire | 16.3 | 18.3 | 31.3 | 4.3 | 34.8 |
| New Jersey | 12.4 | 14.9 | 31.4 | 4.2 | 33.0 |
| New Mexico | 12.1 | 12.3 | 24.6 | 2.3 | 28.2 |
| New York | 11.7 | 13.1 | 31.9 | 6.1 | 35.8 |
| North Carolina | 14.3 | 18.6 | 30.5 | 3.5 | 33.7 |
| North Dakota | 10.2 | 13.8 | 23.0 | 2.4 | 29.4 |
| Ohio | 15.6 | 19.2 | 28.2 | 3.2 | 33.6 |
| Oklahoma | 13.0 | 15.5 | 24.9 | 2.2 | 30.3 |
| Oregon | 11.0 | 16.3 | 28.4 | 3.9 | 30.6 |
| Pennsylvania | 13.8 | 15.5 | 27.1 | 3.4 | 31.8 |
| Rhode Island | 11.3 | 11.9 | 24.9 | 3.4 | 29.5 |
| South Carolina | 15.1 | 18.4 | 27.9 | 2.8 | 32.5 |
| South Dakota | 11.3 | 16.1 | 27.2 | 2.3 | 29.7 |
| Tennessee | 14.4 | 18.8 | 28.4 | 3.0 | 33.6 |
| Texas | 13.6 | 15.5 | 29.7 | 3.8 | 33.7 |
| Utah | 15.7 | 18.0 | 33.4 | 5.8 | 37.0 |
| Vermont | 11.0 | 13.6 | 27.1 | 3.9 | 30.5 |
| Virginia | 14.0 | 12.7 | 31.6 | 7.6 | 34.5 |
| Washington | 15.9 | 19.8 | 31.1 | 6.9 | 36.7 |
| West Virginia | 8.8 | 10.8 | 20.8 | 2.2 | 24.5 |
| Wisconsin | 16.3 | 22.0 | 31.0 | 3.1 | 35.2 |
| Wyoming | 9.2 | 10.0 | 19.7 | 2.0 | 25.3 |



**U.S. Patent and Trademark Office**

600 Dulany Street • Alexandria, Virginia, 22314 • www.uspto.gov

# **EXHIBIT 27**

# DoD Officials: Chinese Actions Threaten U.S. Technological, Industrial Base

June 21, 2018   |   By Lisa Ferdinando, DOD News

You have accessed part of a historical collection on war.gov. Some of the information contained within may be outdated and links may not function. Please contact the DOW Webmaster with any questions.

Defense Department officials warned lawmakers today about the unprecedented threats DoD is facing to its technological and industrial base, as China and other nations actively seek out advanced technology and intellectual property.

"We are here to underscore the urgency with which all of us must focus our actions to maintain our technological and military dominance," Michael D. Griffin, undersecretary of defense for research and engineering, told the House Armed Services Committee's military personnel subcommittee.

Chinese actions include theft of technology and intellectual property through the exfiltration of the work of others, Griffin said in a hearing on military technology transfer.

"The breadth and depth of Chinese malfeasance with regard not only to our technology, but also to our larger economy and our nation, is significant and intentional," he said.



Cyber warfare operators assigned to the 275th Cyber Operations Squadron of the Maryland Air National Guard's 175th Cyberspace Operations Group configure a threat intelligence feed for daily watch in the Hunter's Den at Warfield Air National Guard Base, Middle River, Md., Dec. 2, 2017. Air Force photo by J.M. Eddins Jr.

Griffin appeared before the committee with Kari A. Bingen, deputy undersecretary of defense for intelligence; Eric Chewning, deputy assistant secretary of defense for manufacturing and industrial base policy; and Anthony M. Schinella, national intelligence officer for military issues at the Office of the Director of National Intelligence.

**Maintaining Global Military Advantage**

The United States remains the world's pre-eminent military power, Griffin and the other witnesses said in a joint written statement.

"However, in order to continue to maintain this advantage in an environment of vigorous world competition, we must remain vigilant and employ whole-of-government approaches to the problem set at hand," they said.

To do that, they explained, the Defense Department not only must adapt to the environment, but also must remain the drivers of global technological advances.

"We must get within the decision loops of our adversaries," they said. "We must increase the speed and efficiency at which we educate, invent, adapt, prototype and demonstrate to respond to current and future threats to ensure and preserve our dominance in the field."

**China Seeks Advanced U.S. Technologies**

The threats are putting at risk the capabilities critical to the United States maintaining its military advantage, Bingen said.

"China, in particular, has made it a national goal to acquire foreign technologies to advance its economy and to modernize its military," she said. "It is comprehensively targeting advanced U.S. technologies and the people, the information, businesses and research institutions that underpin them."

China, she said, is using a variety of methods to steal information from the United States and to exploit and circumvent processes. The Defense Department is making significant changes in its approach to industrial and information security, as well as to counterintelligence, she pointed out.

**'Multifaceted Threat' to United States**

China has acquired proprietary technology and early stage ideas through cyber-enabled means, Schinella said. Some actors use largely legitimate legal transfers and relationships to gain access to research fields, experts and key enabling industrial processes that could, over time, erode America's long-term competitive advantages, he explained.

China and Russia are among the nations that recognize that investing in and acquiring technology is essential to achieving their strategic goals, Schinella said.

"They want to develop weapons systems that strike farther, faster, harder and more precisely as a means to erode the traditional pillars of U.S. military strength and challenge the United States in all warfare domains," he said.

The threat from China, Chewning pointed out, has the potential for both long- and short-term impacts.

"Chinese industrial policies of economic aggression, such as investment-driven technology transfer and illegal intellectual property theft, pose a multifaceted threat to our entire national security innovation base," he said.

(Follow Lisa Ferdinando on Twitter: @FerdinandoDoD)

Hosted by Defense Media Activity - WEB.mil

# **EXHIBIT 28**

### 4. Counterfeiting and Piracy

Counterfeiting entails the practice of producing unauthorized fake goods. Piracy is copyright infringement on a commercial scale and "consists in making an unauthorized exact copy–not a simple imitation–of an item covered by an intellectual property right."[41] China is the world's largest source of counterfeit and pirated products.[42]

Estimates of the cost of China's counterfeiting and piracy run into the hundreds of billions of dollars per year. For example, the non-partisan and independent Commission on the Theft of Intellectual Property estimates "that the annual cost to the U.S. economy continues to exceed $225 billion in counterfeit goods, pirated software, and theft of trade secrets and could be as high as $600 billion," "IP theft by thousands of Chinese actors continues to be rampant," and China "remains the world's principal IP infringer." [43]

### 5. Reverse Engineering

Reverse engineering in China is widespread and entails the process of disassembling and examining or analyzing a product or component for the purpose of cloning or producing something similar without authorization from the rights holder. Reverse engineering can be legal; it is illegal when the unauthorized production is of technology under patent or other IP protection.

Reverse engineering allows Chinese engineers and scientists to recreate the products of non-Chinese companies and thereby forego the time and cost of research and development. The practice of reverse engineering is consistent with China's industrial policy goal to introduce, digest, and absorb a foreign technology and "re-innovate" that technology with improvements.[44]

### B. Coercive and Intrusive Regulatory Gambits to Force Technology and IP Transfer

> *[A] longstanding feature of China's industrial policy is that foreign companies are often pushed to transfer technology as the price of market entry, which is in contravention of its commitments as a member of the World Trade Organisation (WTO) . This situation is exacerbated by the fact that the Chinese authorities' ultimate aim is to absorb these technologies…as domestic companies begin to catch up technologically, market access for foreign companies will become increasingly difficult.*
>
> *European Chamber of Commerce[45]*

Chinese industrial policy features a wide range of coercive and intrusive regulatory gambits to force the transfer of foreign technologies and IP to Chinese competitors, often in exchange for access to the vast Chinese market. In its 2017 Member Survey, the U.S.-China Business Council reports that "tech transfer to gain market access is an acute issue for those who face it; nearly 20 percent of respondents to a U.S.-China Business Council 2017 Member Survey have been asked to transfer technology during the past three years" and that "ninety-four percent remain concerned about IP protection."[46]

China's instruments of coercion to force the transfer of foreign technologies and IP to Chinese competitors include: (1) foreign ownership restrictions such as forced joint ventures and partnerships that explicitly or tacitly require or facilitate technology transfers; (2) adverse administrative approvals and licensing processes; (3) discriminatory patent and other IP rights restrictions; (4) security reviews; (5) secure and controllable technology standards; (6) data localization; (7) burdensome and intrusive testing; (8) discriminatory catalogues and lists; (9) government procurement restrictions; (10) imposition of indigenous technology standards that deviate significantly from international norms and that may provide backdoor Chinese access to source codes; (11) forced research and development ("R&D localization); (12) antimonopoly laws; (13) Expert Review Panels; (14) Chinese Communist Party Committees that influence corporate governance; and (15) placement of Chinese employees at foreign joint ventures.

### 1. Foreign Ownership Restrictions

China uses foreign ownership restrictions[47] to force or induce the transfer of technology and IP, often as a condition of access to the Chinese market.[48] Such investment restrictions may also serve both to deter entry of foreign producers into the Chinese market and to enhance indigenous innovation and import substitution.

For example, China requires foreign companies to enter into joint ventures or partnerships with minority stakes in exchange for access to the Chinese market in select sectors.[49] As noted by the USTR: "These requirements prohibit foreign investors from operating in certain industries unless they partner with a Chinese company, and in some cases, unless the Chinese partner is the controlling shareholder."[50]

Once a U.S. or foreign company is coerced into entering a joint venture with a Chinese partner, it opens itself up to the transfer of technology and IP. This can happen through the joint manufacturing process. It can also happen when the Chinese partner engages in covert actions to steal the foreign IP or technology using its access and proximity to the foreign enterprise.

As foreign pressure mounts to end coercive foreign ownership restrictions, China increasingly relies on *tacit* coercion and minimizes written records of forced technology transfer requirements in particular deals.[51] Despite repeated promises from top Chinese leaders to end this practice, it continues.[52]

### 2. Adverse Administrative Approvals and Licensing Requirements

> *The Chinese government uses its administrative licensing and approvals processes to force technology transfer in exchange for the numerous administrative approvals needed to establish and operate a business in China.*
>
> *U.S. Trade Representative[53]*

Foreign companies seeking to invest in China must obtain a variety of administrative approvals; these include investment approvals, project approvals, local approval for site-related conditions, and national security approvals, among others. At each stage, Chinese regulators may seek to extract concessions or force the transfer of technology or IP. In these ways, China's extensive,

# **EXHIBIT 29**



🇺🇸 **An official website of the United States government**
Here's how you know ⌄

**USPTO** | UNITED STATES
PATENT AND TRADEMARK OFFICE ®

Home  >  About Us  >  News & Updates
>  USPTO statement on engagement with Russia, the Eurasian Patent Organization, and Belarus

# USPTO statement on engagement with Russia, the Eurasian Patent Organization, and Belarus

**March 22, 2022**

Per guidance issued by the U.S. Department of State, the United States Patent and Trademark Office (USPTO) has terminated engagement with officials from Russia's agency in charge of intellectual property, the Federal Service for Intellectual Property (commonly known as Rospatent), and with the Eurasian Patent Organization. The USPTO has also terminated engagement with officials from the national intellectual property office of Belarus. Like so many, we are deeply saddened by the events unfolding in Ukraine. We hope for the restoration of peace and human dignity.

Effective March 11, 2022, the USPTO will no longer grant requests to participate in the Global **Patent Prosecution Highway** (GPPH) at the USPTO when such requests are based on work performed by Rospatent as an Office of Earlier Examination under the GPPH. In addition, in pending cases in which, prior to March 11, 2022, the USPTO granted special status under the GPPH to applications based on work performed by Rospatent, the USPTO will remove that status and return those applications to the regular processing and examination queue, meaning that they will no longer be treated as GPPH applications at the USPTO.

The USPTO has advised the Japan Patent Office, which serves as the Secretariat for the GPPH, of this decision.

Please contact **PPHfeedback@uspto.gov** if you have any questions.

---

Questions from the public regarding dealings with Rospatent should be directed to the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) via email at **OFAC_Feedback@treasury.gov.**

Additionally, applicants filing international applications under the **Patent Cooperation Treaty (PCT)** are advised to exercise caution before selecting Rospatent as an International Searching Authority (ISA) or International Preliminary Examining Authority (IPEA). Doing so may prevent successful processing of international applications under the PCT, including the transmittal of required fees through financial institutions.

*Originally published 3/4/22. Updated 3/8/22 to include the national IP office of Belarus. Updated 3/10 to include information on GPPH. Updated 3/22 to include information on OFAC and guidance for PCT applicants regarding selecting Rospatent as an ISA or IPEA.*

---

Was this page helpful?  👍  👎

⌾ Share this page      🖨 Print this page

**Additional information** about this page

---

## Receive updates from the USPTO

Enter your email to subscribe or update your preferences

| your@email.com | Subscribe |

About the USPTO   •   Search for patents   •   Search for trademarks

---

US Department of Commerce

Accessibility

Privacy Policy

Terms of Use

Financial and Performance Data

Vulnerability Disclosure Policy

Freedom of Information Act

Inspector General

NoFEAR Act

USA.gov

Follow us

# EXHIBIT 31

# THE KREMLIN'S INTELLECTUAL PROPERTY COLD WAR: LEGALIZING PATENT THEFT WITH DECREE 299

Mar 28 2022

Russia's bold response to Western economic sanctions following its invasion of Ukraine now includes what amounts to legalizing patent theft against "unfriendly countries." On March 5, 2022, the Kremlin issued Decree 299, which states that Russian companies and individuals can use inventions, utility models and industrial designs without owner permission or compensation, if the patent hails from a list of "unfriendly countries."[1] Specifically, the decree sets compensation for patent infringement at "0%" if the patent holder is a citizen of, is registered in, or has a primary place of business or profit in any of the 48 countries Russia previously designated as "unfriendly."[2] Unsurprisingly, the list includes the United States, Great Britain, European Union members, Australia, and other critics of Russia's actions against Ukraine.

Russia's alienating move comes after weeks of swift responses from the global intellectual property community after it invaded Ukraine. First, on March 1st, the European Patent Office (EPO) stopped all cooperation with the Russian patent office (Rospatent), the national IP office of Belarus, and the Moscow-based Euroasian Patent Organization (EAPO).[3] Then, on March 4th, the U.S. Patent and Trademark Office (USPTO) followed by cutting its ties with the same offices.[4] As an additional blow to Russia, on March 11th the USPTO ended its fast-track Global Patent Prosecution Highway (GPPH) relationship with the Rospatent, removing Russia from its list of participating countries and returning any GPHH applications based on Rospatent work back into the regular examination queue.[5] As a contrast, patent agencies around the world, including the European Union, have rallied behind Ukraine, sending letters of support to the Ukrainian Institute of Intellectual Property (Ukrpatent).[6]

infringement, the Russian government is openly allowing patent theft. This decision will likely deter patent holders and related stakeholders from conducting business in Russia. Decree 299 also has the potential to open a pandora's box when it comes to the protection and enforcement of intellectual property rights in Russia. In fact, there have been rumblings that the Kremlin will soon follow with a similar decree on trademarks.[7] Such a decree would be a legal nightmare for global brands like H&M, McDonald's or Starbucks, who have all pulled their operations out of Russia in response to the country's actions in Ukraine.[8] If the Kremlin issues a decree on trademarks similar to Decree 299, Russian companies or individuals would be able to exploit brand name recognition without consequence. In an alarming preview of what can happen, on March 3rd a Russian district court used Western economic sanctions as its reasoning to rule that a man could use Hasbro Inc.'s "Peppa Pig" trademarks without permission or payment.[9]

Over the coming months, the effects of Decree 299 will become more apparent. Patent holders from "unfriendly countries" with valuable patent portfolios in Russia will have to keep an eye on infringers. Commentators have noted that patent holders will have to weigh whether to continue paying maintenance fees in hopes Russia will reverse the decree or make the difficult decision of abandoning them given the uncertainty of the situation.[10] Seeing as the Kremlin has effectively carved out the patent infringement causes of action in Russia, patent holders will have to explore legal recourse in other countries and this will likely bring forth questions of jurisdiction in those countries. It will also be interesting to see if governments and agencies from "unfriendly countries" will respond to Decree 299 with similar actions invalidating or limiting the intellectual property rights of Russian patent holders. Nonetheless, many have observed that even if the Kremlin rescinds Decree 299, the instability and lack of trust in Russia's willingness to uphold intellectual property rights can deter foreign investment in the country for years to come.[11]

By **James A. Shimota** and **Adrian Gonzalez Cerrillo**

2022 No. 299 "On amendments to Paragraph 2 of the Methodology for determining the amount of compensation paid to the patent holder at the time of decision to use an invention, utility model, or industrial design without their consent, and the procedure for its payment"

2. Decree of the Government of the Russian Federation from March 6, 2022 No. 299 "On amendments to Paragraph 2 of the Methodology for determining the amount of compensation paid to the patent holder at the time of decision to use an invention, utility model, or industrial design without their consent, and the procedure for its payment"; Decree of the Government of the Russian Federation dated March 5, 2022 No. 430-r.

3. *Standing Together for Peace in Europe,* European Patent Office (March 1, 2022), https://www.epo.org/news-events/news/2022/20220301a.html; Dani Kass, European Patent Office Halts Work With Russia, Belarus, Law360.com (March 1, 2022), https://www.law360.com/articles/1469420/european-patent-office-halts-work-with-russia-belarus.

4. *USPTO Statement on Engagement with Russia, the Eurasian Patent Organization, and Belarus*, U.S. Patent and Trademark Office (March 10, 2022) https://www.uspto.gov/about-us/news-updates/uspto-statement-engagement-russia-and-eurasian-patent-organization; Jasmin Jackson, *USPTO Cuts Ties With Russia Following Ukraine Attacks*, Law360.com (March 4, 2022), https://www.law360.com/articles/1470840/uspto-cuts-ties-with-russia-following-ukraine-attacks.

5. *USPTO Statement on Engagement with Russia, the Eurasian Patent Organization, and Belarus*, U.S. Patent and Trademark Office (March 10, 2022) https://www.uspto.gov/about-us/news-updates/uspto-statement-engagement-russia-and-eurasian-patent-organization.

6. Dani Kass, *5 Russian, Ukrainian Patent Updates You May Have Missed, Law360.com* (March 10, 2022), https://www.law360.com/articles/1472668.

9, 2022), https://www.washingtonpost.com/business/2022/03/09/russia-allows-patent-theft/.

8. *Here Are Some of the Companies That Have Pledged to Stop Business in Russia, The New York Times* (March 9, 2022), https://www.nytimes.com/article/russia-invasion-companies.html.

9. Dani Kass, *Russia OKs Use Of Peppa Pig TM As Sanctions Retaliation,* Law360.com (March 11, 2022), https://www.law360.com/articles/1473286?scroll=1&related=1.

10. *See* Kyle Jahner, *Russian IP Animus Fuels Risk, Uncertainty as Firms Recalibrate*, Bloomberg Law (March 21, 2022), https://news.bloomberglaw.com/ip-law/russian-ip-animus-fuels-risk-uncertainty-as-firms-recalibrate.

11. *See id.*

☐     Diving Deeper Into the Amendments ...          Copyright Dispute Over Andy Warhol'...     ☐

# Search

Type here to search...

# Subscribe to Blog Updates

Your Email Address

Enter your email address here

Sign up

Australia's Trade Mark System Further Simplified: Recent Amendments to Regulations

Adopting an "Orphan Works" Scheme: Proposals from the Copyright Amendment Bill 2025 (Cth)

UKIPO Set to Increase Fees for the First Time in Years from April 2026

USPTO Director Squires Signals Future Update to AI Patent Eligibility Guidance at 2025 AIPLA Annual Meeting

USPTO Launches Streamlined Patent Application Program

## Archives

Select Month ▾

## Contact Information

IP Law Watch
K&L Gates
State Street Financial Center, One Lincoln Street
Boston, MA 02111-2950
Phone: 617.261.3100
Fax: 617.261.3175

K&L Gates is a fully integrated global law firm with lawyers and policy professionals across key capital cities and major commercial and financial centers.

For more information about K&L Gates or its locations, practices, and registrations, visit klgates.com.

## Follow Me

Stay connected with us on social networks.

This blog is intended for informational purposes and does not contain or convey legal advice. The information herein should not be used or relied upon in regard to any particular facts or circumstances without first consulting a lawyer. Any views expressed herein are those of the author(s) and not necessarily those of the law firm's clients. By using this blog, you understand that there is no lawyer-client relationship intended or formed between you and the blog publisher or any contributing lawyer. The blog should not be used as a substitute for competent legal advice from a lawyer you have retained and who has agreed to represent you.

Portions of this blog may contain attorney advertising under the rules of some states. Prior results do not guarantee a similar outcome.

HOME    THE GLOBAL IP PRACTICE AT K&L GATES    CONTACT US

Copyright © 2025, K&L Gates LLP. All Rights Reserved.

Disclaimer   Privacy Policy

# **EXHIBIT 32**

190

into German intellectual property law, including patent law, to the extent needed but is also relied upon by German courts when interpreting national law.

### 5.1.3  Patent application trends

Figure 5.1 shows the total number of patent applications (direct, Patent Cooperation Treaty (PCT) national phase entry and European patent DE designation) filed in Germany from 2000 to 2019.

**Figure 5.1  Patent applications filed in Germany, 2000–2019**



Source: WIPO IP Statistics Data Center, available at www3.wipo.int/ipstats/index.htm?tab=patent and EPO PATSTAT, available at www.epo.org/searching-for-patents/business/patstat.html

## 5.2  Patent institutions and administrative review proceedings

Since its beginnings, Germany has followed a double-track system – the so-called bifurcation system – with the patent infringement courts, being part of the ordinary judiciary and adjudicating on the question of infringement, and separate granting authorities, with their own track of judicial review on the validity of the patent. Infringement proceedings are handled by specialized civil courts having exclusive jurisdiction in patent matters with legally-trained judges sitting on the bench.

The validity of a German patent may be challenged within nine months after its grant in an opposition procedure before a board of the German PTO. As a court of judicial review, the FPC hears appeals against the decisions of the PTO on patents. Additionally, a patent's validity may be put into question by a nullity action before the FPC at any time. Decisions of the FPC, which are rendered by a senate consisting of three technical and two legally-qualified judges (including the presiding judge), may be appealed to the Federal Court of Justice (FCJ; "Bundesgerichtshof") (X[th] Senate) so that the separate tracks – validity and infringement – can be finally aligned by the jurisprudence of the FCJ.

## 5.3  Judicial institutions

### 5.3.1  Judicial administration structure

Germany is constituted as a federal republic of 16 states ("Länder"). According to Article 92 of the German Constitution,[9] there are both federal courts and state courts. To preserve uniformity of decisions, according to Article 95(1) of the Constitution, the FCJ was established as the appellate court for state courts in the last instance. If all other legal remedies are exhausted, then, under specific circumstances, a constitutional complaint may be filed to the Federal Constitutional Court ("Bundesverfassungsgericht") established under Articles 92–94 of the Constitution.

9    Grundgesetz (Basic Law), www.gesetze-im-internet.de/englisch_gg/englisch_gg.html

An International Guide to Patent Case Management for Judges

# **EXHIBIT 33**

*Roland Küppers, LL.M.* and *Dr. Eugen Reismann*
Taylor Wessing

*This 5th edition chapter is current through February 2025.*

**Executive Summary**

Germany historically plays a central role in European patent litigation. About 60 percent of all European patent cases are filed in Germany.[1] This is not just due to the key importance of Germany as a European market but is also attributed to its pro-patentee legal system. In Germany, patent infringement proceedings are comparatively cost-effective and quick, with an injunction being a regular outcome. German patent litigation is bifurcated, with infringement and validity being tried on separate tracks. This has the consequence that there is no decision on patent validity taken in the infringement proceedings. Subject to a relatively high threshold, the infringement court will consider a potential stay of the infringement proceedings pending a parallel (customarily slower) validity attack, for example, opposition proceedings or nullity action. Bifurcation can thus have the effect of an "injunction gap," whereby a permanent injunction is available and already enforceable, although pending validity proceedings against the patent have not yet been decided. Of course, the infringer is secured by potential damage claims and, indeed, the patentee would have to deposit a security for the preliminary enforcement of the first-instance judgment. Nevertheless, this "injunction gap" has provided a considerable strategic advantage for the patentee.

Recent changes to German patent legislation made in 2021 codify the principle of proportionality as a prerequisite to the claim for injunctive relief and aims to bridge the "injunction gap" by making available the Federal Patent Court's preliminary opinion on validity to the infringement court within 6 months of filing of the nullity action, i.e. before the hearing in the first instance infringement proceeding.[2] The legislative purpose is to reduce the risk of infringement decisions without a prior preliminary opinion of the Federal Patent Court. Whether the intended effect will materialise depends on the Federal Patent Court's ability to deliver its preliminary opinion during the envisaged timeframe – a shortage of staff and resources is already a recognized issue – as well as the infringement court's own analysis of the Federal Patent Court's preliminary opinion in each individual case.

An obligation to compensate damages resulting from patent infringement, which in Germany reflects actual damages only, can be awarded in the infringement trial. Further, the infringer has to render accounts on the infringing acts in the past. The information provided by the infringer will usually allow the patentee to calculate the amount of damages. Disputes about the actual amount of damages are either settled or handled in a separate court proceeding, usually again before the infringement court.

In Germany, 12 courts exclusively handle patent infringement litigation. Most important of these courts historically has been the Düsseldorf Regional Court, which has three chambers—each of them consisting of three judges—handling patent cases. About 40-50 percent of all German patent infringement cases are handled by the Düsseldorf Regional Court,[3] which, because of its comprehensive jurisprudence and experience, provides for reliable results.[4] Over the past decade, the Mannheim Regional Court had become the second-ranking German court for patent infringement litigation, handling about 20 percent of all German cases.[5] The Mannheim Regional Court has particularly expedited timing and has attracted a lot of mobile telecommunications and other electronics cases.[6] Ranking third is the Munich Regional Court,[7] followed by the Hamburg Regional Court.[8]

**Figure 1. Case Filings in the Busiest Courts in Germany in 2018** [9]



The advantages of German patent litigation have particularly been recognized by the electronics industry, which has chosen (and keeps choosing) Germany as a key forum for its "smartphone wars" in Europe. In addition, the pharmaceutical industry, for which Germany is an important market, is a major player in patent litigation in the country. In the recent past, a trend emerged whereby German courts are increasingly willing to grant preliminary injunctions against generic companies that have not "cleared the way" with a validity attack before entering the market.

**Table 1. Key Germany Data Points**

| System | Civil law |
|---|---|
|  | Bifurcated |
| Number of infringement trial courts | 12 |
| Number of validity trial courts | 1 |
| Number of trials required validity/infringement/damages | 3 |
| Judge or panel | Panel |
| Specialized intellectual property court/judges | Yes/no (but some courts have judges experienced in patent cases) |
| Number of appellate levels | 1 (plus revision on infringement) |
| Loser pays? | Yes |
| Annual patent infringement litigation filings | Estimate ~1,200 |
| Annual patent validity litigation filings | Estimate ~250 (nullity actions) |

| Percentage of cases to trial | Estimate ~50% |
|---|---|
| Average cost | ~EUR 150,000 for first-instance patent infringement action and defending parallel nullity action on basis of a medium-value litigation[10]<br>~EUR 500,000 for first-instance patent infringement action and defending parallel nullity action on basis of a relatively high-value litigation[11] |
| **Average time** | ~22.4 months in first instance (varies by district) (2018-2022)[12] |
| **Patentee win rate** | Infringement cases (proceedings on the merits): 64% (323/503) (2018–2022)[13]<br>Nullity actions in Federal Patent Court: 42% (2018–2022)[14] |
| **Preliminary/permanent injunctions** | Yes/yes |
| **Civil/criminal liability** | Civil/criminal |

**Figure 2. Timeline (Exemplary) of German Patent Infringement Litigation**



*Note*: Average time for infringement action from filing to decision is 22.4 months (2018–2022, based on 353 cases)[15] ; average time for nullity action in the Federal Patent Court was 28.4 months (2018–2022).[16]

**Table 2. Damages Information**

| | |
|---|---|
| Statute of limitations | 3 years (only starting when claimant becomes aware of the infringement and the infringer) |
| Damages usually tried or settled? | Settled |
| Nature of damages awarded | Reasonable royalty, lost profits, infringer's profits |
| When do damages start accruing? | From first date of infringement |
| Damages trial in main or separate hearing? | Separate |
| If separate, average time for damages hearing | 10 to 16 months in first instance (varies by district) |
| Patent marking required for infringement? | No |
| Litigation disbursements usually recoverable? | Yes |
| If yes, percentage | 100% (in theory) |
| Does compulsory licensing exist? | Yes |
| Is a permanent injunction automatic with a damages award? | Permanent injunction and declaration regarding damages can be requested in the same lawsuit |
| Do all appeals on the merits have to be terminated before damages are calculated? | No |
| Largest damages award | EUR 3.2 million (Düsseldorf Regional Court, 2022)[17] |

# **EXHIBIT 34**

### 5.4.1.3.1 Experts

According to German civil procedural law, a strict distinction is to be made between experts appointed by the court (according to the procedure stipulated in Sections 402 et seq. of the Code of Civil Procedure) and party experts. Only the former are considered formal "means of evidence" and heard in court, whereas the opinions of the latter are simply assumed to be part of the submissions of the party that files them. Therefore, it is a rare exception for the FPC to interrogate a party expert in oral proceedings, even though it is possible.

If the FPC wants to consult a court expert, it must take a formal decision to this effect after hearing the parties. This normally takes place in the oral proceedings and may significantly extend the duration of the proceedings since an expert must first be identified, appointed and properly summoned. As this is hardly efficient – and, as the technical judges, due to their technical background, understand the technical aspects of the case at issue – appointing a court expert is a very rare event. Nonetheless, a specialist expert may be very helpful and advisable in complex cases or in cases involving new or specialist areas of technology. The FCJ expects the FPC to ensure that its decision is based on adequate technical expertise, either by means of the court's technical judges or by means of a court-appointed expert.

The remuneration of the court expert (and any witnesses) is governed by Section 128a Patent Act and the Judicial Remuneration and Compensation Act.[24]

### 5.4.1.3.2 Witnesses

Pursuant to Section 373 of the Code of Civil Procedure, evidence by hearing witnesses shall be offered by naming the witnesses and designating the facts regarding which the witnesses are to be examined. The general rules of taking evidence in revocation proceedings (Section 88(3) of the Patent Act) apply: that is, parties need to be notified of the decision to take evidence and need to have the opportunity to attend the taking of evidence. They are allowed to direct appropriate questions to witnesses or court-appointed experts in the hearing. Witnesses of fact mainly play a role in cases of an alleged public prior use.

### 5.4.1.3.3 Inspection

Inspection of a model or an apparatus can also serve as a means of evidence. This occasionally plays a role in mechanical engineering cases, particularly if a public prior use of the apparatus is asserted and the exact functionality or composition of the apparatus or parts thereof are in dispute.

### 5.4.1.4 Access to court files

The parties to the proceedings and third parties may request access to court files. A third party's request is granted unless a party to the revocation proceedings can show that legitimate confidentiality interests would be affected by allowing a third party's access to the court files (e.g., owing to commercial or technical aspects or trade secrets). In general, a legitimate interest of a party cannot justify a complete denial of access to the court files, because information that is to be kept confidential is usually only part of specific briefs or passages thereof. Therefore, access to the files is only excluded with regard to the respective specific briefs or respective confidential passages. These will be blackened prior to granting inspection of the files.

### 5.4.2 Grounds for revocation

### 5.4.2.1 Lack of patentability

Pursuant to Section 21(1), in conjunction with Section 22(1), a German patent shall be revoked or declared null and void if it arises that the subject matter of the patent is not patentable according to Sections 1–5. These sections cover patent eligibility and statutory exclusions (Sections 1, 1a); ordre public, the cloning or genetic manipulation of humans, embryos or animals, plant or animal varieties, and methods of treatment of the human or animal body (Section 2); novelty (Section 3); inventive step (Section 4); and industrial applicability (Section 5). The very same applies to the revocation of a European patent with effect in Germany (with regard to the German part), pursuant to Article II(6) of the Act on International Patent Conventions.[25] The subsections can only provide a very brief overview of these issues and will focus on aspects that have arisen in practice.

---

24  http://www.gesetze-im-internet.de/jveg/
25  http://www.gesetze-im-internet.de/intpat_bkg/

# **EXHIBIT 38**

# The Rising Threat of German Patent Litigation: Are You Ready?

**By Michael J. Summersgill, Todd Zubler, Vanessa Wettner, Harry Hanson and Lisa Fritz**

The threat of German patent litigation is rising. Germany is second only to the United States in the number of patent infringement actions brought by non-practicing entities (NPEs), and with the ready availability of injunctive relief in Germany and the recent advent of the Unified Patent Court (UPC) creating "competition" among European courts for cases, the danger of German patent lawsuits cannot be ignored. Indeed, in many instances, these German actions are one front in a multi-jurisdictional "patent war," with parallel proceedings in other European countries, the United States, China, and elsewhere. The German proceedings in such a patent war can have an outsized role because of the greater threat of an injunction in Germany, and the litigation procedures that generally afford fewer protections for defendants. If a defendant is not careful in developing a comprehensive defensive strategy in Germany, it could soon face an order excluding its products from the German market that could effectively dictate the outcome of the war before most battles have even been fought.

In view of this rising threat, this article explains the aspects of the German patent system that may present particular challenges for defendants (and, conversely, advantages for plaintiffs), and provides suggestions on how to meet those challenges.

First, this article addresses the key features of the German patent system that have made Germany an attractive venue for patent plaintiffs and a challenging one for defendants—including Germany's bifurcated patent litigation system in which infringement and validity proceedings occur in different courts and on different schedules, and German courts' willingness to issue injunctions pre-appeal (and even before the issue of validity is decided).

Second, this article describes the central role Germany plays with regard to NPE infringement actions in Europe, and how the advent of the UPC appears to be creating a dynamic in which German courts are competing with the UPC for cases, making them potentially more plaintiff-friendly.

> **There are multiple features of the German patent system that distinguish it from patent litigation in the United States.**

Third, this article offers recommendations to address the challenges of litigating these cases in Germany. These recommendations include, among others: preparing to file opposition/nullity actions challenging the patent's validity as soon as possible; presenting comprehensive proportionality and other arguments to avoid an injunction if infringement is found; developing a "plan B" to remain in the German market well in advance of any injunction taking effect; and having a system in place to ensure coordination across multiple jurisdictions.

## KEY CHALLENGING ASPECTS OF GERMAN PATENT LITIGATION FOR DEFENDANTS

There are multiple features of the German patent system that distinguish it from patent litigation in the United States, and that can present particular challenges for defendants.[1]

Michael J. Summersgill, Todd Zubler and Vanessa Wettner are litigation partners in WilmerHale's Boston, District of Columbia and Frankfurt offices, respectively. Harry Hanson is a counsel and Lisa Fritz is a senior associate in the firm's Boston and Frankfurt offices, respectively. The authors may be contacted at michael.summersgill@wilmerhale.com, todd.zubler@wilmerhale.com, vanessa.wettner@wilmerhale.com, harry.hanson@wilmerhale.com and lisa.fritz@wilmerhale.com, respectively.

## The Relatively Easy Availability of Injunctive Relief

The overriding difference between German and U.S. patent litigation is the relative ease of obtaining injunctive relief in Germany.

Particularly following the U.S. Supreme Court's 2006 decision in *eBay Inc. v. MercExchange, L.L.C.*, permanent injunctions are the rare exception in district court patent litigation in the United States.[2] Germany, however, has no precedent like *eBay*, and injunctions that prevent the sale of products found to be infringing are the rule. An injunction enters automatically if infringement is found by the first instance regional court—before an appeal, and even before the patent's validity has been adjudicated—absent extraordinary circumstances. And to obtain an injunction, a patentee does not need to compete in the German market; unless specific and severe abusive behavior is shown, NPEs are generally entitled to injunctions to the same degree as practicing entities. This leads to the remarkable potential that an NPE could obtain an injunction blocking all of a defendant's sales in Germany on an invalid patent before any appeal proceedings have taken place.

> **Violations of an injunction are punishable by a fine of up to EUR 250,000 per violation, or even criminal detention.**

Violations of an injunction are punishable by a fine of up to EUR 250,000 per violation, or even criminal detention. Courts have significant discretion in setting the amount of the fine, which can be substantial.[3] For instance, in late 2023, the Munich I Regional Court issued an exceptionally high fine of EUR 150,000 per day to Netflix, or alternatively 15 days of criminal detention for Netflix managers, for each of the 47 days on which Netflix had allegedly violated the injunction—totaling EUR 7.05 million.[4]

An injunction will typically go into effect only after the plaintiff provides a security bond. But once that occurs, it is exceedingly rare for German appellate courts to stop the injunction from being enforced while the appeal plays out—with some courts allowing an injunction to remain in place unless it would threaten "the existence of the defendant." If the injunction is later revoked on appeal, the plaintiff has to pay damages, which can act as a deterrent to enforcement.[5] But this compensation often comes too late to be of much help to a defendant who has already suffered the effects of an injunction.

In 2021, the German legislature amended the German patent statutes to require courts to consider proportionality principles and deny injunctive relief if it would cause disproportionate hardship to the defendant or third parties.[6] To date, however, the change has not had a substantial impact: German judges have consistently rejected proportionality arguments despite the new provision. Indeed, we are aware of no case in which the new provision has been applied successfully.

## Bifurcation of Infringement and Validity Determinations

Patent litigation procedures in Germany are very different from those in the United States, and generally provide fewer protections for defendants.

Most significantly, patent infringement and patent validity proceedings are separated (or "bifurcated") in Germany.[7] Regional courts hear infringement cases, which can be appealed to higher regional courts and, ultimately, the Federal Court of Justice (if leave is granted). Unlike in the United States, patent invalidity is not admitted as a defense in German infringement actions. Rather, cases addressing a patent's invalidity—called "nullity" actions—are filed with a different court: the Federal Patent Court.[8] Nullity decisions may be appealed to the Federal Court of Justice. But, even at the Federal Court of Justice, infringement and invalidity proceedings are heard separately.

This bifurcated system can give substantial advantages to a plaintiff. First, bifurcation creates the potential for an "injunction gap"—a period of time when a patentee can enforce an injunction, or threaten to do so, before the validity question is decided. Because the plaintiff files the infringement action in Germany, infringement proceedings almost always begin before the nullity proceedings are initiated by the defendant. And infringement actions then usually proceed more quickly than nullity actions:

• In infringement proceedings, regional courts typically issue a "first-instance" decision, i.e., the

first judgment in the case that can be appealed to higher regional courts, within 8 to 20 months (median of 15 months); and

- In nullity proceedings, a first-instance decision typically comes down within 15 to 30 months.

As a result, a plaintiff can often obtain an infringement judgment and an injunction before the validity of the patent has been determined. This injunction gap can put enormous pressure on the defendant to settle to avoid the enforcement of the injunction, even if the defendant has a strong invalidity case.[9]

Second, bifurcation gives patentees greater opportunities to take inconsistent positions regarding the scope of their patents in the two proceedings. In the United States, a patentee is typically constrained in its ability to assert an overbroad interpretation of its patent because a defendant can explain to the district court or jury—which considers both infringement and invalidity at the same time—that such an interpretation would render the patent invalid. The patentee, in other words, can be made to face a "squeeze" between its infringement position and the validity of its patent: if the patent is interpreted broadly enough to cover the accused product, then it also covers the prior art and is invalid; if a patent is interpreted narrowly enough to avoid the prior art and preserve its validity, then it is not infringed.

In Germany, however, it is more difficult for defendants to apply such a squeeze because different courts consider infringement and invalidity in separate cases that typically proceed on different schedules. It is therefore entirely possible that the infringement court could find infringement based on a broad interpretation that would render the patent invalid, while the nullity court finds the patent valid based on a different, narrower interpretation that would make the patent not infringed. Such inconsistent interpretations theoretically should be resolved on appeal in the Federal Court of Justice, but only after years of proceedings and long after the plaintiff has been able to obtain and enforce an injunction.

### Limited Discovery & No Trial-Based Proceedings

In German patent proceedings, there is no general pretrial discovery as in the United States. There are only very limited and specific instruments for the parties to discover facts that are not publicly available. Although the lack of discovery may seem like an advantage for defendants, a defendant can be required to explain certain facts if the plaintiff is unable or cannot reasonably be expected to provide more detailed information. If the defendant fails to disclose the information without justification, the facts stated by the plaintiff can be deemed admitted.

---

**In German patent proceedings, there is no general pretrial discovery as in the United States.**

---

Defendants in German patent cases also do not have the trial-based protections that exist in the United States. In German proceedings, the judgment is usually rendered by a bench of three judges (or five at the Federal Patent Court and Federal Court of Justice level); no jury exists. The proceedings are front-loaded: the exchange of written briefs is a substantial part of the process, and the court's decision typically is based on the written submissions, rather than evidence at trial. Expert testimony is not required to establish infringement; instead, the attorneys can make technical arguments.

A condensed hearing usually takes place after the exchange of several briefs. The hearing typically lasts less than a full day and often consists of only attorney argument. Witnesses rarely provide testimony, and there is no opportunity to cross-examine an opposing party's fact or expert witnesses as in U.S. proceedings.

The court may appoint an independent expert to issue an opinion, but the court is not required to do so (and usually does not). Once the expert opinion is issued, the court and the parties have the opportunity to question the expert during a hearing, but there is no cross-examination as in U.S. proceedings. The decision whether to appoint an independent court expert lies within the sole discretion of the court.

### GERMANY IS ATTRACTING PATENT PLAINTIFFS

Given the features of the German patent system described above, it should be no surprise that

Germany has become an increasingly attractive jurisdiction for patent plaintiffs, especially NPEs.

While NPE patent litigation was once predominantly a U.S. phenomenon, it has spread in Europe over the last few years. And Germany plays a central role for NPE litigation in Europe. Germany accounted for approximately 87% of the infringement cases brought by NPEs in Europe from 2018 until 2023, and is second only to the United States in terms of the number of cases filed by NPEs.[10] Many of these NPEs are from the United States. Indeed, eight of the ten most active NPEs in the European Union—accounting for about 45% of the total infringement actions filed by NPEs in the European Union—are based in the United States.[11]

Plaintiffs can choose from twelve regional courts in Germany to file infringement proceedings. The majority of patent lawsuits are filed at the regional courts in Düsseldorf, Munich, and Mannheim; courts that are generally considered to be patentee friendly and have, in recent years, become increasingly competitive with one another for cases.

NPEs have had significant success in Germany. Almost two-thirds (62%) of cases filed by NPEs in the 2012 to 2023 timeframe resulted in a finding of infringement (as compared with a plaintiff win rate in the United States of 27%).[12] And plaintiffs, including NPEs, have obtained injunctions against large operating companies in the digital communication and computer technology spaces, despite those injunctions' impact on third parties and on the German economy. As a few examples:

- Recently, InterDigital obtained an injunction against Lenovo before the Munich I Regional Court for alleged infringement of a patent relating to the 4G and 5G standards.[13] Lenovo filed an appeal, but the injunction is provisionally enforceable in the meantime because InterDigital posted security of about EUR 4 million. The decision led to a Germany-wide ban on the sale of smartphones sold by Lenovo under the Motorola brand name, as well as Lenovo notebooks and tablets with a specific mobile Internet access.[14]

- InterDigital also sued Oppo and its subsidiary OnePlus for infringement of the same patent.[15] In this case, too, the Munich I Regional Court awarded the plaintiff an injunction against the defendants' devices in the German market and ordered the accused products to be recalled.[16]

- In a lawsuit against Oppo filed by Nokia, the Munich I Regional Court ruled that Oppo infringed Nokia patents concerning mobile technology.[17] Presumably pre-empting the enforcement of the judgement, Oppo suspended the sale and marketing of certain products through Oppo's official channels in Germany in 2022.[18] The press states that Oppo and Nokia finally reached a patent agreement at the beginning of this year, enabling Oppo to offer its devices in Germany again.[19]

- In September 2024, the Munich I Regional Court granted an injunction in favor of Nokia against Amazon for allegedly infringing Nokia's patents directed to video technologies. The ruling is part of a multi-jurisdictional patent war between the two companies: in addition to lawsuits in Germany, Nokia has filed lawsuits in district court in Delaware and India, the UK and with the UPC.[20]

The advent of the UPC has also created a dynamic where the German national courts are now in a competitive relationship with the UPC. Patentees can often choose between the national courts and the UPC when bringing an infringement suit. The UPC has jurisdiction for unitary[21] and European patents, and during a seven-year transitional period from the start of the UPC (i.e., until June 1, 2030), infringement or nullity actions regarding a European patent can still be filed before national courts.[22] Indeed, owners of European patents that were applied for/granted before the end of the transitional period can opt-out of the exclusive jurisdiction of the UPC for the future. This availability of multiple forums leads to a situation where German courts are competing with the UPC for cases, making them potentially more plaintiff-friendly. And most UPC infringement actions (up to 76%) are filed in Germany and heard by German judges, meaning that UPC litigation could take on many of the aspects of German patent litigation.[23]

## RECOMMENDATIONS TO MEET THE CHALLENGES OF GERMAN PATENT LITIGATION

As explained above, patent litigation in Germany presents a significant—and rising—threat. This section provides recommendations to meet those challenges.

---

**Patent litigation in Germany presents a significant—and rising—threat.**

---

### Go on Offense Early

Where appropriate, a defendant should promptly file an offensive action of its own. For instance, in a competitor case, the defendant should consider whether a responsive infringement action can be filed; if the plaintiff is an NPE, the defendant can also consider a competition complaint to the European Commission or national competition authorities if the patent has validity issues or if the enforcement is based on other improper conduct. Defendants should also consider filing noninfringement declaratory judgment actions in other European jurisdictions to increase further the pressure on the plaintiff.

### Be Prepared to File Opposition/Nullity Actions Challenging the Patent's Validity as Soon as Possible

Ideally, if a defendant is aware of a potential threat, it should have a nullity action ready to go ahead of time. If not, after learning of an infringement action, it should move to prepare/file a nullity action as quickly as possible. Doing so will narrow the potential "injunction gap," and allow the defendant to argue that the infringement proceedings should be stayed in view of the pending nullity action. It also reduces the patentee's ability to take inconsistent positions regarding patent scope for purposes of infringement and validity. Defendants should also consider filing actions challenging a European patent's validity in other jurisdictions (e.g., France) that are considered less patentee friendly. If a court of another contracting state of the European Patent Convention (EPC) finds the respective national patent to be invalid, the German courts are required at least to consider that opinion.[24]

### Retain Experts, Generate Testing, and Bring to Bear Immediate and Significant Evidence Showing Non-Infringing and Technical Flaws in the Plaintiff's Arguments

Do not assume that the German court will appoint an independent expert to analyze the technical issues. Because the court can decide infringement based on the exchanged briefs alone, a robust set of evidence and expert testing is needed out of the gate. This evidence needs to be presented at a level a non-technical judge can understand, i.e. the evidence needs to be technically correct but also understandable to a non-technical judge. Particularly where there is such limited discovery, testing and simulations are often critical to support non-infringement arguments.

---

**Do not assume that the German court will appoint an independent expert to analyze the technical issues.**

---

### Present Comprehensive Proportionality Arguments Early

Point to the 2021 change in German patent law to argue for a rigorous application of the proportionality standard. Develop a robust set of evidence regarding proportionality showing the harm to the defendant, to third parties, and to the German and European economies; do not rely solely on attorney argument. The presentation can be linked to the arguments that ultimately persuaded U.S. courts to adopt *eBay*: for example, (i) an injunction risks significant harm to the defendant/consumers who use the defendant's products, without providing any corresponding benefit to an NPE who is not selling any products that need to be protected and who can be made whole with a monetary payment (this is particularly true where the patent covers only one feature of a multi-component product); (ii) the threat of a near-automatic injunction imposes an enormous burden on producers and consumers (removal from the market, cost to retool product, etc.); (iii) an injunction enables holders of dubious patents to extract disproportionately valuable settlements before a validity determination has been made; and (iv) an injunction undermines

innovation by encouraging opportunistic litigation that diverts resources from developing new and innovative products. Such arguments have not yet been successful in Germany. But, if presented early and with substantial supporting evidence, we expect that at some point—just as in the United States—these proportionality arguments should help defendants.[25]

### File an Application for Protection Against Enforcement During the First Instance Proceedings[26]

If protection is granted, the defendant can prevent enforcement of the injunction pre-appeal by providing a security. In order for the application to succeed, however, defendants must put on a robust case showing that the pre-appeal enforcement would lead to an irreparable disadvantage for the defendant. Because the court will decide on the application at the same time as it decides on the injunction, such evidence is needed from the outset.

### Use the Patentee's Own Positions to Argue for a High Bond

Plaintiffs often argue that defendants' use of the patented technology is extensive. Those arguments can often be turned around against plaintiffs. For instance, if the plaintiff argues that a defendant's product is broadly used in an industry to support its infringement case, a defendant can use that argument to show that an injunction blocking such broad use would harm the industry that relies on the product. A high security bond for the provisional enforcement can in effect then act as a stay (because the plaintiff risks losing the large bond if it enforces and then the patent is ultimately found invalid or not infringed). To be effective, the relevant arguments need to be presented to the court from the outset.

### Be Prepared in the Event the Injunction Issues and Have a "Plan B"

Prepare strategies to mitigate the impact of a potential injunction well in advance. For this, defendants should analyze whether other products can replace the accused products and work on potential design-arounds that can be ready to go as soon as infringement is found. Even a temporary design-around can act as a bridge to a next generation of products that is significantly different from the allegedly infringing products. Also, be ready to shift inventory from Germany as of the time an injunction may be issued.

### When the Litigation Involves Cases Across Multiple Jurisdictions, Task One Firm With Ensuring Coordination

Because Germany is often one front in a multi-jurisdictional "patent war," defendants should have a system in place to ensure coordination across the multiple jurisdictions. Given the significant complexity of coordinating proceedings across multiple jurisdictions and the fact that multiple firms are often involved, it is often best to have one firm handle the coordination. This promotes efficiency, ensures consistency, and avoids "unforced errors," where a position taken in one jurisdiction may be used against the defendant in another.

There will be many other proposals and actions to be taken in a particular case. These proposals need to be considered based on the particular circumstances of each case.

### Notes

1. For a comprehensive overview of the German patent system, the authors recommend An International Guide to Patent Case Management for Judges 188-247, available at https://www.wipo.int/edocs/pubdocs/en/wipo-pub-1079-en-an-international-guide-to-patent-case-management-for-judges.pdf.

2. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006). A recent analysis of patent cases filed in U.S. district courts from 2000-2023, i.e., pre- and post-eBay, confirmed that "[t]he eBay ruling reduced the annual percent of patent cases in which a motion for an injunction was sought and reduced the annual percentage of patent cases in which permanent injunctions are granted." Kristina M. L. Acri, Injunctive Relief in Patent Cases: the Impact of eBay 24 (June 14, 2024) (Colorado College Working Paper 2024-01), available at *https://ssrn.com/abstract=4866108*; see id. ("[T]he relative decrease in requests for permanent injunctions was 87.4% for non-practicing entities and 65.0% for operating companies. . . . [T]he relative decreases in grants of permanent injunctions were 91.2% for NPEs and 66.7% for operating companies." (emphasis omitted)).

3. When determining the amount of the fine, the type, scope, and duration of the alleged infringement must be taken into account, and the degree of fault and the financial circumstances of the alleged infringer also play a role. Further, the defendant should not benefit from

the alleged infringement, thus the fine should at least amount to the profit gained from the alleged infringement. However, the profit is not an upper limit, the fine can be significantly higher.

4. See German Court Fines Netflix for Patent Infringement, European Innovation Council and SMEs Executive Agency (Jan. 12, 2024), available at https://intellectual-property-helpdesk.ec.europa.eu/news-events/news/german-court-fines-netflix-patent-infringement-euipo-board-appeal-rules-over-pradas-triangle-pattern-2024-01-12_en. In 2024, however, the Federal Patent Court declared the patent null and void. See Win for Netflix and Quinn Emanuel as patent court invalidates Broadcom patent (July 31, 2024), available at https://www.juve-patent.com/cases/win-for-netflix-and-quinn-emanuel-as-patent-court-invalidates-broadcom-patent/.

5. Section 717(2) first sentence German Code of Civil Procedure states that "[i]f a judgment declared provisionally enforceable is reversed or modified, the plaintiff shall be obligated to compensate the defendant for the damages he has suffered by the judgment being enforced, or by the payments he had to make, or any other actions he had to take in order to avert enforcement."

6. Section 139 (1) third and fourth sentences German Patent Act state that a claim for injunctive relief is precluded and that a plaintiff can recover only reasonable monetary compensation where injunctive relief "would lead to disproportionate hardship for the infringer or third parties that is not justified" by the plaintiff's right to exclude. The law codified a decision from 2016 (FCJ, judgment dated May 10, 2016, ref. X ZR 114/13 – Wärmetauscher), in which the Federal Court of Justice—Germany's highest civil court—stated that proportionality principles needed to be considered before granting injunctive relief. In that case, a car manufacturer argued that the infringement of a minor car component (a heat exchanger) should not impede the sale of the entire car.

7. Currently a referral procedure, C-339/22, BSH Hausgeräte v. Electrolux, is pending before the Grand Chamber of the Court of Justice of the European Union (CJEU). The CJEU has to decide whether a national court of an EU Member State can determine infringement of foreign patents by an EU-domicile (including patents designated in other EU Member States and third states, such as the United States and the U.K.), even where the defendant has challenged the validity of those patens. The decision of the CJEU could possibly impact cross-border patent proceedings in Europe and create EU-wide bifurcation of validity and infringement proceedings.

8. Within nine months of the patent's issuance, an opposition with the German Patent and Trade Mark Office has to be filed instead of a nullity action.

9. The infringement court has discretion to stay the infringement proceedings until the decision on the invalidity of the patent has been taken. Generally, infringement proceedings are stayed only if it is likely that the patent will be declared invalid. For this analysis, the Federal Patent Court provides an initial assessment of the patent's validity within the first six months of the nullity proceedings—a so-called qualified opinion of the Federal Patent Court.

10. See Clarivate, 2024 Non-Practicing Entity global litigation report (2024), p. 8.

11. See Clarivate, 2024 Non-Practicing Entity global litigation report (2024), p. 11.

12. See Clarivate, 2024 Non-Practicing Entity global litigation report (2024), p. 16-17.

13. Munich I Regional Court, judgment dated May 2, 2024, ref. 7 O 12029/23.

14. See After success in Germany, InterDigital's FRAND battle with Lenovo shifts to London (May 10, 2024), available at https://www.juve-patent.com/cases/after-success-in-germany-interdigital-lenovo-frand-battle-shifts-to-london/; Vertriebsverbot für Motorola-Handys und Lenovo-Computer mit Funkmodul in Deutschland (May 10, 2024), available at https://www.wiwo.de/technologie/digitale-welt/neuer-streit-um-patente-vertriebsverbot-fuer-motorola-handys-und-lenovo-computer-mit-funkmodul-in-deutschland/29783960.html.

15. Munich I Regional Court, judgment dated December 21, 2023, ref. 7 O 17302/21.

16. See InterDigital prevails against Oppo and OnePlus over SEPs in Munich (Jan. 5, 2024), available at https://www.juve-patent.com/cases/interdigital-prevails-against-oppo-and-oneplus-over-seps-in-munich/.

17. Munich I Regional Court, judgment dated August 5, 2022, ref. 21 O 8879/21.

18. See Oppo stops sales in Germany after Nokia's success in Munich (Aug. 8, 2022), available at https://www.juve-patent.com/cases/oppo-stops-sales-in-germany-after-nokias-success-in-munich/.

19. See Settlement season continues as Nokia and Oppo end global patent battle (Jan. 24, 2024), available at https://www.juve-patent.com/cases/settlement-season-continues-as-nokia-and-oppo-end-global-patent-battle/.

20. See Nokia lands first blow against Amazon at Munich Regional Court (Sep. 20, 2024), available at https://www.juve-patent.com/cases/nokia-lands-first-blow-against-amazon-munich-regional-court/; see Nokia says German court rules in its favour in Amazon patent dispute (Sept. 20, 2024), available at https://whtc.

com/2024/09/20/nokia-says-german-court-rules-in-its-favour-in-amazon-patent-dispute/.

21. The unitary patent is a legal title that provides uniform protection across all participating EU member countries based on a single request to the European Patent Office.

22. The transitional period can be extended by up to a further seven years (see Article 83 (5) Agreement on a Unified Patent Court).

23. See Case load of the Court since operation in June 2023 – update end April 2023 (May 2, 2024), available at https://www.unified-patent-court.org/sites/default/files/upc_documents/Case%20load%20of%20the%20Court_end%20April%202024_30.04_TK_edit%202_05_DC_final.pdf.

24. See FCJ, decision dated April 15, 2010, ref. Xa ZB 10/09 – Walzenformgebungsmaschine.

25. The proportionality arguments can be coupled with a lobbying effort so that the German government is aware of the implications of a potential injunction.

26. Section 712 (1) ZPO states: "Insofar as the enforcement would entail a disadvantage for the debtor that it is impossible to compensate or remedy, the court is to allow him, upon a corresponding petition being filed, to avert enforcement by providing security or by lodgment, without taking account of any security that the creditor may have provided; section 709 second sentence shall apply mutatis mutandis to the cases set out in section 709 first sentence. Where the debtor is not able to do so, the judgment shall not be declared provisionally enforceable, or its enforcement is to be limited to the measures designated in section 720a subsections (1) and (2)."

Copyright © 2025 CCH Incorporated. All Rights Reserved.
Reprinted from *Intellectual Property & Technology Law Journal*, January 2025, Volume 37, Number 1, pages 20–27, with permission from Wolters Kluwer, New York, NY, 1-800-638-8437, www.WoltersKluwerLR.com



# **EXHIBIT 39**

WIPO

Home › About the Patent Judicial Guide › Patent Judicial Guide › Full Guide

# An International Guide to Patent Case Management for Judges

Full Guide

**Download full guide**     Download current chapter     **Build custom guide**

SHARE

   

文A Translate with AI 

## 5.5 Patent infringement

### 5.5.1 Claim construction

According to Section 14 of the Patent Act and Article 69 of the EPC, the scope of protection of a patent is determined by the patent claims, whereby the description of the patent and (if available) the drawings are considered for the interpretation of the claims. Different from other jurisdictions, it is not admissible to use the files of a grant procedure as interpretation material. Conversely, prior art mentioned in the description of the patent can be used for interpretation purposes as well as opposition or nullity decisions.[57]

Patents are construed from the perspective of the so-called average person skilled in the art on the filing date or priority date of the patent. The person skilled in the art is defined as an imaginary person with professional training or qualifications (e.g., a skilled worker, master or engineer) and practical experience of the kind usually gained by those who have worked in the operational or industrial practice of relevant companies in the field to which the teaching of the patent belongs.

Patent protection cannot be derived from the patent description or the drawings alone: a technical teaching that is exclusively described there (both in terms of an extension or a limitation of the claim) but that is not reflected in the patent claims is not covered by the patent.[58] Conversely, the claim must always be interpreted, not only if the wording of the claim is unclear, to determine the technical meaning associated with the wording of the claim.[59] This is mandatory for the simple reason that the patent specification is its own dictionary for the terms used in it, and, therefore, only by referring to the description can information be gained about what the claim means and intends to protect with a certain wording.

In principle, the claim, description and drawings form a coherent unit and must be interpreted in a way such that contradictions do not arise unless contradictions are irreconcilable, in which case the patent claim prevails over the description or the drawings. Embodiments mentioned in the description must therefore give reason to ask whether it is possible to interpret the features of the main claim such that all variants described as being in accordance with the invention are also covered by the wording of the claim. Only if such an interpretation is precluded by the specific wording of the claim is there room for an interpretation that an embodiment disclosed in the description is not covered by the claim. However, such cases are rare exceptions.[60]

Furthermore, the technical meaning or function of the individual feature and the extent to which it contributes to the invention laid down in the patent claim (a so-called functional interpretation) should always be considered.[61] However, in the case of spatially, physically or substance-defined features, this should not be reduced to the mere function of the feature. Rather, the feature should be interpreted in a sense that is consistent with the spatially, physically or substance-defined nature of the

feature.[62] The function-oriented interpretation may exceptionally give rise to a situation wherein the meanings of terms used in different contexts in the patent claim do not necessarily mean the same thing but are instead defined according to the technical functions given by each individual context.[63] This may also result in a feature having different content than the corresponding feature in another publication in the state of the art.[64]

In addition, it must also be ensured that the wording of the claim is fully understood and that the necessary infringement argument is therefore also made with regard to those implicit features that follow only indirectly from the other features of the claim. The following aspects also need to be taken into account when interpreting the features of the claim:

- References in the claim do not limit the protection to an exemplary embodiment.

- It cannot be concluded from the absence of a feature in a drawing (that it is part of the technical teaching) that the feature in question is not present.

- A claim feature may merely express a technical matter of course for the skilled person in the art.

- Features in a patent claim that do not leave any gaps to be filled on the basis of the self-evident knowledge of the average person skilled in the art are to be interpreted in such a way that, from the entirety of the claim features, a suitable subject matter for the purposes of the invention results.

- Most often, the term "in particular" introduces an optional feature. However, this might not be the case when the text following the phrase contains an exemplary concretization of a more general feature that has been mentioned in advance.

- The terms "contains" and "comprises" allow additional components besides those explicitly mentioned in the claim; the terms "consists of" and "is composed of" are to be understood as an exhaustive list such that no additional components are allowed.

- The designation of a component in the plural may suggest the possibility of the use of a generic designation; however, this only applies if there are positive indications in the description that an object with the component as singularly designated is also intended to be in accordance with the invention.

- An obviously false designation (*falsa demonstratio*) in the claim may be corrected based on the description and the drawings.

- Patents need to be interpreted by considering the description and the drawings. It should not influence the interpretation of the patent claim whether this results in an inadmissible extension patent beyond the content of the application. Patent interpretation and added matter are two different issues that should not be mingled.[65] The same is true with regard to patentability: a patent should not be interpreted narrowly just because that would allow its delineation from prior art.

### 5.5.2 Infringement analysis

#### 5.5.2.1 Direct patent infringement

The patent owner generally has an exclusive right to use the invention. Which specific acts are prohibited to third parties depends on whether a product or a method is protected. The different acts that constitute a direct patent infringement are set out in Section 9.

In terms of product claims, third parties are not entitled to manufacture, offer, put on the market or use a product that is the subject matter of the patent. Moreover, they are not entitled to import or possess such a product for the aforementioned purposes (Section 9 no. 1). "Manufacture" covers the entire creation process of the product, not only the final step.[66] The manufacturer of individual parts could also be considered the manufacturer of the overall product if the manufacturer supplies the individual parts to a third party that assembles them into the protected overall product.[67] An offer is any act by which the product is made available to third parties. It does not need to be an offer for a contract but could also be a mere (internet) advertisement.[68] The offered product does not need to be manufactured or brought within the territory of Germany. However, the mere transit of infringing products does not constitute an act of infringement in Germany.

In terms of process claims, a third party is not entitled to use, or offer for use, a process that is the subject matter of the patent if the third party knows or if it is obvious from the circumstances that use of the process is prohibited in the absence of the consent of the proprietor of the patent (Section 9 no. 2). A use of a process requires, in principle, that all the steps of the method are carried out within Germany. However, if the method is carried out partly within Germany and partly abroad, the method claim could nevertheless be infringed. This would require that the method steps carried out abroad can be attributed to the person who carried out the method steps within Germany.[69]

# **EXHIBIT 40**



# The interplay of patent prosecution and litigation in Germany

12 October 2017

This is an Insight article, written by a selected contributor as part of IAM's co-published content. **Read more on Insight** ›

Foreign colleagues in international litigation often ask us whether there is any kind of prosecution history estoppel in Germany. The answer can best be summarised as "generally no; however…" This chapter sheds some light on the extent of the "however" and from this draws advice for both prosecution and litigation practitioners.

## Legal background

The influence of prosecution history on litigation in Germany is minimal when compared to US practice. Historically, prosecution history has had essentially no influence on suits in the German system. If a product was considered to fall under a claim from an objective viewpoint, there was no rescue for the infringer by referencing statements made by the applicant during prosecution. However, legal practice has evolved somewhat.

In *Okklusionsvorrichtung*, an inaugural landmark decision, the German Federal Court of Justice had to decide on infringement in a case where the original application included embodiments A and B to reach a technical situation, and as a consequence of a limitation introduced during prosecution the eventually granted claim was directed to embodiment A only. The court held that infringement under the doctrine of equivalents of a product which corresponded to embodiment B had to be denied because of this intentional exclusion of embodiment B in the claims. Accordingly, the prosecution history can play a role in the case of infringement under the doctrine of equivalents.

US attorneys may recognise a certain similarity to the disclosure dedication rule in the US system. However, the key question is not what the applicant stated during prosecution, but rather what it chose to restrict to get the claims allowed as compared to the alternatives offered by the original disclosure. Nonetheless, to some extent it is fair to say that the prosecution history plays a role in such a situation.

*Pemetrexed*, a more recent decision of the Federal Court of Justice, attracted significant attention and has been called the "introduction of a German file history estoppel". This comparison seems disproportionate from a US perspective, although the case does raise interesting practical considerations. In this decision the court clarified that it is

generally admissible to take into account statements of the applicant or examiners during prosecution as an indication of how the skilled person would understand the subject matter of the patent. Due to their merely indicative nature, such statements do not have a legally binding effect on infringement proceedings. However, they are nonetheless considered seriously alongside other aspects relevant to claim interpretation and thus may have an influence on infringement proceedings.

Accordingly, with reference to the prosecution history of patents in general, the Federal Court of Justice essentially holds that a claim restriction or selection for the purpose of overcoming prior art will ultimately bar the way to infringement under the doctrine of equivalents for the excluded subject matter, irrespective of whether this limitation was objectively necessary. However, where a selection or limitation was made in response to formal objections by the examiner (be they legitimate or not from an objective viewpoint), generally it cannot be assumed that an intentional selection or limitation was made by the applicant at the time, which leaves the question of infringement under the doctrine of equivalents open for the excluded subject matter.

## Recommendations for prosecution practitioners

The recent change in German practice has an impact on patent drafting and prosecution. One straightforward conclusion is that the prosecution attorney should be wary of incorporating features into the claim during prosecution when alternative features performing the same function are disclosed in the application. Particular care should be exercised when incorporating functional language into the claims, since more specific features may not be exactly the same when it comes to the function that they perform. Accordingly, the practitioner may exclude certain more specific examples without even noticing. On the other hand, German prosecution tends to be more flexible with regard to amendments than prosecution before the European Patent Office (EPO), which sometimes takes a hyper-textual approach to added matter. Therefore, when a national German patent is prosecuted, the practitioner should consider whether – instead of selecting one or more features from a list – an overarching, more general feature can be introduced. Such a feature may not necessarily be literally disclosed, but German case law allows for such 'intermediate generalisations' to some degree. This is a way of limiting the claim without excluding certain features by selection as previously mentioned. The intermediate generalisation may provide a limitation which still encompasses various more specific features.

Another conclusion that can be drawn from the recent case law is that the practitioner should make clear in submissions to the patent offices that a certain amendment is based merely on a formal objection raised by the examiner. Such amendments are often prompted by added matter or clarity objections, especially when prosecuting before the EPO. By stating that the amendment is based merely on such a formal objection, the previously described adverse effects may be avoided. Of course, the practitioner should be careful when using the amended feature in a novelty or obviousness discussion, because this may later give rise to the objection that the feature was actually introduced to limit the claim over the prior art. In this case, alternative features may again be excluded from the scope.

One of the conclusions that can be drawn for the patent drafting process is that the drafter should include as many intermediate generalisations as possible. This will allow the prosecution attorney to limit the claim on several levels of abstraction without necessarily excluding alternative concrete realisations of the more general concepts.

## Recommendations for litigation practitioners

The plaintiff in an infringement suit in Germany should keep the applicant's statements in mind during prosecution and should avoid pitfalls that may arise from these statements when arguing for infringement. German infringement courts have a remarkable technical understanding and readily notice (particularly with the defendant's help) the patentee's self-contradictions – which these courts certainly do not appreciate.

The defendant in an infringement suit may make use of the patentee's self-contradictions, establishing a line of argument that it flanks with the patentee's own statements by presenting them to the court as an indication of how the skilled person would perceive certain features.

For both plaintiffs and defendants, it is recommended to keep discussions focused and give way to succinct pleadings with emphasis on reasonable arguments, rather than exhausting elaborations in which good arguments run the risk of being diluted by weak arguments. Among the many aspects that a court must consider when arriving at a decision, the psychological dimension of the litigation should not be underestimated. Clearly, presenting wrong or annoying statements may compromise the party's credibility before the court.

## Utility models: an option that avoids prosecution history

Another potent option which German law offers patentees is the ability to directly file a utility model or branch off a utility model from either a pending European or German national patent application (ie, parent application) or a granted patent until the end of the opposition proceedings. The specification of the utility model is the same as that of the patent from which it branches off. However, the claims may be drafted completely anew and may use the original specification in full. In particular, the claims of a utility model are not in any way limited by the claims of the patent application or patent from which it branches off. After registration, the utility model may be enforced the same as a patent. Registration can typically be expected within one to three months after branching off.

The deadline for branching off a utility model is two months after completion of the examination or opposition procedure, or up to 10 years from the filing date of the patent application (since 10 years is the maximum term of a utility model). The costs for branching off a utility model are low, because the utility model does not undergo formal examination with regard to novelty and obviousness. However, when a utility model is branched off for litigation purposes, the patentee should conduct a prior art search before drafting the utility model claims. By doing so, the risk of validity attacks can be reduced significantly and litigation will be more successful. Due to the ease and low

cost of branching off utility models, one strategy is to branch off multiple utility models of different scopes which cover the patentee's most important competitors.

In short, branching off utility models is a way to quickly obtain a separate protective right that can be used immediately for litigation. Unlike in other jurisdictions, a utility model in Germany may coexist with a patent or patent application without triggering double-patenting issues.

One of the many advantages offered by utility models is that they do not involve an examination proceeding on the merits. Thus, litigation may be less compromised by statements made during prosecution of the utility model. As a utility model can be branched off years after the filing date of its parent patent, it may serve as a powerful weapon because potential infringing products are well known by this time – such that, within the limits set by the scope of disclosure of the patent application, the scope of protection claimed in the utility model can be fully tailored to the infringing products and drafted under consideration of the prior art of the corresponding patent examinations.

### Zimmermann & Partner

Josephspitalstr 15

Munich 80331

Germany

Tel +49 89 232 69 0

Fax +49 89 232 69 232

Web **www.zimpat.com**

### Joel Nägerl

Partner

**naegerl@zimpat.com**

Joel Nägerl is a qualified German and European patent attorney and a partner at Zimmermann & Partner, advising and representing international players in high-profile international litigation. He serves as an appointed court expert at the Dusseldorf Appeal Court. He holds a diploma and a PhD in physics. One of his particular strengths is his technical expertise in developing offensive and defensive strategies in litigation.

### Frank Steinbach

Partner

steinbach@zimpat.com

Frank Steinbach is a partner at Zimmermann & Partner, advising major international players on strategies for complex patent portfolios. He holds a diploma and PhD in physics, and is a qualified German and European patent attorney, US patent agent and certified European patent litigator. His work has a particular emphasis on the interplay between prosecution and national cross-border litigation.

**Benedikt Neuburger**

Partner

neuburger@zimpat.com

Benedikt (Ben) Neuburger is a partner at Zimmermann & Partner, advising a number of large international entities on their patent portfolio strategy with particular focus on prosecution and oppositions. He holds a diploma in theoretical physics, a PhD in economics and a master's in business research, and is a qualified German and European patent attorney. He is involved in a large number of opposition and appeal proceedings. One of his particular strengths is his focus on procedural strategy and the legal aspects of cases.



### Joel Nägerl

Partner
*Zimmermann & Partner*
naegerl@zimpat.com

**View full biography**



### Frank Steinbach

Partner
*Zimmermann & Partner*

**View full biography**



### Benedikt Neuburger

Partner
*Zimmermann & Partner*
neuburger@zimpat.com

**View full biography**

# **EXHIBIT 41**

WIPO

Home › About the Patent Judicial Guide › Patent Judicial Guide › Full Guide

# An International Guide to Patent Case Management for Judges

Full Guide

**Download full guide**    **Download current chapter**    **Build custom guide**

SHARE

   

🌐 Translate with AI                                                                                 

## 5.6 Judicial patent proceedings and case management

### 5.6.1 Key features in patent proceedings and differences to a trial-based system

Patent infringement actions are genuine civil actions whose procedure is governed by the German Code of Civil Procedure ("Zivilprozessordnung").[93] Further basic provisions are contained in the Courts Constitution Act ("Gerichtsverfassungsgesetz").[94] The German Patent Act, however, also provides for a number of specific procedural elements that supplement the general provisions on civil procedure for patent infringement cases (e.g., Section 140c on pre-trial inspection orders). One characteristic fundamentally distinguishes German civil actions (of continental European style) from Anglo-American civil actions, and appreciating this distinction is a way to summarize the key features of a German patent infringement action that will be addressed in this section: German civil actions do not take a trial-based form.

In a typical Anglo-American trial, the facts are presented by the parties to the fact finder through evidence, particularly party-retained expert witnesses, during the main trial hearing rather than through written pleadings.[95] This trial typically takes some days – sometimes weeks or months – depending on the amount and complexity of the evidence. Pre-trial discovery and pre-trial motions (motions to dismiss or summary judgment motions) are important in such a trial-based process.

By contrast, none of these features are present in German civil litigation, with the absolutely rare exception of court-appointed experts and the rare necessity to submit party expert opinions. There are no juries, so the bench (consisting of specialized judges) is the only fact finder and final decision-maker. The proceedings are front-loaded, and most of the input comes through written briefs filed by the parties. There is typically only one final and very dense and concise substantive hearing toward the end of the process. This hearing is only rarely about evidence; in most cases, it is on claim construction and infringement as well as validity. However, validity is only at stake with regard to the decision whether the court, if it finds an infringement of the patent, should stay the proceedings with regard to parallel validity proceedings before the EPO or the FPC pursuant to Section 148 of the Code of Civil Procedure. While these arguments are typically highly fact-specific and therefore technical, the basic technical facts are mostly not in dispute between the parties but rather the correct interpretation of those facts for the purpose of infringement (based on proper claim construction) and validity (based on the proper claim construction and the proper determination of the disclosure of the prior art references). In this process, there are, for the most part, no pre-trial motions that could result in early dismissal of the action before the final hearing. Thus, any lack of "conclusiveness" ("Schlüssigkeit") will only be identified and disposed of by way of dismissing the case at the end of the regular process (i.e., following the briefing and the final hearing).

As there is no specific fact finder (jury), there are no early hearings on certain issues of law, like the "*Markman*" hearing" on claim construction.[96] As the substantive input is fed into proceedings by the parties not through the evidence but through the mostly written party submissions, experts do not play an essential role, and there is no cross-examination of party-appointed experts like in a trial-based system. The bench can, however, resort to independent (technical) experts if relevant facts are in dispute between the parties, but this is the exception.

There is also no general discovery system. Rather, there are limited and specific instruments for the plaintiff to discover facts that are not publicly available (e.g., "inspection orders"). As there is no general discovery, there is also no comprehensive system of privileges and protective orders as is well established in the Anglo-American realm. Both the lack of a discovery and of a general confidentiality system have, over the last two decades, been addressed in the German system by a number of statutory changes and case law. Different from a trial-court system, the court of first instance is not the only "court of record." Rather – and mostly because the process is less time- and resource-consuming – the appellate level is typically also called upon to engage in further fact-finding within certain limits. Thus, there is no clear-cut distinction between trial and appellate levels along the lines of "fact-finding" and "issues of law."

### 5.6.2 Pre-action and pre-trial

#### 5.6.2.1 Cease and desist warnings and requests for right to use

##### 5.6.2.1.1 Relevance of out-of-court communications

One of the most critical points in any patent litigation is how to initially raise the infringement issue with the potential infringer. This is critical because, depending on the way the infringement issue is addressed, the potential infringer can take action against the right holder (e.g., a declaratory judgment action for noninfringement). Furthermore, the form of addressing the infringement issue could open procedural ways for the defendant to dispose of a subsequently filed offensive infringement litigation such that the patentee (plaintiff) would need to bear the costs.

In many jurisdictions, a key point of the analysis is the threshold for filing a declaratory judgment action. In other words, when does flagging a potential infringement issue give the counterpart sufficient reason to file an action seeking declaratory relief for noninfringement? In U.S. practice, this is known as the "case-or-controversy" requirement for filing a declaratory judgment action. A similar requirement exists under German law (cf. Section 256(1) of the Code of Civil Procedure, "Feststellungsinteresse"). The impact on the strategy is less significant, however, because filing the declaratory judgment action does not give that case priority over any subsequently filed offensive infringement action.

Depending on how possible infringers are approached out of court, remedies under unfair competition law could apply (e.g., when warning letters are sent to customers).

##### 5.6.2.1.2 Request for a right to use as opposed to a cease and desist letter

The "safe harbor" in terms of avoiding a declaratory judgment action or any other possible remedy that the potential infringer might be considering is raising the infringement issue in the form of a "request for a right to use." The distinction of such a request compared to a cease-and-desist letter is that this specific form does not conclude that there is infringement or requests that the addressee should cease and desist. Rather, the right holder asks for the reasons that the addressee considers themselves "entitled" to make use of the patented teaching. This category is designed to enable the right holder to enter into a discussion with the addressee without subjecting themselves to possible counterclaims. It is generally not recommended to simply allege infringement of a certain patent but rather to give the request a factual and legal basis in terms of the patent claims and the accused devices or methods.

The alternative is a cease and desist letter, which formally requests that the addressee cease and desist the infringing activity and also requests that the addressee declares a formal undertaking to cease and desist, with any infringement of that obligation triggering a financial penalty (a "cease and desist declaration").[97] If the defendant actually submits such a declaration whose scope and financial penalty are sufficient, the plaintiff cannot assert any claims for injunctive relief in court anymore. The cease and desist declaration is legally considered a functional equivalent to a court judgment, so the patentee (plaintiff) would lack the legal interest in pursuing a claim for injunctive relief notwithstanding the cease and desist declaration.

##### 5.6.2.1.3 Procedural mechanics in connection with a cease and desist letter

It is important to note that there is an enormous amount of case law regarding the requirements that such cease and desist declarations need to meet to be effective. For example, they cannot be conditioned on "actual infringement" because that very issue is meant to be disposed of by the declaration. They also can not only narrowly cover the very devices (in terms of model numbers) identified by the patentee, but they would need to cover any and all devices that are substantially similar to the

# **EXHIBIT 42**


Wolters Kluwer Online

Source: https://research.wolterskluwer-online.de/document/182fcf4b-21ce-3f4f-bdc8-3da4de208b42

| Title | Handbook of Patent Infringement |
|---|---|
| Publisher | Kühnen |
| Edition | 17th edition 2026 |
| Section | D. Legal proceedings → IV. Legal claims |
| Author | Kühnen |
| Publisher | Carl Heymanns Verlag |

# 1. Injunction

## Table of contents

a) Risk of repetition

    aa) Origin

    bb) Termination

b) Risk of first occurrence

    aa) Origin

    bb) Termination

c) Special circumstances

d) Indirect patent infringement

e) Application wording

    aa) Alternative courses of action

    bb) Subject matter of the judgment

    cc) Period

f) Exclusion of enforcement on grounds of proportionality

    aa) Preliminary remark

    bb) Burden of proof

    cc) Case groups

    dd) Overall assessment

    ee) Weighing factors on the infringer's side

    ff) Weighing factors on the plaintiff's side

    gg) Legal consequences

    hh) Subsequently changed circumstances

g) Loss of effect during the infringement proceedings

© 2025 Wolters Kluwer Germany GmbH



The legal basis for the injunction claim for both German and European <sup>patents</sup> is found in Section 139(1) of the German Patent Act (PatG). It does not require fault on the part of the infringer, but merely unlawful use of the teaching of the patent in suit. Due to its forward-looking effect, the conduct giving rise to the claim must have been prohibited both at the time it was committed and at the time of the court's decision, which is particularly important in cases of **legislative changes**.[2] Furthermore, at the time of the oral hearing before <sup>the court</sup>, there must be concern (i.e., it must be proven to the satisfaction of the court) that future (first-time or repeated) patent infringements will occur, which are to be countered with the injunction.

**572**

The injunction claim can also be enforced by a <sup>patent exploitation company</sup> registered as the owner, which does not itself carry out activities covered by the patent and merely aims to encourage infringers to obtain a license.[5] This follows from the fact that the entitlement to claim is linked to simple patent ownership and role registration, and patent law does not impose any obligation to use the patent.

**573**

## a) Risk of repetition

If an unlawful infringement has already occurred, this automatically gives rise to a factual presumption that further infringements will occur in the future (known as **the risk of repetition**).[6] This also applies if the injured party has been awarded damages for the infringement and the damages owed have even been paid. Similarly, it is generally irrelevant whether the patent owner bringing the action was already the owner of the property right at the time of the infringing acts giving rise to the risk of repetition; infringements to the detriment of **legal predecessors** are also relevant.[7] The only exception to this rule is in the case of special circumstances which, in exceptional cases, preclude the conclusion (based on everyday experience) that the infringer will continue his unlawful actions against the new patent holder. This may be the case, for example, if the infringer belongs to the group of companies of the new patent holder or has contractual relations with the latter (which, for example, allow the infringer to use other property rights).

**574**

## aa) Origin

In principle, a distinction must be made between manufacturing companies and pure distribution companies. If manufacturing activities have taken place, there is generally a risk of infringement for subsequent offering and distribution activities as well, because the manufacture of a product typically serves its subsequent sale. A **manufacturer** will therefore regularly be convicted for all acts of use under Section 9 No. 1 PatG.[9] This also applies if the manufacturer does not produce the contested embodiment itself, but has a manufacturing plant that would enable it to do so if it decided to do so. If the

**575**

© 2025 Wolters Kluwer Germany GmbH

 Wolters Kluwer Online

Manufacture of the infringing item (e.g., a blast lance) solely for the purpose of its own use (e.g., for blast cleaning in combustion chambers), there is, exceptionally, no risk of infringement for distribution activities in which the infringing product is placed on the market; in such cases, the injunction is limited to what can actually be expected under the circumstances of the business operation, namely manufacturing, using, and possessing for the purpose of use.[10] If the defendant is a **purely commercial enterprise**, any act of offering (which also includes exhibiting at a trade fair) generally creates a risk of infringement for the placing on the market, use, possession, and importation.[11] This applies even if the defendant expressly denies having carried out any acts of use other than offering, or if this is even undisputed between the parties. On the other hand, a conviction for the alternative action of manufacturing is out of the question due to the clear focus of the company on distribution. [12] If someone has only **used** an infringing item to date (e.g., for the manufacture/processing of products in their business operations), a prohibition that goes beyond use and possession and, if applicable, importation for the purpose of use is not justified. The mere theoretical possibility that the manufacturing device could be sold second-hand in the future does not change this. Rather, circumstances must be presented from which, in relation to the remaining term of the patent, the tangible and imminent implementation of such a decision (in the sense of a risk of first-time infringement) can be inferred.

If the defendant exhibited the patent-infringing item at a **trade fair**, but its statutory purpose is limited to managing its own assets and providing services for other group companies, and if the distribution of the infringing products is carried out internally by other companies within the group, there is no risk of the alternative actions of placing on the market, using, importing, and possessing.[14]                                    **576**

Use during the disclosure period is lawful and does not in itself constitute a risk that use will continue – unlawfully – after the patent has been granted.[15] The same applies to acts of use that are justified for other reasons (e.g., due to Section 12 PatG or due to exhaustion, even if the user was unaware of the exhaustion (e.g., in the case of a test order initiated by the entitled party)).                                    **577**

There is also no **legal succession** in the risk of repetition, regardless of whether it is based on a personal infringement by the legal predecessor or on the fact that organs of the legal predecessor or employees of its company have committed an infringement. Such acts do not in *themselves* constitute a risk of first-time infringement for the legal successor.[19] This is because, although it is legally relevant, it is nevertheless purely factual behavior to which no attribution applies. This applies equally to acts of the insolvent debtor which, in the person of the insolvency administrator, do not give rise to a risk of repetition even if he continues the insolvent debtor's business.[20] Therefore, the legal successor must engage in activities of its own which, when viewed objectively, reasonably suggest that it will continue the infringing actions of its predecessor or use the property right in another way (e.g., with a different device that also infringes the property right). In this respect, not only technical considerations but also corporate strategic considerations may be relevant.                                    **578**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

Example:

**579**

The risk of a first-time infringement is negated if, in the course of the merger, the business area in question is discontinued or even if the product range is simply reorganized in such a way that certain (= infringing) embodiments are discontinued, while others (non-patented) are continued. The risk of first-time infringement can also be ruled out if the product range change could in principle be reversed at reasonable expense (e.g. because the discontinued products are still available unchanged from one or more of the previous external manufacturers or because the company's own manufacturing methods are still available) as long as there are no reliable indications that the discontinued distribution will actually be resumed in the foreseeable future. This possibility may be contradicted, for example, by the fact that the acquiring legal entity has a very special relationship with the proprietor of the property right, which forces it to show consideration, or that the discontinued embodiments are technically obsolete or otherwise outdated outside their patented configuration.

Even if only individual infringing embodiments of a particular device are discontinued, other, equally infringing embodiments of the same device remain in the product range, and even if the former do not differ significantly in design from the latter, the continued distribution of certain embodiments does not, in case of doubt, indicate a risk that the distribution of the other, discontinued embodiments will also be resumed in the future.[21] This is because the scope of the product range is not based on chance, but is regularly the result of a well-considered deliberation process that is not easily overturned at the earliest opportunity.

The situation may be **different** (in terms of a risk of first-time infringement) if there are good reasons (e.g., lack of capacity) for not offering the full range of products from the outset, but rather expanding the range gradually. However, the decision to maintain the entire product range must be final. If the fate of the versions not initially included in the product range is uncertain, for example because the sales success of the other versions is to be awaited first, there is no risk of first-time infringement as long as the decision to expand the product range has not been made.

- It should be noted that the above only applies to a risk of repetition that has arisen in the person of the entity that loses its existence in the course of corporate law proceedings (in the case of a merger, this is the **transferring** legal entity). If infringement proceedings are already pending at the time the merger (or other legal succession) takes effect, the claim for injunctive relief against the legal successor entering the legal dispute can only be pursued if the legal successor's own acts of infringement or at least preparations carrying the risk of first-time infringement can be asserted; otherwise, the claim for injunctive relief must be declared settled in the main proceedings. Claims for disclosure of information, accounting, compensation, damages, recall, and destruction can continue to be asserted to the extent that they were established during the "lifetime" of the predecessor, because the successor is liable for them as for its own obligations. In practical terms, this means that the claims in question must be limited to infringements committed by the predecessor prior to the expiry of his rights.

**580**

© 2025 Wolters Kluwer Germany GmbH

**581**

  –   The opposite is true (in the sense of a continuing risk of repetition) in the reverse case, where the infringing act was committed by the **acquiring** (and legally continuing) **legal entity** or its personnel; in this case, the purely absorbing legal succession does not eliminate a risk of repetition that has already been established.[23] The same applies, of course, even more so in the case of a mere change of form that does not affect the identity of the legal entity (e.g., pursuant to Sections 190 et seq. of the German Transformation Act (UmwG)).[24] In this case, all claims can be pursued (further) unchanged.

**582**

| Practical tip | Sample wording |
|---|---|

In cases of mergers, a distinction must therefore be made. A risk of repetition caused by the *acquiring* company continues to exist after the merger; a risk of repetition caused by *the transferring* company ceases to exist upon completion of the merger.

**583**

Special treatment is appropriate for **contractual obligations to refrain from certain actions** based on a declaration of commitment; these are [transferred] (e.g., in the event of a takeover of the declarant in accordance with the rules of the German Transformation Act (UmwG)) to the legal successor (sic: the company taking over the declarant)[25] and are therefore, in principle, also suitable for eliminating the risk of repetition vis-à-vis the legal successor. [26] However, this is subject to the condition that, based on the overall circumstances, it can be expected that the legal successor (who has not itself issued a declaration of discontinuance) will also feel bound by the commitment made by its legal predecessor and will comply with it.[27] This requires that the legal successor invoke the obligation to refrain from infringement that has been transferred to it by way of legal succession and thereby indicate that the contractual cease-and-desist declaration is also intended to settle the dispute with regard to its person.[28] Furthermore, the contractual penalty must also appear suitable with regard to the legal successor to offer a guarantee of future lawful conduct.

**584**

Regardless of this, lawful use (e.g., during the disclosure period) may give rise **to** the **assertion** that further (now unlawful) acts of use have occurred even after the patent has been granted and published. Depending on the circumstances of the case, such an argument cannot be dismissed as unfounded, which is why the defendant is required to comment on the allegation in question (in accordance with the truth, Section 138 of the German Code of Civil Procedure). In general, this can of course be done by means of a blanket denial, without the need for specific information on how the original object of use may have been modified after the patent was granted.

# bb) Termination

The risk of repetition can only be eliminated—except through the expiry of the property right—by the submission and receipt of an irrevocable cease-and-desist declaration secured by a sufficient contractual penalty clause· It is exceptionally unsuitable if the debtor is recognizably insolvent. Instead of a contractual penalty, reference may not be made to the coercive measures of Section 890 of the German Code of Civil Procedure (ZPO), because these can only be imposed if an enforcement order (e.g., judgment, preliminary injunction, court settlement) is available,31 meaning that the declaration of commitment would ultimately remain without penalty.

**585**

The reason for allowing a voluntary declaration of submission is as follows: In order to avoid a legal dispute, the debtor always has the option of fulfilling the claim, which, if it occurs during pending litigation, leads to its settlement. The opportunity for fulfillment must therefore also exist in the case of a claim for injunctive relief, which raises particular problems in that, unlike other claims for performance, e.g., payment, information, surrender, or performance of another act, fulfillment in this case consists of inaction, i.e., the debtor's permanent inaction, which is why it can only be assessed after the expiry of the property right whether the injunction claim has been voluntarily fulfilled. Because this leads to unacceptable circumstances, another, timely effective option for fulfilling the injunction claim must be granted. This may consist solely of the debtor undertaking to refrain from the infringement in a manner that satisfies the creditor legally in a similar way to a court order. Traditionally, this is done by means of a voluntary cease-and-desist declaration.

**586**

**Whether** the **creditor accepts the cease-and-desist declaration** (which is necessary to establish the contractual claim to the promised contractual penalty for infringements subsequent to the conclusion of the contract) is generally irrelevant. If the cease-and-desist declaration is an expression of a serious intention to cease and desist, the promised penalty, provided it is of a sufficient amount, is already sufficient to deter the promisor from repeating the infringing act.32 However, this is conditional upon the debtor being bound by its cease-and-desist declaration until acceptance or rejection by the creditor, even if this occurs outside the usual acceptance period for a contractual offer (Sections 147 et seq. BGB), so that the creditor can still justify the contractual penalty claim at a later date and the offered declaration of discontinuance, which is still acceptable, continues to have a deterrent effect that justifies the cessation of the risk of repetition.33 For the unlimited duration of the acceptability, no special declaration by the debtor to the effect that his cease-and-desist declaration can be invoked at any time is required. It is true that the cease-and-desist declaration is aimed at the conclusion of a cease-and-desist agreement, whereby

Section 147 of the German Civil Code (BGB) applies, according to which an offer made to a person who is present can only be accepted immediately (this also applies to offers made from person to person by telephone or other technical means), and an offer made to a person who is absent can only be accepted until the time at which the offeror can reasonably expect to receive a response under normal circumstances. On the other hand, however, it must be taken into account that the *primary* purpose of the cease-and-desist declaration is to eliminate the risk of repetition as a substantive legal prerequisite for the claim for injunctive relief in order to prevent an action for injunctive relief, and that this purpose must be strictly distinguished from the conclusion of a cease-and-desist agreement as a prerequisite for a claim for contractual penalties.34 Since the purpose of the unilateral cease-and-desist declaration to eliminate the risk of repetition also applies to

is recognizable to the addressee and this purpose can only be achieved as long as the

**587**

© 2025 Wolters Kluwer Germany GmbH

cease-and-desist declaration remains acceptable, it is reasonable to assume that the declarant agrees to the acceptance of their cease-and-desist agreement offer at any time, even at a later date. The opposite only applies if the contrary is clearly stated or can be inferred from the circumstances. In addition, acceptance of the cease-and-desist declaration must also be permitted without the debtor receiving the declaration of acceptance (Section 151 sentence 1 BGB).[35] This also does not require an express declaration by the debtor, but is sufficiently apparent from the substantive legal purpose of the cease-and-desist declaration.

| Practical tip | Sample wording |
|---|---|
| As long as there is no supreme court ruling on the necessity of a declaration by the debtor regarding the duration of the acceptance period, it is advisable, for reasons of caution, to expressly clarify in the cease-and-desist declaration that the acceptance periods of the German Civil Code (BGB) do not apply to it, but that the declaration can be accepted at any time – also in accordance with Section 151 sentence 1 BGB. | |

**588**

**If the creditor refuses** to accept the cease-and-desist declaration with penalty clause from the debtor (which can also be done by filing an injunction), then, from the moment the refusal is received, there is no longer a contractual penalty threat to control behavior that is intended to deter the debtor from future infringements, because the debtor no longer has to expect that the creditor has established a contractual penalty obligation by accepting the cease-and-desist declaration with penalty clause. The risk of repetition is revived because the presumption of the risk of repetition created by the infringing act can only be rebutted with a cease-and-desist declaration with penalty clause as long as the necessary deterrent effect is (continued to be) ensured by an effective threat of sanctions (which no longer exists after rejection by the creditor).[36] Whether the creditor has valid reasons for its rejection is irrelevant; even if there are no such reasons, a risk of repetition must be assumed. If the creditor brings an action for an injunction under such circumstances, unfair results to the detriment of the debtor can be avoided by the debtor immediately acknowledging the claim and taking into account in the decision on costs whether, in view of the pre-litigation offer of submission, there was a reason for the creditor to take legal action, which is only the case if the offered cease-and-desist declaration was justifiably rejected.

**589**

| Practical tip | Sample wording |
|---|---|
| Provided that the cease-and-desist declaration is sufficiently enforceable, it is strongly recommended that the creditor accept it as soon as possible, preferably explicitly. Only then will they acquire the right to a contractual penalty in the event of a subsequent infringement, whereas without acceptance they will forfeit this right, but as long as they do not reject the cease-and-desist declaration, they will still lose the risk of repetition. | |

**590**

© 2025 Wolters Kluwer Germany GmbH

 **Wolters Kluwer Online**

The cease-and-desist declaration must be **serious**. This is not called into question by    **591**

- that the party subject to the injunction emphasizes that it is issuing the declaration of commitment of its own free will and without any legal obligation to do so. A declaration of discontinuance secured by a contractual penalty does not lose its seriousness as a result of the introductory remark that any patent infringement is disputed and $^{that}$ the cease-and-desist declaration is merely a sign of goodwill and $^{is\ made}$ to avoid a purely academic dispute about the asserted cease-and-desist claims without any acknowledgment of a legal obligation or obligation to bear costs, as long as it is beyond doubt that the cease-and-desist obligation as such is to be legally binding for the declarant.    **592**

  - It is harmless if the declaration of submission is made with the reservation that it must be treated **confidentially** by the creditor.    **593**

  - Nor is it detrimental if the validity of the injunction is made subject to the **condition** subsequent that the asserted property right is definitively destroyed or restricted in a manner that no longer allows it to be used in connection with the contested object.    **594**

  - A condition to the effect that the legal situation is subsequently **clarified by the highest court** to the effect that the conduct complained of is not unlawful is also permissible. However, in order to avoid any doubts arising retrospectively as to the conditions for the declaration of commitment to cease and desist to become invalid, it must be made unambiguously clear which specific legal issue must be decided in which sense in order for the declaration of cessation to cease to have effect.[39]    **595**

  - Finally, a reservation to only be liable for culpable violations is harmless.[40] Such a clause excludes liability for vicarious agents, as    **596**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

it arises from § 278 BGB (German Civil Code), does not apply. If the contractual penalty is expressly promised only for own fault – excluding the application of **Section 278 BGB** (by the debtor, for example, issuing a cease-and-desist declaration in which he promises a contractual penalty only in the event of a culpable violation within the meaning of Section 890 ZPO (German Code of Civil Procedure)), the risk of repetition does not cease to apply according to the prevailing opinion.[41] However, if the creditor accepts such an (insufficient) declaration, a waiver agreement may be concluded which includes a waiver by the creditor of the (in itself continuing) statutory claim for injunctive relief inter partes.[42]

If the declaration of submission is made by a lawyer prior to the proceedings and the lawyer fails to provide proof of his **authority** to make such a declaration despite being requested to do so, the necessary seriousness must be denied.[43] The same applies if the infringer residing abroad refuses to agree to a German place of jurisdiction for the enforcement of the contractual penalty in the event of a breach of the cease-and-desist declaration.[44]

**597**

[In] terms of content and scope, the **declaration of submission** must correspond to the operative part of the judgment that would be issued in contentious court proceedings.[45] A formulation that is not based on the wording of the claims in the patent in suit (and is therefore general in nature), but only refers to the specific embodiment challenged, is therefore insufficient. In principle, it is up to the infringer to submit a declaration of submission that is sufficient to eliminate the risk of repetition, even if the cease-and-desist declaration demanded by the injured party is too broad.

**598**

[In] order to eliminate the risk of repetition, the declaration of submission does not have to be **accepted**; it must only not be **rejected**.

**599**

According to the meaning and function of the cease-and-desist declaration, the requirement of seriousness includes the debtor's willingness to provide the creditor with the declaration upon request in a **form** that enables the enforcement of the claims arising from the promise without legal doubts and without difficulties in proving them. This is because if the debtor wants to achieve, in his own interest, that the creditor refrains from enforcing his claim in court, he must be prepared to grant the creditor a legal starting position that is not too far inferior to that of a title creditor in the event of an infringement.[49] If this willingness is lacking, there are generally justified doubts as to the seriousness of the declaration made and the willingness to submit.

**600**

Whether the cease-and-desist declaration is subject to a legal form requirement within the meaning of **Section 126 (1) of the German Civil Code (BGB)** depends on the person making the declaration. Since the agreement to which the cease-and-desist declaration relates is an abstract acknowledgment of debt, the following applies to it

**601**

© 2025 Wolters Kluwer Germany GmbH

the written form requirement of Sections 780 sentence 1, 781 sentence 1 BGB.[50] However, the situation is different under Sections 343 (1), 350 HGB if the cease-and-desist declaration is made by a merchant in the course of his commercial business.[51]

Insofar as there is no legal requirement for a specific form (in commercial matters), the declaration of discontinuance is not invalid because the defendant did not send the plaintiff a signed **original** declaration of discontinuance within the set period—despite an express request to do so—but only sent a signed declaration as **a PDF file by email**.[52] The transmission of legally binding declarations by email has become established practice in business and legal transactions. In general, this does not give rise to any difficulties in proving or relevant doubts as to the authorship of the sender of an email that would require a different, more reliable means of transmission.

**602**

If one of several patent holders has issued a warning and the infringer has subsequently issued a cease-and-desist declaration with penalty clause, the risk of repetition is also eliminated with regard to the other co-owners because it is indivisible. This constitutes a case of so-called **third-party submission**, which is sufficient if there is no doubt as to the seriousness of the declaration of submission.[53] The latter must be examined particularly carefully if the beneficiary of the third-party submission had not issued a warning himself, because under such conditions it may be questionable what interest the recipient of the third-party submission actually has in monitoring the further conduct of the infringer and preventing any further infringing acts by him.[54] Since the (co-)injured party, to whom no cease-and-desist declaration has been made, has no possibility of imposing sanctions of its own, it must be carefully examined, within the framework of a comprehensive overall assessment and applying the necessary strict standards, whether the creditor of the contractual penalty appears willing and able to exhaust the possibilities of sanctions available only to it, and whether this must be feared by the debtor as so probable that there can be no doubt as to the seriousness of his obligation to cease and desist.[55] In particular, consideration must be given to the person and characteristics of the creditor of the contractual penalty who is not identical with the injured party and to the nature of the debtor's relationship with the creditor.

The basic prerequisite for rebutting the presumption of the risk of repetition by means of a cease-and-desist declaration vis-à-vis a third party is that this declaration fully covers the content of the cease-and-desist claim asserted by the party concerned; [if] it falls short of this, it cannot rebut the presumption of the risk of repetition.

**603**

Special rules apply to the seriousness of third-party submission if a **primary creditor** has (unjustifiably) **rejected** a serious **declaration of submission** that is sufficiently enforceable. Since the rejection of *a* debtor's declaration of submission prevents the risk of repetition from being eliminated for *all* creditors, third-party creditors are no longer prevented from issuing a warning to the debtor as a result of the rejection.[57] To counteract this, the debtor can conclude a cease-and-desist agreement with one of them as quickly as possible, which in turn eliminates the risk of repetition in relation to all creditors. The seriousness of this submission (which, as explained, must otherwise be strictly examined) will generally be affirmed because, after the initial creditor has rejected his cease-and-desist declaration, the debtor has a legitimate interest in a new submission, which is why the seriousness of his declaration is not questionable in case of doubt.

**604**

© 2025 Wolters Kluwer Germany GmbH

**The burden of proof** for the circumstances establishing the appropriateness of third-party submission lies with the infringer.[59] The assessment of whether the risk of repetition of the contested conduct continues to exist is essentially factual in nature and is therefore limited in **appeal proceedings**, namely to verifying whether the court of appeal based its decision on correct legal considerations and did not disregard [any] essential facts.

**605**

On the other hand, the declaration of submission issued by the **company** does not benefit its jointly liable **managing directors**; rather, they must issue a declaration of commitment in their own name in order to invalidate the injunction claim against them personally resulting from the patent infringement that has occurred. If this does not happen, the risk of repetition and, accordingly, the injunction claim against the managing director remains, even if he is dismissed as managing director of the infringing company.[61] This applies even if he does not move to another company operating in a comparable field and there are no indications that he will continue the infringing activities in any other form, e.g., within the framework of an existing or newly founded sole proprietorship.

**606**

Simply ceasing the infringing acts is also insufficient, even if this occurs in the course of discontinuing all business operations. This also applies to cases of indirect **patent infringement**. Merely recommending that the customer use the product in a patent-free manner does not eliminate the risk of repetition established by previous infringing acts.[62] If the defendant succeeds in eliminating the risk of repetition by issuing a corresponding cease-and-desist declaration during the legal dispute, the plaintiff must declare the claim for injunctive relief to be settled in the main proceedings.

**607**

After submission of a sufficient declaration of submission, the risk of repetition **arises again** (with the consequence that legal action can be taken for injunctive relief, etc.) if the infringer—not necessarily culpably—violates its declaration of commitment by engaging in acts that infringe property rights. This risk of repetition can be eliminated once again by a cease-and-desist declaration with a penalty clause; however, this requires a significantly higher penalty in any case.[63] In the case of a contractual penalty clause according to **"Hamburg custom,"** this does not require the inclusion of a fixed lower limit.[64] This is because a contractual penalty clause according to
The "Hamburg custom" already entails a higher penalty insofar as it combines the possibility of setting a contractual penalty at a level that was not previously foreseeable (based on the first declaration of submission) and the fact that repeated infringements disregarding the first cease-and-desist declaration [must] be taken into account in a judicial review of the appropriateness of the contractual penalty.

**608**

As with a first-time infringement (see above, margin note 587 et seq.), the **receipt** of a cease-and-desist declaration from the debtor, which is subject to a penalty and expresses a serious intention to desist, is sufficient to eliminate the risk of repetition. It must be binding until it is accepted or rejected by the creditor, even outside the BGB acceptance period. [66] However, if the creditor [refuses] to accept the declaration of discontinuance with penalty clause vis-à-vis the debtor – whether justified or unjustified – the conclusion of the cease-and-desist agreement fails and, from this point on, there is no

**609**

© 2025 Wolters Kluwer Germany GmbH

 Wolters Kluwer Online

Saved: December 9, 2025, 3:29 p.m.

At the point in time at which the deterrent effect required to eliminate the risk of repetition through a (threatened) contractual penalty obligation ceases to apply, the claim for injunctive relief is revived.

## b) Risk of first-time infringement

If an infringement has not yet occurred (or is not known to the plaintiff), there must be tangible evidence (i.e., presented by the plaintiff and, if necessary, proven) that a patent infringement is imminent under the circumstances (known as the risk of first infringement). The conduct in question must be unlawful at the time of its imminent commission.[69] In addition, the imminent infringement must be so concrete that it is possible to reliably assess whether all the elements of the offense will be realized.[70]

**610**

## aa) Origin

In individual cases, it may be sufficient for the defendant to claim that it is entitled to perform a certain act (e.g., manufacture and distribute the device alleged to infringe the patent). However, it is necessary that the declaration gives rise to a serious threat of infringement in the near future.[71] Such a **declaration** can also be made in the context of pending litigation, e.g., by the defendant asserting in response to the action that the contested conduct does not constitute an infringement of the patent in suit at all. In order to be considered a claim establishing the risk of first infringement, however, the legal defense must be conducted in such a way that it can be inferred that there is a serious willingness to act in accordance with the opinion represented for the purpose of legal defense.[72] For reasons of caution, when contesting the allegation of patent infringement, the defendant should make it clear that its statements serve exclusively for the purpose of legal defense in the proceedings and not for the purpose of asserting a defense. The same applies to cases of negative declaratory actions: the filing of an action seeking a court ruling that there is no obligation to comply with an out-of-court cease-and-desist order does not normally constitute a risk of first-time infringement for the conduct specified in the application for a declaratory judgment.[73] The carrying out of an inspection or submission measure does not, in principle, constitute a claim for recognition because it is based on mere suspicion.[74] Anyone who manufactures infringing products in Germany *regularly* creates the risk of their subsequent domestic offering and distribution; anyone who offers infringing products in Germany *generally* creates the risk of their subsequent distribution.

**611**

Acts of use **during** the disclosure period or other lawful conduct (e.g., Section 12 PatG) do not generally create a risk of first-time infringement for their continuation after the patent has been granted; nor do acts of infringement by the legal predecessor, its organs, or employees.[76] Dishonest test purchases are also irrelevant.[77] The Federal Court of Justice (BGH)[78] has allowed an exception—which cannot be generalized—to the principle that lawful conduct cannot constitute a risk of first-time infringement in the special case where the

**612**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

The legality of use from the point of view of exhaustion *and* the user of the circumstances leading to exhaustion (e.g., abandonment of the order for patented items by a test purchaser authorized by the patent holder) remained unknown, because there is serious concern that the actor will again provide patent-using items at the next opportunity if the conditions for exhaustion are not met.

The same applies when patent protection for an active pharmaceutical ingredient expires. In this case, the considerable economic interest of a generic drug manufacturer in starting to be included in the Lauer Tax shortly before the expiry of patent protection does not in itself create a risk of first-time infringement, even if – due to the publication of the Lauer Tax at specified intervals – a possible patent infringement can no longer be remedied by a preliminary injunction applied for only after inclusion in the tax rate and the generic drug manufacturer has also not agreed to a pre-court warning to refrain from applying for inclusion in the Lauer tax rate before the expiry of the patent protection.[79] A risk of first-time infringement is certainly not justified by the fact that the generic company is in possession of a European marketing authorization for the generic drug before the expiry of the patent protection, provided that the authorization does not expire if it is not used during the remaining term of the patent (and therefore only makes sense for an intention to use after the end of the patent protection), and if the patent holder's pre-litigation letters of warning are left unanswered and the requested undertakings not to enter the market before the end of the patent protection or to give at least 8 weeks' notice of any intention to enter the market are refused.

**613**

The filing of a **negative declaratory action abroad** to clarify the issue of patent infringement for a German property right does not, at least on its own, create a risk of first-time infringement for domestic acts of use.

**614**

A risk of first infringement is also not normally established by exhibiting at a **foreign trade fair**, even if the exhibitor is a domestic company.[81]

**615**

Nor is it created (at a domestic trade fair) by the presentation of a medical device that is **not marketable** due to a lack of CE certification, even if the product that will later be marketable is identical to the one exhibited.[82]

**616**

**Criticism:** This must be contradicted because the trade fair presentation qualifies as an offer (even one that could lead to a repeat offense). The lack of certification may prevent immediate delivery, but this is not a prerequisite for the form of use of the offer. At most, in the case of a recognizable product study, an offer and a risk of infringement can be ruled out.

**617**

© 2025 Wolters Kluwer Germany GmbH

 Wolters Kluwer Online

## bb) Termination

In principle, less stringent requirements are to be imposed on the elimination of the risk of first-time infringement than on the cessation of the risk of repetition caused by an infringing act. A risk of first-time infringement created by a claim and, with it, the right to injunctive relief generally cease to apply when the claim is withdrawn. This is certainly the case with an unrestricted and unambiguous declaration that the contested act will not be carried out in the future. [83] This is the case, for example, if the business relationship with the intended supplier is suspended in order to develop new products, the owner of the property right is notified of this, and almost 1.5 years have passed between the notification and the filing of the lawsuit without the defendant reappearing on the market in an infringing manner or at least taking any outwardly recognizable preparatory steps to do so.[84]

**618**

## c) Special circumstances

It should be noted that once the statute of limitations has expired and the defendant invokes this (defense!), no risk of repetition and no risk of first-time infringement can be derived from an **infringement that** is already time-barred. However, since each new infringing act triggers a new claim for injunctive relief, which is subject to its own new statute of limitations, the claimant is free in such cases to invoke a further infringing act committed by the opposing party within the limitation period for his claim for injunctive relief.
It is also possible to demonstrate the conditions for a risk of first-time infringement, although the act underlying the time-barred injunction claim must of course be disregarded.

**619**

Finally, special provisions apply to **claims for use** if the infringement of the scope of protection lies in the offering and distribution of an item that is obviously designed for the protected use and if the item can also be used without infringing the patent. For details, see section A above, margin note 518.

**620**

## d) Indirect patent infringement

In cases of indirect patent infringement (Section 10 PatG)[85], the injunction must be directed against the offering and distribution of those means which relate to an essential element of the invention and which are suitable and intended for use of the invention within the scope of the PatG. No action can be taken against the manufacture and possession, nor against the offering and delivery of means for use abroad.

**621**

© 2025 Wolters Kluwer Germany GmbH



If the delivered product can be used both patent-free and in a manner that infringes the patent—where this is technically and economically feasible—a general and comprehensive sales ban (**"absolute** ban") is fundamentally out of the question. Rather· only a limited injunction is possible. It requires the defendant to refrain from distributing the means suitable for using the invention without referring to the patent in suit in *the offer* (**warning notice**) and/or *to conclude* a (possibly penalty-backed) **cease-and-desist** agreement with its customer, which enables the patent holder to demand a contractual penalty in the event of use of the delivered means in accordance with the patent. Whether a warning notice is sufficient in the case of delivery or whether, in exceptional cases, a contractual penalty agreement is necessary depends on the circumstances of the individual case.[89] The decisive factor is whether the warning alone (in view of the advantages of use in accordance with the patent) offers sufficient assurance that the patent rights will be observed.[90] Caution is therefore advised with regard to demanding a contractual penalty agreement.

**622**

## e) Wording of the application[91]

When formulating the injunction, the content of the desired judgment must be clarified in several respects.

**623**

## aa) Alternative courses of action

First, it must be determined which actions are to be prohibited to the defendant. In the case of a product patent, these are usually manufacturing (if the defendant manufactures the product itself), otherwise (i.e., in the case of a pure trading company) offering, placing on the market, using, possessing, and importing the patent-infringing product (Section 9 No. 1 PatG).[92] In the case of a process patent, on the other hand, the injunction is directed at offering and/or using the process (Section 9 No. 2 PatG). If the patent protects a manufacturing process, an injunction may also be sought with regard to the manufacture and distribution of those products that are *directly* derived from the patented process (Section 9 No. 3 PatG).

**624**

## bb) Subject matter of the judgment

Secondly, the object whose use the defendant is to refrain from in future must be specified.

**625**

© 2025 Wolters Kluwer Germany GmbH

■ If the plaintiff can assert a **literal patent infringement**, it is generally permissible to formulate the claim in accordance with the wording of the infringed patent claim.[93] The contrary opinion of the Federal Court of Justice[94], according to which the claim (and the operative part of the judgment) if and to the extent that the use of a claim feature is disputed, must be adapted to the form of infringement submitted for decision by specifically describing the design or spatial-physical means by which the disputed claim feature(s) are realized in the contested embodiment, is to be rejected.[95] It has no dogmatic justification[96] and must in any case be rejected for reasons of practicability. The orientation towards the wording of the claim ensures that the operative part of the judgment contains only those details that are relevant to the teaching of the invention, and it reliably prevents the inclusion in the operative part of the judgment of design features that are outside the scope of the features of the invention and would therefore unjustifiably restrict the scope of the prohibition. In the event of enforcement, the operative part following the wording of the claim can be interpreted on the basis of the grounds for the decision, which ensures that the title is not extended to embodiments that are not at the core of the court's prohibition. For decades, patent infringement courts have proceeded in exactly this manner without any adverse effects whatsoever, and the Federal Court of Justice itself has never taken issue with the approach described above in the past. There is therefore no reason whatsoever to abandon the tried and tested form of the application wording, especially not in favor of one that would complicate the infringement proceedings with further points of dispute about the correct wording, which must be sufficiently specific on the one hand, but not too specific on the other. narrow – description of the form of infringement. This is particularly true in view of the fact that only a negligible proportion of infringement judgments are enforced in court proceedings in which a more specific operative part of the judgment, as envisaged by the Federal Court of Justice, could become relevant. Moreover, it is debatable whether it would be of any real use in such enforcement proceedings, because the use of the grounds for the decision, as has been practiced in enforcement proceedings to date, already ensures the appropriate enforcement of the judgment made in the proceedings with regard to a specific form of execution. Finally, it must be objected to the Federal Court of Justice that the obligation to specify disputed claim features allows the defendant to force an increasingly narrower operative part (to the detriment of the plaintiff) by disputing claim features as extensively as possible.

626

It is important to note that, even in the opinion of the Federal Court of Justice, a judgment formulated in accordance with the wording of the claim is **not vague,** despite the disputed use.

627

Unrestricted recourse to the wording of the claim is also permissible if the patent claim contains several equivalent **alternatives for use** and the defendant's conduct has – as is usually the case – only realized one of these alternatives. [97] In the situation described, the defendant has already shown through its unlawful actions that it disregards the exclusive protection conferred by the patent in suit. Against this background, it is not clear why it should not also be prohibited from using the patent in suit in the other alternative actions of the patent claim (which are just as unlawful).

628

© 2025 Wolters Kluwer Germany GmbH

Saved: December 9, 2025, 3:29 p.m.

[98], but rather that, in the event that the defendant switches to another alternative for implementing the invention, the plaintiff should instead be referred to new, time-consuming and costly legal proceedings. A comprehensive judgment is equally justified with regard to the retrospective claims for accounting and damages. The fact that the plaintiff only refers to one of several alternative courses of action in his statement of claim may be due to the fact that (which may be purely coincidental) only *this one* has become known to him. Why should this exonerate the defendant from being held accountable for his infringing acts as a whole (i.e., including all equally unlawful alternative courses of action)? The inclusion of all patent-infringing alternatives also allows for a conviction under the rules of **alternative determination** if it is established that one of the alternative courses of action specified in the patent claim has been used and the only question remaining is which of them the defendant has actually carried out.[99] The above does not apply if the alternative courses of action are the subject of independent, subordinate patent claims.

**629**

– If only **equivalent use** of the patent in suit is considered, the wording of the patent claims may only be relied upon to the extent that its features are literally realized by the contested embodiment. If, on the other hand, modified solvents are used, the claim must include – taking into account the level of abstraction specific to the patent claim – those technical substitutes which, despite their deviation from the wording of the patent claim justify the inclusion of the contested embodiment in the scope of protection of the patent in suit from the point of view of equivalence.[100] If the statement of claim is based – at least in part – on equivalent use, the court must, if necessary, work towards a correspondingly worded claim.[101]

**630**

– If it was only a **modification** of the delivered device carried out by the customer that **led to the patent infringement**, and if this modification is attributable to the supplier because he either instructed it himself or deliberately exploited [it] for his own benefit, then the circumstances that constitute instruction for the modification should be specifically included in the statement of claim, or at least clearly stated in the statement of grounds for the action. In the latter case, the key to the patent infringement lies in the supplier's instruction or exploitation of the modification, which is why the (unrestricted) injunction must necessarily be understood against the background of the liability-relevant environment described above and is only relevant in this context. Despite [the] formally unrestricted [injunction103], the defendant remains free to continue distributing the same device (which does not infringe the patent in itself) if it creates conditions that no longer allow the customer to expect a patent-compliant modification or no longer allow the customer's behavior to be attributed to the defendant. What is required for this depends on the

© 2025 Wolters Kluwer Germany GmbH



specific circumstances of the individual case (e.g., the nature of the invention, the competitive environment, the customer base and their technical capabilities, the frequency of customer manipulation). If, for example, the conversion was instructed by the supplier, it may be sufficient to discontinue the instructions from then on, *provided* that the customers have not acquired a level of knowledge that continues to have an independent effect and justifies the supplier's liability from the point of view of exploitation. Verbal warnings (about dangers) may be promising, but it may also be necessary to switch to a different design that makes conversion impossible or sufficiently difficult. Ultimately, a weighing of interests decides: Which measure promises which success against a patent-compliant conversion? What difficulties are associated with this for the infringer (reasonableness)?

**631**

If the framework conditions have been changed in a way that is not covered by the grounds for the decision, the distribution does not constitute **a** sanctionable **infringement**. Such variations may also constitute an infringement of the scope of protection, but this can only be determined on the basis of new (previously unconsidered) substantive legal considerations, which are inadmissible in enforcement proceedings.

**632**

– Finally, the specific circumstances giving rise to liability must also be taken into account if the infringing item was delivered from **abroad to abroad** and the foreign supplier's responsibility arises from the fact that it has sufficient evidence that the item will subsequently be delivered domestically by its customer.[104]

**633**

| **Practical tip** | Example wording |
| --- | --- |

If subclaims are used, it is advisable to include them in "**in particular** claims." As a rule, these are not included in the operative part of the judgment because they are merely examples of the legal protection sought in the main claim.[105] However, the "in particular request" allows the plaintiff to limit their claim if necessary, which can be important, for example, if the defendant invokes a private right of prior use or the "formstone objection" and this right of prior use and this objection are effective against the main claim of the patent in suit, but not against the subclaim.

© 2025 Wolters Kluwer Germany GmbH

If the defendant argues that the infringement constitutes an **impermissible extension** and if the contested embodiment embodies those features that would have to be included in the patent claim in order to eliminate the alleged extension, it may be advisable to formulate the claim for adaptation to the form of infringement in such a way that the additional features are included. This renders the objection of impermissible extension irrelevant and thus avoids a suspension that might otherwise be imminent, because the operative part of the judgment immediately takes on the wording that the patent in suit will receive if the extension objection is upheld.

## cc) Period

In terms of time, there is no need for an explicit limitation of the injunction until the expiry of the statutory term of protection. Even without specific clarification, it can be assumed that the claim and the operative part of the judgment are inherently limited to the maximum term of protection possible under the law with regard to all claims concerned, and that claims should only be derived from acts of use that occurred during the term of protection of the patent in suit.[106]     **634**

If legal action has been taken and a judgment has been handed down on the basis of the basic patent and the plaintiff has a **supplementary protection certificate** for the basic patent, the title loses its effect upon expiry of the term of protection of the basic patent and must be re-litigated separately on the basis of the protection certificate. This applies regardless of whether the plaintiff was already the holder of the supplementary protection certificate during the infringement proceedings based on the basic patent but did not make it the subject of his infringement action, or whether the certificate was only granted after the conclusion of the proceedings based on the basic patent or the plaintiff became entitled to it.     **635**

## f) Exclusion of enforcement on grounds of proportionality[107]

Particularly in the area of common [law], there has traditionally been a willingness not to grant injunctive relief, even though the factual requirements are fully met, but to deny it in individual cases for overriding reasons of proportionality. This idea has also found supporters in national law, albeit with varying scope.[109] Whether this constitutes a substantive exclusion of claims or merely an obstacle to enforcement has been assessed differently; the legal clarification in Section 139 (1) sentence 3 PatG assumes a restriction not of the substantive claim, but merely     **636**

its enforceability, whether in or out of court.

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

# aa) Preliminary remark

In the present context, it should first be noted that patents are understood as constitutionally protected property rights (Art. 1 4 GG), the infringement of which even constitutes a criminal offense in the case of intentional acts. The central core and, at the same time, the obvious expression of the monopoly right granted to the owner by law is the right to injunctive relief regulated in Section 139 (1) PatG, which allows the owner to exclude any third party from using the invention reserved for him. Viewed **in this light, any restriction on the enforceability of the right to injunctive relief** also constitutes a fundamental **interference with** the property-like **industrial property right itself**. On the other hand, like any measure of state authority, the judicial award of a right to injunctive relief is subject to the principle of proportionality derived from the rule of law, which the legislature has enshrined in Section 139

**637**

Par<sup>agraph</sup> 1, sentence 2 of the German Patent Act (PatG) clarifies that the right to injunctive relief is excluded if and to the extent that – cumulatively – (1) its enforcement would, due to the *special circumstances of the individual case* (2) *and the requirements of good faith* (3), lead to (4) *disproportionate hardship* for the infringer or third parties *that is not justified by the exclusive right*. As is clear from the explanatory memorandum to the Act, the granting of a claim for injunctive relief remains the usual and regular consequence in cases of <sup>patent</sup> <sup>infringement110</sup> and its exceptional restriction is <sup>limited</sup> to very special cases111 in which the claim for injunctive relief <sup>would</sup> cause disproportionately great disadvantages112. In view of this rule-exception relationship, the assertion of the right to injunctive relief does not require a demonstration of proportionality; explanations in this regard are only necessary if the infringer has presented considerable reasons for an exceptional restriction of the right to injunctive relief asserted against him.

# bb) Carryover losses

The circumstances in question must not only appear possible or probable, but must be established to **the court's** complete **certainty**. The rules of strict proof apply. Only those circumstances of which the court is convinced pursuant to Section 286 of the German Code of Civil Procedure (ZPO) are to be assessed in a comprehensive overall consideration. The application for the granting of a period of use may also be successfully filed in the appellate instance if the underlying facts are undisputed or have been established in the courts of fact·

**638**

Because the restriction/exclusion of the right to injunctive relief and its enforceability is an exception to the fixed rule that every unlawful infringement of property rights results in an injunction, it is up to the **infringer to present and prove** the circumstances that require the application of the principle of proportionality in his favor.<sup>115</sup> In this regard, specific factual assertions that are amenable to judicial evidence are required, and not just generalities. Any remaining doubts are to the detriment of the infringer.<sup>116</sup> The defendant does not need to file a formal claim for a specific measure (e.g., a grace period of a certain duration). In order to assess

**639**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

In order to determine whether the defendant is (sufficiently) aggrieved by the court decision, it is necessary, at least in the statement of grounds for the motion to dismiss the action, to specify the specific form of non-enforcement of the injunction sought by the defendant. If the defendant seeks a period of use up or conversion, it must specify the period within which it can accomplish the conversion and use up.

| Practical tip | Sample wording |
|---|---|
| | |

**640**

Typically, when raising an objection of disproportionateness, the infringer will have to disclose internal business information. Even if they can seek protective orders under Section 145a of the German Patent Act (PatG), they should nevertheless carefully consider whether the objection can really be conclusively demonstrated; otherwise, trade secrets will be disclosed without any advantage being gained in the infringement proceedings.

■ The burden of proof lies with the defendant in infringement cases without restriction for all facts originating from the sphere of *its* business operations, because typically only the infringer, but not the injured party, has insight into these facts that enables a substantiated presentation of the facts. Only the infringer has reliable knowledge of the financial, economic, competitive, or other (legally relevant) consequences that a cease-and-desist order would have for the defendant, which is why the patent holder can regularly declare that he has no knowledge of the infringer's assertions (Section 138 (4) ZPO).

**641**

– The same does not apply with the same severity to circumstances within the sphere of the infringer that justify *his* (predominant) interest in enforcing the prohibitory rights under the infringed patent despite the adverse consequences for the infringer. In this respect, too, the infringer must first make a statement, namely to the extent that he is able to understand the situation. However, it is then the secondary burden of proof of the injured party to substantiate its interest in an injunction against the defendant and, in particular, to assert circumstances that are not apparent to an outside third party (such as the infringer). This does not shift the burden of proof, which remains with the infringer, who must therefore refute the patent holder's alleged overriding enforcement interests.

**642**

– The burden of proof ultimately lies with the infringer, who must provide a substantive explanation as to why it is not possible for them to avert the hardship that would result from an injunction, for example by obtaining a license for the patent in suit or by

**643**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

patent-free technology. For details, see para. 663 below.

As is always the case with **circumstantial evidence**, evidence must only be taken on individual factual claims that are alleged to be disproportionate if the circumstances alleged and proven are, when viewed as a whole, conclusive in limiting the enforceability of the claim for injunctive relief. The infringer's overall submission (supported by evidence) must therefore first be examined to determine whether, assuming it is correct, it would give rise to a restriction of the injunction claim. Only where this can be affirmed must the facts relevant to the overall assessment be clarified.

**644**

## cc) Case groups

When discussing limitations on injunctive relief, two scenarios must be strictly distinguished in legal terms.

**645**

- The first concerns the handling of **injunctive relief actions whose success cannot** be **reliably predicted** at the time of the (e.g., first-instance) court decision, whether because the legal validity proceedings against the patent in suit are still ongoing, or because the question of patent infringement, other requirements for a claim (active legal standing, passive legal standing) or significant objections by the defendant raise doubts in factual and/or legal terms that will only be finally clarified in further proceedings.

**646**

**647**

*Such* uncertainties **cannot**, as such, justify **denying** the injured party their **right to injunctive relief**.

This is because they are caused by difficulties in establishing the facts and/or applying the law, which must be taken into account in an appropriate manner, namely by means of the corrective measures specifically provided for this purpose by the applicable law. In addition to the fact that patent infringement is designed as a popular legal remedy, which allows for early rectification of the patent register before one's own

business losses from a

© 2025 Wolters Kluwer Germany GmbH



initiated infringement proceedings, the infringement court has the option of temporarily suspending the patent infringement proceedings before it in cases of doubtful legal validity in order to await the further fate of the patent in suit. When deciding whether or not to grant a suspension, the court will also consider the damages that the defendant may ultimately face in the event of an injunction that is unjustified due to a subsequent revocation of the patent. If a suspension is not granted, the defendant is not left without protection. Rather, enforcement of a favorable injunction judgment can only ever be carried out against security covering the presumed damage to the debtor (Section 709 of the German Code of Civil Procedure (ZPO)), the accurate determination of which the defendant can directly and significantly influence by specifically pointing out and roughly quantifying the consequences that will affect him if he is forced to comply with the injunction. The court of appeals not only has the option of increasing the amount of security set too low in the first instance (Section 718 ZPO), but can also completely suspend enforcement on a provisional basis upon request (Section 717 ZPO ), which is all the more likely the greater the concerns about the correctness of the enforced decision and the more serious and tangible the impending enforcement damages are. In summary, it should therefore be noted that the uncertainties as to whether the asserted claim for injunctive relief is really justified in substance can be countered with a whole range of legal protective measures; they are therefore also the appropriate – and only – means that is appropriate.

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

**648**

– Thus, the denial of the right to injunctive relief is limited to cases in which **both** the **legal validity** of the patent **and** its **unlawful use** can be treated **as immutable** facts and, despite this (assumed) starting point, there are such special circumstances in the dispute that it appears exceptional to allow the infringer to get away with his tortious act (= patent infringement) without imposing a future-oriented prohibition on his unlawful actions.

**649**

The scope of application for the objection of disproportionateness outlined above must, of course, be further restricted. Cases for which the law already contains **specific provisions** elsewhere on how to take into account the infringer's interest in integrity are largely to be excluded.

Circumstances that are reflected in special provisions cannot, in principle, justify an equally effective general objection of disproportionate nature if the special provision fails. This does not, of course, prevent

affirming disproportionateness "across case groups" if the facts of the case are not exhausted by the circumstances addressed by the special law, but are accompanied by facts that are irrelevant under the special provision but which, when weighed against the other circumstances of the case, justify the assumption of disproportionate hardship. The only thing that cannot happen is that the facts that have been subject to a special legal provision and that do not eliminate or restrict the claim for injunctive relief and its enforceability under that provision are used – *identically* – in the context of the general proportionality test to deny the enforcement of the claim for injunctive relief.

**650**

This applies to market-dominant **SEPs with FRAND declarations**. Thanks to the ECJ guidelines from the Huawei Technologies/ZTE decision[118], there is a sophisticated system of reciprocal obligations that must be observed when enforcing a claim for injunctive relief in court and that strike a reasonable balance between the conflicting interests of the market-dominant intellectual property right holder on the one hand and the competitor who is dependent on the use of the SEP due to standard setting (Art. 10 2 TFEU) on the other. Wherever the aforementioned regime of infringement notification, licensing request, and FRAND offer must be completed (because the SEP being sued confers a dominant position in the downstream product market), the rules of ECJ case law determine whether the injunction is enforceable, rather than general considerations of proportionality. Anyone who therefore does not accept a license offer from the SEP owner that satisfies FRAND conditions or does not even request a FRAND license must bear the resulting consequences for the enforcement of the injunction and cannot expect to be spared an injunction in application of general proportionality considerations. In the overall assessment, the decisive factor in this respect will be the fact that the infringer has failed to exercise the rights granted to it in

© 2025 Wolters Kluwer Germany GmbH

FRAND procedure and is therefore responsible for facing an injunction obligation that it could reasonably have avoided. [119]

**651**

The situation is different according to the intention of the legislator in the case of **compulsory licenses** under patent law pursuant to **Section 24 PatG**.[120] While the compulsory license leads to a positive right to use the patent, the application of the principle of proportionality merely means that the claim for injunctive relief (in whole or in part) is no longer enforceable. Furthermore, Section 24 PatG exclusively takes into account the interests of the patent user, whose right of use is at stake in the compulsory licensing proceedings, but not the constitutionally protected interests of the patient, for whom the proceedings under Section 24 PatG are not available.[121] Nevertheless, the "public interest" required as a factual prerequisite for the granting of a compulsory license also and precisely reflects and takes into account the interests of patients. If Section 24 PatG – which is indisputable – goes further in its legal consequences by granting the user a positive right to use the invention, whereas in the context of the disproportionate nature of the injunction, it is merely a matter of an obstacle to enforcement in relation to a single claim after a patent infringement has occurred, it nevertheless remains the case that in situations where the legislature has not seen any need to allow a third party to use the invention (e.g. because there is insufficient public interest in third-party use), a contrary result may not be brought about by requiring the proprietor of the property right who prevails in the compulsory licensing proceedings to grant a de facto license *with the same content* by revoking his right to injunctive relief on the basis of general considerations of proportionality. This cannot be countered by the argument

© 2025 Wolters Kluwer Germany GmbH

Wolters Kluwer Online

that the legislature established the disproportionate reservation in full knowledge of the compulsory licensing provisions. This merely means that, beyond the cases regulated to date in Section 24 PatG, a need was seen for a case-by-case restriction of the enforcement of the right to injunctive relief, which does not alter the fact that there is a special provision for the constellations dealt with in Section 24 PatG which, if it is not used by the infringer without good reason, regularly prohibits recourse to the general clause of disproportionateness, because in such circumstances it cannot be said that the enforcement of the right to injunctive relief constitutes an unreasonable hardship for the infringer.[122]

**652**

In the event of the disproportionate nature of an injunction due to conflicting third-party interests of patients, the only option is to intervene less drastically in the rights of the injured party if compulsory licensing proceedings have not been or cannot be successful, in order to enable, for example, a temporary, cautious transition for patients or the completion of own research for an alternative solution in the interests of patients.

Based on the objection of disproportionateness, therefore, due to such circumstances, which are the subject of examination in compulsory licensing proceedings, a permanent exclusion of claims cannot be considered, but at most a less drastic temporary denial of the claim for injunctive relief (exhaustion period). Of course, apart from the fact that the infringer is allowed to continue its tortious conduct, which in itself is not of decisive importance

— be of objective benefit, e.g., in such a way that a group of patients who are currently being treated medically with the infringing product and for whom a switch to another drug is not possible or reasonable can complete their treatment in an orderly manner.

**653**

A temporary exclusion from enforcement on grounds of proportionality is, of course, out of the question if the infringer has failed to make timely efforts to obtain a license which, had they been made, would have been successful.[123] This is not altered by the fact that it is ultimately the patients (and not the **defaulting infringer**) who have to bear the disadvantages of the dilatory behavior of a patent infringer who does not seek a compulsory license in good time and who therefore cannot be spared the injunction on grounds of proportionality. However, this alone cannot be a reason to assume that the enforcement of the injunction by the

© 2025 Wolters Kluwer Germany GmbH

Wolters Kluwer Online

patent holder is disproportionate. This is because the patients would have to accept the same disadvantages of not receiving adequate medical care for a temporary period even if the infringer had been granted a transition period but had not taken advantage of the opportunity offered to him in the interests of his patients and had continued to treat them with the infringing product.

## dd) Overall assessment

With regard to the necessary [overall assessment][124] of all circumstances arguing for and against an injunction, the following preliminary considerations should be noted:

**654**

- The incentive for inventive efforts (which are sometimes associated with immense effort and expense) is largely derived from the reward that the inventor can expect to receive from the granting of a patent, which is primarily consolidated in the possibility of excluding any competitor from using the invention and thus occupying a monopoly position on the market. Without a right to injunctive relief, there is therefore no incentive. However, the exclusion of third parties from the use of the patent, which is secured by the right to injunctive relief, promotes technical progress in another way by encouraging inventive activity in order to be able to compete on the market without using the invention of others (namely with one's own workaround solution). The right to injunctive relief must therefore be effectively enforceable in the event of infringement and have a general preventive deterrent effect. In view of this, refraining from asserting the right to injunctive relief must be limited to very special, singular individual cases. This is also expressly assumed by the legislator when, in the explanatory memorandum to the planned Section 139 (1) sentence 2 PatG, reference is made – approvingly, at least not reproachfully – to the BGH decision "Heat Exchanger"[125], in which even the mildest conceivable restriction of the injunction claim was handled extremely strictly – and, in the specific case, clearly too strictly – by granting a period of grace.

**655**

**656**

- Insofar as patent exploiters have been challenged in the past – on an individual basis – with regard to their right to injunctive relief, there is no reason for this. Since the German Patent Act (PatG) expressly does not require compulsory use, they are full-fledged intellectual property rights holders who, with their business activities focused on licensing, not only engage in the legally permissible and therefore legally protectable exploitation of inventions, but also ensure the necessary protection of voluntary licensees by taking action against infringers. They thus play a decisive role in ensuring that equal competitive conditions prevail in the downstream product market by effectively preventing individual infringers from operating in the market with unjustified cost advantages resulting from non-payment of license fees.

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

**657**

The fact that the plaintiff's status as a patent exploiter does not in itself invalidate the claim for injunctive relief does not mean, however, that this circumstance is completely irrelevant in the overall assessment. The opposite is true. If, for example, there are no contractual licensees to be protected, the lack of impairment of the plaintiff in its own operational use of the patent through the manufacture and distribution of products based on the invention tends to result in a lower need for protection, which can therefore be more easily overcome by the interests of the infringer than if the plaintiff were dependent on enforcing its patent in order to sell its own goods. In this context, the infringer's dependence on license income for the continuation of its own business operations does not prohibit any restriction in the enforcement of the claim for injunctive relief. This is because Section 139 (1) sentence 4 PatG expressly provides that the infringer shall be awarded financial compensation, thereby taking account of its pecuniary interests.

**658**

– The patent holder's need for protection is **relatively** low if he **refrains from enforcing his prohibition rights without good reason** and thereby causes the infringer to make considerable investments which prove useless in the event of an injunction. Conversely, the greater the infringer's fault in the patent infringement, the less protection they deserve, so that disproportionate conduct in cases of **intent and gross negligence** is generally to be ruled out. For the assumption of at least negligent behavior, it is sufficient that the infringer is recognizably operating in a borderline area of what is legally permissible and must therefore at least consider an assessment of the legal permissibility of his behavior that deviates from his own assessment.[126] It may work in his favor that he has engaged in the conduct at issue for a long time without objection, although a conviction in the lower courts may mean that the defendant could and had to prepare himself for an unfavorable outcome of the appeal proceedings as well.

**659**

– According to the principles of good faith, there can generally be no reason to refrain from issuing a cease-and-desist order if the infringer, with reasonable effort, has the power to avert the adverse consequences of a cease-and-desist order in a reasonable manner. In order to be considered, the measures must be feasible before the expiry of the term of protection and must therefore offer the infringer an alternative course of action to the infringing acts.

© 2025 Wolters Kluwer Germany GmbH

**660**

First of all, a **license** to the patent in suit may be considered. It is relevant as an averting measure if the patent holder is willing to grant a license and his license terms are objectively lawful and subjectively reasonable. Own efforts to eliminate the hardship threatened by a cease-and-desist order and its enforcement therefore do not end where the license terms reach the limits of what is reasonable, but only when they are either unlawful (in particular, contrary to antitrust law, e.g., exploitative) or (e.g., in consideration of the infringer's competitive situation in the market it serves) are no longer reasonable.

**661**

—  Furthermore, in appropriate cases, the infringer must endeavor to **switch** to **patent-free technology**, which it can either develop itself or access by obtaining a license from third parties. Wherever the infringer is reasonably able to avert the impending hardship on its own initiative, it must take action. Anyone who culpably fails to do so must subsequently live with the injunction and its consequences, which may even be existential.

**662**

The requirements for one's own "damage-averting" behavior are strict. It must be implemented as soon as the infringement becomes apparent. The extent to which the infringer's restraint and hesitation are acceptable depends, on the one hand, on the quality of their non-infringement arguments and, on the other hand, on the scope and weight of the investments and services required for patent-free technology and its use. The lower the necessary financial commitment – also measured in terms of the economic strength of the specific infringer – the more appropriate it is to make efforts even in cases where the better arguments speak against patent infringement but the accusation of infringement cannot be ruled out with certainty. Conversely, investments of a truly significant magnitude may be postponed as long as the objectively better reasons speak in favor of non-infringement; otherwise, they must be undertaken in a timely manner. In situations between these two extremes, the willingness to invest tends to increase as the arguments for patent infringement gain in strength. If the patent is about to expire at the time when the efforts are to be made, this does not in itself release the company from taking appropriate measures. The foreseeable expiry of the property right can only be relevant insofar as it involves a costly workaround technology whose investment costs cannot be amortized to any significant extent within the remaining term.

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

**663**

Since the lack of reasonable alternatives is one of the key elements of a claim of disproportionateness, the **burden of proof** for the lack of such alternatives lies with the infringer. The infringer must demonstrate both the patent holder's unwillingness to license and, if the patent holder is willing to license, the unfairness of the license terms offered. The same applies to the lack of availability of reasonable third-party licenses or technical solutions to circumvent the patent in suit.

## ee) Factors to be weighed on the infringer's side

**664**

According to the wording of the law, *special* **circumstances** must exist for a restriction of the right to injunctive relief if the infringer would suffer **hardship** that *is not justified* by the exclusive right. Both conditions make it clear that the disadvantages typically associated with the infringer having to cease the patent-infringing activity are irrelevant. Even if the infringer's business operations are existentially threatened in the event of an injunction and enforcement, or even face foreseeable destruction (e.g., because the infringing product forms the sole or main basis of its business), hardship may exist, but in any case not one based on *special* circumstances, nor one that *would not be justified* by the exclusive right.[129] Rather, the consequences of an injunction, even if they are existential, represent the normal consequence of a future infringement of property rights that must be discontinued. The situation only becomes *special* in that, beyond the mere fact of patent infringement, there are specific circumstances on the part of the infringer that set him apart from the mass of ordinary infringers and as a result of which the interference with his business activities associated with an injunction is not limited to having to refrain from using the patent (= offering and distributing the patented object as such), but also affects their business activities in such a way that the consequences of an injunction against them are so far-reaching that they cannot be justified by the infringement of property rights that has occurred. It is not sufficient that there is an adequate causal link between the injunction and the alleged damage; the disadvantages in question must also fall within the protective purpose of the norm,[130] which means that they should be spared the infringer in light of the meaning and purpose of the disproportionate reservation. This is not the case if the damage is to result from the fact that certain distribution activities can no longer be carried out, the injunction not prohibiting such activities at all in view of its scope.

**665**

This may typically be the case if the subject matter of the patent is merely a subordinate **part of a** larger, **complex object** that the infringer distributes or otherwise uses. If the patented subject matter cannot be separated technically and/or economically (at least not within the current legal dispute) from the non-patented remainder, so that a court injunction prohibiting the use of the patent would inevitably remove the complex sales item as a whole from the market

© 2025 Wolters Kluwer Germany GmbH



or must be taken from the infringer's other uses, the injunction has consequences that go beyond the subject matter of the patent and thus cause (collateral) damage of considerable magnitude to the infringer, which cannot be justified by the infringer's monopoly right. The latter is likely if the patented part is integrated into the rest of the object of sale in such a way that its short-term removal or technical modification is practically impossible. The mutual interconnection of patent-protected and patent-free elements may be based on purely technical circumstances (e.g., the necessary mutual coordination of individual components), but also on lengthy official approval procedures that must be completed (again) if the object of sale is modified. The infringer's need for protection may be further increased by the fact that the product development (and, if applicable, product approval or certification) of the complex infringing object, undertaken in good faith, was particularly costly and/or time-consuming, so that the injunction renders worthless considerable investments made by the infringer outside the scope of the patent.

**Third-party interests** or those of the general public are relevant and may be decisive. They do not only become significant when the interests of the infringer are at least indirectly affected (e.g., in the form of declining market shares or sales) as a result of the impaired third-party interests.    **666**

Although the claim for injunctive relief is independent of fault, the **degree of fault** on the part of the infringer nevertheless plays an important role in the proportionality test according to the explanatory memorandum to the law. A restriction of the claim for injunctive relief should regularly be refused if the infringer is guilty of an intentional or grossly negligent infringement of property rights.    **667**

## ff) Factors to be weighed on the plaintiff's side

On the part of the patent holder, the following circumstances, for example, are relevant for granting a claim for injunctive relief, whereby it depends in each case on how essential it is for the patent holder or its licensees to enforce their exclusive rights: Protection of the patent holder's own position in the market for products based on the invention Protection of contractual licensees from unequal competitive conditions resulting from the fact that the infringer can calculate without the costs that the contractual licensees $^{\text{have to}}$ incur and price in for the lawful use of the patent especially if the patent holder is dependent on the licensees and their contractual fidelity for his own business; swift enforcement of patent rights so that the infringer has not made his (possibly significant) investments in good faith, but in the recognizable risk of infringing the scope of protection.    **668**

## gg) Legal consequences

© 2025 Wolters Kluwer Germany GmbH



### (1) Other infringement claims

Before discussing in more detail the possible restrictive measures that may be considered in the event of the injunction being disproportionate, we will take a brief look at whether and how the disproportionate nature of the injunction affects the other claims for patent infringement. **669**

Since any restriction of the injunction (and therefore also the granting of a grace period) only restricts the enforcement of the injunction, but does not change the culpably unlawful use of the patent, the continuing acts of use (e.g., those committed during the grace period) are fully **subject to** disclosure, accounting, and **damages**. **670**

On the other hand, upholding the objection of disproportionateness against the claim for injunctive relief necessarily means that the enforcement of **the recall** and destruction claim (which would effectively lead to a cessation of further acts of use and thus ultimately to an injunction) is also disproportionate and, like the injunction, may not be granted or may not be granted for a certain period of time. For clarification: Under the conditions applicable to the recall and destruction claim, there may also be other cases in which the recall or destruction claim proves to be disproportionate. **671**

### (2) Possible restrictive measures

The mildest restriction on the right to injunctive relief is the granting of a **grace period**, i.e., a period of time determined by the court during which the infringer may continue its acts of infringement in order to sell off its stock of infringing items.[133] Compared to unfair competition and trademark law, the granting of a grace period in patent law is only considered under stricter conditions. It requires that the immediate enforcement of the injunction, even taking into account the interests of the injured party, constitutes a disproportionate hardship due to the special circumstances of the individual case, which is not justified by the exclusive right guaranteed by law and the regular consequences of its enforcement and is therefore, in exceptional cases, contrary to good faith.[134] According to the applicable case law of the Federal Court of Justice (BGH) (which was handed down before the planned Section 139 (1) sentence 2 was incorporated into the PatG),[135] it is not sufficient in cases of doubt that the object of the infringement is merely a single element within a complex delivery item, the sale of which is blocked altogether by the injunction, provided that reasonable licensing opportunities existed which the infringer did not take advantage of.[136] Even where these do not exist, there must always be serious and disproportionate effects on the infringer's business operations.[137] Without these, the fact that the lower court(s) **672**

© 2025 Wolters Kluwer Germany GmbH

Wolters Kluwer Online

wrongly denied patent infringement.[138] How long the use-up period should be in individual cases depends on the specific circumstances of the market in question. It may be justified to measure the period only by the time likely to be required to sell the substantial stock of goods (and not the very last infringing product).

It is also conceivable to grant a **transition period**, which would be comparable in terms of content.[139] This does not presuppose the existence of infringing stock, the sale of which is to be permitted to the infringer, but serves to allow the infringer to maintain a market presence (sic: with the infringing product) for a certain transitional period, until such time as he has succeeded, with due effort, in switching to a patent-free technology for his product. The length of the period is again determined by the circumstances of the individual case, so that, for example, necessary approval or licensing procedures may extend the transition period. In individual cases, a **combination** of both periods may also be considered, whereby an initial use-up period is granted, which is then extended by a certain transition period.    **673**

A further restriction is to exclude the right to injunctive relief for an even longer period than would be necessary to use up the infringing stock or to make a technical change to a design that is not protected by property rights, or even to exclude it **permanently**.    **674**

In addition, any **other legally permissible restriction** of the right to injunctive relief may be considered which eliminates the disproportionate nature of the claim to the extent that it exists, e.g. factual restrictions on the right to injunctive relief (which, for example, is only unenforceable with regard to certain forms of infringement), geographical restrictions, or customer-specific restrictions (e.g., such that injunctive relief cannot be demanded with regard to certain customer groups, such as patient populations, but can be demanded with regard to others).    **675**

It goes without saying that a measure that more severely restricts the right to injunctive relief can only be considered if it has been established that all less severe measures do not promise the necessary success (in the sense of avoiding hardship for the infringer that cannot be justified by monopoly law). Any limitation of the injunction claim that goes beyond a period of use or conversion therefore requires special objective justification. This will have to involve circumstances in which the infringer is dependent on the use of a patent in order to remain competitive on the market with its complex product, without having a realistic possibility of technical circumvention or licensing. Such cases will hardly ever occur in practice.    **676**

(3) Compensation claim in [cash140]

Regardless of the question of which of the restrictive measures discussed    **677**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

If the right to injunctive relief is limited, provisions must be made to ensure that the injured party receives simple economic compensation (in the form of an equivalent compensation payment) for the unlawful (!) infringements that they are required to tolerate for reasons of proportionality, so that they are not forced to pursue their own rights in a complicated manner (sic: by conducting a lengthy and costly lawsuit for damages). Section 139(1) sentence 4 PatG accordingly provides that the injured party whose claim for injunctive relief is definitively, temporarily, or partially unenforceable may demand monetary compensation. [142] Precisely because it is intended to compensate for the loss of rights in the case of a no-fault claim for injunctive relief, the claim is not dependent on the fault of the infringer. And it does not only apply in exceptional cases, but is a *mandatory* consequence of any restriction of the right to injunctive relief, so that its recognition has no further substantive requirements other than the denial of the right to injunctive relief on grounds of proportionality and, accordingly, does not require any further explanations from the injured party, but for procedural reasons it does require a corresponding claim by the patent holder (Section 308 of the German Code of Civil Procedure (ZPO)). This is because every substantive claim, including one that is the inevitable consequence of a particular set of circumstances, must be raised in the claim in order for it to be awarded by the court in a legal dispute (Section 308 ZPO). It is irrelevant whether the refusal to grant an injunction is based on a contested decision by the court because the patent holder has advocated for the granting of the injunction until the very end, or whether the plaintiff himself has come to the conclusion that it is disproportionate and has therefore dropped the injunction claim from the outset or in the course of the legal dispute. Even in the latter case, the court must be convinced of the disproportionate nature of enforcing the injunction (which is no longer formally asserted) as a factual prerequisite for the claim for compensation.

**678**

From a legal perspective and for reasons of substantive justice, it would have been advisable not to suspend the injunction unconditionally, but rather to grant the infringer (e.g., for the duration of the period granted to him for use up or conversion) the option, by way of a right of avoidance, to to suspend the effect of the injunction by duly accounting for his acts of use (e.g., on a quarterly basis) and paying compensation determined by the court (e.g., a specific unit or turnover license) to the injured party within the specified period. In this way, the compensation payment would be linked to the specific scope of use by the defendant and would therefore be precise and highly equitable. In order to seriously encourage the infringer to fulfill their obligations and to avoid a situation where the injunction becomes temporarily enforceable after obligations have been neglected and then becomes unenforceable again because the neglected actions are subsequently made up for by the infringer, and this procedure is repeated several times if necessary, the

First and only culpable default makes the injunction enforceable once and for all, meaning that the restriction (e.g., in the form of a use-up or conversion period) is irretrievably lost. Below is a ...

**679**

| Practical tip | **Example wording for a use-up period/conversion period** |
| --- | --- |

The defendant is ordered to refrain from ...

For the period until ... (expiration of the use-up or conversion period), the defendant may override the injunction by providing the plaintiff with ... within two weeks of the expiration of ...

© 2025 Wolters Kluwer Germany GmbH

each quarter, stating the delivery quantities, delivery times, and delivery prices, the names and addresses of the delivery recipients, and the turnover achieved, and within the same period, pay the resulting compensation to the plaintiff in the amount of a turnover license of ...% of the net sales price.

If the defendant defaults on any of the above obligations even once, it shall permanently forfeit the right to suspend the injunction.

[This sample text is available in Word Rich Text Format (RTF). You can edit the text as desired and save it under a different file name for further use. Please click on  Kühnen Kap. D. Muster Rdn. 679 to open the desired document in your word processing program.]

Unfortunately, the legislature has not taken this approach, but instead rigorously excludes the enforcement of injunctive relief in cases of disproportionateness and, in return, merely grants the patent holder a claim for monetary compensation, which <sup>is</sup> usually to be calculated according to licensing rules.[144] However, the explanatory memorandum does not provide any indication as to how this compensation is to be liquidated. The possible options will therefore be examined below (see para. 685 et seq.).

**680**

Before this can be done, however, it must first be clarified **which acts of use are subject to compensation**.

**681**

In judicial practice, the question will regularly arise as to whether the injured party should be awarded monetary compensation only for the **future or also** for acts already committed in the **past**, based on the conclusion of the last oral hearing. This is because the lawsuit typically pursues a claim for injunctive relief, whereby the parties will dispute whether this is excluded on grounds of proportionality and whether the exclusion of the claim should be compensated for with financial compensation. During the legal dispute, the infringer will continue its acts of use in case of doubt. If, in such a situation, the court comes to the conclusion that the injunction is excluded on grounds of proportionality and must therefore be dismissed, but that the injured party is entitled to monetary compensation, then both those uses that occurred before the judgment was handed down, when the injunction claim was already materially excluded at that point in time, and those that the infringer will make after the injunction claim has been dismissed, are considered acts for which compensation is payable. An argument in favor of an obligation to pay compensation covering both periods could be that monetary compensation is owed for the material "loss" of the injunction claim and thus for the legally mandated tolerance of the opposing party's acts of use. Whether or not this is based on a court order is irrelevant, which is why uses undertaken before or during the legal dispute are just as subject to compensation as those undertaken by the infringer, protected by a dismissed injunction. However, it seems more correct to focus on the fact that the compensation represents the price for the "revocation" of the future right to injunctive relief. Accordingly, compensation is owed for those uses by the defendant that he undertakes during the period of patent use "permitted" to him on grounds of disproportionateness. Consequently, the following are relevant: manufacturing

**682**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

and sales activities undertaken after the final court hearing at which the judgment dismissing the injunction claim is handed down. The preferred view here is not contradicted by the fact that the claim for compensation under Section 139(1) sentence 4 PatG does not affect the claim for damages under Section 139(2) PatG, meaning that both claims exist side by side for the same acts of use. Such coexistence also arises in the case of patent uses carried out after the final hearings: from the perspective of the decision, these are future, and therefore "permitted" and consequently compensable acts, and at the same time (in the event of fault) they give rise to damages.

Regardless of this, the compensation claim cannot be understood as **an additional surcharge on the damages** owed. The explanatory memorandum to the law provides no basis for such "double" damages. Not only does it contradict the wording of the law, according to which the compensation claim leaves the claim for damages "unaffected," but it is also otherwise unjustifiable. The argument that injunctive relief and damages are usually granted concurrently, which is why the compensation claim must be granted in addition and increase the damages, does not hold water because injunctive relief and damages relate to different acts of use by the infringer. While the injunction claim concerns future uses that must be refrained from, the claim for damages compensates for past uses. The fact that infringements committed in violation of an injunction are sanctioned with an administrative fine (Section 890 ZPO) and that the infringer owes the injured party damages for the same act at the same time does not change anything. This is because the administrative fine goes to the state treasury and therefore does not benefit the injured party. Apart from that, there is also no need for punishment, as intended and associated with an administrative measure, because the defendant does not violate any obligation to cease and desist when exhausting a grace period granted to him or similar, but rather the rights of prohibition are suspended for overriding reasons of proportionality.

**683**

The benefit of the right to compensation must be sought elsewhere, namely in the rapid availability of the compensation payment for the injured party:

**684**

■ A **quantified claim for compensation in connection with** the **infringement action**, as is common in the settlement of damages, is ruled out from the outset. This is because at the time of the oral hearing on the patent infringement, the entitled plaintiff does not know to what extent the defendant will use its patent (subject to compensation) in the future.

**685**

**686**

– A claim for payment **following** the infringement proceedings and subsequent to the period of use granted by the court (reasonably coupled with an accounting **claim**) following the infringement proceedings (which would be admissible as a staged action or in combination with a claim for a declaration of liability for compensation) has the consequence that the patent owner who loses his right to injunctive relief – often for reasons that have nothing to do with him – loses his money.
has to "run after" the infringer by undertaking lengthy legal proceedings to compensate for an immediate loss of rights and also bears the risk of the infringer's insolvency. Such a consequence is inconsistent with the
high importance of the right to injunctive relief and its enforceability in court

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

for the property right arising from a patent. Apart from this, however, the subsequent action for damages also proves to be pointless for another reason. Since only those uses that follow the final hearing are subject to compensation, at least negligent fault and the associated comprehensive liability for damages on the part of the defendant are inevitable for them – solely because of the infringement of property rights established by the court and the arguments supporting this finding in the proceedings. Against this background, the obligation to pay compensation no longer has any independent economic significance, because it is hardly conceivable that the compensation will exceed the damages to be paid by the defendant for the same period of use (which, after all, covers the entire lost profit of the patent holder).

**687**

— A claim for **future payment of a specified amount of compensation** brought in infringement proceedings will fail because the requirements of Sections 257–259 of the German Code of Civil Procedure (ZPO) will generally not be met. It is even doubtful whether it is possible to obtain at least a declaration of liability for damages in the infringement judgment, because although it may be assumed at the conclusion of the proceedings, it is by no means certain that the defendant will continue its acts of use in at least one case. Even if this obstacle can be overcome, the declaratory judgment does not in any case provide the injured party with financial compensation for the immediate loss of its right to injunctive relief.

**688**

— In order to ensure that the injured party receives financial compensation for the loss of their rights in a manner *commensurate* with the revocation of their right to injunctive relief, there is only one viable option. This consists of the court hearing the infringement case, which denies the right to injunctive relief, immediately quantifying and awarding the monetary compensation that will serve as a substitute for the right to injunctive relief denied to the injured party. Unfortunately, the explanatory memorandum to the law does not deal with the procedural enforcement of the claim for compensation, but the text of the law clearly shows the close temporal connection between the denial of the right to injunctive relief and the award of a claim for compensation. This is because *whenever* the court deems the injunction claim unenforceable on grounds of disproportionateness (Section 139 (1) sentence 3 PatG), the court must award the injured party appropriate monetary compensation (Section 139 (1) sentence 4 PatG). The court therefore has the task of determining the amount in the infringement proceedings and awarding the plaintiff, in accordance with his payment claim (Section 308 ZPO), which is also possible as an alternative, the amount that is to be the **"purchase price" for the** defendant's **freedom to** (temporarily **continue) using the patent**.

© 2025 Wolters Kluwer Germany GmbH

**689**

The compensation claim is immediately **due** and enforceable, regardless of whether the relevant judgment is enforced (which, if a grace period is granted, may not take place at all with regard to the injunction claim).

**690**

If the regional court has granted a grace period and awarded quantified compensation in return, which has also been paid, and if the court of appeal subsequently comes to the conclusion that the defendant should have been ordered to cease and desist without restriction, the patent holder retains the right to compensation (insofar as it is correctly determined as such) for the period of use that has expired and been utilized in the meantime and can only be reclaimed in accordance with the rules of the law of unjust enrichment (i.e., proportionally for the remaining period of use that has not been utilized).

**691**

With regard to the **amount of the claim**, the explanatory memorandum to the law states that, as a rule, at least the usual license fee is owed, but in exceptional cases less may be awarded (e.g., if there is no legitimate interest in enforcing the patent) or more (e.g., if the infringer did not undertake a serious examination of the property rights in advance).[146] Proportionality considerations are decisive, for which, for example, the degree of fault attributable to the infringer for now finding themselves in a situation requiring further patent use and the economic (overall) benefit they are likely to derive from continued patent use (expected profits, investment volume saved) may play a role. Since the aim is to compensate the patent holder in a fair manner for the loss of his right to injunctive relief, the starting point for consideration must be that it is a matter of providing adequate compensation for the economic disadvantages (lost sales and profits from own business or reduced license income) associated with the fact that the patent holder cannot exclude the infringer from the market on the basis of his monopoly right, but must continue to tolerate him as a competitor for himself and any licensees.

**692**

In order to at least limit the practical shortcomings associated with the proposed solution, it is not acceptable to conduct a full-scale lawsuit (with prior accounting) to determine the compensation claim, which meticulously weighs up all the assessment factors. This would result not only in the injured party being deprived of their right to injunctive relief, but also in the settlement of the legal dispute being significantly delayed by the additional compensation claim. This cannot and must not be allowed to happen. It therefore seems appropriate for the court to merely estimate the compensation in accordance with licensing rules, whereby, in case of doubt, a license rate at the upper end of the expected compensation license will be appropriate. From a legal point of view, this does not raise any concerns. If the law already allows for an estimate in the case of judicial determination of damages (Section 252 sentence 2 BGB,
**§ 287 ZPO**), the same applies all the more when it comes to determining a loss of

© 2025 Wolters Kluwer Germany GmbH



Saved: December 9, 2025, 3:29 p.m.

injunctive relief. Such an approach raises even fewer concerns, as the infringer, if he believes that the compensation claim is unreasonably high, is free at any time to drop the objection of disproportionateness and to refrain from the acts of use as demanded.

Of course, an estimate also requires **supporting facts**, without which the estimate would be completely up in the air and ultimately arbitrary. An initial and important point of reference can be provided by the **value** in **dispute** in the infringement proceedings, which, if stated truthfully, reflects the plaintiff's interest in pursuing legal action against the infringer in question and therefore provides a useful indication of the financial amount (= share of the total amount in dispute) should be paid for the tolerated use of the patent for the duration of a specific period of use or conversion.

**693**

Methodologically, the amount in dispute is based on a generous license assessment, in that a forecast is made for the remaining term of the patent at the time the action is filed as to what acts of use are likely to occur without an injunction, and a license rate at the upper end of the reasonable range is applied to this.[147] Ultimately, this is an anticipated calculation of damages, which therefore ensures that the amount in dispute is determined in a manner that closely reflects the damages. Since the total amount in dispute for the lawsuit also includes ancillary claims (damages, accounting, destruction), a share of the amount in dispute commensurate with its significance must be applied to the injunction claim. If, as is usually the case, the patent in suit still has some time to run, so that the plaintiff's interest is focused on the future, while the backward-looking claims are of secondary importance, it has become customary to assess the injunction claim at 75% of the total value in dispute. Special features of the individual case must be taken into account accordingly. Since the claim for compensation is intended to compensate for those acts of use which are permitted to the infringer as a result of the successful objection of disproportionateness, the period for which the use-up or conversion period has been granted, or up to which – in the event of a further denial of the injunction claim – the next higher court is likely to take up the matter.

**694**

**Example**: Total amount in dispute: EUR 5,000,000; remaining term of the patent: 10 years; share of the amount in dispute for the injunction claim: 75% of EUR 5,000,000 = EUR 3,750,000; utilization period: 1 year; Share of the amount in dispute for the period of use up in the amount in dispute for the injunction: EUR 3,750,000 / 10 = EUR 375,000.

**695**

Manipulative statements of the amount in dispute are generally not a cause for concern. On the one hand, the respective opposing party provides a certain corrective measure that is capable of correcting any incorrect representation of the financial interest at stake; on the other hand, each party to the proceedings must always bear in mind two scenarios that require very different strategies with regard to the amount in dispute.
If we first turn to the patent holder pursuing a claim for injunctive relief, he may be tempted to state an excessively high amount in dispute with a view to a possible claim for compensation. However, if he does so and the court rejects the claim as disproportionate, the high amount in dispute will be used as security for the enforcement of the injunction.

**696**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

is set (Section 709 of the German Code of Civil Procedure (ZPO)), which cannot be acceptable to the patent holder. Conversely, the infringer may have an interest in downplaying the amount in dispute with a view to the compensation claim. However, if, contrary to expectations, an injunction is granted, the infringer runs the risk of enforcement against him on the basis of security corresponding only to the low amount in dispute. The interests described above should discipline both sides, regardless of the fact that false statements of the amount in dispute constitute at least attempted fraud against the state treasury. In this situation, § 718 ZPO (German Code of Civil Procedure) is also of no help, because security that has been properly determined according to the facts and status of the dispute in the regional court proceedings cannot be changed retrospectively on the basis of a statement of facts that could have been presented to the regional court.[148] The dilemma described above with an incorrectly stated amount in dispute in enforcement proceedings can therefore no longer be resolved.

Following the determination of the partial amount in dispute for the rejected injunction claim, it will be up to the infringer (who is the only party with knowledge in this regard) to present *specific* figures on the intended scope of use that justify a potentially different, in particular lower, compensation. The plaintiff may then comment on these figures and may also cite special circumstances from his sphere that may not have been sufficiently taken into account in the amount in dispute and that may require a higher compensation payment. In the interplay of the mutual burdens of presentation, a set of facts will emerge for the infringement court that will allow it to make a well-founded estimate of the amount of compensation. Nothing more is required, because it is only a matter of *fair* compensation.    **697**

Since the compensation claim is intended to compensate for the loss of the unenforceable substantive injunction, it is clear that only the person with a right in rem to the patent in question, i.e. the registered patent owner and the exclusive licensee, is entitled to compensation. If the **simple licensee** brings an arbitrary action on behalf of others, it is not the licensee but the patent owner behind him who is entitled to the claim, so that the plaintiff licensee must have the compensation claim assigned to him if he wishes to successfully assert it in the infringement dispute.    **698**

If it subsequently transpires that the injured party's claim for damages for the acts of use compensated by the awarded amount of compensation (e.g. from the point of view of lost profits or the infringer's profits) is higher, the amount *exceeding* the compensation payment made can of course be claimed in proceedings to determine the amount of damages (Section 139 (1) sentence 5 PatG), but only the difference, because it is equally necessary that the compensation payment made be offset against the damages incurred for the congruent acts of use. The two claims do not stand side by side as additives, but are intended to compensate for past patent infringements from different legal perspectives. As with claims for damages and unjust enrichment for identical uses, acts of performance in relation to one claim reduce the feasibility of the other. The same does not apply in the reverse situation. There is therefore no **reimbursement**, but the injured party retains the compensation payment determined by the court in any case, even if a subsequent lawsuit to determine the amount of damages should reveal that the damages owed by the infringer for the period in question are actually lower. The payment made is precisely the price to be paid by the infringer for not having to comply (temporarily) with an obligation to refrain from infringement. This does not, of course, affect the possibility of having the compensation payment determined in the appeal proceedings against the infringement judgment reviewed and, if necessary, corrected.    **699**

© 2025 Wolters Kluwer Germany GmbH


Wolters Kluwer Online

For clarification: The above considers cases in which the difference in the claim is explained by damage per act of use that is higher or lower than the compensation determined. The situation is quite different if the **extent of use** is **actually less** than was predicted when the compensation claim was assessed. In extreme cases, it is even conceivable that, in view of the compensation payment imposed on them, the infringer may decide not to make any further use of the patent in suit, which they have been able to do as a result of the dismissal of the injunction application, thereby creating a situation similar to voluntary compliance with an injunction. At first glance, the situation described above appears to be legally irrelevant. This is because the compensation amount that the defendant has been ordered to pay as a result of the dismissal of the injunction application on grounds of proportionality is the price that the patent holder must pay for having been denied an injunction. If this is the case and if the injunction that was not granted cannot be enforced retrospectively, it logically does not matter what the defendant does with the non-existence of an injunction prohibiting the use of the invention. On closer inspection, however, this argument falls short. The claim for compensation is based on the assumption that the defendant actually makes use of the opportunity granted to him by the refusal of an injunction to continue using the invention. Accordingly, the compensation claim aims to compensate the patent holder for the economic disadvantages it suffers as a result of having to tolerate the infringer as a competitor on the market in the future, despite the patent infringement.

**700**

This internal connection means that the infringer is only liable to pay compensation for those uses of the patent which he undertakes on the basis of the restriction of the injunction imposed by the court. Any failure to exhaust the freedom to use the patent, either in whole or in part, must therefore result in a lower compensation payment. The (correctly) adjudicated compensation claim must therefore be reduced to the extent that the actual acts of use fall short of the intensity of use assumed in the estimate. A prerequisite for a subsequent adjustment is, of course, that the compensation claim is subject to appeal and thus subject to modification by the court. The court of appeal may thus amend the compensation payment awarded by the regional court – upwards or downwards – on the basis of better knowledge of the extent of use and order a further compensation payment for the period of its own further refusal to grant an injunction.

The infringer bears **the** full **burden of proof** that he did not actually make use of the possibility of further patent use in a manner that would justify the compensation amount set. A particular difficulty arises from the fact that the compensation claim has been quantified on the basis of the amount in dispute and therefore the actual extent of use must be brought into the correct proportion to this amount in dispute. However, the infringer must accept this, because either they have left the injured party's statement of the amount in dispute unchallenged and thus adopted it as their own, or – in the event of controversial views on the amount in dispute between the parties – there is a court ruling, which will generally be well-founded and therefore provide a basis for the necessary connection.

**701**

However, it should be clarified that, in case of doubt, only a **significant deviation** of the actual scope of use from the predicted scope of use will justify a change in the compensation claim.

**702**

This follows from the fact that the value in dispute is, by its very nature, an approximate assessment criterion which only leads to a reassessment in the event of serious deviations.

© 2025 Wolters Kluwer Germany GmbH

.

If the **court of appeals** concludes that the district court was right to grant the period of grace, this does not mean that the court of appeals must grant the same period of grace again in its judgment; this applies even if the defendant did not actually make use of the period of grace granted in the first instance, but initially voluntarily refrained from further acts of use that were possible for him. If the grace period has expired at the time of the final hearing of the court of appeal, the injunction issued by the regional court will remain in force in the future. Only the awarded compensation claim must be dismissed due to the lack of infringing acts by the infringer during the grace period; if payment has already been made, the infringer is entitled to a claim for unjust enrichment. Other circumstances (in the sense of a renewed granting of an unused exhaustion period) may apply if there were urgent reasons for the non-use of the freedom to use the patent for which the infringer was not responsible.

**703**

## hh) Subsequent changes in circumstances

If the relevant circumstances change **during the** ongoing **proceedings**, this must be taken into account by means of a correspondingly modified (corrective) decision on the claim for injunctive relief and compensation.

**704**

- If the claim for injunctive relief was restricted in the first instance on grounds of proportionality and the grounds for disproportionate nature subsequently cease to apply in whole or in part, the first-instance decision must be amended in accordance with the current findings on proportionality.

**705**

  – If the injunction claim was granted without restriction and reasons for disproportionateness subsequently arise, or if the court of appeal assesses the identical facts differently with regard to the proportionality of enforcing the injunction claim, the same applies: the contested decision must be corrected in accordance with the current state of knowledge.

**706**

  – If, during the appeal proceedings, the extent of use turns out to be less than was predicted in the first instance, the claim for compensation must be reduced accordingly in accordance with para. 702.

**707**

© 2025 Wolters Kluwer Germany GmbH

— The same applies in the opposite direction if a higher than expected scope of use subsequently becomes apparent (= increase in the compensation claim).

**708**

If changed circumstances arise only **after** the infringement proceedings **have been legally concluded**, the further course of action and its prospects of success must be differentiated according to whether the claim for injunctive relief and its enforcement was affirmed or denied in the proceedings.

**709**

■ If the defendant has been ordered to cease and desist (immediately) without restriction and facts subsequently arise that justify the objection of disproportionateness, the relevant objections to the titled (injunctive) claim can be asserted by way of **an action to prevent enforcement** pursuant to Section 767 of the German Code of Civil Procedure (ZPO). If the action to prevent enforcement is successful, the enforcement of the injunction claim will be declared inadmissible to the extent that its enforcement proves to be disproportionate due to the new circumstances. Specifically, the enforcement of the injunction title may be declared inadmissible for the duration of a period of use or conversion to be granted to the debtor.

**710**

— The **reverse situation** is characterized by the fact that the enforcement of the injunction has been limited for reasons of proportionality and it subsequently transpires that the underlying prognosis of the proceedings is inaccurate, for example because the debtor unexpectedly has a suitable alternative technology at its disposal before the end of the conversion period granted to it, or because the consequences of the injunction no longer affect it disproportionately (prematurely) for other reasons. There are no legal remedies available to the creditor to subsequently tighten the judgment of the legally binding proceedings.[149] Any new consideration of the objection of disproportionateness is prohibited in light of the legally binding decision. Even if the prognosis made in the proceedings regarding the consequences of enforcement does not prove to be true, but the circumstances develop differently from what was anticipated, it is in the very nature of a prognosis that it can be confirmed or prove to be inaccurate (in either direction). The decision in the proceedings, which was made in the knowledge of this uncertainty, therefore "praises" both courses of events equally, which is why the occurrence of circumstances that contradict the prognosis does not, in principle, constitute new facts that would justify a renewed judicial review.

**711**

© 2025 Wolters Kluwer Germany GmbH



**712**

The lack of legal remedies that increase liability does not, of course, have as serious an impact in practice as it might appear at first glance. If the debtor succeeds in switching to patent-free technology ahead of schedule, it is in their own best interest to refrain from using the patent as early as possible, as this will release them from their obligation to pay damages and provide accompanying accounting. And if the debtor has already sold all infringing items before the end of the use-up period, there is no threat of further impairment of the creditor's business activities for the remainder of the period, which is why the creditor does not require any special legal protection.

**713**

There is also *an* additional legal remedy. This is available in the form of an action to prevent enforcement against the ongoing enforcement of a fixed **compensation payment** if the legally granted period for exhaustion or conversion is not fully utilized, e.g., because the infringer can switch to a patent-free alternative technology at an early stage and therefore cease using the patent before the deadline expires. In this case, the amount of compensation enforceable under the infringement judgment must be reduced – again in accordance with para. 702 – to the amount that would have been determined if the infringement court had foreseen the actual (lower) extent of patent use. As explained above (para. 702), this is not to be understood in principle as meaning that the actual scope of use would be tracked in detail and that a meticulous adjustment of the compensation amount would take place ex post, which would not be possible anyway if based on the value in dispute. In the constellation under consideration, this is exacerbated by the fact that the compensation payment is necessarily based on a forecast associated with uncertainties and that the failure to issue a cease-and-desist order can no longer be remedied if it is legally accepted as disproportionate. Because this is the case, the "synallagmatically" awarded compensation payment must in principle remain untouched. Something else only applies if the principles of good faith (Section 242 BGB) require judicial intervention, and this is the case if there is a *gross* disproportion between the actual further scope of use by the infringer and the compensation amount determined. If the enforcement of the compensation claim has already been completed and there is no case of abuse of title under Section 826 BGB, there is no possibility of reclaiming objectively overpaid amounts.

## g) Loss of effect during the infringement proceedings150

During ongoing infringement proceedings, the patent in suit may lapse for various reasons. The loss of effect can occur **ex tunc**, namely if the patent in suit is irrevocably revoked or declared invalid in opposition or nullity proceedings.[151] The legal consequences of such a situation for the infringement proceedings are clear: With the retroactive removal of the legal protection of the patent (as a result of revocation or declaration of invalidity), the basis for convicting the defendant of patent infringement is lost from the outset. In the absence of a patent, the plaintiff is not entitled to any claims for injunctive relief, accounting, destruction, or damages. If the plaintiff does not withdraw its action (with the defendant's consent, if applicable), it must be dismissed by final judgment.

**714**

However, the loss of effect vis-à-vis the defendant in the infringement proceedings may just as well cease to apply **ex nunc**. In practice, the most common reason for the future lapse of the patent in suit is that the maximum term of protection of the patent expires before the infringement proceedings are concluded. Other possible reasons for expiry include, for example, renunciation of the patent, non-payment of annual fees, the application of the prohibition of double protection under Art. II § 8 IntPatÜG, the licensing of the patent in suit or a prior right of protection, the granting of a compulsory license, a notice of use pursuant to Section 23 (3) sentence 1 PatG, or the submission of a declaration of submission eliminating the risk of repetition.

**715**

In a case of loss of effect ec nunc, the claim for injunctive relief must be declared settled in the main proceedings.[152] The **declaration of settlement** must be made in the **instance** in which the event giving rise to the settlement occurred. If the loss of effect occurs during the appeal proceedings, the main proceedings must be declared settled in the appellate court – and not only in the subsequent appeal on points of law.

**716**

---

Processing date: August 2025

---

1    See Art. 64 EPC.

2    BGH, GRUR 2007, 890 [BGH 12.07.2007 - I ZR 18/04] – Media harmful to minors on eBay.

3    BGH, GRUR 2014, 363 [BGH 06.02.2014 - I ZR 86/12] – Peter Fechter.

4    See Kessler, Mitt 2011, 489.

5    LG Mannheim, InstGE 11, 9 – UMTS-enabled mobile phone.

6    Federal Court of Justice, GRUR 2014, 363 [Federal Court of Justice February 6, 2014 - I ZR 86/12] – Peter Fechter.

7    LG Düsseldorf, judgment of September 13, 2018 – 4a O 22/17.

8    LG Düsseldorf, judgment of September 13, 2018 – 4a O 22/17.

9    Higher Regional Court of Düsseldorf, judgment of April 6, 2017 – I-2 U 51/16.

10   Higher Regional Court of Düsseldorf, judgment of May 9, 2019 – I-2 U 66/18.

11   Karlsruhe Higher Regional Court, InstGE 11, 15 – SMD resistance; Düsseldorf Higher Regional Court, judgment of April 6, 2017 – I-2 U 51/16. The Federal Court of Justice's case law on trademark law is different (Federal Court of Justice, GRUR 2010, 1103 – Pralinenform II): The display of an object that infringes property rights (chocolate with a trademarked shape) at a domestic trade fair (confectionery fair) should not, without specific evidence, constitute a risk of repetition or a risk of first-time infringement for

© 2025 Wolters Kluwer Germany GmbH

the offering and placing on the market of such items. The reasoning behind this is that each act of use reserved for the proprietor of the property right constitutes a separate subject matter of dispute. The same view applies to patent law: LG Mannheim, InstGE 13, 11 = LG Mannheim, GRUR-RR 2011, 83 – Suction gripper. The Federal Court of Justice (GRUR 2015, 603 [BGH 23.10.2014 - I ZR 133/13] – Keksstangen) also rejects this for competition law if the trade fair was only open to trade visitors and the risk of distribution to consumers is at issue.

12  Higher Regional Court of Düsseldorf, judgment of April 6, 2017 – I-2 U 51/16.

13  Higher Regional Court of Düsseldorf, judgment of October 25, 2018 – I-2 U 30/16.

14  LG Mannheim, InstGE 6, 9 – Capacitor for air conditioning system.

15  LG Düsseldorf, InstGE 7, 1 – Sterilization process; see also BGH, GRUR 1996, 190 – Polyferon.

16  Critical: Mels/Franzen, GRUR 2008, 968; comprehensive: Freund, Legal succession in injunctive relief obligations, 2008.

17  BGH, GRUR 2006, 879 [BGH 16.03.2006 - I ZR 92/03] – Liquid gas tank.

18  BGH, GRUR 2007, 995 [BGH 26.04.2007 - I ZR 34/05] – Succession of debt.

19  BGH, GRUR 2007, 995 [BGH 26.04.2007 - I ZR 34/05] – Succession of debt.

20  BGH, GRUR 2010, 536 [BGH 18.03.2010 - I ZR 158/07].

21  In practice, however, this will often have no consequences because the discontinued embodiments fall within the core area of a judgment that is handed down on the basis of the retained embodiments.

22  The decisive factor for the dissolution of the transferring legal entity is the date on which the merger is entered in the commercial register [Section 20 (1) UmwG].

23  BGH, GRUR 2015, 813 [BGH February 12, 2015 - I ZR 213/13] – Transport service to the eye clinic.

24  BGH, GRUR 2015, 813 [BGH 12.02.2015 - I ZR 213/13] – Transport service to the eye clinic.

25  ... and extend not only to the transferred business operations of the seller, but also to the entire enterprise of the purchaser (OLG Karlsruhe, GRUR-RR 2014, 362 – Transfer of enterprise).

26  OLG Karlsruhe, GRUR-RR 2014, 362 – Transfer of business, with further references to the dispute.

27  Higher Regional Court of Karlsruhe, GRUR-RR 2014, 362 – Transfer of business.

28  Higher Regional Court of Karlsruhe, GRUR-RR 2014, 362 – Transfer of business.

29  Federal Court of Justice, GRUR 2014, 363 [Federal Court of Justice February 6, 2014 - I ZR 86/12] – Peter Fechter.

30  Federal Court of Justice, GRUR 1996, 290, 292 [Federal Court of Justice 09.11.1995 - I ZR 212/93] – Elimination of the risk of repetition I.

31  Of course, a threat of coercive measures cannot be effectively included in the court settlement itself, even if the settlement has been confirmed by a court in accordance with Section 278 (6) ZPO [BGH, WM 2012, 1489]. If this happens nonetheless, the imposition of coercive measures is ruled out. Based on the settlement, the creditor must instead apply for a court order threatening coercive measures. Only infringements that occur after this are relevant under enforcement law.

32  BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

33  Federal Court of Justice, GRUR 2023, 255 [Federal Court of Justice, December 1, 2022 - I ZR 144/21] – Elimination of the risk of repetition III.

34  BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

35  BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

36  BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III (abandoning the previous contrary case law, according to which the risk of repetition remained even if the creditor rejected the cease-and-desist declaration: BGH, GRUR 1990, 1051 [BGH 31.05.1990 - I ZR 285/88] – Contractual penalty without upper limit).

37  Federal Court of Justice, GRUR 2023, 255 [Federal Court of Justice 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

38  LG Düsseldorf, InstGE 5, 1 – Understretch.

39  Higher Regional Court of Düsseldorf, InstGE 5, 68 – Conditional cease-and-desist undertaking.

© 2025 Wolters Kluwer Germany GmbH

40   Federal Court of Justice, GRUR 1985, 155, 156 – Contractual penalty up to ... I.

41   Higher Regional Court of Frankfurt/Main, GRUR-RR 2003, 198, 199 f.

42   Higher Regional Court of Frankfurt/Main, GRUR-RR 2003, 198, 199 f.

43   Higher Regional Court of Karlsruhe, Mitt 2007, 188 – Cease-and-desist declaration by lawyer.

44   KG, GRUR-RR 2014, 351 – Foreign place of jurisdiction.

45   Federal Court of Justice, GRUR 1996, 290, 291 [Federal Court of Justice, November 9, 1995 - I ZR 212/93] – Elimination of the risk of repetition I; Federal Court of Justice, GRUR 1997, 379 [Federal Court of Justice 16.11.1995 - I ZR 229/93] – Elimination of the risk of repetition II.

46   KG, GRUR-RR 2013, 335 – Doubtful third-party submission.

47   BGH, GRUR 2006, 878 [BGH May 18, 2006 - I ZR 32/03] – Contractual penalty agreement; BGH, GRUR 2010, 355 [BGH September 17, 2009 - I ZR 217/07] – Test reference.

48   BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III; cf. above, para. 585 et seq.

49   BGH, GRUR 2023, 742 [BGH 12.01.2023 - I ZR 49/22] – Submission by PDF.

50   BGH, GRUR 2023, 742 [BGH 12.01.2023 - I ZR 49/22] – Submission via PDF.

51   Federal Court of Justice, GRUR 2023, 742 [Federal Court of Justice 12.01.2023 - I ZR 49/22] – Submission via PDF.

52   Federal Court of Justice, GRUR 2023, 742 [Federal Court of Justice January 12, 2023 - I ZR 49/22] – Submission via PDF.

53   See also: KG, GRUR-RR 2013, 335 – Questionable third-party submission.

54   KG, GRUR-RR 2013, 335 – Questionable third-party submission.

55   BGH, GRUR 2019, 431 [BGH 04.12.2018 - VI ZR 128/18] – Secret romantic meeting.

56   BGH, GRUR 2019, 431 [BGH 04.12.2018 - VI ZR 128/18] – Secret romantic meeting.

57   BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

58   Federal Court of Justice, GRUR 2023, 255 [Federal Court of Justice December 1, 2022 - I ZR 144/21] – Elimination of the risk of repetition III.

59   BGH, GRUR 2019, 431 [BGH 04.12.2018 - VI ZR 128/18] – Secret romantic meeting.

60   BGH, GRUR 2019, 431 [BGH 04.12.2018 - VI ZR 128/18] – Secret romantic meeting.

61   LG Düsseldorf, judgment of January 19, 2021 – 4a O 117/18; dissenting opinion: OLG Karlsruhe, GRUR-RR 2021, 203 – Mobile station.

62   BGH, GRUR 2006, 839 [BGH 13.06.2006 - X ZR 153/03] – Ceiling heating.

63   Federal Court of Justice, GRUR 2023, 255 [Federal Court of Justice 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

64   BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

65   BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

66   BGH, GRUR 2023, 255 [BGH 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III.

67   ... even though it is reasonable for him.

68   Federal Court of Justice, GRUR 2023, 255 [Federal Court of Justice 01.12.2022 - I ZR 144/21] – Elimination of the risk of repetition III, abandoning BGH, GRUR 1990, 1051 [BGH May 31, 1990 - I ZR 285/88] – Contractual penalty without upper limit.

69   BGH, GRUR 2007, 890 [BGH 12.07.2007 - I ZR 18/04] – Media harmful to minors on eBay.

70   BGH, WRP 2016, 1351 [BGH 10.03.2016 - I ZR 183/14] – Headlamps.

71   BGH, GRUR 2011, 1038 [BGH 17.08.2011 - I ZR 57/09] – Pen perfume.

72   BGH, NJW-RR 2001, 1483 [BGH May 31, 2001 - I ZR 106/99] – Renunciation of fame.

73   Federal Court of Justice, GRUR 2019, 947 [Federal Court of Justice March 7, 2019 - I ZR 53/18] – Bring me home.

74   See below, section G, para. 14.

75   LG Düsseldorf, InstGE 7, 1 – Sterilization procedure; see also BGH, GRUR 1996, 190 – Polyferon.

76   BGH, GRUR 2007, 995 [BGH 26.04.2007 - I ZR 34/05] – Succession of debt.

© 2025 Wolters Kluwer Germany GmbH

77  BGH, GRUR 2017, 1140 [BGH May 11, 2017 - I ZR 60/16] – Test purchase on the Internet.

78  BGH, GRUR 2012, 1230 [BGH 21.08.2012 - X ZR 33/10] – MPEG-2 video signal coding.

79  Higher Regional Court of Düsseldorf, Mid-2006, 426.

80  LG Düsseldorf, judgment of April 12, 2012 – 4a O 16/12; confirmed by OLG Düsseldorf, GRUR-RR 2013, 241 – HIV medication.

81  Hamburg Regional Court, GRUR-RR 2014, 137 – Coronary stent.

82  Hamburg Regional Court, GRUR-RR 2014, 137 – Coronary stent.

83  Federal Court of Justice, WRP 2001, 1076, 1079 f [Federal Court of Justice May 31, 2001 – I ZR 106/99] – Duty to make a public statement; stricter: Köhler, GRUR 2011, 879, who demands a cease-and-desist declaration with penalty clause after a warning has been issued.

84  BGH, WRP 2016, 1351 [BGH 10.03.2016 - I ZR 183/14] – Headlamps.

85  See Federal Court of Justice, GRUR 2001, 228 [Federal Court of Justice October 10, 2000 - X ZR 176/98] – Air heater.

86  BGH, GRUR 2006, 570 [BGH 22.11.2005 - X ZR 79/04] – extracoronal abutment.

87  Higher Regional Court of Düsseldorf, Mitt 2003, 264, 268 – Drive disc elevator.

88  Federal Court of Justice, GRUR 2004, 758 [Federal Court of Justice 04.05.2004 - X ZR 48/03] – Impeller meter.

89  Federal Court of Justice, GRUR 2006, 839 – ceiling heating; Higher Regional Court of Düsseldorf, InstGE 2, 115 – automatic hood stretching machine.

90  Federal Court of Justice, GRUR 1961, 627 [Federal Court of Justice November 8, 1960 - I ZR 67/59] – Metal spraying process; Federal Court of Justice, GRUR 1964, 496 [Federal Court of Justice April 30, 1964 - Ia ZR 224/63] – Molding sand II.

91  Von Petersdorff-Campen/Timmann, FS 50 Years of the Federal Patent Court, 2011, p. 449.

92  Proof of an offer regularly creates a risk of infringement for distribution and other forms of use.

93  Schuster provides a comparative legal overview, FS for Pagenberg, 2006, p. 57.

94  AA: BGH, GRUR 2005, 569 [BGH 30.03.2005 - X ZR 126/01] – Blasfolienherstellung.

95  Kühnen, GRUR 2006, 180.

96  The Federal Court of Justice acknowledges that a judgment that follows the wording of the claim is sufficiently specific. However, procedural law does not impose any requirements other than specificity on a claim and a judgment.

97  Higher Regional Court of Düsseldorf, judgment of May 15, 2014 – I-2 U 74/13; Higher Regional Court of Düsseldorf, judgment of Jan. 20, 2017 – I-2 U 41/12; Higher Regional Court of Karlsruhe, judgment of July 13, 2016 – 6 U 93/14; see also Federal Court of Justice, GRUR 2013, 1235 [Federal Court of Justice June 20, 2013 – I ZR 55/12] – Restwertbörse II.

98  Of course, in individual cases it may not be possible to reliably determine from the grounds for the decision whether the alternative course of action for which the defendant was also convicted will be pursued, in which case enforcement is ruled out and a new trial is required – but only in individual cases!

99  Higher Regional Court of Düsseldorf, judgment of May 15, 2014 – I-2 U 74/13.

100  Federal Court of Justice, GRUR 2010, 314 [Federal Court of Justice, December 22, 2009 – X ZR 56/08] – Chain Wheel Arrangement II.

101  Federal Court of Justice, GRUR 2010, 314 [Federal Court of Justice 22.12.2009 - X ZR 56/08] – Chain wheel arrangement II.

102  See above, section A, paras. 160–164.

103  ... which can be explained by the fact that it must be left to the infringer to decide how he wishes to end the liability situation.

104  BGH, GRUR 2021, 1167 [BGH 08.06.2021 - X ZR 47/19] – Ultrasonic transducer.

105  LG Mannheim, InstGE 12, 200 – Nitric oxide detection.

106  BGH, GRUR 2010, 996 [BGH 29.07.2010 - Xa ZR 118/09] – Bordako; OLG Karlsruhe, GRUR 2022, 641 [OLG Karlsruhe March 10, 2021 - 6 U 9/16] – Upholstery reworking machine.

107  Schellhorn, Unterlassungsanspruch im Lichte des Verhältnismäßigkeitsgrundsatzes (Right to injunctive relief in light of the principle of proportionality), 2020; Ohly/Stierle, GRUR 2021, 1229;
Ohly, GRUR 2021, 304; Stierle, GRUR 2019, 873; Zhu/Kouskoutis, GRUR 2019, 886.; McGuire, Mitt 2022, 49; Peifer, FS for Kühnen, p. 793.

© 2025 Wolters Kluwer Germany GmbH

108 US Supreme Court, 547 US 388 (2006) – eBay/MercExchange; UK High Court, (2013) 3778 (Pat) – HTC/Nokia.

109 Ohly, GRUR Int 2008, 787; Osterrieth, GRUR 2009, 540; on the state of the dispute, see Sonnenberg, Unterlassungsanspruch, 2013; Stierle, nicht-praktiziertes Patent, 2017.

110 BT-Drucks 19/25821 v 13.1.2021, p. 53.

111 BT-Drucks 19/25821 v 13.1.2021, p. 31.

112 BT-Drucks 19/25821 v 13.1.2021, p. 52.

113 BT-Drucks 19/25821 v 13.1.2021, p. 53, 55.

114 BGH, GRUR 2022, 930 [BGH 07.04.2022 - I ZR 143/19] – Knuspermüsli II.

115 BT-Drucks 19/25821 v 13.1.2021, p. 53; Federal Court of Justice, GRUR 2022, 930 [Federal Court of Justice 07.04.2022 - I ZR 143/19] – Knuspermüsli II.

116 BT-Drucks 19/25821 v 13.1.2021, p. 53.

117 BGH, GRUR 2022, 930 [BGH 07.04.2022 - I ZR 143/19] – Knuspermüsli II.

118 ECJ, GRUR 2015, 764 – Huawei Technologies/ZTE.

119 In agreement with the result: Kather, FS for Kühnen, p. 525.

120 See also Stierle, GRUR 2020, 262, 266.

121 Stierle, GRUR 2020, 262, 266.

122 LG Düsseldorf, GRUR 2022, 1665 – Sofosbuvir; LG Munich I, GRUR-RS 2023, 29783 – Detection of analytes II 7 O 5812/22, May 17, 2023.

123 LG Düsseldorf, GRUR 2022, 1665 – Sofosbuvir.

124 BT-Drucks 19/30498 v 9.6.2021, p. 61.

125 Federal Court of Justice, GRUR 2016, 1031 [Federal Court of Justice May 10, 2016 – X ZR 114/13] – Heat exchanger.

126 BGH, GRUR 2022, 930 [BGH 07.04.2022 - I ZR 143/19] – Knuspermüsli II.

127 Federal Court of Justice, GRUR 2022, 930 [Federal Court of Justice 07.04.2022 - I ZR 143/19] – Crunchy Muesli II.

128 ... this means that it concerns technical issues where "circumventing" the patent in suit is a reasonable option. Where there are no reasonable options for action, no activities need to be undertaken.

129 The same applies to development, market development, and approval efforts that become worthless for a patent-infringing item that is itself the subject of commercial transactions. These efforts also do not justify a restriction of the injunction claim, even if they would mean the ruin of the infringer in the event of a conviction.

130 Munich Higher Regional Court, GRUR-RS 2025, 12678 – Rivaroxaban II 6 U 3325/24, April 10, 2025.

131 Munich Higher Regional Court, GRUR-RS 2025, 12678 – Rivaroxaban II 6 U 3325/24, April 10, 2025.

132 On the enforcement side, third-party and general interests are considerable!

133 Harmsen, GRUR 2021, 222.

134 BGH, GRUR 2016, 1031 [BGH May 10, 2016 - X ZR 114/13] – Heat exchanger.

135 BGH, GRUR 2016, 1031 [BGH 10.05.2016 - X ZR 114/13] – Heat exchanger (questionable; in any case, taking all circumstances into account, a generous grace period should have been granted).

136 BGH, GRUR 2016, 1031 [BGH May 10, 2016 - X ZR 114/13] – Heat exchanger.

137 BGH, GRUR 2016, 1031 [BGH May 10, 2016 - X ZR 114/13] – Heat exchanger.

138 Federal Court of Justice, GRUR 2016, 1031 [Federal Court of Justice May 10, 2016 - X ZR 114/13] – Heat exchanger.

139 This presupposes that the infringer cannot be blamed for not having managed to obtain a license for the patent in suit on reasonable terms by the time of the final oral hearing and for not having gained access to patent-free technology (either through in-house development or by obtaining a license from third parties).

140 Hoffmann, GRUR 2022, 286; Osterrieth, GRUR 2022, 299; Ohly, GRUR 2022, 303; Wagner, GRUR 2022, 294; McGuire,

© 2025 Wolters Kluwer Germany GmbH

 Wolters Kluwer Online

Mitt 2022, 49; Samer, FS für Kühnen, p. 857.

141 Ultimately, this is compensation required by Article 14(3) sentence 2 of the German Basic Law (GG) for the expropriation of the patent holder resulting from the "denial" of the right to injunctive relief.

142 The claim for compensation does not arise if an injunction is granted and the injured party merely voluntarily refrains from enforcing it (e.g., because they want to enable patients who have previously been supplied with the infringing product to switch to their own product).

143 BT-Drucks 19/30498 v 9.6.2021, p. 61.

144 ... which means that the risk of the compensation claim being enforceable (especially in the case of foreign infringers) and the risk of insolvency lie entirely with the injured party.

145 This is precisely the point, namely enforceable and thus immediately available compensation—and not an increase in the amount of damages owed—is the meaning and purpose of the compensation claim.

146 BT-Drucks 19/30498 v 9.6.2021, p. 61. In such cases, it will often be appropriate to reject the enforceability of the injunction claim on its merits, in which case the question of the amount of compensation is not even raised.

147 See Chapter J, para. 196.

148 See Chapter H, para. 102.

149 ... unless the debtor has obtained the judgment in his favor by fraudulent means that justify an action for retrial.

150 See Kühnen, GRUR 2009, 288.

151 Sections 21(3) and 22(2) of the Austrian Patent Act (PatG); Article 68 of the European Patent Convention (EPC). The revocation of the patent in suit must also be taken into account in the appeal proceedings, and indeed ex officio (Federal Court of Justice, GRUR 2004, 710 [Federal Court of Justice, April 6, 2004 - X ZR 272/02] – Printing machine temperature control system I).

152 BGH, GRUR 2010, 996 [BGH 29.07.2010 - Xa ZR 118/09] – Bordako.

153 BGH, NJW-RR 2006, 566 [BGH 24.10.2005 - II ZR 56/04].

© 2025 Wolters Kluwer Germany GmbH

# **EXHIBIT 43**

# II. What *Should* the United States Want?

## *1. What Do We Want Overall?*

First and foremost, we want the continued survival and safety of the United States as an independent, sovereign republic whose government secures the God-given natural rights of its citizens and prioritizes their well-being and interests.

We want to protect this country, its people, its territory, its economy, and its way of life from military attack and hostile foreign influence, whether espionage, predatory trade practices, drug and human trafficking, destructive propaganda and influence operations, cultural subversion, or any other threat to our nation.

We want full control over our borders, over our immigration system, and over transportation networks through which people come into our country—legally and illegally. We want a world in which migration is not merely "orderly" but one in which sovereign countries work together to stop rather than facilitate destabilizing population flows, and have full control over whom they do and do not admit.

We want a resilient national infrastructure that can withstand natural disasters, resist and thwart foreign threats, and prevent or mitigate any events that might harm the American people or disrupt the American economy. No adversary or danger should be able to hold America at risk.

We want to recruit, train, equip, and field the world's most powerful, lethal, and technologically advanced military to protect our interests, deter wars, and—if necessary—win them quickly and decisively, with the lowest possible casualties to our forces. And we want a military in which every single servicemember is proud of their country and confident in their mission.

We want the world's most robust, credible, and modern nuclear deterrent, plus next-generation missile defenses—including a Golden Dome for the American homeland—to protect the American people, American assets overseas, and American allies.

We want the world's strongest, most dynamic, most innovative, and most advanced economy. The U.S. economy is the bedrock of the American way of life, which promises and delivers widespread and broad-based prosperity, creates upward

mobility, and rewards hard work. Our economy is also the bedrock of our global position and the necessary foundation of our military.

We want the world's most robust industrial base. American national power depends on a strong industrial sector capable of meeting both peacetime and wartime production demands. That requires not only direct defense industrial production capacity but also defense-related production capacity. Cultivating American industrial strength must become the highest priority of national economic policy.

We want the world's most robust, productive, and innovative energy sector—one capable not just of fueling American economic growth but of being one of America's leading export industries in its own right.

We want to remain the world's most scientifically and technologically advanced and innovative country, and to build on these strengths. And we want to protect our intellectual property from foreign theft. America's pioneering spirit is a key pillar of our continued economic dominance and military superiority; it must be preserved.

We want to maintain the United States' unrivaled "soft power" through which we exercise positive influence throughout the world that furthers our interests. In doing so, we will be unapologetic about our country's past and present while respectful of other countries' differing religions, cultures, and governing systems. "Soft power" that serves America's true national interest is effective only if we believe in our country's inherent greatness and decency.

Finally, we want the restoration and reinvigoration of American spiritual and cultural health, without which long-term security is impossible. We want an America that cherishes its past glories and its heroes, and that looks forward to a new golden age. We want a people who are proud, happy, and optimistic that they will leave their country to the next generation better than they found it. We want a gainfully employed citizenry—with no one sitting on the sidelines—who take satisfaction from knowing that their work is essential to the prosperity of our nation and to the well-being of individuals and families. This cannot be accomplished without growing numbers of strong, traditional families that raise healthy children.

## *2. What Do We Want* In *and* From *the World?*

Achieving these goals requires marshaling every resource of our national power. Yet this strategy's focus is foreign policy. What are America's core foreign policy interests? What do we want *in* and *from* the world?

- We want to ensure that the Western Hemisphere remains reasonably stable and well-governed enough to prevent and discourage mass migration to the United States; we want a Hemisphere whose governments cooperate with us against narco-terrorists, cartels, and other transnational criminal organizations; we want a Hemisphere that remains free of hostile foreign incursion or ownership of key assets, and that supports critical supply chains; and we want to ensure our continued access to key strategic locations. In other words, we will assert and enforce a "Trump Corollary" to the Monroe Doctrine;
- We want to halt and reverse the ongoing damage that foreign actors inflict on the American economy while keeping the Indo-Pacific free and open, preserving freedom of navigation in all crucial sea lanes, and maintaining secure and reliable supply chains and access to critical materials;
- We want to support our allies in preserving the freedom and security of Europe, while restoring Europe's civilizational self-confidence and Western identity;
- We want to prevent an adversarial power from dominating the Middle East, its oil and gas supplies, and the chokepoints through which they pass while avoiding the "forever wars" that bogged us down in that region at great cost; and
- We want to ensure that U.S. technology and U.S. standards—particularly in AI, biotech, and quantum computing—drive the world forward.

These are the United States' *core, vital* national interests. While we also have others, these are the interests we must focus on above all others, and that we ignore or neglect at our peril.

# III. What Are America's Available Means to Get What We Want?

America retains the world's most enviable position, with world-leading assets, resources, and advantages, including:

- A still nimble political system that can course correct;
- The world's single largest and most innovative economy, which both generates wealth we can invest in strategic interests and provides leverage over countries that want access to our markets;
- The world's leading financial system and capital markets, including the dollar's global reserve currency status;
- The world's most advanced, most innovative, and most profitable technology sector, which undergirds our economy, provides a qualitative edge to our military, and strengthens our global influence;
- The world's most powerful and capable military;
- A broad network of alliances, with treaty allies and partners in the world's most strategically important regions;
- An enviable geography with abundant natural resources, no competing powers physically dominant in our Hemisphere, borders at no risk of military invasion, and other great powers separated by vast oceans;
- Unmatched "soft power" and cultural influence; and
- The courage, willpower, and patriotism of the American people.

In addition, through President Trump's robust domestic agenda, the United States is:

- Re-instilling a culture of competence, rooting out so-called "DEI" and other discriminatory and anti-competitive practices that degrade our institutions and hold us back;
- Unleashing our enormous energy production capacity as a strategic priority to fuel growth and innovation, and to bolster and rebuild the middle class;
- Reindustrializing our economy, again to further support the middle class and control our own supply chains and production capacities;

- Returning economic freedom to our citizens via historic tax cuts and deregulatory efforts, making the United States the premier place to do business and invest capital; and
- Investing in emerging technologies and basic science, to ensure our continued prosperity, competitive advantage, and military dominance for future generations.

The goal of this strategy is to tie together all of these world-leading assets, and others, to strengthen American power and preeminence and make our country even greater than it ever has been.

# IV. The Strategy

## *1. Principles*

President Trump's foreign policy is pragmatic without being "pragmatist," realistic without being "realist," principled without being "idealistic," muscular without being "hawkish," and restrained without being "dovish." It is not grounded in traditional, political ideology. It is motivated above all by what works for America—or, in two words, "America First."

President Trump has cemented his legacy as The President of Peace. In addition to the remarkable success achieved during his first term with the historic Abraham Accords, President Trump has leveraged his dealmaking ability to secure unprecedented peace in eight conflicts throughout the world over the course of just eight months of his second term. He negotiated peace between Cambodia and Thailand, Kosovo and Serbia, the DRC and Rwanda, Pakistan and India, Israel and Iran, Egypt and Ethiopia, Armenia and Azerbaijan, and ended the war in Gaza with all living hostages returned to their families.

Stopping regional conflicts before they spiral into global wars that drag down whole continents is worthy of the Commander-in-Chief's attention, and a priority for this administration. A world on fire, where wars come to our shores, is bad for American interests. President Trump uses unconventional diplomacy, America's military might, and economic leverage to surgically extinguish embers of division between nuclear-capable nations and violent wars caused by centuries-long hatred.

President Trump has proven that American foreign, defense, and intelligence policies must be driven by the following basic principles:

- **Focused Definition of the National Interest** – Since at least the end of the Cold War, administrations have often published National Security Strategies that seek to expand the definition of America's "national interest" such that that almost no issue or endeavor is considered outside its scope. But to focus on everything is to focus on nothing. America's core national security interests shall be our focus.
- **Peace Through Strength** – Strength is the best deterrent. Countries or other actors sufficiently deterred from threatening American interests will not do

so. In addition, strength can enable us to *achieve* peace, because parties that respect our strength often seek our help and are receptive to our efforts to resolve conflicts and maintain peace. Therefore, the United States must maintain the strongest economy, develop the most advanced technologies, bolster our society's cultural health, and field the world's most capable military.

- **Predisposition to Non-Interventionism** – In the Declaration of Independence, America's founders laid down a clear preference for non-interventionism in the affairs of other nations and made clear the basis: just as all human beings possess God-given equal natural rights, all nations are entitled by "the laws of nature and nature's God" to a "separate and equal station" with respect to one another. For a country whose interests are as numerous and diverse as ours, rigid adherence to non-interventionism is not possible. Yet this predisposition should set a high bar for what constitutes a justified intervention.

- **Flexible Realism** – U.S. policy will be realistic about what is possible and desirable to seek in its dealings with other nations. We seek good relations and peaceful commercial relations with the nations of the world without imposing on them democratic or other social change that differs widely from their traditions and histories. We recognize and affirm that there is nothing inconsistent or hypocritical in acting according to such a realistic assessment or in maintaining good relations with countries whose governing systems and societies differ from ours even as we push like-minded friends to uphold our shared norms, furthering our interests as we do so.

- **Primacy of Nations** – The world's fundamental political unit is and will remain the nation-state. It is natural and just that all nations put their interests first and guard their sovereignty. The world works best when nations prioritize their interests. The United States will put our own interests first and, in our relations with other nations, encourage them to prioritize their own interests as well. We stand *for* the sovereign rights of nations, *against* the sovereignty-sapping incursions of the most intrusive transnational organizations, and *for* reforming those institutions so that they assist rather than hinder individual sovereignty and further American interests.

- **Sovereignty and Respect** – The United States will unapologetically protect our own sovereignty. This includes preventing its erosion by transnational and international organizations, attempts by foreign powers or entities to censor our discourse or curtail our citizens' free speech rights, lobbying and influence operations that seek to steer our policies or involve us in foreign conflicts, and the cynical manipulation of our immigration system to build up voting blocs loyal to foreign interests within our country. The United States will chart our own course in the world and determine our own destiny, free of outside interference.

- **Balance of Power** – The United States cannot allow any nation to become so dominant that it could threaten our interests. We will work with allies and partners to maintain global and regional balances of power to prevent the emergence of dominant adversaries. As the United States *rejects* the ill-fated concept of global domination for itself, we must *prevent* the global, and in some cases even regional, domination of others. This does not mean wasting blood and treasure to curtail the influence of all the world's great and middle powers. The outsized influence of larger, richer, and stronger nations is a timeless truth of international relations. This reality sometimes entails working with partners to thwart ambitions that threaten our joint interests.

- **Pro-American Worker** – American policy will be pro-worker, not merely pro-growth, and it will prioritize our own workers. We must rebuild an economy in which prosperity is broadly based and widely shared, not concentrated at the top or localized in certain industries or a few parts of our country.

- **Fairness** – From military alliances to trade relations and beyond, the United States will insist on being treated fairly by other countries. We will no longer tolerate, and can no longer afford, free-riding, trade imbalances, predatory economic practices, and other impositions on our nation's historic goodwill that disadvantage our interests. As we want our allies to be rich and capable, so must our allies see that it is in their interest that the United States also remain rich and capable. In particular, we expect our allies to spend far more of their national Gross Domestic Product (GDP) on their own defense, to start to make up for the enormous imbalances accrued over decades of much greater spending by the United States.

# **EXHIBIT 45**

5

IN THE HIGH COURT OF JUSTICE - CHANCERY DIVISION

10

*Before*: MR JUSTICE ALDOUS

8 and 9 December, 1994

PLASTUS KREATIV AB

15

v. MINNESOTA MINING AND MANUFACTURING CO

*Patents - Declaration of non-infringement - Practice and procedure -* 20
*European Patent designating United Kingdom, France, Germany - No*
*allegation of infringement in respect of France and Germany - Declaration of*
*non-infringement sought in respect of all three countries - Application to strike*
*out those parts of Writ and Statement of Claim - No jurisdiction for declaration*
*- Claim struck out.* 25

*Patents Act 1977, sections 71, 77.*

*Civil Jurisdiction and Judgement Act 1982, Schedule 1.*

*Brussels Convention on Jurisdiction and the Enforcement of Judgements,* 30
*Article 16.*

*RSC Order 15, rule 16; Order 18, rule 19.*

*The plaintiff sold transparent envelopes for use with overhead projection* 35
*systems in the United Kingdom, Germany, and France.  The defendant's*
*European patent was granted in each of these countries. The defendant wrote*
*to the plaintiff alleging patent infringement by reason of the plaintiff's*
*marketing in the United Kingdom.  The plaintiff later wrote to the defendant*
*asking for a written acknowledgement that its activities in France, Germany,* 40
*and the United Kingdom did not constitute infringement of the defendant's*
*patent.  Upon the defendant's refusal to do so the plaintiff issued a writ,*
*endorsed with a statement of claim, seeking a court declaration in the same*
*terms. The defendant applied to strike out those parts of the Statement of Claim*
*that referred to Germany and France.* 45

*The defendant argued that the court had no jurisdiction to make such a*
*declaration as it had never claimed that the plaintiff had infringed or intended*
*to infringe the French or German patents, nor that any acts in those countries*
*constituted infringing acts.  It also submitted that no such allegation could be* 50
*made as patents were strictly territorial and only justiciable in the country in*
*which the patent was granted.  The plaintiff submitted that the defendant had*
*indeed made such a claim.  The plaintiff further submitted that it had a right to*
*the declaration pursuant to the French and German equivalents of section 71 of*
*the Patents Act 1977, which was capable of being tried in this country.*

[No. 14]                     **Patents Court**

*On territoriality, the plaintiff submitted that under the Brussels Convention, and against a background of harmonisation of patent law throughout Europe, there was no reason not to decide infringement of French and German patents*
5  *in the United Kingdom.*

**Held**, *striking out the allegations in respect of the French and German patents,*

*(1) The power to make a declaration under section 71 of the Patents Act*
10 *1977 was confined to acts within the United Kingdom, as section 60 made it clear that infringement only occurred if a person did an act within the United Kingdom without the consent of the proprietor.*

*(2) It was not open to the Court to refuse to follow the principle that a party*
15 *against whom no claim has been formulated cannot sue for a declaration of non-liability. Subject to limitation periods and laches, the prospective plaintiff was entitled to decide for himself when he would bring his action.*

In re Clay, Clay v. Booth *[1919] 1 Ch. 66, and* Barclays Bank plc v. Homan
20 *[1993] BCLC 680, 693 applied.* Malone v. Metropolitan Police Commissioner *[1979] 1 Ch. 344 considered.*

*(3) The defendant's letter was written by English solicitors to an English*
company *complaining about marketing in the United Kingdom and only*
25 *contained an allegation of infringement within the United Kingdom. The plaintiff's reply dealt wholly with the United Kingdom and did not mention the German and French patents. The plaintiff's later letter did seek acknowledgements of non-infringement of the equivalent patents in France and Germany but the defendant made no claim in this respect.*
30
*(4) The plaintiff had not pleaded its alleged right to a declaration under*
French and German equivalents of section 71 of the 1977 Act. Even if it were
assumed that there were such equivalents, these only gave power to the French
and German courts to decide matters in relation to infringement in their
35 *countries and did not enable the English court to make declarations as to English law which would be applicable in France and Germany.*

*(5) As regards territoriality, the submissions of the defendants had*
considerable force, but there was no need to decide this point.
40
**Observed**: *A finding of infringement invariably led to higher prices for the public. If the local courts were responsible for enforcing and deciding questions of validity and enforcement, the conclusions reached were likely to command the respect of the public. It was also convenient that infringement,*
45 *like validity, be decided in the state in which it arises. Furthermore it would not be right to decide a dispute in respect of acts done outside this country provided there was an adequate remedy in the relevant country.*

The following authorities were referred to in the judgement:
50
Barclays Bank plc v. *Homan* [1993] BCLC 680

In re Clay, Clay v. Booth [1919] 1 Ch. 66

Aldous J.    **Plastus Kreativ AB v. Minnesota Mining**    [1995] R.P.C.
**and Manufacturing Co. and anr.**

*British South Africa Company* v. *Companhia de Moçambique* [1893] A.C. 602

*Malone* v. *Metropolitan Police Commissioner* [1979] 1 Ch. 344    5

*Tyburn Productions Ltd.* v. *Conan Doyle* [1991] Ch. 75

The following authorities were referred to in argument:

*Asahi Kasei Kogyo KK's Application* [1991] R.P.C. 485    10

*Camilla Cotton Oil Company* v. *Granadex SA and Tracomin SA; Shawnee Processors Inc.* v. *same* [1976] 2 Lloyd's Reports 10

*Chaplin* v. *Boys* [1971] A.C. 356    15

*Def Lepp Music* v. *Stuart-Brown* [1986] R.P.C. 273

*Gale's Application* [1991] R.P.C. 305    20

*Guaranty Trust Company of New York* v. *Hannay & Company* [1915] 2 KB 536

*Hesperides Hotels Ltd.* v. *Muftizade* [1979] A.C. 508    25

*James Burrough Distillers plc* v. *Speymalt Whisky Distributors Limited* [1979] SLT 561

*Koop and anr.* v. *Bebb* (1951) 84 CLR 679    30

*Norbert Steinhardt and Son Limited* v. *Meth and anr* (1960) 105 CLR 440

*North Eastern Marine Engineering Company* v. *Leeds Forge Company* [1906] 1 Ch 324    35

*Phillips* v. *Eyre* [1870] LR 6 QB 1

*PLG Research Limited* v. *Ardon International Ltd.* [1995] F.S.R. 116 [1995] R.P.C. 287    40

*Potter* v. *The Broken Hill Proprietary Company Limited* [1905] VLR 612, [1906] 3 CLR 479

*Smith Kline and French Laboratories Ltd.* v. *R.D. Harbottle (Mercantile) Ltd.* [1980] R.P.C. 363    45

*Arthur Ashton* instructed by *Theodore Goddard* appeared for the plaintiff. *Andrew Waugh* instructed by *Bristows, Cooke and Carpmael* appeared for the defendant.    50

**Aldous J.**:-  This is an application by the defendants, Minnesota Mining and Manufacturing Company, to strike out parts of the writ and statement of claim pursuant to Order 18, rule 19 of the Rules of the Supreme Court.

441

[No. 14]                          **Patents Court**                          Aldous J.

The plaintiffs, Plastus Kreativ AB, are a Swedish corporation which manufacture in Sweden inter alia transparent envelopes for use with overhead projector systems. The defendants are the proprietors of European Patent 0 047 306 which relates to an invention for such envelopes. It has been granted in the United Kingdom, Germany and France.

5

On 10 October 1994, the plaintiffs issued a writ endorsed with a statement of claim in which they seek a declaration that "the manufacture, disposal or offer to dispose of, importation, use or keeping of any of the Products referred to herein in any of the designated Contracting States of Germany, France and the United Kingdom does not constitute an infringement of European Patent EP 0 047 306."

10

15

The statement of claim recites that the plaintiffs are a Swedish corporation, the plaintiffs manufacture transparent envelopes and that the defendants are proprietors of the patent. It alleges in paragraph 3 that the plaintiffs sell the envelopes in the United Kingdom, Germany and France, and propose to expand their activities in respect of the products in those Contracting States. It goes on to state in paragraph 5 that by a letter dated 7 September 1994, the plaintiffs applied to the defendants for a written acknowledgement to the effect of the declaration prayed for. It is alleged by the plaintiffs that the letter and its attachments constitute full particulars in writing of the relevant acts. The statement of claim goes on to allege that the defendants failed to give an acknowledgement sought, even though the acts did not infringe the patent.

20

25

It should be noted that the Statement of Claim does not allege that the plaintiffs' products did not infringe German or French patents. The right to the declaration appears to be based upon the failure of the defendants to acknowledge that there was no infringement. That is a proper way to plead in respect of the United Kingdom patent, having regard to section 71 of the Patents Act 1977 which is in these terms:

30

"71. - (1) Without prejudice to the court's jurisdiction to make a declaration or declarator apart from this section, a declaration or declarator that an act does not, or a proposed act would not, constitute an infringement of a patent may be made by the court or the comptroller in proceedings between the person doing or proposing to do the act and the proprietor of the patent, notwithstanding that no assertion to the contrary has been made by the proprietor, if it is shown -

35

40

(a)  that that person has applied in writing to the proprietor for a written acknowledgement to the effect of the declaration or declarator claimed, and has furnished him with full particulars in writing of the act in question; and

45

(b)  that the proprietor has refused or failed to give any such acknowledgement."

50

The defendant motion seeks an order that the parts of the statement of claim that refer to Germany and France be struck out. They contend that the court has no jurisdiction to make a declaration of non-infringement in respect of acts carried out in Germany and France and in any case should not do so.

442

Aldous J.    **Plastus Kreativ AB v. Minnesota Mining**    [1995] R.P.C.
**and Manufacturing Co. and anr.**

The power to make a declaration under section 71 of the 1977 Act is confined to acts within the United Kingdom. The acts referred to are the acts of infringement which are set out in section 60 of the Act. That section makes it clear that infringement only occurs if a person does an act within the United Kingdom without the consent of the proprietor. The contrary was not suggested by the plaintiffs. The plaintiffs' case was that the court's jurisdiction to make the declaration sought arose under the court's inherent jurisdiction. If they are right, the statement of claim appears to be defective in that it does not aver that the acts, when carried out in Germany and France, would not be infringements of the German and French patents. Nor does it allege that there is any law in Germany and France equivalent to section 71 of the 1977 Act. Even so, as this is an application under Order 18, rule 19 I will go on and consider the case upon the assumption that some such pleading could be put forward by amendment.

The court has an inherent jurisdiction to make declarations, including declarations as to non-infringement. That jurisdiction comes from section 19 of the Supreme Court Act and is now embodied in Order 15, rule 16 of the Rules of the Supreme Court. That was not disputed by the defendants. They submitted that the court did not have jurisdiction to make a declaration under the inherent jurisdiction of the court because in this case there had been no claim of right made by them that the plaintiffs had infringed or intend to infringe the German or French patents nor that any acts in those countries constituted infringing acts. They also submitted that no such allegation could be made.

The plaintiffs referred me to *In re Clay, Clay* v. *Booth* [1919] 1 Ch. 66. In that case Swinfen Eady M.R. reviewed the relevant authorities and at page 77 came to consider the judgment of Pickford L.J. in *Guaranty Trust Co. of New York* v. *Hannay & Co.* He said at page 77:

"But reliance was mainly placed upon what was said by Pickford L.J. in *Guaranty Trust Co. of New York* v. *Hannay & Co.* Pickford L.J. there first came to the conclusion that there was no necessity in order to invoke proceedings under the rules that we are now considering that there should be an existing cause of action. Then he went on to consider whether the rule could be invoked only by the person claiming the right and intending to assert it. And, again, he negatived that. But no inference whatever can be drawn from that in favour of the petitioners here to the effect that the proceedings can be invoked not only where there is no cause of action and the person instituting the proceedings does not assert the right, but where there is no claim at all by anyone - - by the plaintiff against the defendant, or vice versa. Here the position of the parties is that no claim is made by the defendant Booth as against the petitioners, and the petitioners by their petition make no claim against the defendant Booth. The observations that were made by Cozens-Hardy M.R. in *Dyson* v. *Attorney-General* may properly be referred to. He there said: 'But I desire to guard myself against the supposition that I hold that a person who expects to be made defendant, and who prefers to be plaintiff, can, as a matter of right, attain his object by commencing an action to obtain a declaration that his opponent has no good cause of action against him. The Court may well say: "Wait until you are attacked and then raise your defence," and may dismiss the action with costs.' This is really the position in the present case. The petitioners have

not been attacked. No claim has been made against them; but they launched these proceedings to have it determined that some one who has not made a claim and who has not asserted any right has no claim and no right. In
5  my opinion they are not entitled to do that. As has been pointed out by Duke L.J. during the course of the argument, with regard to rights under contracts there are certain statutory limitations which fix the time during which actions may be brought, and a party to a simple contract has the full statutory period to determine whether or not he will bring an action. And it is not open to a
10  person, certainly to one against whom no claim in fact has been made, to cut the matter short by bringing an action at his own option, and saying, 'I wish to have it determined that you have no claim whatever against me.' That really is the nature of the proceedings in the present case.

15  It is clear that section 71 of the Patents Act is an exception and was enacted to enable a potential infringer to obtain a declaration in certain circumstances, even though no claim had been made against him. However, I believe that *In re Clay* is a good authority and binding upon me for the proposition

20  that a party against whom no claim has been formulated cannot sue for a declaration of non-liability. Subject to limitation periods and laches, the prospective plaintiff is entitled to decide for himself when he will bring his action.

25  (Per Hoffmann J. in *Barclays Bank plc* v. *Homan and others* [1993] BCLC 680 at page 693.)

The plaintiffs did not accept that the statement that I have quoted from the judgment of Hoffmann J. correctly sets out the law. They referred me to the
30  judgment of Sir Robert Megarry V.C. in *Malone* v. *Metropolitan Police Commissioner* [1979] 1 Ch. 344. In particular, they referred me to a passage at the top of page 353 of that judgment. I have read that judgment carefully and I do not believe it casts doubt upon the principle established in *In re Clay* which has been applied for many years. In any case, it was not open to Sir Robert
35  Megarry V.C. to come to a different conclusion to that to which I have referred. The principle of *In re Clay* has been applied at first instance, in the Court of Appeal and in the House of Lords and it is not open to this court to refuse to follow it. The plaintiffs also submit that there had been a claim of right. They relied on a number of letters. The first was a letter from the defendants'
40  instructing solicitors dated 17 June, 1994. It was written to Birdsol Limited, trading as Associated Visual Products, in Welwyn Garden City, Hertfordshire. It was headed, "European Patent 047, 306". It stated:

"We act for the Minnesota Mining & Manufacturing Company of 3M Center,
45  Maplewood, St. Paul, Minnesota, United States of America.

Our client is the proprietor of the above European patent which has as one of its designated states the United Kingdom. The patent relates to an envelope for transparencies for overhead projectors and like projecting apparatus. We
50  enclose a copy of the patent.

We understand from our client that you are marketing in the United Kingdom a transparency envelope for use on overhead projectors. Our client has sent us samples of your product which we have examined in detail. For ease of identification we enclose one such sample.

**Aldous J.**          **Plastus Kreativ AB v. Minnesota Mining**          [1995] R.P.C.
                       **and Manufacturing Co. and anr.**

We have advised our client that your product is within the claims of the
above European patent and so our client is entitled to take action against you
for patent infringement claiming an injunction (i.e. an order that you cease
dealing in the product), including, if appropriate, an interlocutory
(immediate) injunction pending trial, delivery up of all infringing product,       5
damages and legal costs.

Our client takes your infringement of its rights very seriously. If you do not
provide our client with the following undertakings on or before 1 July 1994        10
we will advise our clients to commence proceedings against you in the courts
without further notice."

Thereafter there were set out undertakings not to infringe the patent, to deliver
up, to supply the names and addresses of the persons to whom the product had       15
been supplied and to account and pay costs.

It was submitted that that was a letter in which there was a claim of
infringement, not only in respect of the United Kingdom patent, but also in
respect of the European Patent as a whole which would include the designated       20
states of Germany and France. I do not read the letter as having that effect. It
was written by English solicitors to an English company complaining about
marketing in the United Kingdom. I believe that, upon a true and proper
reading, it only contains an allegation of infringement within the United
Kingdom.                                                                           25

That letter was obviously referred to solicitors acting on behalf of the
plaintiffs. They replied to it by letter dated 30 June, 1994 which stated that
their clients Birdsol Limited, trading as Associated Visual Products, and Plastus
Kreativ AB of Sweden, had passed the letter, which I had read, to them. It went    30
on:

"As your clients are probably aware, AVP is the exclusive distributor of
Plastus' products in the United Kingdom, including the transparent envelope
for use on overhead projectors called the 'Mia-Flip', an example of which          35
was sent to our clients under cover of your letter.

We have carefully considered the claims of your client's patent as against the
example of the Mia-Flip which you enclose and are, with our clients, firmly
of the opinion that your client's patent is not infringed by that product.         40
Accordingly, our clients are not prepared to offer the undertakings sought in
your letter."

The letter went on to point out that an interlocutory injunction would not be
appropriate having regard to certain acts which had taken place in this country.   45
It does not carry the matter any further as it deals solely with the United
Kingdom and does not mention the German and French patents.

The plaintiffs' solicitors followed that up with a letter of the 14 July stating
that no substantive response had been supplied. On 14 July, 1994, the              50
defendants' solicitors replied stating that they were still gathering information.
The next relevant letter was dated 7 September, 1994, from the plaintiffs'
solicitors. It stated:

[No. 14]                    **Patents Court**                    Aldous J.

"Further to our recent correspondence in respect of European Patent 047, 306 ('the patent'), we write on behalf of Plastus Kreativ AB of Sweden ('our clients').

5      As you are aware, our clients are firmly of the view that the transparent envelope sent under cover of your letter dated 17 June 1994 does not infringe the Patent. They and we remain of this view."

10  The letter goes on to refer to certain changes in the envelope that had been made. It ends in this way:

"Our clients therefore seek acknowledgment from your clients that the manufacture, disposal or offer to dispose of, importation, use or keeping of
15  any of the articles attached does not infringe any claim or claims of the Patent or its equivalent in France and Germany. Our clients require this acknowledgement by close of business on 27 September, failing which they shall apply to the High Court for a declaration to this effect."

20  That letter, quite properly in my view, draws a distinction between the patent which had been the subject of the correspondence and its equivalents in France and Germany. It seeks not only an acknowledgement of non-infringement of the patent, but also of the equivalent patents in France and Germany.

25      The rest of the correspondence does not add to the position and, in my view, on a proper reading of the correspondence, there was no claim made by the defendants or their advisers that there had been or was or would be infringement in Germany or France. The correspondence was confined to the position in the United Kingdom until the plaintiffs' solicitors wrote the letter of
30  7 September to which I have referred.

During the hearing I was handed a further letter dated 28 June, 1994, written by Swan Stabilo Limited of Slough to the Managing Director of Associated Visual Products at Welwyn Garden City. It states:
35
"You are no doubt aware by now that I have spoken to Garry regarding our order for File a Frame.

I have been instructed by our Head Office in Germany to halt proceedings on
40  this product until I have clearance from our patent department. They have been informed, and so have we in the U.K., that 3M have, or are about to issue an injunction against you in concern with this product.

I appreciate that we have seen sight of the Indemnity Document but until I
45  have the go ahead from Nuremburg I am afraid we cannot take this product into our range. I will issue a written instruction to you as soon as we can proceed."

It was suggested that that amounted to a claim of right relating to the German
50  and French patents. I do not so read it. It is concerned solely with whether articles can be sold in this country and therefore it does not take the matter any further.

446

**Plastus Kreativ AB v. Minnesota Mining** [1995] R.P.C.
**and Manufacturing Co. and anr.**

I have come to the conclusion that there has been no claim by the defendants that the plaintiffs have infringed the German or French patents or intend to do so. Therefore, the plaintiffs do not have a right to the declaration as sought. The defendants' motion to strike out the reference to the German and French patents must succeed. 5

However, I must go on and consider three further submissions. On behalf of the plaintiffs it was submitted that the plaintiffs had a right to the declaration pursuant to provisions equivalent to section 71 in French and German law. It 10 was submitted that that was capable of being tried in this country. I believe not. First, that submission is not pleaded. Second, if it is assumed that under German and French law there is a right equivalent to section 71 of the Patents Act 1977, those provisions give to the relevant German and French courts an equivalent jurisdiction to that given by section 77, namely, power for those 15 courts to decide matters in relation to infringement in their countries. It does not give to the United Kingdom court any right to decide those matters.

With the exception of the jurisdiction given by section 71, this court's jurisdiction is limited to applying its inherent jurisdiction and it is settled law 20 that this court will not decide questions of law or fact unless there has been a claim of right, and, in particular, a claim of right which is justiciable in this country. The equivalent provisions in French and German law do not, upon the assumption I have made, give this court the right to decide whether to make the declaration sought. Furthermore, it does not give to this court the right to make 25 a declaration as to English law which would be applicable in France and Germany.

Counsel for the defendants also submitted that the allegation seeking a declaration in respect of the German and French patents should be struck out as 30 patents were strictly territorial in operation and were governed by local law and were only justiciable in the country in which the patent was granted.

He referred me to the *British South Africa Company* v. *The Companhia de Moçambique* [1893] A.C. 602. In that case the court had to consider whether 35 there was jurisdiction to consider a question of trespass which occurred outside the jurisdiction. The court held there was no such jurisdiction to decide the matter. That case has been applied since in a number of cases.

Mr. Waugh also drew to my attention the decision of Vinelott J. in *Tyburn* 40 *Productions Ltd.* v. *Conan Doyle* [1991] Ch. 75. Vinelott J., relying upon two Australian cases, concluded that the reasoning of the rule in the *Moçambique* case applied to copyright just as much as it applied to other intellectual property rights such as patents.

45

Mr. Waugh who appeared for the defendants also submitted that the court did not have jurisdiction as the question of infringement of the German and French patents did not satisfy Rule 203 of Dicey.

Mr. Ashton who appeared for the plaintiffs reminded me that this was an 50 application to strike out under Order 18, rule 19, and submitted that I should not accede to the defendants' motion unless it was clear that it could not succeed.

[No. 14]                    **Patents Court**                    Aldous J.

He took me through the cases, in particular the Australian cases relied upon by Vinelott J. in the *Tyburn Productions* case with a view to distinguishing the conclusion drawn in the *Tyburn Productions* case from the present. He also
5 took me to the provisions of the Brussels Convention contained in Schedule 1 to the Civil Jurisdiction and Judgments Act 1982. He submitted that against the background where the law of patents had been harmonised in the United Kingdom, Germany and France, there could be no reason not to decide infringement of German and French patents in the United Kingdom, although
10 the question of validity may be precluded under Article 16 of the Brussels Convention.

Having regard to the conclusion that I have already reached, there is no need for met to decide those issues of law and I believe it would not be right for me
15 to do so at this time. Clearly the submissions of the defendants have considerable force based, as they are, upon the considered judgment of Vinelott J. and the established law. However, it may be necessary at some time to decide whether that is so plainly right as to prevent persons from arguing the point. Certainly that was the view of Vinelott J.

20
For myself I would not welcome the task of having to decide whether a person had infringed a foreign patent. Although patent actions appear on their face to be disputes between two parties, in reality they also concern the public. A finding of infringement is a finding that a monopoly granted by the state is
25 to be enforced. The result is invariably that the public have to pay higher prices than if the monopoly did not exist. If that be the proper result, then that result should, I believe, come about from a decision of a court situated in the state where the public have to pay the higher prices. One only has to imagine a decision of this court that the German public should pay to a British company
30 substantial sums of money to realise the difficulties that might arise. I believe that, if the local courts are responsible for enforcing and deciding questions of validity and infringement, the conclusions reached are likely to command the respect of the public. Also a conclusion that a patent is infringed or not infringed involves in this country a decision on validity as in this country no
35 man can infringe an invalid patent. In the present case the plaintiffs admit the validity of the patent and therefore there is no dispute upon the matter. However, it will be implicit in the judgment of this court that there has been infringement, and that, between the parties, the patent is valid. Thus, I believe it is at least convenient that infringement, like validity, is decided in the state in
40 which it arises.

I also believe that it would not normally be right for the courts of this country to decide a dispute on infringement of a foreign patent in respect of acts done outside this country provided there is an adequate remedy in the
45 relevant country. The local court is able to look at the particular acts in the context in which they are carried out. If it happened that there was not an adequate remedy in the other state, then it might be appropriate that action be taken in a state in which there was an appropriate remedy.

50
I have come to the conclusion that this court has no jurisdiction to hear this claim and for that reason I believe that the allegations in respect of the German and French patents must be struck out. My general comments as to the convenience of this court trying issues of infringement of foreign patents have not played any part in the decision that I have arrived at. I will hear counsel as to the appropriate course to take.

# **EXHIBIT 46**

## Abridged Biography for Professor Margo A. Bagley

Professor Margo A. Bagley is Asa Griggs Candler Professor of Law at Emory University School of Law. She rejoined the Emory faculty in 2016 after a decade at the University of Virginia School of Law, where she was most recently the Hardy Cross Dillard Professor of Law. In Fall 2022 she was the Hieken Visiting Professor in Patent Law at Harvard Law School and in 2025, she was the Herchel Smith Visiting Fellow at the University of Cambridge (UK).

Professor Bagley is a well-known and widely cited scholar on a variety of international intellectual property topics and is a foremost expert on international patent law issues. Professor Bagley served on both the National Academies Committee on Advancing Commercialization from the Federal Laboratories, and on the National Academies Committee on University Management of Intellectual Property: Lessons from a Generation of Experience, Research, and Dialogue. She also has served as a U.S. Department of Commerce Commercial Law Development Program advisor, and as a member of the U.S. DARPA (Defense Advanced Research Projects Agency) ELSI (Ethical, Legal, and Societal Issues) Team for the BRACE (Bio-Inspired Restoration of Aged Concrete Edifices) project. She is a member of the American Law Institute and the Scientific Advisory Board of the Max Planck Institute for Innovation and Competition, as well as the Innovation Board of the EU-funded Blue Remediomics project. In addition, she is a McDonald Distinguished Senior Fellow in Law and Religion at Emory Law, a Harvard Law School Berkman Klein Faculty Affiliate, and a member of the Board of the Global IP Alliance.

Professor Bagley has served as a consultant to the UN Convention on Biological Diversity (CBD), the UN Food and Agriculture Organization Secretariat for the International Treaty on Plant Genetic Resources for Food and Agriculture, and as an expert technical advisor to the African Union Commission in several World Intellectual Property Organization (WIPO) matters. She served for seven years as the Friend of the Chair in the WIPO Intergovernmental Committee on Intellectual Property and Genetic Resources, Traditional Knowledge and Folklore, and has also served as a member of the first Ad Hoc Technical Expert Group on Digital Sequence Information on Genetic Resources for the CBD and Nagoya Protocol. She is a co-director of the Harvard University Global Access in Action Program and has been an expert witness in several patent law disputes. Her scholarship focuses on comparative issues relating to patents and biotechnology, pharmaceuticals and access to medicines, traditional knowledge protection for indigenous peoples and local communities, technology transfer, and IP and social justice.

Professor Bagley has published numerous articles and book chapters, as well as three books with co-authors: Bagley, Okediji, and Erstling, *International Patent Law & Policy* (West Publishing 2013), *Patent Law in Global Perspective* (Okediji and Bagley eds., Oxford University Press 2014), and *Advanced Introduction to International Patent Law* (Margo A. Bagley & Rochelle Dreyfuss, Elgar Press, 2025). At Emory, her courses include domestic and international patent law, trademark law, and international intellectual property. She also co-developed the award-winning TI:GER program (Technological Innovation Generating Economic Results), an innovative educational venture with the Georgia Institute of Technology, which brings together graduate students in law, business, and engineering to learn the process of transforming promising research into commercially viable projects.

Professor Bagley received her JD in 1996 from Emory, where she was a Robert W. Woodruff Fellow, an editor of the *Emory Law Journal*, and elected to Order of the Coif. She is a member of the Georgia bar and is registered to practice before the US Patent and Trademark Office. Bagley worked as an associate with Smith, Gambrell & Russell, LLP and Finnegan, Henderson, Farabow, Garrett & Dunner, LLP before joining the Emory faculty in 1999. She was a visiting professor at Washington & Lee University School of Law in fall 2001 and at the University of Virginia School of Law in fall 2005, after which she joined the University of Virginia faculty in 2006. Since 2012, she has been a faculty lecturer with the Munich Intellectual Property Law Center at the Max Planck Institute in Germany, and also has taught International Patent Law and related courses in China, Cuba, Israel, Singapore, and with the Emory Advancing Health Innovations in Africa (AHIA) program.

A chemical engineer with a B.S.Ch.E. degree from the University of Wisconsin-Madison, Professor Bagley worked in industry (with the Procter & Gamble Company and the Coca Cola Company) for several years before attending law school and is a co-inventor on three utility patents: one for reduced fat peanut butter and two relating to bedding technology. Professor Bagley also completed research internships at Oak Ridge National Laboratory, Lawrence Livermore National Laboratory, AT&T Bell Laboratories, and the NASA Marshall Space Flight Center.

**MARGO A. BAGLEY**
Emory University School of Law
1301 Clifton Road
Atlanta, GA 22903
404-727-8293 (office)
mbagley@emory.edu

## ACADEMIC EXPERIENCE

**EMORY UNIVERSITY SCHOOL OF LAW,** Atlanta, GA                1999-2006, 2016-present
- Asa Griggs Candler Professor of Law (2016-present)
- Vice Dean (2023-2024)
- Associate Dean for Research (2022-2023)
- Associate Professor (2002- 2006)
- Assistant Professor (1999-2002)
- Visiting Professor (Spring 2012, Spring 2013, Spring 2014)
  Courses:  Patent Law, International and Comparative Patent Law, Intellectual Property Law, International Intellectual Property Law, Trademark Law
  (Fundamentals of Innovation I & II (co-instructor, TI:GER program), Special
  Topics in Technology Commercialization (co-instructor, TI:GER Program), Contracts, 1999-2006)

**UNIVERSITY OF VIRGINIA SCHOOL OF LAW,** Charlottesville, VA          2006-2018
- Hardy Cross Dillard Professor of Law (2014-2018)
- Joseph C. Carter, Jr. Research Professor (2015-2016)
- Class of 1963 Research Professor (2006-2009)
- Professor of Law (2006-2016)
- Visiting Professor (Fall 2005)
  Courses: Patent Law, International Patent Law and Policy, Intellectual Property, Property, International Intellectual Property, Current Issues in Patent Law, Trademark Law, Patent Claim Construction Workshop

**HARVARD LAW SCHOOL**, Cambridge, MA                          Fall 2022
- Hieken Visiting Professor in Patent Law
  Courses: Patent Law, International Intellectual Property Law

**WASHINGTON AND LEE UNIVERSITY SCHOOL OF LAW,** Lexington, VA      Fall 2001
- Visiting Professor
  Courses:  Patent Law, International Patent Law and Policy

**BAR ILAN UNIVERSITY,** Tel Aviv, Israel                      December 2013
- Visiting Professor
  Course: International Patent Law & Policy

**NATIONAL UNIVERSITY OF SINGAPORE,** Singapore, Republic of Singapore    2007, 2009, 2011
- Visiting Professor (January 2007, July 2009, January 2011)
  Course: International Patent Law & Policy

**SINGAPORE MANAGEMENT UNIVERSITY**, Singapore, Republic of Singapore    Summers 2010 & 2012
- Visiting Professor (June 2010, May 2012)
  Course: International Patent Law & Policy

**MAX PLANCK INSTITUTE,** Munich, Germany                      Summers 2012-present
- Munich Intellectual Property Law Center Lecturer
  Courses: Protection of Biotechnological Inventions, Pharmaceuticals and IP

**GEORGE WASHINGTON UNIVERSITY SUMMER INTELLECTUAL PROPERTY LAW PROGRAM,**
**Max Planck Institute**, Munich, Germany,                                              Summers 2005-2010
- Adjunct Professor (Summers 2005, 2006, 2007, 2008, 2009, 2010)
  Course: International Patent Law and Policy.

**WHITTIER LAW SCHOOL SUMMER ABROAD PROGRAM**, **Sun Yat Sen University,** Zhuhai, China
- Adjunct Professor (Summer 2004)
  **Course**: International Patent Law

## <u>PUBLICATIONS</u>

**BOOKS**

Margo. A. Bagley & Rochelle C. Dreyfuss, ADVANCED INTRODUCTION TO INTERNATIONAL PATENT LAW, (Edward Elgar, 2025).

Ruth L. Okediji & Margo A. Bagley (eds.), PATENT LAW IN GLOBAL PERSPECTIVE, (Oxford University Press 2014).

Margo A. Bagley, Ruth L. Okediji & Jay A. Erstling, INTERNATIONAL PATENT LAW AND POLICY (West Publishing 2013).

**BOOK CHAPTERS**

With Colleen Chien, *Inclusive Innovation in an Age of AI: Insights from the Innovator Diversity Pilots Initiative, in* INCLUSIVE INNOVATION IN THE AGE OF AI AND BIG DATA (Daryl Lim & Peter Yu (eds.) Oxford University Press, forthcoming 2025).

*The Draft Design Law Treaty's Forbidden Words,* in Dana Beldiman ed. DESIGN LAW: GLOBAL LAW AND PRACTICE (Elgar 2024).

*"Tool Time": The Continuing Relevance of Compulsory Licensing as a Patent Policy Tool, in* IMPROVING INTELLECTUAL PROPERTY: A GLOBAL PROJECT (S. Frankel, M. Chon, G. Dinwoodie, J. Schovsbo and B. Lauriat (eds.), Edward Elgar 2023).

*Exploring Intellectual Property through the Lens of Religious Thought,* in Irene Calboli & Maria Lilla Montagnani eds., HANDBOOK ON INTELLECTUAL PROPERTY RESEARCH, Oxford University Press (2021).

*"Intellectual Property, Access to Medicines, and Christian Tradition,* in Daniel Crane ed. CHRISTIAN TRADITION AND ECONOMIC REGULATION, Cambridge University Press (2021).

*'Thou Shalt Not Steal': The Morality of Limits on Pharmaceutical Patents,* in Thomas C. Berg, Roman Cholij, Simon Ravenscroft, eds., PATENTS ON LIFE: RELIGIOUS, MORAL, AND SOCIAL JUSTICE ASPECTS OF BIOTECHNOLOGY AND INTELLECTUAL PROPERTY, Cambridge University Press (2019).

*Designing Disclosure: Disclosure of Cultural and Genetic Resource Utilisation in Design Protection Regimes*, in THE OBJECT AND PURPOSE OF INTELLECTUAL PROPERTY (Susy Frankel ed., Edward Elgar 2019).

*Towering Wave or Tempest in a Teapot? Synthetic Biology, Access & Benefit Sharing, and Economic Development,* in INTELLECTUAL PROPERTY ON THE INTERNET AND THE CONNECTION WITH HUMAN AND ECONOMIC DEVELOPMENT (Susy Frankel and Daniel Gervais eds., Victoria University Press 2017).

*De-Materializing Genetic Resources: Synthetic Biology, Intellectual Property, and the ABS Bypass*, in ROUTLEDGE HANDBOOK OF BIODIVERSITY AND THE LAW, (Charles McManis and Burton Ong Eds., 2017).

3

*Of Disclosure "Straws" and Patent System "Camels": Patents, Innovation, and the Disclosure of Origin Requirement*, in PROTECTING TRADITIONAL KNOWLEDGE: THE WIPO INTERGOVERNMENTAL COMMITTEE ON INTELLECTUAL PROPERTY AND GENETIC RESOURCES, TRADITIONAL KNOWLEDGE AND FOLKLORE (Daniel Robinson, Ahmed Abdel-Latif, Pedro Roffe eds., Routledge Press 2017).

*"Grant Me Justice Against My Adversary": What Parables Can Teach Us About* Organic Seed Growers & Trade Assoc. v. Monsanto, in DIVERSITY IN INTELLECTUAL PROPERTY: IDENTITIES, INTERESTS, AND INTERSECTIONS (Irene Calboli and Srividhya Ragavan eds., Cambridge University Press 2015).

*Patent Barbarians at the Gate: The Who, What, When, Where, Why & How of U.S. Patent Subject Matter Eligibility Challenges*, in PATENT LAW IN GLOBAL PERSPECTIVE, (Ruth L. Okediji & Margo A. Bagley eds., Oxford University Press 2014).

*Pharmaceutical Data Exclusivity Protection*, in PHARMACEUTICAL INNOVATION, COMPETITION AND PATENT LAW: A TRILATERAL PERSPECTIVE, (Josef Drexl and Nari Lee eds., Edward Elgar Publishing 2013).

*Patents and Technology Commercialization: Issues and Opportunities,* in vol. 18, ADVANCES IN THE STUDY OF ENTREPRENEURSHIP, INNOVATION AND ECONOMIC GROWTH (Gary Libecap, ed., Elsevier Science and Technology Books 2007).

*A Global Controversy: Biotechnology Patents and Morality,* in INTELLECTUAL PROPERTY AND INFORMATION WEALTH (Peter Yu, ed., Praeger 2007).

**ARTICLES**

With Justin Hughes, *Secret Traditions as Trade Secrets,* 66 HARVARD INT'L L.J. 103 (2025).

*Innovator Ecosystem Diversity as a Global Competitiveness Imperative,* MARQUETTE INTELL. PROP. L. REV. *(invited)* (2024).

*Deploying Our Secret Weapon*, MARQUETTE LAWYER 25 (Summer 2024).

Michael Halewood, Margo Bagley, Markus Wyss, and Amber Hartman Scholz, *New Benefit-Sharing Principles for Digital Sequence Information*, Science 382, 520 (2023).

*"Just" Sharing: The Virtues of Digital Sequence Information Benefit-Sharing for the Common Good*, 63 HARVARD INT'L L.J. 1 (2022).

*The Fallacy of Defensive Protection for Traditional Knowledge*, 58 WASHBURN L.J. 323 (2019, symposium issue).

*The Morality of Compulsory Licensing as an Access to Medicines Tool,* 102 MINN. L. REV. 2463 (2018).

*"Ask Me No Questions": The Struggle for Disclosure of Cultural and Genetic Resource Utilization in Design Applications,* 20 VAND. J. ENT. & TECH. L. 975 (2018).

*The Wheat and the (GM) Tares: Lessons for Plant Patent Litigation from the Parables of Christ*, 10 ST. THOMAS L. J. 683 (2013, symposium issue, 2014 publication).

*The New Invention Creation Boundary in Patent Law,* 51 WILLIAM & MARY L. REV. 577 (2009).

*The Need for Speed (and Grace): Issues in a First-Inventor-To-File World,* 23 BERKELEY TECH. L.J. 1035 (2008) (symposium issue)

*Academic Discourse and Proprietary Rights: Putting Patents in Their Proper Place,* 47 B.C.L. REV. 217 (2006).

*Stem Cells, Cloning and Patents: What's Morality Got to Do With It?*  39 NEW ENG. L. REV. 501 (2005, symposium issue).

*Patent First, Ask Questions Later: Morality and Biotechnology in Patent Law,* 45 WILLIAM & MARY L. REV. 469 (2003).

*Legal Movements in IP: TRIPS, Bilateral Agreements, and Access to Essential Medicines,* 17 EMORY INT'L L. REV. 781 (2003, symposium Issue).

*Still Patently Unconstitutional: A Reply to Professor Nard*, 88 MINN. L. REV. 239 (2003).

*Patently Unconstitutional: Geographical Limitations on Prior Art in a Small World*, 87 MINN. L. REV. 679 (2003).

*Internet Business Model Patents: Obvious by Analogy,* 7 MICHIGAN TELECOMM. & TECH. L. REV. 253 (2001) (Symposium issue).

Comment, *Using Section 337 of the Tariff Act of 1930 to Block Materially Different Gray Market Goods in the Common Control Context:  Are Reports of Its Death Greatly Exaggerated?* 44 EMORY L.J. 1541 (1995).

**COMMISSIONED WORKS**

Margo A. Bagley, *Genome Editing in Latin America: CRISPR Patent and Licensing Policy*, NCSU Genetic Engineering and Society Center (July 2021).

Margo A. Bagley and Frederick Perron-Welch, *Study to Identify Specific Cases of Genetic Resources and Traditional Knowledge Associated with Genetic Resources that Occur in Transboundary Situations or for Which it is not Possible to Grant or Obtain Prior Informed Consent*, as requested by decision 3/13 (paragraph 5(a)) from the Third Meeting of the Conference of the Parties to the Convention on Biological Diversity serving as the Meeting of the Parties to the Nagoya Protocol, CBD Secretariat (August 2020).

Margo Bagley, Elizabeth Karger, Frederick Perron-Welch & Siva Thambisetty, *Fact-finding Study on How Domestic Measures Address Benefit-sharing Arising from Commercial and Non-commercial Use of Digital Sequence Information on Genetic Resources and Address the Use of Digital Sequence Information on Genetic Resources for Research and Development*, as requested by decision 14/20 (paragraph 11(e)) from the Fourteenth Conference of the Parties to the Convention on Biological Diversity (CBD), CBD Secretariat (February 2020).

Margo A. Bagley, *Toward an Effective Indigenous Knowledge Protection Regime: Case Study of South Africa* (Policy Paper, Centre for International Governance Innovation, Paper No. 207, December 2018).

Margo A. Bagley, *Illegal Designs? The Draft Design Law Treaty and Disclosure of Origin Requirements* (Policy Paper, Centre for International Governance Innovation, Paper No. 155, December 2017).

Eric W. Welch, Margo A. Bagley, Todd Kuiken, Selim Louafi, *Potential Implications of New Synthetic Biology and Genomic Research Trajectories on the International Treaty for Plant Genetic Resources for Food and Agriculture,* (for the Secretariat of the UN FAO ITPGRFA) (2017).

Margo A. Bagley (for the High-Level Panel Secretariat at UNDP in collaboration with UNAIDS), Background Paper: *A Primer on Features of the Intellectual Property System of Relevance to Issues of Access to Medicines* (2016) (UN Secretary General's High-Level Panel on Access to Medicines).

Margo A. Bagley, *Digital DNA: Synthetic Biology, Intellectual Property Treaties, and the Nagoya Protocol* (2015) (Woodrow Wilson International Center for Scholars).

Margo A. Bagley & Arti K. Rai, *The Nagoya Protocol and Synthetic Biology: A Look at the Potential Impacts* (2013) (Woodrow Wilson International Center for Scholars).

**COMMENTARY**

*The WIPO 2024 IP Treaties: The Triumph of Inclusivity and Strategic Framing,* GRUR INTERNATIONAL (2025).

*The GRATK Treaty: Understanding a Triumph of Multilateralism,* GENEVA POLICY OUTLOOK (2025).

*"Fraud, Delays, and Nonsense (Marks) . . . Oh My!,"* JOTWELL (October 29, 2024) (reviewing Jeanne Fromer & Mark McKenna, *Amazon's Quiet Overhaul of the Trademark System*, 113 Cal. L. Rev. __ (forthcoming, 2025), https://ip.jotwell.com/fraud-delays-and-nonsense-marks-oh-my/.

*"The Diversity Pilots Initiative,"* PatentlyO blog, (May 2023).

With Colleen Chien, *"All Together Now: The Innovator Diversity Pilots Conference,"* PatentlyO blog, (Nov. 2022).

*"Dirty Hands, Dead Patent?,"* JOTWELL (July 2, 2021) (reviewing Sean Seymore, *Unclean Patents*, 102 B.U. L. REV. 1491 (2022), https://ip.jotwell.com/dirty-hands-dead-patent/.

*"On Being Human,"* Review of FIRE IN THE BLOOD (directed by Dylan Mohan Gray), in the JOURNAL OF INTELLECTUAL PROPERTY LAW & PRACTICE (2016).

*"On Shaky Ground?"* Review of Rajshree Chandra, KNOWLEDGE AS PROPERTY: ISSUES IN THE MORAL GROUNDING OF INTELLECTUAL PROPERTY RIGHTS, in the JOURNAL OF INTELLECTUAL PROPERTY LAW & PRACTICE (2013).

Review of *The Global Governance of Knowledge: Patent Offices and Their Clients*, by Peter Drahos, 2 IP LAW BOOK REVIEW 15 (2011).

*Patents and Morality: A Role for Congress,* THE NATIONAL LAW JOURNAL, May 3, 2004.

With Les Bessinger, *Intent and the Powerful Defense of Inequitable Conduct in U.S. Patent Litigation*, published in the December 1998 Intellectual Property Supplement to the FULTON COUNTY DAILY REPORT.

With Joyce B. Klemmer, *Judicial Intolerance of Discovery Abuse*, 2 MANAGING LITIGATION COSTS (Corporate Legal Times, Chicago, Illinois) 1, (1995).

**<u>WORKS IN PROGRESS</u>**

*"Thou Shalt Not Lie": IP Law, AI, and the Biblical Truth Imperative in* INTELLECTUAL PROPERTY AND RELIGION: CROSS-CULTURAL INTERSECTIONS OF FAITH AND LAW, Enrico Bonadio, Bryan Khan, and Nicola Lucchi eds.(Hart Publ. 2026).

With Christine Farley, *Framing Harmonization: Illusion and Reality in the Riyadh Design Law Treaty,* IIC-INTERNATIONAL REVIEW OF INTELLECTUAL PROPERTY AND COMPETITION LAW, (2026).

With Colleen Chien, *Mentoring as a Facilitator of IP Attorney Flourishing* (2026).

## EDUCATION

**EMORY UNIVERSITY SCHOOL OF LAW**, Atlanta, GA                                    1996
**Juris Doctor, with Distinction**; **Final Class Rank:  #3 of 228**
**Honors & Activities:**
Robert W. Woodruff Fellow (full tuition scholarship and stipend), Order of the Coif, Thrower Symposium Editor,
*Emory Law Journal,* American Jurisprudence Awards for highest grades in Torts and Research, Writing, and
Appellate Advocacy (RWA), also highest grades in Regulation of Non-Profit Organizations, Constitutional Law:
Church & State, and Civil Rights Legislation, Henry Quillian Prize in Contracts, Lexis "Best Brief" Award, Dean's
List - all semesters, Dean's Fellow, Honorable Mention in the first year RWA oral argument competition, Black Law
Students Association, Legal Association of Women Students

**UNIVERSITY OF WISCONSIN**, Madison, WI                                    1986
**Bachelor of Science in Chemical Engineering**
**Honors & Activities:**
Dean's List 1986
Society of Women Engineers "Outstanding Member" Award, American Institute of Chemical Engineers, National
Society of Black Engineers, Volunteer, Elvehjem Museum

**OAKWOOD UNIVERSITY (COLLEGE), Huntsville, AL**
**Honors & Activities:**
National Achievement Scholar
Dean's List 1981, 1982, 1983

## ACADEMIC, PROFESSIONAL & CIVIC ACTIVITIES/HONORS/ASSOCIATIONS

**Professional Service & Organizations (past and current)**
Herchel Smith Visiting Fellow, University of Cambridge
Co-Director, Harvard Global Access in Action Project
Member American Law Institute
Harvard Berkman Klein Center Faculty Affiliate
Member, DARPA (Defense Advanced Research Projects Agency) ELSI (Ethical, Legal, Societal Issues) Team for the
BRACE (Bio-Inspired Restoration of Aged Concrete Edifices) project
Member, National Academies of Science, Medicine, and Engineering Committee for Advancing Commercialization
from the Federal Laboratories
Lead Facilitator and Friend of the Chair, World Intellectual Property Organization Intergovernmental Committee on
Intellectual Property and Genetic Resources, Traditional Knowledge, and Folklore
Technical Expert for the African Union, in World Intellectual Property Organization matters and Convention on
Biological Diversity matters
McDonald Distinguished Senior Fellow in Law and Religion, Emory Center for the Study of Law and Religion
Co-Director, Diversity Pilots Initiative
Member, National Order of the Coif Society Nominating Committee for the Executive Committee
Consultant, UN Convention on Biological Diversity Secretariat
Technical Expert for the African Union Preparations for the Fourteenth Conference of the Parties to the Convention
on Biological Diversity, Third Meeting of the Parties to the Nagoya Protocol, Addis Ababa, Ethiopia and Sharm el-
Sheikh, Egypt
Expert Advisor to the Government of Mozambique, World Intellectual Property Organization Intergovernmental
Committee on Intellectual Property and Genetic Resources, Traditional Knowledge and Folklore, and Standing
Committee on Trademarks, Industrial Designs and Geographical Indications
Facilitator, World Intellectual Property Organization Intergovernmental Committee on Intellectual Property and
Genetic Resources, Traditional Knowledge, and Folklore
Project Consultant, UN Food and Agriculture Organization International Treaty on Plant Genetic Resources for Food
and Agriculture Secretariat
Lecturer, Emory Advancing Healthcare Innovations in Africa program, Johannesburg, South Africa

Instructor, CIALE (Center for Inter-American Legal Education) program, Institute Superior de Relaciones Internationales, Havana, Cuba
Senior Fellow, Center for International Governance Innovation
Consultant, Government of Namibia, Ministry of Trade and Industry, regarding Patent and Utility Model Regulations to implement the 2012 Industrial Property Act
Member, National Academy of Sciences Committee on University Management of Intellectual Property: Lessons from a Generation of Experience, Research, and Dialogue
Member, Atlanta IP Inn of Court
American Association of Law Schools Planning Committee, Mid-Year meeting on Intellectual Property
U.S. Department of Commerce CLDP Advisor, Workshop on Practical Approaches to IP Utilization and Protection in Africa
Lecturer, Practising Law Institute (PLI) Patent Bar Review
Lecturer, BARBRI Patent Bar Review
Provided advice on new Patent Act to Government of Zambia
Provided advice on proposed Patent Act revisions to Government of Nigeria
Prepared New Technology Patentability Assessment Report for Japanese Patent Office
Retained as patent legal expert and consultant in several patent cases and prosecution matters
Member, International Association for the Advancement of Teaching and Research in Intellectual Property (ATRIP)
Member, American Intellectual Property Law Association
Member, American Bar Association

**Board Memberships**
Member, Scientific Advisory Board of the Max Planck Institute for Innovation and Competition (present)
Member, Innovation Board, Blue Remediomics Project (EU) (present)
Member, Board of Directors, Global Intellectual Property Alliance (Present)
Member, Board of Directors, Society of Christian Legal Scholars
Member, Board of Directors of the Public Patent Foundation
Member, Board of Directors, Atlanta Adventist Academy

**Bar Memberships**
United States Patent & Trademark Office
State Bar of Georgia


## GRANTS

$50,000 Emory Global Health Institute grant for drug quality assurance program in Mozambique/Malawi with Harvard Global Access in Action (GAiA) program and Emory-Rollins School of Public Health (2018-2020).

$25,000 UN Convention on Biological Diversity as lead for 12 member team conducting study on domestic measures relating to digital sequence information and benefit sharing (2019-2020).


## SELECTED VIDEOS

"The Struggle for Disclosure of Cultural and Genetic Resource Utilization in Design", https://faculti.net/the-struggle-for-disclosure-of-cultural-and-genetic-resource-utilization-in-design/ (2022).

"The Importance of Diversity", https://www.youtube.com/watch?v=zeQyGAScsXM (2021).

"Challenges Encountered as a Diverse Inventor", https://www.youtube.com/watch?v=FP6RCNRGKw4 (2021).

"Beautiful Things Make Money"    https://www.cigionline.org/multimedia/beautiful-things-make-money; https://www.youtube.com/watch?time_continue=62&v=Yc_dGYMw8Ug (Dec. 2017).

"What is Traditional Knowledge?" https://www.youtube.com/watch?v=14YInJGNwZc (June 2017).

**ISSUED U.S. PATENTS**
11,903,507 Bedding with Personal Flaps
11,426,014 Bedding with Personal Flaps
5,230,919   Composition and process of making fluid, reduced fat peanut butters, etc.

## <u>SELECTED PRESENTATIONS (since 2017)</u>

"The Riyadh Design Law Treaty and the Illusion of Harmony and Inclusivity," Annual IPSI Lecture, Nova University Law School, Lisbon, Portugal, October 2025.

Panelist, "Building Your IP Arsenal from the Ground Up: Real World Lessons for Fast-Moving Markets " AUTM Eastern Regional Meeting, Atlanta, GA September 2025.

"Secret Traditions as Trade Secrets," ATRIP Annual Conference, Univ. of Copenhagen, Copenhagen Denmark, July 2025.

"Diversity, Deadlock, and Disclosure: The 2024 WIPO Treaties", Harvard Law School IPX Conference, Cambridge, MA, June 2025.

"A Tale of Two Treaties" or "Much Ado About Disclosure", University of Cambridge Faculty of Law (UK), February 2025.

"A Tale of Two Treaties" or "Much Ado About Disclosure", Leibniz-Institut DSMZ German Collection of Microorganisms and Cell Cultures, Braunschweig, Germany, March 2025.

"The Design Law Treaty and Disclosure of Traditional Knowledge & Genetic Resources" WIPO headquarters, Geneva, Switzerland, October 2024.

 "Innovator Ecosystem Diversity as a Global Competitiveness Imperative" 35th Annual Judicial Conference for the U.S. Court of Federal Claims, Washington, DC, October 2024.

Secret Traditions as Trade Secrets, Intellectual Property Scholars Conference, UC Berkeley Law School, August 2024.

Sacred IP, Southeastern Association of Law School's Annual Meeting, July 2024.

Innovation Policy as an Economic Development Tool, Workshop on the Statute of Monopolies at 400, George Washington University School of Law, May 2024.

Data governance, Indigenous data sovereignty, and intellectual property rights, Roundtable on the Right to Participate in Science, University of Edinburgh (virtual) May 2024.

Genetic Resources and Associated Traditional Knowledge, Digital Sequence Information, and the Patent System, at a workshop on "Indigenous Peoples, Traditional Knowledge, and Intellectual Property in International Law," Harvard, Law School, Cambridge, MA, February 2024.

"The African Group Position on the Design Law Treaty", presentations to the African Group of countries and the Group of Latin American and Caribbean States at the WIPO Special Session on the draft Design Law Treaty, Geneva, Switzerland, October 2023.

The Role of Patents in a Sustainable World, Queen Mary University London, (virtual) September 2023.

Panelist, Building Pipelines to Innovation, The ICDS (JEDI)-Dickinson Law Symposium on Inclusive Innovation, AI, and Big Data, (virtual) August 2023.

Innovator Ecosystem Diversity as a Global Competitiveness Imperative, Intellectual Property Scholars Conference, Cardozo Law School, New York, NY, August 2023.

Panelist, "Increasing Diversity in the Profession", Diversity, Equity & Inclusion Conference, United States Patent & Trademark Office, Alexandria, VA, August 2023.

Panelist, "How NIH Chooses What to Patent and License", NIH Workshop on Transforming Discoveries Into Products: Maximizing NIH's Levers to Catalyze Technology Transfer (virtual), July 2023.

"Chairs Text of a Draft International Legal Instrument Relating to Intellectual Property, Genetic Resources, and Traditional Knowledge Associates with Genetic Resources", African Regional Meeting on the Diplomatic Conference on Intellectual Property, Genetic Resources and Traditional Knowledge Associated with Genetic Resources (WIPO/Govt. of Algeria), Algiers, Algeria June 2023.

"Just" Sharing: The Virtues of Digital Sequence Information Benefit-sharing for the Common Good, TECHNIS Virtual Presentation, May 2023.

"CRISPR Patent and Licensing Policy for Latin America", IADB Project, Argentina Ministry of Agriculture, Buenos Aires, Argentina, May 2023.

"Just" Sharing: The Virtues of Digital Sequence Information Benefit-sharing for the Common Good, Workshop on Traditional Knowledge and Modern Justice, Harvard Law School, Cambridge, MA April 2023.

"Innovator Ecosystem Diversity as a Global Competitiveness Imperative", Helen Nies Memorial Lecture, Marquette Law School, Milwaukee, WI, April 2023.

"Potential Ethical, Legal, and Societal Issues relevant to the BRACE Project", DARPA BRACE Kickoff meeting, Arlington, VA (Feb. 2023).

Digital Sequence Information Benefit-sharing in the CBD and Beyond, AUTM Annual Meeting, Austin, TX February 2023.

"A Tale of Two DipCons: IP, Genetic Resources, Traditional Knowledge, and Folklore at WIPO", AALS Annual meeting, San Diego, January 2023.

Panelist, "DSI and the CBD", 26th International Consortium on Applied Bioeconomy Research, Bologna, Italy, July 2022 (virtual).

"Digital Sequence Information on Genetic Resources: New Studies on Potential Approaches to Access and Benefit Sharing," GIZ ABS Capacity Development Initiative webinar, February 2022.

"Just" Sharing: The Virtues of Digital Sequence Information Benefit-Sharing for the Common Good, University of Cambridge (UK) Speaker Series (virtual), February 2022.

"'Custodians' and the present knowledge 'protection' system at WIPO", Royal Society of Edinburgh Saltire Research Awards Programme on Scientific knowledge across jurisdictions (virtual) January 2022.

Served as one of three expert panelists in the GIZ (Germany) ABS Capacity Development Initiative Global Webinar on the report of the UN Convention on Biological Diversity's Informal Co-Chairs' Advisory Group on Digital

Sequence Information on Genetic Resources December 2021.

"Genome Editing in Latin America: CRISPR Patent and Licensing Policy", Inter-American Development Bank/NCSU Genetic Engineering and Society Center webinar, December 2021.

Keynote Address: 'Just' Sharing: The Virtues of Digital Sequence Information Benefit-Sharing for the Common Good, Suffolk University Law School Third Annual Intellectual Property & Innovation Conference October 2021.

"What do Indigenous Peoples and Local Communities Need to Know About the Patent System?" World Intellectual Property Organization Webinar, "How to Protect and Promote Your Culture", September 2021.

"Lessons Learned from International Negotiations of Legal Instruments to Protect Traditional Cultural Expressions," at the WIPO-INDAUTOR Virtual Regional Seminar on Copyright and Traditional Cultural Expressions, September 2021 (virtual).

"'Just' Sharing", Page-Barbour Lecture, University of Virginia, Charlottesville, VA April 2021 (via Zoom).

Expert Panelist, UNESCO event on "Open Science and Intellectual Property Rights" Paris, France April 2021 (videoconference).

Moderator, "Intellectual Property and Genetic Resources: New and Emerging Technologies," World Intellectual Property Organization IGC Seminar, Geneva, Switzerland January 2021 (videoconference).

Fact-finding Study on How Domestic Measures Address Benefit-sharing Arising from Commercial and Non-commercial Use of Digital Sequence Information on Genetic Resources UN Convention on Biological Diversity Secretariat webinar on "Process and recent outcomes related to digital sequence information on genetic resources under the CBD", Montreal Quebec, Canada, December 2020 (videoconference).

 "What is DSI and What is it Not? (Options and Views)", UN Convention on Biological Diversity Secretariat/ABS Capacity Development Initiative (GIZ) webinar on "Understanding DSI: a technical overview of its production, distribution and use" December 2020 (videoconference).

"'What's Yours is Mine and What's Mine is Mine': Digital Sequence Information, Patents, and Benefit-sharing Obligations", Harvard Law School International Economic Law workshop, Cambridge, MA, November 2020 (videoconference).

"Regulating Digital Innovation and Creativity in Africa: IP, The Nagoya Protocol, DSI, and AI", African Union Webinar on Unlocking the Potential of Intellectual Property in Africa, Addis Ababa, Ethiopia October 2020 (videoconference).

 "Utility Patents on Plants", Rocky Mountain Seed Alliance (October 2020) (videoconference).

"Ask Me No Questions: The Struggle for Disclosure of Cultural and Genetic Resource Utilization in Design", Notre Dame University Law School IP Lecture Series, South Bend, IN, September 2020 (videoconference).

"'What's Yours is Mine and What's Mine is Mine': Digital Sequence Information, Patents, and Benefit-sharing Obligations", Genetic Engineering and Society Colloquium, NCSU, Raleigh, NC, March 2020 (videoconference).

"Study 4: Domestic Measures on DSI", UN Convention on Biological Diversity Ad Hoc Technical Expert Group on Digital Sequence Information, Montreal, Quebec, Canada, March 2020 (videoconference).

"Protection of Copyright in the Digital Environment: Copyright Exceptions and Limitations," African Group workshop on the Protection of Copyright in the Digital Environment, Permanent Mission of the African Union, Geneva, Switzerland, December 2019.

"Connecting the Dots: Genetic Resources, ABS, and Access to Medicines," Global Forum on Intellectual Property and Access to Medicines, Max Planck Institute on Innovation and Competition Law, Munich, Germany, December 2019.

"Biopiracy and the Global Use of Biological Data", 4th Arizona Biosecurity Workshop, Arizona State University, Tempe, AZ, November 2019.

"Patents, DSI, and the Treaty: Trends in the U.S. and Beyond," Eighth Session of the Governing Body of the International Treaty on Plant Genetic Resources for Food and Agriculture, Rome, Italy, November 2019.

"Digital Database 'Protection' for Traditional Knowledge: Fact or Fallacy?", Harvard Law School, workshop on Development in the Data Economy, Cambridge, MA, September 2019.

"The Nagoya Protocol and Digital Sequence Information (DSI) on Genetic Resources:  Emerging Issues," webinar presentation to National Academy of Sciences, Engineering and Medicine Committee on Biological Collections: Their Past, Present, and Future Contributions and Options for Sustaining Them, Washington, D.C., July 2019.

"'What's Yours is Mine and What's Mine is Mine?': Digital Sequence Information and Benefit-sharing Obligations under the Nagoya Protocol," 23rd International Consortium on Applied Bioeconomy Research Conference, Ravello, Italy, June 2019.

Panelist, "*Alice* at Five: Developments, Trends, and Insights," State Bar of Georgia IP Section Seminar, Atlanta, GA, June 2019.

"'Thou Shalt Not Steal': The Morality of Compulsory Licensing as an Access to Medicines Tool," Symposium on Intellectual Property and Access to Medicines in the Global South, Harvard Law School, Cambridge, MA, April 2019.

"'What's Yours is Mine and What's Mine is Mine?': Digital Sequence Information and Benefit-sharing Obligations under the Nagoya Protocol," International Intellectual Property Scholars Conference, Florida State University School of Law, Tallahassee FL March 2019; University of the Pacific-McGeorge School of Law Symposium, Sacramento, CA April 2019.

"Like a Red Headed Stepchild": Traditional Knowledge and the Multilateral IP Protection System, Texas A&M University School of Law, Ft. Worth, TX, March 2019.

"'What's Yours is Mine and What's Mine is Mine?': Digital Sequence Information and Benefit-sharing Obligations under the Nagoya Protocol," The Social, Legal, and Regulatory Challenges of Synthetic Biology Workshop, University of Queensland, Brisbane, Australia February 2019.

"Approaches to Resolving Benefit Sharing in Shared Traditional Knowledge:  Experiences from South Africa," Side event during the 38th Session of the WIPO Intergovernmental Committee, Geneva Switzerland, December 2018.

"Approaches to Resolving Benefit Sharing in Shared Traditional Knowledge:  Experiences from South Africa," Side event during the 14th Conference of the Parties to the CBD, Sharm El-Sheikh, Egypt, November 2018.

"DSI and the Global Benefit Sharing Mechanism Debates," Side event during the 14th Conference of the Parties to the CBD, Sharm El-Sheikh, Egypt, November 2018.

"Disclosure of Origin and the Draft WIPO Design Law Treaty," African Group Workshop on WIPO Issues, Permanent Delegation of the African Union, Geneva, Switzerland, November 2018.

"The Nagoya Protocol, ABS, and "DSI": Legal Issues," 11th Pan African Workshop on ABS, African Union Commission, Addis Ababa, Ethiopia, October 2018.

"Extension of the Nagoya Protocol to DSI – State of Play and Consequences," Symposium: The Use and Circulation of Genetic Resources under Measures Implementing the Nagoya Protocol, London School of Economics, London, UK September 2018.

"The Fallacy of Defensive Protection for Traditional Knowledge," 5th Global Congress on IP and the Public Interest, American University, Washington, D.C., September 2018.

"Illegal Designs? Enhancing Cultural and Genetic Resource Protection Through Design Law," Fourth Annual Intellectual Property Lecture, Hofstra University, Hempstead, New York, March 2018.

Panelist, "The Growth Engine for Biotech Start-Ups," SANBio Annual Conference, Pretoria, South Africa, February 2018.

"Square Peg in a Round Hole or the Perfect Fit? Cultural and Genetic Resource Protection Issues at the World Intellectual Property Organization," Whitney R. Harris World Law Institute of Washington University, St. Louis, Missouri, February 2018.

"Drug Innovation Ventures at Emory," 1st World Conference on Access to Medical Products and International Laws for Trade and Health, in the Context of the 2030 Agenda for Sustainable Development, New Delhi, India, November 2017.

"Case Law in Review," Ninth Annual Georgetown Law-Berkeley Law Conference on the Role of the Courts in Patent Law & Policy, Georgetown University National Law Center, Washington, D.C., November 2017.

"Global Perspectives in Patent Law & Access to Medicines," Universities Allied for Essential Medicines North American Fall Conference, Emory University School of Medicine, Atlanta, GA, October 2017.

"Scoping Report on Potential Implications of New Synthetic Biology and Genomic Research Trajectories on the ITPGRFA: Legal Dimensions," Meeting of the Governing Body of the UN FAO ITPGRFA, Kigali, Rwanda (via video recording), October 2017.

"Making Room at the (Access to Medicines) Table: Is There a Place for Traditional and Holistic Medicine?" University of Minnesota School of Law Symposium, Minneapolis, MN, October 2017.

"Illegal Designs? The Draft Design Law Treaty and Disclosure of Origin Requirements," ATRIP Congress, Wellington, New Zealand, October 2017.

Panelist, "Supreme Court IP Review: Patent Panel I", IIT Chicago-Kent College of Law, Chicago, IL September 2017.

"IP and ABS Issues For Researchers and Entrepreneurs in the Seychelles," NEPAD/SANbio/NISTI Workshop, Mahe, Seychelles, August 2017.

"IP Issues in Africa," Emory-African Network for Drug and Diagnostic Innovations (ANDI) Workshop, Johannesburg, South Africa, July 2017.

"Filing and Examination of a U.S. Patent Application," WIPO IP Negotiators Workshop, Geneva, Switzerland, June 2017.

"Dematerializing Genetic Material: Intellectual Property, Synthetic Biology, and the ABS Bypass," An Open Digital Global South: Risks and Rewards Conference, UC Davis Law School, Davis, CA, May 2017.

"Illegal by Design? The Draft Design Law Treaty and Disclosure of Origin Requirements," International IP Law

Scholars Workshop, New York University School of Law, New York, NY, April 2017.

 "Intellectual Property Regimes and Genetic Resources: The Push for Transparency, Policy Space, and Fairness," Patents, Social Justice, and Public Responsibility Symposium, University of Michigan Ford School of Public Policy, Ann Arbor, MI, March 2017.

Presentations on "Intellectual Property and Access and Benefit-Sharing"; "Disclosure of Origin: Reality and Perspectives"; and "Digital DNA:   IP and Synthetic Biology," World Intellectual Property Organization (WIPO)/Ministry of Foreign Affairs of Colombia, National Workshop on Intellectual Property, Traditional Knowledge, Traditional Cultural Expressions and Genetic Resources, Bogota, Columbia, March 2017.

"Legal and Policy Issues in Access and Benefit Sharing," Sixth Meeting of the Ad-Hoc Open-Ended Working Group To Enhance the Functioning of the Multilateral System, U.N. FAO, Rome, Italy, March 2017.

"Disruptive Technologies: Synthetic Biology, Fairness, and Patents," Vanderbilt University School of Law, Nashville, TN, February 2017.


### ACADEMIC SERVICE (selected activities)

**Emory University School of Law**
Vice Dean
Associate Dean for Research
Member, Emory Global Health Institute Faculty Fellow
Member, Law School Tenure and Promotion Committee
Member, Law School Dean Search Committee (twice)
Experiential Learning Committee
Black Law Students Association 1L success program
Faculty Advisor Emory Adventist Christian Fellowship
President, Emory University School of Law Chapter, Order of the Coif
Advisor, *Emory Law Journal*
Member, Emory University Library Policy Committee
Member, Emory University School of Law Appointments Committee
Member, Emory University School of Law Information Technology Committee
Member, Emory University School of Law Admissions & Scholarship Committee
Vice-President, Emory University School of Law Chapter, Order of the Coif
Principal Emory Law School Director, "Technological Innovation: Generating Economic Results" ("TI:GER") Program:  Significant involvement in numerous aspects of program including creating legal component of program and requirements for Certificate in IP, recruiting and selecting JD students, designing and teaching portions of Fundamentals of Innovation courses, and procuring guest lecturers.  TI:GER is a collaboration between the Emory University School of Law, the Emory University Department of Economics, and the Georgia Institute of Technology ("Georgia Tech"), in which Emory J.D. students are teamed with Georgia Tech MBA and PhD science/engineering students to learn the process of commercializing innovation


**University of Virginia School of Law**

UVA Law School Student Conduct Committee
UVA Law School International Relations Committee
UVA Adventist Christian Fellowship Faculty Sponsor
University of Virginia Faculty Senate
UVA Law School International Relations/Graduate Program Committees
UVA Law School Lecturers Committee
UVA Student Scholarly Lunch Committee

Faculty Advisor, UVA Law School Street Law Society
Member, Law School Dean Search Committee, University of Virginia School of Law
UVA BLSA Mentor

## LEGAL EXPERIENCE

**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Atlanta**, GA
**Associate Attorney:**  Intellectual property practice including design and utility patent prosecution, design and utility patent interferences, patent reexaminations, patent due diligence projects involving U.S., European, and other foreign patents, trade secret counseling, litigation research and brief writing, infringement opinions/infringement clearance analyses, intellectual property assignments and license agreements, U.S. and European client counseling.

**SMITH, GAMBRELL & RUSSELL, LLP, Atlanta**, GA
**Associate Attorney**:  Intellectual property practice including drafting patent and trademark applications, responding to PTO office actions, litigation research and brief writing, drafting patent infringement and trademark opinion letters, patent, trademark and copyright assignments and license agreements, counseling clients on patent, trademark, copyright and trade secret issues.
**Summer/Student Associate**: Researched and drafted legal memoranda in a variety of practice areas including intellectual property, environmental, real estate, and litigation.

**KING & SPALDING, LLP,** Atlanta, GA
**Summer Associate:**  Researched and drafted legal memoranda for intellectual property, environmental, and real estate attorneys and clients.

## OTHER EXPERIENCE

**THE COCA-COLA COMPANY,** Atlanta, GA
**Senior Research Analyst:**  Coca-Cola USA Fountain Marketing Research
Responsibilities included defining client needs and creating targeted studies.  Solicited bids and negotiated study pricing with suppliers.  Presented research proposals and results to clients such as Wendy's International.  Successfully implemented studies simulating consumer purchase decisions and soft drink promotion success.

**THE PROCTER & GAMBLE COMPANY,** Cincinnati, OH; Mt. Dora, FL
**Products Research Group Leader:**  On-Loan to Sundor Brands, Mt. Dora, FL
Broad product and consumer research responsibilities for four beverage brands.  Key achievements:
  **Identified** a way to improve apple juice consumer acceptance while reducing flavor costs by $200K/year.
  **Managed** Product Development support of 16 oz. Hawaiian Punch Colors convenience store test market, including product manufacture, packaging, distribution, and data collection and analysis.
**Products Research/Process Development Engineer:**  Jif Peanut Butter, Cincinnati, OH  Responsibilities included managing support personnel and guiding product development.  Key achievements:
  **Co-inventor** on a United States patent for improved peanut butters.
  **Designed** experiments and produced model prototypes that beat regular Jif 2:1 in consumer taste tests.
  **Contributed** insight on how to talk to consumers about new product; increased purchase intent by 33%.
**Summer Research Intern, Jif Peanut Butter**  Cincinnati, OH
  **Defined** peanut wet-roasting parameters, which generated a cost savings potential of $1M.
**Summer Research Intern, Duncan Hines Cake Mixes** Cincinnati, OH
  **Developed** a proprietary cocoa treatment process that increased cake chocolate flavor by 20%.

**LAWRENCE LIVERMORE NATIONAL LABORATORY**, Livermore, CA
**Summer Research Intern, Hazards Control**
  **Conducted** flammable vapor diffusion studies; assisted in polymer combustion tests.

**AT&T BELL LABORATORIES**, Murray Hill, NJ
**Summer Research Intern, Polymer Science and Technology**
  **Synthesized** photosensitive polyimides for use in integrated circuitry.

**OAK RIDGE NATIONAL LABORATORY**, Oak Ridge, TN
**Summer Research Intern, Cryogenic Physics**
  **Assisted** in flux line lattice studies of superconducting materials at cryogenic temperatures.

**NASA - MARSHALL SPACE FLIGHT CENTER**, Huntsville, AL
**Summer Research Apprentice, Cryogenics Lab**
  **Investigated** effects of oxidation on Nb films for superconductor applications.