# **<u>EXHIBIT F</u>**

**DECLARATION OF PROFESSOR MATTHIAS LEISTNER**

**TABLE OF CONTENTS**

**Page No.**

I. INTRODUCTION ...................................................................................................1

II. SCOPE OF WORK AND TOPICS OF OPINION ....................................................1

III. EXPERIENCE AND QUALIFICATIONS ............................................................3

IV. EU RULES ON INTERNATIONAL JURISDICTION AND CHOICE OF LAW .................5

    A.    International jurisdiction: Brussels I Regulation (recast) ...................................... 6

    B.    Choice of law: Rome II Regulation ...................................................... 8

    C.    Procedural Law: Lex fori ..................................................................... 8

V. THE CIVIL COURT SYSTEM IN GERMANY FOR PATENT INFRINGEMENT AND

    VALIDITY CASES AND THE ROLE OF THE CJEU.......................................................9

VI. THE BACKGROUND AND KEY PRINCIPLES OF THE CJEU's BSH/ELECTROLUX

    JUDGMENT .......................................................................................................13

VII. CASE LAW OF LOWER COURTS SINCE BSH/ELECTROLUX....................................19

    A.    UPC, Local Division Mannheim, 18 July 2025, UPC_CFI_365/2023................. 19

    B.    UPC, Local Division Hamburg, 14 August 2025, UPC_CFI_387/2025 ............. 20

    C.    Munich Regional Court I, 25 September 2025, 7 O 9383/25 .............................. 21

    D.    UPC, Local Division The Hague, 10 October 2025, UPC_CFI_386/2024,
        UPC_CFI_610/2024 ....................................................................................... 23

    E.    Summary: Initial guideposts from the case law of the lower courts.................... 24

VIII. IMPACT OF BSH/ELECTROLUX ON THE INFRINGEMENT PROCEEDINGS

    BETWEEN THE PARTIES BEFORE THE MUNICH REGIONAL COURT I..............25

    A.    Application of the principles of BSH/Electrolux................................................. 25

B.      Reference to the CJEU for a further preliminary ruling because the case concerns U.S. patents? .................................................................................................. 27

C.      Reference to the CJEU for a further preliminary ruling because of additional uncertainties of the implementation of BSH/Electrolux regarding U.S. patents in the German bifurcated patent law system? .......................................................... 28

D.      Summary: Possible scenarios in the current infringement proceedings before the Munich Regional Court I ........................................................................................ 30

IX. General outline of anti-anti-suit-injunctions granted by the Munich Regional Court I and the

Higher Regional Court Munich. ......................................................................................32

X. ATTESTATION ...................................................................................................................34

## I.  INTRODUCTION

1.       My name is Dr. Matthias Leistner, LLM, and I am a Full Professor of Private Law and Intellectual Property Law (the GRUR-Chair) at Ludwig Maximilian University of Munich in Germany. My credentials are more fully described below.

2.       I understand that Bayerische Motoren Werke AG ("BMW AG") has been sued by Onesta IP, LLC ("Onesta") in Germany before the Munich Regional Court I for alleged patent infringements (filed on October 9, 2025; cases 12768/25, 13056/25, 13057/25). BMW AG is headquartered in Munich, Germany, while Onesta is headquartered in Pennsylvania, USA.

3.       I have been retained by Bardehle Pagenberg Partnerschaft mbB ("Counsel") to offer my professional opinions on certain topics of European Union ("EU") and German patent law, as well as EU jurisdictional rules, and private international law in the context of this litigation. The scope pf work and my instructions are more fully described below.

4.       I am an independent expert and not an employee of any party or counsel in this action. I am being compensated for my time at my standard rate of €800 per hour. My compensation has no relationship to the outcome of the litigation between the parties.

## II.  SCOPE OF WORK AND TOPICS OF OPINION

5.       Counsel has informed me of the following facts, which I have been asked to assume and apply for the purposes of my opinions outlined in this report.

6.       Onesta asserts that BMW AG has infringed the German part of a European patent (EP 2 473 920 B1) through actions, or alleged actions, carried out by BMW AG in Germany. Furthermore, I have been told that Onesta claims infringements of two U.S. patents (US 8,854,381 B2; US 8,443,209 B2) based on alleged actions by BMW AG in the United States ("U.S.")

7.     I understand that Onesta argued international jurisdiction of the Munich Regional Court I based on Article 4 of the Brussels I Regulation (recast)[1], particularly relying on a judgment by the Court of Justice of the European Union ("CJEU"), in case C-339/22 of February 25, 2025, BSH Haushaltsgeräte v. Electrolux ("BSH/Electrolux")[2].

8.     I have been instructed to provide an analysis of the impact of the principles established in the BSH/Electrolux judgment by the CJEU on the proceedings between BMW AG and Onesta before the Munich Regional Court I. In the following, I will provide an overview of and offer my opinions on:

- The key principles of the BSH/Electrolux decision (including an overview of respective EU law, in particular the role and function of the CJEU), its authority, limitations, and open questions relevant to the Onesta/BMW AG case.

- A review of subsequent lower court decisions concerning long-arm jurisdiction for foreign patent infringements, and the initial conclusions drawn from BSH/Electrolux in those cases.

- An analysis of the possible impact of BSH/Electrolux on the current Munich proceedings in *Onesta/BMW AG*, including possible distinctions between the present case and the facts underlying the CJEU's decision in BSH/Electrolux.

---

[1] Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast), OJ L 351 of 20.12.2012, p. 1 (current consolidated version, "Brussels I Regulation (recast)", see Exhibit 2).

[2] CJEU, Judgment of 25 February 2025, C-339/22, ECLI:EU:C:2025:108 – BSH/Electrolux, see Exhibit 3.

- A general description of AASI proceedings at the Munich Regional Court I and the Higher Regional Court Munich.

## III. EXPERIENCE AND QUALIFICATIONS

9.      I am currently a full professor and chairholder at Ludwig Maximilian University in Munich, Germany, where I serve as the German Association for the Protection of Intellectual Property ("GRUR") Chair for Civil Law and Intellectual Property Law with Information and IT-Law. Since 2003, I have been a Member of the Faculty of the Munich Intellectual Property Law Center. Previously, I was a full professor at Rheinische Friedrich Wilhelm University in Bonn, Germany, where I served as the Chair for Civil Law, Intellectual Property Law, and Competition Law, and Director of the Institute for Commercial and Economic Law.

10.      In these capacities, I have taught courses and seminars, and supervised doctoral theses, on patent law, including EU and international patent law, since 2007. These courses, seminars, and supervised doctoral theses have covered all relevant questions of EU and German patent law, EU jurisdiction and choice of law rules as they are pertinent to the case at hand.

11.      I was also an associate professor at University of Augsburg in Augsburg, Germany. I have also served as an International Visiting Professor at Columbia Law School in New York City, as a Visiting Scholar at the Engelberg Center on Innovation Law & Policy at NYU School of Law, as a guest professor at University of Xiamen and Tongji University (Shanghai) in China, and as a guest lecturer at Singapore Management University. In the course of my career, I have been called to other positions as full professor at the Universities of Mannheim, Hannover, Bayreuth, and Erlangen, and to a position as Director of the Max Planck Institute for Innovation and Competition in Munich (*see also* below at ¶17); I have declined all these offers and stayed in my respective current positions.

12.     I studied law at the Freie Universitaet Berlin, Humboldt University Berlin, and Université Libre de Bruxelles with an Erasmus fellowship. I completed my Ph.D. studies at the Ludwig Maximilian University. Thereafter, I completed a Legal Clerkship at the Munich Court of Appeals.

13.     During my study of law and my professional career, I have authored, co-authored, or edited eleven books and more than 200 academic papers and smaller contributions covering the topics of general civil law, EU law, including EU rules on international jurisdiction and choice of law, copyright and patent law, internet and information law, as well as unfair competition and antitrust law. I have also served as a member of the Academic Advisory Board of the HumTEC-project (Law and Technology program) within the German "Excellency Initiative" at the RWTH Aachen University in Aachen, Germany, and have opined on patent law related matters in that capacity.

14.     Since 2022, I am one of only three executive editors of GRUR Journal, the leading journal on the entire field of industrial property and copyright law in Germany. Since 2023, I have served on the Editorial Board of GRUR Patent Journal, a specialized sister journal of GRUR focused exclusively on patent law cases and articles. I am also a Member of GRUR, the German Association for the Protection of Intellectual Property, which is the largest and oldest association in Germany that is devoted to the protection of intellectual property, where I have served on the General Board since 2020 and on the Executive Committee since 2023.

15.     I have acted as an expert on matters of patent and IP infringement, relating to patent and IP rights, in numerous cases, including before the German Federal Constitutional Court; the Unified Patent Court; the German Federal Court of Justice; the Duesseldorf, Mannheim, and Munich patent infringement courts; the High Court for England and Wales; U.S. State Courts; the International Trade Commission in Washington, D.C.; the Tribunal Judiciaire in Paris; the

International Chamber of Commerce (ICC) in Paris; and the Hong Kong International Arbitration Centre.

16.     During my career, I have received over five awards and fellowships (for my Doctoral Thesis; during my LL.M. studies at Trinity Hall College, University of Cambridge; and for work on my post-doctoral thesis at LMU Munich).

17.     On July 26, 2023, I was offered the position of Director at the Max Planck Institute for Innovation and Competition, Munich, by the German Max Planck Society. This institute is the leading institution for research on innovation and competition law in the EU and one of the major institutions in this sector worldwide. After extensive negotiations with Max Planck Society and LMU Munich, I decided in May 2024 to decline the offer and stayed in my current position as a full professor and chairholder at LMU Munich.

18.     A copy of my CV is attached hereto as Exhibit 1.

19.     Based upon my experience, qualifications, and expertise, I am qualified to provide expert testimony regarding the EU and German rules on international jurisdiction and choice of law in patent infringement lawsuits in EU Member States' courts and before the Unified Patent Court (UPC).

**IV.  EU RULES ON INTERNATIONAL JURISDICTION AND CHOICE OF LAW**

20.     International jurisdiction and choice of law in German patent infringement cases are governed by EU Regulations. These Regulations are directly applicable and have the same status and effect as German laws in Germany according to Art. 288(2) Treaty of the Functioning of the European Union ("TFEU")[3], which states:

---

[3] Treaty of the Functioning of the European Union, OJ C 326 of 26.10.2012 (current consolidated version), p. 46 ("TFEU"), see Exhibit 4.

"*A regulation shall have general application. It shall be binding in its entirety and directly applicable in all Member States.*"

21.    The Brussels I Regulation (recast) is the legal basis for international jurisdiction and the Rome II Regulation[4] is the legal basis for choice of law.

**A.    International jurisdiction: Brussels I Regulation (recast)**

22.    The Brussels I Regulation (recast) provides the following provisions on jurisdiction relevant for patent infringement proceedings: the jurisdiction of the place of domicile of the defendant (Art. 4(1) Brussels I Regulation (recast)), the place where the harmful event occurred (Art. 7(2) Brussels I Regulation (recast)), the domicile of another defendant in the same dispute, if there is a close connection of the claims (Art. 8(1) Brussels I Regulation (recast).

23.    The most relevant jurisdiction (also essential to the case at hand) is the jurisdiction of the place of domicile (Art. 4(1) Brussels I Regulation (recast)). A company or other legal person or association of natural or legal persons may be sued at the place of its statutory seat, central administration or principal place of business, according to Art. 63(1) Brussels I Regulation (recast) which on principle can decide on any patent infringement regardless of the territory in question (I will further describe the details of the application and limitations of this jurisdiction in regard to foreign patents below). The general objective of the Brussels I Regulation (recast) is to assign jurisdiction to the courts which, on account of their physical and legal proximity, are best placed to hear those disputes.

24.    Art. 4(1) Brussels I Regulation (recast) reads as follows:

---

[4] Regulation (EC) No. 864/2007 of the European Parliament and of the Council of 11 July 2007 on the law applicable to non-contractual obligations, OJ L 199 of 31.7.2007, p. 40 („Rome II Regulation"), see Exhibit 5.

"*Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.*"

25.    Art. 63(1) Brussels I Regulation (recast) reads as follows:

"*For the purposes of this Regulation, a company or other legal person or association of natural or legal persons is domiciled at the place where it has its:*

*(a) statutory seat*

*(b) central administration; or*

*(c) principal place of business.*"

26.    At the same time, the Brussels I Regulation (recast) also provides for an exclusive jurisdiction for proceedings concerning the validity of patents issued by EU Member States. According to Art. 24(4) Brussels I Regulation (recast) the courts of the Member State where the registration has been applied for or has taken place have exclusive jurisdiction for the validity proceedings, regardless of the domicile of the parties.

27.    Art. 24(4) Brussels I Regulation (recast) reads as follows:

"*The following courts of a Member State shall have exclusive jurisdiction, regardless of the domicile of the parties:*

*[…]*

*(4) in proceedings concerned with the registration or validity of patents […], irrespective of whether the issue is raised by way of an action or as a defence, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of an instrument of the Union or an international convention deemed to have taken place.*"

28.     The European Court of Justice ("ECJ") had ruled in its older judgment *GAT/LuK*[5] that Art. 24(4) Brussels I Regulation (recast) applies to any proceedings in which the question of validity is raised. This applied expressly also to infringement proceedings, if the invalidity of the patent was raised as an objection in such proceedings. Therefore, under the older GAT/LuK judgment's understanding national infringement proceedings were effectively limited in their scope to the respective national patents on which the courts of the respective Member State also had jurisdiction concerning their validity (at least in relation to other EU Member States).

**B.      Choice of law: Rome II Regulation**

29.     As to the applicable substantive law in patent disputes, the Rome II Regulation states that the law of the country for which protection is sought shall apply (Art. 8(1) Rome II Regulation). The Rome II Regulation thus effectively follows the "*lex loci protectionis*" principle.

30.     Art. 8(1) Rome II Regulation reads as follows:

"*The law applicable to a non-contractual obligation arising from an infringement of an intellectual property right shall be the law of the country for which protection is claimed.*"

31.     If a German court decided on an infringement of a foreign patent in a foreign country it would therefore have to apply the substantive patent law of the foreign country.

**C.      Procedural Law: Lex fori**

32.     The Rome II Regulation does not apply, however, to evidence and procedure (Art. 1(3) Rome II Regulation). As for rules on civil procedure, therefore, the respective national procedural law applies, also in cases concerning cross-border disputes (so called "*lex fori*" principle).

33.     Art. 1(3) Rome II Regulation:

"*This Regulation shall not apply to evidence and procedure* […]."

---

[5] ECJ, Judgment of 13 July 2006, C-4/03, ECLI:EU:C:2006:457 – GAT/LuK, see Exhibit 6.

## V.  THE CIVIL COURT SYSTEM IN GERMANY FOR PATENT INFRINGEMENT AND VALIDITY CASES AND THE ROLE OF THE CJEU

34.     In Germany, certain specialized Regional Courts and the respective appellate courts (Higher Regional Courts) have jurisdiction for patent infringement cases. The most important regional courts whose judgments provide particularly important orientation for German patent law practice, are the (1) Düsseldorf Regional Court and Court of Appeal; (2) the Mannheim Regional Court and Karlsruhe Court of Appeal; and (3) the Munich Regional Court I and Munich Court of Appeal. Judgments of these courts, especially the Courts of Appeal, are particularly important for German patent law practice.

35.     The structure of the proceedings in patent infringement lawsuits is thus as follows: The first instance proceedings are allocated to the Regional Courts. If the judgments of Regional Courts are appealed, the appeal will be dealt with by the Higher Regional Courts in the respective German region. An appeal in law to the Federal Court of Justice, Germany's highest court in civil law matters, against judgments of the Higher Regional Courts is possible under certain additional conditions. Further, a constitutional complaint to the Federal Constitutional Court is possible in certain very rare cases to decide on issues of possible breaches of constitutional law.

36.     Concerning patent validity, first, it has to be distinguished between the different types of patents in Europe. There are national patents which are granted by the national patent office, in Germany the German Patent and Trademark Office (Deutsches Patent- und Markenamt, "DPMA").

37.     In addition, according to the European Patent Convention ("EPC")[6], a multilateral treaty between 39 states in Europe (more Member States than the European Union, e.g. also the

---

[6] Convention on the Grant of European Patents (European Patent Convention) of 5 October 1973 as revised by the Act revising Article 63 EPC of 17 December 1991 and the Act revising the EPC of 29 November 2000 ("EPC"), see Exhibit 7.

United Kingdom ("UK"), Turkey), a so-called European Bundle Patent may be granted. This is a patent that is granted by the European Patent Office ("EPO") and has to be individually validated for the different EPC Member States. The bundle patent then breaks down into its respective individual national parts for which the respective national courts have jurisdiction. Only individual national patents take effect (Art. 64(1) EPC), but the decision to grant the patent is centralized and the patents share the same uniform legal provisions regarding the conditions on patentability and patent grant (Art. 52ff. EPC).

38.    Concerning invalidation proceedings, in Germany, jurisdiction for both the validity of national patents and the German parts of European (bundle) patents is exclusively allocated to the German Federal Patent Court as the first instance and the Federal Court of Justice as the final instance. The European patent in suit is a European bundle patent in that sense. Furthermore, the period of nine months following the grant of a European patent allows for an opposition to be filed with the EPO. Jurisdiction lies with the Opposition Division at first instance and the Board of Appeal at second instance.

39.    In consequence, in patent law matters, in Germany different jurisdictions apply regarding infringement (Regional Courts, Courts of Appeal) and validity proceedings (Federal Patent Court). This is called "*Trennungsprinzip*" (bifurcated patent court system). Most other countries in the EU grant the same court jurisdiction regarding both infringement and validity. This is called "*Einheitsprinzip*" (unitary patent court system).

40.    Furthermore, and effectively in addition to the national court system, since mid-2023 the Unified Patent Court ("UPC") system is operational. It constitutes a unitary European Patent Court System based on a Mulilateral Treaty between 18 EU Member States. According to

Art. 1(2) Unified Patent Court Agreement ("UPCA")[7], the UPC is a unitary court common to the Contracting Member States. This means it is basically treated like a national court. Germany is a Contracting Member State of the UPC. The UPC has two instances, either the Local or Regional Divisions or the Central Divisions as a court of first instance and the Court of Appeals as the second instance. The UPC is competent to hear infringement and validity cases concerning European Bundle Patents (in this case the jurisdiction is non-exclusive and generally depends on the European patents not being 'opted-out' of the system) and European Patents with unitary effect ("Unitary Patents"; in this case, the jurisdiction is exclusive). Unitary Patents are based on European Bundle Patents but provide a unitary patent covering the whole territory of the UPC Member States.

41.    As to EU law proper, which takes precedence over both, the national law of the Member States as well as over UPC law, in addition to the Member States' courts and the UPC, the CJEU is the highest authority specifically for questions concerning the interpretation of EU law. It can only issue decisions on EU law (impliedly including questions concerning the implementation of EU law in the national law of the Member States). The Rome II Regulation and the Brussels I Regulation (recast) are EU law which is directly applicable in the Member States. Thus, the CJEU authoritatively and uniformly decides on the interpretation of these instruments concerning jurisdiction and choice of law throughout the EU.

42.    There is no appeal to the CJEU. The Court can only be asked for a ruling on a particular question of interpretation by a national court (including the UPC). This is called a reference for a preliminary ruling. Only the highest instance of the national courts (in Germany, in

---

[7] Agreement on a Unified Patent Court signed on 19 February 2013, as amended by decision of the Administrative Committee of the Unified Patent Court of 26 June 2023 ("UPCA"), see Exhibit 8.

patent infringement cases the Federal Court of Justice) is obliged to refer a question to the CJEU if the interpretation of Union law is relevant to the outcome of the case and if it is not clarified beyond a reasonable doubt. The lower instances (in Germany, in patent infringement cases the Regional Courts and Higher Regional Courts) have discretion whether to refer cases if questions of interpretation of Union law are relevant and in doubt.

43.    The CJEU shall be asked for a preliminary ruling if there is an ambiguity concerning the interpretation of EU law. If the CJEU has already decided on a similar matter, the national court effectively has to decide whether the case at hand differs substantially and the question is therefore open (then there should be a reference for a preliminary ruling) or whether the question can be answered based on the existing case law of the CJEU ("acte éclairé") or whether the interpretation of the EU law provision in question is unambiguously clear beyond any reasonable doubt ("acte clair"). In case of acte clair or acte éclairé there is no need for a reference. In all other cases, the lower courts can refer a question for a preliminary ruling while the highest Member States' courts must refer a question for a preliminary ruling.

44. Art. 267 TFEU reads as follows:

"*The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*

*(a) the interpretation of the Treaties;* […]

*Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.*

*Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*"

45.     Any decision of the CJEU is authoritative and binding on the decided questions in law and must be followed by all national courts of the EU Member States and the UPC.

## VI.  THE BACKGROUND AND KEY PRINCIPLES OF THE CJEU's BSH/ELECTROLUX JUDGMENT

46.     The CJEU's decision in the case BSH/Electrolux concerned a patent infringement case in Sweden (a contracting state of the EPC as well as a Member State of the EU). Electrolux, the defendant, was based in Sweden. BSH, the claimant, sued for infringement of a European Bundle patent which was valid in several EPC contracting states, inter alia Germany, Spain, UK as well as in Turkey. Turkey is not an EU Member State but notably is a contracting state of the EPC and thus a member of the EPO system.

47.     BSH claimed infringement in all those European countries as well as in Turkey in the Swedish court based on a European patent validated in all those countries. Sweden has a unitary patent court system in the aforementioned sense where invalidity of the patent in suit can be raised as an objection in the infringement proceedings. Electrolux pleaded that the Swedish court had only jurisdiction for the Swedish patent (i.e. the Swedish part of the European Bundle patent), whereas jurisdiction for the other parts laid with the other respective national courts according to Art. 24(4) Brussels I Regulation (recast). According to the older *GAT/LuK* decision of the ECJ, since the infringement proceedings in BSH/Electrolux also indirectly concerned the validity of the patent in suit (), the exclusive jurisdiction concerning the validity issues had to be determined on the basis of Art. 24(4) Brussels I Regulation (recast).

48.     Against that background, the CJEU in BSH/Electrolux, first, established that Art. 24(4) Brussels I Regulation (recast) was only and exclusively applicable to invalidation proceedings (i.e. with inter omnes effect), whereas jurisdiction for infringement proceedings was entirely and fully governed by the general jurisdiction rule in Art. 4 Brussels I Regulation (recast) (CJEU, BSH/Electrolux, para. 41). The CJEU then noted that cross-border infringement

proceedings would practically be impossible if jurisdiction were denied in any case, where a validity-related objection was raised by the defendant regarding foreign patents in the course of infringement proceedings. Thus, jurisdiction for cross-border infringement proceedings should not be denied just because objections concerning the alleged invalidity of foreign patents were implied in such proceedings. Instead, according to Art. 4 Brussels I Regulation (recast) the Swedish courts, according to the CJEU in BSH/Electrolux, on principle had broad jurisdiction, including with full cross-border effect, for the infringement proceedings, no matter whether Swedish or foreign patents were concerned, since the defendant Electrolux had its seat of business in Sweden.

49.    At the same time, in relation to patents from other EU Member States, the CJEU accepted that the exclusive jurisdiction for invalidation proceedings in those Member States, according to Art. 24(4) Brussels I Regulation (recast) must be taken into account. Therefore, the CJEU concluded that in cases, in which infringement proceedings at the seat of the defendant concern patents from other EU Member States, the infringement court will have to assess the probability of success in respective foreign invalidation proceedings (ECJ, BSH/Electrolux, marginal no. 50-51). The court can then either continue the infringement proceedings for the concerned foreign territories or suspend them depending on the result of this prognosis, thus effectively accepting the exclusive jurisdiction for invalidation proceedings in other EU Member States in substance, while at the same time limiting it strictly to the carrying out of these invalidation proceedings as such and effectively enabling the infringement court to make an inter partes decision on the likely validity of the foreign patents in suit for the purposes of the infringement proceedings.

50.    In the following part of the judgment, concerning courts of so-called third countries (i.e. countries that are not Member States of the EU, such as Turkey in the BSH/Electrolux case) the CJEU emphasized that the Brussels I Regulation (recast) was a system of jurisdiction internal

to the EU. Art. 24(4) Brussels I Regulation (recast), according to its wording and context, was thus not applicable in the first place in a situation in which the patents-in-suit are validated in a third country (CJEU, BSH/Electrolux, para. 56-57).

51.    Nonetheless, the CJEU confirmed that Art. 4(1) Brussels I Regulation (recast) also provides jurisdiction concerning the infringement of a patent validated or granted in a third country (CJEU, BSH/Electrolux, para. 60-61). Therefore, a court of a Member State of the EU may decide about the infringement of a patent that has been applied for or issued in a third country even if a validity objection is raised (CJEU, BSH/Electrolux, para. 76). In such a case, the Court can decide on the validity of the foreign patent in suit with inter partes effect for the purposes of the infringement proceedings.

52.    The CJEU recognized that this extra-territorial jurisdiction may be limited concerning countries that are Member States to the Lugano Convention[8] (inter alia Switzerland, Norway) that provides a similar rule to Art. 24(4) Brussels I Regulation (recast) in Art. 22(4) Lugano Convention (CJEU, BSH/Electrolux, para. 62-63). Additionally, other bilateral agreements with third countries may also indicate otherwise and require further limitations.

53.    However, as a general rule, according to BSH/Electrolux, the court at the seat of the defendant can decide about infringements in third countries with extra-territorial effect, and also (with inter partes effect) about invalidity objections concerning patents applied for or issued in the respective third countries.

54.    It must be carefully noted however that in the BSH/Electrolux judgment, the concerned third country, while not being an EU Member, was an EPC contracting state (i.e. Turkey), and the patent in suit was a European bundle patent uniformly issued by the EPO and

_____

[8] Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, OJ L 339, 21.12.2007, p. 3 („Lugano Convention"), see Exhibit 9.

subsequently validated for Turkey and other EPC contracting states. Thus, on the facts of the BSH/Electrolux case, the CJEU hitherto has only directly decided the matter with regard to third countries that are contracting states of the EPC system.

55.      Also, in the context of cross-border infringement proceedings concerning foreign patents, the infringement court, according to BSH/Electrolux, will have to apply Art. 33-34 Brussels I Regulation (recast).

56.      Art. 33 Brussels I Regulation (recast) reads as follows:

"*(1) Where jurisdiction is based on Article 4 or on Articles 7, 8 or 9 and proceedings are pending before a court of a third State at the time when a court in a Member State is seised of an action involving the same cause of action and between the same parties as the proceedings in the court of the third State, the court of the Member State may stay the proceedings if:*

*(a) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and*

*(b) the court of the Member State is satisfied that a stay is necessary for the proper administration of justice.*

*(2) The court of the Member State may continue the proceedings at any time if:*

*(a) the proceedings in the court of the third State are themselves stayed or discontinued;*

*(b) it appears to the court of the Member State that the proceedings in the court of the third State are unlikely to be concluded within a reasonable time; or*

*(c) the continuation of the proceedings is required for the proper administration of justice.*

*(3) The court of the Member State shall dismiss the proceedings if the proceedings in the court of the third State are concluded and have resulted in a judgment capable of recognition and, where applicable, of enforcement in that Member State.*

*(4) The court of the Member State shall apply this Article on the application of one of the parties or, where possible under national law, of its own motion.*"

Art. 34 Brussels I Regulation (recast) reads as follows:

"*(1) Where jurisdiction is based on Article 4 or on Articles 7, 8 or 9 and an action is pending before a court of a third State at the time when a court in a Member State is seised of an action which is related to the action in the court of the third State, the court of the Member State may stay the proceedings if:*

*(a) it is expedient to hear and determine the related actions together to avoid the risk of irreconcilable judgments resulting from separate proceedings;*

*(b) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and*

*(c) the court of the Member State is satisfied that a stay is necessary for the proper administration of justice.*

*(2) The court of the Member State may continue the proceedings at any time if:*

*(a) it appears to the court of the Member State that there is no longer a risk of irreconcilable judgments;*

*(b) the proceedings in the court of the third State are themselves stayed or discontinued;*

*(c) it appears to the court of the Member State that the proceedings in the court of the third State are unlikely to be concluded within a reasonable time; or*

*(d) the continuation of the proceedings is required for the proper administration of justice.*

*(3) The court of the Member State may dismiss the proceedings if the proceedings in the court of the third State are concluded and have resulted in a judgment capable of recognition and, where applicable, of enforcement in that Member State.*

*(4) The court of the Member State shall apply this Article on the application of one of the parties or, where possible under national law, of its own motion.*"

57.    Hence, according to the BSH/Electrolux judgment (at para. 65),

"*in the circumstances referred to in Articles 33 and 34 of the Brussels I* bis *Regulation, a court of a Member State whose jurisdiction is based on Article 4 of that regulation may be prompted to recognise the jurisdiction of the courts of third States, by staying proceedings, or even terminating the proceedings before it, where proceedings are already pending before a court of a third State at the time when that first court is seised either of an application between the same parties involving the same subject matter and cause of action as the application brought before the court of the third State, or of an application related to the one brought before the court of the third State.*".

58.    In sum, according to the BSH/Electrolux judgment, a European infringement court at the business seat of the defendant, such as the Munich Regional Court I in the case at hand, in principle can decide on the infringement of patents applied for in or issued by third countries (i.e. non-EU Member States) with extra-territorial effect.

59.    In principle, this also applies when invalidity related objections are raised. In this case the infringement court can decide on the validity of the foreign patents with inter partes effect for the purposes of the extra-territorial infringement proceedings.

60.    However, BSH/Electrolux has only directly decided the matter in a case, in which the third country, while not being an EU Member State (i.e. a third country), was still a contracting state of the EPC system and in which the patent in suit was a European bundle patent issued by the EPO. For third countries, which are not contracting states of the EPC, such as e.g. the United States in the case at hand, the question has not been specifically decided by the CJEU yet.

61.    Also, an infringement court, while retaining extra-territorial jurisdiction for infringements based on foreign patents in foreign territories, can (and under certain circumstances shall) nonetheless suspend the proceedings in relation to the foreign patents, in particular if invalidation proceedings have been initiated in the respective third countries. However, the national infringement court will have rather broad discretion in this regard, since the CJEU in BSH/Electrolux did not further specify in which situations the infringement would have to be mandatorily suspended in view of ongoing invalidation or other proceedings abroad.

## VII.  CASE LAW OF LOWER COURTS SINCE BSH/ELECTROLUX

62.    There are several recent decisions by lower courts which have already applied the previously outlined principles of the CJEU's judgment in BSH/Electrolux. In particular, the following judgments issued injunctions based on European Bundle Patents covering not only the respective national territory of the deciding court but having extraterritorial effect for other EPC contracting states.

### A.    UPC, Local Division Mannheim, 18 July 2025, UPC_CFI_365/2023[9]

63.    This infringement action before the UPC Local Division Mannheim was filed by Fujifilm against Kodak. Fujifilm sued Kodak for infringement of a European Bundle patent that was still in force in the UK (an EPC contracting state, but not an EU Member State) and in Germany but had elapsed in all other EPC Member States. Fujifilm sued the German sales companies of the multinational company Kodak, the defendant. Therefore, the defendants had a statutory seat in Germany, a UPC Member State. The UPC Local Division had jurisdiction according to Art. 4(1) Brussels I Regulation (recast). The Local Division had separated the

---

[9] See Exhibit 10.

proceedings concerning the German part of the Bundle Patent and ruled on 2 April 2025 that those parts were found valid and infringed and the infringement action was therefore successful.

64.     Concerning the UK part of the European Bundle Patent, the Local Division examined whether there were any restrictions concerning a decision on the infringement of the UK patent as there was a validity objection raised in the proceedings before the UPC. The Local Division denied any restrictions as the UK is not part of the Lugano Convention and there are no other bilateral agreements with the UK relevant to this case. A stay of the proceedings was not considered as there were no pending proceedings in the UK between the parties. The Local Division considered itself to have jurisdiction concerning the infringement and a decision about the validity of the patent inter partes.

65.     In consequence, the Local Division held the UK patent valid and infringed. According to the *lex loci protectionis* principle, it applied substantive UK patent law concerning the infringement in the UK territory (UK Patents Act 1977). By delivering the infringing embodiment to the UK, the defendants infringed the UK patent. Concerning the validity, the Local Division referred to its judgment from 2 April 2025 on the German part of the European Bundle Patent which was considered valid. The Local Division argued there would be no different outcome for the UK patent as the legal basis (EPC) was the same.

## B.     UPC, Local Division Hamburg, 14 August 2025, UPC_CFI_387/2025[10]

66.     This case brought before the UPC Local Division Hamburg concerned the parties Dyson and Dreame. Dyson applied for provisional measures against Dreame and others based on alleged patent infringement of a European Bundle Patent which was also valid in Spain (an EU Member State, EPC contracting state, but not a contracting state of the UPC system as such). One defendant had its statutory seat in Hong Kong, China. The Local Division applied the

---

[10] See Exhibit 11.

BSH/Electrolux case law of the CJEU and affirmed jurisdiction for the entire matter according to Art. 7(2) Brussels I Regulation (recast) (jurisdiction of the place where the harmful event occurred or may occur) and Art. 8(1) Brussels I Regulation (recast) (the domicile of another defendant in the same dispute with a close connection to the case at hand) Brussels I Regulation (recast), although the CJEU did not expressly rule on these Articles in its BSH/Electrolux decision.

67.     Questions of validity do not seem to have been raised in the proceedings. Also, the Local Division considered the patent to be infringed.

68.     In result, provisional measures were granted with extra-territorial effect for the Spanish part of the Bundle Patent as well. The Local Division applied Spanish substantive patent law concerning the infringement of the Spanish part of the European patent. It granted preliminary measures with a territorial scope covering not only the UPC Member States but also Spain, which notably is not a contracting state of the UPCA, but an EU Member State. Nonetheless, the case might have been decided the same way even before BSH/Electrolux as Art. 35 Brussels I Regulation (recast) provides jurisdiction regardless of Art. 24(4) Brussels I Regulation (recast) in preliminary proceedings. The major impact of BSH/Electrolux concerns infringement proceedings on the merit.

## C.     Munich Regional Court I, 25 September 2025, 7 O 9383/25[11]

69.     This case brought before the Munich Regional Court I concerned the parties Regeneron, Bayer and Formycon. Regeneron and Bayer applied for preliminary measures against Formycon for infringing a European Bundle Patent that was valid in Germany and several other EPC Member States. The defendants had their statutory seat in Germany. The claimants applied for preliminary measures covering 22 EU Member States other than Germany (all at the same time being EPC contracting states). The case for patent infringement in Germany was separated and

---

[11] See Exhibit 12.

decided on the same day (case no. 9382/25). The patent concerned a formulation of a medicine. The infringement was alleged to be by equivalent use.

70.    Concerning patent infringement in the other 22 EU Member States, the court considered itself competent to decide the case according to Art. 4(1) Brussels I Regulation (recast). It cited the BSH/Electrolux judgment of the CJEU. The Munich court held that a stay of the proceedings was not necessary as the German Federal Patent Court had issued a first instance ruling considering the German part of the European Bundle patent valid. As the legal basis for European Bundle Patents was the same, this led the Munich Regional Court I to the assumption that all other national parts of the same European Bundle Patent would be held valid by the respective national courts as well.

71.    Considering infringement, the Regional Court differentiated between the court procedure, which is governed by German law (*lex fori*), and the substantive law of patent infringement, which is governed by the respective national law of the *lex loci protectionis*, according to Art. 8(1) Rome II Regulation. According to German law, the court affirmed patent infringement by equivalence. However, concerning the equivalent patent infringement in the 22 other Member States, the court thus had to apply the respective national laws on infringement. The court nonetheless held that there was a presumption that the other countries would come to the same conclusion regarding infringement, as the legal basis for the granting and the scope of the patent was the same (namely the EPC). However, every country in Europe has its own case law on equivalent infringement. Therefore, the court examined every national law but considered it unnecessary and unduly preventing effective patent enforcement to consult respective legal experts for the national law. Instead, it relied on the presentation of the parties for the respective national law. In that regard, the judgment is in certain tension with the German Federal Court of Justice's

standing case law on Sec. 293 German Code of Civil Procedure[12], according to which, even if one party relies on a certain interpretation of foreign law and the other party does not dispute this, the court will still have to ascertain the interpretation of the foreign law ex officio on its own to confirm the respective interpretation of the foreign law in question.[13]

72.    In result, the Regional Court granted a preliminary injunction covering 22 EU Member States (all being EPC contracting states) other than Germany for infringing the respective part of the European Bundle Patent. As said before, in preliminary proceedings, Art. 35 Brussels I Regulation (recast) could have applied even before BSH/Electrolux and would have made the judgment legally possible. Nonetheless, the court relied on the BSH/Electrolux judgment and probably would not have rendered the judgment in the same way before the decision of the CJEU as it would have lacked jurisdiction in the proceedings on the merit.

### D.    UPC, Local Division The Hague, 10 October 2025, UPC_CFI_386/2024, UPC_CFI_610/2024[14]

73.    This case brought before the UPC Local Division The Hague concerned the parties HL Display and Black Sheep Retail Products. HL Display sued Black Sheep Retail Products, which is based in The Netherlands at the UPC Local Division The Hague for patent infringement of a European Bundle Patent. The patent-in-suit was valid in several EU Member States that are contracting states of the UPC, but also other EU Member States like Poland and Spain (which are not UPC contracting states), as well as in non-EU Member States like Switzerland and Norway which are part of the Lugano Convention and also in non-EU Member States that are not part of

---

[12] See Exhibit 13.

[13] See most recently Federal Court of Justice, Judgment of 6 November 2025, I ZR 182/22, GRUR 2025, 1861 – Gutscheinwerbung II, see Exhibit 14.

[14] See Exhibit 15.

the Lugano Convention, namely the UK. The claimant applied for injunctive relief in all countries in which the European Bundle Patent was valid. Notably, again all these countries were contracting states of the EPC.

74.    The Local Division The Hague assumed broad jurisdiction based on the BSH/Electrolux judgment as the Defendant was seated in The Netherlands. Concerning the EU Member States and the Member States of the Lugano Convention the court explained that it would make an evaluation whether there was a serious, non-negligible prospect that the competent national court will invalidate the patent. Regarding non-EU Member States the court indicated it may decide on the validity inter partes.

75.    The court assessed the validity of the patent and concluded that it was held valid for the UPC Member States. Regarding the Member States of the Lugano Convention it concluded that there was no serious, non-negligible likelihood that the competent national court would hold the patent invalid. For other countries (UK), it held the patent valid inter partes. The evaluation of validity was based on the EPC.

76.    Ultimately, the court held the patent infringed in all concerned countries. It seemed to apply only provisions of the UPCA, at least the applicable provisions were not expressly made clear. From my professional viewpoint, this seems surprising, as the Rome II Regulation demands to apply the respective national law for the assessment of the infringement of the respective national part of the European Bundle patent for which protection is sought (*see above* at ¶29-31).

E.    **Summary: Initial guideposts from the case law of the lower courts**

77.    The early case law of the lower courts, following the recent CJEU's BSH/Electrolux judgment, allows to tentatively derive the following initial guideposts concerning international jurisdiction for infringement proceedings in EU Member States' courts and the UPC.

78.     The lower courts tend to broadly assume jurisdiction for international patent infringement cases if only the defendant has its statutory seat in the country of the court seized, based on Art. 4(1) Brussels I Regulation (recast). They apply national procedural law but are bound to apply the respective national law concerning infringement and validity to the extent that their resulting judgments concern foreign patents with extra-territorial effect.

79.     The existing lower courts' case law, in line with the facts underlying the BSH/Electrolux judgment, has hitherto only dealt with European Bundle Patents, which were uniformly granted, based on the EPC. In consequence, the hitherto existing case law does not extend to foreign patents applied for or granted in countries outside the EPC system, such as the U.S.

80.     Concerning validity, the lower courts differentiate between the EU Member States and Member States of the Lugano Convention, on the one hand, and other third countries on the other. Regarding EU Member States and Member States of the Lugano Convention, the lower courts evaluate whether the respective national court that has jurisdiction on validity may hold the patent invalid. Regarding third countries like the UK, although the possibility of suspension also exists, the courts seem to tend more towards directly deciding on the validity issues inter partes, regardless of respective national proceedings abroad. However, this is not a confirmed trend yet, insofar based on just one judgment since the CJEU's BSH/Electrolux judgment.

## VIII.  IMPACT OF BSH/ELECTROLUX ON THE INFRINGEMENT PROCEEDINGS BETWEEN THE PARTIES BEFORE THE MUNICH REGIONAL COURT I

### A.     Application of the principles of BSH/Electrolux

81.     The BSH/Electrolux decision has a major impact on proceedings in Germany concerning international patent infringement and possible long-arm jurisdiction by the German

patent infringement courts. In my professional opinion, it can clearly be expected that the Munich Regional Court I will apply those principles in the present case.

82.     The defendant in the present case has its statutory seat in Germany. Therefore, from my professional viewpoint there is a non-negligible likelihood that the Munich Regional Court I will assume jurisdiction concerning possible patent infringement of U.S. patents in the U.S. according to Art. 4(1) Brussels I Regulation (recast) based on the interpretation of the Regulation established in the CJEU's judgment BSH/Electrolux.

83.     Nonetheless, a major difference of the case at hand to BSH/Electrolux as well as to all cases decided since BSH/Electrolux in the EU Member States' lower courts and the UPC, is that the patents in suit in the case at hand are not only parts of a European Bundle Patent (and thus granted on the uniform basis of the EPC), but also two U.S. patents. For such a situation, in my professional opinion, there is no directly applicable precedent authority in EU case law yet. Without such directly applicable authority certain doubts remain as to the exact approach the Munich Regional Court I should take.

84.     If the Munich Regional Court I indeed assumed extra-territorial jurisdiction for the infringement of the U.S. patents in U.S. territory, it would then have to apply U.S. substantive patent law concerning infringement and validity. Again, in this situation, the Munich Regional Court I could stay the proceedings; but there would be no duty to do so under the BSH/Electrolux judgment, since the latter judgment leaves this matter to the discretion of the national infringement court and has not established any specific criteria on how to specifically handle such cases in relation to countries that are not contracting states of the EPC.

85.     The Munich Regional Court I could thus as well decide about the validity and infringement of the U.S. patents in such a case, albeit of course only with inter partes effect concerning the matter of patent validity.

86.    Ongoing proceedings in the U.S. concerning the validity and/or infringement of the U.S. patents, either before the U.S. Patent Trial and Appeal Board ("PTAB") or U.S. courts, may increase the probability of a stay in the Munich proceedings regarding the affected U.S. patents and their infringement, but under current law there is no guarantee either way. Without any existing precedence for a case, concerning the infringement of a U.S. patent in the U.S., merely based on BSH/Electrolux the outcome of the infringement proceedings before the Munich Regional Court I seems rather open and hardly predictable in this respect.

**B.    Reference to the CJEU for a further preliminary ruling because the case concerns U.S. patents?**

87.    Under these circumstances (no clear and unambiguous precedent for third countries that are neither EU nor EPC members), the Munich Regional Court I could also refer the case to the CJEU for a further preliminary ruling according to Art. 267 TFEU if it considered the relevant questions on the interpretation of EU law, in particular the Brussels I Regulation (recast), to be unclear. However, since the Munich Regional Court I is not the highest instance in the appeal process in Germany, it is not obliged to refer respective questions to the CJEU for a preliminary ruling (*see above* at ¶42-45).

88.    The CJEU judgment in BSH/Electrolux concerned an infringement action regarding European Bundle Patents granted by the EPO based on the uniform rules laid down in the EPC. The "third country" according to the judgment was a non-EU Member States that was part of the EPC, namely Turkey. In such countries (e.g. Turkey, UK), the national parts of European Bundle Patent are merely validated based on the uniform grant procedure and decision by the EPO. A decision about infringement and validity of these patents in third countries, that are part of the EPC system, is thus much easier compared to a decision about a U.S. patent, because the legal basis for granting the European Bundle Patent is the same for all EPC contracting states.

89.     Equally, the cases that so far applied the BSH/Electrolux judgment did only concern European Bundle Patents, not patents that were granted based on an entirely different foreign substantive patent law. Nonetheless, the CJEU in BSH/Electrolux clearly did not rule out the possibility of assuming jurisdiction for infringement of a patent from a third country not being a member of the EPC system either. There are passages in the judgment that may hint that the CJEU only thought about European Bundle Patents (e.g. CJEU, BSH/Electrolux, para. 54, 67) and not about U.S. or other foreign patents from non-EPC contracting states, but this issue is by far not clear and unambiguous.

90.     In fact, in my professional opinion, it seems rather likely that the Munich Regional Court I will assume jurisdiction based on the CJEU judgment in the case at hand and not issue a reference for a further preliminary decision of the CJEU, since as a lower court it is not obliged to do so anyway.

## C.    Reference to the CJEU for a further preliminary ruling because of additional uncertainties of the implementation of BSH/Electrolux regarding U.S. patents in the German bifurcated patent law system?

91.     Furthermore, to complete the picture it has also to be taken into account that the BSH/Electrolux judgment concerned patent infringement proceedings in Sweden. Sweden has a unitary patent court system which means that the same courts are competent to decide on infringement and validity (typically at the same time in the same proceedings, in particular when an invalidity objection is raised in an infringement case).

92.     By contrast, Germany has a bifurcated patent court system which means that different courts are competent to hear infringement cases and validity cases, and infringement and validity cases have entirely different appeal processes (*see above* at ¶34-39). Within the German court system, the Munich Regional Court I is thus only competent for infringement cases. Within

Germany and in relation to the validity of German patents it could never issue a decision on the validity of a German patent, not even with inter partes effect.

93.     Instead, if a validity objection is raised in (a purely German) infringement case, the Munich Regional Court I would typically issue an injunction only after the German patent was upheld in parallel validity proceedings at least in first instance and typically stay the proceedings until this is the case.

94.     In the recent *Formycon* case, a cross-border case decided by the Munich Regional Court I after BSH/Electrolux (*see above* at ¶69-72), the court accordingly referred to validity proceedings before the German Federal Patent Court and concluded that the validity of the patent in Germany seemed secure. Concerning the foreign parts of the European Bundle Patent it then referred to the validity proceedings in Germany, considering them a strong (and decisive) indicator of validity in the entire EPC territory (since European patents are uniformly granted by the EPO based on international EPC law).

95.     This line of argument, however, is obviously not available in an infringement action concerning a U.S. patent. A German Federal Patent Court decision will not be available or – if it were available concerning a European sister patent of the U.S. patent – has clearly no significant weight concerning the decision about the validity of the U.S. patent as the latter's legal basis is entirely different.

96.     Hence, within the bifurcated German system there is no naturally competent body to decide on the validity of U.S. patents. An assessment of validity by the Munich Regional Court I without reference to the German Federal Patent Court might be in line with BSH/Electrolux but would be in considerable tension with the basic principles of the bifurcated patent court system in German law proper.

97.    Also, this would inevitably result in a different treatment of U.S. patents compared to European Bundle patents. This may even arguably constitute a violation of Art. 3(1) TRIPS[15] which guarantees equal treatment of foreign patents to national patents in the WTO/TRIPS member states.

98.    Again, the Munich Regional Court I could refer the resulting open question to the CJEU for a preliminary ruling on how to handle invalidity objections regarding foreign patents from non-EPC contracting states within the context and constraints of a national bifurcated patent law system. However, at the same time, the Munich Regional Court I – as an EU Member States' lower court – would not be under an obligation to do so and might as well decide to directly assess the validity of the concerned U.S. patents with inter partes effect if necessary for deciding the infringement issue concerning the two U.S. patents in the case at hand.

### D.    Summary: Possible scenarios in the current infringement proceedings before the Munich Regional Court I

99.    In sum, although in my professional viewpoint there are several open questions concerning the applicability of the BSH/Electrolux judgment to the facts of the case at hand (U.S. patents concerned, whereas BSH/Electrolux as well as all hitherto follow-up case law by lower courts concerned European (EPC) bundle patents) as well as its implementation concerning U.S. patents in the context of a bifurcated patent law system (see in the previous section), there is nonetheless a considerable likelihood that the Munich Regional Court I applies the BSH/Electrolux principles to the infringement case at hand.

---

[15] Agreement on Trade-Related Aspects of Intellectual Property Rights, Annex C1 of the Marrakesh Agreement Establishing the World Trade Organization, signed in Marrakesh, Marocco on 15 April 1994, ("TRIPS"), see Exhibit 16.

100.    The court would thus assume international jurisdiction for the infringement of the two concerned U.S. patents in U.S. territory and, in consequence, decide on respective injunctions and damages claims.

101.    The language of the BSH/Electrolux judgment does not exclude this and at least, according to one possible interpretation of its grounds, offers this possibility. Even if considerable doubts remain, the Munich Regional Court I, as a Member States' lower court, for the moment is not under an obligation to refer respective further questions to the CJEU for a preliminary ruling. Instead, it seems more likely that the Munich Regional Court I would issue a decision on the infringement of a U.S. patents, based on BSH/Electrolux as it stands, and leave the issue of a possible further clarifying reference to the CJEU to a higher German court on appeal (i.e. the Higher Regional Court Munich or, ultimately, the Federal Court of Justice). This would also be in line with my professional experience, according to which references to the CJEU by courts of first instances are rather rare.

102.    Under the BSH/Electrolux principles the Munich Regional Court I could also stay the proceedings concerning alleged infringement of the U.S. patents if respective infringement and/or invalidation proceedings were filed in the U.S. until the outcome of such proceedings. However, according to BSH/Electrolux, it would not be obliged to do so, since the latter judgment leaves rather broad discretion to the Member States' patent infringement courts in that regard.

103.    At the same time, in my professional opinion, it seems unclear whether an actual decision of the Munich Regional Court I, granting damages or even injunctions, concerning the infringement of the U.S. patents in the case at hand, would actually be compatible with the existing case law of the CJEU taking into account the previously discussed open questions concerning the scope and implementation of the CJEU's BSH/Electrolux decision in such a case.

104.    Nonetheless, to be sure, while the Munich Regional Court I thus is by no means obliged by EU or German law to issue an injunction and/or grant damages in the present case (in particular, it could also stay the proceedings in relation to the U.S. patents or refer the case to the CJEU), at the same time it could undoubtedly do so.

## IX.  General outline of anti-anti-suit-injunctions granted by the Munich Regional Court I and the Higher Regional Court Munich.

105.    More recently, anti-anti-suit-injunctions have been established and frequently granted in German patent infringement proceedings. Such injunctions were first granted in the dispute between Nokia/Avanci and Daimler/Continental about a licensing agreement concerning standard-essential-patents ("SEPs"). In the following brief outline of this instrument in German law I will focus on the Nokia/Daimler & Continental case decided by the Munich Regional Court I.

106.    Nokia had sued Continental (and Daimler) inter alia at the Munich Regional Court I (case no. 21 O 9333/19). Continental filed a suit against Nokia for antitrust violations before the United States District Court for the Northern District of California ("N.D. Cal."). On 12 June 2019 Continental filed a motion for an anti-suit-injunction requesting the N.D. Cal. to prohibit Nokia from prosecuting the German infringement proceedings.[16] This motion was never granted because Nokia responded by filing a motion before the Munich Regional Court I on 9 July 2019 to order Continental to withdraw the anti-suit-motion in the U.S. (anti-anti-suit-injunction). The N.D. Cal.

---

[16] United States District Court, Northern District of California, Continental Automotive Systems, Inc. v Avanci LLC et al., case no. 5:19-cv-02520-NC, motion of 12 June 2019, see Exhibit 17.

initially gave the defendants time to respond to the anti-suit-motion until 24 July 2019 and set the oral hearing for 10 October 2019.

107.    Against this background, Nokia's motion for an anti-anti-suit-injunction from 9 July 2019 was very swiftly granted by the Munich Regional Court I on 11 July 2019 in preliminary proceedings (case no. 21 O 9512/19).

108.    The anti-anti-suit-injunction of the Munich Regional Court I ordered the Defendant Continental to withdraw the motion for the anti-suit-injunction in the U.S., to refrain from continuing the anti-suit-motion in the U.S. and to refrain from filing a similar motion in the U.S. again. In case the Defendant did not comply with the order, payment of € 250,000 for each violation or imprisonment of a member of the board of directors of the defendant would have been imposed.

109.    In consequence, Continental withdrew the motion in the U.S. and filed an objection against the anti-anti-suit-injunction granted by the Munich Regional Court I on 3 September 2019. The Munich Regional Court I affirmed its decision of 11 July 2019 on 2 October 2019 (case no. 21 O 9333/19).[17] On appeal by the defendant, the Munich Higher Regional Court affirmed the decision of the Munich Regional Court I, although based on a slightly different legal reasoning.[18]

110.    Similar anti-anti-suit-injunctions have since been issued also by other German courts and the UPC. It can be concluded that the Munich Regional Court I is prepared to effectively and expeditiously defend its international jurisdiction against U.S. courts if the court deems this necessary and appropriate. However, it should also be added that the hitherto anti-anti-suit-

---

[17] Munich Regional Court I, judgment of 2 October 2019, case no. 21 O 9333/19, see Exhibit 18.

[18] Munich Higher Regional Court, judgment of 12 December 2019, case no. 6 U 5042/19, see Exhibit 19.

injunction cases concerned German patents or the German parts of European patents that were asserted before German courts, although the parties were disputing a global license for an international patent portfolio in the underlying global SEP disputes.

## X. ATTESTATION

111.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: _12- 12 - 2025_      _____

Prof. Matthias Leistner, L.L.M.

# <u>EXHIBIT 1</u>

**CURRICULUM VITAE**

Personal Details

        Prof. Dr. iur. Matthias Leistner, LL.M. (Cambridge)

Education

| | |
|---|---|
| 1992-1997 | Studies of Law at the Freie Universitaet Berlin, Humboldt University Berlin, Université Libre de Bruxelles (with an Erasmus fellowship). |
| 1997 | First State Examination in Berlin (Grade: "Sehr gut", 14.17, best <0,2%). |
| 1997-1999 | Ph.D.-studies at the Law Faculty of Ludwig Maximilian University (LMU), Munich. Dissertation on *Der Rechtsschutz des Datenbankherstellers im deutschen und europäischen Recht* (Legal protection of database makers in German and European law), *summa cum laude*, under the supervision of Prof. Dr. Dr. h.c. mult. Gerhard Schricker. |
| 1999-2001 | Legal Clerkship at the Munich court of appeals (*Rechtsreferendariat*). |
| 2001 | Second State Examination in Munich (Grade: "Gut", 13.63, Single best participant among 1085 Candidates=best <0,1%). |
| 2003-2006 | Post-doc thesis (*Habilitation*) on *Richtiger Vertrag und lauterer Wettbewerb* (Fair contracts and fair competition), Law Faculty of Ludwig Maximilian University (LMU), Munich, under the supervision of Prof. Dr. Josef Drexl.<br><br>Fellowship of the Bavarian State.<br>(*Bayerischer Habilitationsfoerderpreis*). |
| 2003-2004 | LL.M.-studies, Trinity Hall College, University of Cambridge (First Class LL.M.). |
| 2006 | *Habilitation* at Law Faculty of Ludwig Maximilian University Munich, acquired teaching authorization (*venia legendi*) for Civil Law, German and European Economic Law, Industrial and Intellectual Property Law, Private International Law and Comparative Law. |

Professional career

| | |
|---|---|
| 1997-1999 | Research fellow at Max-Planck-Institute for Foreign and International Patent-, Copyright and Competition Law, Munich. |
| 1999-2001 | Part-time research assistant at Max-Planck-Institute for Foreign and International Patent-, Copyright and Competition Law, Munich. |

| | |
|---|---|
| 2001-Mar.02 | Full-time research position as Head of the commonwealth department of the Max-Planck-Institute for Foreign and International Patent-, Copyright- and Competition Law, Munich. |
| Apr. 2002 | Public Notary assessorship in Landshut for one month |
| May 2002 | |
| Sept. 2003 | Full-time research position as Head of the commonwealth department of the Max-Planck-Institute for Foreign and International Patent-, Copyright- and Competition Law, Munich. |
| Oct. 2003 – | |
| Sep. 2006 | Fellowship of the Bavarian State for the Post-doc thesis (*Bayerischer Habilitationsfoerderpreis*) |
| 2003-2006 | Associate lecturer at LMU Munich. |
| Since 2003 | **Member of the Faculty of the Munich Intellectual Property Law Center (MIPLC).** Courses: Legal protection of databases, Big data and the law |
| April 2006 – | |
| July 2006 | Associated Professor, University of Augsburg. |
| Oct. 2006 – | |
| Feb. 2007 | Associated Professor, Rheinische Friedrich Wilhelm University Bonn. |
| July 2007 – | |
| Sep. 2016 | Full professor (Chair) for Civil Law, Intellectual Property Law and Competition Law, Director of the Institute for Commercial and Economic Law, Rheinische Friedrich Wilhelm University Bonn. Member of the Centre for European Economic Law of Rheinische Friedrich Wilhelm University Bonn.<br><br>Member of the Academic Advisory Board of the Bonn Law Journal.<br><br>Director of the degree course in Law & Economics. |
| 2009-2011 | Guest professor at the University of Xiamen, China. |
| 2010&2017 | Guest professor at the Tongji University, Shanghai, China. |
| 2016 | Guest lecturer at ARCIALA, Singapore Management University (SMU) Law School. |
| Oct. 2016 – | **Full professor (GRUR Chair) for Civil Law, Intellectual Property Law with Information and IT-Law, Ludwig Maximilian University (LMU), Munich.** |
| 2020 | International Visiting Professor at Columbia Law School, University of Columbia, New York City, in the Summer Term. |
| Mar-May 23 | Engelberg Fellow at Engelberg Centre, NYU Law, New York City. |
| Feb-Apr 24 | Engelberg Fellow at Engelberg Centre, NYU Law, New York City. |
| Jul 2023 | Call to the position of Director of the Max Planck Institute for Innovation and Competition (Department for Intellectual Property and Competition Law). Declined and stayed at LMU Munich in May 2024. |

Functions, memberships

| | |
|---|---|
| 2008-2014 | Member of the Academic Advisory Board of the HumTEC-project (Law and Technology program) within the German „Excellency Initiative" at the RWTH Aachen. |
| Since 2007 | Expert for the German Universities' Association (DHV) in matters of copyright and publishing law. |
| Since 2009 | Member of the GRUR Special Committee for copyright law. |
| Since 2019 | Member of the GRUR Special Committee for data rights. |
| Since 2020 | Member of the General Board of GRUR. |
| Since 2023 | Member of the Executive Committee of GRUR. |
| Since 2011 | German *ALAI* group (*Association Littéraire et Artistique Internationale*) (from 2011-17 Member of the German ALAI Board). |
| Since 2008 | Expert in different choice of law, contracts, IP and patent law cases before all relevant German courts (including the German Federal Court of Justice, the German Federal Constitutional Court, the Düsseldorf, Mannheim, Munich and Berlin Regional and Higher Regional Courts) as well as international and foreign courts (including the CJEU, the High Court for England and Wales, different U.S. courts). Inter alia (selected): |
| 2013 | Expert opinion on damages for patent infringement before the Düsseldorf Regional Court |
| 2014 | Expert for the Bavarian government in the „TK 50" case on copyright protection for geographical maps before the Federal Court of Justice & the CJEU. |
| 2015 | Expert for GRUR in the oral hearing of the „Metall auf Metall" case before the German Federal Constitutional Court. |
| 2017 | Expert witness on German patent law before the High Court of England and Wales. |
| 2019 | Expert declaration on German law before the U.S. International Trade Commission, Washington, D.C. |
| 2021 | Expert opinion on choice of law and interpretation of a FRAND declaration under German and Swiss law before the Mannheim Regional Court. |
| 2022 | Expert deposition on aspects of patent infringement in German law before the U.S. District Court for the Western District of Missouri. |
| 2022 | Expert opinion on aspects of copyright protection for an industrial design before the Düsseldorf Higher Regional Court. |
| 2022-24 | Several expert opinions on damages for patent infringement under German civil law before the Federal Court of Justice. |
| 2023 | Expert report on the legal situation of patents in insolvency proceedings under German law in the U.S. District Court for the Western District of Texas, Austin Division. |

| | |
|---|---|
| 2023 | Expert report on pre-contractual duties in German law in the Court of Claims of Ohio. |
| 2023 | Expert report on patent enforcement procedure in Germany before the Tribunal Judiciaire Paris. |
| 2023 | Expert report on aspects of German patent law (including procedural aspects) relevant to the interpretation of a stand-still clause in a patent license agreement under Hong Kong law in the Hong Kong International Arbitration Centre. |
| 2023 | Expert opinions on aspects of regulatory protection for Orphan Drugs before the Munich Regional and Higher Regional Court. |
| 2023 | Expert opinion on the effects of a patent pledge under German law before the Düsseldorf Regional Court. |
| 2024 | Expert opinion on possible anti-trust aspects of patent infringement proceedings in the pharma-sector before the Unified Patent Court (UPC). |
| 2024 | Expert Opinion on the enforcement of standard essential patents before the Unified Patent Court (UPC). |
| Since 2020 | Editor of the German GRUR Journal (leading journal in the area of intellectual and industrial property law). |
| Since 2023 | Member of the Editorial Board of GRUR Patent Journal. |

Awards, academic achievements

| | |
|---|---|
| 2000 | Dieter Rampacher Prize of the German Max Planck Society (for the dissertation). |
| 2003/2004 | Fellowship of the German Academic Exchange Service (DAAD) |
| 2003 | Research Scholarship Trinity Hall College, University of Cambridge; Honorary Cambridge European Trust Scholar; Bateman Scholar of Trinity Hall College; Cambridge European Society Scholar. |
| 2004-2006 | Fellowship of the Bavarian State (for the post-doc thesis). |
| 2006-2011 | Member of the Young Academy of the Berlin-Brandenburg Academy of Sciences and Humanities and the Leopoldina Academy. |
| 2007 | Call to a Full Professorship for Civil law and Information/IT-law at the Leibniz-University Hannover – declined. |
| | Call to a Full Professorship for Civil law, Intellectual Property Law and Competition law to the University of Mannheim – declined. |
| 2010 | Call to a Full Professorship for Civil, European and International Private and Economic law to the Friedrich Alexander University Nuernberg – declined. |

2010        Call to a Full Professorship for Civil Law, Economic and Technology Law to the University of Bayreuth – declined.

Languages

English (fluent); French (fluent);
Spanish (basic); Russian (basic).

# **<u>EXHIBIT 2</u>**

**Excerpt of Brussels I Regulation (recast)**

**Art. 4(1)**

Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.

**Art. 7(2)**

A person domiciled in a Member State may be sued in another Member State: […]
(2) in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur;

**Art. 8(1)**

A person domiciled in a Member State may also be sued:
  (1)     where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgements resulting from separate proceedings;

**Art. 24(4)**

The following courts of a Member State shall have exclusive jurisdiction, regardless of the domicile of the parties: […]
(4) in proceedings concerned with the registration or validity of patents […], irrespective of whether the issue is raised by way of an action or as a defence, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of an instrument of the Union or an international convention deemed to have taken place.

**Art. 33**

(1) Where jurisdiction is based on Article 4 or on Articles 7, 8 or 9 and proceedings are pending before a court of a third State at the time when a court in a Member State is seised of an action involving the same cause of action and between the same parties as the proceedings in the court of the third State, the court of the Member State may stay the proceedings if:
(a) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and
(b) the court of the Member State is satisfied that a stay is necessary for the proper administration of justice.
(2) The court of the Member State may continue the proceedings at any time if:
(a) the proceedings in the court of the third State are themselves stayed or discontinued;
(b) it appears to the court of the Member State that the proceedings in the court of the third State are unlikely to be concluded within a reasonable time; or
(c) the continuation of the proceedings is required for the proper administration of justice.
(3) The court of the Member State shall dismiss the proceedings if the proceedings in the court of the third State are concluded and have resulted in a judgment capable of recognition and, where applicable, of enforcement in that Member State.
(4) The court of the Member State shall apply this Article on the application of one of the parties or, where possible under national law, of its own motion.

**Art. 34**

(1) Where jurisdiction is based on Article 4 or on Articles 7, 8 or 9 and an action is pending before a court of a third State at the time when a court in a Member State is seised of an action which is related to the action in the court of the third State, the court of the Member State may stay the proceedings if:

(a) it is expedient to hear and determine the related actions together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

(b) it is expected that the court of the third State will give a judgment capable of recognition and, where applicable, of enforcement in that Member State; and

(c) the court of the Member State is satisfied that a stay is necessary for the proper administration of justice.

(2) The court of the Member State may continue the proceedings at any time if:

(a) it appears to the court of the Member State that there is no longer a risk of irreconcilable judgments;

(b) the proceedings in the court of the third State are themselves stayed or discontinued;

(c) it appears to the court of the Member State that the proceedings in the court of the third State are unlikely to be concluded within a reasonable time; or

(d) the continuation of the proceedings is required for the proper administration of justice.

(3) The court of the Member State may dismiss the proceedings if the proceedings in the court of the third State are concluded and have resulted in a judgment capable of recognition and, where applicable, of enforcement in that Member State.

**Art. 35**

Application may be made to the courts of a Member State for such provisional, including protective, measures as may be available under the law of that Member State, even if the courts of another Member State have jurisdiction as to the substance of the matter.

**Art. 63(1)**

For the purposes of this Regulation, a company or other legal person or association of natural or legal persons is domiciled at the place where it has its:

(a) statutory seat

(b) central administration; or

(c) principal place of business.

# **EXHIBIT 3**

JUDGMENT OF THE COURT (Grand Chamber)

25 February 2025 (*)

( Reference for a preliminary ruling – Jurisdiction and the enforcement of judgments in civil and commercial matters – Regulation (EU) No 1215/2012 – Article 4(1) – General jurisdiction – Article 24(4) – Exclusive jurisdiction – Jurisdiction in proceedings concerned with the registration or validity of patents – Infringement action – European patent validated in Member States and in a third State – Challenge to the validity of the patent raised as a defence – International jurisdiction of the court hearing the infringement action )

In Case C‑339/22,

REQUEST for a preliminary ruling under Article 267 TFEU from the Svea hovrätt, Patent- och marknadsöverdomstolen (Svea Court of Appeal, Patent and Commercial Court of Appeal, Stockholm, Sweden), made by decision of 24 May 2022, received at the Court on 24 May 2022, in the proceedings

**BSH Hausgeräte GmbH**

v

**Electrolux AB,**

THE COURT (Grand Chamber),

composed of K. Lenaerts, President, T. von Danwitz, Vice-President, K. Jürimäe, C. Lycourgos, I. Jarukaitis, M.L. Arastey Sahún, S. Rodin, A. Kumin, N. Jääskinen and M. Gavalec, Presidents of Chambers, E. Regan, Z. Csehi and O. Spineanu-Matei (Rapporteur), Judges,

Advocate General: N. Emiliou,

Registrar: M. Siekierzyńska, Administrator,

having regard to the written procedure and further to the hearing on 22 June 2023, after considering the observations submitted on behalf of:

–    BSH Hausgeräte GmbH, by M. Dahlman and T. Grennard, advokater, and R. Sedlmaier, Rechtsanwalt,

–    Electrolux AB, by C. Harmsen, Rechtsanwalt, P. Larsson, B. Rundblom Andersson and J. Westerberg, advokater,

–    the French Government, by R. Bénard, A. Daniel and E. Timmermans, acting as Agents,

–    the European Commission, by M. Gustafsson, S. Noë and I. Söderlund, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 22 February 2024,

having regard to the order of 16 April 2024 reopening the oral proceedings and further to the hearing on 14 May 2024,

after considering the observations submitted on behalf of:

–    BSH Hausgeräte GmbH, by M. Dahlman and T. Grennard, advokater, and R. Sedlmaier, Rechtsanwalt,

–    Electrolux AB, by C. Harmsen, Rechtsanwalt, and B. Rundblom Andersson, advokat,

–    the French Government, by R. Bénard, A. Daniel and E. Timmermans, acting as Agents,

–    the European Commission, by P. Němečková, S. Noë and I. Söderlund, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 5 September 2024,

gives the following

## Judgment

1    This request for a preliminary ruling concerns the interpretation of Article 24(4) of Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (OJ 2012 L 351, p. 1; 'the Brussels I *bis* Regulation').

2    The request has been made in proceedings between BSH Hausgeräte GmbH ('BSH'), a company incorporated under German law, and Electrolux AB, a company incorporated under Swedish law, concerning the infringement of a European patent.

### Legal context

#### *European Union law*

3    Recitals 13, 15 and 34 of the Brussels I *bis* Regulation state as follows:

'(13)    There must be a connection between proceedings to which this Regulation applies and the territory of the Member States. Accordingly, common rules of jurisdiction should, in principle, apply when the defendant is domiciled in a Member State.

…

(15)    The rules of jurisdiction should be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile. Jurisdiction should always be available on this ground save in a few well-defined situations in which the subject matter of the dispute or the autonomy of the parties warrants a different connecting factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

…

(34)      Continuity between the [Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters (OJ 1978 L 304, p. 36), as amended by the successive conventions on the accession of new Member States to that convention ("the Brussels Convention")], [Council] Regulation (EC) No 44/2001 [of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (OJ 2001 L 12, p. 1; "the Brussels I Regulation")] and this Regulation should be ensured, and transitional provisions should be laid down to that end. The same need for continuity applies as regards the interpretation by the Court of Justice of the European Union of the … Brussels Convention and of the Regulations replacing it.'

4      Chapter II of that regulation, headed 'Jurisdiction', contains 10 sections. Article 4 of that regulation, which appears in Section 1 of Chapter II, headed 'General provisions', provides, in paragraph 1 thereof:

'Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.'

5      Under Article 24 of the Brussels I *bis* Regulation, which is part of Section 6 of Chapter II, headed 'Exclusive jurisdiction':

'The following courts of a Member State shall have exclusive jurisdiction, regardless of the domicile of the parties:

…

(4)      in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, irrespective of whether the issue is raised by way of an action or as a defence, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of an instrument of the Union or an international convention deemed to have taken place.

Without prejudice to the jurisdiction of the European Patent Office [(EPO)] under the Convention on the Grant of European Patents, signed at Munich on 5 October 1973, the courts of each Member State shall have exclusive jurisdiction in proceedings concerned with the registration or validity of any European patent granted for that Member State;

…'

6      Article 27 of that regulation, which forms part of Section 8 of Chapter II thereof, headed 'Examination as to jurisdiction and admissibility', provides:

'Where a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 24, it shall declare of its own motion that it has no jurisdiction.'

7      In Section 9 of that chapter, headed '*Lis pendens* – related actions', Articles 33 and 34 of the Brussels I *bis* Regulation determine the conditions under which a court of a Member State may stay the proceedings, or even dismiss the proceedings before it, or, conversely, continue those proceedings, where its jurisdiction is based in particular on Article 4 of that regulation and proceedings are pending before a court of a third State at the time when that court in a Member State is seised, respectively, of an action involving the same cause of action between the same parties as the proceedings in the court of the third State or of an action which is related to the action

in the court of the third State.

8      Article 63(1) of that regulation, in Chapter V, headed 'General provisions', provides that, for the purposes of that regulation, a company or other legal person or association of natural or legal persons is domiciled at the place where it has its statutory seat, central administration or principal place of business.

9      Article 73 of the Brussels I *bis* Regulation, which forms part of Chapter VII thereof, headed 'Relationship with other instruments', provides:

'1.      This Regulation shall not affect the application of the [Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters, signed at Lugano on 30 October 2007 (OJ 2007 L 339, p. 3; "the Lugano Convention")].

2.      This Regulation shall not affect the application of the [Convention on the Recognition and Enforcement of Foreign Arbitral Awards, signed at New York on 10 June 1958].

3.      This Regulation shall not affect the application of bilateral conventions and agreements between a third State and a Member State concluded before the date of entry into force of [the Brussels I Regulation] which concern matters governed by this Regulation.'

### Swedish law

10     The second subparagraph of Paragraph 61 of the Patentlagen (1967: 837) (Law on patents (1967: 837; 'the Law on patents') provides as follows:

'If an action concerning patent infringement is brought and the person against whom the action is brought claims that the patent is invalid, the question of invalidity may be considered only after an action to that effect has been brought. The court shall order the party claiming that the patent is invalid to bring such an action within a specific period.'

### The dispute in the main proceedings and the questions referred for a preliminary ruling

11      BSH is the holder of European patent EP 1 434 512, which protects an invention in the field of vacuum cleaners. That patent was validated in Germany, Greece, Spain, France, Italy, the Netherlands, Austria, Sweden, the United Kingdom and Türkiye, which gave rise to the grant of national patents from those States.

12      On 3 February 2020, BSH brought an action against Electrolux alleging infringement of all the national parts of that European patent before the Patent- och marknadsdomstolen (Patent and Commercial Court, Sweden). BSH sought, inter alia, an order requiring Electrolux to cease using the patented invention in all States in which the same European patent had been validated and for Electrolux to be ordered to pay equitable remuneration and damages for the allegedly unlawful use of that invention.

13      Electrolux argues that those claims should be dismissed. It also pleaded that the claims relating to infringements of the national parts of patent EP 1 434 512 other than the Swedish part ('the foreign patents') were inadmissible.

14      In that regard, Electrolux argued that the foreign patents were invalid and that the Swedish courts did not have jurisdiction to rule on whether they had been infringed. According to Electrolux, the

infringement action must be regarded as a dispute 'concerned with the … validity of patents' within the meaning of Article 24(4) of the Brussels I *bis* Regulation, in so far as it is indissociable from the issue of the validity of the patents in question. Therefore, under that provision, the courts of the Member States in which the foreign patents have been validated have jurisdiction to hear BSH's claims relating to the infringement of those national patents. It follows that the Swedish court seised does not have jurisdiction to rule on the infringement of those patents.

15      In addition, according to Electrolux, the second subparagraph of Paragraph 61 of the Law on Patents, which provides that the issue of the validity of a patent must be examined in proceedings separate from the action alleging infringement of that patent, concerns only Swedish patents. Since Swedish law applies exclusively to Swedish patents, a Swedish court cannot, on the basis of that provision, hear a dispute in which the defendant argues, in the context of an infringement action, that a patent granted by a State other than the Kingdom of Sweden is invalid. It follows that BSH has to bring infringement actions relating to the foreign patents in the States in which they were validated.

16      By decision of 21 December 2020, the Patent- och marknadsdomstolen (Patent and Commercial Court) declared, on the basis of Article 24(4) and Article 27 of the Brussels I *bis* Regulation, that it did not have jurisdiction to hear the action alleging an infringement of patents validated in Member States other than the Kingdom of Sweden brought by BSH. It also declared that it did not have jurisdiction to hear the action alleging infringement of the patent validated in Türkiye ('the Turkish patent') on the ground that Article 24(4) is the expression of a principle of jurisdiction recognised at international level.

17      BSH appealed against that decision to the Svea hovrätt, Patent- och marknadsöverdomstolen (Svea Court of Appeal, Patent and Commercial Court of Appeal, Stockholm, Sweden), which is the referring court. BSH argued that Article 24(4) of the Brussels I *bis* Regulation is not applicable to 'pure' patent infringement actions, with the result that a court seised on the basis of Article 4(1) of the Brussels I *bis* Regulation may hear an action alleging infringement of a foreign patent even if it does not have jurisdiction to rule on an action for a declaration that that patent is invalid. Furthermore, according to that party in the main proceedings, the Patent- och marknadsdomstolen (Patent and Commercial Court) could hear an action alleging infringement of a foreign patent which has not been granted or validated in a Member State, such as, in the present case, the Turkish patent, on account of the international jurisdiction arising under Article 4(1) of that regulation. It follows that that court had jurisdiction to rule on the infringement action in its entirety, including in respect of the Turkish patent. The principle that the courts of the State in which the defendant is domiciled have jurisdiction is recognised in international law.

18      Before the referring court, Electrolux reiterated, in essence, the position it had put forward before the Patent- och marknadsdomstolen (Patent and Commercial Court), arguing that Article 24(4) of the Brussels I *bis* Regulation applies to infringement proceedings in which the invalidity of the patent in question is relied on as a defence. The Swedish courts have no jurisdiction to hear the judicial proceedings as a whole, since the infringement and validity issues are indissociable.

19      The referring court has doubts as to whether the Swedish courts have jurisdiction. It is uncertain, first of all, whether Article 24(4) of the Brussels I *bis* Regulation must be interpreted as meaning that the expression 'in proceedings concerned with the registration or validity of patents, … irrespective of whether the issue is raised by way of an action or as a defence', also includes a patent infringement action where the defendant has raised a plea of invalidity in respect of that patent as a defence. That provision could be interpreted as meaning that the national court does not have jurisdiction to hear the action alleging infringement of all the national parts of the European patent

other than the one validated in the Member State of that court, where the defendant has raised, in the context of that action, a plea in which it claims that those national parts are invalid. A single set of proceedings before one court would reduce the risk of conflicting decisions, but such an interpretation would oblige the applicant to bring infringement actions again in other Member States.

20    The referring court states that another possible interpretation would be to take the view that the national court seised of a patent infringement action, in the context of which the defendant raises a plea alleging that foreign patents are invalid, lacks jurisdiction to hear only that plea and could, therefore, rule on that infringement action. Such an interpretation is supported, in particular, by the need to interpret Article 24(4) of the Brussels I *bis* Regulation restrictively, as an exception to the general rule set out in Article 4(1) of that regulation, and by its objective of allowing disputes concerning the validity of patents to be heard only by the courts of the State of registration.

21    Next, if Article 24(4) of the Brussels I *bis* Regulation were to be interpreted as meaning that, where a plea of invalidity is raised in proceedings relating to a patent infringement action, that action comes within the exclusive jurisdiction provided for in that provision, the referring court is unsure whether that interpretation may be precluded by a provision of national law, such as the second subparagraph of Paragraph 61 of the Law on patents, which requires the defendant to bring a separate action seeking a declaration that that patent is invalid.

22    Lastly, the referring court is uncertain whether the fact that the European patent at issue in the main proceedings has been validated in a third State has any impact on its jurisdiction. According to that court, it is not clear whether Article 24(4) of the Brussels I *bis* Regulation applies to the courts of a third State – the Republic of Türkiye, in the present case – whereas Articles 33 and 34 of that regulation do refer to such courts. In that context, the referring court notes that it could follow from the judgment of 1 March 2005, *Owusu* (C‑281/02, EU:C:2005:120, paragraphs 26 and 35), that Article 4 of the Brussels I *bis* Regulation also applies to the courts of third States.

23    In those circumstances, the Svea hovrätt, Patent- och marknadsöverdomstolen (Svea Court of Appeal, Patent and Commercial Court of Appeal, Stockholm), decided to stay the proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

'(1)    Is Article 24(4) of [the Brussels I *bis* Regulation] to be interpreted as meaning that the expression "proceedings concerned with the registration or validity of patents … irrespective of whether the issue is raised by way of an action or as a defence" implies that a national court, which, pursuant to Article 4(1) of that regulation, has declared that it has jurisdiction to hear a patent infringement dispute, no longer has jurisdiction to consider the issue of infringement if a defence is raised that alleges that the patent at issue is invalid, or is the provision to be interpreted as meaning that the national court only lacks jurisdiction to hear the defence of invalidity?

(2)    Is the answer to Question 1 affected by whether national law contains provisions, similar to those laid down in the second subparagraph of Paragraph 61 of the [Law on patents], which means that, for a defence of invalidity raised in an infringement case to be heard, the defendant must bring a separate action for a declaration of invalidity?

(3)    Is Article 24(4) of the [Brussels I *bis* Regulation] to be interpreted as being applicable to a court of a third [State], that is to say, in the present case, as also conferring exclusive jurisdiction on a court in [Türkiye] in respect of the part of the European patent which has been validated there?'

**Consideration of the questions referred**

*The first and second questions*

24     By its first and second questions, which it is appropriate to examine together, the referring court asks, in essence, whether Article 24(4) of the Brussels I *bis* Regulation must be interpreted as meaning that a court of the Member State of domicile of the defendant seised, pursuant to Article 4(1) of that regulation, of an action alleging infringement of a patent granted in another Member State, still has jurisdiction to hear that action where, in the context of that action, that defendant challenges, as its defence, the validity of that patent.

25     The referring court also seeks to ascertain whether the fact that a national procedural rule requires that defendant to bring a separate action seeking a declaration that that patent is invalid has any bearing on the answer to be given to that question.

26     In the latter regard, the Court notes at the outset that such a national rule cannot affect the interpretation of Article 24(4) of the Brussels I *bis* Regulation. That provision makes no reference to the law of the Member States, with the result that the expressions which it contains must be regarded as autonomous concepts of EU law which must be interpreted uniformly in all the Member States, irrespective of any national rule or procedure in that regard (see, to that effect, judgment of 8 September 2022, *IRnova*, C-399/21, EU:C:2022:648, paragraph 38 and the case-law cited).

27     According to settled case-law, in interpreting a provision of EU law it is necessary to consider not only its wording, but also the context in which it occurs and the objectives pursued by the rules of which it is part (see, to that effect, judgment of 7 April 2022, *Berlin Chemie A. Menarini*, C-333/20, EU:C:2022:291, paragraph 34 and the case-law cited).

28     In the specific context of the interpretation of the Brussels I *bis* Regulation, it is also necessary, in accordance with recital 34 of that regulation, to ensure continuity in the interpretation of the provisions which replaced those which may be regarded as 'equivalent' in the previous legislation, such as Article 16(4) of the Brussels Convention and Article 22(4) of the Brussels I Regulation, which have been replaced by Article 24(4) of the Brussels I *bis* Regulation (see, to that effect, judgment of 8 September 2022, *IRnova*, C-399/21, EU:C:2022:648, paragraphs 29 and 37).

29     In accordance with Article 4(1) of Regulation No 44/2001, persons domiciled in a Member State are to be sued in the courts of that Member State. Article 63(1) of that regulation states that a company or other legal person or association of natural or legal persons is domiciled at the place where it has its statutory seat, central administration or principal place of business.

30     However, that rule of jurisdiction of the courts of the Member State of the defendant's domicile is laid down in Article 4(1) 'subject to' the other provisions of the Brussels I *bis* Regulation. While that rule of jurisdiction constitutes, in accordance with recital 15 of that regulation, a rule of principle, that regulation lays down a number of exceptions. Among those provisions, Article 24 of the same regulation provides that the courts of a particular Member State are to have exclusive jurisdiction of in respect of certain matters referred to in that article 'regardless of the domicile of the parties'.

31     As regards, in particular, patents, in accordance with the wording of the first subparagraph of Article 24(4), 'in proceedings concerned with the … validity of patents …, irrespective of whether the issue is raised by way of an action or as a defence, the courts of the Member State in which the … registration [of the patent] has been applied for, has taken place or is under the terms of an

instrument of the Union or an international convention deemed to have taken place' ('the Member State granting the patent') are to have exclusive jurisdiction.

32    In accordance with the second subparagraph of that paragraph 4, the courts of each Member State are to have exclusive jurisdiction in proceedings concerned with the registration or validity of any European patent granted for that Member State.

33    Under the second subparagraph of Article 24(4) of the Brussels I *bis* Regulation, a European patent granted by the EPO in accordance with the procedure laid down in that regard by the Convention on the Grant of European Patents, signed at Munich on 5 October 1973, that has subsequently been validated in a Member State is subject to the same rules of jurisdiction over validity as a national patent.

34    Furthermore, it is clear from the wording of the first subparagraph of Article 24(4) of that regulation, referred to in paragraph 31 of the present judgment, that, as regards the exclusive jurisdiction of the courts of the Member State concerned, it is irrelevant whether the issue of the registration or validity of the patent is raised by way of an action or as a defence.

35    Consequently, pursuant to Article 24(4), the courts of the Member State granting the patent are to have exclusive jurisdiction to hear a dispute concerned with the registration or validity of that patent, irrespective of whether that issue is raised by way of an action or as a defence in an infringement action before a court of another Member State.

36    That exclusive jurisdiction of the courts of the Member State granting the patent over disputes concerned with the registration or validity of that patent is justified both by the fact that the grant of patents involves the intervention of the national authorities, and by the fact that those courts are best placed to hear cases in which the dispute itself concerns the validity of the patent or whether or not deposit or registration has occurred. The courts of the Member State in which the registers are kept may rule, applying their own national law, on the validity of the patents which have been issued in that State. That concern for the sound administration of justice becomes all the more important in the field of patents since, given the specialised nature of that area, a number of Member States have set up a system of specific judicial protection, to ensure that those types of cases are dealt with by specialised courts (see, to that effect, judgment of 13 July 2006, *GAT*, C-4/03, EU:C:2006:457, paragraphs 22 and 23).

37    It follows that, where a court of the Member State in which the defendant is domiciled is seised, pursuant to Article 4(1) of the Brussels I *bis* Regulation, of an action alleging infringement of a patent granted by another Member State, in the context of which the defendant challenges, as its defence, the validity of that patent, that court cannot establish, indirectly, the invalidity of that patent, but must declare that it does not have jurisdiction, in accordance with Article 27 of that regulation, as regards the issue of the validity of that patent, in the light of the exclusive jurisdiction of the courts of the Member State in which the patent is granted, as provided for in Article 24(4) of that regulation (see, as regards Article 16(4) of the Brussels Convention, judgment of 13 July 2006, *GAT*, C-4/03, EU:C:2006:457, paragraphs 26 and 31).

38    However, the question arises whether, in such a situation, the court of the Member State in which the defendant is domiciled still has jurisdiction to hear that infringement action or whether it must declare that it does not have jurisdiction in respect of any aspect of dispute relating to the patent granted by another Member State.

39    In that regard, the Court notes that, in accordance with Article 24(4) of the Brussels I *bis*

Regulation, the exclusive jurisdiction rule laid down therein covers only proceedings 'concerned with the registration or validity of patents'.

40    The Court has held previously that that provision does not concern, inter alia, patent infringement actions, although the examination of such an action does involve a thorough analysis of the scope of the protection conferred by that patent in the light of the patent law of the State in which that patent was granted (see, to that effect, judgments of 15 November 1983, *Duijnstee*, 288/82, EU:C:1983:326, paragraphs 22 and 23, and judgment of 8 September 2022, *IRnova*, C-399/21, EU:C:2022:648, paragraph 48).

41    It follows that the exclusive jurisdiction rule laid down in Article 24(4) of the Brussels I *bis* Regulation concerns only the part of the dispute relating to the validity of the patent. Accordingly, a court of the Member State in which the defendant is domiciled, which has jurisdiction, under Article 4(1) of the Brussels I *bis* Regulation, in an action alleging infringement of a patent granted in another Member State, does not lose that jurisdiction merely because, as its defence, that defendant challenges the validity of that patent.

42    The interpretation of Article 24(4) of the Brussels I *bis* Regulation accepted in the preceding paragraph of the present judgment is borne out by the background of that regulation and by the objectives pursued both by it and by that provision.

43    In the first place, the concept of 'proceedings concerned with the … validity of patents', within the meaning of Article 24(4) of the Brussels I *bis* Regulation, must be interpreted strictly since it establishes exclusive jurisdiction which is an exception to the general rule, set out in Article 4 of that regulation, that the courts for the place where the defendant is domiciled have jurisdiction (see, to that effect, judgments of 15 November 1983, *Duijnstee*, 288/82, EU:C:1983:326, paragraph 23, and judgment of 8 September 2022, *IRnova*, C-399/21, EU:C:2022:648, paragraph 39 and the case-law cited).

44    Moreover, an interpretation to the effect that a court of the Member State in which the defendant is domiciled loses its jurisdiction in an action alleging infringement of a patent granted in another Member State merely because that defendant challenges, indirectly, the validity of that patent would mean, as the Advocate General observed, in essence, in points 69 and 70 of his Opinion of 22 February 2024, that the exception provided for in Article 24(4) of the Brussels I *bis* Regulation would become the rule in many patent disputes.

45    As the Court observed in paragraph 17 of its judgment of 13 July 2006, *GAT* (C-4/03, EU:C:2006:457), the issue of the validity of the patent is very frequently raised as a defence in patent infringement actions. The application of the general rule of jurisdiction laid down in Article 4(1) of the Brussels I *bis* Regulation would therefore be limited to disputes in which such a ground of defence is not raised, whereas that rule is the expression of the jurisdiction of the courts of the Member State of the defendant's domicile, which, as is apparent from recital 15 of that regulation, is the principle underlying the rules of jurisdiction contained in that regulation.

46    In the second place, it is apparent from recital 15 that the Brussels I *bis* Regulation seeks to ensure legal certainty by making the rules of jurisdiction highly predictable. Such an objective could not be achieved if it were accepted that, depending on the defence chosen by the defendant and, as the case may be, whenever the defendant considers it appropriate – in particular where the rules of procedure of the forum permit such a defence to be raised at any stage of the proceedings – a court of a Member State would lose its jurisdiction in an action of which it has properly been seised. As the Advocate General pointed out in points 73 and 74 of his Opinion of 22 February 2024, such an

interpretation of Article 24(4) of the Brussels I *bis* Regulation would mean that, throughout the proceedings before that court, there is a risk that it will have to decline jurisdiction.

47    Furthermore, given that, under Article 27 of the Brussels I *bis* Regulation, a court of a Member State is required to declare that it has no jurisdiction due to the exclusive jurisdiction of a court of another Member State, without being able to refer the case to that court, such an interpretation would mean that a defendant could, by raising a plea of invalidity in respect of a patent granted in a Member State other than that of its domicile, bring to an end infringement proceedings which were nevertheless properly brought against it before a court of the Member State in which it is domiciled.

48    In the third place, the interpretation of Article 24(4) of the Brussels I *bis* Regulation accepted in paragraph 41 of the present judgment fully satisfies the objective of that provision – which, as noted in paragraph 36 of the present judgment, consists of allowing disputes which themselves concern the registration or validity of a patent to be heard only by the courts of the Member State in which that patent is granted, which, on account of their physical and legal proximity, are best placed to hear those disputes – without going beyond what is necessary to achieve that objective.

49    In particular, as the Advocate General observed in points 75 and 77 of his Opinion of 22 February 2024, that interpretation, unlike the one referred to in paragraph 44 of the present judgment, allows the holder of a European patent, who believes that that patent has been infringed by the same defendant in several Member States, to concentrate all of its infringement claims and to obtain overall compensation in a single forum, thus avoiding, inter alia, the risk of divergent decisions.

50    Lastly, the interpretation of Article 24(4) of the Brussels I *bis* Regulation set out in paragraph 41 of the present judgment is not called into question by the fact that its application may cause infringement proceedings, which remain pending before a court of the Member State in which the defendant is domiciled, to be divided from the dispute relating to the validity of the patent granted in another Member State, for which the courts of the latter Member State have exclusive jurisdiction, pursuant to that provision.

51    As the Advocate General observed, in essence, in points 79 to 94 of his Opinion of 22 February 2024, such a division does not mean that the court of the Member State in which the defendant is domiciled that is seised of the infringement action should disregard the fact that an action for a declaration that the patent granted in another Member State is invalid has been duly brought by that defendant in that other Member State. If it considers it justified, in particular where it takes the view that there is a reasonable, non-negligible possibility of that patent being declared invalid by the court of that other Member State that has jurisdiction (see, by analogy, judgment of 12 July 2012, *Solvay*, C-616/10, EU:C:2012:445, paragraph 49), the court seised of the infringement action may, where appropriate, stay the proceedings, which allows it to take account, for the purpose of ruling on the infringement action, of a decision given by the court seised of the action seeking a declaration of invalidity.

52    In the light of the findings above, the answer to the first and second questions is that Article 24(4) of the Brussels I *bis* Regulation must be interpreted as meaning that a court of the Member State of domicile of the defendant which is seised, pursuant to Article 4(1) of that regulation, of an action alleging infringement of a patent granted in another Member State, does still have jurisdiction to hear that action where, in the context of that action, that defendant challenges, as its defence, the validity of that patent, whereas the courts of that other Member State have exclusive jurisdiction to rule on that validity.

*The third question*

53    By its third question, the referring court asks whether Article 24(4) of the Brussels I *bis* Regulation must be interpreted as meaning that it applies to a court of a third State and, consequently, as conferring exclusive jurisdiction on that court as regards the assessment of the validity of a patent granted or validated in that State.

54    Under Article 24(4) of that regulation, the courts of the Member State which granted the patent have exclusive jurisdiction, inter alia, in proceedings concerned with the validity of patents, regardless of the domicile of the parties. As is apparent from paragraph 33 of the present judgment, that provision makes no distinction, in that regard, between a national patent granted in a Member State and a European patent validated in a Member State.

55    It follows from the wording of Article 24(4) of that regulation that the subject of that provision is the exclusive jurisdiction of the courts of the Member States in proceedings concerned with the registration or validity of patents granted by those Member States. As the Advocate General observed, in essence, in point 23 of his Opinion of 5 September 2024, the regime laid down by the Brussels I *bis* Regulation, like the acts which preceded it, is a system of jurisdiction internal to the European Union which pursues objectives specific to it, such as the proper functioning of the internal market and the establishment of an area of freedom, security and justice.

56    In that regard, the Court has held previously that Article 24(4) of the Brussels I *bis* Regulation cannot be regarded as applicable in a situation in which the patents concerned are granted or validated not in a Member State, but in a third State (see, to that effect, judgment of 8 September 2022, *IRnova*, C-399/21, EU:C:2022:648, paragraph 35).

57    Accordingly, it must be held that Article 24(4) of the Brussels I *bis* Regulation does not apply to a court of a third State and, consequently, does not confer any jurisdiction, whether exclusive or otherwise, on such a court as regards the assessment of the validity of a patent granted or validated in that State.

58    That said, in view of the doubts raised by the referring court concerning the interpretation of Article 4(1) of the Brussels I *bis* Regulation and in order to provide an answer that is of assistance to that court, it is still necessary to determine whether, where a court of a Member State is seised, on the basis of Article 4(1), of an action alleging an infringement of a patent granted or validated in a third State in which the issue of the validity of that patent is raised, as a defence, that court has jurisdiction, pursuant to Article 4(1), to rule on that defence.

59    In that regard, the Court recalls that, in order to come within the scope of the Brussels I *bis* Regulation, it is necessary for the legal relationship at issue to have an international element. This may result both from the location of the defendant's domicile and from the subject matter of the proceedings, which may be located in a third State, provided that that situation is such as to raise questions before a court of a Member State relating to the determination of international jurisdiction (see, to that effect, judgment of 8 September 2022, *IRnova*, C-399/21, EU:C:2022:648, paragraphs 27 to 29).

60    It is common ground that the legal relationship at issue in the main proceedings, which is the subject of the third question, involves international elements linked, first, to the applicant's domicile, in that it is situated in a Member State other than that of the defendant's domicile, and, second, to its subject matter, in that the patent at issue in the main proceedings has been validated in a third State, namely Türkiye. Therefore, that legal relationship comes within the scope of that regulation.

61    It follows that, under the general rule laid down in Article 4(1) of the Brussels I *bis* Regulation, the courts of the Member State in which the defendant is domiciled have, in principle, jurisdiction in an infringement action brought against that defendant by the holder of a patent granted or validated in a third State which is domiciled in another Member State. In addition, the jurisdiction of the court of the Member State thus seised does, in principle, by virtue of that general rule, extend to the question of the validity of that patent raised as a defence in the context of that infringement action.

62    Nevertheless, the Court observes that that jurisdiction in principle of the courts of the Member State in which the defendant is domiciled which are seised of such a dispute over the part of that dispute relating to the validity of a patent granted or validated in a third State may be limited by special rules such as those laid down in Article 73 of the Brussels I *bis* Regulation.

63    Thus, under Article 73(1) of that regulation, the courts of the States that are party to the Lugano Convention are to have exclusive jurisdiction to settle issues relating to the validity of a patent granted in one of the States that is a party to that convention, since that convention contains, in Article 22(4) thereof, a rule similar to the one set out in Article 24(4) of that regulation.

64    Similarly, a bilateral convention concluded between a Member State and a third State in the circumstances referred to in Article 73(3) of that regulation may stipulate that the courts of that third State are to have exclusive jurisdiction over disputes relating to the validity of patents granted in that third State.

65    Furthermore, in the circumstances referred to in Articles 33 and 34 of the Brussels I *bis* Regulation, a court of a Member State whose jurisdiction is based on Article 4 of that regulation may be prompted to recognise the jurisdiction of the courts of third States, by staying proceedings, or even terminating the proceedings before it, where proceedings are already pending before a court of a third State at the time when that first court is seised either of an application between the same parties involving the same subject matter and cause of action as the application brought before the court of the third State, or of an application related to the one brought before the court of the third State.

66    Subject to verification by the referring court, no restriction provided for by such special rules seems to have to be taken into consideration in the present case. The Republic of Türkiye is not a State that is party to the Lugano Convention and the file before the Court contains no indication as to whether there is an applicable convention between the Kingdom of Sweden and that third State or as to whether there are proceedings pending before a court of that third State, within the meaning of Articles 33 and 34 of the Brussels I *bis* Regulation.

67    Furthermore, as the Advocate General observed in point 23 of his Opinion of 22 February 2024, the Convention on the Grant of European Patents, signed at Munich on 5 October 1973 does not contain any provision expressly defining or restricting the jurisdiction of the courts of the parties to that convention in cross-border disputes relating to the European patent.

68    That said, it is necessary to determine whether the jurisdiction, based on Article 4(1) of the Brussels I *bis* Regulation, of a court of a Member State to rule on the issue of the validity of a patent granted or validated in a third State where that question is raised as a defence in the context of an infringement action brought before that court, is restricted by general international law.

69    In that regard, the Court recalls that the rules and principles of general international law are binding, as such, upon the EU institutions and form part of the EU legal order (see, to that effect, judgments of 27 February 2018, *Western Sahara Campaign UK*, C-266/16, EU:C:2018:118,

paragraph 47, and of 7 May 2020, *Rina*, C-641/18, EU:C:2020:349, paragraph 54 and the case-law cited). It follows that a measure adopted by virtue of the powers of the European Union, such as the Brussels I *bis* Regulation, must be interpreted, and its scope limited, in the light of those rules and principles (see, to that effect, judgments of 24 November 1992, *Poulsen and Diva Navigation*, C-286/90, EU:C:1992:453, paragraph 9, and of 3 September 2008, *Kadi and Al Barakaat International Foundation* v *Council and Commission*, C-402/05 P and C-415/05 P, EU:C:2008:461, paragraph 291).

70    First, the Court notes that it follows from its case-law that the jurisdiction of the courts of a Member State, based on the fact that the defendant is domiciled in that Member State, to rule in a dispute which is connected, at least in part, because of its subject matter, with a third State, is not contrary to the international law principle of the relative effect of treaties (see, to that effect, judgment of 1 March 2005, *Owusu*, C-281/02, EU:C:2005:120, paragraphs 30 and 31).

71    Second, it must be observed that that jurisdiction of the court of the defendant's domicile must be exercised without infringing the principle of non-interference, according to which a State may not interfere in cases which essentially come within the national jurisdiction of another State.

72    In the exercise of its powers, a State may grant, validate and register intellectual property rights which, within that State, confer on their holder exclusive intellectual property rights, such as a patent. It is also apparent from Mr P. Jenard's report on the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters (OJ 1979 C 59, p. 1) that one of the reasons why Article 16(4) of that convention – to which Article 24(4) of the Brussels I *bis* Regulation corresponds – conferred exclusive jurisdiction on the courts of a State that is a party to that convention which has granted a patent to rule on disputes concerned with the registration or validity of that patent is that 'the grant of a national patent is an exercise of national sovereignty'. Furthermore, as has been pointed out in paragraph 36 of the present judgment, that exclusive jurisdiction is justified both by the fact that the grant of patents involves the intervention of the national authorities, and by the fact that those courts are best placed to hear cases in which the dispute itself concerns either the validity of the patent or the issue of whether or not deposit or registration has occurred.

73    Where a judicial decision annulling a patent affects the existence or, in the event of annulment in part, the content of those exclusive rights, only the courts having jurisdiction in that State may give such a decision. It follows from the principle of non-interference referred to in paragraph 71 of the present judgment that only the courts of the third State in which a patent is granted or validated have jurisdiction to declare that patent invalid by a decision that may cause the national register of that State to be amended as regards the existence or content of that patent.

74    By contrast, the court of the Member State in which the defendant is domiciled which is seised, as in the case in the main proceedings, on the basis of Article 4(1) of the Brussels I *bis* Regulation, of an infringement action in the context of which the issue of the validity of a patent granted or validated in a third State is raised as a defence, does have jurisdiction to rule on that issue if none of the restrictions referred to in paragraphs 63 to 65 of the present judgment is applicable, given that the decision of that court sought in that regard is not such as to affect the existence or content of that patent in that third State, or to cause its national register to be amended.

75    As the Advocate General observed in point 62 of his Opinion of 22 February 2024 and as the parties to the main proceedings and the European Commission stated at the hearing on 14 May 2024 before the Court, that decision has only *inter partes* effects, that is to say, a scope limited to the parties to the proceedings. Thus, where the issue of the validity of a patent granted in a third State is

raised as a defence in an action alleging infringement of that patent before a court of a Member State, that defence seeks only to have that action dismissed, and does not seek to obtain a decision that will cause that patent to be annulled entirely or in part. In particular, under no circumstances can that decision include a direction to the administrative authority responsible for maintaining the national register of the third State concerned.

76    It follows from all the findings above that the answer to the third question is that Article 24(4) of the Brussels I *bis* Regulation must be interpreted as not applying to a court of a third State and, consequently, as not conferring any jurisdiction, whether exclusive or otherwise, on such a court as regards the assessment of the validity of a patent granted or validated by that State. If a court of a Member State is seised, on the basis of Article 4(1) of that regulation, of an action alleging infringement of a patent granted or validated in a third State in which the question of the validity of that patent is raised, as a defence, that court has jurisdiction, pursuant to Article 4(1), to rule on that defence, its decision in that regard not being such as to affect the existence or content of that patent in that third State or to cause the national register of that State to be amended.

## Costs

77    Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the referring court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) hereby rules:

1.    **Article 24(4) of Regulation (EU) No 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters**

   **must be interpreted as meaning that a court of the Member State of domicile of the defendant which is seised, pursuant to Article 4(1) of that regulation, of an action alleging infringement of a patent granted in another Member State, does still have jurisdiction to hear that action where, in the context of that action, that defendant challenges, as its defence, the validity of that patent, whereas the courts of that other Member State have exclusive jurisdiction to rule on that validity.**

2.    **Article 24(4) of Regulation No 1215/2012**

   **must be interpreted as not applying to a court of a third State and, consequently, as not conferring any jurisdiction, whether exclusive or otherwise, on such a court as regards the assessment of the validity of a patent granted or validated by that State. If a court of a Member State is seised, on the basis of Article 4(1) of that regulation, of an action alleging infringement of a patent granted or validated in a third State in which the question of the validity of that patent is raised, as a defence, that court has jurisdiction, pursuant to Article 4(1), to rule on that defence, its decision in that regard not being such as to affect the existence or content of that patent in that third State or to cause the national register of that State to be amended.**

[Signatures]

* Language of the case: Swedish.

# **EXHIBIT 4**

**Excerpt of TFEU**

**Art. 267**

The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:
(a) the interpretation of the Treaties; […]
Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.
Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

**Art. 288(2)**

A regulation shall have general application. It shall be binding in its entirety and directly applicable in all Member States.

# **EXHIBIT 5**

**<u>Excerpt of Rome II Regulation</u>**

**Art. 1(3)**

This Regulation shall not apply to evidence and procedure […].

**Art. 8(1)**

The law applicable to a non-contractual obligation arising from an infringement of an intellectual property right shall be the law of the country for which protection is claimed.

# **<u>EXHIBIT 6</u>**

GAT

JUDGMENT OF THE COURT (First Chamber)

13 July 2006 °

In Case C-4/03,

REFERENCE for a preliminary ruling, pursuant to the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, from the Oberlandesgericht Düsseldorf (Germany), made by decision of 5 December 2002, received at the Court on 6 January 2003, in the proceedings

**Gesellschaft für Antriebstechnik mbH & Co. KG**

v

**Lamellen und Kupplungsbau Beteiligungs KG,**

THE COURT (First Chamber),

composed of P. Jann (Rapporteur), President of the Chamber, N. Colneric, J.N. Cunha Rodrigues, M. Ilešič and E. Levits, Judges,

• Language of the case: German.

Advocate General: L.A. Geelhoed,

Registrar: F. Contet, Principal Administrator,

having regard to the written procedure and further to the hearing on 14 July 2004,

after considering the observations submitted on behalf of:

— Gesellschaft für Antriebstechnik mbH & Co. KG, by T. Musmann, Rechtsan-
walt,

— Lamellen und Kupplungsbau Beteiligungs KG, by T. Reimann, Rechtsanwalt,

— the German Government, by R. Wagner, acting as Agent,

— the French Government, by G. de Bergues and A. Bodard-Hermant, acting as
Agents,

— the United Kingdom Government, by K. Manji, acting as Agent, assisted by D.
Alexander, Barrister,

— the Commission of the European Communities, by A.-M. Rouchaud and S. Grünheid, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 16 September 2004,

gives the following

## Judgment

1    This reference for a preliminary ruling concerns the interpretation of Article 16(4) of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (OJ 1978 L 304, p. 36), as amended by the Convention of 9 October 1978 on the Accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland (OJ 1978 L 304, p. 1, and — amended version — p. 77), by the Convention of 25 October 1982 on the Accession of the Hellenic Republic (OJ 1982 L 388, p. 1), by the Convention of 26 May 1989 on the Accession of the Kingdom of Spain and the Portuguese Republic (OJ 1989 L 285, p. 1), and by the Convention of 29 November 1996 on the Accession of the Republic of Austria, the Republic of Finland and the Kingdom of Sweden (OJ 1997 C 15, p. 1) ('the Convention').

2    The reference has been made in the course of proceedings between Gesellschaft für Antriebstechnik mbH & Co. KG ('GAT') and Lamellen und Kupplungsbau Beteiligungs KG ('LuK') concerning the marketing of products by the first of those companies which, according to the second, amounts to an infringement of two French patents of which it is the proprietor.

**Legal context**

3    Article 16 of the Brussels Convention, which constitutes Section 5 ('Exclusive jurisdiction') of Title II, concerning the rules of jurisdiction, states:

'The following courts shall have exclusive jurisdiction, regardless of domicile:

...

4.    in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, the courts of the Contracting State in which the deposit or registration has been applied for, has taken place or is under the terms of an international convention deemed to have taken place;

...'

4    The fourth paragraph of Article 17 of the Convention, which, together with Article 18, makes up Section 6 ('Prorogation of jurisdiction') of Title II, provides that '[a] greements ... conferring jurisdiction shall have no legal force ... if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 16.'

5    Article 18 of the Convention states:

'Apart from jurisdiction derived from other provisions of this Convention, a court of a Contracting State before whom a defendant enters an appearance shall have jurisdiction. This rule shall not apply ... where another court has exclusive jurisdiction by virtue of Article 16.'

6    Article 19 of the Convention, which features in Section 7 ('Examination as to jurisdiction and admissibility') of Title II, provides:

'Where a court of a Contracting State is seised of a claim which is principally concerned with a matter over which the courts of another Contracting State have exclusive jurisdiction by virtue of Article 16, it shall declare of its own motion that it has no jurisdiction.'

7    According to the first paragraph of Article 28 of the Convention, which is in Section 1 ('Recognition') of Title III, concerning the rules of recognition and enforcement, 'a judgment shall not be recognised if it conflicts with the provisions of Sections 3, 4 or 5 of Title II'. The second paragraph of Article 34 of the Convention, which is in Section 2 ('Enforcement') of Title III, refers, in regard to the possible grounds for refusing enforcement of a decision, to the first paragraph of Article 28, cited above.

**The dispute in the main proceedings and the question referred for a preliminary ruling**

8    GAT and LuK, companies established in Germany, are economic operators competing in the field of motor vehicle technology.

I - 6527

9    GAT made an offer to a motor vehicle manufacturer, also established in Germany, with a view to winning a contract to supply mechanical damper springs. LuK alleged that the spring which was the subject of GAT's proposal infringed two French patents of which LuK was the proprietor.

10   GAT brought a declaratory action before the Landgericht (Regional Court), Düsseldorf to establish that it was not in breach of the patents, maintaining that its products did not infringe the rights under the French patents owned by LuK and, further, that those patents were either void or invalid.

11   The Landgericht Düsseldorf considered that it had international jurisdiction to adjudicate upon the action relating to the alleged infringement of the rights deriving from the French patents. It considered that it also had jurisdiction to adjudicate upon the plea as to the alleged nullity of those patents. The Landgericht dismissed the action brought by GAT, holding that the patents at issue satisfied the requirements of patentability.

12   On appeal by GAT, the Oberlandesgericht (Higher Regional Court) Düsseldorf decided to stay the proceedings and refer the following question to the Court of Justice for a preliminary ruling:

'Should Article 16(4) of the Convention … be interpreted as meaning that the exclusive jurisdiction conferred by that provision on the courts of the Contracting State in which the deposit or registration of a patent has been applied for, has taken place or is deemed to have taken place under the terms of an international convention only applies if proceedings (with *erga omnes* effect) are brought to declare the patent invalid or are proceedings concerned with the validity of patents within the meaning of the aforementioned provision where the defendant in a patent infringement action or the claimant in a declaratory action to establish that a patent

is not infringed pleads that the patent is invalid or void and that there is also no patent infringement for that reason, irrespective of whether the court seised of the proceedings considers the plea in objection to be substantiated or unsubstantiated and of when the plea in objection is raised in the course of proceedings?'

**The question referred for a preliminary ruling**

13    By that question, the referring court seeks in essence to ascertain the scope of the exclusive jurisdiction provided for in Article 16(4) of the Convention in relation to patents. It asks whether that rule concerns all proceedings concerned with the registration or validity of a patent, irrespective of whether the question is raised by way of an action or a plea in objection, or whether its application is limited solely to those cases in which the question of a patent's registration or validity is raised by way of an action.

14    It should be recalled, in this connection, that the notion of proceedings 'concerned with the registration or validity of patents' contained in Article 16(4) of the Convention must be regarded as an independent concept intended to have uniform application in all the Contracting States (Case 288/82 *Duijnstee* [1983] ECR 3663, paragraph 19).

15    The Court has thus held that proceedings relating to the validity, existence or lapse of a patent or an alleged right of priority by reason of an earlier deposit are to be regarded as proceedings 'concerned with the registration or validity of patents' (*Duijnstee*, cited above, paragraph 24)

JUDGMENT OF 13. 7. 2006 — CASE C-4/03

16    If, on the other hand, the dispute does not concern the validity of the patent or the existence of the deposit or registration and these matters are not disputed by the parties, the dispute will not be covered by Article 16(4) of the Convention (*Duijnstee*, paragraphs 25 and 26). Such would be the case, for example, with an infringement action, in which the question of the validity of the patent allegedly infringed is not called into question.

17    In practice, however, the issue of a patent's validity is frequently raised as a plea in objection in an infringement action, the defendant seeking to have the claimant retroactively denied the right on which the claimant relies and thus have the action brought against him dismissed. The issue can also be invoked, as in the case in the main proceedings, in support of a declaratory action seeking to establish that there has been no infringement, whereby the claimant seeks to establish that the defendant has no enforceable right in regard to the invention in question.

18    As the Commission has observed, it cannot be established from the wording of Article 16(4) of the Convention whether the rule of jurisdiction set out therein applies only to cases in which the question of a patent's validity is raised by way of an action or whether it extends to cases in which the question is raised as a plea in objection.

19    Article 19 of the Convention, which, in certain language versions, refers to a claim being brought 'principally', does not provide further clarity. Apart from the fact that the degree of clarity of the wording of that provision varies according to the particular language version, that provision, as the Commission has observed, does not confer jurisdiction but merely requires the court seised to examine whether it has jurisdiction and in certain cases to declare of its own motion that it has none.

I - 6530

20    In those circumstances, Article 16(4) of the Convention must be interpreted by reference to its objective and its position in the scheme of the Convention.

21    In relation to the objective pursued, it should be noted that the rules of exclusive jurisdiction laid down in Article 16 of the Convention seek to ensure that jurisdiction rests with courts closely linked to the proceedings in fact and law.

22    Thus, the exclusive jurisdiction in proceedings concerned with the registration or validity of patents conferred upon the courts of the Contracting State in which the deposit or registration has been applied for or made is justified by the fact that those courts are best placed to adjudicate upon cases in which the dispute itself concerns the validity of the patent or the existence of the deposit or registration (*Duijnstee*, paragraph 22). The courts of the Contracting State on whose territory the registers are kept may rule, applying their own national law, on the validity and effects of the patents which have been issued in that State. This concern for the sound administration of justice becomes all the more important in the field of patents since, given the specialised nature of this area, a number of Contracting States have set up a system of specific judicial protection, to ensure that these types of cases are dealt with by specialised courts.

23    That exclusive jurisdiction is also justified by the fact that the issue of patents necessitates the involvement of the national administrative authorities (see, to that effect, the Report on the Convention by Mr Jenard, OJ 1979 C 59, p. 1, at p. 36).

24    In relation to the position of Article 16 within the scheme of the Convention, it should be pointed out that the rules of jurisdiction provided for in that article are of an exclusive and mandatory nature, the application of which is specifically binding on both litigants and courts. Parties may not derogate from them by an agreement

conferring jurisdiction (fourth paragraph of Article 17 of the Convention) or by the defendant's voluntary appearance (Article 18 of the Convention). Where a court of a Contracting State is seised of a claim which is principally concerned with a matter over which the courts of another Contracting State have jurisdiction by virtue of Article 16, it must declare of its own motion that it has no jurisdiction (Article 19 of the Convention). A judgment given which falls foul of the provisions of Article 16 does not benefit from the system of recognition and enforcement under the Convention (first paragraph of Article 28 and second paragraph of Article 34 thereof).

25    In the light of the position of Article 16(4) within the scheme of the Convention and the objective pursued, the view must be taken that the exclusive jurisdiction provided for by that provision should apply whatever the form of proceedings in which the issue of a patent's validity is raised, be it by way of an action or a plea in objection, at the time the case is brought or at a later stage in the proceedings.

26    First, to allow a court seised of an action for infringement or for a declaration that there has been no infringement to establish, indirectly, the invalidity of the patent at issue would undermine the binding nature of the rule of jurisdiction laid down in Article 16(4) of the Convention.

27    While the parties cannot rely on Article 16(4) of the Convention, the claimant would be able, simply by the way it formulates its claims, to circumvent the mandatory nature of the rule of jurisdiction laid down in that article.

28    Second, the possibility which this offers of circumventing Article 16(4) of the Convention would have the effect of multiplying the heads of jurisdiction and would be liable to undermine the predictability of the rules of jurisdiction laid down by the

Convention, and consequently to undermine the principle of legal certainty, which is the basis of the Convention (see Case C-256/00 *Besix* [2002] ECR I-1699, paragraphs 24 to 26, Case C-281/02 *Owusu* [2005] ECR I-1383, paragraph 41, and Case C-539/03 *Roche Nederland and Others* [2006] ECR I-6535, paragraph 37).

29    Third, to allow, within the scheme of the Convention, decisions in which courts other than those of a State in which a particular patent is issued rule indirectly on the validity of that patent would also multiply the risk of conflicting decisions which the Convention seeks specifically to avoid (see, to that effect, Case C-406/92 *Tatry* [1994] ECR I-5439, paragraph 52, and *Besix*, cited above, paragraph 27).

30    The argument, advanced by LuK and the German Government, that under German law the effects of a judgment indirectly ruling on the validity of a patent are limited to the parties to the proceedings, is not an appropriate response to that risk. The effects flowing from such a decision are in fact determined by national law. In several Contracting States, however, a decision to annul a patent has *erga omnes* effect. In order to avoid the risk of contradictory decisions, it is therefore necessary to limit the jurisdiction of the courts of a State other than that in which the patent is issued to rule indirectly on the validity of a foreign patent to only those cases in which, under the applicable national law, the effects of the decision to be given are limited to the parties to the proceedings. Such a limitation would, however, lead to distortions, thereby undermining the equality and uniformity of rights and obligations arising from the Convention for the Contracting States and the persons concerned (*Duijnstee*, paragraph 13).

31    In the light of the foregoing, the answer to the question referred must be that Article 16(4) of the Convention is to be interpreted as meaning that the rule of exclusive

jurisdiction laid down therein concerns all proceedings relating to the registration or validity of a patent, irrespective of whether the issue is raised by way of an action or a plea in objection.

**Costs**

32   Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (First Chamber) hereby rules:

**Article 16(4) of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, as last amended by the Convention of 29 November 1996 on the Accession of the Republic of Austria, the Republic of Finland and the Kingdom of Sweden, is to be interpreted as meaning that the rule of exclusive jurisdiction laid down therein concerns all proceedings relating to the registration or validity of a patent, irrespective of whether the issue is raised by way of an action or a plea in objection.**

[Signatures]

# **EXHIBIT 7**

**<u>Excerpt of EPC</u>**

**Art. 64(1)**

A European patent shall [...] confer on its proprietor from the date on which the mention of its grant is published in the European Patent Bulletin, in each Contracting State in respect of which it is granted, the same rights as would be conferred by a national patent granted in that State.

# **EXHIBIT 8**

**Excerpt of UPCA**

**Art. 1(2)**

The Unified Patent Court shall be a court common to the Contracting Member States and thus subject to the same obligations under Union law as any national court of the Contracting Member States.

# **EXHIBIT 9**

**Excerpt of Lugano Convention**

**Art. 22(4)**

The following courts shall have exclusive jurisdiction, regardless of domicile: […]
(4) in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, irrespective of whether the issue is raised by way of an action or as a defence, the courts of the State bound by this Convention in which the deposit or registration has been applied for, has taken place or is, under the terms of a Community instrument or an international convention, deemed to have taken place.

# **EXHIBIT 10**



**Unified Patent Court**
**Einheitliches Patentgericht**
**Juridiction unifiée du brevet**

**Mannheim Local Division**
**UPC_CFI_365/2023**

# Decision

**of the Court of First Instance of the Unified Patent Court**

**Local Division Mannheim**

**delivered on 18 July 2025**

**concerning EP 3 511 174 B1**

<u>HEADNOTES:</u>

1. The UPC has jurisdiction to decide upon the infringement of the UK part of a European Patent. However, the UPC does not have jurisdiction to revoke the validated national part of a European Patent in relation to the United Kingdom with *erga omnes* effect (following ECJ, judgement of 25 February 2025, C-339/22, BSH Hausgeräte).

2. The defendant in an infringement action before the UPC, which relates to the UK part of a European bundle patent, is allowed to raise an invalidity defence without being obliged to file a national action for revocation in the UK. The UPC will then assess the validity as a mere prerequisite for infringement (following Local Division Dusseldorf, decision of 28 January 2025, UPC_CFI_355/2023). The outcome of the infringement action before the UPC has *inter partes* effect only.

3. In the absence of a pending national revocation proceeding in the UK, there neither is a reason to stay the infringement proceeding before the UPC, nor to make the decision conditional upon the validity of the UK part of the European patent.

4. There is no legitimate interest of a defendant obtaining a declaration that the UK part of a European bundle patent is invalid, since such declaratory relief is not binding on the national authorities.

<u>KEYNOTES:</u>

Jurisdiction over a national part of a European bundle patent validated in the United Kingdom

<u>CLAIMANT:</u>

**FUJIFILM Corporation,** 26-30, Nishiazabu 2-chome, Minato-ku,Tokyo 106-8620, Japan,

represented by:             Tobias Hahn, HOYNG ROKH MONEGIER, Steinstraße 20, 40212 Düsseldorf, Germany

electronic address for service:     tobias.hahn@hoyngrokh.com

<u>DEFENDANTS:</u>

1.  **Kodak GmbH,** Kesselstraße 19, 70327 Stuttgart, represented by its CEOs, at the same place,

    represented by:           Elena Hennecke, Freshfields Bruckhaus Deringer Rechtsanwälte Steuerberater PartG mbB, Feldmühleplatz 1, 40545 Düsseldorf, Germany

    electronic address for service:     elena.hennecke@freshfields.com

2.  **Kodak Graphic Communications GmbH,** Kesselstraße 19, 70327 Stuttgart, represented by its CEOs, at the same place,

    represented by:           Elena Hennecke, Freshfields Bruckhaus Deringer Rechtsanwälte Steuerberater PartG mbB, Maximiliansplatz 13, 80333 Munich, Germany

    electronic address for service:     elena.hennecke@freshfields.com

3.  **Kodak Holding GmbH,** Kesselstraße 19, 70327 Stuttgart, represented by its CEOs, at the same place,

    represented by:           Elena Hennecke, Freshfields Bruckhaus Deringer Rechtsanwälte Steuerberater PartG mbB, Maximiliansplatz 13, 80333 Munich, Germany

    electronic address for service:     elena.hennecke@freshfields.com

PATENT AT ISSUE:

European patent EP 3 511 174

PANEL/DIVISION:

Panel of the Local Division in Mannheim

DECIDING JUDGES:

This decision is delivered by the presiding judge Tochtermann as judge-rapporteur, the legally qualified judge Böttcher, the legally qualified judge Agergaard and the technically qualified judge Wismeth.

*LANGUAGE OF THE PROCEEDINGS:* English

*SUBJECT OF THE PROCEEDINGS:* Patent infringement

*DATE OF THE ORAL HEARING:* 11 and 12 February 2025 and 6 June 2025

*SUMMARY OF THE FACTS:*

1. Claimant is suing Defendants for the alleged infringement of the EP 3 511 174 B1 which relates to a planographic printing plate original plate, a method for manufacturing, and a printing method. Claimant, a manufacturer of inter alia lithographic plates, is the registered proprietor of the patent-in-suit, which is still in force in Germany and the United Kingdom (cf. SoC, mn. 208; Reply, mn. 510) but elapsed in all other designated contracting member states before the entry into force of the UPCA on 1 June 2023. The mention of the grant of the patent-in-suit was published on 26 May 2021. It was filed on 31 May 2018, claiming the priority of two Japanese patent application of 29 September 2017 and 30 March 2018.

2. Claim 1, 15 and 16 of the patent-in-suit as granted read as follows in the language of the patent:

   "1.   A lithographic printing plate precursor comprising

   an aluminum support; and

   an image recording layer on the aluminum support,

   wherein the aluminum support includes an anodized film on a surface of the image recording layer side,

the anodized film has micropores extending in a depth direction from the surface of the anodized film on the image recording layer side,

the micropores include at least large-diameter pores whose maximum diameter inside the anodized film is in a range of 0.01 μm to 0.30 μm, and wherein an average value of depths of the large-diameter pores to the bottom from the surface of the anodized film is in a range of 100 nm to 1500 nm,

an average pore diameter of the micropores in the surface of the anodized film is 90% or less of the maximum diameter of the micropores inside the anodized film,

a thickness of the anodized film is in a range of 550 nm to 2850 nm, and

the image recording layer contains an acid color former.

15.   A method of preparing a lithographic printing plate, comprising:

a step of imagewise-exposing the lithographic printing plate precursor of any of claims 1-14; and
a step of supplying at least any of printing ink or dampening water and removing an image recording layer in a non-image area on a printing press.

16.   A lithographic printing method comprising:

a step of imagewise-exposing the lithographic printing plate precursor according to any one of claims 1 to 4;
a step of supplying at least any of printing ink or dampening water and removing a non-image area of an image recording layer on a printing press to prepare a lithographic printing plate; and
a step of performing printing using the obtained lithographic printing plate."

3.   Claimant unconditionally amended claim 1 of the patent-in suit in accordance with its new Main request under R. 30.1 RoP (Exhibit K 34) as follows (with changes highlighted in yellow):

"1.   A lithographic printing plate precursor comprising

an aluminum support; and

an image recording layer on the aluminum support,

wherein the aluminum support includes an anodized film on a surface of the image recording layer side,

the anodized film has micropores extending in a depth direction from the surface of the anodized film on the image recording layer side,

the micropores include at least large-diameter pores whose maximum diameter inside the anodized film is in a range of 0.01 μm to 0.30 μm, and wherein an average value of depths of the large-diameter pores to the bottom from the surface of the anodized film is in a range of 100 nm to 1500 nm,

an average pore diameter of the micropores in the surface of the anodized film is ~~90% or less~~ in a range of 10% to 50% of the maximum diameter of the micropores inside the anodized film,

a thickness of the anodized film is in a range of 550 nm to 2850 nm, and

the image recording layer contains an acid color former."

4. The court holds admissible to align the claims accordingly to the defense to the counterclaim for revocation by way of amendment acc. to R. 30.1. RoP (see infra).

5. Defendants, companies incorporated under German law, belong to a multinational group of companies producing and distributing inter alia printing plates. Defendant 1 acts as the German sales company purchasing the products from a UK based company of the group. Defendant 2 and its legal predecessor, respectively, own and operate a manufacturing facility in Germany as contract manufacturer of printing plates for said UK entity. Defendant 1 is a wholly owned subsidiary of Defendant 2, which itself is a wholly owned subsidiary of Defendant 3 and subject to a control and profit and loss transfer agreement with Defendant 3.

6. In Claimant's opinion, printing plates marketed by Defendants under the product name "SONORA XTRA-3" (the claim having been limited to that "contested embodiment" in response to procedural order of 22 January 2025, ORD_598567/2023, by brief of 4 February 2025) are falling within the scope of claim 1 of the patent-in-suit and are means relating to an essential element of the subject-matter of claims 15 and 16 of the patent-in-suit. With regard to the technical design of the contested embodiment, reference is made to exhibit K12, K13, K15, K18 to K21 submitted by Claimant.

7. Defendants challenge the validity of the patent-in-suit by relying on a public prior use right, on lack of novelty in relation to by EP 2 878 452 A1 (EP'452; T34) and WO 2018-160379 A1 (WO'379; T12). Inventive step is challenged by EP 2 878 452 A1 (EP'452; T34) in combination with common knowledge or EP 2 839 968 A1 (EP'968; T36) or US 2009/0047599 A1 (US'599, T40), in the alternative starting with EP 2 839 968 A1 (EP'968; T36). Additionally they put forward, that the patent-in-suit suffers from added matter as it extends beyond the disclosure of the application.

8. The Defendants filed a preliminary objection rejecting the international jurisdiction and competence with regard to United Kingdom (UK). The judge-rapporteur informed the parties that the Court will deal with the preliminary objection in the main proceedings in the light of the forthcoming opinion of the Advocate General in re ECJ C-339/22 (BSH Hausgeräte GmbH v. Aktiebolaget Electrolux).

9. By order of 2 April 2025, the panel separated the proceedings with regard to the UK because the decision of the ECJ in re C-339/22 (BSH Hausgeräte) had not been delivered until the end of the oral hearing but only thereafter on 25 February 2025. This separated proceedings is the subject-matter of the decision at hand, whereas the panel ruled on the other part of the action and on the counterclaim for revocation in its decision of 2 April 2025. According to this decision, the German part of the patent-in-suit was found valid in the version defended in the main request and the infringement action was successful.

10. In the event the Court should find any reason to stay the proceedings insofar as they relate to infringing acts carried out in the UK, or not to grant a permanent injunction for the UK until further conditions are fulfilled, the Claimant had requested that the Court grant a provisional injunction for the UK, pending the stay and/or so long as no permanent injunction is granted (cf. SoC, mn. 209). In its decision of 2 April 2025, the panel rejected this request (cf. mn. 157 of the decision of 2 April 2025 in the main proceedings).

REQUESTS OF THE PARTIES

11. For sake of clarity the requests submitted are once again reflected hereinafter in their entirety, highlighting in yellow the parts of interest to the separated proceedings concerning the UK. The Claimant requests (cf. amended requests from the brief of 22 January 2025, main workflow,):

A.  As main request,

   I.   To hold that Claimant has demonstrated that the contested printing plate precursor SONORA XTRA-3 reproduces OR implements claims No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 14, 15 and 16 of new Main Request (Exhibit K 34);

   II    Consequently, to grant the claims made by Claimants;

III. subject to a penalty to be determined by the Court for each case of infringement to refrain from:

1. making, offering, placing on the market, using or storing it for those purposes a lithographic printing plate precursor within Germany <mark>and the United Kingdom</mark>, that has the following features:

    a. A lithographic printing plate precursor comprising:

    an aluminum support; and

    an image recording layer on the aluminum support,

    wherein the aluminum support includes an anodized film on a surface of the image recording layer side,

    the anodized film has micropores extending in a depth direction from the surface of the anodized film on the image recording layer side,

    the micropores include at least large-diameter pores whose maximum diameter inside the anodized film is in a range of 0.01 μm to 0.30 μm, and wherein an average value of depths of the large-diameter pores to the bottom from the surface of the anodized film is in a range of 100 nm to 1500 nm,

    an average pore diameter of the micropores in the surface of the anodized film is <u>in a range of 10% to 50%</u> of the maximum diameter of the micropores inside the anodized film,

    a thickness of the anodized film is in a range of 550 nm to 2850 nm, and

    the image recording layer contains an acid color former,

    - direct infringement of claim 1 EP 3 511 174 B1 -

    b. in particular, the lithographic printing plate precursor according to claim 1, wherein the micropores are micropores which further include smalldiameter pores communicating with a bottom of the large-diameter pores, extending in the depth direction from a communication position, and having an average pore diameter of 0.01 μm or less and in which the pore diameters of the small-diameter pores in the communication position are smaller than the pore diameters of the large-diameter pores in the communication position

    - direct infringement of subclaim 2 EP 3 511 174B1 -

    and/or,

    c. the lithographic printing plate precursor according to any one of claims 1 to 2, wherein the acid color former is a leuco dye

    - direct infringement of subclaim 3 EP 3 511 174 B1 -

    and/or

d. the lithographic printing plate precursor according to any one of claims 1 to 3, wherein the image recording layer further contains an acid generator

- direct infringement of subclaim 4 EP 3 511 174 B1 -

and/or

e. the lithographic printing plate precursor according to claim 4, wherein the acid generator contains an organic borate compound

- direct infringement of subclaim 5 EP 3 511 174 B1 -

and/or

f. the lithographic printing plate precursor according to any one of claims 1 to 5, wherein a value of a brightness L* in an L*a*b* color system of the surface of the anodized film on the image recording layer side is in a range of 70 to 100

- direct infringement of subclaim 6 EP 3 511 174 B1 -

and/or

g. the lithographic printing plate precursor according to any one of claims 1 to 5, wherein a value of a brightness L* in an L*a*b* color system of the surface of the anodized film on the image recording layer side is in a range of 72 to 90

- direct infringement of subclaim 7 EP 3 511 174 B1 -

and/or

h. the lithographic printing plate precursor according to any one of claims 1 to 7, wherein a steepness a45 representing an area ratio of a portion having an inclining degree of 45° or greater obtained by extracting a component with a wavelength of 0.2 μm to 2 μm in the surface of the anodized film on the image recording layer side in a frequency distribution based on fast Fourier transformation of three-dimensional data obtained by performing measurement using an atomic force microscope is 30% or less

- direct infringement of subclaim 8 EP 3 511 174 B1 -

and/or

i. the lithographic printing plate precursor according to any one of claims 1 to 8, wherein an amount of the image recording layer is in a range of 0.5 g/m 2 to 2.5 g/m 2

- direct infringement of subclaim 9 EP 3 511 174 B1 -

and/or

j. the lithographic printing plate precursor according to any one of claims 1 to 13, which is a lithographic printing plate precursor for on-press development.

- direct infringement of subclaim 14 EP 3 511 174 B1 -

2. supplying and/or offering to any person other than a party entitled within the territory of Germany and the United Kingdom with

lithographic printing plate precursors

which are suitable and intended to use with

a. method of preparing a lithographic printing plate, comprising

a step of imagewise-exposing the lithographic printing plate precursor of any of claims 1-14; and

a step of supplying at least any of printing ink or dampening water and

removing an image recording layer in a non-image area on a printing press.

- indirect infringement of claim 15 EP 3 511 174 B1 -

b. a printing method, comprising:

a step of imagewise-exposing the lithographic printing plate precursor according to any one of claims 1 to 4;

a step of supplying at least any of printing ink or dampening water and removing a non-image area of an image recording layer on a printing press to prepare a lithographic printing plate; and

a step of performing printing using the obtained lithographic printing plate.

- indirect infringement of claim 16 EP 3 511 174 B1 -

B. As further requests,

I. to hold that the Defendants shall pay damages to the Claimant compensating all losses caused by infringing acts referred to in A.III. above in

- Albania, Austria, Cyprus, Czechia, Denmark, Estonia, Finland, Italy, Lithuania, Latvia, Malta, Monaco, The Netherlands, North Macedonia, Poland, Romania, San Marino, Serbia, Slovenia, Spain, Sweden, Türkiye since July 17th, 2019 until May 26th, 2021;

- Belgium, Ireland, Liechtenstein, Luxembourg, Switzerland since July 17th, 2019 until May 31st, 2021,

- France since July 17th, 2019 until July 26th, 2021,

- Bulgaria, Norway since July 17th, 2019 until August 26th, 2021,

- Greece since July 17th, 2019 until August 27th, 2021,

- Iceland since July 17th, 2019 until September 26th, 2021,

- Portugal since July 17th, 2019 until September 27th, 2021,

- the United Kingdom since July 17th, 2019 and while EP 3 511 174 is in force,

- and in Germany since July 17th, 2019;

II.  to order the Defendants to pay to the Claimant EUR 200,.000 (two hundred thousand euros) in compensation for the moral prejudice suffered;

III.  to inform the Claimant to the extent of which the Defendants have committed the infringing acts of EP 3 511 174 referred to in B.I – stating

1.  the origin and distribution channels;

2.  the quantities produced, manufactured, delivered, received or ordered, as well as the price obtained;

in particular

- manufacturing quantities and times;

- the individual deliveries, broken down by delivery quantities, times and prices and the respective product designations as well as the names and addresses of the customers;

- the turnover, the gross margin and the contribution margin generated by the Defendants with the sale of these products;

- the individual offers, broken down by quantities, times and prices and product designations as well as the names and addresses of the commercial offer recipients;

- the advertising carried out, broken down by advertising media, their circulation, distribution period and distribution area, and in the case of Internet advertising, the domain, access figures and placement periods of each campaign;

- the identity of all third parties involved in the distribution, in particular the names and addresses of the commercial buyers and the sales outlets for which the products were intended;

whereby details requiring confidentiality may, at the discretion of the court, be redacted or made available only to certain persons;

within twenty-one days of the date of service of the decision, supported by evidence verified by an independent accountant, under a penalty of EUR 10.000 per delay day from the month following the date of service of the judgment to be handed down;

IV. to order the Defendants to pay the Claimant interim awards on damages in the amount of EUR 10.000.000 (ten million euros) as provided under Rule 119 of the Rules of Procedure pending the communication of the requested accounting information, the Claimant retaining the right to bring an action at a later date for the determination of the damages;

V. to order the Defendants to destroy at their own expense the products, material and/or implements referred to under A. III. which are in their possession and/or ownership within Germany and the United Kingdom, and to provide the Claimant with proper evidence certified by an independent bailiff as to how and when the destruction was carried out;

VI. to order the Defendants to recall the products referred to under A. III. which have been placed on the market from the channels of commerce, with reference to the infringement determined by a court of law (judgement of […] on […]) and with the binding promise to reimburse any fees and to assume any necessary packaging and transport costs as well as customs and storage costs associated with the return and to take back the products,

whereby an exhaustive list of all recipients is to be provided to the Claimants;

VII. to order the Defendants to definitively remove the products referred to under A. III. from the channels of commerce, specifically taking the following measures at their own expense:

1. the Defendants shall take all possible and reasonable measures to identify the locations and owners of the products referred to under A. III;

2. to the extent that the Defendants themselves have legal or actual control over the products referred to under A. III., such measures as are legally permissible and reasonable shall be taken to ensure that such products come into and remain in the Defendants' immediate possession;

3. to the extent that the Defendants do not have legal or actual control over the products referred to under A. III., they shall take all legally permissible and reasonable steps to induce the persons holding claims for restitution against the holders of the control of the products to assert such claims and/or to assist such persons in asserting such claims;

VIII. to order for each defendant

1. to place on its website, within seven days from the date of the decision and for a continuous period of at least two weeks, the following statement (or a statement as the Court deems appropriate), to be displayed in a manner visible directly on the website's home- or landing page, in a text box separate from the website's other content having a white background and black letters, set in typeface Arial and having at least 12pt size, and to provide the Claimant with evidence when and how the statement was placed:

    *"On [date of decision], the Unified Patent Court has ruled that Kodak GmbH, Kodak Graphic Communications GmbH and Kodak Holding GmbH infringed European Patent No. 3 511 174 held by Fujifilm Corporation by manufacturing, selling, and offering for sale SONORA XTRA-3 printing plate precursors. As a consequence, Kodak GmbH, Kodak Graphic Communications GmbH and Kodak Holding GmbH were ordered to terminate all commercial activities related to these products in Germany and the United Kingdom immediately. We apologize for any inconvenience this may cause and will be reaching out directly to clients to offer an appropriate solution."*

2. to send to its clients, within seven days from the date of the decision, in the national language of the client, a letter with the following contents only (or such contents as the Court deems appropriate) and without caption, and to provide the Claimant with copies of all letters sent:

    *"Kodak GmbH, Kodak Graphic Communications GmbH and Kodak Holding GmbH have infringed Fujifilm's European Patent No. 3 476 616 with its products SONORA XTRA-3. Those products may no longer be offered for sale or sold in Germany and the United Kingdom, either on- or offline. We hereby request you to remove (images of) these products from your websites, from your shops and from other promotional and sales channels, to cease all sales and offers for sale of these products, and to return to us these products within seven days from the date of this letter. We will refund the purchase price and all costs associated with the return of the products to you."*

IX. In any case, to order the Defendants to pay the Claimant the sum of EUR 300.000 as an interim award on the legal costs and other expenses as provided under Article 69 of the Unified Patent Court Agreement and Rule 118(5), 119 and 150(2) of the Rules of Procedure.

[For requests C. to F., see infra under "Counterclaim for revocation"]

G. As **a further subsidiary request**, insofar as the Court considers the evidence submitted by the Defendants insufficient to hold Defendant 2) liable for infringement of the patent in suit in the UK, to **order** Defendant 2) to produce,

      I.    the Manufacturing Toll Agreement of 1 January 2017 between Defendant 2) and Kodak Ltd. referred to on page 10 of Exhibit K 3;

      II.   only if this does not become clear from the Toll Manufacturing Agreement, other documents, including purchase orders, invoices, agreements, or terms and conditions, that clarify when title to the SONORA plates manufactured by Defendant 2) intended for the UK market passes, in the case of (a) supplies to Kodak's UK entity and in the case of (b) direct shipments to distributors such as Intuprint.

H. As a further request,

      I.    to dismiss the Defendants' request for an enforcement security,

      II.   if the Court were to consider an enforcement security at all, to limit it to much lower proportions at the discretion of the Court.

12. In the event the Court should find any reason to stay the proceedings as they relate to infringing acts carried out in the UK, or not to grant a permanent injunction for the United Kingdom (UK) until further conditions are fulfilled, the Claimant further requests that the Court grant a provisional injunction for the UK, pending the stay and/or so long as no permanent injunction is granted (cf. SoC, mn. 209).

13. The Defendants request (with regard to the updated amount for the enforcement security, cf. brief of 12 February 2025, workflow App_6928/2025):

1. dismissal of the action (Rules 23, 24 lit. (g) RoP UPC);

2. reimbursement of the Defendants' costs of the infringement action provisionally (Rule 150.2 RoP UPC);

    in the alternative,

3. to make the enforcement of the decision subject to the prior provision of security by the Plaintiff of at least […] (Rules 352.1, 354.2 RoP UPC), which can be provided by a written, irrevocable, unconditional and unlimited guarantee from a credit institution authorized to do business in the territory of a member state of the UPC;

4. to permit the Defendants to avert enforcement of the decision by providing security, which can be made by way of a written, irrevocable, unconditional, and indefinite guarantee of a financial institution in the territory of a member state of the UPC authorized to conduct business in the Federal Republic of Germany, irrespective of a provision of security by Plaintiff (Rule 9.1 RoP UPC);

C̲O̲U̲N̲T̲E̲R̲C̲L̲A̲I̲M̲ ̲F̲O̲R̲ ̲R̲E̲V̲O̲C̲A̲T̲I̲O̲N̲

14. With regard to their counterclaim for revocation (CC_3097/2024, CC_3099/2024, CC_8809/2024), the Defendants request:

5. revocation of the European patent EP 3 511 174 B1 in its entirety with effect in the territory of all Contracting Member States in which the patent has effect (Rule 25 RoP UPC);

6. without prejudice to our primary position that the court either cannot or should not determine the claim so far as it concerns the United Kingdom for the reasons set out in our Preliminary Objections,

    and on the basis that if the court were to assume jurisdiction for the EP 3 511 174 B1 (UK) it should only do so if the Plaintiff first undertakes to consent before the UK Court and Intellectual Property Office to revocation or restriction of the EP 3 476 616 B1 (UK) in line with decision handed down by this court,

    a decision that the EP 3 511 174 B1 (UK) is also invalid in its entirety; and

7. reimbursement of the Defendants' costs of the counterclaim provisionally (Rule 150.2 RoP UPC).

15. The Claimant having filed an Application to amend the patent (App_35678/2024) requests:

C. As a further main request,

    to **dismiss** the Counterclaim for Revocation of EP 3 511 174 B1 to the extent of the new Main request;

D. As a **subsidiary request**, insofar as the Court considers the claims of EP 3 511 174 B1 to be anticipated by any of the prior art documents invoked as contended in the Counterclaim for Revocation under Articles 54(2), 54(3) EPC and/or Article 56 EPC,

    I. to hold that the Application to Amend EP 3 511 174 B1 submitted as Auxiliary Request 1 is admissible;

    II. to hold that the Claimant has demonstrated that the contested printing plate precursor SONORA XTRA-3 reproduces or implements claims No. 1, 2, 3, 4, 5, 6, 7, 12, 13 and 14 of Auxiliary Request 1;

    III. to consequently order the injunctive measures requested under request A.;

    IV. to consequently order the corrective measures requested under request B. of the Statement of Claim;

E. As **a further subsidiary request**, if the Court considers the claims of EP 3 511 174 B1 to be anticipated by any of the prior art documents invoked in the Counterclaim for Revocation under Articles 54(2) or 54(3) EPC,

I.   to **hold** that the Application to Amend EP 3 511 174 B1 submitted as Auxiliary Request 2 is admissible;

II.  to **hold** that the Claimant has demonstrated that the contested printing plate precursor SONORA XTRA-3 reproduces or implements claims 1, 2 ,3, 4, 5, 6, 7, 12, 13 and 14 of Auxiliary Request 2;

III. to consequently **order** the injunctive measures requested under request A.;

IV.  to consequently **order** the corrective measures requested under request B.;

F.  As ==a further subsidiary request==, if the Court considers claim 1 of the Main Request or of Auxiliary Request 1 and/or 2 of EP 3 511 174 B1 to be violating Article 123 (2) EPC as invoked in the Counterclaim for Revocation,

I.   to **hold** that the Application to Amend EP 3 511 174 B1 submitted as Auxiliary Request 3 is admissible;

II.  to **hold** that the Claimant has demonstrated that the contested printing plate precursors SONORA XTRA-3 reproduce or implement claims No. 1, 2, 3, 4, 5, 6, 7, 8, 13, 14  and 15 of Auxiliary Request 3;

III. to consequently **order** the injunctive measures requested under request A.;

IV.  to consequently **order** the corrective measures requested under request B.

16. The Defendants request to dismiss the Claimant's requests to amend the patent.


<u>POINTS AT ISSUE</u>

The parties are in dispute about different aspects of the case at hand.

<u>JURISDICTION</u>

17. The Claimant is of the opinion that the UPC has jurisdiction over the UK part of the patent-in-suit, as confirmed by the ECJ's ruling in re C-339/22 (BSH Hausgeräte). Claimant disputes that Defendants' arguments in their counterclaim of revocation are to be understood as an invalidity defence against the infringement of the UK part of the patent-in-suit.

18. Defendants deny the UPC's jurisdiction, taking into account principles of international law and the scope of application of the UPCA. In addition, Claimant had not observed the requirements established by UK law for the defence of a patent in a limited version.

At least, the UPC had to stay the proceedings. Defendants are of the opinion that their arguments against the validity of the patent-in-suit also constitute an invalidity defence against an infringement of the UK part.

<u>INFRINGEMENT</u>

19. According to Defendants, Sonora XTRA-3 has no micropores in the meaning of the patent-in-suit. In their view its anodized film has a three-layer structure due to corresponding anodization steps instead of a two-layer-structure as required by the patent-in-suit. Moreover, Defendants consider Sonora XTRA-3 not to have continuous boundaries on the topmost layer of the anodized film, but spikes, thus not allowing to find pores having a certain diameter at the film's surface in accordance with the patent-in-suit. Furthermore, they regard Claimant's infringement allegation relating to subclaims 2 and 3 to be inconclusive insofar as Claimant relies on Atomic Force Microscope (AFM) measurements.

20. Claimant opines that Defendants infringe the UK part of the patent-in-suit under the applicable substantive UK law by direct deliveries of Defendant 2 to Kodak Ltd., Watford, and to UK-based distributors like Intuprint as suggested by the "Mintz report" and retaining title to the plates until they reach the distributors' premises. (cf. Reply mn. 469 et seq.; Exhibit K 39 - EXHIBIT PMJ-1TO THE STATEMENT OF PETER MYLES JELF, page 6 and page 8 et seqq. sub point 4, here 4.13 cited as follows" When asked about the transfer of the title of the plates, Mark said that the title of the plates is shifted to a customer once the plates have reached the physical premises of that client."). It alleges a transfer of title in the UK only, thus constituting a direct infringement by importing according to Section 60(1)(a) Patents Act 1977 (Reply, mn. 472 et seq.). In the event that Defendant 2 did not retain title in the UK, the Defendants, at least, were liable as joint tortfeasors under UK law. Furthermore as to defendant 2 claimant relied on a test purchase of printing plates displayed in its SoC mn. 107 et seqq. establishing in its eyes that defendant 2 is the producer of the plates and pointing to defendant no 1's involvement in the production process as well as the control of business of defendant 2 by defendant 3, those facts being submitted uniformly to all alleged acts of infringement, i.e. also with respect to acts on UK territory.

21. Defendants argue that neither the requirements for importing nor for a joint tortfeasorship are met. They refer to the annual report according to Exhibit K3 (Rejoinder mn. 658) which states that the title to all material and products including intermediate products constantly lies with Kodak Limited, Watford with regard to products produced under the toll manufacturing agreement between Defendant 2 and Kodak Ltd., Watford.

22. Moreover, the Defendants allege a private prior use right pursuant to Sec. 12 German Patent Act (PatG) in conjunction with Art. 28 UPCA allowing them to manufacture and distribute the contested embodiments in Germany. The German prior use right would also extend to acts in the territory of the UK due to principles of EU law. They also allege an additional separate prior use right in the UK under Section 64 UK Patents Act 1977.

23. Claimant seeks a permanent injunction, a right to prevent the indirect use of the invention, corrective measures, an order to communicate information and to pay damages as well as an interim award of damages and costs.

24. For further details on the points at issue, reference is made to the briefs and the accompanying exhibits.

COUNTERCLAIM FOR REVOCATION

25. The Defendants base their identical counterclaims for revocation on the following grounds of Art. 138 EPC in conjunction with Art. 65 (2) UPCA.

- lack of novelty (Art. 138(1)a) in conjunction with Art. 54(1), (2) and (3) EPC) due to public prior use, or over WO 379, or over EP 452, and

- lack of inventive step (Art. 138(1)a) in conjunction with Art. 56 EPC) in the light of EP 452 and common general knowledge, or in combination with pre-published patent applications EP 968, US 599,

- added matter (Art. 123(2) EPC).

<u>GROUNDS FOR THE DECISION</u>

26. The infringement action being subject to the separate proceeding at hand is admissible and founded as the attacked embodiment infringes upon the validated national part of the patent-in-suit in the UK as well. The UK part of the patent-in-suit is deemed valid – as a prerequisite for finding for infringement of the UK part of the patent-in-suit – for the same reasons, for which the admissible Counterclaim for revocation directed against the German part of the patent-in-suit had been rejected.

A.    <u>ADMISSIBILITY OF THE INFRINGEMENT ACTION AND OF THE COUNTERCLAIM FOR REVOCATION</u>

27. The infringement action is admissible with regard to the UK part of the patent-in-suit.

I.   <u>RELEVANT REQUESTS CONCERNING THE INFRINGEMENT ACTION</u>

28. The Claimant's amendments to the infringement action are admissible.

<u>Amendments by Claimant's reply</u>

29. By its brief containing its reply to the statement of defence and to the counterclaim for revocation and its application to amend the patent, Claimant submitted auxiliary requests with regard to the infringement proceedings taking into account a potential partly revocation of the patent-in-suit. Such consequential adjustments to the infringement action are admissible as detailed in the decision of 2 April 2025 (para. 25). With respect to the UK part of the infringement action, no other result is justified. Any procedural requirement as to the notification of the UK patent office by the Claimant (or even, if applicable by the court) according to UK procedural law are not applicable in the case at hand. First, the infringement action at hand is exclusively governed by procedural law of the forum at hand in accordance with fundamental principles of international procedural law. Apart from that, as discussed in the oral hearing, non-observance of an obligation to notify the UK patent office would not affect the course of the infringement action before UK courts anyway, in particular it would not affect the course of an infringement proceeding in the UK, in particular not result in a stay of the proceedings until the notification of the UK patent office had taken place. Second, the notification of the UK patent office, at least according to the understanding of the panel, is linked to the limitation of the patent-in-suit with erga-

omnes effect alone. In the proceedings at hand, such limitation is not at issue as the dispute will only be decided upon with inter-partes effect between the parties in accordance with the ECJ's decision (cf. judgment of 25 February 2025, C-339/2022, para. 75 – BSH Hausgeräte).

Amendments by Claimant's brief of 4 February 2025

30. As far as Claimant has amended its requests for the infringement action by its brief of 4 February 2025, the panel has no concerns under R. 263 RoP either. It is referred to the decision of 2 April 2025 (paras. 26 et seqq).

II.  JURISDICTION FOR INFRINGEMENT IN THE UK

31. The UPC has jurisdiction to decide upon the infringement action as far as it relates to acts infringing the UK national part of the patent-in-suit.

32. According to the ECJ's ruling in re BSH Hausgeräte, the court of the Member State of the European Union in which the defendant is domiciled (Article 4(1) of the Brussels Ia Regulation) does have jurisdiction to rule on an infringement action based on a patent granted or validated in a NON-EU member state even if the invalidity of this patent is raised as a defence. This is true safe for the restrictions referred to in paragraphs 63 to 65 of the judgment (Lugao Convention or applicable bilateral convention as the case may be or a situation under Art. 33 or 34 Brussels Ia Reg.). Still, there is no jurisdiction for a defence which seeks to affect the existence or content of that patent in that third state, or to cause its national register to be amended (cf. ECJ, judgement of 25 February 2025, C-399/22, para. 74 et seq.).

33. In the case at hand, none of these restriction apply. The United Kingdom is not a contracting member state to the Lugano Convention. The parties to the infringement action at hand did not bring forward any bilateral convention between a member state to the UPCA and the United Kingdom stipulating that the courts or other authorities in the United Kingdom have exclusive jurisdiction over disputes relating to the validity of

patents granted or validated in the United Kingdom.  Thus, it can be left open whether such bilateral convention with only one or several but not all member states to the UPCA would suffice. In the absence of any proceedings in the United Kingdom which relates to the infringement or validity of the patent-in-suit in the United Kingdom, there is no situation which falls into the scope of Art. 33 or Art. 34 Brussels Ia Reg. either so that there is no reason to stay or dismiss the proceedings according to these provisions. Since the decision at hand, as detailed infra, assesses the validity of the patent-in-suit in relation to the United Kingdom as a mere prerequisite for the question of infringement with *inter partes* effect only, it does neither affect the existence or content of the part of the patent-in-suit, nor does it cause the national register in the UK to be amended. Contrary to Defendants, the ECJ's ruling in re BSH Hausgeräte deals with the principles of international law, in particular with the principles of non-interference, forum inconvenience and comity, exhaustively so that there is no room for denying jurisdiction on these grounds in deviation from the ECJ's ruling.

34. Art. 71b Brussels Ia Regulation and Art. 34 UPCA do not lead to another result. Contrary to Defendants, the term "matter governed by that instrument" in Art. 71b (1) Brussels Ia Reg. does not relate to the territorial scope of jurisdiction but to the substantive legal matter for which the EU member states that are parties to the instrument have transferred the jurisdiction from their national courts to the common court. Rather Art. 71b (1) Brussels Ia Reg. clarifies that the common court has international jurisdiction when the national courts of the participating EU member states would have jurisdiction in the absence of the instrument establishing the common court. Since (leaving aside the transition period and opt-outs) the national courts of the UPCA member states would have jurisdiction over infringement actions in relation to the UK national part in accordance with ECJ's ruling in re BSH Hausgeräte, so does the UPC (cf. for further details LD Dusseldorf, decision of 28 January 2025, UPC_CFI_355/2023, p. 22/23). No different results follows from the UPCA, in particular not from Art. 34 UPCA. This provision does not deal with the international jurisdiction in the first place (which, within the UPCA, is governed by Art. 31 UPCA). The provision does not exclude the UPC's jurisdiction over national parts of European patents in relation to Non-UPC member states. There is no indication that the UPCA member states intended to transfer jurisdiction to the UPC with regard to their national parts of a European patent

only, thereby reserving jurisdiction with regard to other national parts to their national courts. For further details, reference is made to LD Dusseldorf, decision of 28 January 2025, UPC_CFI_355/2023 (p. 23).

35. Since there is no proceeding in the United Kingdom pending relating to the infringement or validity of the patent-in-suit in the United Kingdom, there is no reason to stay the proceeding at hand pursuant to R. 295 (a) or (m) RoP either.

III. DEFENDANTS REQUEST ON VALIDITY IN UK

36. It can remain open whether Defendants' request on the validity of the UK part of the patent-in-suit is to be interpreted as meaning that Defendants seeks revocation of this part by the UPC or as a mere declaratory relief establishing that the UK part is invalid. Similarly, it can be left open, whether pursuant to the principles set out by the ECJ in re BSH Hausgeräte the courts in the European Union have jurisdiction for the aforementioned declaratory relief. In any event, Defendants' request is inadmissible. The UPC has no jurisdiction to revoke the national part of an European bundle patent for states other than UPCA contracting member states (cf. ECJ, judgement of 25 February 2025, C-339/2022, para. 73 – BSH Hausgeräte).

37. The Defendants furthermore do not have a relevant interest in a declaration that the UK part is invalid. A declaration would not be binding on the authorities in the UK, which are solely responsible for revocation of the UK part, or on the Claimant in revocation proceedings in the UK. Otherwise, the UPC would indirectly decide on the validity of the UK part, which would be counter to the principles established by the ECJ.

III. FURTHER ASPECTS OF ADMISSIBILITY

38. In all other respects, the infringement action is admissible.

B.    SCOPE OF THE PATENT-IN-SUIT

39. The patent-in-suit relates to a lithographic printing plate precursor. For a detailed description of its scope, it is referred to the decision of 2 April 2025 (paras. 41 et seqq.).

40. As a solution, the patent-in-suit proposes in claim 1 a lithographic printing plate precursor, the features of which can be structured as follows (numbering according to Claimant's feature analysis, but reordered for the sake of better comprehensibility). The Claimant defends its patent-in-suit only with the following limited feature **1.7'**.

**1**    A lithographic printing plate precursor comprising:

    **1.1**    an aluminum support (10),

        **1.3**    wherein the aluminum support (10) includes an anodized film (20) on a surface of the image recording layer side,

            **1.8**    a thickness (X, F) of the anodized film (10) is in a range of 550 nm to 2850 nm,

        **1.4**    the anodized film has micropores (30) extending in a depth direction from the surface of the anodized film on the image recording layer side,

            **1.5**    the micropores (30) include at least large-diameter pores (130) whose maximum diameter inside the anodized film (34, 122) is in a range of 0.01 μm to 0.30 μm [= 10 nm to 300 nm],

            **1.6**    and wherein an average value of depths of the large-diameter pores (130) to the bottom from the surface of the anodized film (D) is in a range of 100 nm to 1500 nm,

            **1.7'**    an average pore diameter of the micropores in the surface of the anodized film (124) is ~~90 % or less~~ <u>in a range of 10 % to 50 %</u> of the maximum diameter of the micropores inside the anodized film; and

    **1.2**    an image recording layer on the aluminum support (10),

        **1.9**    the image recording layer contains an acid color former.

41. The independent procedural claims protect corresponding methods of manufacturing a lithographic printing plate (claim 15) and for printing with that plate (claim 16), with a specification indicating the printing plate being of an on-press development type, which feature is not subject of claim 1.

CONSTRUCTION OF CLAIM 1

42. For the construction of claim 1 it is referred to the decision of 2 April 2025 (paras. 46 et seqq.).

C.    COUNTERCLAIM FOR REVOCATION

43. The counterclaim, being solely directed against the remaining German part of the patent-in-suit (see supra admissibility), is to be dismissed. It is to be stressed, that the following reasoning is solely of relevance to the UK part of the patent-in-suit insofar as the validity of that part of the bundle patent is a prerequisite to find for infringement of the UK part of the bundle patent in the relation between the parties in the proceedings before the UPC. The decision is not such as to affect the existence or content of that patent in the UK, or to cause its national register to be amended (cf. ECJ judgement of 25 February 2025, C-339/2022, para. 74 – BSH Hausgeräte). The Defendants can neither rely on public prior use, nor does the patent-in-suit lack novelty or inventive step, nor does it contain added matter. In the absence of deviating arguments of the defendants challenging the validity of the patent-in-suit when UK patent law or the EPC as applied by UK courts is concerned, reference is made to the decision of 2 April 2025  (cf. paras. 64 - 101).

INFRINGEMENT BY SONORA-XTRA 3 PLATES

44.    The Defendants also directly infringe upon claim 1 of the UK-Part of the patent-in-suit in the version corresponding to the main request through the commercialization of Sonora-XTRA 3 plates in the UK. The acts of offering, placing on the market, using or storing it for those purposes had not been contested by Defendants with a sufficient level of substantiation (see infra).

45.    However, as far as Claimant requests to order that the Defendants shall refrain from making the attacked embodiments in the UK, it failed to submit sufficient

facts that there at least is an imminent danger that the Defendants will infringe upon the UK bundle patent by relocating the production site from Germany to the UK. Furthermore Claimant did not elaborate on the respective principles of UK law applicable to that question. Furthermore Claimant did not argue that the manufacturing in Germany by Defendant 2 under the Toll Manufacturing Agreement with the UK entity of the Kodak Group, Kodak Ltd, Watford, UK (cf. Exhibit K3, page 10), establishes manufacturing in the territory of the UK according to UK law. The Court has taken the order of the Court of Appeal of 14 February 2025 (UPC_CoA_382/2024, APL_39664/2024) into consideration. That order however dealt with the question in a case where the law of the UPCA was applied and when a general preliminary injunction may be justified, and clarified in this regard that a general injunction "may be justified even if it is not shown that a patent is infringed by all possible infringing acts" (cf. headnote and mn. 142). In the case at hand, where UK law is solely applicable to any acts on UK territory, claimant neither put forward any facts why there should be an imminent danger that defendant 2 relocates its manufacturing from Germany to the UK as a Non-EU- and Non-UPC-MS, nor is this likely in the light of the products being manufactured in Osterrode/Germany with processes of considerable manufacturing complexity as well as taking into consideration that the chemical compounds needed for that process like liquid chemicals are being manufactured on site in Osterrode/ Germany as well (see annual financial report Exhibit K3, page 10 and 11), which makes a relocation even more unlikely.

46. Claimant furthermore submitted sufficient facts to find for infringement in the UK. It alleged without this being contested with substantiation that Defendant 2 makes direct deliveries to the UK like in the example of Intuprint as suggested by the "Mintz report" and retaining title to the plates until they reach the distributors' premises in the UK. Therefore, these acts qualify as disposing in the sense of loss of physical possession by transferring that possession to another entity in the UK under s.60(1)a Patent Act, as offering in the sense of approaching potential customers, individually or by advertisement, indicating a willingness to supply a product, with terms to be agreed under s.60(1)a Patent Act and importing under s.60(1)a Patent Act as construed in Sabaf v MFI [2004] UKHL 45 and Waterford

Wedgwood v David Nagali [1998] FSR 92 (cited after Exhibit K 39, point 10 and K49). These legal principles of UK law had not been put into question by the Defendants. As the Claimant had good reasons, based on the Mintz report, to make its allegations and as only Defendants have exact knowledge of when and under which conditions title to the plates is retained or transferred, their general disputing of such facts is insufficient. It is the Defendants alone who possess knowledge of the respective facts. Therefore they would have been in a position to submit clear and detailed facts deviating from Claimant's allegation, which under the circumstances of the case at hand could not have been more detailed for lack of knowledge of the facts relating to the delivery to distributors in the UK like Intuprint. Therefore it is insufficient that Defendants only state that "nothing in the Mintz Group report (Exhibit PMJ-1) suggests any different facts" (Rejoinder mn. 664). With respect to Defendants 1 and 3, the Defendants did not suggest any facts and legal standards under UK law, which would bar finding them liable for infringement under UK law alongside Defendant 2 as they had been found liable under the UPCA with respect to acts committed in Germany. It would have been for Defendants to submit detailed deviating facts. Before this background it may remain open whether or not the cooperation under the Toll Manufacturing Agreement is to be qualified as joint tortfeasance.

47. Also Defendants cannot be heard with their argument that the attacked embodiment would not infringe upon feature **1.7'** as no pore diameter in the surface could be measured due to the spike-like structure of the surface of the attacked embodiment. Reference is made to the decision of 2 April 2025 (paras. 103 et seqq.).

<u>NO PRIVATE PRIOR USE RIGHT IN GERMANY AND/OR THE UK</u>

48. Defendants can also not rely on a private prior use right under Art. 28 UPCA, § 12 German Patent Act. At least Defendants did not submit sufficient facts so as to establish that they had also made the final business decision within the Kodak Group to commercialize printing plates with the features of the claimed invention before the relevant priority date. Reference is made to the decision of 2 April 2025 (cf. mn. 117 et seqq). In consequence, Defendants' argument, that the German

prior use right would also extend to acts in the UK due to principles of EU law must also fail.

49.    As far as Defendants argue additionally that they could refer to a prior use right under s.64 UK Patents Act 1977 this argument falls through as well, as they did not show a business decision amounting to effective and serious preparations in good faith according to s. 64(1)(b) UK Patents Act 1977 in the UK as the burden of proving that defence also rests on the infringer under UK law (cf. standards of UK law as set out in Exhibit 39).

50.    Finally, as the decision on the preliminary objection had been reserved for the main trial, Defendants' argument that Claimant's arguments submitted with regard to UK law had been filed late, cannot be heard.

INFRINGING ACTS AND REMEDIES SOUGHT

51.    The infringing acts in the UK, remain undisputed by Defendants. The established infringement predominantly justifies Claimant's requests.

REQUEST FOR DECLARATION OF INFRINGEMENT

52.    Since the Claimant did not further elaborate on the request and did not set out that such declaration serves a legitimate interest, the request had to be denied (compare facts in LD Mannheim ORD_11865/2025, UPC_CFI_159/2024 of 11 March 2025 at para. 111), especially since the latest version of the requests explicitly refer to the product name of the attacked embodiment which therefore is displayed in the operative part of the judgement which may be communicated in case of need. Claimant did not submit arguments that a declaratory relief may be granted under different prerequisites according to s.61(1)(e) UK Patents Act 1977.

REQUEST FOR PERMANENT INJUNCTION

53.    The requested injunctive relief has its basis in s.61(1)(a) UK patents Act 1977. It

has not been submitted that the court's power to render an injunction under UK law deviates from Art. 25 (a), Art. 63 (1) UPCA. The request is to be granted with regard to the acts of offering, placing on the market and using and the acts of storing and importing for those purposes, within the UK, because the infringement in the past constitutes a risk of repetition, but not for making as set out supra. There is no need for explicitly deciding upon Claimant's "in particular"-requests relating to the subclaims, because they are merely exemplary specifications of acts already covered by the decision relating to the new Main request's claim 1.

54. Since the court has discretion to grant the permanent injunction under UK law as well as under the UPCA (Art. 63 (1) UPCA "may") the circumstances of the individual case can be taken into account, in particular whether an injunction would be disproportionate (Art. 42 UPCA, Art. 3 (2) Enforcement-Directive). Insofar it may be referred to the decision of 2 April 2025.

55. The requested threat of a penalty payment in general terms ("to be determined by the court for each case of infringement") is a sufficient basis to determine such request as Claimant has elaborated on estimated sales price of Defendants printing plates per square meter at which it arrives by referring to Defendants' annual reports and invoices (Exhibit K12) of roughly 10 € per square meter (SoC para 246), which remained undisputed and rather is in line with Defendants' submissions on security, so that in accordance with previous decisions of the Local Division Mannheim (see LD Mannheim ORD_11865/2025, UPC_CFI_159/2024 of 11 March 2025 at para. 114 (factor 3) and Local division Mannheim ORD_598506/2023 UPC_CFI_210/2023 of 22 November 2024, para. 175: 1.000 € per mobile) to be dissuasive, the amount is set to 50 € per square meter. Defendants did not submit that UK law would not allow such order.

REQUEST FOR DECLARATION OF DAMAGES

56. The declaration of entitlement to damages on the merits is based on s.61(1)(c) Uk Patents Act 1977 and justified by the established infringement (cf. decision of 2 April 2025). Defendants did not submit deviating principles to be applied under UK law.

57.    The determination of the amount of damages and time periods to be taken into account is reserved for subsequent proceedings under R. 125 et seqq. RoP (see LD Mannheim ORD_11865/2025, UPC_CFI_159/2024 of 11 March 2025 at para. 103 et seqq., 116 and infra at "ordering information").

58.    As far as the requests extends back to 17 July 2019 with regard to UK, in the light of the reasoning given in the statement of claim, the request has to be interpreted to relate to compensation pursuant to Art. 67 EPC the amount of which is to be determined in subsequent proceedings under R. 125 et seqq. RoP as well. Therefore, at this stage, the panel does not have to adjudicate on potential time periods to be left out in this regard either.

REQUEST TO PAY DAMAGES IN COMPENSATION FOR MORAL PREJUDICE

59.    Even if the request for damages in compensation for moral prejudice may find a basis in UK law, the request is to be denied as set out in more detail in the decision of 2 April 2025.

REQUEST FOR INTERIM AWARD OF DAMAGES

60.    Claimant seeks an interim award of damages. However the request had to be denied for thee reasons specified in the decision of 2 April 2025.

REQUEST FOR INFORMATION

61.    The request for information had to be accepted. Defendants did not point to deviating principles of UK law in that respect. Therefore, reference is made to the decision of 2 April 2025. The panel does take into account the Court of Appeal's order of 30 May 2025 (UPC_CoA_845/2024, 50/2025). On the instant facts, considering the complexity, the panel regards it as not feasible to set an appropriate time period in advance in the individual case at hand. Whether the Defendants will have provided the required information in due time, depends on the circumstances and will be assessed in the enforcement proceedings, if necessary.

REQUEST FOR DESTRUCTION, REQUEST FOR RECALL, REQUEST FOR REMOVAL

62. The request to <u>destroy</u> the infringing embodiments in possession and/or ownership in the UK is based on s.61(1)(b) UK Patents Act 1977

63. The <u>recall</u>, not being codified but still being accepted in UK law (Paul England, A Practitioner's Guide to European Patent law 2nd ed. p. 227), is to be restricted to commercial recipients only, because private end users are not part of the channels of commerce (cf. Local Division Düsseldorf, decision of 3 July 2024, UPC_CFI_7/2023, GRUR-RS 2024, 17732 mn. 143). However, Claimant's request takes this into account by restricting the requested recall to the channels of commerce. Again, the Defendants did not state any specific fact which calls for the assumption of disproportionality. It is for the infringer to take the appropriate measures to be taken to make an appropriate recall. Similarly as for the destruction, it lies in the infringer's own vital interest to indicate the fulfilment of its recall obligation beyond any reasonable doubts towards the Claimant in order to avoid an enforcement proceedings. However, contrary to Claimant's request at hand, there is no need to order the infringer to provide a list of the recipients of the recall letter.

64. The requested definite <u>removal</u> of infringing products from the channel of commerce is a separate corrective measure additional to the recall (cf. Local Division Mannheim, decision of 22 November 2024, UPC_CFI_210/2024 mn. 177). The Defendants did not state any specific fact which would turn the removal disproportionate. In the opinion of the panel, it suffices to request and order the definite removal without specifying the modalities thereof (different opinion Local Division Düsseldorf, decision of 3 July 2024, UPC_CFI_7/2023, GRUR-RS 2024, 17732 mn. 147). The reason is that Art. 64 (d) UPCA calls for the success of the definite removal. It is the infringer's responsibility how he guarantees such success. The Defendants, again, did not point to deviating principles of UK law.

<u>REQUEST FOR PUBLICATION</u>

65. The requested publication of an own declaration by the Defendants on their webpage had to be denied for the reasons set out in the decision of 2 April 2025.

<u>REQUEST FOR AN INTERIM AWARD ON COSTS</u>

66. The request for an interim award on costs had been accepted in the main proceeding. There are no grounds to exercise the discretion to grant the interim award on costs again with regard to the follow-up-proceedings to the main proceedings.

INDIRECT INFRINGEMENT

67. With regard to the indirect infringement of claims 15 and 16 in the version corresponding to the main request by the attacked embodiment in the UK, the requests are justified according to s.60(1)(b) UK Patents Act 1977. Reference is made to the considerations supra. As far as requests B.V. also refers to A.III.2 this is considered to be a mere oversight by Claimant. It is furthermore not apparent that the attacked embodiment can be used without making use of the invention so that an unrestricted permanent injunction appears justified.

ENFORCEMENT SECURITY

68. Art. 82 (2) UPCA, R. 118.8 RoP give the court the discretion to make any order subject to the provision of a security for its enforceability. Applying these principles, the panel exercises its discretion not to make the enforceability subject to the provision of a security by Claimant (cf. decision of 2 April 2025).

COSTS

69. The decision on costs is based on Art. 69 (1) UPCA, R. 118.5 RoP. Since the statement of claim was unsuccessful to a minor part only – including the request to render an injunction for making the attacked embodiments – and the panel considers the economical focus of the case to be on the product Sonora XTRA-3, the panel exercises its discretion that the Defendants have to bear the recoverable costs in full despite the partial withdrawal of the infringement action regarding Sonora X and Sonora XTRA-2 and the full substantive scope of the patent-in-suit as granted.

70. Claimant clarified in the oral hearing that it did not intend to apply to increase the ceilings set forth in the Administrative Committee's decision on scale of ceilings under para 3. of its brief of 4 February 2025. Defendants did not apply for an increase of the ceilings either.

<u>Value in dispute</u>

71. The value of the whole dispute (including this part and the part decided on in the decision of 2 April 2025) had already been set to 15.000.000 € after having heard the parties in the oral hearing.

<u>Decision:</u>

A.I. The Defendants are ordered to refrain from:

1. offering, placing on the market, using or storing it for those purposes a lithographic printing plate precursor within the United Kingdom, that has the following features:

    a. A lithographic printing plate precursor comprising:

    an aluminum support; and

    an image recording layer on the aluminum support,

    wherein the aluminum support includes an anodized film on a surface of the image recording layer side,

    the anodized film has micropores extending in a depth direction from the surface of the anodized film on the image recording layer side,

    the micropores include at least large-diameter pores whose maximum diameter inside the anodized film is in a range of 0.01 μm to 0.30 μm, and wherein an average value of depths of the large-diameter pores to the bottom from the surface of the anodized film is in a range of 100 nm to 1500 nm,

    an average pore diameter of the micropores in the surface of the anodized film is <u>in a range of 10% to 50%</u> of the maximum diameter of the micropores inside the anodized film,

    a thickness of the anodized film is in a range of 550 nm to 2850 nm, and

    the image recording layer contains an acid color former,

    - direct infringement of claim 1 EP 3 511 174 B1 -

2. supplying and/or offering to any person other than a party entitled within the territory of the United Kingdom with

    lithographic printing plate precursors

    which are suitable and intended to use with

    a. method of preparing a lithographic printing plate, comprising

    a step of imagewise-exposing the lithographic printing plate precursor of any of claims 1-14; and

a step of supplying at least any of printing ink or dampening water and removing an image recording layer in a non-image area on a printing press.

- indirect infringement of claim 15 EP 3 511 174 B1 -

b. a printing method, comprising:

a step of imagewise-exposing the lithographic printing plate precursor according to any one of claims 1 to 4;

a step of supplying at least any of printing ink or dampening water and removing a non-image area of an image recording layer on a printing press to prepare a lithographic printing plate; and

a step of performing printing using the obtained lithographic printing plate.

- indirect infringement of claim 16 EP 3 511 174 B1 -

A.II.   It is ordered, that in the event of any violation of the injunction under A.I. above, the respective Defendants shall pay severally to the Court a penalty payment of EUR 50 per square meter of the contested printing plate precursor.

B.I.   It is held that the Defendants shall pay damages to the Claimant compensating all losses caused by infringing acts referred to in A.I. above in the United Kingdom since 17 July 2019.

II.   The Defendants are ordered to inform the Claimant to the extent of which the Defendants have committed the infringing acts of EP 3 511 174 referred to in A.I – stating

1. the origin and distribution channels;

2. the quantities delivered, received or ordered, as well as the price obtained;

in particular

- the individual deliveries, broken down by delivery quantities, times and prices and the respective product designations as well as the names and addresses of the customers;

- the turnover, the gross margin and the contribution margin generated by the Defendants with the sale of these products;

- the individual offers, broken down by quantities, times and prices and product designations as well as the names and addresses of the commercial offer recipients;

- the advertising carried out, broken down by advertising media, their circulation, distribution period and distribution area, and in the case of Internet advertising, the domain, access figures and placement periods of each campaign;

- the identity of all third parties involved in the distribution, in particular the names and addresses of the commercial buyers and the sales outlets for which the products were intended;

whereby the Defendants each reserve the right to disclose the names of their non-commercial customers to an impartial auditor only, chosen by Claimant and paid by the respective Defendant, who, upon Claimant's request, confirms or denies whether a specific non-commercial customer is contained in the disclosure and who, in all other cases, is subject to confidentiality towards the Claimant.

III.   The Defendants are ordered to destroy at their own expense the products, material and/or implements referred to under A.I.1. which are in their possession and/or ownership within the United Kingdom.

IV.   The Defendants are ordered to recall the products referred to under A.I. which have been placed on the market from the channels of commerce, with reference to the infringement determined by a court of law (Unified Patent Court, Local Division Mannheim, decision of 2 April 2025);

V.   The Defendants are ordered to definitively remove the products referred to under A. I. from the channels of commerce at their own expense.

C.   All further requests of Claimant are dismissed.

D.   The Defendants have to bear the costs of the litigation.

E.   The Orders A.I., B.II. to B.VI. shall be enforceable only after the Claimant has notified the Court which part of the orders it intends to enforce, this notification has been served on the Defendant concerned and a certified translation of the orders in the official language of a Contracting Member State in which the enforcement shall take place has been provided by the Claimant and served on the Defendant concerned.

Delivered in Mannheim on 18 July 2025

**NAMES AND SIGNATURES**

| | |
|---|---|
| Presiding judge Tochtermann | |
| Legally qualified judge Agergaard | |
| Legally qualified judge Böttcher | |
| Technically qualified judge Wismeth | |
| For the Sub-Registrar: Kranz, Clerk LD Mannheim | |

**Information about appeal**
An appeal against the present Decision may be lodged at the Court of Appeal, by any party which has been unsuccessful, in whole or in part, in its submissions, within two months of the date of its notification (Art. 73(1) UPCA, R. 220.1(a), 224.1(a) RoP).

**Information about enforcement** (Art. 82 UPCA, Art. Art. 37(2) UPCS, R. 118.8, 158.2, 354, 355.4 RoP)
An authentic copy of the enforceable decision or order will be issued by the Deputy-Registrar upon request of the enforcing party, R. 69 RegR.

# **<u>EXHIBIT 11</u>**


**Unified Patent Court**
**Einheitliches Patentgericht**
**Juridiction unifiée du brevet**

# Hamburg - Local Division

## UPC_CFI_387/2025
## Final Order of the Court of
## First Instance of the Unified Patent Court
## delivered on 14/08/2025

HEADNOTES:

1. The UPC as a common Court has jurisdiction regardless of the defendant's domicile for all patent infringements committed in a UPC member state (Art. 71b (2) in conjunction with Art. 7 sub (2) Brussels I recast regulation (1215/2012/EU).

2. When a Defendant is not domiciled and not active in the Member State who's local division is applied to, but it is part of the same company group as other defendants, and when the attacked embodiments are the same, the claims are closely connected in the meaning of Art. 8 (1) Brussels I recast regulation (1215/2012/EU).

3. In order to establish international jurisdiction for the alleged infringement of the national part of a European patent outside of the UPCA-countries requires at least the plausible allegation of infringing acts by that party in the country in question (here Spain).

4. As it is not possible for non-EU based manufacturers to sale electronics in the EU without an Authorized Representative in the Union (regulations 2023/988/EU on general product safety and 2019/1020/EU on market surveillance and compliance of products), the legal framework puts the Authorized Representative in the role of being an indispensable party in the distribution of electronic products. Thus, an Authorized Representative can serve as an anchor defendant with respect to Art. 8 (1) Brussels I recast regulation (1215/2012/EU).

5. An Authorized Representative in the Union (regulations 2023/988/EU on general product safety and 2019/1020/EU on market surveillance and compliance of products) is an intermediary and can as such be subject to an injunction, Art. 63 (1) 2nd sentence UPCA.

KEYWORDS:

Preliminary injunction; Art. 62(2) UPCA; Rule 209(2) RoP; Authorized representative; Intermediary, Art. 63 (1) 2nd sentence UPCA; International jurisdiction; Art. 7 sub (2)

Brussels I recast regulation (1215/2012/EU); Art. 8 (1) Brussels I recast regulation (1215/2012/EU); Anchor Defendant.

<u>CLAIMANT</u>

**Dyson Technology Limited**
(Applicant) - Tetbury Hill - SN16 0RP - Malmesbury, Wiltshire  - GB

Represented by Dr. Constanze Krenz

<u>DEFENDANTS</u>

1) **DREAME INTERNATIONAL (HONGKONG) LIMITED**
(Defendant) - Room H28G, Blk EH, 10th Floor, Golden Bear Ind. Ctr., 66-82 Chai Wan Kok St., Tsu-en Wan - n.a. - Hong Kong - HK

Represented by Dr. Anna Friese-Okoro

2) **Teqphone GmbH**
(Defendant) - Nördlicher Park 16 - 61231 - Bad Nauheim - DE

Represented by Christian Stoll

3) **Eurep GmbH**
(Defendant) - Schlüterstraße 3 - 85057  - Ingolstadt - DE

Represented by Christian Stoll

4) **Dreame Technology AB**
(Defendant) - Sigrid Undsets Gata 20 - lgh 1101,168, 49 - Stockholm (Bromma) - SE

Represented by Christian Stoll

| <u>PATENT AT ISSUE</u> | *Proprietor/s* |
|---|---|
| ***Patent no.*** | |
| **EP3119235** | **Dyson Technology Limited** |

*<u>SUBJECT-MATTER OF THE PROCEEDINGS</u>*

Application for provisional measures

<u>LANGUAGE OF THE PROCEEDINGS</u>

English

2

PANEL

Panel of the Local Division in Hamburg

DECIDING JUDGES

This order has been issued by the presiding judge Sabine Klepsch, the legally qualified judge and judge-rapporteur Dr. Stefan Schilling and the legally qualified judge Stefan Johansson.

ORAL HEARING

24.07.2025, 10:00 Uhr

SUMMARY OF FACTS

1    The Applicant is claiming that the Defendants are infringing the European Patent of EP 3 119 235 (hereinafter also referred to as the "patent in suit" or "the patent", exhibit A5), which relates to a hand held device, in particular a hair care appliance.

2    The Applicant, who is the owner of the patent in suit, belongs to the international Dyson Group. It markets a hair treatment device under the name "Dyson Airwrap", which can be used, amongst others, to curl hair.

3    Defendant 1) is a company based in Hong Kong and belongs to the Dreame Group. The products of Defendant 1) include hair drying and styling appliances, wet and dry vacuum cleaners and robotic vacuum cleaners.

4    Defendant 1) is offering both the "Dreame Airstyle Pro" as well as the "Dreame Pocket Neo" ("Staggered Curling Attachments", first group of attacked embodiments) via its official Dreame website. The "Dreame Airstyle Pro" is a multi-functional hairdryer with one main device with a motor and seven attachments with different functions which can be connected with the main device. The attachments are one quick hair dryer, two hot brushes, one styling brush or two curling barrels having the same diameter for curls. The Dreame "Pocket Neo" is a smaller travel hair dryer version with fewer attachments. The main device is foldable. In the event, the user wishes to curl its hair, it can attach the curling barrel. Furthermore, Defendant 1) has been offering the products "Dreame Airstyle" and the "Dreame Pocket" on the market ("Curling Attachments", second group of attacked embodiments), and these products are – undisputedly – still available in e.g. France and Italy. "Dreame Airstyle" and the "Dreame Pocket" are older versions of "Dreame Airstyle Pro" and "Dreame Pocket Neo".

5    Defendant 1) is the website operator of almost all the relevant country specific websites, including Spain, at which the "Dreame AirStyle Pro" and "Dreame Pocket" are also available for sale respectively.

6    Defendant 2) is a limited liable company based in Bad Nauheim and the "Official Distributor of Dreame". Products can be purchased via the German website DREAME Store (https://dreame.de/) and in Defendant's 2) retail store in Frankfurt Zeil.

7    Defendant 3) is a limited liable company based in Ingolstadt and is mentioned on the packaging of attacked embodiments. According to the German commercial register, Defendant 3) acted – or at least has acted until recently – as the so-called "Authorized

Representative" for manufacturers based in a non-EU-Member-State (on the Website of Defendant 1) named as "EU representative" ("EU-Vertreter")).

8   Defendant 4) is the Swedish affiliate to Defendant 1) and runs the country specific website www.se.dreamtech.com as well as a retail store in Stockholm.

9   The patent in suit was filed on 6 March 2015, claiming priority of the British patent application GB20140004983 of 20 March 2014. The application was published on September 24, 2015, the grant of the patent on 30 April 2025. An application for a unitary effect has been filed on 4 April 2025 (exhibit A4). The patent in suit is in force in all UPC member states and in the Kingdom of Spain.

10   The patent relates to an attachment for a hand held device, in particular a hair care appliance such as a hot styling brush (para. [0001]).

11   With its application for provisional measures dated 2 May 2025, the Applicant claims that the Defendants are infringing claims 1 and 11 of the patent.

12   Its  claim 1 reads as follows:

*1. An attachment (30) for a hand held appliance comprising a body having a wall, a fluid inlet at one end of the wall and a fluid outlet through the wall,*

*wherein:*

*the fluid outlet comprises a slot (102, 202, 282) extending along the wall,*

*the slot (102, 202, 282) is formed by an overlap of a first end of the wall and a second end of the wall,*

*the attachment (30) is tubular,*

*the slot (102, 202, 282) extends longitudinally along the tubular attachment (30),*

*hair is wrapped around the attachment (30) in the direction of fluid flow,*

*the fluid emitted from the fluid outlet is attracted to an external surface (112) of the wall, and*

*fluid emitted from the fluid outlet flows around the external surface (112) of the wall.*

13   Its claim 11 reads as follows:

*11. A hand held appliance comprising a handle (20) having a fluid flow path from a fluid inlet (40) to a fluid outlet and a fan unit for drawing fluid into the fluid inlet and an attachment (30) as claimed in any preceding claim for attaching to the handle, wherein the fluid inlet of the attachment (30), when the attachment is attached to the handle, is in fluid communication with the fluid outlet of the handle.*

S̲T̲A̲T̲E̲M̲E̲N̲T̲ ̲O̲F̲ ̲T̲H̲E̲ ̲F̲O̲R̲M̲S̲ ̲O̲F̲ ̲O̲R̲D̲E̲R̲ ̲S̲O̲U̲G̲H̲T̲ ̲B̲Y̲ ̲T̲H̲E̲ ̲P̲A̲R̲T̲I̲E̲S̲:

14   T̲h̲e̲ ̲A̲p̲p̲l̲i̲c̲a̲n̲t̲ ̲r̲e̲q̲u̲e̲s̲t̲s̲ ̲w̲i̲t̲h̲ ̲i̲t̲s̲ ̲A̲p̲p̲l̲i̲c̲a̲t̲i̲o̲n̲ ̲f̲o̲r̲ ̲p̲r̲o̲v̲i̲s̲i̲o̲n̲a̲l̲ ̲m̲e̲a̲s̲u̲r̲e̲s̲ ̲d̲a̲t̲e̲d̲ ̲2̲ ̲M̲a̲y̲ ̲2̲0̲2̲5̲:

I. Defendants 1), 2), 3) and 4) are ordered, by way of preliminary injunction, to refrain from making, offering, placing on the market, using, importing or storing for the aforementioned purposes within the territory of the Contracting Member States of the Agreement on a Unified Patent Court (UPCA) and the territory of the Kingdom of Spain

<u>an attachment</u> for a hand held appliance comprising a body having a wall, a fluid inlet at one end of the wall and a fluid outlet through the wall,

wherein:

the fluid outlet comprises a slot extending along the wall, the slot is formed by an overlap of a first end of the wall and a second end of the wall, the attachment is tubular, the slot extends longitudinally along the tubular attachment, hair is wrapped around the attachment in the direction of fluid flow, the fluid emitted from the fluid outlet is attracted to an external surface of the wall, and fluid emitted from the fluid outlet flows around the external surface of the wall. (Direct infringement of EP 3 119 235, Claim 1);

<u>a hand held appliance</u> comprising a handle having a fluid flow path from a fluid inlet to a fluid outlet and a fan unit for drawing fluid into the fluid inlet and an attachment as claimed in claim 1 for attaching to the handle, wherein the fluid inlet of the attachment, when the attachment is attached to the handle, is in fluid communication with the fluid outlet of the handle. (Direct infringement of EP 3 119 235, Claim 11).

II. For each individual case of non-compliance with the order under I., Defendants 1), 2), 3) and 4) must pay a recurring penalty payment of up to EUR 250,000 to the court (repeatedly if necessary). These penalties will be determined by the Local Division in Hamburg upon request by the Applicant (Art. 63(2) UPCA; R. 354).

III. Defendants 1), 2), 3) and 4) have to bear all costs of the proceedings.

IV. The orders are immediately effective and enforceable.

V. If Defendants do not respond within the time limit set by the court, we request that defendants are ordered by default decision (R 355 (1) (a), (3) RoP)

15  <u>The Defendants request with their Objection to the application dated 10 June 2025:</u>

I. The application for provisional measures is rejected.

II. The Applicant is ordered to bear the costs of the proceedings.

III. The Applicant is ordered to pay to Defendants jointly an interim reimbursement of costs of 56.000 EUR.

<u>POINTS AT DISPUTE</u>

<u>The Applicant's position</u>

16  The Applicant claims an infringement of claims 1 and 11 by the Defendants due to the fact that Defendant 1) sells the "Dreame AirStyle Pro" in Germany via the German website and the "Dreame Pocket" amongst others via its country specific websites in e.g. Spain and Italy. It refers to that Defendant 4) sells the "Dreame AirStyle" and the "Dreame Pocket" via the country specific website www.se.dreamtech.com and in its retail store in Stockholm. Furthermore, it refers to that Defendant 2) sells the "Airstyle Pro" and "Pocket Neo" via the website DREAME Store (https://dreame.de/). In addition, the products were also available at resellers in Germany.

17  The Applicant claims that Defendant 3) must also be considered an infringer of the patent since – without an EU representative – it would not be possible at all for Defendant 1) to legally sell its products within the EU market. Given that the EU representative is a mandatory requirement, it must be considered that it participates in the same way in the sales as Defendant 1) does. At the very least, Defendant 3) is an intermediary within the meaning of Art. 63 UPCA and under Spanish patent law.

18  The Applicant is of the opinion that international jurisdiction is given. Art. 71b (1), (2) first sentence in conjunction with Art. 8 (1) Brussels Recast (hereinafter: "BR") would be applicable to Defendant 1) as both Defendants 2) and 3) serve as "anchor defendants" for Defendant 1) with respect to the infringement in Spain. The requirements of Art. 8 (1) BR are met. The Applicant claims that the Defendants have not disputed but instead confirmed that Defendant 3) was the EU Representative of the infringing devices. According to the Applicant, this position is sufficient for Defendant 3) to be complicit in the offering and sale by Defendant 1).

19  The Applicant claims that as far as Defendants state that the "Dreame Pocket" has been removed from "most major European countries such as Germany, the UK, the Netherlands etc.", it remained undisputed that the "Dreame Pocket" has been and is still available in e.g. France and Italy.

20  Regarding claim construction the Applicant argues that any perceived statement or conclusion made by the applicant or the EPO during the prosecution history cannot apply a meaning to the claim feature that is not in line with the wording of the claim and the embodiments of the specification. Especially, it is not possible to apply a meaning to the patent claim in view of perceived statements during prosecution, based on which *no* embodiment of the patent specification would fall within the scope of the patent claim. If the Defendants' interpretation of the claim was true, none of the embodiments of the patent in suit would be covered by claim 1.

21  The Applicant is of the opinion that it is reasonable to grant provisional measures. It should be in particular noted that observations by third parties were submitted during the grant proceedings and that the patent is therefore even "tested" on validity.

22  Furthermore, the parties are competitors in the field of hair treatment devices, and the distribution of the infringing devices directly affects the Applicant's own sales opportunities. The patented invention is, in the view of the Applicant, also one of the main selling factors and the core technology, which it sees copied by Defendants and incorporated in the attacked embodiments. As the invention directly relates to the hair treatment itself, it provides a significant improvement over other products, in which curling the hair must be achieved by manually wrapping it around the attachment.

23  The Applicant is of the opinion that its interest in not being further impacted in its intellectual property rights must be considered being much higher than the interest of Defendants to secure market share. This would be even more true since the products were not on the market for a long time and it will therefore be even more difficult for the Applicant to calculate damages against the Defendants. Also, and especially in view of the fact that Defendant 1) as the manufacturer of the product is a Chinese based company and it is almost impossible to enforce a damages claim into China. It is particularly important to emphasize in this context that the contested product was - according to Applicant's knowledge – put on the market through the specified channels relatively shortly before the grant of the patent.

The Defendants' position

24  The Defendants are of the opinion that the Court has no jurisdiction with respect to the alleged infringement of the Spanish patent by Defendants. The Applicant failed to demonstrate a close connection between the claims against Defendant 1) and the claims against Defendants 2) and 3), as it has not provided any evidence that Defendants 2) and 3) participated in the distribution of the attacked products in Spain.

25  Defendant 2) is the distributor of Defendant 1) for Germany and operates the Dreame retail store in Germany. Defendant 2) also ships products to secondary distributors in Austria, the Netherlands, Belgium and Luxembourg. However, the Defendants assert that it is not involved in any offering and sales of the attacked products in countries other than five mentioned above or in Spain, nor does it ship any of the attacked products of the Dreame group to Spain. Defendant 2) appears also as importer on the boxes of the attacked products in the aforementioned countries, only.

26  They assert that Defendant 3) has been the European representative for Defendant 1 until 23 May 2025. The contractual relationship with Defendant 3) ended at this date and will not be continued. The Defendants claim that as EU representative for Defendant 1), Defendant 3) had the sole task to serve as a contact point for consumers and EU authorities. Defendant 3) did not do any testing of the attacked products.

27  Defendant 4) belongs – like Defendant 1) – to the Dreame group of companies and is solely responsible for the Swedish market in Europe and operates the Dreame retail store in Stockholm.

28  The Defendants argue that there is no basis for international jurisdiction for provisional measures over Defendant 1). Art. 71b (2) and Art. 35 Brussels I recast (hereinafter referred

to as "BR") do not apply and the Applicant did not establish a real connection between the subject-matter of the measures sought and the territorial jurisdiction of the UPC. In contrast to Art. 71b (2) BR, Art. 35 BR extends international jurisdiction for provisional measures only for measures "available under the law of that Member State". This means Art. 35 BR refers to the applicable national provisions on jurisdiction. However, as the UPCA and the RoP do not have any jurisdictional rules other than those of the Brussels I recast, its Art. 35 simply refers to the provisions in its Art. 4 - 26. Art. 32 and 33 UPCA are not applicable, as they do not concern international jurisdiction of the UPC in relation to non-UPC contracting member states. Instead, Art. 32 UPCA concerns the UPC's exclusive jurisdiction over certain matters in relation to the courts of the UPC contracting member states. Art. 33 UPCA addresses the internal jurisdiction among the different divisions of the UPC Court of First Instance.

29  Moreover, they claim that the Applicant could not establish any potentially infringing act of Defendant 3), so that Defendant 3) lacks standing to be sued entirely. Regarding Defendant 2) it is only undisputed that Defendant 2) is active in distribution activities concerning the attacked embodiment in the UPC territory and only in those countries as mentioned in the Objection (Germany, Austria, the Netherlands, Belgium and Luxembourg). It is disputed that Defendant 2) actively or passively participated in distribution activities of Defendant 1) in Spain. They claim, that Defendant 1) currently does not offer the Dreame "Airstyle" and the Dreame "Pocket" in most major European countries such as Germany, the UK, the Netherlands, etc. In some of these countries, such as the UK, the Defendants never sold these products.

30  Regarding claim construction, the Defendants point out that the subject matter of the patent does not extend to embodiments described in the patent, if there are "sufficiently clear indications in the patent claim" that an embodiment is not covered by the claim. Contrary to the Applicant's suggestions the statements of the patent examiner and of the applicant in the patent examination proceedings have to be taken into account as they indicate the view of the skilled person in the art at the filing date, which is relevant for the construction of the patent claims. This clearly contradicts the Applicant's assertion that a patent proprietor may advocate one interpretation of a patent claim in the examination procedure in order to obtain a patent, whereas the same patent proprietor may advocate a contrary interpretation of the claim in infringement proceedings.

31  When weighing the interests of the parties, the Defendants are of the opinion that their interests have to prevail because the attacked products are not infringing the patent. Moreover, Defendants' interests would be massively impaired if they were unable to temporarily offer the attacked products on the market due to a preliminary injunction, since the Defendants and the Applicant are also direct competitors on the market.

32  They assert that the competing product of the Applicant (Dyson Airwrap) costs approx. € 499 (currently with a € 50 price reduction online) which is more than twice the price of the attacked products. The Applicant conveniently disregards that the enormous price of its products cannot be afforded by most customers for a personal hair care product. Also, next to the products of the Applicant and Defendant 1), several of other companies offer

much more affordable hair stylers like the Shark FlexStyle from SharkNinja, the One-Step Voluminizer from Revlon and the AireBrush Duo from T3.

33  The Defendants object to the Applicants allegations that the product was put deliberately on the market between the publication of the decision to grant the patent in dispute and the actual grant. The "Airstyle" and the "Pocket" of Defendant 1) are longer on the market and currently not sold anymore in most of the contracting member states. With regard to the "Airstyle Pro" and the "Pocket Neo", the Defendant 1) simply put newer versions of its products in the market after the research and development of these products were finished for the product launch.

34  Regarding any additional arguments brought forward by the parties reference is made to the submissions of the parties and to the audio recording of the oral hearing.

Grounds for the Order

35  The Application for provisional measures is admissible and partly founded. R. 211.2 Rules of Procedure (hereinafter RoP), in conjunction with Art. 62(4) Agreement on the Unified Patent Court (hereinafter UPCA), see also Art. 9 (3) Directive 2004/48/EC, provides that the Court may invite the applicant for provisional measures to provide reasonable evidence to satisfy the Court to a sufficient degree of certainty that the applicant is entitled to institute proceedings under Art. 47 UPCA, that the patent in suit is valid and that it is infringed, or that such an infringement is imminent. These criteria are fulfilled for the second group of attacked embodiments, the products "Dreame Airstyle" and the Dreame "Pocket" ("Curling Attachments"), but not for the first group of attacked embodiments , the products "Dreame Airstyle Pro" or "Dreame Pocket Neo" ("Staggered Curling Attachments"; see in the following under section D.). Defendants 1) and 3) are also subject to the UPC's international jurisdiction with respect to alleged infringing acts as far as it relates to the Spanish national part of the patent-in-suit (see in the following under section B.).

**A. Applicant's entitlement to bring actions**

36  As the Applicant is the registered proprietor of the patent at issue and as there have not been raised any concerns to the contrary, the Applicant is entitled to bring actions to the court, Art. 47 (2) UPCA and R. 8.5 and 211.2 RoP.

**B. International jurisdiction**

37  The UPC has international jurisdiction over the dispute. With respect to Defendants 1) and 3) the UPC has also jurisdiction to decide upon the infringement as far as it relates to acts infringing the Spanish national part of the patent-in-suit.

I. UPCA countries

38  Art. 31 UPCA stipulates that the international jurisdiction of the UPC shall be established in accordance with Regulation (EU) No 1215/2012 ("BR", as defined before) or, where applicable, on the basis of the Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Lugano Convention). Art. 71

a-d BR incorporated the UPC as a new common court into the existing Brussels recast Regulation System (LD Düsseldorf, 28 January 2025 – UPC_CFI_355/2023, ACT_578607/2023 – FUJI Film). Thus, the UPC is a common court within the meaning of Art. 71a (1) BR, see Art. 71a (2) (a) BR. According to Art. 71b (1) BR, the UPC as a 'common court' of several EU Member States (Art. 71a) has jurisdiction in patent matters (within the meaning of the UPCA), if a court of an EU Member State that is a party to the UPCA would be competent (if the UPC did not exist) under the rules of jurisdiction of the Brussels-Ia-Regulation (Bopp/Kircher EurPatentprozess-HdB/Bopp/Krumm, 3rd ed. 2025, Section 8, para. 11). This means that, in relation to claims against defendants domiciled in a Member State, all the bases for jurisdiction contained in Brussels I recast Regulation also apply to the UPC.

<u>1. Art. 4 (1) Brussels I recast</u>

39   Pursuant to Art. 4 (1) BR, persons domiciled in a Member State, whatever their nationality, shall be sued in the courts of that Member State. Following Art. 63 (1) BR a company or other legal person or association of natural or legal persons is domiciled at the place where it has its statutory seat; central administration; or principal place of business. This jurisdiction in the forum of the courts of the Member State in which the defendant is domiciled or has its seat under Art. 4 (1) BR is a universal jurisdiction (LD Düsseldorf, 28 January 2025 – UPC_CFI_355/2023, ACT_578607/2023 – FUJI Film). This gives a claimant - including before the UPC as the court of residence - the option of including patents in third countries in its infringement action, long arm jurisdiction (Tilmann, GRUR 2025, 521, 523).

40   Applying these principles, the UPC has undoubtedly international jurisdiction with respect to Defendants 2) and 3) as they are domiciled in Germany, Art. 4 (1) BR. This extends to the territories of the Contracting Member States of the UPCA for which the European patent is in effect (regarding Spain see below).

<u>2. Art. 7 (2) Brussels I recast</u>

41   Under Art. 7 sub (2) BR, the courts of a Contracting Member State would have jurisdiction in an infringement action within the meaning of Art. 32 (1) (a) UPCA against a person domiciled in an EU Member State where the harmful event occurred or may occur in that Contracting Member State.

a)

42   Art. 71b (2) BR supplements the basic rule under Art. 7 BR where a Defendant is <u>not</u> domiciled in an EU member state, by opening jurisdiction according to Art. 7 Brussels-Ia-Regulation regardless of the defendant's domicile. This is confirmed by the case law of the UPC Court of Appeal, who ordered that Art. 7(2) in conjunction with Art. 71b (1) BR must be interpreted as meaning, that the UPC has international jurisdiction in respect of an infringement action where the European patent relied on by the claimant is in effect in at least one Contracting Member State, and where the alleged damage may occur in that particular Contracting Member State (Court of Appeal, Order of September 03, 2024,

CoA_188/2024). The UPC thus has international jurisdiction for all patent infringements committed in a UPC member state, regardless of the Defendant's place of residence, (LD Hamburg, 17 March 2025 – UPC_CFI_169/2024, App_66363/2024; Bopp/Kircher EurPatentprozess-HdB/Bopp/Krumm, 3rd ed. 2025, Section 8, para. 12; comp. Tilmann/Plassmann/Grabinski/W. Tilmann, 1st ed. 2024, UPCA, Art. 31 para. 22a). As the UPC as a common Court has jurisdiction *regardless of the defendant's domicile* for all patent infringements committed in a UPC member state (Art. 71b (2) in conjunction with Art. 7 sub (2) BR) international jurisdiction is given to that Contracting Member State in which the harmful event occurred or may occur, within the meaning of Art. 7 sub (2) BR. The only requirement is that the place of infringement or action is in a member state that is a party to the UPCA (see Geimer/Schütze Int. Private Law/E. Peiffer/M. Peiffer, 67th supplement June 2024, VO (EG) 1215/2012 Art. 71b para. 6).

b)

43   The international jurisdiction with respect to Defendant 1) follows Art. 7 sub (2) BR as this provision in conjunction with Art. 71b (2) BR opens international jurisdiction, regardless of the Defendant's place of residence, for all patent infringements (allegedly) committed in a UPC Member State, which is Germany. The jurisdiction granted by Art. 7 sub (2) BR is not limited to the Member State – here Germany – as according to Art. 34 UPCA Decisions of the Court shall cover, in the case of a European patent, the territory of those Contracting Member States for which the European patent is in effect. Whereas Art. 34 UPCA does not deal with the international jurisdiction of the court in the first place – which is dealt with in Art. 31 UPCA – Art. 34 UPCA covers the territorial scope of the Court's decision within the territory of the Contracting Member States. Thus, the international jurisdiction of the UPC inevitable leads to a decision covering all territories of UPCA countries in which the patent in suit is in effect. The Applicant has sufficiently stated in its Application that the patent in suit is in force in in all UPC member states (and in Spain) and that damage may occur in all of these UPCA countries, including Germany, where the Local Division is located.

3. Art. 8 (1) Brussels I recast

44   The international jurisdiction with respect to Defendant 4) follows Art. 8 (1) BR. According to this provision a person domiciled in a Member State may also be sued where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings. These criteria are present. Defendant 4) belongs to the Dreame group of companies, is responsible for the Swedish market in Europe and operates the Dreame retail store in Stockholm. As Defendant 4) is part of the Dreame group and as the attacked embodiments are the same, the claims are closely connected in the meaning of said provision. Following Art. 34 UPCA, the effect of the UPC's orders are not limited to Sweden but are effective in UPCA countries in which the patent in suit is in effect.

II. SPANISH NATIONAL PART OF THE PATENT-IN-SUIT

45  With respect to Defendants 1) and 3) the UPC has also jurisdiction to decide upon the infringement as far as it relates to acts infringing the Spanish national part of the patent-in-suit.

### 1. Case law of the Court of First Instance

46  It is already established case law of the Court of First Instance that the UPC has international jurisdiction also with respect of the infringement of national parts of an European Patent outside of the UPCA countries and even outside of the European Union (see LD Düsseldorf, 28 January 2025 – UPC_CFI_355/2023, ACT_578607/2023 – FUJI Film; LD Mannheim, 18 July 2025 – UPC_CFI_365/2023, FUJI ./. Kodak, both regarding the UK national part of a patent-in-suit; LD The Hague, 23. Mai 2025 – UPC_CFI_191/2025 - ACT_10280/2025, regarding Norway, Spain and Poland). This is in line with the ECJ's ruling in "BSH Hausgeräte", according to which the court of the Member State of the European Union in which the defendant is domiciled has jurisdiction under Article 4 (1) BR to rule on an action for infringement of a patent granted in another Member State and does even not lose that jurisdiction solely on the ground that the defendant contests the validity of that patent by way of a defense (ECJ, 25 February 2025, C-399/22, GRUR 2025, 568 para 41).

### 2. Spain

47  In the present case, the Applicant has sufficiently stated in its Application that the patent in suit is in force not only in all Contracting Member States of the UPCA, but also in Spain, and that damage may also occur in Spain as the attacked embodiments were available there, as well.

a)

48  However, with respect to Defendant 2) the UPC's international jurisdiction is limited to the territories of the Contracting Member States of the UPCA for which the European patent is in effect. While it is true, that the issue whether the patent has been infringed and whether that infringement may be attributed to individual Defendants falls within the scope of the examination of the substance of the action by the court having jurisdiction (Court of Appeal, Order of September 03, 2024, CoA_188/2024). Still, in order to establish jurisdiction requires at least the plausible allegation of infringing acts by that party in the country in question, here Spain. However, the Applicant did not provide any reliable facts that Defendant 2) is or was involved in any marketing of the attacked embodiments in Spain. The same applies to Defendant 4).

b)

49  Defendant 3), on the other hand, is subject to the UPC's universal jurisdiction including the Spanish national part of the patent in suit as the Applicant provided plausible facts that Defendant 3) could at least be subject to an injunction for the infringement of the Spanish national part of the patent in suit according to Art. 71 (2) Spanish Patent Act as an intermediary (cf. Art. 63 (1) 2nd sentence UPCA). Undisputedly, Defendant 3) acted –

or at least has acted until recently – as the so-called "Authorized Representative" for manufacturers based in a non-EU-Member State, which refers back to the EU regulations 2023/988/EU on general product safety (GPSR) and 2019/1020/EU on market surveillance and compliance of products. These regulations require that non-EU-based manufacturers provide for an authorized representative in the European Union.

aa) Legal framework

50  According to Art 16 (1) EU-Reg 2023/988 on general product safety (GPSR) a product covered by this Regulation shall not be placed on the market unless there is an economic operator established in the Union who is responsible for the tasks set out in Article 4(3) of Regulation (EU) 2019/1020 in respect to that product.

51  The term "economic operator" is defined in Art. 3 (13) of the corresponding EU-Reg 2019/1020 on market surveillance and compliance of products meaning:

*the manufacturer, the authorised representative, the importer, the distributor, the fulfilment service provider or any other natural or legal person who is subject to obligations in relation to the manufacture of products, making them available on the market or putting them into service in accordance with the relevant Union harmonisation legislation;*

52  The term "authorised representative" is defined in Art. 3 (12) of this regulation:

*"authorised representative" means any natural or legal person established within the Union who has received a written mandate from a manufacturer to act on its behalf in relation to specified tasks with regard to the manufacturer's obligations under the relevant Union harmonisation legislation or under the requirements of this Regulation;*

53  The legal obligations of an authorized representative are defined in Art. 4 (3) EU-Reg 2019/1020 on market surveillance and compliance of products:

*3. Without prejudice to any obligations of economic operators under the applicable Union harmonisation legislation, the economic operator referred to in paragraph 1 shall perform the following tasks:*

*(a) if the Union harmonisation legislation applicable to the product provides for an EU declaration of conformity or declaration of performance and technical documentation, verifying that the EU declaration of conformity or declaration of performance and technical documentation have been drawn up, keeping the declaration of conformity or declaration of performance at the disposal of market surveillance authorities for the period required by that legislation and ensuring that the technical documentation can be made available to those authorities upon request;*

*(b) further to a reasoned request from a market surveillance authority, providing that authority with all information and documentation necessary to demonstrate the*

*conformity of the product in a language which can be easily understood by that authority;*

*(c) when having reason to believe that a product in question presents a risk, informing the market surveillance authorities thereof;*

*(d) cooperating with the market surveillance authorities, including following a reasoned request making sure that the immediate, necessary, corrective action is taken to remedy any case of non-compliance with the requirements set out in Union harmonisation legislation applicable to the product in question, or, if that is not possible, to mitigate the risks presented by that product, when required to do so by the market surveillance authorities or on its own initiative, where the economic operator referred to in paragraph 1 considers or has reason to believe that the product in question presents a risk.*

bb) Role of an authorized representative

54   This legal framework puts Defendant 3) in the role of being an essential party in the distribution in the EU for the electronic products in question, which require a CE certificate and declaration of conformity. Without an authorized representative in the EU, Defendant 1) is not legally able to sale the attacked embodiments in the EU. This is regardless of the fact, that in the present case the non-EU manufacturer (Defendant 1) issued the declaration of conformity, as it is the authorized representative's task to make sure that this declaration is issued by "verifying that the EU declaration of conformity or declaration of performance and technical documentation have been drawn up". Whether Defendant 3) actually fulfilled these legal obligations or whether Defendant 3)'s contractual obligations with respect to Defendant 1) are deviating or not (Exhibit HL 20, p. 4), is irrelevant for the legal assessment, as the legal obligations are not subject to the parties' disposition.

55   The Local Division does not follow the Defendants' argumentation that Defendant 3)'s obligations are mere after-sales activities without any influence on the actual patent infringement, similar to a call-centre. On the contrary, to have an EU declaration of conformity for electronics in place is a pre-requisite for placing them on the inner market, thus its verification is a pre-marketing obligation. This position might not be strong enough to be held liable for damages incurred by the alleged patent infringement, but it is the provision of an indispensable service to the actual infringer. Thus, an authorized representative can be subject to an injunction as an intermediary in the meaning of the Enforcement Directive 2004/48/EC. The Applicant successfully asserted in the oral hearing that these rules are incorporated in Spanish Patent Law in Art. 71 (2) of the Spanish Patent Act covering intermediaries. With respect to the UPCA countries, this concept is incorporated in Art. 63 (1) 2nd sentence UPCA.

cc) Result

56  As a result, Defendant 3) is subject to the universal jurisdiction of the UPC at its seat, including alleged infringing acts with respect to the Spanish national part of the patent in suit.

c) Anchor defendant

57  Defendant 1) is not subject to the UPC's universal jurisdiction according to Art. 4 (1) BR. Also, the scope of Art. 7 sub (2) BR in conjunction with Art. 71b (1) BR is limited to infringing acts in the Contracting Member States of the UPCA, which Spain is not. Thus, the international jurisdiction with respect of Defendant 1) regarding the Spanish national part of the patent in suit can only be obtained by means of Art. 8 BR. In the present case Defendant 3) serves as an anchor defendant for Defendant 1) as the remaining criteria of Art. 8 (1) BR are met.

aa)

58  As stated above the application of Art. 8 (1) BR requires a close connection with a defendant who is domiciled in the forum state and who is, thus, subject to the UPC's universal jurisdiction (Art. 4 BR). According to its wording, Art. 71b (2) BR allows for all rules in chapter II of the Brussel I recast regulation to be applied regardless of the domicile or seat of the defendant. Despite the fact, that Chapter II (Art. 4 –35 BR) shall apply to defendants domiciled in third states "as appropriate" (Art. 71b (2) BR), this wording does not limit the applicability of Art. 8 (1) BR to co-defendants seated within of the European Union (questioned by Müller-Stoy, GRUR Patent 2025, 331, 335). This is shown by the German and French versions of the Brussels I recast Regulation, which do not indicate any limitation in the sense of "where appropriate" as they use the terms "soweit einschlägig" bzw. "le cas échéant", which require only that the remaining criteria of Art. 8 (1) BR - apart from the domicile criterion - are met, without any additional requirements.

59  Thus, Art. 8 (1) BR is to be applied by the UPC to co-defendants not domiciled in the EU (or Lugano Convention states, Art. 73 (1) Brussels I bis). For the question at hand – the competence of the UPC to decide on alleged infringing acts in Spain – the close connecting has to be assessed based on infringing acts in Spain and not only in other EU-/UPCA-countries. According to the "Roche" decision of the ECJ such a connection cannot exist in the case of actions for infringement of the same European patent brought against a company established in another Contracting State on the basis of acts allegedly committed there by that company (ECJ, 13. 7. 2006 – C-539/03, GRUR 2007, 47 para. 33 – Roche Nederland BV and others v Primus and Goldenberg). That means that the infringement of various parts of a European patent by different infringers is not in itself sufficient to establish jurisdiction under Article 8 (1) BR even if the infringers belong to the same group and pursue a uniform business policy drawn up by the main defendant (Kalbfus, GRUR-Prax 2025, 307, 311).

bb)

60  As a consequence, the establishment of jurisdiction under Art. 8 (1) BR requires a party domiciled in the forum state (here: Germany) that acted allegedly in Spain, opening up for universal jurisdiction, which is here Defendant 3). As laid out above, Defendant 3) is an indispensable party in the distribution of the attacked embodiments in the European Union. Without an authorized representative, a manufacturer based outside of the EU is not able to distribute its electronic products. This brings the authorized representative into the position that by terminating its role, the distribution of the products are illegal. This might be limited only until the manufacturer installed a new authorized representative but still enables the authorized representative to stop any distribution by its own will. Due to the legal framework, there is a necessary, legally established close connection between Defendant 1) and Defendant 3) for the distribution of the attacked embodiments in the EU, including Spain, as the 'authorised representative' has the mandate from the manufacturer to act on its behalf in relation to specified tasks with regard to the manufacturer's obligations under the relevant Union harmonisation legislation.

cc)

61  This result is confirmed when looking at the corresponding provision in Article 33 (1) (b) UPCA concerning competence of the UPC divisions. This rule provides that in case of multiple defendants, the local division hosted by the CMS where one of the defendants has its residence, is competent to hear the case, provided that the defendants have a commercial relationship and where the action relates to the same alleged infringement, regardless of whether the other defendants are based inside or outside the CMS or inside or outside the EU.

62  The requirement of a "commercial relationship" implies a "certain quality and intensity" (LD Paris, 11 April 2024– UPC CFI 495/2023, GRUR-RS 2024, 9684 Rn. 21). To avoid multiple actions regarding the same infringement and the risk of irreconcilable decisions from such separate proceedings, and to comply with the main principle of efficiency within the UPC, the interpretation of "a commercial relationship" and therefore the link between the defendants should not be interpreted too narrowly. The fact of belonging to the same group (of legal entities) and having related commercial activities aimed at the same purpose – such as R&D, manufacturing, sale and distribution of the same products – is sufficient to be considered as "a commercial relationship" within the meaning of the Article 33(1) (b) (LD Paris, 11 April 2024, UPC CFI 495/2023, GRUR-RS 2024, 9684 Rn. 21; see also LD Munich, 29 September 2023, UPC_CFI_15/2023). Whether or not, joint research and development can already establish the required commercial relationship, in the present case the acting as authorized representative for the manufacturer for the distribution of the same attacked embodiments, is without doubt sufficient to fulfil these criteria.

dd)

63  The Hamburg Local Division is aware of the legal consequences of these legal findings, in particular, that the installation of an authorized representative in a certain Member State of the European Union likely subjugates a non-EU manufacturer under the jurisdiction of the UPC in that Member State, including with respect to the national parts of the patent in suit in non-UPCA or third countries. This burden on the other hand, does not seem to be unfair, as the rational of having an authorized representative is to have the distribution channels under the effective control of the relevant authorities by having a representative that has to report to them. Furthermore, it is the manufacturers choice, whom and where to assign this role to.

64  Additionally, it has to be noted, that in proceedings for provisional measures, like in the present case, Art. 35 BR opens for jurisdiction even if the courts of another Member State have jurisdiction as to the substance of the matter.


III. COMPETENCE

65  Insofar as the UPC has international jurisdiction over the dispute, the Local Division Hamburg has competence according to Article 33 (1) (a) and (b) UPCA. Reference can be made to the explanations above.


**C. THE PATENT**

I. BACKGROUND

66  The patent in suit relates to an attachment for a hand held device, in particular a hair care appliance such as a hot styling brush (para. [0001]).

67  In a conventional hot styling brush, air is sucked into an inlet by a fan unit and directed towards the hair by an attachment or head. Depending on the style desired, the air may or may not be heated. The head or attachment often includes bristles onto which hair is wrapped and held for styling. The air is generally blown out of the head or attachment normal to the surface of the head.

68  The patent refers to EP 0 482 906 as an example of the related art that describes an electrically powered hand held hair curling appliance (para. [0002]).

69  The patent in suit does not expressly mention an object of the invention. However, in view of the background and the underlying prior art, also taking into account the claim wording, the patent in suit has the objective function of providing an attachment and an appliance that facilitates styling of hair.

70  In order to solve this problem, the patent discloses an attachment in claim 1 and a hand held appliance in claim 11.

71  Claim 1 can be broken down into the following features:

*1.1 An attachment (30) for a hand held appliance*

*1.2 comprising a body having a wall*

*1.3 a fluid inlet at one end of the wall*

*1.4 a fluid outlet through the wall*

*1.5 wherein the fluid outlet comprises a slot extending along the wall*

*1.6 the slot is formed by an overlap of a first end of the wall and a second end of the wall*

*1.7 the attachement is tubular*

*1.8 the slot extends longitudinally along the tubular attachment (30)*

*1.9 hair is wrapped around the attachment (30) in the direction of fluid flow*

*1.10 the fluid emitted from the fluid outlet is attracted to an external surface (112) of the wall, and*

*1.11 fluid emitted from the fluid outlet flows around the external surface (112) of the wall*

72 Claim 11 can be broken down into the following features:

*11.1 A hand held appliance comprising*

*11.2 a handle (20) having a fluid flow path from a fluid inlet (40) to a fluid outlet and*

*11.3 a fan unit for drawing fluid into the fluid inlet and*

*11.4 an attachment (30) as claimed in any preceding claim for attaching to the handle,*

*11.5 wherein the fluid inlet of the attachment (30), when the attachment is attached to*

*the handle, is in fluid communication with the fluid outlet of the handle*

## II. CLAIM CONSTRUCTION OF CLAIM 1

### 1. Principles of claim construction

73 According to Art. 69 EPC in conjunction with Art. 1 of the Protocol on its interpretation, the patent claim is not only the starting point, but the definitive basis for determining the protective scope of a European patent. The interpretation of a patent claim does not depend solely on its exact wording in the linguistic sense. Rather, the description and the drawings must always be taken into account as explanatory aids for the interpretation of the patent claim and not only be used to clarify any ambiguities in the patent claim. However, this does not mean that the patent claim serves only as a guideline and that its scope may extend to what, from a consideration of the description and drawings, the patent proprietor has contemplated. The patent claim is always to be interpreted from the point of view of a person skilled in the art (Court of Appeal, UPC_CoA_1/2024, Order

of 13 May 2024, App_8/2024 – VusionGroup SA v Hanshow Technology Co. Ltd et al.; UPC_CoA_335/2023, Order of 26 February 2024, App_576355/2023 - 10X Genomics and Harvard/Nanostring case; Order of 11 March 2024, GRUR-RS 2024, 2829, headnote 2. and para. 73 - 77 - Nachweisverfahren; LD Düsseldorf, UPC_CFI_452/2023, Order of 9 April 2024, p. 13, GRUR-RS 2024, 7207, para. 49). Additionally, the skilled person is taking the purpose of every patent claim into account, to provide the average person skilled in the art with a technical teaching which, when reworked, leads to the intended success of the invention.

### 2. Person skilled in the art

74 The person skilled in the art is a mechanical engineer having multiple years of experience in the development of hair care appliances and respective knowledge in fluid dynamics.

### 3. Features 1.1, 1.2 and 1. 7

*1.1 An attachment (30) for a hand held appliance*

*1.2 comprising a body having a wall*

*1.7 the attachment is tubular*

75 Feature 1.1 describes the purpose of the claimed product, which is to be used as an attachment for a hand held appliance. According to feature 1.7, the attachment is tubular, i.e. it has a cylindrical or oval shape (see para. [0064]). According to feature 1.2, the attachment has a body having a wall, which refers to the outer surface of the attachment. The term "wall" therefore refers to the outer surface of the attachment, as shown in figure 3a of the patent:



FIG. 3a

76 It is rightfully undisputed amongst the parties that the wall according to feature 1.2 can comprise different "plates" (see below).

### 4. Feature 1.3

*1.3 a fluid inlet at one end of the wall*

77 According to feature 1.3, the body has an inlet at one end of the wall. This feature refers to the one (lower) end of the wall which is arranged to be connected to the hand held appliance to provide an inlet for the fluid flow generated by the hand held appliance (see paragraph [0028], and figure 3b).

### 5. Features 1.4, 1.5, 1.6 and 1.8

*1.4 a fluid outlet through the wall*

*1.5 wherein the fluid outlet comprises a slot extending along the wall*

*1.6 the slot is formed by an overlap of a first end of the wall and a second end of the wall*

*1.8 the slot extends longitudinally along the tubular attachment (30)*

a) Feature 1.4

78   According to feature 1.4, the fluid outlet is arranged "*through the wa*ll", which means that a fluid can leave the attachment through the tubular outer surface of the attachment.

79   This fluid outlet is further characterized in features 1.5 to 1.7, specifying that the fluid outlet must comprise a slot. Feature 1.5 requires that the fluid outlet comprises a slot extending along the wall. The wording "comprises" indicates that the fluid outlet is not limited to the described slot, but that the fluid outlet may also comprise additional openings. In fact, all embodiments shown in the specification have a plurality of slots (cf. e.g. fig. 3a, see above). The slot can comprise spacers, see para. [0008].

80   As specified in feature 1.6, at least one slot must be formed by an overlap of a first end of the wall and a second end of a wall. An exemplary embodiment of such overlap is shown in figure 5b:



*FIG. 5b*

b) Feature 1.5

*1.5 wherein the fluid outlet comprises a slot extending along the wall*

81   A "slot" can be defined as long, narrow opening. This general definition in dictionaries (see Exhibit HL 21) is also applicable in the patent where the term "slot" is consistently used to designate a long, narrow opening.

82   The term "*comprise*" clarifies that the outlet needs a slot but can also comprise openings other than a slot. The use of the indefinite article "a" leaves it open for it to comprise more than one slot, as feature 1.5 uses the indefinite article "a" (slot) instead of the numeral "one" (slot). When feature 1.6 refers to "the" slot, it refers to how such a slot mentioned in feature 1.5 needs to be defined. It does not contain any limitation with

respect to the number of slots. Indeed, all figures of the patent show an attachment with multiple slots.

c) Feature 1.6

*1.6 the slot is formed by an overlap of a first end of the wall and a second end of the wall*

aa) Slot

83   Feature 1.6 requires that the slot is formed by the two adjacent wall ends being arranged at a distance so that a slot is formed between them.

84   Para. [0004] clearly indicates a possible plurality of plates forming the wall(s), which can lead to a plurality of slots:

*[0004] Preferably, the wall is formed from at least two plates. It is preferred that a first one of the at least two plates comprises the first end of the wall. Preferably, a second one of the at least two plates comprises the second end of the wall. It is preferred that the first of the at least two plates defines a radially inner surface of the slot. Preferably, the second one of the at least two plates defines a radially outer surface of the slot.*

85   This is confirmed in para [0029] that discloses a plurality of parallel slots:

*[0029] The fluid outlet 100 is formed from a number of parallel slots 102 which extend along the length of the head 30 from the first end 32 to the second end 36. The slots 102 are formed from an overlap 120 (Figure 5b) formed between adjacent plates 110 which results in fluid being directed between a radially inner surface 104 formed from the outer surface 112 of a first plate 110a and a radially outer surface 106 formed from the inner surface 114 of a second plate 110b.  [...]*

86   Para. [0029] refers to slots formed by an overlap formed "between adjacent plates", which deviates from the claim language that does not refer to plates, but to "an overlap of a first end of the wall and a second end of the wall". Still, para. [0004] discloses that the plates are a part of the wall and that *the wall is formed from at least two plates.* This shows the skilled person that there is no difference when the claim requires that the slot has to be formed by two ends of the wall, as this can be plates forming the wall. In that sense, the wall is to the understanding of the skilled person simply a term for the entire outer frame of the tubular appliance that could consist of several plates forming several overlaps.

87   Figure 5b, which is referred to in para. [0029], also shows a plurality of plates (six), providing that "the wall" has fourteen ends, while twelve of those ends forming six slots, i.e. a pair of ends forming a slot respectively (colouring by Applicant):



FIG. 5a

bb) Overlap

88   There are only two sections of the description dealing with the "overlap", one is para [0006] the other para [0029], while only the latter provides some more details on the formation of the overlap [underlining added by the Court]:

> *[0029] The fluid outlet 100 is formed from a number of parallel slots 102 which extend along the length of the head 30 from the first end 32 to the second end 36. <u>The slots 102 are formed from an overlap 120 (Figure 5b) formed between adjacent plates 110 which results in fluid being directed between a radially inner surface 104 formed from the outer surface 112 of a first plate 110a and a radially outer surface 106 formed from the inner surface 114 of a second plate 110b.</u> The fluid 122 flowing out of the slot 102 is tangential 130 to the outer surface 112 of the plate 110a and joins with the fluid flowing out of the other slots of the fluid outlet 100 forming a fluid flow around the circumference of the head 30. Thus, the fluid 122 is blown out along the external surface of the head and this encourages hair to wrap around the head 30 automatically.*

89   This sections contains two elements:

-   an overlap 120 (Figure 5b) formed between adjacent plates 110,

-   which results in fluid being directed between a radially inner surface 104 [..] and a radially outer surface 106.

90   Thus, the objects forming the overlap are *adjacent* plates. The description of the patent does not teach anything about how the overlap is positioned, especially whether there needs to be an overlap in the radial direction of the tubular attachment, or not, apart from being formed between adjacent plates.

91   When turning to the function of a slot being formed by an overlap, the skilled person understands that it is to direct the fluid. Para. [0029] of the patent explains that it is the overlap who is guiding the direction of the fluid flow and is facilitating the usage of the "Coanda" effect for the purposes of curling hair automatically.

92   The Coanda effect is mentioned in para. [0030]:

> *[0030] The fluid 122 exiting the slots 102 is attracted to the curved surface of the head 30 by the Coanda effect. This in turn causes hair that is presented to the head 30 to automatically wrap around the surface and then styled into curls. [..]*

93  It is a well-known fluid dynamics phenomenon where a directed fast-moving fluid, tends to adhere to a nearby surface, even when the surface curves away from the fluid jet's initial path. This adherence occurs due to the jet entraining surrounding air and creating a lower pressure area near the surface causing the air to "stick" to the surface. Thus, due to the fluid flow around the external surface of the wall, hair is automatically wrapped around the attachment in the direction of the fluid flow. Due to this effect, both, drying hair and/or styling of hair into curls is facilitated, see. para. [0016].

94  Position 120 and air-flow 122 are illustrated in figure 5b of the patent, which para. [0029] explicitly refers to (here marked in red by the Defendants):



FIG. 5b

95  It has to be noted that para. [0029] uses figure 5b to describe the directing of the air flow by stating that fluid *being directed between a radially inner surface 104 formed from the outer surface 112 of a first plate 110a and a radially outer surface 106 formed from the inner surface 114 of a second plate 110b.*

96  The Defendants take from this description of the drawing in figure 5b that it would be clear, that the overlap needs to be an overlap in the radial direction of the tubular attachment, i.e. seen from the centre-point of the tube. Or at least, they argue, that the patent teaches a sandwich formation of the wall ends forming a passageway between the two walls, which directs the fluid. As the wall is tubular, the skilled person takes from it, that there has to be a (sandwich-style) overlap. Therefore, the picture construed by the Defendants in their Rejoinder (para 98) would in their view not be in line with the teaching of the patent:



97  The panel agrees that the term "overlap" defines a physical-spatial arrangement of how the "slot" is formed, namely by an "overlap" of two wall elements which form a passageway in the region of the overlap. However, the patent does not teach anything from which angle to assess whether the wall ends are *overlapping*. Therefore, the patent is not limited to a physical overlap in the radial direction seen from the centre of the tube.

23

The patent only requires a configuration that directs the airflow and which is not a planar slot, but a fluid directing "overlap" somewhat perpendicular to the flow of air without the one extending over the other in the radial direction.

98  The Applicant rightfully argues that even the margin indicated by number 120 (highlighted in red below, by Applicant) in figure 5b is <u>not</u> radial to the tubular attachment:



FIG. 5b

99  Contrary to the Applicant's position, however, the overlap is not just providing for a difference in height seen from the cross-section, neither. From a functional perspective a flow path for the fluid outlet is formed by an overlap of the wall ends, namely between the radially inner wall (110a) and the radially outer wall (110b). The patent does not teach that the desired direction of the airflow or the use of the Coanda effect would be reliant on directing the airflow as close as possible to the tubular outer surface of the appliance. To the contrary, functionally, the fluid would still be *directed between a radially inner surface 104 formed from the outer surface 112 of a first plate 110a and a radially outer surface 106 formed from the inner surface 114 of a second plate 110b (para. [0029]),* even if the overlap is not in a radial position with respect to the centre of the tube, but "overlapping" seen from another angle, which is more off-set or seen from the direction of the airflow. That is because, neither the wording of the claim nor the description of the patent makes any reference whatsoever how to construct, estimate or measure the actual overlap

cc) <u>End</u> of the wall

100  Additionally, feature 1.6 requires that the slot is formed by the two (from whichever angle) overlapping wall <u>ends</u> being arranged at a distance so that a slot is formed between them, and not simply being an aperture in a through-going wall. A wall, however, can have a plurality of ends and according to para. [0004] a wall can consist of a <u>plurality</u> of plates. This does lead to the understanding, that every end of a plate can be seen as an end of the wall, thus the wall, which is the outer surface of the tubular appliance, can have a plurality of ends. The skilled person takes this from the fact that the attachment is tubular, which is circular and thus normally does not have an end. But the claim cannot be constructed in a way, that simple apertures <u>in</u> the wall, which are not formed by the two <u>ends</u> of the wall (or its plates), fulfil the feature of "a slot" formed by the end of a wall.

101 This is confirmed by the pieces of prior art the parties referred to and which were cited in the granting procedure. Neither of them showed any slot defined by an overlap, be it by the end of walls or the end plates forming a wall, but simple apertures in an otherwise solid attachment.

102 This can be seen with respect to JP 62-41606 (cited as "D1", Exhibit HL 11) as illustrated by its Figure 5 (highlighting added by Defendants):



103 The same is the case with respect to US 2004/0129289 A1 (cited as "D2", Exhibit HL 12) as illustrated by its Figure 1 (highlighting added by Defendants):



104 Also, the same applies to EP 0 482 906 A1 (cited as "D3", Exhibit HL 13) with respect to the embodiment shown in figure 4a (highlighting added by Defendants):



105 The granting procedure is not by itself relevant for the interpretation of the claim, but according to the case law of the CoA, the patent claim must be interpreted from the perspective of the person skilled in the art. And the patentee's assertions during the grant proceedings, and in particular the TBA's endorsement thereof, can be seen as an indication of the view of the person skilled in the art at the filing date (CoA, decision of

20.12.2024 – UPC_CoA_402/2024, GRUR 2025, 396 Rn. 43 – Alexion/Samsung). The Defendants have rightfully laid out, that the EPO's Examining Division was of the position that slots which are not formed by the two ends of the wall do not fulfil feature 1.6. The panel agrees that it has to be distinguished between a slot <u>in</u> the wall, which does not fulfil feature 1.6, and a slot formed by an overlap of two ends of the wall, as feature 1.6 explicitly requires.

d) Feature 1.8

106 According to feature 1.8, the slot extends longitudinally along the wall of the tubular attachment. The term "longitudinally" characterizes the direction in which the slot shall extend. The claim does not contain any limitation with respect to the length of the slot. While the embodiments show slots that extend along the entire length of the attachment, this is only an optional embodiment ("extends longitudinally") of the slot.

5. Features 1.9-1.11

*11.9 hair is wrapped around the attachment (30) in the direction of fluid flow*

*1.10 the fluid emitted from the fluid outlet is attracted to an external surface (112) of the wall, and*

*1.11 fluid emitted from the fluid outlet flows around the external surface (112) of the wall*

107 Features 1.10 through 1.12 describe the implementation of the "Coanda effect" for hair styling. Due to the fluid flow around the external surface of the wall, hair is automatically wrapped around the attachment in the direction of the fluid flow, see also para. [0029, 0030]. Due to this effect, both, drying hair and/or styling of hair into curls is facilitated, cf. para. [0016].

III. CLAIM CONSTRUCTION OF CLAIM 11

1. Features 11.1 and 11.2

*11.1 A hand held appliance comprising*

*11.2 a handle (20) having a fluid flow path from a fluid inlet (40) to a fluid outlet and*

108 Features 11.1 and 11.2 relate to a hand held appliance comprising a handle (20) containing a fluid flow path from a fluid inlet (40) to a fluid outlet. Figure 1a shows an example of an appliance according to the invention:.



FIG. 1a

### 2. Features 11.3

*11.3 a fan unit for drawing fluid into the fluid inlet*

109 The appliance comprises a fan unit for drawing air into the fluid inlet.

### 3. Feature 11.4

*11.4 an attachment (30) as claimed in any preceding claim for attaching to the handle,*

110 Feature 11.4 refers to an attachment according to any of the preceding claims, including claim 1, which makes it a dependant claim.

### 4. Feature 11.5

*11.5 wherein the fluid inlet of the attachment (30), when the attachment is attached to the handle,*

*is in fluid communication with the fluid outlet of the handle*

111 When the attachment is attached to the handle, feature 11.5 requires a fluid flow between the fluid inlet and the fluid outlet.

### D. INFRINGEMENT

112 Based on the understanding of the features of the patented claims stated above, the products "Dreame Airstyle" and "Dreame Pocket" ("Curling Attachments") make literal use of the technical teaching of claim 1 and 11 of the patent in suit. The Panel also finds that it is more likely than not that the patent in suit is infringed by the Defendant's offer and distribution of these attacked embodiment in the market of the Contracting Member States of the UPCA, and – with regard to Defendants 1) and 3) – the territory of the Kingdom of Spain. However, the products "Dreame Airstyle Pro" and "Dreame Pocket Neo" ("Staggered Curling Attachments") do not make literal use of the technical teaching of claim 1 and 11 of the patent.

### I. CLAIM 1

113 The Defendants rightly did not dispute that the features 1.1 – 1.5 and 1.7 – 1.11 of claim 1 are implemented, so that no further explanation in necessary in this respect. The

Defendants only object the fulfilment of feature 1.6, hence, only this is discussed in detail below.

<u>1. Attacked embodiments:</u>

114 The Applicant sees two groups of products as attacked embodiment that are patent infringing. The first group are the newer "Dreame Airstyle Pro" and "Dreame Pocket Neo" products, which the Applicant calls "Staggered Curling Attachments":



*Screenshot taken on April 30, 2025 Curling Attachment* <mark>Dreame AirStyle Pro</mark> Dreame Airstyle Pro
(https://dreame.de/products/dreame-airstyle-pro)



*Screenshot taken on April 30, 2025 Curling Attachment* <mark>Dreame Pocket Neo</mark> Dreame Pocket Neo
Haartrockner (https://dreame.de/products/dreame-pocket-neo)

115 The other group are the "Dreame Airstyle" and "Dreame Pocket" products, which the Applicant calls "Curling Attachments":



*Screenshot taken on April 30, 2025, Dreame Airstyle Multi-styler and hair dryer – Dreame Sweden*
(https://se.dreametech.com/products/airstyle)



*Screenshot taken von April 30, 2025, Dreame Hair Pocket Hair Dryer – Dreame Sweden*
(https://se.dreametech.com/products/hair-pocket)

2. "Staggered Curling Attachments"

116 Dreame Airstyle Pro and Dreame Pocket Neo products do not make literal use of feature 1.6:

> *the slot is formed by an overlap of a first end of the wall and a second end of the wall*

117 These attacked embodiments have multiple apertures in their outside walls (see Application, para. 61 ff):




118 There are also overlaps, visible in an enlarged picture of a cross section of a plate from the Staggered Curling Attachment (Application para. 54-56 and Exhibits A 10 [para. 9] and Defendants exhibit HL 24):





119 As stated above, it is only relevant if there is an overlap in the direction of the slot and the fluid flow, while it is not necessary whether there is also an overlap in a radial direction of the tubular attachment.

120 The Applicant provided further images in its Reply para. 55 ff. showing the orientation and overlay of the Staggered Curling Attachment that matches the overlap of Fig. 5b of the patent, when tilted:



121 However, the apertures ("slots") in the "Staggered Curling Attachments" of the "AirStyle Pro" and "Pocket Neo" products are not formed by the ends of a wall. Feature 1.6 requires that the slot is formed by the two (from whichever angle) overlapping ends of a wall (or a plate) being arranged at a distance so that a slot is formed between them. As a wall can have a plurality of ends, and according to para. [0004] can consist of a plurality of plates, every end of a plate could be seen as an end of the wall, thus the wall (which is the outer surface of the tubular appliance) can have a plurality of ends.

122 It is undisputed that in the "Staggered Curling Attachments", the wall is formed by two circles of six plates, which are attached to an internal support structure. Moreover, there is a spacer ring in the centre as one of the support structures for the upper and lower ring. The Defendants provided as evidence for the structure and physical properties of these products an affidavit / declaration in lieu of oath of Mr. Wenming Nie, R&D Director

of DREAME TECHNOLOGY (SHANGHAI) CO., LTD., (Exhibit HL 17), which the Applicant did not contest. It shows an arrangement of the two circles of six plates illustrated as follows:



123 The Applicant provided as physical evidence (Exhibit A6) product samples of the Dreame AirStyle Pro and the Dreame Pocket. The Defendants provided as physical evidence a sample of a plate of the "Staggered Curling Attachment" (Exhibit HL 28). These illustrations and the physical evidence confirm that the plates have apertures, but that the plates when fixed to the curling attachment, have no gap and no fluid outlet between the plates. It is undisputed that the air flow can only pass through apertures which are located in the middle of the body of each of the plates. The apertures are arranged in the plates in two offset rows each row having three apertures. Hence, there is no fluid outlet between the end of a wall of any adjacent plate as required by feature 1.6 of the patent. Simple apertures in a through-going wall are not covered by the claim.

## 3. "Curling Attachment"

124 These attacked groups of products do, however, make literal use of feature 1.6. With regard to this feature the Defendants explained that the "Curling Attachments" of the "Airstyle" and "Pocket" are formed by four plates and four Integral injection moulded C-shaped members spaced apart, wherein the two ends of the C-shaped members extend inwardly such that about one-half of the C-shaped members are disposed in the inner cavity of the curling attachment and the other one-half are exposed on the outer surface, and an air outlet of the curling attachment is formed between the plates and the exposed portions of the C-shaped members (descriptions added by Defendants):



125 It is undisputed that the air flows between the end of a plate (coloured in green) and the curved edge of the C-shaped member (coloured in red). For better understanding the Defendants additionally provided a CAD drawing of a cross-sectional view of the curling attachments of the AirStyle and Pocket products (Exhibit HL 30, with descriptions added by Defendants):



126 Contrary to the Defendants' argumentation, the ends of the C-shaped members do in fact participate in the formation of the slot and the directing of the airflow. This is because the <u>curved edges</u> of the C-shaped members constitute their "ends" in the meaning of feature 1.6 of the patent:

The structure of the "Airstyle" and "Pocket" curling arrangements provide multiple slots formed by the first and second ends of the (green) plates (see sample exhibit HL 28) and the curved edges of the C-shaped members of the main body element. These curved edges qualify as the end of a plate as they are the outermost point in the longitudinal extension of these elements. These outermost points in the longitudinal extension mark the physical boundary of these elements in the longitudinal dimension, not the last part turned inward away from the outermost point. These curved points are adjacent to the end of the other plates (coloured in green).

127 This assessment is confirmed by another consideration: Assumed the C-shaped members were not hollow but solid, they would have an oval shape, leaving no doubt to the skilled person, that the outermost point in the longitudinal extension of an oval member would be its end in the meaning of the patent. As the thickness of a plate is neither defined nor limited in the patent even a solid oval member could without doubt be seen as a plate that constitutes the outer wall. Thus, it is not relevant, that the Defendants chose to shape this element in a hollow form, be it for the purpose of attaching it to the inner body of the tube or be it to fulfil other functions. Feature 1.6 is fulfilled.

## II. CLAIM 11

128 The same applies for an infringement of claim 11. The products "Dreame Airstyle" and "Dreame Pocket" ("Curling Attachments") make literal use of the technical teaching of claim 11 of the patent in suit, that protects the complete hand held appliance with an attachment according to claim 1. In order to avoid repetition reference is made to the assessment above.

## III. LIABILITY OF THE DEFENDANTS

129 Defendant 1) is liable for the patent infringement in the UPCA countries and in Spain as it is the producer and website operator in European countries and thereby inter alia offering the products, Art. 62 UPCA and Art. 59 of Spanish Patent Act (Law 24/2015). Defendant 2) is liable as the Germany based "Official Distributor of Dreame" and seller. Its liability is limited to UPCA countries as the Court has no jurisdiction regarding the infringement of the Spanish national part of the patent in suit (see above under section B. II. 2. a)).  The same applies to Defendant 4), who is the Swedish affiliate to Defendant 1) and runs the country specific website www.se.dreamtech.com as well as a retail store in Stockholm.

130 It is undisputed that Defendant 3) is the Authorized Representative for Defendant 1). As such it is not physically involved in the distribution of the attacked embodiments. Despite the fact that the Applicant demonstrated by means of a test purchase conducted via the German website (https://dreame.de/) that a sticker identifying Defendant 3) as the EU representative was affixed to the packaging of the respective product, this does not qualify Defendant 3) being an infringer in the meaning of Art. 62 and 63 (1) 1st sentence UPCA. It is undisputed that it is Defendant 2), who is the importer for the German market, on which the test purchase took place, not Defendant 3). Defendant 3) does not perform any acts mentioned in Art. 25 UPCA.

131 However, the Applicant can successfully claim that Defendant 3) is an intermediary. Based on its function as Authorized Representative for the non-EU-based manufacturer, Defendant 3) qualifies as an intermediary whose services are essential for the distribution of the attacked embodiments in the European Union, including Spain. As stated above, the legal framework puts Defendant 3) in the role of being an indispensable party in the distribution in the EU for the electronic products in question, which require a CE certificate and declaration of conformity. Without an authorized representative in the EU, Defendant 1) is not legally able to sale the attacked embodiments in the EU.

Reference is made to the assessment above regarding the international jurisdiction (see above under section B. II. 2. b) bb)). Thus, as an intermediary Defendant 3) can also be subject to an injunction, Art. 63 (1) 2nd sentence UPCA.

132 When it comes to the Spanish national part of the patent in suit, an injunction regarding Defendant 3) cannot be based on the UPCA as Spain is not a member of the UPC system. The argument presented by the Applicant, that the above-mentioned sticker on the packaging, identifying Defendant 3) as the EU representative, would be sufficient for holding Defendant 3) liable as an importer under Art. 59 of Spanish Patent Act (Law 24/2015) is not convincing. As Defendant 3) cannot be qualified as an importer, Art. 59 of Spanish Patent Act, which is the Spanish rule corresponding to Art. 25 UPCA, is not applicable. However, the Applicant can successfully claim that, at the very least, Defendant 3) is an intermediary within the meaning of Art. 63 UPCA and under Spanish patent law (see Applicant's Reply, para. 21) and therefore, can be subject to an injunction. As the Applicant rightfully argued in the oral hearing, the Spanish patent act is reliant on EU legislation, including the Enforcement Directive 2004/48/EC. According to Art. 9 (1) (a) 2004/48/EC an interlocutory injunction may also be issued, under the same conditions, against an intermediary whose services are being used by a third party to infringe an intellectual property right. The Applicant undisputedly explained that Art. 71 (2) of the Spanish Patent Act transformed this provision into Spanish national law allowing to grant an injunction against intermediaries whose services are used by a third party to infringe patent rights, even if the acts of such intermediaries do not in themselves constitute an infringement, as long as these measures are objective, proportionate and non-discriminatory. As these criteria are met, Defendant 3) is also subject to an injunction with regard to the Spanish national part of the patent in suit.

## IV. Urgency

133 The Applicant did not wait for an unreasonably long time. The Applicant filed the application almost immediately after the publication of grant of the patent in suit and had the attacked embodiment examined.

## V. Weighing of interests

134 To the extent the panel recognized an infringement of claim 1 and claim 11, the interests of the Applicant outweigh those of the Defendants. It is therefore justified to grant a preliminary injunction in the case at hand.

### 1. Principles

135 Pursuant to Art. 62(2) UPCA and Rule 211.3 RoP, the Court weighs the interests of the parties against each other at its discretion, taking into account in particular the possible damage that could arise for one of the parties from the issuance of the Provisional measures or the dismissal of the request (see also UPC Appeal Court, Order of 25 September 2024, UPC_CFI_182/2024 – Ortovox Sportartikel v Mammut Sports Group; LD Munich, Order of 27 August 2024, UPC_CFI_74/2024 = ACT_ 9216/2024 – Hand Held Products v. Scandit; LD Düsseldorf, Order of 31 October 2024, UPC_CFI_347/2024 = ACT_37931/2024 – Valeo Electrification v. Magna PT; LD Hamburg, Order of 16 June

2025, UPC_CFI_ 281/2025 = ACT 14764/2025). However, the aspects mentioned are not an exclusive list of the circumstances to be taken into account when weighing up interests (see 'in particular' in Art. 62(2) UPCA and Rule 211.3 RoP). Rather, all relevant circumstances must be taken into account in the balancing of interests (LD Munich, Order of 27 August 2024, UPC_CFI_74/2024 = ACT_9216/2024 – Hand Held Products v. Scandit). Above all, the balance of interests must take into account the probability of an erroneous decision and also the objective urgency in terms of the necessity of provisional measures with regard to equally possible proceedings on the merits. All aspects are to be weighed against each other in relation to each other.

136  The necessity of also taking these aspects into account in the context of the weighing of interests arises from the relationship between the proceedings on provisional measures under Rule 206 et seq. RoP and possible proceedings on the merits. In procedural terms, the proceedings on the merits are the rule, while the preliminary proceedings, with their summary examination and the possibility of a subsequent legal defence, are the exception (LD Düsseldorf, Order of 31 October 2024, UPC_CFI_347/2024 = ACT_37931/2024 – Valeo Electrification/Magna P). This relationship follows directly from the provisional nature of the order of provisional measures.

137  The necessity of provisional measures may also follow from the fact that there is direct competition between the attacked embodiment and the product of the patent holder (see UPC Court of Appeal, order of 24 February 2025, UPC_CoA_540/2024, APL_52692/2024, Biolitec v Light Guide et al, para. 26).

2. Assessment in this case

138  In the present case there are special circumstances justifying an injunction. The Applicant is being deprived of market shares through the distribution of the attacked embodiments, and this situation is being perpetuated. The parties are competitors in the field of hair treatment devices, and the distribution of the infringing devices is very likely to directly affect the Applicant's own sales opportunities, even though there are other competitors on the market. The panel agrees with the Applicant that the patented invention belongs to the main selling factors as the invention directly relates to the hair treatment itself, which provides a significant improvement over other products, in which curling the hair must be achieved by manually wrapping it around the attachment. Moreover, the attacked embodiments are offered for half the price, which is a strong indicator for the risk of loss of market shares and price erosion.

139  Additionally, the product display and offerings by the Defendants of the "Dreame Airstyle" and "Dreame Pocket" products are very much resembling to the actual competing "Airwrap" product of the Applicant. The assertion made by the Defendants that these attacked embodiments are currently not offered in most *major* European countries such as Germany, the UK, the Netherlands, etc., is not relevant, as it leaves undisputed that they are still offered in other European markets. Furthermore, the Defendants have not issued a cease-and-desist declaration regarding these products. On

the other hand, the Defendants are not completely restricted in their business activities, as it can still market the "Staggered Curling Attachments".

140 For the same reasons these measures are proportionate with regard to Defendant 3) concerning the Spanish national part of the patent in suit, Art. 71 (2) Spanish Patent Law.

VI. CONCLUSIONS

### 1. Preliminary injunction in part

141 As a result, the Court finds that it is more likely than not that the patent-in-suit is infringed by the Defendants by their offer and distribution of the attacked "Dreame Airstyle" and "Dreame Pocket" products. Furthermore, it is more likely than not that the patent-in-suit is valid. The Defendants have not submitted any substantiated attack on the validity of the patent. Additionally, also third party objections were considered in the granting process.

142 Since the granting of provisional measures is also necessary in terms of time and substance, and since the weighing of interests is also in favour of the Applicant, the Court, exercises its discretion (R. 209.2 RoP) to grant the requested provisional measures, Art. 62 (1), 25 (a) UPCA. Only a preliminary injunction takes into account the Applicant's interest in the effective enforcement of the patent-in-suit. As a rule, injunctions will cover the territory of those CMS for which the patent has effect, unless certain circumstances justify an exception (Art. 34 UPCA, UPC Court of Appeal, 30.04.2025 - UPC_CoA_768/2024, APL_64374/2024 – Insulet ./. EOFlow). Here, the injunction is to be granted for the Spanish national part of the patent in suit, as well, with respect to Defendants 1) and 3), but not Defendants 2) and 4) for the reasons laid out above. With regard to the "Dreame Airstyle Pro" and "Dreame Pocket Neo" products the application is dismissed due to the lack of likelihood of a patent infringement.

### 2. Penalty payments

143 The threat of penalty payments in the event of non-compliance is based on R. 354.3 RoP. The setting of an overall limit gives the Panel the necessary flexibility to also take into account the Defendant's behaviour in the event of an infringement and, on that basis, to determine an appropriate penalty payment in accordance with R. 354.4 RoP.

### 3. Security

144 Where appropriate, the enforcement of a decision may, pursuant to Art. 82(2) UPCA, be subject to the provision of security or an equivalent assurance to ensure compensation for any damage suffered, in particular in the case of injunctions. For provisional measures, this is reflected in R. 211.5 RoP, first sentence, which states that the Court may order the applicant to provide adequate security for appropriate compensation for any injury likely to be caused to the defendant, which the applicant may be liable to bear in the event that the Court revokes the order for provisional measures. Furthermore, according to R. 352.1 RoP, decisions and orders may be subject to the rendering of a security (whether by deposit or bank guarantee or otherwise) by a party to the other party for legal costs and other expenses and compensation for any damage incurred or

likely to be incurred by the other party if the decisions and orders are enforced and subsequently revoked.

145 However, the panel does not see the necessity to order an enforcement security. There are no signs that the Applicant, who is a well-known manufacturer, would not be able to reimburse any damages in case the provisional measures are lifted. The Defendants did not request a security, either.

146 According to the case law of the Local Division Hamburg, a decision on the obligation to bear legal costs is justified (Order of 21 February 2025, ORD_68880/2024, UPC_CFI_701/2024; Order of 26 June 2024, ORD_38032/2024, UPC_CFI_124/2024). The Court is of the opinion, like the Court of Appeal (Order of 3 March 2025, UPC_CoA_523/2024 – Sumi Agro v. Syngen-ta; Order of 6 August 2024, UPC_CoA_335/2024, 10x Genomics et al v. NanoString), that a cost decision should be issued in inter partes proceedings for provisional measures, since it concludes the action.

147 As the Applicant succeeds with one out of two groups of attacked embodiments and is awarded an injunction for two out of four Defendants with respect to the Spanish national part, as well, it appears adequate to order that each party has to bear their own costs.

<u>4. Value</u>

148 The value of the case is set to € 1 million, as indicated by the panel in the oral hearing.


<span style="font-variant: small-caps">Order</span>

I.

Defendants 1), 2), 3) and 4) are ordered, by way of preliminary injunction,

a. Defendants 1), 2) and 4) to refrain from making, offering, placing on the market, using, importing or storing for the aforementioned purposes within the territory of the Contracting Member States of the Agreement on a Unified Patent Court (UPCA),

b. Defendant 3) to refrain from providing service for making, offering, placing on the market, using, importing or storing of for the aforementioned purposes within the territory of the Contracting Member States of the Agreement on a Unified Patent Court (UPCA),

c. Defendant 1) and 3) also with respect to the territory of the Kingdom of Spain,

<u>an attachment</u> for a hand held appliance comprising a body having a wall, a fluid inlet at one end of the wall and a fluid outlet through the wall,

wherein:

the fluid outlet comprises a slot extending along the wall, the slot is formed by an overlap of a first end of the wall and a second end of the wall, the attachment is tubular, the slot extends longitudinally along the tubular attachment, hair is wrapped around the

attachment in the direction of fluid flow, the fluid emitted from the fluid outlet is attracted to an external surface of the wall, and fluid emitted from the fluid outlet flows around the external surface of the wall. (Direct infringement of EP 3 119 235, Claim 1);

<u>a hand held appliance</u> comprising a handle having a fluid flow path from a fluid inlet to a fluid outlet and a fan unit for drawing fluid into the fluid inlet and an attachment as claimed in claim 1 for attaching to the handle, wherein the fluid inlet of the attachment, when the attachment is attached to the handle, is in fluid communication with the fluid outlet of the handle. (Direct infringement of EP 3 119 235, Claim 11).

II.

For the remaining parts the application for provisional measures is dismissed.

III.

For each individual case of non-compliance with the order under I., Defendants 1), 2), 3) and 4) must pay a recurring penalty payment of up to EUR 250,000 to the court (repeatedly if necessary). These penalties will be determined by the Local Division in Hamburg upon request by the Applicant (Art. 63(2) UPCA; R. 354).

IV.

Each party has to bear its own costs of the proceedings, except for the court fees, which shall be borne by the Applicant for 50% and by the Defendants for 50%.

V. The orders are immediately effective and enforceable.

<u>INFORMATION ON THE APPEAL</u>

Both parties may appeal against this order within 15 days of its notification, Art. 73 (2) lit. a), Art. 62 UPCA, R. 220.1(c), 224.2(b) RoP.

<u>INFORMATION ON THE ENFORCEMENT</u>

A certified copy of the enforceable decision or order is issued by the Deputy Registrar at the request of the enforcing party, R. 69 RoP.

<u>DETAILS OF THE ORDER</u>

Order no. ORD_Not provided in ACTION NUMBER:  ACT_20368/2025
UPC number:   UPC_CFI_387/2025
Action type:     Application for provisional measures (RoP206)

<u>SIGNATURES</u>

Presiding judge Sabine Klepsch

Judge rapporteur Dr. Stefan Schilling

Legally qualified judge Stefan Johansson

For the sub-registry

# **EXHIBIT 12**

# Landgericht München I

Az.:    7 O 9383/25



## IM NAMEN DES VOLKES

In dem Rechtsstreit

1. ███████████████████████████████████
   ██████████████████████████████,
   - Verfügungsklägerin -

2. ███████████████████████████████████
   ████████████████████████████████████
   ████████████████████████████
   - Verfügungsklägerin -

███████████████████████
█████████████████████████████████████
██████████████████████

gegen

1. ███████████████████████████████████
   ████████████████████████████████████
   █████████████████████

2. ███████████████████████████████████
   ████████████████████████████████████
   █████████████████████

███████████████████████
████████████████████████████████████

wegen einstweiliger Verfügung wegen Patentverletzung EP
2 364 691 B1

**Die Tenorierung folgt dem Berichtigungsbeschluss vom 08.10.2025**

erlässt das Landgericht München I - 7. Zivilkammer - durch den Vorsitzenden Richter am Landgericht Dr. Schön, die Richterin am Landgericht Tözsér und den Richter am Landgericht Dr. Schweyer aufgrund der mündlichen Verhandlung vom 25. September 2025 folgendes

# Endurteil

I.  Die Verfügungsbeklagten werden verurteilt,

es bei Meidung eines für jeden Fall der Zuwiderhandlung fälligen, vom Gericht festzusetzenden Ordnungsgeldes bis zu 250.000,00 EUR – ersatzweise Ordnungshaft bis zu sechs Monaten – oder einer Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft am jeweiligen gesetzlichen Vertreter der Verfügungsbeklagten zu vollziehen ist,

**zu unterlassen,**

eine ophthalmische Formulierung eines vaskulären Endothelzellen-Wachstumsfaktor (VEGF)-Antagonisten zur Verwendung zur intravitrealen Verabreichung, umfassend:

a)  1–100 mg/ml eines VEGF-Antagonisten, bestehend aus Aminosäuren 27–457 von SEQ ID NO: 4, welcher an Asn-Resten 62, 94, 149, 222 und 308 glycosyliert ist;

b)  0,01–5% eines oder mehrere organische(n) Co-Lösungsmittel(s), welche(s) eins oder mehrere von Polysorbat, Polyethylenglycol (PEG) und Propylenglycol ist;

c)  30–150 mM eines Tonizitätsmittels, welches aus Natriumchlorid oder Kaliumchlorid ausgewählt ist;

d)  5–40 mM Histidinpuffer; und

e)  1,0–7,5% eines Stabilisierungsmittels, welches aus der Gruppe, bestehend aus Saccharose, Sorbit, Glycerin, Trehalose und Mannit, ausgewählt ist,

pH zwischen etwa 5,8–7,0

in Österreich, Belgien, Bulgarien, Dänemark, Finnland, Frankreich, Griechenland, Irland, Italien, Litauen, Luxemburg, Niederlande, Polen, Portugal, Rumänien, Slowakei, Slowenien, Spanien,

Landgericht München I, 7 O 9383/25

Schweden, Tschechische Republik, Ungarn und Zypern anzubie-
ten, in Verkehr zu bringen, zu gebrauchen oder zu den genannten
Zwecken entweder einzuführen oder zu besitzen.

II.     Von den Kosten des Verfahrens tragen die Verfügungsklägerinnen ein
        Fünftel, die Verfügungsbeklagten vier Fünftel.


**Leitsätze der Kammer:**

1.  Nach Ansicht der Kammer ist die örtliche Zuständigkeit bei grenzüber-
    schreitenden Patentverletzungsverfahren auch gegenüber Beklagten ge-
    geben, die ihren allgemeinen Gerichtsstand nicht im Zuständigkeitsbereich
    des angerufenen Gerichts, sondern an einem beliebigen Ort in der Bundes-
    republik Deutschland haben. Denn das Patentverletzungsverfahren ist
    durch den „fliegenden", deliktischen Gerichtsstand geprägt. Dieser findet
    auch bei grenzüberschreitenden Sachverhalten Anwendung, da die
    Rechtsstellung von Patentinhabern ansonsten vom allgemeinen Gerichts-
    stand des Verletzers abhängig wäre. Denn in tatsächlicher Hinsicht sind
    nur wenige Gerichte erfahren, komplexe Patentverletzungsverfahren zu
    verhandeln. Ein solches Verständnis würde dem hinter der Konzentrations-
    maxime des § 143 Abs. 2 PatG stehenden Gedanken und dem von der
    Richtlinie 2004/48/EG beabsichtigten effektiven Schutz von Rechten des
    geistigen Eigentums nicht gerecht (Rn. 34).

2.  Die Frage, ob ein Verfügungspatent rechtsbeständig ist, wird nach deut-
    schem Verständnis im Rahmen des Vorliegens eines Verfügungsgrundes
    beurteilt. Anderes gilt auch dann nicht, wenn grenzüberschreitende Sach-
    verhalte zu entscheiden sind, da es sich um eine prozessuale Frage han-
    delt, die sich nach dem Recht des Staates des angerufenen Gerichts richtet
    (Rn. 43).

3.  Verfahrensrechtliche Fragen unterfallen dem Recht des Gerichtsortes („lex
    fori"). Materiell-rechtliche Fragen richten sich nach dem Recht des Landes
    in dem die Ansprüche geltend gemacht werden („Schutzlandprinzip"). Aus-
    gehend von diesem Grundsatz gilt es zu unterscheiden, wann genau eine
    Vorschrift als materiell-rechtliche Vorschrift zu qualifizieren ist. Denn nur
    materiell-rechtliche Vorschriften unterfallen nicht dem deutschen Recht.
    Ausgangspunkt    ist    das    Verständnis    (unter    Berücksichtigung    der

Grundwertungen des Europäischen Patentübereinkommens und der Durchsetzungsrichtlinie 2004/48/EG), dass Verfahrensvorschriften in keinem Land dazu dienen sollen, Patentverletzungen den Weg zu ebnen und Patentinhabern die Verfahrensführung in einem grenzüberschreitenden Sachverhalt zu erschweren (Rn. 49 f.).

4. Vorschriften, die eine technische oder formelle Handhabung in einem anderen Land regeln, kommt keine Schutzfunktion in Hinblick auf das Ermöglichen von Patentverletzungen zu. Diese Vorschriften sind stets dem Verfahrensrecht zuzuordnen und richten sich mithin im vorliegenden Fall nach deutschem Recht. So kann sichergestellt werden, dass Inhaber von Patenten in mehreren Staaten nicht durch eine kleinteilige Betrachtung von Formvorschriften von ihrer Rechtsdurchsetzung abgehalten werden (Rn. 51).

5. Sollte dies dazu führe, dass eine Patentverletzung in bestimmten Staaten nur dann verfolgbar ist, wenn der Verletzer seinen allgemeinen Gerichtsstand in der Bundesrepublik Deutschland hat, mag dies faktisch zutreffend sein. Es ist aber nicht ersichtlich, dass in Deutschland ansässige Patentverletzer einen Anspruch darauf haben könnten, dass sie unter ein ähnlich niedriges Schutzniveau gestellt werden, wie in anderen Staaten ansässige Patentverletzer. Einen Anspruch auf Gleichheit im Unrecht gibt es nicht (Rn. 52).

6. In jedem Fall wäre nach einer Entscheidung des Bundespatentgerichts im Nichtigkeitsverfahren betreffend den deutschen Teil eines Europäischen Patents auch Dringlichkeit hinsichtlich der anderen nationalen Teile des Europäischen Patents gegeben. Das folgt daraus, dass die Dringlichkeitsfrist mit jeder bestätigenden Entscheidung über den Rechtsbestand neu beginnt. Diese Wirkung tritt auch für die anderen nationalen Teile des Europäischen Patents ein, da aufgrund der anerkannten Expertise des auch mit technischen Richtern besetzten Bundespatentgerichts seinen Entscheidungen eine europaweite Signalwirkung zukommt ("Leuchtturmcharakter") (Rn. 66).

7. Die Bewertung hinsichtlich der Rechtslage in der Bundesrepublik Deutschland hat eine starke Indizwirkung dahingehend, dass das gleiche Ergebnis in den weiteren EPÜ-Mitgliedstaaten in gleicher Weise gefunden wird. Auf Grund dieser starken Indizwirkung ist es nicht erforderlich, dass die Kammer zum jeweiligen ausländischen Recht Gutachten unabhängiger

Sachverständiger einholen muss. Ansonsten wäre die von der Durchsetzungsrichtlinie geforderte effektive Durchsetzung gewerblicher Schutzrechte in einer den Schutzrechtsinhabern nicht zumutbaren Weise erschwert. Vielmehr ist es an der in Anspruch genommenen Partei, konkrete Anhaltspunkte vorzutragen, dass auf Grund des nationalen Rechts eine anderweitige Entscheidung ergehen würde. Ihr obliegt die Darlegungslast, warum andere Staaten zu einer anderen Bewertung kommen würden (Rn. 153 ff.).

8.  Es ist unbeachtlich, ob in anderen Ländern Verfahren grundsätzlich anders geführt werden (z.B. durch Sachverständigenbeweis), einstweilige Verfügungen deutlich länger dauern oder eine grundsätzliche Skepsis gegenüber dem Rechtsinstitut der äquivalenten Patentverletzung besteht (Rn. 156).

9.  Maßstab ist tatsächlich allein, ob nationales Recht (Gesetze oder etabliertes Richterrecht) die Voraussetzungen des EPÜ in einer Weise modifiziert, die zu einem anderen Ergebnis führen würde. Dies bedeutet, dass die in Anspruch genommene Partei die aus ihrer Sicht relevanten Vorschriften bzw. Entscheidungen vorzulegen hat. Zusätzlich muss sie eine qualifizierte Stellungnahme eines in dem jeweiligen Rechtsgebiet kundigen Experten vorlegen, der zumindest standesrechtlich zur Wahrheit verpflichtet sein muss. Diese Grundsätze zur Indizwirkung der Verletzung nach deutschem Recht gelten nicht nur für wortsinngemäße, sondern auch für äquivalente Patentverletzungen und insbesondere, wenn eine einfachgelagerte Äquivalenzkonstellation vorliegt. Nach dem Verständnis der Kammer dient die Ausweitung des Schutzbereichs auf äquivalente Verletzungsformen dazu, eindeutige Umgehungslösungen in den Schutzbereich eines Patents zu ziehen. Eine eindeutige Umgehungslösung ist zumindest dann gegeben, wenn ein nicht den Kern der Erfindung tragendes Merkmal modifiziert wird (Rn. 157 f.).

10. Äußerungen im Erteilungsverfahren können allenfalls unter dem Gesichtspunkt widersprüchlichen Verhaltens einen Einfluss auf den durch die Erteilung gewährten Schutz haben. Der Schutzumfang eines Patents ist immer objektiv zu bestimmen. Soweit ein Patent zu Unrecht erteilt worden ist, weil im Rahmen der Anmeldung unzutreffende Angaben gemacht worden sind, kann dieses Verhalten einer Durchsetzung allenfalls unter dem Gesichtspunkt widersprüchlichen Verhaltens entgegengesetzt werden (Rn. 168).

11. Die Anforderungen an den klägerischen Vortrag zur Erstbegehungsgefahr dürfen nicht überspannt werden. Insbesondere ist es zulässig, wenn die Klagepartei Tatsachen vorträgt, die es als hinreichend wahrscheinlich erscheinen lassen, dass in allen geltend gemachten Staaten eine unmittelbare Patentverletzung bevorstehen könnte, beispielsweise durch das mögliche baldige Anbieten eines Produkts. Ausreichend wäre der Vortrag, dass eine Zulassung zumindest beantragt ist und eine Vertriebsstruktur besteht, die es ermöglichen würde, das Produkt zu vertreiben. Gerade im Pharmabereich werden sich die erheblichen Investitionen in neue Produkte nur refinanzieren lassen, wenn dieses Produkt weithin verfügbar ist. Dies gilt für die in der Entwicklung kostspieligen Biosimilars besonders. Wenn ein solcher Vortrag erfolgt ist, wäre es bei der in Anspruch genommenen Partei vorzutragen und gegebenenfalls zu beweisen, dass trotz der Möglichkeit entweder ein Vertrieb nicht geplant ist, oder die rechtlichen Voraussetzungen in einem Land einen Unterlassungsanspruch nicht rechtfertigen würden (Rn. 275).

12. Eine effektive Durchsetzung von Patentrechten fordert – zumindest für die Mitgliedsstaaten der Europäischen Union unmittelbar – mit der Durchsetzungsrichtlinie 2004/48/EG, dass bei einer hinreichend konkreten Gefährdungslage vorsorglich Unterlassungsbegehren erlangt werden können. Dies gilt insbesondere auch unter dem Gesichtspunkt der Verfahrenskonzentration. Potenzielle Patentverletzer sollen sich nicht dadurch einen Vorteil verschaffen können, dass sie in sukzessiver Weise vorgehen. Ansonsten wären sie in der Lage finanzielle und personelle Ressourcen von Patentinhabern – die sich nicht aussuchen können, dass ihre Schutzrechte von Dritten in verschiedenen Staaten verletzt werden – über Gebühr beansprucht werden (Rn. 278).

# Tatbestand

1    Die Verfügungsklägerinnen nehmen die Verfügungsbeklagten wegen behaupteter Patentverletzung mit äquivalenten Mitteln des Europäischen Patents 2 364 691 B1 in insgesamt 22 Staaten in Anspruch. Das Verfügungspatent betrifft Formulierungen mit VEGF-Antagonisten für eine intravitreale Verabreichung.

2    Das Europäische Patent 2 364 691 B1 (Anlage AST 9, nachfolgend: Verfügungspatent) wurde am 14. Juni 2007 unter Inanspruchnahme der Priorität der US-amerikanischen Patentschrift 2006 0814484 P vom 16. Juni 2006 für das US-amerikanische Unternehmen ███████████████████████ angemeldet. Die Anmeldung wurde am 14. September 2011 und der Erteilungshinweis am 24. April 2013 veröffentlicht.

3    Das Verfügungspatent steht in den Staaten Österreich, Belgien, Bulgarien, Dänemark, Estland, Finnland, Frankreich, Griechenland, Island, Irland, Italien, Lettland, Liechtenstein, Litauen, Luxemburg, Malta, Monaco, Niederlande, Polen, Portugal, Rumänien, Slowakei, Slowenien, Spanien, Schweden, Schweiz, Tschechische Republik, Türkei, Ungarn und Zypern in der erteilten Fassung in Kraft.

4    In einem von einer dritten Partei vor dem Bundespatentgericht gegen das Verfügungspatent geführten Nichtigkeitsverfahren (Az.: 3 Ni 15/23 (EP)) wurde das Verfügungspatent – nach einem entsprechenden Hinweis des Patentgerichts vom 8. Dezember 2023 (Anlage AST 8) – durch Urteil vom 26. Juni 2025 in eingeschränkter Form aufrechterhalten. Zum Zeitpunkt der mündlichen Verhandlung lagen die schriftlichen Urteilsgründe nicht vor.

5    Der hier maßgebliche Anspruch 1 des Verfügungspatents lautet in der Verfahrenssprache in der eingeschränkten Fassung:

> An ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist for use in intravitreal administration, wherein said ophthalmic formulation comprises:
>
> (a) 1-100 mg/ml of a VEGF antagonist consisting of amino acids 27-457 of SEQ ID No:4, which is glycosylated at Asn residues 62, 94, 149, 222 and 308;
>
> (b) 001-5% of one or more organic co-solvent(s) which is one or more of polysorbate, polyethylene glycol (PEG), and propylene glycol;

(c) 30-150 mM of a tonicity agent selected from sodium chloride or potassium chloride;

(d) 5-40 mM of sodium phosphate buffer; and

(e) 1.0-7.5% of a stabilizing agent selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol, pH between about 5.8-7.0

6    Der Unterschied zur erteilten Fassung des Verfügungspatents besteht darin, dass in der erteilten Fassung die Formulierung lediglich zur intravitrealen Verabreichung geeignet sein musste.

7    Die Patentinhaberin ist weiterhin Inhaberin des nach Verlängerung am 23. November 2025 auslaufenden ergänzenden Schutzzertifikats DE 12 2013 000 041.4 für die Verwendung des Wirkstoffs Aflibercept für eine ophthalmische Anwendung. Das Präparat wird vom ████Konzern unter dem Handelsnamen ████vertrieben.

8    Die Verfügungsklägerinnen gehören zum ████-Konzern und sind mit der Entwicklung und Vermarktung von Medikamenten unter anderem gegen Augenerkrankungen befasst. Zwischen ████nd der Verfügungsklägerin zu 1) wurde am 18. Oktober 2006 (Anlage AST 11a) ein Lizenzvertrag bezüglich des Verfügungspatents geschlossen. Die Verfügungsklägerin zu 2) leitet ihre Berechtigung am Verfügungspatent aus dem zwischen ihr und der Verfügungsklägerin zu 1) im Dezember 2012 / Januar 2013 geschlossenen Lizenzvertrag (Anlage AST 12) her.

9    Die Verfügungsbeklagte zu 1) befasst sich mit der Herstellung von Biosimilar-Arzneimitteln unter anderem im Bereich der Augenheilkunde. Sie hat das Biosimilar ████ entwickelt, die arzneimittelrechtliche Zulassung für dieses Biosimilar beantragt und auch erteilt bekommen. Die Verfügungsbeklagte zu 2) ist mit der Herstellung und dem Vertrieb von Arzneimitteln befasst und ist Lizenznehmerin und Inhaberin der weltweiten Vermarktungsrechte für ████.

10    Das Biosimilar ███████ hat folgende Zusammensetzung (siehe Anlage AST 1):

| Name of ingredient | Quantity |
|---|---|
| Aflibercept | 40 mg/mL |
| L-histidine | 0.917 mg/mL |
| L-Histidine HCL monohydrate | 0.857 mg/mL |
| Sodium chloride | 40 mM (2.34 mg/mL) |
| Sucrose | 50 mg/mL (5% (w/v)) |
| Polysorbate 20 | 0.3 mg/mL (0.03% (w/v)) |

11    Mit Schreiben vom 18. Juni 2025 (Anlage AST 1) informierten die Verfügungsbe-
klagten die Verfügungsklägerin zu 1) darüber, dass beabsichtigt sei, das Biosimilar
███████ nach Ablauf des ergänzenden Schutzzertifikats „in major parts of Europe,
including Germany" zu vermarkten. In dem Schreiben forderten die Verfügungsbe-
klagten die Verfügungsklägerin zu 1) zudem auf, zu erklären, dass das Biosimilar
das Verfügungspatent nicht verletze.

12    Hinsichtlich des Verfügungspatents und einer etwaigen Verletzung durch das Bio-
similar ███████ werden vor der Kammer – teilweise mit unterschiedlichen Par-
teien – weitere Verfahren geführt. In dem Verfügungsverfahren 7 O 9382/25 be-
gehrt die Verfügungsklägerin zu 2) von den hiesigen Verfügungsbeklagten sowie
von der ███████ (die den Vertrieb des Biosimilars in Deutschland vor-
nehmen soll) Unterlassung für das Gebiet der Bundesrepublik Deutschland. In
dem Hauptsacheverfahren 7 O 16055/24 begehrt die Patentinhaberin ███████
███████ . mit der Widerklage von den hiesigen Verfügungsbeklagten,
der ███████ und der ███████ Unter-
lassung in der Bundesrepublik Deutschland und in weiteren Staaten der Europäi-
schen Union und macht Folgeansprüche geltend. Das Hauptsacheverfahren be-
gann als negative Feststellungsklage. Zuletzt machten dort die vier mit der Wider-
klage in Anspruch genommenen Parteien die Feststellung der Nichtverletzung des
Verfügungspatents gegen ███████ die hiesigen Ver-
fügungsklägerinnen geltend.

13      Neben den genannten Verfahren sind in weiteren Staaten weitere Rechtsstreitig-keiten anhängig bzw. wurden bereits entschieden. Aus diesem Grund betreffen die Verfahren 7 O 9382/25 und 7 O 16055/24 teilweise unterschiedliche Staaten. Konkret wird betreffend Italien, Frankreich und Belgien im Hauptsacheverfahren kein Unterlassungsanspruch geltend gemacht.

14      Nach der mündlichen Verhandlung erging durch den UK High Court die Entscheidung [2025] EWHC 2527 (Pat), bei der die Verfügungsbeklagten gegen die Verfügungsklägerin zu 1) und die Patentinhaberin auf Feststellung geklagt haben, dass das Biosimilar ███████ das Verfügungspatent in einer auf den Unteranspruch 5 beschränkten Fassung nicht verletze. Nach den Ausführungen des UK High Court sei bereits die erste Äquivalenzfrage nach dem dort geltenden Prüfungsschema zu verneinen.

15      **Die Verfügungsklägerin ist der Ansicht**, dass die angegriffene Ausführungsform eine Verletzung des Verfügungspatents mit äquivalenten Mitteln darstelle, weil die Ersetzung des im Patentanspruch angegebenen Puffers Natriumphosphat durch Histidin gleichwirkend, auffindbar und gleichwertig sei. Diese Beurteilung müsse in allen in Anspruch genommenen Staaten gleich ausfallen.

16      Das Landgericht München I sei für die europaweite Entscheidung zuständig, weil die Verfügungsbeklagten ihren Sitz im Zuständigkeitsbereich des Landgerichts München I haben.

17      Hinsichtlich der Staaten Estland, Island, Lettland, Liechtenstein, Malta, Monaco, der Schweiz und der Türkei haben die Verfügungsklägerinnen den Antrag zurück-genommen.

18      **Die Verfügungsklägerinnen beantragen zuletzt**:

        den Verfügungsbeklagten unter Androhung eines Ordnungsgeldes bis zu EUR 250.000,00 für jeden Fall der Zuwiderhandlung, ersatzweise Ordnungshaft, oder Ordnungshaft bis zu sechs Monaten, zu vollstrecken an dem jeweiligen gesetzlichen Vertreter, im Wiederholungsfall Ordnungshaft bis zu insgesamt zwei Jahren, zu untersagen,

        eine ophthalmische Formulierung eines vaskulären Endothelzellen-Wachs-tumsfaktor (VEGF)-Antagonisten zur Verwendung zur intravitrealen Verabrei-chung, umfassend:

a)  1-100 mg/ml eines VEGF-Antagonisten, bestehend aus Aminosäuren 27-457 von SEQ ID NO: 4, welcher an AsnResten 62, 94, 149, 222 und 308 glycosyliert ist;

b)  0,01-5% eines oder mehrere organische(n) CoLösungsmittel(s), welche(s) eins oder mehrere von Polysorbat, Polyethylenglycol (PEG) und Propylenglycol ist;

c)  30-150 mM eines Tonizitätsmittels, welches aus Natriumchlorid oder Kaliumchlorid ausgewählt ist;

d)  5-40 mM Histidinpuffer; und

e)  1,0-7,5% eines Stabilisierungsmittels, welches aus der Gruppe, bestehend aus Saccharose, Sorbit, Glycerin, Trehalose und Mannit, ausgewählt ist,

pH zwischen etwa 5,8-7,0

in Österreich, Belgien, Bulgarien, Dänemark, Finnland, Frankreich, Griechenland, Irland, Italien, Litauen, Luxemburg, Niederlande, Polen, Portugal, Rumänien, Slowakei, Slowenien, Spanien, Schweden, Tschechische Republik, Ungarn und Zypern

anzubieten, in Verkehr zu bringen, zu gebrauchen oder zu den genannten Zwecken entweder einzuführen oder zu besitzen.

(äquivalente Verletzung von Anspruch 1 des EP 2 364 691 B1)

**Die Verfügungsbeklagten beantragen,**

den Antrag zurückzuweisen.

19    **Die Verfügungsbeklagten sind der Ansicht**, dass die Verfügungsklägerinnen nicht aktivlegitimiert seien, da die Verfügungsklägerin zu 1) keine exklusive Lizenz von der Patentinhaberin erhalten und deshalb keine Berechtigung gehabt habe, der Verfügungsklägerin zu 2) wiederum eine exklusive Lizenz zu erteilen. Sollte die Verfügungsklägerin zu 1) allerdings der Verfügungsbeklagten zu 2) wirksam eine exklusive Lizenz erteilt haben, sei die Verfügungsklägerin zu 1) nicht aktivlegitimiert.

20    Die angegriffene Ausführungsform verletze das Verfügungspatent nicht, weil das Biosimilar ███████ keinen Natriumphosphat-Puffer enthalte. Die verwendete

Pufferlösung Histidin stelle keine äquivalente Patentverletzung dar, da sie weder auffindbar noch gleichwertig sei. Das Verfügungspatent habe sich bewusst für die im Anspruch genannte Zusammensetzung entschieden; eine Abweichung sei nicht vorgesehen. Dies ergäbe sich auch aus den Äußerungen der Patentanmelderin im Erteilungsverfahren. Falls eine Auffindbarkeit bejaht werden sollte, könnten sich die Verfügungsbeklagten zumindest auf den „Formstein"-Einwand berufen.

21    **Im Übrigen** wird auf die Schriftsätze der Parteien nebst Anlagen sowie das Proto-koll der mündlichen Verhandlung vom 25. September 2025 verwiesen.

22    Die Entscheidung wurde im unmittelbaren Anschluss an die Hauptverhandlung am 25. September 2025 verkündet. Bei der Abfassung des Tenors erfolgte ein offen-sichtliches Schreibversehen, weil die teilweise Klagerücknahme hinsichtlich der Staaten Estland, Island, Lettland, Liechtenstein, Malta, Monaco, der Schweiz und der Türkei nicht berücksichtigt worden ist. Dieser Fehler wurde mit Beschluss vom 8. Oktober 2025 korrigiert, weil ein offensichtlicher Fehler vorlag. Die Offensicht-lichkeit ergab sich aus der Kostenentscheidung, weil die Klagepartei – bis auf den Teil der Klagerücknahme – vollständig obsiegt hat. Der Tenor dieser Entscheidung beinhaltet den Berichtigungsbeschluss vom 8. Oktober 2025.

# Entscheidungsgründe

23    Der zulässige Antrag auf Erlass einer einstweiligen Verfügung ist im vollen Umfang begründet.

24    Das Biosimilar ███████ macht in allen 22 Ländern (*Österreich, Belgien, Bulgarien, Dänemark, Finnland, Frankreich, Griechenland, Irland, Italien, Litauen, Luxem-burg, Niederlande, Polen, Portugal, Rumänien, Slowakei, Slowenien, Spanien, Schweden, Tschechische Republik, Ungarn und Zypern*), die noch Gegenstand dieses einstweiligen Verfügungsverfahrens sind, von der Lehre des Anspruchs 1 des Verfügungspatents in äquivalenter Weise Gebrauch. Denn aufgrund der Ver-ankerung der äquivalenten Patentverletzung in Art. 2 des Protokolls zu Art. 69 EPÜ ist davon auszugehen, dass in allen Staaten bezüglich der Voraussetzungen

für die Annahme einer äquivalenten Patentverletzung die gleichen Maßstäbe gelten. Deshalb hat die Bewertung, dass nach deutschen Recht eine Patentverletzung mit äquivalenten Mitteln vorliegt, einen Leitcharakter für die weiteren EPÜ-Staaten. Es ist den Verfügungsbeklagten nicht gelungen darzulegen, dass in einem der genannten Staaten ein abweichender Maßstab Geltung hat.

25    Soweit der UK High Court in Bezug auf das Biosimilar ███████ zu einer anderen Einschätzung gelangt ist, liegt dies nach den dortigen Ausführungen auch an der Tatsache, dass dort nicht Anspruch 1 Gegenstand des Verfahrens war, sondern eine auf den unabhängigen Nebenanspruch 5 beschränkte Fassung.

26    Zudem ist zu berücksichtigen, dass in Patentverletzungsverfahren der Beibringungsgrundsatz gilt. Insofern gibt es erhebliche Zweifel, ob der im vorliegenden Verfahren zur Entscheidung gebrachte Sachverhalt den gleichen Inhalt hat, wie er in dem Verfahren vor dem UK High Court nach der Anhörung von mehreren Sachverständigen zur Entscheidung stand. Möglicherweise haben die Verfügungsbeklagten deshalb auch im vorliegenden Verfahren die Frage der Gleichwirkung – die nach der Entscheidung des UK High Court zu verneinen sei – dahingestellt sein lassen.

27    Das Landgericht München I ist für den Erlass der einstweiligen Verfügung international und örtlich zuständig (A.). Für grenzüberschreitende Patentverletzungsklagen ist streng zwischen Fragen des Prozess- und des materiellen Rechts zu unterscheiden, wobei insbesondere formelle Vorschriften anderer Staaten in keinem Fall dazu dienen sollen, Patentverletzungen Vortrieb zu leisten (B. I.). Die Verfügungsklägerinnen sind aktivlegitimiert (B. II.) und haben gegen die Verfügungsbeklagten aus dem Verfügungspatent einen Verfügungsanspruch auf Unterlassung aufgrund äquivalenter Patentverletzung, §§ 940, 936, 920 f. ZPO in Verbindung mit den jeweiligen Vorschriften bezüglich des Unterlassungsanspruchs in den geltend gemachten Ländern (B. III.). Der Verfügungsgrund ist gegeben, da eine zeitliche Dringlichkeit – die sich als Verfahrensvorschrift nach dem deutschen Recht richtet – glaubhaft gemacht ist (C. I.) und die zu treffende Interessenabwägung – die sich ebenfalls nach deutschem Recht richtet – ebenfalls zugunsten der Verfügungsklägerin streitet (C. II.). Daraus ergibt sich die Kostenfolge (D.).

# A.

28     Der Antrag auf Erlass der einstweiligen Verfügung ist zulässig. Insbesondere ist das Landgericht München I international und örtlich zuständig, da beide Verfügungsbeklagten ihren Sitz im Zuständigkeitsbereich des Landgerichts München I haben (dazu I.). Deshalb kommt es vorliegend nicht darauf an, dass in grenzüberschreitenden Sachverhalten der deliktische Gerichtsstand das Wesen der Patentverletzungsklagen derart prägt, dass im Falle einer grenzüberschreitenden Patentverletzungsklage alle zwölf in der Bundesrepublik Deutschland für Patentverletzungsklagen zuständigen Gerichte angerufen werden können (dazu II.). Am Rechtsbestand des Verfügungspatents besteht auch im Hinblick auf die geltend gemachten Staaten keine Bedenken. Die Entscheidung des Bundespatentgerichts hat insofern auch für andere Staaten eine starke Indizwirkung, die einem Leuchtturmcharakter gleichkommt (dazu III.).

## I.     Zuständigkeit des Landgerichts München I

29     Beide Verfügungsbeklagte haben ihren Sitz im Zuständigkeitsbereich des Landgerichts München I. Damit sind die internationale und die örtliche Zuständigkeit gegeben.

30     Die internationale Zuständigkeit ergibt sich aus Art. 4 Abs. 1 der Verordnung Nr. 1215/2012 des Europäischen Parlaments und des Rates über die gerichtliche Zuständigkeit und die Anerkennung und Vollstreckung von Entscheidungen in Zivil- und Handelssachen (Brüssel-Ia-VO). Danach sind Personen, die ihren Wohnsitz im Hoheitsgebiet eines Mitgliedstaats haben, ohne Rücksicht auf ihre Staatsangehörigkeit vor den Gerichten dieses Mitgliedstaats zu verklagen. Dies wird durch Art. 63 Abs. 1 Brüssel-Ia-VO konkretisiert. Danach haben Gesellschaften und juristische Personen ihren Wohnsitz an dem Ort, an dem sich entweder ihr satzungsmäßiger Sitz oder ihre Hauptverwaltung oder ihre Hauptniederlassung befindet.

31     Bezüglich Patentverletzungsklagen bestand stets Einvernehmen dahingehend, dass die Möglichkeit besteht, dass Beklagte auch grenzüberschreitend bei ihrem Wohnsitzgericht in Anspruch genommen werden können. Allerdings ging der Gerichtshof der Europäischen Union vormals davon aus, dass für Verfahren des

Rechtsbestands eine ausschließliche Zuständigkeit der nationalen Gerichte besteht, auch wenn die Frage des Rechtsbestands nur einredeweise aufgeworfen wird (EuGH, GRUR 2007, 49 – GAT/ LuK). Im Ergebnis musste das Verfahren bei internationalen Sachverhalten deshalb immer ausgesetzt werden, sobald die Nichtigkeitseinrede erhoben wurde. Tatsächlich hat dies dazu geführt, dass grenzüberschreitende Verfahren zumindest in der Bundesrepublik Deutschland nicht geführt worden sind.

32   Nach neuem Verständnis des Gerichtshofs der Europäischen Union (EuGH, GRUR 2025, 568 – BSH Hausgeräte) bleibt das angerufene Verletzungsgericht zuständig, auch wenn der Nichtigkeitseinwand – in welcher Form auch immer – erhoben wird. Nach dem Verständnis der Kammer steht es im Ermessen des angerufenen Verletzungsgerichts zu entscheiden, wie es mit einem solchen Einwand umgeht. Dabei kommt sowohl die Aussetzung in Bezug auf die Durchführung eines Nichtigkeitsverfahrens in einem anderen Staat als auch die Entscheidung in der Sache in Betracht, wenn das angerufene Verletzungsgericht vom gesicherten Rechtsbestand des Klagepatents ausgeht.

33   Da der Sitz der Verfügungsbeklagten im Zuständigkeitsbereich des Landgerichts München I liegt, ist die örtliche Zuständigkeit unstreitig gegeben, § 17 ZPO.

## II. Örtliche Zuständigkeit bei Beklagten mit Sitz außerhalb Bezirks des angerufenen Gerichts

34   Nach Ansicht der Kammer ist die örtliche Zuständigkeit bei grenzüberschreitenden Patentverletzungsverfahren auch gegenüber Beklagten gegeben, die ihren allgemeinen Gerichtsstand nicht im Zuständigkeitsbereich des angerufenen Gerichts, sondern an einem beliebigen Ort in der Bundesrepublik Deutschland haben. Denn das Patentverletzungsverfahren ist durch den „fliegenden", deliktischen Gerichtsstand geprägt. Dieser findet auch bei grenzüberschreitenden Sachverhalten Anwendung, da die Rechtsstellung von Patentinhabern ansonsten vom allgemeinen Gerichtsstand des Verletzers abhängig wäre. Denn in tatsächlicher Hinsicht sind nur wenige Gerichte erfahren, komplexe Patentverletzungsverfahren zu verhandeln. Ein solches Verständnis würde dem hinter der Konzentrationsmaxime des § 143 Abs. 2 PatG stehenden Gedanken und dem von der Richtlinie 2004/48/EG beabsichtigten effektiven Schutz von Rechten des geistigen Eigentums nicht gerecht.

Dazu im Einzelnen:

35    1.        Art. 4 Abs. 1 Brüssel-Ia-VO regelt nur die internationale Zuständigkeit. So-
bald diese feststeht, ist in einem zweiten Schritt zu klären, welches der nationalen
(deutschen) Gericht für Patentverletzungsklagen örtlich zuständig ist. Dabei wird
keine Unterscheidung getroffen, ob die vorgetragene Patentverletzung im Inland
oder auf dem Gebiet anderer EU-Mitgliedsstaaten begangen worden sein soll. In
beiden Fällen richtet sich die örtliche Zuständigkeit allein nach deutschem Recht.

36    2.        Für Patentverletzungsverfahren gilt gemäß § 143 Abs. 2 PatG eine Kon-
zentrationsmaxime. Die Landesregierungen wurden ermächtigt, durch Rechtsver-
ordnungen die Patentstreitsachen zu konzentrieren. Diese Vorschrift basiert auf
dem bis zur Schaffung der Vorgängervorschrift im Jahr 1936 bestehenden Miss-
stand, „dass Gerichte, die nur selten mit derartigen Prozessen befasst sind, sich
infolge der geringen Berührung mit dem besonders schwierigen Gebiet des Pa-
tentrechts und mit Fragen der Technik verschiedentlich nicht in der Lage gezeigt
haben, die Verfahren mit der gebotenen Beschleunigung zu fördern und die Ent-
scheidungen mit der nötigen Sachkunde zu treffen" (so die damalige amtliche Be-
gründung, siehe BeckOK Patentrecht/Kircher, 37. Ed., § 143 Rn 17).

37    Tatsächlich wurde von den eingeräumten Möglichkeiten Gebrauch gemacht. Der-
zeit sind in der Bundesrepublik Deutschland nur 12 Landgerichte zuständig über
Patentverletzungsverfahren zu entscheiden. Dies sind:

- München I
- Nürnberg
- Mannheim
- Frankfurt am Main
- Saarbrücken
- Erfurt
- Leipzig
- Magdeburg
- Düsseldorf
- Braunschweig
- Berlin
- Hamburg

38    3.        Bei Verletzungsklagen ohne Auslandsbezug wird in aller Regel neben dem
allgemeinen Gerichtsstand juristischer Personen nach § 17 ZPO auch eine delikti-
sche Zuständigkeit nach § 32 ZPO gegeben sein. Tatsächlich hat dies dazu ge-
führt, dass sich nur an wenigen Gerichten spezialisiert Patentstreitkammern aus-
gebildet    haben.    Auch    die    Fachanwaltschaft    hat    sich    an    wenigen

Gerichtsstandorten spezialisiert. Insgesamt kann davon ausgegangen werden, dass die <u>Durchsetzung von Patentrechten durch den fliegenden – deliktischen – Gerichtsstand geprägt</u> ist.

39    Bei reinen Auslandssachverhalten besteht im Inland kein deliktischer Gerichtsstand. Die Zuständigkeit deutscher Gerichte ist in derartigen Konstellationen nur dann gegeben, wenn der Beklagte seinen allgemeinen Gerichtsstand im Zuständigkeitsbereich des jeweiligen Gerichts hat. Die dahinterstehende – sehr allgemeine, auch §§ 12, 17 ZPO, 17 Abs. 2 GVG zugrundeliegende – Überlegung ist, dass es einer Partei immer auch möglich sein muss, eine andere Partei dort zu verklagen, wo diese Partei beheimatet ist, entweder weil der Weg in eine andere Jurisdiktion beschwerlich ist oder weil sich so – wie im vorliegenden Verfahren – eine Konzentration herbeiführen lässt.

40    Ausgehend von diesen Überlegungen erscheint es problematisch, wenn man die Inhaber internationaler Patente darauf verwiesen, dass sich die Zuständigkeit streng nach den einzelnen Bundesländern (und in Bayern sogar nach dem OLG-Bezirk) richten soll. Denn in einem solchen Fall müssten gerade in besonders komplizierten, grenzüberschreitenden Fällen Gerichte angerufen werden, die keine auf Patentverletzungsverfahren spezialisierten Kammern vorhalten. Dies entspricht insbesondere auch nicht der Intention des historischen Gesetzgebers, wie sich aus der oben dargestellten Gesetzesbegründung ergibt.

41    Zur Überzeugung der Kammer entsteht durch die Teilnahme an einem grenzüberschreitenden Handel mit Dienstleistungen und Waren ein tatsächlicher Sachverhalt, der es rechtfertigt, für Patentverletzungsklagen gemäß § 17 Abs. 1 Satz 2 ZPO einen vom herkömmlichen Verständnis des Verwaltungssitzes abweichenden allgemeinen Gerichtsstand anzunehmen. Deshalb können in solchen Konstellationen Beklagte, die ihren allgemeinen Gerichtsstand im Gebiet der Bundesrepublik Deutschland haben, an allen für Patentverletzungsklagen zuständigen Landgerichten verklagt werden. Dieses Verständnis steht im Einklang mit dem hinter der Richtlinie 2004/48/EG stehenden Bedürfnis nach einer effektiven Durchsetzung von Rechten des geistigen Eigentums.

42    Es ist nicht ersichtlich, dass Patentinhabern durch dieses Verständnis Nachteile entstehen können, weil Entscheidungen betreffend die örtliche Zuständigkeit mit Rechtsmitteln nicht angreifbar sind. Auch die in Anspruch genommenen Parteien profitieren davon, weil die rechtliche Beurteilung durch Gerichte erfolgen kann, die mit patentrechtlichen Fragen hinreichend befasst sind. Zudem gibt es kein Recht

potenzieller Patentverletzer darauf, in Gebieten tätig werden zu können, wo Patente nicht effektiv durchgesetzt werden können.

### III.    Gesicherter Rechtsbestand des Verfügungspatents als nach dem nationalen Recht zu beurteilende Frage

43    Die Frage, ob ein Verfügungspatent rechtsbeständig ist, wird nach deutschem Verständnis im Rahmen des Vorliegens eines Verfügungsgrundes beurteilt. Anderes gilt auch dann nicht, wenn grenzüberschreitende Sachverhalte zu entscheiden sind, da es sich um eine prozessuale Frage handelt, die sich nach dem Recht des Staates des angerufenen Gerichts richtet.

44    Gemäß der Entscheidung des EuGH (GRUR 2025, 568 – BSH Hausgeräte) ist insbesondere nicht erforderlich, dass das anhängige Verletzungsverfahren in Bezug auf ein in einem anderen Mitgliedsstaat geführtes Nichtigkeitsverfahren oder auf das Erheben des Nichtigkeitseinwands ausgesetzt wird.

45    Vielmehr wird es darauf ankommen, <u>ob das mit dem Verletzungsverfahren befasste Gericht den Rechtsbestand der jeweils geltend gemachten Europäischen Patente als hinreichend gesichert ansieht.</u> Nach Ansicht der Kammer kann dies hinsichtlich der im vorliegenden Verfahren geltend gemachten 22 nationalen Europäischen Patente (*Österreich, Belgien, Bulgarien, Dänemark, Finnland, Frankreich, Griechenland, Irland, Italien, Litauen, Luxemburg, Niederlande, Polen, Portugal, Rumänien, Slowakei, Slowenien, Spanien, Schweden, Tschechische Republik, Ungarn und Zypern*) unterstellt werden, weil es eine erstinstanzliche Entscheidung des Bundespatentgerichts gibt, die das Verfügungspatent in einer eingeschränkten Fassung aufrechterhalten hat.

46    Der Entscheidung des Bundespatentgerichts kommt eine starke Indizwirkung zu: Es ist davon auszugehen, dass die entsprechenden Patente in den weiteren Staaten in gleicher Form rechtsbeständig sein werden. Dabei kommt es nicht darauf an, ob die erteilten Ansprüche in den anderen Staaten bereits auf die mit der Klage geltend gemachten Fassung beschränkt sind, oder ob dies noch nicht erfolgt ist. Denn die eingeschränkten Ansprüche sind als Minus in den erteilten Ansprüchen enthalten.

**B.**

47    Die Verfügungsklägerinnen haben einen <u>Verfügungsanspruch</u> glaubhaft gemacht, §§ 940, 936, 920 f. ZPO.

## I.    Bestimmung des anwendbaren Rechts

48    Bei grenzüberschreitenden Verfahren ist hinsichtlich des anwendbaren Rechts zwischen verfahrensrechtlichen und materiell-rechtlichen Fragen zu unterscheiden.

### 1.    <u>Grundsätzliche Differenzierung zwischen prozessualen und materiell-rechtlichen Fragen</u>

49    Verfahrensrechtliche Fragen unterfallen dem Recht des Gerichtsortes („lex fori"). Materiell-rechtliche Fragen richten sich nach dem Recht des Landes in dem die Ansprüche geltend gemacht werden („Schutzlandprinzip"). Ausgehend von diesem Grundsatz gilt es zu unterscheiden, wann genau eine Vorschrift als materiell-rechtliche Vorschrift zu qualifizieren ist. Denn nur materiell-rechtliche Vorschriften unterfallen nicht dem deutschen Recht.

50    Ausgangspunkt ist das Verständnis (unter Berücksichtigung der Grundwertungen des Europäischen Patentübereinkommens und der Durchsetzungsrichtlinie 2004/48/EG), dass Verfahrensvorschriften in keinem Land dazu dienen sollen, Patentverletzungen den Weg zu ebnen und Patentinhabern die Verfahrensführung in einem grenzüberschreitenden Sachverhalt zu erschweren.

51    Vorschriften, die eine technische oder formelle Handhabung in einem anderen Land regeln, kommt keine Schutzfunktion in Hinblick auf das Ermöglichen von Patentverletzungen zu. Mit anderen Worten: Die Beklagtenpartei kann sich beispielsweise nicht darauf berufen, dass ein Lizenzvertrag nicht in ein Register eingetragen ist, oder dass es in anderen Ländern noch nicht zu einer Beschränkung des erteilten Patentanspruchs gekommen ist, solange feststeht, dass das dahinterstehende materielle Recht bei der Klagepartei vorhanden ist. Diese Vorschriften sind stets dem Verfahrensrecht zuzuordnen und richten sich mithin im vorliegenden Fall nach deutschem Recht. So kann sichergestellt werden, dass Inhaber von Patenten in mehreren Staaten nicht durch eine kleinteilige Betrachtung von Formvorschriften von ihrer Rechtsdurchsetzung abgehalten werden.

52      Sollte dies dazu führe, dass eine Patentverletzung in bestimmten Staaten nur dann verfolgbar ist, wenn der Verletzer seinen allgemeinen Gerichtsstand in der Bundesrepublik Deutschland hat, mag dies faktisch zutreffend sein. Es ist aber nicht ersichtlich, dass in Deutschland ansässige Patentverletzer einen Anspruch darauf haben könnten, dass sie unter ein ähnlich niedriges Schutzniveau gestellt werden, wie in anderen Staaten ansässige Patentverletzer. Einen Anspruch auf Gleichheit im Unrecht gibt es nicht.

53      Für die Abgrenzung zwischen verfahrensrechtlichen und materiellrechtlichen Fragen sei als Beispiel die Frage des Schadensersatzanspruchs – der vorliegend nicht einschlägig ist – herangezogen. Als materiellrechtlich anzusehen ist die Frage, unter welchen Umständen ein Schadensersatzanspruch besteht und wie hoch ein solcher Schadensersatzanspruch tatsächlich ausfällt. Als verfahrensrechtliche Frage ist es aber anzusehen, wie ein solcher Anspruch geltend gemacht werden kann. Selbst wenn in einem anderen Staat die Geltendmachung von Schadensersatzansprüchen in einer Art und Weise erfolgt, dass eine Klage erhoben wird und die genaue Festlegung des Schadensersatzbetrags durch Gutachter erfolgt, kann in einem deutschen Verfahren die Feststellung beantragt werden, dass eine Schadensersatzpflicht in Bezug auf das andere Land besteht, so dass damit eine Bindung dem Grunde nach herbeigeführt wird. Denn die Durchsetzung des Schadensersatzanspruchs ist eine Frage des Verfahrensrechts. Deshalb ist es auch konsequent, wenn man in einem etwaig folgenden Höheverfahren auf die in Deutschland vorherrschende prozessuale Handhabung zurückgreift.

54      Diskussionswürdig ist in diesem Zusammenhang die Frage der <u>Einordnung des Auskunftsanspruchs</u>. Obwohl es Gründe gibt, den Auskunftsanspruch dem materiellen Recht zuzuordnen, vertritt die Kammer die Auffassung, dass der Auskunftsanspruch so stark verfahrensrechtlich dominiert ist, dass er als verfahrensrechtlicher Anspruch nach deutschem Recht zu behandeln ist. Denn ansonsten wäre es der Klagepartei nicht möglich den – ausländischen – Schadensersatzanspruch in einem Folgeverfahren vor einem deutschen Gericht durchzusetzen.

55      Damit sind zwei Aspekte relevant: Einerseits darf nichts zugesprochen werden, was in einem anderen Staat materiellrechtlich nicht vorgesehen ist. Andererseits darf das, was die ausländische Rechtsordnung vorsieht, in effektiver Weise zugesprochen werden. Diese Grundwertung ist auf andere Fragestellungen entsprechend zu übertragen.

## 2.    Relevanz der Unterscheidung im vorliegenden Fall

56    Basierend auf diesen Vorgaben sind nachfolgend einige der in diesem Verfahren diskutierten Fragen in vorgezogener und konzentrierter Weise zu beantworten:

### a.    Eintragung des Lizenznehmers in Register

57    Soweit es um die zwischen den Parteien unstreitige Tatsache geht, dass die Geltendmachung eines Patents durch einen (exklusiven) Lizenznehmer in einigen Ländern (u.a. Spanien, Frankreich) die vorherige Eintragung des Lizenznehmers im jeweiligen nationalen Patentregister erfordere, stellt dieses Erfordernis eine <u>verfahrensrechtliche Regelung</u> dar, die der Geltendmachung von Ansprüchen nicht entgegensteht. Denn es handelt sich um eine rein administrative Voraussetzung, damit privatrechtlich begründete Rechte durchgesetzt werden können. Das stellt entgegen der Auffassung der Verfügungsbeklagten keine materiell-rechtliche Voraussetzung im Rahmen der Aktivlegitimation dar, sondern eine verfahrensrechtliche Regelung.

58    Das Eintragungserfordernis dient nicht dem Schutz eines in Anspruch genommenen möglichen Patentverletzers. Es ist vielmehr ausreichend, wenn der Lizenzinhaber materiell-rechtlich berechtigt ist, das Patent geltend zu machen.

59    Soweit die Parteien übereinstimmend erklärt haben, dass es in den Niederlanden für exklusive Lizenznehmer nicht möglich sei, in eigenem Namen zu klagen, wurde diesbezüglich von der Klagepartei eine Prozessstandschaft vorgelegt (AST31_NL; Anlage 1).

### b.    Geltendmachung einer eingeschränkten Fassung des Patentanspruchs

60    Soweit die Verfügungsbeklagten die Auffassung vertreten, es sei in einigen Ländern (u.a. Belgien, Spanien, Frankreich) unzulässig, die vom Bundespatentgericht eingeschränkte Fassung des Verfügungspatents geltend zu machen, bevor diese eingeschränkte Fassung in das Patentregister des jeweiligen Landes eingetragen wurde, stellt auch dieses Erfordernis eine verfahrensrechtliche Regelung dar. Es ist für die jeweiligen Länder davon auszugehen, dass die <u>eingeschränkte Fassung als „Minus" in der erteilten Fassung des Verfügungspatents enthalten</u> ist. Das gilt für sämtliche der geltend gemachten Länder.

c.     Verfügungsgrund (insb. Dringlichkeit)

61    Das Vorliegen eines Verfügungsgrund stellt eine <u>verfahrensrechtliche Regelung</u> dar.

62    Nach allgemeinem Verständnis setzt der Verfügungsgrund voraus, dass eine Dringlichkeit im zeitlichen Sinne gegeben ist und zudem eine Interessensabwägung zugunsten der antragstellenden Partei ausfällt. In der Sache geht es um die Frage, ob ein gegebener materieller Anspruch (Verfügungsgrund) in besonderer Weise (im Wege des einstweiligen Rechtsschutzes) ausgesprochen werden kann. Mit anderen Worten geht es allein darum, ob die antragstellende Partei darauf verwiesen werden muss, abzuwarten, dass ein – teilweise sehr lange dauerndes – Hauptsacheverfahren durchgeführt wird. Weil die Art und Weise, in welcher Verfahrensart das Verletzungsverfahren geführt werden kann, das Vorliegen des eigentlichen (materiellrechtlichen) Anspruchs nicht berührt, streitet nichts dagegen, den <u>Verfügungsgrund als rein verfahrensrechtliche Regelung</u> anzusehen.

63    Damit ist es ausreichend, dass Dringlichkeit und Interessensabwägung zugunsten der Patentinhaberin in einem Verfahren gegen eine in der Bundesrepublik Deutschland ansässige Partei nach deutschem Verständnis vorliegen, um gegen diese Partei wegen gleichgelagerter Fälle europaweit vorgehen zu können.

64    Die Kammer verkennt nicht, dass diskutiert wird, ob der Verfügungsgrund eine Sachurteils- oder eine Prozessvoraussetzung ist. Dabei wird diese Frage für das Gebiet des geistigen Eigentums nicht einheitlich beantwortet (vgl. Cepl/Voß, 3. Aufl., § 940 Rn 66). Das OLG Düsseldorf behandelt den Verfügungsgrund jedenfalls für den Bereich des Patentrechts (ohne Begründung) als Sachurteilsvoraussetzung (siehe Urteil vom 04.08.2011, I-2 U 23/11, GRUR-RR 2011, 350, 353 – Pramipexol), während das OLG München ihn jedenfalls für den Bereich des Lauterkeitsrechts (ebenfalls ohne Begründung) als Prozessvoraussetzung betrachtet (OLG München, 29 U 1661/19, MMR 2020, 35 Rn 4).

65    Selbst wenn diese Diskussion für die Einordnung als verfahrensrechtliche Frage eine Bedeutung haben sollte, ist der Ansicht des OLG München auch in Hinblick auf patentrechtliche Sachverhalte zu folgen. Es ist nicht ersichtlich, warum dem Verfügungsgrund eine andere Bedeutung zugemessen werden soll als eine zeitliche und inhaltliche Begrenzung für die Beantragung einstweiligen Rechtsschutzes. Dies wird deutlich, wenn man die Folgen betrachtet: ein Patentinhaber hat einen Anspruch darauf, dass sein Patent nicht verletzt wird. Wenn er die

Dringlichkeitsfrist versäumt, kann er den Unterlassungsanspruch nicht mehr geltend machen, bis ein Gericht einen Termin für das Hauptsacheverfahren findet. Er wird insofern auf die Durchsetzung eines etwaigen Schadensersatzanspruchs beschränkt. Dies kann aber nicht bedeuten, dass ein Patentverletzer in einer solchen Konstellation einen (materiellrechtlichen) Anspruch darauf hat, sein patentverletzendes Verhalten weiter fortzusetzen, um dann möglicherweise – in ferner Zukunft – irgendwann Schadensersatzansprüchen ausgesetzt zu sein.

66    In jedem Fall wäre nach einer Entscheidung des Bundespatentgerichts im Nichtigkeitsverfahren betreffend den deutschen Teil eines Europäischen Patents auch Dringlichkeit hinsichtlich der anderen nationalen Teile des Europäischen Patents gegeben. Das folgt daraus, dass die Dringlichkeitsfrist mit jeder bestätigenden Entscheidung über den Rechtsbestand neu beginnt. Diese Wirkung tritt auch für die anderen nationalen Teile des Europäischen Patents ein, da aufgrund der anerkannten Expertise des auch mit technischen Richtern besetzten Bundespatentgerichts seinen Entscheidungen eine europaweite Signalwirkung zukommt („Leuchtturmcharakter")

## II.    Aktivlegitimation der Verfügungsklägerinnen

67    Die Verfügungsklägerinnen sind aktivlegimitiert.

68    Die Verfügungsklägerin zu 1) als exklusive Lizenznehmerin und die Verfügungsklägrin zu 2) als exklusive Unterlizenznehmerin sind beide jeweils zur Klage aus dem Verfügungspatent im eigenen Namen berechtigt.

69    Die Verfügungsbeklagten haben in Frage gestellt, ob der Lizenzvertrag zwischen der Patentinhaberin und der Verfügungsklägerin zu 1) vom 18. Oktober 2006 überhaupt eine exklusive Lizenz einräumt und zudem in Frage gestellt, ob ein exklusiver Lizenznehmer seine Klagebefugnis behält, wenn er selbst eine exklusive Lizenz weitergibt. Diese Bedenken stehen einer Aktivlegitimation jedoch nicht entgegen.

70    Die von der Verfügungsklägerin zu 1) als exklusive Lizenznehmerin erlangte Klagebefugnis hat sie auch nicht durch das Einräumen einer Unterlizenz verloren.

1.    Aktivlegitimation der Verfügungsklägern zu 1) (███████████████████)

71    a.    Ein Lizenznehmer ist nach allgemeiner Meinung dann berechtigt, eine Patentverletzung im eigenen Namen geltend zu machen, wenn er über eine exklusive

Lizenz betreffend die jeweils geltend gemachte patentrechtliche Benutzungshand-
lung verfügt. Grund dafür ist, dass der Patentinhaber bestimmen können muss,
wie und wo sein Schutzrecht verteidigt wird. Lediglich bei einer ausschließlichen
Lizenz hat er sich seiner Rechte am Schutzrecht so weit begeben, dass sein Inte-
resse hinter dem Interesse des Lizenznehmers, seine ausschließliche Lizenz ver-
teidigen zu können, zurücktritt.

72    Eine exklusive Lizenz in diesem Sinn liegt auch dann vor, wenn sich der Patentin-
haber eine eigene Nutzung vorbehält. Denn es stünde dem exklusiven Lizenzneh-
mer im Zweifel frei, Unterlizenzen zu erteilen (siehe BGH, X ZR 127/99, GRUR
2002, 801, 803 – Abgestuftes Getriebe), auch an den Patentinhaber.

73    b.    Die Patentinhaberin hat der Verfügungsklägerin zu 1) in Ziffern 4.1 und 4.5
des Vertrags vom 18. Oktober 2006 (Anlage AST 11a, nachfolgend: Lizenzvertrag)
eine für die Zwecke der Aktivlegitimation ausreichende exklusive Lizenz für den
geltend gemachten Antrag erteilt.

74    Die Kammer kann diesen Lizenzvertrag – der US-amerikanischen Recht unterfällt
– auf Grundlage des Vorbringens beider Parteien auslegen, da es sich um eine
einfach gelagerte Rechtsfrage handelt, hinsichtlich der es im internationalen
Rechtsverkehr einheitliche Standards gibt. Denn Lizenzverträge mit internationaler
Wirkung müssen auch für die lizensierten Gebiete handhabbar sein. Es kann der
Anwendung der Verträge nicht von jedem Dritten entgegengehalten werden, dass
sie nach dem einschlägigen Recht Ausnahmen postulieren würden. Soweit eine
Partei der Ansicht ist, dass der Vertrag nach dem einschlägigen Recht anders aus-
zulegen sei, müsste sie konkret vortragen, welche Rechtsgrundsätze Anwendung
finden sollen und weshalb diese Rechtsgrundsätze zu einem anderen Ergebnis
führen. Ein solcher Vortrag wurde nicht erbracht und es ist auch nicht ersichtlich,
dass er zielführend gewesen wäre. Ergänzend ist zu erwähnen, dass sich die Pa-
tentinhaberin, ███████████████████████████████████ in den
unterschiedlichen Verfahren gegen die (Verfügungs-)Beklagten betreffend das Bi-
osimilar ████████ abgestimmt haben. Sofern die Patentinhaberin Zweifel daran ge-
habt hätte, dass der Lizenzvertrag vom 18. Oktober 2006 eine hinreichende Legi-
timationsgrundlage darstellt, hätte sie diese Zweifel im Wege der gewillkürten Pro-
zessstandschaft ausräumen können, wie sie es auch tatsächlich in Hinblick auf die
Niederlande getan haben.

75    c.    Ziffer 4.1 des Lizenzvertrags lautet, soweit hier relevant, wobei „Company"
████████████████████also die Verfügungsklägerin zu 1), meint:



76    Dabei ist es nicht ausreichend, dass der Lizenzvertrag (unter 4.1. b) von einer „Ex-
      klusivlizenz" spricht. Die Frage, welche Rechtsnatur eine Lizenz hat, bestimmt sich
      nicht nach der Bezeichnung, sondern nach dem Inhalt. Allerdings hat eine Be-
      zeichnung eine Indizwirkung. Deshalb ist zu überprüfen, ob die zurückbehaltenen
      Rechte einen solchen Umfang haben, dass die für eine Prozessführungsbefugnis
      (bzw. die Weiterlizenzierung einer solchen) erforderliche Exklusivität nicht mehr
      vorliegt.

77    Der Vertragstext ist so zu verstehen, dass die Patentinhaberin der ███████
      ████████████████ (also der Verfügungsklägerin zu 1)) eine exklusive Lizenz (vorbe-
      haltlich Ziffer 4.5) betreffend die Herstellung, das Herstellenlassen, die Verwen-
      dung, die Entwicklung, den Import und den Export der lizenzierten Produkte, in
      einem Co-Exklusivitätsverhältnis mit der Patentinhaberin und ihren Tochter- oder
      Konzerngesellschaften („*affiliates*"), erteilt.

78    Wie dargestellt, steht es der Einordnung als Exklusivlizenz nicht entgegen, dass
      sich die Patentinhaberin bestimmte Nutzungsrechte zurückbehält. Eine andere Be-
      urteilung ist auch nicht dadurch veranlasst, dass in diese Nutzungsrechte auch
      Tochter- oder Konzerngesellschaften („*affiliates*") einbezogen sind. Denn es steht
      der Patentinhaberin frei, wie sie sich organisiert und es ist anerkannt und bei wer-
      tender Betrachtung auch wirtschaftlich erforderlich, dass sich Unternehmen so or-
      ganisieren, dass Konzernunternehmen arbeitsteilig tätig werden. Eine solche Auf-
      teilung von Aufgaben auf Tochter- oder Konzernunternehmen kann deshalb nicht
      dazu führen, dass die Exklusivität der Lizenz entfällt. Denn der Patentinhaberin ist
      es gerade nicht gestattet, Lizenzen an fremde Dritte zu erteilen.

79    d.    Der Einordnung als Exklusivlizenz steht auch Ziffer 4.5 des Lizenzvertrags
      nicht entgegen. Dieser lautet, soweit hier relevant:

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████

80    (1.)    Es ist bereits zweifelhaft, ob der Umfang dieser zurückbehaltenen Rechte über § 11 Nr. 2 PatG hinausgeht, und ob die Tatsache, dass diese Ausnahme ausdrücklich in dem Vertrag enthalten ist, nicht allein der unterschiedlichen Rechtspraxis in den Vereinigten Staaten von Amerika geschuldet ist. Dies kann aber dahinstehen, weil die Einschränkung keinen Umfang hat, der einer Exklusivlizenz entgegensteht.

81    (2)    Die Tatsache, dass die Patentinhaberin sich, ihren Tochtergesellschaften und Drittlizenznehmern unter Ziffer 4.5.(a) das Recht zu patentrechtlichen Benutzungshandlungen für „Development purposes" vorbehält, hat keinen Einfluss auf die exklusive Lizenz für die Verfügungsklägerin zu 1) für den Vertrieb des patentierten Produkts außerhalb der USA. Ziffer 1.30 des Lizenzvertrags definiert „Develop" oder „Development" als Aktivitäten betreffend Forschung, klinische Studien, Technologietransfer, etc. sowie als „jeglichen anderen Entwicklungsaktivitäten betreffend das lizenzierte Produkt […] einschließlich […] Aktivitäten zur Unterstützung neuer Produktformulierungen, Verabreichungstechnologien und/oder neue Einsatzgebiete". Damit werden „Development purposes" klar abgegrenzt von der hier relevanten exklusiven Lizenz für den Vertrieb der lizenzierten Produkte.

82    (3)    Insoweit als sich die Patentinhaberin in Ziffer 4.5.(b) „das Recht zur Herstellung und, falls die Zustimmung von [████████████] vorliegt oder falls es so in Plänen festgelegt ist, das Recht zur Kommerzialisierung der lizenzierten Produkte" vorbehält, hat dies keinen Einfluss auf die hier relevante exklusive Lizenz für den Vertrieb der lizenzierten Produkte. Die ████Gesellschaften haben unter Vorlage einer eidesstattlichen Versicherung des bei der Verfügungsklägerin zu 2) arbeitenden Mitarbeiters ████████████ (Anlage AST 25) vorgetragen, dass weder eine Zustimmung von ████ vorläge für einen entsprechenden Vertrieb seitens der Patentinhaberin noch es entsprechende Pläne gäbe. Diesen Vortrag haben die Verfügungsbeklagten nicht erschüttern können. Herr Dr. ████████████ arbeitet zwar erst seit dem Jahr 2015 bei der Verfügungsklägerin

zu 2), betreut aber ihr Ophthalmologiegeschäft und ihre Beziehungen mit der Patentinhaberin. Folglich wäre er darüber informiert, wenn die in Ziffer 4.5.(b) genannte Bedingung eingetreten wäre. Der Vortrag der Verfügungsbeklagten erfolgt demnach ins Blaue hinein.

83      Dadurch, dass eine Zustimmung der Lizenznehmerin erforderlich ist, liegt zudem eine Konstellation vor, die ein einseitiges Tätigwerden des Lizenzgebers ausschließt. Insofern ist dieser Sachverhalt nicht anders zu bewerten als die Einräumung einer Rücklizenz.

84      e.      Die Verfügungsklägerin zu 1) hat ihre Aktivlegitimation nicht deshalb verloren, weil sie der Verfügungsklägerin zu 2) eine alleinige Unterlizenz erteilt hat. Zu dieser Weiterlizenzierung war sie gemäß Ziffer 4.3 des Lizenzvertrages sowie gemäß der zwischen der Patentinhaberin und der Verfügungsklägerin zu 1) im Juli 2025 getroffenen Klarstellung dieser Ziffer (Anlage AST 11c) ohne Zustimmung der Patentinhaberin berechtigt.

85      Wie bereits ausgeführt, steht es Unternehmen frei, wie sie sich organisieren. Insbesondere steht es in deren Organisationsbefugnis, wie Aufgaben zwischen Tochter- oder Konzernunternehmen aufgeteilt werden. Deshalb ist kein Grund ersichtlich, weshalb die Verfügungsklägerin zu 1) ihre Aktivlegitimation auf Grund der Einräumung einer exklusiven Lizenz an die Verfügungsbeklagte zu 2) verloren haben soll. Beide Verfügungsklägerinnen sind jeweils Konzerngesellschaften des ███ Konzerns.

86      Weiter ist die Stellung eines Exklusivlizenznehmers in Hinblick auf eine Kette von Lizenzverträgen mit der Stellung des Patentinhabers vergleichbar. Der Exklusivlizenznehmer hat ein eigenes Recht daran, dass er die mit der Exklusivlizenz verbundenen Rechte gegenüber Dritten verteidigen kann. Auf Grund seiner Stellung besteht insbesondere keine Gefahr von widersprüchlichem Vorgehen.

        2.      Aktivlegitimation der Verfügungsklägerin zu 2) (███████████)

87      Der Verfügungsklägerin zu 2) wurde von der Verfügungsklägerin zu 1) eine exklusive Lizenz für alle Gebiete außerhalb der Vereinigten Staaten von Amerika eingeräumt. Damit ist sie nach allgemeinem Verständnis berechtigt, das vorliegende Recht im eigenen Namen geltend zu machen.

### III.   Vorliegen eines Verfügungsanspruchs

88   Ein Verfügungsanspruch liegt vor. Die Verfügungsklägerinnen haben gegen die Verfügungsbeklagten in den geltend gemachten 22 Ländern aus dem Verfügungspatent, welches in allen Ländern validiert ist, einen Unterlassungsanspruch wegen äquivalenter Patentverletzung.

89   Dieses Urteil stützt sich auf die festgestellte äquivalente Patentverletzung nach deutschem Recht (siehe dazu auch das Parallelverfahren 7 O 9382/25) (dazu 1.) und die von den Verfügungsbeklagten nicht erschütterte Vermutung, dass die Rechtslage betreffend die patentrechtliche Äquivalenz in den von den Verfügungsklägerinnen geltend gemachten Ländern des EPÜ der deutschen Rechtslage entspricht (dazu 2.).

90   Eine andere Beurteilung ist auch nicht deshalb veranlasst, weil der UK High Court in der Entscheidung [2025] EWHC 2527 (Pat) vom 8. Oktober 2025 entschieden hat, dass die angegriffene Ausführungsform (das Biosimilar ███████) von der Lehre des Verfügungspatents – in der dort geltend gemachten Fassung – nicht mit äquivalenten Mitteln Gebrauch macht.

91   Es ist davon auszugehen, dass die Frage, wann eine Patentverletzung mit äquivalenten Mitteln vorliegt in den einzelnen Mitgliedsstaaten des Europäischen Patentübereinkommens im Ergebnis gleich zu entscheiden sein wird. Das gilt auch, falls für die Prüfung der Äquivalenz jeweils unterschiedliche Prüfungsschritte angewendet werden. Diese Annahme stützt sich auf dem in allen Staaten geltenden Art. 2 des Protokolls zu Art. 69 EPÜ. Vor dem Hintergrund dieses Verständnisses kann dahingestellt bleiben, ob eine Vereinheitlichung zumindest hinsichtlich der Staaten gilt, die das Übereinkommen über ein einheitliches Patentgericht ratifiziert haben. Denn bei der Prüfung eines Patents wendet das Europäische Patentamt einen einheitlichen Maßstab an, unabhängig davon, ob ein Einheitspatent oder ein herkömmliches Europäisches Patent beantragt worden ist.

#### 1.   Äquivalente Patentverletzung nach deutschem Recht

92   Nach deutschem Recht stellt die angegriffene Ausführungsform, das Biosimilar ███████, eine äquivalente Verletzung von Anspruch 1 des Verfügungspatents dar.

93    Im Folgenden werden in kursiver Schrift die Ausführungen aus dem Parallelver-
fahren 7 O 9382/25 wiedergegeben. In dem in Bezug genommenen Verfahren ist
die Verfügungsklägerin zu 1) gegen die Verfügungsbeklagten zu 1) und 2) und
eine weitere Partei im Wege des einstweiligen Rechtsschutzes wegen einer Pa-
tentverletzung aus dem Verfügungspatent in der Bundesrepublik Deutschland vor-
gegangen. Das Verfahren und das vorliegende Verfahren 7 O 9383/25 wurden
gemeinsam verhandelt, und eine Entscheidung erging jeweils am Sitzungstag.

94    Eine Bezugnahme auf die dortigen Gründe erfolgt auch deshalb, weil die jeweiligen
Beklagtenparteien einheitlich vertreten worden sind und deshalb derselbe Tatsa-
chenvortrag den beiden Entscheidungen zu Grunde lag.

95    In der Entscheidung 7 O 9382/25 wird zu einer Patentverletzung mit äquivalenten
Mitteln ausgeführt:

------------------------

96    *a)    Das Verfügungspatent betrifft in der aufrecht erhaltenen Anspruchs-
fassung eine ophthalmische Formulierung eines VEGF-Antagonisten zur
Verwendung zur intravitrealen Verabreichung.*

97    *Nach der Verfügungspatentschrift ist die Erfindung gerichtet auf pharma-
zeutische Formulierungen mit Wirkstoffen, die vaskuläre endotheliale
Wachstumsfaktoren („vascular endothelial growth factor", nachfolgend:
VEGF) hemmen könnten, geeignet zur intravitrealen Verabreichung, d.h.
zur Verabreichung in den Glaskörper des Auges (Abs. [0001]).*

98    *VEGF sind eine Gruppe von Proteinen, die das Wachstum des vaskulären
Endothels anregen, d.h. der innersten Schicht der Blutgefäße, die mit dem
Blut in Berührung kommt. Bei einer Krebserkrankung ermöglicht VEGF
die pathologische Neubildung von Blutgefäßen in Krebsgewebe, wodurch
das Tumorgewebe mit Blut versorgt wird und wachsen kann. Dies kann
durch eine Hemmung des Gefäßwachstums, beispielsweise durch VEGF-
Antagonisten, unterbunden werden, indem sich Letztere an die VEGF bin-
den. Der Wirkstoff des Verfügungspatents, Aflibercept, ist ein solcher
VEGF-Antagonist in Form eines Proteins.*

99    *Im Stand der Technik war bereits bekannt, dass VEGF-Antagonisten auch
eine wirksame Behandlungsmöglichkeit für Augenerkrankungen, wie der
neovaskulären    „feuchten"    altersbedingten    Makuladegeneration*

*(nachfolgend: nAMD), bieten könnte. Diese Erkrankung ist durch das Wachstum fragiler kleiner Blutgefäße unter der Netzhaut gekennzeichnet, welche die für das Sehen essenziellen Strukturen durchbrechen. Anders als bei der Krebstherapie erfolgt in diesem Fall eine Verabreichung des VEGF-Antagonisten nicht intravenös, sondern per Injektion in den Glaskörper des Auges, d.h. intravitreal.*

100    *Gemäß dem Verfügungspatent stellt die Stabilität pharmazeutisch verwendbarer Proteine eine große Herausforderung dar (Abs. [0041]). Dabei unterscheiden sich die erforderlichen Stabilitätsbedingungen von Protein zu Protein.*

101    *b)    Vor diesem Hintergrund besteht die Aufgabe des Verfügungspatents – entsprechend dem qualifizierten Hinweisbeschluss des Bundespatentgerichts im Nichtigkeitsverfahren (Anlage AST 8; dort Ziffer 2) – in der Bereitstellung von für die intravitreale Verabreichung geeigneten Formulierungen des VEGF-Antagonisten bestehend aus den in Merkmal 1.1 genannten Aminosäuren.*

102    *c)    Als Lösung stellt das Verfügungspatent den hier in der Fassung des Urteils des Bundespatentgerichts geltend gemachten Anspruch 1 vor, der sich wie folgt gliedern lässt:*

1.    *Ophthalmische Formulierung eines vaskulären Endothelzellen-Wachstumsfaktor (VEGF)-Antagonisten zur Verwendung zur intravitrealen Verabreichung, umfassend:*

1.1    *(a) 1-100 mg/ml eines VEGF-Antagonisten, bestehend aus Aminosäuren 27-457 von SEQ ID NO: 4, welcher an Asn-Resten 62, 94, 149, 222 und 308 glycosyliert ist;*

1.2    *(b) 0,01-5% eines oder mehrere organische(n) Co-Lösungsmittel(s), welche(s) eins oder mehrere von Polysorbat, Polyethylenglycol (PEG) und Propylenglycol ist;*

1.3    *(c) 30-150 mM eines Tonizitätsmittels, welches aus Natriumchlorid oder Kaliumchlorid ausgewählt ist;*

1.4    *(d) 5-40 mM Natriumphosphatpuffer; und*

1.5 (e) 1,0-7,5% eines Stabilisierungsmittels, welches aus der Gruppe, beste-
hend aus Saccharose, Sorbit, Glycerin, Trehalose und Mannit, ausgewählt
ist,

1.6 pH zwischen etwa 5,8-7,0

103    d)    Das Verfügungspatent schützt in Anspruch 1 eine ophthalmische
Formulierung mit dem Wirkstoff Aflibercept, die zur intravitrealen Verab-
reichung bestimmt ist.

104    (1)    Als Fachmann sieht die Kammer ein Team bestehend aus einem
auf dem Gebiet der Ophthalmologie tätigen Mediziner und einem phar-
mazeutischen Technologen (Galeniker) mit Hochschulausbildung, und
mehrjähriger praktischer Erfahrung auf dem Gebiet der Herstellung phar-
mazeutischer Formulierungen an (entsprechend dem Hinweisbeschluss
des Bundespatentgerichts im Nichtigkeitsverfahren (Anlage AST 8; dort
Ziffer 3)). Dieser wird das Verfügungspatent wie folgt verstehen:

105    Aufgrund des konkreten Anwendungsfelds, nämlich der Injektion der For-
mulierung in den Glaskörper des Auges, sind besonders hohe Anforde-
rungen an die Eigenschaften und die Stabilität der Formulierung zu stel-
len.

106    Innerhalb der Zusammensetzung der Formulierung dient das Tonizitäts-
mittel im Wesentlichen dazu, die osmotischen Eigenschaften der Formu-
lierung festzulegen. Das Stabilisierungsmittel dient hauptsächlich zum
Schutz der Faltung des Wirkstoffs, damit das Aflibercept in der erforderli-
chen Faltung an die Stellen im Glaskörper gelangen kann, wo es die er-
wünschte medizinische Wirkung entfalten soll. Der Puffer dient dazu, dass
die Formulierung in einem festgelegten pH-Bereich stabil bleibt.

107    Aus einem Vergleich mit den in Anspruch 6 genannten zur Lyophilisierung
geeigneten ophthalmischen Formulierungen (die nicht Gegenstand die-
ses Verfahrens sind) ergibt sich, dass sowohl auf ein Tonizitätsmittel als
auch auf ein Stabilitätsmittel verzichtet werden kann. Nicht verzichtet wer-
den kann auf einen Puffer. Es wird keine Aussage darüber getroffen, ob
sich eine solche Ausgestaltung auch für nicht zur Lyophilisierung geeig-
nete ophthalmische Formulierungen anbietet.

108    *Hinsichtlich der Pufferlösung erwähnt das Verfügungspatent ausschließ-lich Natriumphosphat, bzw. stellt in Abs. [0047] klar, dass auch dann, wenn lediglich „Phosphat" genannt wird, „Natriumphosphat" gemeint ist. Aus Abs. [0047] am Ende ergibt sich auch ausdrücklich, dass der Puffer zum Einstellen des pH-Werts der Lösung dient, was allerdings für den Fachmann eine Selbstverständlichkeit darstellt.*

109    *Dem Fachmann ist weiter bekannt, dass sich zum Prioritätszeitpunkt des Verfügungspatents als einziger Proteinwirkstoff zur intravitrealen Behand-lung von nAMD der Wirkstoff Ranibizumab ▇▇▇▇▇▇ in der späten kli-nischen Entwicklung befand. Dieser Wirkstoff unterscheidet sich von Af-libercept darin, dass Aflibercept eine andere und größere Molekülstruktur aufweist und daher längere Zeit im Körper verweilt. Zudem wies die Ra-nibizumab-Formulierung statt einem Natriumphosphatpuffer einen Histi-dinpuffer sowie Trehalose auf, hingegen weder Natrium- noch Kalium-chlorid.*

110    *(2)    Eine wortsinngemäße Verletzung des Verfügungspatents liegt nicht vor, da die angegriffene Ausführungsform ▇▇▇▇ einen Histidinpuffer anstelle eines Natriumphosphatpuffers aufweist. Allerdings stellt die Ver-wendung eines Histidinpuffers eine Verwirklichung des Merkmals 1.4 mit äquivalenten Mitteln dar.*

111    *(3)    Für die Annahme einer äquivalenten Patentverletzung müssen nach der ständigen Rechtsprechung des BGH folgende Voraussetzungen erfüllt sein (siehe BGH, Urteil vom 13.01.2015, X ZR 81/13, GRUR 2015, 361 Rn 18 – Kochgefäß; BGH, Urteil vom 12.03.2002, X ZR 168/00, GRUR 2002, 515, 517 – Schneidmesser I; weiter: BGH, Urteil vom 14.06.2016, X ZR 29/15, GRUR 2016, 921 – Pemetrexed):*

    *1.    Gleichwirkung der Mittel: Löst die angegriffene Ausführungsform das der Erfindung zugrundeliegende Problem mit zwar abgewan-delten, aber objektiv gleichwirkenden Mitteln?*

    *2.    Auffindbarkeit der gleichwirkenden Mittel: Befähigen ihre Fach-kenntnisse den Fachmann, die abgewandelten Mittel als gleichwir-kend aufzufinden?*

3.   *Gleichwertigkeit der Abwandlung: Sind die Überlegungen, die der Fachmann anstellen muss, derart am Sinngehalt der im Patentanspruch unter Schutz gestellten technischen Lehre orientiert, dass der Fachmann die abweichende Ausführung mit ihren abgewandelten Mitteln als der gegenständlichen gleichwertige Lösung in Betracht zieht?*

4.   *Im Weiteren sind zu prüfen, ob der Patentinhaber bestimmte Ausführungsformen bewusst aus dem Schutzbereich genommen hat, und ob der sog. „Formsteineinwand" der Annahme einer Verletzung mit äquivalenten Mitteln entgegensteht.*

112     *(aa)  Im Rahmen des ersten Prüfungsschritts, der Gleichwirkung, ist zu prüfen, ob die angegriffene Ausführungsform nicht nur im Wesentlichen die Gesamtwirkung der Erfindung erreicht, sondern gerade auch diejenige Wirkung erzielt, die das nicht wortsinngemäß verwirklichte Merkmal erzielen soll (vgl. BGH, Urteil vom 13.01.2015 – Kochgefäß – Rn 19).*

113     *Das Merkmal 1.4 betrifft einen Puffer. Ein Puffer hat im Allgemeinen die Aufgabe, den pH-Wert der jeweiligen Lösung stabil zu halten. Etwas anderes ergibt sich auch nicht aus der Beschreibung des Verfügungspatents, welches über die Funktion des Puffers in der beanspruchten Formulierung keine weitergehenden Angaben macht. Aus der bereits aufgezeigten Stelle in Abs. [0047] ergibt sich, dass der Puffer zumindest auch für die Einstellung des pH-Werts der Formulierung dient. Es ist davon auszugehen, dass Histidin insofern die gleichen Eigenschaften mit sich bringt, wie das im Anspruch genannte Natriumphosphat. Letztlich kann dies aber dahinstehen, weil die Verfügungsbeklagten die Gleichwirkung nicht bestreiten.*

114     *(bb)  Auch die zweite Frage ist im Sinne der Verfügungsklägerin zu bejahen. Der für Proteinformulierungen verwendbare Puffer Histidin war für den Fachmann zum Prioritätszeitpunkt anstelle von Natriumphosphat als gleichwirkendes Mittel auffindbar. Dieses Auffinden setzt selbst keine erfinderische Tätigkeit des Fachmanns voraus (vgl. Meier-Beck, GRUR 2003, 905, 909). Dabei schließt die Notwendigkeit von Routineversuchen das Fehlen erfinderischer Tätigkeit nicht aus (BGH, Urteil vom 11.04.2006, X ZR 175/01, GRUR 2006, 666 Rn 56 – Stretchfolienhaube;*

*Benkard/Asendorf/Schmidt/Tochtermann, PatG, 12. Aufl., § 4 Rn 21).*
*Dazu im Einzelnen:*

115    *(aaa) Dem Fachmann ist die Verwendung von Pufferlösungen bei der*
*Herstellung von Proteinformulierungen bekannt. Dem Puffer kommt die*
*Aufgabe zu, für eine ph-Stabilität der Formulierung zu sorgen. Dabei ha-*
*ben die Puffer, die für Proteinformulierungen geeignet sind, bestimmte*
*pH-Bereiche, bei denen sie eingesetzt werden können. Insofern ist be-*
*kannt, dass Histidin und Phosphat einen sehr ähnlichen Anwendungsbe-*
*reich haben. Auch Histidin kann im pH-Bereich der beanspruchten For-*
*mulierung von 5,8–7,0 (Merkmal 1.6) zumindest in Teilen verwendet wer-*
*den, weil es in pH-Bereichen zwischen 6,2–7,8 eingesetzt werden kann,*
*während Phosphat im Bereich von 6,0–8,2 eingesetzt werden kann, also*
*in einem weitgehend deckungsgleichen Bereich.*

116    *Dieser Anwendungsbereich unterscheidet Phosphat und Histidin von den*
*allermeisten der weiteren in Proteinformulierungen üblicherweise genutz-*
*ten Pufferstoffen, wie sich aus der nachfolgenden, vorveröffentlichten Ta-*
*belle aus dem Lehrbuch „Fomulation Development of Protein Dosage*
*Forms" ergibt (siehe Anlage AST 14, S. 64):*

**Table V**
**Buffers Used in Protein Formulations**

| Buffer system | pK$_a$ | pH range of use |
|---|---|---|
| Acetate | 4.76 | 2.5–6.5 |
| Citrate | 3.14, 4.8, 5.2 | 2.5–6.0 |
| Glutamate | 9.67(pK$_{a3}$) | 8.2–10.2 |
| Glycinate | 2.4,9.8 | 6.5–7.5 |
| Histidine | 1.8, 6.0, 9.2 | 6.2–7.8 |
| Lactate | 3.8 | 3.0–6.0 |
| Maleate | 1.92, 6.23 | 2.5–5.0 |
| Phosphate | 7.2 (pK$_{a2}$) | 6.0–8.2 |
| Succinate | 4.2, 5.64 | 4.8–6.3 |
| Tartrate | 2.93, 4.23 | 3.0–5.0 |
| Tris | 6.2 (pK$_b$ 7.8) | 6.8–7.7 |

117    *Diese Eigenschaften weisen den Fachmann auf Histidin als Alternative zu*
*Natriumphosphat hin. Für den Fachmann ist es im Bereich des allgemei-*
*nen Fachwissens liegend, dass sich eine Formulierung aus verschiede-*
*nen Bestandteilen zusammensetzt, und dass eine grundsätzliche Aus-*
*tauschbarkeit gegeben ist. Wobei es allerdings keine Garantie gibt, dass*
*die Gesamtformulierung auch nach dem Austausch die erwünschten Ei-*
*genschaften hat. Insofern werden stets weitere Tests erforderlich sein, die*

*allerdings ebenfalls in den Bereich des üblichen Vorgehens des Fachmanns fallen.*

118    *(bbb) Vorliegend gibt es noch einen weiteren Anhaltspunkt, der auf eine Verwendung von Histidin hinweist. Denn das einzige zum Prioritätszeitpunkt weitgehend ausentwickelte, vergleichbare Medikament verwendet ebenfalls Histidin als Puffer. Es handelt sich um das auf dem Wirkstoff Ranibizumab basierende Arzneimittel* ███████████████ ███████████████████████████████*travitreale Verabreichung vorgesehen gewesen. Es befand sich im Endstadium der klinischen Tests. In der Formulierung war Histidin in einer Menge von 10 mM als Puffer enthalten (vgl. Abelson u.a., Anlage AST 37).*

119    *Die Patentschrift, mit der die für Ranibizumab verwendete Formulierung (WO 2006/047325 A 1; Anlage AST 21) unter Schutz gestellt werden sollte, zeigt auf S. 31 in Zeile 27 ff. die konkrete Formulierung für die intravitreale Verabreichung auf (darunter 10 mM Histidin). Diese Patentschrift wurde am 4. Mai 2006 - vor dem Prioritätszeitpunkt des Verfügungspatents - veröffentlicht.*

120    *(ccc) Vor diesem Hintergrund sind die Ausführungen in dem von der Verfügungsklägerin vorgelegten Gutachten des Sachverständigen Prof. Dr.* ███████*, dass sich angesichts der Verwendung von Histidin im Medikament* ███████ *die Verwendung von Histidin anstelle von Natriumphosphat auch für eine Formulierung auf Basis von Aflibercept (anstelle auf Basis von Ranibizumab) besonders angeboten habe, auch unter Berücksichtigung des unterschiedlichen Aufbaus der beiden Proteine (Anlage AST 39, S. 3), nachvollziehbar.*

121    *Ausschlaggebend ist für die Kammer insofern, dass es sich bei der bekannten Ranibizumab-Formulierung um die zum Prioritätszeitpunkt einzige für die intravitreale Verabreichung geeignete und getestete Proteinformulierung (jedenfalls soweit VEGF-Antagonisten betroffen sind) handelte. Angesichts dessen bietet sich der alternative Puffer Histidin für den Fachmann auch unter Berücksichtigung der unterschiedlichen Strukturen von Aflibercept und Ranibizumab an.*

122    *(ddd) Dass auch bei gleichem pH-Bereich Stabilitätsstudien erforderlich sind, um zu überprüfen, ob Histidin in der konkreten Formulierung*

*ausreichende Stabilität gewährleisten würde, steht der Auffindbarkeit nicht entgegen. Denn es handelt sich um Routineversuche, die das Fehlen erfinderischer Tätigkeit und mithin die Auffindbarkeit nicht ausschließen. Insbesondere eine unstreitig fehlende Vorhersehbarkeit der Auswirkung des Austauschs von Hilfsstoffen auf die Stabilität des jeweiligen Proteins sprechen nicht gegen die Auffindbarkeit. Denn es ist nicht ersichtlich (und von den Verfügungsbeklagten auch nicht vorgetragen), dass mehr als Routineversuche vonnöten gewesen wären.*

123    *Insbesondere geht der Verweis der Verfügungsbeklagten auf die Ausführungen der Verfügungsklägerin, welch große Herausforderung die Entwicklung einer stabilen Proteinformulierung auf Basis von Aflibercept bedeutet hätte (siehe Rn 42 der Antragsschrift), fehl, denn an der Stelle schildert die Verfügungsklägerin die Situation vor Anmeldung des Verfügungspatents, während sich die Frage der Auffindbarkeit auf Basis der Kenntnis der Patentschrift bemisst.*

124    *(eee) Die Parteien haben übereinstimmend vorgetragen, dass Histidin damals im Verdacht stand, nach einer gewissen Zeit zu einer gelblichen Verfärbung der Formulierung zu führen, was gerade im menschlichen Auge nicht erwünscht sei. Dies ergibt sich exemplarisch aus dem von den Verfügungsbeklagten in Bezug genommenen Schreiben des patentanwaltlichen Vertreters der Patentinhaberin an das Europäische Patentamt vom 09.03.2012 (S. 4: „The use of phosphate, rather than histidine, is an important distinction. In particular, histidine can degrade and confers a yellowish hue to a formulation over time. Injecting yellowish formulations into human eyes is clearly not desirable.", abgerufen über Espacenet).*

125    *Wie die Verfügungsklägerin in der mündlichen Verhandlung auf Frage der Kammer unwidersprochen ausgeführt hat, bezieht sich diese Gelbfärbung aber nur auf die Formulierung; die Injektion einer so verfärbten Formulierung ins Auge führe nicht zu einer gelblichen Verfärbung des Augapfels. Allerdings hätten die Patienten Vorbehalte, sich eine gelbliche Lösung in das Auge injizieren zu lassen. Dennoch stand auch dieser Umstand der kommerziellen Nutzung von* ███████ *nicht entgegen.*

126    *Das bedeutet aber, dass die von der Patentinhaberin im Erteilungsverfahren geäußerten Bedenken lediglich einen ästhetischen Aspekt betrafen, dessen Bedeutung unterschiedlich bewertet werden kann. Daher steht*

*auch dieser Umstand einer Verwendung nicht entgegen, zumal sich die Patienten das Medikament nicht selbst injizieren und von den behandeln-den Ärzten erwartet werden kann, dass sie sich von der Farbe der Injek-tionsflüssigkeit nicht abhalten lassen.*

127    *(cc)   Die Überlegungen, die der Fachmann anstellen musste, um zu His-tidin als Puffer zu gelangen, sind auch derart am Sinngehalt der im Pa-tentanspruch unter Schutz gestellten technischen Lehre orientiert, dass der Fachmann die abweichende Ausführung mit ihren abgewandelten Mit-teln als der gegenständlichen gleichwertige Lösung in Betracht zieht.*

128    *(aaa) Die Orientierung am Patentanspruch setzt voraus, dass der Pa-tentanspruch in allen seinen Merkmalen nicht nur den Ausgangspunkt, sondern die maßgebliche Grundlage für die Überlegungen des Fach-manns bildet.*

129    *Dies ist vorliegend gegeben, weil das Verfügungspatent in Anspruch 1 eine Formulierung unter Schutz stellt, die einen Puffer verwendet, um den pH-Wert der Formulierung einzustellen. Weder der Anspruch noch die Be-schreibung weisen dem konkret gewählten Natriumphosphat einen wei-tergehenden Zweck oder eine weitere Funktion zu. Der Fachmann er-kennt deshalb, dass die Funktion des Puffers nicht über den Zweck der pH-Einstellung hinausgeht, so dass die Verwendung von Histidin anstelle von Natriumphosphat als gleichwertig anzusehen ist. Denn Histidin ist ebenfalls geeignet den pH-Wert einer Protein Formulierung zu bestim-men.*

130    *(bbb) Es liegt auch keine bewusste Beschränkung des Patentanspruchs durch den Patentinhaber vor. Dies wäre gegeben, wenn sich das Patent bei objektiver Betrachtung auf eine engere Anspruchsfassung be-schränkt, als dies vom technischen Gehalt der Erfindung und gegenüber dem Stand der Technik geboten wäre. Denn dann dürfte die Fachwelt darauf vertrauen, dass der Schutz entsprechend beschränkt ist. Dem Pa-tentinhaber ist es dann verwehrt, nachträglich Schutz für etwas zu bean-spruchen, was er nicht unter Schutz hat stellen lassen. Dies gilt selbst dann, wenn der Fachmann erkennt, dass die erfindungsgemäße Wirkung als solche (in dem vorstehend ausgeführten engeren Sinn) über den im Patentanspruch unter Schutz gestellten Bereich hinaus erreicht werden könnte. Deshalb ist eine Ausführungsform aus dem Schutzbereich des*

*Patents ausgeschlossen, die zwar offenbart oder für den Fachmann jedenfalls auffindbar sein mag, von der der Leser der Patentschrift aber annehmen muss, dass sie – aus welchen Gründen auch immer – nicht unter Schutz gestellt werden sollte (BGH, Urteil vom 14.06.2016, X ZR 29/15, GRUR 2016, 921 Rn 50 – Pemetrexed). Nicht erforderlich ist, dass die Patentschrift den Fachmann zur abweichenden Ausgestaltung der patentierten Lehre hinlenkt (BGH, Urteil vom 06.05.2014, X ZR 36/13, GRUR 2014, 852 Rn 16 – Begrenzungsanschlag).*

131    *Die Rechtsprechung des Bundesgerichtshofs zur Patentverletzung mit äquivalenten Mitteln ist in Bezug auf den Gesichtspunkt der Auswahlentscheidung dahingehend zu verstehen, dass die Entscheidung Pemetrexed eine Antwort auf eine durch die Entscheidung Okklusionsvorrichtung geschaffene Unsicherheit darstellt. Maßgeblich ist die in Rn. 68 enthaltene Wertung: in der Regel kann nicht von einer Auswahlentscheidung des Patentinhabers ausgegangen werden. Vielmehr bedarf es besonderer Gründe, um von einer Auswahlentscheidung auszugehen. Solche besonderen Umstände haben die Verfügungsbeklagten nicht vorgetragen und sind auch ansonsten nicht ersichtlich. Vielmehr handelt es sich um eine typische Konstellation in der eine äquivalente Patentverletzung anzunehmen ist. Dazu im Einzelnen:*

132    *(i)    Soweit in der Patentschrift nicht explizit von Natriumphosphat die Rede ist, sondern von Phosphat (etwa Abs. [0011], [0059]), wird in Abs. [0047] klargestellt, dass der Begriff „Phosphat" stets für Natriumphosphat steht. Andere Stoffe oder Oberbegriffe für Stoffe werden nicht erwähnt.*

133    *Weiter wird in Abs. [0048] unter der Überschrift „Stable Liquid Ophthalmic Formulations" kein konkreter Stoff für den zu verwendenden Puffer genannt, während für die übrigen nach dem Patentanspruch zu verwendenden Hilfsstoffe konkrete Stoffe entsprechend Anspruch 1 des Verfügungspatents aufgeführt werden.*

134    *Anschließend offenbart Abs. [0049] die Zusammensetzung der Formulierung so, wie sie Anspruch 1 entspricht, nämlich mit Natriumphosphat als Puffer. Der unterschiedliche Grad der Konkretisierung hinsichtlich der unterschiedlichen Hilfsstoffe in Abs. [0048] gibt jedoch dem Fachmann einen*

*Hinweis darauf, dass der Puffer nicht zwingend aus Natriumphosphat be-
stehen muss.*

135    *(ii)    Dieser Hinweis wird weiter dadurch gestützt, dass an keiner Stelle
in der Patentschrift bestimmte Vorzüge von Natriumphosphat bzw. sons-
tige Gründe erläutert werden, weshalb der Puffer aus Natriumphosphat
oder auch aus einer bestimmten übergeordneten Gruppe (z.B. Salze, an-
organische Stoffe) stammen müsste.*

136    *(iii)    Damit entnimmt der Fachmann der Patentschrift, dass es nicht auf
den konkreten Pufferstoff, sondern auf die Funktion des Puffers ankommt.
Das spielt für die Orientierung am Patentanspruch – wie oben bereits aus-
geführt – eine wesentliche Rolle (vgl. BGH, X ZR 76/14, GRUR 2016,
1254 Rn 20 – V-förmige Führungsanordnung). Ausgehend von dieser
Überlegung kann durch die Festlegung auf eine konkrete Ausführungs-
form jedoch nicht geschlossen werden, dass andere Ausführungsformen
aus dem Schutzbereich des Patents ausgeschlossen wären. Ansonsten
würde es immer dann zu einem Ausschluss des Patentschutzes führen,
wenn der Patentinhaber erkannt hat (oder hätte erkennen können), dass
für ein im Anspruch benanntes Lösungselement Austauschmittel denkbar
sind und er es versäumt hat, auf eine Fassung des Patents hinzuwirken,
bei der die Austauschmittel vom Wortsinn des Patentanspruchs umfasst
worden wären. Dieses Ergebnis wäre nicht sachgerecht (BGH, Urteil vom
23.08.2016 – V-förmige Führungsanordnung – Rn 21 ff.).*

137    *Insofern ist die vorliegende Konstellation, dass das Verfügungspatent die
Obergruppe „Puffer" nennt, ähnlich gelagert, wie in dem vom Bundesge-
richtshof entschiedenen Fall „Pemetrexed"; dort hat der BGH ausgeführt,
dass es der Gleichwertigkeit (und damit der Annahme einer äquivalenten
Verletzung) nicht entgegensteht, wenn die Patentschrift die Geeignetheit
einer Stoffgruppe offenbart, dann aber nur einen bestimmten Stoff aus
dieser Gruppe beansprucht, da die Auffindbarkeit eines alternativen Stof-
fes nicht gleichzusetzen sei mit dessen expliziter Offenbarung in der Pa-
tentschrift (BGH, Urteil vom 14.06.2016, X ZR 29/15, GRUR 2016, 921 –
Pemetrexed). Nichts anderes kann auch hier gelten.*

138    *(ccc) Hiergegen sprechen auch nicht die von den Verfügungsbeklagten
in Bezug genommenen Äußerungen und Handlungen des Patentanmel-
ders im Erteilungsverfahren.*

139    *(i)    Gemäß der Rechtsprechung des BGH gilt der Grundsatz, dass der Patentinhaber über die Rechtsfigur der Äquivalenz nicht nachträglich Schutz für etwas beanspruchen darf, was er nicht unter Schutz hat stellen lassen (BGH, Urteil vom 14.06.2016 – Pemetrexed – aaO Rn 64 ff.). Das wäre dann der Fall, wenn der Anspruchswortlaut zwischen Anmeldung und Erteilung des Patents eingeschränkt wurde, um sich vom Stand der Technik abzusetzen. Vorliegend gibt es aber hinsichtlich der Verwendung von Natriumphosphat als Puffer keinen Unterschied zwischen der angemeldeten, der erteilten und der eingeschränkten Fassung des Verfügungspatentanspruchs.*

140    *(ii)    Die Verfügungsbeklagten argumentieren, dass die Patentinhaberin im Erteilungsverfahren die beanspruchte Erfindung u.a. von den Entgegenhaltungen D1 (die Patentschrift WO 2006/047325 [siehe Stellungnahme des EPA zum Europäischen Recherchebericht vom 11. August 2011, S. 2, abgerufen über Espacenet], d.h. die dem Medikament Lucentis zugrundeliegende Patentschrift) und D2 (die Patentschrift WO 2005/000895, siehe aaO) als erfinderisch abgegrenzt habe, indem sie auf die Verwendung von Natriumphosphat anstelle von Histidin hingewiesen habe (siehe Schreiben des patentanwaltlichen Vertreters der Patentinhaberin an das EPA vom 05. Oktober 2009, S. 3, Anlage BBY 18; Schreiben des patentanwaltlichen Vertreters der Patentinhaberin an das EPA vom 09. März 2012, S. 4, abgerufen über Espacenet).*

141    *Nach dem allgemeinen Verständnis der deutschen Patentgerichtsbarkeit besteht Einvernehmen, dass Unterlagen aus dem Erteilungsverfahren im Regelfall nicht zur Bestimmung des Schutzbereichs des Patents herangezogen werden können. Der Grund liegt in Artikel 69 EPÜ, der Äußerungen im Erteilungsverfahren gerade nicht zur Schutzbereichsbestimmung heranzieht. Zulässig ist es, Äußerungen des Anmelders und des Prüfers im Erteilungsverfahren als Indiz dafür heranzuziehen, wie der Fachmann den Gegenstand des Patents versteht (BGH, GRUR 2016, 921 Rn. 39 – Pemetrexed).*

142    *Nach Ansicht der Kammer ist bei der vom BGH benannten Indizwirkung zwischen Äußerungen der Prüfer und Äußerungen des Anmelders zu unterscheiden. In der Regel wird einer Äußerung des Prüfers im Erteilungsverfahren ein hoher Indizwert zukommen. Bei Äußerungen des Patentanmelders kann dies nicht ohne weiteres angenommen werden. Vielmehr*

*ist insofern von einem eingeschränkten Indizwert auszugehen. Der Grund liegt darin, dass im argumentativen Kampf um die Erteilung des Patents teilweise eine Vielzahl von Argumenten vorgetragen werden, teilweise wissend, dass sie das allgemeine Fachverständnis weit dehnen. Unter Bezugnahme auf solche Äußerungen später gegen die Patentinhaber zu argumentieren würde die Praxis der Patenterteilungsverfahren in unzutreffender Weise außer Betracht lassen. Vielmehr ist bei der Analyse von Äußerungen des Patentinhabers immer zu prüfen, ob sie einen Niederschlag in der Argumentation des Prüfers gefunden haben. Denn er, nicht der Anmelder, ist derjenige, der den hoheitlichen Akt der Patenterteilug vollzieht, aus dem sodann gemäß § 58 Abs. 1 Satz 3 PatG die gesetzlichen Wirkungen des Patents folgen. Falls dies so ist, können sie gegebenenfalls in der beschriebenen Weise Berücksichtigung finden, nämlich als Verständnis des Fachmanns zu dem damaligen Zeitpunkt.*

143     *Selbst wenn man die von den Verfügungsbeklagtenvertretern in Bezug genommenen Äußerungen des Patentinhabers im Erteilungsverfahren berücksichtigte, führte dies nicht dazu, dass sich die Patentinhaberin auf Natriumphosphat anstelle von Histidin oder anderen Puffern beschränkt hätte. Es gibt keine Anhaltspunkte dafür, dass die Patentinhaberin Histidin aus dem Schutzbereich des Patents nehmen wollte.*

144     *Die erfinderische Tätigkeit wird in den Schreiben vom 05. Oktober 2009 damit begründet, dass das Verfügungspatent einen anderen VEGF-Antagonisten verwende als die D1 und der Fachmann keine Veranlassung hätte, den VEGF-Antagonisten der D2 gegen denjenigen der D1 auszutauschen. Der Verweis auf die Verwendung eines anderen Puffers (Histidin) erfolgte im Sinne einer „Überdies"-Argumentation. Einem solchen Vorbringen kann kein Verzichtscharakter beigemessen werden.  Das ergibt sich schon daraus, dass eine Hinzunahme von Histidin in den Patentanspruch eine unzulässige Erweiterung bedeutet hätte.*

145     *Entsprechendes gilt in Bezug auf die in der mündlichen Verhandlung von den Verfügungsbeklagten diskutierte Stellungnahme in den zitierten Schreiben des patentanwaltlichen Vertreters der Patentinhaberin im Erteilungsverfahren betreffend die damalige Entgegenhaltung D3 (die Patentschrift WO 2006/104852, Anlage BBY 19, entspricht der Entgegenhaltung D10 im Nichtigkeitsverfahren; siehe Schreiben des patentanwaltlichen Vertreters der Patentinhaberin an das EPA vom 05. Oktober 2009,*

*S. 2, Anlage BBY 18; Schreiben des patentanwaltlichen Vertreters der Patentinhaberin an das EPA vom 09. März 2012, S. 3, abgerufen über Espacenet). Insoweit lautet es in den damaligen Schreiben, die D3 offenbare keine Formulierung mit einem Phosphatpuffer außer in einer Kombination mit 20 % Saccharose, im Übrigen sei nur ein Puffer aus Histidin oder aus einer Kombination von Citrat und Phosphat vorhanden, deshalb sei das Verfügungspatent neu. Auch aus dieser Stellungnahme kann aber aus den benannten Gründen kein Verzicht auf Histidin herausgelesen werden.*

146        *dd)  Eine Patentverletzung scheidet auch nicht aufgrund des „Formstein"-Einwands aus.*

147        *(aaa) Macht der Kläger eine Patentverletzung mit abgewandelten, aber gleichwirkenden Mitteln geltend, so kann sich der Beklagte auch mit dem Einwand verteidigen, die angegriffene Ausführungsform sei nicht patentfähig, weil sie vom Stand der Technik im Prioritätszeitpunkt des Klagepatents vorweggenommen oder nahegelegt gewesen sei (BGH, X ZR 28/85, GRUR 1986, 803, 806 – Formstein). Es handelt sich inhaltlich um das Argument des freien Stands der Technik, welches lediglich bei einer Schutzbereichsausweitung durch äquivalente Mittel Anwendung finden kann. Im Ergebnis ist Voraussetzung, dass es die angegriffene Ausführungsform mit allen Merkmalen (auch dem äquivalent verletzten) bereits zum Prioritätszeitpunkt des Patents im Stand der Technik gegeben haben muss.*

148        *Dies ist nicht der Fall, weil die von den Verfügungsbeklagten in Bezug genommene D10 (Anlage BBY 19, die Aflibercept als Wirkstoff und Histidin als Puffer enthält) gerade keine ophthalmische Formulierung eines VEGF-Antagonisten zur Verwendung zur intravitrealen Verabreichung zeigt. Die D10 ist zur intravitrealen Verabreichung geeignet, aber nicht bestimmt. Deshalb gehört ▮▮▮▮ nicht zum freien Stand der Technik.*

149        *(bbb) In der mündlichen Verhandlung haben die Verfügungsbeklagten argumentiert, dass der Formstein-Einwand aus Gründen der Rechtssicherheit gelten müsse. Dies haben sie damit begründet, dass die erteilte Fassung des Patentanspruchs 1 der Lehre der D10 und der tatsächlichen Formulierung der angegriffenen Ausführungsform entsprechen würde. Wäre diese Fassung noch gültig, so könnte sich die Verfügungsbeklagte auf den Formstein-Einwand berufen.*

150     *Insofern ist zwar zutreffend, dass die eingeschränkte Fassung des Pa-*
        *tentanspruchs 1 der Abgrenzung gegenüber der D10 dient. Es ist aber*
        *nicht ersichtlich, dass die Verfügungsbeklagten einen Vertrauenstatbe-*
        *stand in Hinblick auf die erteilte Fassung haben könnten. Es entspricht*
        *dem allgemeinen Verständnis, dass Patentansprüche im Laufe von Nich-*
        *tigkeitsverfahren eingeschränkt werden können. Dritten steht es frei, sich*
        *durch Lektüre der Ansprüche, der Beschreibung und der Figuren ein Bild*
        *vom wahren Schutzumfang des jeweiligen Patents zu machen.*

        (Ende der Ausführungen zur Patentverletzung mit äquivalenten Mitteln in der Bun-
        desrepublik Deutschland.)

---

151     2.      Patentverletzung mit äquivalenten Mitteln in Österreich, Belgien, Bulgarien,
        Dänemark, Finnland, Frankreich, Griechenland, Irland, Italien, Litauen, Luxem-
        burg, Niederlande, Polen, Portugal, Rumänien, Slowakei, Slowenien, Spanien,
        Schweden, Tschechische Republik, Ungarn und Zypern

152     Hinsichtlich der geltend gemachten Patentverletzung in den 22 EPÜ-Mitgliedstaa-
        ten, die allesamt auch Mitgliedsstaaten der Europäischen Union sind, ist eine Pa-
        tentverletzung mit äquivalenten Mitteln anzunehmen, weil der Schutzbereich des
        Verfügungspatents, welches nach der Erteilung durch das Europäische Patentamt
        in nationale Patente zerfallen ist, einheitlich zu bewerten ist.

        a.      Indizwirkung der Bewertung in Deutschland

153     Die Bewertung hinsichtlich der Rechtslage in der Bundesrepublik Deutschland hat
        eine starke Indizwirkung dahingehend, dass das gleiche Ergebnis in den weiteren
        EPÜ-Mitgliedstaaten in gleicher Weise gefunden wird.

154     Auf Grund dieser starken Indizwirkung ist es nicht erforderlich, dass die Kammer
        zum jeweiligen ausländischen Recht Gutachten unabhängiger Sachverständiger
        einholen muss. Ansonsten wäre die von der Durchsetzungsrichtlinie geforderte ef-
        fektive Durchsetzung gewerblicher Schutzrechte in einer den Schutzrechtsinha-
        bern nicht zumutbaren Weise erschwert.

155     Vielmehr ist es an der in Anspruch genommenen Partei, konkrete Anhaltspunkte
        vorzutragen, dass auf Grund des nationalen Rechts eine anderweitige

Entscheidung ergehen würde. <u>Ihr obliegt die Darlegungslast, warum andere Staaten zu einer anderen Bewertung kommen würden</u>.

156    Keine Berücksichtigung kann dabei das Argument finden, dass die Verfahren in anderen Ländern in tatsächlicher Hinsicht anders durchgeführt werden. Mit anderen Worten: <u>Es ist unbeachtlich, ob in anderen Ländern Verfahren grundsätzlich anders geführt werden</u> (z.B. durch Sachverständigenbeweis), einstweilige Verfügungen deutlich länger dauern oder eine grundsätzliche Skepsis gegenüber dem Rechtsinstitut der äquivalenten Patentverletzung besteht (typischerweise haben Richter, die nicht regelmäßig mit Patentverletzungen befasst sind, Berührungsängste dieses Rechtsinstitut anzuwenden). Denn dabei handelt es sich um tatsächliche Gegebenheiten, auf die sich eine wegen Patentverletzung in Anspruch genommene Partei nicht berufen kann.

157    Maßstab ist tatsächlich allein, ob nationales Recht (Gesetze oder etabliertes Richterrecht) die Voraussetzungen des EPÜ in einer Weise modifiziert, die zu einem anderen Ergebnis führen würde. Dies bedeutet, dass die in Anspruch genommene Partei die aus ihrer Sicht relevanten Vorschriften bzw. Entscheidungen vorzulegen hat. Zusätzlich muss sie eine qualifizierte Stellungnahme eines in dem jeweiligen Rechtsgebiet kundigen Experten vorlegen, der zumindest standesrechtlich zur Wahrheit verpflichtet sein muss.

158    Diese Grundsätze zur <u>Indizwirkung </u>der Verletzung nach deutschem Recht gelten nicht nur für wortsinngemäße, sondern <u>auch für äquivalente Patentverletzungen</u> und insbesondere, wenn eine einfachgelagerte Äquivalenzkonstellation vorliegt. Nach dem Verständnis der Kammer dient die Ausweitung des Schutzbereichs auf äquivalente Verletzungsformen dazu, eindeutige Umgehungslösungen in den Schutzbereich eines Patents zu ziehen. Eine <u>eindeutige Umgehungslösung ist zumindest dann gegeben, wenn ein nicht den Kern der Erfindung tragendes Merkmal modifiziert wird</u>.

159    Dies ist vorliegend der Fall: Es wird lediglich die Pufferlösung der Formulierung geändert. Diesem Puffer kommt nach dem Verfügungspatent keine andere Bedeutung zu, als den pH-Wert der Formulierung einzustellen. Dabei verkennt die Kammer nicht, dass die Verfügungsbeklagten – wohl unter dem Eindruck des Verfahrens im Vereinigten Königreich – das Gutachten der Sachverständigen ███████
██████ (Anlage BBY 16) vorgelegt und ausgeführt haben, dass die Wahl des Puffers auch eine Bedeutung für die Stabilität einer Proteinformulierung habe. Wie bereits dargelegt, ist damit keine wesentliche Erhöhung des Komplexitätsgrades

verbunden. Denn einfach gelagerte Routinetests ermöglichen die Kontrolle, ob sich der Austausch des Puffers im Gesamtgefüge der Formulierung auf die Stabilität auswirkt. Die Durchführung solcher Tests stellt für den Fachmann keine Hürde dar.

160    Bei wertender Betrachtung ist der Vortrag der Verfügungsbeklagten als Versuch einzuordnen, das ausgetauschte Merkmal über den Wortlaut und die Beschreibung hinaus mit Bedeutung aufzuladen, um dem Austausch den – aus einer äquivalenten Verletzung hinausführenden – Anschein einer erfinderischen Tätigkeit zu geben. Aus den oben diskutierten Gründen ist dies nicht überzeugend.

 

b.    Keine Erschütterung der Indizwirkung durch die Entscheidung des UK High Court

161    Die Rechtsprechung des Bundesgerichtshofs und des UK High Court ist geprägt von dem Verständnis, dass in allen EPÜ-Mitgliedstaaten eine im Wesentlichen gleiche Bewertung der Voraussetzungen für die Annahme einer Patentverletzung mit äquivalenten Mitteln vorliegt. Der Bundesgerichtshof nimmt in Entscheidungen zur Patentverletzung mit äquivalenten Mitteln regelmäßig auf die Rechtsprechungspraxis und auf konkrete Entscheidungen der Gerichte aus dem Vereinigten Königreich Bezug. Auch die Richter im Vereinigten Königreich gehend davon aus, dass im Kern die gleichen Ergebnisse erzielt werden.

162    Auch in der Parallelentscheidung vor dem UK High Court mit dem Aktenzeichen [2025] EWHC 2527 (Pat) betont das Gericht, dass der angewandte Standard nicht von dem deutschen Verständnis abweicht (vgl. Ziffer 423, Nr. 62). Dass dennoch in der Sache anders entschieden wurde, hat nach dem Verständnis der Kammer im Wesentlichen zwei Gründe:

163    Erstens: In dem UK-Verfahren wird nicht der eingeschränkte Anspruch 1 geltend gemacht, sondern eine auf den unabhängigen Nebenanspruch 5 beschränkte Fassung. Dadurch ist die durch den Anspruch geschützte Formulierung wesentlich genauer beschrieben. Bei den Ausführungen zu den einzelnen Staaten (konkret Belgien) wird ausgeführt werden, dass dies zu einem anderen Ergebnis führt. Das kann jedoch nicht dahingehend verallgemeinert werden, dass der UK High Court in der streitgegenständlichen Konstellation die Äquivalenz verneinen würde.

164     Zweitens: Die Parteien haben in den beiden Verfahren unterschiedlich vorgetra-
        gen, so dass der UK High Court über einen anderen Lebenssachverhalt zu ent-
        scheiden hatte, was naturgemäß zu einem anderen Ergebnis führen kann. Es wird
        beispielsweise darauf hingewiesen, dass der UK High Court das Vorliegen der ers-
        ten Frage (nach deutschem Verständnis die Gleichwirkung) verneint hat. Im vor-
        liegenden Verfahren wurde insofern hingegen ausgeführt (Erwiderung vom 05. Au-
        gust 2025, Rn. 108): *Die erste Äquivalenzfrage, ob die abgewandelte Ausfüh-
        rungsform (unter Verwendung von Histidin als Puffer) objektiv dieselbe Wirkung
        erzielt wie die beanspruchte Formulierung mit Natriumphosphat, kann an dieser
        Stelle dahinstehen.* Die entsprechende Frage stand demnach gar nicht im Mittel-
        punkt der Diskussion. Dabei wird nicht verkannt, dass die Verfügungsbeklagten
        das Argument, dass der Puffer einen Einfluss auf die Stabilität der Formulierung
        habe, an anderer Stelle vorgebracht haben.

165     Deshalb ist die benannte Indizwirkung nicht durch die Entscheidung des UK High
        Court erschüttert.

        c.      Bewertung von Äußerungen im Erteilungsverfahren

166     Unterschiedliche Ergebnisse folgen auch nicht aus einer etwaigen unterschiedli-
        chen Behandlung von Äußerungen im Erteilungsverfahren in einem der geltend
        gemachten 22 Staaten.

167     Als Ausgangspunkt ist festzuhalten, dass die Schutzbereichsbestimmung eines
        Europäischen Patents in keinem EPÜ-Mitgliedstaat unter Berücksichtigung von
        Äußerungen im Erteilungsverfahren erfolgen darf. Art. 69 Abs. 1 EPÜ ist insofern
        abschließend. Maßgeblich sind die Patentansprüche, und Beschreibung und
        Zeichnungen zur Auslegung der Patentansprüche heranzuziehen.

168     Äußerungen im Erteilungsverfahren können allenfalls unter dem Gesichtspunkt wi-
        dersprüchlichen Verhaltens einen Einfluss auf den durch die Erteilung gewährten
        Schutz haben. Der Schutzumfang eines Patents ist immer objektiv zu bestimmen.
        Soweit ein Patent zu Unrecht erteilt worden ist, weil im Rahmen der Anmeldung
        unzutreffende Angaben gemacht worden sind, kann dieses Verhalten einer Durch-
        setzung allenfalls unter dem Gesichtspunkt widersprüchlichen Verhaltens entge-
        gengesetzt werden.

169     Im Hinblick auf die Äußerungen im Erteilungsverfahren haben sich die Verfügungs-
        beklagten hinsichtlich einiger Länder darauf bezogen, dass die Patentinhaberin ei-
        nen konkludenten Verzicht erklärt habe. Die Patentinhaberin habe mithin während

des Erteilungsverfahrens aufgrund des Einwands fehlender Neuheit oder fehlender erfinderischer Tätigkeit auf eine Erstreckung des Schutzbereichs des Patents auf eine Ausführungsform mit Histidin als Puffer verzichtet. Diese Ausführungen sind allerdings nicht überzeugend, wie im Rahmen der Diskussion der deutschen Rechtslage bereits ausgeführt worden ist. Zutreffend ist auch der UK High Court zum gleichen Ergebnis gekommen.

170      d.      Auf dieser Grundlage ist davon auszugehen, dass <u>in allen 22 Staaten eine Verletzung des Patentanspruch 1 in der mit dem Hauptantrag geltend gemachten Fassung mit äquivalenten Mitteln indiziert</u> ist. Der Vortrag der Verfügungsbeklagtenvertreter ist nicht geeignet, diese Indizwirkung zu widerlegen.


         e.      <u>Beurteilung der Rechtslage in den 22 geltend gemachten Ländern</u>

171      Auf Basis dieser für alle untersuchten Länder geltenden allgemeinen Grundsätze und dem konkreten Vortrag der Parteien zu dem Recht der einzelnen Staaten ist hinsichtlich der einzelnen Länder jeweils wie folgt Stellung zu nehmen.

172      Vorangestellt werden soll noch eine <u>Einschätzung des gesamten Sachverhalts</u>. Die Verfügungskläger stützen sich auf insgesamt 22 nationale Patente, die vom Europäischen Patentamt einheitlich erteilt worden sind. Die Verfügungsbeklagten haben ihren Sitz in der Bundesrepublik Deutschland und haben für das Biosimilar ███████ eine einheitliche Zulassung erhalten, die sie mit nur wenigen weiteren Schritten berechtigt, dieses Biosimilar in allen 22 Staaten auf den Markt zu bringen. Entsprechende Vorbereitungshandlungen sind bereits getroffen worden. Gegen den hier geltend gemachten Unterlassungsanspruch werden teilweise kleinteilige Argumente vorgebracht, welche konkreten Gesichtspunkte hinsichtlich der jeweiligen Staaten nicht berücksichtigt worden seien. Dabei verkennen die Verfügungsbeklagten die durch das EPÜ und die Durchsetzungsrichtlinie bestehende Einheitlichkeit hinsichtlich der Bewertung, ob eine äquivalente Patentverletzung vorliegt. Sie stützen sich mit ihren Argumenten auf Normen und Rechtsinstitute, deren Zweck es nicht ist die Durchsetzung von Patentrechten zu erschweren.

         (1)     Österreich

173      Der Unterlassungsanspruch wegen Patentverletzung folgt aus § 147 des österreichischen Patentgesetzes (öPatG). Die von den Verfügungsklägerinnen angegebene Vorschrift des § 22 öPatG regelt hingegen die Wirkungen des erteilten

Patents. Gemäß § 22a Abs. 1 S. 3 öPatG ist das Protokoll zu Art. 69 EPÜ aus-drücklich zur Schutzbereichsbestimmung heranzuziehen.

174    Entgegen der Auffassung der Verfügungsbeklagten ist der Antrag in Bezug auf Österreich nicht deshalb unzulässig, weil die Verfügungsklägerinnen es versäumt haben, die Rechtsvorschrift anzugeben, in der der Unterlassungsantrag geregelt ist, sondern stattdessen die Vorschrift, in der die Wirkungen des Patents geregelt sind. Wie die Verfügungsbeklagten selbst einräumen, muss ein Antragsteller sei-nen Anspruch rechtlich nicht qualifizieren, folglich muss er auch nicht die Norm angeben, auf die er seinen Anspruch stützt. Die Verfügungsbeklagten berufen sich auf folgende Aussage des österreichischen Rechtsanwalts ███████████ (An-lage BBY 33, S. 2 f.):

> „Wenn der Kläger seinen Anspruch aber ausdrücklich auf einen einzigen Rechts-grund beschränkt, darf das Gericht dem Klagebegehren nicht aus einem anderen Rechtsgrund stattgeben; andernfalls liegt ein Verstoß gegen § 405 ZPO (aliud-Verbot) und damit ein beachtlicher Verfahrensmangel vor (OGH 4 Ob 26/07p; RIS-Justiz RS0037659)."

175    In der zitierten Entscheidung des OGH heißt es weiter: „Maßgebend für den Ent-scheidungsspielraum des Gerichts ist der vom Kläger vorgetragene Sachverhalt; eine unrichtige rechtliche Qualifikation wirkt sich nicht zum Nachteil des Klägers aus, wenn er alle anspruchsbegründenden Tatsachen vorgetragen und unter Be-weis gestellt hat." Danach ist die Angabe der falschen Norm unschädlich.

176    Gemäß dem Gutachten des österreichischen Rechtsanwalts ██████ (Anlage BBY 33, S. 9) wird die Äquivalenz in Österreich bejaht, wenn (1) die abgewandelte Ausführungsform das der Erfindung zugrunde liegende Problem mit zwar abge-wandelten, aber objektiv gleichwirkenden Mitteln löst (Gleichwirkung); (2) die Fachperson die bei der Ausführungsform eingesetzten abgewandelten Mittel mit Hilfe ihrer Fachkenntnisse zur Lösung des der Erfindung zugrunde liegenden Prob-lems als gleichwirkend auffinden kann (Naheliegen); und (3) die Überlegungen der Fachperson derart am Sinngehalt der im Patentanspruch unter Schutz gestellten technischen Lehre orientiert sind, dass die Fachperson die abweichende Ausfüh-rung mit ihren abgewandelten Mitteln als der patentgemäßen Ausführung gleich-wertige Lösung in Betracht zieht (OGH, Beschluss vom 20.05.2008, 17 Ob 6/08v, GRUR Int. 2008, 1047, 1048 – Bicalutamid II). Dabei bezieht sich der OGH explizit auf die deutsche Rechtsprechung.

177   Im Gutachten von Rechtsanwalt ▮▮▮ heißt es weiter (siehe Anlage BBY 33, S. 9):

> „Das <u>Naheliegen</u> des ausgetauschten Elements wäre in einem Fall wie hier nur dann gegeben, wenn durch die Erläuterungen zum Stand der Technik zum Prioritätszeitpunkt im Patent <u>übersichtsweise, genau und mit Fundstellen, die einzelnen Verbindungen angeführt, und bei der Erläuterung der Wirkung der Erfindung auf die Gruppe dieser Mittel (Puffer) Bezug genommen werden würde</u> (und nicht nur auf die eine, einzig genannte Verbindung (Natriumphosphat) (siehe OLG Wien 133 R 15/18f, Pemetrexed).“

178   Diese Aussage stellt aber erkennbar eine Fehlinterpretation des Urteils des OLG Wien dar. Denn die zitierte Aussage wird dort nicht in dem Sinne getätigt, dass es für ein Naheliegen zwingend einer solchen Angabe in der Patentschrift bedürfe (das würde auch nicht zu den Vorgaben des OGH passen, wo das Naheliegen anders als die Gleichwertigkeit keinen Bezug zur Patentschrift aufweist). In dem vom OLG Wien zu entscheidenden Fall war es nur so, dass die Angaben so genau in der Patentschrift vorhanden waren.

179   Es ist daher davon auszugehen, dass ein österreichischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(2)   Belgien

180   Der Unterlassungsanspruch wegen Patentverletzung folgt in Belgien aus Art. XI.334 § 1 des *Code de droit économique* (CDE). Die von den Verfügungsklägerinnen angegebene Vorschrift des § 57 der *Loi relative à la propriété industrielle* ist nicht existent. Die in dem von den Verfügungsbeklagten vorgelegten Gutachten des belgischen Rechtsanwalts ▮▮▮ (Anlage BBY 8) bzw. in Anlage AST 49 angegebene Vorschrift des Art. XI.29 CDE regelt die Wirkungen des erteilten Patents.

181   Die belgische Rechtsprechung wendet unstreitig den sogenannten „<u>function-way-result</u>"-Test zur Feststellung einer äquivalenten Patentverletzung an. Nach diesem aus dem US-amerikanischen Recht stammenden Test muss das jeweilige Merkmal der angegriffenen Ausführungsform im Wesentlichen dieselbe Funktion erfüllen wie nach dem Patentanspruch, und zwar auf im Wesentlichen dieselbe Weise, um im Wesentlichen zum selben Ergebnis zu führen wie in der patentierten Erfindung (siehe U.S. Supreme Court, *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 (1997)).

182    Die britische Rechtsprechung hat diesen Ansatz im Wesentlichen als erste von den drei sogenannten „Improver"-Fragen übernommen (siehe UK Supreme Court, *Actavis UK Ltd. v. Eli Lilly and Co.,* [2017] UKSC 48 Rn. 60, 66). Nachdem das vorstehend zitierte Urteil die Fragen neu formuliert hat, wird im Folgenden von „Actavis"-Fragen gesprochen. Diese drei Fragen lauten:

1.    Erreicht die Variante, auch wenn sie nicht dem Wortlaut des relevanten Patentanspruchs entspricht, im Wesentlichen das-selbe Ergebnis auf im Wesentlichen dieselbe Weise wie die Er-findung, d. h. wie die im Patent offenbarte erfinderische Idee?

2.    Wäre es für einen Fachmann, der das Patent am Prioritätstag liest und weiß, dass die Variante im Wesentlichen dasselbe Er-gebnis wie die Erfindung erzielt, naheliegend („*obvious*"), dass sie dies auf im Wesentlichen dieselbe Weise tut wie die Erfin-dung?

3.    Hätte ein solcher Leser des Patents geschlussfolgert, dass der Patentinhaber dennoch beabsichtigte, dass die strikte Einhal-tung des Wortlauts des relevanten Patentanspruchs eine we-sentliche Voraussetzung der Erfindung sei?

183    Für den „function-way-result"-Test ist <u>allein die erste Actavis-Frage relevant</u>. Auf die zweite und die dritte Frage wird daher an dieser Stelle nicht eingegangen. Sie werden bei den Ausführungen zur Rechtslage in Irland erörtert.

184    Die Verfügungsbeklagten haben sich nicht darauf berufen, dass der „function-way-result"-Test in Belgien in besonderer Art und Weise angewendet würde. In dem von den Verfügungsbeklagten vorgelegten Gutachten des belgischen Rechtsan-walts Eric de Gryse (Anlage BBY 8) wird nur ausgeführt, dass in Belgien dieser Test angewendet würde ohne jegliche weitere Erläuterung.

185    Die Merkmale „dieselbe Funktion" und „dasselbe Ergebnis" des function-way-re-sult-Tests entsprechen dem deutschen Merkmal der Gleichwirkung. Das Merkmal „dieselbe Weise" entspricht den deutschen Merkmalen Auffindbarkeit und Gleich-wertigkeit (siehe Meier-Beck, GRUR 2018, 241, 245). Dabei ist die Entsprechung für das Merkmal „dieselbe Weise", bezogen auf den hiesigen Fall, genauer auszu-führen.

186    Übertragen auf den hiesigen Fall bedeutet das, dass die angegriffene Ausfüh-
rungsform ebenso wie die patentierte Erfindung eine (vom Wortlaut nicht erfasste)
Pufferlösung enthält und deshalb im Wesentlichen dasselbe Ergebnis auf im We-
sentlichen dieselbe Weise erzeugt.

187    Dem steht die bereits in Bezug genommene Entscheidung des UK High Court vom
8. Oktober 2025 ([2025] EWHC 2527 (Pat)) nicht entgegen. Vielmehr wird die hie-
sige Bewertung durch die Ausführungen im britischen Urteil gestützt. Das Gericht
würde zu derselben Entscheidung gelangen, wenn derselbe Anspruch und der-
selbe Tatsachenvortrag zur Entscheidung gestanden hätten.

188    Im dortigen Fall hatte die Patentinhaberin auf Anspruch 1 des Verfügungspatents
verzichtet und sich stattdessen auf eine – nochmal eingeschränkte – Fassung von
Anspruch 5 gestützt. Auf dieser Basis kam das britische Gericht zu der Schlussfol-
gerung, der Anspruch sei aufgrund der genauen Angabe der Bestandteile (samt
deren Dosierung) der Formulierung derart eng gefasst, dass sich das „erfinderi-
sche Konzept" des Anspruchs auf die beanspruchte Zusammensetzung be-
schränke (aaO, Rn 475). Nach diesem „erfinderischen Konzept" sei im Rahmen
der ersten „Actavis"-Frage zu fragen (aaO, Rn 424 f., 427, 465). Deshalb sei im
Rahmen der ersten „Actavis"-Frage zu konstatieren, dass die Formulierung der
Verfügungsbeklagten das erfinderische Konzept auf andere Weise umsetze (siehe
aaO, Rn 487 f., 491). Würde man hingegen das erfinderische Konzept breiter for-
mulieren – namentlich in dem Sinne, dass es in der Formulierung einer für die
intravitreale Verabreichung geeigneten, d.h. auch ausreichend stabilen, Formulie-
rung auf Basis von 40 mg/ml von Aflibercept (diese Menge entspricht der im briti-
schen Verfahren eingeschränkten Fassung von Anspruch 5 des Verfügungspa-
tents) und einem pH-Wert von 6,2–6,3 liege –, wäre die erste „Actavis"-Frage zu
bejahen (aaO, Rn 491). Das Bundespatentgericht hat aber für den in diesem Ver-
fahren relevanten Anspruch 1 des Verfügungspatents festgestellt, dass die Auf-
gabe des Verfügungspatents (also das „erfinderische Konzept") in der Bereitstel-
lung von für die intravitreale Verabreichung geeigneten Formulierungen des vas-
kulären Endothelzellen-Wachstumsfaktor (VEGF)-Antagonisten bestehend aus
den in Merkmal 1.1 genannten Aminosäuren besteht. Das ist nochmal breiter als
die vom britischen Gericht alternativ betrachtete breitere Formulierung des erfin-
derischen Konzepts. Für den im hiesigen Verfahren relevanten Anspruch 1 würde
folglich auch ein britisches Gericht die erste „Actavis"-Frage bejahen

189    Es ist daher davon auszugehen, dass ein belgischer Richter ebenfalls zur Fest-
stellung einer äquivalenten Patentverletzung kommen würde.

(3)     Bulgarien

190    Der Unterlassungsanspruch wegen Patentverletzung folgt in Bulgarien aus Art. 28 Abs. 1 Nr. 3 des Gesetzes über Patente und die Registrierung von Gebrauchs-mustern (*ЗАКОН ЗА ПАТЕНТИТЕ И РЕГИСТРАЦИЯТА НА ПОЛЕЗНИТЕ МОДЕЛИ*). Das ergibt sich aus dem von den Verfügungsbeklagten vorgelegten Gutachten der bulgarischen Rechtsanwälte ██████████████████ ██████████████████ (Anlage BBY 34, S. 10), welches insoweit durch die Kam-mer überprüft wurde. Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 19 „Patentgesetz" regelt (soweit man davon ausgeht, dass die Verfü-gungsklägerinnen damit das zitierte Gesetz meinen) hingegen die Wirkungen des erteilten Patents.

191    Die bulgarische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Ver-fügungsbeklagten haben sich nicht darauf berufen, dass der „function-way-result"-Test in Bulgarien in besonderer Art und Weise angewendet würde. Daher kann auf die obigen Ausführungen zu Belgien verwiesen werden.

192    Es ist daher davon auszugehen, dass ein bulgarischer Richter ebenfalls zur Fest-stellung einer äquivalenten Patentverletzung kommen würde.

(4)     Dänemark

193    Der Unterlassungsanspruch wegen Patentverletzung folgt in Dänemark – entspre-chend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Art. 59 Abs. 1 des konsolidierten Patentgesetzes (*Bekendtgørelse af patentloven*). Die von den Verfügungsklägerinnen an anderer Stelle angegebene Vorschrift des Art. 3 des Patentgesetzes regelt hingegen die Wirkungen des erteilten Patents.

194    Ausweislich der von den Verfügungsklägerinnen vorgelegten Antworten der däni-schen Mitglieder der Internationalen Vereinigung für den Schutz des geistigen Ei-gentums (AIPPI) auf einen Fragebogen der Vereinigung aus dem Jahr 2023 gibt es in der dänischen Rechtsprechung keinen fest etablierten Test, um eine äquiva-lente Patentverletzung zu prüfen. Es soll aber ausweislich dieser Antworten gemäß einem Urteil des dänischen Obersten Gerichtshofs entscheidend sein, ob das we-sentliche Element der patentierten Erfindung in der angegriffenen Ausführungs-form vorhanden ist, ob die Abweichungen zwischen der patentierten Erfindung und der angegriffenen Ausführungsform unwesentlich sind und ob die Abweichungen für die Fachperson naheliegend waren (siehe AIPPI, Yearbook 2023 – Doctrine of

Equivalents, Anlage AST 18, S. 156 ff.; die zitierte Entscheidung des Obersten Gerichtshofs ist jünger als die ebenfalls zitierten Entscheidungen zweier Berufungsgerichte, die eine dem function-way-result-Test ähnliche Prüfung vorgenommen haben, und es wird auch angegeben, dass der Oberste Gerichtshof den von der AIPPI abgefragten „function test" nicht explizit in Bezug genommen habe).

195    Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Dänemark nicht geäußert. Nach dem somit entscheidenden Maßstab stellt der streitgegenständliche Sachverhalt auch in Dänemark eine äquivalente Patentverletzung dar. Das wesentliche Element der Erfindung ist die Nutzbarmachung des Wirkstoffs Aflibercept für die intravitreale Injektion. Vor diesem Hintergrund ist die Verwendung eines Histidinpuffers anstelle eines Natriumphosphatpuffers unwesentlich und auch für den Fachmann ohne erfinderische Tätigkeit auffindbar, also naheliegend.

196    Es ist daher davon auszugehen, dass ein dänischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(5)    Finnland

197    Der Unterlassungsanspruch wegen Patentverletzung folgt in Finnland – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Art. 57 Abs. 1 des Patentgesetzes (*Patenttilaki*). Die von den Verfügungsklägerinnen an anderer Stelle angegebene Vorschrift des Art. 3 des Patentgesetzes regelt hingegen die Wirkungen des erteilten Patents.

198    Die finnische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Finnland nicht geäußert. Aus den Antworten der finnischen Mitglieder der AIPPI auf den Fragebogen der Organisation ergeben sich keine Besonderheiten betreffend die Anwendung des Tests (siehe Anlage AST 18, S. 187 ff.). Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

199    Es ist daher davon auszugehen, dass ein finnischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(6) Frankreich

200    Der Unterlassungsanspruch wegen Patentverletzung folgt in Frankreich – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Art.L615-3 Abs. 1 S. 1 des *Code de la propriété intellectuelle.* Die von den Verfügungsklägerinnen an anderer Stelle angegebene Vorschrift des Art. 613-3 dieses Gesetzes regelt hingegen die Wirkungen des erteilten Patents.

201    Die Parteien sind sich darin einig, dass die französische Rechtsprechung einen Test mit drei Fragen anwendet, um die Äquivalenz festzustellen:

1. Erfüllt das abgewandelte Mittel der angegriffenen Ausführungsform dieselbe Funktion wie in der patentierten Erfindung?

2. Wird mit dem abgewandelten Mittel dasselbe Ergebnis erzielt?

3. Ist die Funktion, die das abgewandelte Mittel wahrnimmt, neu? Das bedeutet, dass eine äquivalente Patentverletzung nach französischem Recht nur vorliegt, wenn die Funktion, die das abgewandelte Mittel wahrnimmt, zum Prioritätszeitpunkt neu war.

202    Die Parteien sind sich nicht einig, wie Frage 3 im Zusammenhang mit Patenten auf eine Kombination mit mehreren Merkmalen zu verstehen ist. Die Verfügungsbeklagten vertreten, unter Verweis auf ein Gutachten des französischen Rechtsanwalts ▬▬▬▬ (siehe Anlage BBY 10a, Punkt 7.10 f.) folgende Auffassung:

> „7.10 Im Rahmen des französischen Verfahrens ist ▬▬▬▬der Ansicht, dass die Neuheit der Funktion als Ganzes zu beurteilen ist, d. h. unter Berücksichtigung der Funktion aller Merkmale der Formulierung. Aus den Randnummern 91 und 93 der Klageschrift entnehme ich, dass die ▬▬▬Unternehmen im deutschen Verfahren einen anderen Ansatz verfolgen und sich speziell auf die Funktion des Natriumphosphat-Puffers stützen. Da keine synergistische Wirkung vorliegt, die über die bloße Addition der erwarteten Wirkungen der einzelnen Hilfsstoffe der Formulierung hinausgeht, erscheint mir dieser Ansatz in der Tat korrekter.
>
> 7.11 Nach französischem Recht bin ich der Ansicht, dass die Pufferfunktion von Phosphat in den Ansprüchen des Patents EP 691 nicht durch Äquivalenz verletzt werden kann, da die Funktion des Natriumphosphat-Puffers nicht neu war:
>
>> 7.11.1 In der Erfindung, die Gegenstand des Patents EP 691 ist, übt Natriumphosphat seine bekannte Funktion als Puffer aus. Es wird weder behauptet noch nachgewiesen, dass Natriumphosphat in Kombination mit

den anderen Bestandteilen der Formulierung eine besondere, unbekannte Funktion ausübt.

7.11.2 Die Funktion von Natriumphosphat als Puffer zur Einstellung des pH-Werts von Formulierungen von Proteinen und therapeutischen Antikörpern war in der bisherigen Technik weithin bekannt, wie von ████████n im französischen Verfahren anerkannt wurde und wie auch aus den Ausführungen von ████ auf den Seiten 42 bis 47 der Klageschrift hervorgeht.“

203    Hierauf entgegneten die Verfügungsklägerinnen unter Verweis auf ein Gutachten der französischen Rechtsanwältin ██████████████ (siehe Anlage AST 28ü, Punkt 5.1):

„Nach französischer Rechtsprechung, einschließlich derjenigen des französischen Kassationsgerichtshofs, muss im Falle einer Gruppe kombinierter Mittel das Kriterium der Neuheit der Funktion als Ganzes und nicht für jedes Mittel einzeln geprüft werden: ‚*Das Berufungsgericht, das **die neue Funktion der Kombination von Mitteln des Patents** definiert und ohne sich selbst zu widersprechen festgestellt hat, **dass die fragliche Vorrichtung, obwohl sie sich in ihrer Form unterscheidet, dieselbe Funktion erfüllt**, um ein Ergebnis gleicher Art zu erzielen, selbst wenn die Behinderung nicht vollständig ist, konnte das Vorliegen von Verletzungshandlungen bestätigen.*‘ [gefolgt von einem Verweis auf ein Urteil der Cour de Cassation vom 15.09.2009, welches in Anhang 24 ihres Gutachtens komplett abgedruckt ist]

Meiner Meinung nach würden französische Richter im vorliegenden Fall den Gegenstand der Erfindung von EP691 als eine Zusammensetzung betrachten, bei der die Gruppe von Mitteln als Ganzes zu betrachten ist.

➢ ████████hat im französischen Verfahren nachgewiesen, dass die Funktion der Gruppe von Mitteln von EP691, d. h. die technische Wirkung des Gegenstands dieser Ansprüche, neu war.

➢ In seiner Stellungnahme bestreitet der gegnerische Anwalt nicht, dass die Funktion als Ganzes neu ist. Dies wird zur Kenntnis genommen.

➢ Er stellt lediglich fest, dass ein synergistischer Effekt nachgewiesen werden müsste.

Nach französischer Rechtsprechung bezieht sich ein synergistischer Effekt auf ‚Mittel, die Zusammenwirken, um ein Gesamtergebnis zu erzielen, das sich von der Summe der Ergebnisse unterscheidet, die sie jeweils isoliert erzielen würden‘ [gefolgt von einem Verweis auf ein Urteil der Cour d'Appel Paris vom 28.05.1999]

███████ ird keine Schwierigkeiten haben, Gutachten vorzulegen, die bestätigen, dass ein erfahrener Formulierer die Formulierung eines Arzneimittels als Ganzes betrachtet. Die Hilfsstoffe zusammen, und nicht jeder für sich allein, führen zu einer stabilen Formulierung."

204    Rechtsanwalt ████ erwiderte hierauf wie folgt (siehe Anlage BBY 24a, Punkt 6.1):

„Ich stelle jedoch fest, dass in der ███████████████ nicht bestritten wird, dass es nach französischem Recht, wie ich behaupte (Absätze 7.10 ff. meiner Bescheinigung Fabre Nr. 1), erforderlich ist, um den Schutzumfang eines Anspruchs, der sich auf eine Kombination bekannter Mittel bezieht, auf Äquivalente auszuweiten, eine synergistische Wirkung nachzuweisen, die über die bloße Aneinanderreihung der erwarteten und bekannten Wirkungen jedes Mittels der Kombination hinausgeht."

205    Es ist anzumerken, dass die Verfügungsklägerinnen in der mündlichen Verhandlung klargestellt haben, dass ein synergistischer Effekt ihrer Meinung nach nicht erforderlich sei.

206    Die dritte Frage des französischen Äquivalenztests zielt nach Auffassung der Kammer darauf ab, im Stand der Technik bekannte Funktionen bestimmter Mittel nicht mittels des Äquivalenzgrundsatzes durch ein Patent zu monopolisieren. In solchen Fällen kann der Patentanspruch nur die spezifische Implementierung der Funktion in Form eines bestimmten Mittels abdecken (siehe Cour de Cassation, Entscheidung vom 26.02.2008, Bourgeois v. Pimas, IIC 2009, 338). Damit stellt die dritte Frage letztlich eine andere Ausprägung des „Formstein"-Einwands dar (siehe auch die bejahende Antwort der französischen Mitglieder der AIPPI auf die Frage des Fragebogens, ob das französische Recht eine Doktrin wie den „Formstein"-Einwand kenne, AIPPI, Yearbook 2023 – Doctrine of Equivalents, Anlage AST 18, S. 203 f.). Das spricht dafür, die dritte Frage, also die Neuheit, zu bejahen, aus denselben Gründen, aus denen der „Formstein"-Einwand abgelehnt wurde. Hinzu kommt Folgendes:

207    Bei einer komplexen chemischen Formulierung wie der von Anspruch 1 des Verfügungspatents geschützten ist eine Bewertung, welche Wirkung die einzelnen Bestandteile der Formulierung bei isolierter Betrachtung hätten, praktisch unmöglich. Insofern sind sich die Parteien einig, dass die einzelnen Bestandteile der beanspruchten Formulierung aufeinander abgestimmt werden müssen. Das betrifft sowohl die Auswahl der einzelnen Mittel als auch deren Dosierung. Dann stellt aber eine isolierte Betrachtung der einzelnen Bestandteile eine theoretische Übung dar,

die mit der Frage, welchen Beitrag der Patentinhaber zum Stand der Technik geliefert hat, nichts mehr zu tun hat.

208   Die Verfügungsbeklagten tragen vor, dass die aktuelle französische Rechtsprechung bei einem Kombinationspatent einen synergistischen Effekt der einzelnen Merkmale fordert. Jedenfalls für eine komplexe Formulierung wie der streitgegenständlichen erscheint das zweifelhaft. Das Urteil der Cour d'Appel von 1999, auf das sich die Verfügungsbeklagten für ihre Auffassung stützen, betrifft eine Formulierung, die nur aus Laktose und einem „bestimmten Ergänzungsmittel" bestand, und von der zumindest nicht berichtet wird, dass sie für eine sensible Verwendung wie die Injektion ins menschliche Auge vorgesehen war (siehe Anlage BBY 24, Punkt 6.3). Weder in dem bereits zitierten Urteil der Cour de Cassation aus dem Jahr 2008 noch aus dem dem Gutachten der Rechtsanwältin Jacquand beigegebenen Urteil der Cour de Cassation vom 15.09.2009 (Anhang 24 von Anlage AST 18) ist die Rede vom Erfordernis eines synergistischen Effekts. Vielmehr heißt es im letztgenannten Urteil, dass die Vorinstanz eine äquivalente Patentverletzung darin gesehen habe, dass „die patentierbare Kombination der bekannten Mittel sich von der einfachen Aneinanderreihung bekannter, nicht patentierbarer Mittel darin unterscheide, dass die Mittel im Hinblick auf ein gemeinsames Ergebnis zusammenarbeiteten" („*qu'une combinaison de moyens connus brevetable se distingue de la simple juxtaposition de moyens connus non brevetable en ce que les moyens coopèrent ensemble en vue d'un résultat commun*"). Diese Entscheidung der Vorinstanz wurde bestätigt. Auch in den Antworten der französischen Mitglieder der AIPPI auf die Frage, ob das französische Recht eine Doktrin wie den „Formstein"-Einwand kenne, wird zwar die dritte Frage der Äquivalenzprüfung dargestellt und das Urteil der Cour de Cassation vom 15.09.2009 in Bezug genommen. Vom Erfordernis eines synergistischen Effekts ist aber auch dort nicht die Rede.

209   Dann müsste ein französischer Richter nach dem Verständnis der Kammer darauf schauen, ob die Funktion des ausgetauschten Mittels, also Natriumphosphat, in Kombination mit den anderen Merkmalen von Anspruch 1 des Verfügungspatents, namentlich in Kombination mit dem Wirkstoff Aflibercept und der Bestimmung zur intravitrealen Verabreichung, neu war. Das ist zu bejahen, da Neuheit und erfinderische Tätigkeit der von Anspruch 1 des Verfügungspatents geschützten Erfindung losgelöst von der konkreten Art des Puffers bejaht wurde.

210   Es ist daher davon auszugehen, dass ein französischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(7)    Griechenland

211    Der Unterlassungsanspruch wegen Patentverletzung folgt in Griechenland aus Art. 17 Abs. 1 des Gesetzes Nr. 1733/1987 (*Νομοσ υπ' αριθμ. 1733/1987*). Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 10 Abs. 1 dieses Gesetzes regelt hingegen die Wirkungen des erteilten Patents.

212    Die griechische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Griechenland nicht geäußert. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

213    Es ist daher davon auszugehen, dass ein griechischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(8)    Irland

214    Der Unterlassungsanspruch wegen Patentverletzung folgt in Irland aus Art. 47 Abs. 1 a) des *Patents Act*. Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 40 dieses Gesetzes regelt hingegen die Wirkungen des erteilten Patents.

215    Die Parteien sind sich darin einig, dass die irischen Gerichte wahrscheinlich den britischen Ansatz zur patentrechtlichen Äquivalenz übernehmen. Demnach würden sie die drei „Actavis"-Fragen anwenden.

216    Die Verfügungsbeklagten bzw. die von ihnen eingeschaltete irische Rechtsanwältin Jane Bourke (siehe Anlage BBY 12) vertreten keine Meinung zu der Frage, wie die irischen Gerichte diese drei Fragen beantworten würden.

217    (a.)    Hinsichtlich der ersten „Actavis"-Frage kann auf die Ausführungen zum belgischen Recht verwiesen werden. Wie auch die patentierte Erfindung enthält die angegriffene Ausführungsform eine – wenn auch vom Anspruchswortlaut nicht erfasste – Pufferlösung. Sie erzeugt deshalb im Wesentlichen dasselbe Ergebnis auf im Wesentlichen dieselbe Weise.

218    (b.)    Die zweite „Actavis"-Frage ist ebenfalls zu bejahen. Danach ist zu klären, ob es für einen Fachmann, der das Patent am Prioritätstag liest und weiß, dass die Variante im Wesentlichen dasselbe Ergebnis wie die Erfindung erzielt, naheliegend wäre (*„obvious"*), dass sie dies auf im Wesentlichen dieselbe Weise tut wie

die Erfindung. <u>Der Fachmann hätte bei Lektüre der Patentschrift und Kenntnis dessen, dass die angegriffene Ausführungsform im Wesentlichen zum selben Ergebnis wie die patentierte Erfindung führt, gewusst, dass dies darauf beruht, dass Histidin ebenso ein Puffer ist wie Natriumphosphat.</u> In dem Zusammenhang erscheint auch relevant, dass der britische Supreme Court die zweite „Actavis"-Frage in *Actavis* gerade aktualisiert hat um sicherzustellen, dass Routinetests chemischer Formulierungen dem Naheliegen nicht entgegenstehen (Supreme Court, *Actavis UK Ltd. v. Eli Lilly and Co.,* [2017] UKSC 48, Rn 61 f.).

219    Mit Blick auf das Urteil des High Court of England and Wales vom 8. Oktober 2025 im Verfahren ███████████████ [2025] EWHC 2527 (Pat) ist betreffend die zweite „Actavis"-Frage Folgendes auszuführen: Das Urteil verneint die zweite Frage zwar, dies ist aber eine Konsequenz dessen, dass im dortigen Fall nicht Anspruch 1, sondern Anspruch 5 zur Entscheidung stand (siehe schon oben bei der Diskussion bei der Rechtslage in Belgien, Rn 187). Wenn man das „erfinderische Konzept" nicht auf die konkrete (und im britischen Verfahren nochmal eingeschränkte) Formulierung von Anspruch 5 beschränkt, sondern entsprechend der für Anspruch 1 geäußerten Auffassung des Bundespatentgerichts weiter fasst (siehe dazu schon oben Rn 187), käme auch das britische Gericht zu einer Bejahung der zweiten „Actavis"-Frage (siehe aaO, Rn 489, 492). Im Übrigen scheint es fraglich, ob die höheren britischen Instanzen der im zitierten Urteil entwickelten Auffassung folgen, dass im Rahmen der zweiten „Actavis"-Frage keine Tests berücksichtigt werden dürfen (siehe aaO, Rn 431 ff., 489), zumal der britische Supreme Court die Fragen nicht zuletzt mit Blick auf die beabsichtigte Kohärenz mit der deutschen, italienischen und niederländischen Rechtsprechung neu formuliert hat (siehe *Actavis v Lilly* [2017] UKSC 48 Rn 62).

220    (c.)    Die dritte Frage beschäftigt sich damit, ob der Patentinhaber aus objektiver Sicht die strikte Einhaltung des Wortlauts als wesentliche Voraussetzung der Erfindung angesehen hätte. Diese Frage ist ebenso wie im deutschen Recht zu verneinen. <u>Aus dem Schweigen der Patentschrift zu möglichen alternativen Pufferlösungen kann nicht der Schluss gezogen werden, der Patentinhaber habe den Schutzbereich des Patents auf einen Natriumphosphatpuffer beschränken wollen.</u> Mit Blick auf das entgegenstehende Ergebnis im zitierten britischen Urteil ist erneut darauf hinzuweisen, dass dies erklärtermaßen daran liegt, dass Anspruch 5 viel enger formuliert ist als Anspruch 1 (siehe aaO, Rn 494).

221    Es ist daher davon auszugehen, dass ein irischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(9)    Italien

222    Der Unterlassungsanspruch wegen Patentverletzung folgt in Italien aus Art. 131 Abs. 1 des *Codice della proprietà industriale*. Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 66 dieses Gesetzes regelt hingegen die Wirkungen des erteilten Patents.

223    Die italienische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Italien nur betreffend die Berücksichtigung der Erteilungsgeschichte geäußert. Insoweit wird auf die einleitenden Bemerkungen verwiesen. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

224    Es ist daher davon auszugehen, dass ein italienischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(10)    Litauen

225    Der Unterlassungsanspruch wegen Patentverletzung folgt in Litauen aus Art. 52 Abs. 2 des Patentgesetzes (*Patentų įstatymas 1994 m. sausio 18 d. Nr. I-372*). Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 16 dieses Gesetzes regelt hingegen die Offenbarung der Erfindung in der Patentschrift. Die in Anlage AST 49 angegebene Vorschrift des Art. 35 dieses Gesetzes regelt die Wirkungen der Erfindung.

226    Die litauische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Dieser ist auch in Art. 38 Abs. 3 Unterabs. 1 des Patentgesetzes als einer der beiden Faktoren zur Feststellung einer äquivalenten Patentverletzung explizit genannt. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Litauen nicht geäußert. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden. Der zweite, in Art. 38 Abs. 3 Unterabs. 2 des Patentgesetzes genannte Faktor fragt danach, ob es für den Fachmann naheliegend war, dass dasselbe Ergebnis wie in der patentierten Erfindung durch das Austauschmittel erreicht werden kann. Auch diese Frage ist im vorliegenden Fall zu bejahen.

227    Es ist daher davon auszugehen, dass ein litauischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(11)    Luxemburg

228    Der Unterlassungsanspruch wegen Patentverletzung folgt in Luxemburg aus Art. 80 Abs. 4 a) des Gesetzes vom 20. Juli 1992 zur Änderung der Regelung für Patente für Erfindungen (*Loi du 20 juillet 1992 portant modification du régime des brevets d'invention*). Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 29 Abs. 1 einer *Loi sur les brevets* existiert nicht. Die in Anlage AST 49 angegebene Vorschrift des Art. 45 des Gesetzes vom 20. Juli 1992 regelt die Wirkungen des erteilten Patents.

229    Es ist unstreitig zwischen den Parteien, dass es zu erwarten ist, dass luxemburgische Gerichte den „function-way-result"-Test anwenden. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Luxemburg nicht geäußert. Es scheint allerdings auch nicht ausgeschlossen, dass die luxemburgischen Gerichte den französischen oder auch den deutschen Ansatz übernehmen würden. In allen drei Fällen wäre eine äquivalente Patentverletzung, wie oben gesehen, zu bejahen.

230    Es ist daher davon auszugehen, dass ein luxemburgischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(12)    Niederlande

231    Der Unterlassungsanspruch wegen Patentverletzung folgt in den Niederlanden aus Art. 70 Abs. 1 des Patentgesetzes (*Rijksoctrooiwet*). Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 53 Abs. 1 dieses Gesetzes regelt die Wirkungen des Patents.

232    Die niederländische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in den Niederlanden nur betreffend die Berücksichtigung der Erteilungsgeschichte geäußert. Insoweit wird auf die einleitenden Bemerkungen verwiesen. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

233    Es ist daher davon auszugehen, dass ein niederländischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(13)    Polen

234    Der Unterlassungsanspruch wegen Patentverletzung folgt in Polen – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Art. 287 Abs. 1 des Gesetzes betreffend das industrielle Eigentum (*Ustawa z dnia 30 czerwca 2000 r. Prawo własności przemysłowej*). Die von den Verfügungsklägerinnen an anderer Stelle angegebene Vorschrift des Art. 63 Abs. 1 dieses Gesetzes regelt die Wirkungen des Patents.

235    Die polnische Rechtsprechung wendet unstreitig den sogenannten „function-way-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Polen nicht geäußert. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

236    Es ist daher davon auszugehen, dass ein polnischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(14)    Portugal

237    Der Unterlassungsanspruch wegen Patentverletzung folgt in Portugal aus Art. 345 Abs. 1 des *Código da Propiedade Industrial*. Die von den Verfügungsklägerinnen angegebene Vorschrift des Art. 102 dieses Gesetzes regelt die Wirkungen des Patents.

238    Die Verfügungsklägerinnen haben vorgetragen, die portugiesische Rechtsprechung wende den „function-way-result"-Test. Die Verfügungsbeklagten tragen durch den portugiesischen Rechtsanwalt ▆▆▆▆▆▆ vor, der Test zur äquivalenten Patentverletzung laute zusammenfassend in Portugal wie folgt (siehe Anlage BBY 28a, S. 6 f.):

> „Zusammenfassend lässt sich sagen, dass in Portugal eine Verletzung durch Äquivalenz vorliegt, wenn

> (i)    Wenn die alternative Ausführungsform dasselbe technische Problem löst und im Wesentlichen dieselbe Funktion erfüllt, um im Wesentlichen dasselbe Ergebnis zu erzielen wie die beanspruchte Erfindung.

      (ii)    Wenn der Fachmann zum Zeitpunkt der Anmeldung oder der Priorität ver-
standen hätte, dass die alternative Ausführungsform im Wesentlichen die
gleiche Funktion erfüllt, um im Wesentlichen das gleiche Ergebnis wie die
beanspruchte Erfindung zu erzielen.

      (iii)    Außer wenn die alternative Ausführungsform

         (a)  war aus dem Stand der Technik ersichtlich

         (b)  unter klare Verzichtserklärungen oder Einschränkungen fällt, die der
Patentinhaber während des Prüfungsverfahrens oder des Nichtigkeits-
verfahrens gemacht hat,

         (c)  ist in der Patentschrift enthalten, aber nicht in den Ansprüchen.“

239    Eine äquivalente Patentverletzung ist sowohl nach dem „function-way-result“-Test
(insoweit kann auf die Ausführungen zu Belgien verwiesen werden) als auch nach
dem von Rechtsanwalt ▮▮▮▮▮▮▮ zitierten Test zu bejahen. Namentlich zu Kriterium
(iii) (b) wird auf die einleitenden Bemerkungen des Abschnitts verwiesen.

240    Es ist daher davon auszugehen, dass ein portugiesischer Richter ebenfalls zur
Feststellung einer äquivalenten Patentverletzung kommen würde.

(15)    Rumänien

241    Der Unterlassungsanspruch wegen Patentverletzung folgt in Rumänien – entspre-
chend den Angaben der Verfügungsklägerinnen – aus Art. 61 Abs. 1 des Patent-
gesetzes (*Lege nr. 64 din 11 octombrie 1991 privind brevetele de invenție*). Die in
Anlage AST 49 angegebene Vorschrift des Art. 31 dieses Gesetzes regelt hinge-
gen die Wirkung des erteilten Patents.

242    Die rumänische Rechtsprechung wendet unbestritten einen Test an, wonach eine
äquivalente Patentverletzung vorliegt, wenn das Austauschmittel (1) für die Fach-
person naheliegend war und (2) dasselbe Ergebnis erzielt. Das deckt sich insoweit
mit den Antworten der rumänischen Mitglieder der AIPPI auf den Fragebogen der
Vereinigung, als es dort heißt, das rumänische Recht definiere ein äquivalentes
Element als ein solches, das zum selben Ergebnis führt (siehe AIPPI, Yearbook
2023 – Doctrine of Equivalents, Anlage AST 18, S. 464). Die Verfügungsbeklagten
haben sich zur Prüfung der äquivalenten Patentverletzung in Rumänien nicht ge-
äußert. Auf Basis des geschilderten Tests ist eine äquivalente Patentverletzung zu
bejahen.

243    Es ist daher davon auszugehen, dass ein rumänischer Richter ebenfalls zur Fest-
stellung einer äquivalenten Patentverletzung kommen würde.

(16)    Slowakei

244    Der Unterlassungsanspruch wegen Patentverletzung folgt in der Slowakei aus
§ 32 Abs. 1 des Gesetzes betreffend Patente, ergänzende Schutzzertifikate und
einige Änderungen (*Slovak Zákon č. 435/2001 Z.z o patentoch, dodatkových
ochranných osvedčeniach a o zmene a doplnení niektorých zákonov*). Die in An-
lage AST 49 angegebene Vorschrift des § 15 dieses Gesetzes regelt hingegen die
Wirkung des erteilten Patents. Die an anderer Stelle von den Verfügungsklägerin-
nen angegebene Vorschrift des § 11 Abs. 1 dieses Gesetzes regelt Arbeitnehmer-
erfindungen.

245    Die Verfügungsklägerinnen tragen vor, nach slowakischem Recht liege eine äqui-
valente Patentverletzung vor, wenn (1) das Austauschmittel im Wesentlichen die-
selbe Funktion erfüllt und (2) das betroffene Merkmal, in dem das Austauschmittel
von dem Anspruch im Wortsinn abweicht, keinen relevanten Einfluss auf die Funk-
tion hat. Die Verfügungsbeklagten vertreten hingegen die Auffassung, es werde
geprüft, ob (1) das Merkmal in Kombination mit allen anderen Merkmalen des be-
trachteten unabhängigen Patentanspruchs im Wesentlichen die gleiche Funktion
erfüllt und ob (2) das Merkmal dem Fachmann zum Zeitpunkt der Bewertung be-
kannt ist; beide Merkmale müssten kumulativ erfüllt sein, um eine Äquivalenz zu
bejahen. Nach beiden Tests ist eine äquivalente Patentverletzung zu bejahen.

246    Es ist daher davon auszugehen, dass ein slowakischer Richter ebenfalls zur Fest-
stellung einer äquivalenten Patentverletzung kommen würde.

(17)    Slowenien

247    Der Unterlassungsanspruch wegen Patentverletzung folgt in Slowenien aus
Art. 121 Abs. 1 a) des Gesetzes betreffend das gewerbliche Eigentum (*Zakon o
industrijski lastnini*). Die in Anlage AST 49 angegebene Vorschrift des Art. 18
Abs. 1 dieses Gesetzes regelt hingegen die Wirkung des erteilten Patents. Die an
anderer Stelle von den Verfügungsklägerinnen angegebene Vorschrift des Art. 19
Abs. 1 dieses Gesetzes regelt Ausnahmen von der Wirkung des Patents.

248    Die Verfügungsklägerinnen haben unbestritten vorgetragen, die slowenischen Ge-
richte orientierten sich an der Rechtsprechung der deutschen und britischen

Gerichte. <u>Sie würden daher eine äquivalente Patentverletzung bejahen, wenn jene nach deutschen Maßstäben zu bejahen wäre.</u>

249    Es ist daher davon auszugehen, dass ein slowenischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(18)    Spanien

250    Der Unterlassungsanspruch wegen Patentverletzung folgt in Spanien – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Art. 71 Abs. 1 a) des Patentgesetzes (*Ley N° 24/2015, de 24 de julio de 2015, de Patentes*). Die an anderer Stelle von den Verfügungsklägerinnen angegebene Vorschrift des Art. 50 dieses Gesetzes regelt verfahrensrechtliche Fragen betreffend die Erteilung des Patents.

251    Die Verfügungsklägerinnen vertreten die Auffassung, dass die spanischen Gerichte sich an der britischen Rechtsprechung orientieren würden, wie sie im Urteil des britischen Supreme Court in *Actavis v. Eli Lilly* ausgesprochen wurde (siehe dazu oben zu Irland). Auf dieser Basis würden die spanischen Gerichte zur Feststellung einer Patentverletzung kommen.

252    Die Verfügungsbeklagten vertreten hingegen, unter Verweis auf ein Urteil des spanischen Obersten Gerichtshofs vom 29.04.2015 (ECLI:ES:TS:2015:1940), die Auffassung, die spanischen Gerichte würden die zweite „Actavis"-Frage aus Sicht des Patentinhabers strenger formulieren. So heißt es in dem von den Verfügungsbeklagten vorgelegten Gutachten des spanischen Rechtsanwalts ██████████ (Anlage BBY 27a, Punkt 36):

> „In diesem Zusammenhang sei daran erinnert, dass der Oberste Gerichtshof in seinem Urteil zu Escitalopram (siehe Dok. 18 meiner ersten Rechtsauffassung) feststellt, dass Frage 2 des Protokolls bewertet zum Prioritätsdatum des Patents, und dass ,*die Kammer die strengere These des Berufungsgerichts für zutreffender hält, da sie verlangt, dass die <u>begründete Erwartung, dass die Alternative funktionieren wird, die Schwelle der Vorhersehbarkeit erreicht</u>. [...]. Es ist erforderlich, dass der Fachmann „hätte" annehmen müssen, dass die Variante (das äquivalente Element) eine naheliegende Alternative war, d. h., dass der Erfolg der Substitution zur zufriedenstellenden Lösung des durch das Patent behandelten technischen Problems vorhersehbar war*'. Dementsprechend steht dieser Ansatz derzeit nicht im Einklang mit dem des britischen Obersten Gerichtshofs im Fall Pemetrexed, der eine Neuformulierung von Frage 2 des Protokolls in dem Sinne vorschlägt, dass

zum Prioritätsdatum davon ausgegangen werden muss, dass die Variante funktio-
niert." (Fettdruck des letzten Satzes, wie im Original, weggelassen)

253    In dem von den Verfügungsklägerinnen vorgelegten Gutachten des spanischen
Rechtsanwalts ███████████ (Anlage AST 29ü, Punkt 27) wird hingegen
die Erwartung geäußert, dass die spanischen Gerichte in Zukunft dem Ansatz des
britischen Supreme Court in *Actavis v. Eli Lilly* folgen würden.

254    Aus dem von Rechtsanwalt ██████ zitierten Urteil des spanischen Obersten
Gerichtshofs ergibt sich, dass im dort zu entschiedenen Rechtsstreit diskutiert
wurde, wie der Begriff *„obviedad"* auszulegen sei. Die kompletten relevanten drei
Absätze lauten wie folgt (Rn 15 des Urteils, Annex von Anlage BBY 9):

> „Der Unterschied zwischen dem angefochtenen Urteil und dem, was der Kläger in
> seiner Berufung vorbringt, besteht darin, dass die *Audiencia Provincial* der Auffas-
> sung ist, dass für das Vorliegen von Naheliegen ein Fachmann vorhersehen kann,
> dass die in der umstrittenen Umsetzung eines der technischen Elemente des Pa-
> tents verwendete Alternative, die dessen Funktionsweise nicht verändert, das tech-
> nische Problem des Patents lösen wird, der Berufungskläger es jedoch für ausrei-
> chend hält, dass ein Fachmann diese Alternative testen oder ausprobieren würde
> und vernünftigerweise erwarten kann, dass sie funktioniert.

> Das Gericht hält die anspruchsvollere Sichtweise des Gerichts für zutreffender,
> wonach die vernünftige Erwartung, dass die Alternative funktioniert, die Schwelle
> der Vorhersehbarkeit erreichen muss. Diese Vorhersehbarkeit ist nicht als 100-
> prozentige Erfolgssicherheit zu verstehen (die in diesen Bereichen der Wissen-
> schaft und Technologie schwer zu erreichen ist), sondern als eine sehr hohe Er-
> folgswahrscheinlichkeit. Es reicht nicht aus, wie der Berufungskläger behauptet,
> dass der Fachmann die Variante mit Erfolgserwartungen in Betracht gezogen
> hätte. Erforderlich ist, dass der Fachmann die Variante (das äquivalente Element)
> als naheliegende Alternative betrachtet hätte; das heißt, dass der Erfolg der Sub-
> stitution bei der Lösung des durch das Patent zufriedenstellenden technischen
> Problems vorhersehbar war.

> Daher reicht die bloße Möglichkeit, dass der Fachmann die Lösung des techni-
> schen Problems im Lichte des neuesten Stands der Technik übernommen hätte
> (‚could'), nicht aus; vielmehr ist eine hohe Wahrscheinlichkeit erforderlich, dass er
> dies getan hätte (‚would')."

> *(„La diferencia entre lo que afirma la sentencia recurrida y lo que sostiene la de-*
> *mandante en su recurso es que mientras que la Audiencia Provincial considéra*
> *que para que exista obviedad es necesario que para el experto en la materia sea*

*predecible que la alternativa utilizada en la realización controvertida respecto de uno de los elementos técnicos de la patente, que no altera el funcionamiento de la misma, solucionará el problema técnico abordado por la patente, en cambio para la recurrente basta con que el experto en la materia probaría o intentaría esa alternativa al tener una expectativa razonable de que funcionará.*

*La Sala considéra que es más acertada la tesis mas exigente de la Audiencia, al requérir que la expectativa razonable de que la alternativa funcionará alcance el umbral de la predecibilidad. Esta predecibilidad debe ser entendida no como un cien por cien de seguridad en el éxito (que en estos campos de la ciencia y de la técnica es difícil poder alcanzar) pero si como una probabilidad muy elevada de éxito. No es suficiente, como pretende la recurrente, que el experto en la materia habría contemplado la variante con expectativas de éxito. Es necesario que el experto en la materia "habría" contemplado que la variante (el elemento équivalente) era una alternativa obvia, esto es, que el éxito de la sustitucion, para resolver el problema técnico abordado satisfactoriamente por la patente, era predecible.*

*Por tanto, no basta la simple posibilidad de que el experto en la materia hubiera adoptado la solución al problema técnica a la vista del estado de la técnica mas reciente (podía, 'could'), sino que se exige una alta probabilidad de que lo hubiera hecho (habría, 'would').")*

255    In dem Sinne, wie der spanische Oberste Gerichtshof demnach ausweislich des dritten zitierten Absatzes den Begriff *„obviedad"* auslegt – was nicht unbedingt dem deutschen Verständnis des Begriffs „Vorhersehbarkeit" entspricht –, wäre eine äquivalente Patentverletzung zu bejahen. Denn anzustellende Routinetests stehen der „hohen Wahrscheinlichkeit", dass die Alternative funktioniert, nicht entgegen.

256    Darüber hinaus hält die Kammer es aber auch für wahrscheinlich, dass die spanischen Gerichte in Zukunft dem Ansatz des britischen Supreme Court, wie er in *Actavis v. Eli Lilly* geäußert wurde, zumindest für den Bereich pharmazeutischer Erfindungen folgen. Denn es ist zwischen den Parteien unstreitig, dass die spanischen Gerichte sich in der Vergangenheit an den britischen Gerichten orientiert haben. Und der britische Supreme Court hat in der genannten Entscheidung explizit mit Blick auf die spanischen Gerichte ausgesprochen, dass er eine Annäherung an kontinentaleuropäische Rechtsprechung anstrebe (siehe [2017] UKSC 48 Rn 97). Insoweit als der High Court of England and Wales in seiner Entscheidung vom 8. Oktober 2025 im Verfahren ▇▇▇▇▇▇▇▇▇ ([2025] EWHC 2527 (Pat)) ausgesprochen hat, im Rahmen der zweiten „Actavis"-Fragen sollten keine

Tests berücksichtigt werden, hat die Kammer Bedenken, ob die höheren britischen Instanzen dem folgen, geschweige denn die spanischen Gerichte.

(19) Schweden

257 Der Unterlassungsanspruch wegen Patentverletzung folgt in Schweden – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Kap. 15 § 4 des Patentgesetzes (*Patentlag*). Die an anderer Stelle von den Verfügungsklägerinnen angegebene Vorschrift des § 3 dieses Gesetzes stellt einen unklaren Verweis dar.

258 Die schwedische Rechtsprechung wendet unstreitig den sogenannten „functionway-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Schweden nicht geäußert. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

259 Es ist daher davon auszugehen, dass ein schwedischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(20) Tschechien

260 Der Unterlassungsanspruch wegen Patentverletzung folgt in Tschechien – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus § 4 des Gesetzes zur Durchsetzung gewerblicher Eigentumsrechte und zum Schutz von Betriebsgeheimnissen (*Zákon č. 221/2006 Sb., ze dne 25. dubna 2006 o vymáhání práv z průmyslového vlastnictví a ochraně obchodního tajemství*). Die an anderer Stelle von den Verfügungsklägerinnen angegebene Vorschrift des § 13 Abs. 1 des Patentgesetzes regelt hingegen die Wirkungen des erteilten Patents.

261 Die Verfügungsklägerinnen vertreten die Auffassung, nach tschechischem Recht liege – wie nach slowakischem Recht – eine äquivalente Patentverletzung vor, wenn (1) das Austauschmittel im Wesentlichen dieselbe Funktion erfüllt und (2) das betroffene Merkmal, in dem das Austauschmittel von dem Anspruch im Wortsinn abweicht, keinen relevanten Einfluss auf die Funktion hat.

262 Die Verfügungsbeklagten tragen hingegen unter Verweis auf ein Gutachten der tschechischen Rechtsanwältin ███████████ (Anlage BBY 29a, Punkt 12 ff.) Folgendes vor:

„Die Gerichte haben drei Voraussetzungen für die Anwendung der Äquivalenzdoktrin definiert:

Die erste Voraussetzung ist, dass das Merkmal ein wesentliches Merkmal der patentgeschützten Lösung sein muss.

Gemäß der zweiten Voraussetzung müssen der Gegenstand der Beurteilung und das entsprechende wesentliche Merkmal des Patents im Hinblick auf das im Patent festgelegte Ziel die gleiche Funktion haben.

Gemäß der dritten Voraussetzung muss das verglichene Element des Gegenstands der Beurteilung zum Zeitpunkt der Veröffentlichung des Patents im Stand der Technik bekannt gewesen sein, sodass ein Fachmann es ohne erfinderische Tätigkeit identifizieren konnte.

Die oben genannten Bedingungen müssen kumulativ erfüllt sein; die Nichterfüllung auch nur einer dieser Bedingungen reicht aus, um zu dem Schluss zu kommen, dass das verglichene Element des Gegenstands kein technisches Äquivalent des entsprechenden Merkmals der patentgeschützten Lösung ist.

Bei Zweifeln hinsichtlich des Umfangs des Patentschutzes ‚ist es erforderlich, eine Auslegung der Patentansprüche zu wählen, die zum Schutz dessen führt, was tatsächlich neu an der Erfindung war und warum das Patent erteilt wurde. Patentansprüche können daher nicht weit ausgelegt werden, um die Verwendung von Lösungen zu verhindern, die vor der Einreichung der Patentanmeldung bekannt waren, oder von neuen technischen Lösungen, die sich von dem erteilten Patent unterscheiden.'

Gemäß dem vom Tschechischen Amt für gewerbliches Eigentum herausgegebenen Praktischen Leitfaden für Verfahren vor dem Amt ‚darf die neue Kombination von Merkmalen (mit einem technischen Äquivalent) aufgrund dieses Äquivalents auch nicht so nahe an den Stand der Technik heranreichen, der für die Patentierbarkeit des betreffenden unabhängigen Patentanspruchs relevant war, dass diese Patentierbarkeit durch ihr Vorhandensein in Frage gestellt wird. Die Anwendung der Äquivalenztheorie ist generell ausgeschlossen in Fälle, in denen ein technisches Äquivalent an die Stelle eines Merkmals eines unabhängigen Patentanspruchs treten sollte, das allein die Kombination der Merkmale dieses Anspruchs vom Stand der Technik unterscheidet.'"

263    Die Verfügungsbeklagten schlussfolgern, dass ein tschechisches Gericht die Äquivalenz für nicht nachgewiesen erachten würde, „da dies den Anwendungsbereich des erteilten Patents in unangemessener Weise ausweiten würde, um ein Merkmal

abzudecken, das am Prioritätstag selbst nach den Ausführungen der Patentinhaberin und der Antragstellerinnen als erfinderisch angesehen worden wäre."

264     Danach ist eine äquivalente Patentverletzung unabhängig davon, ob der Auffassung der Verfügungsklägerinnen oder derjenigen der Verfügungsbeklagten zu folgen ist, zu bejahen. Denn bei der Prüfung der äquivalenten Patentverletzung nach deutschem Recht wurde festgestellt (darauf wird auch in den einleitenden Bemerkungen dieses Abschnitts verwiesen), dass das Merkmal „Natriumphosphatpuffer" nicht „allein die Kombination der Merkmale [des Patentanspruchs] vom Stand der Technik unterscheidet" bzw. dass die Patentinhaberin dieses Merkmal nicht (für sich genommen) als erfinderisch angesehen hat.

265     Es ist daher davon auszugehen, dass ein tschechischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(21)    Ungarn

266     Der Unterlassungsanspruch wegen Patentverletzung folgt in Ungarn – entsprechend der Angabe der Verfügungsklägerinnen in Anlage AST 49 – aus Art. 35 Abs. 2 b) des Gesetzes zum Schutz von Erfindungen durch Patente (*1995. évi XXXIII. törvény a találmányok szabadalmi oltalmáról*).

267     Die ungarische Rechtsprechung wendet unstreitig den sogenannten „functionway-result"-Test zur Feststellung einer äquivalenten Patentverletzung an. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Ungarn nicht geäußert. Daher kann auf die obigen Ausführungen zur Anwendung des function-way-result-Tests in Belgien verwiesen werden.

268     Es ist daher davon auszugehen, dass ein ungarischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

(22)    Zypern

269     Der Unterlassungsanspruch wegen Patentverletzung folgt in Zypern aus Art. 61 Abs. 2 a) des Patentgesetzes (*Ο περί Διπλωμάτων Ευρεσιτεχνίας Νόμος του 1998 (Ν. 16(Ι)*). Die in Anlage AST 49 und an anderer Stelle von den Verfügungsklägerinnen angegebene Vorschrift des Art. 27 Abs. 1 dieses Gesetzes regelt hingegen die Wirkungen des erteilten Patents.

270     Die zypriotische Rechtsprechung orientiert sich unstreitig an den britischen Gerichten. Dies erscheint auch vor dem Hintergrund der Kolonialgeschichte (Zypern

war von 1878 bis 1960 britisches Protektorat) nachvollziehbar. Die Verfügungsbeklagten haben sich zur Prüfung der äquivalenten Patentverletzung in Zypern nicht geäußert. Daher kann auf die obigen Ausführungen zu Irland verwiesen werden.

271   Es ist daher davon auszugehen, dass ein zypriotischer Richter ebenfalls zur Feststellung einer äquivalenten Patentverletzung kommen würde.

f.   Ergebnis der Analyse der Äquivalenzprüfung in den 22 geltend gemachten Ländern

272   Es ist davon auszugehen, dass die Einwände der Verfügungsbeklagten in keinem Fall durchgreifen und ein nationaler Richter in jedem Staat zu dem Ergebnis kommen würde, dass eine Patentverletzung mit äquivalenten Mitteln vorliegen würde.


3.   Erstbegehungsgefahr

273   Es besteht in Hinblick auf alle 22 mit diesem Verfahren geltend gemachten Staaten eine Erstbegehungsgefahr, so dass das von den Verfügungsklägerinnen geltend gemachte Unterlassungsbegehren begründet ist.

a.   Erstbegehungsgefahr als materiell-rechtliche Voraussetzung

274   Ausgangspunkt ist, dass sich die Prüfung einer etwa erforderlichen Erstbegehungsgefahr als materiell-rechtliche Voraussetzung des Unterlassungsanspruchs nach dem Recht des Schutzlands richtet (siehe BGH, Urteil vom 26.04.1990, I ZR 99/88, GRUR 1990, 687, 689 – Anzeigenpreis II; Benkard/Grabinski/Zülch/Tochtermann, PatG, 12. Aufl., § 139 Rn 27).

275   Die Anforderungen an den klägerischen Vortrag zur Erstbegehungsgefahr dürfen nicht überspannt werden. Insbesondere ist es zulässig, wenn die Klagepartei Tatsachen vorträgt, die es als hinreichend wahrscheinlich erscheinen lassen, dass in allen geltend gemachten Staaten eine unmittelbare Patentverletzung bevorstehen könnte, beispielsweise durch das mögliche baldige Anbieten eines Produkts. Ausreichend wäre der Vortrag, dass eine Zulassung zumindest beantragt ist und eine Vertriebsstruktur besteht, die es ermöglichen würde, das Produkt zu vertreiben. Gerade im Pharmabereich werden sich die erheblichen Investitionen in neue Produkte nur refinanzieren lassen, wenn dieses Produkt weithin verfügbar ist. Dies gilt für die in der Entwicklung kostspieligen Biosimilars besonders. Wenn ein solcher Vortrag erfolgt ist, wäre es bei der in Anspruch genommenen Partei vorzutragen

und gegebenenfalls zu beweisen, dass trotz der Möglichkeit entweder ein Vertrieb nicht geplant ist, oder die rechtlichen Voraussetzungen in einem Land einen Unterlassungsanspruch nicht rechtfertigen würden.

276    Vorliegend ist von maßgeblicher Bedeutung, dass mit der Zulassung des Biosimilars ▮▮▮▮ die Möglichkeit besteht, dass es in allen geltend gemachten Staaten in arzneimittelrechtlicher Hinsicht zugelassen werden könnte. Nach dem Vortrag der Verfügungsbeklagten haben sie bereits eine Struktur entwickelt, die in arbeitsteiliger Weise den Europäischen Markt mit dem Biosimilar ▮▮▮▮ versorgen kann. Hinzu kommt, dass es in Deutschland, Frankreich, Belgien und Italien bereits negative Feststellungsklagen gibt bzw. gegeben hat. Insgesamt kann dies nur so bewertet werden, dass für alle in Anspruch genommenen Länder zumindest die Gefahr eines Markteintritts besteht.

b.    <u>Hinreichend konkrete Verletzungsgefahr in allen 22 Ländern</u>

277    Es ist den Verfügungsklägerinnen in Anbetracht dieser Bedrohungssituation nicht zuzumuten, bezüglich jedes Landes, in dem das Verfügungspatent validiert ist, zuzuwarten, bis die Verfügungsbeklagten eventuell auch für dieses Land einen Markteintritt ankündigen und/oder in diesen Mitgliedstaaten weitere negative Feststellungsklagen gegen die Verfügungsklägerinnen erheben.

278    Eine effektive Durchsetzung von Patentrechten fordert – zumindest für die Mitgliedstaaten der Europäischen Union unmittelbar – mit der Durchsetzungsrichtlinie 2004/48/EG, dass bei einer hinreichend konkreten Gefährdungslage vorsorglich Unterlassungsbegehren erlangt werden können. Dies gilt insbesondere auch unter dem Gesichtspunkt der Verfahrenskonzentration. Potenzielle Patentverletzer sollen sich nicht dadurch einen Vorteil verschaffen können, dass sie in sukzessiver Weise vorgehen. Ansonsten wären sie in der Lage finanzielle und personelle Ressourcen von Patentinhabern – die sich nicht aussuchen können, dass ihre Schutzrechte von Dritten in verschiedenen Staaten verletzt werden – über Gebühr beansprucht werden.

c.    <u>Keine andere Bewertung aufgrund der Entscheidung des LG Düsseldorf, 4b O 103/23</u>

279    Soweit die Verfügungsbeklagten in diesem Zusammenhang auf ein Urteil des LG Düsseldorf verweisen (Urteil vom 13.08.2024, 4b O 103/23, GRUR-RS 2024,

44187) liegt der dortigen Entscheidung und auch namentlich der von den Verfügungsbeklagten zitierten Textstelle eine andere Konstellation zugrunde. Im dortigen Verfahren ging es um eine negative Feststellungsklage eines Biosimilar-Herstellers, dessen chemische Formulierung zum Entscheidungszeitpunkt im Einzelnen noch nicht feststand. Die Interessenlage der Parteien im dortigen Verfahren war mithin eine gänzlich andere als hier. Dort wollte der Kläger weit im Vorfeld gerichtlich die Zulässigkeit seines Handelns abklären lassen, bevor er seine Investitionen im Hinblick auf die konkrete Formulierung und Vermarktungspläne fortsetzte. Das stellt aber kein rechtliches Interesse dar, wie das LG Düsseldorf zutreffend festgestellt hat. Im hiesigen Fall geht es um die Abwehr einer drohenden Patentverletzung, die hinsichtlich des Eingriffs in den Schutzbereich bereits feststeht. Die von den Verfügungsbeklagten konkret zitierte Stelle des Urteils (Rn 28) besagt, dass sich die Patentinhaberin in Deutschland keine Äußerungen ihrer Prozessvertreter in einem ausländischen Verfahren zurechnen lassen muss, in denen diese Prozessvertreter eine Erstbegehungsgefahr für das ausländische Land bejahen. Von jener Konstellation ist es zu unterscheiden, wenn die Kammer auf Basis der dargelegten Umstände betreffend mehrerer Länder zu dem Ergebnis kommt, dass eine Erstbegehungsgefahr für diese Länder zu bejahen ist.

d.    Bewertung anhand einer Gesamtschau der auf die einzelnen Länder bezogenen Äußerungen und Handlungen des Patentverletzers

280    Die Erstbegehungsgefahr ist in Fällen, in denen der Patentinhaber gleichzeitig die Unterlassung der Patentverletzung in mehreren ausländischen Ländern geltend macht, auf Basis einer Gesamtschau der auf diese Länder bezogenen Äußerungen und Handlungen des Patentverletzers zu bewerten. Nach diesem Maßstab sind die folgenden Aspekte relevant:

281    (1)    Die Verfügungsbeklagten haben in dem in ihrem Namen versandten Schreiben an die Verfügungsklägerin zu 1) vom 18. Juni 2025 (Anlage AST 1) angekündigt:



> „We therefore officially inform you that our clients will, in collaboration with ███ ███████████████████████ as strategic commercialisation partner, market ████████ in Germany under the brand names ███████████████████, starting after the expiry of the SPC on November 23, 2025. █████████ GmbH has signed a licensing agreement with ███████████ GmbH for the semi-exclusive commercialisation of ██████ in major parts of Europe, including Germany."

282    Es droht folglich eine Vermarktung von ▬▬▬„in großen Teilen Europas" ab dem 24. November 2025. Diese Ankündigung deckt sich mit dem Inhalt des Berichts für die Hauptversammlung der Verfügungsbeklagten zu 1) vom selben Tag. Dort heißt es zum Einführungsstatus in Bezug auf die angegriffene Ausführungsform (Anlage AST 44, S. 33):



283    Eine Seite zuvor werden Vertriebspartner für die angegriffene Ausführungsform präsentiert (MENA steht wahrscheinlich für „Middle East, Northern Africa", APAC für „Asia, Pacific" und LATAM für „Latin America"):



284    Dies zeigt, dass die <u>Verfügungsbeklagten eine weltweite Vermarktungsstrategie planen mit einem besonderen Fokus auf eine schnelle Einführung in Europa</u>. Dabei zeigt der Bericht für die Hauptversammlung der Verfügungsbeklagten zu 1), dass sie in Bezug auf andere Biosimilars neben Deutschland, Frankreich, Italien und dem Vereinigten Königreich auch Spanien zu den „5 Topmärkten" in Europa zählt (Anlage AST 44, S. 26, 30).

285    (2)    <u>Diese Ankündigungen haben die Verfügungsbeklagten auch umgesetzt</u>. In ihrer Schutzschrift vom 18. März 2025 haben sie mitgeteilt (siehe dort Rn. 43), dass sie den italienischen Behörden die nach Art. 5 Abs. 2 b) der Verordnung Nr. 469/2009 des Europäischen Parlaments und des Rates über das ergänzende Schutzzertifikat (ESZ-VO) erforderliche Mitteilung über eine bevorstehende Herstellung von ███████gemacht hätten. In der Anmeldung hätten sie kundgetan, dass „Zweck der Herstellung die Ausfuhr und die Lagerung von ██████ sei und dass der Mitgliedstaat, in dem die Herstellung stattfinden solle, Italien sei" (dort Rn. 44).

286    Weiter haben die Verfügungsbeklagten im August und Dezember 2024 <u>in Frankreich bzw. Belgien jeweils negative Feststellungsklage mit dem Ziel erhoben, feststellen zu lassen, dass die angegriffene Ausführungsform das Verfügungspatent nicht verletz</u>t. Im Februar 2025 folgte ein entsprechender Antrag im einstweiligen Rechtsschutz in Italien. In dem von der Kammer zu entscheidenden Hauptsacheverfahren 7 O 16055/24 haben die Verfügungsbeklagten ihre negative Feststellungsklage im Übrigen auf die Niederlande, Österreich, Portugal, Schweiz und Spanien erweitert.

287    Laut dem von den Verfügungsklägerinnen vorgelegten Gutachten des belgischen Rechtsanwalts ████████ (Anlage AST 30ü, Rn 22) sind auf der Website der belgischen Föderalen Agentur für Arzneimittel und <u>Gesundheitsprodukte alle belgischen Produktinformationen bereits veröffentlicht</u>, darunter die Fachinformation, die Etikettierung und die Packungsbeilage fü█████████████████, die in Niederländisch, Französisch, Deutsch und Englisch heruntergeladen werden könnten. In dem von den Verfügungsklägerinnen vorgelegten Gutachten der französischen Rechtsanwältin ████████heißt es, durch Entscheidung vom 31. Juli 2025 seien ████████████in die Liste der █████Biosimilar-Arzneimittel der französischen Behörde für die Zulassung von Arzneimitteln in Frankreich (,ANSM') aufgenommen worden (siehe Anlage AST 28ü, S. 19).

288    Es ist auch von Bedeutung, dass die Verfügungsbeklagten über <u>eine einheitliche</u> <u>europäische arzneimittelrechtliche Zulassung</u> für die angegriffene Ausführungsform verfügen, mithin für keinen EU-Mitgliedstaat große regulatorischen Hürden vor einer Vermarktung bestehen.

289    (3)    Die Verfügungsbeklagten haben eine Studie der Europäischen Kommission mit dem Titel „Generics in small markets or for low volume medicines" (Anlage BBY 14) vorgelegt, mit der sie nachweisen wollen, dass die europaweit simultane Einführung von Generika und Biosimilars die „absolute Ausnahme" sei (Antragserwiderung vom 05.08.2025, Rn 83). Die Verfügungsbeklagten geben aber in dem Zusammenhang selbst an, „üblich [seien] gestaffelte Markteintritte, bei denen Pharmafirmen große und lukrative Märkte zuerst bedienen und kleinere Staaten verzögert oder gar nicht". Sie geben also selbst an, dass es <u>in der Regel gut mög</u> <u>lich ist, dass kleinere Staaten ebenfalls beliefert werden, nur später als die großen</u>. Es ist davon auszugehen, dass bei – wie die Verfügungsbeklagten selbst betonen – in der Entwicklung sehr teuren Biosimilars häufiger eine wenigstens verzögerte Markteinführung stattfindet als bei Generika, um die Kosten durch die breitere Vermarktung zu amortisieren. Zudem zeigt die – Generika und Biosimilars gemeinsam erfassende – Studie immerhin, dass zu einem bestimmten Zeitpunkt in neun von 30 Staaten mindestens fünf Generika bzw. Biosimilars, bezogen auf elf Wirkstoffe, verfügbar waren und in weiteren neun Staaten drei bis vier Generika bzw. Biosimilars. In mehr als der Hälfte der untersuchten Staaten waren also allein zu einem bestimmten Zeitpunkt etwa ein Drittel der Wirkstoffe durch Generika bzw. Biosimilars flankiert, womit ein verzögerter Markteintritt noch nicht abgedeckt ist.

290    (4)    Es ist mithin davon auszugehen, dass die Verfügungsbeklagten ihr Produkt ▇▇▇▇ nicht nur in Deutschland, Belgien, Frankreich und Italien, sondern auch in mehreren anderen europäischen Ländern zeitnah auf den Markt bringen werden. In einer solchen Konstellation können aber nach Auffassung der Kammer nicht die üblichen Maßstäbe für die Erstbegehungsgefahr gelten, wie sie die Verfügungsbeklagten für mehrere europäische Länder aufgezeigt haben, ohne dass in jenen Fällen (erkennbar) auf eine Konstellation wie die hiesige abgestellt worden wäre. Der <u>feststehende, nah bevorstehende Markteintritt zumindest in Deutschland, Bel</u> <u>gien, Frankreich und Italien muss</u> vor dem Hintergrund der von den Verfügungsbeklagten selbst eingeräumten Tatsache, dass Biosimilars zeitgleich oder verzögert auch in anderen europäischen Staaten auf den Markt gebracht werden, <u>dazu</u> <u>führen, dass die Erstbegehungsgefahr auch für die anderen europäischen Staaten</u> <u>bejaht wird</u>.

# C.

291    Auch der erforderliche Verfügungsgrund liegt für alle geltend gemachten Länder vor.

## I.    Voraussetzungen eines Verfügungsgrundes

292    Der Erlass einer einstweiligen Verfügung ist nur gerechtfertigt, wenn neben dem Verfügungsanspruch auch ein Verfügungsgrund glaubhaft gemacht wird. Wie bereits ausgeführt, richtet sich die Prüfung des Verfügungsgrundes nach der *lex fori*, also nach deutschem Recht.

293    Der Erlass einer einstweiligen Verfügung setzt gemäß §§ 940, 936, 920 f. ZPO eine objektiv begründete Gefahr voraus, dass die Rechtsverwirklichung des Verfügungsklägers mittels eines erst im Hauptsacheprozess erlangten Urteils vereitelt oder erschwert werden könnte. Dies verlangt zum einen eine für die Eilmaßnahme sprechende rein zeitliche Dringlichkeit (II.), einen gesicherten Rechtsbestand des Verfügungspatents (III.1) und daneben eine Abwägung der widerstreitenden Interessen zwischen den dem Schutzrechtsinhaber ohne den Erlass der beantragten Verfügung drohenden Nachteilen, welche gegen die Interessen des als Verletzer in Anspruch genommenen Verfügungsbeklagten abgewogen werden müssen (III.2). Das Vorliegen eines Verfügungsgrundes ist seitens der Verfügungskläger darzulegen und glaubhaft zu machen (vgl. st. Rpsr., vgl. Urteil der Kammer vom 29.09.2022, 7 O 4716/22, GRUR-RS 2022, 26511 Rn 62 – Fingolimod, mit Verweis auf OLG München, Urteil vom 22.04.2021, 6 U 6968/20, GRUR-RS 2021, 12272 – Cinacalcet).

## II.    Dringlichkeit

294    Die im Geltungsbereich des Oberlandesgerichts München auch für Patentsachen geltende Monatsfrist wurde seitens der Verfügungsklägerinnen eingehalten.

295    Die Monatsfrist hat mit der Entscheidung des Bundespatentgerichts am 26. Juni 2025 begonnen und war bei Antragstellung am 21. Juli 2025 noch nicht abgelaufen.

296     Als einstweiligen Rechtsschutz begehrende Partei sind die Verfügungsklägerinnen zwar grundsätzlich zur zügigen Durchsetzung ihrer Rechte angehalten, und jedes zögerliche Verhalten kann sich zu ihren Ungunsten auswirken. Gleichwohl sind sie nicht verpflichtet, auf einer rechtlich und/oder tatsächlich ungesicherten Basis Rechtsschutz zu begehren. Sie dürfen vielmehr das Gericht erst dann anrufen, wenn sie alle erforderlichen Tatsachen ermittelt haben und ein Obsiegen sicher absehbar ist, wobei sie bei der Ermittlung des Sachverhalts die im Einzelfall gebotene Eile an den Tag legen müssen (OLG Düsseldorf, Beschluss vom 15.02.2021, 2 W 3/21, GRUR-RS 2021, 2572 – Cinacalcet),

297     Da nach der Rechtsprechung des Oberlandesgerichts München mit einem Hinweis nach § 83 Abs. 1 Satz 1 PatG oder einer Entscheidung des Bundespatentgerichts in einem Nichtigkeitsverfahren eine gesteigerte Vermutung der Rechtsbeständigkeit des Verfügungspatents einhergeht, entsteht sowohl mit dem Erlass eines vorläufigen Hinweises nach § 83 Abs. 1 Satz 1 PatG, als auch mit einem das Patent – ganz oder teilweise – aufrechterhaltenden Urteil eine neue Tatsache, die den Rechtsbestand des jeweiligen Patents untermauert und damit die Durchsetzung vereinfacht. Deshalb wird dadurch jeweils eine neue Dringlichkeitsfrist in Gang gesetzt.

298     Dieser Maßstab gilt auch im hiesigen grenzüberschreitenden Kontext. Angesichts der hohen Bedeutung einer Entscheidung des Bundespatentgerichts auch über die Grenzen Deutschlands hinaus durften die Verfügungsklägerinnen den Erlass dieser Entscheidung abwarten. Denn hätte das Bundespatentgericht das Verfügungspatent am 26. Juni 2025 für nichtig erklärt, hätte dies die Erfolgsaussichten der Verfügungsklägerinnen auch in anderen Jurisdiktionen erheblich geschmälert.

### III.     Interessenabwägung

299     Die bei der Prüfung des Verfügungsgrundes vorzunehmende Interessenabwägung fällt zu Gunsten der Verfügungsklägerinnen aus. Das Erfordernis des Verfügungsgrundes umfasst in Patentstreitigkeiten auch die Frage des Rechtsbestandes des Verfügungspatents. Dieser ist vorliegend gesichert (1.). Auch die Interessenabwägung im Übrigen fällt zugunsten der Verfügungsklägerinnen aus (2.).

300     1.     Der <u>Rechtsbestand</u> ist durch die erstinstanzliche Entscheidung des BPatG vom 26. Juni 2025 gesichert. Die Verfügungsbeklagten haben insoweit auch keine weiteren Argumente vorgebracht.

301    2.    Die stets durchzuführende <u>Interessenabwägung</u> unter Berücksichtigung der Besonderheiten dieses Einzelfalls fällt zugunsten der Verfügungsklägerinnen aus.

302    Dabei ist grundsätzlich das Interesse des Verfügungsklägers an dem Erlass einer einstweiligen Verfügung vorrangig, wenn der Verfügungsanspruch und der Rechtsbestand hinreichend glaubhaft gemacht sind. Die Zurückweisung einer einstweiligen Verfügung kommt nur dann in Betracht, wenn die aus ihrer Vollstreckung den Verfügungsbeklagten erwachsenden Nachteile deutlich über die üblicherweise mit einem Unterlassungsgebot einhergehenden Eingriffe hinausgehen (LG München I, Urteil vom 27.10.2022, 7 O 10295/22, GRUR 2023, 152 Rn 104 – Bortezomib). Hierfür bestehen vorliegend keine greifbaren Anhaltspunkte.

303    Es sind keine durchgreifenden Gründe erkennbar, warum es den Verfügungsklägerinnen zuzumuten sein sollte, die weitere Präsenz des patentverletzenden Produkts – in weiten Teilen Europas – hinzunehmen und stattdessen bei einer Verurteilung der Verfügungsbeklagten in einem Hauptsacheprozess auf Schadenersatzansprüche verwiesen zu werden.

304    Das Gericht verkennt nicht, dass erhebliche wirtschaftliche Interessen der Verfügungsbeklagten betroffen sind. Diese sind bei der Abwägung allerdings nur ausnahmsweise zu berücksichtigen. Die Verfügungsbeklagten haben nicht dargelegt, dass der ihnen drohende Schaden über das hinausgeht, was regelmäßige Folge eines Unterlassungsgebots ist, auch wenn dieser Schaden angesichts der höheren Investitionen eines Biosimilar-Herstellers gegenüber einem Generika-Hersteller entsprechend erhöht ist. Das ist aber letztlich nur eine Folge des gewählten Produktmarkts. Dann haben die Verfügungsbeklagten als Verletzerinnen des Verfügungspatents diesen Schaden jedoch hinzunehmen. Weiter ist auch zu beachten, dass es sich bei den <u>Parteien um direkte Wettbewerber handelt und daher auch bei den Verfügungsklägerinnen ein besonderes wirtschaftliches Interesse und damit ein gesteigertes Schutzbedürfnis vorliegt</u>. Umgekehrt können die von den Verfügungsbeklagten angeführten Argumente betreffend die aus der Unterlassung resultierenden Folgen für Patienten (verminderter Zugang zu preisgünstiger Therapie) und Krankenkassen (höhere Kostenbelastung) nicht entscheidend berücksichtigt werden, weil diese Interessen nur im Rahmen nicht patentverletzender Aktivitäten Geltung beanspruch können. Vor diesem Hintergrund scheidet ein Zurückstehen des Unterlassungsanspruchs im Wege der einstweiligen Verfügung aus.

**D.**

**I.**

305    Die Kostenentscheidung folgt aus § 92 Abs. 1 S. 1 ZPO. Dabei war die teilweise Klagerücknahme bezüglich der Länder Estland, Island, Liechtenstein, Lettland, Malta, Monaco, Schweiz und Türkei nach § 269 Abs. 3 S. 2 ZPO zu berücksichtigen.

306    Hinsichtlich der im Verhältnis von der Verfügungsklägerin zu tragenden Kosten hat das Gericht insbesondere die Bevölkerungsanzahl der ausgeschiedenen Länder ins Verhältnis gesetzt zur Bevölkerungsanzahl aller ursprünglich zur Entscheidung gestellten 30 Länder. Danach haben die ausgeschiedenen Länder einen Anteil von etwa 18,5 Prozent an allen 30 Ländern. Angesichts dessen, dass es vorliegend um ein Medikament zur Behandlung beim Menschen geht, schien diese Herangehensweise dem Gericht angemessen. Wenn man stattdessen den Ansatz der Verfügungsklägerin heranzieht, welche das BIP der jeweiligen Länder vergleichen möchte, kommt man auf einen Anteil der acht Länder am BIP aller 30 Länder von etwa 17 Prozent. Vor dem Hintergrund, dass acht von 30 Ländern einen Quotienten von etwa 26 Prozent ergibt, hat das Gericht die genannten Anteile auf ein Fünftel aufgerundet, anstatt sie auf 15 Prozent abzurunden.

**II.**

307    Aus der Natur des einstweiligen Verfügungsverfahrens ergibt sich, dass die Entscheidung vorläufig vollstreckbar ist.

308    Die Anordnung der von den Verfügungsbeklagten angeregten Sicherheitsleistung gemäß §§ 936, 921 S. 2 ZPO kam nicht in Betracht. Diese wird nur angeordnet, wenn Anhaltspunkte dafür bestehen oder konkret vorgetragen sind, dass ein etwaiger Schadensersatzanspruch der unterlegenen Verfügungsbeklagten nach § 945 ZPO gegenüber der Verfügungsklägerin nicht realisiert werden könnte (siehe LG München I, Urteil vom 24.06.2016, 21 O 5583/16, GRUR-RS 2016, 11707 Rn 117 – Generikum, unter Verweis auf OLG München, Urteil vom 28.06.2021, 6 U 1560/12, BeckRS 2013, 14928 – Hydrogentartrat; a.A. in

ständiger Rechtsprechung LG Düsseldorf, vgl. GRUR-RS 2020, 39316 Rn 99 – Schnellauflöseformulierung). Dies ist nicht der Fall.



Dr. Schön                          Tözsér                          Dr. Schweyer




Verkündet am:

_____
Urkundsbeamtin der Geschäftsstelle

## Munich Regional Court I

Ref.:   7 O 9383/25



## IN THE NAME OF THE PEOPLE

In the legal dispute

**1.** ███████████████████████████████████

███████████████████████████████, 

     - plaintiff -

**2.** ███████████████████████████████████

██████████████████████████████████████

███████████████████████

  - Plaintiff -

█████████████████

███████████████████████████████████

███████████████████

against

**1.** ███████████████████████████████████

██████████████████████████████████████

███████████████████████

**2.** ███████████████████████████████████

██████████████████████████████████

███████████████████

█████████████████

███████████████████████████████████

███████

regarding a preliminary injunction for patent infringement
EP 2 364 691 B1

<div style="border:1px solid red; color:red;">

**The operative part follows
the correction order of
October 8, 2025**

</div>

the Regional Court of Munich I - 7th Civil Chamber - presided over by Regional

Court Judge Dr. Schön, Regional Court Judge Tözsér, and Regional Court Judge

Dr. Schweyer, based on the oral hearing of

September 25, 2025, the following

Munich Regional Court I, 7 O
9383/25

# Final judgment

I.    The defendants are ordered

under penalty of a fine of up to EUR 250,000.00 to be determined by the court for each case of infringement – or, alternatively, imprisonment of up to six months – or imprisonment of up to six months, in the case of repeated infringements up to a total of two years, whereby the imprisonment is to be served by the respective legal representative of the respondents,

**to refrain from**

an ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist for use in intravitreal administration, comprising:

a)  1–100 mg/ml of a VEGF antagonist consisting of amino acids 27–457 of SEQ ID NO: 4, which is glycosylated at Asn residues 62, 94, 149, 222, and 308;

b)  0.01–5% of one or more organic co-solvents, which are one or more of polysorbate, polyethylene glycol (PEG), and propylene glycol;

c)  30–150 mM of a tonicity agent selected from sodium chloride or potassium chloride;

d)  5–40 mM histidine buffer; and

e)  1.0–7.5% of a stabilizer selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol,

pH between about 5.8–7.0

in Austria, Belgium, Bulgaria, Denmark, Finland, France, Greece, Ireland, Italy, Lithuania, Luxembourg, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain,

Sweden, the Czech Republic, Hungary, and Cyprus, or to import or possess them for the aforementioned purposes.

II.    The plaintiffs shall bear one-fifth of the costs of the proceedings and the defendants shall bear four-fifths.

**Guiding principles of the Chamber:**

1.  In the opinion of the Chamber, local jurisdiction in cross-border patent infringement proceedings also applies to defendants who do not have their general place of jurisdiction within the jurisdiction of the court seised, but at any location in the Federal Republic of Germany. This is because patent infringement proceedings are characterized by the "flying" tort jurisdiction. This also applies to cross-border cases, as otherwise the legal position of patent holders would depend on the general place of jurisdiction of the infringer. In fact, only a few courts have experience in hearing complex patent infringement proceedings. Such an understanding would not do justice to the idea behind the concentration maxim of Section 143 (2) PatG and the effective protection of intellectual property rights intended by Directive 2004/48/EC (para. 34).

2.  According to German understanding, the question of whether a patent is legally valid is assessed in the context of the existence of a reason for an injunction. This also applies when cross-border issues are to be decided, as this is a procedural question governed by the law of the state of the court seised (para. 43).

3.  Procedural issues are governed by the law of the place of jurisdiction ("lex fori"). Substantive issues are governed by the law of the country in which the claims are asserted ("principle of protection"). Based on this principle, it is necessary to distinguish when exactly a provision qualifies as a substantive law provision. This is because only substantive law provisions are not subject to German law. The starting point     is     the understanding    (taking into account       the

fundamental principles of the European Patent Convention and Enforcement Directive 2004/48/EC) that procedural rules in no country should serve to pave the way for patent infringements and make it more difficult for patent holders to conduct proceedings in cross-border cases (para. 49 f.).

4. Regulations governing technical or formal procedures in another country do not serve a protective function with regard to enabling patent infringements. These regulations always fall under procedural law and are therefore governed by German law in the present case. This ensures that patent holders in several countries are not prevented from enforcing their rights by a fragmented consideration of formal requirements (para. 51).

5. If this means that patent infringement can only be prosecuted in certain countries if the infringer has their general place of jurisdiction in the Federal Republic of Germany, this may be factually correct. However, it is not apparent that patent infringers based in Germany could claim that they should be subject to a similarly low level of protection as patent infringers based in other countries. There is no right to equality in wrongdoing (para. 52).

6. In any case, following a decision by the Federal Patent Court in nullity proceedings concerning the German part of a European patent, there would also be urgency with regard to the other national parts of the European patent. This follows from the fact that the urgency period begins anew with each confirmatory decision on the legal validity. This effect also applies to the other national parts of the European patent, since the decisions of the Federal Patent Court, which also includes technical judges, have a Europe-wide signal effect ("beacon character") due to its recognized expertise (para. 66).

7. The assessment of the legal situation in the Federal Republic of Germany is a strong indication that the same result will be found in the other EPC member states. Due to this strong indication, it is not necessary for the Chamber to obtain expert opinions from independent experts on the respective foreign law.

Otherwise, the effective enforcement of industrial property rights required by the Enforcement Directive would be made more difficult in a way that would be unreasonable for the owners of such rights. Rather, it is up to the party against whom the claim is made to present concrete evidence that a different decision would be made under national law. It is incumbent upon them to explain why other states would come to a different assessment (para. 153 ff.).

8. It is irrelevant whether proceedings are conducted differently in other countries (e.g., through expert evidence), whether preliminary injunctions take significantly longer, or whether there is fundamental skepticism toward the legal concept of equivalent patent infringement (para. 156).

9. The only criterion is whether national law (statutes or established case law) modifies the requirements of the EPC in a way that would lead to a different result. This means that the party being sued must submit the provisions or decisions that it considers relevant. In addition, it must submit a qualified opinion from an expert knowledgeable in the relevant field of law who is bound by professional ethics to tell the truth. These principles regarding the indicative effect of infringement under German law apply not only to literal patent infringements, but also to equivalent patent infringements, particularly in cases of simple equivalence. In the Chamber's understanding, the extension of the scope of protection to equivalent forms of infringement serves to bring clear circumvention solutions within the scope of protection of a patent. A clear circumvention solution exists at least when a feature that does not form the core of the invention is modified (para. 157 et seq.).

10. Statements made during the granting procedure may, at most, have an influence on the protection granted by the grant in terms of contradictory behavior. The scope of protection of a patent must always be determined objectively. If a patent has been wrongfully granted because inaccurate information was provided in the application, this conduct may be opposed to enforcement at most from the perspective of contradictory conduct (para. 168).

11. The requirements for the plaintiff's submission regarding the risk of first infringement must not be excessive. In particular, it is permissible for the plaintiff to present facts that make it appear sufficiently probable that an immediate patent infringement could be imminent in all the countries asserted, for example, through the possible imminent offering of a product. It would be sufficient to argue that an application for approval has at least been filed and that a distribution structure exists that would enable the product to be distributed. In the pharmaceutical sector in particular, the considerable investments in new products can only be refinanced if these products are widely available. This applies in particular to biosimilars, which are costly to develop. If such an argument is made, the party against whom the claim is brought would have to argue and, if necessary, prove that, despite the possibility, either distribution is not planned or the legal requirements in a country would not justify a claim for injunctive relief (para. 275).

12. Effective enforcement of patent rights requires—at least for the member states of the European Union directly—that, in the case of a sufficiently concrete threat, injunctions can be obtained as a precautionary measure under Enforcement Directive 2004/48/EC. This applies in particular from the perspective of procedural concentration. Potential patent infringers should not be able to gain an advantage by proceeding in a successive manner. Otherwise, they would be in a position to place an excessive burden on the financial and human resources of patent holders, who cannot choose to have their property rights infringed by third parties in different countries (para. 278).

# Facts

1    The plaintiffs are suing the defendants for alleged patent infringement with equivalent means of European Patent 2 364 691 B1 in a total of 22 countries. The patent in suit concerns formulations with VEGF antagonists for intravitreal administration.

2    European patent 2 364 691 B1 (Annex AST 9, hereinafter: disposal patent) was filed on June 14, 2007, claiming priority from US patent specification 2006 0814484 P dated June 16, 2006, for the US company

. The application wa████████████████████████ was published on April 24, 2013.

3    The patent is in force in Austria, Belgium, Bulgaria, Denmark, Estonia, Finland, France, Greece, Iceland, Ireland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, Switzerland, the Czech Republic, Turkey, Hungary, and Cyprus in the granted version.

4    In nullity proceedings brought by a third party before the Federal Patent Court against the provisional patent (Ref.: 3 Ni 15/23 (EP)), the provisional patent was revoked following a corresponding notice from the Patent Court on December 8, 2023 (Annex AST 8) – upheld in limited form by judgment of June 26, 2025. At the time of the oral hearing, the written grounds for the judgment were not available.

5    The relevant claim 1 of the patent in suit reads as follows in the language of the proceedings in its limited form:

> An ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist for use in intravitreal administration, wherein said ophthalmic formulation comprises:
>
> (a) 1-100 mg/ml of a VEGF antagonist consisting of amino acids 27-457 of SEQ ID No:4, which is glycosylated at Asn residues 62, 94, 149, 222 and 308;
>
> (b) 001-5% of one or more organic co-solvent(s) which is one or more of polysorbate, polyethylene glycol (PEG), and propylene glycol;

(c) 30-150 mM of a tonicity agent selected from sodium chloride or potassium chloride;

(d) 5-40 mM of sodium phosphate buffer; and

(e) 1.0-7.5% of a stabilizing agent selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol, pH between about 5.8-7.0

6      The difference to the granted version of the patent is that in the granted version, the formulation only had to be suitable for intravitreal administration.

7      The patent holder also holds the supplementary protection certificate DE 12 2013 000 041.4 for the use of the active ingredient aflibercept for ophthalmic applications, which expires on November 23, 2025, following an extension. The preparation is marketed by the ████ Group under the trade name ████ .

8      The plaintiffs belong to the ████ Group and are involved in the development and marketing of drugs for the treatment of eye diseases, among other things. On October 18, 2006 (Exhibit AST 11a), ████████ and the first plaintiff entered into a license agreement regarding the patent in question.
October 18, 2006 (Exhibit AST 11a). The plaintiff in the injunction proceedings 2) derives its entitlement to the injunction patent from the license agreement concluded between it and the plaintiff in the injunction proceedings 1) in December 2012/January 2013 (Exhibit AST 12).

9      The first defendant is involved in the manufacture of biosimilar drugs, including in the field of ophthalmology. It developed the biosimilar, applied for and obtained ████████ marketing authorization for this biosimilar under pharmaceutical law and has also been granted marketing authorization for it. The second respondent is involved in the manufacture and distribution of drugs and is the licensee and owner of the worldwide marketing rights for ████

10    The biosimilar ███████ has the following composition (see Annex AST 1):

| Name of ingredient | Quantity |
|---|---|
| Aflibercept | 40 mg/mL |
| L-histidine | 0.917 mg/mL |
| L-Histidine HCL monohydrate | 0.857 mg/mL |
| Sodium chloride | 40 mM (2.34 mg/mL) |
| Sucrose | 50 mg/mL (5% (w/v)) |
| Polysorbate 20 | 0.3 mg/mL (0.03% (w/v)) |

11    In a letter dated June 18, 2025 (Annex AST 1), the defendants informed the plaintiff in the injunction proceedings 1) that they intended to market the ████milar "in major parts of Europe, including Germany" after the expiry of the supplementary protection certificate. In the letter, the defendants also requested the plaintiff in the injunction proceedings 1) to declare that the biosimilar did not infringe the patent in suit.

12    With regard to the injunction patent and a possible infringement by the biosimilar ████████, further proceedings are being conducted before the Chamber, in some cases with different parties. In injunction proceedings 7 O 9382/25, the plaintiff in the injunction proceedings 2) is seeking an injunction against the defendants in the injunction proceedings and against ███████████ (which is to distribute the biosimilar in Germany) for the territory of the Federal Republic of Germany. In the main proceedings 7 O 16055/24, the patent holder ███████████ . is s████████████unterclaim, an injunction against the defendants in the present case, the ███████████████████████████, to refrain from in the Federal Republic of Germany and other European Union countries and is asserting consequential claims. The main proceedings began as an action for a negative declaration. Most recently, the four parties against whom the counterclaim was brought sought a declaration that the patent in suit had not been infringed against ████████████ the plaintiffs in the injunction proceedings.

Munich Regional Court I, 7 O
9383/25

13      In addition to the aforementioned proceedings, further legal disputes are pending or have already been decided in other countries. For this reason, proceedings 7 O 9382/25 and 7 O 16055/24 concern different countries in part. Specifically, no injunction is being sought in the main proceedings with regard to Italy, France, and Belgium.

14      Following the oral hearing, the UK High Court issued its decision [2025] EWHC 2527 (Pat), in which the defendants sought a declaration against the plaintiff in 1) and the patent holder that the biosimilar ███████ did not infringe the patent in suit in a version limited to subclaim 5. According to the UK High Court, the first question of equivalence must already be answered in the negative according to the test applicable there.

15      **The plaintiff is of the opinion** that the contested embodiment constitutes an infringement of the injunction patent by equivalent means because the replacement of the sodium phosphate buffer specified in the patent claim with histidine is equally effective, detectable, and equivalent. This assessment must be the same in all countries where the patent is claimed.

16      The Munich I Regional Court has jurisdiction over the Europe-wide decision because the defendants are based within the jurisdiction of the Munich I Regional Court.

17      The plaintiffs have withdrawn their application with regard to Estonia, Iceland, Latvia, Liechtenstein, Malta, Monaco, Switzerland, and Turkey.

18      **The plaintiffs finally request**:

> to prohibit the defendants, under penalty of a fine of up to EUR 250,000.00 for each case of infringement, or alternatively, imprisonment for up to six months, to be enforced against the respective legal representative, or, in the event of a repeat offense, imprisonment for up to a total of two years,
>
> an ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist for use in intravitreal administration, comprising:

a)  1-100 mg/ml of a VEGF antagonist consisting of amino acids 27-457 of SEQ ID NO: 4, which is glycosylated at Asn residues 62, 94, 149, 222, and 308;

b)  0.01-5% of one or more organic co-solvents, which are one or more of polysorbate, polyethylene glycol (PEG), and propylene glycol;

c)  30-150 mM of a tonicity agent selected from sodium chloride or potassium chloride;

d)  5-40 mM histidine buffer; and

e)  1.0-7.5% of a stabilizer selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol,

pH between about 5.8-7.0

in Austria, Belgium, Bulgaria, Denmark, Finland, France, Greece, Ireland, Italy, Lithuania, Luxembourg, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, the Czech Republic, Hungary, and Cyprus

to offer, place on the market, use, or import or possess for the aforementioned purposes.

(equivalent infringement of claim 1 of EP 2 364 691 B1)

**The respondents request that**

that the application be dismissed.

19    **The respondents are of the opinion** that the applicants do not have standing to sue, as the first applicant did not obtain an exclusive license from the patent holder and therefore had no authority to grant the second applicant an exclusive license. However, if the first plaintiff did effectively grant the second defendant an exclusive license, the first plaintiff does not have standing to sue.

20    The contested embodiment does not infringe the patent in suit because the biosimilar ███████ does not contain a sodium phosphate buffer. The used

Buffer solution histidine does not constitute an equivalent patent infringement, as it is neither findable nor equivalent. The injunction patent deliberately opted for the composition specified in the claim; no deviation was intended. This is also evident from the statements made by the patent applicant during the granting procedure. If discoverability were to be affirmed, the defendants could at least invoke the "form stone" objection.

21    Reference is **also** made to the parties' written submissions and annexes, as well as the minutes of the oral hearing on September 25, 2025.

22    The decision was announced immediately after the main hearing on September 25, 2025. An obvious clerical error was made in drafting the operative part, as the partial withdrawal of the action with regard to Estonia, Iceland, Latvia, Liechtenstein, Malta, Monaco, Switzerland, and Turkey was not taken into account. This error was corrected by order of October 8, 2025, corrected because there was an obvious error. The obviousness resulted from the decision on costs, because the plaintiff prevailed completely, except for the part of the withdrawal of the action. The operative part of this decision includes the correction order of October 8, 2025.

# Reasons for the decision

23    The admissible application for a preliminary injunction is justified in its entirety.

24    The biosimilar ▮▮▮▮▮ is still subject to these preliminary injunction proceedings in all 22 countries (*Austria, Belgium, Bulgaria, Denmark, Finland, France, Greece, Ireland, Italy, Lithuania, Luxembourg, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, the Czech Republic, Hungary, and Cyprus*) that are still subject to these preliminary injunction proceedings. This is because, based on the establishment of equivalent patent infringement in Article 2 of the Protocol to Article 69 EPC, it can be assumed that the same standards apply in all countries with regard to the requirements

Munich Regional Court I, 7 O
9383/25

for accepting an equivalent patent infringement. Therefore, the assessment that a patent infringement by equivalent means exists under German law serves as a guideline for the other EPC states. The defendants have not succeeded in demonstrating that a different standard applies in any of the aforementioned states.

25    Insofar as the UK High Court came to a different conclusion with regard to the biosimilar ▮▮▮▮▮ , this is also due to the fact that claim 1 was not the subject of the proceedings there, but rather a version limited to independent auxiliary claim 5.

26    It should also be noted that the principle of admissibility applies in patent infringement proceedings. In this respect, there are considerable doubts as to whether the facts of the case decided in the present proceedings have the same content as those decided in the proceedings before the UK High Court after hearing several experts. It is possible that the defendants in the injunction proceedings therefore left the question of equivalent effect—which, according to the decision of the UK High Court, is to be denied—open in the present proceedings.

27    The Munich I Regional Court has international and local jurisdiction to issue the preliminary injunction (A.). In cross-border patent infringement lawsuits, a strict distinction must be made between questions of procedural and substantive law, whereby formal regulations of other countries should in no case serve to promote patent infringements (B. I.). The plaintiffs are entitled to bring an action (B. II.) and have a claim for injunctive relief against the defendants under the patent in suit on the basis of equivalent patent infringement, Sections 940, 936, 920 et seq. ZPO in conjunction with the respective provisions regarding the claim for injunctive relief in the countries in which the claim is asserted (B. III.). The grounds for the injunction are given, since a temporal urgency – which is governed by procedural rules under German law – has been credibly established (C. I.) and the weighing of interests to be carried out – which is also governed by German law – also favors the plaintiff (C. II.). This results in the cost consequences (D.).

Munich Regional Court I, 7 O
9383/25

**A.**

28    The application for a preliminary injunction is admissible. In particular, Munich Regional Court I has international and local jurisdiction, as both defendants are based within the jurisdiction of Munich Regional Court I (see I.). Therefore, it is irrelevant in the present case that, in cross-border matters, the tortious jurisdiction characterizes the nature of patent infringement actions to such an extent that, in the event of a cross-border patent infringement action, all twelve courts competent for patent infringement actions in the Federal Republic of Germany can be called upon (see II.). There are also no concerns regarding the legal status of the patent in suit with regard to the countries asserted. In this respect, the decision of the Federal Patent Court also has a strong indicative effect for other countries, which is equivalent to a landmark character (see III.).

**I.       Jurisdiction of the Munich I Regional Court**

29    Both defendants are based within the jurisdiction of the Munich I Regional Court. This means that both international and local jurisdiction are established.

30    International jurisdiction is based on Article 4(1) of Regulation No. 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Brussels Ia Regulation). According to this, persons domiciled in the territory of a Member State shall be sued in the courts of that Member State, regardless of their nationality. This is specified in Article 63(1) of the Brussels Ia Regulation. According to this provision, companies and legal persons are domiciled at the place where they have their registered office, central administration, or principal place of business.

31    With regard to patent infringement actions, there has always been agreement that it is possible for defendants to be sued across borders in the courts of their place of residence. However, the Court of Justice of the European Union previously assumed that for proceedings concerning

Legal status is the exclusive jurisdiction of national courts, even if the question of legal status is only raised as a defense (ECJ, GRUR 2007, 49 – GAT/LuK). As a result, proceedings in international cases always had to be suspended as soon as the plea of invalidity was raised. In fact, this has meant that cross-border proceedings have not been conducted, at least in the Federal Republic of Germany.

32      According to the new understanding of the Court of Justice of the European Union (CJEU, GRUR 2025, 568 – BSH Hausgeräte), the infringement court seised remains competent even if the nullity objection is raised in any form whatsoever. In the Chamber's understanding, it is at the discretion of the infringement court seised to decide how to deal with such an objection. In doing so, both the suspension of the infringement proceedings in another state and the decision on the merits of the case may be considered if the infringement court seised assumes that the patent in suit is valid.

33      Since the defendant's registered office is within the jurisdiction of the Munich I Regional Court, <u>local jurisdiction</u> is undisputed, Section 17 ZPO.


## II.      Local jurisdiction for defendants with registered offices outside the district of the court seised

34      In the opinion of the Chamber, local jurisdiction in cross-border patent infringement proceedings also applies to defendants who do not have their general place of jurisdiction within the jurisdiction of the court seized, but at any location in the Federal Republic of Germany. This is because patent infringement proceedings are characterized by the "flying" tortious place of jurisdiction. This also applies to cross-border cases, as otherwise the legal position of patent holders would depend on the general place of jurisdiction of the infringer. In fact, only a few courts have experience in dealing with complex patent infringement proceedings. Such an understanding would not do justice to the idea behind the concentration maxim of
Section 143 (2) PatG and the effective protection of intellectual property rights intended by Directive 2004/48/EC.

Munich Regional Court I, 7 O
9383/25

In detail:

35    Art. 4 (1) Brussels Ia Regulation only regulates international jurisdiction. Once this has been established, the next step is to clarify which national (German) court has local jurisdiction for patent infringement actions. No distinction is made as to whether the alleged patent infringement was committed in Germany or in the territory of another EU member state. In both cases, local jurisdiction is governed solely by German law.

36    2. Concentration of patent litigation (    ) Pursuant to Section 143 (2) PatG, a concentration maxim applies to patent infringement proceedings. The state governments have been authorized to concentrate patent litigation by means of statutory orders. This provision is based on the unsatisfactory situation that existed until the creation of the previous provision in 1936, "that courts which are rarely involved in such proceedings have, in some cases, proved unable, due to their limited exposure to the particularly difficult field of patent law and to technical issues, to expedite the proceedings with the necessary speed and to make decisions with the necessary expertise" (according to the official justification at the time, see BeckOK Patentrecht/Kircher, 37th ed., § 143 Rn 17).

37    In fact, use was made of the options available. Currently, only 12 regional courts in the Federal Republic of Germany are competent to rule on patent infringement proceedings. These are:

> - Munich I
> - Nuremberg
> - Mannheim
> - Frankfurt
> - Saarbrücken
> - Erfurt
> - Leipzig
> - Magdeburg
> - Düsseldorf
> - Braunschweig
> - Berlin
> - Hamburg

38    3.    In infringement suits without foreign involvement, tort jurisdiction under Section 32 of the German Code of Civil Procedure (ZPO) will generally apply in addition to the general place of jurisdiction for legal entities under Section 17 ZPO. In fact, this has led to the formation of specialized patent litigation chambers at only a few courts    .    Also    the    specialist bar    has specialized    at    few

court locations. Overall, it can be assumed that the <u>enforcement of patent rights</u> is <u>characterized by the flying – tortious – place of jurisdiction</u>.

39    In purely foreign cases, there is no tortious jurisdiction in Germany. German courts only have jurisdiction in such cases if the defendant has its general place of jurisdiction within the jurisdiction of the respective court. The underlying – very general – consideration, which is also the basis for Sections 12 and 17 of the German Code of Civil Procedure (ZPO) 17 (2) GVG – is that it must always be possible for one party to sue another party where that party is domiciled, either because it is difficult to travel to another jurisdiction or because, as in the present proceedings, this allows for a concentration of proceedings.

40    Based on these considerations, it seems problematic to require holders of international patents to refer to the jurisdiction strictly according to the individual federal states (and in Bavaria even according to the Higher Regional Court district). In such a case, particularly in complex cross-border cases, courts would have to be called upon that do not have chambers specializing in patent infringement proceedings. In particular, this is not in line with the intention of the historical legislator, as can be seen from the explanatory memorandum to the law presented above.

41    The Chamber is convinced that participation in cross-border trade in services and goods creates a factual situation that justifies the assumption of a general place of jurisdiction for patent infringement actions pursuant to Section 17 (1) sentence 2 ZPO that deviates from the traditional understanding of the administrative headquarters. Therefore, in such constellations, defendants who have their general place of jurisdiction in the territory of the Federal Republic of Germany can be sued in all regional courts competent for patent infringement actions. This understanding is in line with the need for effective enforcement of intellectual property rights underlying Directive 2004/48/EC.

42    It is not apparent that this understanding could disadvantage patent holders, because decisions concerning local jurisdiction cannot be challenged by legal remedies. The parties against whom claims are brought also benefit from this, because the legal assessment can be made by courts that are sufficiently familiar with patent law issues. Furthermore, there is no right

potential patent infringers to operate in areas where patents cannot be effectively enforced.

### III.        Secure legal status of the injunction patent as a matter to be assessed under national law

43      According to German understanding, the question of whether a patent is legally valid is assessed in the context of the existence of grounds for an injunction. This also applies when cross-border issues are to be decided, as it is a procedural question governed by the law of the state of the court seised.

44      According to the decision of the ECJ (GRUR 2025, 568 – BSH Hausgeräte), it is not necessary for the pending infringement proceedings to be suspended in relation to invalidity proceedings conducted in another Member State or to the raising of the invalidity objection.

45      Rather, it will depend on <u>whether the court dealing with the infringement proceedings considers the legal status of the European patents asserted in each case to be sufficiently secure.</u> In the opinion of the Chamber, this can be assumed with regard to the 22 national European patents asserted in the present proceedings (*Austria, Belgium, Bulgaria, Denmark, Finland, France, Greece, Ireland, Italy, Lithuania, Luxembourg, Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, the Czech Republic, Hungary, and Cyprus*) because there is a first-instance decision by the Federal Patent Court that upheld the injunction patent in a limited version.

46      The decision of the Federal Patent Court has strong indicative value: it can be assumed that the corresponding patents will be legally valid in the same form in the other countries. It is irrelevant whether the claims granted in the other countries are already limited to the version asserted in the lawsuit or whether this has not yet been done. This is because the limited claims are included as a minus in the claims granted.

**B.**

47    The plaintiffs have substantiated their <u>claim for injunctive relief</u>,

Sections 940, 936, 920 et seq. ZPO.

### I.    Determination of the applicable law

48    In cross-border proceedings, a distinction must be made between procedural and
substantive law issues with regard to the applicable law.

### 1.    <u>Fundamental differentiation between procedural and substantive legal issues</u>

49    Procedural issues are governed by the law of the place of jurisdiction ("lex fori").
Substantive issues are governed by the law of the country in which the claims are
asserted ("principle of protection"). Based on this principle, it is necessary to
distinguish when exactly a provision qualifies as a substantive law provision. This
is because only substantive law provisions are not subject to German law.

50    The starting point is the understanding (taking into account the fundamental
values of the European Patent Convention and Enforcement Directive
2004/48/EC) that procedural rules in no country should serve to pave the way for
patent infringements and make it more difficult for patent holders to conduct
proceedings in cross-border cases.

51    Regulations governing technical or formal procedures in another country do not
have a protective function with regard to enabling patent infringements. In other
words, the defendant cannot, for example, argue that a license agreement is not
entered in a register or that there has not yet been a restriction of the granted
patent claim in other countries, as long as it is established that the underlying
substantive law exists for the plaintiff. These provisions are always classified as
procedural law and are therefore governed by German law in the present case.
This ensures that patent holders in several countries are not prevented from
enforcing their rights by a fragmented consideration of formal requirements.

52        If this means that patent infringement can only be prosecuted in certain countries
          if the infringer has their general place of jurisdiction in the Federal Republic of
          Germany, this may be factually correct. However, it is not apparent that patent
          infringers based in Germany could claim that they should be subject to a similarly
          low level of protection as patent infringers based in other countries. There is no
          right to equality in wrongdoing.

53        The question of compensation claims—which is not relevant in the present
          case—can be used as an example to illustrate the distinction between procedural
          and substantive law issues. The question of under what circumstances a claim
          for damages exists and how high such a claim for damages actually is must be
          regarded as a matter of substantive law. However, the question of how such a
          claim can be asserted is to be regarded as a procedural issue. Even if, in another
          country, claims for damages are asserted in such a way that a lawsuit is filed and
          the exact amount of damages is determined by experts, in German proceedings it
          is possible to apply for a declaration that there is a liability to pay damages in
          relation to the other country, thereby establishing a binding obligation on the
          merits. This is because the enforcement of the claim for damages is a matter of
          procedural law. It is therefore consistent to refer to the procedural practice
          prevailing in Germany in any subsequent proceedings to determine the amount of
          damages.

54        The question of how to classify the right to information is worthy of discussion in
          this context. Although there are reasons to classify the right to information as
          substantive law, the Chamber is of the opinion that the right to information is so
          strongly dominated by procedural law that it must be treated as a procedural
          claim under German law. Otherwise, it would not be possible for the plaintiff to
          enforce the – foreign – claim for damages in subsequent proceedings before a
          German court.

55        This raises two relevant issues: on the one hand, nothing may be awarded that is
          not provided for under substantive law in another country. On the other hand,
          what is provided for under foreign law may be awarded in an effective manner.
          This basic assessment must be applied accordingly to other issues.

## 2.  Relevance of the distinction in the present case

56   Based on these guidelines, some of the questions discussed in these proceedings are answered below in a condensed and concentrated manner:

### a.  Entry of the licensee in the register

57   Insofar as it is undisputed between the parties that the enforcement of a patent by an (exclusive) licensee in some countries (including Spain and France) requires the prior entry of the licensee in the respective national patent register, this requirement constitutes a procedural rule that does not preclude the enforcement of claims. This is because it is a purely administrative requirement for the enforcement of rights under private law. Contrary to the respondent's opinion, this does not constitute a substantive legal requirement in the context of standing to sue, but rather a procedural rule.

58   The registration requirement does not serve to protect a possible patent infringer who is being sued. Rather, it is sufficient if the licensee is substantively entitled to assert the patent.

59   Insofar as the parties have unanimously declared that it is not possible for exclusive licensees in the Netherlands to bring legal action in their own name, the plaintiff has submitted a representative action in this regard (AST31_NL; Annex 1).

### b.  Assertion of a limited version of the patent claim

60   Insofar as the respondents are of the opinion that in some countries (including Belgium, Spain, and France) it is inadmissible to assert the version of the injunction patent limited by the Federal Patent Court before this limited version has been entered in the patent register of the respective country, this requirement also constitutes a procedural rule. It can be assumed for the respective countries that the limited version is included as a "minus" in the granted version of the injunction patent. This applies to all of the countries asserted.

c.    Grounds for injunction (in particular urgency)

61    The existence of a reason for the injunction constitutes a procedural rule.

62    According to general understanding, the grounds for the injunction require that there be urgency in terms of time and that the balance of interests be in favor of the applicant. The issue at stake is whether a given substantive claim (grounds for the injunction) can be declared in a special way (by way of interim relief). In other words, the only question is whether the applicant must be required to wait for the main proceedings, which may take a long time in some cases, to be conducted. Because the type of proceedings in which the infringement proceedings can be conducted does not affect the existence of the actual (substantive) claim, there is no reason not to regard the grounds for the injunction as a purely procedural rule.

63    It is therefore sufficient that urgency and the balancing of interests in favor of the patent holder exist in proceedings against a party based in the Federal Republic of Germany according to German understanding in order to be able to take action against this party in similar cases throughout Europe.

64    The Chamber does not fail to recognize that there is debate as to whether the grounds for the injunction are a substantive requirement or a procedural requirement. There is no uniform answer to this question in the field of intellectual property (see Cepl/Voß, 3rd ed.,
§ 940 marginal no. 66). In any case, the Higher Regional Court of Düsseldorf treats the grounds for the injunction as a substantive requirement in the field of patent law (without giving reasons) (see judgment of August 4, 2011, I-2 U 23/11, GRUR-RR 2011, 350, 353 – Pramipe-xol), while the Munich Higher Regional Court considers it to be a prerequisite for proceedings in the field of unfair competition law (also without justification) (Munich Higher Regional Court, 29 U 1661/19, MMR 2020, 35 marginal no. 4).

65    Even if this discussion is relevant for classification as a procedural issue, the opinion of the Munich Higher Regional Court should also be followed with regard to patent law issues. It is not apparent why the grounds for the injunction should be given any meaning other than a temporal and substantive limitation on the application for interim legal protection. This becomes clear when one considers the consequences: a patent holder has a right to ensure that his patent is not infringed. If he

If the deadline for urgent action is missed, the claimant can no longer assert the claim for injunctive relief until a court sets a date for the main proceedings. In this respect, they are limited to enforcing any claims for damages. However, this cannot mean that a patent infringer in such a situation has a (substantive) right to continue their patent-infringing behavior in order to then possibly – in the distant future – be exposed to claims for damages at some point.

66    In any case, according to a decision by the Federal Patent Court in nullity proceedings concerning the German part of a European patent, there would also be urgency with regard to the other national parts of the European patent. This follows from the fact that the urgency period begins anew with each confirmatory decision on the legal status. This effect also applies to the other national parts of the European patent, since the decisions of the Federal Patent Court, which also includes technical judges, have a Europe-wide signal effect ("beacon character") due to its recognized expertise.

## II.    Legal standing of the plaintiffs

67    The plaintiffs have standing to sue.

68    The plaintiff in the injunction proceedings 1) as the exclusive licensee and the plaintiff in the injunction proceedings 2) as the exclusive sublicensee are both entitled to bring an action under the injunction patent in their own name.

69    The defendants have questioned whether the license agreement between the patent holder and the plaintiff in the injunction proceedings 1) dated October 18, 2006, grants an exclusive license at all and have also questioned whether an exclusive licensee retains its right to sue if it itself transfers an exclusive license. However, these concerns do not preclude standing to sue.

70    The right to sue acquired by the plaintiff in the injunction proceedings as the exclusive licensee was not lost by the granting of a sublicense.

1.    Legal standing of the plaintiff in the injunction             ▮▮▮▮▮▮▮▮▮▮)
proceedings (1) (

71    a.    According to general opinion, a licensee is entitled to assert a patent infringement in its own name if it has an exclusive

License relating to the respective asserted patent infringement. The reason for this is that the patent holder must be able to determine how and where his property right is defended. Only in the case of an exclusive license has he relinquished his rights to the property right to such an extent that his interest takes a back seat to the licensee's interest in being able to defend his exclusive license.

72   An exclusive license in this sense also exists if the patent holder reserves the right to use the patent himself. This is because, in case of doubt, the exclusive licensee would be free to grant sublicenses (see BGH, X ZR 127/99, GRUR 2002, 801, 803 – Abgestuftes Getriebe), even to the patent holder.

73   b.   In sections 4.1 and 4.5 of the agreement dated October 18, 2006 (Exhibit AST 11a, hereinafter: License Agreement), the patent holder granted the plaintiff in item 1) an exclusive license sufficient for the purposes of standing to sue for the asserted claim.

74   The Chamber can interpret this license agreement—which is governed by US law—on the basis of the arguments put forward by both parties, as it is a straightforward legal issue for which there are uniform standards in international legal relations. This is because license agreements with international effect must also be manageable for the licensed territories. The application of the agreements cannot be opposed by any third party on the grounds that they would postulate exceptions under the relevant law. If a party is of the opinion that the agreement should be interpreted differently under the relevant law, it would have to specifically state which legal principles should apply and why these legal principles lead to a different result. No such submission was made, nor is it apparent that it would have been effective. In addition, it should be mentioned that the patent holder,                                        in the coordinated di███████████████████████████████cerning the biosimilar██████ . If the patent holder had any doubts that the license agreement of October 18, 2006, constituted a sufficient basis for legitimacy, it could have dispelled these doubts by means of arbitrary litigation, as it actually did with regard to the Netherlands.

75   c.   Clause 4.1 of the license agreement reads, insofar as relevant here, whereby "Company"
██████████████████ , i.e. the plaintiff in the injunction proceedings 1), means:



76      It is not sufficient that the license agreement (under 4.1. b) refers to an "exclusive license." The legal nature of a license is determined not by its designation but by its content. However, a designation does have indicative value. It must therefore be examined whether the rights retained are so extensive that the exclusivity required for the right to sue (or to sublicense such a right) no longer exists.

77      The text of the agreement is to be understood as meaning that the patent holder ▇▇ f ▇▇▇▇▇▇▇▇▇▇ (i.e., the plaintiff in the injunction proceedings) an exclusive license (subject to Section 4.5) concerning the manufacture, production, use, development, import, and export of the licensed products, in a co-exclusivity relationship with the patent holder and its subsidiaries or affiliates. .

78      As explained above, the fact that the patent holder reserves certain rights of use does not preclude classification as an exclusive license. Nor does the fact that these rights of use also include subsidiaries or affiliates give rise to a different assessment. This is because the patent holder is free to organize itself as it sees fit, and it is recognized and, on balance, also economically necessary for companies to organize themselves in such a way that group companies operate on the basis of a division of labor. Such a division of tasks among subsidiaries or group companies cannot therefore lead to the exclusivity of the license being lost. This is because the patent holder is specifically not permitted to grant licenses to third parties.

79      d.    Clause 4.5 of the license agreement does not preclude classification as an exclusive license either. Insofar as relevant here, it reads as follows:



80    (1.)    It is already doubtful whether the scope of these retained rights goes beyond Section 11 No. 2 PatG and whether the fact that this exception is expressly included in the agreement is not solely due to the different legal practice in the United States of America. However, this can be left open because the restriction does not have a scope that conflicts with an exclusive license.

81    (2)    The fact that the patent holder reserves the right for itself, its subsidiaries, and third-party licensees under Section 4.5.(a) to use the patent for "development purposes" has no influence on the exclusive license for the plaintiff in 1) for the distribution of the patented product outside the USA. Section 1.30 of the license agreement defines "develop" or "development" as activities relating to research, clinical trials, technology transfer, etc., as well as "any other development activities relating to the licensed product [...] including [...] activities to support new product formulations, delivery technologies, and/or new areas of application." This clearly distinguishes "development purposes" from the exclusive license for the distribution of the licensed products relevant here.

82    (3)    Insofar as the patent holder reserves in clause 4.5.(b) "the right to manufacture and, if the consent of [ ███████████████ ] or if so specified in plans, the right to commercialize the licensed products," this has no influence on the exclusive license for the distribution of the licensed products relevant here. The ██████ companies have submitted an affidavit from the employee working for the plaintiff in the injunction proceedings 2) ███████ (Exhibit AST 25), that ██████ had not given its conse████████████████████ patent holder and that there were no plans to do so. The defendants were unable to refute this submission. Although Dr. has only been working for the plaintiff since 2015

2), but manages its ophthalmology business and its relations with the patent holder. Consequently, he would have been informed if the condition specified in section 4.5.(b) had been met. The respondent's submission is therefore unfounded.

83    Furthermore, the fact that the licensee's consent is required means that there is a situation that precludes unilateral action by the licensor. In this respect, this situation is no different from the granting of a back license.

84    e.    The plaintiff in the injunction proceedings 1) has not lost its right to sue because it granted the plaintiff in the injunction proceedings 2) an exclusive sublicense. It was entitled to grant this sublicense without the consent of the patent holder in accordance with Section 4.3 of the license agreement and the clarification of this section agreed between the patent holder and the plaintiff in the injunction proceedings 1) in July 2025 (Exhibit AST 11c).

85    As already explained, companies are free to organize themselves as they see fit. In particular, it is within their organizational authority to decide how tasks are divided between subsidiaries or group companies. Therefore, there is no apparent reason why the plaintiff in the injunction proceedings 1) should have lost its right to sue on the basis of the granting of an exclusive license to the defendant in the injunction proceedings 2). Both plaintiffs in the injunction proceedings are group companies of the group.

86    Furthermore, the position of an exclusive licensee in a chain of license agreements is comparable to that of the patent holder. The exclusive licensee has its own right to defend the rights associated with the exclusive license against third parties. Due to its position, there is no risk of conflicting actions.

2.    Legal standing of the plaintiff in 2) (⬛⬛⬛⬛⬛⬛⬛⬛)

87    The plaintiff in the injunction proceedings 2) was granted an exclusive license by the plaintiff in the injunction proceedings 1) for all territories outside the United States of America. This means that, according to general understanding, it is entitled to assert the present right in its own name.

### III.    Existence of a claim for injunction

88    A claim for injunction exists. The plaintiffs have a claim for injunctive relief against the defendants in the 22 countries asserted under the patent, which is validated in all countries, due to equivalent patent infringement.

89    This ruling is based on the established equivalent patent infringement under German law (see also parallel proceedings 7 O 9382/25) (see 1.) and the presumption, which has not been rebutted by the defendants, that the legal situation regarding patent equivalence in the EPC countries asserted by the plaintiffs corresponds to the legal situation in Germany (see 2.).

90    Nor is there any reason for a different assessment because the UK High Court ruled in [2025] EWHC 2527 (Pat) of October 8, 2025, that the contested embodiment (the biosimilar ███████ ) does not make use of equivalent means within the teaching of the patent in suit, as asserted therein.

91    It can be assumed that the question of when a patent infringement with equivalent means exists will ultimately be decided in the same way in the individual member states of the European Patent Convention. This also applies if different examination steps are used to examine equivalence in each case. This assumption is based on Article 2 of the Protocol to Article 69 EPC, which applies in all states. Against the background of this understanding, it can be left open whether standardization applies at least to those states that have ratified the Agreement on a Unified Patent Court. This is because the European Patent Office applies a uniform standard when examining a patent, regardless of whether a unitary patent or a conventional European patent has been applied for.

1.    Equivalent patent infringement under German law

92    Under German law, the contested embodiment, the biosimilar ███████ , constitutes an equivalent infringement of claim 1 of the patent in suit.

93    The following is a reproduction in italics of the statements from parallel proceedings 7 O 9382/25. In the proceedings referred to, the plaintiff in the injunction proceedings 1) took action against the defendants in the injunction proceedings 1) and 2) and another party by way of interim legal protection for patent infringement under the injunction patent in the Federal Republic of Germany. The proceedings and the present proceedings 7 O 9383/25 were heard jointly, and a decision was issued on the day of the hearing in each case.

94    Reference is also made to the reasons given there because the respective defendant parties were represented uniformly and therefore the same statement of facts formed the basis for both decisions.

95    In decision 7 O 9382/25, the following is stated regarding a patent infringement with equivalent means:

-----------------------

96    *a)    The patent in suit concerns, in the upheld claim formulation, an ophthalmic formulation of a VEGF antagonist for use in intravitreal administration.*

97    *According to the patent specification, the invention relates to pharmaceutical formulations containing active ingredients that could inhibit vascular endothelial growth factors (hereinafter: VEGF), suitable for intravitreal administration, i.e., administration into the vitreous body of the eye (para. [0001]).*

98    *VEGF is a group of proteins that stimulate the growth of the vascular endothelium, i.e., the innermost layer of blood vessels that comes into contact with blood. In cancer, VEGF enables the pathological formation of new blood vessels in cancer tissue, supplying the tumor tissue with blood and allowing it to grow. This can be prevented by inhibiting vascular growth, for example with VEGF antagonists, which bind to VEGF. The active ingredient in the patent in question, aflibercept, is such a VEGF antagonist in the form of a protein.*

99    *It was already known in the prior art that VEGF antagonists could also be an effective treatment option for eye diseases such as neovascular "wet"    age-related    macular degeneration*

*(hereinafter: nAMD). This disease is characterized by the growth of fragile small blood vessels under the retina, which break through the structures essential for vision. Unlike in cancer therapy, in this case the VEGF antagonist is not administered intravenously, but by injection into the vitreous body of the eye, i.e. intravitreally.*

100    *According to the patent in suit, the stability of pharmaceutically usable proteins poses a major challenge (para. [0041]). The stability conditions required differ from protein to protein.*

101    *b)    Against this background, the task of the patent in suit—in accordance with the qualified reference decision of the Federal Patent Court in the nullity proceedings (Annex AST 8; item 2 therein)—is to provide formulations of the VEGF antagonist consisting of the amino acids mentioned in feature 1.1 that are suitable for intravitreal administration.*

102    *c)    As a solution, the provisional patent presents claim 1, as asserted here in the version of the Federal Patent Court's judgment, which can be broken down as follows:*

> *1.  Ophthalmic formulation of a vascular endothelial growth factor (VEGF) antagonist for use in intravitreal administration, comprising:*
>
> *1.1 (a) 1-100 mg/ml of a VEGF antagonist consisting of amino acids 27-457 of SEQ ID NO: 4, which is glycosylated at Asn residues 62, 94, 149, 222, and*
> *308;*
>
> *1.2 (b) 0.01-5% of one or more organic co-solvents, which are one or more of polysorbate, polyethylene glycol (PEG), and propylene glycol;*
>
> *1.3 (c) 30-150 mM of a tonicity agent selected from sodium chloride or potassium chloride;*
>
> *1.4 (d) 5-40 mM sodium phosphate buffer; and*

Munich Regional Court I, 7 O
9383/25

1.5 (e) 1.0-7.5% of a stabilizer selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol,

1.6 pH between about 5.8-7.0

103    d) The patent in suit protects in claim 1 an ophthalmic formulation containing the active ingredient aflibercept, which is intended for intravitreal administration.

104    (1)    The Board considers a team consisting of a physician working in the field of ophthalmology and a pharmaceutical technologist (galenician) with university education and several years of practical experience in the field of manufacturing pharmaceutical formulations to be a person skilled in the art (in accordance with the reference decision of the Federal Patent Court in the nullity proceedings (Annex AST 8; item 3 there)). This team will understand the patent in suit as follows:

105    Due to the specific field of application, namely the injection of the formulation into the vitreous body of the eye, particularly high demands must be placed on the properties and stability of the formulation.

106    Within the composition of the formulation, the tonicity agent essentially serves to determine the osmotic properties of the formulation. The stabilizing agent mainly serves to protect the folding of the active ingredient so that the aflibercept can reach the areas in the vitreous body where it is supposed to exert the desired medical effect in the required folding. The buffer serves to keep the formulation stable within a specified pH range.

107    A comparison with the ophthalmic formulations suitable for lyophilization mentioned in claim 6 (which are not the subject of this proceeding) shows that both a tonicity agent and a stability agent can be dispensed with. A buffer cannot be dispensed with. No statement is made as to whether such a design is also suitable for ophthalmic formulations that are not suitable for lyophilization.

Munich Regional Court I, 7 O
9383/25

108     *With regard to the buffer solution, the patent in suit mentions only sodium phosphate, or clarifies in paragraph [0047] that even if only "phosphate" is mentioned, "sodium phosphate" is meant. The end of paragraph [0047] also expressly states that the buffer serves to adjust the pH value of the solution, which is, however, self-evident to the skilled person.*

109     *The skilled person is also aware that, at the priority date of the patent in suit, the only protein active ingredient for the intravitreal treatment of nAMD that was in late-stage clinical development was the active ingredient ranibizumab███████████ . This active ingredient differs from aflibercept in that aflibercept has a different and larger molecular structure and therefore remains in the body for a longer period of time. In addition, the ranibizumab formulation contained a histidine buffer and trehalose instead of a sodium phosphate buffer, but neither sodium nor potassium chloride.*

110     *(2) There is no literal infringement of the patent in suit, as the contested embodiment███████ has a histidine buffer instead of a sodium phosphate buffer. However, the use of a histidine buffer constitutes a realization of feature 1.4 by equivalent means.*

111     *(3) According to the established case law of the Federal Court of Justice, the following conditions must be met for an equivalent patent infringement to be assumed (see Federal Court of Justice, judgment of January 13, 2015, X ZR 81/13, GRUR 2015, 361 marginal number 18 – Cooking vessel; Federal Court of Justice, judgment of March 12, 2002, X ZR 168/00, GRUR 2002, 515, 517 – Schneidmesser I; further: Federal Court of Justice, judgment of June 14, 2016, X ZR 29/15, GRUR 2016, 921 – Pemetrexed):*

     1.     *Equivalent effect of the means: Does the contested embodiment solve the problem underlying the invention with means that are modified but objectively equivalent in effect?*

     2.     *Findability of the means having the same effect: Does their technical knowledge enable the skilled person to find the modified means as having the same effect?*

3.      *Equivalence of the modification: Are the considerations that the skilled person must make so oriented towards the meaning of the technical teaching protected in the patent claim that the skilled person considers the deviating embodiment with its modified means to be the equivalent solution in question?*

4.      *Furthermore, it must be examined whether the patent holder deliberately excluded certain embodiments from the scope of protection and whether the so-called "form stone objection" precludes the assumption of infringement by equivalent means.*

112     *(aa) In the first step of the examination, which concerns equivalent effect, it must be examined whether the contested embodiment not only essentially achieves the overall effect of the invention, but also achieves the effect that the feature not literally realized is intended to achieve (see Federal Court of Justice, judgment of January 13, 2015 – Cooking vessel – para. 19).*

113     *Feature 1.4 relates to a buffer. A buffer generally has the task of keeping the pH value of the respective solution stable. Nothing else can be inferred from the description of the patent in suit, which does not provide any further information on the function of the buffer in the claimed formulation. It follows from the passage already cited in paragraph [0047] that the buffer also serves at least to adjust the pH value of the formulation. It can be assumed that histidine has the same properties in this respect as the sodium phosphate mentioned in the claim. Ultimately, however, this can be left open because the respondents do not dispute the equivalent effect.*

114     *(bb) The second question must also be answered in favor of the plaintiff. At the time of priority, the buffer histidine, which can be used for protein formulations, was available to the skilled person as an agent with the same effect instead of sodium phosphate. This discovery does not in itself require any inventive step on the part of the skilled person (see Meier-Beck, GRUR 2003, 905, 909). The necessity of routine experiments does not exclude the absence of inventive step (BGH, judgment of April 11, 2006, X ZR 175/01, GRUR 2006, 666 marginal number 56 – Stretchfolienhaube;*

*Benkard/Asendorf/Schmidt/Tochtermann, PatG, 12th ed., § 4 para. 21). In detail:*

115    *(aaa) The use of buffer solutions in the manufacture of protein formulations is known to those skilled in the art. The buffer has the task of ensuring the pH stability of the formulation. Buffers that are suitable for protein formulations have specific pH ranges in which they can be used. In this respect, it is known that histidine and phosphate have a very similar range of applications. Histidine can also be used, at least in part, in the pH range of the claimed formulation of 5.8–7.0 (feature 1.6) because it can be used in pH ranges between 6.2–7.8, while phosphate can be used in the range of 6.0–8.2, i.e., in a largely overlapping range.*

116    *This area of application distinguishes phosphate and histidine from most other buffering agents commonly used in protein formulations, as can be seen from the following table, previously published in the textbook "Formulation Development of Protein Dosage Forms" (see Appendix AST 14, p. 64):*

**Table V**
**Buffers Used in Protein Formulations**

| Buffer system | $pK_a$ | pH range of use |
|---|---|---|
| Acetate | 4.76 | 2.5–6.5 |
| Citrate | 3.14, 4.8, 5.2 | 2.5–6.0 |
| Glutamate | $9.67(pK_{a3})$ | 8.2–10.2 |
| Glycinate | 2.4,9.8 | 6.5–7.5 |
| Histidine | 1.8, 6.0, 9.2 | 6.2–7.8 |
| Lactate | 3.8 | 3.0–6.0 |
| Maleate | 1.92, 6.23 | 2.5–5.0 |
| Phosphate | 7.2 $(pK_{a2})$ | 6.0–8.2 |
| Succinate | 4.2, 5.64 | 4.8–6.3 |
| Tartrate | 2.93, 4.23 | 3.0–5.0 |
| Tris | 6.2 $(pK_b\ 7.8)$ | 6.8–7.7 |

117    *These properties indicate to the skilled person that histidine is an alternative to sodium phosphate. It is common knowledge among those skilled in the art that a formulation is composed of various components and that these are fundamentally interchangeable. However, there is no guarantee that the overall formulation will still have the desired properties after the exchange. In this respect, further tests will always be necessary, which*

*fall within the scope of the usual practice of the skilled person.*

118    *(bbb) In the present case, there is another indication pointing to the use of histidine. This is because the only comparable drug that was largely developed at the priority date also uses histidine as a buffer. This is the drug based on the active ingredient ranibizumab*

████████████████████████████████████████

*administration. It was in the final stage of clinical testing. The formulation contained histidine in a quantity of 10 mM as a buffer (see Abelson et al., Annex AST 37).*

119    *The patent specification, which was intended to protect the formulation used for ranibizumab (WO 2006/047325 A 1; Annex AST 21), shows the specific formulation for intravitreal administration (including 10 mM histidine) on p. 31, line 27 ff. This patent specification was published on May 4, 2006, before the priority date of the patent in suit.*

120    *(ccc) Against this background, the statements in the expert opinion submitted by the plaintiff, prepared by Prof. Dr.*
████████ *that, in view of the use of histidine in the drug* ████████ *, the use of histidine instead of sodium phosphate was also particularly suitable for a formulation based on aflibercept (instead of ranibizumab), also taking into account the different structure of the two proteins (Annex AST 39, p. 3), are understandable.*

121    *The decisive factor for the Board in this respect is that the known ranibizumab formulation was the only protein formulation suitable and tested for intravitreal administration at the priority date (at least as far as VEGF antagonists are concerned). In view of this, the alternative buffer histidine is also obvious to the skilled person, even taking into account the different structures of aflibercept and ranibizumab.*

122    *(ddd) Stability studies are also necessary in the same pH range to verify whether histidine in the specific formulation*

*ensuring sufficient stability does not preclude discoverability. This is because these are routine experiments that do not exclude the absence of inventive step and thus discoverability. In particular, the undisputed lack of predictability of the effect of replacing excipients on the stability of the respective protein does not argue against discoverability. This is because it is not apparent (nor has it been argued by the respondents) that more than routine experiments would have been necessary.*

123    *In particular, the respondent's reference to the applicant's statements regarding the great challenge that the development of a stable protein formulation based on aflibercept would have posed (see paragraph 42 of the application) is misguided, because in that passage the plaintiff describes the situation prior to the filing of the patent in suit, whereas the question of discoverability is assessed on the basis of the knowledge contained in the patent specification.*

124    *(eee) The parties have unanimously argued that histidine was suspected at the time of causing a yellowish discoloration of the formulation after a certain period of time, which was undesirable, particularly in the human eye. This is evident, for example, from the letter from the patent attorney representing the patent holder to the European Patent Office dated March 9, 2012, referred to by the respondents (p. 4: "The use of phosphate, rather than histidine, is an important distinction. In particular, histidine can degrade and confers a yellowish hue to a formulation over time. Injecting yellowish formulations into human eyes is clearly not desirable," accessed via Espacenet).*

125    *However, as the plaintiff in the injunction proceedings stated uncontested in the oral hearing in response to a question from the Chamber, this yellow discoloration only refers to the formulation; injecting such a discolored formulation into the eye does not lead to a yellowish discoloration of the eyeball. Nevertheless, patients would have reservations about having a yellowish solution injected into their eyes. Nevertheless, this circumstance did not preclude the commercial use of* ▮▮▮▮▮ .

126    *However, this means that the concerns expressed by the patent holder during the granting procedure merely concerned an aesthetic aspect, the significance of which can be assessed differently. Therefore,*

*this circumstance does not preclude use, especially since patients do not inject the drug themselves and treating physicians can be expected not to be deterred by the color of the injection fluid.*

127    *(cc) The considerations that the skilled person had to make in order to arrive at histidine as a buffer are also so closely aligned with the meaning of the technical teaching protected in the patent claim that the skilled person would consider the different design with its modified means to be an equivalent solution to the one in question.*

128    *(aaa) Orientation towards the patent claim presupposes that the patent claim, in all its features, forms not only the starting point but also the decisive basis for the considerations of the skilled person.*

129    *This is the case here because the patent in suit in claim 1 protects a formulation that uses a buffer to adjust the pH value of the formulation. Neither the claim nor the description assign any further purpose or function to the specifically chosen sodium phosphate. The skilled person therefore recognizes that the function of the buffer does not go beyond the purpose of pH adjustment, so that the use of histidine instead of sodium phosphate is to be regarded as equivalent. This is because histidine is also suitable for determining the pH value of a protein formulation.*

130    *(bbb) Nor is there any deliberate limitation of the patent claim by the patent holder. This would be the case if, viewed objectively, the patent were limited to a narrower claim than would be required by the technical content of the invention and the prior art. In that case, the skilled person would be entitled to assume that the protection was limited accordingly. The patent holder is then prevented from subsequently claiming protection for something that he has not had protected. This applies even if the skilled person recognizes that the effect of the invention as such (in the narrower sense described above) could be achieved beyond the scope of protection claimed in the patent claim. Therefore, an embodiment from the scope of protection of the*

Munich Regional Court I, 7 O
9383/25

*Patents are excluded which, although disclosed or at least discoverable by a person skilled in the art, the reader of the patent specification must assume that they should not be protected for whatever reason (Federal Court of Justice, judgment of June 14, 2016, X ZR 29/15, GRUR 2016, 921 marginal no. 50 – Pemetrexed). It is not necessary for the patent specification to direct the skilled person to a different design of the patented teaching (BGH, judgment of May 6, 2014, X ZR 36/13, GRUR 2014, 852 marginal no. 16 – Begrenzungsanschlag).*

131    *The case law of the Federal Court of Justice on patent infringement with equivalent means is to be understood, with regard to the aspect of the selection decision, as meaning that the Pemetrexed decision represents a response to an uncertainty created by the Occlusion Device decision. The assessment contained in para. 68 is decisive: as a rule, it cannot be assumed that the patent holder made a selection decision. Rather, there must be special reasons to assume that a selection decision was made. The defendants did not present such special circumstances, nor are they otherwise apparent. Rather, this is a typical constellation in which an equivalent patent infringement is to be assumed. In detail:*

132    *(i) Where the patent specification does not explicitly refer to sodium phosphate but to phosphate (e.g. paragraphs [0011], [0059]), paragraph [0047] clarifies that the term "phosphate" always refers to sodium phosphate. Other substances or generic terms for substances are not mentioned.*

133    *Furthermore, in paragraph [0048] under the heading "Stable Liquid Ophthalmic Formulations," no specific substance is named for the buffer to be used, whereas for the other excipients to be used according to the patent claim, specific substances are listed in accordance with claim 1 of the patent in suit.*

134    *Paragraph [0049] then discloses the composition of the formulation as corresponding to claim 1, namely with sodium phosphate as a buffer. However, the varying degrees of specificity with regard to the different excipients in paragraph [0048] indicate to the skilled person*

*indication that the buffer does not necessarily have to consist of sodium phosphate.*

135    *(ii)    This indication is further supported by the fact that nowhere in the patent specification are certain advantages of sodium phosphate or other reasons explained as to why the buffer must be made of sodium phosphate or even of a certain superordinate group (e.g., salts, inorganic substances).*

136    *(iii) The skilled person therefore concludes from the patent specification that it is not the specific buffer material that is important, but rather the function of the buffer. As already explained above, this plays an important role in the interpretation of the patent claim (see BGH, X ZR 76/14, GRUR 2016, 1254 marginal no. 20 – V-shaped guide arrangement). Based on this consideration, however, the specification of a specific embodiment does not mean that other embodiments are excluded from the scope of protection of the patent. Otherwise, patent protection would always be excluded if the patent proprietor recognized (or could have recognized) that replacement means were conceivable for a solution element named in the claim and failed to work towards a version of the patent in which the replacement means would have been covered by the literal meaning of the patent claim. This result would not be appropriate (Federal Court of Justice, judgment of August 23, 2016 – V-shaped guide arrangement – para. 21 et seq.).*

137    *In this respect, the present constellation, in which the patent in suit refers to the supergroup "buffers," is similar to the "Pemetrexed" case decided by the Federal Court of Justice; In that case, the Federal Court of Justice stated that equivalence (and thus the assumption of an equivalent infringement) is not precluded if the patent specification discloses the suitability of a group of substances but then only claims a specific substance from that group, since the discoverability of an alternative substance is not equivalent to its explicit disclosure in the patent specification (Federal Court of Justice, judgment of June 14, 2016, X ZR 29/15, GRUR 2016, 921 – Pemetrexed). The same applies here.*

138    *(ccc) The statements and actions of the patent applicant in the grant procedure referred to by the respondents do not contradict this either.*

139    *(i)    According to the case law of the Federal Court of Justice (BGH), the principle applies that the patent holder may not subsequently claim protection for something that he has not had protected by means of the legal concept of equivalence (BGH, judgment of June 14, 2016 – Pemetrexed – loc. cit. para. 64 ff.). This would be the case if the wording of the claim had been restricted between the filing and the granting of the patent in order to distinguish it from the prior art. In the present case, however, there is no difference between the filed, granted, and restricted versions of the patent claim with regard to the use of sodium phosphate as a buffer.*

140    *(ii) The defendants argue that, in the grant procedure, the patent proprietor distinguished the claimed invention from, inter alia, the citations D1 (the patent specification WO 2006/047325 [see EPO response to the European search report dated August 11, 2011, p. 2, accessed via Espacenet], i.e. the patent specification underlying the drug Lucentis        and D2    (the patent specification      WO 2005/000895, see ibid.) as inventive by pointing to the use of sodium phosphate instead of histidine (see letter from the patent attorney representing the patent proprietor to the EPO dated October 5, 2009, p. 3, Annex BBY 18; letter from the patent attorney representing the patent proprietor to the EPO dated March 9, 2012, p. 4, accessed via Espacenet).*

141    *According to the general understanding of German patent jurisdiction, there is agreement that documents from the grant procedure cannot, as a rule, be used to determine the scope of protection of the patent. The reason for this lies in Article 69 EPC, which specifically excludes statements made during the grant procedure from being used to determine the scope of protection. It is permissible to use statements made by the applicant and the examiner during the grant procedure as an indication of how the skilled person understands the subject matter of the patent (BGH, GRUR 2016, 921 marginal no. 39 – Pemetrexed).*

142    *In the opinion of the Board, a distinction must be made between the indicative effect of statements made by examiners and statements made by applicants, as specified by the Federal Court of Justice. As a rule, a statement made by the examiner in the grant procedure will have a high indicative value. This cannot be assumed without further ado in the case of statements made by the patent applicant. Rather,*

*can therefore be assumed to have limited evidential value. The reason for this is that in the argumentative battle over the granting of a patent, a multitude of arguments are sometimes put forward, sometimes in the knowledge that they stretch the general technical understanding far beyond its limits. To use such statements later to argue against the patent holder would be to disregard the practice of patent granting procedures in an inappropriate manner. Rather, when analyzing statements made by the patent holder, it must always be examined whether they have been reflected in the examiner's reasoning. This is because it is the examiner, not the applicant, who performs the sovereign act of granting the patent, from which the legal effects of the patent then follow in accordance with Section 58 (1) sentence 3 PatG. If this is the case, they may be taken into account in the manner described, namely as the understanding of the skilled person at that time.*

143    *Even if the statements made by the patent holder in the grant procedure referred to by the respondents' representatives were taken into account, this would not have led to the patent holder limiting itself to sodium phosphate instead of histidine or other buffers. There are no indications that the patent holder wanted to exclude histidine from the scope of protection of the patent.*

144    *The inventive step is justified in the letters dated October 5, 2009, on the grounds that the patent in suit uses a different VEGF antagonist than D1 and that the skilled person would have no reason to replace the VEGF antagonist of D2 with that of D1. The reference to the use of a different buffer (histidine) was made in the sense of an "in addition" argument. Such an argument cannot be considered a waiver. This is clear from the fact that adding histidine to the patent claim would have constituted an inadmissible extension.*

145    *The same applies to the statement discussed by the respondents in the oral proceedings in the cited letters from the patent attorney representing the patent proprietor in the grant proceedings concerning the then citation D3 (the patent specification WO 2006/104852, Annex BBY 19, corresponds to citation D10 in the nullity proceedings; see letter from the patent attorney representing the patent proprietor to the EPO dated October 5, 2009,*

*P. 2, Annex BBY 18; letter from the patent attorney representing the patent proprietor to the EPO dated March 9, 2012, p. 3, accessed via Espacenet). In this regard, the letters at the time state that D3 does not disclose any formulation with a phosphate buffer except in combination with 20% sucrose, and that otherwise only a buffer consisting of histidine or a combination of citrate and phosphate is present, and therefore the patent in suit is novel. However, for the reasons stated, this statement does not indicate a waiver of histidine.*

146     *dd) Patent infringement is also not ruled out on the basis of the "Form-stein" objection.*

147     *(aaa) If the plaintiff asserts a patent infringement with modified but equally effective means, the defendant may also defend itself with the objection that the contested embodiment is not patentable because it was anticipated or suggested by the prior art at the priority date of the patent in suit (BGH, X ZR 28/85, GRUR 1986, 803, 806 – Formstein). In terms of content, this is the argument of prior art, which can only be applied in the case of an extension of the scope of protection by equivalent means. As a result, it is a prerequisite that the contested embodiment with all its features (including the equivalently infringed feature) must already have been present in the prior art at the priority date of the patent.*

148     *This is not the case because D10 (Exhibit BBY 19, which contains aflibercept as the active ingredient and histidine as a buffer), referred to by the respondents, does not show an ophthalmic formulation of a VEGF antagonist for use in intravitreal administration. D10 is suitable for intravitreal administration, but not intended for this purpose. Therefore, ▮▮▮▮▮▮ does not belong to the prior art.*

149     *(bbb) In the oral proceedings, the respondents argued that the Formstein objection must apply for reasons of legal certainty. They justified this by stating that the granted version of patent claim 1 would correspond to the teaching of D10 and the actual formulation of the contested embodiment. If this version were still valid, the respondent could invoke the molded brick objection.*

150     *In this respect, it is true that the limited version of patent claim 1 serves to distinguish it from D10. However, it is not apparent that the defendants could have a legitimate expectation with regard to the granted version. It is generally understood that patent claims can be limited in the course of nullity proceedings. Third parties are free to form their own opinion of the true scope of protection of the respective patent by reading the claims, the description, and the figures.*

(End of remarks on patent infringement by equivalent means in the Federal Republic of Germany.)

---

151     2.   Patent infringement with equivalent means in Austria, Belgium, Bulgaria, Denmark, Finland, France, Greece, Ireland, Italy, Lithuania, Luxembourg, the Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, the Czech Republic, Hungary, and Cyprus

152     With regard to the alleged patent infringement in the 22 EPC member states, all of which are also member states of the European Union, patent infringement by equivalent means is to be assumed because the scope of protection of the patent in suit, which has been divided into national patents after being granted by the European Patent Office, must be assessed uniformly.

    a.   Indicative effect of the assessment in Germany

153     The assessment with regard to the legal situation in the Federal Republic of Germany has a strong indicative effect in that the same result will be found in the other EPC member states in the same way.

154     Due to this strong presumption, it is not necessary for the Chamber to obtain expert opinions from independent experts on the respective foreign law. Otherwise, the effective enforcement of industrial property rights required by the Enforcement Directive would be made more difficult in a manner that would be unreasonable for the owners of the property rights.

155     Rather, it is up to the party being sued to present concrete evidence that    that on the basis of   national   law   a   other

decision would be made. <u>It is incumbent upon you to explain why other states would come to a different assessment</u>.

156    The argument that proceedings in other countries are conducted differently in factual terms cannot be taken into account. In other words: <u>It is irrelevant whether proceedings in other countries are conducted differently in principle</u> (e.g., through expert evidence), whether preliminary injunctions take significantly longer, or whether there is fundamental skepticism toward the legal concept of equivalent patent infringement (typically, judges who do not regularly deal with patent infringements are reluctant to apply this legal concept). This is because these are factual circumstances that a party sued for patent infringement cannot invoke.

157    The only criterion is whether national law (statutes or established case law) modifies the requirements of the EPC in a way that would lead to a different result. This means that the party being sued must submit the provisions or decisions that it considers relevant. In addition, it must submit a qualified opinion from an expert knowledgeable in the relevant field of law who is bound by professional ethics to tell the truth.

158    These principles regarding <u>the indicative effect</u> of infringement under German law apply not only to literal <u>patent infringements</u>, but <u>also to equivalent patent infringements</u>, particularly in cases involving a simple equivalence constellation. In the Chamber's view, extending the scope of protection to equivalent forms of infringement serves to bring clear circumvention solutions within the scope of protection of a patent. A <u>clear circumvention solution exists at least when a feature that does not form the core of the invention i</u>s <u>modified</u>.

159    This is the case here: only the buffer solution of the formulation is changed. According to the patent in suit, this buffer has no other significance than to adjust the pH value of the formulation. In this regard, the Chamber does not fail to recognize that the defendants – presumably under the impression of the proceedings in the United Kingdom – the expert opinion of the experts ███████ ████ (Appendix BBY 16) and explained that the choice of buffer also has an impact on the stability of a protein formulation. As already explained, this does not significantly increase the degree of complexity

. This is because simple routine tests make it possible to check whether replacing the buffer in the overall structure of the formulation has an effect on stability. Performing such tests does not pose any obstacle for a person skilled in the art.

160    On evaluation, the respondent's submission can be classified as an attempt to imbue the exchanged feature with meaning beyond the wording and description in order to give the exchange the appearance of an inventive step, which would result in an equivalent infringement. For the reasons discussed above, this is not convincing.


    b.    No undermining of the indicative effect by the decision of the UK High Court

161    The case law of the Federal Court of Justice and the UK High Court is characterized by the understanding that in all EPC member states, there is essentially the same assessment of the requirements for assuming patent infringement by equivalent means. In decisions on patent infringement by equivalent means, the Federal Court of Justice regularly refers to the case law and specific decisions of the courts in the United Kingdom. The judges in the United Kingdom also assume that essentially the same results are achieved.

162    In the parallel decision before the UK High Court with the file number [2025] EWHC 2527 (Pat), the court also emphasizes that the standard applied does not deviate from the German understanding (see paragraph 423, No. 62). In the Chamber's view, there are essentially two reasons why the decision in this case was different:

163    Firstly, in the UK proceedings, it is not the limited claim 1 that is asserted, but a version limited to the independent secondary claim 5. This means that the wording protected by the claim is described in much greater detail. In the comments on the individual countries (specifically Belgium), it will be explained that this leads to a different result. However, this cannot be generalized to mean that the UK High Court would deny equivalence in the constellation at issue.

164    Secondly, the parties presented different arguments in the two proceedings, meaning that the UK High Court had to rule on different facts, which naturally could lead to a different outcome. For example, it should be noted that the UK High Court denied the existence of the first question (according to the German understanding of equivalent effect). In the present proceedings, however, it was stated (response of August 5, 2025, para. 108): *The first question of equivalence, whether the modified form (using histidine as a buffer) objectively achieves the same effect as the claimed formulation with sodium phosphate, can be left open at this point.* The corresponding question was therefore not the focus of the discussion. It is not overlooked that the respondents to the injunction have put forward the argument elsewhere that the buffer has an influence on the stability of the formulation.

165    Therefore, the aforementioned indicative effect is not undermined by the decision of the UK High Court.

c.    Assessment of statements made during the grant procedure

166    Nor do different results follow from any different treatment of statements made during the grant procedure in one of the 22 countries asserted.

167    As a starting point, it should be noted that the scope of protection of a European patent may not be determined in any EPC member state by taking into account statements made during the grant procedure. Art. 69(1) EPC is conclusive in this respect. The patent claims are decisive, and the description and drawings are to be used to interpret the patent claims.

168    Statements made during the granting procedure may, at most, have an influence on the protection granted by the patent from the point of view of contradictory behavior. The scope of protection of a patent must always be determined objectively. If a patent has been wrongfully granted because inaccurate information was provided in the application, this conduct can only be countered from the perspective of contradictory behavior.

169    With regard to the statements made during the grant procedure, the defendants in the injunction proceedings referred to the fact that the patent holder had declared an implied waiver in some countries. The patent holder had therefore waived

the granting procedure, the patent holder waived an extension of the scope of protection of the patent to an embodiment with histidine as a buffer on the basis of the objection of lack of novelty or lack of inventive step. However, these statements are not convincing, as has already been explained in the discussion of the German legal situation. The UK High Court also correctly came to the same conclusion.

170     On this basis, it can be assumed that <u>in all 22 countries</u> there is <u>an indication of infringement of patent claim 1 in the version asserted in the main application by equivalent means</u>. The arguments put forward by the respondents' representatives are not sufficient to refute this indication.

e.     <u>Assessment of the legal situation in the 22 countries asserted</u>

171     On the basis of these general principles applicable to all countries examined and the specific submissions of the parties on the law of the individual countries, the following comments can be made with regard to each individual country.

172     First, an <u>assessment of the overall facts of the case</u> should be provided. The plaintiffs base their claim on a total of 22 national patents that have been granted uniformly by the European Patent Office. The defendants are based in the Federal Republic of Germany and have obtained a uniform marketing ███████zation for the biosimilar, which entitles them, with only a few further steps, to market this biosimilar in all 22 countries. The necessary preparatory measures have already been taken. The defendants have put forward arguments, some of them rather minor, against the injunction sought in this case, claiming that specific aspects relating to the respective countries have not been taken into account. In doing so, the defendants fail to recognize the uniformity that exists under the EPC and the Enforcement Directive with regard to the assessment of whether an equivalent patent infringement has occurred. Their arguments are based on standards and legal institutions whose purpose is not to make it more difficult to enforce patent rights.

(1)     Austria

173     The claim for injunctive relief due to patent infringement is based on Section 147 of the Austrian Patent Act (öPatG). The provision of Section 22 öPatG cited by the plaintiffs, on the other hand, regulates the effects of the granted

patent. Pursuant to Section 22a (1) sentence 3 öPatG, the Protocol to Article 69 EPC is expressly to be used to determine the scope of protection.

174    Contrary to the opinion of the defendants, the application is not inadmissible with regard to Austria because the plaintiffs failed to specify the legal provision governing the application for an injunction, but instead specified the provision governing the effects of the patent. As the respondents themselves admit, an applicant is not required to qualify his claim in legal terms and therefore does not have to specify the provision on which he bases his claim. The respondents refer to the following statement by the Austrian lawyer█████████████ (Annex BBY 33, p. 2 f.):

> However, if the plaintiff expressly limits his claim to a single legal basis, the court may not grant the claim on another legal basis; otherwise, this would constitute a violation of Section 405 of the Code of Civil Procedure (ZPO) (aliud prohibition) and thus a significant procedural defect (OGH 4 Ob 26/07p; RIS-Justiz RS0037659)."

175    The cited decision of the OGH further states: "The facts presented by the plaintiff are decisive for the court's scope of discretion; an incorrect legal qualification does not disadvantage the plaintiff if he has presented all the facts substantiating his claim and provided evidence for them." According to this, the indication of the incorrect standard is harmless.

176    According to the expert opinion of Austrian attorney█████ (Exhibit BBY 33, p. 9), equivalence is affirmed in Austria if (1) the modified embodiment solves the problem underlying the invention by means that are modified but objectively equivalent (equivalent effect); (2) the skilled person can, with the aid of their technical knowledge, find that the modified means used in the embodiment have the same effect in solving the problem underlying the invention (obviousness); and (3) the considerations of the skilled person are oriented towards the meaning of the technical teaching protected in the patent claim in such a way that the skilled person considers the deviating embodiment with its modified means to be an equivalent solution to the embodiment according to the patent (OGH, decision of May 20, 2008, 17 Ob 6/08v, GRUR Int. 2008, 1047, 1048 – Bicalutamide II). In this context, the OGH explicitly refers to German case law.

177 ███ 's expert opinion further states (see Annex BBY 33, p. 9):

> "In a case such as this, the <u>obviousness</u> of the replaced element would only be given if the explanations of the prior art at the priority date in the patent <u>listed the individual compounds in an overview, accurately and with references, and if the explanation of the effect of the invention on the group of these agents (buffers)</u> (and not just to the one, only mentioned compound (sodium phosphate) (see OLG Vienna 133 R 15/18f, Pemetrexed)."

178 However, this statement clearly misinterprets the ruling of the Vienna Higher Regional Court. This is because the quoted statement is not made there in the sense that such information is mandatory in the patent specification for something to be obvious (this would also not be in line with the requirements of the Supreme Court, where obviousness, unlike equivalence, has no reference to the patent specification). In the case decided by the Vienna Higher Regional Court, it was simply the case that the information was available in the patent specification in such detail.

179 It can therefore be assumed that an Austrian judge would also find an equivalent patent infringement.

(2) Belgium

180 In Belgium, the right to injunctive relief for patent infringement arises from Article XI.334 § 1 of *the Code de droit économique* (CDE). The provision of § 57 of *the Loi relative à la propriété industrielle* cited by the plaintiffs does not exist. The provision of Art. XI.29 CDE cited in the expert opinion of Belgian lawyer ███████ (Exhibit BBY 8) submitted by the defendants and in Exhibit AST 49 regulates the effects of the granted patent.

181 Belgian case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. According to this test, which originates in US law, the respective feature of the contested embodiment must essentially perform the same function as in the patent claim, and in essentially the same manner, in order to lead to essentially the same result as in the patented invention (see U.S. Supreme Court, *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 (1997)).

182    British case law has essentially adopted this approach as the first of the three so-called "improver" questions (see UK Supreme Court, *Actavis UK Ltd. v. Eli Lilly and Co.,* [2017] UKSC 48 para. 60, 66). Following the reformulation of the questions in the above-cited judgment, the following refers to "Actavis" questions. These three questions are:

> 1. Even if the variant does not correspond to the wording of the relevant patent claim, does it essentially achieve the same result in essentially the same way as the invention, i.e., as the inventive idea disclosed in the patent?
>
> 2. Would it be *obvious* to a person skilled in the art reading the patent on the priority date and knowing that the variant achieves essentially the same result as the invention that it does so in essentially the same way as the invention?
>
> 3. Would such a reader of the patent have concluded that the patent owner nevertheless intended strict adherence to the wording of the relevant patent claim to be an essential requirement of the invention?

183    <u>Only the first Actavis question </u>is <u>relevant </u>for the "function-way-result" test. The second and third questions will therefore not be addressed here. They will be discussed in the section on the legal situation in Ireland.

184    The respondents did not argue that the "function-way-result" test is applied in a particular way in Belgium. The expert opinion of Belgian lawyer Eric de Gryse (Exhibit BBY 8) submitted by the respondents merely states that this test is applied in Belgium without providing any further explanation.

185    The characteristics "same function" and "same result" of the function-way-result test correspond to the German characteristic of equal effect. The characteristic "The same manner" corresponds to the German characteristics of findability and equivalence (see Meier-Beck, GRUR 2018, 241, 245). In this context, the correspondence for the characteristic "the same manner" must be explained in more detail with reference to the present case.

186    Applied to the present case, this means that the contested embodiment, like the patented invention, contains a buffer solution (not covered by the wording) and therefore produces essentially the same result in essentially the same way.

187    This is not contradicted by the decision of the UK High Court of October 8, 2025 ([2025] EWHC 2527 (Pat)) does not preclude this. Rather, the present assessment is supported by the statements in the British judgment. The court would have reached the same decision if the same claim and the same facts had been presented for decision.

188    In that case, the patent holder had waived claim 1 of the patent in suit and instead relied on a further restricted version of claim 5. On this basis, the British court concluded that the claim was so narrowly defined due to the precise specification of the components (including their dosage) of the formulation that the "inventive concept" of the claim was limited to the claimed composition (loc. cit., para. 475). According to this "inventive concept," the first "Actavis" question must be asked (loc. cit., para. 424 et seq., 427, 465). Therefore, in the context of the first "Actavis" question, it must be stated that the defendant's formulation implements the inventive concept in a different way (see loc. cit., para. 487 et seq., 491). If, on the other hand, the inventive concept were to be formulated more broadly – namely in the sense that it lies in the formulation of a formulation suitable for intravitreal administration, i.e., also sufficiently stable, based on 40 mg/ml of aflibercept (this amount corresponds to the limited version of claim 5 of the patent in suit in the British proceedings) and a pH value of 6.2–6.3 – the first "Actavis" question would have to be answered in the affirmative (loc. cit., para. 491). However, the Federal Patent Court has determined for the relevant claim 1 of the patent in suit in these proceedings, the Federal Patent Court found that the subject matter of the injunction patent (i.e., the "inventive concept") consists in the provision of formulations of the vascular endothelial growth factor (VEGF) antagonist consisting of the amino acids mentioned in feature 1.1 that are suitable for intravitreal administration. This is even broader than the broader formulation of the inventive concept considered by the British court as an alternative. For claim 1, which is relevant to the present proceedings, a British court would therefore also answer the first "Actavis" question in the affirmative.

189    It can therefore be assumed that a Belgian judge would also find that there was equivalent patent infringement.

(3)    Bulgaria

190    In Bulgaria, the right to injunctive relief for patent infringement arises from Art. 28(1)(3) of the Law on Patents and the Registration of Utility Models (*ЗАКОН ЗА ПАТЕНТИТЕ И РЕГИСТРАЦИЯТА НА ПОЛЕЗНИТЕ МОДЕЛИ*). This is evident from the expert opinion of the Bulgarian lawyers submitted by the respondents ███████████████████████ ████████████████████(Exhibit BBY 34, p. 10), which was reviewed by the Chamber in this respect. However, the provision of Art. 19 of the "Patent Law" cited by the plaintiffs (assuming that the plaintiffs are referring to the cited law) regulates the effects of the granted patent.

191    Bulgarian case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants did not argue that the "function-way-result" test is applied in a particular way in Bulgaria. Therefore, reference can be made to the above comments on Belgium.

192    It can therefore be assumed that a Bulgarian judge would also find that there was equivalent patent infringement.

(4)    Denmark

193    In Denmark, the right to injunctive relief for patent infringement follows from Section 59(1) of the Consolidated Patent Act (*Bekendtgørelse af patentloven*), as stated by the plaintiffs in Annex AST 49. The provision of Section 3 of the Patent Act referred to by the plaintiffs elsewhere, on the other hand, regulates the effects of the granted patent.

194    According to the responses submitted by the plaintiffs to a questionnaire issued by the International Association for the Protection of Intellectual Property (AIPPI) in 2023, there is no established test in Danish case law for assessing equivalent patent infringement. However, according to these responses, a ruling by the Danish Supreme Court states that it is decisive whether the essential element of the patented invention is present in the contested embodiment, whether the differences between the patented invention and the contested embodiment are insignificant, and whether the differences were obvious to a person skilled in the art (see AIPPI, Yearbook 2023 – Doctrine of

Equivalents, Annex AST 18, p. 156 ff.; the cited decision of the Supreme Court is more recent than the decisions of two courts of appeal, which are also cited, that conducted an examination similar to the function-way-result test, and it is also stated that the Supreme Court did not explicitly refer to the "function test" requested by the AIPPI).

195    The respondents did not comment on the examination of the equivalent patent infringement in Denmark. According to the decisive standard, the facts of the case also constitute an equivalent patent infringement in Denmark. The essential element of the invention is the utilization of the active ingredient aflibercept for intravitreal injection. Against this background, the use of a histidine buffer instead of a sodium phosphate buffer is insignificant and can also be found by a person skilled in the art without inventive activity, i.e., it is obvious.

196    It can therefore be assumed that a Danish judge would also find an equivalent patent infringement.

(5)    Finland

197    In Finland, the right to injunctive relief for patent infringement follows from Section 57(1) of the Patent Act (*Patenttilaki*), as stated by the plaintiffs in Annex AST 49. The provision of Section 3 of the Patent Act, referred to by the plaintiffs elsewhere, regulates the effects of the granted patent.

198    Finnish case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants did not comment on the examination of equivalent patent infringement in Finland. The responses of the Finnish members of the AIPPI to the organization's questionnaire do not reveal any particularities regarding the application of the test (see Annex AST 18, p. 187 ff.). Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

199    It can therefore be assumed that a Finnish judge would also find equivalent patent infringement.

Munich Regional Court I, 7 O
9383/25

(6) France

200    In France, the right to injunctive relief for patent infringement arises from Article L615-3(1)(1) of *the Code de la propriété intellectuelle*, as stated by the plaintiffs in Appendix AST 49. However, the provision of Art. 613-3 of this law, referred to by the plaintiffs elsewhere, regulates the effects of the granted patent.

201    The parties agree that French case law applies a three-question test to determine equivalence:

1.  Does the modified means of the contested embodiment perform the same function as in the patented invention?

2.  Does the modified means achieve the same result?

3.  Is the function performed by the modified agent new? This means that, under French law, equivalent patent infringement only exists if the function performed by the modified agent was new at the priority date.

202    The parties disagree on how question 3 should be understood in relation to patents on a combination of several features. The defendants, referring to an expert opinion by French lawyer ███████ (see Annex BBY 10a, point 7.10 f.), take the following view:

> "7.10 In the context of the French proceedings, ███████ considers that the novelty of the function must be assessed as a whole, i.e. taking into account the function of all the characteristics of the formulation. I understand from paragraphs 91 and 93 of the statement of claim that the companies ███████ are taking a different approach in the German proceedings and are relying specifically on the function of the sodium phosphate buffer. Since there is no synergistic effect that goes beyond the mere addition of the expected effects of the individual excipients in the formulation, this approach seems to me to be more correct.

> 7.11 Under French law, I am of the opinion that the buffering function of phosphate in the claims of patent EP 691 cannot be infringed by equivalence, since the function of the sodium phosphate buffer was not new:

> > 7.11.1 In the invention that is the subject of patent EP 691, sodium phosphate performs its known function as a buffer. It is neither claimed nor proven that sodium phosphate, in combination with

the other components of the formulation.

7.11.2 The function of sodium phosphate as a buffer for adjusting the pH value of protein and therapeutic antibody formulations was widely known in the prior art, as recognized by ████████ in the French proceedings and as can also be seen from the statements made by ████ on pages 42 to 47 of the statement of claim.

203    The plaintiffs responded to this by referring to an expert opinion by French lawyer ██████████████ (see Annex AST 28ü, point 5.1):

*According* to French case law, including that of the French Court of Cassation, in the case of a group of combined means, the criterion of novelty must be examined as a whole and not for each means individually: '*The Court of Appeal, which defined **the new function of the combination of means of the patent** and found, without contradicting itself, **that the device in question, although different in form, performs the same function** in order to achieve a result of the same kind, even if the obstruction is not complete, was able to confirm the existence of acts of infringement*.' [followed by a reference to a judgment of the Cour de Cassation of September 15, 2009, which is reproduced in full in Appendix 24 of its opinion]

In my opinion, French judges would consider the subject matter of the invention of EP691 in the present case to be a composition in which the group of agents must be considered as a whole.

➢    ████████ has proven in the French proceedings that the function of the group of agents of EP691, i.e., the technical effect of the subject matter of these claims, was new.

➢    In his statement, the opposing attorney does not dispute that the function as a whole is new. This is noted.

➢    He merely states that a synergistic effect would have to be proven.

According to French case law, a synergistic effect refers to 'agents that interact to achieve an overall result that differs from the sum of the results they would achieve individually' [followed by a reference to a judgment of the Cour d'Appel Paris of May 28, 1999].

██████████ will have no difficulty in providing expert opinions confirming that an experienced formulator considers the formulation of a medicinal product as a whole. The excipients together, and not each individually, result in a stable formulation."

204    ██████, attorney at law, responded as follows (see Exhibit BBY 24a, point 6.1):

"However, I note that it is not di███████████████h law, as I maintain (paragraphs 7.10 ff.),                          it is not disputed that, under French law, as I maintain (paragraphs 7.10 et seq. my certificate Fabre No. 1), in order to extend the scope of protection of a claim relating to a combination of known agents to equivalents, it is necessary to prove a synergistic effect that goes beyond the mere juxtaposition of the expected and known effects of each agent in the combination."

205    It should be noted that the plaintiffs clarified in the oral hearing that, in their opinion, a synergistic effect was not necessary.

206    In the opinion of the Chamber, the third question of the French equivalence test aims to prevent the monopolization of functions of certain means known in the prior art by means of a patent based on the principle of equivalence. In such cases, the patent claim can only cover the specific implementation of the function in the form of a specific means (see Cour de Cassation, decision of February 26, 2008, Bourgeois v. Pimas, IIC 2009, 338). The third question thus ultimately represents another form of the "form stone" objection (see also the affirmative answer of the French members of the AIPPI to the question in the questionnaire as to whether French law recognizes a doctrine such as the "form stone" objection, AIPPI, Yearbook 2023 – Doctrine of Equivalents, Annex AST 18, p. 203 et seq.). This argues in favor of answering the third question, i.e., novelty, in the affirmative, for the same reasons that the "form stone" objection was rejected. In addition, the following applies:

207    In the case of a complex chemical formulation such as that protected by claim 1 of the patent in suit, it is practically impossible to assess what effect the individual components of the formulation would have when considered in isolation. In this respect, the parties agree that the individual components of the claimed formulation must be coordinated with each other. This applies both to the selection of the individual agents and to their dosage. However, considering the individual components in isolation is then a theoretical exercise

that has nothing to do with the question of what contribution the patent holder has made to the state of the art.

208  The respondents argue that current French case law requires a synergistic effect of the individual characteristics in the case of a combination patent. In any case, this seems doubtful for a complex formulation such as the one at issue. The 1999 ruling of the Cour d'Appel, on which the respondents base their opinion, concerns a formulation consisting only of lactose and a "specific supplement," and there is no indication that it was intended for sensitive use such as injection into the human eye (see Exhibit BBY 24, point 6.3). Neither the aforementioned 2008 judgment of the Cour de Cassation nor the judgment of the Cour de Cassation of September 15, 2009 (Annex 24 of Annex AST 18), which was attached to the expert opinion of attorney Jacquand, mentions the requirement of a synergistic effect. Rather, the latter judgment states that the lower court had found an equivalent patent infringement in that "the patentable combination of known means differs from the simple juxtaposition of known, non-patentable means in that the means cooperate with each other to achieve a common result" (*"qu'une combinaison de moyens connus brevetable se distingue de la simple juxtaposition de moyens connus non brevetable en ce que les moyens coopèrent ensemble en vue d'un résultat commun"*). This decision of the lower court was upheld. In their responses to the question of whether French law recognizes a doctrine such as the

Although the "molded brick" objection is known, the third question of the equivalence test is presented and the judgment of the Cour de Cassation of September 15, 2009, is referred to. However, there is no mention of the requirement of a synergistic effect there either.

209  In the Chamber's view, a French judge would then have to examine whether the function of the replaced agent, i.e., sodium phosphate, in combination with the other features of claim 1 of the patent in suit, namely in combination with the active ingredient aflibercept and the provision for intravitreal administration, was new. This is to be affirmed, since the novelty and inventive step of the invention protected by claim 1 of the patent in suit were affirmed independently of the specific type of buffer.

210  It can therefore be assumed that a French judge would also find equivalent patent infringement.

(7)    Greece

211    In Greece, the right to injunctive relief for patent infringement arises from Article 17(1) of Law No. 1733/1987 (*Νομοσ υπ' αριθμ. 1733/1987*). However, the provision of Article 10(1) of this law cited by the plaintiffs regulates the effects of the granted patent.

212    Greek case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants did not comment on the examination of equivalent patent infringement in Greece. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

213    It can therefore be assumed that a Greek judge would also find an equivalent patent infringement.

(8)    Ireland

214    In Ireland, the right to injunctive relief for patent infringement follows from Section 47(1)(a) of *the Patents Act*. However, the provision of Section 40 of this Act cited by the plaintiffs regulates the effects of the granted patent.

215    The parties agree that the Irish courts would probably adopt the British approach to patent equivalence. Accordingly, they would apply the three "Actavis" questions.

216    The defendants and the Irish lawyer they have engaged, Jane Bourke (see Annex BBY 12), do not express an opinion on how the Irish courts would answer these three questions.

217    (a.)    With regard to the first "Actavis" question, reference can be made to the comments on Belgian law. Like the patented invention, the contested embodiment contains a buffer solution, even though this is not covered by the wording of the claim. It therefore produces essentially the same result in essentially the same way.

218    (b.)    The second "Actavis" question must also be answered in the affirmative. It must then be clarified whether it would be *obvious* to a person skilled in the art reading the patent on the priority date and knowing that the variant achieves essentially the same result as the invention that it does so in essentially the same way as

The invention. <u>Upon reading the patent specification and knowing that the contested embodiment essentially leads to the same result as the patented invention, a person skilled in the art would have known that this is based on the fact that histidine is a buffer just like sodium phosphate</u>. In this context, it also seems relevant that the British Supreme Court has just updated the second "Actavis" question in *Actavis* to ensure that routine testing of chemical formulations does not preclude obviousness (Supreme Court, *Actavis UK Ltd. v. Eli Lilly and Co.,* [2017] UKSC 48, para. 61 et seq.).

219    With regard to the judgment of the High Court of England and Wales of October 8, 2025, in the [REDACTED] [2025] EWHC 2527 (Pat) concerning the second "Actavis" question, the following should be noted: Although the judgment denies the second question, this is a consequence of the fact that in that case, it was not claim 1 but claim 5 that was at issue (see above in the discussion of the legal situation in Belgium, para. 187). If the "inventive concept" is not limited to the specific wording of claim 5 (which was further restricted in the British proceedings), but is interpreted more broadly in line with the opinion of the Federal Patent Court expressed in relation to claim 1 (see para. 187 above), the British court would also answer the second "Actavis" question in the affirmative (see loc. cit., para. 489, 492). Incidentally, it seems questionable whether the higher British courts would follow the view developed in the cited judgment that no tests may be taken into account in the context of the second "Actavis" question (see loc. cit., para. 431 et seq., 489), especially since the British Supreme Court has reformulated the questions, not least with a view to ensuring consistency with German, Italian, and Dutch case law (see *Actavis v Lilly* [2017] UKSC 48, para. 62).

220    (c.)    The third question concerns whether, from an objective point of view, the patent holder would have regarded strict adherence to the wording as an essential prerequisite for the invention. As in German law, the answer to this question is no<u>. The silence of the patent specification on possible alternative buffer solutions does not allow the conclusion to be drawn that the patent holder intended to limit the scope of protection of the patent to a sodium phosphate buffer</u>. With regard to the contrary result in the cited British judgment, it should be noted once again that this is expressly due to the fact that claim 5 is formulated much more narrowly than claim 1 (see loc. cit., para. 494).

221    It can therefore be assumed that an Irish judge would also find that there was equivalent patent infringement.

(9)    Italy

222    In Italy, the right to injunctive relief for patent infringement follows from Article 131(1) of *the Codice della proprietà industriale*. The provision of Article 66 of this law cited by the plaintiffs, on the other hand, regulates the effects of the granted patent.

223    Italian case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants in the injunction proceedings have only commented on the consideration of the history of the grant of the patent in Italy with regard to the examination of equivalent patent infringement. In this respect, reference is made to the introductory remarks. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

224    It can therefore be assumed that an Italian judge would also find an equivalent patent infringement.

(10)    Lithuania

225    In Lithuania, the right to injunctive relief for patent infringement follows from Article 52(2) of the Patent Law (*Patentų įstatymas 1994 m. sausio 18 d. Nr. I-372*). However, the provision of Article 16 of this law cited by the plaintiffs regulates the disclosure of the invention in the patent specification. The provision of Article 35 of this law cited in Annex AST 49 regulates the effects of the invention.

226    Lithuanian case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. This is also explicitly mentioned in Art. 38(3) subparagraph 1 of the Patent Act as one of the two factors for determining equivalent patent infringement. The respondents did not comment on the examination of equivalent patent infringement in Lithuania. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium. The second factor mentioned in Art. 38(3) subpara. 2 of the Patent Law asks whether it was obvious to the skilled person that the same result as in the patented invention could be achieved by the replacement means. This question can also be answered in the affirmative in the present case.

227    It can therefore be assumed that a Lithuanian judge would also find that there was equivalent patent infringement.

(11)    Luxembourg

228    In Luxembourg, the right to injunctive relief for patent infringement arises from Article 80(4)(a) of the Law of July 20, 1992, amending the rules governing patents for inventions (*Loi du 20 juillet 1992 portant modification du régime des brevets d'invention*). The provision of Article 29(1) of a *Loi sur les brevets* cited by the plaintiffs does not exist. The provision of Article 45 of the Law of July 20, 1992, cited in Annex AST 49, regulates the effects of the granted patent.

229    It is undisputed between the parties that Luxembourg courts are expected to apply the "function-way-result" test. The respondents have not commented on the examination of equivalent patent infringement in Luxembourg. However, it does not seem to be out of the question that the Luxembourg courts would adopt the French or German approach. In all three cases, equivalent patent infringement would be affirmed, as seen above.

230    It can therefore be assumed that a Luxembourg judge would also find equivalent patent infringement.

(12)    Netherlands

231    In the Netherlands, the right to injunctive relief for patent infringement follows from Article 70(1) of the Patent Act (*Rijksoctrooiwet*). The provision of Article 53(1) of this Act cited by the plaintiffs regulates the effects of the patent.

232    Dutch case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The respondents have only commented on the consideration of the history of the grant in relation to the examination of equivalent patent infringement in the Netherlands. In this respect, reference is made to the introductory remarks. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

233    It can therefore be assumed that a Dutch judge would also find an equivalent patent infringement.

(13)    Poland

234    In Poland, the right to injunctive relief for patent infringement follows – according to the information provided by the plaintiffs in Annex AST 49 – from Art. 287(1) of the Industrial Property Law (*Ustawa z dnia 30 czerwca 2000 r. Prawo własności przemysłowej*). The provision of Art. 63 (1) of this Act, referred to by the plaintiffs elsewhere, regulates the effects of the patent.

235    Polish case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants have not commented on the examination of equivalent patent infringement in Poland. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

236    It can therefore be assumed that a Polish judge would also find an equivalent patent infringement.

(14)    Portugal

237    In Portugal, the right to injunctive relief for patent infringement follows from Article 345(1) of the *Código da Propiedade Industrial*. The provision of Article 102 of this law cited by the plaintiffs regulates the effects of the patent.

238    The plaintiffs have argued that Portuguese case law applies the "function-way-result" test. The defendants, represented by Portuguese lawyer ▮▮▮▮▮▮▮ , argue that the test for equivalent patent infringement in Portugal can be summarized as follows (see Annex BBY 28a, p. 6 f.):

> "In summary, it can be said that in Portugal, infringement by equivalence equivalence exists if
>
> (i)    the alternative embodiment solves the same technical problem and essentially performs the same function to achieve essentially the same result as the claimed invention.

(ii)   If, at the time of filing or priority, a person skilled in the art would have understood that the alternative embodiment essentially performs the same function in order to achieve essentially the same result as the claimed invention.

(iii)   Unless the alternative embodiment

(a) was apparent from the prior art

(b) falls under clear disclaimers or limitations made by the patent owner during the examination or nullity proceedings,

(c) is included in the patent specification but not in the claims."

239   An equivalent patent infringement can be affirmed both according to the "function-way-result" test (in this respect, reference can be made to the comments on Belgium) and according to the test cited by attorney█████ . Specifically, with regard to criterion
(iii) (b), reference is made to the introductory remarks in this section.

240   It can therefore be assumed that a Portuguese judge would also find that there has been an equivalent patent infringement.

(15)   Romania

241   In Romania, the right to injunctive relief for patent infringement follows – according to the information provided by the plaintiffs – from Art. 61(1) of the Patent Law (*Lege nr. 64 din 11 octombrie 1991 privind brevetele de inventie*). The provision of Art. 31 of this law, as specified in Annex AST 49, regulates the effect of the granted patent.

242   Romanian case law indisputably applies a test according to which an equivalent patent infringement exists if the replacement means (1) was obvious to a person skilled in the art and (2) achieves the same result. This is consistent with the responses of the Romanian members of the AIPPI to the association's questionnaire, which states that Romanian law defines an equivalent element as one that leads to the same result (see AIPPI, Yearbook 2023 – Doctrine of Equivalents, Annex AST 18, p. 464). The respondents did not comment on the examination of equivalent patent infringement in Romania. Based on the test described above, equivalent patent infringement must be affirmed.

243    It can therefore be assumed that a Romanian judge would also find equivalent patent infringement.

(16)    Slovakia

244    The right to injunctive relief for patent infringement in Slovakia is based on Section 32(1) of the Act on Patents, Supplementary Protection Certificates and Certain Amendments (*Slovak Zákon č. 435/2001 Z.z o patentoch, dodatkových ochranných osvedčeniach a o zmene a doplnení niektorých zákonov*). The provision of Section 15 of this Act, as set out in Annex AST 49, regulates the effect of the granted patent. The provision of Section 11(1) of this Act, as referred to elsewhere by the plaintiffs, regulates employee inventions.

245    The plaintiffs argue that, under Slovak law, an equivalent patent infringement exists if (1) the replacement means essentially performs the same function and (2) the feature in question, in which the replacement means differs from the claim in the literal sense, has no relevant influence on the function. The defendants, on the other hand, take the view that it must be examined whether (1) the feature, in combination with all other features of the independent patent claim in question, essentially fulfills the same function and whether (2) the feature is known to the skilled person at the time of the assessment; both features must be cumulatively fulfilled in order to affirm equivalence. According to both tests, an equivalent patent infringement must be affirmed.

246    It can therefore be assumed that a Slovakian judge would also find equivalent patent infringement.

(17)    Slovenia

247    In Slovenia, the right to injunctive relief for patent infringement arises from Article 121(1)(a) of the Industrial Property Act (*Zakon o industrijski lastnini*). The provision of Article 18(1) of this Act, as set out in Annex AST 49, regulates the effect of the granted patent. The provision of Article 19(1) of this Act, as referred to elsewhere by the applicants, regulates exceptions to the effect of the patent.

248    The plaintiffs have undisputedly argued that the Slovenian courts follow the case law of the German and British

courts. <u>They would therefore affirm an equivalent patent infringement if it were to be affirmed according to German standards</u>.

249    It can therefore be assumed that a Slovenian judge would also find that there was equivalent patent infringement.

(18)    Spain

250    In Spain, the right to injunctive relief for patent infringement follows from Article 71(1)(a) of the Patent Law (*Ley N° 24/2015, de 24 de julio de 2015, de Patentes*), as stated by the plaintiffs in Annex AST 49. The provision of Art. 50 of this law, referred to elsewhere by the plaintiffs, regulates procedural issues concerning the granting of patents.

251    The plaintiffs are of the opinion that the Spanish courts would follow the British case law as expressed in the judgment of the British Supreme Court in *Actavis v. Eli Lilly* (see above regarding Ireland). On this basis, the Spanish courts would find that there has been a patent infringement.

252    The defendants, on the other hand, refer to a judgment of the Spanish Supreme Court of April 29, 2015 (ECLI:ES:TS:2015:1940) and argue that the Spanish courts would formulate the second "Actavis" question more strictly from the perspective of the patent holder. The expert opinion of the Spanish lawyer submitted by the respondents states ██████████████ (Appendix BBY 27a, point 36):

> "In this context, it should be recalled that the Supreme Court, in its judgment on Escitalopram (see Doc. 18 of my first legal opinion), the Supreme Court found that Question 2 of the protocol was assessed on the priority date of the patent and that *'the Chamber considers the stricter thesis of the Court of Appeal to be more accurate, as it requires that <u>reasonable expectation that the alternative will work reaches the threshold of predictability</u>. [...]. It is necessary that the skilled person 'should have' assumed that the variant (the equivalent element) was an obvious alternative, i.e., that the success of the substitution in satisfactorily solving the technical problem addressed by the patent was foreseeable'*. Accordingly, this approach is currently not in line with that of the UK Supreme Court in the Pemetrexed case, which proposes a reformulation of Question 2 of the Protocol to the effect that

on the priority date, it must be assumed that the variant functioned

(bold print in the last sentence omitted, as in the original)

253     In the expert opinion of the Spanish lawyer submitted by the plaintiffs    (Exhibit AST 29ü, poin███████████expectation that the Spanish courts would follow the approach of the British Supreme Court in *Actavis v. Eli Lilly* in the future.

254     The judgment of the Spanish Supreme Court cited by lawyer█████████ shows that the legal dispute to be decided there discussed how the term *"obviedad"* should be interpreted. The complete three relevant paragraphs read as follows (para. 15 of the judgment, annex to Annex BBY 9):

> "The difference between the contested judgment and what the plaintiff argues in his appeal is that the *Provincial Court* is of the opinion that, for obviousness to exist, a person skilled in the art must be able to foresee that the alternative used in the contested implementation of one of the technical elements of the patent, which does not alter its mode of operation, will solve the technical problem of the patent. However, the appellant considers it sufficient that a person skilled in the art would test or try this alternative and could reasonably expect it to work.

> The court considers the more demanding view of the court to be more accurate, according to which the reasonable expectation that the alternative will work must reach the threshold of predictability. This predictability is not to be understood as 100% certainty of success (which is difficult to achieve in these areas of science and technology), but as a very high probability of success. It is not sufficient, as the appellant claims, that the skilled person would have considered the variant with expectations of success. It is necessary that the skilled person would have considered the variant (the equivalent element) as an obvious alternative; that is, that the success of the substitution in solving the technical problem satisfactorily addressed by the patent was foreseeable.

> Therefore, the mere possibility that the skilled person would have adopted the solution to the technical problem in light of the latest state of the art ("could") is not sufficient; rather, a high probability that he would have done so ("would") is required."

> *("The difference between what the appealed judgment states and what the appellant argues in its appeal is that, while the Provincial Court considers that, for something to be obvious, it must be*

> *predictable that the alternative used in the disputed implementation with respect to one of the technical elements of the patent, which does not alter its functioning, will solve the technical problem addressed by the patent, whereas for the appellant it is sufficient that the expert in the field would try or attempt that alternative with a reasonable expectation that it will work.*

> *The Chamber considers that the more demanding thesis of the Court of Appeal is more accurate, as it requires that the reasonable expectation that the alternative will work reaches the threshold of predictability. This predictability should be understood not as 100% certainty of success (which is difficult to achieve in these fields of science and technology), but as a very high probability of success. It is not sufficient, as the appellant claims, that the expert in the field would have considered the variant with expectations of success. It is necessary that the expert in the field "would have" considered that the variant (the equivalent element) was an obvious alternative, that is, that the success of the substitution, in order to satisfactorily solve the technical problem addressed by the patent, was predictable.*

> *Therefore, it is not sufficient that the expert in the field could have adopted the technical solution to the problem in view of the state of the art (podía, 'could'), but rather there must be a high probability that he would have done so (habría, 'would').*

255     In the sense in which the Spanish Supreme Court interprets the term *"obviedad"* according to the third paragraph cited above—which does not necessarily correspond to the German understanding of the term "predictability"—an equivalent patent infringement would be affirmed. This is because routine tests to be carried out do not preclude the "high probability" that the alternative will work.

256     Furthermore, the Chamber also considers it likely that Spanish courts will follow the approach of the British Supreme Court, as expressed in *Actavis v. Eli Lilly*, at least in the field of pharmaceutical inventions. This is because it is undisputed between the parties that Spanish courts have followed British courts in the past. And in the aforementioned decision, the British Supreme Court explicitly stated, with regard to the Spanish courts, that it was seeking to align itself with continental European case law (see [2017] UKSC 48 para. 97). Insofar as the High Court of England and Wales ruled in its decision of October 8, 2025, in the proceedings                                                    ([2025] EWHC 2527 (Pat)), the Chamber has concerns ███████████████ er British courts will follow this, let alone the Spanish courts.

tests should be taken into account, the Chamber has doubts as to whether the higher British courts will follow this, let alone the Spanish courts.

(19)    Sweden

257     In Sweden, the right to injunctive relief for patent infringement arises from Chapter 15, Section 4 of the Patent Act (*Patentlag*), as stated by the plaintiffs in Annex AST 49. The provision of Section 3 of this Act, referred to elsewhere by the plaintiffs, is an unclear reference.

258     Swedish case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants have not commented on the examination of equivalent patent infringement in Sweden. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

259     It can therefore be assumed that a Swedish judge would also find an equivalent patent infringement.

(20)    Czechia

260     In Czechia, the right to injunctive relief for patent infringement follows from Section 4 of the Act on the Enforcement of Industrial Property Rights and Protection of Trade Secrets (*Zákon č. 221/2006 Sb., ze dne 25. dubna 2006 o vymáhání práv z průmyslového vlastnictví a ochraně obchodního tajemství*). The provision of Section 13(1) of the Patent Act, referred to elsewhere by the plaintiffs, regulates the effects of the granted patent.

261     The plaintiffs are of the opinion that, under Czech law – as under Slovak law – an equivalent patent infringement exists if (1) the replacement means essentially fulfills the same function and (2) the feature in question, in which the replacement means differs from the claim in the literal sense, has no relevant influence on the function.

262     The defendants, on the other hand, refer to an expert opinion by Czech lawyer ███████████████ (Exhibit BBY 29a, point 12 ff.) and argue as follows:

"The courts have defined three conditions for the application of the equivalence doctrine :

The first requirement is that the feature must be an essential feature of the patented solution.

According to the second requirement, the subject matter of the assessment and the corresponding essential feature of the patent must have the same function with regard to the objective set out in the patent.

According to the third requirement, the compared element of the subject matter of the assessment must have been known in the prior art at the time of publication of the patent, so that a person skilled in the art could identify it without inventive activity.

The above conditions must be met cumulatively; failure to meet even one of these conditions is sufficient to conclude that the compared element of the subject matter is not a technical equivalent of the corresponding feature of the patented solution.

In case of doubt regarding the scope of patent protection, 'it is necessary to choose an interpretation of the patent claims that protects what was actually new about the invention and why the patent was granted. Patent claims cannot therefore be interpreted broadly to prevent the use of solutions that were known before the patent application was filed or of new technical solutions that differ from the granted patent.

According to the Practical Guide to Proceedings before the Office published by the Czech Industrial Property Office, 'the new combination of features (with a technical equivalent) must not, on the basis of this equivalent, come so close to the prior art that it is relevant to the patentability of the independent claim in question that this patentability is called into question by its existence.The application of the equivalence theory is generally excluded in cases where a technical equivalent would replace a feature of an independent patent claim that alone distinguishes the combination of features of that claim from the prior art."

263    The respondents conclude that a Czech court would consider the equivalence to be unproven, "as this would unduly extend the scope of the granted patent in order to cover a feature

Munich Regional Court I, 7 O
9383/25

that, on the priority date, would not have been considered inventive even according to the statements of the patent holder

and the applicants, would have been considered inventive on the priority date."

264    Accordingly, an equivalent patent infringement must be affirmed, regardless of whether the opinion of the plaintiffs or that of the defendants is to be followed. This is because, when examining the equivalent patent infringement under German law, it was found (as also referred to in the introductory remarks to this section) that the feature "sodium phosphate buffer" does not "alone distinguish the combination of features [of the patent claim] from the prior art" or that the patent holder did not consider this feature (on its own) to be inventive.

265    It can therefore be assumed that a Czech judge would also find equivalent patent infringement.

(21)    Hungary

266    In Hungary, the claim for injunctive relief for patent infringement is based on Art. 35(2)(b) of the Act on the Protection of Inventions by Patents (*1995. évi XXXIII. törvény a találmányok szabadalmi oltalmáról*), as stated by the plaintiffs in Annex AST 49.

267    Hungarian case law indisputably applies the so-called "function-way-result" test to determine equivalent patent infringement. The defendants did not comment on the examination of equivalent patent infringement in Hungary. Therefore, reference can be made to the above comments on the application of the function-way-result test in Belgium.

268    It can therefore be assumed that a Hungarian judge would also find an equivalent patent infringement.

(22)    Cyprus

269    In Cyprus, the right to injunctive relief for patent infringement follows from Art. 61(2)(a) of the Patent Law (*Ο περί Διπλωμάτων Ευρεσιτεχνίας Νόμος του 1998 (N. 16(I))*. However, the provision of Art. 27(1) of this law, referred to in Annex AST 49 and elsewhere by the plaintiffs, regulates the effects of the granted patent.

270    Cypriot case law is indisputably based on that of the British courts. This is also understandable in light of the country's colonial history (Cyprus

was a British protectorate from 1878 to 1960). The defendants have not commented on the examination of equivalent patent infringement in Cyprus. Therefore, reference can be made to the above comments on Ireland.

271   It can therefore be assumed that a Cypriot judge would also find that there was equivalent patent infringement.

   f.   Result of the analysis of the equivalence test in the 22 countries where the claim was asserted

272   It can be assumed that the objections of the respondents are not valid in any case and that a national judge in each country would conclude that there is a patent infringement by equivalent means.

   3.   Risk of first-time infringement

273   There is a risk of first-time infringement with regard to all 22 countries asserted in these proceedings, so that the injunction sought by the plaintiffs is justified.

   a.   Risk of first infringement as a substantive legal requirement

274   The starting point is that the examination of any necessary risk of first-time infringement as a substantive legal prerequisite for the claim for injunctive relief is governed by the law of the country of protection (see Federal Court of Justice, judgment of April 26, 1990, I ZR 99/88, GRUR 1990, 687, 689 – Anzeigenpreis II; Benkard/Grabinski/Zülch/Tochmann, PatG, 12th ed., Section 139 marginal no. 27).
termann, PatG, 12th ed., § 139 marginal no. 27).

275   The requirements for the plaintiff's submission regarding the risk of first infringement must not be excessive. In particular, it is permissible for the plaintiff to present facts that make it appear sufficiently probable that an immediate patent infringement could be imminent in all of the countries asserted, for example, through the possible imminent offering of a product. It would be sufficient to argue that an application for approval has at least been filed and that a distribution structure exists that would enable the product to be distributed. In the pharmaceutical sector in particular, the considerable investments in new products can only be refinanced if these products are widely available. This applies in particular to biosimilars, which are costly to develop. If such an argument is made, the party against whom the claim is brought would have to argue

and, if necessary, to prove that, despite the possibility, either distribution is not planned or the legal requirements in a country would not justify a claim for injunctive relief.

276    In the present case, it is of decisive importance that, with the approval of the biosimilar ███████ , there is a possibility that it could be approved in all the countries claimed in terms of pharmaceutical law. According to the respondent's submission, they have already developed a structure that can supply the European market with the biosimilar ███████ in a division of labor manner. In addition, there are or have been negative declaratory actions in Germany, France, Belgium, and Italy. Overall, this can only be assessed as meaning that there is at least a risk of market entry for all countries claimed.

b.    Sufficiently concrete risk of infringement in all 22 countries

277    In view of this threatening situation, it is unreasonable to expect the plaintiffs to wait until the defendants announce their market entry for each country in which the patent is validated and/or file further negative declaratory actions against the plaintiffs in these Member States.

278    Effective enforcement of patent rights requires—at least for the member states of the European Union directly—that, in the case of a sufficiently concrete threat, injunctive relief can be obtained as a precautionary measure under Enforcement Directive 2004/48/EC. This applies in particular from the point of view of procedural concentration. Potential patent infringers should not be able to gain an advantage by proceeding in a successive manner. Otherwise, they would be in a position to place undue strain on the financial and human resources of patent holders, who cannot choose to have their property rights infringed by third parties in different countries.

c.    No other assessment based on the decision of the Regional Court of Düsseldorf, 4b O 103/23

279    Insofar as the respondents refer in this context to a judgment of the Regional Court of Düsseldorf (judgment of August 13, 2024, 4b O 103/23, GRUR-RS 2024,

44187), the decision there and, in particular, the passage cited by the respondents are based on a different constellation. The proceedings there concerned a negative declaratory action brought by a biosimilar manufacturer whose chemical formulation had not yet been determined in detail at the time of the decision. The interests of the parties in that case were therefore completely different from those in the present case. In that case, the plaintiff wanted to have the admissibility of its actions clarified by the court well in advance before continuing its investments with regard to the specific formulation and marketing plans. However, as the Regional Court of Düsseldorf correctly stated, this does not constitute a legal interest. The present case concerns the defense against an imminent patent infringement, which has already been established with regard to the infringement of the scope of protection. The passage of the judgment specifically cited by the respondents (para. 28) states that the patent holder in Germany does not have to accept any statements made by its legal representatives in foreign proceedings in which these legal representatives affirm a risk of first-time infringement for the foreign country. A distinction must be made between this situation and a situation in which the Chamber concludes, on the basis of the circumstances presented concerning several countries, that a risk of first infringement for these countries must be affirmed.

d.    Assessment based on an overall view of the statements and actions of the patent infringer in relation to the individual countries

280    In cases where the patent holder simultaneously asserts the cessation of patent infringement in several foreign countries, the risk of first-time infringement must be assessed on the basis of an overall view of the statements and actions of the patent infringer relating to these countries. According to this standard, the following aspects are relevant:

281    (1) In the letter sent on their behalf to the plaintiff in the injunction proceedings 1) dated June 18, 2025 (Exhibit AST 1), the defendants announced:

> "We therefore officially inform you that our clients will, in collaboration with ████
> ████████████████████ as strategic commercialization partner,
> market████████ in Germany under the brand name██████████████,
> starting after the expiry of the SPC on November 23, 2025.  ████████
> GmbH has signed a licensing agreement with ████████████
> GmbH for the semi-exclusive commercialization of████████ in major parts of Europe, including Germany.
> Europe, including Germany."

282    Consequently, there is a threat that ▮▮▮▮▮▮ will be marketed "in large parts of Europe" from November 24, 2025. This announcement coincides with the content of the report for the general meeting of the first respondent on the same day. It states the following regarding the introduction status of the contested embodiment (Exhibit AST 44, p. 33):



283    One page earlier, distribution partners for the contested embodiment are presented (MENA probably stands for "Middle East, Northern Africa," APAC for "Asia, Pacific," and LATAM for "Latin America"):



284    This shows that the respondents are planning a global marketing strategy with a particular focus on rapid introduction in Europe. The report for the general meeting of the first respondent shows that, in addition to Germany, France, Italy, and the United Kingdom, it also considers Spain to be one of the "top 5 markets" in Europe for other biosimilars (Exhibit AST 44, pp. 26, 30).

285    (2)    The respondents have also implemented these announcements. In their protective letter dated March 18, 2025, they stated (see margin note 43) that they had notified the Italian authorities of the imminent manufacture of ████████ , as required under Article 5(2)(b) of Regulation No. 469/2009 of the European Parliament and of the Council on the supplementary protection certificate (SPC Regulation). In the notification, they stated that "the purpose of the manufacture was the export and storage of ██████ and that the Member State in which the manufacture was to take place was Italy" (para. 44).

286    Furthermore, in August and December 2024, the respondents filed negative declaratory actions in France and Belgium, respectively, with the aim of establishing that the contested embodiment did not infringe the patent in suit. In February 2025, a corresponding application for interim relief was filed in Italy. In the main proceedings 7 O 16055/24 to be decided by the Chamber, the defendants extended their negative declaratory action to the Netherlands, Austria, Portugal, Switzerland, and Spain.

287    According to the expert opinion of Belgian lawyer ██████████ (Exhibit AST 30ü, para. 22) submitted by the plaintiffs, all Belgian product information is already published on the website of the Belgian Federal Agency for Medicines and Health Products, including the summary of product characteristics, labeling, and package insert        █ ████████████████, which can be downloaded in Dutch, French, German, and English. The expert opinion of French lawyer ██████████████ submitted by the plaintiffs states that, by decision of July 31, 2025        ██████████████████████included in the list of biosimilar medicinal products ( ██████ ) of the French Medicines Agency (ANSM) (see Annex AST 28ü, p. 19).

288     It is also significant that the respondents have a uniform European marketing authorization for the contested form of execution, meaning that there are no major regulatory hurdles to marketing in any EU member state.

289     (3)     The respondents submitted a study by the European Commission entitled "Generics in small markets or for low volume medicines" (Exhibit BBY 14), with which they seek to prove that the simultaneous introduction of generics and biosimilars across Europe is the "absolute exception" (response to the application dated August 5, 2025, para. 83). However, the respondents themselves state in this context that "staggered market entries are common, with pharmaceutical companies serving large and lucrative markets first and smaller countries later or not at all." They themselves therefore state that it is generally quite possible for smaller countries to also be supplied, only later than the large ones. It can be assumed that, as the respondents themselves emphasize, biosimilars, which are very expensive to develop, are more likely to be launched on the market at least later than generics in order to amortize the costs through broader marketing. In addition, the study, which covers both generics and biosimilars, shows that at a given point in time, at least five generics or biosimilars were available in nine out of 30 countries for 11 active ingredients, and three to four generics or biosimilars were available in another nine countries. In more than half of the countries surveyed, around one-third of active ingredients were accompanied by generics or biosimilars at a given point in time, which does not yet cover delayed market entry.

290     (4)     It can therefore be assumed that the respondents will launch their product ███████ not only in Germany, Belgium, France, and Italy, but also in several other European countries in the near future. In such a constellation, however, in the opinion of the Chamber, the usual standards for the risk of first infringement, as demonstrated by the respondents for several European countries, cannot apply without (recognizable) reference to a constellation such as the one at hand in those cases. The established, imminent market entry at least in Germany, Belgium, France, and Italy must, against the background of the fact admitted by the defendants themselves that biosimilars will also be launched simultaneously or with a delay in other European countries, lead to the risk of first-time infringement also being affirmed for the other European countries.

.

# C.

291   The necessary grounds for the injunction also exist for all the countries asserted.

## I.    Requirements for a reason for the injunction

292   The issuance of a preliminary injunction is only justified if, in addition to the claim for injunctive relief, a reason for the injunction is also substantiated. As already explained, the examination of the reason for the injunction is governed by *lex fori*, i.e., German law.

293   Pursuant to Sections 940, 936, 920 et seq. of the German Code of Civil Procedure (ZPO), the issuance of a preliminary injunction requires an objectively justified risk that the enforcement of the plaintiff's rights could be thwarted or impeded by a judgment obtained only in the main proceedings. This requires, on the one hand, a purely temporal urgency that justifies the urgent measure (II.), a secure legal status of the patent in suit (III.1) and, in addition, a weighing of the conflicting interests between the disadvantages threatening the owner of the property right without the issuance of the requested injunction, which must be weighed against the interests of the defendant against whom the injunction is sought as the infringer (III.2). The existence of a reason for the injunction must be demonstrated and substantiated by the plaintiff (see established case law, see judgment of the Chamber of September 29, 2022, 7 O 4716/22, GRUR-RS 2022, 26511 marginal no. 62 – Fingolimod, with reference

to Munich Higher Regional Court, judgment of April 22, 2021, 6 U 6968/20, GRUR-RS 2021, 12272

– Cinacalcet).

## II.    Urgency

294   The one-month period applicable to patent matters within the jurisdiction of the Munich Higher Regional Court was complied with by the plaintiffs.

295   The one-month period began with the decision of the Federal Patent Court on June 26, 2025, and had not yet expired when the application was filed on July 21, 2025.

296    As parties seeking interim legal protection, the plaintiffs are generally required to enforce their rights swiftly, and any hesitation on their part may work to their disadvantage. Nevertheless, they are not obliged to seek legal protection on a legally and/or factually uncertain basis. Rather, they may only bring the matter before the court once they have established all the necessary facts and victory is certain, whereby they must act with the urgency required in the individual case when establishing the facts (Higher Regional Court of Düsseldorf, decision of February 15, 2021, 2 W 3/21, GRUR-RS 2021, 2572 – Cinacalcet).

297    According to the case law of the Munich Higher Regional Court, a notice pursuant to Section 83 (1) sentence 1 PatG or a decision by the Federal Patent Court in nullity proceedings gives rise to an increased presumption of the legal validity of the patent in question. both the issuance of a preliminary notice pursuant to Section 83 (1) sentence 1 PatG and a judgment upholding the patent in whole or in part give rise to a new fact that underpins the legal validity of the respective patent and thus simplifies its enforcement. Therefore, this triggers a new urgency period in each case.

298    This standard also applies in the local cross-border context. In view of the great significance of a decision by the Federal Patent Court even beyond Germany's borders, the plaintiffs were entitled to wait for this decision to be issued. If the Federal Patent Court had declared the patent invalid on June 26, 2025, this would have significantly reduced the plaintiffs' chances of success in other jurisdictions as well.


    III.    Balancing of interests

299    The weighing of interests to be carried out when examining the grounds for the injunction is in favor of the plaintiffs. In patent disputes, the requirement of grounds for the injunction also includes the question of the legal validity of the injunction patent. This is assured in the present case (1.). The weighing of interests is also in favor of the plaintiffs (2.).

300    1.    The legal situation is secured by the first-instance decision of the Federal Patent Court (BPatG) of June 26, 2025. The respondents have not put forward any further arguments in this regard.

301   2.   The <u>weighing of interests,</u> which must always be carried out taking into account the particularities of this individual case, is in favor of the plaintiffs.

302   In principle, the plaintiff's interest in the issuance of a preliminary injunction takes precedence if the claim for the injunction and the legal situation have been sufficiently substantiated. The rejection of a preliminary injunction can only be considered if the disadvantages arising for the defendants from its enforcement clearly exceed the usual interference associated with an injunction (LG Munich I, judgment of October 27, 2022, 7 O 10295/22, GRUR 2023, 152 marginal no. 104 –

Bortezomib). There are no tangible indications of this in the present case.

303   There are no compelling reasons why the plaintiffs should be expected to accept the continued presence of the patent-infringing product in large parts of Europe and instead be referred to claims for damages in the event of a judgment against the defendants in the main proceedings.

304   The court does not fail to recognize that the respondents' significant economic interests are affected. However, these are only to be taken into account in exceptional cases when weighing up the interests involved. The defendants have not demonstrated that the damage they face exceeds what is normally the consequence of an injunction, even if this damage is correspondingly higher in view of the higher investments made by a biosimilar manufacturer compared to a generic manufacturer. Ultimately, however, this is only a consequence of the chosen product market. As infringers of the patent in suit, the respondents must therefore accept this damage. It should also be noted that the <u>parties are direct competitors and that the plaintiffs therefore have a particular economic interest and thus an increased need for protection</u>. Conversely, the arguments put forward by the defendants regarding the consequences of the injunction for patients (reduced access to affordable therapy) and health insurance companies (higher costs) cannot be taken into account in a decisive manner, because these interests can only be asserted in the context of activities that do not infringe the patent. Against this background, the claim for injunctive relief by way of a preliminary injunction is ruled out.

# D.

## I.

305    The decision on costs is based on Section 92 (1) sentence 1 ZPO. In this regard, the partial withdrawal of the action with regard to Estonia, Iceland, Liechtenstein, Latvia, Malta, Monaco, Switzerland, and Turkey had to be taken into account in accordance with Section 269 (3) sentence 2 ZPO.

306    With regard to the costs to be borne by the plaintiff in the injunction proceedings, the court specifically compared the population of the countries that had withdrawn with the population of all 30 countries originally included in the decision. According to this comparison, the countries that withdrew account for approximately 18.5 percent of all 30 countries. Given that the present case concerns a drug for the treatment of humans, the court considered this approach to be appropriate. If, instead, the approach of the plaintiff, who wishes to compare the GDP of the respective countries, is taken, the eight countries account for approximately 17 percent of the GDP of all 30 countries. Given that eight out of 30 countries represent a share of approximately 26 percent, the court rounded up the aforementioned shares to one-fifth instead of rounding them down to 15 percent.

## II.

307    The nature of preliminary injunction proceedings means that the decision is provisionally enforceable.

308    The order for security to be provided as requested by the respondents pursuant to Sections 936, 921 sentence 2 ZPO was not considered. This is only ordered if there are indications or concrete evidence that any claim for damages by the unsuccessful respondents under Section 945 ZPO against the plaintiff could not be realized (see LG Munich I, judgment of June 24, 2016, 21 O 5583/16, GRUR-RS 2016, 11707 marginal no. 117 – Generikum, with reference to Munich Higher Regional Court, judgment of June 28, 2021, 6 U 1560/12, BeckRS 2013, 14928 – Hydrogentartrat; dissenting opinion in

Munich Regional Court I, 7 O
9383/25

established case law of the Regional Court of Düsseldorf, cf. GRUR-RS 2020, 39316 marginal no. 99 –

fast-dissolving formulation). This is not the case.

Dr. Schön                    Tözsér                    Dr. Schweyer

Announced on:

_____
Registrar of the Registry

# **<u>EXHIBIT 13</u>**

**<u>Excerpt and Translation of German Code of Civil Procedure (Zivilprozessordnung – ZPO)</u>**

**§ 293**

Fremdes Recht; Gewohnheitsrecht; Statuten

Das in einem anderen Staat geltende Recht, die Gewohnheitsrechte und Statuten bedürfen des Beweises nur insofern, als sie dem Gericht unbekannt sind. Bei Ermittlung dieser Rechtsnormen ist das Gericht auf die von den Parteien beigebrachten Nachweise nicht beschränkt; es ist befugt, auch andere Erkenntnisquellen zu benutzen und zum Zwecke einer solchen Benutzung das Erforderliche anzuordnen.

**Translation:**

**Sec. 293**

Foreign law; customary law; statutes

The laws applicable in another state, customary laws, and statutes must be proven only insofar as the court is not aware of them. In making inquiries as regards these rules of law, the court is not restricted to the proof produced by the parties in the form of supporting documents; it has the authority to use other sources of reference as well, and to issue the required orders for such use.

# **EXHIBIT 14**

| Gericht: | BGH 1. Zivilsenat |
|---|---|
| Entscheidungsname: | Gutscheinwerbung II |
| Entscheidungsdatum: | 06.11.2025 |
| Rechtskraft: | ja |
| Aktenzeichen: | I ZR 182/22 |
| ECLI: | ECLI:DE:BGH:2025:061125UIZR182.22.0 |
| Dokumenttyp: | Urteil |

| Quelle: | |
|---|---|
| Normen: | Art 86 EGRL 83/2001, Art 87 Abs 3 EGRL 83/2001, § 293 ZPO, § 945 ZPO, § 73 Abs 1 S 1 Nr 1a AMG ... mehr |
| Zitiervorschlag: | BGH, Urteil vom 6. November 2025 – I ZR 182/22 –, juris |

**Zulässigkeit von Werbemaßnahmen einer niederländischen Versandapotheke - Gutscheinwerbung II**

**Leitsatz**

Gutscheinwerbung II

1. Legt das Tatgericht Vortrag einer Partei zum Inhalt ausländischen Rechts mit der Begründung zugrunde, dieser Vortrag sei von der anderen Partei nicht bestritten worden, ohne eigene Ermittlungen zur Verifizierung dieses Vortrags vorzunehmen, liegt darin ein Verstoß gegen die nach § 293 ZPO bestehende Pflicht zur Ermittlung ausländischen Rechts von Amts wegen.(Rn.47)

2. Der Tatbestand des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG, der Werbegaben und Zuwendungen ausnahmsweise gestattet, wenn sie in einem bestimmten oder auf bestimmte Art zu berechnenden Geldbetrag gewährt werden, erfasst nicht die Auslobung der Bandbreite einer im Einzelfall noch zu bestimmenden Prämienhöhe (hier: mindestens 2,50 € und bis zu 20 € pro Rezept).(Rn.71)

3. Der Ausnahmetatbestand des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG gestattet es einer Apotheke nicht, für die Einreichung eines Rezepts über verschreibungspflichtige Arzneimittel einen Geldbetrag oder einen prozentualen Rabatt für den nachfolgenden Erwerb weiterer Produkte einschließlich nicht verschreibungspflichtiger Arzneimittel auszuloben.(Rn.65)

Fundstellen

NSW Richtlinie 2001/83/EG Art. 86 (BGH-intern)
NSW Richtlinie 2001/83/EG Art. 87 (BGH-intern)
NSW ZPO § 293 (BGH-intern)
NSW ZPO § 945 (BGH-intern)
NSW AMG § 73 (BGH-intern)
NSW AMG § 78 (BGH-intern)
NSW HWG § 7 (BGH-intern)
NSW UWG § 4 aF (BGH-intern)
Verfahrensgang

vorgehend BGH 1. Zivilsenat, 13. Juli 2023, I ZR 182/22, EuGH-Vorlage
vorgehend OLG Düsseldorf 20. Zivilsenat, 3. März 2022, I-20 U 86/19, ..., Urteil
vorgehend LG Düsseldorf, 17. Juli 2019, 15 O 436/16
Diese Entscheidung wird zitiert

**Kommentare**
*Rieger/Dahm/Katzenmeier/Stellpflug/Ziegler, Heidelberger Kommentar Arztrecht, Krankenhausrecht, Medizinrecht*
● Köber, 5540 Wettbewerbsrecht; II. Einzelne Tatbestände; 2. Marktverhaltensregeln (§ 3a)
● Koeber, 2440 Heilmittelwerbegesetz; I. Anwendungsbereich (§§ 1, 2 HWG)
● Koeber, 2440 Heilmittelwerbegesetz; II. Werbebeschränkungen und -verbote; 7. Verbot von Werbegaben (§ 7 HWG)
**Literaturnachweise**
XX, DAZ 2025, Nr 46, 123 (Anmerkung)


**Tenor**

Auf die Revision der Beklagten wird das Grund- und Teilurteil des 20. Zivilsenats des Oberlandesgerichts Düsseldorf vom 3. März 2022 aufgehoben, soweit darin zum Nachteil der Beklagten erkannt worden ist.


Die Berufung der Klägerin gegen das Urteil der 15. Zivilkammer des Landgerichts Düsseldorf vom 17. Juli 2019 in der Fassung des Berichtigungsbeschlusses vom 22. August 2019 wird zurückgewiesen, soweit darin die Klageanträge 1 und 2 hinsichtlich der einstweiligen Verfügungen vom 8. Mai 2013 (Az. 84 O 90/13), vom 26. September 2013 (Az. 84 O 220/13) und vom 4. November 2014 (Az. 84 O 208/14) abgewiesen worden sind.


Wegen der auf die einstweiligen Verfügungen vom 5. November 2013 (Az. 84 O 256/13) und vom 29. September 2015 (Az. 81 O 82/15) gestützten Klageanträge 1 und 2 sowie wegen der Kosten der Revision wird die Sache zur neuen Verhandlung und Entscheidung an das Berufungsgericht zurückverwiesen.


Von Rechts wegen


**Tatbestand**

1    Die Klägerin ist eine niederländische Versandapotheke, die rezeptfreie und rezeptpflichtige Medikamente im Wege des Versandhandels an Endkunden nach Deutschland liefert.

2        Die Beklagte ist die Berufsvertretung der Apotheker im Bezirk Nordrhein.

3        Die Klägerin warb seit dem Jahr 2012 mit verschiedenen Rabattaktionen, bei denen Kunden bei dem Bezug von verschreibungspflichtigen Arzneimitteln ein Vorteil in Form eines Barrabatts, eines Gutscheins zur Verrechnung beim Kauf eines anderen Medikaments, eines Hotelgutscheins oder einer Jahresmitgliedschaft beim ADAC versprochen wurde. Die Beklagte sieht diese Werbemaßnahmen als Verstoß gegen die arzneimittelrechtliche Preisbindung für verschreibungspflichtige Arzneimittel an und erwirkte deshalb - soweit für das Revisionsverfahren von Bedeutung - in den Jahren 2013 bis 2015 folgende fünf einstweilige Unterlassungsverfügungen gegen die Klägerin, die jeweils ordnungsgemäß vollzogen wurden.

4        Am 8. Mai 2013 erwirkte die Beklagte eine am 14. Mai 2013 vollzogene einstweilige Verfügung des Landgerichts Köln (Az. 84 O 90/13) gegen eine Werbung der Klägerin mit den Angaben

Rezept einsenden - Mitmachen und bis zu 20 Euro Prämie sichern! D. M.        legt Wert auf umfassende Beratung. Unterstützen Sie uns dabei und nehmen Sie am Arzneimittel-Check teil. Für Ihre Mithilfe bedanken wir uns mit einer Geldprämie. Sie erhalten mindestens 2,50 Euro und bis zu 20 Euro Prämie pro Rezept. (…),

wobei die Höhe der versprochenen Prämie sich nach der Komplexität der Erkrankung beziehungsweise dem Preis des rezeptpflichtigen Medikaments richtete (zum Beispiel 2,50 € Prämie für die Einsendung eines Rezepts für ein hormonelles Verhütungsmittel, zwischen 2,50 € und 20 € Prämie für die Einsendung eines Medikaments zur Therapie schwerer chronischer Erkrankungen wie der Parkinson-Krankheit). Diese einstweilige Verfügung hob das Landgericht Köln mit Urteil vom 22. März 2017 wegen veränderter Umstände mit Blick auf das Urteil des Gerichtshofs der Europäischen Union in der Sache "Deutsche Parkinson Vereinigung" (EuGH, Urteil vom 19. Oktober 2016 - C-148/15, GRUR 2016, 1312 = WRP 2017, 36) auf.

5        Am 26. September 2013 erwirkte die Beklagte eine am 2. Oktober 2013 vollzogene einstweilige Unterlassungsverfügung des Landgerichts Köln (Az. 84 O 220/13) gegen eine Werbung der Klägerin mit den Angaben

Jetzt Freunde werben & Gratis-Übernachtungen sammeln! (…)

Je geworbenem Freund: 1 Hotelgutschein im Wert von cirka 150 Euro* + 5 Euro-Gutschein für Ihren Freund! (…)

Sobald Ihr Freund ein Rezept einreicht oder rezeptfreie Produkte im Gesamtwert von mindestens 20 Euro bestellt. (…)

Jeder geworbene Freund erhält außerdem einen 5 Euro-Gutschein zum Bestellen rezeptfreier Medikamente, Gesundheits- und Pflegeprodukte.

sowie eine weitere Werbung mit den Angaben

Jetzt einen Freund werben und dafür eine ADAC-Mitgliedschaft im 1. Jahr beitragsfrei erhalten* (…)

Denn für jeden Freund, den Sie werben, bedanken wir uns bei Ihnen mit einer klassischen ADAC-Mitgliedschaft (im 1. Jahr beitragsfrei statt 44,50 €) bzw. mit einer im 1. Jahr vergünstigten ADAC Plus-Mitgliedschaft (im 1. Jahr für nur 35,00 Euro statt 79,50 Euro) (…)

Sobald Ihr Freund ein Rezept einreicht oder rezeptfreie Produkte im Gesamtwert von mindestens 20 Euro bestellt. (…)

Jeder geworbene Freund erhält außerdem einen 5 Euro-Gutschein zum Bestellen rezeptfreier Medikamente, Gesundheits- und Pflegeprodukte.

6      Am 5. November 2013 erwirkte die Beklagte eine am 21. Januar 2014 vollzogene einstweilige Verfügung des Landgerichts Köln (Az. 84 O 256/13) gegen eine Werbung der Klägerin mit den Angaben

Jetzt Rezept einsenden! (…) Den Weg zum Briefkasten können wir Ihnen leider nicht ersparen. Aber zum Ausgleich für Ihre Fahrtkosten mit Bus und Bahn erhalten Neukunden von uns 10 Euro, die bei Rezepteinsendung sofort vom Rechnungsbetrag abgezogen werden,

wobei der Rabatt für die Bestellung verschreibungspflichtiger Medikamente ab 50 € Bestellwert ausgelobt wurde. Diese einstweilige Verfügung hob das Landgericht Köln mit Urteil vom 22. März 2017 wegen veränderter Umstände mit Blick auf das Urteil des Gerichtshofs der Europäischen Union in der Sache "Deutsche Parkinson Vereinigung" auf.

7      Am 4. November 2014 erwirkte die Beklagte eine am 30. Dezember 2014 vollzogene einstweilige Verfügung des Landgerichts Köln (Az. 84 O 208/14) gegen eine Werbung der Klägerin mit den Angaben

10 €-Gutschein für Ihr Rezept

für eine nachfolgende Bestellung rezeptfreier Produkte. Diese einstweilige Verfügung hob das Landgericht Köln mit Urteil vom 22. März 2017 wegen veränderter Umstände mit Blick auf das Urteil des Gerichtshofs der Europäischen Union in der Sache "Deutsche Parkinson Vereinigung" auf.

8    Am 29. September 2015 erwirkte die Beklagte eine am 26. Mai 2016 vollzogene einstweilige Verfügung des Landgerichts Köln (Az. 81 O 82/15) für eine Werbung der Klägerin mit den Angaben

     5 Euro Gutschein für Ihre nächste Rezeptbestellung,

wobei der genannte Betrag direkt vom Rechnungsbetrag abgezogen werden sollte. Diese einstweilige Verfügung hob das Landgericht Köln mit rechtskräftigem Urteil vom 21. März 2017 auf.

9    Im Rahmen der Vollziehung einiger der einstweiligen Verfügungen wurden auf Antrag der Beklagten hohe Ordnungsgelder gegen die Klägerin verhängt.

10    Die Klägerin verlangt von der Beklagten Schadensersatz mit der Begründung, die einstweiligen Verfügungen seien von Anfang an ungerechtfertigt gewesen. Denn der Gerichtshof der Europäischen Union habe in der Sache "Deutsche Parkinson Vereinigung" (EuGH, GRUR 2016, 1312) entschieden, dass die im Arzneimittelgesetz vorgesehene Preisbindung für die Abgabe von verschreibungspflichtigen Humanarzneimitteln gegen die Warenverkehrsfreiheit (Art. 34 AEUV) verstoße, da sie sich auf die Abgabe verschreibungspflichtiger Arzneimittel durch in anderen Mitgliedstaaten ansässige Apotheken stärker auswirke als auf die Abgabe solcher Arzneimittel durch im Inland ansässige Apotheken.

11    Das Landgericht hat die Klage abgewiesen. In der Berufungsinstanz hat die Klägerin ihre Klage erweitert und - soweit für das Revisionsverfahren von Bedeutung - beantragt,

     1.    die Beklagte zu verurteilen, an die Klägerin Schadensersatz für den Zeitraum bis einschließlich 30. September 2016 in Höhe von mindestens 18.476.648,12 € zuzüglich Zinsen in Höhe von neun Prozentpunkten über dem Basiszinssatz seit dem 3. Oktober 2015 zu zahlen;

     2.    festzustellen, dass die Beklagte verpflichtet ist, der Klägerin allen weiteren, über den mit dem Klageantrag 1 bezifferten Mindestschaden hinausgehenden Schaden zu ersetzen, der der Klägerin bis einschließlich 31. Dezember 2016 infolge der Vollziehung der einstweiligen Verfügungen des Landgerichts Köln zu den Aktenzeichen 84 O 90/13, 84 O 220/13, 84 O 256/13, 84 O 208/14 und 81 O 82/15 entstanden ist und noch entstehen wird.

12   Das Berufungsgericht hat das Urteil des Landgerichts auf die Berufung der Klägerin im Wege eines Grund- und Teilurteils abgeändert, den Klageantrag 1 für dem Grunde nach gerechtfertigt erklärt und dem Klageantrag 2 im vorbezeichneten Umfang stattgegeben (OLG Düsseldorf, Urteil vom 3. März 2022 - 20 U 86/19, juris). Mit ihrer vom Berufungsgericht zugelassenen Revision, deren Zurückweisung die Klägerin beantragt, verfolgt die Beklagte ihren Antrag auf vollständige Abweisung der Klage weiter.

13   Der Senat hat dem Gerichtshof der Europäischen Union mit Beschluss vom 13. Juli 2023 (GRUR 2023, 1318 = WRP 2023, 1198 - Gutscheinwerbung I) zur Auslegung der Richtlinie 2001/83/EG zur Schaffung eines Gemeinschaftskodexes für Humanarzneimittel folgende Fragen zur Vorabentscheidung vorgelegt:

1.   Unterliegt Werbung für den Bezug verschreibungspflichtiger Arzneimittel aus dem gesamten Warensortiment einer Apotheke dem Anwendungsbereich der Regelungen zur Werbung für Arzneimittel in der Richtlinie 2001/83/EG (Titel VIII und VIIIa, Art. 86 bis 100)?

2.   Für den Fall, dass Frage 1 zu bejahen ist:

Steht es mit den Bestimmungen des Titels VIII und insbesondere mit Art. 87 Abs. 3 der Richtlinie 2001/83/EG in Einklang, wenn eine nationale Vorschrift (hier: § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG) dahin ausgelegt wird, dass sie die Werbung für das gesamte Sortiment verschreibungspflichtiger Arzneimittel einer in einem anderen Mitgliedstaat ansässigen Versandapotheke mit Werbegaben in Gestalt von Gutscheinen über einen Geldbetrag oder einen prozentualen Rabatt für den nachfolgenden Erwerb weiterer Produkte verbietet?

3.   Weiter für den Fall, dass Frage 1 zu bejahen ist:

Steht es mit den Bestimmungen des Titels VIII und insbesondere mit Art. 87 Abs. 3 der Richtlinie 2001/83/EG in Einklang, wenn eine nationale Vorschrift (hier: § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG) dahin ausgelegt wird, dass sie die Werbung für das gesamte Sortiment verschreibungspflichtiger Arzneimittel einer in einem anderen Mitgliedstaat ansässigen Versandapotheke mit Werbegaben in Gestalt unmittelbar wirkender Preisnachlässe und Zahlungen gestattet?

14   Hierauf hat der Gerichtshof der Europäischen Union mit Urteil vom 27. Februar 2025 (C-517/23, GRUR 2025, 424 = WRP 2025, 583 - Apothekerkammer Nordrhein) geantwortet:

1.   Art. 86 Abs. 1 der Richtlinie 2001/83/EG des Europäischen Parlaments und

des Rates vom 6. November 2001 zur Schaffung eines Gemeinschaftskodexes für Humanarzneimittel in der durch die Richtlinie 2011/62/EU des Europäischen Parlaments und des Rates vom 8. Juni 2011 geänderten Fassung ist dahin auszulegen, dass

-    Werbeaktionen für den Bezug unbestimmter verschreibungspflichtiger Arzneimittel in Gestalt von Preisnachlässen und Zahlungen nicht unter den Begriff „Werbung für Arzneimittel" im Sinne dieser Bestimmung fallen,

-    wohingegen Werbeaktionen für den Bezug unbestimmter verschreibungspflichtiger Arzneimittel unter Verwendung von Werbegaben in Form von Gutscheinen für den nachfolgenden Erwerb nicht verschreibungspflichtiger Arzneimittel unter diesen Begriff fallen.

2.    Art. 34 AEUV und Art. 3 Abs. 4 Buchst. a der Richtlinie 2000/31/EG des Europäischen Parlaments und des Rates vom 8. Juni 2000 über bestimmte rechtliche Aspekte der Dienste der Informationsgesellschaft, insbesondere des elektronischen Geschäftsverkehrs („Richtlinie über den elektronischen Geschäftsverkehr") sind dahin auszulegen, dass sie einer nationalen Regelung nicht entgegenstehen, die eine Werbeaktion, in deren Rahmen den Kunden einer in einem anderen Mitgliedstaat ansässigen Apotheke für die Einsendung ihrer Rezepte und die Teilnahme an einem „Arzneimittel-Check" eine Geldprämie angeboten wird, ohne dass die genaue Höhe dieser Prämie ersichtlich wäre, aus Verbraucherschutzgründen verbietet.

3.    Art. 87 Abs. 3 der Richtlinie 2001/83/EG in der durch die Richtlinie 2011/62/EU geänderten Fassung ist dahin auszulegen, dass er einer nationalen Regelung nicht entgegensteht, die Werbeaktionen für den Bezug unbestimmter verschreibungspflichtiger Arzneimittel unter Verwendung von Werbegaben in Gestalt von Gutscheinen über einen bestimmten Geldbetrag oder über einen prozentualen Preisnachlass für den nachfolgenden Erwerb weiterer Produkte, wie nicht verschreibungspflichtiger Arzneimittel, verbietet.

**Entscheidungsgründe**

15    A. Das Berufungsgericht hat den Klageantrag 1 für dem Grunde nach und den Klageantrag 2 hinsichtlich der vorstehend genannten einstweiligen Verfügungen für begründet erachtet und hierzu ausgeführt:

16    Die Beklagte schulde der Klägerin den mit dem Antrag 1 geltend gemachten Ersatz des durch die Vollziehung der von Anfang an ungerechtfertigten einstweiligen Verfügungen entstandenen Schadens.

17    Dem Schadensersatzanspruch der Klägerin gemäß § 945 ZPO stehe nicht entgegen, dass die Beklagte in ihrer Rolle als Selbstverwaltung der Apotheker im Gebiet Nordrhein in Form einer Körperschaft öffentlichen Rechts hoheitliche Aufgaben wahrnehme und in dieser Funktion gegenüber ihren Mitgliedern hoheitlich handele, auch wenn sie nicht die Aufsicht

über die Apotheken im Bezirk ausübe. Gegenüber der Klägerin habe die Beklagte mit der Beantragung der einstweiligen Verfügungen nicht den Weg gewählt, mittels öffentlich-rechtlichen Verwaltungshandelns vorzugehen oder die Aufsichtsbehörden einzuschalten, sondern sie habe die Zivilgerichte angerufen. Hieran müsse sie sich auch mit Blick auf eine etwaige Schadensersatzpflicht wegen Vollziehung der einstweiligen Verfügungen festhalten lassen.

18      Die einstweiligen Verfügungen erwiesen sich als von Anfang an ungerechtfertigt.

19      Die Klägerin habe durch den Vertrieb von Arzneimitteln aus den Niederlanden an Endkunden in Deutschland nicht gegen § 73 Abs. 1 Satz 1 Ziffer 1a Satz 3 AMG verstoßen. Die Klägerin betreibe eine Apotheke nach niederländischem Recht. Es bestehe auch ein mit Deutschland vergleichbarer Standard für den Versandhandel mit Arzneimitteln aus den Niederlanden, soweit Versandapotheken - so wie die Klägerin im Streitfall - gleichzeitig eine Präsenzapotheke unterhielten.

20      Die einstweiligen Verfügungen seien auch nicht wegen Verstoßes der Klägerin gegen § 7 Abs. 1 HWG gerechtfertigt. Die Werbeaktionen der Klägerin seien von der Ausnahmevorschrift des § 7 Abs. 1 Satz 1 Nr. 2 Buchst. a HWG erfasst; ein Verstoß gegen das Arzneimittelpreisrecht liege nicht vor.

21      Die in § 78 Abs. 1 Satz 4 AMG aF vorgesehene Arzneimittelpreisbindung sei, wie der Gerichtshof der Europäischen Union entschieden habe, wegen Verstoßes gegen die Warenverkehrsfreiheit (Art. 34 und Art. 36 AEUV) gegenüber der in den Niederlanden ansässigen Klägerin nicht anwendbar. Die vorliegend zu beurteilenden Fallgestaltungen seien ebenso zu beurteilen wie der dem Urteil des Gerichtshofs der Europäischen Union zugrundeliegende Fall einer Rabattaktion in Gestalt eines "Rezeptbonus" in Höhe von 2,50 €, eines weiteren Bonus in Höhe von 0,5 % des Warenwerts sowie eines Gutscheins über 5 € für die Erstbestellung. Das Urteil des Gerichtshofs der Europäischen Union wirke nicht lediglich zwischen den Parteien des seinerzeitigen Rechtsstreits, sondern sei allgemeinverbindlich; zudem wirke es auf den Zeitpunkt der Vollziehung der einstweiligen Verfügungen zurück.

22      Es bedürfe keiner erneuten Vorlage an den Gerichtshof der Europäischen Union zur Klärung der Frage, ob die Arzneimittelpreisbindung zur Gewährleistung einer flächendeckenden und gleichmäßigen Versorgung mit verschreibungspflichtigen Arzneimitteln erforderlich sei.

23      Der von der Klägerin mit dem Klageantrag 1 geltend gemachte Anspruch sei hinsichtlich der Schadenshöhe nicht entscheidungsreif. Der Schaden bestehe jedoch mit hoher Wahrscheinlichkeit, so dass der Erlass eines Zwischenurteils gerechtfertigt sei. Jedenfalls mit Blick auf Privatversicherte, die den Kaufpreis für ein Medikament vorfinanzieren müssten und auch aufgrund der beihilferechtlichen Preisdämpfungspauschalen oder versicherungsvertraglichen Freibeträgen besonders preissensibel seien, spreche vieles für einen Schaden.

24      Der Klageantrag 2 habe - soweit für die Revision von Bedeutung - Erfolg. Das erforderliche

Feststellungsinteresse bestehe, weil die Klägerin den ihr entstandenen Schaden noch nicht endgültig beziffern könne und Verjährung drohe. Der Antrag sei auch begründet, weil sich die einstweiligen Verfügungen als von Anfang an ungerechtfertigt erwiesen.

25    B. Die Revision der Beklagten hat Erfolg. Zwar steht einem Schadensersatzanspruch der Klägerin gemäß § 945 ZPO (dazu nachfolgend B I) nach der zutreffenden Auffassung des Berufungsgerichts nicht entgegen, dass die Beklagte eine Körperschaft öffentlichen Rechts ist (dazu nachfolgend B II), und dass sich die ergangenen einstweiligen Verfügungen nicht unter dem Gesichtspunkt eines in der beanstandeten Auslobung von Prämien und Gutscheinen liegenden Verstoßes gegen § 4 Nr. 11 UWG aF in Verbindung mit der in § 78 Abs. 1 Satz 1 und 4 AMG vorgesehenen Arzneimittelpreisbindung als von Anfang an gerechtfertigt erweisen (dazu nachfolgend B III). Die Revision wendet sich jedoch mit Erfolg gegen die Beurteilung des Berufungsgerichts, die Klägerin habe nicht gegen das in § 73 Abs. 1 Satz 1 Nr. 1a AMG geregelte Verbringungsverbot verstoßen, so dass ein Schadensersatzanspruch nach § 945 ZPO nicht wegen der aus einem solchen Verstoß folgenden Unterlassungspflicht ausgeschlossen sei (dazu nachfolgend B IV). Die heilmittelwerberechtliche Beurteilung des Berufungsgerichts hält der rechtlichen Nachprüfung ebenfalls nicht durchgehend stand (dazu nachfolgend B V).

26    I. Nach § 945 Fall 1 ZPO ist die Partei, die eine von Anfang an ungerechtfertigte einstweilige Verfügung erwirkt hat, verpflichtet, dem Gegner den Schaden zu ersetzen, der ihm aus deren Vollziehung entsteht. Die Vorschrift des § 945 ZPO beruht auf dem Rechtsgedanken, dass die Vollstreckung aus einem noch nicht endgültigen Vollstreckungstitel auf Gefahr des Gläubigers erfolgt (BGH, Urteil vom 19. November 2015 - I ZR 109/14, GRUR 2016, 720 [juris Rn. 11] = WRP 2016, 854 - Hot Sox, mwN).

27    Der Anspruch nach § 945 ZPO scheidet zum einen aus, wenn sich die einstweilige Verfügung als von Anfang an gerechtfertigt, also zu Recht ergangen erweist. Zum anderen besteht dieser Anspruch nicht, wenn der durch die Vollziehung einer ungerechtfertigt ergangenen Verfügung Betroffene ohnehin materiell-rechtlich verpflichtet ist, das ihm durch die einstweilige Verfügung untersagte Verhalten zu unterlassen. Im letztgenannten Fall fehlt es jedenfalls an einem nach § 945 ZPO zu ersetzenden Schaden (BGH, Urteil vom 20. Juli 2006 - IX ZR 94/03, BGHZ 168, 352 [juris Rn. 27]; BGH, GRUR 2016, 720 [juris Rn. 38] - Hot Sox, jeweils mwN). Deshalb kommt es im Schadensersatzprozess auf die Frage, ob die rechtskräftige Aufhebung von einstweiligen Verfügungen im nachfolgenden Hauptsacheverfahren Bindungswirkung entfaltet (dafür zuletzt BGH, Urteil vom 26. März 1992 - IX ZR 108/91, NJW 1992, 2297 [juris Rn. 14]; aA MünchKomm.ZPO/Drescher, 7. Aufl., § 945 Rn. 16; Braun in Musielak/Voit, ZPO, 22. Aufl., § 945 Rn. 5; Bruns in Stein/Jonas, ZPO, 23. Aufl., § 945 Rn. 26), generell nicht an (vgl. BGH, GRUR 2016, 720 [juris Rn. 38] - Hot Sox, mwN; Teplitzky/Sender, Wettbewerbsrechtliche Ansprüche und Verfahren, 13. Aufl., Kap. 36 Rn. 21 mwN).

28    II. Der Anwendung von § 945 ZPO steht im Streitfall - wie das Berufungsgericht zu Recht ausgesprochen hat - nicht entgegen, dass die Beklagte eine Körperschaft des öffentlichen Rechts ist.

29    Geht eine juristische Person des öffentlichen Rechts in einer dem Zivil- und Zivilprozessrecht unterliegenden Handlungsform vor, hat sie die Anwendung zivilrechtlicher und zivilprozessualer Rechtsfolgen hinzunehmen. So muss sich eine juristische Person des öffentlichen Rechts, die wegen ihres geschäftlichen Handelns lauterkeitsrechtlich in

Anspruch genommen werden kann, die Anwendung der zivilprozessualen Vorschriften über Ordnungsmittel gefallen lassen (vgl. dazu BGH, Urteil vom 12. März 2020 - I ZR 126/18, BGHZ 225, 59 [juris Rn. 82 bis 84] - WarnWetter-App, mwN). Die Beklagte hat sich zur Geltendmachung lauterkeitsrechtlicher Ansprüche im Wege des zivilprozessualen Verfahrens der einstweiligen Verfügung entschieden und muss deshalb die mit dieser Art der Anspruchsverfolgung einhergehende Anwendung des § 945 ZPO hinnehmen.

30    III. Ohne Erfolg wendet sich die Revision gegen die Beurteilung des Berufungsgerichts, die ergangenen einstweiligen Verfügungen seien nicht unter dem Gesichtspunkt eines in der beanstandeten Auslobung von Prämien und Gutscheinen liegenden Verstoßes gegen § 4 Nr. 11 UWG aF in Verbindung mit der in § 78 Abs. 1 Satz 1 und 4 AMG vorgesehenen Arzneimittelpreisbindung von Anfang an gerechtfertigt.

31    1. Das Berufungsgericht hat zu Recht angenommen, dass die Arzneimittelpreisbindung nicht zu Lasten der Klägerin angewendet werden darf, soweit sich die in § 78 Abs. 1 Satz 4 AMG aF vorgesehene Festlegung einheitlicher Abgabepreise als absolutes Verbot des Preiswettbewerbs erweist und sich als solches auf die Klägerin - eine in einem anderen Mitgliedstaat als der Bundesrepublik Deutschland ansässige Apotheke - stärker auswirkt als auf im deutschen Hoheitsgebiet ansässige Apotheken, weil dies eine gegen Art. 34 AEUV verstoßende Behinderung des Marktzugangs darstellt (vgl. EuGH, GRUR 2016, 1312 [juris Rn. 26 f.] - Deutsche Parkinson Vereinigung; EuGH, Urteil vom 15. Juli 2021 - C-190/20, GRUR 2021, 1325 [juris Rn. 40 bis 44] = WRP 2021, 1277 - DocMorris; BGH, Urteil vom 18. November 2021 - I ZR 214/18, GRUR 2022, 391 [juris Rn. 65] = WRP 2022, 434 - Gewinnspielwerbung II).

32    2. Für eine erneute Vorlage an den Gerichtshof der Europäischen Union zur Klärung der Frage, ob die in § 78 Abs. 1 Satz 4 AMG aF vorgesehene Arzneimittelpreisbindung erforderlich ist, um die gebotene flächendeckende und gleichmäßige Versorgung der Bevölkerung mit Arzneimitteln sicherzustellen und das finanzielle Gleichgewicht des Systems der gesetzlichen Krankenversicherung abzusichern (dazu BGH, Urteil vom 24. November 2016 - I ZR 163/15, GRUR 2017, 635 [juris Rn. 49] = WRP 2017, 694 - Freunde werben Freunde), besteht kein Anlass. Nach den Feststellungen des Berufungsgerichts ist ein im Jahr 2018 an die Bundesregierung gerichtetes Auskunftsersuchen des Oberlandesgerichts München bis zur Entscheidung in der Berufungsinstanz unbeantwortet geblieben. Die Beklagte hat keine Anhaltspunkte dafür vorgetragen, dass ein weiteres Auskunftsersuchen erfolgversprechend wäre. Eine weitere Aufhellung der der mittlerweile außer Kraft getretenen Regelung in § 78 Abs. 1 Satz 4 AMG zugrundeliegenden wirtschaftlichen, statistischen und gesundheitspolitischen Datenlage ist nicht zu erwarten (vgl. auch BGH, Urteil vom 17. Juli 2025 - I ZR 74/24, GRUR 2025, 1404 [juris Rn. 52 bis 60] = WRP 2025, 1159 - Arzneimittel-Check).

33    IV. Die Revision wendet sich mit Erfolg gegen die Beurteilung des Berufungsgerichts, die Klägerin habe nicht gegen das in § 73 Abs. 1 Satz 1 Nr. 1a AMG geregelte Verbringungsverbot verstoßen, so dass ein Schadensersatzanspruch nach § 945 ZPO nicht wegen der aus einem solchen Verstoß folgenden Unterlassungspflicht ausgeschlossen sei.

34    1. Nach § 73 Abs. 1 Satz 1 Nr. 1a AMG in der seit dem 31. Mai 2011 unverändert geltenden Fassung dürfen zugelassene Arzneimittel im Falle des Versands an den Endverbraucher in das Inland nur verbracht werden, wenn sie von einer Apotheke eines Mitgliedstaats der Europäischen Union oder eines anderen Vertragsstaats des Abkommens über den

Europäischen Wirtschaftsraum entsprechend den deutschen Vorschriften zum Versandhandel oder zum elektronischen Handel versandt werden und die Apotheke nach ihrem nationalen Recht, soweit es dem deutschen Apothekenrecht im Hinblick auf die Vorschriften zum Versandhandel entspricht, oder nach dem deutschen Apothekengesetz für den Versandhandel befugt ist. Nach § 73 Abs. 1 Satz 3 AMG veröffentlicht das Bundesministerium in regelmäßigen Abständen eine aktualisierte Übersicht über die Mitgliedstaaten der Europäischen Union und die anderen Vertragsstaaten des Europäischen Wirtschaftsraums, in denen für den Versandhandel und den elektronischen Handel mit Arzneimitteln dem deutschen Recht vergleichbare Sicherheitsstandards bestehen.

35    Das in § 73 Abs. 1 Satz 1 Nr. 1a AMG geregelte Verbringungsverbot stellt eine Marktverhaltensregelung im Sinne von § 4 Nr. 11 UWG in der im Zeitpunkt des Erlasses der einstweiligen Verfügungen geltenden Fassung (jetzt: § 3a UWG) dar (vgl. BGH, Urteil vom 20. Dezember 2007 - I ZR 205/04, GRUR 2008, 275 [juris Rn. 20] = WRP 2008, 356 - Versandhandel mit Arzneimitteln).

36    2. Das Berufungsgericht hat angenommen, die Klägerin habe nicht gegen das Verbringungsverbot verstoßen, und dazu ausgeführt:

37    Die Klägerin betreibe eine Apotheke nach niederländischem Recht, wie sie durch die Vorlage von Auszügen aus dem niederländischen Apothekenregister und eines Schreibens der zuständigen niederländischen Aufsichtsbehörde dargelegt habe. Die Klägerin habe vorgetragen, dass das niederländische Recht für den Betrieb einer Apotheke lediglich eine Anzeigepflicht und kein Erfordernis einer Betriebserlaubnis voraussetze. Die Klägerin habe weiter vorgetragen, gemäß Art. 61 des niederländischen Apothekengesetzes sei eine Apotheke verpflichtet, einen Apotheker zu benennen, der in das Register der niedergelassenen Apotheker für den Standort der Apotheke eingetragen sei. Die niederländische Aufsichtsbehörde für das Gesundheitswesen und Jugend führe nach dem weiteren Vortrag der Klägerin das Apothekenregister und aktualisiere es im 14Tages-Rhythmus. Diesem Vortrag sei die Beklagte nicht substantiiert entgegengetreten.

38    Soweit die Klägerin nach dem insoweit unsubstantiierten und von der Klägerin bestrittenen Vortrag der Beklagten eine sogenannte "Grensapotheke" betreibe, die ausschließlich Medikamente an Personen liefere, die in einem anderen Staat der Europäischen Union lebten, und das niederländische Recht vorsehe, dass sich die Zulässigkeit des Betriebs einer solchen Apotheke nach den Vorschriften des Mitgliedstaats richte, in dem der Patient lebe, gebe es keine Anhaltspunkte dafür, dass die Klägerin einer Genehmigung oder Erklärung der deutschen Aufsichtsbehörden zum Betrieb ihrer Präsenzapotheke in den Niederlanden bedürfe.

39    Die Klägerin sei, wie sich aus einem Bericht der "Inspectie voor de Gezondheidszorg" vom 8. April 2016 ergebe, nach niederländischem Recht zum Versandhandel mit Arzneimitteln befugt. Nach der Bekanntmachung des Bundesministeriums für Gesundheit vom 5. Juli 2011 bestehe ein mit Deutschland vergleichbarer Standard für den Versandhandel mit Arzneimitteln aus den Niederlanden, soweit Versandapotheken gleichzeitig eine Präsenzapotheke unterhielten.

40    3. Das Berufungsgericht hat zutreffend zugrunde gelegt, dass die Bekanntmachung nach

§ 73 Abs. 1 Satz 3 AMG die Gerichte insoweit bindet, als sie feststellt, dass in bestimmten Mitgliedstaaten der Europäischen Union - gegebenenfalls unter bestimmten Voraussetzungen - zum Zeitpunkt ihrer Veröffentlichung dem deutschen Recht vergleichbare Sicherheitsstandards für den Versandhandel und den elektronischen Handel mit Arzneimitteln bestanden (BGH, GRUR 2008, 275 [juris Rn. 30] - Versandhandel mit Arzneimitteln).

41    Gegen die Feststellung des Berufungsgerichts, das Bundesministerium für Gesundheit habe am 5. Juli 2011 bekanntgemacht, dass für Arzneimittel, die zur Anwendung am oder im menschlichen Körper bestimmt sind, die Vergleichbarkeit in den Niederlanden besteht, soweit Versandapotheken gleichzeitig eine Präsenzapotheke unterhalten, wendet sich die Revision nicht. Weil nach der Bekanntmachung die Feststellung der Vergleichbarkeit vom Betrieb einer Präsenzapotheke abhängt, beruft sich die Revisionserwiderung vergeblich darauf, die Klägerin sei selbst dann zum Versandhandel befugt, wenn sie keine Präsenzapotheke betreibe.

42    Das Berufungsgericht hat weiter zutreffend zugrunde gelegt, dass die Frage nach der Unterhaltung einer Präsenzapotheke nach den hierfür in den Niederlanden bestehenden Erfordernissen zu beurteilen ist, weil der Bekanntmachung des Bundesministeriums für Gesundheit ein Vergleich der rechtlichen Vorgaben für den Versandhandel in den Mitgliedstaaten der Europäischen Union und in den anderen Vertragsstaaten des Europäischen Wirtschaftsraums zugrunde liegt, bei dem die jeweiligen nationalen Besonderheiten berücksichtigt wurden (vgl. BGH, GRUR 2008, 275 [juris Rn. 30] - Versandhandel mit Arzneimitteln).

43    4. Die Revision rügt jedoch mit Erfolg, das Berufungsgericht habe gegen § 293 ZPO verstoßen, indem es die Erfordernisse für den Betrieb einer Präsenzapotheke nach niederländischem Recht unzureichend ermittelt habe.

44    a) Nach § 293 ZPO bedarf das in einem anderen Staat geltende Recht des Beweises nur insofern, als es dem Gericht unbekannt ist (Satz 1); bei Ermittlung dieser Rechtsnormen ist das Gericht auf die von den Parteien beigebrachten Nachweise nicht beschränkt und befugt, auch andere Erkenntnisquellen zu benutzen und zum Zwecke einer solchen Benutzung das Erforderliche anzuordnen (Satz 2). Diese Möglichkeiten entbinden das Tatgericht aber grundsätzlich nicht von der Verpflichtung, die für die Entscheidung des Falles erheblichen Vorschriften des anwendbaren ausländischen Rechts von Amts wegen zu ermitteln (BGH, Beschluss vom 6. Oktober 2016 - I ZB 13/15, NJW-RR 2017, 313 [juris Rn. 66]; Beschluss vom 9. Februar 2017 - V ZB 166/15, NZG 2017, 546 [juris Rn. 7]; Urteil vom 25. Juni 2019 - X ZR 166/18, NJW 2019, 3375 [juris Rn. 23]). Wie sich das Tatgericht diese Kenntnis verschafft, liegt in seinem pflichtgemäßen Ermessen. Jedoch darf sich die Ermittlung des fremden Rechts nicht auf die Heranziehung der Rechtsquellen beschränken, sondern muss auch die konkrete Ausgestaltung des Rechts in der ausländischen Rechtspraxis, insbesondere die ausländische Rechtsprechung, berücksichtigen. Das Tatgericht ist gehalten, das Recht als Ganzes zu ermitteln, wie es sich in Lehre und Rechtsprechung entwickelt hat. Es muss dabei die ihm zugänglichen Erkenntnisquellen ausschöpfen (st. Rspr.; vgl. nur BGH, Urteil vom 14. Januar 2014 - II ZR 192/13, NJW 2014, 1244 [juris Rn. 15]; Urteil vom 10. September 2015 - IX ZR 304/13, WM 2015, 2248 [juris Rn. 15]). Weil ausländische Rechtsnormen keine Tatsachen, sondern Rechtssätze sind, besteht für sie keine Darlegungslast der Parteien (BGH, Beschluss vom 12. Dezember 2007 - XII ZB 240/05, NJW-RR 2008, 586 [juris Rn. 37]; Beschluss vom 17. Mai 2018 - IX ZB 26/17, WM 2018, 1316 [juris Rn. 19]).

45    Das Revisionsgericht prüft insoweit lediglich, ob das Tatgericht sein Ermessen rechtsfehlerfrei ausgeübt, insbesondere sich anbietende Erkenntnisquellen unter Berücksichtigung der Umstände des Einzelfalls hinreichend ausgeschöpft hat (BGH, Beschluss vom 30. April 2013 - VII ZB 22/12, WM 2013, 1225 [juris Rn. 39]; BGH, NJW 2014, 1244 [juris Rn. 15]; BGH, Urteil vom 18. März 2020 - IV ZR 62/19, NJW-RR 2020, 802 [juris Rn. 23]; zur Rechtsbeschwerde vgl. Beschluss vom 20. Februar 2025 - I ZB 26/24, GRUR 2025, 848 [juris Rn. 51] = WRP 2025, 471 - Fernbus in Belgien).

46    b) Danach hat das Berufungsgericht sein Ermessen bei der Ermittlung der für den Betrieb einer Präsenzapotheke bestehenden Erfordernisse nach niederländischem Recht rechtsfehlerhaft ausgeübt.

47    Das Berufungsgericht hat den Inhalt des niederländischen Rechts ausschließlich dem Vortrag der Klägerin entnommen, nach dem für den Betrieb einer Apotheke in den Niederlanden kein Erfordernis einer Betriebserlaubnis, sondern lediglich eine Anzeigepflicht bestehe und Art. 61 des niederländischen Apothekengesetzes die Pflicht einer Apotheke vorsehe, einen Apotheker zu benennen, der in das Register der niedergelassenen Apotheker für den Standort der Apotheke eingetragen sei. Das Berufungsgericht hat diesen Vortrag mit der Begründung zugrunde gelegt, die Beklagte sei ihm nicht substantiiert entgegengetreten. Damit hat das Berufungsgericht in rechtsfehlerhafter Weise die Grundsätze der Darlegungs- und Beweislast bei der Ermittlung ausländischen Rechts angewendet, anstatt - wie nach § 293 ZPO grundsätzlich erforderlich - eigene Ermittlungen zur Verifizierung dieses Vortrags zu unternehmen. Soweit es auf den Inhalt der von der Klägerin vorgelegten Schreiben amtlicher Stellen abgestellt hat, lässt die Begründung des Berufungsgerichts nicht erkennen, dass in diesen Schreiben die Erfordernisse des niederländischen Rechts für den Betrieb einer Präsenzapotheke erläutert würden. Auch die von der Beklagten aufgeworfene Frage, ob eine niederländische "Grensapotheke" besonderen rechtlichen Erfordernissen unterliege, hat das Berufungsgericht rechtsfehlerhaft nach den Grundsätzen der Darlegungs- und Beweislast für unerheblich gehalten.

48    V. Die Beurteilung des Berufungsgerichts, die einstweiligen Verfügungen seien unter dem Gesichtspunkt des § 7 HWG von Anfang an ungerechtfertigt gewesen, hält der rechtlichen Nachprüfung nur teilweise, nämlich hinsichtlich der einstweiligen Verfügungen vom 5. November 2013 (Az. 84 O 256/13) und vom 29. September 2015 (Az. 81 O 82/15) stand. Die einstweiligen Verfügungen vom 8. Mai 2013 (Az. 84 O 90/13), vom 26. September 2013 (Az. 84 O 220/13) und vom 4. November 2014 (Az. 84 O 208/14) erweisen sich hingegen als von Anfang an gerechtfertigt, so dass insoweit ein Schadensersatzanspruch nach § 945 ZPO ausscheidet.

49    1. Nach § 7 Abs. 1 Satz 1 Halbsatz 1 HWG ist es unzulässig, Zuwendungen und sonstige Werbegaben (Waren oder Leistungen) anzubieten, anzukündigen oder zu gewähren oder als Angehöriger der Fachkreise anzunehmen, es sei denn, es liegt einer der in § 7 Abs. 1 Satz 1 Halbsatz 2 HWG gesetzlich geregelten Ausnahmefälle vor. Von dem Verbot ausgenommen sind danach - was hier allein in Betracht kommt - geringwertige Kleinigkeiten (§ 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 1 Fall 2 HWG) und Zuwendungen oder Werbegaben in einem bestimmten oder auf bestimmte Art zu berechnenden Geldbetrag (§ 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG). Allerdings bleiben bei beiden Ausnahmen Zuwendungen oder sonstige Werbegaben für Arzneimittel unzulässig, soweit sie entgegen den Preisvorschriften gewährt werden, die aufgrund des Arzneimittelgesetzes - oder des Fünften Buches Sozialgesetzbuch (so die seit dem 15. Dezember 2020 geltenden

Fassungen) - gelten (§ 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 1 Halbsatz 2, § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 2 HWG).

50    2. Das Berufungsgericht hat zutreffend zugrunde gelegt, dass das in § 7 Abs. 1 Satz 1 HWG geregelte grundsätzliche Verbot des Anbietens, Ankündigens und Gewährens von Werbegaben eine Marktverhaltensregelung im Sinne von § 4 Nr. 11 UWG aF (jetzt: § 3a UWG) darstellt, weil es dem Gesundheitsschutz der Verbraucher dient. Es soll durch eine weitgehende Eindämmung der Wertreklame im Bereich der Heilmittel der abstrakten Gefahr begegnen, dass Verbraucher bei der Entscheidung, ob und gegebenenfalls welche Heilmittel sie in Anspruch nehmen, durch die Aussicht auf Werbegaben unsachlich beeinflusst werden (st. Rspr.; vgl. nur BGH, GRUR 2022, 391 [juris Rn. 26] - Gewinnspielwerbung II, mwN).

51    3. Mit Recht hat das Berufungsgericht die angegriffenen Werbemaßnahmen als produktbezogen und damit vom Anwendungsbereich des Heilmittelwerbegesetzes erfasst angesehen.

52    a) Einbezogen in den Geltungsbereich dieses Gesetzes ist nur die produktbezogene Werbung (Produkt- und Absatzwerbung) und nicht die allgemeine Firmenwerbung (Unternehmens- und Imagewerbung), durch die ohne Bezugnahme auf bestimmte Arzneimittel für Ansehen und Leistungsfähigkeit des Unternehmens allgemein geworben wird. Die Beantwortung der für die Anwendbarkeit des Heilmittelwerbegesetzes entscheidenden Frage, ob die zu beurteilende Werbung Absatz- oder Firmenwerbung ist, hängt maßgeblich davon ab, ob nach dem Gesamterscheinungsbild der Werbung die Darstellung des Unternehmens oder aber die Anpreisung bestimmter oder zumindest individualisierbarer Produkte im Vordergrund steht. Auch eine Werbung für das gesamte Warensortiment der Apotheke kann produktbezogen sein. Es gibt keinen überzeugenden Grund, den vom Gesetzgeber im Bereich der Heilmittelwerbung als grundsätzlich unerwünscht angesehenen Anreiz einer Wertreklame gerade dann hinzunehmen, wenn diese Form der Reklame für eine besonders große Zahl von Heilmitteln eingesetzt wird (st. Rspr.; vgl. nur BGH, GRUR 2022, 391 [juris Rn. 35] - Gewinnspielwerbung II, mwN).

53    b) Das Berufungsgericht hat mit Recht angenommen, die angegriffenen Werbemaßnahmen hätten entweder auf das gesamte Angebot rezeptpflichtiger Medikamente oder sogar auf das gesamte Sortiment der Klägerin gezielt und seien deshalb produktbezogen. Es handelt sich - entgegen der von der Klägerin in der Revisionsinstanz vertretenen Auffassung - nicht lediglich um dem Anwendungsbereich des Heilmittelwerbegesetzes nicht unterfallende unternehmensbezogene Werbung. Nach der Rechtsprechung des Gerichtshofs der Europäischen Union stellt die Werbung einer Apotheke für den Erwerb verschreibungspflichtiger Arzneimittel, mit der allein die Entscheidung für die Apotheke beeinflusst werden soll, bei der ein Kunde bereits verschriebene rezeptpflichtige Arzneimittel bezieht, keine Werbung für Arzneimittel im Sinne der Richtlinie 2001/83/EG dar, sondern eine nicht von dieser Richtlinie erfasste Werbung für die Apotheke (EuGH, GRUR 2025, 424 [juris 34 bis 37] - Apothekerkammer Nordrhein, mwN). Hieraus folgt jedoch nicht, dass eine solche Werbung nicht in den Anwendungsbereich des Heilmittelwerbegesetzes fällt. Aus der in § 7 HWG geregelten Gegenausnahme für (preisgebundene) verschreibungspflichtige Arzneimittel ergibt sich zweifelsfrei, dass das Heilmittelwerbegesetz auch die Werbung für verschreibungspflichtige Arzneimittel erfasst. Die Gegenausnahme ist zwar nicht auf den Versand verschreibungspflichtiger Arzneimittel aus einem anderen EU-Mitgliedstaat, wohl aber auf die Abgabe (auch im Wege des Versands) innerhalb Deutschlands anwendbar. Der Bundesgerichtshof hat bereits entschieden, dass der Richtlinie 2001/83/EG und dem Heilmittelwerbegesetz unterschiedliche Begriffe der "Werbung für Arzneimittel" zugrunde liegen und das Heilmittelwerbegesetz anders als die Richtlinie 2001/83/EG auch Werbung

einer Apotheke für den Erwerb verschreibungspflichtiger Arzneimittel umfasst (BGH, GRUR 2022, 391 [juris Rn. 34 bis 40] - Gewinnspielwerbung II).

54      4. Mit Recht hat das Berufungsgericht die in den angegriffenen Werbemaßnahmen ausgelobten Prämien und Gutscheine als Werbegaben im Sinne des § 7 Abs. 1 Satz 1 HWG eingeordnet.

55      Der Begriff der Werbegabe in § 7 Abs. 1 Satz 1 HWG ist mit Blick auf den Zweck der dortigen Regelung, durch eine weitgehende Eindämmung von Werbegeschenken im Heilmittelbereich der abstrakten Gefahr einer hiervon ausgehenden unsachlichen Beeinflussung zu begegnen, weit auszulegen. Er erfasst grundsätzlich jede aus der Sicht des Empfängers nicht berechnete geldwerte Vergünstigung. Eine Werbegabe setzt demnach voraus, dass die Zuwendung aus der Sicht des Empfängers unentgeltlich gewährt wird; er muss diese als ein Geschenk ansehen (vgl. BGH, GRUR 2022, 391 [juris Rn. 41] - Gewinnspielwerbung II, mwN). Die im Streitfall zu beurteilenden Prämien und Gutscheine erfüllen diese Voraussetzung.

56      5. Bei den in den angegriffenen Werbemaßnahmen ausgelobten Prämien und Gutscheinen handelt es sich nicht um geringwertige Kleinigkeiten im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 1 Halbsatz 1 Fall 2 HWG. Ihr Wert überschreitet jeweils die für Publikumswerbung bei 1 € liegende Schwelle der Geringwertigkeit (vgl. BGH, Urteil vom 17. Juli 2025 - I ZR 43/24, GRUR 2025, 1416 [juris Rn. 45] = WRP 2025, 1154 - PAYBACK, mwN).

57      6. Bei diesen Prämien und Gutscheinen handelt es sich nur teilweise um Zuwendungen oder Werbegaben, die im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG in einem bestimmten oder auf bestimmte Art zu berechnenden Geldbetrag gewährt werden.

58      a) Eine in einem bestimmten Geldbetrag gewährte Werbegabe im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG ist die Zuwendung einer zahlenmäßig bestimmten Geldsumme, über deren Höhe infolge ihrer Bestimmtheit beim Publikum kein Zweifel aufkommen kann (BeckOK.HWG/Doepner/Reese, 14. Edition [Stand 1. Mai 2025], § 7 Rn. 603). So verhält es sich etwa bei der Auslobung einer Bankgutschrift in Höhe von 10 € für die Werbung eines Neukunden (vgl. BGH, GRUR 2017, 635 [juris Rn. 56] - Freunde werben Freunde), eines "Sofort-Bonus", der mit der gesetzlichen Zuzahlung verrechnet wird (vgl. BGH, Urteil vom 26. Februar 2014 - I ZR 79/10, GRUR 2014, 593 [juris Rn. 2] = WRP 2014, 692 - Sofort-Bonus), der Rückvergütung des Kaufpreises für ein Medizinprodukt (OLG Hamburg, GRUR-RR 2019, 486 [juris Rn. 33]; OLG Köln, WRP 2022, 368 [juris Rn. 62]) oder eines "Beauty Bonus" in Höhe von 50 € für die Anrechnung auf die Erstbehandlung mit einem Medizinprodukt (LG Hamburg, PharmR 2011, 487 [juris Rn. 39]).

59      b) Mit einem "auf eine bestimmte Art zu berechnenden Geldbetrag" im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG sind Preisnachlässe in prozentualer oder sonst auf einfache Weise zu ermittelnder Höhe gemeint, die auf den Normalpreis gewährt werden (BGH, GRUR 2022, 391 [juris Rn. 48] - Gewinnspielwerbung II; Fritzsche in Spickhoff, Medizinrecht, 4. Aufl., § 7 HWG Rn. 25; Prütting/Mand, Medizinrecht, 7. Aufl., § 7 HWG Rn. 85). Ein solcher Fall liegt etwa bei der Auslobung eines Rabatts in Höhe von 10 % für die Werbung eines Neukunden vor (vgl. BGH, GRUR 2017, 635 [juris Rn. 56] - Freunde

werben Freunde) oder bei der Verrechnung auf eine in prozentualer Höhe gesetzlich vorgeschriebene Zuzahlung für medizinische Hilfsmittel (vgl. BGH, Urteil vom 1. Dezember 2016 - I ZR 143/15, GRUR 2017, 641 [juris Rn. 41] = WRP 2017, 536 - Zuzahlungsverzicht bei Hilfsmitteln).

60          c) Hingegen erfüllt die Werbung mit einem geldwerten Vorteil, der nicht in einem bestimmten oder bestimmbaren Geldbetrag, sondern als Sachzuwendung - etwa von Gebrauchsgegenständen oder Dienstleistungen - gewährt wird, nicht den Ausnahmetatbestand des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG (vgl. BGH, Urteil vom 26. März 2009 - I ZR 99/07, GRUR 2009, 1082 [juris Rn. 17] = WRP 2009, 1385 - DeguSmiles & more; BeckOK.HWG/Doepner/Reese aaO § 7 Rn. 601; vgl. auch Prütting/Mand aaO § 7 HWG Rn. 89). Dies gilt auch, wenn der Wert des Vorteils mit einem bestimmten Geldbetrag angegeben wird. Hierfür spricht zunächst der Wortlaut der Vorschrift, weil eine Sachzuwendung kein Geldbetrag ist. Hierfür spricht weiter, dass sich der Werbende andernfalls bei einer Sachzuwendung allein durch die Angabe des Werts dem Anwendungsbereich des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 1 Halbsatz 1 Fall 2 HWG entziehen könnte, der für die Zulässigkeit einer Sachzuwendung deren Geringwertigkeit verlangt, und in den Genuss der Regelung des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG gelangen (vgl. OLG Hamm, WRP 2022, 633 [juris Rn. 42]). Sachzuwendungen fallen auch deshalb nicht in den Anwendungsbereich dieser Ausnahmeregelung, weil bei ihnen - anders als bei zu einer unmittelbaren Preisermäßigung führenden Geldzuwendungen - in besonderer Weise der Schutzzweck des Heilmittelwerberechts relevant ist, eine unsachliche Beeinflussung zu verhindern. Denn es besteht kein sachlicher Zusammenhang mit dem Erwerb des Heilmittels und zudem die abstrakte Gefahr der Irreführung über den Wert der Sachzuwendung.

61          Bei einem Verbot von Sachzuwendungen, die nicht in der im Streitfall allein entscheidungserheblichen Gewährung betragsmäßig oder mit einer Prozentangabe bezeichneter Rabattgutscheine für den nachfolgenden Erwerb weiterer Produkte bestehen (dazu nachfolgend Rn. 62 und Rn. 73), dürfte es sich auch nicht um ein gegen Art. 34 AEUV verstoßendes "absolutes Verbot eines Preiswettbewerbs" im Sinne der Rechtsprechung des Gerichtshofs der Europäischen Union handeln, weil darunter allein das Verbot der Werbung mit unmittelbar wirkenden Preisnachlässen fällt (vgl. BGH, GRUR 2023, 1318 [juris Rn. 64] - Gutscheinwerbung I). Dies hat der Senat für die Werbung mit einem Gewinnspiel bereits entschieden (BGH, GRUR 2022, 391 [juris Rn. 49 bis 56] - Gewinnspielwerbung II). Es ist nicht ersichtlich, dass für andere Werbegaben etwas anderes gelten sollte, die gleichfalls nicht allein zu einer unmittelbar wirkenden Preisermäßigung führen und deren Verbot dem Gesundheitsschutz dient, weil eine unsachliche Beeinflussung verhindert werden soll.

62          d) Die Frage, ob die Gewährung betragsmäßig oder mit einer Prozentangabe bezeichneter Rabattgutscheine für den nachfolgenden Erwerb weiterer Produkte (etwa: Rabattgutschein für den nächsten Einkauf beim Werbenden im Wert von 5 €; Gutschein über 10 % Rabatt bei einem Online-Marktplatz), bei denen es sich nach dem Vorstehenden gleichfalls um Sachzuwendungen handelt, dem Ausnahmetatbestand des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG unterfällt, wird in Rechtsprechung und Literatur nicht einheitlich beantwortet. Sie ist nach Auffassung des Senats, der sich bisher in dieser Frage nicht festgelegt hat (siehe Rechtsprechungsnachweise in BGH, GRUR 2023, 1318 [juris Rn. 35] - Gutscheinwerbung I), zu verneinen.

63          aa) Teils wird angenommen, ein Geldrabatt im Sinne dieser Vorschrift sei allein ein solcher, der den Preis des beworbenen Heilmittels herabsetze (einen Geldrabatt im Falle eines Einkaufsgutscheins für einen Online-Marktplatz verneinend OLG Köln, WRP 2016, 1388;

Brixius in Bülow/Ring/Artz/Brixius, HWG, 6. Aufl., § 7 Rn. 282; Sosnitza in Sosnitza/Meisterernst (vormals Zipfel/Rathke), Lebensmittelrecht, Stand: 192. Ergänzungslieferung [Stand März 2025], § 7 HWG Rn. 40; Wesser, A&R 2019, 109, 113 f.). Grund für die Zulassung von Geldrabatten sei die Annahme, dass bei der Werbung mit einer Preisermäßigung keine unsachliche Beeinflussung vorliege, weil die Preiswürdigkeit im Leistungswettbewerb ein maßgebliches Merkmal für die Verbraucherentscheidung darstelle. Damit seien allein Rabatte privilegiert, die sich auf den Preis des Produkts auswirkten. Andernfalls werde das grundsätzliche Zuwendungsverbot des § 7 Abs. 1 Satz 1 HWG ausgehebelt, weil dann jede geldwerte Werbegabe als zulässiger Geldrabatt im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG gelten müsse (vgl. Wesser, A&R 2019, 109, 113 f.).

64    bb) Nach anderer Auffassung sind auch auf einen Geldbetrag lautende Gutscheine für den Erwerb weiterer Produkte vom Anwendungsbereich des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG umfasst (OLG Bamberg, WRP 2013, 1641; BeckOK.HWG/Doepner/Reese aaO § 7 Rn. 603c; Fritzsche in Spickhoff aaO § 7 HWG Rn. 24).

65    cc) Nach Auffassung des Senats ist der Ausnahmetatbestand des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG dahin auszulegen, dass ihm allein unmittelbar wirkende Preisnachlässe und Zahlungen, nicht aber auf einen Geldbetrag oder einen prozentualen Rabatt lautende Gutscheine für den nachfolgenden Erwerb weiterer Produkte unterfallen.

66    Eine Beschränkung des Ausnahmetatbestands des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG auf unmittelbar wirkende Preisnachlässe und Zahlungen legt schon der Wortlaut der Vorschrift nahe, der verlangt, dass die Zuwendung oder Werbegabe "in einem (…) Geldbetrag (…) gewährt" wird. Diese Formulierung ist naheliegenderweise so zu verstehen, dass ein Geldbetrag ausgezahlt oder zumindest vom Rechnungsbetrag abgezogen wird. Dies ist bei einem Rabattgutschein für zukünftige Erwerbsvorgänge nicht der Fall. Vor allem aber entspricht dieses Verständnis in besonderer Weise dem Schutzzweck des § 7 Abs. 1 HWG, im Zusammenhang mit dem Erwerb von Heilmitteln der auch nur abstrakten Gefahr einer unsachlichen Beeinflussung der Werbeadressaten entgegenzuwirken. Zwar trifft es zu, dass ein Verbraucher über den Wert eines betragsmäßig bezeichneten Gutscheins für einen zukünftigen Einkauf im Bilde ist und deshalb keine Fehleinschätzung des Werts der Werbegabe droht (zu diesem Motiv der Privilegierung von Geldrabatten vgl. BGH, GRUR 2009, 1082 [juris Rn. 9 und 11] - DeguSmiles & more). Soweit durch einen solchen Rabattgutschein ein Anreiz für den Erwerb weiterer Heilmittel geschaffen wird, ist allerdings der weitere Schutzzweck des Heilmittelwerberechts berührt, einer unkritischen Selbstmedikation und einem womöglich gesundheitsgefährdenden Zuviel- und Fehlgebrauch von Heilmitteln entgegenzuwirken (zu diesem Schutzzweck vgl. BeckOK.HWG/Doepner/Reese aaO § 7 Rn. 364 f.; Prütting/Mand aaO § 7 HWG Rn. 3). Durch die Zuordnung von Rabattgutscheinen für zukünftige Erwerbsvorgänge unter den Begriff der Zuwendung oder Werbegabe im Sinne des § 7 Abs. 1 Halbsatz 2 Nr. 1 Halbsatz 1 Fall 2 HWG, die nur als geringwertige Kleinigkeit zulässig sind, wird diesem weiteren Schutzzweck in besonderer Weise Rechnung getragen, weil von geringwertigen Rabattversprechen auch nur eine verminderte Anreizwirkung ausgeht. Mit Blick auf für den Heilmittelerwerb ausgelobte Rabattgutscheine für den Einkauf bei Anbietern anderer Waren vermindert diese Einordnung schon die Gefahr einer unsachlichen Motivation des Erstkaufs von Heilmitteln. Die Unsachlichkeit liegt darin, dass - im Gegensatz zu zulässigen Barrabatten - nicht mit der Herabsetzung des Preises für das gewünschte Heilmittel, sondern mit einem Vorteil beim Erwerb anderer Waren geworben wird, der in keinerlei Zusammenhang mit dem Erwerb des Heilmittels steht (BGH, GRUR 2025, 1416 [juris Rn. 34] - PAYBACK; aA BeckOK.HWG/Doepner/Reese aaO § 7 Rn. 603c bis 603e;

Prütting/Mand aaO § 7 HWG Rn. 92; Deckers, MedR 2024, 110, 111; Reese, MPR 2024, 121, 129 f.).

67    Die klare Abgrenzung zwischen Barrabatt im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG und (sonstiger) Werbegabe im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 1 Halbsatz 1 Fall 2 HWG, die (auch in Form eines Rabattversprechens) nur als geringwertige Kleinigkeit zulässig ist, dient zugleich der Rechtssicherheit (vgl. BGH, GRUR 2023, 1318 [juris Rn. 37] - Gutscheinwerbung I).

68    Soweit der Senat mit Blick auf eine unlautere Anlockwirkung im Sinne des § 1 UWG aF entschieden hat, dass die in Form eines Einkaufsgutscheins über 10 DM gewährte Vergünstigung sich der Sache nach als ein Preisnachlass beim Wareneinkauf darstellt und der verständige Verbraucher dies erkennt (BGH, Urteil vom 22. Mai 2003 - I ZR 8/01, GRUR 2003, 1057 [juris Rn. 18] = WRP 2003, 1428 - Einkaufsgutschein), ist diese Bewertung auf das Heilmittelwerberecht, das - wie dargelegt - eine spezifische Schutzrichtung hat, nicht übertragbar.

69    e) Danach ist nur ein Teil der hier in Rede stehenden Zuwendungen oder Werbegaben nach § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG zulässig, weil sie in einem bestimmten oder auf bestimmte Art zu berechnenden Geldbetrag gewährt werden.

70    aa) Unzulässig sind die Zuwendungen oder Werbegaben, die Gegenstand der einstweiligen Verfügungen vom 8. Mai 2013 (Az. 84 O 90/13), vom 26. September 2013 (Az. 84 O 220/13) und vom 4. November 2014 (Az. 84 O 208/14) sind.

71    (1) Bei der mit einstweiliger Verfügung vom 8. Mai 2013 (Az. 84 O 90/13) verbotenen Werbung mit einer Prämie für die Teilnahme am "Arzneimittel-Check" der Klägerin von mindestens 2,50 € und bis zu 20 € pro Rezept handelt es sich entgegen der Auffassung des Berufungsgerichts nicht um die Auslobung eines bestimmten oder auf eine bestimmte Art zu berechnenden Geldbetrags im Sinne des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG. Nach den Feststellungen des Berufungsgerichts werden jedenfalls solche Adressaten der Werbung, die am Erwerb von Medikamenten zur Behandlung schwerer chronischer Krankheiten interessiert sind, über die absolute Höhe oder die Berechnung der in Aussicht gestellten Prämie im Unklaren gelassen, weil lediglich eine Bandbreite möglicher Prämienhöhen angegeben ist, ohne die von der Klägerin vorgesehene Berechnungsmethode offenzulegen. Der Schutzzweck der Vorschrift ist berührt, weil mit der Möglichkeit, dass Adressaten der Werbung aufgrund der Angabe einer Bandbreite die Höhe der im Einzelfall gewährten Prämie überschätzen, die Gefahr einer unsachlichen Beeinflussung der Werbeadressaten besteht.

72    Diese Auslegung des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG ist unionsrechtskonform. Zwar unterfällt die hier betroffene Werbemaßnahme nach der Rechtsprechung des Gerichtshofs nicht dem Begriff der Werbung für Arzneimittel im Sinne von Art. 86 Abs. 1 der Richtlinie 2001/83/EG, weil Werbeaktionen für den Bezug (unbestimmter) verschreibungspflichtiger Arzneimittel in Gestalt von Preisnachlässen und Zahlungen hiervon nicht erfasst werden (vgl. EuGH, GRUR 2025, 424 [juris Rn. 39 bis 42 und 81] - Apothekerkammer Nordrhein). Ein Verbot dieser Werbemaßnahme ist allerdings angesichts des ihr innewohnenden Potentials zur Irreführung von Verbrauchern mit Art. 34

AEUV und Art. 3 Abs. 4 Buchst. a der Richtlinie 2000/31/EG vereinbar (vgl. EuGH, GRUR 2025, 424 [juris Rn. 61 bis 81] - Apothekerkammer Nordrhein).

73    (2) Die mit einstweiliger Verfügung vom 26. September 2013 (Az. 84 O 220/13) verbotene Werbung ist ebenfalls vom Ausnahmetatbestand des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG nicht erfasst. Dabei ist im Streitfall nicht entscheidungserheblich, ob eine Sachzuwendung - hier: Hotelgutschein oder beitragsfreie Jahresmitgliedschaft im ADAC - diesem Tatbestand auch dann nicht unterfällt, wenn ihr Wert in einem bestimmten Geldbetrag angegeben wird (dazu bereits Rn. 60). Denn in der Auslobung eines Rabattgutscheins für den neu geworbenen Kunden zwecks nachfolgenden Erwerbs rezeptfreier Produkte liegt keine nach § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG erlaubte Werbegabe, weil keine unmittelbar wirkenden Preisnachlässe oder Zahlungen gewährt werden.

74    Diese Auslegung des § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG ist unionsrechtskonform. Die hier betroffene Werbemaßnahme unterfällt mit Blick auf den dem neu geworbenen Kunden versprochenen Rabattgutschein für den nachfolgenden Erwerb rezeptfreier Produkte nach der Rechtsprechung des Gerichtshofs dem Begriff der Werbung für Arzneimittel im Sinne von Art. 86 Abs. 1 der Richtlinie 2001/83/EG, weil sie den Kauf nicht verschreibungspflichtiger Arzneimittel fördert (vgl. EuGH, GRUR 2025, 424 [juris Rn. 43 bis 45 und 81] - Apothekerkammer Nordrhein). Diese Werbung kann entgegen Art. 87 Abs. 3 der Richtlinie 2001/83/EG zu einer unzweckmäßigen und übermäßigen Verwendung nicht verschreibungspflichtiger Arzneimittel führen, so dass ihr Verbot dem mit dieser Vorschrift verfolgten wesentlichen Ziel des Schutzes der öffentlichen Gesundheit entspricht (vgl. EuGH, GRUR 2025, 424 [juris Rn. 82 bis 94] - Apothekerkammer Nordrhein).

75    (3) Die mit einstweiliger Verfügung vom 4. November 2014 (Az. 84 O 208/14) verbotene Werbung mit einem 10 €-Gutschein bei Rezepteinreichung für eine nachfolgende Bestellung nicht verschreibungspflichtiger Arzneimittel sowie Gesundheits- und Pflegeprodukte ist ebenfalls keine nach § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG erlaubte Werbegabe, weil keine unmittelbar wirkenden Preisnachlässe oder Zahlungen gewährt werden. Aus den soeben bereits ausgeführten Gründen (siehe Rn. 73 f.) ist auch dieses Verbot unionsrechtskonform.

76    (4) In den vorgenannten Fällen besteht auch die für die Annahme einer Werbegabe erforderliche abstrakte Gefahr einer unsachlichen Beeinflussung des Werbeadressaten. Diese teleologische Einschränkung des Begriffs der Werbegabe gilt nicht nur für die Fachkreiswerbung, sondern auch für die Publikumswerbung (st. Rspr.; vgl. nur BGH, Urteil vom 20. Februar 2020 - I ZR 214/18, GRUR 2020, 659 [juris Rn. 24] = WRP 2020, 722 - Gewinnspielwerbung I, mwN). Das Berufungsgericht hat sich dazu nicht ausdrücklich geäußert. Allerdings bilden die vom Berufungsgericht getroffenen Feststellungen eine ausreichende Grundlage für die Beurteilung durch den Senat. Im Streitfall besteht eine Gefahr der unsachlichen Beeinflussung, soweit - wie in den vorgenannten Fällen - mit auf einen Geldbetrag oder einen prozentualen Rabatt lautenden Gutscheinen für den nachfolgenden Erwerb nicht verschreibungspflichtiger Arzneimittel sowie Gesundheits- und Pflegeprodukte geworben wird. Hierdurch wird der Schutzzweck des § 7 Abs. 1 HWG berührt, einer unkritischen Selbstmedikation und einem womöglich gesundheitsgefährdenden Zuviel- und Fehlgebrauch von Heilmitteln entgegenzuwirken (dazu bereits vorstehend Rn. 66).

77    bb) Die Revision wendet sich ohne Erfolg gegen die Beurteilung des Berufungsgerichts, die einstweiligen Verfügungen vom 5. November 2013 (Az. 84 O 256/13; Verbot eines als Fahrtkostenerstattung bezeichneten Rabatts in Höhe von 10 € bei Rezepteinsendung), und vom 29. September 2015 (Az. 81 O 82/15; Verbot einer Werbung mit einem Rabatt in Höhe von 5 € bei Rezeptbestellung) seien unter dem Gesichtspunkt des § 7 HWG von Anfang an ungerechtfertigt.

78    (1) Es handelt sich in beiden Fällen um nach § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 1 Buchst. a HWG zulässige Geldrabatte, die unmittelbar den Rechnungsbetrag der Bestellung reduzieren. Sie verstoßen zwar gegen § 7 Abs. 1 Satz 1 Halbsatz 2 Nr. 2 Teilsatz 2 HWG, weil sie entgegen den Preisvorschriften gewährt wurden, die seinerzeit aufgrund des Arzneimittelgesetzes galten. Die Werbung hatte verschreibungspflichtige Arzneimittel zum Gegenstand, die der Arzneimittelpreisbindung unterlagen. Durch die Gewährung eines den Rechnungsbetrag der Bestellung unmittelbar reduzierenden Geldrabatts wird gegen die Arzneimittelpreisbindung verstoßen. Das Berufungsgericht hat jedoch zu Recht angenommen, dass dieser Vorbehalt der Einhaltung der Arzneimittelpreisbindung gegenüber der Klägerin nicht angewendet werden darf (dazu bereits vorstehend Rn. 31 f.).

79    (2) Die Revision macht ohne Erfolg geltend, häufig werde ein nach Abzug der Zuzahlung verbleibender Restbetrag oder (bei Entfallen der Zuzahlung) der gesamte Rabattbetrag mit dem Preis weiterer Produkte aus dem Sortiment verrechnet, die innerhalb derselben Bestellung verkauft würden und bei denen es sich auch um nicht verschreibungspflichtige Arzneimittel handeln könne. Die Revision kann mit diesem Argument schon deshalb keinen Erfolg haben, weil sie sich damit entgegen § 559 Abs. 1 ZPO auf erstmals in der Revisionsinstanz gehaltenen Sachvortrag stützt.

80    VI. Für eine erneute Vorlage an den Gerichtshof der Europäischen Union besteht keine Veranlassung (vgl. EuGH, Urteil vom 6. Oktober 1982 - 283/81, Slg. 1982, 3415 [juris Rn. 21] = NJW 1983, 1257 - Cilfit u.a.; Urteil vom 1. Oktober 2015 - C-452/14, GRUR Int. 2015, 1152 [juris Rn. 43] - Doc Generici; Urteil vom 6. Oktober 2021 - C-561/19, NJW 2021, 3303 [juris Rn. 32 f.] - Consorzio Italian Management and Catania Multiservizi). Im Streitfall stellt sich keine entscheidungserhebliche Frage zur Auslegung des Unionsrechts, die nicht bereits durch die Rechtsprechung des Gerichtshofs geklärt ist oder nicht zweifelsfrei zu beantworten ist. Soweit die Auffassung des Senats, das Verbot von Sachzuwendungen unterfalle nicht dem vom Gerichtshof der Europäischen Union geprägten Begriff des "absoluten Verbots eines Preiswettbewerbs" (dazu siehe Rn. 60), unionsrechtlich in Zweifel gezogen werden könnte, kommt es hierauf im Streitfall nicht an (dazu siehe Rn. 73).

81    C. Danach ist das angegriffene Urteil auf die Revision der Beklagten aufzuheben, soweit darin zum Nachteil der Beklagten erkannt worden ist. Die Berufung der Klägerin gegen das landgerichtliche Urteil ist zurückzuweisen, soweit darin die Klageanträge 1 und 2 hinsichtlich der einstweiligen Verfügungen vom 8. Mai 2013 (Az. 84 O 90/13), vom 26. September 2013 (Az. 84 O 220/13) und vom 4. November 2014 (Az. 84 O 208/14) abgewiesen worden sind, weil die Sache insoweit entscheidungsreif ist (§ 562 Abs. 1, § 563 Abs. 3 ZPO). Wegen der Entscheidung über die auf die einstweiligen Verfügungen vom 5. November 2013 (Az. 84 O 256/13) und vom 29. September 2015 (Az. 81 O 82/15) gestützten Klageanträge 1 und 2, sowie wegen der Kosten der Revision ist die Sache zur neuen Verhandlung und Entscheidung an das Berufungsgericht zurückzuverweisen (§ 563 Abs. 1 Satz 1 ZPO).

Koch
nke

Löffler

Schwo

Feddersen

Odörfer

| | |
|---|---|
| **Court:** | BGH 1st Civil Senate |
| **Decision name:** | Voucher advertising II |
| **Decision date:** | 06.11.2025 |
| **Legal force:** | Yes |
| **Reference number:** | I ZR 182/22 |
| **ECLI:** | ECLI:DE:BGH:2025:061125UIZR182.22.0 |
| **Document type:** | Judgment |

| | |
|---|---|
| **Source:** | |
| **Standards:** | Art 86 EC Directive 83/2001, Art 87 para 3 EC Directive 83/2001, § 293 ZPO, § 945 ZPO, § 73 para 1 sentence 1 no 1a AMG ... more |
| **Suggested citation:** | BGH, judgment of November 6, 2025 - I ZR 182/22 -, juris |

**Permissibility of advertising measures of a Dutch mail-order pharmacy - voucher advertising II**

**Guiding principle**

Voucher advertising II

1. if the court of fact bases its decision on a party's submission on the content of foreign law on the grounds that this submission was not disputed by the other party without carrying out its own investigations to verify this submission, this constitutes a breach of the obligation to investigate foreign law ex officio pursuant to section 293 of the Code of Civil Procedure (marginal no. 47).

2. the facts of § 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG, which exceptionally permits advertising gifts and benefits if they are granted in a certain amount of money or in a certain way, does not cover the offer of a range of premiums to be determined in individual cases (here: at least € 2.50 and up to € 20 per prescription).

3. the exception in Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG does not permit a pharmacy to offer a monetary amount or a percentage discount for the subsequent purchase of other products, including non-prescription medicinal products, for the submission of a prescription for prescription-only medicinal products (para.65).

References

NSW Directive 2001/83/EC Art. 86 (BGH- internal)

NSW Directive 2001/83/EC Art. 87 (BGH- internal)
NSW ZPO § 293 (BGH- internal)
NSW ZPO § 945 (BGH- internal)
NSW AMG § 73 (BGH- internal)
NSW AMG § 78 (BGH- internal)
NSW HWG § 7 (BGH- internal)
NSW UWG § 4 aF (BGH- internal)
Course of proceedings

preceding BGH 1st Civil Senate, July 13, 2023, I ZR 182/22, CJEU- submission
preceding OLG Düsseldorf 20th Civil Senate, March 3, 2022, I- 20 U 86/19, ..., judgment
preceding LG Düsseldorf, July 17, 2019, 15 O 436/16
This decision is cited

**Comments**
*Rieger/Dahm/Katzenmeier/Stellpflug/Ziegler, Heidelberg Commentary on Medical Law, Hospital Law, Medical Law*
● Köber, 5540 Competition law; II. individual facts; 2. market conduct rules (§ 3a)
● Koeber, 2440 Therapeutic Products Advertising Act; I. Scope of application (§§ 1, 2 HWG)
● Koeber, 2440 Therapeutic Products Advertising Act; II. Advertising restrictions and prohibitions; 7. Prohibition of promotional gifts (Section 7 HWG)
**Literature references**
XX, DAZ 2025, no. 46, 123 (note)

**Tenor**

On the defendant's appeal, the basic and partial judgment of the 20th Civil Senate of the Düsseldorf Higher Regional Court of 3 March 2022 is set aside insofar as it found against the defendant.

The plaintiff's appeal against the judgment of the 15th Civil Chamber of the Düsseldorf Regional Court of July 17, 2019, as amended by the corrective order of August 22, 2019, is dismissed insofar as it dismisses the first and second claims regarding the preliminary injunctions of May 8, 2013 (Case No. 84 O 90/13), September 26, 2013 (Case No. 84 O 220/13) and November 4, 2014 (Case No. 84 O 208/14).

The case is referred back to the Court of Appeal for a new hearing and decision with regard to claims 1 and 2 based on the interim injunctions of November 5, 2013 (case no. 84 O 256/13) and September 29, 2015 (case no. 81 O 82/15) and with regard to the costs of the appeal.

By operation of law

**Facts of the case**

1    The plaintiff is a Dutch mail-order pharmacy that supplies over-the-counter and prescription drugs to end customers in Germany by mail order.

2    The defendant is the professional association of pharmacists in the North Rhine district.

3        Since 2012, the plaintiff has advertised with various discount campaigns in which customers were promised a benefit in the form of a cash discount, a voucher to be offset against the purchase of another medicine, a hotel voucher or an annual ADAC membership when purchasing prescription medicines. The defendant considers these advertising measures to be a violation of the fixed prices for prescription drugs under pharmaceutical law and therefore obtained the following five interim injunctions against the plaintiff in the years 2013 to 2015, each of which was duly enforced - insofar as this is relevant to the appeal proceedings.

4        On May 8, 2013, the defendant obtained a preliminary injunction from the Regional Court of Cologne (Ref. 84 O 90/13), which was enforced on May 14, 2013, against advertising by the plaintiff with the following information

        Send in your prescription - take part and get up to 20 euros bonus! D. M. attaches great importance to comprehensive advice. Support us in this and take part in the drug check. We would like to thank you for your help with a cash reward. You will receive at least 2.50 euros and up to 20 euros per prescription. (...),

        whereby the amount of the promised bonus depended on the complexity of the illness or the price of the prescription medication (for example, a €2.50 bonus for sending in a prescription for a hormonal contraceptive, between €2.50 and €20 bonus for sending in a medication for the treatment of severe chronic illnesses such as Parkinson's disease). In its ruling of March 22, 2017, the Regional Court of Cologne lifted this injunction due to changed circumstances in light of the ruling of the Court of Justice of the European Union in the "Deutsche Parkinson Vereinigung" case (CJEU, ruling of October 19, 2016 - C- 148/15, GRUR 2016, 1312 = WRP 2017, 36).

5        On September 26, 2013, the defendant obtained a preliminary injunction from the Regional Court of Cologne (case no. 84 O 220/13), which was enforced on October 2, 2013, against an advertisement by the plaintiff with the following information

        Refer friends now & collect free overnight stays! (...)

        For each friend you refer: 1 hotel voucher worth approx. 150 euros* + 5 euro voucher for your friend! (...)

        As soon as your friend submits a prescription or orders non-prescription products with a total value of at least 20 euros. (...)

        Each referred friend will also receive a 5 euro voucher for ordering over-the-counter medicines, health and care products.

and a further advertisement with the following information

> Refer a friend now and receive an ADAC- membership free of charge for the first year* (...)

> For every friend you refer, we will thank you with a classic ADAC- membership (free of charge for the first year instead of €44.50) or with a discounted ADAC Plus-membership for the first year (for only €35.00 instead of €79.50 for the first year) (...)

> As soon as your friend submits a prescription or orders non-prescription products with a total value of at least 20 euros. (...)

> Every friend you refer will also receive a 5 euro voucher for ordering over-the-counter medicines, health and care products.

6       On November 5, 2013, the defendant obtained a preliminary injunction from the Regional Court of Cologne (Ref. 84 O 256/13), which was enforced on January 21, 2014, against advertising by the plaintiff with the following information

> Send in your prescription now! (...) Unfortunately, we cannot spare you the trip to the mailbox. But to compensate for your travel costs by bus and train, new customers will receive 10 euros from us, which will be deducted immediately from the invoice amount when the prescription is sent in,

whereby the discount was offered for orders of prescription drugs with an order value of €50 or more. In a ruling dated March 22, 2017, the Cologne Regional Court revoked this temporary injunction due to changed circumstances in light of the ruling of the Court of Justice of the European Union in the "German Parkinson's Association" case.

7       On November 4, 2014, the defendant obtained a preliminary injunction from the Regional Court of Cologne (case no. 84 O 208/14), which was enforced on December 30, 2014, against an advertisement by the plaintiff containing the following information

> 10 €- voucher for your prescription

for a subsequent order of over-the-counter products. In a ruling dated March 22, 2017, the Regional Court of Cologne lifted this preliminary injunction due to changed circumstances in light of the ruling of the Court of Justice of the European Union in the "German Parkinson's

Association" case.

8       On September 29, 2015, the defendant obtained a preliminary injunction from the Regional Court of Cologne (case no. 81 O 82/15), which was executed on May 26, 2016, for an advertisement by the plaintiff with the statements

      5 Euro voucher for your next prescription order,

whereby the amount stated was to be deducted directly from the invoice amount. This injunction was lifted by the Regional Court of Cologne in a final judgment dated March 21, 2017.

9       As part of the enforcement of some of the preliminary injunctions, high administrative fines were imposed on the plaintiff at the defendant's request.

10      The plaintiff claims damages from the defendant on the grounds that the injunctions were unjustified from the outset. This is because the Court of Justice of the European Union ruled in the "Deutsche Parkinson Vereinigung" case (CJEU, GRUR 2016, 1312) that the fixed prices provided for in the German Medicinal Products Act for the supply of prescription-only medicinal products for human use are contrary to the free movement of goods (Art. 34 TFEU), as they have a greater impact on the supply of prescription-only medicinal products by pharmacies established in other Member States than on the supply of such medicinal products by pharmacies established in Germany.

11      The Regional Court dismissed the action. In the appeal instance, the plaintiff extended its claim and - insofar as relevant for the appeal proceedings - filed a motion,

      1. to order the defendant to pay the plaintiff damages for the period up to and including September 30, 2016 in the amount of at least € 18,476,648.12 plus interest in the amount of nine percentage points above the base interest rate since October 3, 2015;

      2. declare that the defendant is obliged to compensate the plaintiff for all further damages in excess of the minimum damages quantified in claim 1, which the plaintiff has incurred and will incur up to and including December 31, 2016 as a result of the enforcement of the interim injunctions of the Regional Court of Cologne under file numbers 84 O 90/13, 84 O 220/13, 84 O 256/13, 84 O 208/14 and 81 O 82/15.

12      In response to the plaintiff's appeal, the Court of Appeal amended the judgment of the Regional Court by way of a basic and partial judgment, declared claim 1 to be justified on the merits and granted claim 2 to the extent described above (OLG Düsseldorf, judgment of March 3, 2022 - 20 U 86/19, juris). With its appeal allowed by the Court of Appeal, which the

plaintiff requests be dismissed, the defendant continues to pursue its request for the action to be dismissed in full.

13    By order of July 13, 2023 (GRUR 2023, 1318 = WRP 2023, 1198 - Gutscheinwerbung I), the Senate referred the following questions to the Court of Justice of the European Union for a preliminary ruling on the interpretation of Directive 2001/83/EC on the Community code relating to medicinal products for human use:

> (1) Is advertising for the purchase of prescription-only medicinal products from a pharmacy's entire range of goods subject to the scope of the rules on the advertising of medicinal products in Directive 2001/83/EC (Titles VIII and VIIIa, Articles 86 to 100)?

> 2 In the event that question 1 is answered in the affirmative:

>> Is it consistent with the provisions of Title VIII and, in particular, Article 87(3) of Directive 2001/83/EC for a national provision (here: Paragraph 7(1), first sentence, second half-sentence, No 2, first sub-sentence, point (a) of the HWG) to be interpreted as prohibiting the advertising of the entire range of prescription medicines of a mail-order pharmacy established in another Member State with promotional gifts in the form of vouchers for a sum of money or a percentage discount for the subsequent purchase of further products?

> 3.    further in the event that question 1 is answered in the affirmative:

>> Is it consistent with the provisions of Title VIII and, in particular, Article 87(3) of Directive 2001/83/EC for a national provision (here: Paragraph 7(1)(1)(2)(2)(1)(a) of the HWG) to be interpreted as permitting the advertising of the entire range of prescription medicines of a mail-order pharmacy established in another Member State with promotional gifts in the form of directly effective price reductions and payments?

14    The Court of Justice of the European Union answered this question in its judgment of February 27, 2025 (C- 517/23, GRUR 2025, 424 = WRP 2025, 583 - Apothekerkammer Nordrhein):

> (1) Article 86(1) of Directive 2001/83/EC of the European Parliament and of the Council of 6 November 2001 on the Community code relating to medicinal products for human use, as amended by Directive 2011/62/EU of the European Parliament and of the Council of 8 June 2011, must be interpreted as meaning that

- promotions for the supply of unspecified prescription-only medicinal products in the form of price reductions and payments are not covered by the term 'advertising of medicinal products' within the meaning of that provision,

- whereas promotions for the purchase of unspecified prescription medicines using promotional gifts in the form of vouchers for the subsequent purchase of non-prescription medicines fall under this term.

(2) Article 34 TFEU and Article 3(4)(a) of Directive 2000/31/EC of the European Parliament and of the Council of 8 June 2000 on certain legal aspects of the provision of services in the field of health and social protection. Article 34 TFEU and Article 3(4)(a) of Directive 2000/31/EC of the European Parliament and of the Council of 8 June 2000 on certain legal aspects of information society services, in particular electronic commerce ('Directive on electronic commerce') must be interpreted as not precluding national legislation which, for reasons of consumer protection, prohibits a promotion offering customers of a pharmacy established in another Member State a cash reward for sending in their prescriptions and participating in a 'medicines check', without the exact amount of that reward being apparent.

(3) Article 87(3) of Directive 2001/83/EC, as amended by Directive 2011/62/EU, must be interpreted as not precluding national legislation which prohibits promotions for the purchase of unspecified prescription-only medicinal products using promotional gifts in the form of vouchers for a certain amount of money or a percentage discount for the subsequent purchase of other products, such as non-prescription medicinal products.

**Reasons for the decision**

15    A. The Court of Appeal held that the first head of claim was well-founded and the second head of claim was well-founded with regard to the above-mentioned interim injunctions and stated in this regard:

16    The defendant owes the plaintiff the compensation claimed in claim 1 for the damage caused by the enforcement of the injunctions, which were unjustified from the outset.

17    The plaintiff's claim for damages pursuant to § 945 ZPO is not precluded by the fact that the defendant, in its role as the self-administration of pharmacists in the North Rhine region in the form of a corporation under public law, performs sovereign tasks and in this function acts in a sovereign capacity vis-à-vis its members, even if it does not exercise supervision over the pharmacies in the district. With regard to the plaintiff, the defendant had not chosen the path of taking action against the plaintiff by means of public legal administrative action or involving the supervisory authorities, but had instead appealed to the civil courts. It must also adhere to this with regard to any liability for damages due to the enforcement of the injunctions.

18    The interim injunctions proved to be unjustified from the outset.

19        The plaintiff had not violated § 73 para. 1 sentence 1 no. 1a sentence 3 AMG by distributing medicinal products from the Netherlands to end customers in Germany. The plaintiff operates a pharmacy under Dutch law. There is also a standard for the mail-order sale of medicinal products from the Netherlands comparable to that in Germany, insofar as mail-order pharmacies - such as the plaintiff in the case in dispute - also maintain a retail pharmacy.

20        The preliminary injunctions are also not justified on the grounds that the plaintiff violated Section 7 (1) HWG. The plaintiff's advertising campaigns are covered by the exemption provision of § 7 para. 1 sentence 1 no. 2 letter a HWG; there is no violation of the law on the pricing of medicinal products.

21        As the Court of Justice of the European Union has ruled, the pharmaceutical price maintenance provided for in Section 78 para. 1 sentence 4 AMG aF is not applicable to the plaintiff based in the Netherlands due to a violation of the free movement of goods (Art. 34 and Art. 36 TFEU). The cases to be assessed in the present case are to be assessed in the same way as the case underlying the judgment of the Court of Justice of the European Union of a discount campaign in the form of a "prescription bonus" of €2.50, a further bonus of 0.5% of the value of the goods and a voucher of €5 for the first order. The judgment of the Court of Justice of the European Union is not only effective between the parties to the legal dispute at the time, but is generally binding; moreover, it has retroactive effect to the time of enforcement of the injunctions.

22        There is no need for a new referral to the Court of Justice of the European Union to clarify the question of whether fixed prices for medicinal products are necessary to ensure a nationwide and uniform supply of prescription-only medicinal products.

23        The claim asserted by the plaintiff in application 1 is not ready for decision with regard to the amount of damage. However, the damage is highly probable, so that the issue of an interim judgment is justified. In any case, with regard to privately insured persons who have to pre-finance the purchase price of a medicine and are also particularly price-sensitive due to the price reduction lump sums under state aid law or insurance contract allowances, there are many indications of damage.

24        Claim 2 is successful, insofar as it is relevant to the appeal. The necessary interest in a declaratory judgment exists because the plaintiff cannot yet definitively quantify the damage it has suffered and there is a risk of limitation. The application is also justified because the interim injunctions proved to be unjustified from the outset.

25        B. The defendant's appeal is successful. According to the correct opinion of the Court of Appeal, the fact that the defendant is a corporation under public law (see B II below) does not preclude the plaintiff's claim for damages pursuant to Section 945 ZPO (see B I below) and that the preliminary injunctions issued cannot be justified from the point of view of a violation of Section 4 no. 11 UWG aF in conjunction with the pharmaceutical price maintenance provided for in § 78 para. 1 sentences 1 and 4 AMG as justified from the outset (see B III below). However, the appeal successfully challenges the assessment of the Court

of Appeal that the plaintiff did not violate the prohibition of sale regulated in § 73 para. 1 sentence 1 no. 1a AMG, so that a claim for damages pursuant to § 945 ZPO is not excluded due to the obligation to cease and desist resulting from such a violation (see B IV below). The Court of Appeal's assessment of the law on therapeutic products also does not stand up to legal scrutiny throughout (see B V below).

26    I. Pursuant to Section 945 (1) ZPO, the party who has obtained an interim injunction that was unjustified from the outset is obliged to compensate the opposing party for the loss incurred as a result of its enforcement. The provision of Section 945 ZPO is based on the legal idea that the enforcement of a not yet final enforcement order is at the risk of the creditor (BGH, judgment of November 19, 2015 - I ZR 109/14, GRUR 2016, 720 [juris Rn. 11] = WRP 2016, 854 - Hot Sox, mwN).

27    On the one hand, the claim under Section 945 ZPO is excluded if the preliminary injunction proves to be justified from the outset, i.e. if it was issued rightly. On the other hand, this claim does not exist if the party affected by the enforcement of an unjustified injunction is in any case legally obliged to refrain from the conduct prohibited by the injunction. In the latter case, there is in any case no damage to be compensated in accordance with Section 945 ZPO (BGH, judgment of July 20, 2006 - IX ZR 94/03, BGHZ 168, 352 [juris para. 27]; BGH, GRUR 2016, 720 [juris para. 38] - Hot Sox, in each case with further references). Therefore, the question of whether the legally binding revocation of interim injunctions has a binding effect in the subsequent main proceedings is important in the damages proceedings (most recently BGH, judgment of March 26, 1992 - IX ZR 108/91, NJW 1992, 2297 [juris para. 14]; aA MünchKomm.ZPO/Drescher, 7th ed, § Section 945 para. 16; Braun in Musielak/Voit, ZPO, 22nd ed., Section 945 para. 5; Bruns in Stein/Jonas, ZPO, 23rd ed., Section 945 para. 26), generally does not apply (see BGH, GRUR 2016, 720 [juris para. 38] - Hot Sox, mwN; Teplitzky/Sender, Wettbewerbsrechtliche Ansprüche und Verfahren, 13th ed., chapter 36 para. 21 mwN).

28    II The application of Section 945 ZPO is not precluded in the dispute - as the Court of Appeal rightly stated - by the fact that the defendant is a public corporation.

29    If a legal entity under public law acts in a manner subject to civil law and civil procedural law, it must accept the application of the legal consequences under civil law and civil procedural law. Thus, a legal entity under public law that can be held liable under unfair competition law for its commercial actions must accept the application of the civil procedural provisions on administrative remedies (see BGH, judgment of March 12, 2020 - I ZR 126/18, BGHZ 225, 59 [juris para. 82 to 84] - WarnWetter- App, mwN). The defendant has decided to assert claims under unfair competition law by way of civil proceedings for an interim injunction and must therefore accept the application of Section 945 ZPO associated with this type of claim pursuit.

30    III. The appeal is unsuccessful against the assessment of the Court of Appeal that the interim injunctions issued are not justified from the outset from the point of view of a violation of Section 4 No. 11 UWG aF in conjunction with the pharmaceutical price maintenance provided for in Section 78 (1) sentences 1 and 4 AMG in the contested promotion of premiums and vouchers.

31      (1) The Court of Appeal rightly assumed that the fixed prices for medicinal products may not be applied to the detriment of the plaintiff, insofar as the determination of uniform selling prices provided for in § 78 (1) sentence 4 AMG aF proves to be an absolute prohibition of price competition and as such has a greater effect on the plaintiff - a pharmacy established in a Member State other than the Federal Republic of Germany - than on pharmacies established in German territory, because this constitutes a restriction contrary to Art. 34 TFEU (see CJEU, GRUR 2016, 1312 [juris para. 26 et seq.] - Deutsche Parkinson Vereinigung; CJEU, judgment of July 15, 2021 - C- 190/20, GRUR 2021, 1325 [juris para. 40 to 44] = WRP 2021, 1277 - DocMorris; Federal Court of Justice, judgment of November 18, 2021 - I ZR 214/18, GRUR 2022, 391 [juris para. 65] = WRP 2022, 434 - Gewinnspielwerbung II).

32      2. there is no reason for a new referral to the Court of Justice of the European Union to clarify the question of whether the fixed pharmaceutical prices provided for in Section 78 (1) sentence 4 AMG aF are necessary to ensure the necessary nationwide and uniform supply of medicinal products to the population and to ensure the financial balance of the statutory health insurance system (see BGH, judgment of November 24, 2016 - I ZR 163/15, GRUR 2017, 635 [juris Rn. 49] = WRP 2017, 694 - Freunde werben Freunde). According to the findings of the Court of Appeal, a request for information sent to the Federal Government by the Higher Regional Court of Munich in 2018 remained unanswered until the decision in the appeal instance. The defendant has not provided any indications that a further request for information would be promising. A further clarification of the economic, statistical and health policy data situation underlying the provision in Section 78 (1) sentence 4 AMG , which has since expired, is not to be expected (see also BGH, judgment of July 17, 2025 - I ZR 74/24, GRUR 2025, 1404 [juris para. 52 to 60] = WRP 2025, 1159 - Arzneimittel- Check).

33      IV. The appeal successfully challenges the assessment of the Court of Appeal that the plaintiff did not violate the prohibition of movement regulated in Section 73 (1) sentence 1 no. 1a AMG, so that a claim for damages pursuant to Section 945 ZPO is not excluded due to the obligation to cease and desist resulting from such a violation.

34      (1) Pursuant to Section 73 (1) sentence 1 no. 1a AMG in the version in force unchanged since 31 May 2011, authorized medicinal products may only be shipped to the end consumer in Germany if they are shipped by a pharmacy of a Member State of the European Union or another State party to the Agreement on the European Economic Area in accordance with the German provisions on mail order or electronic commerce and the pharmacy is authorized to engage in mail order under its national law, insofar as it corresponds to German pharmacy law with regard to the provisions on mail order, or under the German Pharmacy Act. In accordance with Section 73 para. 1 sentence 3 AMG, the Federal Ministry regularly publishes an updated overview of the member states of the European Union and the other contracting states of the European Economic Area in which safety standards comparable to German law exist for the mail-order and electronic trade in medicinal products.

35      The prohibition of shipment regulated in Section 73 para. 1 sentence 1 no. 1a AMG constitutes a market conduct regulation within the meaning of Section 4 no. 11 UWG in the version applicable at the time the preliminary injunctions were issued (now: Section 3a UWG) (see BGH, judgment of December 20, 2007 - I ZR 205/04, GRUR 2008, 275 [juris Rn. 20] = WRP 2008, 356 - Versandhandel mit Arzneimitteln).

36      2 The Court of Appeal assumed that the plaintiff had not violated the prohibition of transfer

and stated that:

37    The plaintiff operated a pharmacy under Dutch law, as it had demonstrated by submitting excerpts from the Dutch pharmacy register and a letter from the competent Dutch supervisory authority. The plaintiff submitted that Dutch law only requires a notification obligation for the operation of a pharmacy and does not require an operating license. The applicant further argued that, pursuant to Article 61 of the Dutch Pharmacy Act, a pharmacy is obliged to appoint a pharmacist who is entered in the register of established pharmacists for the location of the pharmacy. According to the plaintiff's further submission, the Dutch Supervisory Authority for Healthcare and Youth maintains the pharmacy register and updates it every 14 days. The defendant did not substantiate this submission.

38    In so far as, according to the defendant's unsubstantiated submission, which is disputed by the plaintiff, the plaintiff operates a so-called "Grensapotheke", which exclusively supplies medicines to persons living in another Member State of the European Union, and Dutch law provides that the admissibility of the operation of such a pharmacy is governed by the rules of the Member State in which the patient lives, there is no evidence that the plaintiff requires an authorization or declaration from the German supervisory authorities to operate its retail pharmacy in the Netherlands.

39    According to a report by the "Inspectie voor de Gezondheidszorg" of 8 April 2016, the plaintiff is authorized to sell medicinal products by mail order under Dutch law. According to the announcement of the Federal Ministry of Health of July 5, 2011, there is a standard for the mail-order trade in medicinal products from the Netherlands that is comparable to that in Germany, insofar as mail-order pharmacies also maintain a retail pharmacy.

40    (3) The Court of Appeal correctly assumed that the announcement pursuant to Section 73 (1) sentence 3 AMG is binding on the courts insofar as it establishes that in certain Member States of the European Union - possibly under certain conditions - safety standards comparable to German law existed for the mail-order and electronic trade in medicinal products at the time of its publication (BGH, GRUR 2008, 275 [juris para. 30] - Versandhandel mit Arzneimitteln).

41    The appeal does not challenge the Court of Appeal's finding that the Federal Ministry of Health announced on July 5, 2011 that comparability exists in the Netherlands for medicinal products intended for use on or in the human body, provided that mail-order pharmacies also maintain a retail pharmacy. Because, according to the announcement, the determination of comparability depends on the operation of a retail pharmacy, the appellant's opposition to the appeal relies in vain on the fact that the plaintiff is authorized to sell by mail order even if it does not operate a retail pharmacy.

42    The Court of Appeal also correctly assumed that the question of the maintenance of a retail pharmacy is to be assessed in accordance with the requirements existing in the Netherlands, because the announcement of the Federal Ministry of Health is based on a comparison of the legal requirements for mail order in the Member States of the European Union and in the other contracting states of the European Economic Area, in which the respective national characteristics were taken into account (see BGH, GRUR 2008, 275 [juris Rn. 30] - Versandhandel mit Arzneimitteln).

43      4 However, the appeal successfully complains that the Court of Appeal violated Section 293 ZPO by insufficiently determining the requirements for the operation of a retail pharmacy under Dutch law.

44      a) According to Section 293 ZPO, the law applicable in another state only requires evidence insofar as it is unknown to the court (sentence 1); when determining these legal norms, the court is not limited to the evidence provided by the parties and is authorized to use other sources of knowledge and to order what is necessary for the purpose of such use (sentence 2). However, these options do not release the court of fact from the obligation to determine the provisions of the applicable foreign law relevant to the decision of the case ex officio (BGH, decision of October 6, 2016 - I ZB 13/15, NJW- RR 2017, 313 [juris para. 66]; decision of February 9, 2017 - V ZB 166/15, NZG 2017, 546 [juris para. 7]; judgment of June 25, 2019 - X ZR 166/18, NJW 2019, 3375 [juris para. 23]). How the court of first instance obtains this knowledge is at its discretion. However, the determination of foreign law must not be limited to the use of legal sources, but must also take into account the specific form of the law in foreign legal practice, in particular foreign case law. The trial court is required to determine the law as a whole, as it has developed in doctrine and case law. In doing so, it must exhaust the sources of knowledge available to it (established case law; see only BGH, judgment of January 14, 2014 - II ZR 192/13, NJW 2014, 1244 [juris para. 15]; judgment of September 10, 2015 - IX ZR 304/13, WM 2015, 2248 [juris para. 15]). Because foreign legal norms are not facts but legal principles, the parties have no burden of proof for them (BGH, decision of December 12, 2007 - XII ZB 240/05, NJW- RR 2008, 586 [juris para. 37]; decision of May 17, 2018 - IX ZB 26/17, WM 2018, 1316 [juris para. 19]).

45      In this respect, the court of appeal only examines whether the court of fact exercised its discretion without error of law, in particular whether it sufficiently exhausted available sources of information, taking into account the circumstances of the individual case (BGH, decision of 30. April 2013 - VII ZB 22/12, WM 2013, 1225 [juris para. 39]; BGH, NJW 2014, 1244 [juris para. 15]; BGH, judgment of March 18, 2020 - IV ZR 62/19, NJW- RR 2020, 802 [juris para. 23]; on the appeal on points of law, see decision of February 20, 2025 - I ZB 26/24, GRUR 2025, 848 [juris para. 51] = WRP 2025, 471 - Fernbus in Belgien).

46      b) Accordingly, the Court of Appeal erred in law in exercising its discretion in determining the requirements for the operation of a retail pharmacy under Dutch law.

47      The Court of Appeal took the content of Dutch law exclusively from the plaintiff's submission, according to which there is no requirement for an operating license for the operation of a pharmacy in the Netherlands, but only a duty of notification and Article 61 of the Dutch Pharmacy Act provides for the obligation of a pharmacy to appoint a pharmacist who is entered in the register of established pharmacists for the location of the pharmacy. The Court of Appeal took this submission as a basis on the grounds that the defendant had not substantiated its argument. In doing so, the Court of Appeal erred in law by applying the principles of the burden of presentation and proof in determining foreign law instead of undertaking its own investigations to verify this submission, as is generally required under Section 293 ZPO. Insofar as it relied on the content of the letters from official bodies submitted by the plaintiff, the reasoning of the Court of Appeal does not indicate that the requirements of Dutch law for the operation of a retail pharmacy were explained in these letters. The Court of Appeal also erred in law in considering the question raised by the defendant as to whether a Dutch "Grensapotheke" was subject to special legal requirements to be irrelevant in accordance with the principles of the burden of presentation and proof.

48        V. The Court of Appeal's assessment that the preliminary injunctions were unjustified from the outset from the perspective of Section 7 HWG only partially withstands legal review, namely with regard to the preliminary injunctions of November 5, 2013 (Ref. 84 O 256/13) and September 29, 2015 (Ref. 81 O 82/15). The preliminary injunctions of May 8, 2013 (case no. 84 O 90/13), September 26, 2013 (case no. 84 O 220/13) and November 4, 2014 (case no. 84 O 208/14), on the other hand, prove to be justified from the outset, so that a claim for damages under Section 945 ZPO is ruled out in this respect.

49        1. according to section 7 para. 1 sentence 1 half-sentence 1 HWG, it is not permitted to offer, announce or grant benefits and other advertising gifts (goods or services) or to accept them as a member of the professional circles, unless one of the exceptions regulated by law in section 7 para. 1 sentence 1 half-sentence 2 HWG applies. The only exceptions to the prohibition - which is the only case in question here - are low-value small items (Section 7 para. 1 sentence 1 half-sentence 2 no. 1 half-sentence 1 case 2 HWG) and gifts or promotional gifts in a specific amount of money or in a specific way (Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG). However, with both exceptions, gifts or other promotional gifts for medicinal products remain inadmissible if they are granted contrary to the price regulations that apply on the basis of the German Medicinal Products Act - or the Fifth Book of the German Social Code (as amended since December 15, 2020) (Section 7 para. 1 sentence 1 half-sentence 2 no. 1 half-sentence 2, Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 2 HWG).

50        (2) The Court of Appeal correctly assumed that the fundamental prohibition of offering, announcing and granting advertising gifts regulated in § 7 para. 1 sentence 1 HWG constitutes a market conduct regulation within the meaning of § 4 no. 11 UWG aF (now: § 3a UWG) because it serves to protect the health of consumers. It is intended to counteract the abstract risk that consumers will be improperly influenced by the prospect of advertising gifts when deciding whether and, if so, which remedies to use (established case law; see only BGH, GRUR 2022, 391 [juris Rn. 26] - Gewinnspielwerbung II, mwN).

51        3 The Court of Appeal was right to consider the challenged advertising measures to be product-related and thus covered by the scope of application of the Therapeutic Products Advertising Act.

52        a) Only product-related advertising (product and sales advertising) and not general company advertising (company and image advertising), through which the reputation and performance of the company is generally advertised without reference to specific medicinal products, is included in the scope of application of this law. The answer to the question of whether the advertising to be assessed is sales or company advertising, which is decisive for the applicability of the Therapeutic Products Advertising Act, depends largely on whether the overall appearance of the advertising focuses on the presentation of the company or on the promotion of specific or at least customizable products. Advertising for the entire product range of the pharmacy can also be product-related. There is no convincing reason to accept the incentive of value advertising, which the legislator considers to be fundamentally undesirable in the area of advertising for medicinal products, especially if this form of advertising is used for a particularly large number of medicinal products (established case law; see only BGH, GRUR 2022, 391 [juris para. 35] - Gewinnspielwerbung II, with further references).

53    b) The Court of Appeal rightly assumed that the challenged advertising measures either targeted the entire range of prescription drugs or even the entire product range of the plaintiff and were therefore product-related. Contrary to the view expressed by the plaintiff in the appeal instance, this is not merely company-related advertising that does not fall within the scope of the Heilmittelwerbegesetz. According to the case law of the Court of Justice of the European Union, advertising by a pharmacy for the purchase of prescription-only medicinal products, which is solely intended to influence the decision in favor of the pharmacy from which a customer obtains prescription-only medicinal products already prescribed, does not constitute advertising for medicinal products within the meaning of Directive 2001/83/EC, but rather advertising for the pharmacy not covered by this Directive (CJEU, GRUR 2025, 424 [juris 34 to 37] - Apothekerkammer Nordrhein, mwN). However, it does not follow from this that such advertising does not fall within the scope of application of the Therapeutic Products Advertising Act. It is clear from the counter-exception for (price-linked) prescription drugs regulated in Section 7 HWG that the Therapeutic Products Advertising Act also covers advertising for prescription drugs. Although the counter-exception does not apply to the shipment of prescription-only medicinal products from another EU member state , it does apply to the distribution (also by way of shipment) within Germany. The Federal Court of Justice has already ruled that Directive 2001/83/EC and the Therapeutic Products Advertising Act are based on different concepts of "advertising for medicinal products" and that, unlike Directive 2001/83/EC, the Therapeutic Products Advertising Act also covers advertising by a pharmacy for the purchase of prescription-only medicinal products (BGH, GRUR 2022, 391 [juris para. 34 to 40] - Gewinnspielwerbung II).

54    (4) The Court of Appeal was right to classify the bonuses and vouchers offered in the challenged advertising measures as promotional gifts within the meaning of Section 7 (1) sentence 1 HWG.

55    The term "promotional gift" in Section 7 para. 1 sentence 1 HWG is to be interpreted broadly in view of the purpose of the provision there, which is to counteract the abstract risk of improper influence emanating from promotional gifts in the therapeutic products sector by largely curbing them. In principle, it covers any non-cash benefit that is not calculated from the recipient's perspective. An advertising gift therefore requires that the benefit is granted free of charge from the recipient's perspective; he must regard it as a gift (see BGH, GRUR 2022, 391 [juris Rn. 41] - Gewinnspielwerbung II, mwN). The bonuses and vouchers to be assessed in the dispute fulfill this requirement.

56    5. the bonuses and vouchers offered in the challenged advertising measures are not low-value small items within the meaning of Section 7 (1) sentence 1 half-sentence 2 no. 1 half-sentence 1 case 2 HWG. Their value exceeds the threshold of low value of € 1 for advertising to the public (see BGH, judgment of July 17, 2025 - I ZR 43/24, GRUR 2025, 1416 [juris para. 45] = WRP 2025, 1154 - PAYBACK, with further references).

57    (6) These bonuses and vouchers are only partly benefits or promotional gifts that are granted in a certain amount of money or in a certain way within the meaning of Section 7 (1) sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG.

58    a) An advertising gift granted in a certain amount of money within the meaning of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG is the grant of a numerically determined sum of money, the amount of which cannot be doubted by the public due to its certainty (BeckOK.HWG/Doepner/Reese, 14th edition [as of May 1, 2025], Section

7 para. 603). This is the case, for example, with the offer of a bank credit in the amount of € 10 for the advertising of a new customer (see BGH, GRUR 2017, 635 [juris para. 56] - Freunde werben Freunde), an "Sofort- Bonus", which is offset against the statutory additional payment (see BGH, judgment of February 26, 2014 - I ZR 79/10, GRUR 2014, 593 [juris para. 2] = WRP 2014, 692 - Sofort- Bonus), the reimbursement of the purchase price for a medical device (OLG Hamburg, GRUR- RR 2019, 486 [juris para. 33]; OLG Cologne, WRP 2022, 368 [juris para. 62]) or a "beauty bonus" in the amount of € 50 for offsetting against the initial treatment with a medical device (LG Hamburg, PharmR 2011, 487 [juris para. 39]).

59    b) A "monetary amount to be calculated in a certain way" within the meaning of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG refers to price discounts in a percentage or otherwise easily determined amount that are granted on the normal price (BGH, GRUR 2022, 391 [juris para. 48] - Gewinnspielwerbung II; Fritzsche in Spickhoff, Medizinrecht, 4th ed, § Section 7 HWG para. 25; Prütting/Mand, Medizinrecht, 7th edition, Section 7 HWG para. 85). Such a case exists, for example, when a discount of 10% is offered for the advertising of a new customer (see BGH, GRUR 2017, 635 [juris para. 56] - Freunde werben Freunde) or when a percentage of a legally prescribed co-payment for medical aids is offset (see BGH, judgment of December 1, 2016 - I ZR 143/15, GRUR 2017, 641 [juris para. 41] = WRP 2017, 536 - Zuzahlungsverzicht bei Hilfsmitteln).

60    c) On the other hand, advertising with a non-cash benefit that is not granted in a specific or determinable amount of money, but as a benefit in kind - such as consumer goods or services - does not fulfill the exception under Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG (see BGH, judgment of March 26, 2009 - I ZR 99/07, GRUR 2009, 1082 [juris para. 17] = WRP 2009, 1385 - DeguSmiles & more; BeckOK.HWG/Doepner/Reese loc. cit. § 7 para. 601; see also Prütting/Mand loc. cit. § 7 HWG para. 89). This also applies if the value of the benefit is stated as a specific amount of money. This is initially supported by the wording of the provision because a benefit in kind is not a monetary amount. This is further supported by the fact that the advertiser could otherwise avoid the scope of application of Section 7 para. 1 sentence 1 half-sentence 2 no. 1 half-sentence 1 case 2 HWG, which requires a benefit in kind to be of low value in order to be admissible, and benefit from the provision of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG (see OLG Hamm, WRP 2022, 633 [juris para. 42]). Gifts in kind also do not fall within the scope of this exception because - in contrast to cash gifts leading to a direct price reduction - the protective purpose of the law on the advertising of medicinal products is particularly relevant in preventing improper influence. This is because there is no factual connection with the purchase of the remedy and there is also an abstract risk of being misled about the value of the benefit in kind.

61    A prohibition of benefits in kind, which do not consist of the granting of discount vouchers for the subsequent purchase of further products, which are the only relevant factor in the dispute (see para. 62 and para. 73 below), is also unlikely to constitute an "absolute prohibition of price competition" in breach of Art. 34 TFEU within the meaning of the case law of the Court of Justice of the European Union, because this only includes the prohibition of advertising with directly effective price reductions (see BGH, GRUR 2023, 1318 [juris para. 64] - Gutscheinwerbung I). The Senate has already decided this for advertising with a competition (BGH, GRUR 2022, 391 [juris para. 49 to 56] - Gewinnspielwerbung II). It is not apparent that anything else should apply to other advertising gifts, which also do not solely lead to a directly effective price reduction and whose prohibition serves to protect health because an improper influence is to be prevented.

62    d) The question of whether the granting of discount vouchers designated in terms of amount

or percentage for the subsequent purchase of further products (e.g. discount voucher for the next purchase of a product) should be prohibited: Discount voucher for the next purchase from the advertiser with a value of € 5; voucher for a 10% discount at an online marketplace), which according to the above are also benefits in kind, falls under the exception of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG, is not answered uniformly in case law and literature. In the opinion of the Senate, which has not yet decided on this question (see case law references in BGH, GRUR 2023, 1318 [juris para. 35] - Gutscheinwerbung I), the answer is in the negative.

63      aa) It is sometimes assumed that a cash discount within the meaning of this provision is only one that reduces the price of the advertised remedy (denying a cash discount in the case of a shopping voucher for an online marketplace, OLG Cologne, WRP 2016, 1388; Brixius in Bülow/Ring/Artz/Brixius, HWG, 6th ed, § Section 7 para. 282; Sosnitza in Sosnitza/Meisterernst (formerly Zipfel/Rathke), Lebensmittelrecht, Stand: 192. Ergänzungslieferung [Stand März 2025], Section 7 HWG para. 40; Wesser, A&R 2019, 109, 113 f.). The reason for allowing cash discounts is the assumption that there is no improper influence when advertising with a price reduction because value for money is a decisive feature for consumer decisions in performance competition. This means that only discounts that have an effect on the price of the product are privileged. Otherwise, the fundamental prohibition of gratuities in Section 7 (1) sentence 1 HWG would be undermined because any monetary advertising gift would then have to be considered a permissible cash discount within the meaning of Section 7 (1) sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG (see Wesser, A&R 2019, 109, 113 f.).

64      bb) According to another opinion, vouchers for the purchase of additional products denominated in a monetary amount are also covered by the scope of application of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG (OLG Bamberg, WRP 2013, 1641; BeckOK.HWG/Doepner/Reese loc. cit. Section 7 para. 603c; Fritzsche in Spickhoff loc. cit. Section 7 HWG para. 24).

65      cc) In the opinion of the Senate, the exception in Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG is to be interpreted as meaning that only directly effective price reductions and payments, but not vouchers for the subsequent purchase of further products denominated in a monetary amount or a percentage discount, are subject to it.

66      The wording of the provision, which requires that the benefit or promotional gift is "granted in a (...) monetary amount (...)", suggests that the exception in Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG is limited to directly effective price discounts and payments . This wording is obviously to be understood as meaning that a sum of money is paid out or at least deducted from the invoice amount. This is not the case with a discount voucher for future purchases. Above all, however, this understanding corresponds in a special way to the protective purpose of Section 7 (1) HWG to counteract the even abstract risk of improperly influencing the advertising addressees in connection with the purchase of remedies. It is true that a consumer is aware of the value of a voucher designated in terms of amount for a future purchase and is therefore not at risk of misjudging the value of the advertising gift (on this motive for privileging cash discounts, see BGH, GRUR 2009, 1082 [juris para. 9 and 11] - DeguSmiles & more). Insofar as such a discount voucher creates an incentive for the purchase of further remedies, however, the further protective purpose of the law on the advertising of remedies is affected, namely to counteract uncritical self-medication and a possibly health-endangering overuse and misuse of remedies (for this protective purpose, see BeckOK.HWG/Doepner/Reese loc. cit. § 7 para.

364 f.; Prütting/Mand loc. cit. § 7 HWG para. 3). By classifying discount vouchers for future purchase transactions under the concept of a benefit or promotional gift within the meaning of Section 7 (1) half-sentence 2 no. 1 half-sentence 1 case 2 HWG, which are only permissible as low-value small items, this further protective purpose is taken into account in a special way, because low-value discount promises also only have a reduced incentive effect. With regard to discount vouchers offered for the purchase of remedies for the purchase from suppliers of other goods, this classification already reduces the risk of an unobjective motivation for the initial purchase of remedies. The lack of objectivity lies in the fact that - in contrast to permissible cash discounts - it is not advertised with a reduction in the price of the desired remedy, but with an advantage in the purchase of other goods that is in no way related to the purchase of the remedy (BGH, GRUR 2025, 1416 [juris para. 34] - PAYBACK; aA BeckOK.HWG/Doepner/Reese loc. cit. Section 7 para. 603c to 603e; Prütting/Mand loc. cit. Section 7 HWG para. 92; Deckers, MedR 2024, 110, 111; Reese, MPR 2024, 121, 129 f.).

67       The clear distinction between cash discounts within the meaning of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG and (other) advertising gifts within the meaning of Section 7 para. 1 sentence 1 half-sentence 2 no. 1 half-sentence 1 case 2 HWG, which (also in the form of a discount promise) is only permissible as a low-value trifle, also serves to ensure legal certainty (see BGH, GRUR 2023, 1318 [juris para. 37] - Gutscheinwerbung I).

68       Insofar as the Senate has ruled with regard to an unfair enticement effect within the meaning of Section 1 UWG aF that the discount granted in the form of a shopping voucher for DM 10 is in fact a discount on the purchase of goods and that the reasonable consumer recognizes this (BGH, judgment of 22. May 2003 - I ZR 8/01, GRUR 2003, 1057 [juris para. 18] = WRP 2003, 1428 - Einkaufsgutschein), this assessment is not transferable to the law on the advertising of medicinal products, which - as explained - has a specific protective purpose.

69       e) Accordingly, only some of the benefits or promotional gifts at issue here are permissible pursuant to Sec. 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG because they are granted in a certain amount of money or in a certain way to be calculated.

70       aa) The benefits or promotional gifts that are the subject of the interim injunctions of May 8, 2013 (Ref. 84 O 90/13), September 26, 2013 (Ref. 84 O 220/13) and November 4, 2014 (Ref. 84 O 208/14) are inadmissible.

71       (1) Contrary to the opinion of the Court of Appeal, the advertising with a bonus of at least € 2.50 and up to € 20 per prescription for participating in the plaintiff's "Arzneimittel- Check", which was prohibited by the preliminary injunction of May 8, 2013 (Ref. 84 O 90/13), does not constitute the promise of a certain amount of money or an amount of money to be calculated in a certain way within the meaning of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG. According to the findings of the Court of Appeal, the addressees of the advertising who are interested in purchasing drugs for the treatment of serious chronic diseases are in any case left in the dark about the absolute amount or the calculation of the promised premium because only a range of possible premium amounts is stated without disclosing the calculation method envisaged by the plaintiff. The protective purpose of the provision is affected because the possibility that the addressees of the advertising overestimate the amount of the premium granted in the individual case due to the indication of a range creates the risk of improperly influencing the advertising addressees.

72    This interpretation of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG is in conformity with EU law. According to the case law of the Court of Justice, the advertising measure concerned here does not fall within the concept of advertising for medicinal products within the meaning of Article 86(1) of Directive 2001/83/EC, because advertising campaigns for the purchase of (unspecified) prescription-only medicinal products in the form of price discounts and payments are not covered by this (see CJEU, GRUR 2025, 424 [juris para. 39 to 42 and 81] - Apothekerkammer Nordrhein). However, a prohibition of this advertising measure is compatible with Article 34 TFEU and Article 3(4)(a) of Directive 2000/31/EC in view of its inherent potential to mislead consumers (see CJEU, GRUR 2025, 424 [juris para. 61 to 81] - Apothekerkammer Nordrhein).

73    (2) The advertising prohibited by the preliminary injunction of September 26, 2013 (Ref. 84 O 220/13) is also not covered by the exception in Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG. In this case, it is not relevant to the decision whether a benefit in kind - here: hotel voucher or annual membership free of charge in the ADAC - does not fall under this element even if its value is stated in a certain amount of money (see already para. 60). This is because the offer of a discount voucher for the newly acquired customer for the purpose of subsequently purchasing over-the-counter products does not constitute an advertising gift permitted under Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG because no directly effective price reductions or payments are granted.

74    This interpretation of Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG is in conformity with EU law. With regard to the discount voucher promised to the newly recruited customer for the subsequent purchase of non-prescription products, the advertising measure concerned here falls within the concept of advertising for medicinal products within the meaning of Article 86(1) of Directive 2001/83/EC according to the case law of the Court of Justice because it promotes the purchase of non-prescription medicinal products (see CJEU, GRUR 2025, 424 [juris para. 43 to 45 and 81] - Apothekerkammer Nordrhein). Contrary to Article 87(3) of Directive 2001/83/EC, this advertising may lead to an inappropriate and excessive use of non-prescription medicinal products, so that its prohibition corresponds to the essential objective of the protection of public health pursued by this provision (see CJEU, GRUR 2025, 424 [juris para. 82 to 94] - Apothekerkammer Nordrhein).

75    (3) The advertising prohibited by the preliminary injunction of November 4, 2014 (Ref. 84 O 208/14) with a €10 voucher upon submission of a prescription for a subsequent order of non-prescription drugs as well as health and care products is also not a permitted advertising gift pursuant to Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG because no directly effective price discounts or payments are granted. For the reasons just explained (see para. 73 f.), this prohibition also complies with EU law.

76    (4) In the aforementioned cases, there is also the abstract risk of improperly influencing the advertising addressee required for the assumption of an advertising gift. This teleological restriction of the concept of an advertising gift applies not only to advertising to trade circles, but also to advertising to the public (established case law; see only BGH, judgment of February 20, 2020 - I ZR 214/18, GRUR 2020, 659 [juris para. 24] = WRP 2020, 722 - Gewinnspielwerbung I, mwN). The Court of Appeal did not expressly comment on this. However, the findings made by the Court of Appeal form a sufficient basis for the Senate's assessment. In the case in dispute, there is a risk of improper influence insofar as - as in the

aforementioned cases - vouchers for the subsequent purchase of non-prescription medicines and health and care products are advertised with a monetary amount or a percentage discount. This affects the protective purpose of Section 7 (1) HWG, which is to counteract uncritical self-medication and the potentially harmful overuse and misuse of remedies (see para. 66 above).

77    bb) The appeal unsuccessfully challenges the assessment of the Court of Appeal that the interim injunctions of November 5, 2013 (case no. 84 O 256/13; prohibition of a discount of € 10 for sending prescriptions, described as reimbursement of travel costs) and of September 29, 2015 (case no. 81 O 82/15; prohibition of advertising with a discount of € 5 for ordering prescriptions) were unjustified from the outset from the perspective of Section 7 HWG.

78    (1) In both cases, these are cash discounts permitted under Section 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 1 letter a HWG, which directly reduce the invoice amount of the order. They violate § 7 para. 1 sentence 1 half-sentence 2 no. 2 sub-sentence 2 HWG because they were granted contrary to the price regulations that applied at the time on the basis of the German Medicinal Products Act. The advertising concerned prescription drugs that were subject to fixed drug prices. The granting of a cash discount that directly reduces the invoice amount of the order is in breach of the fixed pharmaceutical prices. However, the Court of Appeal rightly assumed that this reservation of compliance with fixed pharmaceutical prices may not be applied to the plaintiff (see para. 31 f. above).

79    (2) The appeal asserts without success that a residual amount remaining after deduction of the co-payment or (if the co-payment is waived) the entire discount amount is often offset against the price of other products from the range that are sold within the same order and which may also be non-prescription medicinal products. The appeal cannot be successful with this argument because, contrary to Section 559 (1) ZPO, it is based on factual submissions made for the first time in the appeal instance.

80    VI. There is no reason for a new referral to the Court of Justice of the European Union (see CJEU, judgment of October 6, 1982 - 283/81, ECR 1982, 3415 [juris para. 21] = NJW 1983, 1257 - Cilfit et al.; judgment of October 1, 2015 - C- 452/14, GRUR Int. 2015, 1152 [juris para. 43] - Doc Generici; judgment of October 6, 2021 - C- 561/19, NJW 2021, 3303 [juris para. 32 f.] - Consorzio Italian Management and Catania Multiservizi). In the case in dispute, no question of interpretation of EU law arises that is relevant to the decision, which has not already been clarified by the case law of the Court of Justice or cannot be answered beyond doubt. Insofar as the Senate's view that the prohibition of non-cash benefits is not subject to the concept of the "absolute prohibition of price competition" coined by the Court of Justice of the European Union (see para. 60) could be called into question under Union law, this is not relevant in the case in dispute (see para. 73).

81    C. Accordingly, the judgment under appeal must be set aside on the defendant's appeal on points of law insofar as it was found to be to the detriment of the defendant. The plaintiff's appeal against the judgment of the Regional Court must be dismissed to the extent that it dismissed claims 1 and 2 with regard to the preliminary injunctions of May 8, 2013 (Ref. 84 O 90/13), September 26, 2013 (Ref. 84 O 220/13) and November 4, 2014 (Ref. 84 O 208/14), because the matter is ready for decision in this respect (§ 562 para. 1, § 563 para. 3 ZPO). The case must be referred back to the court of appeal for a new hearing and decision (Section 563 (1) sentence 1 ZPO) with regard to the decision on claims 1 and 2 based on the interim injunctions of November 5, 2013 (case no. 84 O 256/13) and September 29, 2015

(case no. 81 O 82/15) and with regard to the costs of the appeal.

Koch Löffler          Schwonke

Feddersen          Odörfer

# **EXHIBIT 15**



**Unified Patent Court
Einheitliches Patentgericht
Juridiction unifiée du brevet**

| |
|---|
| **UPC_CFI_386/2024** |
| **UPC_CFI_610/2024** |

# Decision
## of the Court of First Instance of the Unified Patent Court
## Local Division of the Hague
## delivered on 10/10/2025
## concerning: infringement action and counterclaim for revocation as well as a declaration of non-infringement

<u>H</u>EADNOTES

1. Infringement action about shelf dividers. Patent valid and infringed. Indirect infringement. Long-arm jurisdiction.

2. Counterclaim for declaration of non-infringement with revised product held inadmissible. There was no assertion of infringement prior to instituting the counterclaim nor had defendant applied in writing for an acknowledgement as meant in R. 61.1 RoP. Such assertion may not be deduced from the mere fact that the patent was invoked with respect to a different product. Relevant date is marked by the launch of the counterclaim. Failure to respond with an acknowledgement within 30 days from counterclaim does not trigger R. 61.1.b RoP, as it would run counter to the very point of R. 61.1 RoP: to prevent the commencement of unnecessary proceedings for a declaration of non-infringement when the proprietor or its licensee did not yet assert the patent with respect to a certain product (or process). It would also mean that effectively R. 61.1.a and b would be rendered redundant.

<u>K</u>EYWORDS

Infringement; validity; added matter; inventive step; counterclaim for declaration of non-infringement; inadmissible; long-arm jurisdiction;

<u>CLAIMANT</u>

| | | |
|---|---|---|
| 1) | **HL Display AB**<br>(Claimant) - 131 26 Nacka Strand - Box 1118 - Stockholm - SE | Represented by Gertjan Kuipers |

DEFENDANT

1)  **Black Sheep Retail Products B.V.**          Represented by Tjibbe Douma
    (Defendant) - Betsy van Goorstraat 22 -
    6702DC - Wageningen - NL

PATENT AT ISSUE

| Patent no. | Proprietor/s |
|---|---|
| **EP2432351** | **HL Display AB** |

DECIDING JUDGES

Presiding judge and Judge-rapporteur   **Edger Brinkman**
Legally qualified judge                **Margot Kokke**
Legally qualified judge                **Mélanie Bessaud**
Technically qualified judge            **Koen Callewaert**

LANGUAGE OF PROCEEDINGS: English

SUBJECT-MATTER OF THE PROCEEDINGS

Infringement claim and counterclaim for revocation as well as a declaration of non-infringement (the admissibility of which is contested)

Claimant is hereinafter referred to as "**HL Display**" or **"Claimant".** Defendant is hereinafter referred to as "**BSRP**" or "**Defendant**".

PROCEDURE

1.      The Court refers to the above-mentioned case files in the CMS for a list of submissions and exhibits.

1.1.    The oral hearing took place on 22 August 2025.

1.2.    At the oral hearing, also the two panel review requests were discussed. These concerned applications to deposit two physical objects dated 24 February 2025 (regarding the old and new product 2) and dated 5 June 2025 (regarding three further objects). The JR had dismissed both applications for lack of explanation why they could not have been filed earlier (see ORD_35239/2025 and ORD_28264/2025 respectively). The full panel, having heard the

2

parties, decided to overturn the JR decision on deposit of the old and new product 2 but to uphold the JR decision to dismiss the deposit of three further items.

1.3.      In response to HL Display's objection[1], the panel further indicated that the novelty attack developed in its reply in the counterclaim by BSRP, was inadmissible because no proper reason had been given why it could not have been raised earlier, i.e. in the counterclaim itself. It did not follow from a further development of the arguments.

<u>SUMMARY OF FACTS</u>

**2.      The application is based on the following facts:**

2.1.    *Claimant*

2.1.1.  HL Display is a Swedish-based company that is specialized in innovative and sustainable solutions for a better shopping experience. It is an international supplier of products and solutions for in-store communication and merchandising to the food and non-food retail sectors. HL Display distributes within Europe – among other things – a system for securing shelf accessories to a shelf.

2.2.    *Defendant*

2.2.1.  BSRP is a Dutch company that focuses on designing, producing and offering a broad range of no-nonsense products for the retail industry (shelf presentation solutions), such as shelf storage systems, shelf trays, shelf dividers and counter display units, shopping baskets and the like.

2.3.    *Mutual customer: Kruidvat*

2.3.1.  Kruidvat is a subsidiary of A.S. Watson Group, which is in turn a subsidiary of CK Hutchinson Holdings Limited. A.S. Watson Group releases tenders for the Benelux regarding the supply of shelf divider products. A tender is a formal invitation to suppliers to bid for a contract to supply these products or services. The A.S. Watson Group tenders cover the supply of products for Kruidvat (a large drugstore chain in the Netherlands and Belgium). Several companies seem to compete in these tenders. BSRP understands that HL Display was the first to supply Kruidvat with its shelf divider products (likely in the 2010-2014 timeframe).

2.3.2.  Bruegmann had won one of the tenders (likely in the 2014-2016 timeframe). Subsequently, HL Display had won a tender (likely in the 2016-2018 timeframe). Since then, HL Display has not won the tender anymore. BSRP won the tender in recent years. As a result of the tenders as from 2019, BSRP's shelf accessory products have been on the market within the territory for which the patent at issue – granted on 27 June 2018 – has been validated (the "Territory") since at least September 2019. The last tender was for the period of 2023-2025. The products in this product category generally have a lifetime of around 10 years. Consequently, a total of approximately 1.100 Kruidvat stores are equipped with (a mix of) shelf accessory products from HL Display, Bruegmann and BSRP.

---

[1] Rejoinder to the reply to the defence to the counterclaim of 19 March 2025, chapter 4 (pages 24/5)

2.3.3.  The products BSRP delivered to Kruidvat look like this:





## 2.4.  *The patent*

2.4.1.  The patent EP 2 432 351 B1 (hereinafter "**the patent**" or "**EP 351**"), was granted on 27 June 2018 and has an application date of 19 May 2010. It will expire on 19 May 2030. No opposition has been filed against the patent and – to the knowledge of HL Display – there are no prior or pending proceedings relating to the patent before the UPC or any national court or authority (including any action for revocation or a declaration of non-infringement). The patent is in force

in Austria, Belgium, Switzerland, Germany, France, United Kingdom, Ireland, Italy, Liechtenstein, the Netherlands, Norway, Poland, Portugal and Sweden.

2.4.2.   The patent is titled "*System for securing shelf accessories to a shelf*". The patent has 7 claims. HL Displays asserts claims 1, 2 and 5.

2.4.3.   The independent claim 1 reads as follows, divided into features:

| 1.1 | System for securing shelf accessories to a shelf, comprising |
|-----|---|
| 1.2 | a front securing device (20), which is configured for fixing to the front edge of a shelf, |
| 1.3 | a rear securing device (30) comprising an elongated profiled element having a cross-sectional profile, with a lower base plate (31), a first arm (32) projecting upwards from the base plate, and a second arm (33), with a rear end (33a), projecting rearwards from the first arm and being configured for fixing on top of a shelf substantially parallel with the longitudinal direction of the shelf, and |
| 1.4 | a shelf accessory (10) having a front engagement member (11) configured for engagement with the front securing device, as well as a rear engagement member (40) comprising a forward projecting third arm (43) configured for engagement with the rear securing device and comprising a front end (44), which third arm (43) is configured to, in mounted position, be received between the base plate (31) and the second arm (33) of the profiled element of the rear securing device (30), wherein |
| 1.5 | the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30)<br><br>**characterized in that** |
| 1.6 | the rear securing device (30) comprises a first stop face (32a) which is constituted by a forward-facing surface of the first arm (32), |

| 1.7 | the rear engagement member (40) comprises a second stop face (47) which is constituted by a rearward-facing surface disposed in front of the front end (44) of the third arm, wherein the distance (B) between the second stop face (47) and the front end (44) of the third arm is less than the distance (A) between the first stop face (32a) and the rear end (33a) of the second arm and **in that** |
|---|---|
| 1.8.1 | said first (32a) and second (47) stop faces are configured to be brought into and out of mutually overlapping relation in the vertical direction by rotating the shelf accessory (10) about said axis, |
| 1.8.2 | such that the first (32a) and second (47) stop faces, in mutual contact, prevent the rear engagement member (40) from being disengaged from the rear securing device (30) when the shelf accessory (10) is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping, |
| 1.8.3 | and to allow the rear engagement member (40) to be released from the rear securing device (30) when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop surfaces thereby are vertically non- overlapping. |

2.4.4. *Claim 2* is dependent of claim 1 and reads as follows:

| 2.1 | System according to any one of Claim 1, in which the rear securing device (30) or the rear engagement member (40) comprises a friction member, |
|---|---|
| 2.2 | which is made of an elastic material. |

2.4.5. *Claim 5* is dependent of claims 1 to 4 and reads as follows:

| 5.1 | System according to any one of Claims 1-4, in which the rear securing device (30) comprises a magnet for fixing the rear securing device to a shelf comprising a magnetic material. |
|---|---|

.

6

## 2.4.6.   The description contains the following:

**Field of the invention**

[0001] The present invention relates to a system for securing shelf accessories to a shelf. The invention also relates to a shelf comprising such a system. The invention is especially well suited to the securement of shelf dividers, feed devices and other shelf accessories for use with shop shelves.

**Background of the invention**

[0002] In general stores, for example, goods are often displayed on shelves. In order to improve the display of the goods and facilitate the loading and unloading of the goods, a host of different accessories, such as shelf dividers, various types of feed devices, and various types of product trays, etc. are used. Such accessories are often fixed to the shelves.

[0003] According to the prior art, the accessories can be fixed to the shelf in a number of different ways, for example mechanically with screws or the like, by snap fastening or by adhesion with double-sided adhesive tape or the like.

[0004] The arrangements which are used to fix the accessories to the shelves should have some basic characteristics. One important characteristic is that it should be possible to fix the accessories in arbitrary positions along the length of the shelf, so that the distances between the accessories can be made arbitrarily long to fit different packagings and quantities of goods. In addition, the accessories should be firmly secured to the shelf to prevent them from being accidentally removed or displaced from their intended positions.

[0005] The securement of the accessories should also ensure that they stand steady, so that they do not tilt. In this context, it is of great importance that firm securement is ensured, at the same time as the securing arrangement allows the accessories to be easily fastened and removed.

[0006] The accessories should be secured to the shelf both at its front and rear end in order to prevent either end of the accessory from being lifted from the shelf. Especially if the accessory comprises a front plate or front stop plate which the goods rest against, for example in the case of a sloping shelf or a feed device, the force of the goods upon the front plate produces a turning moment upon the accessory, which endeavours to lift the rear portion of the accessory from the shelf. Such lifting of the rear end of the accessory is naturally undesirable, since it can cause disorder on the shelf and can result, moreover, in the front end of the accessory being turned out of its engagement with a front securing device, whereupon both the accessory and the goods can crash down from the shelf.

[0007] A desired characteristic is that it should be possible to arrange a shelf with a simple manoeuvre by first fitting the desired number of accessories to the shelf and then displacing them along the shelf into the definitive position of the respective accessory, so as finally to fix the accessories in these positions.

[0008] Even once the shelf is arranged and the accessories are placed in their respective positions, it is sometimes necessary to reorganize the shelf, with one or a few shelf dividers having to be moved, taken away or fastened. This is the case, for example, when the distance between two shelf dividers has to be adapted to a new product or product packaging of different dimensions. In order to facilitate such reorganization of parts of an already arranged shelf, it is therefore desirable for individual accessories to be able to be displaced along the shelf into a new position.

[0009] In the arrangement of a new shelf and in the reorganization of an already arranged shelf, it is desirable to be able to displace the accessories along the shelf by taking hold of just the front edge of the accessory and shifting the entire accessory by guiding the front edge in either direction. This eliminates the need to reach one arm and the hand in towards the rear end of the accessory so as simultaneously, with both hands, to displace both ends of the accessory along the shelf. Such simultaneous displacement of both ends of the accessory is both strenuous and ergonomically disadvantageous and complicated to perform, especially if the distance between shelves arranged one above the other is small and if goods present on the shelf make access to the rear end of the accessory difficult.

[0010] In addition, the arrangements for the securement of the accessories should be aesthetically appealing, should not unnecessarily hinder loading or unloading of goods onto or from the shelf or adjoining shelves, and should be simple and cheap to produce and assemble.

7

[0011] It is desirable, moreover, that the arrangements for securing accessories to a shelf should be able to be directly applied to pre-existing shelves without the need to exchange or adapt these existing shelves.

[0012] Apart from the fact that the accessories should be releasable from the shelf, it is an advantage if the fastening devices with which the accessories are fixed to the shelf are also detachable. This makes it easier, inter alia, to keep the shelves clean and to carry out major reorganizations of the shelves. Recently, magnetically working securing devices have therefore become increasingly popular. These fastening devices comprise a magnet, usually one or more thin permanent magnets with which the securing device can be detachably fixed to shelves made of magnetic material, such as steel. Once the securing device has been fixed magnetically to the shelf, the accessories can be detachably fixed, for example by snap-fastening action, to the securing devices.

**Prior art**

[0013] DE 299 02 933 U1 describes a device for securing a shelf divider. The shelf divider comprises at its front and rear end mutually pretensioned jaws, which can grasp a front and a rear T-rail jutting up from the shelf. In order to allow displacement of the shelf divider along the shelf, both the front and rear jaws are required to be separated by the application of a separation force to a purpose-built member disposed on the front and rear jaws. It is therefore necessary to reach in to the rear end of the divider in order to allow decoupling and displacement of the divider.

[0014] WO 03/005862 A2 and US 5,803,276 describe systems for securing shelf accessories. In these systems, the rear end of the accessories is held fixed to the shelf by means of snap-fastening engagement with a rail jutting up from the shelf. In these systems, too, it is necessary to reach in to the rear end of the shelf accessory in order to obtain release of the rear end and thus allow displacement of the accessory.

[0015] WO 2005/084498 describes a system for securing shelf accessories, in which the rear end of the accessory has a first hook which engages with an oppositely directed second hook disposed on the shelf. The second hook is configured as a profiled element extending in the longitudinal direction of the shelf. With this system, securement of the rear end of the shelf accessory is obtained in the direction perpendicular to the shelf plane. This solution, however, offers no securement of the rear end of the accessory in the longitudinal direction of the shelf.

[0016] SE 531 411 C2 describes a system for fixing accessories to a shelf, which system comprises a rear securing device. The rear securing device resembles in certain respects the rear securing device described in WO 2005/084498, but additionally comprises a friction rail which, in contact with a rear engagement member disposed on the shelf accessory, also ensures firm securement of the rear end of the shelf accessory in the longitudinal direction of the shelf.

[0017] The systems described in WO 2005/084498 and SE 531 411 C2 offer good securement of the accessories under normal use and simple release, as well as relocation of the accessories. If the accessories are mistakenly disengaged from the front securing device, or if the front securing device is mistakenly displaced relative to the shelf, in these systems it can happen, however, that the rear engagement member disposed on the accessory is accidentally disengaged from the rear securing device. This can, in turn, cause the accessory to tip over or come loose from the shelf, which is not desirable. If the front securing device is magnetically fixed to the shelf, a knock against the shelf accessory or the front securing device can bring about rearward displacement of the front securing device and hence of the accessory. The rear engagement member of the accessory can then be disengaged from the rear securing device. There is consequently a risk that disorder is created on the shelf, for example if a passing customer happens to knock against a front securing device or an accessory with a customer trolley or a goods basket.

**Summary of the invention**

[0018] One object of the invention is therefore to provide an improved system for securing shelf accessories to a shelf.

[0019] Another object is to provide a system of this kind which deters the rear engagement member of the accessory from mistakenly being disengaged from the rear securing device.

[0020] A further object is to provide a system of this kind which allows simple intentional release and repositioning of the accessory.

[0021] One more object is to provide a system of this kind which allows simple repositioning of the accessory and which nevertheless allows the rear end of the shelf accessory to be firmly secured in mounted position.

[0022] Yet another object is to provide a system of this kind which is simple and relatively cheap to produce and easy to use with different types of shelves.

[0023] These and other objects are achieved with a system of the kind which is defined in the preamble to patent Claim 1 and which has the distinguishing features defined in the characterizing part of the claim.

[0024] By virtue of the interacting stop faces on the rear engagement member of the shelf accessory, and the rear securing device, the rear end of the accessory is simply and effectively deterred from accidentally coming loose from the rear securing device if, for example, the front end of the shelf accessory or the front securing device suffers a knock or the like. This is especially advantageous if the front securing device is fixed to the shelf by means of a magnet, since such magnetic fixing can cause the front securing device and the accessory to be displaced rearwards towards the rear securing device if, for example, a passing customer happens to knock against the accessory or the front securing device. At the same time, the system according to the invention allows very simple intentional release of the engagement between the rear engagement member of the accessory and the rear securing device by deliberately releasing the front engagement member from the front securing device and thereafter simply lifting the front end of the accessory and guiding the accessory somewhat in the rearward direction. After this, the accessory can be released and/or displaced easily, and without the need to reach a hand into the rear end of the accessory, into a new position in which it can be refixed by lowering the front end of the accessory and bringing the front engagement member into engagement with the front securing device.

[0025] In the system according to the invention, the profiled element of the rear securing device has a cross-sectional profile, with a lower base plate, a first arm projecting upwards from the base plate, and a second arm, with a rear end, projecting rearwards from the first arm. The rear engagement member expediently comprises a forward-projecting third arm with a front end, which third arm is configured to, in mounted position, be received between the base plate and the second arm of the profiled element of the rear securing device. The first stop face is then expediently constituted by a forward-facing surface of the first arm and the second stop face is expediently constituted by a rearward-facing surface disposed in front of the front end of the third arm, the distance between the second stop face and the front end of the third arm then expediently being less than the distance between the first stop face and the rear end of the second arm.

[0026] This ensures that the rear engagement member is in engagement with the rear securing device even if the accessory has been displaced rearwards relative to the rear securing device to the point where the two stop faces have come into contact with each other. At the same time, intentional disengagement of the rear engagement member from the rear securing device is made possible.

[0027] The securing device and the rear engagement member are configured to allow rotation of the shelf accessory about an axis which is parallel with the longitudinal direction of the profiled element when the rear engagement member is in engagement with the rear securing device. This enables the rear engagement member to be easily disengaged from the rear securing device by deliberately lifting the front end of the accessory by a predetermined distance from the top side of the shelf and thereafter displacing the accessory somewhat in the rearward direction. In this way, the rear end of the accessory can be released easily, and in an intuitively easily comprehensible manner, for removal or repositioning, for example by displacement of the accessory along the longitudinal direction of the shelf.

[0028] Either the rear securing device or the rear engagement member expediently comprises a friction member, which is made of an elastic material. The friction member allows, through frictional interaction with a corresponding member of the other of the rear securing device and the rear engagement member, a friction force between them which is sufficiently large to prevent displacement of the rear end of the accessory along the profiled rail under normal use. Moreover, the elastic friction member exerts a clamping force which ensures an engagement without unwanted play.

(…)

[0040] The rear securing device 30 is constituted by an extruded or injection-moulded profiled element of substantially uniform cross section over the whole of its length. The cross section of the rear securing device has a bottom plate 31, a first arm 32 projecting upwards from the bottom plate 31, and a second arm 33 projecting rearwards from those ends of the first arm 32 which are distal to the bottom plate. The first arm 32 has, on an end portion distal to the bottom plate, a forward-facing first stop face 32a. The second arm 33 has a free rear end 33a. A friction member in the form of an elastic friction rail 34 projecting upwards from the bottom plate 31 is arranged essentially below the rear end 33a of the second arm. The bottom plate 31, the first 32 and the second 33 arm are made of

9

PVC, whilst the friction rail 34 is made of softened PVC. The rear securing device 30 is expediently produced by co-extrusion of these two materials, which gives a simple and cheap production of the rear securing device. A thin, ribbon-shaped permanent magnet (not shown) is fixed to the bottom side, facing away from the first arm 32, or the bottom plate 31. In the illustrative embodiment, both the front and the rear securing devices comprise an elongated, ribbon-shaped magnet, which extends substantially along the full length of the respective profiled element. It is also possible, however, for each profiled element to be provided on its bottom side with a plurality of magnets distributed along the length of the profiled element.

[0041] The shelf accessory 10 further comprises a rear engagement member 40. The rear engagement member has a continuous recess 41 disposed close to the rear, lower corner of the shelf accessory. The recess 41 is delimited in the rearward direction by a downward-jutting portion 42. A third arm 43 projects in the forward direction from the lower end of the downward-jutting portion 42. The third arm has a front free end 44. The recess 41 is further delimited by a first, rear edge portion 45 of the shelf accessory 10, which slopes forwards and upwards from the downward-jutting portion 42, and by a second front edge portion 46 of the shelf accessory. The second edge portion 46 is disposed in front of the first edge portion 45 and has a horizontal part 46a and a part 46b which is curved downwards in front of the horizontal part. A second, rearward-facing stop face 47 is disposed between the first 45 and second 46 edge portion and extends substantially vertically between these edge portions.

[0042] As can most clearly be seen from Fig. 3, the first stop face 32a of the rear securing device 30 is arranged at a certain distance A from the rear end 33a of the second arm 33. The second stop face 47 of the rear engagement member 40 of the shelf accessory 10 is arranged at a certain distance B from the front end 44 of the third arm 43. The distance B is less than the distance A.

[0043] With reference to Figs. 4a-c, the use of the system is described below. The front securing device 20 is fixed to the shelf, which is made of steel, by quite simply placing the securing device on top of the shelf, on or close to the front edge of the shelf and substantially parallel therewith. The front securing device 20 is hence held in place by the magnetic force. Correspondingly, the rear securing device 30 is fixed on or close to the rear edge of the shelf, substantially parallel with the front securing device 20. The two securing devices 20, 30 are fixed at a distance apart corresponding to the distance between the front 11 and rear 40 engagement member of the shelf accessory 10 to be fixed to the shelf.

[0044] When a shelf accessory is to be fixed to the shelf, it is brought in over the shelf, approximately to the position shown in Fig. 4a, so that the front 11 and rear 40 engagement members are placed approximately above the respective securing device 20, 30. After this, the rear end of the shelf accessory 10 is guided down towards the rear securing device 30, and the third arm 43 of the rear engagement member 40 is slipped in between the bottom plate 31 and the second arm 33 of the rear securing device 30 (see Fig. 4b). The friction rail 34 is hereby elastically deformed, whereupon the friction rail 34 comes to exert an upwardly directed force which presses the third arm 43 upwards so that it comes to bear against the bottom side of the second arm 33 of the rear securing device 30. Once the rear engagement member 40 has thereby entered into engagement with the rear securing device 30, the front end of the shelf accessory is guided downwards until the front engagement member 11 has been snap-fastened around the upward-projecting rail 22 of the front securing device 20.

[0045] As the front end of the accessory is bent down in this way, the second stop face 47 of the rear engagement member 40 will be guided down in front of the first stop face 32a of the rear securing device so that the two stop faces 32a, 46 mutually overlap in the vertical direction. If, in this mounted position, the shelf accessory or the front securing device suffers a knock or the like, it can happen that the front engagement member 11 disengages from the front securing device 20, or that the front securing device 20 is displaced along the shelf in the rearward direction. The shelf accessory 10 is then consequently at risk of displacement in the rearward direction. In the event of such accidental rearward displacement of the shelf accessory, the second stop face 47 of the rear engagement member 40 comes to bear against the first stop face 32a of the rear securing device 30. Further relative displacement of the shelf accessory in relation to the rear securing device 30 is thereby deterred. Since the distance B is less than the distance A (see Fig. 3), the contact between the two stop faces will prevent the third arm 43 of the rear engagement member from disengaging from the rear securing device 30, between the second arm 33 and the bottom plate 31 and friction rail 34 respectively. In this way, the shelf accessory is thus simply and effectively prevented from accidentally coming loose from its engagement with the rear securing device, even if the shelf accessory comes loose from the front securing device or if the front securing device is displaced from its intended position on the shelf.

[0046] When the shelf accessory 10 is to be deliberately removed from the shelf, its front end is lifted upwards so that its front engagement member 11 comes loose from the projecting rail 22 of the front securing device 20. After

this, the front end of the shelf accessory, as the shelf accessory is rotated about an axis lying parallel with the longitudinal direction of the securing device 30, is lifted, until the second stop face 47 is above and detaches from the first stop face 32a and the first arm 32 of the rear securing device. The shelf accessory can thereafter be guided rearwards, whereupon the third arm 43 of the rear engagement member is disengaged from the rear securing device. The shelf accessory 10 can then be removed or displaced along the shelf into a new desired position in which it can be refixed to the shelf by making the rear 40 and front 11 engagement members engage with the rear 30 and front 20 securing device respectively, as has been described above.

[0047] The invention should not be deemed to be limited to the above-described embodiments, but can be varied within the scope of the following patent claims. For example, the accessory, instead of being constituted by a shelf divider, can be constituted by any other shelf accessory whatsoever which shall be fixed to the shelf. The system according to the invention can also comprise a number of different types of accessories which are fixed to a shelf. The constituent parts of the system can be made, of course, of a host of different materials. Furthermore, the front and/or the rear securing device, instead of comprising magnets for fixing to a shelf of magnetic material, can comprise other fixing means, such as double-sided adhesive tape, screw or rivet joints. The securing devices can also be fixed to a shelf by means of glue. In the case of sloping shelves, it can be especially advantageous to fix the front securing device by means of one or more magnets, whilst the rear securing device is fixed to the shelf by means of double-sided adhesive tape. The firmer securement which is obtained with the double-sided adhesive tape deters the constituent parts of the system from sliding forwards and downwards along the sloping shelf under the influence of gravity. This is especially advantageous if the accessories or the front securing device comprise stop plates which are rested against by the goods placed on the shelf. In the shown embodiment, a friction member in the form of a friction rail is arranged projecting upwards from the base plate of the rear securing device. In certain applications, however, the friction member can be dispensed with. The shown friction rail can also be replaced with other friction members, for example a friction rail projecting downwards from the free end of the second arm. In another embodiment, the friction member is constituted by a friction rail which projects upwards from the free end of the first arm.

## 2.4.7.  The patent contains the following drawings:



Fig. 1a

Fig. 2

Fig. 1b



Fig. 3



Fig. 4a



Fig. 4b



Fig. 4c

<u>ORDERS SOUGHT BY CLAIMANTS</u>

3.    Asserting infringement of claims 1, 2 and 5, HL Display is seeking the following orders:

I.    to order BSRP, immediately from the date of service of the judgment, to cease and desist from making, offering, placing on the market, using, and importing and storing for those purposes:

a)    A system for securing shelf accessories to a shelf, comprising a front securing device (20), which is configured for fixing to the front edge of a shelf, a rear securing device (30) comprising an elongated profiled element having a cross-sectional profile, with a lower base plate (31) a first arm (32) projecting upwards from the base plate, and a second arm (33), with a rear end (33a), projecting rearwards from the first arm and being configured for fixing on top of a shelf substantially parallel with the longitudinal direction of the shelf, and a shelf accessory (10) having a front engagement member (11) configured for engagement with the front securing device, as well as a rear engagement member (40) comprising a forward projecting third arm (43) configured for engagement with the rear securing device and comprising a front end  (44), which third arm (43) is configured to, in mounted position, be received between the base plate (31) and the second arm (33) of the profiled element of the rear securing device (30), wherein the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30) characterized in that the rear securing device (30) comprises a first stop face (32a) which is constituted by a forward facing surface of the first arm (32), the rear engagement member (40) comprises a second stop face (47) which is constituted by a rearward-facing surface disposed in front of the front end (44) of the third arm, wherein the distance (B) between the second stop face (47) and the front end (44) of the third arm is less than the distance (A) between the first stop face (32a) and the rear end (33a) of the second arm and in that said first (32a) and second (47) stop faces are configured to be brought into and out of mutually overlapping relation in the vertical direction by rotating the shelf accessory (10) about said axis, such that the first (32a) and second (47) stop faces, in mutual contact, prevent the rear engagement member (40) from being disengaged from the rear securing device (30) when the shelf accessory (10) is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping, and to allow the rear engagement member (40) to be released from the rear securing device (30) when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop surfaces thereby are vertically non-overlapping;

b)    In particular, wherein the system for securing shelf accessories to a shelf of subparagraph a) includes the feature that the rear securing device (30) or the rear engagement member (40) comprises a friction member, which is made of an elastic material;

c)    In particular, wherein the system for securing shelf accessories to a shelf of subparagraphs a) and b) includes the feature that the rear securing device (30) comprises a magnet for fixing the rear securing device to a shelf comprising a magnetic material;

d)    More in particular the BSRP product;

and to cease and desist from supplying and offering to supply means relating to an essential element of the invention (as set out above under a) - c)), for putting it into effect, such as a

shelf accessory (10) and a rear securing device (30), more in particular the shelf accessory of the BSRP product and the rear securing device of the BSRP product;

II.    to declare that BSRP has infringed the patent EP 2 432 351 B1 by committing the acts as specified in I. above;

III.    to order BSRP at its own expense, within one week after service of the judgment to be rendered in these proceedings to:

a)    recall and definitively remove the products as specified in the injunction order from all channels of commerce; and

b)    destroy all products as specified in the injunction order and which are in the custody or control of BSRP;

IV.    to order BSRP, within three weeks after service of the judgment to be rendered in these proceedings, to inform HL Display of:

a)    the origin and distribution channels of the infringing products;

b)    the quantities produced, manufactured, delivered, received or ordered, as well as the prices paid for the infringing products; and

c)    the identity of any third person involved in the production or distribution of the infringing products;

d)    the number and dates of the products offered;

e)    the advertising carried out, broken down by advertising medium, its distribution, the distribution period and the distribution area, including evidence of these advertising activities;

f)    the costs, broken down by individual cost factors and the profits realised;

all substantiated by means of all relevant supporting documents, including but not limited to legible orders, order confirmations, invoices and copies of other purchase and sales documents;

V.    to order BSRP to pay a recurring penalty of up to be imposed by the Court for every day, part of a day counting as a full day, that the order specified under I, III and IV is breached, or a penalty of EUR

250 for each individual product or part thereof with which the order specified under I, III and IV is breached;

VI.   to declare that BSRP is liable to compensate HL Display for all damages that are incurred and will incur due to the acts specified I. above as to be specified separate damage proceedings;

VII.   to order BSRP to pay the reasonable and proportionate legal costs of these proceedings and other expenses;

VIII.  to declare that the orders according to items I, III, IV and VII are immediately enforceable notwithstanding any appeal.


### DEFENDANT'S POSITION

4.      Defendant argues that claimant's request is unfounded in several respects. Defendant alleges that the challenged embodiment does not realize features 1.3, 1.5, 1.6 and 1.8.1-1.8.3 nor claim 2 and 5, while further disputing indirect infringement. BSRP also proposed an alternative design, hereinafter referred to as product 2, which allegedly additionally lacks feature 1.7. For this they filed a declaration of non-infringement as a counterclaim. BSRP also claims the patent is invalid on the grounds of added matter and lack of inventive step and formulated a (second) counterclaim to revoke the patent. Finally, Defendants request that an injunction be made subject to the provision of security by HL Display pursuant to Art. 82(2) UPCA  and requests mitigation of the requested penalties.

### GROUNDS FOR THE ORDER

**5.     COMPETENCE**

5.1.    Defendant, domiciled in the Netherlands, rightfully did not dispute the international and relative competence of this (Local Division of the) Court. This also applies to the long arm jurisdiction of the Court regarding countries outside UPC Territory where the patent is valid, notably Liechtenstein, Ireland, Norway, Poland, Switzerland and United Kingdom where the patent is valid. At the hearing, the court raised the issue of the defence of invalidity for the non-CMS in view of the ECJ ruling in the BSH/Electrolux case. The defendant clarified that its counterclaim for revocation only pertained to the CMS; for the non-CMS, it was to be considered a defence. The defendant also clarified that no revocation claims had been instituted in any of the non-CMS countries. The Court therefore assumes competence for hearing the infringement claims regarding all designated countries in the EP, even if they are not UPC contracting member states. Regarding non-CMS EU or Lugano Member States, however, the Court will evaluate whether there is a serious, non-negligible chance that the competent national court will invalidate the patent. Regarding non-EU Member States, the Court may make an inter partes decision on validity.

5.2.    For the rest, competence was not disputed for the counterclaims.

## 6. ADMISSABILITY OF THE COUNTERCLAIM FOR DECLARATION OF NON-INFRINGEMENT

6.1. HL Display disputed the admissibility of this counterclaim for a declaration of non-infringement as to product 2. It referred to R. 61 RoP. The Court agrees with HL Display that, prior to instituting the counterclaim, HL Display did not assert infringement with respect to product 2 nor had BSRP applied in writing for an acknowledgement as meant in R. 61.1 (a) and (b) RoP. Such assertion may not be deduced from the mere fact that the patent was invoked with respect to a different product.

6.2. The Court finds that the relevant date here when all requirements of R.61.1 (a) and (b) should be fulfilled, is the launch of the counterclaim. It could be argued that the counterclaim as such is a written application to the proprietor as meant in R.61.1 (a), and failure to respond with an acknowledgement within 30 days might trigger R. 61.1.b RoP, but that interpretation would run counter to the very point of R. 61.1 RoP: to prevent the commencement of unnecessary proceedings for a declaration of non-infringement when the proprietor or its licensee did not yet assert the patent with respect to a certain product (or process). It would also effectively render R. 61.1.a and b RoP redundant.

6.3. For these reasons, the Court finds that the counterclaim for declaration of non-infringement is not admissible.

## 7. THE PATENT

7.1. The patent concerns the following. In general stores, for example, goods are often displayed on shelves. In order to improve the display of the goods and facilitate the loading and unloading of the goods, a host of different accessories, such as shelf dividers, are used. Such accessories are often fixed to the shelves (par. [0002] of the patent).

7.2. The patent describes that in the prior art, the accessories can be fixed to the shelf in a number of different ways, for example mechanically with screws or the like, by snap fastening or by adhesion with double-sided adhesive tape or the like (par. [0003]). In prior art such as DE 299 02 933 U1, WO 03/005862 A2 and US 5,803,276, a device or system for securing shelf dividers/accessories is disclosed. However, in these devices or systems, it is necessary to reach in to the rear end of the shelf accessory in order to obtain release of the rear end and thus allow displacement of the accessory (pars. [0013] and [0014]).

7.3. WO 2005/084498 describes a system for securing shelf accessories (par. [0015]). The patent further mentions SE 531 411 C2 (par. [0016]). In these sytems in the prior art, however, if the accessories are mistakenly disengaged from the front securing device or if the front securing device is mistakenly displaced relative to the shelf, it can happen that the rear engagement member disposed on the accessory is accidentally disengaged from the rear securing device. This is not desirable. If the front securing device is magnetically fixed to the shelf, a knock against the shelf accessory or the front securing device can bring about rearward displacement of the front securing device and hence of the accessory. The rear engagement member of the accessory can then be disengaged from the rear securing device. Therefore, there is a risk that for instance a passing customer happens to knock against a front securing device or an accessory, which creates disorder on the shelf (par. [0017]).

7.4. The (alleged) invention of the patent aims to overcome the problems and drawbacks

16

described above that were present in the prior art. The invention laid down in EP 351 relates to a system for securing shelf accessories to a shelf. This (alleged) invention is especially well suited to the securement of shelf dividers, feed devices and other shelf accessories for use with shop shelves (par. [0001] of EP 351). The goal of the (alleged) invention is therefore to provide an improved system for securing shelf accessories to a shelf (par. [0018]). This improvement follows from the following objects (described below) that are achieved by the (alleged) invention.

7.5.    One object of the invention is to provide a system of this kind which deters the rear engagement member of the accessory from mistakenly being disengaged from the rear securing device (par. [0019]). By virtue of the interacting stop faces (32a and 47) on the rear engagement member (40) of the shelf accessory, and the rear securing device (30), the rear end of the accessory is simply and effectively deterred from accidentally coming loose from the rear securing device if, for example, the front end of the shelf accessory or the front securing device suffers a knock or the like (par. [0024]). This is achieved by the patent according to claim 1.

7.6.    A further object is to provide a system of this kind which allows simple intentional release and repositioning of the accessory (par. [0020]). The system according to the (alleged) invention also allows very simple intentional release of the engagement between the rear engagement member of the accessory and the rear securing device by deliberately releasing the front engagement member from the front securing device and thereafter simply lifting the front end of the accessory and guiding the accessory somewhat in the rearward direction. After this, the accessory can be released and/or displaced easily, and without the need to reach a hand into the rear end of the accessory, into a new position in which it can be refixed by lowering the front end of the accessory and bringing the front engagement member into engagement with the front securing device (par. [0024]). This is achieved by the present (alleged) invention according to claim 1.

7.7.    One more object is to provide a system of this kind which allows simple repositioning of the accessory and which nevertheless allows the rear end of the shelf accessory to be firmly secured in mounted position (par. [0021]). The system according to the (alleged) invention which deters the rear engagement member of the accessory from mistakenly being disengaged from the rear securing device, at the same time allows very simple intentional release of the engagement between the rear engagement member of the accessory and the rear securing device by deliberately releasing the front engagement member from the front securing device and thereafter simply lifting the front end of the accessory and guiding the accessory somewhat in the rearward direction.

## 8.    SKILLED PERSON

8.1.    According to BSRP the relevant skilled person for EP 351 is an engineer with experience in designing and producing shelf presentation products in the retail industry. HL Display did not dispute this, and the Court will follow this definition of the skilled person which seems reasonable.

## 9.    CLAIM CONSTRUCTION

9.1.    The Court notes that the description and drawings must be used as explanatory aid for claim.[2] While they should be used to interpret the claims, given the primacy of the claims generally the description and drawings do not limit the subject-matter of the claimed invention.[3] It is also noted that, as has been considered by the UPC, a claim need not be limited to preferred

---

[2] UPC_CoA_335/2023 App_576355/2023, par. 2 (*10x/Nanostring*), UPC_CoA_1/2024 APL_8/2024, par. 26 (*SESImagotag/Hanshow*).
[3] LD Düsseldorf in *FUJIFILM/Kodak* (UPC_CFI_355/2023) dated 28 January 2025, see p. 27 second to last paragraph.

embodiments.[4] Nonetheless, in special circumstances it can be clear to the skilled person that the description and drawings are in fact intended to limit the claim, e.g. to specific embodiments.

9.2.    The Court agrees with HL display that BSRP relies on an unjustifiably narrow claim construction. BSRP has not shown special circumstances to add features to the claim wording, relying on the description and drawings. Also, the Court rejects BSRP's argument that HL Display did not make its claim interpretation clear in its statement of claim. From the statement read as a whole, taking into consideration the explanation by HL Display regarding infringement, the way it interpreted features of claim 1 (and subsequent claims) is sufficiently clear.

### 9.3.    Single embodiment

9.3.1.    BSRP asserts that the "*claimed invention in EP 351 relies on the technical features of one single embodiment*". BSRP further suggests that no multiple embodiments are disclosed in the disclosure of EP 351, but rather only one single embodiment. BSRP also asserts that all the specific features of this 'single embodiment' have a structural and functional relationship. As HL Display has pointed out however, this is incorrect. For example, under the section 'detailed description of embodiments' (plural) in the patent, par. [0047], clearly describes several embodiments. Also, as mentioned above, a claim generally should not be limited to one specific embodiment, in absence of clear indications to the contrary.

### 9.4.    In engagement (feature 1.5)

9.4.1. Feature 1.5 reads as follows:

*"the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30)"*

Feature 1.5 thus specifies that the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30).

9.4.2. According to BSRP, "*for the engagement state to be present the first (32a) and second (47) stop faces should be mutually overlapping*" (see par. 54 of the Statement of Defence), thereby referring to feature 1.8 and suggesting that engagement is no longer present when there is no mutual overlap of the stop faces (anymore). This interpretation cannot be followed. A skilled person would not interpret 'in engagement' in this way. It is clear to a skilled person that engagement of the rear engagement member with the rear securing device refers to the situation where the forward projecting third arm (43) of the rear engagement member (40) is received between the base plate (31) and the second arm (33) of the profiled element of the rear securing device (30). This interpretation is clear for a skilled person from the wording of claim 1 alone, see features 1.4, 1.5 and 1.8. It is further confirmed by the description, e.g. par. [0025] to [0027] and [0046].

9.4.3. Contrary to what BSRP asserts, the mere rotation of the shelf accessory such that the second stop face is above the first stop face (i.e. the first and second stop faces are no longer

---

[4] LD Düsseldorf in *SodaStream Industries Ltd./Aarke AB* (UPC_CFI_373/2023) dated 31 October 2024, see p. 16 second paragraph.

mutually overlapping in the vertical direction) does not already mean disengagement. Engagement is only lost if subsequently the shelf accessory is guided in the rearward direction such that the forward projecting third arm (43) of the rear engagement member (40) is removed from between the base plate (31) and the second arm (33) of the profiled element of the rear securing device (30). Therefore, for disengagement, the shelf accessory should not only be lifted (so that the first and second stop faces are no longer vertically overlapping) but it should also be guided in the rear direction. This is clear from e.g. par. [0027]:

"*The securing device and the rear engagement member are configured to allow rotation of the shelf accessory about an axis which is parallel with the longitudinal direction of the profiled element when the rear engagement member is in engagement with the rear securing device. This enables the rear engagement member to be easily disengaged from the rear securing device by deliberately lifting the front end of the accessory by a predetermined distance from the top side of the shelf and thereafter displacing the accessory somewhat in the rearward direction.*"

See also e.g. par. [0046]:

"*After this, the front end of the shelf accessory, as the shelf accessory is rotated about an axis lying parallel with the longitudinal direction of the securing device 30, is lifted, until the second stop face 47 is above and detaches from the first stop face 32a and the first arm 32 of the rear securing device. The shelf accessory can thereafter be guided rearwards, whereupon the third arm 43 of the rear engagement member is disengaged from the rear securing device.*

### 9.5.    First stop face (feature 1.6)

9.5.1.  Feature 1.6 reads as follows:

*"the rear securing device (30) comprises a first stop face (32a) which is constituted by a forward-facing surface of the first arm (32)"*

9.5.2.   BSRP asserts that the first stop face (32a in fig. 3) should be located at the top of the first arm and that it should be forward-facing in the sense of straight (vertical). As to the location, the Court refers here to its reasoning on added matter (see 10.1.11-10.1.15). As to the forward-facing surface of the stop face, the Court finds for HL Display. When read in connection with the purpose to – succinctly put – create a 'lock' (by interaction with the second stop face 47 of the rear engagement member, see 10.1.14 and 10.2.1 hereafter), it is clear to a skilled person what is meant with "forward-facing". Such surface does not need to be (totally) straight/vertical. It only needs to be able to 'interlock' with the second stop face (overlapping surfaces). Likewise, it can be a protrusion on the first arm in order to obtain that lock.

9.5.3.   Contrary to what BSRP asserts, this reading of the claim feature does not mean it will encompass the prior art. Succinctly put here (more detail in the chapter on inventive step), it is not disclosed in the prior art to use the specific setup of the two overlapping faces in combination with specification of the relationship between distances A and B specified in feature 1.7.

### 9.6.    Engagement/disengagement (feature 1.8)

9.6.1.  Feature 1.8 reads as follows:

*1.8.1 "said first (32a) and second (47) stop faces are configured to be brought into and out of mutually overlapping relation in the vertical direction by rotating the shelf accessory (10) about said axis,"*

*1.8.2 "such that the first (32a) and second (47) stop faces, in mutual contact, prevent the rear engagement member (40) from being disengaged from the rear securing device (30) when the shelf accessory (10) is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping,"*

*1.8.3 "and to allow the rear engagement member (40) to be released from the rear securing device (30) when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop surfaces thereby are vertically non-overlapping."*

9.6.2.   According to BSRP, features 1.8.1-1.8.3 "require the rear engagement member and the rear securing device to switch between an 'engaged' and 'disengaged' state and for the first and second stop faces to switch between vertical overlapping (and in mutual contact) and vertically non-overlapping". Here again, the Court sides with HL Display. Feature 1.8 does not require any switching between an 'engaged' and 'disengaged' state. The configuration required by feature 1.8 allows for disengagement (see also the word "allow" in feature 1.8.3). As set out in the patent, and as already mentioned above regarding the feature of "in engagement" of feature 1.5, actual disengagement requires a further rearward displacement of the shelf accessory.

9.6.3.   A skilled person would interpret feature 1.8 as follows, in the light of the description. Feature 1.8.1 specifies that the first and second stop faces can be brought into and out of mutually overlapping relation in the vertical direction by rotating the shelf accessory (10) about said axis (the axis in the sense of feature 1.5).

Feature 1.8.2 then specifies that, in the situation where the shelf accessory (10) is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping, the first and second stop faces, in mutual contact, prevent the rear engagement member (40) from being disengaged from the rear securing device.

Feature 1.8.3 in turn specifies that, on the other hand, when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop faces thereby are vertically non-overlapping, the rear engagement member (40) is in this position allowed to (i.e. able to) be released from the rear securing device (30). A rotated position in which the first and second stop faces are out of mutually overlapping relation in the vertical direction thus allows for disengagement of the rear engagement member from the rear securing device. Actual disengagement is achieved in such situation by subsequently displacing the accessory in the rearward direction, see e.g. par. [0027] and [0046] of the patent and the explanation above regarding feature 1.5.

## 9.7.   **Other points raised regarding claim interpretation**

9.7.1.   BSRP further raised various features it seeks included in claim 1 as granted on the same grounds as it argues (regarding the 'free' rear end of the second arm (claim feature 1.3), a friction member/rail and magnetic fixation. Since the description and figures of the patent in these respects are the same as of the application as filed, for brevity and to avoid repetition, the Court refers here to its reasoning why the omission of those features is no added matter (and hence they are also not required to be read into the claim), which makes claim construction regarding these features unnecessary here.

## 10.   VALIDITY

### 10.1.   Added matter

10.1.1. An extension of subject matter is deemed inadmissible if the subject matter of the granted claim goes beyond the content of the application as originally filed. In order to determine this, the Court must first establish what information a skilled person, based on an objective assessment and on the filing date, would immediately and unambiguously derive from the entirety of the application as filed, using their general technical knowledge. In doing so, implicitly disclosed subject matter must also be regarded as part of the content, i.e. subject matter that clearly and unambiguously results from what is expressly stated.[5]

10.1.2. BSRP alleges that the subject matter of EP 351 would extend beyond the content of the application as originally filed. The reason for this, according to BSRP, is that the amendments made during the prosecution introduced some features into claim 1 while omitting some other features which according to BSRP are inextricably linked to the introduced features.[6]

*The friction member/friction rail (projecting upwards from the base plate)*

10.1.3. BSRP asserts that the friction member/rail (34 in fig. 3) is inextricably linked to the rest of the features as claimed in claim 1, and hence the omission thereof amounts to added matter (intermediate generalisation). The Court finds with HL Display that BSRP has not been able to show (although it has the burden of proof in the counterclaim) why the skilled person would consider the presence of a friction member/rail to be necessary to the claim, read in light of the disclosure of the application as a whole. The original application discloses on p. 16 and 17 that a friction member is optional (underlining added) and that the optional friction member, if used at all, can be on the second arm of the rear securing device projecting downwards:

> *"The invention should not be deemed to be limited to the above-described embodiments, but can be varied within the scope of the following patent claims. For example, [...]. In the shown embodiment, a friction member in the form of a friction rail is arranged projecting upwards from the base plate of the rear securing device;*
>
> *<u>In certain applications, however, the friction member can be dispensed with.</u> The shown friction rail can also be replaced with other friction members, for example a friction rail projecting downwards from the free end of the second arm. In another embodiment, the friction member is constituted by a friction rail which projects upwards from the free end of the first arm."*

10.1.4. Also, in the claims of the original application, the subject matter of original claim 3 – which contains the required 'rotation' and was introduced into claim 1 (see feature 1.5) – did not comprise a friction member (which rather was part of the subject matter of original claim 4). It is thus clear to the skilled person that, for the rotation (and the engagement) described in original claim 3, a friction member is not necessary.

10.1.5. Thus, various embodiments with and without a friction member are described in the original application. It is clear that the original application does not give any specific connection (inextricable link) of the friction member (let alone a friction member on the base plate

---

[5] UPC CoA 2 October 2025, UPC_CoA_764/2024 and UPC_CoA_774/2024, *expert klein v. Seoul Viosys*
[6] See UPC Court of Appeal dated 14 February 2025, *Abbott/Sibio* (UPC_CoA_382/2024).

projecting upwards) to any specific configuration described therein. The skilled person cannot discern any functional or structural relationship between a friction member (let alone a friction member on the base plate projecting upwards) and the rest of the features described under the section 'detailed description of embodiments' in the original application.

10.1.6. BSRP has pointed to p. 9, l. 23-35 of the original application which describes a friction member projecting upwards from the base plate in a specific embodiment. In view of the disclosure of the application as a whole, however, it is clear that a friction member is optional, while moreover also for its position various options are provided. For the skilled person it is thus clear that it does not have an inextricable link to the elements in claim 1, i.e. the claimed invention.

10.1.7. BSRP then proceeds by referring to specifically p. 14, l. 16-36 of the original application, which describes that in a specific embodiment a friction member projecting upwards from the base plate presses the third arm against the second arm. Also from this section it however does not follow that a friction member projecting upwards from the base plate would be necessary for 'engagement'. As sufficiently explained by HL Display, the term 'engaged' refers to the situation where the forward projecting third arm (43) of the rear engagement member (40) is received between the base plate (31) and the second arm (33) of the profiled element of the rear securing device (30). It is clear to the skilled person that a friction member projecting upwards from the base plate is not necessary for engagement. Again, the friction member is clearly stated as being optional in the application as filed, including the original claims.

10.1.8. BSRP also does not properly explain that a friction member projecting upwards from the bottom plate would be "*essential for the proper functioning of the system*" of the specific embodiment on which BSRP relies for its added matter allegations. This lack of explanation is especially glaring, given HL Display explanation, that the skilled person would rather understand from the original application and also based on common general knowledge that a friction member is neither essential for rotation of the shelf accessory, nor for engagement. HL Display made its arguments more visible with these figures (not from the patent or its application) to illustrate why for engagement nor for rotation a friction member/rail is required:



22

10.1.9. BSRP's asserts that the illustrative embodiment of the figure shown above would 'rattle around'. This would mean according to BSRP that the embodiment would not meet the object of the invention. It seems however that BSRP attempts to rely again on a wrong interpretation of par. [0021] of the patent in that avoiding 'unwanted play' would be <u>necessary</u> for firm securing. As explained above, the skilled person already recognizes that the friction member is optional from the description and the original claims. Also for this reason it is clear to the skilled person that 'firm securing' (as described on page 6 of the original application) does not require a friction member.

10.1.10.        Concluding: there is no inextricable link between the allegedly omitted feature of a friction member (let alone on the base plate projecting upwards) and the rest of the features of claim 1. BSRP has failed to show otherwise. Omission of this feature thus does not add matter.

*'Free' rear end of second arm*

10.1.11.        According to BSRP in its counterclaim, the requirement of a friction member in claim 1 would mean that the rear end of the second arm (33) of claim 1 necessarily should be a 'free' rear end in the sense that no element can be present at the rear end of the second arm as otherwise the third arm (43) could not come to bear against the bottom side of the second arm. BSRP's argument is dependent on the incorrect allegation that a friction member that presses the third arm upwards such that it comes to bear against the bottom side of the second arm would be required/unjustifiably omitted. Already for this reason it fails.

10.1.12.        HL Display further rightly notes that it is unclear why – as BSRP alleges – the presence of an element on the end of the second arm would prohibit the third arm from being pressed upwards such that it comes to bear against the bottom side of the second arm. The Court fails to see this.

*Location of first stop face*

10.1.13.        BSRP asserts that claim 1 as granted would violate art 123(2) EPC because the claim specifies "a first stop face (32a) which is constituted by a forward-facing surface of the first arm (32)" (feature 1.6), without specifying the location of the first stop face on the forward-facing surface of the first arm more precisely (on the end portion of the first arm).

10.1.14.        Following HL Display's reply, BSRP has not explained sufficiently clearly why the skilled person would consider the precise location of the first stop face on the first arm to be inextricably linked to the features in claim 1 as granted. There is no structural and functional link between the location of the first stop face on the forward-facing surface of the first arm and any feature from the description which was incorporated into claim 1 during prosecution. A skilled person would understand that the location of the first stop face should be such that the invention of claim 1 is achieved. This means that the distance (B) between a second stop face and a front end of the third arm is less than the distance (A) between a first stop face and a rear end of a second arm, such that the stop faces in mutual contact prevent the rear engagement member from being disengaged from the rear securing device when the shelf accessory is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping and such that it allows the rear engagement member to be disengaged from the rear securing device when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop surfaces thereby are vertically non-overlapping (see [0024]-[0026] of the patent).

23

10.1.15.    The introduction of feature 1.6 which specifies that the first stop face (32a) is constituted by a forward-facing surface of the first arm (32) has basis in claim 2 of the original application. The subject matter of the original claim 2 was thus introduced into claim 1. Again, the inclusion of original claim 2 in claim 1 has not resulted in an unallowable intermediate generalization.

*Magnetic fixation*

10.1.16.    BSRP asserts that magnetic fixation was unjustifiably omitted from claim 1. As explained by HL Display, on page 16 lines 25-29 of the original application it is clearly set out that the magnetic fixation of the front securing device and the rear securing device is optional. HL Display also refers to original claim 6. There is no structural and functional relationship between the allegedly omitted features and the features added to claim 1 from the description. BSRP has not been able to show otherwise.

```
        The system according to the invention can also comprise
        a number of different types of accessories which are
        fixed to a shelf. The constituent parts of the system
        can be made, of course, of a host of different
   25   materials. Furthermore, the front and/or the rear
        securing device, instead of comprising magnets for
        fixing to a shelf of magnetic material, can comprise
        other fixing means, such as double-sided adhesive tape,
        screw or rivet joints. The securing devices can also be
   30   fixed to a shelf by means of glue. In the case of
        sloping shelves, it can be especially advantageous to
        fix the front securing device by means of one or more
        magnets, whilst the rear securing device is fixed to
        the shelf by means of double-sided adhesive tape. The

        6.   System according to any one of Claims 1-5, in
   35   which the front securing device (20) comprises a magnet
        for fixing the front securing device to a shelf
        comprising a magnetic material.
```

## 10.2.   Inventive step

*EP 351 solves a technical problem*

10.2.1. The main problem solved by the invention is described in par. [0017]:

> "[…] *If the accessories are mistakenly disengaged from the front securing device, or if the front securing device is mistakenly displaced relative to the shelf, in these systems it can happen, however, that the rear engagement member disposed on the accessory is accidentally disengaged from the rear securing device. This can, in*

24

> *turn, cause the accessory to tip over or come loose from the shelf, which is not desirable.* […]"

10.2.2. As mentioned already above (see 10.1.14), it is described in par. [0024] that "*by virtue of the interacting stop faces on the rear engagement member of the shelf accessory, and the rear securing device, the rear end of the accessory is simply and effectively deterred from accidentally coming loose from the rear securing device if, for example, the front end of the shelf accessory or the front securing device suffers a knock or the like*". Par. [0025] describes that the distance between the second stop face and the front end of the third arm is less than the distance between the first stop face and the rear end of the second arm. Par. [0026] then describes that "*this ensures that the rear engagement member is in engagement with the rear securing device even if the accessory has been displaced rearwards relative to the rear securing device to the point where the two stop faces have come into contact with each other*". This is how the patent solves the abovementioned problem. At the same time, the system according to the patent allows for simple release and repositioning. Par. [0024] describes that "*at the same time, the system according to the invention allows very simple intentional release of the engagement between the rear engagement member of the accessory and the rear securing device by deliberately releasing the front engagement member from the front securing device and thereafter simply lifting the front end of the accessory and guiding the accessory somewhat in the rearward direction. After this, the accessory can be released and/or displaced easily, and without the need to reach a hand into the rear end of the accessory, into a new position in which it can be refixed by lowering the front end of the accessory and bringing the front engagement member into engagement with the front securing device*". See also par. [0026] which describes that, despite the fact that the abovementioned problem is solved in the way described, "*at the same time, intentional disengagement of the rear engagement member from the rear securing device is made possible*".

*Problem does not only occur in case of claim 4 (magnetic fixation)*

10.2.3. BSRP asserts in essence that EP 351 would only solve a problem in the situation of claim 4, which requires that the front securing device is fixed magnetically to a shelf. For other scenarios there would not be a problem according to BSRP. It further asserts that in such situation the patent either does not solve any technical problem, or such problems were already solved by the prior art. All this is incorrect and unsubstantiated.

10.2.4. As pointed out by HL Display, par. [0017] of the patent describes the situations in which the shelf accessory may be accidentally disengaged from the rear securing device, namely (i) after the accessories are mistakenly disengaged from the front securing device or (ii) after the front securing device is mistakenly displaced relative to the shelf. According to BSRP, however, the first situation would be "*almost impossible to occur with the front securing devices known on the market at the priority date and disclosed with the claimed embodiment of the Patent*". In order to substantiate this assertion, BSRP points to patent application *US 5 803 276* ("Vogler") related to a front securing device and front engagement member and suggests that this would be part of the common general knowledge at the priority date. However, the teaching of a single patent publication cannot be considered as common general knowledge.[7]

10.2.5. BSRP further asserts that this exact front securing device as shown in Vogler would be the same front securing device and front engagement member as disclosed in the "*claimed embodiment*" of the patent in suit. As mentioned before, the claimed invention is not limited to

---

[7] EPO Guidelines for Examination, G.VII.3.1.

any specific embodiment. Rather, claim 1 merely requires a "*front securing device configured for fixing to the front edge of a shelf*" and a "*front engagement member configured for engagement with the front securing device*" (both elements also being part of the original claims). It is not limited to any specific front securing device or front engagement member that is shown in Vogler.

10.2.6. BSRP then asserts for the combination of the front securing device and front engagement member that would be shown in Vogler (and allegedly also in the patent and in the BSRP Product) that the "*presented problem of accessories being mistakenly disengaged from the front securing device does not realistically occur*". This assertion of BSRP, which is disputed by HL Display, is not substantiated in any way, even if it has the onus to do so. It is unclear why accidental disengagement of accessories from the specific front securing device referred to by BSRP would not realistically occur. Bare assertions cannot suffice. Already for this reason it fails.

*Problem not yet solved in the prior art*

10.2.7. Contrary to what BSRP asserts, SE 531 411 C2 ( "Lindén"; cited as prior art in [0016] of the patent specification) does not (claim to) provide firm securing of the rear end of the shelf accessory in the sense of the invention. For 'firm securing' of the rear end of the shelf accessory as mentioned by par. [0021], engagement without unwanted play which can be obtained with an optional friction member is not necessary. Rather, par. [0021] refers back to the first and second benefits and clarifies that the system allows for simple repositioning while also allowing for the accessory to be firmly secured (in at least the sense of the first benefit) in mounted position. This is also clear from the original application, in particular in view of the original claims. These benefits of the invention are provided by the changes that were made vis-à-vis the prior art.

10.2.8. BSRP asserted that the prior art document "EasyShelf 2006" (disclosed in HL Display's product catalogue 2006) would have claimed to already solve the problems of the prior art systems as described in the patent, including the problem that if accessories are mistakenly disengaged from the front securing device or if the front securing device is mistakenly displaced relative to the shelf, the rear engagement member of the accessory can then be disengaged from the rear securing device with the consequent risk that disorder is created on the shelf. In its submission of 23 December 2024, HL Display disputed this incorrect assertion. EasyShelf 2006 does not (claim to already) solve these problems (which includes the abovementioned problem) described in the patent. BSRP now tries to frame this contestation as an "*attempt to rebut its own statements from 2006*". BSRP's suggestions are misleading at best. It attempts to create a contradiction where there is none.

*Inventive step – problem-solution-approach*

10.2.9. Since both parties applied the problem-solution-approach, so will the Court. Parties concur that at least features 1.7, 1.8.2 and 1.8.3 are missing in WO 2005/084498 ("Ahlund", cited as prior art in the patent [0015]) Lindén and Easy Shelf 2006. Benefits of the system according to the patent are that it (i) deters the rear engagement member of the accessory from mistakenly being disengaged from the rear securing device, (ii) allows for simple release and repositioning and (iii) allows for simple repositioning which nevertheless allows the rear end to be firmly secured in mounted position. See [0017] and [0024]. The first benefit is the technical effect achieved with the distinguishing features 1.7, 1.8.2 and 1.8.3. BSRP asserts that the technical effect of these features enforces its argument that the second and third benefits were already solved in the prior art. BSRP fails to understand however that the second and third benefits lie in

the fact that the effects described therein are preserved in the claimed system, despite the changes that were made vis-à-vis the prior art which allow for the first benefit to be achieved. In other words, the technical effect of the distinguishing features allows for the first benefit to be realized while nevertheless also maintaining the other benefits.

10.2.10.      HL Display sufficiently (and convincingly) explained that when starting out from Ahlund (or Lindén or EasyShelf 2006) as realistic starting point(s) in the prior art, the objective technical problem correctly derived from this technical effect by a skilled person may be as follows: providing a shelf system in which an accessory is more securely fixed to a shelf while also allowing for simple release and repositioning.[8] As also sufficiently (and convincingly) explained by HL Display, the solution of the patent was not obvious based on the above problem. The prior art does not teach to make distance B smaller than distance A nor the specific locking system of the rear engagement member and rear securing device and to release the accessory by lifting it (out of the overlapping surfaces). EP 351 is therefore inventive.

10.2.11.      BSRP, asserting that the technical effect would not be achieved over the whole scope of the claim, submits that the objective technical problem would be the provision of an 'alternative device'. It wrongfully suggests that the distinguishing features merely provide for an alternative solution over the prior art. Ahlund, Lindén and EasyShelf 2006 do not disclose a system for preventing the rear end of an accessory from being accidentally disengaged from the rear engagement member when either the accessory is mistakenly disengaged from the front securing device or when the front securing device is mistakenly displaced relative to the shelf. This problem, present in the systems of all these prior art documents, is solved by the patent.

10.2.12.      BSRP also asserts that, starting from Ahlund, Lindén or EasyShelf 2006, "*it would be obvious for the skilled person to modify the distances (A) and (B) to the effect a rearward shift of the shelf accessory would not immediately release said shelf accessory from the shelf*" which "*would only entail a mere workshop modification*". These assertions have not been sufficiently substantiated. BSRP has not showed any hint in the prior art given to the skilled person towards the claimed solution and is not able to explain why the skilled person <u>would</u> make such modification.

10.2.13. Concluding, BSRP's inventive step attack should fail.

### 10.3.   Conclusion on validity

10.3.1. From the above it is clear the patent is to be held valid. This means the Court will dismiss the counterclaim for revocation for the UPC CMS in which the patent is in force. For the EU member states in which the patent is in force, that are however not UPC CMS, as well as the Lugano member states, the Court finds there is no serious, non-negligible chance the patent will be revoked by the competent national court. Equally, for the other states in which the patent is in force, the Court holds *inter partes* that the patent is valid.

---

[8] See HL Display's Defence, par. 3.64.

## 11.    INFRINGEMENT

11.1.    BRSP does not dispute that its contested shelf accessory system contains features 1.1, 1.2, 1.4 and 1.7 of claim 1 of the patent. The contested features are discussed below.

### 11.2.    Feature 1.3

11.2.1. Feature 1.3 reads as follows:

"*a rear securing device (30) comprising an elongated profiled element having a cross-sectional profile, with a lower base plate (31) a first arm (32) projecting upwards from the base plate, and a second arm (33), with a rear end (33a), projecting rearwards from the first arm and being configured for fixing on top of a shelf substantially parallel with the longitudinal direction of the shelf, and*"

11.2.2.    BSRP asserts that the skilled person would understand from certain embodiments in the description and drawings that the rear end (33a) of feature 1.3 is 'free'. With the claim construction of the Court following from the above (see the chapter on added matter, 10.1.11 and 10.1.12), this argument no longer holds. The BSRP Product thus meets the requirements of feature 1.3 of claim 1.

### 11.3.    Feature 1.5

11.3.1. Feature 1.5 reads as follows:

"*the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30)*"

Feature 1.5 thus specifies that the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30).

11.3.2. The BSRP Product fulfils feature 1.5. As is clear from the pictures shown by HL Display (see below), the BSRP Product has a rear engagement member (40) which engages with a rear securing device (30), and rear engagement member (40) and rear securing device (30) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30).

28





11.3.3. BSRP however asserts that the BSRP Product would not fulfil feature 1.5 of claim 1. BSRP bases this on two arguments. As a first argument, BSRP asserts that it would follow from embodiments in the description that the rotation as claimed in feature 1.5 would rest on a friction member, more in particular a friction member projecting upwards from the bottom plate of the rear securing device. As the Court does not follow BSRP's claim interpretation to include such friction member/rail, this argument does not hold.

11.3.4. As a second argument, BSRP asserts that HL Display would not have shown that the shelf accessory of the BSRP Product rotates as claimed while it is 'engaged'. This is incorrect as it relies on an incorrect interpretation of "in engagement". (see before 9.4). The difference between the engaged and disengaged states in the attacked embodiment is illustrated below. In both figures the front end of the shelf accessory has already been lifted (i.e. rotated about an axis which is substantially parallel with the longitudinal direction of the profiled element (feature 1.5)) to such an extent that the first and second stop faces are brought out of mutually overlapping relation in the vertical direction (feature 1.8). In the first figure there is still engagement (the forward projecting third arm (43) of the rear engagement member (40) continues to be received between the base plate (31) and the second arm (33) of the profiled

element of the rear securing device (30)), while in the second picture the rear securing device is disengaged following displacement of the shelf accessory in the rearward direction:



11.3.5. The BSRP Product thus meets the requirements of feature 1.5 of claim 1 in the correct interpretation.

## 11.4.   Feature 1.6

11.4.1. Feature 1.6 reads as follows:

*"the rear securing device (30) comprises a first stop face (32a) which is constituted by a forward-facing surface of the first arm (32)"*

11.4.2.  BSRP asserts that an additional element from an embodiment in the description and drawings should be read into feature 1.6, namely that the first stop face (32a) is on the first arm 32 at an end portion distal to the bottom plate, as illustrated in Fig 3 of the patent. This cannot be followed as indicated in the chapter on claim interpretation (see 9.5 and 10.1.13 to 10.1.15 above). In any case, the protrusion/additional surface, is located at the distal end of the first arm.

11.4.3.  BSRP's assertion that the 'additional surface'/protrusion of (the first stop face of) the BSRP Product, see the picture below that was submitted by BSRP but more clearly the below pictures made by the Court (using HL Display's further below figure), is situated on the second arm (33, orange) and not on the first arm (blue) as required by 1.6, is dismissed.





11.4.4. Contrary to what BSRP implies, claim 1 does not require that the first arm (32) is a completely 'straight'/vertical arm (see claim construction 9.5), or that it has a constant thickness over its whole length. Equally contrary to what BSRP implies, claim 1 (specifically: feature 1.3) does not specify that the second arm projects rearwards from *the top of* the first arm. It merely specifies that it projects rearwards from the first arm (32). Therefore, the facts that the arm projecting upwards from the base plate in the BSRP Product is not formed by a completely straight arm with an equal thickness and that the second arm does not project rearwards from the very end of such arm, do not mean that the part above the second arm is not part of the first arm (32) in the sense of claim 1. The part of the rear securing device of the BSRP Product which is indicated by BSRP as an 'additional surface' is therefore to be viewed as a forward-facing surface of the first arm (32) that acts as a stop face. This is clear from the below illustrative figures HL Display made of a rear securing device wherein the first (32) and second (33) arms have been roughly outlined in blue and orange respectively:



11.4.5. BSRP further asserts that the skilled person would conclude that the 'additional surface' of the BSRP product is 'more rearward' facing and thus not forward-facing. As indicated in the part before of claim interpretation, it is not necessary that the stop face is completely vertical/straight. The surface of the first stop face (32a) in the BSRP Product is forward-facing as it is made up/consists of/has a surface which is forward facing, i.e. it has a surface which faces towards a person during normal use of the shelf system. That (part(s) of) the first arm in the BSRP Product is (are) slightly slanted in the rearward direction does not make that a surface thereof (including the surface which constitutes the first stop face) cannot be forward-facing. In addition, the additional surface performs the function ascribed to the stop face of the claimed invention. The Court thus finds that the protrusion/additional surface is connected to the top of what at the very least would be considered the first arm by a skilled person, so that this same person would consider it a forward-facing surface of the first arm and feature 1.6 is therefore met in the BSRP product.

11.4.6. At any rate, also in case BSRP were followed and one would draw the borderline between the first and second arm differently so that the protrusion/rail that contains a stop

surface in the BSRP Product is considered to be located on the second arm (see the Court's drawings in 11.4.3), as BSRP maintains, this would amount to infringement by equivalence as the protrusion is technically equivalent.

11.4.7. Thus, BSRP's arguments cannot be followed. Feature 1.6 is met in the BSRP Product.

## 11.5.    Feature 1.8

11.5.1. Feature 1.8 reads as follows:

*1.8.1 "said first (32a) and second (47) stop faces are configured to be brought into and out of mutually overlapping relation in the vertical direction by rotating the shelf accessory (10) about said axis,"*
*1.8.2 "such that the first (32a) and second (47) stop faces, in mutual contact, prevent the rear engagement member (40) from being disengaged from the rear securing device (30) when the shelf accessory (10) is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping,"*
*1.8.3 "and to allow the rear engagement member (40) to be released from the rear securing device (30) when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop surfaces thereby are vertically non-overlapping."*

11.5.2. Regarding feature 1.8, BSRP repeats its assertion that the BSRP Product would not have a first stop face (32a) in the sense of feature 1.6. For brevity, the Court refers to its reasoning above why this feature is met. The same applies to BSRP's contention that there would not be "rotational movement in the BSRP Product as claimed in feature 1.5 that would result in the elements required in feature 1.8.1-1.8.3". Finally, as indicated above in the chapter on claim interpretation, there is no need for a disengagement.

## 11.6.    (In)direct infringement

11.6.1. In view of the above, it is established that BRSP's contested shelf accessories meets all features of claim 1 of the patent The Court finds that when the shelf accessory and rear device are sold together this constitutes direct infringement. The fact that they are not sold in an assembled state, does not alter this view as they are nonetheless sold together as the system of claim 1. As to the shelf accessory or rear securing device sold separately, the Court opines that HL Display has sufficiently substantiated that both the shelf accessory and the rear securing device of the BSRP Product are means relating to essential elements of the invention. BSRP also does not deny that it knew or should have known that those means are suitable and intended for putting the invention of EP 351 into effect.

## 11.7.    Infringing acts

11.7.1. BSRP states that HL Display would not have sufficiently demonstrated that BSRP has performed or performs infringing acts. However, before going to the question of evidence, a statement of fact should first be (sufficiently) denied. This was not done by BSRP. It has not denied that it has performed infringing acts (up to the moment it transferred to Product 2, end of July 2025).

33

11.7.2. Furthermore, as in fact BSRP conceded in Chapter 1.2 of its Statement of Defence, the infringing BSRP Products have been on the market within the territory for which EP 351 is valid since at least 2019 (see notably para 7 of the Statement of Defence). It can be left undecided therefore whether the products were/are also offered on its website bsrp.eu.

## 11.8.    Conclusion on infringement

11.8.1.As the BSRP product applies all features of claim 1 of the patent, the Court therefore need not look at the other asserted dependent claims. It is sufficiently clear that BSRP performed (directly and indirectly) infringing acts with its product.

## 12.    OUTCOME, RELIEF AND COSTS

**In the main action:**

12.1.    It follows from the above that BSRP until at least recently has infringed the patent indirectly and directly. This means an injunction is in order. For the sake of clarity, the injunction or any other order do not extend to BSRP Product 2 (i.e. the rear securing device sold together with the new accessory or the new accessory alone) as the Court did not evaluate whether Product 2 infringes (and BSRP pointed to several differences between Product 1 and 2 that could be material to the infringement question). The order is directed to the "old" BSRP Product, termed "BSRP Product 1". The fact that on 19 February 2025 BSRP gave an undertaking to cease and desist from making, offering, etc… its "BSRP Shelf Divider 1" as of 1 July 2025, and to surrender such products on that same date, does not mean HL Display lacks an interest in an injunction. Even if BSRP is complying with its undertaking, legitimate interest in an injunction should be assumed, given that BSRP only very recently ended its infringement and that at the time the statement of claim was submitted, and even at the time of BSRP's defence, infringement was ongoing. Equally, HL Display is deemed to have a sufficient interest in a declaration of infringement and liability for compensation of damages.

12.2.    In view of its self-imposed cessation of the infringement with "BSRP Shelf Divider 1", the Court fails to see why such injunction cannot be immediately enforceable or that a security should be imposed, as requested by BSRP.

12.3.    The recall and destruction sought of the shelf accessory of the "BSRP Shelf Divider 1" are proportionate corrective measures to stop further infringement. The Court finds that a request for recall and destruction normally shall be granted, in order to effectively avoid further acts of infringement. It is for the infringer to present facts and proof of any circumstances, e.g. based on proportionality, justifying that the Court dismiss the request or concludes that it is sufficient to amend the infringing goods (cf. CoA 3.10.2025 UPC_CoA_534/2024, UPC_CoA_683/2024 and UPC_CoA_19/2025), *Belkin/Philips*, and e.g. Local Division Mannheim, 11.03.2023, UPC_CFI_159/2024, paragraph 125 and Northern Baltic Regional Division 31.7.2025, UPC_CFI_9/2024, *Texport v. Sloen*, paragraph 107). BSRP has failed to do so. BSRP should request its customers to return the shelf accessory of the "BSRP Shelf Divider 1" as indicated above. The fact that its customers (notably: Kruidvat) may not be amenable to comply with this request in view of the costs involved, does not mean BSRP should not be ordered to at least request this. It is up to the customers whether they wish to comply. The Court also fails to see that polluting destruction of plastic materials should mean the order is disproportionate. HL Display rightly indicates that if BSRP's customers indeed return the infringing products, it would mean HL Display does not need to institute proceedings against them. Also, BSRP has not contended it can

repurpose the shelf accessory of the "BSRP Shelf Divider 1" to not infringe. Since the rear securing device, together with the new shelf accessory of BSRP's Product 2, fall outside the scope of this decision, HL Display has not explained sufficiently why recalling and destructing the rear devices is necessary or proportionate. Finally and again, given BSRP's cease and desist declaration, the Court fails to see why this order should not be immediately enforceable or subject to a security.

12.4.    According to Article 67 UPCA and Rule 191 RoP, the Court may order an infringer to inform the claimant of: a) the origin and distribution channels of the infringing products or processes, b) the quantities produced, manufactured, delivered, received or ordered, as well as the price obtained for the infringing products, c) the identity of any third person involved in the production or distribution of the infringing products or in the use of the infringing process, and d) such other information as is reasonably necessary for the purpose of advancing that party's case. This means inter alia that the claimant also has a right to information needed to verify the information and to calculate the damage (see e.g. Local Division Mannheim, decision of 11.03.2025, UPC_CFI_159/2024, paragraph 103 and Nordic Baltic Regional Division 31.7.2025, UPC_CFI_9/2024, *Texport v. Sloen*, paragraph 90-91).

12.5.    HL Display has requested that the Court shall declare that the decision is immediately enforceable. It follows from Article 82.1 UPCA and Rule 354.1 RoP that decisions and orders of the Court shall, subject to Rule 118.8 and 352 RoP, be directly enforceable from their date of service in each contracting member state. Even if the UPCA as said provides for immediate enforceability, the Court will order so out of an abundance of caution should national law of a Contracting Member-State require this and/or to avoid any unnecessary enforcement dispute about it (cf. Court of Appeal, order of 30.05.2025, UPC_CoA_845/2024 and UPC_CoA_50/2025). This means inter alia that HL Display needs to notify the Court of its intention to enforce any orders in the decision, before the Court will issue an order for the enforcement.

**In the counterclaim:**

12.6.    The counterclaim for revocation is dismissed and the counterclaim for a declaration of non-infringement is inadmissible.

**In both actions:**

12.7.    As parties have indicated they agree on the recoverable costs for the main action and the counterclaim each at € 56,000 (the maximum of the cost ceiling), the Court will award the final costs in this decision (including the court fee). As to the counterclaim for a declaration of non-infringement, HL Display requested a separate cost reimbursement of € 7.900,98 (annex 1 in App_34902/2025). However, since the value of the counterclaim (as a whole) was set in the interim conference at € 500,000 by agreement of the parties, no further costs may be awarded above the ceiling. HL Display did not apply to raise the ceiling as envisaged in Art. 2 of the Decision of the Administrative Committee of 24 April 2023 on the scale of recoverable cost ceilings.

O̲RDER

The Court:

**In the 333-applications (outcome already given at the hearing):**

- revises ORD_35239/2025 of 21 August 2025 so as to allow for deposit of the old and new BSRP Product (as BB38);
- refuses to revise ORD_28264/2025 of 21 August 2025 and therefore refuses submission of three further physical objects (as BB40A-C);

**In the main action:**

I.      orders BSRP, immediately from the date of service of the judgment, to cease and desist from making, offering, placing on the market, using, and importing and storing for those purposes, in territories where EP 2 432 351 B1 is in force:

A system for securing shelf accessories to a shelf, comprising a front securing device (20), which is configured for fixing to the front edge of a shelf, a rear securing device (30) comprising an elongated profiled element having a cross-sectional profile, with a lower base plate (31) a first arm (32) projecting upwards from the base plate, and a second arm (33), with a rear end (33a), projecting rearwards from the first arm and being configured for fixing on top of a shelf substantially parallel with the longitudinal direction of the shelf, and a shelf accessory (10) having a front engagement member (11) configured for engagement with the front securing device, as well as a rear engagement member (40) comprising a forward projecting third arm (43) configured for engagement with the rear securing device and comprising a front end  (44), which third arm (43) is configured to, in mounted position, be received between the base plate (31) and the second arm (33) of the profiled element of the rear securing device (30), wherein the rear securing device (30) and the rear engagement member (40) are configured to allow rotation of the shelf accessory (10) about an axis which is substantially parallel with the longitudinal direction of the profiled element when the rear engagement member (40) is in engagement with the rear securing device (30) characterized in that the rear securing device (30) comprises a first stop face (32a) which is constituted by a forward facing surface of the first arm (32), the rear engagement member (40) comprises a second stop face (47) which is constituted by a rearward-facing surface disposed in front of the front end (44) of the third arm, wherein the distance (B) between the second stop face (47) and the front end (44) of the third arm is less than the distance (A) between the first stop face (32a) and the rear end (33a) of the second arm and in that said first (32a) and second (47) stop faces are configured to be brought into and out of mutually overlapping relation in the vertical direction by rotating the shelf accessory (10) about said axis, such that the first (32a) and second (47) stop faces, in mutual contact, prevent the rear engagement member (40) from being disengaged from the rear securing device (30) when the shelf accessory (10) is held substantially parallel with the top side of the shelf and the first and second stop faces thereby are vertically overlapping, and to allow the rear engagement member (40) to be released from the rear securing device (30) when the front end of the shelf accessory has been lifted such that the shelf accessory has assumed an angle to the top side of the shelf and the first and second stop surfaces thereby are vertically non-overlapping;

in effect: the BSRP Product 1 or similar;

36

and to cease and desist from supplying and offering to supply means relating to an essential element of the invention (as set out above), for putting it into effect,
in effect: a shelf accessory (10) of the BRSP Product 1 (or similar) and a rear securing device (30) for use together with the shelf accessory of the BSRP Product 1 (or similar);

II.    declares that BSRP has infringed the patent EP 2 432 351 B1 by committing the acts as specified in I. above;

III.    orders BSRP at its own expense, within one week after service of the judgment to:

a)    recall and definitively remove the **shelf accessories** as specified in the injunction order from all channels of commerce; and

b)    destroy the **shelf accessories** as specified in the injunction order and which are in the custody or control of BSRP;

IV.    orders BSRP, within three weeks after service of the judgment, to inform HL Display of:

a)    the origin and distribution channels of the infringing products;

b)    the quantities produced, manufactured, delivered, received or ordered, as well as the prices paid for the infringing products; and

c)    the identity of any third person involved in the production or distribution of the infringing products;

d)    the number and dates of the products offered;

e)    the advertising carried out, broken down by advertising medium, its distribution, the distribution period and the distribution area, including evidence of these advertising activities;

f)    the costs, broken down by individual cost factors and the profits realised;

all substantiated by means of all relevant supporting documents, including but not limited to legible orders, order confirmations, invoices and copies of other purchase and sales documents;

V.    orders BSRP to pay a recurring penalty payment of up to a maximum of EUR 25,000 imposed by the Court for every day, part of a day counting as a full day, that the order specified under I, III and IV is breached, or a penalty of up to a maximum of EUR 250 for each individual product or part thereof with which the order specified under I, III and IV is breached, in all up to a maximum of EUR 2,000,000;

VI.    declares that BSRP is liable to compensate HL Display for all damages that are incurred and will incur due to the acts specified at I. above as to be specified separate damage proceedings;

VII.    orders BSRP to pay to HL Display the reasonable and proportionate legal costs of these proceedings and other expenses in the amount of EUR 56,000 plus EUR 11,000 court fee;

VIII.    declares that the orders according to items I, III, IV and VII are immediately enforceable notwithstanding any appeal, subject to the requirements that follow from Rule 118.8 RoP;

IX.    dismisses all other orders sought;

**In the counterclaim:**

- declares the counterclaim for a declaration of non-infringement inadmissible;
- dismisses the counterclaim for revocation;
- orders BSRP to pay to HL Display the reasonable and proportionate legal costs of these proceedings and other expenses in the amount of EUR 56,000;
- declares the cost order immediately enforceable.


INFORMATION ABOUT APPEAL

An appeal against the present Decision may be lodged at the Court of Appeal, by any party which has been unsuccessful, in whole or in part, in its submissions, within two months of the date of its notification (Art. 73(1) UPCA, R. 220.1(a), 224.1(a) RoP).

INFORMATION ABOUT ENFORCEMENT

Art. 82 UPCA, Art. Art. 37(2) UPCS, R. 118.8, 158.2, 354, 355.4 RoP. An authentic copy of the enforceable decision will be issued by the Deputy-Registrar upon request of the enforcing party, R. 69 RegR.

| | |
|---|---|
| Brinkman | |
| Kokke | |
| Bessaud | |
| Callewaert | |
| On behalf of the registry | |

# **EXHIBIT 16**

## Excerpt of TRIPS

### Art. 3(1)

Each Member shall accord to the nationals of other Members treatment no less favourable than that it accords to its own nationals with regard to the protection of intellectual property, subject to the exceptions already provided in, respectively, the Paris Convention (1967), the Berne Convention (1971), the Rome Convention or the Treaty on Intellectual Property in Respect of Integrated Circuits. In respect of performers, producers of phonograms and broadcasting organizations, this obligation only applies in respect of the rights provided under this Agreement. Any Member availing itself of the possibilities provided in Article 6 of the Berne Convention (1971) or paragraph 1(b) of Article 16 of the Rome Convention shall make a notification as foreseen in those provisions to the Council for TRIPS.

# **<u>EXHIBIT 17</u>**

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2     A Limited Liability Partnership
      Including Professional Corporations
3   STEPHEN S. KORNICZKY, Cal. Bar No. 135532
4   MARTIN R. BADER, Cal. Bar No. 222865
    MATTHEW W. HOLDER, Cal. Bar No. 217619
5   12275 El Camino Real, Suite 200
    San Diego, California 92130
6   Telephone:  858.720.8900
7   Facsimile:  858.509.3691
    E mail        skorniczky@sheppardmullin.com
8                 mbader@sheppardmullin.com
9                 mholder@sheppardmullin.com

10  MICHAEL W. SCARBOROUGH, Cal. Bar No. 203524
11  MONA SOLOUKI, Cal. Bar No. 215145
12  Four Embarcadero Center
    Seventeenth Floor
13  San Francisco, California 94111
14  Telephone:  415.434.9100
    Facsimile:  415.434.3947
15  E mail        mscarborough@sheppardmullin.com
16                msolouki@sheppardmullin.com

17  Attorneys for Plaintiff Continental
18  Automotive Systems, Inc.

19              UNITED STATES DISTRICT COURT

20            NORTHERN DISTRICT OF CALIFORNIA

21  CONTINENTAL AUTOMOTIVE              Case No. 5:19-cv-02520-NC
22  SYSTEMS, INC.,
                                        **CONTINENTAL'S MOTION FOR
23            Plaintiff,                ANTI-SUIT INJUNCTION**

24        v.                            Hearing Date:  July 31, 2019
                                        Time:  1:00 p.m.
25                                      Place:  Courtroom 5
26  AVANCI, LLC, et al.,                Judge:  Hon. Nathanael Cousins

27            Defendants.               **PUBLIC REDACTED VERSION**
28

1   TO THE COURT, DEFENDANTS AVANCI, LLC, AVANCI PLATFORM

2   INTERNATIONAL LIMITED, NOKIA CORPORATION, NOKIA OF AMERICA

3   CORPORATION, NOKIA SOLUTIONS AND NETWORKS US LLC, NOKIA

4   SOLUTIONS AND NETWORKS OY, NOKIA TECHNOLOGIES OY,

5   CONVERSANT WIRELESS LICENSING SARL, OPTIS UP HOLDINGS, LLC,

6   OPTIS CELLULAR TECHNOLOGY, LLC, OPTIS WIRELESS TECHNOLOGY,

7   LLC (COLLECTIVELY, "DEFENDANTS"), AND THEIR COUNSEL OF

8   RECORD:

9   PLEASE TAKE NOTICE that on July 31, 2019 at 1:00 p.m., or as soon

10  thereafter as the matter may be heard, in the courtroom of the Honorable Nathanael

11  M. Cousins, located at 280 South 1st Street, San Jose, California 95113, Plaintiff

12  Continental Automotive Systems, Inc. ("Continental") respectfully requests that this

13  Court enjoin Defendants Nokia Solutions and Networks Oy, Nokia Technologies

14  Oy, and any related entities (collectively, "Nokia") from prosecuting the patent

15  infringement actions filed in Germany against Continental's customer, Daimler AG

16  (the "German Actions").  The German Actions are more specifically identified as

17  follows:

18      • *Nokia Solutions and Networks Oy v. Daimler AG*, First Munich

19         Regional Court, Patent Division, No. 21 O 3889/19.

20      • *Nokia Technologies Oy v. Daimler AG*, First Munich Regional Court,

21         Patent Division, No. 7 O 3890/19.

22      • *Nokia Technologies Oy v. Daimler AG*, First Munich Regional Court,

23         Patent Division, No. 21 O 3891/19.

24      • *Nokia Technologies Oy v. Daimler AG*, Düsseldorf Regional Court,

25         Patent Division, No. 4a O 26/19.

26      • *Nokia Technologies Oy v. Daimler AG*, Düsseldorf Regional Court,

27         Patent Division, No. 4a O 27/19.

28

- *Nokia Technologies Oy v. Daimler AG*, Düsseldorf Regional Court, Patent Division, No. 4c O 17/19.

- *Nokia Technologies Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 37/19.

- *Nokia Technologies Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 36/19.

- *Nokia Solutions and Networks Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 35/19.

- *Nokia Solutions and Networks Oy v. Daimler AG*, Mannheim Regional Court, Patent Division, No. 2 O 34/19.

In addition, Continental seeks an order enjoining Defendants from instituting against Continental or any of its customers (or their subsidiaries or affiliates) any action alleging infringement of their global 2G, 3G and 4G SEPs during the pendency of the FRAND proceeding in this Court, or from acting in concert with anyone to institute such an action.

This motion is based on this notice of motion and supporting memorandum of points and authorities, the supporting declarations of Matthew W. Holder and Dr. Frank-Erich Hufnagel, the accompanying exhibits, reply briefing in further support of this motion and supporting declarations and accompanying exhibits, as well as other written or oral argument that Continental may present to the Court.

Dated:  June 11, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
    _/s/ Matthew W. Holder_
    STEPHEN S. KORNICZKY
    MARTIN R. BADER
    MATTHEW W. HOLDER
    MICHAEL W. SCARBOROUGH
    MONA SOLOUKI

Attorneys for Plaintiff Continental Automotive
Systems, Inc.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................... 4

    A.     The Nature and Risks of Standardization ....................................... 4

    B.     Nokia's Prior Advocacy on the Issues Addressed in This Motion ........ 7

    C.     The Dispute Between the Parties ...................................................... 8

        1.     Continental sought a direct license to Nokia's SEPs. ................. 8

        2.     Daimler and others filed complaints with the European
            Commission regarding Nokia's refusal to license
            suppliers. .................................................................................. 9

        3.     Nokia then filed retaliatory infringement lawsuits against
            Daimler. ................................................................................. 10

        4.     Continental filed the present action against Nokia and the
            other Defendants to resolve the global dispute between the
            parties. ................................................................................... 12

III.   APPLICABLE LEGAL STANDARD ...................................................... 13

IV.    NOKIA AND THE OTHER DEFENDANTS SHOULD BE
     ENJOINED FROM PURSUING SEP INFRINGEMENT CLAIMS
     AGAINST CONTINENTAL AND ITS CUSTOMERS. ............................... 15

    A.     The Parties and Issues Are Functionally the Same. ............................ 15

        1.     Continental, as a manufacturer of the accused products, is
            the real party-in-interest. ........................................................ 15

        2.     This lawsuit is dispositive of the actions to be enjoined. ........... 18

    B.     Multiple *Unterweser* Factors Justify an Anti-Suit Injunction. ............. 20

        1.     Nokia's German Actions frustrate important U.S. policies. ......... 20

        2.     Nokia's German Actions are vexatious and oppressive. ............. 22

        3.     Nokia's German Actions present a risk of inconsistent
            judgments. .............................................................................. 23

    C.     The Impact of an Injunction on Comity Is Tolerable. ........................ 24

V.     CONCLUSION ...................................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

<u>Cases</u>

4

*Apple v. Motorola*

5

757 F.3d 1286 (Fed. Cir. 2014) ..............................................................21

6

*Applied Med. Distrib. Corp. v. Surgical Co. BV*

7

587 F.3d 909 (9th Cir. 2009) ................................................................14

8

*Codex Corp. v. Milgo Electronic Corp.*

9

553 F.2d 735 (1st Cir. 1977) .........................................................16, 17

10

*E. & J. Gallo Winery v. Andina Licores S.A.*

446 F.3d 984 (9th Cir. 2006) ....................................13, 14, 20, 24, 25

11

*Ericsson, Inc. v. D-Link Sys., Inc.*

12

773 F.3d 1201 (Fed. Cir. 2014) ..............................................................5

13

*FTC v. Qualcomm*

14

No. 17-CV-00220-LHK, 2019 WL 2206013 (N.D. Cal. May 21,

2019) ...........................................................................................2, 3, 21

15

*Gilbane Fed. v. United Infrastructure Projects Fzco*

16

Case No. 14-cv-03254-VC, 2014 WL 4950011 (N.D. Cal. Sep. 24,

17

2014) .......................................................................................................15

18

*Huawei Techs., Co. v. Samsung Elecs. Co.*

19

Case No. 3:16-CV-02787-WHO, 2018 WL 1784065 (N.D. Cal. Apr.

13, 2018) ..........................................................14, 15, 18, 19, 20, 21

20

*Kahn v. General Motors Corp.*

21

889 F.2d 1078 (Fed. Cir. 1989) ............................................................16

22

*Katz v. Lear Siegler, Inc.*

23

909 F.2d 1459 (Fed. Cir. 1990) ............................................................16

24

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*

25

731 F.2d 909 (D.C. Cir. 1984)........................................................20, 21

26

*Medtronic, Inc. v. Catalyst Research Corp.*

27

518 F. Supp. 946 (D. Minn. 1981), *aff'd*, 664 F.2d 660 (8th Cir.

1981)........................................................................................................18

28

*Microsoft Corp. v. Motorola Inc.*
696 F.3d 872 (9th Cir. 2012) ....................2, 3, 6, 13, 14, 18, 19, 20, 21, 22, 23, 24

*Microsoft Corp. v. Motorola Inc.*
795 F.3d 1024 (9th Cir. 2015) .................................................................2, 5, 21

*Microsoft Corp. v. Motorola, Inc.*
871 F. Supp. 2d 1089 (W.D. Wash. 2012), aff'd, 696 F.3d 872 (9th
Cir. 2012) ......................................................................................... 13, 23

*In re Nintendo of Am., Inc.*
756 F.3d 1363 (Fed. Cir. 2014) ...................................................................... 16

*In re Personalweb Techs., LLC Patent Litig.*
Case No. 18-md-02834-BLF, 2019 WL 1455332 (N.D. Cal. April 2,
2019) ................................................................................................. 17

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*
361 F.3d 11 (1st Cir. 2004) ........................................................................... 20

*Quanta Computer, Inc. v. LG Electronics, Inc.*
553 U.S. 617 (2008) ...................................................................................... 19

*Realtek Semiconductor Corp. v. LSI Corp.*
946 F. Supp. 2d 998 (N.D. Cal. 2013).............................................................3, 6

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*
657 F.3d 1349 (Fed. Cir. 2011) ..................................................................... 17

*T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*
Case No. 13-CV-5356, 2013 WL 6409476 (S.D.N.Y. Dec. 9, 2013).................. 13

*TCL Communication Technology Holdings, Ltd. v.*
*Telefonaktienbolaget LM Ericsson*
No. 8:14-cv-00341-JVS-DFM, Dkt. 279-1 (C.D. Cal. June 29, 2015)............... 18

*In re Unterweser Reederei, GmbH*
428 F.2d 888 (5th Cir. 1970) ........................................................14, 20, 22, 24

*Zynga, Inc. v. Vostu USA, Inc.*
816 F. Supp. 2d 824 (N.D. Cal. 2011)............................................................. 15

<u>Other Authorities</u>

Fed. R. Civ. P. 65(d)(2)(C) ............................................................................ 13

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

# I.    **INTRODUCTION**

Plaintiff Continental Automotive Systems, Inc. ("Continental") is a leading supplier of telematics control units ("TCUs") for cars which incorporate 2G, 3G, and/or 4G cellular communications.  Continental filed this lawsuit after Defendants refused to grant Continental a direct license to their standard essential patents ("SEPs") for the relevant standards, despite being bound by commitments to license their SEPs on fair, reasonable, and non-discriminatory ("FRAND") terms to implementers like Continental.  Instead, Defendants—both individually and through the "licensing platform" Avanci—have conspired to demand non-FRAND royalties from Continental's customers, which are the automotive vehicle manufacturers ("OEMs").  Continental, in turn, risks bearing the financial burden of the inflated royalties in the form of indemnity demands to Continental by the OEMs.

With respect to Nokia, Continental tried for more than a year to obtain a direct license to Nokia's cellular SEPs.  In violation of its FRAND obligation, Nokia refused to consider a direct license to Continental and instead insisted on licensing only OEMs, such as Continental's customer Daimler AG ("Daimler"), ███████████ ███████████████████████████████████████████████.  Once it became clear that Nokia would not reconsider its improper policy, Daimler and some of its suppliers, including Continental, individually asked the European Commission to investigate Nokia's refusal to directly license anyone other than OEMs.  Yet rather than adjust course and comply with its FRAND obligation, Nokia instead doubled-down on its efforts to hold-up the OEMs by filing ten retaliatory patent infringement lawsuits against Daimler in Germany.  Each suit alleges that Daimler's vehicles infringe one of Nokia's SEPs based on inclusion of a TCU which includes cellular functionality.  Then, almost simultaneous with Continental's filing of this lawsuit, Nokia expanded the German lawsuits to also request injunctive relief against Daimler's products (which, by extension, would also have the practical effect, in economic terms, of enjoining Continental's ability to further supply Daimler).

1   Nokia's lawsuits against Daimler are clearly not intended as a comprehensive

2   adjudication of the FRAND terms and conditions of a license to Nokia's SEPs,

3   because Nokia claims it holds up to 20% of 3G and 4G SEPs, and yet the lawsuits

4   cover only a handful of alleged SEPs. Rather, the purpose of Nokia's German

5   lawsuits is to pressure Daimler to accept a license on non-FRAND terms by using

6   the threat of an injunction to stop automobile production, and the financial burden of

7   litigating Nokia's scattershot infringement actions.

8       Nokia's German lawsuits are an attempt to force Daimler and other OEMs to

9   accept non-FRAND licenses before this Court has an opportunity to adjudicate the

10  case on the merits, and thus should be enjoined. Nokia's stated policy of only

11  licensing at the OEM level is directly contrary to Ninth Circuit precedent, which

12  states that SEP owners are required "to license . . . all comers on [FRAND] terms,"

13  *Microsoft Corp. v. Motorola Inc.*, 696 F.3d 872, 876 (9th Cir. 2012) ("*Microsoft I*"),

14  and "cannot refuse a license to a manufacturer who commits to paying the RAND

15  rate." *Microsoft Corp. v. Motorola Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015)

16  ("*Microsoft II*"). In a recent decision in this district, Judge Lucy H. Koh likewise

17  concluded that the FRAND commitment "require[s] Qualcomm to license its SEPs

18  to rival modem chip suppliers," and also that Qualcomm (one of the founders of

19  Defendant Avanci) instituted the unlawful practice of only licensing OEMs

20  "because Qualcomm determined that it was far more lucrative" to license OEMs

21  rather than suppliers. *FTC v. Qualcomm*, No. 17-CV-00220-LHK, 2019 WL

22  2206013, at \*75-81 (N.D. Cal. May 21, 2019). Notably, Judge Koh's decision also

23  addressed the fact that Nokia "followed Qualcomm's lead and refuse[s] to license

24  modem chip suppliers because it is more lucrative to license only OEMs," despite

25  Nokia making prior statements to the European Commission that the FRAND

26  commitment establishes an "unequivocal" obligation to license to component

27  suppliers. *Id.* at \*79. Nokia now seeks to use burdensome patent infringement

28  litigation to pressure Daimler and other OEMs to quickly sign license agreements

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

before this Court can enter an injunction that Nokia "must make exhaustive SEP licenses available" on FRAND terms to Continental, similar to the relief granted by Judge Koh in the *FTC v. Qualcomm* matter. *Id.* at *138.

Nokia's decision to seek injunctive relief in at least eight of the German Actions, and thereby acutely increase the pressure on Daimler and other OEMs to accede to Nokia's unfair royalty demands, is also directly contrary to U.S. policy. Under well-established case law, it is inappropriate for a SEP-holder to seek injunctive relief on FRAND-encumbered patents against a willing licensee like Continental. The Ninth Circuit has previously upheld an anti-suit injunction in similar situations because "injunctive relief against infringement is arguably a remedy inconsistent with the [FRAND] licensing commitment." *Microsoft I*, 696 F.3d at 885; *see also Realtek Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1006–08 (N.D. Cal. 2013). When Nokia previously litigated against Qualcomm (and before Nokia exited the handset business), it similarly acknowledged that the "effects of an injunction itself could be devastating and irreparable," with the potential to "substantially distort royalty negotiations, as patent holders may seek unreasonable royalties through the mere threat of lawsuits and injunctions thus practically holding hostage the entire revenue stream and profits of the target company's relevant business." (Decl. of Matthew W. Holder, Ex. 1 at ¶ 34.) Yet now, unburdened by the need to obtain SEP licenses for its own user equipment, Nokia is engaging in the very same tactics it previously contended were breaches of the FRAND commitment. Moreover, Nokia's requests for injunctive relief against Daimler based on the incorporation of Continental's TCUs are, in economic terms, effectively requests for injunctive relief against Continental in direct violation of Nokia's FRAND obligations not to seek injunctive relief against a willing licensee.

Continental is a willing licensee, as evidenced by its sincere but ultimately futile efforts to obtain a direct license from Nokia, and the subsequent filing of the

present action to adjudicate the FRAND terms of a license with Nokia and the other Defendants.  In contrast to Nokia's piecemeal infringement litigation in Germany, Continental's complaint here is intended to fully resolve the dispute between Continental, its customers, and Nokia by making clear that Continental is entitled to a direct license, and determining the FRAND royalty rates for a license to Nokia's entire cellular SEP portfolio.  Nokia's numerous infringement lawsuits against Daimler interfere with the Court's ability to reach a just result in this case by exerting undue pressure on Daimler to accept "a super-monopoly royalty" under threat of injunction.  (Holder Decl., Ex. 1 at ¶ 34.)  This, in turn, exerts undue pressure on Continental, as OEMs typically demand indemnity of such licensing costs as a condition of purchasing any TCUs from suppliers like Continental.

Accordingly, Continental respectfully requests that the Court temporarily enjoin Nokia from prosecuting its lawsuits in Germany against Daimler until the FRAND issues are finally resolved in this case.  Likewise, because the other Defendants should not be permitted to do what Nokia has already done, Continental further requests that the Court enjoin Defendants from filing additional actions against Continental or its customers alleging infringement of the SEPs at issue in this litigation, or otherwise acting in concert with anyone else to file or pursue additional such actions, while the FRAND action here remains pending.

## II.   FACTUAL BACKGROUND

### A.   The Nature and Risks of Standardization

Avanci's Members own alleged standard-essential patents that are subject to the obligations of various standard-setting organizations ("SSOs") relevant to this action—the European Telecommunications Standards Institute ("ETSI"), the Alliance for Telecommunications Industry Solutions ("ATIS"), and the Telecommunications Industry Association ("TIA").  (Dkt. 1, ¶¶ 80–94.)  These SSOs have been involved in standardizing numerous 2G, 3G, and 4G cellular technologies.  (Dkt. 1, ¶¶ 64–70.)  The development of technology standards such as

those at issue in this litigation has many benefits, including for companies who participate in standardization, companies who manufacture products compliant with the standards, consumers, and society as a whole.

Along with the many advantages of standardization, however, the incorporation of technology into a standard also carries the risk that SEP owners will engage in anti-competitive behavior.  *See Microsoft II*, 795 F.3d at 1030–31.  As the Ninth Circuit has recognized, once a standard becomes widely adopted, SEP holders obtain substantial leverage over manufacturers of standard-compliant products and can abuse that leverage by demanding more for a license than the patented technology would be worth had it not been adopted by the SSO.  *See id.* at 1031.  The tactic of withholding a license unless and until a manufacturer agrees to pay an unduly high royalty rate for an SEP is referred to as "hold-up."  *Id.*; *Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1209 (Fed. Cir. 2014).

To mitigate the risk that SEP holders will extract more than the fair value of their patented technology, SSOs require SEP holders to declare potentially essential patents and commit to license those patents on FRAND terms and conditions.  For example, the ETSI IPR Policy requires SEP owners to commit to provide "irrevocable licenses on fair, reasonable and nondiscriminatory ('FRAND') terms and conditions."  (Holder Decl., Ex. 14 at § 6.1.)  The TIA policy requires any SEP holder that wishes to monetize its essential patents to commit to license SEPs "to all applicants under terms and conditions that are reasonable and non-discriminatory . . . to the extent necessary for the practice of . . . the Standard."  (*Id.*, Ex. 15 at § 3.1.1(2)(a).)  The ATIS policy requires SEP holders to commit that a license "will be made available . . . to the applicants desiring to utilize the license for the purpose of implementing the standard . . . under reasonable terms and conditions that are demonstrably free of any unfair discrimination."  (*Id.*, Ex. 16.)

Avanci's Members have directly declared many of their patents as essential, or are successors-in-interest to patents that were directly declared essential to the

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

2G, 3G, and 4G telecommunications standards established by the above SSOs.
(Dkt. 1, ¶¶ 80–94.)  Therefore, Avanci's Members are bound to license their patents
consistent with the SSO's policies.  (*See id.*)  According to these policies, owners of
intellectual property that may be considered essential to a particular standard or
technical specification are contractually bound to grant irrevocable licenses to third
parties on FRAND terms and conditions.  (Dkt. 1, ¶¶ 71–79.)

Unfortunately, the mere existence of the FRAND commitment alone, without
judicial enforcement, does not protect against the efforts of some SEP owners to act
in an anti-competitive manner.  As the Federal Trade Commission has explained,
SEP owners seeking to inappropriately exploit value added by virtue of
standardization (as opposed to the value of their patents) "may have especially
severe consequences for innovation and competition in the context of standardized
technology."  (Holder Decl., Ex. 17 at p. 22.)  This pursuit of overcompensation
would raise the price to consumers or even "threaten to undermine the collaborative
innovation that can result from the standard setting process."  (*Id.*, p. 28.)

Courts and commentators also have recognized that "injunctive relief against
infringement is arguably a remedy inconsistent with the [FRAND] licensing
commitment."  *Microsoft I,* 696 F.3d at 885; *Realtek v. LSI*, 946 F. Supp. 2d at
1006–08; Holder Decl., Ex. 18 at pp. 6-7 ("Patent holders should not generally be
allowed to obtain injunctions in the presence of a FRAND commitment.  As a
matter of economics, injunctions are inimical to some of the fundamental objectives
of FRAND, such as fostering broad licensing of SEPs and adoption of the
standard.").  This inconsistency arises from a recognition that the mere threat of
injunctive relief gives the SEP owner additional power to hold up implementers.
*Microsoft I*, 696 F.3d at 886 (the threat of injunctive relief "compromis[es] the
court's ability to reach a just result in the case before it free of external pressure on
[the accused infringer] to enter into a 'holdup' settlement before the litigation is
complete"); Holder Decl., Ex. 18 at p. 7 ("An injunction provides a means for a

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

1   patent holder to exercise the additional market power gained by inclusion of a patent

2   in a standard, and the threat of an injunction places at risk the investment and

3   ongoing profits of firms using the standard.  This allows the patent holder to engage

4   in hold-up and ask for payment in excess of the *ex ante* value of the patent.").

5       **B.**    **Nokia's Prior Advocacy on the Issues Addressed in This Motion**

6         Importantly, Nokia itself has acknowledged in a prior statement before the

7   European Commission that "the FRAND commitment is fundamentally about

8   ensuring access to patented technology in standards and avoiding anti-competitive

9   effects."  (Holder Decl., Ex. 2 at p. 1.)  According to Nokia, "[t]o be fully effective,

10   a FRAND commitment has to be both ***meaningful and binding***."  (*Id.* (emphasis

11   added).)  As Nokia explained at the time, "it would ***not make sense*** if it was

12   possible for an essential patent owner ***to obtain an injunction against anyone***

13   ***prepared to take a license*** on FRAND terms . . . ."  (*Id.* (emphasis added).)

14         Similarly, in 2014—amid concerns that Nokia would "abuse its position" as a

15   SEP owner after divesting its handset business to Microsoft—Nokia reaffirmed its

16   FRAND obligation and outlined the very limited circumstances under which it

17   believed injunctive relief appropriate:

18           Nokia confirms its support for a principle that, subject to

19           reciprocity, injunctions with SEPs should not be enforced to

20           prevent the implementation of a standard subject to FRAND

21           undertakings, unless a patent holder has made a FRAND

22           license available and the prospective licensee has been

23           unwilling to enter into such FRAND license or to comply with

24           its terms.

25   (*Id.*, Ex. 3 at p. 2.)

26         Indeed, Nokia argued fervently against the availability of injunctive relief on

27   SEPs in an earlier dispute with Qualcomm.  In that case, when it was in the position

28   of the prospective licensee, Nokia advocated that Qualcomm, by virtue of its

1   FRAND declarations for patents it had declared essential to the ETSI standards,

2   "gave up the remedy of an injunction in the event of a dispute with Nokia over the

3   amount of a FRAND royalty."  (*Id.*, Ex. 4 at pp. 1–2.)  As Nokia admitted, a SEP

4   owner "using the threat of injunctions against a willing licensee to gain leverage in

5   its demand for excessive royalty rates" is exactly the type of hold-up that the

6   "voluntary FRAND contracts were designed to preclude."  (*Id.*, Ex. 1 at ¶ 79.)

7           **C.**    **The Dispute Between the Parties**

8               1.   Continental sought a direct license to Nokia's SEPs.

9         Continental is one of the leading providers of TCUs to OEMs in the

10   automotive industry.  (Dkt. 1, ¶¶ 1, 17–18.)  No later than early 2017, Defendants

11   began targeting certain Continental customers, asserting that their connected cars

12   practice the cellular standards covered by Defendants' alleged SEPs, and insisting

13   that they pay excessive royalty rates in return for a license.  (*See id.*, ¶¶ 128–141.)

14   But in the automotive industry, intellectual property licenses have historically been

15   handled by the suppliers of the relevant components (given, for example, that there

16   are hundreds, if not thousands, of separate components which are incorporated into

17   the vehicle).  As the parties responsible for implementing the technology,

18   component suppliers are in a much better position than OEMs to determine whether

19   or not a given component practices a patented technology.  As the supplier of TCUs

20   to Daimler and a willing licensee, Continental attempted to negotiate with each

21   Defendant in a good-faith effort to obtain FRAND licenses to all relevant SEPs, but

22   was continually rebuffed by Avanci and various of its members.  (*See id.*)  Rather,

23   Defendants insist they are only willing to grant direct licenses to OEMs, and refuse

24   to grant direct licenses to any other parties in the supply chain.

25         With respect to Nokia, Continental sent a letter to Nokia in October 2017,

26   which specifically referenced the fact that Nokia had approached Daimler,

27   confirmed that Continental is a willing licensee, and sought to negotiate a license

28   covering Continental's products.  (Holder Decl., Ex. 8.)  In addition, Continental

1   requested further information regarding Nokia's portfolio, as well as claim charts, so

2   that it could examine whether Nokia's patents were truly essential, and whether it

3   would indeed require a license from Nokia for its products.  (*See id.*)

4            Despite Nokia's FRAND obligation to license its SEPs, Nokia refused to

5   directly license Continental.  Rather, when it responded to Continental in November

6   2017, Nokia stated that its policy is ████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████  (*Id.*, Ex. 9 (emphasis added).)  Instead of a direct license, Nokia

9   proposed an alternative model in which ████████████████████████████

10  █████████████████████████████████████████████████████████████

11  ███████████████████████████████  (*Id.*)

12           Throughout 2018 and into 2019, Continental and its affiliates continually

13  attempted to negotiate a direct license with Nokia.  However, Nokia refused to

14  consider a direct license to suppliers.  (*See id.*, Ex. 10.)  In an October 2018 letter,

15  Continental expressed its concern regarding Nokia's offer, including the lack of a

16  direct license to Continental.  (*See id.*, Ex. 11.)  In December 2018, Continental sent

17  another letter to Nokia explaining in detail why Nokia's position is inconsistent with

18  its FRAND obligations and also contradicts Nokia's own prior position that it had

19  outlined to the European Commission in earlier proceedings.  (*See id.*, Ex. 12.)

20  Continental urged Nokia to reconsider and asked Nokia to submit a license offer.

21  Nokia finally replied in April 2019, ████████████████████████████████

22  ████████████████████████████████████.  (Decl. of Dr. Frank-Erich

23  Hufnagel, Ex. 6 at pp. 5–6.)  Continental responded on May 7, 2019, to further

24  explain why Nokia's proposal was not FRAND, and why Continental both needed,

25  and was entitled to, a direct FRAND license.  (Holder Decl., Ex. 13.)

26       2.   <u>Daimler and others filed complaints with the European Commission</u>

27            <u>regarding Nokia's refusal to license suppliers.</u>

28           After years of Nokia refusing to engage in direct licensing discussions with

Daimler's suppliers of TCUs and insisting, contrary to its FRAND obligation, that it will only directly license at the OEM level, Daimler filed a complaint against Nokia with the European Commission Directorate-General for Competition in November 2018, wherein Daimler asked for an investigation of Nokia's SEP licensing practices in the automotive industry.  (Hufnagel Decl., ¶¶ 2–4, Ex. 1.)  Daimler noted that "[f]air and non-discriminatory access to these standards for *all users* of the essential patents for telecommunications standards is a key prerequisite for the development of new products and services for connected driving."  (*Id.* (emphasis added).)

Daimler's complaint was followed by similar individual complaints from some of Daimler's Tier-1 suppliers, including Continental, Bury, and Valeo, as well as chipmaker Gemalto.  (*Id.*, ¶ 5, Ex. 2.)  Continental's complaint to the European Commission related directly to Nokia's refusal to license SEPs for mobile telecommunication standards on FRAND terms to any supplier of automotive components seeking a license, including Continental and its supply chain.  (*See id.*)

3.  Nokia then filed retaliatory infringement lawsuits against Daimler.

Rather than adjust course and offer direct FRAND licenses to Daimler's suppliers, Nokia further exacerbated the dispute by filing a wide array of retaliatory patent infringement lawsuits intended to pressure Daimler into taking a non-FRAND license.  On March 20, 2019, Nokia filed ten patent infringement suits against Daimler in Germany:  three each in Munich and Düsseldorf, and four in Mannheim (collectively, the "German Actions").  (*See id.*, ¶ 6.)  All of the patents asserted against Daimler in the German Actions were declared by Nokia to ETSI, and thus are subject to the FRAND obligation.  (*See id.*, ¶¶ 9, 15, 20, 25, 30, 36, 41, 45, 50, 55, Exs. 4, 8, 11, 14, 19, 22, 24, 27, 30.)  Nokia's complaints against Daimler also claim that the asserted patents are essential to the 3G and 4G standards.  (*See, e.g.*, *id.*, ¶¶ 8–9; Ex. 3 §§ II, V.)  Nokia's German Actions expressly concern Daimler vehicles with TCUs, including those supplied by Continental:

This complaint is challenging Defendant's *automobiles*

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

1  manufactured, imported, exported, offered or sold, whether

2  directly or indirectly, by Defendant, which are (i) ***compliant***

3  ***with one or more of the following standards: GSM/GPRS***

4  ***standard, UMTS standard, CDMA standard and/or LTE***

5  ***standard*** (as promulgated by ETSI, 3GPP, TIA or 3GPP2

6  standard developing organizations) to which the patent in suit

7  with the asserted claims is essential; and (ii) ***incorporating***

8  ***components*** (such as telematics control units, wireless modules

9  or other network access devices) from ***Continental AG*** . . . .

10  (*Id.*, ¶ 8; Ex. 3 at § III (emphasis added).)

11      In each of the German Actions, Nokia pursues (1) claims for information and

12  rendering of account as to the extent of the infringing activities for the relevant

13  patent at issue (including, *e.g.*, requests to disclose the quantities of products

14  manufactured or sold, the names of customers and suppliers, and costs and profits),

15  (2) a motion for a declaratory judgment holding Daimler liable to pay damages for

16  the infringing activities, (3) an order requiring Daimler to pay the costs of the

17  proceedings, and (4) to declare a judgment provisionally enforceable against

18  security.  (*See id.*, ¶¶ 10, 16, 21, 26, 31, 37, 42, 46, 51, 56.)  In eight of the German

19  Actions, Nokia has already expanded its original complaint to include a request for

20  injunctive relief against Daimler's products incorporating Continental TCUs.  (*See*

21  *id.*, ¶¶ 17, 22, 27, 32, 38, 47, 52, 57; Exs. 9, 12, 15, 17, 20, 25, 28, 31.)  Nokia added

22  these requests for injunctive relief very close in time to when Continental filed the

23  current action seeking a FRAND license to the wireless SEPs of Nokia and all

24  Avanci Members.[1]  These requests for injunctive relief are clearly directed not

25  toward protecting any of Nokia's rights, but rather toward pressuring Daimler to

26

27  _____

[1] Nokia's injunction requests were made on May 8, two days before Continental filed this action, and were served on Daimler on May 15 and May 28, after

28  Continental filed and served this action.  (Hufnagel Decl., ¶¶ 17, 22, 27, 32, 38, 47, 52, 57; Exs. 9, 12, 15, 17, 20, 25, 28, 31.)

Case No. 5:19-cv-02520-NC

MOTION FOR ANTI-SUIT INJUNCTION

accept a license on non-FRAND terms.  In none of the German Actions does Nokia request that the court adjudicate and impose a global FRAND license between the parties, as Continental does here.

Continental's interests are further intertwined in the outcome of Nokia's German Actions because Daimler asserts that Continental is contractually obligated to indemnify Daimler for allegations of infringement related to Continental's products.  (Holder Decl., Ex. 7.)  In fact, no later than August 7, 2017, Continental received an indemnification request from Daimler regarding license requests Daimler received from Nokia (and others) regarding its cellular patent portfolio.  (*See id.*)  Therefore, Continental may be liable for the damages Nokia seeks to obtain from Daimler in the German Actions.

Moreover, on May 17, 2019, Daimler served Continental and its relevant subsidiaries with a formal Third Party Notice of the dispute in Docket No. 7 O 3890/19, which permit Continental to participate in the proceeding as an intervenor.  (Hufnagel Decl., ¶ 11, Ex. 5.)  Under German law, Daimler is only entitled to file a Third Party Notice against any third party against which it "believes to be able to raise indemnification claims . . . in case of a negative outcome of the proceedings."  (*Id.*, ¶ 11.)  A Third Party Notice is only appropriate where a third party has a legitimate legal interest in the outcome of the litigation.  (*See id.*)  On May 31, 2019, Continental formally intervened in the above-stated German Action pursuant to the Third Party Notice received from Daimler.  (*See id.*, ¶ 12, Ex. 6.)

> 4.   Continental filed the present action against Nokia and the other Defendants to resolve the global dispute between the parties.

On May 10, 2019, Continental initiated this litigation ("the California Action") because Defendants' collusive agreement to refuse licenses to Continental and other suppliers on FRAND terms breaches Defendants' FRAND commitments and constitutes anticompetitive conduct, and also because the royalties demanded by Defendants are far higher than what should be considered FRAND.  (Dkt. 1, ¶¶ 8–

15.)  Continental asks the court to "[a]djudge and decree that Continental and other suppliers in the automotive supply chain are entitled to a license from Defendants" for all relevant SEPs, and to "set the FRAND terms and conditions" of the license. (Dkt. 1, Prayer For Relief D-E.)

In contrast to Nokia's piecemeal patent infringement lawsuits, this litigation is intended to broadly resolve all disputed issues between Continental on the one hand, and Nokia and Defendants on the other hand, related to Defendants' wireless SEPs. Indeed, an adjudication on the merits here in this action that Nokia and Defendants are required to license suppliers like Continental on FRAND terms will demonstrate why it was improper for Nokia to sue Daimler in the first place.

## III.   **APPLICABLE LEGAL STANDARD**

This Court has the power to enjoin parties from proceeding with an action in the courts of a foreign country.  *See Microsoft I,* 696 F.3d at 880–81; *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) ("*Gallo*").  "Courts derive the ability to enter an anti-suit injunction from their equitable powers.  Such injunctions allow the court to restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust." *Gallo*, 446 F.3d at 989.  Anti-suit injunctions are appropriate when a party's foreign actions "frustrate[] this court's ability to adjudicate issues properly before it" or when "[w]ithout the issuance of an anti-suit injunction, the integrity of the action before this court will be lessened." *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1100 (W.D. Wash. 2012), aff'd, 696 F.3d 872 (9th Cir. 2012).  The Ninth Circuit emphasizes that district courts have "a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants." *Gallo*, 446 F.3d at 995.  Anti-suit injunctions can properly extend to all "other persons who are in active concert or participation with" the parties addressed in the motion.  Fed. R. Civ. P. 65(d)(2)(C); *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, Case No. 13-CV-5356, 2013 WL 6409476, at \*4 (S.D.N.Y. Dec. 9, 2013) (enjoining "Respondents . .

1    . and all other persons who are in active concert or participation with Respondents'

2    from prosecuting any action in Israel").

3         In *Microsoft I*, the Ninth Circuit used a three-part test to evaluate the propriety

4    of an anti-suit injunction in a case similar to this one (*i.e.*, a case involving a global

5    FRAND dispute). *See Microsoft I*, 696 F.3d at 881. Under that test, the court

6    should first determine "whether or not the parties and the issues are the same" in

7    both actions, and whether the current action is dispositive of the action to be

8    enjoined. *Id.* at 881, citing *Gallo*, 446 F.3d at 991 (citations omitted); *see also*

9    *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 914–15 (9th Cir.

10   2009) ("*Applied Medical*") (explaining the first step of the *Gallo* test is a "functional

11   inquiry concerning dispositiveness," not a requirement that the claims be identical).

12   Second, the court should determine whether at least one of the "*Unterweser* factors"

13   applies, asking whether the litigation to be enjoined would "(1) frustrate a policy of

14   the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the

15   issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings

16   prejudice other equitable considerations." *Microsoft I*, 696 F.3d at 881-82; *In re*

17   *Unterweser Reederei, GmbH*, 428 F.2d 888, 890 (5th Cir. 1970) ("*Unterweser*").

18   Finally, the court should assess whether the proposed injunction's impact on comity

19   is tolerable. *See Microsoft I*, 696 F.3d at 881. "Comity is less likely to be

20   threatened in the context of a private contractual dispute than in a dispute

21   implicating public international law or government litigants." *Id.* at 887.

22        A request for an anti-suit injunction is evaluated only under the *Gallo* test, not

23   the traditional four factor test for a preliminary injunction. *See Microsoft I*, 696

24   F.3d at 881 (addressing only the *Gallo* factors); *Applied*, 587 F.3d at 913 (same); *see*

25   *also Huawei Techs., Co. v. Samsung Elecs. Co.*, Case No. 3:16-CV-02787-WHO,

26   2018 WL 1784065, *4 (N.D. Cal. Apr. 13, 2018) ("*Huawei*") ("The Ninth Circuit's

27   analysis [in *Microsoft*] convinces me that I need only focus on the three-part inquiry

28   under *Gallo*. . .").

## IV.  NOKIA AND THE OTHER DEFENDANTS SHOULD BE ENJOINED FROM PURSUING SEP INFRINGEMENT CLAIMS AGAINST CONTINENTAL AND ITS CUSTOMERS.

### A.  The Parties and Issues Are Functionally the Same.

"The threshold consideration for a foreign anti-suit injunction is whether or not the parties and the issues are the same in both the domestic and foreign actions, and whether or not the first action is dispositive of the action to be enjoined.  The consideration should be approached functionally, not in a technical or formal sense, but in the sense that all the issues in the foreign action can be resolved in the local action."  *Huawei,* 2018 WL 1784065 at *6 (internal citations and quotations omitted).  Continental, as a manufacturer of the allegedly infringing products, is the real party-in-interest in any patent infringement lawsuits filed by Defendants against Continental's customers (*e.g.*, Nokia's pending actions against Daimler in Germany).  Moreover, the relief sought by Continental in this action—namely, that the Court "set the FRAND terms and conditions that Continental is entitled to under Defendants' obligations to the relevant SSOs . . . for a license to Defendants' 2G, 3G, and 4G SEPs"—would resolve any patent infringement claims relating to Defendants' SEPs against Continental and its customers.  (Dkt. 1, pp. 63–64.)

### 1.  Continental, as a manufacturer of the accused products, is the real party-in-interest.

"Perfect identity of parties is not required for an anti-suit injunction."  *Zynga, Inc. v. Vostu USA, Inc.*, 816 F. Supp. 2d 824, 828 (N.D. Cal. 2011).  Rather, the relevant inquiry is whether the parties are "affiliated in such a way that their interests coincide."  *Id.*; *see also Gilbane Fed. v. United Infrastructure Projects Fzco*, Case No. 14-cv-03254-VC, 2014 WL 4950011, at *5 (N.D. Cal. Sep. 24, 2014) (finding identity of the parties where their "interests are practically identical and are well represented by each other").  In any lawsuit filed by a Defendant in this action targeting Continental products purchased and installed by a Continental

1    customer, Continental's interests align with its customer's interests such that the

2    "same parties" requirement is satisfied.

3        In particular, the parties in Nokia's German Actions are either the same as

4    those in this lawsuit, or are functionally the same.  The complaints against Daimler

5    in Germany were filed by Nokia Technologies Oy and Nokia Solutions and

6    Networks Oy.  (Hufnagel Decl., ¶¶ 7, 13, 18, 23, 28, 33, 39, 43, 48, 53; Exs. 3, 7,

7    10, 13, 16, 18, 21, 23, 26, 29.)  Both are defendants to this action.  Even though the

8    complaints in Germany target products which come from Tier 1 suppliers like

9    Continental, Nokia initially listed Continental's customer Daimler AG as the sole

10   defendant.  But in accordance with German procedures, Daimler thereafter served

11   Continental with a Third Party Notice of the dispute in at least one of the cases, and

12   Continental now has joined that case as an intervenor.  (*Id.*, ¶¶ 11–12, Exs. 5, 6.)

13   Daimler's notice recognizes Continental's legal interest in the German Actions, and

14   the alignment of Continental's interests with Daimler's interests in those suits.

15       Separate and apart from the fact that Continental has intervened in one of the

16   German Actions, Continental's status as the real party-in-interest in the German

17   Actions is further demonstrated by the fact that under the "customer suit exception,"

18   federal courts regularly enjoin patentees from litigating first-filed lawsuits against

19   the customer of a manufacturer when there is a separate proceeding involving the

20   manufacturer.  *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir.

21   2014); *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990).  "The

22   customer suit exception is based on the manufacturer's presumed greater interest in

23   defending its actions against charges of patent infringement; and to guard against

24   possibility of abuse."  *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed.

25   Cir. 1989).  "At the root of the preference for a manufacturer's declaratory judgment

26   action is the recognition that, in reality, the manufacturer is the true defendant in the

27   customer suit."  *Codex Corp. v. Milgo Electronic Corp.*, 553 F.2d 735, 737–38 (1st

28   Cir. 1977).  As recognized in *Codex*, "it is a simple fact of life that a manufacturer

1  must protect its customers, either as a matter of contract, or good business, or in
2  order to avoid the damaging impact of an adverse ruling against its products." *Id.* at
3  738. The "guiding principles" of the customer suit exception are "efficiency and
4  judicial economy." *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657
5  F.3d 1349, 1357 (Fed. Cir. 2011).

6        The rationale underlying the customer suit exception is equally applicable
7  here. In any instance where Defendants file suit for patent infringement targeting
8  Continental's products (as Nokia has already done vis-à-vis Daimler in the German
9  Actions), Continental is the functional defendant in that lawsuit regardless of
10 whether it is a named party. In addition to the business need to protect its
11 customers, recognized repeatedly by the federal courts in the "customer suit
12 exception" line of cases, Continental has also received requests for indemnification
13 from its customers related to Defendants' infringement allegations related to the
14 SEPs at issue in this litigation. (*See, e.g.*, Holder Decl., Ex. 7.) Under similar
15 circumstances, courts have recognized that a manufacturer and customer are in
16 privity based on an indemnification obligation "because they share the same interest
17 in the unfettered use of" an allegedly infringing product and the manufacturer
18 "adequately represent[s] this interest." *In re Personalweb Techs., LLC Patent Litig.*,
19 Case No. 18-md-02834-BLF, 2019 WL 1455332, at *8 (N.D. Cal. April 2, 2019)
20 (finding Amazon and its customers were privies based on their indemnity
21 agreement). Moreover, resolving Defendants' claims against Continental's products
22 through this litigation, rather than individually litigating the issue in a piecemeal
23 fashion against different customers in any number of jurisdictions, certainly
24 promotes efficiency and judicial economy. *See Spread Spectrum Screening LLC*,
25 657 F.3d at 1357.

26        For the above reasons, the interests of Continental and its customers in
27 defending against patent infringement claims which target Continental's products
28 are sufficiently aligned, such that the identity of parties requirement for granting an

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

1 anti-suit injunction is satisfied.

2         2. <u>This lawsuit is dispositive of the actions to be enjoined.</u>

3       In deciding whether to issue an anti-suit injunction, the Ninth Circuit has

4 explained that a court should assess "whether the issues are the same not in a

5 technical or formal sense, but [rather] in the sense that all the issues in the foreign

6 action . . . can be resolved in the local action." *Microsoft I,* 696 F.3d at 882–83

7 (citations omitted). In *Microsoft I*, the Ninth Circuit affirmed the anti-suit injunction

8 issued by the district court, agreeing that Microsoft's RAND claim was capable of

9 resolving Motorola's infringement claim in Germany because Motorola's licensing

10 offers included the German patents and Motorola promised to license those German

11 patents on RAND terms. *See id.* at 883–84; *see also Medtronic, Inc. v. Catalyst*

12 *Research Corp.*, 518 F. Supp. 946 (D. Minn. 1981), *aff'd*, 664 F.2d 660 (8th Cir.

13 1981) (issuing an anti-suit injunction against the enforcement of foreign patents

14 based on a contract between the parties not to enforce the patents).

15       Indeed, several other courts have recognized the propriety of resolving

16 FRAND licensing disputes between two parties first, rather than allowing piecemeal

17 infringement suits on individual SEPs. In *TCL v. Ericsson,* the court granted an

18 anti-suit injunction to prevent Ericsson from pursuing foreign patent claims on

19 individual SEPs that were the subject of the court's global FRAND determination

20 because "the [domestic] FRAND action should resolve [the parties'] global

21 licensing dispute." *TCL Communication Technology Holdings, Ltd. v.*

22 *Telefonaktiebolaget LM Ericsson*, No. 8:14-cv-00341-JVS-DFM, Dkt. 279-1 at 5

23 (C.D. Cal. June 29, 2015). Similarly, in *Huawei*, the court found that the parties'

24 competing breach of contract claims based on the alleged failure to abide by their

25 respective FRAND commitments to ETSI controlled the disputes between the

26 parties and dictated that the action Samsung filed in California was "dispositive of

27 Huawei's Chinese actions." *Huawei*, 2018 WL 1784065 at *7-8.

28       Like the cases discussed above, Continental's complaint against Defendants

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

alleges that Defendants have breached their contractual commitments to the relevant SSOs, including ETSI, TIA, and/or ATIS, by refusing to license their alleged 2G, 3G, and/or 4G SEPs to Continental. (Dkt. 1, Prayer For Relief D–G.) Continental asks this Court to declare that "Continental and other suppliers in the automotive supply chain are entitled to a license from Defendants" for all 2G, 3G, and 4G SEPs and to "set the FRAND terms and conditions that Continental is entitled to under Defendants' obligations to the relevant SSOs." (*Id.* at Prayer For Relief D, E.) Continental seeks a worldwide license to Defendants' SEPs, consistent with Defendant Avanci's representations that the "Avanci license covers *the entire* essential 2G, 3G and 4G patent portfolio" of its members. (Holder Decl., Ex. 19 (emphasis added).) Nokia's patent infringement claims in the German Actions against Daimler, based on its use of Continental's products, likewise relate to patents which are allegedly essential to the 2G, 3G, and/or 4G standards, and which are subject to declarations that Nokia will license the patents on FRAND terms. (*See, e.g.*, Hufnagel Decl. ¶¶ 8–9; Ex. 3 §§ II, V.) Nokia's infringement claims stem from the implementation of these standards by the TCUs incorporated into Daimler's vehicles. (*Id.*)

Given the above facts, the California Action is capable of resolving the issues in the German Actions. Indeed, if this Court determines that Nokia is obligated to license its 2G, 3G, and 4G SEPs to Continental in the first instance, and sets the FRAND terms and conditions of the license, then Nokia's (and any other Defendant's) infringement claims against all Continental products—whether sold to Daimler or any other of Continental's customers—will be mooted. Once this Court enters the requested declaratory judgment and injunction, Continental's sales to its customers will be licensed and Defendants' patent rights exhausted. *See Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008) ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."). As in *Microsoft* and

Case No. 5:19-cv-02520-NC

MOTION FOR ANTI-SUIT INJUNCTION

*Huawei*, "the availability of injunctive relief for [Nokia's] SEPs depends on the breach of contract claims" at issue in the California Action. *Huawei*, 2018 WL 1784065 at *12; *Microsoft I*, 696 F.3d at 883. Accordingly, the issues in the California Action are functionally the same as the issues in the German Actions, and an anti-suit injunction is appropriate against Nokia and the other Defendants, in order to prevent them from doing what Nokia has already improperly done in Germany.

### B. Multiple *Unterweser* Factors Justify an Anti-Suit Injunction.

The second step of the framework followed in *Microsoft* is to determine if any of the *Unterweser* factors apply. Importantly, ***only one*** factor needs to apply for injunctive relief to be appropriate. *See Gallo*, 446 F.3d at 991. Here, multiple *Unterweser* factors support the requested anti-suit injunction. Nokia's German actions are vexatious and oppressive, will frustrate U.S. law and policy, and prejudice multiple equitable considerations.

### 1. Nokia's German Actions frustrate important U.S. policies.

Courts have repeatedly found foreign litigation to frustrate domestic policy when defendants seek to use the foreign litigation to evade contractual obligations or compliance with U.S. law. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 20 (1st Cir. 2004); *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984) ("Injunctions are most often necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum."). Nokia's German Actions implicate several important policies.

First, this Court should grant Continental's motion because Nokia's filing of the German Actions against Daimler is a direct extension of Defendants' breach of contract and anticompetitive behavior. Continental's breach of contract and antitrust claims arise of out Defendants collectively "refusing to offer individual fully exhaustive direct FRAND licenses to suppliers in the automotive supply chain

in order to preserve Avanci's ability to extract supra-competitive prices at the OEM level." (Dkt. 1, pp. 45–46, 48–50.) Ninth Circuit precedent clearly states that Nokia cannot refuse to license Continental, which is willing to pay a FRAND royalty rate. *See Microsoft II*, 795 F.3d at 1031. In the *FTC v. Qualcomm* case, Judge Koh also recently determined that the policy of Qualcomm (again, one of the founders of Avanci) to license only at the OEM level was inconsistent with Qualcomm's FRAND obligation and U.S. antitrust law. *See FTC v. Qualcomm*, 2019 WL 2206013, at \*75-81. Moreover, Judge Koh's decision specifically identified Nokia (as well as Ericsson, another Avanci founder) as copying Qualcomm's anticompetitive conduct by "refus[ing] to license modem chip suppliers because it is more lucrative to license only OEMs." *Id.* An anti-suit injunction is proper in this case where Nokia is "attempting to escape application of the antitrust laws to [its] conduct" by using the German Actions to pressure Continental's customer to accept non-FRAND terms, all while trying to avoid or otherwise delay an adjudication by this Court that its refusal to license Continental is a breach of FRAND and in violation of U.S. antitrust law. *See Laker Airways*, 731 F.2d at 932.

Second, Nokia seeks injunctive relief against Daimler in the German Actions, and yet the Ninth Circuit, several regulatory bodies, and prominent economists all have declared that seeking injunctive relief against a willing licensee is antithetical to a FRAND commitment. *See, e.g., Microsoft I*, 696 F.3d at 885 (upholding order preventing enforcement of German injunction, because injunctive relief was inconsistent with the contractual RAND obligation); *Apple v. Motorola*, 757 F.3d 1286, 1332 (Fed. Cir. 2014); Holder Decl., Ex. 18 at pp. 6–7 ("As a matter of economics, injunctions are inimical to some of the fundamental objectives of FRAND, such as fostering broad licensing of SEPs and adoption of the standard."). In *Huawei*, the district court granted a motion for anti-suit injunction in view of the important policy of preserving the "court's ability to determine the propriety of injunctive relief." *Huawei*, at \*17.

In previous litigation against Qualcomm, Nokia itself took the position that a SEP owner "is not entitled to an injunction or exclusion order that could prevent implementation of the standard—except in extraordinary circumstances, such as where the manufacturer refuses to pay judicially determined FRAND compensation for the actual infringement of a valid essential patent."  (Holder Decl., Ex. 5 at pp. 1–2.)  Here, Continental has clearly demonstrated that it is a willing licensee by first seeking a license from Nokia and the other Defendants, and then by initiating the present litigation to adjudicate the terms of a SEP license.  None of the extraordinary circumstances which may justify an exclusion order vis-à-vis the practice of SEPs are present in this case.  Nokia should not be permitted to circumvent the policy against enjoining a willing licensee in SEP cases by seeking injunctions against Continental's downstream customer in a foreign country, especially when the alleged infringement relates to a single component in a product (the car) that otherwise incorporates countless other technologies, and is obviously not fundamentally based on the use of the cellular standards.

In short, preventing SEP holders from abusing their dominant position by using injunctive relief to force a settlement of claims on non-FRAND terms, all while refusing to license a willing manufacturer further upstream in the supply chain, is exactly in line with U.S. law and policy.

> 2.   Nokia's German Actions are vexatious and oppressive.

An anti-suit injunction is also appropriate under the *Unterweser* factors because Nokia's litigation is vexatious and oppressive to Continental, and interferes with this Court's ability to reach a just result free of external pressure on the parties or Daimler to enter into a "hold-up" settlement before the litigation is complete.

In *Microsoft*, the court found that Motorola's actions raised concerns of "duplicative and vexatious litigation," which were "heightened by the fact that Motorola's commitments to the ITU involved approximately 100 Motorola owned patents, yet Motorola invoked the German Action implicating only two . . . of these

patents and sought injunctive relief in Germany before this court could adjudicate that precise issue." *Microsoft I*, 696 F.3d at 886.  Nokia has similarly chosen to file piecemeal infringement actions against Daimler in an effort to force it to sign a non-FRAND license.  Nokia filed the German Actions, including the requests for injunctive relief, *after* Daimler and Continental filed complaints with the European Commission and put Nokia on notice that its refusal to license Continental was a breach of its FRAND obligation.  (Hufnagel Decl., ¶¶ 2–6.)  Nokia then added the requests for injunctive relief at approximately the same time Continental filed and served the present action, and maintains these requests despite the ability of this Court to resolve the global licensing dispute between the parties on the merits.

Nokia is aware that the "effects of an injunction itself could be devastating and irreparable," and the mere threat of an injunction can "substantially distort royalty negotiations," because it previously argued exactly that in its prior litigation against Qualcomm.  (Holder Decl., Ex 1 at ¶ 34.)  This "substantial distortion" of royalty negotiations is precisely what Nokia wants here—it is using the threat of injunctive relief to pressure Continental's customer Daimler to capitulate before this Court has the opportunity to reach a just result on the merits.  The risk of distortion is even greater in this case because Nokia seeks injunctions to exclude entire vehicles from the market (with retail prices almost always well in excess of $30,000), based on their inclusion of a TCU which is obviously tangential to the overall functionality of the vehicle.

        3.    Nokia's German Actions present a risk of inconsistent judgments.

In *Microsoft*, the district court also found that injunctive relief was appropriate because allowing Motorola to continue the foreign litigation posed a risk of inconsistent judgments.  *See Microsoft,* 871 F. Supp. 2d at 1100.  Nokia's German Actions likewise present a significant risk of inconsistent judgments.

A finding by this Court that Defendants, including Nokia, breached their

-23-

1  FRAND obligation by failing to offer Continental a license on FRAND terms and

2  conditions would be inherently inconsistent with a German court issuing an

3  injunction against Daimler's vehicles based on their inclusion of a Continental TCU

4  implementing the cellular standards.  The present action also seeks to adjudicate the

5  FRAND terms and conditions of a license to all of Nokia's SEPs for the relevant

6  standards (as well as to all of the SEPs licensed by Avanci, of which Nokia is a

7  member).  In contrast, the German courts may set royalty rates for a handful of

8  patents which represent a fraction of Nokia's portfolio, which Nokia says "exceeds

9  20%" of all 3G and 4G SEPs.  (Hufnagel Decl., Ex. 3 at p. 34.)

10       Any of the factors discussed above, by itself, "may justify a foreign anti-suit

11  injunction."  *Microsoft I*, 696 F.3d at 882 n.9.  Because multiple *Unterweser* factors

12  apply here, Continental's request for an anti-suit injunction is especially appropriate.

### C.       The Impact of an Injunction on Comity Is Tolerable.

14       The final step of the *Gallo* analysis is to address whether the injunction's

15  "impact on comity is tolerable."  *Gallo*, 446 F.3d at 991.  "Comity is the

16  'recognition which one nation allows within its territory to the legislative, executive

17  or judicial acts of another nation, having due regard both to international duty and

18  convenience, and to the rights of its own citizens, or of other persons who are under

19  the protection of its laws.'"  *Gallo*, 446 F.3d at 994, citations omitted.  Comity is

20  "neither a matter of absolute obligation . . . nor of mere courtesy and good will."  *Id.*

21       The Court need not "calculate the precise quantum of the injunction's

22  interference with comity," but rather need only determine "whether any such

23  interference is so great as to be intolerable."  *Microsoft,* 696 F.3d at 886.  The Ninth

24  Circuit has made clear that private contractual disputes like this case have little, if

25  any, impact on comity.  *See id.* at 887 ("[C]omity is less likely to be threatened in

26  the context of a private contractual dispute than in a dispute implicating public

27  international law or government litigants.").  In *Gallo*, the Ninth Circuit held that the

28  fact the foreign suit was filed first "makes no difference as to the propriety of an

anti-suit injunction." *Gallo*, 446 F.3d at 994. This is particularly true when the competing actions are between private parties and do not directly involve a governmental interest or a matter of international law. *See id.*

The anti-suit injunction requested by Continental would have little impact on comity. This is a private commercial dispute between corporations based on the contractual promise made by Nokia and the other Defendants to license their SEPs to implementers like Continental on FRAND terms and conditions. The purpose of the present lawsuit is to enforce Defendants' obligation to license their SEPs to Continental, obtain a ruling that Defendants' demanded royalty rates are not FRAND, and establish the FRAND terms and conditions for a license to Defendants' SEPs. The requested anti-suit injunction merely prevents Nokia from continuing its campaign of harassment against Continental and its customers in an attempt to capture *supra*-FRAND royalty rates, while affording this Court the opportunity to adjudicate Defendants' obligations under their FRAND commitments without the risk of inconsistent, piecemeal judgments in a foreign court.

## V.   **CONCLUSION**

For the reasons set forth herein, Continental respectfully requests that this Court grant its motion for an anti-suit injunction and enter an order temporarily barring Nokia and any related entities from prosecuting the German Actions against Daimler. Further, Continental requests an order prohibiting Defendants from filing, or acting in concert with anyone else to file, any action against Continental or any of its customers (or subsidiaries or affiliates) alleging infringement of their global 2G, 3G and 4G SEPs during the pendency of the FRAND proceeding in this Court. The other Defendants should not be permitted to do in the future what Nokia has already improperly done in Germany.

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

Dated:  June 12, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By        _/s/ Matthew W. Holder_

STEPHEN S. KORNICZKY
MARTIN R. BADER
MATTHEW W. HOLDER
MICHAEL W. SCARBOROUGH
MONA SOLOUKI

Attorneys for Plaintiff Continental Automotive Systems, Inc.

Case No. 5:19-cv-02520-NC
MOTION FOR ANTI-SUIT INJUNCTION

# **<u>EXHIBIT 18</u>**

| | |
|---|---|
| **Gericht:** | LG München I 21. Zivilkammer |
| **Entscheidungsname:** | Anti-Suit-Injunction |
| **Entscheidungsdatum:** | 02.10.2019 |
| **Aktenzeichen:** | 21 O 9333/19 |
| **Dokumenttyp:** | Urteil |
| | |
| **Normen:** | § 823 Abs 1 BGB, § 1004 Abs 1 S 1 BGB, § 1004 Abs 1 S 2 BGB, § 1004 Abs 2 BGB, § 937 Abs 2 ZPO ... mehr |
| **Zitiervorschlag:** | LG München I, Urteil vom 2. Oktober 2019 – 21 O 9333/19 –, juris |

**Einstweiliges Verfügungsverfahren des Inhabers eines standardessentiellen Patents aus dem Bereich der Mobilfunkkommunikation: Vorbeugender Unterlassungsanspruch gegen die Beantragung bzw. Weiterverfolgung einer us-amerikanischen Anti-Suit-Injunction betreffend die Untersagung des Betreibens von Patentverletzungsstreiten in Deutschland**

### Orientierungssatz

1. Das Patentrecht als Ausschließlichkeitsrecht ist faktisch wertlos, wenn dem Patentinhaber die Möglichkeit genommen wird, sein Ausschließlichkeitsrecht über das allein zur Verfügung stehende staatliche Gewaltmonopol im Form des ordentlichen Gerichtsverfahrens auch durchzusetzen.(Rn. 109)

2. Das bedeutet, dass das Ausschließlichkeitsrecht auch die Befugnis des Patentinhabers beinhaltet zu entscheiden, ob und ggf. gegen wen er sein Ausschließlichkeitsrecht durchsetzt und gegen wen nicht.(Rn. 110)

3. In dieses Recht greift eine Anti-Suit-Injunction in den USA, mit der einem Inhaber von Schutzrechten, insbesondere auf dem Gebiet der Mobilfunktelekommunikation, die Fortführung mehrerer Patentverletzungsklagen in Deutschland untersagt werden soll bzw. wird, bis durch das us-amerikanische Gericht geklärt ist, ob eine Lizenzierung der Mobilfunktelekommunikationspatente zu angemessenen FRAND-entsprechenden Bedingungen zu erfolgen hat, in erheblichen Maße ein.(Rn. 110)

4. Dieser Eingriff ist nach dem allein maßgeblichen deutschen Recht auch rechtswidrig. Die Rechtswidrigkeit folgt daraus, dass die Anti-Suit Injunction darauf abzielt, dem Patentinhaber seine Klagebefugnisse im Inland zu nehmen.(Rn. 112)

5. Die Rechtswidrigkeit wird auch nicht dadurch beseitigt, dass der Antrag auf Erlass einer Anti-Suit Injunction in den USA ein zulässiger Rechtsbehelf und die Anti-Suit Injunction eine zulässige Maßnahme der US-amerikanischen Rechtsprechung ist. Maßgeblich für die Beurteilung der Rechtswidrigkeit bzw. der Rechtmäßigkeit einer Handlung ist allein die Rechtsordnung der Bundesrepublik Deutschland und der Europäischen Union, die ein derartiges Rechtskonstrukt aber nicht kennt bzw. sogar ablehnt.(Rn. 113)

6. Von daher kann es dem Antragsteller einer solchen Anti-Suit-Injunction in einem deutschen einstweiligen Verfügungsverfahren untersagt werden, eine Anti-Suit-Injunction zu beantragen bzw. ein solches Verfahren außer zum Zweck der Antragsrücknahme weiter zu betreiben. Denn darin liegt ein Eingriff in ein sonstiges Recht i.S.d. § 823 Abs. 1 BGB (Patentrecht), dem mit einem vorbeugenden Unterlassungsanspruch begegnet werden kann (§ 1004 BGB).(Rn. 103)

7. Der Umstand, dass bei Befolgung der einstweiligen Verfügung dem Erlass einer Anti-Suit-Injunction die Grundlage entzogen wäre, verstößt nicht gegen Völkerrecht. Eine völkerrechtswidrige Einmischung in die Hoheitsrechte eines anderen Staates liegt nicht vor, wenn für die durch das Gericht eines anderen Staates erlassene Maßnahme ein ausreichender Inlandsbezug gemäß dem Territorialitätsprinzip besteht. Danach ist die Regelung der Auswirkung extraterritorialen Handelns auf das eigene Staatsgebiet (effects doctrine), etwa bei wettbewerbsbeschränkenden Wirkungen auf inländische Märkte zulässig.(Rn. 132)

Fundstellen

WuW 2019, 661-663 (red. Leitsatz und Gründe)
IPRspr 2019, Nr 327a, 683-689 (red. Leitsatz und Gründe)

**Tenor**

1. Die einstweilige Verfügung vom 11.07.2019 (Az. 21 O 9333/19) wird bestätigt.

2. Die Antragsgegnerin hat die Kosten des Rechtsstreits zu tragen.

3. Das Urteil ist vorläufig vollstreckbar.

**Tatbestand**

1    Die Antragstellerinnen wenden sich mit ihrem Antrag auf Erlass einer Unterlassungsverfügung gegen die Versuche der Antragsgegnerin, mittels einer sog. *Anti-Suit Injunction* in den USA die Fortführung mehrerer Patentverletzungsklagen in der Bundesrepublik Deutschland zu verhindern oder zumindest zu erschweren.

2    Die Antragstellerinnen sind Teil der N.-Unternehmensgruppe, die weltweit Telekommunikationsdienstleistungen und entsprechende Hardware- und Softwareprodukte anbietet. Die Antragstellerinnen sind Inhaberinnen mehrerer Schutzrechte, insbesondere auf dem Gebiet der Mobilfunktelekommunikation.

3    Die Antragsgegnerin ist Teil der C.-Gruppe; diese ist unter der Muttergesellschaft C. AG organisiert und eine weltweit operierende Unternehmensgruppe, die vor allem als Zulieferin der Automobilindustrie agiert.

4      Die Antragstellerin zu 1) ist Inhaberin folgender Patente:

5      - DE 60 240 446 C5;

6      - EP 1 671 505 B1;

7      - EP 2 087 626 B1;

8      - EP 1 273 199 B2;

9      - EP 1 929 826 B1;

10      - EP 2 087 629 B1;

11      - EP 2 145 404 B1

12      (Anlagenkonvolut AR 1).

13      Die Antragstellerin zu 2) ist Inhaberin folgender Patente:

14      - EP 2 797 239 B1;

15      - EP 2 286 629 B2;

16      - EP 2 981 103 B1

17      (Anlagenkonvolut AR 1a).

18      Die Patente betreffen Mobilfunktelekommunikation der zweiten (GSM), dritten (UMTS) und vierten (LTE) Generation.

19    Die C. AG erhob am 07.01.2019 unter dem Az. AT.40620 eine kartellrechtliche Beschwerde bei der EU Kommission, da sie der Auffassung ist, der N-Konzern verweigere unzulässiger Weise entgegen Art. 102 AEUV eine Lizenz an seinen standardessentiellen Patenten (Anlage AR 6).

20    Die Antragstellerinnen reichten am 21.03.2019 insgesamt zehn Patentverletzungsklagen gegen die D AG vor den Landgerichten München I, Mannheim und Düsseldorf ein. Diese sind beim LG München I unter den Aktenzeichen 21 O 3889/19 (= Patent EP 2 797 239 B1), 21 O 3891/19 (= Patent DE 60 240 446 C5) und 7 O 3890/19 (= Patent EP 1 671 505 B1), beim LG Düsseldorf unter den Aktenzeichen 4c O 17/19 (= Patent EP 2 087 629 B1), 4a O 26/19 (= Patent EP 2 087 626 B1) und 4a O 27/19 (= Patent EP 1 929 826 B1) und beim LG Mannheim unter den Aktenzeichen 2 O 34/19 (= Patent EP 2 981 103 B1), 2 O 35/19 (= Patent EP 2 286 629 B2), 2 O 36/19 (= Patent EP 2 145 404 B1) und 2 O 37/19 (= Patent EP 1 273 199 B2) anhängig.

21    In diesen Verfahren verkündete die Beklagte D AG jeweils unter anderen zwei Konzerngesellschaften der Antragsgegnerin, der C. A. GmbH und der C. A. H. Kft., den Streit. In sämtlichen Verfahren traten diese Konzerngesellschaften dem Rechtsstreit bei (Anlage AR 3, Anlage AR 5b). In keinem dieser Verfahren ist bisher ein Urteil ergangen.

22    Am 10.05.2019 erhob die Antragsgegnerin in den USA vor dem United States District Court, Northern District of California, Klage gegen die Av LLC, die Antragstellerinnen sowie weitere Dritte (Anlage AR 7). In diesem Verfahren möchte die Antragsgegnerin unter anderem eine Lizenzierung zu angemessenen, FRAND-entsprechenden Bedingungen betreffend die den Antragstellerinnen gehörenden Mobilfunktelekommunikationspatente erreichen ("*complaint for breach of FRAND commitments and violations of antitrust and unfair competition laws*") – vgl. Anlage AR 7, Seite 3/63).

23    Am 12.06.2019 beantragte die Antragsgegnerin im Rahmen des dortigen Verfahrens eine sogenannte *Anti-Suit-Injunction*, wonach den Antragstellerinnen von dem US-amerikanischen Gericht verboten werden soll, ihre vorgenannten Patentverletzungsklagen in Deutschland weiterzuführen, bis eine Entscheidung im dortigen Verfahren ergangen ist. Der Antrag lautet auszugsweise:

24    "*(…) Plaintiff C A Systems, Inc. ("C") respectfully requests that this Court enjoin Defendants N Solutions and Networks Oy and Networks Oy, N Technologies Oy, and any related entities (collectively, "N") from prosecuting the patent infringement actions filed in Germany against C's customer, D AG (the "German Actions"). The German Actions are more specifically identified as follows:*

25    *- N Solutions and Networks Oy v. D AG, First Munich Regional Court, Patent Division, No. 21 O 3889/19.*

26    *- N Solutions and Networks Oy v. D AG, First Munich Regional Court, Patent Division, No. 21 O 3890/19.*

27    *- N Solutions and Networks Oy v. D AG, First Munich Regional Court, Patent Division, No. 21 O 3891/19.*

28    *- N Solutions and Networks Oy v. D AG, Düsseldorf Regional Court, Patent Division, No. 4a O 26/19.*

29      *- N Solutions and Networks Oy v. D AG, Düsseldorf Regional Court, Patent Division, No. 4a O 27/19.*

30      *- N Solutions and Networks Oy v. D AG, Düsseldorf Regional Court, Patent Division, No. 4c O 17/19.*

31      *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 37/19.*

32      *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 36/19.*

33      *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 35/19.*

34      *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 34/19.*

35      *In addition, C seeks an order enjoining Defendants from instituting against C or any of its customers (or their subsidiaries or affiliates) any action alleging infringement of their global 2G, 3G and 4G SEPs during the pendency of the FRAND proceeding in this Court, or from acting in concert with anyone to institute such an action."*

36      (Anlage AR 4, Seite 2 ff. – Übersetzung Anlage AR 4a S. 2 ff.).

37      Das US-amerikanische Gericht gab den Antragstellerinnen Gelegenheit zur Stellungnahme zum Antrag der Antragsgegnerin auf Erlass einer Anti-Suit-Injunction bis zum 24.07.2019 und hatte eine mündliche Verhandlung auf den 10.10.2019 terminiert.

38      Daraufhin haben die Antragstellerinnen mit Schriftsatz vom 09.07.2019 gegen die hiesige Antragsgegnerin sowie C AG den Erlass einer einstweiligen Verfügung beantragt, wonach letzteren aufgegeben werden soll, die Beantragung und Weiterverfolgung einer *Anti-Suit-Injunction* zu unterlassen und einen darauf gerichteten Antrag zurücknehmen.

39      Das Gericht trennte mit Beschluss vom 11.07.2019 (Bl. 39/40 d. A.) das Verfahren gegen die C AG als neues Verfahren 21 O 9512/19 ab und erließ unter demselben Datum eine einstweilige Verfügung (Bl. 42/54 d. A.) gegen die Antragsgegnerin.

40      Die einstweilige Verfügung hat folgenden Tenor:

41      *1. Der Antragsgegnerin wird bei Meidung eines für jeden Fall der Zuwiderhandlung festzusetzenden*

*Ordnungsgeldes bis zu EUR 250.000,00 - ersatzweise Ordnungshaft - oder einer Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft an einem Mitglied des Board of Directors der Antragsgegnerin zu vollziehen ist,*

42      *untersagt,*

43      *eine Anti-Suit Injunction zu beantragen, mit der den Antragstellerinnen unmittelbar oder mittelbar verboten werden soll, eines oder mehrere der nachfolgend genannten Patentverletzungsverfahren in Deutschland, nämlich*

44      *1. Landgericht München I, Az. 21 O 3889/19;*

45      *2. Landgericht München I, Az. 21 O 3891/19;*

46      *3. Landgericht München I, Az. 7 O 3890/19;*

47      *4. Landgericht Düsseldorf, Az. 4a O 27/19;*

48      *5. Landgericht Düsseldorf, Az. 4a O 26/19;*

49      *6. Landgericht Düsseldorf, Az. 4c O 17/19;*

50      *7. Landgericht Mannheim, Az. 2 O 37/39;*

51      *8. Landgericht Mannheim, Az. 2 O 36/19;*

52      *9. Landgericht Mannheim, Az. 2 O 35/19;*

53      *10. Landgericht Mannheim, Az. 2 O 34/19;*

54      *weiter zu betreiben,*

55      *wenn dies geschieht wie mit dem Antrag auf Erlass einer Anti-Suit Injunction vom 12. Juni 2019 in dem Verfahren mit dem Aktenzeichen 5:19-cv-02520-LHK Akteneingangsnr. 32 vor dem United States Disctrict*

*Court - Northern District of California (Anlage AR 4),*

56    *wobei diese Unterlassungsverpflichtung insbesondere auch umfasst,*

57    *- das Gebot, den Antrag auf Erlass einer Anti-Suit Injunction vom 12. Juni 2019 in dem Verfahren mit dem Aktenzeichen 5:19-cv-02520-LHK Akteneingangsnr. 32 vor dem United States Disctrict Court - Northern District of California unverzüglich nach Zustellung dieses Verfügungsbeschlusses zurückzunehmen, und*

58    *- das Verbot, dieses Anti-Suit Injunction-Verfahren außer zum Zweck der Antragsrücknahme weiter zu betreiben.*

59    *2. Die Antragsgegnerin hat die Kosten des Rechtsstreits zu tragen.*

60    *3. Der Streitwert wird auf 2.500.000,00 € festgesetzt.*

61    *4. Mit dem Beschluss ist zuzustellen: Antragsschrift vom 09.07.2019 samt Anlagen.*

62    Die Antragsgegnerin legte gegen diese einstweilige Verfügung am 03.09.2019 Widerspruch ein (Bl. 80/117 d. A.). Zugleich nahm sie den Antrag auf Erlass einer *Anti-Suit-Injunction* im US-Amerikanischen Verfahren zurück und behielt sich die Neustellung für den Fall der Aufhebung der einstweiligen Verfügung vor (vgl. Anlage AR 27, AR 27a).

63    **Die Antragstellerinnen sind der Auffassung**, der Antrag auf Erlass der begehrten einstweiligen Verfügung gegen die hiesige Antragsgegnerin sei zulässig und begründet.

64    Zunächst sei die 21. Zivilkammer des Landgerichts München I gem. §§ 143 PatG, 937, 32 ZPO zuständig. Eine Hauptsache sei für das einstweilige Verfügungsverfahren nicht anderweitig anhängig. Die anderweitig anhängigen Verletzungsklagen stellten keine diesbezügliche Hauptsache dar. Deswegen gehe die Argumentation der Antragsgegnerin, das Verfahren sei diesbezüglich zu verweisen, fehl.

65    Die Antragsstellerinnen hätten auch ein Rechtsschutzbedürfnis und der Antrag sei begründet.

66    Die in den USA beantragte *Anti-Suit-Injunction* stelle einen Eingriff in ihre patentrechtlichen Ausschließlichkeitsrechte dar, weswegen ihnen bereits aufgrund der Beantragung ein vorbeugender Unterlassungsanspruch gemäß §§ 1004 Abs. 1 Satz 2 BGB analog in Verbindung mit § 823 Abs. 1 BGB wegen Erstbegehungsgefahr zustehe. Ebenso stelle dies eine vorsätzliche, sittenwidrige Schädigung im Sinne des § 826 BGB und einen rechtswidrigen Eingriff in den eingerichteten und ausgeübten Gewerbebetrieb dar.

67   Erstbegehungsgefahr liege insbesondere auch deshalb vor, weil eine *Anti-Suit-Injunction* nach dem Ermessen des Gerichts bereits vor einer terminierten mündlichen Verhandlung erlassen werden könne (vgl. Anlage AR 11) und zudem die Gerichte des neunten Bezirks, in dem auch das Verfahren der Antragsgegnerin gegen die Av LLC, die Antragstellerinnen und andere geführt werde, sich durch eine besonders extensive Rechtsauffassung in Bezug auf den Erlass von *Anti-Suit-Injunctions* auszeichneten.

68   Mit der beantragten *Anti-Suit-Injunction* werde den Antragstellerinnen untersagt, ihre Patentrechte in Deutschland gerichtlich geltend zu machen. Damit würden ihnen de facto ihre Rechte aus §§ 139 ff. PatG entzogen. Widersetzten sie sich der *Anti-Suit-Injunction*, stellte dies nach US-amerikanischem Recht ein "contempt of court" dar, was zu erheblichen Geldbußen führen könne. Eine *Anti-Suit-Injunction* sei nach deutschem Rechtsverständnis unzulässig. Dies habe auch das OLG Düsseldorf in seiner Entscheidung vom 10.01.1996, 3 VA 11/95, Rn. 29 – 31 so gesehen. Der EuGH habe gleichfalls die Vereinbarkeit von *Anti-Suit-Injunctions* mit dem Europarecht verneint.

69   Die Rechtswidrigkeit der *Anti-Suit-Injunction* sei durch den durch sie drohenden Eingriff in die Patentrechte der Antragstellerinnen indiziert. Ferner folge die Rechtswidrigkeit aus dem Umstand, dass durch eine *Anti-Suit-Injunction* der Justizgewährungsanspruch der Antragstellerinnen faktisch ausgehöhlt werde.

70   Schließlich sei das Begehren der Antragstellerinnen auch dringlich gewesen, da das US-Gericht nach freiem Ermessen vor der mündlichen Verhandlung am 10.10.2019 eine *Anti-Suit-Injunction* erlassen könne und zudem die Interessenabwägung eindeutig zugunsten der in ihren patentrechtlichen Ausschließlichkeitsrechten sowie ihrem Justizgewährleistungsanspruch gefährdeten Antragstellerinnen ausfiele. Ein schützenswertes Interesse der Antragsgegnerin sei demgegenüber nicht erkennbar.

71   Die Dringlichkeit bestehe auch nach Rücknahme des Antrags fort, da die Antragsgegnerin angekündigt habe, einen Antrag bei Erfolg im Widerspruch- bzw. Berufungsverfahren erneut zu stellen.

72   **Die Antragstellerinnen beantragen zuletzt,**

73   die einstweilige Verfügung der Kammer vom 11. Juli 2019 aufrecht zu erhalten.

74   **Die Antragsgegnerin beantragt zuletzt**,

75   das Verfahren nach § 281 ZPO an die nach dem Turnus zuständige allgemeine Zivilkammer, jedenfalls gem. § 937 ZPO an das jeweilige Gericht der Hauptsache zu verweisen, soweit das Gericht für den vorliegenden Verfügungsantrag örtlich und sachlich unzuständig ist,

76   darüber hinaus,

77    den Verfügungsantrag der Antragstellerinnen vom 9. Juli 2019 unter Aufhebung der einstweiligen Verfügung vom 11. Juli 2019 zurückzuweisen.

78    **Die Antragsgegnerin ist der Auffassung**, der vorliegende Verfügungsantrag sei unzulässig und unbegründet.

79    Die Antragsgegnerin bestreitet bereits die Zuständigkeit des Gerichts, da es sich vorliegend nicht um eine Patentstreitsache im Sinne des § 143 PatG handele und die Kammer jedenfalls für die nicht bei ihr anhängigen Verfahren sowohl nach dem innergerichtlichen Geschäftsverteilungsplan wie auch örtlich nicht zuständig sei. Denn dass eine zunächst bei ihr eingereichte Verfahren sei mittlerweile an die 7. Zivilkammer des LG München I wegen Vorbefassung abgegeben worden. Für die in Düsseldorf und Mannheim anhängigen Verfahren fehle es an der örtlichen Zuständigkeit gemäß § 937 ZPO. Zuständig seien nämlich die jeweiligen Gerichte der Hauptsache und diese seien – soweit Patentverletzungsklagen in Düsseldorf und Mannheim betroffen seien – eben diese Gerichte.

80    Ferner verneint sie, dass durch die beantragte *Anti-Suit-Injunction* eine dem Maßstab von §§ 1004 Abs. 1 Satz 2 BGB analog in Verbindung mit § 823 Abs. 1 BGB entsprechende Rechtsbeeinträchtigung erfolge. Ein absolutes Recht nach § 823 Abs. 1 BGB sei nur verletzt, wenn das Recht entzogen oder auf seine Substanz eingewirkt werde. Das sei vorliegend nicht der Fall. Denn die beantragte *Anti-Suit-Injunction* würde lediglich die prozessuale Durchsetzung standardessentieller Patente gegen bestimmte Betroffene beschränken. Den Antragstellerinnen stünde es weiterhin frei, gegen andere vorzugehen. Ferner müsse beachtet werden, dass die Durchsetzung standardessentieller Patente ohnehin besonderen Beschränkungen unterliege. Auch ein drohender Vermögensschaden der Antragstellerinnen sei nicht erkennbar.

81    Unabhängig davon fehle es an einem rechtswidrigen Eingriff. Im Gegenteil leide die bereits erlassene einstweilige Verfügung an einem inhärenten und unüberwindbaren Widerspruch. Denn indem die Kammer der Antragsgegnerin mittels gerichtlicher Verfügung aufgebe, die Fortführung einer nach US-amerikanischen Recht zulässigen *Anti-Suit-Injunction* zu unterlassen, werde gegen deutsches, europäisches Recht und Völkerrecht verstoßen. Das deutsche Recht kenne nämlich kein Prozessführungsverbot, wie die *Anti-Suit-Injunction*. Im Gegenteil, sei ein solches Prozessführungsverbot nach deutschem Recht rechtswidrig. Dies habe der BGH in der Entscheidung vom 13.03.1979, Az. VI ZR 117/77, festgestellt. Nicht anders habe das Bundesverfassungsgericht in der Entscheidung vom 25.02.1987, Az. 1 BvR 1086/85, ausgesprochen. Zudem habe der EuGH in mehreren Entscheidungen die Unvereinbarkeit von *Anti-Suit-Injunctions* bzw. Prozessführungsverboten mit dem Europarecht ausgesprochen. Dies gelte auch in Bezug auf Drittstaaten.

82    Das Begehren der Antragstellerinnen und eine entsprechende einstweilige Verfügung verstießen ferner gegen das Völkerrecht. Denn durch das die gerichtliche Untersagung, ein in einem Drittstaat zulässiges Verfahren (weiter) zu betreiben, werde jedenfalls mittelbar in dessen Hoheitsgewalt eingegriffen. Ein derartiger Eingriff stehe dem Gericht eines anderen Staates jedoch nach dem völkerrechtlichen Prinzip des "par in parem non habet imperium" nicht zu. Daraus folge, dass gegen einen rechtswidrigen Drittakt, die *Anti-Suit-Injunction*, das nationale Gericht, hier die erkennende Kammer, nicht ihrerseits mit einer völkerrechtswidrigen Verfügung antworten dürfe. Lediglich passive Maßnahmen seien erlaubt. Daher habe auch das OLG Düsseldorf in seiner Entscheidung vom 10.01.1996, Az. 3 VA 11/95, allein die Erledigung des Zustellungsantrags aus einer *Anti-Suit-Injunction* verweigert.

83    Die Antragstellerinnen könnten demnach nicht einerseits die Rechtswidrigkeit einer *Anti-Suit-Injunction* durch die Antragsgegnerin monieren und andererseits im selben Moment eine eben solche *Anti-Anti-*

*Suit-Injunction* vom Gericht verlangen.

84    Schließlich fehle den Antragsgegnerinnen das Rechtsschutzbedürfnis, da sie durch die Gewährung rechtlichen Gehörs im US-amerikanischen Verfahren und die zu erfüllenden Voraussetzungen für den Erlass einer *Anti-Suit-Injunction* ausreichend Rechtsschutz hätten.

85    Im Übrigen wird auf die Schriftsätze der Parteien nebst Anlagen sowie das Protokoll der mündlichen Verhandlung vom 02.10.2019 verwiesen.

**Entscheidungsgründe**

86    Der Antrag auf Erlass einer einstweiligen Verfügung ist zulässig und begründet. Die einstweilige Verfügung der Kammer vom 11.07.2019 war daher zu bestätigen.

**I.**

87    Der Antrag ist zulässig. Insbesondere ist die 21. Zivilkammer des Landgerichts zuständig.

88    1) Die sachliche Zuständigkeit ergibt sich aus § 143 PatG. Der vorliegende Rechtsstreit betrifft eine Patentstreitsache im Sinne dieser Vorschrift.

89    Es entspricht dem Zweck des Gesetzes (Amtliche Begründung zum Patentgesetz von 1936, §§ 51, 52, §§ 53, 54, Bl. 36, 103, 114 ff.), den Begriff der "Patentstreitsache" weit auszulegen und damit den Anwendungsbereich der an den Begriff anknüpfenden Vorschriften möglichst weit zu halten (Grabinski/Zülch, in: Benkard, Patentgesetz, 11. Auflage, 2015, § 143 Rn. 1).

90    Es ist nicht darauf abzustellen, ob in dem Rechtsstreit eine Erfindung mit einer Patentanmeldung oder einem erteilten Patent in Verbindung gebracht wird. Stattdessen sind vielmehr schlechthin alle Klagen zu den Patentstreitsachen zu zählen, die einen Anspruch auf eine Erfindung oder aus einer Erfindung zum Gegenstand haben oder sonst wie mit einer Erfindung eng verknüpft sind (BGH GRUR 2011, 662 – Patentstreitsache; BeckRS 2013, 06895 – Patentstreitsache II). Der Zusammenhang zwischen Erfindung und Klageanspruch muss nicht notwendig ein rechtlicher sein; eine "enge Verknüpfung" zwischen Erfindung und Rechtsstreit kann vielmehr auch durch rein tatsächliche Umstände hergestellt sein (dies., ebd.).

91    Vorliegend machen die Antragstellerinnen unter anderem die Verletzung eines sonstigen Rechts im Sinne des § 823 Abs. 1 BGB geltend. Bei diesem sonstigen Recht handelt es sich um ihre Patente. Die von ihnen begehrte Unterlassungsverfügung hat nach ihrem Vortrag – und allein dieser ist für die Frage der Zuständigkeit entscheidend (dies, a.a.O., Rn. 3 mit Verweis auf LG Düsseldorf, InstGE 1, 264) – seine

Grundlage in einer Erfindung im Sinne des § 1 PatG (vgl. Anlage AR 1, AR 1a). Der von Gesetz und Rechtsprechung geforderte enge Zusammenhang zu einer Erfindung ist daher gegeben.

92    2) Ferner ist das Gericht auch örtlich gemäß §§ 937, 32 ZPO zuständig, da der Erfolgsort auf dem Gebiet der Bundesrepublik Deutschland liegt und damit ein sog. fliegender Gerichtsstand vorliegt.

93    a) Der Antrag der Antragstellerinnen zielt darauf ab, der Antragsgegnerin aufzugeben, die bereits beantragte *Anti-Suit-Injunction* oder andere gleichwertige Maßnahmen in Bezug auf die 10 bei den Landgerichten München I, Düsseldorf und Mannheim anhängigen Patentverletzungsklagen zu unterlassen bzw. fortzuführen.

94    Der streitgegenständliche Antrag der Antragsgegnerin im US-Amerikanischen Verfahren auf Erlass der *Anti-Suit-Injunction* ist auf darauf gerichtet, den Antragstellerinnen zu untersagen, die in Deutschland erfolgte gerichtliche Geltendmachung ihrer Patentrechte weiter zu betreiben. Es soll ihnen verboten werden, in ganz Deutschland und damit insbesondere auch vor dem Landgericht München I ihre Patentrechte geltend zu machen. Dies ergibt sich aus der Antragsschrift:

95    "*Accordingly, C respectfully requests that the Court temporarily enjoin N from prosecuting its lawsuits in Germany against D until FRAND issues are finally resolved in this case.*"

96    (Anlage AR 4, dort Seite 11, Zeile 12-14; ferner Anlage AR 4, dort Seite 2, Zeile 12-16 sowie Seite 29, Zeile 10-15).

97    Der Antrag auf *Anti-Suit-Injunction* ist daher nicht allein auf die konkrete Unterlassung der Weiterverfolgung der bereits anhängigen Klagen am jeweiligen Gerichtsstandort, sondern in ganz Deutschland gerichtet. Eine Rücknahme der Klagen in Düsseldorf und Mannheim und eine Klageerhebung stattdessen am Landgericht München I soll mit dem Antrag auf Erlass einer *Anti-Suit-Injunction* ebenfalls unterbunden werden. Denn nur so kann das nach den Angaben der Antragsschrift mit der *Anti-Suit-Injunction* verfolgte Ziel, eine umfassende Lizenzvereinbarung mit Av bzw. den Antragstellerinnen im Verfahren in den USA zu erzielen (vgl. Anlage AR 4, dort Seite 11, Zeile 12-14), erreicht werden.

98    Entsprechend ist auch der Antrag der Antragstellerinnen zu verstehen.

99    b) Da die von den Antragstellerinnen in den Patentverletzungsklagen beantragten Rechtsfolgen, wie etwa Unterlassung und Auskunft, eine deutschlandweite Wirkung haben, liegt der Erfolgsort einer beantragten *Anti-Suit-Injunction* nicht nur am Ort des Gerichts der Patentverletzungsklage, sondern in der gesamten Bundesrepublik. Die aus einer etwaigen Patentverletzung resultierenden Ansprüche nach §§ 139 ff. PatG könnten – da die Verfahren infolge einer *Anti-Suit Injunction* nicht weiter geführt werden – deutschlandweit nicht durchgesetzt werden.

100    c) Damit liegt ein Erfolgsort im Sinne des § 32 ZPO (vgl. Vollkommer, in: Zöller, ZPO, 31. Auflage, 2016, § 32 Rn. 16) nicht am Ort des Gerichtssitzes der jeweils anhängigen Klagen, sondern in gesamten Gebiet der Bundesrepublik Deutschland und damit auch im Zuständigkeitsbereich des Landgerichts

München I. Dieses ist daher örtlich zuständiges Hauptsachegericht im Sinne des § 937 ZPO.

**II.**

101    Der Antrag ist auch begründet. Verfügungsanspruch und -Grund bestehen.

102    1) Es besteht ein Verfügungsanspruch, da den Antragstellerinnen ein Unterlassungsanspruch aus § 1004 (analog) i. V. m. § 823 Abs. 1 BGB gegen die Antragsgegnerin zusteht.

103    a) Der Erlass der seitens der Antragsgegnerin begehrten *Anti-Suit Injunction* würde in geschützte Rechtsgüter der Antragstellerinnen eingreifen. Patente sind nach allgemein anerkannter Meinung als sonstige Rechte im Sinne des § 823 Abs. 1 BGB geschützt (vgl. etwa MüKo-BGB, § 823, Rn. 282).

104    aa) Zwar würde der Erlass der *Anti-Suit Injunction* die Antragstellerinnen nicht unmittelbar daran hindern, die vorbezeichneten Patentverletzungsverfahren in Deutschland weiter zu betreiben. Denn diese würde in Deutschland keine Wirkung entfalten, da sie keinen hier vollstreckbaren Inhalt enthielte (vgl. etwa OLG Düsseldorf ZIP 1996, 294). Insgesamt liegt die Entscheidung, ob die gerichtliche Anordnung befolgt wird – oder nicht – daher letztlich bei den Antragstellerinnen.

105    Allerdings würde ein Fortführen der hiesigen Patentverletzungsverfahren durch die Antragstellerinnen nach Erlass einer *Anti-Suit Injunction* für die Antragstellerinnen in den USA weitreichende Folgen haben; sie hätten insbesondere erhebliche wirtschaftliche Nachteile zu befürchten. Aufgrund des – unwidersprochenen – Vortrags der Antragstellerinnen und der durch die Anlage AR 11, Ziffer 7, glaubhaft gemachten drohenden Strafen bei Nichtbefolgung, geht das Gericht davon aus, dass die Antragstellerinnen einer *Anti-Suit-Injunction* Folge leisten werden.

106    bb) Entgegen den Ausführungen der Antragsgegnerin liegt darin auch ein Eingriff in ein absolutes Recht im Sinne des § 823 Abs. 1 BGB.

107    Voraussetzung des Schutzes nach § 1004 BGB ist eine Beeinträchtigung des Eigentums, die in anderer Weise als durch Entziehung oder Vorenthaltung des Eigentums erfolgt. Diese Beeinträchtigung ist im Falle des § 1004 Abs. 1 Satz 1 BGB eine gegenwärtige, im Falle des § 1004 Abs 1 Satz 2 eine zu erwartende, zukünftige. Beeinträchtigung in diesem Sinne ist jeder dem Inhalt des Eigentumsrechts widersprechende tatsächliche Zustand oder Vorgang (Gursky, in: Staudinger, BGB, 2012, § 1004 Rn. 17).

108    Dementsprechend kann eine Eigentumsbeeinträchtigung auch einfach darin liegen, dass der Eigentümer bei der Ausübung des ihm zustehenden Besitzes behindert oder belästigt wird, also an irgendeiner zulässigen Benutzung der Sache oder einer sonstigen rechtmäßigen Einwirkung auf diese gehindert wird (ders. a.a.O., Rn. 33 mit Verweis auf BGHZ 146, 98, 101 = WM 2001, 512, 513; OLGR Saarbrücken 2004, 497, 498).

109    Es kann demnach keinen Unterschied machen, ob jemand den Eigentümer eines Grundstücks daran hindert, auf seinem Grundstück ein Bauwerk oder einen Zaun zu errichten (ders. a.a.O., Rn. 33) oder den Patentinhaber an der Ausübung seines Ausschließlichkeitsrechts nach §§ 9 ff., 139 ff. PatG hindert. Es ist sogar zu konstatieren, dass das Patentrecht als Ausschließlichkeitsrecht (vgl. § 9 PatG) faktisch wertlos ist, wenn dem Patentinhaber die Möglichkeit genommen wird, sein Ausschließlichkeitsrecht über das allein zur Verfügung stehende staatliche Gewaltmonopol im Form des ordentlichen Gerichtsverfahrens auch durchzusetzen.

110    Dass es den Antragstellerinnen auch nach der *Anti-Suit-Injunction* unbenommen bleibt, andere als die dort genannten zu verklagen oder Dritten Lizenzen zu erteilen, ändert daran nichts. Denn das Ausschließlichkeitsrecht gilt gerade gegenüber jedermann ("jedem Dritten"). Das bedeutet, dass das Ausschließlichkeitsrecht auch die Befugnis des Patentinhabers beinhaltet zu entscheiden, ob und ggf. gegen wen er sein Ausschließlichkeitsrecht durchsetzt und gegen wen nicht. In dieses Recht greift eine *Anti-Suit-Injunction* in erheblichen Maße ein. Das gilt auch und gerade für den vorliegenden Fall. Denn die Patentverletzungsklagen sind gerade nicht gegen einen vermeintlich unbedeutenden Patentbenutzer gerichtet, sondern gegen einen weltweit führenden Fahrzeughersteller. Die vom Gericht unterstellte erhebliche wirtschaftliche Dimension von dessen gerichtlicher Inanspruchnahme zeigt, dass es sich – anders als die Antragsgegnerin behauptet – gerade nicht um eine bloße unbedeutende Beeinträchtigung des jeweiligen Patentrechts handelt.

111    b) Dieser Eingriff ist nach dem allein maßgeblichen deutschen Recht auch rechtswidrig. Grundsätzlich indiziert der Eingriff die Rechtswidrigkeit (vgl. etwa MüKo-BGB § 1004, Rn. 198).

112    Die Rechtswidrigkeit folgt auch daraus, dass die *Anti-Suit Injunction* darauf abzielt, den Antragsgegnerinnen ihre Klagebefugnisse im Inland zu nehmen. Dadurch ist ein rechtsstaatlich ordnungsgemäßes Gerichtsverfahren gefährdet, da dieses nur gewährleistet ist, wenn die Beteiligten ohne jede Beschränkung die nach der Prozesslage notwendigen Anträge stellen können (OLG Düsseldorf, aaO. Rn. 31). Die durch die Anti-Suit-Injunction drohende Nichtweiterführung der Patentverletzungsklagen widerspricht dem eigentumsrechtlichen Zuweisungsgehalt des Patents nach §§ 9 f., 139 ff. PatG.

113    aa) Die Rechtswidrigkeit wird auch nicht dadurch beseitigt, dass der Antrag auf Erlass einer *Anti-Suit Injunction* in den USA ein zulässiger Rechtsbehelf und die *Anti-Suit Injunction* eine zulässige Maßnahme der US-amerikanischen Rechtsprechung ist. Maßgeblich für die Beurteilung der Rechtswidrigkeit bzw. der Rechtmäßigkeit einer Handlung ist allein die Rechtsordnung der Bundesrepublik Deutschland und der Europäischen Union, die ein derartiges Rechtskonstrukt aber nicht kennt bzw. sogar ablehnt.

114    bb) Auch der in diesem Zusammenhang erfolgte Verweis der Antragsgegnerin auf die Entscheidungen des BGH (Az. VI ZR 117/77) und des BVerfG (Az. 1 BvR 1086/85) ist nicht zielführend.

115    So ist in Bezug auf diese Entscheidungen zum einen zu beachten, dass allein das Indizieren der Rechtswidrigkeit durch ein rechtsstaatliches Verfahren verneint wurde. Das bedeutet nicht, dass ein – nach deutschen Maßstäben nicht rechtsstaatliches Prozessverhalten, nämlich die Beantragung einer *Anti-Suit-Injunction* – automatisch rechtmäßig ist. Die Rechtswidrigkeit wird lediglich nicht indiziert. Entsprechend lautet auch der amtliche 2. Leitsatz der BGH-Entscheidung:

116    *"2. Das Verfahren zur Abnahme der eidesstattlichen Versicherung gegen einen Gewerbetreibenden (hier:*

*Versicherungsvertreter) und dessen zeitweilige Eintragung im Schuldnerverzeichnis stellen **grundsätzlich noch keinen Eingriff in den eingerichteten und ausgeübten** Gewerbebetrieb dar." (Hervorhebung durch das Gericht)*

117     Zum anderen war in beiden Verfahren jeweils ein deutsches Verfahren Gegenstand der Prüfung. Die Entscheidungen beziehen sich daher auf nach deutschem Verständnis rechtmäßige Verfahren. Aus ihnen kann daher nicht hergeleitet werden, dass jedes nach dem Recht eines Drittstaates zulässiges Verhalten/Verfahren automatisch das Placet der deutschen Rechtsordnung erhält.

118     c) Aus den gleichen Gründen besteht auch keine Duldungspflicht für die Antragsgegnerinnen nach § 1004 Abs. 2 BGB (analog).

119     d) Durch den Antrag auf Erlass der *Anti-Suit Injunction* hat die Antragsgegnerin die konkrete Gefahr eines rechtswidrigen Eingriffs in die nach § 823 Abs. 1 BGB geschützten Patentrechte der Antragstellerinnen geschaffen. Die Antragstellerinnen brauchen daher nicht die erste rechtswidrige Beeinträchtigung durch den Erlass der *Anti-Suit Injunction* abzuwarten. Vielmehr besteht eine sog. Erstbegehungsgefahr, da diese erste Beeinträchtigung hinreichend nahe bevorsteht. Mit dem Erlass einer *Anti-Suit Injunction* ist zumindest ab 24.07.2019 zu rechnen. Hierbei ist die Entscheidung in das Ermessen des US-amerikanischen Gerichts gestellt - mit der Stellung des Antrags hat die Antragsgegnerin das dortige Verfahren in Lauf gesetzt.

120     Die Erstbegehungsgefahr entfällt auch nicht dadurch, dass die Antragsgegnerin ihren Antrag nunmehr auf Druck der einstweiligen Verfügung zurückgenommen hat. So hat die Antragsgegnerin sich ausdrücklich die erneute Stellung des Antrags vorbehalten, sollte die einstweilige Verfügung aufgehoben werden.

121     e) Schließlich verfangen die weiteren Einwände der Antragsgegnerin gegen den Erlass der einstweiligen Verfügung nicht.

122     aa) Die Antragsgegnerin rügt, das Gericht sanktioniere eine von ihm als rechtswidrig betrachtete *Anti-Suit-Injunction* seinerseits mit einem Prozessführungsverbot. Dies sei widersprüchlich und verstoße gegen Völkerrecht, Europarecht und deutsches Verfassungs- und einfaches Bundesrecht.

123     bb) Entgegen der Ansicht der Antragsgegnerin hat das Gericht keine Prozessführungsverbote ausgesprochen.

124     Wie die Antragsgegnerin ausführt, dient die *Anti-Suit-Injunction* der von deutschen Gerichtsentscheidungen ungestörten Prozessführung in den USA. Dieser Gerichtsprozess ist das von der Antragsgegnerin am 10.05.2019 vor dem United States District Court, Northern District of California angestrengte Verfahren (19-cv-2520, vgl. Anlage AR 7) gegen die Antragstellerinnen sowie die Av, LLC et al. Dieses Verfahren bezeichnet die Antragsgegnerin im Schriftsatz vom 09.08.2019 (Seite 7 / Bl. 74 d.A.) als US-Hauptsacheverfahren. Dieses Verfahren soll durch die *Anti-Suit-Injunction* nicht in der Weise beeinträchtigt werden, dass sich die D AG in Deutschland aufgrund der dort anhängigen Klagen gegen sie mit den Antragstellerinnen vergleicht:

125     *"N's German lawsuits are an attempt to force D and other OEMs to accept non-FRAND licenses before this Court has an opportunity to adjudicate the case on the merits, and thus should be enjoined."*

126     (Anlage AR 4, Seite 9, Zeile 8-10; vgl. auch Schriftsatz der Antragsgegnerin vom 09.08.2019, Seite 7, Absatz 19).

127     Die gegen Antragsgegnerin erlassene einstweilige Verfügung der Kammer gibt ihr nicht auf, das Hauptsacheverfahren zurückzunehmen oder nicht weiter zu betreiben. Sie gibt ihr lediglich auf, innerhalb dieses Hauptsacheverfahrens alles zu unterlassen, was die Antragstellerinnen an einer Ausübung ihrer patentrechtlichen Ausschließlichkeitsrechte in Deutschland hindert. Dadurch bleibt das Recht der Antragsgegnerin, ihre Klage in den USA weiterzuverfolgen, unberührt (vgl. bereits 21 O 9333/19, dort Seite 11 Buchst. cc). Es handelt sich daher bei der einstweiligen Verfügung – anders als bei der *Anti-Suit-Injunction* – nicht um ein gerichtliches Verbot, Prozesse zu führen. Der Antragsgegnerin wird nur untersagt, in einem gerichtlichen Verfahren eine gerichtliche Maßnahme zu erwirken, die den Antragstellerinnen ein Prozessführungsverbot auferlegt.

128     Der Antragsgegnerin bleibt es nach den Entscheidungen der hiesigen Kammer unbenommen, die Antragstellerinnen mit weiteren Klagen weltweit zu beanspruchen. Allein die Beeinträchtigung der Patentrechte der Antragstellerinnen durch ein faktisches Verbot der Weiterführung ihrer Verletzungsklagen – innerhalb des weiterhin unangetasteten US-Hauptsacheverfahrens – wird ihnen untersagt. Ein Prozessführungsverbot liegt somit gerade nicht vor.

129     cc) Das vorliegende Unterlassungsgebot verstößt ferner nicht gegen Völkerrecht.

130     Anders als die Antragsgegnerin, aber auch die Antragstellerinnen, behaupten, geht die Kammer nicht davon aus, dass eine *Anti-Suit-Injunction* völkerrechtswidrig ist. Der Annahme der Völkerrechtswidrigkeit steht bereits entgegen, dass zwei weltweit außerordentlich bedeutende Rechtsordnungen, nämlich die US-amerikanische und die britische Rechtsordnung, die *Anti-Suit-Injunction* für zulässig erachten. Da völkerrechtliche Regeln stets auf der gemeinsamen Überzeugung der überwiegenden, wenn nicht der gesamten Völkergemeinschaft beruhen, scheidet bereits aus diesem Grund eine Völkerrechtswidrigkeit aus (vgl. auch Geimer, Internationales Zivilprozessrecht, 7. Auflage, 2015, Dritter Teil, 1. Kapitel, Ziffer VII. Rn. 399c).

131     Selbstverständlich haben auch die deutschen Gerichte die verbindlichen Regeln des Völkerrechts gemäß Art. 25 GG bzw. des Völkervertragsrechts gemäß Art. 59 Abs. 2 GG zu beachten. Aus dem von der Antragsgegnerin zitierten völkerrechtlichen Grundsatz "par in parem non habet imperium" folgt indes ebenso wenig wie aus anderen völkerrechtlichen Grundsätzen die Rechtswidrigkeit der einstweiligen Verfügung.

132     Der Umstand, dass bei Befolgung der einstweiligen Verfügung dem Erlass einer *Anti-Suit-Injunction* die Grundlage entzogen wäre, verstößt nicht gegen Völkerrecht. Eine völkerrechtswidrige Einmischung in die Hoheitsrechte eines anderen Staates liegt nicht vor, wenn für die durch das Gericht eines anderen Staates erlassene Maßnahme ein ausreichender Inlandsbezug gemäß dem Territorialitätsprinzip besteht. Danach ist die Regelung der Auswirkung extraterritorialen Handelns auf das eigene Staatsgebiet (effects doctrine), etwa bei wettbewerbsbeschränkenden Wirkungen auf inländische Märkte zulässig (vgl. Herdegen, in: Maunz/Dürig, Grundgesetz-Kommentar, Werkstand: 86. EL, Januar 2019, Art. 25 Rn. 50). So ist für das Steuerrecht anerkannt, dass auch Ausländer für Abgaben herangezogen werden können, wenn

ein entsprechender Anknüpfungsmoment, wie etwa die Staatsangehörigkeit, Niederlassung, Wohnsitz oder Aufenthalt im Inland, die Verwirklichung eines Abgabentatbestandes im Inland oder die Herbeiführung eines abgabenrechtlich erheblichen Erfolges im Inland gegeben ist (vgl. BVerfG NJW 1983, 2757, 2761, 4 b). Demnach ist es ebenfalls zulässig, demjenigen, der im Ausland die Beeinträchtigung/Störung von Eigentumsrechten in Deutschland betreibt, von Gerichtswegen die Unterlassung aufzugeben.

133    Ein Eingriff in staatliche Hoheitsrechte liegt auch deswegen nicht vor, da die einstweilige Verfügung nicht die *Anti-Suit-Injunction* des US-Gerichts selbst verbietet, sondern der Antragsgegnerin aufgibt, keine solche zu erwirken bzw. weiter zu betreiben.

134    Dies stellt keine – von der Antragsgegnerin behauptete – faktische Ausübung von Hoheitsgewalt über das US-amerikanische Gerichtsverfahren dar. Erlassen die US-Gerichte eine *Anti-Suit-Injunction* nur auf Betreiben eines Prozessbeteiligten, ist ihre Hoheitsgewalt nicht betroffen, da der Erlass vom Handeln eines Prozessbeteiligten abhängig ist und somit keine umfassende, vom Verhalten Dritter unabhängige Hoheitsgewalt vorliegt. Die USA hätten sich dann insoweit gerade der umfassenden Hoheit entledigt und für die Einflussnahme Dritter geöffnet. Anders ist dies in vielen Staaten im Strafprozessrecht, wo die Strafverfolgung unabhängig vom Handeln/Antrag einer Privatperson ist (Legalitätsprinzip statt Parteimaxime). Erlassen die US-Gerichte unabhängig vom Betreiben eines Prozessbeteiligten eine *Anti-Suit-Injunction*, berührt sie der Erlass einer einstweiligen Verfügung wie von der hiesigen Kammer erlassen, gar nicht (vgl. Geimer, a.a.O.).

135    Ist aber schon eine *Anti-Suit-Injunction* nicht völkerrechtswidrig, ist es das mit der einstleigen Verfügung im Verfahren 21 O 9333/19 sowie im hiesigen Verfahren angeordnete "Weniger" in Bezug auf das Betreiben einer solchen durch eine Partei, erst recht nicht.

136    dd) Auch ein Verstoß gegen Europarecht kann nicht konstatiert werden. Zum einen sind europarechtliche Vorschriften mangels eines grenzüberschreitenden, innereuropäischen Sachverhalts bereits nicht einschlägig. Zum anderen belegen auch die von der Antragsgegnerin vorgelegten Entscheidungen nicht, dass die vorliegende Verfügung gegen Europarecht verstößt.

137    So haben die angeführten Entscheidungen des EuGH jeweils *Anti-Suit-Injunctions* eines europäischen Gerichts zum Gegenstand, mit denen die Prozessführung in einem anderen europäischen Staat unterbunden werden soll. Nur für diese Fälle hat der EuGH in der Tat ausgesprochen, dass sie Europarecht, insbesondere der europäischen Gerichtszuständigkeitsverordnung, widersprechen.

138    Gleichfalls liegen den Entscheidungen des EuGH Sachverhalte zugrunde, bei denen die Weiterführung bzw. Erhebung eines eigenständigen Gerichtsverfahrens mittels *Anti-Suit-Injunction* untersagt wird (vgl. EuGH, EuZW 2004, 468, 469 – Turner/Grovit). Genau das ist hier – wie oben unter b) ausgeführt – nicht der Fall.

139    ee) Schließlich verstößt das Gericht auch nicht gegen deutsches Verfassungs- oder einfaches Bundesrecht.

140    Dass zur Begründung des Gegenteils von der Antragsgegnerin angeführten Entscheidungen des BGH und

des BVerfG nicht tauglich sind, wurde bereits oben erläutert.

141    Zudem liegt – wie ebenfalls bereits ausgeführt – kein Prozessführungsverbot vor.

142    Selbst wenn man dazu käme, einen Eingriff in die Grundrechte der Antragsgegnerin anzunehmen, etwa in Gestalt von Art. 2 Abs. 1 GG, ggf. in Verbindung mit Art. 19 Abs. 4 GG, wäre dieser jedenfalls gerechtfertigt und verhältnismäßig. Denn auf der anderen Seite wären die ebenfalls schützenwerten Interessen der Antragstellerinnen, namentlich das Eigentumsrecht aus Art. 14 GG sowie der Justizgewährungsanspruchs aus Art. 19 Abs. 4 GG zu berücksichtigen. Die Abwägung der Grundrechte gegeneinander führt zu einer Entscheidung zugunsten der Antragstellerinnen, da sie sich nicht nur auf das Grundrecht aus Eigentum, sondern auch den Justizgewährungsanspruch berufen können. Ob die Antragsgegnerin sich in Bezug auf Art. 19 Abs. 4 GG auch auf ein nach deutschem Verständnis rechtswidriges Verfahren in einem außereuropäischen Drittstaat berufen kann, ist demgegenüber fraglich.

143    2) Es besteht auch ein Verfügungsgrund, da die Sache dringlich ist und die Interessen der Antragstellerinnen am Erlass der einstweiligen Verfügung die der Antragsgegnerin überwiegen.

144    a) Zunächst haben die Antragstellerinnen durch ihr Verhalten gezeigt, dass ihnen die Sache dringlich ist. Sie haben insbesondere innerhalb einer Frist von weniger als einem Monat nach Kenntnis des Antrags auf Erlass einer *Anti-Suit Injunction* vom 12.06.2019 - nämlich am 09.07.2019 - den Antrag auf Erlass einer einstweiligen Verfügung gestellt.

145    b) Auch war vorliegend zunächst eine Entscheidung im Beschlusswege gemäß § 937 Abs. 2 ZPO ausnahmsweise ohne vorherige Anhörung der Antragsgegnerin wegen besonderer Dringlichkeit geboten.

146    Zwar gebietet der Grundsatz der prozessualen Waffengleichheit, in einem gerichtlichen Verfahren der Gegenseite grundsätzlich vor einer Entscheidung Gehör und damit die Gelegenheit zu gewähren, auf eine bevorstehende gerichtliche Entscheidung Einfluss zu nehmen (BVerfG 2018, 3631 Rn. 15 m.w.N.). Allerdings ist in den besonderen Verfahrenslagen des einstweiligen Rechtsschutzes eine vorherige Anhörung verzichtbar, wenn sie den Zweck des Verfahrens vereiteln würde, wie etwa im Arrestverfahren, bei der Anordnung von Untersuchungshaft oder bei Wohnungsdurchsuchungen (BVerfG aaO.).

147    Im vorliegenden Fall wäre der Kammer eine mündliche Verhandlung frühestens am 19.07.2019 möglich gewesen. Eine Absetzung, Ausfertigung und Zustellung des Urteils an die Antragsgegnerin wäre daher vor Ablauf der Stellungnahmefrist der Antragstellerinnen am 24.07.2019 nicht gesichert gewesen - ab diesem Zeitpunkt wäre es dem US-amerikanischem Gericht aber möglich, eine *Anti-Suit Injunction* zu erlassen. Damit liefen die Antragstellerinnen Gefahr, ihrer Rechte verlustig zu werden.

148    Auch eine Anhörung der Antragsgegnerin hätte zu einer entsprechenden Verzögerung geführt. Im Übrigen wäre zu befürchten gewesen, dass die Antragsgegnerin bei Kenntnis des hiesigen Verfügungsantrags das US-amerikanische Gericht über das hiesige Geschehen informiert, um einstweilige Maßnahmen gegen das hiesige Verfügungsverfahren zu beantragen (vgl. Anlagen AR 11 und AR 12). Damit liefen die Antragstellerinnen ebenfalls Gefahr, dass ihre hiesigen Rechte vereitelt werden.

149    Nach alldem ist eine den Beispielsfällen des Bundesverfassungsgerichts vergleichbare Lage gegeben, die den Erlass der einstweiligen Verfügung ohne vorherige Anhörung der Antragsgegnerin rechtfertigt. Deren Anspruch auf rechtliches Gehör ist in einem etwaigen Widerspruchsverfahren nachzuholen.

150    Insofern verfängt auch die Argumentation der Antragsgegnerin nicht, sie hätte eine weitere Replikfrist bis zum 09.08.2019 bekommen und das Gericht hätte nicht vorher entschieden. Insofern haben die Antragstellerinnen glaubhaft gemacht, dass das US-Amerikanische Gericht jederzeit "nach Abschluss der schriftlichen Eingaben (d. h. nach dem 24. Juli)" entscheiden könne (Anlage AR 11a S. 2). Ob das Gericht damit tatsächlich eine weitere Replik der Antragsgegnerin abgewartet hätte, wie von dieser behauptet (Bl. 88 d. A.), ist nicht ausreichend glaubhaft gemacht.

151    c) Die Angelegenheit ist auch weiterhin dringlich – insbesondere ist die Dringlichkeit nicht durch Rücknahme des Antrags auf Erlass der *Anti-Suit-Injunction* entfallen. Die Antragsgegnerin hat selbst klargestellt, dass sie jederzeit nach Wegfall einer Unterlassungsverfügung wieder einen Antrag stellen würde. Ein Abwarten der Hauptsache kann den Antragstellerinnen daher nicht genügen, da dann wiederum jederzeit mit einer Entscheidung des US-Gerichts gerechnet werden müsste.

152    d) Auch die Interessenabwägung fällt zugunsten der Antragsstellerinnen aus. Insbesondere verfügt die Antragsgegnerin, die an den hiesigen Patentverletzungsverfahren in der Bundesrepublik Deutschland weder als Streithelferin noch als Partei beteiligt ist, nicht über ein schützenswertes Interesse.

153    Zu berücksichtigen ist diesbezüglich auch, dass die einstweilige Verfügung nicht darauf gerichtet ist (im Gegensatz zur beantragten *Anti-Suit Injunction*), die Antragsgegnerin ihre Klagerechte zu nehmen. Denn die einstweilige Verfügung richtet sich gerade nicht gegen die Hauptsacheklage, die in den USA anhängig ist (vgl. oben).

**III.**

154    Die Kostenentscheidung folgt aus § 91 Abs. 1 S. 1 ZPO.

155    Einer gesonderten Entscheidung über die vorläufige Vollstreckbarkeit bedarf es nicht. Es folgt aus der Natur der Sache, dass die einstweiligen Rechtsschutz gewährende Entscheidung sofort vollstreckbar sein muss.

| | |
|---|---|
| **Court:** | Regional Court Munich I 21st Civil Chamber |
| **Decision name:** | Anti-Suit-Injunction |
| **Decision date:** | 02.10.2019 |
| **File number:** | 21 O 9333/19 |
| **Document type:** | Judgment |
| | |
| **Standards:** | § Section 823 (1) BGB, Section 1004 (1) sentence 1 BGB, Section 1004 (1) sentence 2 BGB, Section 1004 (2) BGB, Section 937 (2) ZPO ... more |
| **Suggested citation:** | Regional Court Munich I, judgment of October 2, 2019 - 21 O 9333/19 -, juris |

**Preliminary injunction proceedings of the owner of a standard-essential patent in the field of mobile communications: Preventive injunctive relief against the application for or pursuit of a US anti-suit injunction prohibiting the conduct of patent infringement litigation in Germany**

**Guiding principle**

1. the patent right as an exclusive right is de facto worthless if the patent proprietor is deprived of the possibility of enforcing his exclusive right via the state monopoly on the use of force that is solely available in the form of ordinary court proceedings (para. 109).

(2) This means that the exclusive right also includes the power of the patent proprietor to decide whether and, if so, against whom he enforces his exclusive right and against whom he does not.(para. 110)

3. an anti-suit injunction in the USA, with which a holder of property rights, in particular in the field of mobile telecommunications, is to be or is being prohibited from continuing several patent infringement actions in Germany until the US court has clarified whether the mobile telecommunications patents are to be licensed on appropriate FRAND-compliant terms, interferes with this right to a considerable extent (para. 110).

4) This interference is also unlawful under the only applicable German law. The unlawfulness follows from the fact that the anti-suit injunction aims to deprive the patent proprietor of its right to sue in Germany (para. 112).

5 The illegality is also not eliminated by the fact that the application for an anti-suit injunction is a permissible legal remedy in the USA and the anti-suit injunction is a permissible measure in US jurisdiction. Only the legal system of the Federal Republic of Germany and the European Union, which does not recognize or even rejects such a legal construct, is decisive for the assessment of the illegality or legality of an act (para. 113).

6 Therefore, the applicant for such an anti-suit injunction may be prohibited from applying for an anti-suit injunction in German preliminary injunction proceedings or from continuing such proceedings other than for the purpose of withdrawing the application. This is because it constitutes an infringement of another right within the meaning of Section 823 (1) BGB (patent law), which can be countered with a preventive injunction (Section 1004 BGB).(para. 103)

(7) The fact that compliance with the preliminary injunction would deprive the issuance of an anti-suit injunction of its basis does not violate international law. There is no interference in the sovereign rights of another state contrary to international law if the measure issued by the court of another state has a sufficient domestic connection in accordance with the principle of territoriality. According to this principle, it is permissible to regulate the effects of extraterritorial action on a state's own territory (effects doctrine), for example in the case of restrictive effects on domestic markets.(para. 132)

References

WuW 2019, 661-663 (red. headnote and reasons)
IPRspr 2019, no. 327a, 683-689 (red. headnote and reasons)

**Tenor**

1. the preliminary injunction of 11.07.2019 (Ref. 21 O 9333/19) is confirmed

2. the defendant shall bear the costs of the legal dispute

3. the judgment is provisionally enforceable.

**Facts of the case**

1    With their application for an injunction, the applicants are challenging the defendant's attempts to prevent or at least impede the continuation of several patent infringement actions in the Federal Republic of Germany by means of a so-called *anti-suit injunction* in the USA.

2    The applicants are part of the N. group of companies, which offers telecommunications services and corresponding hardware and software products worldwide. The applicants are the owners of several intellectual property rights, in particular in the field of mobile telecommunications.

3    The respondent is part of the C. Group, which is organized under the parent company C. AG and is a globally operating group of companies that operates primarily as a supplier to the automotive industry.

4    Applicant 1) is the owner of the following patents:

5         - DE 60 240 446 C5;

6         - EP 1 671 505 B1;

7         - EP 2 087 626 B1;

8         - EP 1 273 199 B2;

9         - EP 1 929 826 B1;

10       - EP 2 087 629 B1;

11       - EP 2 145 404 B1

12       (AR 1 system package).

13       Applicant 2) is the owner of the following patents:

14       - EP 2 797 239 B1;

15       - EP 2 286 629 B2;

16       - EP 2 981 103 B1

17       (system bundle AR 1a).

18       The patents relate to mobile telecommunications of the second (GSM), third (UMTS) and fourth (LTE) generation.

19       On 7 January 2019, C. AG filed an antitrust complaint with the EU Commission under file no. AT.40620, as it is of the opinion that the N Group is unlawfully refusing to grant a license to its standard-essential patents contrary to Art. 102 TFEU (Annex AR 6).

20    On March 21, 2019, the applicants filed a total of ten patent infringement actions against D AG before the Regional Courts of Munich I, Mannheim and Düsseldorf. These are registered with the Munich I Regional Court under the case numbers 21 O 3889/19 (= patent EP 2 797 239 B1), 21 O 3891/19 (= patent DE 60 240 446 C5) and 7 O 3890/19 (= patent EP 1 671 505 B1), with the Düsseldorf Regional Court under the case number 4c O 17/19 (= patent EP 2 087 629 B1), 4a O 26/19 (= patent EP 2 087 626 B1) and 4a O 27/19 (= patent EP 1 929 826 B1) and at the Regional Court of Mannheim under the file numbers 2 O 34/19 (= patent EP 2 981 103 B1), 2 O 35/19 (= patent EP 2 286 629 B2), 2 O 36/19 (= patent EP 2 145 404 B1) and 2 O 37/19 (= patent EP 1 273 199 B2).

21    In each of these proceedings, the defendant D AG served notice of the dispute on two of the defendant's group companies, C. A. GmbH and C. A. H. Kft. These group companies joined the dispute in all proceedings (Annex AR 3, Annex AR 5b). No judgment has yet been issued in any of these proceedings.

22    On May 10, 2019, the respondent filed a lawsuit in the United States District Court, Northern District of California, against Av LLC, the petitioners and other third parties (Annex AR 7). In these proceedings, the defendant seeks, among other things, to obtain a license on reasonable, FRAND-compliant terms regarding the mobile telecommunications patents belonging to the applicants ("*complaint for breach of FRAND commitments and violations of antitrust and unfair competition laws*" - see Exhibit AR 7, page 3/63).

23    On June 12, 2019, the defendant applied for an *anti-suit injunction* as part of the proceedings there, according to which the applicants are to be prohibited by the US court from continuing their aforementioned patent infringement actions in Germany until a decision has been reached in the proceedings there. The motion reads in part:

24    "*(...) Plaintiff C A Systems, Inc. ("C") respectfully requests that this Court enjoin Defendants N Solutions and Networks Oy, N Technologies Oy, and any related entities (collectively, "N") from prosecuting the patent infringement actions filed in Germany against C's customer, D AG (the "German Actions"). The German Actions are more specifically identified as follows:*

25    *- N Solutions and Networks Oy v. D AG, First Munich Regional Court, Patent Division, No. 21 O 3889/19.*

26    *- N Solutions and Networks Oy v. D AG, First Munich Regional Court, Patent Division, No. 21 O 3890/19.*

27    *- N Solutions and Networks Oy v. D AG, First Munich Regional Court, Patent Division, No. 21 O 3891/19.*

28    *- N Solutions and Networks Oy v. D AG, Düsseldorf Regional Court, Patent Division, No. 4a O 26/19.*

29    *- N Solutions and Networks Oy v. D AG, Düsseldorf Regional Court, Patent Division, No. 4a O 27/19.*

30    *- N Solutions and Networks Oy v. D AG, Düsseldorf Regional Court, Patent Division, No. 4c O 17/19.*

31    *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 37/19.*

32    *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 36/19.*

33    *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 35/19.*

34    *- N Solutions and Networks Oy v. D AG, Mannheim Regional Court, Patent Division, No. 2 O 34/19.*

35    *In addition, C seeks an order enjoining Defendants from instituting against C or any of its customers (or their subsidiaries or affiliates) any action alleging infringement of their global 2G, 3G and 4G SEPs during the pendency of the FRAND proceeding in this Court, or from acting in concert with anyone to institute such an action*."

36    (Annex AR 4, page 2 et seq. - translation Annex AR 4a p. 2 et seq.).

37    The US court gave the petitioners the opportunity to comment on the respondent's application for an anti-suit injunction by July 24, 2019 and scheduled a hearing for October 10, 2019.

38    Subsequently, the applicants filed a motion for a preliminary injunction against the defendant and C AG on July 9, 2019, according to which the latter should be ordered to refrain from applying for and pursuing an *anti-suit injunction* and to withdraw an application directed at this.

39    The court separated the proceedings against C AG as new proceedings 21 O 9512/19 by order dated 11.07.2019 (p. 39/40 of the file) and issued a preliminary injunction (p. 42/54 of the file) against the defendant on the same date.

40    The interim injunction has the following tenor:

41    *1. the defendant is ordered to pay a fine of up to EUR 250,000.00 to be determined for each case of infringement - or alternatively to serve a term of imprisonment of up to six months, in the event of repeated infringements up to a total of two years, whereby the term of imprisonment is to be enforced on a member of the defendant's Board of Directors,*

42    *prohibited,*

43      *seeking an anti-suit injunction to prohibit the applicants, directly or indirectly, from pursuing one or more of the following patent infringement proceedings in Germany, namely*

44      *1. regional court Munich I, Ref. 21 O 3889/19;*

45      *2nd Regional Court Munich I, Ref. 21 O 3891/19;*

46      *3. regional court Munich I, ref. 7 O 3890/19;*

47      *4. regional court Düsseldorf, ref. 4a O 27/19;*

48      *5. regional court Düsseldorf, ref. 4a O 26/19;*

49      *6. regional court Düsseldorf, ref. 4c O 17/19;*

50      *7 Mannheim Regional Court, Ref. 2 O 37/39;*

51      *8. regional court Mannheim, ref. 2 O 36/19;*

52      *9 Mannheim Regional Court, Ref. 2 O 35/19;*

53      *10 Mannheim Regional Court, Ref. 2 O 34/19;*

54      *to continue to operate,*

55      *if done as with the Motion for Anti-Suit Injunction filed June 12, 2019 in Docket No. 5:19-cv-02520-LHK Docket Entry No. 32 in the United States Disctrict Court - Northern District of California (Exhibit AR 4),*

56      *which injunctive relief includes, in particular,*

57      *- the requirement to withdraw the June 12, 2019 Motion for Anti-Suit Injunction in Docket No. 5:19-cv-02520-LHK Docket Entry No. 32 in the United States Disctrict Court - Northern District of California*

*immediately upon service of this Order; and*

58     *- enjoining further prosecution of this Anti-Suit Injunction proceeding other than for the purpose of withdrawing the motion.*

59     *2. order the defendant to pay the costs of the proceedings.*

60     *3. the value in dispute is set at € 2,500,000.00.*

61     *4. to be served with the order: Notice of motion dated 09.07.2019 including attachments.*

62     The defendant filed an objection to this preliminary injunction on September 3, 2019 (p. 80/117 of the file). At the same time, it withdrew the application for an *anti-suit injunction* in the US proceedings and reserved the right to file a new application in the event that the preliminary injunction is lifted (see Annex AR 27, AR 27a).

63     **The applicants are of the opinion** that the application for the interim injunction sought against the respondent here is admissible and well-founded.

64     First of all, the 21st Civil Chamber of the Regional Court Munich I has jurisdiction pursuant to Sections 143 PatG, 937, 32 ZPO. A main action is not pending elsewhere for the preliminary injunction proceedings. The infringement actions pending elsewhere did not constitute a main matter in this respect. Therefore, the defendant's argument that the proceedings should be referred in this regard is misguided.

65     The applicants also have a need for legal protection and the application is well-founded.

66     The *anti-suit injunction* applied for in the USA constitutes an interference with their exclusive rights under patent law, which is why they are entitled to preventive injunctive relief pursuant to Section 1004 (1) sentence 2 BGB by analogy in conjunction with Section 823 (1) BGB due to the risk of first infringement. This also constitutes intentional, immoral damage within the meaning of Section 826 BGB and an unlawful interference with the established and exercised commercial enterprise.

67     The risk of first occurrence also exists in particular because an *anti-suit injunction* can be issued at the discretion of the court even before a scheduled oral hearing (see Exhibit AR 11) and, moreover, the courts of the Ninth District, in which the defendant's proceedings against Av LLC, the applicants and others are also being conducted, are characterized by a particularly extensive interpretation of the law with regard to the issuance of *anti-suit injunctions*.

68       The *anti-suit injunction* requested would prohibit the applicants from asserting their patent rights in court in Germany. This would de facto deprive them of their rights under Sections 139 et seq. PatG would be de facto withdrawn. If they opposed the *anti-suit injunction*, this constituted a "contempt of court" under US law, which could lead to substantial fines. An *anti-suit injunction* is inadmissible under German law. This was also the view of the Düsseldorf Higher Regional Court in its decision of 10.01.1996, 3 VA 11/95, para. 29 - 31. The CJEU also denied the compatibility of *anti-suit injunctions* with European law.

69       The unlawfulness of the *anti-suit injunction* was indicated by the interference with the applicants' patent rights that it threatened. Furthermore, the unlawfulness follows from the fact that an *anti-suit injunction* de facto undermines the applicants' right to justice.

70       Finally, the applicants' request was also urgent, as the US court could issue an *anti-suit injunction* at its discretion before the oral hearing on 10 October 2019 and, moreover, the balance of interests was clearly in favor of the applicants, whose exclusive patent rights and right to the protection of justice were at risk. In contrast, no interest of the defendant worthy of protection was discernible.

71       The urgency continues to exist even after the withdrawal of the application, as the defendant has announced that it will resubmit an application if it is successful in the opposition or appeal proceedings.

72       **The applicants finally apply,**

73       to uphold the Chamber's interim injunction of July 11, 2019.

74       **The defendant finally applied**,

75       to refer the proceedings pursuant to Section 281 ZPO to the general civil chamber with jurisdiction according to the rotation, in any case pursuant to Section 937 ZPO to the respective court of the main matter, insofar as the court does not have local and subject-matter jurisdiction for the present application for an injunction,

76       beyond that,

77       dismiss the applicants' application for an injunction of July 9, 2019, setting aside the preliminary injunction of July 11, 2019.

78       **The defendant is of** the opinion that the present application for an injunction is inadmissible and unfounded.

79       The defendant already disputes the jurisdiction of the court, as the present case is not a patent dispute

within the meaning of Section 143 PatG and the chamber is in any case not competent for the proceedings not pending before it, both according to the internal court distribution plan and locally. This was because the proceedings initially filed with it had in the meantime been transferred to the 7th Civil Chamber of Munich Regional Court I due to prior referral. For the proceedings pending in Düsseldorf and Mannheim, there was a lack of local jurisdiction pursuant to Section 937 ZPO. The respective courts of the main proceedings have jurisdiction and these are - as far as patent infringement actions in Düsseldorf and Mannheim are concerned - precisely these courts.

80      Furthermore, it denies that the requested *anti-suit injunction* results in an impairment of rights corresponding to the standard of Section 1004 (1) sentence 2 BGB analogously in conjunction with Section 823 (1) BGB. An absolute right pursuant to Section 823 (1) BGB is only infringed if the right is withdrawn or its substance is affected. This was not the case here. The requested *anti-suit injunction* would merely restrict the procedural enforcement of standard-essential patents against certain affected parties. The applicants would still be free to take action against others. Furthermore, it should be noted that the enforcement of standard-essential patents is subject to special restrictions anyway. There was also no discernible threat of financial loss to the applicants.

81      Irrespective of this, there was no unlawful interference. On the contrary, the preliminary injunction already issued suffers from an inherent and insurmountable contradiction. By ordering the defendant to refrain from continuing an *anti-suit injunction* permitted under US law by means of a court order, the Chamber is violating German, European and international law. German law does not recognize a prohibition of litigation such as the *anti-suit injunction*. On the contrary, such a prohibition of litigation is illegal under German law. This was established by the BGH in its decision of 13.03.1979, case no. VI ZR 117/77. The Federal Constitutional Court did not rule otherwise in its decision of 25.02.1987, case no. 1 BvR 1086/85. In addition, the CJEU has ruled in several decisions that *anti-suit injunctions* and bans on conducting proceedings are incompatible with European law. This also applies in relation to third countries.

82      The applicants' request and a corresponding interim injunction also violate international law. This is because the court's prohibition from (further) conducting proceedings that are admissible in a third country would in any case indirectly interfere with its sovereignty. According to the principle of international law of "par in parem non habet imperium", however, the court of another state is not entitled to such interference. It follows that the national court, in this case the adjudicating chamber, may not respond to an unlawful third-party act, the *anti-suit injunction*, with an injunction contrary to international law. Only passive measures are permitted. Therefore, in its decision of January 10, 1996, file no. 3 VA 11/95, the Higher Regional Court of Düsseldorf also refused to grant the application for service of an *anti-suit injunction* alone.

83      Accordingly, the applicants could not, on the one hand, complain about the illegality of an *anti-suit injunction* by the defendant and, on the other hand, at the same time demand such an *anti- suit injunction* from the court.

84      Finally, the defendants lack the need for legal protection, as they have sufficient legal protection through the granting of a right to be heard in the US proceedings and the requirements to be met for the issuance of an *anti-suit injunction*.

85      Reference is also made to the parties' written submissions and annexes as well as the minutes of the hearing on October 2, 2019.

Reasons for the decision

86    The application for a temporary injunction is admissible and well-founded. The Chamber's interim injunction of 11.07.2019 was therefore to be confirmed.

I.

87    The application is admissible. In particular, the 21st Civil Chamber of the Regional Court has jurisdiction.

88    1) Subject matter jurisdiction arises from § 143 PatG. The present legal dispute concerns a patent dispute within the meaning of this provision.

89    It is in line with the purpose of the law (Official Explanatory Memorandum to the Patent Act of 1936, §§ 51, 52, 52, §§ 53, 54, pp. 36, 103, 114 et seq.) to interpret the term "patent litigation" broadly and thus to keep the scope of application of the provisions linked to the term as broad as possible (Grabinski/Zülch, in: Benkard, Patent Act, 11th edition, 2015, § 143 para. 1).

90    It is not important whether an invention is associated with a patent application or a granted patent in the legal dispute. Instead, all actions that have a claim to an invention or from an invention as their subject matter or are otherwise closely linked to an invention are to be classified as patent litigation (BGH GRUR 2011, 662 - Patentstreitsache; BeckRS 2013, 06895 - Patentstreitsache II). The connection between the invention and the claim does not necessarily have to be a legal one; rather, a "close link" between the invention and the legal dispute can also be established by purely factual circumstances (ibid., ibid.).

91    In the present case, the applicants assert, inter alia, the infringement of another right within the meaning of Section 823 (1) BGB. This other right concerns its patents. According to their submission - and this alone is decisive for the question of jurisdiction (dies, loc. cit., para. 3 with reference to LG Düsseldorf, InstGE 1, 264) - the injunction sought by them has its basis in an invention within the meaning of Section 1 PatG (cf. Annex AR 1, AR 1a). The close connection to an invention required by law and case law is therefore given.

92    2) Furthermore, the court also has local jurisdiction pursuant to Sections 937, 32 ZPO, as the place of success is in the territory of the Federal Republic of Germany and thus a so-called "flying jurisdiction" exists.

93    a) The petitioners' request is aimed at ordering the respondent to refrain from or continue the *anti-suit injunction* already requested or other equivalent measures in relation to the 10 patent infringement actions pending before the Regional Courts of Munich I, Düsseldorf and Mannheim.

94    The defendant's application for an *anti-suit injunction* in the US proceedings is aimed at prohibiting the applicants from continuing to assert their patent rights in court in Germany. They are to be prohibited from asserting their patent rights throughout Germany and thus in particular also before the Munich I Regional Court. This is evident from the application:

95    "*Accordingly, C respectfully requests that the Court temporarily enjoin N from prosecuting its lawsuits in Germany against D until FRAND issues are finally resolved in this case*."

96    (Annex AR 4, page 11, lines 12-14; also Annex AR 4, page 2, lines 12-16 and page 29, lines 10-15).

97    The motion for *anti-suit injunction* is therefore not directed solely at the specific injunction against further prosecution of the actions already pending at the respective court location, but throughout Germany. The application for an *anti-suit injunction* is also intended to prevent the withdrawal of the actions in Düsseldorf and Mannheim and the filing of an action at Munich Regional Court I instead. This is the only way to achieve the objective pursued with the *anti-suit injunction*, according to the information in the petition, of reaching a comprehensive license agreement with Av or the petitioners in the proceedings in the USA (see Exhibit AR 4, page 11, lines 12-14).

98    The Applicants' motion is to be understood accordingly.

99    b) Since the legal consequences requested by the applicants in the patent infringement actions, such as injunctive relief and information, have a Germany-wide effect, the place of success of a requested *anti-suit injunction* is not only at the place of the court of the patent infringement action, but in the entire Federal Republic of Germany. The claims resulting from a possible patent infringement pursuant to Sections 139 et seq. PatG could not be enforced throughout Germany as the proceedings would not be continued as a result of an *anti-suit injunction*.

100    c) Thus, a place of success within the meaning of Section 32 ZPO (see Vollkommer, in: Zöller, ZPO, 31st edition, 2016, Section 32 para. 16) is not only at the place of the court seat of the respective pending actions, but in the entire territory of the Federal Republic of Germany and thus also in the area of jurisdiction of the Regional Court Munich I. This is therefore the main court with local jurisdiction within the meaning of Section 937 ZPO.

**II.**

101    The application is also well-founded. The claim for an injunction and the grounds exist.

102    1) There is a claim for an injunction, as the applicants are entitled to injunctive relief against the defendant under Section 1004 (analogous) in conjunction with Section 823 (1) BGB.

103    a) The issuance of the *anti-suit injunction* requested by the defendant would interfere with the protected legal interests of the applicants. According to generally accepted opinion, patents are protected as other rights within the meaning of Section 823 (1) BGB (see, for example, MüKo-BGB, Section 823, para. 282).

104    aa) It is true that the issuance of the *anti-suit injunction* would not directly prevent the applicants from continuing the aforementioned patent infringement proceedings in Germany. This is because it would have no effect in Germany as it would not contain any content that could be enforced here (see, for example, OLG Düsseldorf ZIP 1996, 294). Overall, the decision as to whether the court order is complied with - or not - therefore ultimately lies with the applicants.

105    However, a continuation of the patent infringement proceedings here by the applicants after an *anti-suit injunction* has been issued would have far-reaching consequences for the applicants in the USA; in particular, they would have to fear considerable economic disadvantages. Based on the - uncontradicted - submissions of the applicants and the threat of penalties for non-compliance made credible by Exhibit AR 11, item 7, the Court assumes that the applicants will comply with an *anti-suit injunction*.

106    bb) Contrary to the respondent's statements, this also constitutes an infringement of an absolute right within the meaning of Section 823 (1) BGB.

107    The prerequisite for protection under § 1004 BGB is an impairment of property that occurs in a way other than by deprivation or withholding of property. In the case of Section 1004 para. 1 sentence 1 BGB, this impairment is a present one, and in the case of Section 1004 para. 1 sentence 2, it is an expected future one. Impairment in this sense is any actual state or process that contradicts the content of the property right (Gursky, in: Staudinger, BGB, 2012, Section 1004 para. 17).

108    Accordingly, an impairment of property can also simply be the fact that the owner is hindered or inconvenienced in the exercise of the possession to which he is entitled, i.e. is prevented from any permissible use of the property or any other lawful influence on it (loc. cit., para. 33 with reference to BGHZ 146, 98, 101 = WM 2001, 512, 513; OLGR Saarbrücken 2004, 497, 498).

109    It can therefore make no difference whether someone prevents the owner of a property from erecting a building or a fence on his property (loc. cit., para. 33) or prevents the patent proprietor from exercising his exclusive right pursuant to Sections 9 et seq. and 139 et seq. PatG. It can even be stated that the patent right as an exclusive right (cf. Section 9 PatG) is de facto worthless if the patent proprietor is deprived of the possibility of enforcing his exclusive right via the sole available state monopoly on the use of force in the form of ordinary court proceedings.

110    The fact that, even after the *anti-suit injunction*, the applicants remain free to sue parties other than those named therein or to grant licenses to third parties does not change this. This is because the exclusive right applies to anyone ("any third party"). This means that the exclusive right also includes the power of the patent proprietor to decide whether and, if so, against whom he enforces his exclusive right and against whom he does not. An *anti-suit injunction* interferes with this right to a considerable extent. This also and especially applies to the present case. This is because the patent infringement claims are not directed against a supposedly insignificant patent user, but against a leading global vehicle manufacturer. The considerable economic dimension of the court's assertion of claims against the latter shows that - contrary to what the defendant claims - it is not a matter of a merely insignificant impairment of the respective patent right.

111     b) This interference is also unlawful under the only applicable German law. In principle, the interference indicates unlawfulness (see, for example, MüKo-BGB § 1004, para. 198).

112     The unlawfulness also follows from the fact that the *anti-suit injunction* aims to deprive the defendants of their right to sue in Germany. This jeopardizes due process of law, as this is only guaranteed if the parties involved can file the applications required by the legal situation without any restrictions (OLG Düsseldorf, loc. cit. para. 31). The threat posed by the anti-suit injunction of not continuing the patent infringement actions contradicts the assignment content of the patent under property law pursuant to Sections 9 et seq. and 139 et seq. PatG.

113     aa) The unlawfulness is also not eliminated by the fact that the application for an *anti-suit injunction* in the USA is a permissible legal remedy and the *anti-suit injunction* is a permissible measure in US jurisdiction. Only the legal system of the Federal Republic of Germany and the European Union, which does not recognize or even rejects such a legal construct, is decisive for the assessment of the illegality or legality of an act.

114     bb) The reference made by the defendant in this context to the decisions of the BGH (case no. VI ZR 117/77) and the BVerfG (case no. 1 BvR 1086/85) is also not expedient.

115     With regard to these decisions, it should be noted on the one hand that the mere indication of unlawfulness by a constitutional procedure was denied. This does not mean that procedural conduct that is not in accordance with the rule of law by German standards, namely the application for an *anti-suit injunction*, is automatically lawful. The illegality is merely not indicated. The official second guiding principle of the BGH decision reads accordingly:

116     *"2. the procedure for taking an affidavit against a trader (here: insurance agent) and his temporary entry in the debtor register do not **in principle** constitute an interference with the established and exercised trade."* (Emphasis added by the court)

117     Secondly, in both proceedings, German proceedings were the subject of the examination. The decisions therefore relate to proceedings that are lawful under German law. It cannot therefore be inferred from them that every conduct/procedure permissible under the law of a third country automatically receives the placet of the German legal system.

118     c) For the same reasons, there is also no duty to tolerate for the defendants pursuant to Section 1004 (2) BGB (analogously).

119     d) By applying for the *anti-suit injunction*, the defendant has created a concrete risk of unlawful interference with the applicants' patent rights protected under Section 823 (1) BGB. The applicants therefore do not need to wait for the first unlawful interference caused by the *Anti-Suit Injunction*. Rather, there is a so-called risk of first infringement, as this first infringement is sufficiently imminent. An *anti-suit injunction* is expected to be issued at least from 24.07.2019. The decision is at the discretion of the US court - by filing the application, the defendant has initiated the proceedings there.

120    The risk of first occurrence is also not eliminated by the fact that the defendant has now withdrawn its application in response to pressure from the preliminary injunction. The defendant has expressly reserved the right to resubmit the application if the interim injunction is lifted.

121    e) Finally, the defendant's further objections to the issuance of the preliminary injunction are not valid.

122    aa) The defendant complains that the court is sanctioning an *anti-suit injunction* that it considers to be unlawful with a prohibition on conducting proceedings. This is contradictory and violates international law, European law and German constitutional and ordinary federal law.

123    bb) Contrary to the view of the defendant, the court did not pronounce any prohibitions on conducting proceedings.

124    As the respondent states, the *anti-suit injunction* serves the purpose of conducting proceedings in the USA undisturbed by German court decisions. These court proceedings are the proceedings initiated by the defendant on May 10, 2019 before the United States District Court, Northern District of California (19-cv-2520, see Exhibit AR 7) against the applicants and Av, LLC et al. The defendant refers to these proceedings as the main US proceedings in its pleading dated August 9, 2019 (page 7 / p. 74 of the Exhibit). These proceedings should not be impaired by the *anti-suit injunction* in such a way that D AG in Germany settles with the petitioners on the basis of the lawsuits pending against them there:

125    *"N's German lawsuits are an attempt to force D and other OEMs to accept non-FRAND licenses before this Court has an opportunity to adjudicate the case on the merits, and thus should be enjoined."*

126    (Annex AR 4, page 9, lines 8-10; see also the defendant's statement of 09.08.2019, page 7, paragraph 19).

127    The interim injunction issued by the Chamber against the defendant does not order it to withdraw or discontinue the main proceedings. It merely orders it to refrain from doing anything within these main proceedings that prevents the applicants from exercising their exclusive rights under patent law in Germany. This does not affect the defendant's right to pursue its action in the USA (see already 21 O 9333/19, page 11 letter cc). The preliminary injunction - unlike the *anti-suit injunction* - is therefore not a judicial prohibition on conducting lawsuits. The defendant is only prohibited from obtaining a judicial measure in court proceedings that imposes a prohibition on the applicants from conducting litigation.

128    According to the decisions of the Chamber, the defendant is at liberty to bring further actions against the applicants worldwide. Only the impairment of the applicants' patent rights by a de facto prohibition of the continuation of their infringement actions - within the still untouched US main proceedings - is prohibited. There is therefore no prohibition of litigation.

129    cc) Furthermore, the present injunction does not violate international law.

130    Contrary to what the defendant, but also the applicants, claim, the Chamber does not assume that an *anti-suit injunction* is contrary to international law. The assumption that it is contrary to international law is already contradicted by the fact that two extremely important legal systems worldwide, namely the US and British legal systems, consider the *anti-suit injunction* to be permissible. Since rules of international law are always based on the common conviction of the majority, if not the entire international community, this alone rules out the possibility of a violation of international law (see also Geimer, Internationales Zivilprozessrecht, 7th edition, 2015, Part Three, Chapter 1, Section VII, para. 399c).

131    Of course, the German courts must also observe the binding rules of international law pursuant to Article 25 of the Basic Law and international treaty law pursuant to Article 59 (2) of the Basic Law. The principle of international law cited by the defendant, "par in parem non habet imperium", does not mean that the preliminary injunction is unlawful, any more than other principles of international law.

132    The fact that compliance with the preliminary injunction would deprive the issuance of an *anti-suit injunction* of its basis does not violate international law. There is no interference in the sovereign rights of another state contrary to international law if the measure issued by the court of another state has a sufficient domestic connection in accordance with the principle of territoriality. According to this principle, it is permissible to regulate the effects of extraterritorial action on a state's own territory (effects doctrine), for example in the case of restrictive effects on domestic markets (see Herdegen, in: Maunz/Dürig, Grundgesetz-Kommentar, edition: 86th EL, January 2019, Art. 25 para. 50). Thus, it is recognized in tax law that foreigners can also be liable for taxes if a corresponding connecting factor, such as nationality, establishment, domicile or residence in Germany, the realization of a taxable event in Germany or the achievement of a significant result under tax law in Germany is given (see BVerfG NJW 1983, 2757, 2761, 4 b). Accordingly, it is also permissible to order a person abroad to refrain from impairing/disturbing property rights in Germany by way of a court order.

133    There is also no interference with state sovereign rights because the preliminary injunction does not prohibit the *anti-suit injunction* of the US court itself, but rather orders the defendant not to obtain or continue to pursue such an injunction.

134    This does not constitute a de facto exercise of jurisdiction over the US court proceedings, as claimed by the defendant. If the US courts issue an *anti-suit injunction* only at the instigation of a party to the proceedings, their sovereign power is not affected, as the order is dependent on the actions of a party to the proceedings and thus does not constitute a comprehensive sovereign power independent of the conduct of third parties. In this respect, the USA would then have disposed of its comprehensive sovereignty and opened itself up to the influence of third parties. The situation is different in many countries in criminal procedure law, where criminal prosecution is independent of the actions/application of a private individual (principle of legality instead of party maxim). If the US courts issue an *anti-suit injunction* independently of the actions of a party to the proceedings, they are not affected by the issuance of a temporary injunction as issued by the Chamber here (see Geimer, loc. cit.).

135    However, if an *anti-suit injunction* is not already contrary to international law, the "less" ordered by the interlocutory injunction in proceedings 21 O 9333/19 and in the present proceedings with regard to the operation of such an injunction by a party is certainly not.

136    dd) Nor can a violation of European law be established. On the one hand, European law provisions are already not relevant due to the lack of a cross-border, intra-European situation. Secondly, the decisions

submitted by the defendant also do not prove that the present injunction violates European law.

137    The cited decisions of the CJEU each relate to *anti-suit injunctions* issued by a European court to prevent litigation in another European state. It is only in these cases that the CJEU has indeed ruled that they are contrary to European law, in particular the European jurisdiction regulation.

138    The CJEU's decisions are also based on situations in which the continuation or bringing of independent court proceedings is prohibited by means of *anti-suit injunction* (see CJEU, EuZW 2004, 468, 469 - Turner/Grovit). This is precisely not the case here - as explained above under b).

139    ee) Finally, the court also does not violate German constitutional or simple federal law.

140    It has already been explained above that the decisions of the BGH and the BVerfG cited by the defendant are not suitable to justify the contrary.

141    Furthermore, as also explained above, there is no prohibition on conducting proceedings.

142    Even if one were to assume an encroachment on the fundamental rights of the defendant, for example in the form of Article 2 (1) of the Basic Law, possibly in conjunction with Article 19 (4) of the Basic Law, this would in any case be justified and proportionate. On the other hand, the interests of the applicants, which are also worthy of protection, namely the right to property under Article 14 of the Basic Law and the right to the guarantee of justice under Article 19 (4) of the Basic Law, would have to be taken into account. Weighing the fundamental rights against each other leads to a decision in favor of the applicants, as they can invoke not only the fundamental right to property, but also the right to justice. In contrast, it is questionable whether the defendant can also invoke a procedure in a non-European third country that is unlawful according to German understanding with regard to Article 19 (4) of the Basic Law.

143    2) There is also a reason for an injunction, as the matter is urgent and the interests of the applicants in obtaining the preliminary injunction outweigh those of the defendant.

144    a) First of all, the applicants have shown by their conduct that the matter is urgent for them. In particular, they filed the application for a preliminary injunction within a period of less than one month after becoming aware of the application for an *anti-suit injunction* of 12.06.2019 - namely on 09.07.2019.

145    b) In the present case, a decision by way of an order pursuant to Section 937 (2) ZPO was also exceptionally required without a prior hearing of the defendant due to particular urgency.

146    It is true that the principle of procedural equality of arms requires that, in court proceedings, the opposing party must generally be heard before a decision is made and thus be given the opportunity to influence an impending court decision (BVerfG 2018, 3631 para. 15 with further references). However, in

the special procedural situations of interim legal protection, a prior hearing can be dispensed with if it would frustrate the purpose of the proceedings, such as in arrest proceedings, when pre-trial detention is ordered or in the case of home searches (BVerfG loc. cit.).

147     In the present case, the chamber would have been able to hold an oral hearing on 19.07.2019 at the earliest. Therefore, it would not have been possible to set down, execute and serve the judgment on the respondent before the expiry of the petitioners' comment period on July 24, 2019 - from this date, however, it would have been possible for the US court to issue an *anti-suit injunction*. The applicants would therefore run the risk of losing their rights.

148     A hearing of the defendant would also have led to a corresponding delay. Moreover, it would have been feared that the defendant would have informed the US court of the events here upon learning of the application for an injunction here in order to apply for interim measures against the injunction proceedings here (see Annexes AR 11 and AR 12). As a result, the applicants also ran the risk that their rights here would be thwarted.

149     According to all of the above, a situation comparable to the example cases of the Federal Constitutional Court exists, which justifies the issuance of the preliminary injunction without a prior hearing of the defendant. The defendant's right to be heard must be made good in any appeal proceedings.

150     In this respect, the defendant's argument that it had been given a further deadline to respond by 09.08.2019 and that the court had not ruled before then does not hold water. In this respect, the applicants have made it credible that the US court could decide at any time "after completion of the written submissions (i.e. after July 24)" (Annex AR 11a p. 2). Whether the court would actually have waited for a further reply from the defendant, as claimed by the defendant (p. 88 of the file), has not been sufficiently substantiated.

151     c) The matter continues to be urgent - in particular, the urgency has not been *removed* by the withdrawal of the application for *an anti-suit injunction*. The defendant itself has made it clear that it would file another application at any time after an injunction has lapsed. It is therefore not sufficient for the applicants to wait for the main proceedings, as a decision by the US court would then have to be expected at any time.

152     d) The balance of interests is also in favor of the applicants. In particular, the defendant, which is not involved in the patent infringement proceedings in the Federal Republic of Germany either as an intervener or as a party, does not have an interest worthy of protection.

153     In this regard, it must also be taken into account that the preliminary injunction is not aimed at depriving the defendant of its right to sue (in contrast to the *anti-suit injunction* requested). This is because the preliminary injunction is not directed against the main action, which is pending in the USA (see above).

**III.**

154    The decision on costs follows from Section 91 (1) sentence 1 ZPO.

155    A separate decision on provisional enforceability is not required. It follows from the nature of the case that the decision granting interim relief must be immediately enforceable.

# **<u>EXHIBIT 18</u>**

| | |
|---|---|
| **Gericht:** | OLG München 6. Zivilsenat |
| **Entscheidungsname:** | Anti-Suit-Injunction |
| **Entscheidungsdatum:** | 12.12.2019 |
| **Rechtskraft:** | ja |
| **Aktenzeichen:** | 6 U 5042/19 |
| **Dokumenttyp:** | Urteil |
| | |
| **Normen:** | § 820 Abs 1 BGB, § 823 Abs 1 BGB, § 1004 Abs 1 S 2 BGB, § 9 PatG, § 139 PatG |
| **Zitiervorschlag:** | OLG München, Urteil vom 12. Dezember 2019 – 6 U 5042/19 –, juris |

**Deliktischer Eingriff in Patentrechte durch Erlass einer Anti Suit-Injunction - Anti-Suit-Injunction**

**Orientierungssatz**

1. Sowohl für Klagen, die sich gegen die Prozessführung als solche richten, als auch für Klagen, die sich gegen andere Maßnahmen im Rahmen von anhängigen gerichtlichen Verfahren richten, fehlt es am Rechtsschutzbedürfnis. (Rn.70)

2. Mit Anträgen auf Erlass einer Anti Suit-Injunction bzw. einer Temporary Restraining Order soll regelmäßig der zeitliche Vorrang des Verfahrens auf Lizenzierung gesichert werden, um dieses „ungestört" von in Deutschland anhängigen Patentverletzungsverfahren betreiben zu können. (Rn.71)

3. Der Erlass einer einstweiligen Verfügung stellt sich als einzige wirksame Abwehrmaßnahme gegenüber einer Anti Suit-Injunction dar, mittels derer die Ausübung der Rechtsposition von Patentinhabern in den in Deutschland anhängigen Patentverletzungsverfahren bis zum Abschluss des zwischen anderen Parteien geführten US-Verfahrens gesichert werden kann. (Rn.78)

4. Der mit einem drohenden und damit einen vorbeugenden Unterlassungsanspruch begründenden Erlass einer Anti Suit-Injunction verbundene tatbestandsmäßig deliktische Eingriff in Patentrechte kann sich im konkreten Fall als rechtswidrig darstellen. (Rn.73)

Fundstellen

GRUR 2020, 379-383 (red. Leitsatz und Gründe)
MittdtschPatAnw 2020, 169-171 (red. Leitsatz und Gründe)
IPRspr 2019, Nr 327b, 683-694 (red. Leitsatz und Gründe)
Verfahrensgang

vorgehend LG München I, 30. August 2019, 21 O 9512/19
Diese Entscheidung wird zitiert

**Rechtsprechung**

Anschluss LG München I 7. Zivilkammer, 20. Juli 2023, 7 O 5416/23

Anschluss OLG Düsseldorf 2. Zivilsenat, 7. Februar 2022, I-2 U 27/21, ...

Anschluss OLG Düsseldorf 2. Zivilsenat, 7. Februar 2022, I-2 U 25/21, ...

**Kommentare**

*Erman, BGB*

● Wagner, § 227 Notwehr; II. Die Voraussetzungen der Notwehr – Notwehrlage und Notwehrhandlung; 1. Angriff

*Herberger/Martinek/Rüßmann/Weth/Würdinger, jurisPK-BGB*

● M. Otto, 10. Auflage 2023, § 227 BGB

*Staudinger, BGB*

● Repgen, § 227 Notwehr; III. Der Tatbestand der Notwehr; 1. Notwehrlage; c) Die Rechtswidrigkeit des Angriffs 2024

**Literaturnachweise**

Bolko Ehlgen, GRUR 2020, 383-384 (Anmerkung)

**Sonstiges**

*Geimer, Internationales Zivilprozessrecht*

● Geimer, 1. Verurteilung zur Leistung bzw. Unterlassung im Ausland

● Geimer, 3. Pflichten der Parteien

*Linke/Hau, Internationales Zivilverfahrensrecht*

● Linke/Hau, 5. Abwehrmaßnahmen

*Nagel/Gottwald, Internationales Zivilprozessrecht*

● Gottwald, § 6 Inlandsverfahren mit Auslandsbezug; III. Maßnahmen gegen ausländische Verfahren

**Tenor**

1. Die Berufung der Antragsgegnerin gegen das Urteil des Landgerichts München I vom 30.08.2019, Az. 21 O 9512/19, wird mit der Maßgabe zurückgewiesen, dass Nr. III wie folgt lautet:

Der Antragsgegnerin wird bei Meidung eines für Fall der Zuwiderhandlung festzusetzenden Ordnungsgeldes bis zu € 250.000, - ersatzweise Ordnungshaft - oder einer Ordnungshaft bis zu sechs Monaten, im Falle wiederholter Zuwiderhandlung bis zu insgesamt zwei Jahren, wobei die Ordnungshaft am jeweiligen Vorstandsvorsitzenden zu vollziehen ist, verboten, eine Anti-Suit Injunction oder andere gleichwertige Maßnahmen wie eine Temporary Restraining Order zu beantragen oder beantragen zu lassen, mit der den Antragstellerinnen unmittelbar oder mittelbar verboten werden soll, eines oder mehrere der nachfolgend genannten Patentverletzungsverfahren in Deutschland, nämlich

1. Landgericht München I, Az. 21 O 3889/19

2. Landgericht München I, Az. 21 O 3891/19

3. Landgericht München I, Az. 7 O 3890/19

4. Landgericht Düsseldorf, Az. 4a O 27/19

5. Landgericht Düsseldorf, Az. 4a O 26/19

6. Landgericht Düsseldorf, Az. 4c O 17/19

7. Landgericht Mannheim, Az. 2 O 37/39

8. Landgericht Mannheim, Az. 2 O 36/19

9. Landgericht Mannheim, Az. 2 O 35/19

10. Landgericht Mannheim, Az. 2 O 34/19

weiter zu betreiben, wobei diese Unterlassungsverpflichtung auch umfasst,

(1) die C. C. E. GmbH anzuweisen, die C.-One Holdinggesellschaft mbH anzuweisen, die CGH Holding B.V. anzuweisen, die C. Automotive Holding Netherlands B.V. anzuweisen, die C. Automotive, Inc. anzuweisen, die C. Automotive Systems, Inc. anzuweisen und/oder

(2) durch sonstige Einwirkung auf die C. Automotive Systems, Inc. und erforderlichenfalls auf die vorgenannten Gesellschaften,

durchzusetzen, dass die C. Automotive Systems, Inc. keinen Antrag stellt wie geschehen mit dem Antrag auf Erlass einer Anti-Suit Injunction vom 12. Juni 2019 in dem Verfahren mit dem Aktenzeichen 5:19-cv-02520-LHK Akteneingangsnr. 32 vor dem United States District Court Northern District of California.

2. Die Antragsgegnerin hat die Kosten des Berufungsverfahrens zu tragen.

Beschluss

Der Streitwert des Berufungsverfahrens wird auf € 2,5 Millionen festgesetzt.

**Tatbestand**

I.

1       Die Antragstellerinnen, Unternehmen der N. Unternehmensgruppe mit Sitz in Finnland, machen gegen
        die Antragsgegnerin, die Muttergesellschaft des C.-Konzerns mit Sitz in Hannover, im Wege des
        einstweiligen Verfügungsverfahrens einen Unterlassungsanspruch wegen behaupteter drohender
        Verletzung ihrer Patentrechte aufgrund der Stellung eines Anti-Suit Antrags durch ein
        Konzernunternehmen der Antragsgegnerin in den USA geltend.

2       Mit Urteil vom 30.08.2019 hat das Landgericht der Antragsgegnerin bei Meidung der gesetzlich
        vorgesehenen Ordnungsmittel unter Kostenauferlegung zu deren Lasten verboten, eine Anti-Suit-
        Injunction oder andere gleichwertige Maßnahmen zu beantragen oder beantragen zu lassen, mit der den
        Antragstellerinnen unmittelbar oder mittelbar verboten werden soll, eines oder mehrere der
        nachfolgend genannten Patentverletzungsverfahren in Deutschland, nämlich

3       1. Landgericht München I, Az. 21 O 3889/19
        2. Landgericht München I, Az. 21 O 3891/19
        3. Landgericht München I, Az. 7 O 3890/19
        4. Landgericht Düsseldorf, Az. 4a O 27/19
        5. Landgericht Düsseldorf, Az. 4a O 26/19
        6. Landgericht Düsseldorf, Az. 4c O 17/19
        7. Landgericht Mannheim, Az. 2 O 37/39
        8. Landgericht Mannheim, Az. 2 O 36/19
        9. Landgericht Mannheim, Az. 2 O 35/19
        10. Landgericht Mannheim, Az. 2 O 34/19 weiter zu betreiben, wobei diese Unterlassungsverpflichtung
        auch umfasst,

4       (1) die C. C. E. GmbH anzuweisen, die C.-One Holdinggesellschaft mbH anzuweisen, die CGH Holding B.V.
        anzuweisen, die C. Automotive Holding Netherlands B.V. anzuweisen, die C. Automotive, Inc.
        anzuweisen, die C. Automotive Systems, Inc. anzuweisen und/oder

5       (2) durch sonstige Einwirkung auf die C. Automotive Systems, Inc. und erforderlichenfalls auf die
        vorgenannten Gesellschaften,

6       durchzusetzen, dass die C. Automotive Systems, Inc.

7       - den Antrag auf Erlass einer Anti-Suit Injunction vom 12. Juni 2019 in dem Verfahren mit dem
        Aktenzeichen 5:19-cv-02520-LHK Akteneingangsnr. 32 vor dem United States District Court-Northern
        District of California unverzüglich insoweit zurücknimmt,

8       - sowie dieses Anti-Suit Injunction-Verfahren außer zum Zweck der Antragsrücknahme mit sofortiger
        Wirkung nicht weiter betreibt.

9       Zur Begründung ist im Ersturteil, auf dessen Feststellungen in tatsächlicher Hinsicht Bezug genommen
        wird, ausgeführt:

10      Ein Verfügungsgrund ergebe sich aus dem durch Vorlage der eidesstattlichen Versicherung des Prof. R. gemäß Anl. AR 11 antragstellerseits glaubhaft gemachten Vortrag, eine im Ermessen des Gerichts stehende Anti-Suit Injunction könne nach dem Recht der Vereinigten Staaten jederzeit ergehen. Daher bestehe die unmittelbare Gefahr, dass die Patentrechte der Antragstellerin jederzeit durch den Erlass einer solchen Anti-Suit Injunction beeinträchtigt werden könnten.

11      Ein Verfügungsanspruch der Antragstellerinnen in Gestalt eines Unterlassungsanspruchs folge aus § 1004 Abs. 1 S. 2 BGB analog i.V.m. § 823 Abs. 1 BGB, da der von der Antragsgegnerin mit zu verantwortende Antrag auf Erlass einer Anti-Suit Injunction die Antragstellerinnen in ihren Patentrechten bedrohe.

12      Der von der Konzerngesellschaft der Antragsgegnerin C. Automotive Systems Inc. (nachfolgend: CAS) am 12.06.2019 vor dem United States District Court, Northern District of California gestellte Antrag auf Erlass einer Anti-Suit Injunction sei geeignet, einen rechtswidrigen Eingriff in die Patentrechte der Antragstellerinnen zu begründen. Für den Fall einer Anti-Suit Injunction seien nämlich die Antragstellerinnen nach US-amerikanischem Recht gezwungen, die in der Injunction genannten Patentverletzungsverfahren in Deutschland nicht weiter zu betreiben. Aufgrund der antragstellerseits glaubhaft gemachten (Anl. AR 11, Nr. 7) drohenden Strafen bei Nichtbefolgung sei davon auszugehen, dass die Antragstellerinnen einer Anti-Suit Injunction Folge leisten würden. Da durch die Anti-Suit Injunction den Antragstellerinnen untersagt würde, ihre Patentrechte (weiter) gerichtlich geltend zu machen, sei darin ein Eingriff in das Ausschließlichkeitsrecht des Patentinhabers als eigentumsähnliches Recht i.S.v. § 823 Abs. 1 BGB zu sehen. Das Patentrecht sei faktisch wertlos, wenn dessen Inhaber die Möglichkeit genommen werde, sein Ausschließlichkeitsrecht über das allein zur Verfügung stehende staatliche Gewaltmonopol in Form eines ordentlichen Gerichtsverfahrens auch durchzusetzen. Dass den Antragstellerinnen nach der Anti-Suit Injunction unbenommen bleibe, andere als die genannten Personen oder Unternehmen zu verklagen oder Dritten Lizenzen zu erteilen, ändere daran nichts, nachdem das Ausschließlichkeitsrecht des Patentinhabers gegenüber jedermann gelte. Dieses schließe die Befugnis ein, darüber zu entscheiden, ob und gegebenenfalls gegen wen der Patentinhaber das Ausschließlichkeitsrecht durchsetze. Dies gelte gerade auch für den Streitfall, nachdem sich die in Deutschland anhängigen Patentverletzungsklagen gegen einen weltweit führenden Kraftfahrzeughersteller (die D. AG) richteten.

13      Der Eingriff in die Patentrechte durch die Anti-Suit Injunction stelle sich nach dem allein maßgeblichen deutschen Recht auch als rechtswidrig dar. Die durch die Anti-Suit Injunction drohende Nichtweiterführung der Patentverletzungsklagen widerspreche dem eigentumsrechtlichen Zuweisungsgehalt des Patents nach den §§ 9 f., 139 ff. PatG. Dem könne die Antragsgegnerin nicht mit Erfolg entgegenhalten, dass das US-amerikanische Anti-Suit Verfahren nach amerikanischem Recht zulässig sei und von daher nicht rechtswidrig sein könne. Für die Bestimmung der Rechtswidrigkeit sei zunächst allein das deutsche Rechtsverständnis maßgeblich. Dabei bedeute ein am Maßstab des deutschen Rechts ausgesprochenes Unwerturteil nicht, dass einem ausländischen Verfahren die Rechtmäßigkeit nach dortigem Verständnis abgesprochen werde. Dem könnten die Entscheidungen des BGH zu Az. VI ZR 117/77 und des BVerfG zu Az. 1 BvR 1086/85 nicht entgegengehalten werden, da diesen keine vergleichbaren Fallkonstellationen zugrunde gelegen hätten.

14      Für die drohende Rechtsbeeinträchtigung zum Nachteil der Antragstellerinnen habe die Antragsgegnerin als Mittäterin einzustehen und Abhilfe zu leisten. Die Mittäterschaft der Antragsgegnerin zeige sich darin, dass die beiden dem Patentverletzungsverfahren vor dem Landgericht Düsseldorf, Az. 4c O 17/19, beigetretenen Konzerngesellschaften der Antragsgegnerin dort vorgetragen hätten, dass sich aufgrund des Fehlverhaltens von N. „C." gezwungen gesehen habe, sowohl eine Beschwerde bei der EU-Kommission einzureichen als auch durch eine US-amerikanische Konzerngesellschaft ein Verfahren auf Erteilung einer FRAND-Lizenz in den USA gegen N. und andere einzuleiten. Ferner werde mitgeteilt, dass sich die Continental Gruppe dazu verpflichtet habe, sich an die Entscheidung des US-Gerichts betreffend die FRAND-Bedingungen zu halten. Mit „Continental" seien dabei gemäß dem Einleitungssatz des

Schriftsatzes nicht nur die beiden betroffenen Konzerngesellschaften gemeint, sondern „alle weiteren Gesellschaften der C.-Gruppe". In Rn. 7 desselben Schriftsatzes sei ausgeführt worden, dass die C.-Gruppe das Verfahren nicht eingeleitet habe, um die Jurisdiktion der deutschen Gerichte zu untergraben, sondern weil es für sie wirtschaftlich sinnvoller sei, die FRAND-Bedingungen in einem einzigen Verfahren zu klären. Hieraus folge, dass hinsichtlich der Lizenz-/FRAND-Thematik, die alle zwischen den Parteien geführten Streitigkeiten betreffe, der Continental-Gesamtkonzern betroffen sei, insbesondere auch die Antragsgegnerin als Konzernmutter. Vor diesem Hintergrund sei die Kammer zur Überzeugung gelangt, dass die CAS jedenfalls mit Wissen und Wollen der Antragsgegnerin nicht nur die US-Hauptsacheklage, sondern auch den Antrag auf Erlass einer Anti-Suit Injunction eingereicht habe. Damit sei dem eigentlichen Ziel auf Seiten der C.-Gruppe, eine für den gesamten Konzern geltende FRAND-Bestimmung ungestört von den deutschen Verfahren zu erreichen, Rechnung getragen worden.

15    Soweit die Antragsgegnerin ihre Mittäterschaft bestritten habe, sei dies unbehelflich. Das diesbezügliche Bestreiten sei bereits nicht hinreichend substantiiert. Sie könne sich auch nicht auf mangelnden Vorsatz berufen. Ohnehin würde nur ein unbeachtlicher Verbotsirrtum vorliegen, soweit die Antragsgegnerin von der Rechtmäßigkeit der Anti-Suit Injunction nach deutschem Recht ausgegangen sei - wogegen allerdings deren Ausführungen im Schriftsatz vom 09.08.2019, Rn. 37 sprächen.

16    Ob die Antragsgegnerin auch unter dem Gesichtspunkt der Störerhaftung auf Unterlassung in Anspruch genommen werden könnte, könne bei dieser Sachlage offen bleiben.

17    Infolge der Anti-Suit Injunction, welche jederzeit nach dem Ermessen des US-amerikanischen Gerichts erlassen werden könne, bestehe auch Erstbegehungsgefahr.

18    Dem Bestehen eines Verfügungsanspruchs könne die Antragsgegnerin nicht entgegenhalten, die Sanktion einer Anti-Suit Injunction als rechtswidrig führe zu einem Prozessführungsverbot zum Nachteil der Antragsgegnerin und verstoße gegen Völkerrecht, Europarecht und deutsches Verfassungs- sowie einfaches Bundesrecht.

19    Die von der Kammer gegen die CAS erlassene einstweilige Verfügung lasse deren Recht, die Hauptsacheklage in den USA weiterzuverfolgen, unberührt. Im Gegensatz zur Anti-Suit Injunction handle es sich insoweit nicht um ein gerichtliches Verbot, Prozesse zu führen. Der CAS werde nur untersagt, in einem gerichtlichen Verfahren eine Maßnahme zu erwirken, welche den Antragstellerinnen ein Prozessführungsverbot auferlege. Entsprechendes gelte für die gegen die Antragsgegnerin zu erlassende einstweilige Verfügung. Sowohl dieser wie auch der CAS bleibe unbenommen, die Antragstellerinnen weltweit mit weiteren Klagen zu überziehen. Allein die Beeinträchtigung der Patentrechte der Antragstellerin werde durch ein faktisches Verbot der Weiterführung ihrer Verletzungsklagen untersagt.

20    Die Kammer gehe nicht davon aus, dass eine Anti-Suit Injunction völkerrechtswidrig sei. Dem stehe bereits entgegen, dass die US-amerikanische wie auch die britische Rechtsordnung eine solche für zulässig erachteten. Aus dem Grundsatz, dass die deutschen Gerichte die verbindlichen Regeln des Völkerrechts zu beachten haben, folge allerdings nicht die Rechtswidrigkeit einer einstweiligen Verfügung gegen die Antragsgegnerin. Ein Eingriff in staatliche Hoheitsrechte eines anderen Staates liege schon deshalb nicht vor, weil die einstweilige Verfügung nicht eine Anti-Suit Injunction des US-Gerichts selbst verbiete, sondern der CAS bzw. der Antragsgegnerin aufgebe, eine solche nicht zu erwirken bzw. ein insoweit bereits eingeleitetes Verfahren weiter zu betreiben.

21    Auch ein Verstoß gegen Europarecht liege durch den Erlass der beantragten einstweiligen Verfügung nicht vor. Europarechtliche Vorschriften seien mangels grenzüberschreitenden innereuropäischen Sachverhalts nicht einschlägig. Die antragsgegnerseits vorgelegten Entscheidungen belegten zudem eine Europarechtswidrigkeit der beantragten einstweiligen Verfügung nicht.

22    Soweit in der einstweiligen Verfügung ein Eingriff in Grundrechte der Antragsgegnerin (Art. 2 Abs. 1 GG i.V.m. Art. 19 Abs. 4 GG) zu sehen sei, sei dieser jedenfalls gerechtfertigt und verhältnismäßig. Die Abwägung der sich gegenüberstehenden Grundrechte führe nämlich zu einer Entscheidung zugunsten der Antragstellerinnen, welche sich zum einen auf ihr Grundrecht auf Eigentum und zum anderen ebenfalls auf den Justizgewährungsanspruch gemäß Art. 19 Abs. 4 GG berufen könnten.

23    Schließlich könne sich die Antragsgegnerin nicht mit Erfolg darauf berufen, dass dem Erlass einer gegen sie gerichteten einstweiligen Verfügung der Umstand entgegenstehe, dass es sich bei den Klagepatenten der Antragstellerinnen um kartellrechtlich relevante standardessentielle Patente handle. Damit könne ein rechtswidriger Eingriff in verfassungsrechtlich gewährleistete Eigentumsrechte nicht gerechtfertigt werden.

24    Gegen dieses Urteil wendet sich die Antragsgegnerin mit ihrer Berufung, die sie wie folgt begründet:

25    In tatsächlicher Hinsicht sei vorzutragen, dass die CAS in Erfüllung der gegen sie im Verfahren 21 O 9333/19 LG München I ergangenen einstweiligen Verfügung mit Schriftsatz vom 03.09.2019 (Anl. FDB B 2, deutsche Übersetzung Anl. FDB B 2a) den Antrag auf Erlass einer Anti-Suit Injunction - welcher nur zu dem Zweck gestellt worden sei, mit den Antragstellerinnen eine wirtschaftlich sinnvolle FRAND-Lizenzregelung zu erzielen - zwischenzeitlich zurückgenommen habe. Am 10.09.2019 habe darüber hinaus der District Court des Northern Districts of California den Anti-Suit Injunction-Antrag der CAS (ohne Präjudizwirkung, weshalb die CAS einen neuen Antrag stellen könnte) zurückgewiesen.

26    Für einen Unterlassungsanspruch der Antragstellerinnen fehle es bereits an einem Rechtsschutzbedürfnis, weil diese dem Antrag auf Erlass einer Anti-Suit Injunction in dem US-amerikanischen Verfahren entgegentreten könne. Es sei nicht Aufgabe eines deutschen Gerichts, präventiv zu prüfen (im Sinne einer „Kontrollprüfung"), ob das gerichtliche Verfahren im Ausland, gegen das sich der hier geltend gemachte Unterlassungsanspruch richte, unter dem Gesichtspunkt der Rechtsstaatlichkeit zu beanstanden sei.

27    Die angegriffene einstweilige Verfügung des Landgerichts verstoße darüber hinaus gegen das Gebot des freien Zugangs zu den staatlichen Gerichten und gegen das Gebot der unabhängigen und ungestörten staatlichen Rechtspflege.

28    Ein Verstoß eines deutschen Gerichts gegen derart grundlegende Prinzipien des deutschen Zivilrechts und Zivilprozessrechts sei auch weder erforderlich noch gerechtfertigt, um einen drohenden „Angriff" einer ausländischen Prozesspartei in Form eines Anti-Suit Injunction-Antrags bereits im Voraus „abzuwehren". Eine ausländische Prozesspartei, die sich freiwillig in den Geltungsbereich der US-amerikanischen Rechtsordnung begeben habe, könne nicht den deutschen Rechtsstaat bemühen, um mit aktiven Unterlassungsanordnungen in die Justizhoheit und Gerichtsgewalt eines anderen Staates - hier der Vereinigten Staaten - einzugreifen. Die rechtliche Bewertung des Landgerichts hätte zur Konsequenz, dass deutsche Gerichte ermächtigt wären, ausländische gerichtliche Verfahren, welche eine Auswirkung auf Rechtsgüter eines Betroffenen in Deutschland haben könnten und mit der inländischen

Rechtsordnung nicht vereinbar seien, bereits im Zeitpunkt der Verfahrenseinleitung zu untersagen. Einem hieraus resultierenden Abwehrbedürfnis werde hinreichend dadurch Rechnung getragen, dass entsprechende Urteile in Deutschland nicht anzuerkennen und nicht zu vollstrecken seien.

29    Die angegriffene landgerichtliche Entscheidung beruhe auf einer fehlerhaften Anwendung des § 823 Abs. 1 BGB i.V.m. Art. 20 Abs. 3 GG, § 830 Abs. 1 BGB. Jede gerichtliche Anordnung eines deutschen Gerichts, mit der einer Partei eines gerichtlichen Verfahrens ein bestimmtes prozessuales Verhalten untersagt oder die Weiterführung eines gerichtlichen Verfahrens sanktioniert werde, stelle sich als unzulässiger, rechtswidriger Eingriff in ein anderes zivilprozessuales Gerichtsverfahren dar. Erfolge ein solcher Eingriff über die Grenzen der Bundesrepublik Deutschland hinaus dadurch, dass - wie im Streitfall - in ein betroffenes Verfahren im Ausland eingegriffen werde, stelle dies zugleich einen - jedenfalls mittelbaren - Eingriff in die Justizhoheit des betroffenen Staates dar. Ob mit der als formaljuristisch zu beurteilenden Entscheidung des Landgerichts durch die angegriffene Maßnahme ein „Prozessführungsverbot" einhergehe, sei unmaßgeblich. Entscheidend sei allein die Wirkung des Urteils in der Sache.

30    Die angegriffene landgerichtliche Entscheidung sei überdies mit der Rechtsprechung des BGH und der Obergerichte, wonach gerichtliche Weisungen an eine Prozesspartei in der Form, ein bestimmtes Hauptsacheverfahren fortzuführen, durch die deutschen Gerichte nicht ergehen dürften, unvereinbar. Das Erstgericht verhalte sich auch widersprüchlich, wenn es davon ausgehe, dass einerseits eine Anti-Suit Injunction das Justizhoheit Deutschlands und damit die Freiheit der Beteiligten, uneingeschränkt die nach der Prozesslage notwendigen Anträge stellen zu können, verletze, aber andererseits die ergangene einstweilige Verfügung - welche ebenfalls die Freiheit, prozessuale Anträge zu stellen, beschränke - die Justizhoheit der USA bzw. die prozessualen Rechte der CAS nicht verletzten. Beide gerichtlichen Anordnungen richteten sich an die jeweilige Prozesspartei und wirkten unmittelbar auf ein gerichtliches Verfahren ein, weil beide Gerichte die Einhaltung ihrer Anordnungen mittels Ordnungsmaßnahmen sicherstellen könnten. Der Umstand, dass nach US-amerikanischem Rechtssystem gerichtliche Weisungen erteilt werden könnten, welche mit deutschem Recht unvereinbar seien, rechtfertige nicht, dass ein deutsches Gericht zu gleichen Mitteln greife und Weisungen bzgl. eines US-amerikanischen Verfahrens erteile.

31    Das in die Justizhoheit der USA eingreifende Vorgehen des Landgerichts München I sei zudem völkerrechtswidrig. Es verstoße gegen das Interventionsverbot, welches den Staaten die Einmischung in Bereiche verbiete, die der ausschließlichen Zuständigkeit anderer Staaten unterlägen. Der mittelbare Zwang, den das Ersturteil im Hinblick auf die Wirkung einer Anti-Suit Injunction sehe, begründe die Völkerrechtswidrigkeit des der Antragsgegnerin gegenüber ausgesprochenen Verbots.

32    Zur Anwendung des § 823 Abs. 1 BGB zu Lasten der Antragsgegnerin habe das Landgericht darüber hinaus verkannt, dass es insoweit bereits an einem Schaden fehle, nachdem das US-Verfahren in der Hauptsache darauf abziele, der Antragstellerin die angemessene FRAND-Lizenzgebühr zu verschaffen.

33    Unabhängig von der Unbegründetheit des Verfügungsantrags in der Sache komme die Antragsgegnerin als Unterlassungsschuldnerin nicht in Betracht. Das Landgericht sei in Verkennung der Grundsätze zur Darlegungslast des Unterlassungsgläubigers von einer Mittäterschaft der Antragsgegnerin ausgegangen. Der lediglich pauschale, unsubstantiierte Vortrag der Antragstellerinnen habe für die Antragsgegnerin keine Veranlassung begründet, sich über das bloße Bestreiten einer Mittäterschaft hinaus zu erklären. Insbesondere sei das Vorbringen der Antragstellerinnen zu den Äußerungen zweier Konzerngesellschaften der C.-Gruppe nicht geeignet und ausreichend, den Vorwurf der Mittäterschaft der Antragsgegnerin zu begründen. Eine konkrete Beteiligung der Antragsgegnerin an dem Antrag auf Erteilung der Anti-Suit Injunction folge auch nicht daraus, dass der Vorstandsbereich „Recht" durch das Vorstandsmitglied der Antragsgegnerin Schäfer geleitet werde. Die Wertung des Landgerichts hätte zur

Folge, dass die Antragsgegnerin allein aufgrund ihrer vermeintlichen „Einbindung" in einen Gesamtkomplex immer als Mittäterin für alle Prozesshandlungen ihrer Tochtergesellschaften in diesem Komplex anzusehen wäre, ohne dies näher präzisieren zu müssen. Dies sei mit der BGH-Rechtsprechung unvereinbar (BGH GRUR 2016, 1031 – Wärmetauscher). Im Streitfall habe die Antragsgegnerin insoweit ausdrücklich vorgetragen, dass sie die fraglichen Prozesshandlungen nicht angeordnet und die CAS eigenverantwortlich gehandelt habe.

34    Schließlich sei die Antragsgegnerin auch nicht als Störerin durch das spätere Unterlassen einer Einwirkung auf die eigentliche Täterin, die CAS, anzusehen. Die bloße Kenntnis der vermeintlichen Rechtsverletzung begründe im Streitfall mangels Organstellung der Antragsgegnerin und aufgrund fehlender Einwirkungsmöglichkeit auf die CAS noch keine Störerhaftung.

35    Die Antragsgegnerin beantragt,

36    unter Aufhebung des angegriffenen Ersturteils die einstweilige Verfügung des Landgerichts vom 30.09.2019 aufzuheben und den auf ihren Erlass gerichteten Antrag vom 09.07.2019 zurückzuweisen.

37    Die Antragstellerinnen beantragen,

38    die Berufung der Antragsgegnerin mit der Maßgabe zurückzuweisen, dass der Tenor des landgerichtlichen Urteils unter III. wie folgt lautet:

39    - „… eine Anti-Suit Injunction oder andere gleichwertige Maßnahmen wie eine Temporary Retraining Order …"

40    - „… durchzusetzen, dass die Continental Automotive Systems Inc. keinen Antrag stellt wie geschehen mit dem Antrag auf Erlass … vor dem Northern District of California United States Court"

41    Sie verteidigen das Ersturteil und führen ergänzend hierzu aus:

42    Die von den Antragstellerinnen erwirkte einstweilige Verfügung des Landgerichts stelle sich als eine dem allgemeinen Notwehrgedanken folgende Abwehrmaßnahme dar, um den unstreitig verletzten Ausschließlichkeitsrechten der Antragstellerinnen an deren Patenten dadurch Geltung zu verschaffen, dass sich diese gegen rechtswidrige Angriffe auf verfassungsrechtlich geschützte Rechtspositionen, namentlich deren Eigentumsrechte, zur Wehr setzten. Den Antragstellerinnen müsse das Recht, Patentverletzungen in Deutschland durch die ordentlichen Gerichte prüfen zu lassen, unbenommen bleiben. Demgegenüber führe der Anti-Suit Injunction-Antrag der CAS zur Torpedierung der anhängigen Hauptsacheklagen in dem Verfahrenskomplex zwischen den Antragstellerinnen und der D. AG. Allein die Antragsgegnerin missachte sämtliche Grundsätze des internationalen Rechts sowie der staatlichen Souveränität und der Territorialität im gewerblichen Rechtsschutz. Durch die in den USA nachträglich erhobene Klage auf Erteilung einer FRAND-Lizenz nach US-Maßstäben solle weltweit eine Lizenzrate bestimmt werden, welche allein den in Kalifornien geltenden Berechnungsmethoden folge. Um dies zu

erreichen, wolle die Antragsgegnerin die zuvor eingereichten deutschen Patentverletzungsklagen, welche eine FRAND-Bewertung nach deutschen und europäischen Maßstäben umfassten, mit allen Mitteln stoppen. Mit einer Anti-Suit Injunction beabsichtige die Antragsgegnerseite daher, den deutschen Gerichten die Anwendung von US-Recht aufzuzwingen.

43    Entgegen der Darstellung der Antragsgegnerin bestehe das Risiko eines umfassenden Vertriebsstopps durch die von den Antragstellerinnen erwirkte einstweilige Verfügung nicht. Sollten sich diese nicht FRANDkonform verhalten, würde ein Unterlassungsantrag gegen die D. AG abgewiesen. Anderenfalls könne diese das FRAND-Angebot annehmen und so eine Vollstreckung eines Unterlassungstitels abwenden.

44    Vor diesem Hintergrund stelle sich das Ersturteil als mildestes aller zur Verfügung stehenden Mittel dar. Jede andere Bewertung würde im Ergebnis zur Kapitulation des deutschen Rechtsstaats vor übergriffigen Rechtsordnungen führen.

45    In tatsächlicher Hinsicht sei anzumerken, dass die CAS am 08./09.10.2019 erneut einen Antrag auf Erlass einer Anti-Suit Injunction, darauf gerichtet, dass den Antragstellerinnen verboten werden solle, ihre Patentrechte in Deutschland gegen irgendein Unternehmen des C.-Konzerns oder dessen Kunden gerichtlich geltend zu machen, gestellt habe (Anl. AR 44 und AR 44a), wobei die streitgegenständlichen zehn rechtshängigen Patentverletzungsverfahren hiervon nur vorläufig ausgenommen seien. Zur Sicherung der Anti-Suit Injunction sei eine Temporary Restraining Order (TRO) beantragt worden, welche unverzüglich die Abwehr der hierdurch drohenden Beeinträchtigung deutscher Patentrechte verbieten solle. Ferner sei beantragt worden, eine Anti-Suit Injunction zunächst einstweilen und ohne mündliche Verhandlung zu erlassen, bis über den Antrag endgültig entschieden werde. Der Antrag sei zwar zunächst mangels Glaubhaftmachung zurückgewiesen worden. Es sei allerdings zu befürchten, dass er alsbald erneut eingereicht werde.

46    Den von der Antragsgegnerin gegen das Ersturteil erhobenen Einwänden sei kein Erfolg verbeschieden. Das Landgericht habe in der Sache richtig entschieden. Durch den Antrag auf Anti-Suit Injunction drohe eine Beeinträchtigung der Patentrechte. Das Vorliegen eines Schadens sei keine Voraussetzung für die Geltendmachung von sich auf Deliktsrecht stützenden Unterlassungsansprüchen; ausreichend sei die drohende widerrechtliche Beeinträchtigung eines geschützten Rechtsguts. Die drohende Beeinträchtigung im Streitfall sei auch rechtswidrig. Ein auf den Antrag auf Anti-Suit Injunction zurückzuführendes und sich als Prozessführungsverbot darstellendes Verbot der Fortführung deutscher Patentverletzungsklagen widerspreche dem eigentumsrechtlichen Kern der Ausschließlichkeitsrechte der Antragstellerinnen.

47    Eine Mittäterschaft der Antragsgegnerin sei hinreichend glaubhaft gemacht. Den von den Antragstellerinnen vorgetragenen und glaubhaft gemachten Indiztatsachen - wobei insoweit darauf hinzuweisen sei, dass nach der Rechtsprechung des BGH der praktisch ohnehin unmögliche Nachweis der konkreten Mittäterschaft einer konkreten internen Mitwirkungshandlung nicht erforderlich sei - sei die Antragsgegnerin nicht substantiiert entgegengetreten. Insbesondere habe sie nicht bestritten, dass der Anti-Suit Injunction-Antrag gemeinsam mit der CAS abgestimmt und im gemeinsamen Einvernehmen mit Wissen und Wollen der Antragsgegnerin bei Gericht eingereicht worden sei. Das vom Landgericht gefundene Ergebnis werde überdies unter dem Gesichtspunkt der Nebentäterschaft bzw. der Störereigenschaft getragen. Trotz der antragstellerseits aufgezeigten zahlreichen Unterstützungshandlungen durch die Antragsgegnerin und trotz ihr zumutbarer tatsächlicher und rechtlicher Einwirkungsmöglichkeiten habe diese nichts dagegen unternommen, um die ihr bekannte Verletzungshandlung der von ihr beherrschten CAS zu unterbinden.

48    Entgegen der Auffassung der Antragsgegnerin sei die angegriffene landgerichtliche Entscheidung mit deutschem Recht vereinbar. Das Erstgericht habe kein Prozessführungsverbot ausgesprochen. Die Antragsgegnerin verkenne, dass durch den Antrag auf Erlass einer Anti-Suit Injunction eine Notwehrsituation geschaffen worden sei, zu deren Abwehr die bloße Verweigerung der Anerkennung oder Vollstreckung nicht ausreiche. Demgegenüber könne sich die Antragsgegnerin nicht auf den Justizgewährungsanspruch im Hinblick auf ein ausländisches, unstreitig rechtswidriges Verfahren berufen. Die von der Antragsgegnerin zitierte Rechtsprechung des BGH (Anl. FBD B 5 - FBD B 7) bzw. des OLG Düsseldorf (Anl. FBD B 9) verhelfe ihrer Rechtsverteidigung nicht zum Erfolg. Das OLG Düsseldorf habe vielmehr in der als Anl. AR 14 vorgelegten Entscheidung die offensichtliche Rechtswidrigkeit der Anti-Suit Injunction bejaht.

49    Schließlich verstoße das landgerichtliche Urteil auch nicht gegen Völkerrecht, nachdem der Unterlassungstenor in Umsetzung des Territorialitätsprinzips allein der Abwehr drohender Beeinträchtigungen deutscher Patentrechte in Deutschland diene. Etwaige reflexartige extraterritoriale Wirkungen seien hierdurch legitimiert und stellten keine Einmischung in die Hoheitsrechte der USA dar. Außerdem sei der Vorrang des Grundgesetzes zu beachten, weshalb dem hier inmitten stehenden rechtswidrigen Eingriff in die Grundrechte der Antragstellerinnen ein vermeintlicher Konflikt mit dem Völkerrecht nicht entgegengehalten werden könne.

50    Letztlich stehe den Antragstellerinnen auch deren Rechtsschutzbedürfnis zur Seite, nachdem im US-amerikanischen Verfahren eine Prüfung der Verletzung ihrer Patentrechte nicht erfolge. Daher sei es nicht veranlasst, dass die Antragstellerinnen vorab den Ausgang eines ausländischen Rechtsstreits abwarten müssen - in dem sie zudem ihre Rechte nicht wahrnehmen könnten -, bevor sie ihre Patentrechte in Deutschland gerichtlich durchzusetzen in der Lage seien.

51    Sie verweisen auf Entscheidungen des Tribunal de Grande Instance de Paris vom 8.11.2019 N° RG 19/59311 (AR 46a, AR 46b) und des High Court of Justice vom selben Tag Case No HP 2019-000024 (AR 47) zu vergleichbaren Fallgestaltungen - Anträge auf Erlass einer Anti SuitInjunction beim United States District Court for the Northern District of California.

52    Im Übrigen wird auf die im Berufungsverfahren gewechselten Schriftsätze und auf das Protokoll des Termins vom 14.11.2019 Bezug genommen.

53    Nach Schluss der mündlichen Verhandlung hat die Antragsgegnerin einen Schriftsatz vom 25.11.2019, die Antragstellerinnen haben einen Schriftsatz vom 29.11.2019 eingereicht.

**Entscheidungsgründe**

II.

54    Die Berufung der Antragsgegnerin gegen das angegriffene Urteil des Landgerichts München I vom 30.08.2019 ist zulässig, insbesondere ist sie form- und fristgerecht eingelegt (§ 517 ZPO) und begründet (§ 520 Abs. 2 ZPO) worden. Sie führt allerdings in der Sache nicht zum Erfolg. Lediglich der Tenor war dem geänderten Antrag anzupassen. Die Feststellung des Landgerichts, ein mit dem drohenden Erlass einer Anti-Suit Injunction verbundener, von der Antragsgegnerin in deliktischer Hinsicht mitzuverantwortender Eingriff in die Rechte der Antragstellerinnen an deren streitgegenständlichen Patenten durch ein Verbot, die in Deutschland anhängigen gerichtlichen Patentverletzungsstreitigkeiten

gegen die D. AG fortzuführen, stelle sich als rechtswidrig dar und begründe unbeschadet der hiergegen von der Antragsgegnerin erhobenen Einwände den mit dem Antrag auf Erlass einer einstweiligen Verfügung antragstellerseits verfolgten vorbeugenden Unterlassungsanspruch, ist jedenfalls im Ergebnis frei von Rechtsfehlern. Im Einzelnen:

55    A. Der Verfügungsantrag ist zulässig.

56    1. Die örtliche und sachliche Zuständigkeit des Landgerichts ist in der Berufungsinstanz nicht mehr zu prüfen (§ 513 Abs. 2 ZPO). Die internationale Zuständigkeit der deutschen Gerichte ergibt sich aus dem Sitz der Antragsgegnerin in Deutschland.

57    2. Der Antrag auf Erlass einer einstweiligen Verfügung genügt dem Bestimmtheitserfordernis. Entgegen der Auffassung der Antragsgegnerin gilt dies auch für die im Termin vor dem Senat geänderte Antragsfassung.

58    Der Zusatz „… eine Anti-Suit Injunction oder andere gleichwertige Maßnahmen wie eine Temporary Retraining Order …" trägt dem vom Senat im Termin geäußerten Bedenken gegen die Bestimmtheit der ursprünglichen Antragsfassung, soweit sich diese auf „andere gleichwertige Maßnahmen" bezogen hat, Rechnung (§ 253 Abs. 2 Nr. 2 ZPO); die Antragstellerinnen haben im Schriftsatz vom 06.11.2019 erläutert, dass die von der CAS im US-amerikanischen Verfahren beantragte „Temporary Retraining Order" der Sicherung des Anti-Suit Antrags diene und damit als gleichwertige Maßnahme im Sinne des geänderten Verfügungsantrags anzusehen sei.

59    Der Antragsänderung steht auch nicht mangelnde Dringlichkeit entgegen, nachdem die „Temporary Retraining Order" bereits von dem Begriff „andere gleichwertige Maßnahmen" im Verfügungsantrag vom 09.07.2019 umfasst war.

60    Soweit die Antragstellerinnen im Termin den Antrag des Weiteren dahingehend geändert haben, als die letzten beiden Spiegelstriche entfallen sollten und statt dessen die Worte „… durchzusetzen, dass die Continental Automotive Systems Inc. keinen Antrag stellt wie geschehen mit dem Antrag auf Erlass … vor dem Northern District of California United States Court" in den Antrag aufgenommen wurden, haben sie dem Umstand, dass der Anti-Suit Antrag der CAS vom 12.06.2019 in den USA nicht mehr verfahrensgegenständlich ist, in zulässiger Weise Rechnung getragen.

61    3. Für den Antrag auf Erlass einer einstweiligen Verfügung fehlt es auch nicht am Rechtsschutzbedürfnis. Das Rechtsschutzbedürfnis als allgemeine Prozessvoraussetzung ergibt sich in der Regel aus der Nichterfüllung des vom Kläger geltend gemachten Anspruchs. Es fehlt, wenn der Kläger sein Rechtsschutzziel auf einfacherem und billigerem Wege erreichen kann. Der Argumentation der Antragsgegnerin, es fehle am Rechtsschutzbedürfnis, da die Antragstellerinnen darauf zu verweisen seien, sich gegen den Anti Suit-Antrag im Rahmen des Verfahrens in den USA zu verteidigen, kann nicht gefolgt werden (siehe hierzu nachfolgend unter B.3).

62    B. Die Berufung der Antragsgegnerin hat auch in der Sache keinen Erfolg.

63      1. Das Landgericht hat von der Berufung unbeanstandet deutsches Recht zugrunde gelegt, sodass hierzu keine weiteren Ausführungen veranlasst sind.

64      2. Eine dem angelsächsischen Recht vergleichbare richterliche Befugnis, einer Partei die Prozessführungsbefugnis abzusprechen, existiert nach deutschem Verfahrensrecht nicht (vgl. Schulze, in Wieczorek/Schütze, ZPO, 4. Aufl., Vor § 50 Rn. 43, 44, § 51 Rn. 10). Jedoch kann sich ein materiellrechtlicher Anspruch, die Prozesseinleitung zu unterlassen, aus einer vorausgegangenen vertraglichen Abrede ergeben (vgl. auch BGH, Urt. v. 17.10.2019 - III ZR 42/19); ebenso aus dem Gesichtspunkt der unerlaubten Handlung (Schulze a.a.O.; Schack, Internationales Zivilverfahrensrecht, Rn. 859 ff.), wovon das Landgericht ausgegangen ist.

65      a) Die Berufung wendet sich auch nicht gegen die zutreffende Beurteilung des Landgerichts, ein Erlass der von der CAS im Verfahren vor dem Northern District of California United States Court beantragten Anti-Suit Injunction stelle sich tatbestandsmäßig als drohender Eingriff in ein absolutes Recht der Antragstellerinnen im Sinne von § 823 Abs. 1 i.V.m. § 1004 Abs. 1 Satz 1 BGB dar (wobei die Auffassung der Antragsgegnerin, es fehle insoweit an einem Schaden der Antragstellerinnen, nicht durchgreift, weil der geltend gemachte vorbeugende Unterlassungsanspruch einen solchen nicht voraussetzt), namentlich in deren eigentumsähnliche Rechte an den verfahrensgegenständlichen Patenten. Zutreffend hat das Landgericht insoweit festgestellt, dass die Beeinträchtigung des Eigentums im Sinne von § 1004 Abs. 1 Satz 1 BGB auch in anderer Weise als durch dessen Entziehung oder Vorenthaltung erfolgen könne, im Streitfall namentlich dadurch, dass es den Antragstellerinnen bei Erlass einer Anti-Suit Injunction - ebenso wie im Falle einer Temporary Restraining Order - versagt wäre, in Richtung auf die Daimler AG von ihrem Ausschließlichkeitsrecht an den Klagepatenten in den anhängigen Patentverletzungsrechtsstreitigkeiten durch deren Fortführung geltend zu machen, um auf diesem Weg die begehrten Klageansprüche gerichtlich durchsetzen zu können, ohne das Ergebnis des Hauptsacheverfahrens in den USA abwarten zu müssen.

66      Der vom Landgericht somit zutreffend bejahten Erstbegehungsgefahr steht nicht entgegen, dass die CAS nach Zustellung der gegen sie im Verfahren 21 O 9333/19 ergangenen Beschlussverfügung den Antrag auf Erlass einer Anti-Suit Injunction zurückgenommen hat. Denn wie der erneute Antrag vom 8.10.2019 (Anlage AR 44, AR 44a), welcher sich nach dem insoweit unbestritten gebliebenen Vortrag der Antragstellerinnen nur unter Vorbehalt nicht auf die in Deutschland streitgegenständlichen Patentverletzungsverfahren gegen die D. AG bezieht, belegt, hat die CAS nicht von ihrem Vorhaben Abstand genommen, weiterhin entsprechende Anträge zu stellen.

67      b) Das Landgericht ist davon ausgegangen, dass der drohende Eingriff in die Patentrechte der Antragstellerin nach dem maßgeblichen deutschen Recht als rechtswidrig zu qualifizieren ist (LGU, Seite 21 f. unter c)). Es hat dabei zu Recht darauf abgestellt, dass nach der Rechtsprechung des BGH (Urt. v. 13.3.1979 - VI ZR 177/77, betreffend die Haftung des Anzeigeerstatters) sowie des BVerfG (Beschluss vom 25.2.1987 - 1 BvR 1086/85 betreffend den Antrag auf Abgabe der eidesstattlichen Versicherung), wonach das Ergreifen von rechtsstaatlichen Verfahren allein die Rechtswidrigkeit nicht indizieren kann, wenn sich das Vorgehen nachträglich als sachlich nicht gerechtfertigt herausstellt, die Rechtswidrigkeit nicht bereits aus der Bejahung einer (drohenden) Verletzung folgt. Das Landgericht hat, dem folgend, die Rechtswidrigkeit des Anti-Suit Antrags der CAS positiv festgestellt. Zudem hat es zutreffend darauf hingewiesen, dass diese Rechtsprechung, die sich auf nach deutschem Rechtsverständnis rechtmäßige Verfahren bezieht, nicht hergeleitet werden kann, dass jedes nach dem Recht eines Drittstaates zulässige Verhalten/Verfahren damit dem Anwendungsbereich dieser Rechtsprechung unterfällt. Da auch hiergegen von der Berufung keine substantiierten Einwendungen erhoben werden, bedarf es hierzu keiner weiteren Ausführungen.

68      3. Der Berufung kann nicht gefolgt werden, wenn sie aus der Unzulässigkeit des Anti Suit-Antrags

herleitet, dass nach diesen Grundsätzen auch das vom Landgericht ausgesprochene Verbot („Anti-Anti-Suit Injunction") nicht hätte ergehen dürfen.

69    Soweit das Landgericht die Auffassung vertreten hat, der Einwand der Antragsgegnerin, einer vom Gericht als rechtswidrig beurteilten Anti-Suit Injunction könne nicht mittels eines sich auf das gerichtliche Verfahren in den USA zumindest mittelbar auswirkenden Prozessführungsverbots („Anti-Anti-Suit Injunction") begegnet werden, greife nicht durch, weil ein solches mit Erlass der antragstellerseits beantragten einstweiligen Verfügung gerade nicht ausgesprochen werde, vermag sich der Senat dem allerdings mit der vom Erstgericht gegebenen Begründung nicht anzuschließen.

70    a) Dem Ansatz des Landgerichts, mit dem Erlass der antragstellerseits beantragten einstweiligen Verfügung gehe ein gegenüber der CAS im Hinblick auf das US-Gerichtsverfahren wirkendes Prozessführungsverbot nicht einher, weil die begehrte einstweilige Verfügung das dortige Hauptsacheverfahren unberührt lasse und im Übrigen es sowohl der Antragsgegnerin als auch der CAS unbenommen bleibe, die Antragstellerinnen mit weiteren Klagen weltweit zu überziehen (LGU S. 20/21), kann nicht beigetreten werden. Zwar trifft es zu, dass die einstweilige Verfügung keinen - unmittelbaren oder direkten - Einfluss auf das von der CAS gegen die Antragstellerinnen in den USA geführte, auf eine Lizenzierung der Nokia-Patente zu angemessenen, FRAND entsprechenden Bedingungen gerichtete Hauptsacheverfahren ausübt. Dies ändert allerdings nichts daran, dass der CAS mit Erlass der antragstellerseits beantragten einstweiligen Verfügung versagt würde, einen nach US-Recht zulässigen Antrag im Rahmen eines anhängigen Gerichtsverfahrens zu stellen bzw. dort weiterzuverfolgen. Der vom Landgericht vorgenommenen Differenzierung - unzulässige Beeinflussung der Führung des Hauptsacheverfahrens auf Lizenzierung einerseits, zulässige Untersagung eines Antrags im Rahmen des Hauptsacheverfahrens andererseits - kann nicht gefolgt werden. Nach der Rechtsprechung fehlt es nicht nur für Klagen, die sich gegen die Prozessführung als solche richten, am Rechtsschutzbedürfnis (BGH GRUR 2013, 647 Tz. 12 f. - Rechtsmissbräuchlicher Zuschlagsbeschluss; BGH GRUR 2005, 882 Tz. 23 - Unberechtigte Schutzrechtsverwarnung I; BGH GRUR 2006, 219 Tz. 14 - Detektionseinrichtung II), sondern auch für Klagen, die sich gegen andere Maßnahmen im Rahmen von anhängigen gerichtlichen Verfahren (wie etwa Parteivorbringen) richten (vgl. die Rspr.-Nachw. bei BGH GRUR 2018, 757 Tz. 16 - 18).

71    Bei dem Antrag auf Erlass einer Anti Suit-Injunction bzw. einer Temporary Restraining Order handelt es sich um Anträge im Rahmen der im Mai 2019 in den USA eingereichten Klage auf Lizenzierung. Mit ihnen soll der zeitliche Vorrang des Verfahrens auf Lizenzierung gesichert werden, um dieses „ungestört" von den zehn in Deutschland anhängigen Patentverletzungsverfahren betreiben zu können. Dass es sich bei den „begleitenden Anträgen" nicht um selbständige Verfahren handelt, sondern diese ein anhängiges Hauptsacheverfahren voraussetzen, rechtfertigt nicht die Beurteilung, die vorgenannte Rechtsprechung würde nur das Hauptsacheverfahren ergreifen, nicht aber begleitende Verfahrensanträge in Gestalt eines Antrags auf Erlass einer Anti Suit-Injunction bzw. einer Temporary Restraining Order.

72    Dem kann auch nicht entgegengehalten werden, dass die deutschen Gerichte in der Vergangenheit die Zustellung der Anordnung einer Anti-Suit Injunction abgelehnt und deren Vollstreckung für unzulässig erachtet haben (vgl. OLG Düsseldorf, Beschluss vom 10.01.1996 - 3 VA 11/95, Juris LS und Tz. 31, Anl. FDB 9). Eine mögliche Unvereinbarkeit der Anordnung eines ausländischen Gerichts mit deutschem Recht ist unabhängig von der Frage zu beurteilen, ob es einem deutschen Gericht verwehrt ist, auf die Befugnis zur Stellung und Weiterverfolgung von Anträgen einer Partei eines ausländischen Gerichtsverfahrens einzuwirken.

73    b) Der mit dem (hier drohenden und damit einen vorbeugenden Unterlassungsanspruch i.S.v. § 1004 BGB begründenden) Erlass einer Anti-Suit Injunction verbundene tatbestandsmäßig deliktische Eingriff in die Patentrechte der Antragstellerinnen stellt sich im konkreten Fall als rechtswidrig dar (siehe vorstehend

unter 2.b). Dem Erlass der einstweiligen Verfügung steht auch nicht ein prozessuales Privileg entgegen. Entsprechendes gilt für die Temporary Restraining Order im Sinne des Verfügungsantrags.

74      aa) Die Antragstellerinnen sehen in ihrem Antrag auf Erlass einer einstweiligen Verfügung (lediglich) eine Abwehrmaßnahme gegen einen Angriff der Antragsgegnerin in Gestalt eines AntiSuit Injunction-Antrags, darauf gerichtet, den Antragstellerinnen zu untersagen, Patentverletzungen in Deutschland durch die ordentlichen Gerichte im Rahmen eines ordentlichen Verfahrens (weiter-)prüfen zu lassen. Bei der gegen die Antragsgegnerin gerichteten einstweiligen Verfügung handele es sich um die Ausübung eines zugunsten der Antragstellerinnen streitenden Notwehrrechts (§ 227 BGB), um deren verfassungsrechtlich gesicherter Rechtsstellung aus ihrem Eigentumsrecht und ihrem Justizgewährungsanspruch Geltung zu verschaffen gegenüber einer nur destruktive Ziele verfolgenden gerichtlichen Maßnahme der CAS im Rahmen einer in zeitlicher Hinsicht gegenüber den in Deutschland anhängigen Patentverletzungsklagen nachträglich in den USA erhobenen Hauptsacheklage. Den Antragstellerinnen müsse es bei dieser Sachlage unbenommen bleiben, ungestört ihre Patentverletzungsklagen in Deutschland fortzuführen, ohne das Ergebnis des US-Hauptsacheverfahrens abwarten zu müssen.

75      Gemäß § 227 Abs. 1 BGB ist eine durch Notwehr gebotene Handlung nicht widerrechtlich. Als Notwehr definiert Abs. 2 diejenige Verteidigung, welche erforderlich ist, um einen gegenwärtigen rechtswidrigen Angriff von sich oder einem anderen abzuwehren. Sind diese tatbestandlichen Voraussetzungen gegeben, ist die Notwehrhandlung rechtmäßig und begründet keine Schadensersatzpflicht. Dabei geht es, wie bereits im Termin erörtert, um Handlungen, die ergriffen werden, weil aufgrund des gegenwärtigen rechtswidrigen Angriffs die Beschreitung des Rechtswegs nicht möglich ist. Inwieweit mit diesem Ansatz daher die Anordnung eines nach den vorstehenden Grundsätzen der Rechtsprechung unzulässigen Prozessführungsverbots gerechtfertigt werden könnte, erscheint daher fraglich. bb) Dies kann jedoch dahinstehen. Das von der Rechtsprechung entwickelte prozessuale Privileg, wonach dem Prozessgegner ein bestimmtes prozessuales Verhalten einschließlich der Einleitung eines gerichtlichen/behördlichen Verfahrens nicht im Wege der Klage/einstweiligen Verfügung untersagt werden kann, beruht auf der Annahme, dass der Schutz des Prozessgegners regelmäßig durch das gerichtliche Verfahren nach Maßgabe seiner gesetzlichen Ausgestaltung gewährleistet wird. Wo dies nicht gewährleistet ist, hat es dagegen beim uneingeschränkten Rechtsgüterschutz zu verbleiben (BGH a.a.O., Tz. 21 m.w.N. - Unberechtigte Schutzrechtsverwarnung I). Diese Rechtsprechung zu dem sog. prozessualen Privileg betrifft - soweit für den Senat ersichtlich - nur Fallgestaltungen, in denen es um prozessbezogene Äußerungen oder Handlungen im Zusammenhang mit inländischen Verfahren ging, d.h. die Zulässigkeit einer Äußerung oder einer sonstigen prozessbezogenen Handlung war der Prüfung in einem inländischen gerichtlichen oder behördlichen Verfahren vorbehalten.

76      Sofern man diese Rechtsprechung auf vorliegende Fallgestaltung, bei der die Zulässigkeit und die Begründetheit des Antrags auf Erlass einer Anti-Suit Injunction ausschließlich nach dem maßgeblichen US-Recht von dem zuständigen Gericht in Kalifornien geprüft wird, übertragen wollte, wäre zu fordern, dass die Interessen der Antragstellerinnen an der Fortführung der Patentverletzungsverfahren hinreichend gewahrt sind. Davon kann nach dem glaubhaft gemachten Sachvortrag nicht ausgegangen werden.

77      Nach diesen Grundsätzen gilt Folgendes:

78      (1) Zugunsten der Antragstellerinnen streitet bei Abwägung der sich gegenüberstehenden Interessen deren grundrechtlich geschütztes eigentumsähnliches Recht an ihren Patenten (in Gestalt der gerichtlichen Durchsetzbarkeit des aus dem Eigentum resultierenden Ausschließlichkeitsrechts gegenüber jedermann, insbesondere gegenüber dem potentiellen Patentverletzer), welches im Streitfall gegenüber dem Grundrecht der Antragsgegnerin auf allgemeine Handlungsfreiheit (Art. 2 Abs. 1 GG) Vorrang genießt und den Erlass der antragstellerseits beantragten einstweiligen Verfügung wie vom

Erstgericht im Ergebnis zutreffend festgestellt gebietet. Die Antragstellerinnen verweisen insoweit zutreffend darauf, dass der Erlass einer einstweiligen Verfügung sich als einzige wirksame Abwehrmaßnahme gegenüber einer Anti-Suit Injunction darstelle, mittels derer den Antragstellerinnen die Ausübung ihrer Rechtsposition als Patentinhaberinnen in den in Deutschland anhängigen Patentverletzungsverfahren bis zum Abschluss des zwischen anderen Parteien geführten US-Verfahrens, dessen Streitgegenstand mit den hiesigen Verletzungsverfahren nicht identisch ist, gesichert werden kann. Auch wenn nach dem Vortrag der Antragsgegnerin das Hauptsacheverfahren in den USA (Lizenzierung) auf der Grundlage einer Benutzung der Patente der Antragstellerinnen geführt wird, ist nicht dargetan oder sonst ersichtlich, inwiefern der Einwand der Lizenzierung zu FRAND-Bedingungen nicht in den bereits vor dem Hauptsacheverfahren in den USA anhängigen Verletzungsverfahren in Deutschland geltend gemacht werden kann, an denen zwei C.-Konzerngesellschaften als Nebenintervenienten beteiligt sind.

79    (2) Dem kann die Antragsgegnerin nicht mit Erfolg entgegenhalten, den Antragstellerinnen - welche sich durch ihre Teilnahme am US-amerikanischen Markt der dortigen Rechtsordnung bewusst unterworfen hätten, sich daher an dieser festhalten lassen müssten - stünden im Rahmen eines Anti-Suit Injunction-Antrags in den USA hinreichende Möglichkeiten der Rechtsverteidigung einschließlich eines Rechtsmittels zur Verfügung. Dass den Antragstellerinnen zu dem Antrag auf Erlass einer Anti-Suit Injunction rechtliches Gehör gewährt wird und sie gegen deren Erlass ein Rechtsmittel einlegen könnten, belegt nicht, dass die Rechte der Antragstellerinnen nach den vorstehenden Grundsätzen im Rahmen des Verfahrens betreffend den Antrag auf Erlass einer Anti-Suit Injunction (ebenso betreffend den Antrag auf Erlass einer Temporary Restraining Order, die auf eine einstweilige Maßnahme ohne vorherige Anhörung des Gegners abzielt) hinreichend gewahrt werden. Dies ergibt sich weder aus dem Vorbringen der Antragsgegnerin - soweit der nicht nachgelassene Schriftsatz der Antragsgegnerin vom 25.11.2019 neuen Sachvortrag enthält, war dieser nicht mehr zu berücksichtigen (§ 296a ZPO) - noch aus dem als Anlage AR 4 vorgelegten Antrag. Nach dem Verständnis des Senats steht bei der Prüfung der „Schutz" des Hauptsacheverfahrens im Vordergrund. Die Auswirkungen eines Verbots der Fortführung der in Deutschland anhängigen Patentverletzungsverfahren sind demgegenüber offensichtlich nur insoweit Gegenstand der Prüfung, ob die damit einhergehende Berührung einer anderen ausländischen Rechtsordnung als „tolerabel" angesehen werden kann.

80    (3) Eine mangelnde Schutzbedürftigkeit der Antragstellerinnen kann ferner nicht daraus abgeleitet werden, dass nach der Rechtsprechung des OLG Düsseldorf eine Anti-Suit Injunction in Deutschland nicht für vollstreckbar erklärt werden könnte. Die Antragstellerinnen verweisen insoweit zu Recht darauf, dass sie für den Fall der Zuwiderhandlung gegen eine Anti-Suit Injunction in den USA mit der Verhängung einer gegen sie auszusprechenden Strafe rechnen müssten.

81    (4) Bei dieser Sachlage muss das Interesse der Antragsgegnerin, einen nach dem US-amerikanischen Recht zulässigen Antrag auf Erlass einer Anti-Suit Injunction zu stellen, zurücktreten. Die Antragsgegnerin kann sich auch nicht mit Erfolg darauf berufen, dass sich die Antragstellerinnen mit ihrem Antrag auf Erlass einer einstweiligen Verfügung insoweit widersprüchlich verhalten würden, als sie zum einen ein Abwehrrecht gegen ein potentielles Verbot, ihre Patentverletzungsprozesse in Deutschland fortführen zu können, beanspruchten, zum anderen aber ihrerseits die Antragsgegnerin mit einem Prozessführungsverbot in den USA überzögen. Aus den vorstehenden Gründen liegt ein Ausnahmefall vor, der den Erlass einer einstweiligen Verfügung als zwingend gebotene Abwehrreaktion auf eine mögliche Anti-Suit Injunction (in Gestalt einer „Anti-Anti-Suit Injunction") rechtfertigt.

82    4. Entgegen der Auffassung der Antragsgegnerin verstößt der Erlass der antragstellerseits beantragten einstweiligen Verfügung nicht gegen das Völkerrecht. Auf die zutreffenden Ausführungen im landgerichtlichen Urteil (LGU S. 27 ff.) wird insoweit Bezug genommen. Insbesondere ist anzumerken, dass die einstweilige Verfügung in Umsetzung des Territorialprinzips lediglich der Abwehr drohender Patentrechte in Deutschland dient; etwaige reflexartige extraterritoriale Wirkungen sind hierdurch

legitimiert, sie stellen keine Einmischung in die Hoheitsrechte der USA dar (vgl. Maunz/Dürig, GG, 87. Aufl. 2019, Art. 25 Rn. 50; Geimer, Internationales Zivilprozessrecht, 8. Aufl., Gerichtsbarkeit, Rn. 399c). Zudem steht das Völkerrecht gemäß Art. 25 GG als „Bestandteil des Bundesrechts" im Rang unterhalb des Bundesrechts. Nachdem aus den vorstehenden Gründen unter 3. der Erlass einer einstweiligen Verfügung wie durch das Landgericht erfolgt verfassungsrechtlich legitimiert ist, ist eine entgegenstehende Wertung durch das Völkerrecht auch insoweit nicht veranlasst (vgl. BVerfG NJW 2016, 1295 Rn. 67 ff.).

83    5. Schließlich verstößt die landgerichtliche Entscheidung auch nicht gegen Europäisches Recht. Insoweit mangelt es wie vom Landgericht zutreffend beurteilt bereits an einem grenzübergreifenden innereuropäischen Sachverhalt. Die Antragstellerinnen gehen gegen die Antragsgegnerin wegen behaupteter Verletzung ihrer Patentrechte im Inland in Gestalt der rechtswidrigen Beeinträchtigung ihres Ausschließlichkeitsrechts durch drohende Erwirkung eines Prozessfortführungsverbots vor.

84    Das von der Antragsgegnerin in Bezug genommene Urteil des BGH vom 17.10.2019 - III ZR 42/19 (Schadensersatz, Gerichtsstandsvereinbarung betreffend die Verpflichtung zum Schadensersatz bei vertragswidriger Erhebung einer Hauptsacheklage in den USA) stützt die gegenteilige Beurteilung der Antragsgegnerin nicht. Wenn der BGH auf die Rechtsprechung des EuGH Bezug nimmt, wonach gerichtlich angeordnete Prozessführungsverbote mit der (vormaligen) EuGVÜ und der (jetzigen) EuGVVO nicht vereinbar sind, da sie dem Grundsatz des gegenseitigen Vertrauens und den gesetzlich geregelten Zuständigkeitsbestimmungen, wonach jedem der Gerichte in der Europäischen Union die gleiche Sachkenntnis zuerkannt wird und eine Prüfung der Zuständigkeit eines Gerichts durch das Gericht eines anderen Vertrags- oder Mitgliedsstaats nicht gestattet ist, widersprechen, gilt dies gerade nicht im Verhältnis zu Drittstaaten, wie den USA (BGH a.a.O., Tz. 30 a.E.). Soweit in der Literatur im Anschluss an die Rechtsprechung des EuGH die Auffassung vertreten wird, mit der Ablehnung der Anti-Suit Injunction dürfte im europäischen Raum zugleich die AntiSuit Injunction erledigt sein (Mankowski, EWiR 555, 756 a.E.; ders., in Rauscher, Europäisches Zivilprozess- und Kollisionsrecht, 4. Auf., Vorbemerkungen zu Art. 4 Rn. 55), betrifft auch diese Beurteilung vorliegende Fallkonstellation nicht.

85    6. Die Antragsgegnerin ist auch passivlegitimiert.

86    a) Für eine deliktische Handlung nach Maßgabe des § 823 Abs. 1 BGB haftet im Grundsatz derjenige, der die das Rechtsgut verletzende bzw. beeinträchtigende Handlung selbst als Täter oder als mittelbarer Täter begangen hat (vgl. Palandt/Sprau a.a.O., § 823 Rn. 76); ebenso, wer die fragliche Handlung zusammen mit anderen begeht (§ 830 Abs. 1 Satz 1 BGB).

87    b) Für eine Beteiligung der Antragsgegnerin haben die Antragstellerinnen hinreichende Umstände vorgetragen, denen die Antragsgegnerin nicht - wie geboten - substantiiert entgegengetreten ist.

88    aa) Das Landgericht hat ausgeführt, die Antragsgegnerin, Muttergesellschaft der Continental-Gruppe, sei als Mittäterin für die festgestellte, den vorbeugenden Unterlassungsanspruch des § 1004 Abs. 1 i.V.m. § 823 Abs. 1 BGB begründende deliktische Handlung verantwortlich. Zur Begründung ist im erstinstanzlichen Urteil insoweit ausgeführt, die CAS habe mit Wissen und Wollen der Antragsgegnerin nicht nur die US-Hauptsacheklage, sondern auch den Antrag auf Erlass einer Anti-Suit Injunction eingereicht. Dies folge vor allem aus dem vom Landgericht festgestellten Sachvortrag und dem Prozessverhalten der beiden dem Patentverletzungsverfahren vor dem Landgericht Düsseldorf, Az. 4c O 17/19, beigetretenen Konzerngesellschaften der Antragsgegnerin.

89    bb) Dieser Beurteilung tritt der Senat bei.

90    Bei der zentralen Streitfrage, zu welchen Konditionen die Antragstellerinnen zur Lizenzierung ihrer
      Patente verpflichtet sind, handelt es sich um eine Frage, die nicht nur den Geschäftsbereich einzelner
      Konzerngesellschaften auf Seiten der Antragsgegnerin berührt, wie sich auch aus der Argumentation der
      Antragsgegnerin zur konzernbezogenen Prüfung des FRAND-Einwands ergibt. Entsprechend der
      Bedeutung dieser Frage hat auch ersichtlich die Antragsgegnerin im Januar 2019 die Beschwerde bei der
      EU-Kommission erhoben (Anlage AR 6). Nach den Feststellungen des Landgerichts wurde die
      Hauptsacheklage in den USA von der CAS mit Wissen und Wollen der Antragsgegnerin eingereicht. Dass
      die Antragsgegnerin positive Kenntnis von der (erstmaligen) Stellung des Anti-Suit Injunction-Antrags der
      CAS gehabt hat, hat sie eingeräumt (Schriftsatz vom 13.08.2019, Rn. 10). Die Behauptung der
      Antragstellerinnen, die Antragsgegnerin sei unbeschadet ihres Vortrags, die CAS habe
      eigenverantwortlich gehandelt, in übergreifende Entscheidungen des Konzerns und in
      gesamtstrategische Überlegungen einbezogen gewesen, hat diese nicht spezifiziert bestritten, sondern
      lediglich darauf hingewiesen, dass der Rückschluss, wonach alle Prozesshandlungen und Schriftsätze der
      CAS im Anti-Suit-Verfahren mit der Antragsgegnerin abgestimmt gewesen seien, nicht in zulässiger Weise
      gezogen werden könne. Die Antragsgegnerin hat auch nicht in Abrede gestellt, dass sie die CAS im Anti-
      Suit-Verfahren fortlaufend mit Informationen versorgt habe (vgl. Schriftsatz der Antragsgegnerin vom
      09.08.2019, Rn. 90, erster Spiegelstrich).

91    Vor diesem Hintergrund erachtet es der Senat als fernliegend, dass die Entscheidung zur Erhebung der
      Hauptsacheklage in den USA von Seiten der CAS zwar in Abstimmung mit der Antragsgegnerin erfolgt ist,
      der Antrag auf Erlass einer Anti-Suit Injunction mit dem Ziel, das Hauptsacheverfahren „ungestört" von
      den bereits anhängigen Patentverletzungsverfahren in Deutschland vorrangig führen zu können, dagegen
      „im Alleingang" gestellt wurde. Da sich die zugrunde liegenden Vorgänge und Entscheidungsprozesse
      naturgemäß der Kenntnis der Antragstellerinnen entziehen, genügen diese ihrer Darlegungslast, wenn
      sie, wie geschehen, ausreichende Anhaltspunkte für eine gemeinsame Abstimmung vortragen mit der
      Folge, dass die Antragsgegnerin eine sekundäre Darlegungslast für die Behauptung trifft, dass eine solche
      Abstimmung nicht stattgefunden hat (vgl. BGH BeckRS 2019, 12963 Tz. 47). Dem ist die Antragsgegnerin
      nicht nachgekommen, die sich in erster Instanz darauf beschränkt hat, den diesbezüglichen Vortrag der
      Antragstellerin als ungenügend zu rügen. Etwas anderes ergibt sich auch nicht aus der von der
      Antragsgegnerin in Bezug genommenen Entscheidung BGH GRUR 2016, 1031 - Wärmetauscher. In dieser
      Entscheidung (Tz. 58) hat der BGH allein aus dem Umstand, dass es sich bei der dortigen Beklagten zu 2
      um die Muttergesellschaft der Beklagten zu 1 gehandelt hat und die an die Beklagte zu 3 gelieferten Teile
      eine bestimmte Kennzeichnung aufwiesen, nicht als haftungsbegründend ausreichen lassen, weil die
      Kennzeichnung auch auf die Beklagte zu 1 hindeuten könne und dies folglich auch unter Berücksichtigung
      der gesellschaftsrechtlichen Verbundenheit keine Zurechnung der Patentverletzung rechtfertige. Damit
      ist vorliegender Sachverhalt nicht vergleichbar.

      III.

92    Die Entscheidung über die Kosten beruht auf § 97 Abs. 1 ZPO.

93    Die Festsetzung des Streitwerts für das Berufungsverfahren beruht auf § 47 Abs. 1 Satz 1 GKG.

| | |
|---|---|
| **Court:** | OLG Munich 6th Civil Senate |
| **Decision name:** | Anti-Suit-Injunction |
| **Decision date:** | 12.12.2019 |
| **Legal force:** | Yes |
| **Reference number:** | 6 U 5042/19 |
| **Document type:** | Judgment |
| | |
| **Standards:** | § Section 820 (1) BGB, Section 823 (1) BGB, Section 1004 (1) sentence 2 BGB, Section 9 PatG, Section 139 PatG |
| **Suggested citation:** | OLG Munich, judgment of December 12, 2019 - 6 U 5042/19 -, juris |

**Tortious interference with patent rights by issuing an anti-suit injunction - anti-suit injunction**

**Guiding principle**

(1) There is no need for legal protection both for actions directed against the conduct of proceedings as such and for actions directed against other measures in the context of pending court proceedings. (para. 70)

2. applications for an anti-suit injunction or a temporary restraining order are regularly intended to secure the temporal priority of the licensing proceedings in order to be able to pursue them "undisturbed" by patent infringement proceedings pending in Germany. (para. 71)

3. the issuance of a preliminary injunction is the only effective defensive measure against an anti-suit injunction by means of which the exercise of the legal position of patentees in the patent infringement proceedings pending in Germany can be secured until the conclusion of the US proceedings between other parties. (para.78)

4. the factual tortious interference with patent rights associated with the threat of an anti-suit injunction, which constitutes a preventive injunctive relief, may be unlawful in the specific case. (para. 73)

References

GRUR 2020, 379-383 (editorial headnote and reasons)
MittdtschPatAnw 2020, 169-171 (editorial headnote and reasons)
IPRspr 2019, no. 327b, 683-694 (red. headnote and reasons)
Course of proceedings

preceding LG Munich I, August 30, 2019, 21 O 9512/19
This decision is cited

**Case law**

Connection LG Munich I 7th Civil Chamber, July 20, 2023, 7 O 5416/23

Connection OLG Düsseldorf 2nd Civil Senate, February 7, 2022, I-2 U 27/21, ...

Connection OLG Düsseldorf 2nd Civil Senate, February 7, 2022, I-2 U 25/21, ...

**Comments**

*Erman, BGB*

● Wagner, § 227 Self-defense; II. The requirements of self-defense - self-defense situation and act of self-defense; 1. attack

*Herberger/Martinek/Rüßmann/Weth/Würdinger, jurisPK-BGB*

● M. Otto, 10th edition 2023, § 227 BGB

*Staudinger, BGB*

● Repgen, § 227 Self-defense; III. the facts of self-defense; 1. self-defense situation; c) the unlawfulness of the attack 2024

**Literature references**

Bolko Ehlgen, GRUR 2020, 383-384 (note)

**Miscellaneous**

*Geimer, International Civil Procedure Law*

● Geimer, 1 Conviction for performance or omission abroad

● Geimer, 3. Obligations of the parties

*Linke/Hau, International Civil Procedure Law*

● Linke/Hau, 5. defensive measures

*Nagel/Gottwald, International Civil Procedure Law*

● Gottwald, § 6 Domestic proceedings with a foreign element; III. Measures against foreign proceedings


**Tenor**

    1. the defendant's appeal against the judgment of the Regional Court of Munich I of 30.08.2019, file no. 21 O 9512/19, is dismissed with the proviso that no. III reads as follows


    The defendant is ordered to pay a fine of up to € 250.000 - alternatively imprisonment - or imprisonment for up to six months, in the event of repeated infringements up to a total of two years, whereby the imprisonment is to be enforced on the respective Chairman of the Executive Board, to apply for an anti-suit injunction or other equivalent measures such as a Temporary Restraining Order, or to have such measures applied for, with which the applicants are to be directly or indirectly prohibited from conducting one or more of the following patent infringement proceedings in Germany, namely


    1. regional court Munich I, Ref. 21 O 3889/19


    2. regional court Munich I, ref. 21 O 3891/19


    3. regional court Munich I, ref. 7 O 3890/19


    4. regional court Düsseldorf, Ref. 4a O 27/19


    5. regional court Düsseldorf, Ref. 4a O 26/19

6. regional court Düsseldorf, ref. 4c O 17/19

7. regional court Mannheim, ref. 2 O 37/39

8. regional court Mannheim, ref. 2 O 36/19

9. regional court Mannheim, ref. 2 O 35/19

10. regional court Mannheim, ref. 2 O 34/19

to continue to operate, whereby this obligation to cease and desist also includes

(1) to instruct C. C. E. GmbH, to instruct C.-One Holdinggesellschaft mbH, to instruct CGH Holding B.V., to instruct C. Automotive Holding Netherlands B.V., to instruct C. Automotive, Inc., to instruct C. Automotive Systems, Inc. and/or

(2) by otherwise influencing C. Automotive Systems, Inc. and, if necessary, the aforementioned companies,

enjoin C. Automotive Systems, Inc. from filing the Motion for Anti-Suit Injunction dated June 12, 2019, in Docket No. 5:19-cv-02520-LHK, Docket No. 32 in the United States District Court Northern District of California.

2. order the defendant to pay the costs of the appeal.

Order

The value in dispute of the appeal proceedings is set at € 2.5 million.

**Facts of the case**

I.

1    The applicants, companies of the N. group of companies based in Finland, assert a claim for injunctive relief against the defendant, the parent company of the C. group of companies based in Hanover, by way of preliminary injunction proceedings on the grounds of alleged threatened infringement of their patent rights due to the filing of an anti-suit application by a group company of the defendant in the USA.

2    In its judgment dated August 30, 2019, the Regional Court prohibited the defendant from applying for an anti-suit injunction or other equivalent measures, or having such measures applied for, to directly or indirectly prohibit the applicants from continuing one or more of the following patent infringement proceedings in Germany, namely

3    1. regional court Munich I, Ref. 21 O 3889/19
     2. regional court Munich I, Ref. 21 O 3891/19
     3. regional court Munich I, ref. 7 O 3890/19
     4. regional court Düsseldorf, Ref. 4a O 27/19
     5. regional court Düsseldorf, Ref. 4a O 26/19
     6. regional court Düsseldorf, ref. 4c O 17/19
     7. regional court Mannheim, ref. 2 O 37/39
     8th Regional Court of Mannheim, Ref. 2 O 36/19
     9. regional court Mannheim, ref. 2 O 35/19
     10. regional court Mannheim, ref. 2 O 34/19, whereby this obligation to cease and desist also includes

4    (1) to instruct C. C. E. GmbH, to instruct C.-One Holdinggesellschaft mbH, to instruct CGH Holding B.V., to instruct C. Automotive Holding Netherlands B.V., to instruct C. Automotive, Inc., to instruct C. Automotive Systems, Inc. and/or

5    (2) by otherwise influencing C. Automotive Systems, Inc. and, if necessary, the aforementioned companies,

6    to enforce that C. Automotive Systems, Inc.

7    - immediately withdraw the motion for anti-suit injunction filed on June 12, 2019 in case number 5:19-cv-02520-LHK docket no. 32 in the United States District Court-Northern District of California,

8    - and immediately discontinues this anti-suit injunction proceeding except for the purpose of withdrawing the motion.

9    The grounds are set out in the first judgment, to the findings of which reference is made in factual terms:

10   A ground for an injunction arises from the submission made credibly by the applicant by submitting the affidavit of Prof. R. pursuant to Exhibit AR 11 that an anti-suit injunction at the discretion of the court could be issued at any time under the law of the United States. Therefore, there is an imminent danger

that the patent rights of the applicant could be impaired at any time by the issuance of such an anti-suit injunction.

11    A claim for an injunction by the applicants in the form of a claim for injunctive relief follows from Section 1004 (1) sentence 2 BGB analogously in conjunction with Section 823 (1) BGB. § Section 823 (1) BGB, as the application for an anti-suit injunction for which the defendant is jointly responsible threatens the applicants' patent rights.

12    The application filed by the defendant's group company C. Automotive Systems Inc. (hereinafter: CAS) filed on June 12, 2019 before the United States District Court, Northern District of California for an anti-suit injunction is likely to constitute an unlawful interference with the applicants' patent rights. In the event of an anti-suit injunction, the applicants would be forced under US law to discontinue the patent infringement proceedings in Germany referred to in the injunction. Based on the credible evidence provided by the applicants (Exhibit AR 11, No. 7) of the threat of penalties in the event of non-compliance, it can be assumed that the applicants would comply with an anti-suit injunction. Since the anti-suit injunction would prohibit the applicants from (further) asserting their patent rights in court, this was to be seen as an interference with the exclusive right of the patent proprietor as a property-like right within the meaning of Section 823 (1) BGB. The patent right is de facto worthless if its owner is deprived of the possibility of enforcing his exclusive right via the only available state monopoly on the use of force in the form of ordinary court proceedings. The fact that the anti-suit injunction leaves the applicants free to sue persons or companies other than those named or to grant licenses to third parties does not change this, since the exclusive right of the patent proprietor applies to everyone. This includes the power to decide whether and, if so, against whom the patent proprietor enforces the exclusive right. This also applies in particular to the case in dispute, since the patent infringement actions pending in Germany were directed against a leading global motor vehicle manufacturer (D. AG).

13    The interference with the patent rights by the anti-suit injunction is also unlawful under the only applicable German law. The threat of non-continuation of the patent infringement actions due to the anti-suit injunction contradicts the assignment content of the patent under property law pursuant to Sections 9 et seq. and 139 et seq. PatG. The defendant cannot successfully argue that the US anti-suit proceedings are admissible under US law and therefore cannot be unlawful. Only the German understanding of the law is relevant for determining unlawfulness. A judgment of unlawfulness based on German law does not mean that a foreign proceeding is denied lawfulness according to the understanding of German law. The decisions of the BGH in case no. VI ZR 117/77 and the BVerfG in case no. 1 BvR 1086/85 could not be held against this, as they were not based on comparable case constellations.

14    The defendant was responsible as an accomplice for the impending impairment of rights to the detriment of the applicants and had to take remedial action. The defendant's complicity is shown by the fact that the two group companies of the defendant that joined the patent infringement proceedings before the Düsseldorf Regional Court, case no. 4c O 17/19, stated that, due to N.'s misconduct, "C." felt compelled to file a complaint with the EU Commission and to initiate proceedings for the grant of a FRAND license in the USA against N. and others through a US group company. Furthermore, it is stated that the Continental Group has undertaken to comply with the decision of the US court regarding the FRAND conditions. According to the introductory sentence of the pleading, "Continental" refers not only to the two group companies concerned, but "all other companies of the C. Group". In para. 7 of the same pleading, it was stated that the C. Group had not initiated the proceedings in order to undermine the jurisdiction of the German courts, but because it made more economic sense for it to clarify the FRAND conditions in a single procedure. It follows from this that, with regard to the license/FRAND issue, which concerns all disputes between the parties, the Continental group as a whole is affected, in particular also the defendant as the parent company. Against this background, the Chamber had come to the conclusion that CAS had not only filed the US main action, but also the application for an anti-suit injunction, in any

event with the knowledge and intent of the defendant. The actual objective of the C. Group to achieve a FRAND provision applicable to the entire group undisturbed by the German proceedings had thus been taken into account.

15    Insofar as the defendant denied its complicity, this was irrelevant. The denial in this regard was not sufficiently substantiated. Nor could she invoke a lack of intent. In any case, there would only be an irrelevant error of prohibition if the defendant had assumed that the anti-suit injunction was lawful under German law - although its statements in the pleading of 9 August 2019, para. 37, argue against this.

16    Whether the defendant could also be held liable for injunctive relief under the aspect of fault-based liability could be left open in this situation.

17    As a result of the anti-suit injunction, which can be issued at any time at the discretion of the US court, there is also a risk of first infringement.

18    The defendant cannot counter the existence of a claim for an injunction by arguing that the sanction of an anti-suit injunction as unlawful leads to a prohibition of litigation to the detriment of the defendant and violates international law, European law and German constitutional and ordinary federal law.

19    The preliminary injunction issued by the Chamber against the CAS does not affect its right to pursue the main action in the USA. In contrast to the Anti-Suit Injunction, it is not a judicial prohibition on litigation. The CAS is only prohibited from obtaining a measure in court proceedings that imposes a prohibition on the applicants from conducting litigation. The same applies to the interim injunction to be issued against the respondent. Both the respondent and the CAS remain free to bring further actions against the applicants worldwide. Only the impairment of the applicant's patent rights is prohibited by a de facto ban on the continuation of its infringement actions.

20    The Chamber does not assume that an anti-suit injunction is contrary to international law. This is already contradicted by the fact that both the US and British legal systems consider such an injunction to be permissible. However, the principle that the German courts must observe the binding rules of international law does not mean that an injunction against the defendant is unlawful. There is no interference with the sovereign rights of another state simply because the preliminary injunction does not prohibit an anti-suit injunction by the US court itself, but rather instructs the CAS or the defendant not to obtain such an injunction or to continue proceedings that have already been initiated in this respect.

21    The issuance of the requested preliminary injunction also does not constitute a violation of European law. European law provisions are not relevant due to the lack of cross-border intra-European facts. Moreover, the decisions submitted by the defendant do not prove that the requested preliminary injunction is contrary to European law.

22    To the extent that the interim injunction interferes with the defendant's fundamental rights (Art. 2 para. 1 GG in conjunction with Art. 19 para. 4 GG), it is justified and proportionate. The balancing of the opposing fundamental rights led to a decision in favor of the applicants, who could invoke their

fundamental right to property on the one hand and the right to the protection of justice pursuant to Art. 19 para. 4 GG on the other.

23    Finally, the defendant could not successfully argue that the fact that the patents in suit of the applicants are standard essential patents relevant under antitrust law precludes the issuance of a preliminary injunction against it. This could not justify an unlawful interference with constitutionally guaranteed property rights.

24    The defendant appeals against this judgment, arguing as follows:

25    In factual terms, it is submitted that CAS, in compliance with the preliminary injunction issued against it in proceedings 21 O 9333/19 LG Munich I, has in the meantime withdrawn the application for an anti-suit injunction - which was filed solely for the purpose of achieving an economically reasonable FRAND license agreement with the applicants - by means of a statement dated 03.09.2019 (Annex FDB B 2, German translation Annex FDB B 2a). Furthermore, on September 10, 2019, the District Court of the Northern District of California dismissed the anti-suit injunction application of the CAS (without prejudice, which is why the CAS could file a new application).

26    There was already no need for injunctive relief for the applicants because they could oppose the application for an anti-suit injunction in the US proceedings. It is not the task of a German court to examine preventively (in the sense of a "control examination") whether the judicial proceedings abroad, against which the injunctive relief asserted here is directed, are objectionable from the point of view of the rule of law.

27    Furthermore, the challenged interim injunction of the Regional Court violates the requirement of free access to the state courts and the requirement of the independent and undisturbed administration of justice by the state.

28    A violation of such fundamental principles of German civil law and civil procedural law by a German court is also neither necessary nor justified in order to "ward off" an impending "attack" by a foreign litigant in the form of an anti-suit injunction motion in advance. A foreign litigant who has voluntarily placed itself within the scope of the US legal system cannot use the German rule of law to interfere with the judicial sovereignty and jurisdiction of another state - in this case the United States - with active injunctions. The legal assessment of the Regional Court would have the consequence that German courts would be authorized to prohibit foreign court proceedings, which could have an effect on the legal interests of an affected party in Germany and are incompatible with the domestic legal system, already at the time the proceedings are initiated. A resulting need for defence is sufficiently taken into account by the fact that corresponding judgments are not to be recognized and enforced in Germany.

29    The challenged regional court decision is based on an incorrect application of Section 823 (1) BGB in conjunction with Article 20 (3) GG. Art. 20 para. 3 GG, § 830 para. 1 BGB. Any court order by a German court prohibiting a party to a court proceeding from engaging in certain procedural conduct or sanctioning the continuation of a court proceeding constitutes an impermissible, unlawful interference in another civil court proceeding. If such an interference takes place beyond the borders of the Federal Republic of Germany by interfering - as in the case in dispute - in proceedings abroad, this also constitutes an - at least indirect - interference in the judicial sovereignty of the state concerned. Whether the decision of the Regional Court, which is to be assessed as a formal legal decision, is accompanied by a

"prohibition on conducting proceedings" as a result of the challenged measure is irrelevant. The only decisive factor is the effect of the judgment on the merits.

30    Moreover, the challenged decision of the regional court is incompatible with the case law of the Federal Court of Justice and the higher courts, according to which court orders to a litigant in the form of continuing a specific main action may not be issued by the German courts. The court of first instance also acted inconsistently when it assumed that, on the one hand, an anti-suit injunction violated Germany's judicial sovereignty and thus the freedom of the parties involved to be able to make the applications required by the procedural situation without restriction, but that, on the other hand, the interim injunction issued - which also restricts the freedom to make procedural applications - did not violate the judicial sovereignty of the USA or the procedural rights of CAS. Both court orders were directed at the respective litigant and had a direct effect on court proceedings because both courts could ensure compliance with their orders by means of regulatory measures. The fact that, under the US legal system, court orders could be issued that are incompatible with German law does not justify a German court using the same means and issuing orders in relation to US proceedings.

31    The action of the Munich I Regional Court, which interferes with the judicial sovereignty of the USA, is also contrary to international law. It violates the prohibition on intervention, which prohibits states from interfering in areas that are subject to the exclusive jurisdiction of other states. The indirect coercion that the first judgment sees with regard to the effect of an anti-suit injunction justifies the illegality of the prohibition imposed on the defendant under international law.

32    With regard to the application of Section 823 (1) BGB to the detriment of the defendant, the Regional Court also failed to recognize that there was already no damage in this respect, since the main objective of the US proceedings was to obtain the appropriate FRAND license fee for the applicant.

33    Irrespective of the unfounded nature of the application for an injunction on the merits, the defendant cannot be considered as a party liable to pay an injunction. The Regional Court disregarded the principles of the burden of proof of the injunction creditor and assumed that the defendant was an accomplice. The merely general, unsubstantiated submission of the applicants did not give the defendant any reason to explain itself beyond the mere denial of complicity. In particular, the submission of the applicants regarding the statements of two group companies of the C. Group was not suitable and sufficient to substantiate the allegation of the defendant's complicity. A specific involvement of the defendant in the application for the anti-suit injunction also does not follow from the fact that the "Legal" board division is headed by the defendant's board member Schäfer. The assessment of the Regional Court would have the consequence that the defendant would always have to be regarded as an accomplice for all procedural acts of its subsidiaries in this complex solely due to its alleged "involvement" in an overall complex, without having to specify this in more detail. This is incompatible with BGH case law (BGH GRUR 2016, 1031 - Wärmetauscher). In the case in dispute, the defendant had expressly stated that it had not ordered the procedural acts in question and that CAS had acted on its own responsibility.

34    Finally, the defendant was also not to be regarded as a disturber due to its subsequent failure to exert any influence on the actual perpetrator, CAS. In the case in dispute, the mere knowledge of the alleged infringement does not establish liability for interference due to the lack of the defendant's position as an organ and the lack of possibility to influence CAS.

35    The defendant applies,

36        annul the interim injunction of the Regional Court of 30.09.2019, setting aside the contested first judgment, and reject the application of 09.07.2019 for its issuance.

37        The applicants apply,

38        dismiss the defendant's appeal with the proviso that the operative part of the Regional Court judgment under III. reads as follows:

39        - "... an anti-suit injunction or other equivalent measures such as a Temporary Retraining Order ..."

40        - "... to enforce that Continental Automotive Systems Inc. does not file a motion as was done with the motion for relief ... in the Northern District of California United States Court"

41        They defend the initial judgment and add to it:

42        The preliminary injunction obtained by the applicants from the Regional Court is a defensive measure based on the general concept of self-defense in order to enforce the undisputedly infringed exclusive rights of the applicants to their patents by defending themselves against unlawful attacks on constitutionally protected legal positions, namely their property rights. The applicants must retain the right to have patent infringements in Germany examined by the ordinary courts. In contrast, the anti-suit injunction application of the CAS leads to the torpedoing of the pending main actions in the complex of proceedings between the applicants and D. AG. The respondent alone disregarded all principles of international law as well as state sovereignty and territoriality in the protection of industrial property rights. The action subsequently brought in the USA for the grant of a FRAND license according to US standards is intended to determine a worldwide license rate that follows only the calculation methods applicable in California. In order to achieve this at , the defendant wanted to stop the previously filed German patent infringement lawsuits, which included a FRAND assessment according to German and European standards, by all means. With an anti-suit injunction, the defendant therefore intends to impose the application of US law on the German courts.

43        Contrary to the defendant's representation, there is no risk of a comprehensive sales stop as a result of the preliminary injunction obtained by the applicants. Should they not behave in a FRAND-compliant manner, an application for an injunction against D. AG would be dismissed. Otherwise, the latter could accept the FRAND offer and thus avert the enforcement of an injunction.

44        Against this background, the first judgment is the mildest of all available means. Any other assessment would ultimately lead to the capitulation of the German constitutional state to encroaching legal systems.

45        From a factual point of view, it should be noted that on October 8/9, 2019, the CAS again filed an application for an anti-suit injunction aimed at prohibiting the applicants from asserting their patent rights in Germany against any company of the C. Group or its customers (Exhibits AR 44 and AR 44a), whereby the ten pending patent infringement proceedings at issue are only provisionally excluded from

this. In order to secure the anti-suit injunction, a Temporary Restraining Order (TRO) was applied for, which should immediately prohibit the defense against the threatened impairment of German patent rights. Furthermore, it was requested that an anti-suit injunction be issued provisionally and without an oral hearing until a final decision is made on the application. The application was initially rejected for lack of prima facie evidence. However, it is to be feared that it will be filed again soon.

46    The objections raised by the defendant against the first judgment were unsuccessful. The Regional Court had ruled correctly on the merits. The application for anti-suit injunction threatened to impair the patent rights. The existence of damage is not a prerequisite for the assertion of claims for injunctive relief based on tort law; the threat of unlawful impairment of a protected legal interest is sufficient. The impending impairment in the case in dispute was also unlawful. A prohibition of the continuation of German patent infringement actions, which can be traced back to the application for anti-suit injunction and presents itself as a prohibition of litigation, contradicts the proprietary core of the exclusive rights of the applicants.

47    Complicity on the part of the defendant has been sufficiently substantiated. The defendant had not substantiatedly countered the circumstantial facts presented and made credible by the applicants - whereby it should be pointed out in this respect that, according to the case law of the Federal Court of Justice, the practically impossible proof of concrete complicity of a concrete internal act of cooperation is not required. In particular, it had not disputed that the anti-suit injunction application had been jointly coordinated with CAS and submitted to the court with the defendant's knowledge and consent. Moreover, the result reached by the Regional Court is supported from the point of view of secondary perpetration or disruptive capacity. Despite the numerous acts of support by the defendant pointed out by the applicant and despite its reasonable factual and legal possibilities to intervene, the defendant had done nothing to prevent the act of infringement known to it by CAS, which it controlled.

48    Contrary to the opinion of the defendant, the challenged regional court decision is compatible with German law. The court of first instance had not issued a prohibition on conducting proceedings. The defendant disregards the fact that the application for an anti-suit injunction has created a self-defense situation, for the defense of which the mere refusal of recognition or enforcement is not sufficient. On the other hand, the defendant could not invoke the right to the protection of justice with regard to a foreign, indisputably unlawful procedure. The case law of the BGH (Annex FBD B 5 - FBD B 7) and the OLG Düsseldorf (Annex FBD B 9) cited by the defendant did not help its legal defense to succeed. On the contrary, in the decision submitted as Annex AR 14, the Düsseldorf Higher Regional Court affirmed the obvious unlawfulness of the anti-suit injunction.

49    Finally, the judgment of the Regional Court did not violate international law, since the injunction in implementation of the principle of territoriality serves solely to avert imminent infringements of German patent rights in Germany. Any reflexive extraterritorial effects were thus legitimized and did not constitute interference in the sovereign rights of the USA. Furthermore, the primacy of the Basic Law must be observed, which is why the unlawful interference with the fundamental rights of the applicants cannot be countered by an alleged conflict with international law.

50    Ultimately, the applicants also have a need for legal protection, since the US proceedings do not include an examination of the infringement of their patent rights. It is therefore not appropriate for the applicants to have to wait for the outcome of a foreign legal dispute - in which they are also unable to assert their rights - before they are able to enforce their patent rights in court in Germany.

51    They refer to decisions of the Tribunal de Grande Instance de Paris of 8 November 2019 N° RG 19/59311

(AR 46a, AR 46b) and the High Court of Justice of the same date Case No HP 2019-000024 (AR 47) on comparable cases - applications for an anti-suit injunction at the United States District Court for the Northern District of California.

52    Reference is also made to the pleadings exchanged in the appeal proceedings and to the minutes of the hearing on November 14, 2019.

53    After the conclusion of the hearing, the defendant submitted a written submission dated 25/11/2019 and the applicants submitted a written submission dated 29/11/2019.

**Reasons for the decision**

II.

54    The defendant's appeal against the contested judgment of the Regional Court of Munich I dated August 30, 2019 is admissible; in particular, it has been lodged in due form and time (Section 517 ZPO) and is well-founded (Section 520 (2) ZPO). However, it is not successful on the merits. Only the operative part had to be adapted to the amended application. The Regional Court's finding that an interference with the rights of the applicants in their patents at issue, for which the defendant is jointly responsible in tort, in connection with the impending issuance of an anti-suit injunction by prohibiting them from continuing the patent infringement disputes pending in court in Germany against D. AG in Germany is unlawful and, notwithstanding the objections raised by the defendant, justifies the preventive injunction claim pursued by the applicant with the application for a preliminary injunction, is in any case free of legal errors. In detail:

55    A. The application for an injunction is admissible.

56    1. the local and subject-matter jurisdiction of the Regional Court is no longer to be examined in the appeal instance (Section 513 (2) ZPO). The international jurisdiction of the German courts arises from the defendant's registered office in Germany.

57    2. the application for an interim injunction satisfies the requirement of certainty. Contrary to the opinion of the defendant, this also applies to the amended version of the application before the Senate.

58    The addition of "... an anti-suit injunction or other equivalent measures such as a temporary retraining order ..." takes into account the concerns expressed by the Senate at the hearing about the specificity of the original version of the application, insofar as it referred to "other equivalent measures" (Section 253 (2) no. 2 ZPO). 2 no. 2 ZPO); the applicants explained in the statement of 6 November 2019 that the "Temporary Retraining Order" requested by CAS in the US proceedings served to secure the anti-suit motion and was therefore to be regarded as an equivalent measure within the meaning of the amended injunction request.

59    The amendment to the application is also not precluded by a lack of urgency, since the "Temporary

Retraining Order" was already included in the term "other equivalent measures" in the application for an injunction of July 9, 2019.

60    Insofar as the applicants further amended the motion at the hearing to the effect that the last two indents should be omitted and instead the words "... to enforce that Continental Automotive Systems Inc. does not file a motion as was done with the motion for a decree ... before the Northern District of California United States Court" were included in the motion, they have permissibly taken into account the fact that the anti-suit motion of the CAS dated June 12, 2019 is no longer subject to proceedings in the USA.

61    3. there is also no lack of legal protection for the application for a preliminary injunction. The need for legal protection as a general procedural requirement usually arises from the non-fulfilment of the claim asserted by the plaintiff. It is lacking if the plaintiff can achieve his legal protection objective in a simpler and cheaper way. The defendant's argument that there is no need for legal protection because the applicants should be referred to defending themselves against the anti-suit motion in the context of the proceedings in the USA cannot be accepted (see B.3 below).

62    B. The defendant's appeal is also unsuccessful on the merits.

63    1. the Regional Court applied German law as the basis for the appeal without objection, so that no further comments are necessary in this regard.

64    2. a judicial power comparable to Anglo-Saxon law to deny a party the right to institute proceedings does not exist under German procedural law (see Schulze, in Wieczorek/Schütze, ZPO, 4th ed., Vor § 50 para. 43, 44, § 51 para. 10). However, a substantive claim to refrain from initiating proceedings may arise from a prior contractual agreement (see also BGH, judgment of 17.10.2019 - III ZR 42/19); likewise from the point of view of tort (Schulze loc. cit.; Schack, Internationales Zivilverfahrensrecht, para. 859 et seq.), which the Regional Court assumed.

65    a) The appeal also does not challenge the District Court's correct assessment that the issuance of the anti-suit injunction requested by CAS in the proceedings before the Northern District of California United States Court constitutes a factual threat of interference with an absolute right of the applicants within the meaning of Section 823 (1) in conjunction with Section 1004 (1) sentence BGB (whereby the respondent's view that there is no damage to the applicants in this respect does not apply because the asserted preventive injunction does not apply). § Section 1004 (1) sentence 1 BGB (whereby the defendant's view that the applicants have not suffered any damage in this respect does not apply because the asserted preventive injunctive relief does not require such damage), namely in their property-like rights to the patents at issue in the proceedings. In this respect, the Regional Court correctly found that the impairment of property within the meaning of Section 1004 para. 1 sentence 1 of the German Civil Code (BGB) could also occur in a way other than by its withdrawal or withholding, in the case in dispute namely by the fact that the applicants would be denied the right to use the patents if an anti-suit injunction were issued - just as in the case of a temporary restraining order, to assert their exclusive right to the patents-in-suit in the pending patent infringement disputes against Daimler AG by continuing them in order to be able to enforce the desired claims in court without having to wait for the outcome of the main proceedings in the USA.

66    The fact that the CAS withdrew the application for an anti-suit injunction after service of the order issued

against it in proceedings 21 O 9333/19 does not prevent the District Court from correctly affirming the risk of first occurrence. This is because, as the renewed application of 8 October 2019 (Annex AR 44, AR 44a), which, according to the applicants' undisputed submission in this respect, only conditionally does not relate to the patent infringement proceedings at issue in Germany against D. AG, proves, CAS has not refrained from its intention to continue to file corresponding applications.

67    b) The Regional Court assumed that the threatened interference with the applicant's patent rights is to be qualified as unlawful under the relevant German law (LGU, page 21 f. under c)). In doing so, it rightly based its decision on the fact that, according to the case law of the BGH (Urt. v. 13.3.1979 - VI ZR 177/77, concerning the liability of the person making the report) and the BVerfG (decision of 25.2.1987 - 1 BvR 1086/85 concerning the application to make an affidavit), according to which the taking of constitutional proceedings alone cannot indicate unlawfulness if the action subsequently proves to be objectively unjustified, unlawfulness does not already follow from the affirmation of an (imminent) violation. In line with this, the Regional Court positively established the unlawfulness of CAS's anti-suit application. It also correctly pointed out that this case law, which relates to proceedings that are lawful under German law, cannot be inferred to mean that every conduct/procedure that is permissible under the law of a third country falls within the scope of this case law. Since the appeal does not raise any substantiated objections to this either, there is no need for any further explanation in this regard.

68    3. the appeal cannot be upheld if it infers from the inadmissibility of the anti-suit application that, according to these principles, the prohibition issued by the Regional Court ("anti-anti-suit injunction") should not have been issued either.

69    Insofar as the Regional Court took the view that the defendant's objection that an anti-suit injunction judged to be unlawful by the court could not be countered by means of a prohibition on litigation ("anti-anti-suit injunction"), which at least indirectly affects the court proceedings in the USA, did not apply because such a prohibition was not issued when the preliminary injunction requested by the applicant was issued, the Senate is unable to agree with this on the grounds given by the Court of First Instance.

70    a) The approach of the Regional Court that the issuance of the preliminary injunction requested by the applicant is not accompanied by a prohibition of litigation against the CAS with regard to the US court proceedings because the requested preliminary injunction does not affect the main proceedings there and, moreover, both the defendant and the CAS remain at liberty to bring further actions against the applicants worldwide (LGU p. 20/21) cannot be accepted. It is true that the preliminary injunction has no - immediate or direct - influence on the main proceedings conducted by the CAS against the applicants in the USA, which are aimed at licensing the Nokia patents on appropriate, FRAND-compliant terms. However, this does not change the fact that, by issuing the preliminary injunction requested by the applicants, the CAS would be denied the right to file or pursue an application admissible under US law in the context of pending court proceedings. The differentiation made by the Regional Court - inadmissible influence on the conduct of the main proceedings for licensing on the one hand, admissible prohibition of an application in the main proceedings on the other - cannot be followed. According to case law, the need for legal protection is not only lacking for actions directed against the conduct of the proceedings as such (BGH GRUR 2013, 647 para. 12 f. - Abusive award decision; BGH GRUR 2005, 882 para. 23 - Unjustified IP warning I; BGH GRUR 2006, 219 para. 14 - Detection device II), but also for actions directed against other measures in the context of pending court proceedings (such as party submissions) (cf. the case law in BGH GRUR 2018, para. 12 et seq.see BGH GRUR 2018, 757 para. 16 - 18).

71    The application for an anti-suit injunction and a temporary restraining order are applications in the context of the action for licensing filed in the USA in May 2019. They are intended to secure the temporal priority of the licensing proceedings in order to be able to pursue them "undisturbed" by the ten patent infringement proceedings pending in Germany. The fact that the "accompanying motions" are not

independent proceedings, but require pending main proceedings, does not justify the assessment that the aforementioned case law only applies to the main proceedings, but not to accompanying procedural motions in the form of a motion for an anti-suit injunction or a temporary restraining order.

72    Nor can this be countered by the fact that the German courts have in the past refused to serve an anti-suit injunction and considered its enforcement to be inadmissible (see OLG Düsseldorf, decision of 10.01.1996 - 3 VA 11/95, Juris LS and para. 31, Annex FDB 9). A possible incompatibility of the order of a foreign court with German law must be assessed independently of the question of whether a German court is prohibited from influencing the authority to file and pursue applications of a party to foreign court proceedings.

73    b) The factual tortious interference with the patent rights of the applicants associated with the issuance of an anti-suit injunction (which is threatened here and thus constitutes a preventive injunctive relief within the meaning of Section 1004 BGB) is unlawful in the specific case (see above under 2.b). The issuance of the preliminary injunction is also not precluded by a procedural privilege. The same applies to the Temporary Restraining Order within the meaning of the application for an injunction.

74    aa) The applicants see their application for a preliminary injunction (merely) as a defensive measure against an attack by the defendant in the form of an anti-suit injunction application aimed at prohibiting the applicants from having patent infringements in Germany (further) examined by the ordinary courts in the context of ordinary proceedings. The preliminary injunction directed against the defendant is the exercise of a right of self-defense in favor of the applicants (§ 227 BGB) in order to enforce their constitutionally secured legal position arising from their property rights and their claim to the protection of justice against a judicial measure of the CAS pursuing only destructive objectives in the context of a main action brought subsequently in the USA in relation to the patent infringement actions pending in Germany. In this situation, the applicants must remain free to continue their patent infringement actions in Germany undisturbed without having to await the outcome of the US main proceedings.

75    Pursuant to Section 227 (1) BGB, an act required by self-defense is not unlawful. Subsection 2 defines self-defense as the defense required to ward off a present unlawful attack by oneself or another. If these conditions are met, the act of self-defense is lawful and does not give rise to any liability for damages. As already discussed at the hearing, this relates to actions that are taken because it is not possible to take legal action due to the current unlawful attack. The extent to which this approach could therefore justify the ordering of a prohibition of litigation that is inadmissible according to the aforementioned principles of case law therefore appears questionable. bb) However, this can be left open. The procedural privilege developed by case law, according to which the opposing party cannot be prohibited from certain procedural conduct, including the initiation of judicial/administrative proceedings, by way of an action/interim injunction, is based on the assumption that the protection of the opposing party is regularly guaranteed by the judicial procedure in accordance with its statutory structure. Where this is not guaranteed, however, the unrestricted protection of legal interests must remain (BGH loc. cit., para. 21 with further references - Unjustified warning of property rights I). This case law on the so-called procedural privilege concerns - as far as the Senate can see - only cases involving statements or actions in connection with domestic proceedings, i.e. the admissibility of a statement or other procedural action was reserved for examination in domestic judicial or official proceedings.

76    If this case law were to be applied to the present case, in which the admissibility and merits of the application for an anti-suit injunction are examined exclusively under the relevant US law by the competent court in California, it would be necessary to ensure that the interests of the applicants in the continuation of the patent infringement proceedings are sufficiently safeguarded. This cannot be assumed based on the credible factual submission.

77      According to these principles, the following applies:

78      (1) In favor of the applicants, when weighing the opposing interests, their constitutionally protected property-like right to their patents (in the form of the judicial enforceability of the exclusive right resulting from the property against anyone, in particular against the potential patent infringer), which in the case in dispute takes precedence over the defendant's fundamental right to general freedom of action (Art. 2 para. 1 GG) and requires the issuance of the preliminary injunction requested by the applicant, as correctly determined by the court of first instance. In this respect, the applicants correctly point out that the issuance of a preliminary injunction is the only effective defensive measure against an anti-suit injunction by means of which the applicants can secure the exercise of their legal position as patent owners in the patent infringement proceedings pending in Germany until the conclusion of the US proceedings conducted between other parties, the subject matter of which is not identical to the infringement proceedings here. Even if, according to the respondent's submission, the main proceedings in the USA (licensing) are being conducted on the basis of use of the applicants' patents, it has not been demonstrated or is otherwise apparent to what extent the objection of licensing on FRAND terms cannot be asserted in the infringement proceedings in Germany, which are already pending before the main proceedings in the USA and in which two C. group companies are involved as intervening parties.

79      (2) The defendant cannot successfully argue that the applicants - who, by participating in the US market, have consciously subjected themselves to the legal system there and must therefore adhere to it - have sufficient possibilities of legal defense, including an appeal, in the context of an anti-suit injunction application in the USA. The fact that the applicants are granted the right to be heard on the application for an anti-suit injunction and that they could appeal against its issuance does not prove that the rights of the applicants are sufficiently safeguarded in accordance with the above principles in the context of the proceedings concerning the application for an anti-suit injunction (likewise concerning the application for a temporary restraining order, which is aimed at an interim measure without prior hearing of the opponent). This is neither apparent from the defendant's submissions - insofar as the defendant's unadmitted pleading of November 25, 2019 contains new factual submissions, these were no longer to be taken into account (Section 296a ZPO) - nor from the application submitted as Annex AR 4. According to the Senate's understanding, the "protection" of the main proceedings is at the forefront of the examination. In contrast, the effects of a prohibition on the continuation of the patent infringement proceedings pending in Germany are obviously only the subject of the examination to the extent that the associated impact on another foreign legal system can be regarded as "tolerable".

80      (3) Furthermore, a lack of need for protection on the part of the applicants cannot be inferred from the fact that, according to the case law of the Düsseldorf Higher Regional Court, an anti-suit injunction could not be declared enforceable in Germany. In this respect, the applicants rightly point out that in the event of a violation of an anti-suit injunction in the USA, they would have to reckon with the imposition of a penalty to be pronounced against them.

81      (4) In this situation, the defendant's interest in filing an application for an anti-suit injunction, which is admissible under US law, must take a back seat. Nor can the defendant successfully argue that the applicants are behaving inconsistently with their application for a preliminary injunction in that, on the one hand, they are claiming a right of defense against a potential prohibition on continuing their patent infringement proceedings in Germany and, on the other hand, they are overreaching the defendant with a prohibition on conducting proceedings in the USA. For the above reasons, an exceptional case exists that justifies the issuance of a preliminary injunction as a mandatory defensive reaction to a possible anti-suit injunction (in the form of an "anti-anti-suit injunction").

82    4 Contrary to the opinion of the defendant, the issuance of the preliminary injunction requested by the applicant does not violate international law. Reference is made in this respect to the relevant statements in the Regional Court judgment (LGU p. 27 et seq.). In particular, it should be noted that the preliminary injunction in implementation of the territorial principle only serves to defend against the threat of patent rights in Germany; any reflexive extraterritorial effects are legitimized by this , they do not constitute interference in the sovereign rights of the USA (see Maunz/Dürig, GG, 87th ed. 2019, Art. 25 para. 50; Geimer, Internationales Zivilprozessrecht, 8th ed., Gerichtsbarkeit, para. 399c). In addition, under Article 25 of the Basic Law, international law ranks below federal law as a "component of federal law". Since the issuance of an interim injunction as carried out by the Regional Court is constitutionally legitimized for the above reasons under 3., a contrary assessment by international law is not justified in this respect either (see BVerfG NJW 2016, 1295 para. 67 et seq.).

83    5 Finally, the Regional Court's decision also does not violate European law. In this respect, as correctly assessed by the Regional Court, there is already a lack of a cross-border intra-European situation. The applicants are taking action against the defendant for alleged infringement of their patent rights in Germany in the form of the unlawful impairment of their exclusive right by threatening to obtain a prohibition on the continuation of proceedings.

84    The judgment of the BGH of 17.10.2019 - III ZR 42/19 (damages, agreement on jurisdiction regarding the obligation to pay damages in the event of an action on the merits in the USA in breach of contract) referred to by the defendant does not support the defendant's contrary assessment. When the BGH refers to the case law of the CJEU, according to which court-ordered prohibitions on conducting proceedings are incompatible with the (former) Brussels Convention and the (current) Brussels Regulation, as they contradict the principle of mutual trust and the statutory provisions on jurisdiction, according to which each of the courts in the European Union is recognized as having equal jurisdiction and an examination of the jurisdiction of a court by the court of another contracting or member state is not permitted, this does not apply in relation to third countries, such as the USA (BGH loc. cit.loc. cit, para. 30 a.E.). To the extent that the literature, following the case law of the CJEU, takes the view that the rejection of the anti-suit injunction in the European area should also mean that the anti-suit injunction is no longer applicable (Mankowski, EWiR 555, 756 a.E.; ders., in Rauscher, Europäisches Zivilprozess- und Kollisionsrecht, 4th ed., Vorbemerkungen zu Art. 4 para. 55), this assessment does not apply to the present case constellation either.

85    6 The defendant also has standing.

86    a) In principle, the person liable for a tortious act in accordance with § 823 para. 1 BGB is the person who has committed the act infringing or impairing the legal interest as the perpetrator or as an indirect perpetrator (see Palandt/Sprau loc. cit., § 823 para. 76); the same applies to anyone who commits the act in question together with others (§ 830 para. 1 sentence 1 BGB).

87    b) The applicants have presented sufficient circumstances for the involvement of the defendant, which the defendant has not - as required - substantiated.

88    aa) The Regional Court stated that the defendant, the parent company of the Continental Group, was a joint perpetrator of the established claim for preventive injunctive relief pursuant to Section 1004 (1) in conjunction with Section 823 (1) BGB. § Section 823 (1) BGB. In this respect, the judgment of the court of first instance states that CAS not only filed the US main action with the knowledge and intent of the defendant, but also the application for an anti-suit injunction. This follows above all from the facts established by the Regional Court and the procedural conduct of the two group companies of the

defendant that joined the patent infringement proceedings before the Regional Court of Düsseldorf, file no. 4c O 17/19.

89     bb) The Senate agrees with this assessment.

90     The central question in dispute, namely the conditions under which the applicants are obliged to license their patents, is a question that does not only affect the business area of individual group companies on the part of the defendant, as can also be seen from the defendant's argumentation on the group-related examination of the FRAND objection. In line with the importance of this issue, the defendant also evidently lodged the complaint with the EU Commission in January 2019 (Annex AR 6). According to the findings of the Regional Court, the main action in the USA was filed by CAS with the knowledge and will of the defendant. The defendant has admitted that it had positive knowledge of the (first) filing of the anti-suit injunction application by CAS (statement of 13.08.2019, para. 10). The applicants' assertion that the defendant was involved in overarching decisions of the group and in overall strategic considerations, notwithstanding its submission that CAS acted on its own responsibility, was not specifically disputed by the defendant, but merely pointed out that the conclusion that all procedural acts and pleadings of CAS in the anti-suit proceedings were coordinated with the defendant could not be drawn in an admissible manner. The defendant also did not deny that it had continuously provided CAS with information in the anti-suit proceedings (see defendant's statement of 09.08.2019, para. 90, first indent).

91     Against this background, the Senate considers it far-fetched that the decision to file the main action in the USA was made by CAS in coordination with the defendant, but that the application for an anti-suit injunction was filed "single-handedly" with the aim of being able to conduct the main proceedings "undisturbed" by the patent infringement proceedings already pending in Germany. Since the underlying events and decision-making processes are naturally beyond the knowledge of the applicants, they meet their burden of presentation if, as happened, they provide sufficient evidence of a joint coordination with the consequence that the defendant has a secondary burden of presentation for the assertion that such a coordination did not take place (see BGH BeckRS 2019, 12963 para. 47). The defendant did not comply with this, limiting itself in the first instance to criticizing the claimant's submission in this regard as insufficient. Nor does anything else arise from the decision referred to by the defendant, BGH GRUR 2016, 1031 - Wärmetauscher. In this decision (para. 58), the BGH did not allow the mere fact that defendant 2 was the parent company of defendant 1 and that the parts supplied to defendant 3 had a specific marking to be sufficient to establish liability, because the marking could also point to defendant 1 and this therefore did not justify attribution of the patent infringement, even taking into account the corporate affiliation. The facts of the present case are not comparable with this.

III.

92     The decision on costs is based on Section 97 (1) ZPO.

93     The determination of the amount in dispute for the appeal proceedings is based on Section 47 (1) sentence 1 GKG.