*Exhibit 2*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT, | |
| Plaintiff, | Case No. 6:25-cv-00581-ADA |
| v. | |
| ONESTA IP, LLC, | |
| Defendant. | |

**DECLARATION OF PROF. PETER G. PICHT, LL.M. (Yale)**

I, Prof. Peter Picht of Zurich, Switzerland, under penalty of perjury, declare and state as follows:

## I.      Background and Qualifications

1.       I am a full professor of law and hold the Chair for Commercial, Competition and Intellectual Property Law at the University of Zurich.[1] My veniae legendi and academic activity comprise international private and procedural law as well. Furthermore, I am the chair of Zurich University's Center for Intellectual Property & Competition Law (CIPCO), an Affiliated Research Fellow at the Max Planck Institute for Innovation and Competition, and the President of ASCOLA, the international Academic Society for Competition Law. I am enclosing a curriculum vitae as Exhibit P-CV.

2.       I am Of Counsel in the IP Group and Competition Group of the Swiss law firm Schellenberg Wittmer AG.  As part of my practice work I regularly advise clients on cross-border patent law matters.

3.       I am a German qualified attorney, also admitted to the Bar in Switzerland, and received my LL.M. from Yale University in 2013.  I received my doctorate degree in law (summa cum laude) and my qualification as a professor (Habilitation) from the Ludwig Maximilian University of Munich in 2011, having done my doctorate and my professorship qualification phase as a Senior Research Fellow at the Max Planck Institute for Innovation and Competition in Munich. My work at this Max Planck Institute included chairing the Institute's working group on international patent law and FRAND matters.

4.       I have extensively taught and published on intellectual property (IP) law,

---

[1] Cf., https://www.ius.uzh.ch/en/staff/professorships/alphabetical/picht/team/pichtpg.html.

including IP issues with trans-border effect, among others in the arena of standard-essential patents. My publications on international patent law included co-authorships with leading patent scholars from the United States of America (US), such as professors Jorge Contreras, Colleen Chien, and Tom Cotter. To give just one recent example for this activity, I am a co-editor of, and comment on the conflicts of law provisions in, the Beck Online Commentary on the Unified Patent Court law and system, arguably the leading English commentary on the matter.  I also taught and teach not only at Zurich University, but also at King's College London, the European University Institute (Florence), the Centre for International Intellectual Property Studies (Strasbourg), and the Max Planck Institute in Munich. As of 2026, I will be the lead editor of the journal Sic!, Switzerland's leading journal on IP matters, including international patent law. I am also on the review boards of several other journals, including GRUR International and the Journal for International Property Law and Practice (JIPLIP).

5.      I am also regularly giving policy advice on matters relating to patent law.  Inter alia, I was a senior legal expert for the EU Commission's study on the implementation of its envisaged SEP regulation and am a member of the EU Commission's recently formed expert advisory group on the Unified Patent Court.

6.      I am an independent expert and not an employee of any party or counsel in this action. I am being compensated for my time at my standard rate of €800 per hour. My compensation has no relationship to the outcome of the litigation between the parties.


## II.    Scope of Work

7.      I have been asked by German counsel for Onesta IP, LLC ("Onesta"), to provide, on very short notice, an expert declaration ("Declaration") on pertinent key aspects of the Court of Justice of the European Union´s ("CJEU") decision in the matter of BSH Hausgeräte GmbH v

Electrolux AB, Case C-339/22 of 25 February 2025 ("*Electrolux*"). I understand that a copy of that decision proper has already been submitted in these proceedings as Exhibit 3 to the Declaration submitted by Professor Matthias Leistner.

8.      I have further been asked by Onesta to take into consideration, for the above task, the declarations by Prof. Leistner ("Leistner Dec.") and Prof. Bagley ("Bagley Dec.") also submitted in the present proceedings and, where called for, to comment on statements made therein. Due to the limited time at hand for preparing this opinion, my not commenting on certain paragraphs in those declarations should not be deemed agreement, unless explicitly so stated, or otherwise construed to express views not made explicit in my Declaration.

## III.    Opinion

### A.    Under *Electrolux*, a "Third State" Is Any Non-EU Member State

9.      *Electrolux*, a decision rendered by the highest European court, the CJEU, is a landmark decision in many respects. Exceptionally, the decision was taken by the Grand Chamber, which is composed of 15 judges, including the President of the Court. Per Art. 60 of the Rules of Procedure of the Court of Justice, apart from cases including EU Member States, a case is assigned to the Grand Chamber only where "the difficulty or importance of the case or particular circumstances" so require. The proceedings were further exceptional in that not one, as usual, but two opinions were rendered by the Advocate-General ("AG") and not one, but two, oral hearings took place.

10.     As for international IP law, this may be one of the most important CJEU decisions of the last decades.  In particular, it set – as the subsequent sections of this Declaration shall

unfold – new law in abandoning the CJEU's previous position, taken in the decision *GAT v LuK*,[2]

on jurisdiction of EU Member State courts for patent infringement claims in the event of an

invalidity defense (on the fact that *GAT v LuK* is old law, see also, concurring, para. 28 Leistner

Dec.).

11.     As for substance, the decision deals, inter alia, explicitly with the aspect of so-

called "third States". In EU law third States are states that are not members of the European

Union ("EU"). I note that the Leistner Dec. does not put this definition into doubt but, in fact,

proffers it himself (though he speaks of "third countries" instead of "third States"; *Electrolux*

only refers to the latter term) in para. 50 (emphasis added): "In the following part of the

judgment, concerning courts of so-called third countries (**i.e. countries that are not Member

States of the EU**, such as Turkey in the BSH/Electrolux case) […]."

12.     The dichotomy of EU "Member States", on the one hand, and third States, on the

other hand, emerges, furthermore, from the *Electrolux* decision itself; see, for example, the

header of this decision:

> JUDGMENT OF THE COURT (Grand Chamber)
>
> 25 February 2025 ( [*1] )
>
> (Reference for a preliminary ruling – Jurisdiction and the enforcement of judgments in civil and commercial matters – Regulation (EU) No 1215/2012 – Article 4(1) – General jurisdiction – Article 24(4) – Exclusive jurisdiction – Jurisdiction in proceedings concerned with the registration or validity of patents – Infringement action – European patent validated in Member States and in a third State – Challenge to the validity of the patent raised as a defence – International jurisdiction of the court hearing the infringement action)

para. 8 of the decision:

---

[2] Gesellschaft für Antriebstechnik mbH & Co. KG v Lamellen und Kupplungsbau Beteiligungs KG, ECJ, Judgment of 13 July 2006, C-4/03, ECLI:EU:C:2006:457 – GAT/LuK; Exhibit 6 to the Leistner Dec.

> 7    In Section 9 of that chapter, headed '*Lis pendens* – related actions', Articles 33 and 34 of the Brussels I *bis* Regulation determine the conditions under which a court of a Member State may stay the proceedings, or even dismiss the proceedings before it, or, conversely, continue those proceedings, where its jurisdiction is based in particular on Article 4 of that regulation and proceedings are pending before a court of a ==third State== at the time when that court in a ==Member State== is seised, respectively, of an action involving the same cause of action between the same parties as the proceedings in the court of the third State or of an action which is related to the action in the court of the third State.

and, as a further example, a passage reciting Art. 71 Brussels I *bis* (ibid., para. 9):

> 3.  This Regulation shall not affect the application of bilateral conventions and agreements between a ==third State== and a ==Member State== concluded before the date of entry into force of [the Brussels I Regulation] which concern matters governed by this Regulation.'

(all highlighting added).

13.    As evidenced by the above language in *Electrolux*, "third State" is an established technical term covering *any* non-EU countries, including Türkiye (to which the case pertained specifically) but, e.g., also the United States of America, China or Canada.

14.    Hence, it is of no consequence either whether a third State is a member of the European Patent Convention ("EPC"). The EPC is not an EU community act but a stand-alone international treaty administered by a non-EU body, the European Patent Office ("EPO") (see, to the same effect, para. 37 Leistner Dec.). EPC membership does not rank a state among the EU Member States. Türkiye, for example, is an EPC member state and yet the CJEU considers it a third State in *Electrolux* (cf., e.g., ibid., para. 22, 60).

15.    Contrary to what the Leistner Dec. seems to suggest (para. 60), *Electrolux* does not distinguish between third States based on their EPC membership, nor does it leave the referred question open regarding non-EPC third States. Nor does the CJEU in any way base its findings on the EPC basis of the patent in suit. Nothing in *Electrolux* suggests that "third State" in this context could mean anything else than in prior decisions and general EU practice, namely non-EU states, including the United States of America.

16.     It comes as no surprise, therefore, that **well-reputed experts in cross-border patent law have already acknowledged the status of the United States of America as a third State** in the sense of *Electrolux*. For example, Finnegan's Dr. Johannes Druschel and Julia Obradovic-Walz have stated that: "Unlike the UPC that has jurisdiction only over EPs, the (national) courts of any EU member state could, however, likewise assume international jurisdiction even over patents registered in non-EPC states, such as the USA, Japan or China, in case the respective defendant is domiciled in their EU member state".[3] I understand that **Finnegan** are representing a party in the case at bar. **Willem Hoyng**, inter alia the Chairman of the Advisory Committee to the UPC, a member of the former drafting committee of the Rules of Proceedings of the UPC states: "I also think that the reasoning of the court is also valid with respect to foreign non EP patents (f.i. suing a French company in France for infringement of a German national patent and/or a UK and/or US national patent). In these cases the court will have to apply the law of the patent".[4]

### B.    Member State Court Jurisdiction Under *Electrolux* and the Brussels I *bis* Regulation

17.     Parts of the *Electrolux* case concerned the fact that BSH asserted, among others, the Turkish part of a European patent before a Swedish civil court.  Türkiye is not a member state of the European Union and is therefore, in line with established EU law, designated a third State in *Electrolux* (cf. above, para. 13).

18.     As to the jurisdiction of an EU Member State court to adjudicate, under the

---

[3] Dr. Johannes Druschel; Julia Obradovic-Walz, A Revival of Cross-border Injunctions in Europe?, 29 April 2025, https://www.finnegan.com/en/insights/blogs/european-ip-blog/a-revival-of-cross-border-injunctions-in-europe.html; Exhibit P-01.
[4] Comment Prof. Willem Hoyng on BSH Hausgeräte v. Electrolux, 6 March 2025, https://www.hoyngrokhmonegier.com/news-insights/detail/cjeu-comment-prof-willem-hoyng-on-bsh-hausgeraete-v-electrolux; Exhibit P-02.

Brussels I *bis* Regulation, matters regarding patents granted by third States, I can draw on the introduction to said Regulation given by para. 20 et seq. of the Leistner Dec. Suffice it, therefore, to recall the following:

19.    Per Art. 4(1) Brussels I *bis*, "[s]ubject to this Regulation, persons **domiciled** in a Member State shall, whatever their nationality, be sued **in the courts of that Member State**." (emphases added). Pursuant to Art. 63(1) Brussels I *bis*, "[f]or the purposes of this Regulation, a **company** or other legal person or association of natural or legal persons is domiciled at the place where it has its: (a) statutory seat; (b) central administration; or (c) principal place of business."

20.    It follows that, as a rule, a **company seated in Germany** can, and often must (since the German courts cannot deny jurisdiction based on *forum non conveniens* considerations), be **sued in a German court**.[5]

21.    As also the Leistner Dec. (para. 20) explains, **Brussels I *bis* applies directly (like national law) in all EU Member States**. Putting this differently, once there is an international, cross-border context a German national court must base its jurisdiction on the rules of Brussels I *bis* and will assume jurisdiction according to Art. 4 Brussels I *bis* if the defendant is domiciled in Germany. Art. 4 Brussels I *bis* applies irrespective of whether the case has a connection to another EU Member State or merely to one or several third States.[6]

22.    Art. 4(1) Brussels I *bis* enshrines the key rationale[7] that a party may rely on the fact that it will face potential lawsuits primarily in its home jurisdiction. This is the jurisdiction

---

[5] CJEU C-281/02, 1 March 2005, *Owusu*, EU:C:2005:120, para. 37-46; Exhibit P-03. For an extensive overview on the literature regarding lack of a forum non conveniens doctrine, see MüKoZPO/Gottwald, 6. Aufl. 2022, Brüssel Ia-VO Art. 4 Rn. 11; Exhibit P-04a; English translation Exhibit P-04b.

[6] See, e.g., CJEU C-281/02, 1 March 2005, *Owusu*, EU:C:2005:120, para. 24.

[7] See, e.g., Musielak/Voit/Stadler/Krüger, 22. Aufl. 2025, VO (EU) 1215/2012 Art. 4; Exhibit P-05, English translation Exhibit P-05b.

to which said party voluntarily submitted itself and, typically, the one it knows best. The home jurisdiction also counterbalances the fact that it is the defendant who is drawn into a lawsuit against its will. In that sense, it is a procedural privilege – including for patent infringers – and not simply the imposition of a "long-arm" jurisdiction.

23.    Art. 24(4) Brussels I *bis* Regulation reserves exclusive jurisdiction "in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights […]" to "the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of an instrument of the Union or an international convention deemed to have taken place". However, in settings as the one addressed in *Electrolux*, Art. 24(4) Brussels I *bis* Regulation does not apply and does not alter jurisdiction under Art. 4(1) Brussels I *bis* Regulation. *Electrolux* leaves no doubt on this (emphases added):

> 56    In that regard, the Court has held previously that **Article 24(4) of the Brussels I bis Regulation cannot be regarded as applicable in a situation in which the patents concerned are granted or validated not in a Member State, but in a third State** (see, to that effect, judgment of 8 September 2022, IRnova, C-399/21, EU:C:2022:648, paragraph 35).

> 76.    It follows from all the findings above that the answer to the third question is that Article 24(4) of the Brussels I bis Regulation must be interpreted as not applying to a court of a **third State** and, consequently, as not conferring any jurisdiction, whether exclusive or otherwise, on such a court as regards the assessment of the validity of a patent granted or validated by that State. If a court of a Member State is seised, on the basis of Article 4(1) of that regulation, of an action alleging infringement of a patent granted or validated in a third State in which the question of the validity of that patent is raised, as a defence, **that court has jurisdiction**, pursuant to Article 4(1), to rule on that defence, its decision in that regard not being such as to affect the existence or content of that patent in that third State or to cause the national register of that State to be amended.

24.    **Prof. Leistner agrees** that Art. 24 Brussels I *bis* concerns only patents that are validated in EU Member States (see para. 50 Leistner Dec.).

25.    Accordingly, in *Electrolux*, Europe´s highest court explicitly considers as

permissible an infringement action brought in an EU Member State based on the infringement of a patent with effect in a third State and alleging infringing activities in that third State. The CJEU thus **confirms jurisdiction** of the seized court of that EU Member State based on Art. 4(1) Brussels I *bis*. This is **precedent binding** all EU Member State courts and the UPC (see also para. 45 Leistner Dec.).

26.      In *Electrolux* the proceedings took place in Sweden, but the *ratio decidendi* equally applies to any other EU Member State, including Germany.

27.      Furthermore, while *Electrolux* addressed a **patent effective in, and alleged infringing activities taking place in**, Türkiye, its *ratio decidendi* applies equally to **any other third State**.  In line with the established use of the term "third State" in EU law, and absent any language limiting the term to certain third States, it is clear that the CJEU here refers to *any* jurisdiction that is not an EU Member State. **This cohort includes the United States of America**.

28.      Prof. Leistner concurs with this view and states (para 51, 53 Leistner Dec.; emphasis added):

> The ECJ/CJEU confirmed that Art. 4 Brussels I also provides jurisdiction concerning the infringement of a patent validated or granted **in a third country**; if validity issues are raised as a defense in such case the national court would only decide on validity *inter partes*; that means the sovereignty of the country granting the patent remains unaffected.

29.      If a German court, based on its jurisdiction under the Brussels I *bis* Regulation, adjudicated a case involving the infringement of US patents, it **would apply US law to this US patent infringement issue**, according to Art. 8(1) Rome II-Regulation, as already explained by

Prof. Leistner (see para. 29-31, 84 Leistner Dec.).[8] The defendant/alleged infringer would be able to **raise defenses based on US law**. In this sense, at the substantive law level such German proceedings would mirror US patent infringement litigation. This aspect, together with the fact that petitioning an EU Member State court in an *Electrolux* setting is covered by the Brussels I *bis* Regulation and explicit CJEU case law, weighs, in my professional opinion, against allegations of an abusive deployment of a respective patent in suit. In any case, a defense based on such allegations of abusive deployment could be raised in German court proceedings, i.e. the defendant/infringer would not be deprived of this argument because of the German venue.

### C.    *Electrolux* Based on a Thorough Consideration of Sovereignty and Comity

30.    As regards the issue to be decided by this Court, the *Electrolux* proceedings and decision are moreover pertinent in that they, expressly and thoroughly, deal with issues of sovereignty, non-intervention, and comity under public international law. In my view, the sensitive nature of these issues at least contributed to the aforementioned careful procedural treatment of the case and the involvement of the CJEU's Grand Chambre.

31.    To demonstrate the thorough, well-reasoned approach taken by the CJEU on matters of comity and sovereignty, I shall quote from the final opinion of the Advocate-General in *Electrolux* and from the judgment itself.

#### 1.    Opinion of Advocate-General Emiliou

32.    I enclose the Advocate-General's 5 September 2024 opinion as <u>Exhibit P-06</u>

---

[8] See also CJEU – Comment Prof. Willem Hoyng on BSH Hausgeräte v. Electrolux, 6 March 2025, <u>https://www.hoyngrokhmonegier.com/news-insights/detail/cjeu-comment-prof-willem-hoyng-on-bsh-hausgeraete-v-electrolux</u>; <u>Exhibit P-02</u>.

33.     Pursuant to Art. 252(2) of the Treaty on the Functioning of the European Union

("TFEU"), "[i]t shall be the duty of the Advocate-General, acting with **complete impartiality**

**and independence**, to make, in open court, reasoned submissions on cases which, in accordance

with the Statute of the Court of Justice of the European Union, require his involvement."

34.     In paras. 11 et seq. of that opinion, the AG explains the basic principles of

jurisdiction in international law (bold emphases added):

> 11.     As the majority of experts point out and as, moreover, the French
> Government and the Commission acknowledged at the second hearing (despite
> some initial misgivings), customary international law circumscribes the
> adjudicatory jurisdiction of States in civil and commercial matters. In essence, a
> State may legitimately claim such jurisdiction only where there is a *sufficient*
> *connection* between itself and a particular dispute, which may be of a territorial or
> national nature. Accordingly, where a State defines the international jurisdiction of
> its courts by adopting rules of private international law (or where the European
> Union does so, in respect of the courts of the Member States), it **must respect that**
> **framework**.
>
> 12.     In that regard, for *most disputes* in civil and commercial matters, the universal
> jurisdiction of the courts of the Member State in which the defendant is domiciled,
> as provided for in Article 4(1) of the Brussels I *bis* Regulation, is **consistent with**
> **customary international law**. A State may legitimately adjudicate on actions
> brought against persons **domiciled** on its territory, even where such actions
> otherwise concern factual matters which have arisen **in another State** (be it a
> Member State or a **third State**). That domicile establishes, as between the first State
> and those actions, a sufficient connection to that end. On that basis, the courts of
> the Member States may legitimately adjudicate, in particular, on an **action for**
> **infringement of a third-State patent brought against a 'local' defendant**. (13)
> In exercising such adjudicatory jurisdiction, the Member State in which the
> defendant is domiciled **does not undermine the sovereignty of the third State**
> concerned. In particular, the first State in no way prevents the latter State from
> exercising its own adjudicatory jurisdiction over the dispute in question. (14) The
> resulting overlap of jurisdiction over one and the same dispute is not contrary to
> (but rather **inherent** in) customary international law. (15)
>
> 13.     However, and by way of exception, it would be (highly) **questionable**, in the
> light of that law, for the courts of a Member State to rule on certain disputes in civil
> and commercial matters involving another State (whether a Member State or a third
> State), **even** where the defendant concerned is domiciled in the territory of the first
> State. That is the case, in particular, for proceedings concerned with the
> **registration or validity of patents**. […]"

35.     Importantly, in footnote 13 to para. 12, the AG points out:

Some foreign courts consider that customary international law or international comity (*comitas gentium*) prevents them from ruling on the infringement of a foreign patent (see, inter alia, United States Court of Appeals for the Federal Circuit, 1 February 2007, Jan K. Voda, M.D. v. Cordis Corp., 476 F.3d 887, 905 (Fed. Cir. 2007). That is not the case. With regard to customary law, I have just explained why. As regards *comitas gentium*, the fact that a court of one State gives effect to a title of another State constitutes, on the contrary, an **act of comity towards it** (see Supreme Court (United Kingdom), 27 July 2011, Lucasfilm Limited and others v Ainsworth and another (2011) UKSC 39, §§ 104, 105 and 109)."

## 2.    The *Lucasfilm* Decision

36.    I enclose as <u>Exhibit P-07</u> the *Lucasfilm* decision of the Supreme Court of the United Kingdom, (2011) UKSC 39, to which the AG refers in the footnote just cited. In that case, Lucasfilm sued Ainsworth in the UK for infringement of U.S. copyright relating to the sale of replica Star Wars helmets made by Ainsworth and sold (in part) in the United States. The UK Supreme Court ultimately held that English courts could exercise jurisdiction in such a case and consider claims of infringement under United States copyright law against a defendant domiciled in England.

37.    It is worthwhile reciting paras 105 and 109 of *Lucasfilm* (bold emphases added):

105.    We have come to the firm conclusion that, in the case of a claim for infringement of copyright of the present kind, the claim is one over which the English court **has jurisdiction**, provided that there is a basis for **in personam** jurisdiction over the defendant, or, to put it differently, the claim is justiciable. […]

109.    There are **no issues of policy which militate against** the enforcement of foreign copyright. States have an interest in the international recognition and enforcement of their copyrights, as the Berne Convention on the International Union for the Protection of Literary and Artistic Works shows. Many of the points relied on by the Court of Appeal to justify the application of the Moçambique rule in this case as a matter of policy would apply to many international cases over which the English court would have jurisdiction and would in principle exercise it, especially the suggestion that **questions of foreign law** would have to be decided. It was also said by the Court of Appeal that enforcement of foreign intellectual property law might involve a clash of policies such that a defendant may be restrained by injunction from doing acts in this country which are lawful in this country. But such an injunction will be granted only if the acts are anticipated to achieve fruition in another country, and there is no objection in principle to such an

injunction. **Nor is there any objection in principle**, as the Court of Appeal thought, **to a restraint on acts in another country**. Extra-territorial injunctions are commonly granted here against defendants **subject to the in personam jurisdiction**. The Court of Appeal also thought that it was relevant that there was no international regime for the mutual recognition of copyright jurisdiction and of copyright judgments, but this is no reason for the English court refusing to take jurisdiction over an English defendant in a claim for breach of foreign copyright.

38.    In particular, the unanimous UK Supreme Court took into account the US stance

as to which it referred as follows:

> 65. As a result there is a fourth, and decisive, strand in the decision, namely the act of state doctrine. The classic statement of the act of state doctrine was enunciated by Fuller CJ in the United States Supreme Court in Underhill v Hernandez, 168 US 250, 252 (1897):

> "Every sovereign State is bound to respect the independence of every other sovereign State, and the Courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

39.    The UK Supreme Court, in allowing a claim concerning copyright infringement in

the US, evidently considers its approach compatible with *Underhill*.

40.    The UK Supreme Court further points to the fact that Regulation (EC) No

864/2007 of the European Parliament and of the Council on the law applicable to non-contractual

obligations ("Rome II") "shows clearly that there is no European public policy against the

litigation of foreign intellectual property rights" (loc. cit., para. 91).

41.    The fact that *Lucasfilm* is, in the world of international law, a relatively recent

decision (2011) by the highest court of a common law jurisdiction and that it extensively

analyzes US law seems to add to its relevance for the present case.


### 3.    The *Electrolux* Decision

42.    The key holding of *Electrolux* (cf. for quotes below) can be summarized as

follows: the adjudication by an EU Member State court of an infringement of a third State patent,

whereby the infringement is taking or has taken place in that third State, and even where the defendant has raised the invalidity of the infringed patent as a defense, is **compatible** both with

- the principle of non-interference under international law and

- the principle of relativity of international treaties

since

- the decision of the infringement court only has effect *inter partes* and

- has no impact on the status of the patent register in the granting state.

In contrast, the court seized must not interfere with the third State´s (e.g., Türkiye´s or the US´) authority whether to grant or to revoke (i.e., delete from its national register) a patent that has been applied for or granted in that third State.

43.     I shall quote relevant passages elucidating the above position (emphases added):

68.     That said, it is necessary to determine whether the jurisdiction, based on Article 4(1) of the Brussels I bis Regulation, of a court of a Member State to rule on the issue of the **validity** of a patent granted or validated in a **third State** where that question is raised as a defence in the context of an infringement action brought before that court, is restricted by general international law.

69.     In that regard, the Court recalls that the **rules and principles of general international law are binding**, as such, upon the EU institutions and form part of the EU legal order (see, to that effect, judgments of 27 February 2018, Western Sahara Campaign UK, C-266/16, EU:C:2018:118, paragraph 47, and of 7 May 2020, Rina, C-641/18, EU:C:2020:349, paragraph 54 and the case-law cited). It follows that a measure adopted by virtue of the powers of the European Union, such as the Brussels I bis Regulation, **must be interpreted, and its scope limited, in the light of those rules and principles** (see, to that effect, judgments of 24 November 1992, Poulsen and Diva Navigation,C-286/90, EU:C:1992:453, paragraph 9, and of 3 September 2008, Kadi and Al Barakaat International Foundation v Council and Commission, C-402/05 P and C-415/05 P, EU:C:2008:461, paragraph 291).

70.     First, the Court notes that it follows from its case-law that the jurisdiction of the courts of a Member State, based on the fact that the defendant is domiciled in that Member State, to rule in a dispute which is connected, at least in part, because of its subject matter, with a third State, is **not contrary to the international law principle of the relative effect of treaties** (see, to that effect, judgment of 1 March 2005, Owusu, C-281/02, EU:C:2005:120, paragraphs 30 and 31).

71.     Second, it must be observed that that jurisdiction of the court of the defendant's domicile must be exercised **without infringing the principle of non-interference**, according to which a State may not interfere in cases which essentially come within the national jurisdiction of another State.

72.     In the exercise of its powers, a State may **grant**, validate and register intellectual property rights which, within that State, confer on their holder exclusive intellectual property rights, such as a patent. It is also apparent from Mr P. Jenard's report on the Convention of 27 September 1968 on jurisdiction and the enforcement of judgments in civil and commercial matters (OJ 1979 C 59, p. 1) that one of the reasons why Article 16(4) of that convention – to which Article 24(4) of the Brussels I bis Regulation corresponds – conferred **exclusive** jurisdiction on the courts of a State that is a party to that convention which has granted a patent to rule on disputes concerned with the registration or validity of that patent is that **'the grant of a national patent is an exercise of national sovereignty'**. Furthermore, as has been pointed out in paragraph 36 of the present judgment, that exclusive jurisdiction is justified both by the fact that the grant of patents involves the intervention of the national authorities, and by the fact that those courts are best placed to hear cases in which the dispute itself concerns either the validity of the patent or the issue of whether or not deposit or registration has occurred.

73.     Where a judicial decision annulling a patent affects the existence or, in the event of annulment in part, the content of those exclusive rights, **only** the courts having jurisdiction in that State may give such a decision. It follows from the principle of non-interference referred to in paragraph 71 of the present judgment that only the courts of the third State in which a patent is granted or validated have jurisdiction **to declare that patent invalid** by a decision that may cause the national **register** of that State to be amended as regards the existence or content of that patent.

74.     **By contrast**, the court of the Member State in which the defendant is domiciled which is seised, as in the case in the main proceedings, on the basis of Article 4(1) of the Brussels I bis Regulation, of an **infringement** action in the context of which the issue of the validity of a patent granted or validated in a third State is raised as a defence, **does have jurisdiction** to rule on that issue if none of the restrictions referred to in paragraphs 63 to 65 of the present judgment is applicable, given that the decision of that court sought in that regard is **not such as to affect the existence or content of that patent in that third State**, or to cause its national register to be amended.

75.     As the Advocate General observed in point 62 of his Opinion of 22 February 2024 and as the parties to the main proceedings and the European Commission stated at the hearing on 14 May 2024 before the Court, that decision has **only inter partes effects**, that is to say, a scope limited to the parties to the proceedings. Thus, where the issue of the validity of a patent granted in a third State is raised as a defence in an action alleging infringement of that patent before a court of a Member State, that defence seeks only to have that action dismissed, and does not seek to obtain a decision that will cause that patent to be annulled entirely or in part. In

particular, under no circumstances can that decision include a direction to the administrative authority responsible for maintaining the national register of the third State concerned.

76.    It follows from all the findings above that the answer to the third question is that Article 24(4) of the Brussels I bis Regulation must be interpreted as not applying to a court of a **third State** and, consequently, as not conferring any jurisdiction, whether exclusive or otherwise, on such a court as regards the assessment of the validity of a patent granted or validated by that State. If a court of a Member State is seised, on the basis of Article 4(1) of that regulation, of an action alleging infringement of a patent granted or validated in a third State in which the question of the validity of that patent is raised, as a defence**, that court has jurisdiction**, pursuant to Article 4(1), to rule on that defence, its decision in that regard not being such as to affect the existence or content of that patent in that third State or to cause the national register of that State to be amended.


### D.    No CJEU Referral Perspective

44.    According to Art. 267 TFEU, the CJEU gives preliminary rulings on open matters of EU law interpretation upon referral by Member State courts. Whereas the referral of such a matter is mandatory for the respective highest court in a Member State, lower courts have discretion whether to refer or not. No referral is admissible, and the CJEU would reject any such referral pursuant to Art. 99 of the Rules of Procedure of the CJEU[9], where the referred issue has already been decided by the Court (acte éclairé), where it may be clearly resolved based on existing CJEU case law, or where EU law leaves no reasonable doubt over how to resolve the issue (acte claire) (see also, concurring, para. 43-44 Leistner Dec.).[10]

45.    Given that *Electrolux* has answered the referred questions also for third States

---

[9] Exhibit P-08.
[10] See, furthermore, CJEU C-283/81, 6 October 1982, *CILFIT*, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:61981CJ0283, Exhibit P-09, in particular para. 21 (emphases added): "[…] unless it has established that the question raised is **irrelevant** or that the Community provision in question **has already been interpreted** by the Court of Justice or that the correct application of Community law is so obvious as to leave **no scope for any reasonable doubt**".

which are no EPC member states, the CJEU would, in my professional opinion, very likely reject as acte éclairé another referral asking whether Art. 4(1), 24(4) Brussels I *bis* Regulation apply to non-EPC states in an *Electrolux* setting (see also, concurring on the upshot, para. 90 Leistner Dec.: "it seems rather likely that the Munich Regional Court I will assume jurisdiction based on the CJEU judgment in the case at hand and not issue a reference for a further preliminary decision of the CJEU […]").

IV.    **Conclusion**

46.    "Third States" in the sense of the *Electrolux* judgment are not only EPC member states but all states that are no EU Member States.

47.    Art. 4(1), 24(4) Brussels I *bis* Regulation award, subject to further applicable EU and national law, EU Member State courts jurisdiction over claims for the infringement of a third State patent, and that competence stays in place even where the defendant raises an invalidity defense.

48.    The *Electrolux* decision takes a thorough, well-reasoned approach on matters of international law, taking specifically into account the notions of comity and sovereignty.

49.    The acte éclairé doctrine most likely stands in the way of a new referral asking whether Art. 4(1), 24(4) Brussels I *bis* Regulation apply, in an *Electrolux* setting, to non-EPC states generally or to the United States of America or any other (non-European) third State(s) specifically.

**Attestation**

I declare under penalty of perjury under the laws of the United States and the State of

Texas that the foregoing is true and correct to the best of my knowledge and belief.


Executed on: December 23, 2025

_____

Prof. Dr. iur. Peter G. Picht, LL.M. (Yale)

Exhibit 1-CV
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA



# P R O F .   D R .   P E T E R   G E O R G   P I C H T ,   L L . M .   ( Y A L E )

## MAIN POSITIONS

- **Professor of Law** – Chair for Business, Competition, and Intellectual Property Law, University of Zurich, since 2016
- Chairman **Center for Intellectual Property and Competition Law** CIPCO, Zurich
- **Affiliated Research Fellow**, Max Planck Institute for Innovation and Competition
- **Of Counsel**, Schellenberg Wittmer Ltd., Zurich, since 2018
- **Regular advisory work on IP and competition policy issues** for, i.a., the OECD, the EU Commission, German and Swiss governmental agencies
- **Regular Visiting Faculty**
  - King's College, London
  - European University Institute, Florence
  - Kyoto University Law School
  - University of Lausanne
  - CEIPI Strasbourg
- **President** Academic Society for Competition Law (Ascola)

## EDUCATION AND PROFESSIONAL EXPERIENCE

- **Qualification as Professor (Habilitation)**, Max Planck Institute for Intellectual Property and Competition Law Munich and University of Munich, 2013 – 2016
- **LL.M.,** Yale Law School, 2012/2013
- **Doctor of Law**, *Summa cum laude*, University of Munich, 2012
- Part-time work for **law firms**, i.a. Hengeler Mueller, Linklaters, Allen&Overy, 2005-2016
- **Senior Research Fellow**, Max Planck Institute for Intellectual Property and Competition Law, Munich. 2008 – 2016, since 2016 Affiliated Research Fellow
- **Bar Exam** (Second State Exam in Law), 2008. Admitted to the Bar for Germany and Switzerland
- **Clerkship** (Referendariat), 2006-2008
- **European Commission, Directorate General for Competition**, Brussels, 2005 – 2006
- **Legal Studies**, University of Munich, 2000-2005

## ACADEMIC FIELDS OF INTEREST

Competition law, intellectual property law, corporate and commercial law, conflicts of law and international procedural law (mainly regarding international trade and liability disputes)

**SELECTED FURTHER MEMBERSHIPS/ACTIVITIES**

- Munich IP Dispute Resolution Forum (President)
- Association Internationale de Droit Economique A.I.D.E. (Board Member)
- Sic! Zeitschrift für Immaterialgüter-, Informations- und Wettbewerbsrecht (Lead Editor)
- Zeitschrift für Wettbewerbsrecht (Editor)
- Peer Review Board of, i.a., GRUR International; International Review of Intellectual Property and Competition Law ICC; Journal for Intellectual Property Law and Practice, JIPLP

**PERTINENT US (RELATED) EXPERT WORK IN THE PREVIOUS FIVE YEARS**

- **Nokia/Lenovo**, ICT Investigation No. 337-TA-1208 – Expert for German and EU FRAND law
- **PanOptis/Apple**, UK Case No: CA-2024-000695 – Expert for German and EU FRAND and general patent law
- **Iarnach Technologies/Charter Communications**, US District Court for the Eastern District of Texas, Marshall Division, Civil Action No. 2:24-cv-00230-JRG – Expert for German and EU FRAND and general patent law

**Exhibit P-01**
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA

# FINNEGAN

EUROPEAN IP BLOG

# A Revival of Cross-border Injunctions in Europe?

29 April 2025
Authored and Edited by Dr. Johannes Druschel; Julia Obradovic-Walz

## Key takeaways

Revival of cross-border injunctions in the EU? Examining UPC - *Fujifilm Corp. v. Kodak GmbH et al.* and *CJEU - BSH Hausgeräte GmbH v. Electrolux AB*

- Regarding third states, such as China, Japan or USA?
  Likely yes, before national EU courts!

- Regarding non-EU but EPC states, such as the UK, Turkey?
  Likely yes, before EU national courts and the UPC!

- Regarding EU states?
  Remains to be seen how courts within the EU/the UPC will handle stay requests.

---

Cross-border injunctions for patent infringement used to be a real thing in patent litigation in Europe about 20 years ago. Back then such were regularly granted in particular by Dutch and German courts. Following the decision of the Court of Justice of the European Union (CJEU) in the matter of *GAT v LUK* (docket no. C-4/03[ii]) in 2006, there was, however, a significant decline. The CJEU had held that for proceedings concerned with the registration or validity of a patent, exclusive jurisdiction shall lay with the courts of the EU member state of registration, irrespective of whether the issue is raised by way of an action or as a defense. As a consequence, German courts stayed cases once the defendant raised an invalidity defense regarding the asserted foreign patent(s). This scared off plaintiffs from pursuing cross-border injunctions which instead filed separate lawsuits to not waste time. In recent years, however, the discussion over cross-border injunctions in Europe has started anew.

With the Unified Patent Court (UPC) on the horizon, discussions began whether the UPC would be able to exercise long arm jurisdiction with respect to the assessment of infringement (and possibly validity) of national parts of a European Patent (EP) validated outside the territory of the (currently 18) EU member states that have ratified the UPC Agreement (UPCA[iii]). Recently, on January 28, 2025, the UPC, which finally opened its doors on June 1, 2023, held for the very first time that it does indeed have long arm jurisdiction, in this specific case for the assessment of infringement of the UK-part of a classic European patent (EP) asserted against a defendant domiciled in Germany (Dusseldorf Local Division, docket no. UPC_CFI_355/2023, *Fujifilm Corp v Kodak GmbH et al*[iiii]).

In a seemingly unrelated matter, *BSH Hausgeräte GmbH* brought an infringement action against *Electrolux AB* in Sweden in 2020 asserting not only the Swedish but also the national parts of an EP relating to vacuum cleaning technology validated in several other EU members states (including Germany) as well as in a non-EU state (Turkey). In response, *Electrolux* not only filed a corresponding (and finally unsuccessful) nullity action in Germany (among others) but also

questioned the validity of the asserted national parts in the Swedish case. While the Swedish court seized in the first instance denied it had jurisdiction for the non-Swedish parts after Electrolux raised the argument that all patents in litigation were invalid, the Swedish Court of Appeal, on May 24, 2022, referred three questions to the CJEU concerning international jurisdiction. Now, on February 25, 2025, the CJEU rendered its decision confirming the *status quo* for the question of validity after its decision in the matter of *GAT v LUK*, though only with respect to courts of EU member states and not of third-states outside the EU (docket no. C-339/22[iv]). As we will see later, this CJEU decision finally informed the Dusseldorf Local Division's decision in the above-mentioned case.

Therefore, these two recent decisions pose the question raised above: Could we see a revival of cross-border injunctions in Europe, either by the UPC and/or courts of the EU member states which exercise parallel or competing jurisdiction over classic EPs during the so-called transitional period?

## European rules on international jurisdiction and jurisdiction of the UPC

EU-harmonized rules on international jurisdiction are provided in the so-called Brussels I*bis* Regulation, *i.e.*, Regulation (EU) No 1215/2012[v] on (international) jurisdiction and the recognition and enforcement of judgments in civil and commercial matters which directly applies to the courts of any of the (currently 27) EU member states, except for Denmark. Having signed the Lugano Convention[vi], similar rules are, nevertheless, applicable also in Denmark.

Art. 31 UPCA stipulates that the international jurisdiction of the UPC shall be established in accordance with the Brussels I*bis* Regulation or, where applicable, on the basis of the Lugano Convention. With its recast, which became applicable on January 10, 2015, Arts. 71(a)-(d) Brussels I*bis* Regulation were introduced in order to address the back then still slowly but steadily looming UPC.

The UPC is deemed a court common to several EU (*i.e.*, the UPCA) member states under Art. 71a(2) Brussels I*bis* Regulation and Art. 1 para. 2 UPCA. According to Art. 71a(1) Brussels I*bis* Regulation, this means that the UPC, for the purposes of the Brussels I*bis* Regulation, is deemed to be a EU member state court as the UPCA in Art. 32 confers the UPC jurisdiction over matters falling within the scope of the Brussels I*bis* Regulation. Art. 32(1) UPCA confers the UPC exclusive jurisdiction for the civil matters listed in its lit. (a)-(i), which include actions for (non-)infringement and revocation of "patents". Here, "patents" is understood to cover classic EPs that grant a bundle of national patents (so-called national parts) which are solely enforceable in each of the European Patent Convention (EPC) member states the EP is validated in, as well as EPs with unitary effect that grant a single exclusive patent right which is uniformly enforceable within the territory of the UPCA member states; *cf.* Art. 2 lit. (g) UPCA.

While the UPC naturally and as of its beginning has exclusive jurisdiction over EPs with unitary effect, exclusive jurisdiction over classic EPs comes in fact in two steps. During the seven-year transition period, which commenced the day the UPC opened its doors and lapses on May 31, 2030, if not prolonged for another seven years upon prior evaluation, the UPC and the national courts/authorities in the UPCA member states exercise parallel jurisdiction with respect to classic EPs validated there, unless the classic EP concerned is validly opted-out from the exclusive jurisdiction of the UPC. After the transition period, the UPC in fact gains exclusive jurisdiction for any classic EP not (validly) opted-out by then. Under certain circumstances such an opt-out can also be withdrawn later (however only once).

## Long arm jurisdiction of the UPC

With this regulatory framework in mind, when can the UPC exercise long arm jurisdiction? This question arises in two scenarios: (i) awarding damages for damage which results from a patent infringement within the territory of the UPCA member states but occurs outside thereof, and (ii) adjudicating patents registered in a non-UPCA member state, whether this state is an EU member or a third-state.

Scenario (i) is expressly addressed in Art. 71(b)(3) Brussels I*bis* Regulation, which insofar basically states: Where the UPC, in a dispute relating to an infringement of an EP, has jurisdiction over a defendant under Art. 71(b)(2) Brussels I*bis* Regulation (*e.g.*, because allegedly infringing acts are committed in a UPCA member state) <u>and</u> this infringement gives rise to damage within the EU,

the UPC can also exercise (long arm) jurisdiction in relation to damage arising outside the EU from such an infringement. Such jurisdiction can, however, only be established if (a) property, which belongs to the defendant, is located in a UPCA member state, and (b) the dispute has a sufficient connection with any such member state.

Scenario (ii), in contrast, is not addressed in Artt. 71(a)-(d) Brussels I*bis* Regulation so that an answer for it must be sought in its general and specific rules. This has now been confirmed by both the Dusseldorf Local Division of the UPC and the CJEU in their respective decisions mentioned above. Considering the interplay between the CJEU case's genesis and the UPC decision, the following analysis will focus on the latter and offer insights on the CJEU decision by way of an excursus.

## The UPC decision in *Fujifilm Corp v. Kodak GmbH et al*

*Fujifilm* had sued three *Kodak* entities all of which are domiciled in Germany for infringement of a classic EP (*i.e.*, Art. 71(b)(2) Brussels I*bis* Regulation did not apply from the outset). The infringement claims covered both Germany (a UPCA member) and the UK (neither a UPCA nor EU member, but a third-state). In response, the defendants first lodged a preliminary objection regarding international jurisdiction of the seized court with respect to the UK, which the court decided to deal with in the main proceedings, and subsequently filed a counterclaim for revocation asking the court to revoke the patent in suit in its entirety with effect for the territory of all UPCA member states in which it has effect (*i.e.*, Germany only). While no nullity action had been filed in the UK, the defendants claimed that the UK-part of the asserted EP was invalid under UK law for the same reasons brought forward otherwise.

The Dusseldorf Local Division found the preliminary objection to be admissible but unfounded, thus assuming international jurisdiction also for the assessment of infringement of the UK-part. The Local Division revoked the asserted EP in the territory of the UPCA member states it is validated in and consequently dismissed the corresponding infringement claim. The infringement claim with respect to the UK was dismissed as well because the UK part was accordingly held to be invalid under UK law in view of the parties' submissions, which the Local Division assessed as a prerequisite for infringement.

## The reasoning

The Dusseldorf Local Division finds that international jurisdiction in any case follows from Art. 4(1) in conjunction with Art. 71b(1) Brussels I*bis* Regulation (as they are both generally applicable pursuant to Art. 31 UPCA) and Artt. 32(1) lit. (a) and 33(1) lit. (a) UPCA (which grant the competence to hear an action for infringement of patents occurred in the UPCA member state hosting the Local Division).

As the defendants' revocation action was limited to the territory of the UPCA members states in which the patent in suit is in force, the Local Division first points out that there was no situation in which it had to decide whether it had jurisdiction to revoke the UK-part of the patent in suit (which it explicitly denies later on nonetheless – more on this further below). So, the Local Division turns to the question whether it has jurisdiction to decide the infringement action also with respect to the UK-part of the patent in suit, which it answers in favor of the claimant while noting that this had to be answered irrespective of the question of which substantive law was applicable. In detail:

As a starting point, the Local Division elaborates on the special rule of Art. 24(4) Brussels I*bis* Regulation. This provision codifies the decision of the CJEU in the matter of *GAT v LUK*, which, as mentioned above, was rendered in response to a German referral in a case where an action for declaration of non-infringement was filed which had also been based on the argument that the patent in suit was invalid. Following the CJEU's ruling the EU legislator amended the wording of the provision so that it now reads: "The [...] courts of a[n EU m]ember [s]tate shall have exclusive jurisdiction, regardless of the domicile of the parties[,] [...] in proceedings concerned with the registration or validity of [, *inter alia*,] patents [granted for the territory of said EU members state], irrespective of whether the issue is raised by way of an action or as a defen[s]e". This compulsory rule is meant to prevent that *e.g.* a nullity action against a national part of an EP is heard and decided by a court of an EU member state other than the EU member state in which it is registered. The main *ratio* behind this is to ensure that the EU member states do not interfere with each other's sovereignty rights regarding the grant and revocation of patents registered in and for their territory. However, since the special rule of Art. 24(4) Brussels I*bis* Regulation did

obviously not apply to the question of which court has jurisdiction in infringement proceedings, in the case of *Fujifilm Corp v Kodak GmbH et al*, the Local Division moves on to the general rules of the Brussels I*bis* Regulation (before returning to Art. 24(4) Brussels I*bis* Regulation later with respect to the legal consequences of an invalidity defense raised by a defendant in response to an infringement action).

Thus, to clarify the question of jurisdiction for the infringement action, the Local Division discusses the general rule of Art. 4(1) Brussels I*bis* Regulation, which confers jurisdiction on the courts of the EU member state in which the defendant is domiciled, whatever the nationality may be (and irrespective of whether the defendant is a natural or legal person; *cf.* Art. 63 Brussels I*bis* Regulation). Since Art. 4(1) Brussels I*bis* Regulation is applicable in the case at stake with all the defendants being domiciled in Germany, the Local Division raises the question whether the scope of Art. 4(1) Brussels I*bis* Regulation also allowed to assume international jurisdiction over national parts of an asserted EP validated outside the UPCA member states. To enter this discussion, the Local Divisions refers to the decision of the CJEU in the matter of *Owusu* (docket no. C-281/02[vii]). According to this decision, the uniform rules of jurisdiction as contained today in the Brussels I*bis* Regulation, which include Art. 4(1), do not only apply to situations in which there was a real and sufficient link with the working of the internal market of the EU, which by definition involved a number of EU member states, but also to circumstances involving relations between the courts of a single EU member state and those of a non-EU state. Therefrom, the Local Division draws the conclusion that the international element required for the application of the Brussels I*bis* Regulation may not only be intra-EU but also between an EU member state and a third-state.

In support, the Local Division also refers to the opinion of the Advocate General in the above-mentioned matter *BSH v Electrolux*, which was still pending at the time the Local Division delivered its decision. In his opinion delivered on February 22, 2024[viii], the Advocate General opined that the jurisdiction of the courts of the EU member state where the defendant is domiciled was universal. Thus, such jurisdiction could extend to the infringement of an EP committed in all the states it is validated in and these courts could consequently fully adjudicate the infringement case, which, neither in view of the CJEU decision in the matter of *GAT v LUK* nor Art. 24(4) Brussels I*bis* Regulation as subsequently recast, would lose jurisdiction for the assessment of infringement in case the defendant later raised a corresponding invalidity defense with respect to the national part(s) registered in a state other than the state of the court seized. This has now been confirmed by the CJEU:

### Excursus: The CJEU decision in *BSH Hausgeräte GmbH* v. *Electrolux AB*

On February 3, 2020, *BSH* brought an infringement action against *Electrolux* in Sweden, where *Electrolux* is domiciled, asserting not only the Swedish but also the national parts of an EP relating to vacuum cleaning technology validated in several EU members states (including Germany) as well as in a non-EU state (Turkey). In response, *Electrolux* had not only previously filed a (and finally unsuccessful) nullity action in Germany (among others), but questioned the validity of the asserted national parts in the Swedish case. While the Swedish court seized in the first instance initially confirmed jurisdiction, it denied it after Electrolux raised its invalidity defense; it denied it had jurisdiction not only for the validity defense but also for the infringement of the non-Swedish parts, the Swedish Court of Appeal, on May 24, 2022, chose to refer the three below summarized questions to the CJEU:

1. Is Art. 24(4) Brussels I*bis* Regulation to be interpreted as meaning that a national court of an EU member state that assumes jurisdiction to adjudicate a patent infringement dispute also over a national part of an EP not validated in its EU member state under Art. 4(1) Brussels I*bis* Regulation loses jurisdiction for said dispute once a corresponding invalidity defense is raised, or does such a national court only lack jurisdiction to adjudicate the raised invalidity defense?

2. Is the answer to (1) affected by whether national law contains provisions which state that, for a defense of invalidity raised in an infringement case to be adjudicated, the defendant must bring a separate action for a declaration of invalidity?

3. Is Art. 24(4) Brussels I*bis* Regulation further to be interpreted as being applicable to a court of a non-EU state, *i.e.*, also conferring exclusive jurisdiction on a court in a third-state with respect to the national part of the EP validated there?

After the Advocate General delivered his above-mentioned opinion on February 22, 2024, the CJEU assigned the case to the Grand Chamber and reopened the oral hearing with a focus on question (3). On September 5, 2024, the Advocate General delivered another opinion [ix] focusing on that question. In its decision of February 25, 2025, the CJEU follows the Advocate General and (treating question (1) and (2) together) responds that Art. 24(4) Brussels I*bis* Regulation must be interpreted

1. as meaning that a court of the Member State of domicile of the defendant seized, pursuant to Art. 4(1) Brussels I*bis* Regulation, of an infringement action regarding a patent granted in another EU member state has jurisdiction to hear that infringement action even where, in the context of that action and by means of defense, the defendant challenges the validity of that patent, whereas the courts of that other EU member state have exclusive jurisdiction to rule on that validity; and

2. as not applying to third-states and, consequently, as not conferring any jurisdiction, whether exclusive or otherwise, on any third-state court regarding the patent's validity, meaning that if a court of an EU member state is seized of an infringement action regarding a patent granted or validated in a third-state, the EU member state court having jurisdiction pursuant to Art. 4(1) Brussels I*bis* Regulation is also competent to rule on the question of validity raised by means of defense, where its decision in that regard does not affect the existence or content of the patent in the third-state or cause the national register of the third-state to be amended.

Since it has always been undisputed that the courts of the state a patent is registered in have exclusive jurisdiction over actions for revocation or nullification, the core issue of the case was that the ambiguous ruling of the CJEU in the matter of *GAT v LUK* could not simply be overturned seeing as the decision had been subsequently codified in Art. 24(4) Brussels I*bis* Regulation. In other words, Art. 24(4) Brussels I*bis* Regulation stands in the way of the solution favored by the Advocate General consisting in the rules of exclusive jurisdiction for proceedings concerned with the validity of a patent not applying where an invalidity defense is raised in infringement proceedings to the extent that the judgment delivered by the court seized would produce *inter partes* effects only. Instead, the only option the Advocate General saw was opting for one of two possible interpretations of the decision in the matter of *GAT v LUK* – a (i) broad and a (ii) narrow interpretation:

- either the courts of the EU member state said patent is registered in were (or became) exclusively competent under Art. 24(4) Brussels I*bis* Regulation for the entire case and any other court seized must decline (its formerly established) jurisdiction pursuant to Art. 27 Brussels I*bis* Regulation;

- or the courts of the EU member state said patent is registered in had exclusive jurisdiction under Art. 24(4) Brussels I*bis* Regulation for the assessment of validity only and other courts seized could have (or keep) jurisdiction for the assessment of infringement under the general rules the Brussels I*bis* Regulation (such as Art. 4(1)).

As seen above, the CJEU opted for the narrow interpretation, which the Advocate General considered "*the lesser evil*" (first opinion, recital 88). The main arguments for this are the predictability and certainty of jurisdiction: Applying the broad interpretation would compromise these two goals of the Brussels I*bis* Regulation, while the application of the narrow interpretation would not, as it did not force a court to decline its formerly established jurisdiction once an invalidity defense was later raised. Concerning the practical implications of this split jurisdiction for the assessment of infringement and validity, the Advocate General also proposed some guidelines which the CJEU generally endorsed (decision, recital 51; more on that further below).

With respect to patents registered in third-states, the CJEU sub (2) above holds that Art. 24(4) Brussels I*bis* Regulation was, due to the express wording, neither applicable directly nor by way of analogy. This meant that a seized court of an EU member state could, based on the jurisdiction conveyed under the general rules in the Brussels I*bis* Regulation, in principle, adjudicate the entire case even where an invalidity defense is later raised. While the Advocate General held that, in such cases, the court seized should not be bound by the general jurisdiction but rather have, albeit limited, discretionary power to decline adjudicating the validity issue and instead stay the case under specific circumstances in a manner reflecting the solution for intra-EU cases addressed by

Art. 24(4) Brussels I*bis* Regulation, the CJEU opted for a "*third way*" which came up during the second hearing (second opinion, recitals 42 *et seqq.*).

According to this third way, the general rule of Art. 4(1) Brussels I*bis* Regulation must be read as meaning that, in principle, it confers jurisdiction to also hear and determine actions concerned with the registration or validity of patents registered in a third-state on the courts of the EU member state the defendant is domiciled in. However, this comes with limitations, as the CJEU pointed out (decision, recitals 61 to 75).

First, there are limitations within the Brussel I*bis* Regulation. According to Art. 73(1) and (3) Brussels I*bis* Regulation no such jurisdiction is given where either (i) the Lugano Convention is applicable [x], which in Art. 22(4) contains a provision similar to Art. 24(4) Brussels I*bis* Regulation or (ii) a bilateral convention concluded between an EU member state and a third-state stipulates that the courts of that third-state are to have exclusive jurisdiction over disputes relating to the validity of patents granted in that third-state. According to Artt. 33 and 34 Brussels I*bis* Regulation, an EU court seized can (iii) stay (or even terminate) its case if a court in a third-state has already been seized with either a case between the same parties concerning the same subject-matter and cause or a case related to the case brought before the court of an EU member state.

Second, the courts of the EU member states must exercise jurisdiction without infringing the principle of non-interference, *i.e.*, not interfere with matters that essentially come within the national jurisdiction of another state. This was, however, not generally the case where a court of an EU member state is asked to decide on the validity of patent registered in a third-state. Rather, the courts of the EU member states had jurisdiction where their decision had only *inter partes* but no *erga omnes* effects. Thus, they may decide on invalidity as incidental question when assessing infringement as such decision would only bind the parties of the case.

---

Coming back to the UPC decision in *Fujifilm Corp v Kodak GmbH et al*, the Dusseldorf Local Division went on and held that neither Art. 71b(1) Brussels I*bis* Regulation nor Art. 34 UPCA altered the found result. Art. 71b(1) Brussels I*bis* Regulation, which stipulates that the UPC has jurisdiction where, under the Brussels I*bis* Regulation, the national courts of a UPCA member state would have jurisdiction, could not be read as limiting the territorial scope of the UPC's decisions to the territory of the UPCA member states, but only as limiting the extent of legal matters conveyed by the UPCA member states to the UPC. Since, in accordance with the case law of the CJEU, the courts of the conveying UPCA member state did indeed have jurisdiction over third-state patent infringement actions under the Brussels I*bis* Regulation, the UPC had to have the same jurisdiction. Art. 34 UPCA, in contrast, which governs the territorial scope of UPC decisions, did – unlike Art. 31 UPCA – not deal with the international jurisdiction of the UPC in the first place and further not exclude that UPC decisions had effect beyond the territory of the UPCA members states. Since EPs were not necessarily in force in all UPCA member states, Art. 34 UPCA could also be understood to clarify that, in the case of an EP, UPC decisions normally covered the entire territory of the UPCA member states, only except for the territories of the UPCA member states where that EP was not or no longer in force.

When dismissing the infringement claim also with respect to the UK-part, the Local Division states the following: "*Even though the UK part of the patent in suit is not covered by the counterclaim for revocation and* […] *no revocation action has been filed in the UK, the validity of the patent in suit is a prerequisite for an injunction and further orders based on a finding of infringement.* […] *Even if the Court cannot decide on the validity of the UK part of the patent in suit, and certainly cannot revoke that part, the infringement action cannot be successful in such a factual and legal situation* [note: a situation where validity was discussed and denied for the national part of the EP validated in Germany and an invalidity defense has been raised with respect to the UK-part referring to the same reasons]. […] *There is no need for a stay of the proceedings pending on the validity of the UK-part of the patent in suit in the present case. The prerequisite for a stay would be a pending revocation action in the UK, which is lacking (R. 295 RoP). The Court also finds that there is no legal basis for ordering the Defendants to bring such a revocation action in the United Kingdom.*" (page 60 *et seq.*).

As demonstrated, the Local Division apparently follows the "*third way*" the Advocate General discussed in his second opinion and the CJEU eventually adopted in its subsequent decision, even though the Local Division initially states that "[i]n view of the scope of the revocation action, the outcome of the pending case BSH Hausgeräte GmbH v Electrolux AB (C-339/22) is not decisive for the present case as regards to the third question referred to the ECJ, which was the reason for the referral of the case to the Grand Chamber and the reopening of the oral hearing." (page 21): The Local Division denies international jurisdiction for the assessment of validity of the UK-part, however, neither pursuant to Art. 73 Brussels I*bis* Regulation nor in favor of a stay/termination of its case (insofar). Instead, the Local Division solely assesses the validity of the UK-part as a prerequisite for infringement, which is determining the validity issue as an incidental question, thus with *inter partes* effects only.

## Outlook

For the first time the UPC has assumed (long arm) jurisdiction for the assessment of infringement of a national part of an EP not validated in a UPCA member state. The reasoning refers to the competences conveyed by the UPCA member states, which, as the CJEU has now confirmed, may exercise such long arm jurisdiction *mutatis mutandis*. Unlike the UPC that has jurisdiction only over EPs, the (national) courts of any EU member state could, however, likewise assume international jurisdiction even over patents registered in non-EPC states, such as the USA, Japan or China, in case the respective defendant is domiciled in their EU member state.

Will this cause a revival of cross-border injunctions? Likely yes!

For intra-EU cases, the CJEU has basically confirmed the *GAT v LUK* ruling with regard to the validity of a patent. So, the application of Art. 24(4) Brussels I*bis* Regulation as confirmed by the CJEU ensures that courts of non-UPCA member states such as Spanish courts (Spain being the EU's most prominent non-UPCA member state) are exclusively competent not only for dedicated nullity actions but also for determining validity in cases where an invalidity defense is raised before the UPC or any national EU member state court. However, whether there will be additional competition with respect to the assessment will depend on how the courts will deal with the split jurisdiction for infringement and validity. The CJEU points to the possibility of a stay of the infringement case for which the Advocate General proposed guidelines. According to these guidelines the court seized should, under its national procedural law, (i) preliminarily assess the chances of invalidity proceedings (already pending or to be initiated within a court-set deadline) before the competent court in the state the patent is registered in, and (ii), where applicable and appropriate, stay the case pending the invalidity case abroad. This resembles the discretionary decision German patent infringement courts take under Sec. 148 of the German Code of Civil Procedure, where due to the bifurcation no invalidity defense can be raised but only a stay of the infringement proceedings requested pending parallel invalidity proceedings. The CJEU added that a stay could in particular be justified "*where it takes the view that there is a reasonable, non-negligible possibility of that patent being declared invalid*" (decision, recital 51). Whether this indicates a lower standard than applied in Germany remains to be seen. Seeing as this assessment would in any event be an assessment under the respective foreign law (which the court seized might be unfamiliar with), the national courts within the EU could, however, generally be more inclined to stay the case due to additional uncertainties involved.

Finally, for third-state cases, the CJEU points to Artt. 33 and 34 Brussels I*bis* Regulation, according to which a court of an EU member state seized "*may*" stay their case, even though the CJEU seems to favor a stay in such cases ("*a court of a Member State* [...] *may be prompted to recognise the jurisdiction of courts of third States*", decision, recital 65; "*if none of the restrictions referred to in paragraphs 63 to 65 is applicable*", decision, recital 74). Where Artt. 33 and 34 Brussels I*bis* Regulation are not applicable, the court of an EU member state seized may rely on the provisions provided by the civil procedural laws of its member states. In Germany, courts may stay their case under Sec. 148 of the German Code of Civil Procedure also with respect to proceedings pending abroad. Whether they will, is still an open question, but this allows to open things up. For the UPC, Rule 295(a) of the Rules of Procedure[xi] becomes relevant which stipulates that the UPC "*may*" stay the infringement action provided that a decision in the invalidity proceedings "*may be expected to be given rapidly*". So far, the UPC has been rather reluctant to stay its proceedings thereunder. It remains to be seen whether this will hold true also in such cases. For the courts of the UK and Turkey, two of the most prominent non-EU (and, thus, also non-UPCA) member states of the EPC, the decisions, thus, indicate additional competition with respect to the assessment of infringement of the national parts of an EP validated there,

including an incidental decision on validity in cases where only a corresponding invalidity
defense is raised.

## Endnotes

[i] Online available: https://curia.europa.eu/juris/showPdf.jsf?
text=&docid=56479&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=427055
(last retrieved 02/07/2025).

[ii] Online available: https://www.unified-patent-
court.org/sites/default/files/upc_documents/agreement-on-a-unified-patent-court.pdf (last
retrieved 01/31/2025).

[iii] Online available: https://www.unified-patent-
court.org/sites/default/files/files/api_order/CC5DDB59B23C4060B18ADA327BFB5640_en.pdf
(last retrieved 01/31/2025).

[iv] https://curia.europa.eu/juris/document/document.jsf?
text=&docid=295685&pageIndex=0&doclang=EN&mode=req&dir=&occ=first&part=1&cid=14133197
(last retrieved 02/25/2025).

[v] Online available: https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?
uri=CELEX:02012R1215-20150226 (last retrieved 01/31/2025).

[vi] Online available: https://www.consilium.europa.eu/en/documents-publications/treaties-
agreements/agreement/?id=2007081 (last retrieved 02/25/2025).

[vii] Online available: https://curia.europa.eu/juris/showPdf.jsf?
text=&docid=55027&pageIndex=0&doclang=en&mode=lst&dir=&occ=first&part=1&cid=427221
(last retrieved 07/02/2025).

[viii] Online available:
https://curia.europa.eu/juris/document/document.jsf;jsessionid=9D5BC637993029E661098ECB002A44DF?
text=&docid=283062&pageIndex=0&doclang=EN&mode=req&dir=&occ=first&part=1&cid=3336248
(last retrieved 02/03/2025).

[ix] Online available: https://curia.europa.eu/juris/document/document.jsf?
text=&docid=289819&pageIndex=0&doclang=en&mode=req&dir=&occ=first&part=1&cid=9548064
(last retrieved 02/07/2025).

[x] In the case the third state is Denmark, Norway, Iceland, or Switzerland.

[xi] Online available: https://www.unified-patent-
court.org/sites/default/files/upc_documents/rop_en_25_july_2022_final_consolidated_published_on_website.pdf
(last retrieved 02/07/2025).

## Tags

Unified Patent Court (UPC), European Union (EU)

## Related Practices

Enforcement and Litigation
Unitary Patent System (UPS) and the Unified Patent Court (UPC)

## Related Industries

AI, Electronics, and Information Technology
Communications
Media
Consumer Goods and Services

Consumer Products

**Related Offices**

Munich

**Contacts**





**Dr. Johannes Druschel**
Partner
Munich
+49 89 83931 1232
Email

**Julia Obradovic-Walz**
Associate
Munich
+49 89 83931 1261
Email

Copyright © 2025 Finnegan, Henderson, Farabow, Garrett & Dunner, LLP.

DISCLAIMER: Although we wish to hear from you, information exchanged in this blog cannot and does not create an attorney-client relationship. Please do not post any information that you consider to be personal or confidential. If you wish for Finnegan, Henderson, Farabow, Garrett & Dunner, LLP to consider representing you, in order to establish an attorney-client relationship you must first enter a written representation agreement with Finnegan. Contact us for additional information. One of our lawyers will be happy to discuss the possibility of representation with you. Additional disclaimer information





**Share now**



# CJEU – Comment Prof. Willem Hoyng on BSH Hausgeräte v. Electrolux

06 March 2025

## 25 February 2025

## BSH Hausgeräte v. Electrolux, CJEU Case C-339/22

### Introduction



EN

2. In The Netherlands the so called crossborder injunction was then invented helped by the so called 'kort geding' (Dutch PI proceedings) and by famous judges as Jan Brinkhof and Jan Willems. The practice flourished to the dismay from some especially UK lawyers which branded it as cowboy justice.

3. It was all based on the idea that the Brussels Convention (and as far as non EU defendants were concerned: national law) granted jurisdiction also with respect to the infringement in other countries against a domiciled company and its codefendants. With respect to Art. 16(4) (now Art. 24(4)) it was thought that the court in PI decisions did not give a decision about invalidity but only looked at the chances that in invalidity proceedings the patent would be invalidated.

4. In Roche/Primus the ECJ stated that Art. 6(1) (now Art. 8(1)) was not applicable in a situation where each defendant infringed only in his own country. This decision was heavily criticized because in all these EP countries Art. 69 EPC was direct or indirect applicable to the infringement question.

5. In Solvay/Honeywell after questions formulated by judge Kalden (now the presiding judge of the second panel of the UPC Court of Appeal) the ECJ endorsed the Dutch crossborder practice in situations where more defendants infringed in the same foreign country.

6. However, it remained unclear what would be the situation in cases on the merit especially because in GAT/LUK the ECJ had ruled that a court could also not deal with the invalidity of a foreign patent if it was raised as a defense against an infringement claim.

7. This lead to different solutions in cases on the merit. The UK (then still an EU member) ruled in Coins Control that after such defense the court would also loose its competence for the infringement case. In The Netherlands the Supreme Court ruled that the court in that case had to give the plaintiff the possibility to withdraw its infringement claim and if not to suspend the case until the foreign court had dealt with the invalidity. That was basically also the dead of the case as no infringer would start invalidity proceedings because there was no incentive to do so as long as the case was suspended.



### The facts

9. BSH sues Electrolux (a Swedish company) for the Patent and Commercial Court in Sweden alleging infringement of its European Patent 1434512 (validated for certain EU states (at that time including the UK) and Turkey in all these countries and asking for an injunction and damages.

10. Electrolux argued that the patents were invalid and that the court had no jurisdiction as Art. 24(4) Brussels Regulation (BR) meant that if invalidity was raised the court had no jurisdiction for the infringement.

### Questions

11.

1. Does Art. 24(4) BR means that if invalidity is raised the court also loses jurisdiction (which it has pursuant Art. 4(1) BR) for the infringement case?

2. Is it for question 1 relevant that under Swedish law if you raise invalidity as a defense you also have to start invalidity proceedings?

3. Is Art. 24(4) also applicable to Turkey?

### Answer / Comment

12. **Question 2**

1. National Rules do not play a role for the interpretation of Art. 24(4) BR.

*Hoyng*: This is of course not surprising. EU law is the same in all EU countries and not dependent on local law.

13. **Question 1**

1. CJEU:
a. Interpretation of EU law is not only based on the wording but also the context in which it occurs and the objectives pursued.



EN

c. CJEU cites Art. 4(1). This (suing the defendant in its domicile etc.) is a rule of principle. Art. 24 provides an exception.

d. Validated EP patents are national patents.

e. It is clear from Art. 24(4) that Art. 24(4) is applicable whether invalidity is raised by way of an action or as a defense.

*Hoyng*: this is indeed clear. As Art. 24(4) is reflecting the GAT/LUK decision which means that the CJEU cannot overturn that unfortunate decision as also the AG remarked.

f. The CJEU emphasis as the ratio for Art. 22(4) the fact that a foreign court should not interfere with the administration of another country (such as the patent register) *Hoyng*: This limited objective comes back in the interpretation of Art. 24(4).

g. As the CJEU has already established Art. 24(4) is an exception to the general rule of Art. 4.1 and should therefor interpreted strictly.

*Hoyng*: The same is true but to a lesser extent (?) with respect to codefendants for which there is jurisdiction on the basis of Art. 8(1) BR where there is the argument of avoiding irreconcilable judgments.

h. The CJEU following the AG clearly sees and says that Art. 4(1) would become a dead letter for patent disputes as most of the time invalidity will be raised which makes the question of jurisdiction highly unpredictable certainly if invalidity can be raised at any stage of the proceedings.

i. The CJEU also referring to the AG cites as advantage to have the dispute in one court avoiding the risk of diverging decisions.

*Hoyng*: This is (very different from Roche) an implicit reminder that the law of infringement (Art. 69) and damages (see the Enforcement Directive) is the same in the different EP respectively EU countries.

j. The CJEU makes clear that a court cannot disregard the fact that an invalidity case has been brought in the country/countries of the patent. The Court proposes the



*Hoyng*: it seems that the CJEU expects that alleged infringer at least starts invalidity proceedings in the foreign countries. However, the CJEU refers also to Solvay (in which case no invalidity cases were started in the foreign countries). What is very clear is that courts cannot suspend simply because they do not like crossborder cases. However, on the other hand I do not think that filing invalidity cases is a requirement. Very often the court will have to decide upon the validity in their own country. The outcome of that case could be leading for the decision to suspend or not.

The court does not address the question what would happen if injunctions are granted and damages awarded and later (one of) the foreign patents is invalidated. In practice this will very seldom happen but it could be resolved by granting a conditional judgment (under the condition that the patents are not invalidated). See for the UPC for instance Rules of Procedure R.118.2(a).

### 14. **Question 3**

a. As the Advocate General the CJEU not surprisingly rules that Art. 24(4) BR is not applicable to non EU member states and deals with the defense inter partes which does not affect the registration of the patent.

*Hoyng*: This is different from the AG's opinion which suggested that the court would also have the possibility to decline jurisdiction or act as with respect to EU states (suspension if there is a likelihood of invalidity).

The CJEU chose here -where it is possible- the route which because of GAT/LUK it could not take for the EU.

I think that this solution is a very good one as it does not interfere with the grant or invalidity erga omnes and the administration of foreign patents.

This is a clear hint in my opinion that, as the AG, the CJEU disapproves of GAT/LUK and it sends a message to the Commission to change 22(4) BR making it possible to allege invalidity inter partes as a defense. At the same time the Rules of Procedure of the UPC have to be changed to make such defense possible without having to start a cross complaint for revocation.

### **The future**





EN

16. It is clear the decision is also applicable to a defendant domiciled in the UPC. In my view, since the UPC has to be seen as one territory with one court of first instance (which is to be considered as a court common to the different member states) such defendant can be sued in any Local Division.

17. I also think that the reasoning of the court is also valid with respect to foreign non EP patents (f.i. suing a French company in France for infringement of a German national patent and/or a UK and/or US national patent). In these cases the court will have to apply the law of the patent.

18. The decision is silent about Art. 8(1) of the Brussels Regulation which can together with an Art. 4(1) defendant give jurisdiction against non domiciled companies in case there is the possibility of irreconcilable decision. If such non domiciled company is domiciled outside the EU the national law of the court will be applicable with respect to the question of jurisdiction. However, in the UPC this will be (also) the Brussels Regulation (Art. 71(2)b). As known the UPC has in Art. 33(1)(b) further requirements which is that there has to be a commercial relationship and the same infringement. In my opinion these limitations have only an internal effect (within the Court of First Instance) but do not restrict for the UPC the jurisdiction under Art. 8(1) BR.

19. From Roche it becomes clear that if the infringements in the different countries are committed by different legal entities then (even in the case of a – same – European Patent and even if these different legal entities belong to the same concern) Art. 8(1) is not applicable all assuming that Roche is still good law which I doubt.

20. From Solvay it becomes clear that if the Art. 4(1) defendant and the Art. 8(1) infringe the same foreign patents Art. 8(1) is applicable (f.i. the domiciled company delivering products to its subsidiaries).

21. However, if the domiciled company is involved in or can prevent infringements in other countries (without itself infringing in such countries) such acts (f.i. making available a marketing authorization) may be seen under the law of the domiciled company as an unlawful act and under the present decision the domiciled court has jurisdiction to deal with the question of infringement in such countries which is necessary as that is the basis for acting unlawfully.



EN

infringement of European Patents.

23. The above are just a few (of the many) possibilities, questions which are raised by this decision.

**Conclusion**

In my opinion this is a very well reasoned decision which fully endorses this time the crossborder practice started 40 years ago and which makes an even more efficient enforcement of patents possible which in my opinion can only enhance innovation.



What we do

Unified Patent Court

Our Team

News & insights

Join us

Diversity & Inclusion

Privacy Policy

Imprint & Complaints Procedure

General Conditions

Contact

Legal notices

©2025 HOYNG ROKH MONEGIER

All Rights Reserved

in

OWUSU

**Exhibit P-03**
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA

JUDGMENT OF THE COURT (Grand Chamber)

1 March 2005 [*]

In Case C-281/02,

Reference for a preliminary ruling under the Protocol of 3 June 1971 on the interpretation by the Court of Justice of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters by the Court of Appeal (England and Wales) Civil Division (United Kingdom), by decision of 5 July 2002, received at the Court on 31 July 2002, in the proceedings

**Andrew Owusu**

v

**N.B. Jackson, trading as 'Villa Holidays Bal-Inn Villas',**

**Mammee Bay Resorts Ltd,**

**Mammee Bay Club Ltd,**

[*] Language of the case: English.

I - 1445

**The Enchanted Garden Resorts & Spa Ltd**,

**Consulting Services Ltd**,

**Town & Country Resorts Ltd**,

THE COURT (Grand Chamber),

composed of P. Jann, President of the First Chamber, acting for the President, C.W.A. Timmermans and A. Rosas, Presidents of Chambers, C. Gulmann, J.-P. Puissochet, R. Schintgen (Rapporteur), N. Colneric, S. von Bahr and J.N. Cunha Rodrigues, Judges,

Advocate General: P. Léger,
Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 4 May 2004,

after considering the observations submitted on behalf of:

—  Mr Owusu, by R. Plender QC and P. Mead, barrister,

I - 1446

— Mr Jackson, by B. Doherty and C. Thomann, solicitors,

— Mammee Bay Club Ltd, The Enchanted Garden Resorts & Spa Ltd and Town & Country Resorts Ltd, by P. Sherrington, S. Armstrong and L. Lamb, solicitors,

— the United Kingdom Government, by K. Manji, acting as Agent, and D. Lloyd-Jones QC,

— the German Government, by R. Wagner, acting as Agent,

— the Commission of the European Communities, by A.-M. Rouchaud-Joët and M. Wilderspin, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 14 December 2004,

gives the following

## Judgment

1   This reference for a preliminary ruling concerns the interpretation of Article 2 of the Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters (OJ 1978 L 304, p. 36), as amended by the Convention of 9 October 1978 on the Accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland (OJ 1978

L 304, p. 1, and — amended version — p. 77), by the Convention of 25 October 1982 on the Accession of the Hellenic Republic (OJ 1982 L 388, p. 1) and by the Convention of 26 May 1989 on the Accession of the Kingdom of Spain and the Portuguese Republic (OJ 1989 L 285, p. 1; 'the Brussels Convention').

2    The reference was made in the course of proceedings brought by Mr Owusu against Mr Jackson, trading as 'Villa Holidays Bal-Inn Villas', and several companies governed by Jamaican law, following an accident suffered by Mr Owusu in Jamaica.

**Legal background**

*The Brussels Convention*

3    According to its preamble the Brussels Convention is intended to facilitate the reciprocal recognition and enforcement of judgments of courts or tribunals, in accordance with Article 293 EC, and to strengthen in the Community the legal protection of persons therein established. The preamble also states that it is necessary for that purpose to determine the international jurisdiction of the courts of the contracting States.

4    The provisions relating to jurisdiction appear in Title II of the Brussels Convention. According to Article 2 of the Convention:

'Subject to the provisions of this Convention, persons domiciled in a Contracting State shall, whatever their nationality, be sued in the courts of that State.

OWUSU

Persons who are not nationals of the State in which they are domiciled shall be governed by the rules of jurisdiction applicable to nationals of that State'.

5    However, Article 5(1) and (3) of that convention provides that a defendant may be sued in another Contracting State, in matters relating to a contract, in the courts for the place of performance of the obligation in question, and, in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred.

6    The Brussels Convention is also intended to prevent conflicting decisions. Thus, according to Article 21, which concerns *lis pendens*:

'Where proceedings involving the same cause of action and between the same parties are brought in the courts of different Contracting States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established.

Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court'.

7    Article 22 of the Convention provides:

'Where related actions are brought in the courts of different Contracting States, any court other than the court first seised may, while the actions are pending at first instance, stay its proceedings.

I - 1449

A court other than the court first seised may also, on the application of one of the parties, decline jurisdiction if the law of that court permits the consolidation of related actions and the court first seised has jurisdiction over both actions.

For the purposes of this article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.'

*National law*

8    According to the doctrine of *forum non conveniens*, as understood in English law, a national court may decline to exercise jurisdiction on the ground that a court in another State, which also has jurisdiction, would objectively be a more appropriate forum for the trial of the action, that is to say, a forum in which the case may be tried more suitably for the interests of all the parties and the ends of justice (1986 judgment of the House of Lords, in *Spiliada Maritime Corporation* v *Cansulex Ltd* [1987], AC 460, particularly at p. 476).

9    An English court which decides to decline jurisdiction under the doctrine of *forum non conveniens* stays proceedings so that the proceedings which are thus provisionally suspended can be resumed should it prove, in particular, that the foreign forum has no jurisdiction to hear the case or that the claimant has no access to effective justice in that forum.

OWUSU

**The main proceedings and the questions referred for a preliminary ruling**

10   On 10 October 1997, Mr Owusu ('the claimant'), a British national domiciled in the United Kingdom, suffered a very serious accident during a holiday in Jamaica. He walked into the sea, and when the water was up to his waist he dived in, struck his head against a submerged sand bank and sustained a fracture of his fifth cervical vertebra which rendered him tetraplegic.

11   Following that accident, Mr Owusu brought an action in the United Kingdom for breach of contract against Mr Jackson, who is also domiciled in that State. Mr Jackson had let to Mr Owusu a holiday villa in Mammee Bay (Jamaica). Mr Owusu claims that the contract, which provided that he would have access to a private beach, contained an implied term that the beach would be reasonably safe or free from hidden dangers.

12   Mr Owusu also brought an action in tort in the United Kingdom against several Jamaican companies, namely Mammee Bay Club Ltd ('the third defendant'), the owner and occupier of the beach at Mammee Bay which provided the claimant with free access to the beach, The Enchanted Garden Resorts & Spa Ltd ('the fourth defendant'), which operates a holiday complex close to Mammee Bay, and whose guests were also licensed to use the beach, and Town & Country Resorts Ltd ('the sixth defendant'), which operates a large hotel adjoining the beach, and which has a licence to use the beach, subject to the condition that it is responsible for its management, upkeep and control.

13   According to the file, another English holidaymaker had suffered a similar accident two years earlier in which she, too, was rendered tetraplegic. The action in tort

I - 1451

against the Jamaican defendants therefore embraces not only a contention that they failed to warn swimmers of the hazard constituted by the submerged sand bank, but also a contention that they failed to heed the earlier accident.

14    The proceedings were commenced by a claim form issued out of Sheffield District Registry of the High Court (England and Wales) Civil Division on 6 October 2000. They were served on Mr Jackson in the United Kingdom and, on 12 December 2000, leave was granted to the claimant to serve the proceedings on the other defendants in Jamaica. Service was effected on the third, fourth and sixth defendants, but not on Mammee Bay Resorts Ltd or Consulting Services Ltd.

15    Mr Jackson and the third, fourth and sixth defendants applied to that court for a declaration that it should not exercise its jurisdiction in relation to the claim against them both. In support of their applications, they argued that the case had closer links with Jamaica and that the Jamaican courts were a forum with jurisdiction in which the case might be tried more suitably for the interests of all the parties and the ends of justice.

16    By order of 16 October 2001, the Judge sitting as Deputy High Court Judge in Sheffield (United Kingdom) held that it was clear from Case C-412/98 *UGIC* v *Group Josi* [2000] ECR I-5925, paragraphs 59 to 61, that the application of the jurisdictional rules in the Brussels Convention to a dispute depended, in principle, on whether the defendant had its seat or domicile in a Contracting State, and that the Convention applied to a dispute between a defendant domiciled in a Contracting State and a claimant domiciled in a non-Contracting State. In those circumstances the decision of the Court of Appeal in *In re Harrods (Buenos Aires) Ltd* [1992] Ch

OWUSU

72, which accepted that it was possible for the English courts, applying the doctrine of *forum non conveniens*, to decline to exercise the jurisdiction conferred on them by Article 2 of the Brussels Convention, was bad law.

17    Taking the view that he had no power himself under Article 2 of the Protocol of 3 June 1971 to refer a question to the Court of Justice for a preliminary ruling to clarify this point, the Judge sitting as Deputy High Court Judge held that, in the light of the principles laid down in *Group Josi*, it was not open to him to stay the action against Mr Jackson since he was domiciled in a Contracting State.

18    Notwithstanding the connecting factors that the action brought against the other defendants might have with Jamaica, the judge held that he was also unable to stay the action against them, in so far as the Brussels Convention precluded him from staying proceedings in the action against Mr Jackson. Otherwise, there would be a risk that the courts in two jurisdictions would end up trying the same factual issues upon the same or similar evidence and reach different conclusions. He therefore held that the United Kingdom, and not Jamaica was the State with the appropriate forum to try the action and dismissed the applications for a declaration that the court should not exercise jurisdiction.

19    Mr Jackson and the third, fourth and sixth defendants appealed against that order. The Court of Appeal (England and Wales) Civil Division states that, in this case, the competing jurisdictions are a Contracting State and a non-Contracting State. If Article 2 of the Brussels Convention is mandatory, even in this context, Mr Jackson would have to be sued in the United Kingdom before the courts of his domicile and it would not be open to the claimant to sue him under Article 5(3) of the Brussels Convention in Jamaica, where the harmful event occurred, because that State is not another Contracting State. In the absence of an express derogation to that effect in

the Convention, it is therefore not permissible to create an exception to the rule in Article 2. According to the referring court, the question of the application of *forum non conveniens* in favour of the courts of a non-Contracting State, when one of the defendants is domiciled in a Contracting State, is not a matter on which the Court of Justice has ever given a ruling.

20    According to the claimant, Article 2 of the Brussels Convention is of mandatory application, so that the English courts cannot stay proceedings in the United Kingdom against a defendant domiciled there, even though the English court takes the view that another forum in a non-Contracting State is more appropriate.

21    The referring court points out that if that position were correct it might have serious consequences in a number of other situations concerning exclusive jurisdiction or *lis pendens*. It adds that a judgment delivered in England, deciding the case, which was to be enforced in Jamaica, particularly as regards the Jamaican defendants, would encounter difficulty over certain rules in force in that country on the recognition and enforcement of foreign judgments.

22    Against that background, the Court of Appeal decided to stay its proceedings and to refer the following questions to the Court for a preliminary ruling:

'1.  Is it inconsistent with the Brussels Convention … , where a claimant contends that jurisdiction is founded on Article 2, for a court of a Contracting State to exercise a discretionary power, available under its national law, to decline to

hear proceedings brought against a person domiciled in that State in favour of the courts of a non-Contracting State:

(a) if the jurisdiction of no other Contracting State under the 1968 Convention is in issue;

(b) if the proceedings have no connecting factors to any other Contracting State?

2.  If the answer to question 1(a) or (b) is yes, is it inconsistent in all circumstances or only in some and if so which?'

**On the questions referred**

*The first question*

23    In order to reply to the first question it must first be determined whether Article 2 of the Brussels Convention is applicable in circumstances such as those in the main proceedings, that is to say, where the claimant and one of the defendants are domiciled in the same Contracting State and the case between them before the courts of that State has certain connecting factors with a non-Contracting State, but not with another Contracting State. Only if it is will the question arise whether, in the circumstances of the case in the main proceedings, the Brussels Convention precludes the application by a court of a Contracting State of the *forum non conveniens* doctrine where Article 2 of that convention would permit that court to claim jurisdiction because the defendant is domiciled in that State.

The applicability of Article 2 of the Brussels Convention

24    Nothing in the wording of Article 2 of the Brussels Convention suggests that the application of the general rule of jurisdiction laid down by that article solely on the basis of the defendant's domicile in a Contracting State is subject to the condition that there should be a legal relationship involving a number of Contracting States.

25    Of course, as is clear from the Jenard report on the Convention (OJ 1979 C 59, pp. 1, 8), for the jurisdiction rules of the Brussels Convention to apply at all the existence of an international element is required.

26    However, the international nature of the legal relationship at issue need not necessarily derive, for the purposes of the application of Article 2 of the Brussels Convention, from the involvement, either because of the subject-matter of the proceedings or the respective domiciles of the parties, of a number of Contracting States. The involvement of a Contracting State and a non-Contracting State, for example because the claimant and one defendant are domiciled in the first State and the events at issue occurred in the second, would also make the legal relationship at issue international in nature. That situation is such as to raise questions in the Contracting State, as it does in the main proceedings, relating to the determination of international jurisdiction, which is precisely one of the objectives of the Brussels Convention, according to the third recital in its preamble.

27    Thus the Court has already interpreted the rules of jurisdiction laid down by the Brussels Convention in cases where the claimant was domiciled or had its seat in a

OWUSU

non-Contracting State while the defendant was domiciled in a Contracting State (see Case C-190/89 *Rich* [1991] ECR I-3855, Case C-406/92 *Tatry* [1994] ECR I-5439 and *Group Josi*, paragraph 60).

28    Moreover, the rules of the Brussels Convention on exclusive jurisdiction or express prorogation of jurisdiction are also likely to be applicable to legal relationships involving only one Contracting State and one or more non-Contracting States. That is so, under Article 16 of the Brussels Convention, in the case of proceedings which have as their object rights in rem in immovable property or tenancies of immovable property between persons domiciled in a non-Contracting State and relating to an asset in a Contracting State, or, under Article 17 of the Brussels Convention, where an agreement conferring jurisdiction binding at least one party domiciled in a non-Contracting State opts for a court in a Contracting State.

29    Similarly, as the Advocate General pointed out in points 142 to 152 of his Opinion, whilst it is clear from their wording that the Brussels Convention rules on *lis pendens* and related actions or recognition and enforcement of judgments apply to relationships between different Contracting States, provided that they concern proceedings pending before courts of different Contracting States or judgments delivered by courts of a Contracting State with a view to recognition and enforcement thereof in another Contracting State, the fact nevertheless remains that the disputes with which the proceedings or decisions in question are concerned may be international, involving a Contracting State and a non-Contracting State, and allow recourse, on that ground, to the general rule of jurisdiction laid down by Article 2 of the Brussels Convention.

30    To counter the argument that Article 2 applies to a legal situation involving a single Contracting State and one or more non-Contracting States, the defendants in the main proceedings and the United Kingdom Government cited the principle of the relative effect of treaties, which means that the Brussels Convention cannot impose any obligation on States which have not agreed to be bound by it.

I - 1457

JUDGMENT OF 1. 3. 2005 — CASE C-281/02

31    In that regard, suffice it to note that the designation of the court of a Contracting State as the court having jurisdiction on the ground of the defendant's domicile in that State, even in proceedings which are, at least in part, connected, because of their subject-matter or the claimant's domicile, with a non-Contracting State, is not such as to impose an obligation on that State.

32    Mr Jackson and the United Kingdom Government also emphasised, in support of the argument that Article 2 of the Brussels Convention applied only to disputes with connections to a number of Contracting States, the fundamental objective pursued by the Convention which was to ensure the free movement of judgments between Contracting States.

33    The purpose of the fourth indent of Article 220 of the EC Treaty (now the fourth indent of Article 293 EC), on the basis of which the Member States concluded the Brussels Convention, is to facilitate the working of the common market through the adoption of rules of jurisdiction for disputes relating thereto and through the elimination, as far as is possible, of difficulties concerning the recognition and enforcement of judgments in the territory of the Contracting States (Case C-398/92 *Mund & Fester* [1994] ECR I-467, paragraph 11). In fact it is not disputed that the Brussels Convention helps to ensure the smooth working of the internal market.

34    However, the uniform rules of jurisdiction contained in the Brussels Convention are not intended to apply only to situations in which there is a real and sufficient link with the working of the internal market, by definition involving a number of Member States. Suffice it to observe in that regard that the consolidation as such of the rules on conflict of jurisdiction and on the recognition and enforcement of judgments, effected by the Brussels Convention in respect of cases with an international element, is without doubt intended to eliminate obstacles to the functioning of the internal market which may derive from disparities between national legislations on the subject (*see*, by analogy, as regards harmonisation

I - 1458

OWUSU

directives based on Article 95 EC intended to improve the conditions for the establishment and working of the internal market, Joined Cases C-465/00, C-138/01 and C-139/01 *Österreichischer Rundfunk and Others* [2003] ECR I-4989, paragraphs 41 and 42).

35    It follows from the foregoing that Article 2 of the Brussels Convention applies to circumstances such as those in the main proceedings, involving relationships between the courts of a single Contracting State and those of a non-Contracting State rather than relationships between the courts of a number of Contracting States.

36    It must therefore be considered whether, in such circumstances, the Brussels Convention precludes a court of a Contracting State from applying the *forum non conveniens* doctrine and declining to exercise the jurisdiction conferred on it by Article 2 of that Convention.

The compatibility of the *forum non conveniens* doctrine with the Brussels Convention

37    It must be observed, first, that Article 2 of the Brussels Convention is mandatory in nature and that, according to its terms, there can be no derogation from the principle it lays down except in the cases expressly provided for by the Convention (see, as regards the compulsory system of jurisdiction set up by the Brussels Convention, Case C-116/02 *Gasser* [2003] ECR I-14693, paragraph 72, and Case C-159/02 *Turner* [2004] ECR I-3565, paragraph 24). It is common ground that no exception on the basis of the *forum non conveniens* doctrine was provided for by the

authors of the Convention, although the question was discussed when the Convention of 9 October 1978 on the Accession of Denmark, Ireland and the United Kingdom was drawn up, as is apparent from the report on that Convention by Professor Schlosser (OJ 1979 C 59, p. 71, paragraphs 77 and 78).

38    Respect for the principle of legal certainty, which is one of the objectives of the Brussels Convention (see, inter alia, Case C-440/97 *GIE Groupe Concorde and Others* [1999] ECR I-6307, paragraph 23, and Case C-256/00 *Besix* [2002] ECR I-1699, paragraph 24), would not be fully guaranteed if the court having jurisdiction under the Convention had to be allowed to apply the *forum non conveniens* doctrine.

39    According to its preamble, the Brussels Convention is intended to strengthen in the Community the legal protection of persons established therein, by laying down common rules on jurisdiction to guarantee certainty as to the allocation of jurisdiction among the various national courts before which proceedings in a particular case may be brought (*Besix*, paragraph 25).

40    The Court has thus held that the principle of legal certainty requires, in particular, that the jurisdictional rules which derogate from the general rule laid down in Article 2 of the Brussels Convention should be interpreted in such a way as to enable a normally well-informed defendant reasonably to foresee before which courts, other than those of the State in which he is domiciled, he may be sued (*GIE Groupe Concorde and Others*, paragraph 24, and *Besix*, paragraph 26).

41    Application of the *forum non conveniens* doctrine, which allows the court seised a wide discretion as regards the question whether a foreign court would be a more

OWUSU

appropriate forum for the trial of an action, is liable to undermine the predictability of the rules of jurisdiction laid down by the Brussels Convention, in particular that of Article 2, and consequently to undermine the principle of legal certainty, which is the basis of the Convention.

42    The legal protection of persons established in the Community would also be undermined. First, a defendant, who is generally better placed to conduct his defence before the courts of his domicile, would not be able, in circumstances such as those of the main proceedings, reasonably to foresee before which other court he may be sued. Second, where a plea is raised on the basis that a foreign court is a more appropriate forum to try the action, it is for the claimant to establish that he will not be able to obtain justice before that foreign court or, if the court seised decides to allow the plea, that the foreign court has in fact no jurisdiction to try the action or that the claimant does not, in practice, have access to effective justice before that court, irrespective of the cost entailed by the bringing of a fresh action before a court of another State and the prolongation of the procedural time-limits.

43    Moreover, allowing *forum non conveniens* in the context of the Brussels Convention would be likely to affect the uniform application of the rules of jurisdiction contained therein in so far as that doctrine is recognised only in a limited number of Contracting States, whereas the objective of the Brussels Convention is precisely to lay down common rules to the exclusion of derogating national rules.

44    The defendants in the main proceedings emphasise the negative consequences which would result in practice from the obligation the English courts would then be under to try this case, inter alia as regards the expense of the proceedings, the

possibility of recovering their costs in England if the claimant's action is dismissed, the logistical difficulties resulting from the geographical distance, the need to assess the merits of the case according to Jamaican standards, the enforceability in Jamaica of a default judgment and the impossibility of enforcing cross-claims against the other defendants.

45    In that regard, genuine as those difficulties may be, suffice it to observe that such considerations, which are precisely those which may be taken into account when *forum non conveniens* is considered, are not such as to call into question the mandatory nature of the fundamental rule of jurisdiction contained in Article 2 of the Brussels Convention, for the reasons set out above.

46    In the light of all the foregoing considerations, the answer to the first question must be that the Brussels Convention precludes a court of a Contracting State from declining the jurisdiction conferred on it by Article 2 of that convention on the ground that a court of a non-Contracting State would be a more appropriate forum for the trial of the action even if the jurisdiction of no other Contracting State is in issue or the proceedings have no connecting factors to any other Contracting State.

*The second question*

47    By its second question, the referring court seeks essentially to know whether, if the Court takes the view that the Brussels Convention precludes the application of *forum non conveniens*, its application is ruled out in all circumstances or only in certain circumstances.

OWUSU

48   According to the order for reference and the observations of the defendants in the main proceedings and of the United Kingdom Government, that second question was asked in connection with cases where there were identical or related proceedings pending before a court of a non-Contracting State, a convention granting jurisdiction to such a court or a connection with that State of the same type as those referred to in Article 16 of the Brussels Convention.

49   The procedure provided for in Article 234 EC is an instrument of cooperation between the Court of Justice and national courts by means of which the former provides the latter with interpretation of such Community law as is necessary for them to give judgment in cases upon which they are called to adjudicate (see, inter alia, Case C-231/89 *Gmurzynska-Bscher* [1990] ECR I-4003, paragraph 18, Case C-314/96 *Djabali* [1998] ECR I-1149, paragraph 17, and Case C-318/00 *Bacardi-Martini and Cellier des Dauphins* [2003] ECR I-905, paragraph 41).

50   Thus, the justification for a reference for a preliminary ruling is not that it enables advisory opinions on general or hypothetical questions to be delivered but rather that it is necessary for the effective resolution of a dispute (see, to that effect, *Djabali*, paragraph 19, *Bacardi-Martini and Cellier des Dauphins*, paragraph 42, and Joined Cases C-480/00 to C-482/00, C-484/00, C-489/00 to C-491/00 and C-497/00 to C-499/00 *Azienda Agricola Ettore Ribaldi and Others* [2004] ECR I-2943, paragraph 72).

51   In the present case, it is common ground that the factual circumstances described in paragraph 48 of this judgment are not the same as those of the main proceedings.

52   Accordingly there is no need to reply to the second question.

**Costs**

53   Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Grand Chamber) rules as follows:

**The Convention of 27 September 1968 on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, as amended by the Convention of 9 October 1978 on the Accession of the Kingdom of Denmark, Ireland and the United Kingdom of Great Britain and Northern Ireland, by the Convention of 25 October 1982 on the Accession of the Hellenic Republic and by the Convention of 26 May 1989 on the Accession of the Kingdom of Spain and the Portuguese Republic, precludes a court of a Contracting State from declining the jurisdiction conferred on it by Article 2 of that convention on the ground that a court of a non-Contracting State would be a more appropriate forum for the trial of the action even if the jurisdiction of no other Contracting State is in issue or the proceedings have no connecting factors to any other Contracting State.**

[Signatures]

I - 1464

© 2021 Verlag C.H.Beck GmbH & Co. KG. Jede urheberrechtliche Nutzung ist grundsätzlich unters...
oder in KI-Systemen oder KI-Modellen. Die Nutzung zum Text-und-Data-Mining nach § 44b Abs. 3 U...

| Brüssel Ia-VO Art. 4 [Allgemeiner internationaler Gerichtsstand] | Gottwald | Münchener Kommentar zur ZPO 6. Auflage 2022 | Rn. 11 |

## 5. Keine forum non conveniens-Doktrin

Besteht nach der Brüssel Ia-VO eine internationale Zuständigkeit, so haben die Parteien einen uneingeschränkten Justizgewährungsanspruch; das angerufene Gericht muss tätig werden und darf seine Tätigkeit nicht als ein „forum non conveniens" verweigern. [Fn. 19: EuGH C-281/02, EuGHE 2005, I-1383 – Owusu = IPRax 2005, 244 (Heinze/Dutta S. 224) = JZ 2005, 887 (Bruns); Geimer/Schütze/Paulus Int. Rechtsverkehr Vor Art. 4 Rn. 32; Magnus/Mankowski/Vlas Rn. 6 ff.; Musielak/Voit/Stadler Rn. 1; van Lith in Dickinson/Lein, Rn. 3.11; Gottwald FS Jayme, 2004, 277; Stein/Jonas/Wagner Vor Art. 2 aF Rn. 39; vgl. Würdinger RabelsZ 75 (2011), 102 (110). ] Dies gilt auch, wenn eine der Parteien ihren Wohnsitz/Sitz in einem Drittstaat hat. [Fn. 20: Geimer/Schütze/Paulus Int. Rechtsverkehr Vor Art. 4 Rn. 34; Geimer/Schütze EuZivilVerfR Art. 4 Rn. 70 ff.; Coester-Waltjen FS Nakamura, 1996, 89 (107); aA Schlosser/Hess/Schlosser Vor Art. 4–35 Rn. 6. ] Bei der Reform der Brüssel I-VO hielt die Kommission an der strikten Justizgewährungspflicht fest, während das Europäische Parlament dagegen dafür plädierte, die Möglichkeit einzuführen, entsprechend Art. 15 Brüssel IIa-VO (EheGVO) bzw. Art. 6 EU-ErbVO einen Rechtsstreit an ein besser geeignetes Gericht abzugeben. In der letztlich verabschiedeten Neufassung der Brüssel Ia-VO hat sich die Ansicht der Kommission durchgesetzt. [Fn. 21: Für künftige Übernahme dagegen Coester-Waltjen RabelsZ 79 (2015), 471 (501 ff.). ] Nach Ansicht des englischen High Court folgt aus der unbedingten Justizgewährungspflicht zudem, dass Klagen wegen der Verletzung territorial begrenzter gewerblicher Schutzrechte auch vor den Gerichten anderer Mitgliedstaaten erhoben werden können. [Fn. 22: English High Court, I. L. Pr. [1998], 10. ]

11

Zitiervorschläge:

MüKoZPO/Gottwald Brüssel Ia-VO Art. 4 Rn. 11

MüKoZPO/Gottwald, 6. Aufl. 2022, Brüssel Ia-VO Art. 4 Rn. 11

© 2021 Verlag C.H.Beck GmbH & Co. KG. Urheberrechtlich geschützter Inhalt. Verlag C.H.Beck GmbH & Co. KG ist ausschließlicher Inhaber aller Nutzungsrechte. Ohne gesonderte Erlaubnis ist jede urheberrechtliche Nutzung untersagt, insbesondere die Nutzung des Inhalts im Zusammenhang mit, für oder in KI-Systemen, KI-Modellen oder Generativen Sprachmodellen. Verlag C.H.Beck GmbH & Co. KG behält sich alle Rechte vor, insbesondere die Nutzung zum Text-und-Data-Mining (TDM) nach § 44b Abs. 3 UrhG (Art. 4 DSM-RL).

Exhibit 4b
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA

© 2021 Verlag C.H.Beck GmbH & Co. KG. Any use subject to copyright is strictly prohibited, in particular use in connection with AI systems or AI models. The right to use for text and data mining in accordance with Section 44b (German Copyright Act (UrhG) is reserved.

| Brussels Ia Regulation Art. 4 [General international jurisdiction] | Gottwald Munich Commentary on margin note 11 ZPO<br>6th edition 2022 |
|---|---|

## 5. No forum non conveniens doctrine

If international jurisdiction exists under the Brussels Ia Regulation, the parties have an unrestricted right to a judicial decision; the court seised must act and may not refuse to do so on the grounds of forum non conveniens. [Fn. 19: ECJ C-281/02, EuGHE 2005, I-1383 – Owusu = IPRax 2005, 244 (Heinze/Dutta p. 224) =

JZ 2005, 887 (Bruns); Geimer/Schütze/Paulus Int. Rechtsverkehr Vor Art. 4 Rn. 32; Magnus/Mankowski/Vlas Rn. 6 ff.; Musielak/Voit/Stadler Rn. 1; van Lith in Dickinson/Lein, Rn. 3.11; Gottwald FS Jayme, 2004, 277; Stein/Jonas/Wagner Before Art. 2 old version margin note 39; cf. Würdinger RabelsZ 75 (2011), 102 (110). ] This also applies if one of the parties is domiciled/has its registered office in a third country. [Fn. 20: Geimer/Schütze/Paulus Int. Rechtsverkehr Before Art. 4 Rn. 34; Geimer/Schütze EuZivilVerfR Art. 4 Rn. 70 ff.; Coester-Waltjen FS Nakamura, 1996, 89 (107); dissenting opinion Schlosser/Hess/Schlosser Before Art. 4-35 margin note 6. ] In the case of $_{11}$

Reform of the Brussels I Regulation, the Commission maintained its strict obligation to provide justice,

while the European Parliament argued in favor of introducing the possibility of transferring a legal dispute to a more suitable court in accordance with Art. 15 Brussels IIa Regulation (Marriage Regulation) or Art. 6 EU Succession Regulation. The Commission's view prevailed in the final version of the Brussels Ia Regulation. [Fn. 21: For future adoption, however, see Coester-Waltjen RabelsZ 79 (2015), 471 (501 ff.). ] In the opinion of the English High Court, the unconditional obligation to provide justice also means that actions for infringement of territorially limited industrial property rights can also be brought before the courts of other Member States. [Fn. 22: English High Court, I. L. Pr. [1998], 10. ]

Suggested citation:

MüKoZPO/Gottwald Brussels Ia Regulation Art. 4 margin note 11

MüKoZPO/Gottwald, 6th ed. 2022, Brussels Ia Regulation Art. 4

margin note 11

© 2021 Verlag C.H.Beck GmbH & Co. KG. Copyrighted content. Verlag C.H.Beck GmbH & Co. KG is the exclusive owner of all rights of use. Without separate permission, any use of copyrighted material is prohibited, in particular the use of content in connection with, for, or in AI systems, AI models, or generative language models. Verlag C.H.Beck GmbH & Co. KG reserves all rights, in particular the use for text and data mining (TDM) in accordance with Section 44b (3) UrhG (Art. 4 DSM Directive).

abgerufen am 23.12.2025 12:53 - Quelle: beck-online DIE DATENBANK

Verlag C.H.Beck GmbH & Co. KG ist Inhaber von Nutzungsrechten. Jede urheberrechtliche Nutzung
untersagt, insbesondere mit, für oder in KI-Systemen oder KI-Modellen. Die Nutzung zum Text-und
Abs. 3 UrhG wird vorbehalten.

| VO (EU) 1215/2012 Art. 4 [Allgemeiner internationaler Gerichtsstand] | Stadler/Krüger | Musielak/Voit, ZPO 22. Auflage 2025 | Rn. 1 |
|---|---|---|---|

## a) Art. 4 Abs. 1 als Grundtatbestand zur Bestimmung der internationalen Zuständigkeit

Die Neufassung der EuGVVO hat am System der internationalen Zuständigkeit nichts verändert. Die Reform beschränkt sich auf wenige Änderungen bei einzelnen Zuständigkeitsvorschriften. Insbesondere konnte sich die Einbeziehung von Drittstaatensachverhalten und die vor diesem Hintergrund von der Kommission vorgeschlagene Einführung neuer Gerichtsstände (subsidiäre Zuständigkeit und Notzuständigkeit) [Fn. 1: Art. 25, 26 des Kommissionsvorschlags KOM(2010) 748 endg v. 14.12.2010. ] nicht durchsetzen, obwohl dies im Schrifttum als einer der wesentlichen [Fn. 2: Alegria Borrás, The Application of the Brussels I Regulation to Defendants domiciled in third States: from the EGPIL to the Commission Proposal, in Lein, The Brussels I Review Proposal Uncovered, London 2012, p. 57. ], wichtigsten [Fn. 3: Layton, The Brussels I Regulation in the International Legal Order: Some Reflections on Reflectiveness, in Lein (vorige Fn.) p. 74 (75). ] und bedeutsamsten Teile der Reform angesehen worden war.

[1]

Gem. Art. 4 Abs. 1 bestimmt sich die internationale Zuständigkeit der Gerichte grundsätzlich nach dem Wohnsitz des Beklagten („actor sequitur forum rei"). [Fn. 4: Vgl. Erwägungsgrund Nr. 11, ABl. 2001 L 12, S. 2. ] Diese Regel begünstigt diesen, [Fn. 5: EuGH Slg. 2000, I-5925 Rn. 35 = NJW 2000, 3121 – Group Josi; Slg. 2002, I-1699 Rn. 52 = NJW 2002, 1407 – Besix. ] da er sich in seiner Heimatsprache in einem ihm vertrauten Gerichtssystem verteidigen kann und keine weiten Wege auf sich nehmen muss. Die Verordnung stellt für die Bestimmung der internationalen Zuständigkeit hingegen nur ganz ausnahmsweise auf den Wohnsitz des Klägers ab. [Fn. 6: EuGH Slg. 2000, I-5925 Rn. 47 = NJW 2000, 3121 – Group Josi; EuZW 2014, 181 – Corman-Collins. ] Neben dem allgemeinen Gerichtsstand des Art. 4 Abs. 1 kennt die Verordnung besondere und ausschließliche Gerichtsstände (Art. 5 ff.). Ist ein **zwingender oder ausschließlicher** Gerichtsstand eröffnet, kann nur an diesem geklagt werden. Insoweit dienen die Regelungen in Art. 10−16, 17−19 und 20−23 dem Schutz der schwächeren Partei. Bei **besonderen** Gerichtsständen hat der Kläger die Wahl, ob er an diesem oder am allgemeinen Gerichtsstand des Wohnsitzes nach Art. 4 Abs. 1 klagt. Hierdurch ist dem Kläger durchaus ein gewisses *forum shopping* eröffnet. Im Übrigen ist Art. 4 zwingend. Von ihm kann nur in den von der VO ausdrücklich vorgesehenen Fällen der Art. 5 ff. abgewichen werden. [Fn. 7: EuGH Slg. 2005, I-1383 Rn. 37 = EuZW 2005, 345 – Owusu. ] So wird gewährleistet, dass ein informierter, verständiger Beklagter vorhersehen kann, vor welchem anderen Gericht als dem des Wohnsitzstaats er verklagt werden könnte. [Fn. 8: EuGH Slg. 1999, I-6307 Rn. 24 = NJW 2000, 719 – Groupe Concorde; Slg. 2002, I-1699 Rn. 26 = NJW 2002, 1407 – Besix. ] Die Frage, ob aus Art. 4 auch ein unmittelbar einklagbares Recht erwächst, das durch eine *anti-*

*suit injunction* durchzusetzen wäre, war dem EuGH zwar vom englischen Court of Appeal zur Vorabentscheidung vorgelegt [Fn. 9: BeckEuRS 2019, 628079 (C-946/19). ], infolge einer Rücknahme [Fn. 10: BeckEuRS 2020, 657731 (C-946/19). ] aber nicht entschieden worden. Sie dürfte – im Hinblick auf die Rechtsprechung des EuGH zu sog. *anti-suit injunctions* (→ Vorbem. Abschnitt 9 Rn. 1) – jedoch zu verneinen sein. Die Zuständigkeitsregeln, die vom allgemeinen Grundsatz des Beklagtenwohnsitzes nach Art. 4 Abs. 1 abweichen, sind keiner Auslegung zugänglich, die über die in der Verordnung ausdrücklich vorgesehenen Fälle hinausgeht. [Fn. 11: EuGH Slg. 2000, I-5925 Rn. 49 m. w. N. = NJW 2000, 3121 – Group Josi. ] Damit soll verhindert werden, dass der Kläger einen Gerichtsstand wählt, der für den in einem Mitgliedstaat ansässigen Beklagten unvorhersehbar ist. [Fn. 12: EuGH Slg. 2002, I-1699 Rn. 54 = NJW 2002, 1407 – Besix. ] Aus diesem Grund ist auch die in manchen mitgliedstaatlichen Rechtsordnungen anerkannte Doktrin des **forum non conveniens,** nach der ein Gericht seine Zuständigkeit nach Ermessensgrundsätzen verneinen kann, wenn es ein ausländisches Gericht für geeigneter hält, über den Rechtsstreit zu entscheiden, im Rahmen der EuGVVO nicht anwendbar. [Fn. 13: EuGH Slg. 2005, I-1383 Rn. 41 ff. = EuZW 2005, 345 – Owusu; hierzu ausf. ua Hare 2006 Journal of Business Law, 157; Rauscher/Fehre ZEuP 2006, 463; Bruns JZ 2005, 890 ff.; Dohmann/Briggs FS Schlosser, 2005, 161; Huber RIW 1993, 977; Kohler FS Matscher, 1993, 251; sa Hess EuZivilProzR Rn. 6.38; Linke/Hau IntZivilVerfR Rn. 4.79, 4.80; krit. Briggs ZSR 124 II (2005), 231 (238 ff.); Hartley Journal of Comparative Law Quarterly 54 (2005), 813 ff. ]

Zitiervorschläge:

Musielak/Voit/Stadler/Krüger VO (EU) 1215/2012 Art. 4 Rn. 1

Musielak/Voit/Stadler/Krüger, 22. Aufl. 2025, VO (EU) 1215/2012 Art. 4 Rn. 1

Urheberrechtlich geschützter Inhalt. Verlag C.H.Beck GmbH & Co. KG ist Inhaber von Nutzungsrechten. Ohne gesonderte Berechtigung ist jede urheberrechtliche Nutzung untersagt, insbesondere die Nutzung des Inhalts im Zusammenhang mit, für oder in KI-Systemen, KI-Modellen oder Generativen Sprachmodellen. Verlag C.H.Beck GmbH & Co. KG behält sich alle Rechte vor, insbesondere die Nutzung zum Text-und-Data-Mining (TDM) nach § 44b Abs. 3 UrhG (Art. 4 DSM-RL).

Retrieved on 12/23/2025 at 12:53 p.m. - Source: beck-online DIE DATENBANK

Verlag C.H.Beck GmbH & Co. KG is the owner of the rights of use. Any use is subject to copyright is in particular with, for or in AI systems or AI models. The right to use for text and data mining is 44b (3) of the German Copyright Act (UrhG) is reserved.

| Regulation (EU) 1215/2012 Art. 4 [General international jurisdiction] | Stadler/Krüger Musielak/Voit, ZPO 22nd edition 2025 | margin note 1 |

a) Art. 4(1) as the basic provision for determining international jurisdiction

The recast of the Brussels I Regulation has not changed the system of international jurisdiction. The reform is limited to a few changes to individual jurisdiction rules. In particular, the inclusion of third-country situations and the introduction of new jurisdictions (subsidiary jurisdiction and emergency jurisdiction) proposed by the Commission against this background [Fn. 1: Articles 25 and 26 of Commission Proposal COM(2010) 748 final of December 14, 2010. ] even though this is considered one of the essential [Footnote 2: Alegria Borrás, The Application of the Brussels I Regulation to Defendants domiciled in third States: from the EGPIL to the Commission Proposal, in Lein, The Brussels I Review Proposal Uncovered, London 2012, p. 57. ], most important [Fn. 3: Layton, The Brussels I Regulation in the International Legal Order: Some Reflections on Reflectivness, in Lein (previous Fn.) p. 74 (75). ] and most significant parts of the reform.

According to Article 4(1), the international jurisdiction of the courts is generally determined by the defendant's place of residence ("actor sequitur forum rei"). [Fn. 4: See Recital No. 11, OJ 2001 L 12, p. 2. ] This rule favors the defendant, [Fn. 5: ECJ Rec. 2000, I-5925 para. 35 = NJW 2000, 3121 – Group Josi; Rec. 2002, I-1699 para. 52 = NJW 2002, 1407 – Besix. ] as he can defend himself in his native language in a court system with which he is familiar and does not have to travel long distances. However, the regulation only refers to the plaintiff's place of residence in very exceptional cases when determining international jurisdiction. [Fn. 6: ECJ Rec. 2000, I-5925 para. 47 = NJW 2000, 3121 – Group Josi; EuZW 2014, 181 – Corman-Collins. ] In addition to the general jurisdiction of Art. 4(1), the Regulation provides for special and exclusive jurisdictions (Art. 5 et seq.). If a mandatory or exclusive jurisdiction has been established, legal action can only be brought in that jurisdiction. In this respect, the provisions in Art. 10-16, 17-19, and 20-23 serve to protect the weaker party. In the case of special places of jurisdiction, the plaintiff has the choice of whether to bring an action at this place or at the general place of jurisdiction of the domicile under Art. 4(1). This opens up a certain amount of *forum shopping* for the plaintiff. Otherwise, Art. 4 is mandatory. It may only be deviated from in the cases expressly provided for in Art. 5 et seq. of the Regulation. [Fn. 7: ECJ Rec. 2005, I-1383 para. 37 = EuZW 2005, 345 – Owusu. ] This ensures that an informed, reasonable defendant can foresee before which court other than that of the State of residence he could be sued. [Fn. 8: ECJ Rec. 1999, I-6307 para. 24 = NJW 2000, 719 – Groupe Concorde; ECR 2002, I-1699 para. 26 = NJW 2002, 1407 – Besix. ] The question of whether Art. 4 also gives rise to a directly enforceable right that can be enforced by means of an *anti-*

Retrieved on 12/23/2025 at 12:53 p.m. - Source: beck-online DIE DATENBANK

Whether *a suit injunction* could be enforced was referred to the ECJ by the English Court of Appeal for a preliminary ruling [Fn. 9: BeckEuRS 2019, 628079 (C-946/19). ], but was not decided due to a withdrawal [Fn. 10: BeckEuRS 2020, 657731 (C-946/19). ]. However, it is likely to be rejected in view of the ECJ's case law on so-called *anti-suit injunctions* (→ Preliminary Remarks, Section 9, para. 1). The rules on jurisdiction that deviate from the general principle of the defendant's domicile under Art. 4(1) are not open to interpretation beyond the cases expressly provided for in the Regulation. [Fn. 11: ECJ Rec. 2000, I-5925 para. 49 with further references = NJW 2000, 3121 – Group Josi. ] This is to prevent the plaintiff from choosing a place of jurisdiction that is unpredictable for the defendant domiciled in a Member State. [Fn. 12: ECJ Rec. 2002, I-1699 para. 54 = NJW 2002, 1407 – Besix. ] For this reason, the doctrine of forum non conveniens, which is recognized in some Member State legal systems and according to which a court may decline jurisdiction on the basis of discretionary principles if it considers a foreign court to be more suitable for deciding the dispute, is not applicable under the Brussels I Regulation. [Fn. 13: ECJ Rec. 2005, I-1383 para. 41 ff. = EuZW 2005, 345 – Owusu; for details, see, inter alia, Hare 2006 Journal of Business Law, 157; Rauscher/Fehre ZEuP 2006, 463; Bruns JZ 2005, 890 ff.; Dohmann/Briggs FS Schlosser, 2005, 161; Huber RIW 1993, 977; Kohler FS Matscher, 1993, 251; see Hess EuZivilProzR margin note 6.38; Linke/Hau IntZivilVerfR margin note 4.79, 4.80; critical Briggs ZSR 124 II (2005), 231 (238 ff.); Hartley Journal of Comparative Law Quarterly 54 (2005), 813 ff. ]

Suggested citation:

Musielak/Voit/Stadler/Krüger Regulation (EU) 1215/2012 Art. 4 margin note 1

Musielak/Voit/Stadler/Krüger, 22nd ed. 2025, Regulation (EU) 1215/2012 Art. 4 margin note 1

Copyright-protected content. Verlag C.H.Beck GmbH & Co. KG is the owner of the rights of use. Without separate authorization, any use of the copyrighted material is prohibited, in particular the use of the content in connection with, for, or in AI systems, AI models, or generative language models. Verlag C.H.Beck GmbH & Co. KG reserves all rights, in particular the use for text and data mining (TDM) in accordance with Section 44b (3) UrhG (Art. 4 DSM Directive).

Exhibit P-06
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA



Reports of Cases

OPINION OF ADVOCATE GENERAL
EMILIOU
delivered on 5 September 2024 [1]

**Case C-47/23**

**European Commission**

**v**

**Federal Republic of Germany**

(Failure of a Member State to fulfil obligations – Article 258 TFEU – 'Systemic and persistent infringement' – Directive 92/43/EEC – Conservation of natural habitats and of wild fauna and flora – Admissibility of evidence relating to individual situations not discussed during the pre-litigation procedure – Article 6(2) – Appropriate steps to avoid, in special areas of conservation, the deterioration of natural habitats – Failure to take such appropriate steps – Habitat types 6510 and 6520 – 'Lowland hay meadows' and 'Mountain hay meadows' – Article 4(1) – Obligation for the Member States to propose a list of sites hosting protected natural habitat types – Failure to update regularly the information relating to those sites)

**I. Introduction**

1. Under the Habitats Directive [2] which, together with the directive on the conservation of wild birds, [3] is the cornerstone of the EU biodiversity policy, most of the obligations imposed on the Member States relate to the protection or conservation of specific sites. When a Member State fails to comply with those obligations as regards a single site, that failure may be sufficient for the European Commission to bring proceedings before the Court in application of Article 258 TFEU. [4] However, where the same failure can be observed not with regard to one, but to numerous sites, the Commission may find it overly burdensome (or even impossible) to initiate parallel proceedings for each occurrence of that failure. Instead, it may conclude that those particular

---

[1] Original language: English.

[2] Council Directive 92/43/EEC of 21 May 1992 on the conservation of natural habitats and of wild fauna and flora (OJ 1992 L 206, p. 7), as amended by Council Directive 2013/17/EU of 13 May 2013 (OJ 2013 L 158, p. 193).

[3] Directive 2009/147/EC of the European Parliament and of the Council of 30 November 2009 on the conservation of wild birds (OJ 2010 L 20, p. 7), as amended by Regulation (EU) 2019/1010 of the European Parliament and of the Council of 5 June 2019 on the alignment of reporting obligations in the field of legislation related to the environment, and amending Regulations (EC) No 166/2006 and (EU) No 995/2010 of the European Parliament and of the Council, Directives 2002/49/EC, 2004/35/EC, 2007/2/EC, 2009/147/EC and 2010/63/EU of the European Parliament and of the Council, Council Regulations (EC) No 338/97 and (EC) No 2173/2005, and Council Directive 86/278/EEC (OJ 2019 L 170, p. 115).

[4] Indeed, Article 258 TFEU enables the Commission to institute proceedings for failure to fulfil obligations each time it takes the view that a Member State has failed to fulfil an obligation under EU law, without its being required to draw distinctions based on the nature or gravity of the infringement (see, to that effect, judgment of 1 February 2001, *Commission* v *France* (C-333/99, EU:C:2001:73, paragraph 33)).



EN

situations are illustrative of a widespread policy or practice of the Member State concerned which is, in and of itself, contrary to EU law. It may then bring a single set of proceedings before the Court, alleging a 'systemic and persistent infringement' of EU law. [5]

2.  In the present proceedings, the Commission claims that the Federal Republic of Germany has failed 'in a general and structural manner' to prevent, in a significant number of sites across its territory, the deterioration of two natural habitat types: Habitat type 6510 (Lowland hay meadows) and Habitat type 6520 (Mountain hay meadows), the protection of which the Habitats directive aims to ensure. Furthermore, it contends that that Member State has failed, also 'in a general and structural manner', to update regularly the data relating to sites hosting those habitat types.

3.  By using the expression 'in a general and structural manner', the Commission thus claims before the Court that the Federal Republic of Germany is responsible for a 'systemic and persistent infringement' of two key provisions of that directive.

4.  Within that context, the present case furnishes the Court with the opportunity to elaborate, first, on the admissibility of evidence relating to sites which has been presented by the Commission for the first time before the Court and was not discussed during the pre-litigation procedure and, second, on the legal criteria that must guide the Court's assessment of whether the Commission has discharged its burden of proof and in fact established the existence of a 'systemic and persistent infringement'.

5.  In accordance with the request of the Court, I will confine my analysis to examining those two issues.

## II.  Legal background

### A.  European Union law

6.  Pursuant to Article 2(2) of the Habitats Directive, 'measures taken pursuant to this Directive shall be designed to maintain or restore, at favourable conservation status, natural habitats and species of wild fauna and flora of Community interest'.

7.  Article 4(1) of that directive provides:

'On the basis of the criteria set out in Annex III (Stage 1) and the relevant scientific information, each Member State shall propose a list of sites indicating which natural habitat types in Annex I and which species in Annex II that are native to its territory the sites host … Where appropriate, Member States shall propose adaptation of the list in the light of the results of the surveillance referred to in Article 11.

The list shall be transmitted to the Commission within three years of the notification of this Directive, together with information on each site. That information shall include a map of the site, its name, location and extent and the data resulting from application of the criteria specified

---

[5]  See, for examples of 'systemic and persistent infringements' of the provisions of the Habitats Directive, judgments of 29 June 2023, *Commission* v *Ireland (Protection of special areas of conservation)* (C-444/21, EU:C:2023:524), and of 21 September 2023, *Commission* v *Germany (Protection of special areas of conservation)* (C-116/22, EU:C:2023:687).

in Annex III (Stage 1) provided in a format established by the Commission in accordance with the procedure laid down in Article 21.'

8. Pursuant to Article 6(2) of the Habitats Directive:

'Member States shall take appropriate steps to avoid, in the special areas of conservation, the deterioration of natural habitats and the habitats of species as well as disturbance of the species for which the areas have been designated, in so far as such disturbance could be significant in relation to the objectives of this Directive.'

## B. German law

9. The relevant national legislation is the Gesetz über Naturschutz und Landschaftspflege (Bundesnaturschutzgesetz) (Law on the protection of nature and rural conservation) of 29 July 2009 (BGBl. 2009 I, p. 2542; 'the Federal Law on the protection of nature').

10. Paragraph 30 of that law provides:

'…

(2) Actions that could result in the destruction or significant deterioration of the following habitats are prohibited:

…

7. Lowland hay meadows and mountain hay meadows within the meaning of Annex I to the [Habitats Directive] …

(3) Upon request, derogations from the prohibitions set out in subparagraph 2 may be granted where it is possible for the deterioration to be offset.'

11. Paragraph 33(1) of the Federal Law on the protection of nature provides:

'Any change and any disturbance such as to lead to significant adverse effects for a Natura 2000 site in its components that are decisive for the conservation objectives or the protection purpose shall be prohibited. The authority that is competent in the protection of nature and rural preservation matters may, subject to the conditions laid down in Paragraph 34(3) to (5), allow derogations from the prohibition referred to in the first sentence …'

12. Paragraph 34 of that law provides:

'(1) Before they are approved or implemented, projects must be assessed as regards their implications in view of the conservation objectives of a Natura 2000 site, where, individually or in combination with other projects or plans, they are likely to have a significant adverse effect on the site and are not directly used for the management of the site. …

(2) If the assessment of the implications shows that the project may have a significant adverse effect on the site in its components that are decisive for the conservation objectives or the protection purpose, the project shall be prohibited.

(3)  By way of derogation from subparagraph 2, a project may only be approved or implemented in so far as

1. it is necessary for imperative reasons of overriding public interest, including those of a social or economic nature, and

2. reasonable alternative means of achieving the purpose pursued with the project in a different place without any adverse effects or with less adverse effects are not available.

…'

## III.  The pre-litigation procedure

13.  On 7 May 2018, the Commission, having noted a deterioration of the geographical sites hosting Habitat types 6510 (Lowland hay meadows) and 6520 (Mountain hay meadows) on the territory of Germany, issued a request for information to the Federal Republic of Germany.

14.  In the light of the Federal Republic of Germany's reply of 12 October 2018, the Commission took the view that that Member State had breached Article 6(2) of the Habitats Directive by systematically failing to adopt appropriate measures to avoid the deterioration of Habitat types 6510 and 6520 in designated geographical sites. On 26 July 2019, the Commission sent a letter of formal notice to the Federal Republic of Germany.

15.  In its letter, the Commission noted a loss of surface area across a significant number of sites hosting Habitat types 6510 and 6520 in Germany. It also noted that no binding legal measures had been adopted to ensure the adequate monitoring of those sites or to protect them against over-fertilisation and early mowing.

16.  It also alleged that the Federal Republic of Germany had systematically breached the second subparagraph of Article 4(1) of the Habitats Directive, since it had consistently failed to update the standard data forms (SDFs) submitted to the Commission in accordance with the format prescribed in the Commission Implementing Decision of 11 July 2011 concerning a site information format for Natura 2000 sites [6] ('the 2011 Implementing Decision').

17.  On 26 November 2019, the Federal Republic of Germany responded to the Commission's letter of formal notice, denying the allegations contained therein.

18.  On 30 October 2020, the Commission addressed a reasoned opinion to the Federal Republic of Germany, in which it reiterated its complaints.

19.  In its response of 30 December 2020, the Federal Republic of Germany indicated that the Commission's complaints were unfounded.

20.  On 31 January 2023, the Commission decided to initiate infringement proceedings against the Federal Republic of Germany before the Court, in application of the second paragraph of Article 258 TFEU.

---

[6]  Notified under document C(2011) 4892 (OJ 2011 L 198, p. 39).

## IV.  Procedure before the Court

21.  In the application, lodged on 31 January 2023, the Commission claims that the Court should:

– declare that the Federal Republic of Germany has failed to comply with its obligations under Article 6(2) and the second subparagraph of Article 4(1) of the Habitats Directive, with respect to Habitat types 6510 (Lowland hay meadows) and 6520 (Mountain hay meadows), since it has failed, 'in a general and structural manner':

– to adopt appropriate measures to avoid the deterioration of those habitat types in the designated geographical sites that host them, and

– to communicate to the Commission regularly updated data as regards those sites;

– order the Federal Republic of Germany to pay the costs of the proceedings.

22.  The Federal Republic of Germany, having been duly served the application initiating the proceedings, lodged a defence on 17 April 2023. It claims that the Court should:

– dismiss the action in its entirety;

– order the Commission to pay the costs of the proceedings.

23.  The parties to the present case were invited by the Court to submit a second round of written observations. The reply and the rejoinder were lodged on 30 May 2023 and 10 July 2023, respectively.

24.  Both parties were represented at the hearing, which took place on 6 March 2024.

## V.  Analysis

25.  The Habitats Directive has as its aim 'to promote the maintenance of biodiversity',[7] by ensuring that Member States contribute to the creation of the Natura 2000 network (the EU-wide network of nature conservation areas) in proportion to the representation, within their respective territories, of the natural habitat types and the habitats of species listed in Annex I and Annex II to that directive. To that effect, Member States are required, in accordance with Article 4 of that instrument and at the end of the procedure established by it,[8] to designate the sites hosting those natural habitats and species as 'special areas of conservation'.[9]

---

[7]  See the preamble to that directive. See also Article 2(1) thereof.

[8]  The procedure governing the designation of sites as 'special areas of conservation', as provided for in Article 4 of that directive, consists of various stages. Under Article 4(1) of that directive, each Member State proposes a list of sites indicating the natural habitat types and native species that they host and that list is transmitted to the Commission. Thereafter, the Commission adopts, based on the lists submitted by the Member States, a list of sites selected as 'sites of Community importance'. Once a site of Community importance has been adopted, the Member State concerned must designate it as a 'special area of conservation' as soon as possible and within six years at most.

[9]  See judgment of 29 June 2023, *Commission* v *Ireland (Protection of special areas of conservation)* (C‑444/21, EU:C:2023:524, paragraph 44). See, also, the definition of 'special area of conservation' in Article 1(l) of the Habitats Directive.

26. As regards those areas, Member States must adopt three categories of measures, namely conservation measures, preventive measures and compensatory measures, as provided by Article 6(1), (2) and (4) of that directive, respectively. The present case concerns the second category of measures, namely preventive measures (Article 6(2) of the Habitats Directive).

27. Habitat types 6510 (Lowland hay meadows) and 6520 (Mountain hay meadows), which are at issue in the present proceedings, are two of the natural habitat types listed in Annex I to the Habitats Directive which may be present in 'special areas of conservation'. [10] Both are described as species-rich hay meadows, which may be harmed by intensive management practices (such as early mowing or the heavy application of fertilisers). [11]

28. I understand from the Court's case-law on Article 6(2) of the Habitats Directive that Member States must not only refrain from undertaking actions that could have a negative ecological impact on 'special areas of conservation' (negative obligation), but must also adopt appropriate measures to prevent natural or man-caused impairment of the habitats or significant disturbance of the species for which those areas have been designated (positive obligation). [12] In other words, the purpose of that provision is, essentially, to pre-empt any future damage to those habitats or species in 'special areas of conservation'. However, it does not specify what protective measures are to be adopted in that regard.

29. Indeed, the Court has already had the opportunity to clarify that the expression 'appropriate steps' in Article 6(2) of the Habitats Directive imply that Member States enjoy discretion in applying that provision. [13] The Court has emphasised that that provision places on Member States an obligation of result, which is consistent with the objective, pursued within the framework of the EU environmental policy under Article 191(1) TFEU, of preserving, protecting and improving the quality of the environment and with the principle, set out in Article 191(2) TFEU, that environmental damage should as a priority be rectified at source. [14]

30. Having made those preliminary remarks, I would recall that, as I have explained in the introduction above, by the first complaint, the Commission claims that, inasmuch as the Federal Republic of Germany has failed to take appropriate steps to prevent the deterioration of a significant number of sites hosting Habitat types 6510 and 6520 across its territory (by failing to adopt preventive measures), it has breached Article 6(2) of the Habitats Directive 'in a general and structural manner'. By the second complaint, the Commission argues that Article 4(1) of that directive places Member States under the obligation to update regularly the data relating to 'special areas of conservation', in the SDFs prepared pursuant to the 2011 Implementing Decision. It considers that the Federal Republic of Germany has infringed that obligation in the same 'general and structural manner' in respect of sites hosting Habitat types 6510 and 6520.

---

[10] See Annex I to the Habitats Directive.

[11] See European Commission, Directorate-General Environment (ENV B.3) 'Interpretation Manual of European Union Habitats – EUR 28' (April 2013), pp. 80 and 81 (available at the following address: https://circabc.europa.eu/ui/group/3f466d71-92a7-49eb-9c63-6cb0fadf29dc/library/37d9e6d9-b7de-42ce-b789-622e9741b68f/details).

[12] See judgment of 29 June 2023, *Commission* v *Ireland (Protection of special areas of conservation)* (C-444/21, EU:C:2023:524, paragraphs 147 to 149 and the case-law cited). See also judgment of 13 December 2007, *Commission* v *Ireland* (C-418/04, EU:C:2007:780, paragraph 204).

[13] See judgment of 14 January 2016, *Grüne Liga Sachsen and Others* (C-399/14, EU:C:2016:10, paragraphs 36 and 40).

[14] See judgment of 24 June 2021, *Commission* v *Spain (Deterioration of the Doñana natural area)* (C-559/19, EU:C:2021:512, paragraphs 152 to 154).

31. I will start by recalling some of the specific features of 'systemic and persistent infringements' (A). I will then explain why evidence relating to sites mentioned by the Commission for the first time before the Court may be admissible for establishing the existence of a 'systemic and persistent infringement' (B). Finally, I will clarify the legal criteria that must guide the Court's assessment of whether the Commission has discharged its burden of proof in such a context, before assessing the two complaints formulated in the present case against those criteria (C).

## A. Preliminary remarks on the concept of 'systemic and persistent infringement'

32. As I have already explained in the introduction, the concept of 'systemic and persistent infringement' comes into play where the Commission relies on particular situations of non-compliance with EU law obligations with a view to making the broader claim that the Member State concerned has infringed those obligations in a 'general and persistent' manner. The possibility of the Commission making such a claim involves significant practical benefits, as it enables that institution to save time and resources by initiating a single set of proceedings before the Court, instead of adopting a 'piecemeal' approach by targeting each isolated occurrence of the breach separately. As some authors have argued, this enables a more effective enforcement of EU law. [15]

33. Furthermore, if a Member State has committed such a 'systemic and persistent infringement' of EU law, it must, in my view, not only remedy the specific instances relied on by the Commission, but also adopt a general change in its practice. In other words, it must identify the source or origin of the 'systemic and persistent infringement', with a view to 'curing' not only the 'symptoms' but also the 'disease' itself. [16] It seems to me that the Court hinted at that requirement when it stated that 'the fact that the deficiencies identified in any particular case have been remedied does not necessarily mean that the general and continuous approach of those authorities, as evidenced by those specific deficiencies in some cases, has come to an end'. [17]

34. The Court introduced the concept of 'systemic and persistent infringement' in *Commission* v *Ireland*. [18] In that judgment, it insisted on two particular features. First, it indicated that, in order to prove such an infringement, it is sufficient for the Commission to show the existence of an administrative practice contrary to EU law. In other words, the source of the infringement does not have to be a legislative or regulatory act adopted by the Member State concerned. Second, the particular occurrences of the infringement on which the Commission relies must not be isolated, but must form a pattern of non-compliance.

---

[15] Hamer, J., 'General and persistent breach of EC Environmental Law', *European Law Reporter* (2005) n° 7-8, p.p. 324–327. See also, for a general discussion on 'systemic and persistent infringements', Prete, L., 'The systemic criterion in the use of infringement proceedings', *German Law Journal*, 2023, Vol. 24, pp. 1011 to 1022. As the author explains, before the possibility of bringing proceedings for 'systemic and persistent infringements' existed, the Commission had to initiate proceedings for every factual situation that was contrary to EU law, which was very time-consuming and of limited effectiveness.

[16] See also Prete, L., as referenced in the previous footnote.

[17] See judgment of 5 September 2019, *Commission* v *Italy (Bacterium* Xylella fastidiosa) (C-443/18, EU:C:2019:676, paragraph 75). See, also, in support of that view, Prete, L., 'The systemic criterion in the use of infringement proceedings', *German Law Journal*, 2023, Vol. 24, pp. 1011 to 1022.

[18] See judgment of 26 April 2005 (C-494/01, EU:C:2005:250).

35.  The judgments delivered since then have concerned the situation where the Commission was seeking, in parallel, a finding that specific provisions of EU law had not been complied with in *particular specifically identified situations* and a finding that those provisions had not been complied with because of *a general practice contrary* to EU law, which was illustrated by those particular situations.[19]

36.  The present case differs from the previous case-law in that the Commission seeks (to my knowledge, for the first time) only a declaration from the Court that there has been a general practice on the part of the competent German authorities contrary to Article 6(2) and Article 4(1) of the Habitats Directive. That institution relies on particular situations merely to illustrate such a general failure, that is to say, not with the aim of obtaining a specific declaration from the Court that those provisions have been infringed in each of those situations. Accordingly, if the Court were to conclude that the Federal Republic of Germany has indeed breached 'in a general and structural manner' Article 6(2) and Article 4(1) of the Habitats Directive, the Commission could not subsequently ask for sanctions to be imposed on that Member State, if it failed to remedy each of those situations. It could only do so if it had sought a finding that those provisions had not been complied in each occurrence of the infringement.

37.  That difference aside, I am of the view that the requirements which I have outlined in point 34 above must be applied in the present case in the same way as they were in previous cases.

38.  Having made those remarks, I will now explain why, in the situation of an allegedly 'systemic and persistent infringement', the Commission may, in general, bring before the Court additional examples of the alleged practice of non-compliance, even though those examples were not discussed during the pre-litigation procedure.

**B. Admissibility of 'additional examples' of the practice of non-compliance not discussed during the pre-litigation stage**

*1. Arguments of the parties*

39.  The Federal Republic of Germany notes that, in the application, the Commission alleges a loss of surface area across 596 sites hosting Habitat type 6510 and 88 sites hosting Habitat type 6520. However, in its reasoned opinion, the Commission mentions only 497 and 86 sites respectively. Accordingly, it submits that the Commission's action is inadmissible in so far as it concerns 101 sites which are not mentioned in the reasoned opinion ('the disputed sites').

40.  The Federal Republic of Germany states that the subject matter of an action for failure to fulfil obligations is determined by the Commission's reasoned opinion. Such an action must, therefore, be based on the same grounds and pleas as that opinion.[20] Facts or complaints not notified during the pre-litigation procedure may not be relied on in support of the action.

---

[19]  See judgment of 5 September 2019, *Commission* v *Italy (Bacterium* Xylella fastidiosa) (C‑443/18, EU:C:2019:676, paragraph 73 and the case-law cited) (emphasis added). For even more recent examples where both findings were sought by the Commission, see judgments of 29 June 2023, *Commission* v *Ireland (Protection of special areas of conservation)* (C‑444/21, EU:C:2023:524), and of 21 September 2023, *Commission* v *Germany (Protection of special areas of conservation)* (C‑116/22, EU:C:2023:687).

[20]  See judgment of 21 March 2019, *Commission* v *Poland* (C‑127/17, EU:C:2019:236, paragraph 119).

41. The Commission disputes those arguments. It claims that the evidence relating to the disputed sites is complementary to that already presented during the pre-litigation stage as regards other sites and, therefore, admissible.

## 2. *Assessment*

42. According to settled case-law relating to the burden of proof in proceedings for failure to fulfil an obligation under Article 258 TFEU, it is for the Commission to determine, in each case, that the particular EU law obligation in dispute has not been fulfilled. That institution must provide the Court with the information necessary for it to determine whether the infringement exists and is not allowed to alter the subject matter of the dispute, which must be delimited by the complaints submitted during the pre-litigation procedure.[21] It follows that the Commission cannot seek a declaration of a specific infringement of EU law regarding a particular situation that was not referred to in the course of that procedure.[22] A specific ground of complaint of that kind would necessarily have had to be raised at the pre-litigation stage, so that the Member State concerned has the opportunity to remedy the particular situation complained of or avail itself of its right to defend itself in that regard.

43. However, in the present case, the Commission has stated from the outset, before the Court, that the particular situations referred to in the application constitute illustrations of the 'systemic and persistent infringement' of Article 6(2) and Article 4(1) of the Habitats Directive by the Federal Republic of Germany.

44. In that regard, the Court has made it abundantly clear that, in such a context, the production of additional evidence intended to support that finding before the Court cannot, in principle, be ruled out. Indeed, in such a situation, the Commission does not alter the subject matter of the dispute, but merely clarifies its initial grounds of complaint by producing additional evidence intended to illustrate the general and persistent failure which it alleges.[23]

45. Those statements date back to the judgment in *Commission* v *Ireland*,[24] a judgment which I have already mentioned in point 34 above and in which the Court found that Ireland had failed to take all the measures necessary to ensure a correct implementation of certain provisions of the 'Waste Directive' in force at the time.[25] The Court held that, although they were not referred to during the pre-litigation procedure, examples of the massive illegal dumping of (on occasions, hazardous) waste in the County Wicklow (Ireland), of which the Commission had become aware after issuing the reasoned opinion, could properly be mentioned by that institution in the application for the purpose of illustrating Ireland's general failure to fulfil its obligations under that directive.[26] The Court did not require the Commission to establish that those examples

---

[21] See judgment of 29 June 2023, *Commission* v *Ireland (Protection of special areas of conservation)* (C-444/21, EU:C:2023:524, paragraph 141 and the case-law cited).

[22] See judgment of 26 April 2005, *Commission* v *Ireland* (C-494/01, EU:C:2005:250, paragraph 37).

[23] Ibid.

[24] Judgment of 26 April 2005 (C-494/01, EU:C:2005:250).

[25] Council Directive 75/442/EEC of 15 July 1975 on waste (OJ 1975 L 194, p. 39), as amended by Council Directive 91/156/EEC of 18 March 1991 (OJ 1991 L 78, p. 32).

[26] See judgment of 26 April 2005, *Commission* v *Ireland* (C-494/01, EU:C:2005:250, paragraph 39).

occurred only after the adoption of the reasoned opinion.[27] Nor did it require the Commission to establish that there was no way for it to have discovered or known about those examples prior to issuing the reasoned opinion.[28]

46.  Applying that logic to the present case, I am of the view that the evidence relating to the 101 sites that the Commission did not include in the reasoned opinion is admissible, even where it was already accessible to that institution during the pre-litigation stage. Indeed, it suffices, in my view, that that evidence came to the attention of the Commission, in good faith, after it issued the reasoned opinion and that those examples are presented as further illustrations or examples of the 'systemic and persistent' failure alleged by that institution.

47.  To conclude on that issue, I would nevertheless like to point out that the possibility which the Commission has of introducing such new illustrations or examples of a 'systemic and persistent' failure to comply with EU law obligations before the Court is, indeed, broad but not without limits. It would be an abuse of procedure if the Commission could rely on only a few examples during the pre-litigation procedure, but then initiate proceedings before the Court as regards a 'bag' of infringements, made up not only of those few examples but also of numerous others, making it excessively difficult for the Member State concerned to refute that institution's claims.[29] There is, in my view, a line to be drawn between 'mere clarification' of the initial grounds of complaint, which, as I have explained, the Court has expressly acknowledged as a possibility, and situations where the production of additional examples could actually amount to an abuse of procedure (a situation which, fortunately, does not arise in the present case).

## C. The Commission's burden of proof when it alleges the existence of a 'systemic and persistent infringement'

48.  As a rule, when the Commission alleges the existence of a 'systemic and persistent' failure to comply with the provisions of a directive, first, it must establish that the Member State in question has failed to comply with an EU law obligation in a number of particular specifically identified situations. Second, the Commission must show, to the requisite legal standard, by means of sufficiently precise, clear and detailed arguments and data, that those particular situations are, in fact, representative (or illustrative) of a general and persistent practice contrary to such an obligation.[30]

---

[27]  At the same time, the Court has formally recognised that the subject matter of an action for an allegedly persistent failure to fulfil obligations may extend to events which took place after the reasoned opinion, provided that they are of the same kind as the events to which the opinion referred and constitute the same conduct (see judgment of 5 September 2019, *Commission* v *Italy* (*Bacterium* Xylella fastidiosa) (C-443/18, EU:C:2019:676, paragraph 76 and the case-law cited)).

[28]  In that regard, I add that, during the pre-litigation stage, the Commission does not have investigative powers of its own and is largely reliant, when it comes to checking that the national provisions intended to ensure effective implementation of a directive are applied correctly in practice, on the information provided by any complainants and by the Member State concerned (see judgment of 29 June 2023, *Commission* v *Ireland* (*Protection of special areas of conservation*) (C-444/21, EU:C:2023:524, paragraph 142 and the case-law cited)).

[29]  See, by analogy, the case-law pursuant to which the excessive duration of the pre-litigation procedure is capable of constituting a defect rendering an action for failure to fulfil obligations inadmissible where the conduct of the Commission has made it difficult to refute its arguments, thus infringing the rights of the defence of the Member State concerned (see judgments of 12 May 2005, *Commission* v *Belgium* (C-287/03, EU:C:2005:282, paragraph 14 and the case-law cited, and of 8 December 2005, *Commission* v *Luxembourg* (C-33/04, EU:C:2005:750, paragraph 76)).

[30]  See judgment of 29 June 2023, *Commission* v *Ireland* (*Protection of special areas of conservation*) (C-444/21, EU:C:2023:524, paragraphs 170 and 173).

49.  It follows that that institution cannot, under the guise of claiming that that Member State has generally and persistently failed to fulfil its obligations under EU law, avoid complying with its obligation to prove the alleged failure on the basis of concrete evidence and simply rely on presumptions or schematic causations.[31] At the same time, as Advocate General Ćapeta[32] has stated, it is not necessary for it to demonstrate, or for the Court to assess, the existence of a failure as to each site concerned (in the present case, each one of the sites hosting Habitat types 6510 and 6520 across the territory of Germany). As I have already explained, it suffices for the Commission to show a pattern of non-compliance, which recurs in a number of particular specifically identified situations that are representative (or illustrative) of the breach alleged and from which the conclusion could be drawn that that breach likely exists in respect of other situations not specifically examined by the Commission.

50.  In comparison to 'classic' claims of infringement, the burden of proof incumbent on the Commission when it alleges a 'systemic and persistent infringement' is thus twofold: not only must it show that certain EU law obligations have not been complied with in particular specifically identified situations, but it must also establish (as an additional requirement) that those particular situations are, in fact, representative (or illustrative) of a general and persistent practice contrary to such an obligation.

51.  In the following sections, I will elaborate on and consider those legal requirements in relation to the two complaints put forward by the Commission.

### 1.  The first complaint: 'systemic and persistent infringement' of Article 6(2) of the Habitats Directive

### (a)  Arguments of the parties

52.  By the first complaint, the Commission takes the view that the Federal Republic of Germany has failed, 'in a general and structural manner', to adopt appropriate measures to prevent the deterioration of Habitat types 6510 and 6520 in 'special areas of conservation' across its territory, thereby infringing Article 6(2) of the Habitats Directive.

53.  In that regard, the Commission submits, first, that the deterioration of those habitat types can be inferred from the 2014 Grünland-Report (Meadowland Report) of the Bundesamt für Naturschutz (Federal Agency for Nature Conservation, Germany) and from the reports submitted by the Federal Republic of Germany, in application of Article 17 of the Habitats Directive, for the periods 2001-2006, 2007-2012 and 2013-2018. It also notes that the surface area of 'special areas of conservation' hosting Habitat types 6510 and 6520 in Germany is in decline. A loss of area qualifies as a 'deterioration', within the meaning of Article 6(2) of the Habitats Directive.

54.  The Commission explains that it has done a comparative analysis of the data contained in the SDFs prepared and submitted to it by that Member State in accordance with the format prescribed in the 2011 Implementing Decision. That analysis shows that, between 2006 and 2017,

---

[31]  Ibid., paragraph 167.

[32]  See her Opinion in *Commission* v *Ireland (Protection of special areas of conservation)* (C-444/21, EU:C:2023:90, point 50).

over 50% of the surface area across more than 30% of sites hosting Habitat types 6510 and 6520 has been lost. That loss of area affects 596 out of 2 027 sites hosting Habitat type 6510 and 88 out of 295 sites hosting Habitat type 6520. Those sites are spread out across the German territory.

55. The Commission adds that, contrary to what the Federal Republic of Germany submits, a global assessment of all sites hosting Habitat types 6510 and 6520 was not necessary, because deterioration in certain areas cannot be compensated by improvements in others.

56. Furthermore, it points to the fact that, while the Federal Republic of Germany recognises some of the losses of area (977.44 hectares for Habitat type 6510 and 110.49 hectares for Habitat type 6520), that Member State also argues that (part of the) other losses observed by the Commission are not 'real losses', but the result of the correction of 'scientific errors' or errors which were due to (i) the erroneous classification of certain sites as 'special areas of conservation' and (ii) estimates that 'vitiated' the initial calculation of the perimeter of the relevant sites in 2006. Those errors would account for 6 476.61 hectares across 347 sites hosting Habitat type 6510 and 1 322.16 hectares across 75 sites hosting Habitat type 6520. The Commission does not accept those justifications. It claims that it was entitled to rely on the data provided by the Federal Republic of Germany in the SDFs submitted in 2006, as well as during the subsequent years, to carry out its comparative analysis.

57. At any rate, the Commission submits that the losses of area that it has noted are too significant to be the result of mere corrections. Indeed, for more than 50% of the sites examined by that institution, approximately 60 to 100% of the surface area in 2006 had been lost by 2017.

58. Second, the Commission contends that the deterioration of the sites hosting Habitat types 6510 and 6520 in Germany is due to the systematic failure of the competent German authorities to perform adequate, regular monitoring of those sites. According to the Commission, a Member State, the authorities of which do not perform regular and specific monitoring of 'special areas of conservation', necessarily fails to comply with its obligations under Article 6(2) of the Habitats Directive. The frequency with which check-ups must be performed depends on what is necessary in order to avoid deterioration.

59. The Commission further submits that the deterioration of Habitat types 6510 and 6520 across the German territory is also caused by the Federal Republic of Germany's failure to adopt legally binding measures to protect 'special areas of conservation'. The Federal Republic of Germany favours a contractual approach to ensuring the protection of nature. In the Commission's view, that approach would not be sufficient to prevent early mowing or over-fertilisation in the sites hosting those habitat types.

60. The Federal Republic of Germany disputes the Commission's arguments and submits that it has not failed to fulfil its obligations under Article 6(2) of the Habitats Directive.

61. First, it claims that the Commission could not have concluded, based on a global assessment of the sites concerned, that the losses of area across sites hosting Habitat types 6510 and 6520 in Germany are so significant as to demonstrate the existence of a 'systemic and persistent' failure to comply with that provision. According to that Member State, the Commission has focused its comparative analysis on a limited number of sites the surface area of which is relatively small. Had the Commission performed a global assessment of all the sites hosting those Habitat types

instead of focusing on only a portion of them, it would have noted only a 4.27% loss of area for the sites hosting Habitat type 6520 and a 5.22% increase in area for those hosting Habitat type 6510, the losses in certain areas being compensated by gains in other areas.

62.  The Federal Republic of Germany adds that the 2006 SDFs do indeed contain scientific errors and estimates, which were corrected in subsequent SDFs. That is why the area recorded for sites hosting Habitat types 6510 and 6520 in those subsequent SDFs is significantly smaller than in the 2006 SDFs. According to that Member State, 'real losses' of area account for only 977.44 hectares (across 81 sites hosting Habitat type 6510) and 110.49 hectares (across 15 sites hosting Habitat type 6520). Those numbers are insufficient to establish the existence of a 'systemic and persistent' infringement.

63.  The Federal Republic of Germany also claims that the 2014 Grünland-Report of the Federal Agency for Nature Conservation and the reports submitted, in application of Article 17 of the Habitats Directive, for the periods 2001-2006, 2007-2012 and 2013-2018, merely confirm that there has been a loss of area. However, they do not indicate that such a loss is significant enough to establish the existence of 'persistent and systemic infringement'.

64.  Second, the Federal Republic of Germany agrees with the Commission that Article 6(2) of the Habitats Directive imposes an obligation of monitoring for the Member States. However, it submits that it is for the Member States to determine how that monitoring is to be performed. Article 6(2) of the Habitats Directive lays down an obligation of result only (which is to prevent the deterioration of certain natural habitats and species) and does not set out in detail the specific measures that must be taken in that regard.

65.  In that regard, the Federal Republic of Germany claims that Member States are also free to decide which preventive measures they wish to adopt. In Germany, it is for the competent authorities to decide the content of such measures on a case-by-case basis, following a flexible contractual approach. Although such an approach cannot guarantee that deterioration will never occur, it is generally effective and entails regular monitoring.

### (b)  Assessment

66.  The Federal Republic of Germany and the Commission agree that Article 6(2) of the Habitats Directive requires Member States to achieve a certain result (namely to prevent the deterioration of the habitats listed in Annex I to that directive and the disturbance of species listed in Annex II thereto) by taking 'appropriate steps'.

67.  In that regard, I would recall that the Court has already indicated that, even though a provision of a directive does not specify the actual content of the measures to be taken in order to fulfil the objective that it pursues, it is nonetheless binding on the Member States as to that objective.[33] Article 6(2) of the Habitats Directive is such a provision. It imposes a clear obligation as to the result to be achieved (to prevent deterioration), without prescribing the actual content of the 'appropriate steps' to be taken in that regard.

68.  Given the two requirements which I have outlined in point 50 above, it follows, in my view, that, to show that the Federal Republic of Germany has 'in a general and structural manner' failed to comply with that provision, the Commission must, first, establish the existence of a

---

[33]  See, by analogy, judgment of 26 April 2005, *Commission* v *Ireland* (C-494/01, EU:C:2005:250, paragraph 168 and the case-law cited).

failure, on the part of the Federal Republic of Germany, to prevent deterioration, contrary to the objective pursued under Article 6(2) of the Habitats Directive, in a number of particular specifically identified situations (that is to say, sites hosting Habitat types 6510 and 6520 in Germany). Second, in application of what I have called the 'additional requirement', which is specific to 'systemic and persistent infringements', it must show that those situations of non-conformity are representative (or illustrative) of that Member State's 'systemic and persistent' failure to comply with that provision.

*(1) The first requirement (failure to prevent deterioration in a number of particular specifically identified situations)*

69. To begin with, I am of the view that, in the present case, the Commission may satisfy its burden of proof as to the first requirement without having to determine the exact cause of the deterioration allegedly affecting sites hosting Habitat types 6510 and 6520 in Germany. Indeed, as I have explained above, Article 6(2) of the Habitats Directive lays down an obligation to prevent deterioration, whatever its cause (natural or man-made or both). Biodiversity losses across the sites analysed by the Commission may be linked to various phenomena, which the Commission is not under an obligation to identify or quantify. What the Commission must show, however, is, first, that there is a deterioration (whatever the reason or cause) and, second, that the Member State concerned has taken action that had a risk of causing such a deterioration or failed to take steps to prevent it from occurring. Indeed, while, for example, the simple occurrence of a deterioration of 'special areas of conservation' linked to climate change is not sufficient to establish a breach of Article 6(2) of the Habitats Directive, the failure of a Member State to take measures to limit the effects of climate change may, in fact, be sufficient.

70. In that regard, I would add that the Court has already found that the tolerant approach of a Member State towards situations in which the provisions of a directive are not complied with or the persistence of a situation of deterioration in the environment over a protracted period without any action being taken by the competent authorities can, in and of itself, be indicative of an administrative problem, which, if sufficiently general and long-lasting, could enable the conclusion to be drawn that the Member State concerned has exceeded the discretion conferred on it to achieve the prescribed result. [34] As such, both positive actions and omissions (or deferential conduct) of a Member State are relevant for the purpose of establishing a breach of Article 6(2) of the Habitats Directive.

71. I would also note that the Court has held that it is sufficient for the Commission to show that there is a probability or risk that the action or inaction of the Member State concerned might have caused (or failed to prevent) a deterioration of the habitats listed in Annex I to that directive or significant disturbance of the species referred to in Annex II thereto. Indeed, it is not for the Commission to establish the existence of a cause-and-effect relationship between the action or inaction of the Member State concerned and the deterioration or disturbance of the habitats or species concerned. [35]

---

[34] Ibid., paragraph 133. See, also, judgment of 5 September 2019, *Commission* v *Italy (Bacterium* Xylella fastidiosa) (C-443/18, EU:C:2019:676, paragraph 79).

[35] See judgment of 24 June 2021, *Commission* v *Spain (Deterioration of the Doñana natural area)* (C-559/19, EU:C:2021:512, paragraph 155 and the case-law cited).

72. Turning now to the factual situation at hand in the present case, I would recall, first, that the Federal Republic of Germany does not dispute the Commission's finding that that Member State has, at national level, failed to adopt legally binding conservation measures to prevent, in relevant sites, the deterioration of Habitat types 6510 and 6520, preferring instead a contractual approach to 'the protection of nature'.

73. Second, the Commission claims that 596 sites hosting Habitat type 6510 and 89 sites hosting Habitat type 6520 across Germany are affected by a loss of area amounting to 'deterioration', within the meaning of Article 6(2) of the Habitats Directive. The Republic of Germany disagrees with those findings. However, it does concede that there has been a loss of area in 89 sites hosting Habitat type 6510 (81 upon correction [36] and as confirmed at the hearing) and 15 sites hosting Habitat type 6520 (16 upon correction [37] and 15 as confirmed at the hearing) across its territory ('the admitted losses'). In addition, that Member State recognises that it can provide no valid justification or explanation for some (other) losses of area noted by the Commission in its comparative analysis ('the unexplained losses'). Those losses represent a total of 9 853.38 hectares across more than 200 sites of Habitat type 6510 and 249.78 hectares across 24 sites of Habitat type 6520. [38]

74. Third, the Federal Republic of Germany does not present any convincing argument or sufficiently precise evidence to rebut the Commission's contention that there is a probability or risk that its failure to adopt, at national level, legally binding conservation measures might have caused the admitted and unexplained losses.

75. In the light of the foregoing, taking into account only those admitted and unexplained losses, and without its being necessary to consider the losses of surface which the Republic of Germany claims to be the result of scientific errors or other errors, I am of the view that the Court can already, without much difficulty, come to the conclusion that the Federal Republic of Germany has failed to comply with Article 6(2) of the Habitats Directive in at least 200 sites hosting Habitat type 6510 and 24 sites hosting Habitat type 6520.

76. Having made those remarks, I will now examine whether those examples are sufficiently representative (or illustrative) of the Federal Republic of Germany's 'systemic and persistent' failure to comply with that provision (the second requirement).

*(2) The second requirement ('representativeness')*

77. I would recall that, in his Opinion in *Commission* v *Ireland*, [39] Advocate General Geelhoed stated that, to establish that an infringement by a Member State is 'systemic and persistent', dimensions of scale, time and seriousness must be taken into consideration. The dimension of scale refers to the number of instances in which it is established that the relevant EU law obligations have been infringed, as well as indications that the breach is widespread and/or likely to keep recurring. The dimension of time (duration) corresponds to a requirement that the situation of non-compliance must have existed for a certain period of time during which the

---

[36] See columns J-1 and J-11 of Annex B.4 submitted by the Federal Republic of Germany.

[37] Ibid.

[38] See columns J-3 and J-31 of Annex B.4 submitted by the Federal Republic of Germany.

[39] C-494/01, EU:C:2004:546, points 43 to 48.

obligation was effective. The dimension of seriousness refers to the degree to which the actual situation in the Member State concerned deviates from the result to be achieved by the obligation in question.

78. That framework of analysis was relied upon, inter alia, by Advocate General Cápeta in a context where the Commission had alleged that Ireland had 'systemically and persistently' failed to comply with its obligation under Article 6(1) of the Habitats Directive. [40] Advocate General Cápeta considered that all three dimensions are relevant when examining whether the 'representativeness' criterion is fulfilled, that is to say whether the particular situations relied on by the Commission are representative (or illustrative of) a 'systemic and persistent infringement'. I agree.

79. Indeed, it seems to me that all three dimensions (scale, duration and seriousness) must be considered by the Court as part of that assessment, although they do not have to be fulfilled to the same degree. For example, the particular situations relied upon by the Commission may be particularly serious and numerous, but they may not have lasted for very long; however, that does not prevent them from being 'illustrative of' a 'systemic and persistent infringement'. Conversely, those situations may not be numerous, but they may be of such seriousness and duration that only a defect of a structural nature could have caused them. In other words, the three dimensions provide a flexible 'toolkit', more than an indispensable 'checklist'.

80. As to the first dimension (scale), I would note that, in the present proceedings, the Federal Republic of Germany openly admits a loss of surface area in 96 out of 2 322 sites hosting Habitat types 6510 and 6520 across the German territory. Overall, that Member State thus admits that 4.13% of all sites hosting those habitat types on its territory have experienced a loss of area since 2006. I agree that that percentage is not very high. However, first, those sites are distributed across the German territory, since they are located in 10 different *Länder* [41] (for Habitat type 6510) and 5 different *Länder* (for Habitat type 6520). Second, for at least five sites hosting Habitat type 6520, the loss of surface area exceeds 25% of the area recorded in 2006. Significant losses (in relation to the overall surface area of certain sites) can also be observed in a significant number of the sites hosting Habitat type 6510.

81. Third, while it is true that, for Habitat type 6510, the losses admitted by the Federal Republic of Germany represent 957.75 hectares only, if account is also taken of the losses for which that Member State admits that it can provide no valid justification or explanation, the total deficit becomes 10 811.13 hectares (almost 60% of that alleged by the Commission). [42] Similarly, for Habitat type 6520, the losses expressly recognised by the Federal Republic of Germany account for 110.49 hectares only. However, once the losses for which that Member State has no valid justification or explanation are included in the assessment, the total deficit becomes 360.27 hectares (approximately 20% of the deficit alleged by the Commission). [43]

82. In my view, those numbers are sufficient to establish the existence of a failure to comply with Article 6(2) of the Habitats Directive in multiple sites, that are not only widespread (in terms of their geographical distribution across the German territory) but also sufficiently numerous to

---

[40] See her Opinion in *Commission v Ireland (Protection of special areas of conservation)* (C-444/21, EU:C:2023:90, point 106).

[41] Those 10 *Länder* are: Brandenburg, Baden-Württemberg, Bremen, Hesse, Mecklenburg-Western Pomerania, Lower Saxony, North Rhine-Westphalia, Saarland, Saxony-Anhalt and Thuringia (see column C of the table provided by the Federal Republic of Germany in Annex B.4).

[42] See columns I-1, J-11 and J-31 of the table provided by the Federal Republic of Germany in Annex B.4.

[43] Ibid.

enable the conclusion to be drawn that the infringement is likely to keep recurring and that the administrative practice followed in Germany with a view to implementing that provision is problematic on the whole.

83.  I should add that, in the present case, the Commission's action concerns only two natural habitat types (namely Habitat type 6510 and Habitat type 6520) and that the evidence presented by that institution relates only to sites that host those natural habitats. This case is therefore different from the case which led to the recent judgment in *Commission* v *Ireland (Protection of special areas of conservation),*[44] in which the Court rejected the Commission's arguments on the ground that those examples were not 'representative' of all the sites of Community importance at issue. Indeed, in that judgment, the action pertained to 423 sites of Community importance in Ireland, hosting a great variety of habitats and species, whereas the Commission had relied on only three examples of those habitats and species (coastal lagoons, blanket bogs and the freshwater pearl mussel) to show that the conservation measures put in place by Ireland in those sites were generally, systemically and persistently of insufficient quality.

84.  Concerning the evidence submitted in the present case, I wish to emphasise, first, that it is not actually necessary, in my view, for the Commission to show that the particular situations that it relies on represent a 'major' or even 'significant' part of all the sites hosting Habitat types 6510 and 6520. As I have stated, it suffices that they are numerous enough to show that the breach is widespread and/or likely to keep recurring because of a defect in the administrative practice adopted by the Member State whose effects could carry on over time.

85.  Second, contrary to what the Federal Republic of Germany submits, the Commission is not required to perform a global assessment and analyse whether the losses experienced in some sites are compensated by gains in others. In that regard, I would recall that, as I have already explained, Article 6(2) of the Habitats Directive lays down an obligation for the Member States to prevent deterioration in *every* site that is recognised as a 'special area of conservation'. It does not require them to prevent an overall deterioration of those sites considered as a whole. Had that been the case, the Commission would not have been able to claim a 'systemic and persistent' infringement of Article 6(2) of the Habitats Directive. It could simply have sought a declaration that that provision has been breached in a single instance (that is to say, in relation to all the sites hosting Habitat types 6510 and 6520, taken as a whole).

86.  As to the second dimension (duration), I note that the numbers mentioned by the Commission correspond to losses for the period 2006-2017. It follows that the deficit shown by that institution is not temporary, but has lasted over a significantly long period. The 2014 Grünland-Report of the Federal Agency for Nature Conservation confirms an overall decline of the conservation status of hay meadows in Germany since 2007. That report indicates that 'meadows … are no longer in a good condition throughout Germany. The reason for this is a significant loss in surface area and quality. Compared with … 2007, the situation in … lowland hay meadows and mountain hay meadows have measurably deteriorated in parts'.[45]

87.  As to the third dimension (seriousness), which corresponds to the degree to which the actual situation in the Member State concerned deviates from the result to be achieved by the obligation in question, I would recall that, as I have explained in point 28 above, the objective of Article 6(2)

---

[44]  See judgment of 29 June 2023, *Commission* v *Ireland (Protection of special areas of conservation)* (C-444/21, EU:C:2023:524, paragraphs 168 to 175). See, also, in that regard, judgment of 21 September 2023, *Commission* v *Germany (Protection of special areas of conservation)* (C-116/22, EU:C:2023:687, paragraphs 122 to 125).

[45]  See p. 13 of the 2014 Grünland-Report of the Federal Agency for Nature Conservation, submitted as Annex A.2 by the Commission.

is to prevent the natural or man-caused impairment of the habitats or significant disturbance of the species for which 'special areas of conservation' have been designated. That objective will, in my view, be seriously compromised if the area of the sites hosting those habitats and species diminishes over time. What is more, a loss of area appears to me to be a particularly serious form of 'deterioration' within the meaning of that provision, given its irreversible nature.

88.  In view of the foregoing, I consider that the Commission has established the existence of an infringement of Article 6(2) of the Habitats Directive by the Federal Republic of Germany of such scale, duration and seriousness that it may be regarded as 'systemic and persistent'.

## 2.  The second complaint: 'systemic and persistent infringement' of Article 4(1) of the Habitats Directive

### (a)  Arguments of the parties

89.  By the second complaint, the Commission submits that the Federal Republic of Germany has breached Article 4(1) of the Habitats Directive by failing 'in a general and structural manner' to provide updated data relating to the sites hosting Habitat types 6510 and 6520. According to the Commission, that failure concerns 202 out of 596 sites hosting Habitat type 6510 and 14 out of 88 sites hosting Habitat type 6520, in 10 *Länder*.

90.  In that regard, the Commission claims that Article 4(1) of the Habitats Directive requires Member States to provide regularly updated data about, inter alia, the surface area of each 'special area of conservation'. Such an obligation is not expressly mentioned in that provision, but follows from a contextual and teleological interpretation of the provision. Indeed, it is necessary for the Commission to be in possession of accurate information and data as regards 'special areas of conservation' in order to ensure compliance with the conservation objectives set out in Article 2 of the Habitats Directive. The importance of providing such regularly updated data is also made clear by Article 17 of that directive, which requires Member States to draw up a report every six years, in which they must set out in detail the measures taken and the improvements made to each site.

91.  The Commission further points out that recital 4 of the 2011 Implementing Decision states that: 'the content of the Natura 2000 Standard Data Form should be updated regularly based on the best available information for each site of the network in order to allow the Commission to fulfil its coordinating role…'.

92.  The Federal Republic of Germany disputes those arguments. It claims that Article 4(1) of the Habitats Directive requires data relating to relevant sites to be communicated only once (namely, when the list of 'special areas of conservation' is established by the Commission). The key provision regarding subsequent communications that must take place between that institution and the Member States is Article 17 of the Habitats Directive, not Article 4(1) thereof.

93.  That Member State adds that the fact that the 2011 Implementing Decision refers to the importance of 'regular' updates without specifying when those updates must take place confirms that the Habitats Directive contains no specific obligation in that regard. Furthermore, it is not necessary, with a view to identifying which sites suffer from deterioration, to update regularly the

data contained in SDFs. At any rate, the SDFs communicated by the Federal Republic of Germany are systematically updated. However, the Commission has rejected the 2021 SDFs submitted by the Federal Republic of Germany.

### (b) Assessment

94.  The main point of disagreement between the Commission and the Federal Republic of Germany as regards the second complaint concerns whether Article 4(1) of the Habitats Directive includes an obligation for the Member States to update the data relating to 'special areas of conservation', within the meaning of that directive. In that regard, the Commission admits that that provision does not expressly contain such an obligation.

95.  Indeed, Article 4(1) of the Habitats Directive provides, in unambiguous terms, that the list of relevant sites shall be transmitted to the Commission '*within three years* of the notification of this Directive, together with information on each site'.[46] I understand from that provision that Member States are only expressly required, under that provision, to communicate information about relevant sites at a specific point in time, that is to say, before those sites are formally recognised as 'special areas of conservation' and as part of the procedure for them to be designated as such. I do not see anything in Article 4(1) of the Habitats Directive from which an obligation for the Member States to update the data relating to 'special areas of conservation' regularly, once those areas have been formally identified, could be derived. In fact, the sole purpose of that provision seems to me to be to lay down the procedure which the Commission and Member States must follow in order for 'special areas of conservation' to be properly designated.

96.  Moreover, I would note that Article 17 of the Habitats Directive provides that Member States are to draw up a report on the implementation of the measures taken under that directive 'every six years'. Again, I fail to see, in that provision, any indication that Article 4(1) of that directive is to be interpreted as meaning that Member States are required to provide updated data relating to 'special areas of conservation' every year.

97.  I agree with the Commission that Article 9 of the Habitats Directive requires it to 'periodically review the contribution of Natura 2000 towards [the] achievement of the objectives set out in Article 2 and 3' of that directive. In application of that provision, the Commission has adopted the 2011 Implementing Decision, recital 4 of which provides that 'the content of the Natura 2000 Standard Data Form should be updated regularly based on the best available information for each site of the network in order to allow the Commission to fulfil its coordinating role and in accordance with Article 9 of [the Habitats Directive] to periodically review the contribution of Natura 2000 towards the achievement of the objectives set out in Articles 2 and 3' of that directive.

98.  However, even assuming that an obligation for the Member States to update regularly the data for each site classified as a 'special area of conservation' could be read into Article 9 of the Habitats Directive, that does not change the fact, in my view, that such an obligation still does not result from Article 4(1) of that instrument.

99.  Accordingly, I consider that the Commission has failed to show to the requisite legal standard that the Federal Republic of Germany has breached that provision. The second complaint must, therefore, be rejected.

---

[46]  My emphasis.

## VI.  Conclusion

100.  In the light of the foregoing, I suggest that the Court of Justice:

– declare that the Federal Republic of Germany has failed, in a general and structural manner, to fulfil its obligations under Article 6(2) of Council Directive 92/43/EEC of 21 May 1992 on the conservation of natural habitats and of wild fauna and flora, as amended by Council Directive 2013/17/EU of 13 May 2013;

– dismiss the action as to the remainder;

– order the European Commission and the Federal Republic of Germany to each bear its own costs.

Exhibit F-07
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA



**Trinity Term**
**[2011] UKSC 39**
*On appeal from: [2009] EWCA Civ 1328*

# JUDGMENT

## Lucasfilm Limited and others (Appellants) *v* Ainsworth and another (Respondents)

**before**

**Lord Phillips, President**
**Lord Walker**
**Lady Hale**
**Lord Mance**
**Lord Collins**

## JUDGMENT GIVEN ON

## 27 July 2011

**Heard on 7, 8 and 9 March 2011**

| *Appellant* | *Respondent* |
|---|---|
| Jonathan Sumption QC | Alastair Wilson QC |
| Michael Bloch QC | George Hamer |
| Alan Bryson | |
| (Instructed by Harbottle & Lewis LLP) | (Instructed by S C Andrew LLP) |

**LORD WALKER AND LORD COLLINS (with whom Lord Phillips and Lady Hale agree)**

*Introduction*

1.    The first Star Wars film (later renamed "Star Wars Episode IV – A New Hope" in order to provide for "prequels" as well as sequels) was released in the United States in 1977. It was an enormous commercial success. It won an Oscar for best costume design. This appeal is concerned with intellectual property rights in various artefacts made for use in the film. The most important of these was the Imperial Stormtrooper helmet to which the trial judge (Mann J) referred in his judgment ([2008] EWHC 1878 (Ch), [2009] FSR 103, paras [2] and [121]):

> "One of the most abiding images in the film was that of the Imperial Stormtroopers. These were soldiers clad in white armour, including a white helmet which left no part of the face uncovered... The purpose of the helmet was that it was to be worn as an item of costume in a film, to identify a character, but in addition to portray something about that character – its allegiance, force, menace, purpose and, to some extent, probably its anonymity. It was a mixture of costume and prop."

The parties are agreed that for the purposes of this final appeal the helmet can be taken as the paradigm case that will be decisive of the outcome.

2.    The facts are set out in the judge's clear and thorough judgment. For present purposes a brief summary will suffice. The film's story-line and characters were conceived by Mr George Lucas. Between 1974 and 1976 Mr Lucas's concept of the Imperial Stormtroopers as threatening characters in "fascist white-armoured suits" was given visual expression in drawings and paintings by an artist, Mr Ralph McQuarrie, and three-dimensional form by Mr Nick Pemberton (a freelance scenic artist and prop-maker) and Mr Andrew Ainsworth (who is skilled in vacuum-moulding in plastic). Mr Pemberton made a clay model of the helmet, which was adapted several times until Mr Lucas was happy with it. Mr Ainsworth produced several prototype vacuum-moulded helmets. Once Mr Lucas had approved the final version Mr Ainsworth made 50 helmets for use in the film. These events all took place in England. Although Mr Lucas and his companies are based in California he had come to live in England while the film was made at Elstree (there was also filming on location in Tunisia).

3.      The first appellant is a Californian corporation owned by Mr Lucas. The second appellant is an English company owned by Mr Lucas. The third appellant is a Californian corporation responsible for the group's licensing activities; it is wholly owned by the first appellant. Between them these three companies own copyrights in the artistic works created for the Star Wars films, and they can be referred to generally as "Lucasfilm". Apart from the huge commercial success of the Star Wars films, Lucasfilm has built up a successful licensing business which includes licensing models of Imperial Stormtroopers and their equipment. This litigation has come about because in 2004 Mr Ainsworth, the principal respondent in this appeal, used his original tools to make versions of the Imperial Stormtrooper helmet and armour, and other artefacts that it is not necessary to detail, for sale to the public. The second respondent is a private company owned by Mr Ainsworth but for practical purposes Mr Ainsworth can be treated as the only respondent.

4.      Mr Ainsworth sold some of the goods that he produced (to the value of at least $8,000 but not more than $30,000) in the United States. In 2005 Lucasfilm sued Mr Ainsworth in the United States District Court, Central District of California, and in 2006 it obtained a default judgment for $20m, $10m of which represented triple damages under the Lanham Act. The whole judgment remains unsatisfied. Lucasfilm also commenced proceedings in the Chancery Division of the English High Court. The re-amended particulars of claim put forward a variety of claims under English law, including infringement of copyright (paras (1) to (10) of the prayer for relief); a claim for enforcement of the United States judgment to the extent of $10m (para (11)); and claims under United States copyright law (paras (12) to (17)).

5.      The trial occupied 17 days during April and May 2008. In his judgment delivered on 31 July 2008 Mann J dismissed all Lucasfilm's claims based on English copyright law (together with some other claims that are no longer pursued). He held that the helmet made by Mr Ainsworth was a substantial reproduction of original work carried out by Mr McQuarrie and other persons working for Lucasfilm. But the English copyright claims failed because the helmet was not a work of sculpture and Mr Ainsworth had defences (to a claim that he was reproducing Mr McQuarrie's work) under sections 51 and 52 of the Copyright Designs and Patents Act 1988 ("the 1988 Act"). The judge also dismissed Mr Ainsworth's counterclaim based on his own claim to copyright in the helmet.

6.      The judge held that the United States judgment was unenforceable for want of personal jurisdiction over Mr Ainsworth and his company. But he held that Lucasfilm's United States copyright claims were justiciable in England and that Mr Ainsworth and his company had infringed those rights.

7.    The Court of Appeal ([2009] EWCA Civ 1328, [2010] Ch 503) agreed with the judge that the United States judgment is unenforceable, and there is no further appeal on that point. The Court of Appeal also agreed with the judge that any intellectual property rights in the helmet belong to Lucasfilm, and this Court has refused Mr Ainsworth permission to cross-appeal on that point. The issues that are open in this Court are whether the helmet was a sculpture and the defences under sections 51 and 52 of the 1988 Act (on all of which the Court of Appeal agreed with the judge) and justiciability in England of the United States copyright claims (on which the Court of Appeal disagreed with the judge). The issues on sections 51 and 52 arise only if the helmet was a sculpture (and so an artistic work) within the meaning of the 1988 Act. In the Court of Appeal Lucasfilm abandoned its alternative contention that the helmet qualified as an artistic work because it was a work of artistic craftsmanship.

**Part I: English copyright law issues**

*Current statutory provisions*

8.    The Court has been taken to the full legislative history but it is better to start with the current legislation, that is the 1988 Act. Under section 1(1)(a)  copyright is a property right which subsists in original literary, dramatic, musical or artistic works. Other works, including films, come in under section 1(1)(b) and (c).  By section 4(1) "artistic work" means, for copyright purposes,

> "(a) a graphic work, photograph, sculpture or collage, irrespective of artistic quality,
>
> (b) a work of architecture being a building or a model for a building, or
>
> (c) a work of artistic craftsmanship."

By section 4(2) "sculpture" includes a cast or model made for purposes of sculpture.

9.    Sections 51 and 52 are in Part I, Chapter III of the 1988 Act (acts permitted in relation to copyright works). Chapter III contains a variety of exemptions from liability on general grounds, including fair dealing (sections 29-31) and educational, archival and other public purposes (sections 32-50). Section 62

contains a general exemption for buildings, sculpture and works of artistic craftsmanship on permanent public display.

10.    Section 51 (design documents and models) as amended provides as follows:

"(1) It is not an infringement of any copyright in a design document or model recording or embodying a design for anything other than an artistic work or a typeface to make an article to the design or to copy an article made to the design.

(2) Nor is it an infringement of the copyright to issue to the public, or include in a film or communicate to the public, anything the making of which was, by virtue of subsection (1), not an infringement of that copyright.

(3)  In this section –

'design' means the design of any aspect of the shape or configuration (whether internal or external) of the whole or part of an article, other than surface decoration; and

'design document' means any record of a design, whether in the form of a drawing, a written description, a photograph, data stored in a computer or otherwise."

11.    Section 52 (effect of exploitation of design derived from artistic work) provides as follows:

(1) This section applies where an artistic work has been exploited, by or with the licence of the copyright owner, by -

(a)   making by an industrial process articles falling to be treated for the purposes of this Part as copies of the work, and

(b)   marketing such articles, in the United Kingdom or elsewhere.

(2) After the end of the period of 25 years from the end of the calendar year in which such articles are first marketed, the work may be copied by making articles of any description, or doing anything for the purpose of making articles of any description, and anything may be done in relation to articles so made, without infringing copyright in the work.

(3) Where only part of an artistic work is exploited as mentioned in subsection (1), subsection (2) applies only in relation to that part.

(4)  The Secretary of State may by order make provision –

(a) as to the circumstances in which an article, or any description of article, is to be regarded for the purposes of this section as made by an industrial process;

(b) excluding from the operation of this section such articles of a primarily literary or artistic character as he thinks fit.

(5)  An order shall be made by statutory instrument which shall be subject to annulment in pursuance of a resolution of either House of Parliament.

(6)  In this section –

(a) references to articles do not include films; and

(b) references to the marketing of an article are to its being sold or let for hire or offered or exposed for sale or hire."

12.    These two sections operate so as to limit (in different ways) the influence of literary or artistic copyright on other persons' freedom to make and market three-dimensional objects. Section 51 applies where the end-product of a design document or model is not an artistic work. It provides a more principled answer to the problem to which the House of Lords gave a radical and controversial solution in *British Leyland Motor Corporation Ltd v Armstrong Patents Co Ltd* [1986] AC 577 while the Bill which became the 1988 Act was before Parliament. Section 52 applies (subject to exceptions specified by the Secretary of State) where there is an

artistic work, but that work has been exploited (with the consent of the copyright owner) by industrial production of copies to be marketed.

13.    The Copyright (Industrial Process and Excluded Articles) (No 2) Order 1989 (SI 1989/1070) ("the 1989 Order"), made under section 52(4) of the 1988 Act, provides (para 2) for an article to be regarded as made by an industrial process if it is one of more than 50 articles which are to be treated as copies of a particular artistic work (and are not together a set). The Order also provides (para 3(1)(a)) for the exclusion from section 52 of "works of sculpture, other than casts or models used or intended to be used as models or patterns to be multiplied by any industrial process."

*Legislative history: before the 1911 Act*

14.    These provisions (and especially sections 51 and 52) are difficult to understand without reference to their legislative history. Unfortunately the history is itself quite complicated.  The Copyright Act 1911 ("the 1911 Act") was (as Lord Bridge observed in *British Leyland* [1986] AC 577, 619) "the first attempt to provide a comprehensive code of copyright protection".  Section 1(1) of the 1911 Act was in terms similar to those of section 1(1)(a) of the 1988 Act, (except that the words "irrespective of artistic quality" did not appear in the 1911 Act), and it may give the impression of embodying a well-proportioned symmetrical principle providing equal protection to every form of human creativity. Any such impression would be misleading. When the 1911 Act was passed there had already been two centuries of legislative history, starting with the Copyright Act 1709 ("the 1709 Act"), and for most of that time it was the protection of printed words – published literary works – that was the law's principal concern. Moreover the original legislative purpose of laws on literary copyright was the protection of the commercial interests of stationers (the early publishers) and booksellers, and the control of unlicensed (and possibly subversive) publications, rather than the vindication of the legal and moral rights of authors. There are useful summaries of the history of English copyright law in *Copinger and Skone James on Copyright*, 16th ed (2010), paras 2-08 to 2-42, and *Cornish, Llewelyn and Aplin, Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 7th ed (2010), paras 10-01 to 10-41.

15.    The 1709 Act protected literary works, books and other writings. During the 18th century protection was extended (by statute) to engravings and (by a liberal interpretation of the 1709 Act) to musical and dramatic compositions. Three-dimensional works of art were brought within the scope of copyright by a statute enacted in 1798, 38 Geo III c 71, but it was very badly drafted and offered little practical protection (Lord Ellenborough said in *Gahagan v Cooper* (1811) 3 Camp 111, 113 that "The Statute seems to have been framed with a view to defeat its own

object"). This Act was replaced by the Sculpture Copyright Act 1814 ("the 1814 Act"). The class of protected works was described in discursive terms, starting with

> "any new and original sculpture, or model, or copy, or cast of the human figure or human figures, or of any bust or busts, or of any part or parts of the human figure, clothed in drapery or otherwise,"

and continuing in broader terms, referring to "any matter being subject of invention in sculpture."  The sculpture was required to bear the maker's name and the date when it was made. Paintings, drawings and photographs were not protected until the Fine Arts Copyright Act 1862 ("the 1862 Act").  The 1862 Act required registration as a condition of protection. Architectural works were not protected until the 1911 Act (which also introduced works of "artistic craftsmanship" into the definition of "artistic work" in section 35 of that Act).

16.    The 1814 Act remained in force until the coming into force of the 1911 Act, and was until then the only statute that gave long-term copyright protection to any three-dimensional works. During the 19th century the rapid expansion of mechanical mass-production produced an obvious need for industrial designers and manufacturers to be protected against unfair competition by copying of their designs. Parliament decided that protection should be provided by a new right which was (rather confusingly, as the Court of Appeal said in para [24] of its judgment) called copyright, but which differed in two respects from literary and artistic copyright.  First, the proprietor was required to register his design.  Second, the period of protection was much shorter. Those were the essential features of the scheme introduced by the Copyright of Designs Act 1839, repealed and replaced by the Designs Act 1842. Earlier legislation granting copyright to the design of a range of printed textiles was repealed and replaced by the new system of registration, but copyright in sculpture under the 1814 Act was preserved.

17.    The law as to registered designs was amended by the Copyright of Designs Act 1850, was further amended and consolidated by Part III of the Patents, Designs and Trade Marks Act 1883 ("the 1883 Act") and finally (as regards legislation before the 1911 Act) was further amended by the Patents and Designs Act 1907 ("the 1907 Act"). Most of the detail of this history is irrelevant for present purposes. But it is to be noted that although the periods of protection for registered designs were progressively extended, they were always much shorter than the period for literary or artistic copyright. It is also to be noted that after an uncertain start in the early statutes, a design for a work of sculpture was excluded from the statutory definition of "design" (section 60 of the 1883 Act and section 93 of the 1907 Act).

18.     Only one judicial decision on the 1814 Act calls for mention, that is *Britain v Hanks Bros & Co* (1902) 86 LT 765. Wright J held that copyright protection as sculpture was available to what the report refers to as "toy metal models of soldiers on horseback, or mounted yeomen." The models were designed and made by William Britain, a partner in the plaintiff firm. The report does not say how large the models were, but they were evidently large enough for each to have stamped on it the maker's name and the date of its manufacture. There was expert evidence, which the judge accepted, that the models were "artistic productions, in that the anatomy is good, and that the modelling shows both technical knowledge and skill." The judge seems to have regarded the case as near the borderline, but was prepared to hold that the models were entitled to protection.

19.     The Court of Appeal observed (para [59]) that it is "difficult . . . to take too much from this case." A minor point in the appellants' case is that that is just what the Court did (para [82]) in describing the *Britain* models as "highly crafted models designed to appeal to the collector but which might be played with by his children."

*Legislative history: the 1911 Act and afterwards*

20.     The introduction by the 1911 Act of full copyright protection for "a work of artistic craftsmanship" was ascribed by Lord Simon, in *George Hensher Ltd v Restawile Upholstery (Lancs) Ltd* [1976] AC 64, 89-91, to the influence of the Arts and Crafts movement inspired by William Morris and John Ruskin. Lord Simon's view (at p 91) was that the expression is a composite phrase which must be construed as a whole, and that view has had recent support from the High Court of Australia (*Swarbrick v Burge* (2007) 232 CLR 336).

21.     Section 22 of the 1911 Act provided as follows:

"(1) This Act shall not apply to designs capable of being registered under the Patents and Designs Act 1907, except designs which, though capable of being so registered, are not used or intended to be used as models or patterns to be multiplied by any industrial process.

(2) General rules under section 86 of the Patents and Designs Act 1907 may be made for determining the conditions under which a design shall be deemed to be used for such purposes as aforesaid."

The test for production by an industrial process was (by rule 89 of the Designs Rules 1920, and so far as now material) the same as that in the 1989 Order (mentioned in para [13] above).

22.    The effect of the double negative in section 22(1) can be more easily understood, as Viscount Maugham observed in *King Features Syndicate Inc v O & M Kleeman Ltd* [1941] AC 417, 427, if it is rewritten:

> "This Act shall apply to designs capable of being registered under [the 1907 Act], which are not used or intended to be used as models or patterns to be multiplied by any industrial process. With that exception this Act shall not apply to designs capable of being registered under [the 1907 Act]."

The main issue in that case (which was concerned with "Popeye" dolls derived from published comic strips enjoying artistic copyright) was the time at which the intention of use for industrial production had to be formed. The Lords decided that the intention must have been there from the start.

23.    The Patents and Designs Act 1919 amended the 1907 Act by substituting for the definition in section 93 of the 1907 Act a new definition of "design" which referred to features applied "by any industrial process" and did not make an express exception for a design for a sculpture. Because of the way that section 22 of the 1911 Act was framed, this had the effect of withdrawing from works of sculpture their specially privileged position in relation to mass-production of copies. Its effect was illustrated by *Pytram Ltd v Models (Leicester) Ltd* [1930] 1 Ch 639. The Boy Scouts Association commissioned a model of a wolf-cub's head which was to be used to produce a permanent mould for the production of large numbers of papier-maché models to be attached to the top of wooden poles. Clauson J dismissed the plaintiff's claim to copyright in the original model. He accepted that the model was a work of sculpture, but it was not automatically exempt from registration under the 1907 Act as amended, and it did not come within the exception in section 22(1) because (p 647) "The whole point in the preparation of this model was to enable the plaintiffs to supply totem poles in large quantities."

24.    After the second world war there was a legislative shift back again. In 1947 the Swan Committee recommended that works of sculpture should again be excluded from registrable designs. The Registered Designs Act 1949 provided (section 1(3) and (4)) for exclusions from registration of articles which were primarily literary or artistic in character. Rule 26(1) of the Designs Rules 1949 (SI 1949/2368) excluded "works of sculpture other than casts or models used or

intended to be used as models or patterns to be multiplied by any industrial process." This wording (now reproduced in the 1989 Order) followed section 22(1) of the 1911 Act and must be construed in line with the House of Lords' decision on that section in *King Features*.

25.    The 1911 Act was repealed by the Copyright Act 1956 ("the 1956 Act"). Section 10 of the 1956 Act (special exception in respect of industrial designs) restated the boundaries between copyright and design right. As amended by the Design Copyright Act 1968, section 10(3) set a 15-year limit on copyright protection for any work in respect of which a corresponding design could have been registered under the 1949 Act. But section 10(4) made an exception for designs excluded from registration by rules made under the 1949 Act; and rule 26 of the Designs Rules 1949 has now been replicated by rule 26 of the Registered Designs Rules 1989.

26.    The 1956 Act introduced the words "irrespective of artistic quality" into para (a) of its definition of "artistic work" in section 3(1). This was, it seems, as a result of maps, charts and plans being reclassified by the 1956 Act as artistic rather than literary works. The new wording sits rather uneasily with "works of artistic craftsmanship" in para (c) of the same definition. In *Hensher* [1976] AC 64, 94, Lord Simon suggested an explanation which some may not find wholly convincing. But it is common ground that in copyright cases the court is not concerned with passing judgment on the merits of either literary or artistic works.

27.    The Court of Appeal drew two general conclusions from its own survey of the legislative history (which occupies paras [21] to [39] of the judgment). The first ([40] and [41]) was that there is little or no assistance as to the meaning of "sculpture" in the 1988 Act to be derived from the relationship between copyright and registered design rights. The second ([42] and [43]) is that "design" and "artistic work" are different concepts. Apart from unregistered design right (introduced by Part III of the 1988 Act), design right statutes are concerned with features that have visual appeal. Copyright protection depends on a work falling within a particular category specified in the 1988 Act: "It does not depend upon a further analysis or identification of its design features."

*The meaning of "sculpture"*

28.    Both the judge and the Court of Appeal undertook a full review of English and Commonwealth authority as to the meaning of "sculpture". They rightly concluded that some first-instance decisions gave them no real assistance, and it is unnecessary to go into them again.  The judgments that call for discussion are (in chronological order) those of the Court of Appeal of New Zealand in *Wham-O*

*Manufacturing Co v Lincoln Industries Ltd* [1985] RPC 127, [1984] 1 NZLR 641; of Falconer J in *Breville Europe Plc v Thorn EMI Domestic Appliances Ltd* [1995] FSR 77; of Laddie J in *Metix (UK) Ltd v G H Maughan (Plastics) Ltd* [1997] FSR 718; and of Angel J (sitting in the Supreme Court of the Northern Territory) in *Wildash v Klein* (2004) 61 IPR 324.

29.     Before discussing these four cases it is appropriate to make a further brief reference to the decision of the House of Lords in *Hensher* [1976] AC 64. Since Lucasfilm is no longer contending that the helmet is a work of artistic craftsmanship it is unnecessary to make much further reference to *Hensher,* which Mann J discussed at some length, drawing attention to the difficulty of identifying the true principle of the decision. The reason why that contention has been abandoned is stated (para 22(2) of the appellants' printed case) to be that section 4(1)(c) of the 1988 Act is intended to comprise articles whose purpose is primarily functional, and which cannot therefore qualify as sculpture. The relative significance of the functional and the artistic is central to this appeal. The speeches in *Hensher,* difficult though they are, show a general inclination to start with the ordinary meaning of the words of the statute (see Lord Reid at p 78, Lord Morris at p 81, Viscount Dilhorne at pp 86-87, Lord Simon at p 91 and Lord Kilbrandon at p 97), however much they differed as to the application of that principle. The same approach is called for in relation to the meaning of "sculpture".

30.     In *Wham-O* the Court of Appeal of New Zealand was concerned with frisbees (light plastic discs used in outdoor games because of their aerodynamic qualities). Lincoln made and marketed in New Zealand frisbees which were alleged to infringe Wham-O's copyright in design drawings, wooden models, moulds and the final plastic moulded products. The relevant parts of the Copyright Act 1962 of New Zealand were similar but not identical to those of the 1988 Act. At first instance Moller J held that the wooden models were copyright as sculptures and that the moulds and final products were engravings. The Court of Appeal upheld this result, while holding that the final products were not sculptures (a point left open by the judge). Much of the judgment is taken up with reasoning leading to the rather surprising conclusion that the moulds and final products were engravings. The finding that the wooden model of a frisbee - and that alone – was a sculpture seems to have been based mainly on the fact that only the model had been made by hand, and the moulds and final products had been made industrially. Davison CJ stated ([1985] RPC 127, 157):

> "It seems to us inappropriate to regard utilitarian objects such as plastic flying discs, manufactured as toys, by an injection moulding process, as items of sculpture for the purposes of the Copyright Act."

31.    The *Breville* case was concerned with sandwich toasters. Copyright was claimed for plaster shapes made for the production of die-cast moulds of the heating plates (which were required to have the same scalloped shape as was to be impressed on the toasted sandwiches). Falconer J held that there had been no infringement, but went on to express the view that the plaster shapes were protected by copyright. He stated (at p 94):

> "I do not see why the word 'sculpture' in section 3 of the Copyright Act 1956 should not receive its ordinary dictionary meaning except in so far as the scope of the word is extended by section 48(1) which provides that 'sculpture' includes any cast or model made for purposes of sculpture."

In reaching this conclusion he relied on the part of the *Wham-O* decision which recognised copyright in the wooden model of a frisbee. He also relied on the Concise Oxford Dictionary's definition of "sculpture":

> "Art of forming representations of objects etc or abstract designs in the round or in relief by chiselling stone, carving wood, modelling clay, casting metal, or similar processes; a work of sculpture."

32.    Falconer J was a very experienced intellectual property judge but in *Breville* he seems to have overlooked the significance of the words "for purposes of sculpture" in the statute and the significance of the first word, "Art", in the dictionary definition. That was the view of the Court of Appeal (para [66]):

> "The same ['far removed from the creation of expressive form'] goes for the plastic shapes considered by Falconer J in the *Breville* case [1995] FSR 77. No ordinary citizen – indeed no ordinary lawyer – would regard a sandwich toaster or any part of it as a work of sculpture – even if it did produce 'scalloped' sandwiches. So why should a copyright lawyer take a different view? A total or almost total emphasis on the manner of creation, as in the *Breville* case and *Wham-O* case [1985] RPC 127 produces a result which offends common sense and in our view is wrong. There must, as Mann J said, be some element of artistic expression however unsuccessful."

33.    The point about "for purposes of sculpture" is underlined by some observations earlier in the judgment of the Court of Appeal (paras [49] and [50], and again at para [70]) as to the word "sculpture" being applicable both to a process and to a product (terms familiar to intellectual property lawyers). Over the

centuries statues and other works of art cast in metal have been produced by what is basically a three-stage process: first by making a model in clay or some other malleable material; then by taking a mould from the model; and then by casting, that is, pouring molten metal into the mould to produce the work of art (followed no doubt by appropriate finishing). Copyright protection is therefore extended (currently by section 4(2) of the 1988 Act) to a cast or model made for purposes of sculpture. But not every product of industrial casting or moulding is sculpture. As the Court of Appeal observed (para [50]):

> "Casting or moulding is an industrial process commonly used where the end product is made of plastic or metal of some kind. It is used in the production of millions of ordinary household objects, none of which would usually be described as sculptures. A motor car is but one obvious example. Some would have qualified for protection as registered designs so as to be excluded under section 22(1) of the 1911 Act. But would they have qualified as 'sculpture'?".

34.    *Metix* can be taken more shortly. It was a case in which Laddie J rightly rejected a claim to artistic copyright in moulds used for making cartridges used in conjunction with flow mixers (the judge described them as looking like double-barrelled hyperdermic syringes). Laddie J, another very experienced intellectual property judge made some general observations (at pp 721-722):

> "The law has been bedevilled by attempts to widen out the field covered by the Copyright Acts. It is not possible to say with precision what is and what is not sculpture, but I think Mr Meade was close to the heart of the issue. He suggested that a sculpture is a three-dimensional work made by an artist's hand. It appears to me that there is no reason why the word 'sculpture' in the 1988 Act, should be extended far beyond the meaning which that word has to ordinary members of the public."

Mr Meade's formulation as recorded by Laddie J seems to be the only suggested definition or near-definition that has not attracted adverse comment from any quarter.

35.    *Wildash v Klein* (2004) 61 IPR 324, like *Metix*, is of interest not so much for what it decides as for its discussion of general issues (including the notion of copying of part, which is not an issue here). The case was an unfortunate dispute between two women, each of whom made craftwork depicting local wildlife for sale at markets. Initially they cooperated but later each accused the other of copyright infringement. The craftworks were made of wire but also (and here the

summaries in the judgments below are rather sparse) glass rods, glass nuggets, copper foil and other materials. The judge held that they were sculptures or, alternatively, works of artistic craftsmanship. The judge cited the Court of Appeal of New Zealand in *Wham-O* ("sculpture should in some way express in three-dimensional form an idea of the sculptor") and also Laddie J in *Metix*. In connection with copying the judge also cited Lord Hoffmann's cryptic observation about foxes and hedgehogs in *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2000] 1 WLR 2416, 2423, describing it as an allusion to an essay written in 1953 by Sir Isaiah Berlin; in fact Sir Isaiah was alluding, as has Professor Ronald Dworkin in his latest book, *Justice for Hedgehogs* (2011), to a saying attributed to Archilochus in the 7th century BC

"πολλ' οιδ'αλωπηξ, αλλ'εχινος έν μεγα

(the fox knows many things, but the hedgehog one big thing.)"

*The judgments of Mann J and the Court of Appeal*

36.    It was primarily from these authorities that Mann J derived what he called "guidelines, not rigid requirements" as to the meaning of sculpture in the 1988 Act. These are set out in nine numbered sub-paragraphs in para 118 of his judgment. The Court of Appeal quoted this paragraph in full, [2010] Ch 503, para [54], and was generally in agreement with it. As the guidelines are readily accessible we will not quote them again.

37.    The first three note (as did the House of Lords in *Henscher* [1976] AC 64) that normal English usage is important, though not determinative. The fourth guideline ("no judgment is to be made about artistic worth") is in the text of section 4(1)(a) of the 1988 Act, and is common ground. The Court is not to set itself up as an arbiter of artistic merit. But it is concerned with artistic purpose ("the artist's hand"). The fifth guideline ("not every three-dimensional representation of a concept can be regarded as a sculpture") is also uncontroversial, at any rate if "concept" is understood as covering any idea, functional as well as artistic (Mr Bloch QC challenged it in the Court of Appeal, but it is consistent with the appellants' printed case in this Court, especially paras 7 and 14).

38.    In the courts below as in the parties' written and oral submissions in this Court, the argument has centred on the right approach to three-dimensional objects that have both an artistic purpose (of some sort) and a utilitarian function (of some sort). These issues are addressed in the rest of the judge's guidelines. The

appellants' printed case gives some world-famous examples: the caryatids which form part of the Erectheion at Athens; the Medici tombs in the sacristy of San Lorenzo in Florence; the Trevi fountain in Rome. These seem to be rather special cases, not because of their outstanding merit but because they all have a strong architectural element, and the fact that a work of architecture is functional does not disqualify it from copyright protection. Other artefacts mentioned in the case, such as the Ribchester helmet in the British Museum or a decorated medieval suit of armour, would come more naturally under the head of works of artistic craftsmanship, together with fine furniture, musical instruments, silverware and ceramics. But the appellants have made clear that it is no longer part of their case that the Imperial Stormtrooper helmet was a work of artistic craftsmanship.

39.    Instead, the appellants contend that the helmet had no practical function at all. Their case is that it is sculpture because its purpose is wholly artistic. Para 7 of their printed case puts it in these terms:

> "In the present case, the question of functionality does not arise, because the articles in question have no functional purpose whatever. The Stormtroopers' helmets and armour did not exist in order to keep their wearers warm or decent or to protect them from injury in an inter-planetary war. Their sole purpose was to make a visual impression on the filmgoer. They are therefore artistic works."

40.    Mann J saw it differently. He stated (para [121], and here we are picking up the quotation in the first paragraph in this judgment):

> "It was a mixture of costume and prop. But its primary function is utilitarian. While it was intended to express something, that was for utilitarian purposes. While it has an interest as an object, and while it was intended to express an idea, it was not conceived, or created, with the intention that it should do so other than as part of character portrayal in the film. That, in my view, does not give it the necessary quality of artistic creation inherent in the test suggested by Laddie J."

41.    The Court of Appeal took the same view (paras [79] and [80]):

> "Mr Bloch seeks to avoid our example of a real soldier's helmet being used as a prop in a film by stressing the fictional and imaginary nature of the stormtroopers and what they were . . .

But that argument confuses the fictional nature of the stormtrooper with his physical depiction in the film. Although invented, the helmet and armour are still recognisable as such and have a function within the confines of the film as the equipment of the stormtrooper."

*Discussion*

42.    In this Court the appellants have challenged the reasoning of the judge and the Court of Appeal.  Mr Sumption QC said that it was eccentric of the judge to describe the helmet's purpose as utilitarian, and that the Court of Appeal could find it to have a functional purpose only by treating it as having the same functional purpose as a real helmet "within the confines of a film".

43.    This is quite a puzzling point. The Star Wars films are set in an imaginary, science-fiction world of the future. War films set in the past (Paths of Glory, for instance, depicting the French army in the first world war, or Atonement depicting the British Expeditionary Force at Dunkirk) are at least based on historical realities. The actors and extras in the trenches or on the beaches may be wearing real steel helmets, or (because real steel helmets of the correct style are unobtainable in sufficient numbers) they may be wearing plastic helmets painted khaki. In either case the helmets are there as (in the judge's words) "a mixture of costume and prop" in order to contribute to the artistic effect of the film as a film. They are part of a production process, as Laddie J said in *Metix* at p 721, citing Whitford J in *Davis (J & S)(Holdings) Ltd v Wright Health Group Ltd* [1988] RPC 403, 410-412. In this case the production process was the making of a full-length feature film.

44.    It would not accord with the normal use of language to apply the term "sculpture" to a 20th century military helmet used in the making of a film, whether it was the real thing or a replica made in different material, however great its contribution to the artistic effect of the finished film. The argument for applying the term to an Imperial Stormtrooper helmet is stronger, because of the imagination that went into the concept of the sinister cloned soldiers dressed in uniform white armour. But it was the Star Wars film that was the work of art that Mr Lucas and his companies created.  The helmet was utilitarian in the sense that it was an element in the process of production of the film.

45.    Those were the concurrent findings of both the judge and the Court of Appeal, in paras [121] and [80] of their respective judgments. The type of judgmental conclusion that often has to be reached in intellectual property cases – on issues such as obviousness, inventiveness, and copying – are matters on which

appellate courts should be slow to interfere with the judgment of the trial judge. In *Designers Guild* [2000] 1 WLR 2416, 2423-2424, Lord Hoffmann observed that there were two reasons for this. The first is that the judge has, and the appellate court has not, seen and heard the witnesses.  Lord Hoffmann continued,

> "Secondly, because the decision involves the application of a not altogether precise legal standard to a combination of features of varying importance, I think that this falls within the class of case in which an appellate court should not reverse a judge's decision unless he has erred in principle: see *Pro Sieben Media AG v Carlton UK Television Ltd* [1991] 1 WLR 605, 612-613. I agree with Buxton LJ in *Norowzian v Arks Ltd (No 2)* [2000] FSR 363, 370 when he said: 'where it is not suggested that the judge has made any error of principle a party should not come to the Court of Appeal simply in the hope that the impression formed by the judges in this court, or at least two of them, will be different from that of the trial judge.'"

That applies with extra force in the case of a second appeal. To the same effect are Lord Hoffmann's observations in *Biogen Inc v Medeva plc* [1997] RPC 1, 45, which are too well known to need repetition.

46.   The Court of Appeal (para [78]) relied on Lord Hoffmann's observations in *Designers Guild*, and in our view it was right to do so. During the 17 days of the trial Mann J heard evidence about the helmet and the other artefacts from numerous different witnesses. Long and thorough as his judgment is, he may not have recorded every nuance that contributed to his conclusion. He did not err in law or reach an obviously untenable conclusion, and the Court of Appeal was right to uphold his decision on this point.

47.   We would uphold the judgments below very largely for the reasons that they give. But (at the risk of appearing humourless) we are not enthusiastic about the "elephant test" in para [77] of the Court of Appeal's judgment ("knowing one when you see it"). Any zoologist has no difficulty in recognising an elephant on sight, and most could no doubt also give a clear and accurate description of its essential identifying features. By contrast a judge, even one very experienced in intellectual property matters, does not have some special power of divination which leads instantly to an infallible conclusion, and no judge would claim to have such a power. The judge reads and hears the evidence (often including expert evidence), reads and listens to the advocates' submissions, and takes what the Court of Appeal rightly called a multi-factorial approach. Moreover the judge has to give reasons to explain his or her conclusions.

48.    There is one other matter to which the Court of Appeal attached no weight, but which seems to us to support the judge's conclusion. It is a general point as to the policy considerations underlying Parliament's development of the law in order to protect the designers and makers of three-dimensional artefacts from unfair competition. After reviewing the legislative history the Court of Appeal took the view (para [40]) that there was no assistance to be obtained from the relationship between copyright and registered design right. We respectfully disagree, especially if the relatively new unregistered design right is also taken into account. It is possible to recognise an emerging legislative purpose (though the process has been slow and laborious) of protecting three-dimensional objects in a graduated way, quite unlike the protection afforded by the indiscriminate protection of literary copyright. Different periods of protection are accorded to different classes of work. Artistic works of art (sculpture and works of artistic craftsmanship) have the fullest protection; then come works with "eye appeal" (*AMP Inc v Utilux Pty Ltd* [1971] FSR 572); and under Part III of the 1988 Act a modest level of protection has been extended to purely functional objects (the exhaust system of a motor car being the familiar example). Although the periods of protection accorded to the less privileged types have been progressively extended, copyright protection has always been much more generous. There are good policy reasons for the differences in the periods of protection, and the Court should not, in our view, encourage the boundaries of full copyright protection to creep outwards.

*Sections 51 and 52*

49.    The appellants accept that if the helmet did not qualify as a sculpture within the meaning of the 1988 Act, then Mr Ainsworth had a defence under section 51 to any infringement claim based on Mr McQuarrie's graphics, and section 52 does not arise. The Court of Appeal dealt with these sections, for completeness, in paras 83 to 98 of its judgment. It is unnecessary to cover the same ground again. We would dismiss the appeal so far as it is based on the English law of copyright.

*Part II: Whether a claim against a defendant domiciled in England for infringement of a foreign copyright is justiciable*

**The decision of the Court of Appeal and the issue on the appeal**

50.    The issue on this aspect of the appeal is a narrow one, whether the English court may exercise jurisdiction in a claim against persons domiciled in England for infringement of copyright committed outside the European Union in breach of the copyright law of that country. That issue has raised two questions. The first question is whether a claim for infringement of a foreign copyright is non-justiciable. The second question only arises if the answer to the first question is in

the affirmative: the question would then arise whether the English court is in any event required to accept jurisdiction by virtue of Council Regulation (EC) No 44/2001 on jurisdiction and the enforcement of judgments in civil and commercial matters (the Brussels I Regulation), article 2, which provides that, subject to the terms of the Regulation, persons domiciled in a Member State shall be sued in the courts of that Member State.

51.    The Court of Appeal decided that the claim for breach of the United States copyright was non-justiciable. It held that the rule in *British South Africa Co v Companhia de Moçambique* [1893] AC 602 that the English court has no jurisdiction to entertain an action for the determination of the title to, or the right to possession of, foreign land, or the recovery of damages for trespass to such land, was an example of a general principle which applied not only to foreign land, but also to claims for infringement of foreign intellectual property rights, including copyright, irrespective of whether issues of title or validity were involved; and irrespective of whether the rights required registration (such as trade marks or registered designs) or not. It also held that article 2 of the Brussels I Regulation did not require the English court to exercise jurisdiction.

52.    The substantial question on this aspect of the appeal is whether, as Lucasfilm contends, the Court of Appeal was wrong, as a matter of law and policy, to extend to foreign copyrights the common law rule in the *Moçambique* case that actions for damages for infringement or invasion of property rights in foreign land are not justiciable.

### The foreign land rule and its application to intellectual property: British South Africa Co v Companhia de Moçambique and Potter v Broken Hill Pty Co Ltd

53.    Some legal archaeology is necessary for an understanding of how the law developed to the point where the English courts, at first instance and in the Court of Appeal, decided that claims for infringement of foreign copyright were not justiciable in England.

### British South Africa Co v Companhia de Moçambique

54.    The decision in the *Moçambique* case is the authoritative foundation for the rule that the English court "has no jurisdiction to entertain an action for (1) the determination of the title to, or the right to the possession of, any immovable situate out of England … or (2) the recovery of damages for trespass to such immovable" (*Dicey, Conflict of Laws*, 1st ed (1896), pp 214-215, Rule 39). The rule has for long been subject to an exception where there is a contract, or an

equity, between the parties, which the courts of equity will enforce: ibid, p 216; *Penn v Lord Baltimore* (1750) 1 Ves Sen 444.

55.     As the House of Lords noted, in the United States there is a similar local action rule (based on *Livingston v Jefferson*, 15 Fed Cas 660 (CCD Va, 1811), Marshall CJ on circuit) for actions to determine title: see *Hay, Borchers & Symeonides, Conflict of Laws*, 5th ed (2010), para 7.7. But the current prevailing view in the United States is that the local action rule does not apply to actions for trespass to foreign land: Restatement Second, *Conflict of Laws*, section 87 (1971). It seems also that that part of the rule which denies jurisdiction for trespass to foreign land had no counterpart outside common law countries (*Rabel, Conflict of Laws: A Comparative Study*, 2nd ed, (1960) vol 2, p 47; *Wolff, Private International Law*, 2nd ed (1950), p 92; and for the position in France see Audit, *Droit International Privé*, 6th ed (2010), para 346), and, as will be seen, although the House of Lords refused to reconsider the trespass rule, it no longer applies at least as regards land in other Member States of the European Union.

56.     The speeches of Lord Herschell LC and Lord Halsbury (and, in the Court of Appeal, of Lord Esher MR, whose dissenting judgment was upheld in the House of Lords) are substantially based on *Story's Conflict of Laws*. The essence of the decision is that jurisdiction in relation to land is local (that is, the claim has a necessary connection with a particular locality) as opposed to transitory (where such a connection is not necessary) and that it is contrary to international law, or comity, for one state to exercise jurisdiction in relation to land in another state. Lord Esher MR said ([1892] 2 QB 358, 398):

> "…an action quare clausum fregit cannot be entertained by an English Court in respect of an alleged wrongful entry on land situated abroad; and … the ground of the inability is … no consent of other nations by way of comity to the exercise of such jurisdiction can be inferred."

57.     Lord Herschell LC and Lord Halsbury relied in particular on Story's quotation (*Story, Conflict of Laws*, section 553, from the 1st edition in 1834 to the 8th edition in 1883) of a translation of a passage in Vattel's *Droit des Gens*, which concluded that, in the case of an action relating to an estate in land, or to a right annexed to such an estate: [1893] AC at 622, 631:

> "in such a case, inasmuch as property of the kind is to be held according to the laws of the country where it is situated, and as the right of granting it is vested in the ruler of the country, controversies

relating to such property can only be decided in the state in which it depends."

58.    In *Hesperides Hotels Ltd v Aegean Turkish Holidays Ltd* [1979] AC 508 Lord Wilberforce said (at p 537) that the foreign land rule involved "possible conflict with foreign jurisdictions, and the possible entry into and involvement with political questions of some delicacy;" and Viscount Dilhorne said (at p 541) that: "Questions of comity of nations may well be involved".

59.    The leading cases all involved unusual factual situations in which the claim had major political ramifications, and in which, therefore, issues of international law and comity were engaged. The Moçambique company was a Portuguese company (with substantial British ownership) effectively in control of Mozambique and Cecil Rhodes' British South Africa Co was effectively in control of Southern Rhodesia. The *Moçambique* case was a battle between them over mines in territories which were claimed by Portugal. In *Hesperides Hotels* the plaintiffs were Greek Cypriot hotel owners who were seeking to establish that their hotels in Northern Cyprus had been illegally requisitioned by the authorities of the unrecognised Turkish Federated State of North Cyprus. Similarly, in the leading case on the related, and more general, principle that the courts will not adjudicate upon the transactions of foreign sovereign states, *Buttes Gas and Oil Co v Hammer (No 3)* [1982] AC 888, Occidental Petroleum was endeavouring to establish that Buttes and the Ruler of Sharjah had fraudulently deprived Occidental of the benefit of its oil concession in the neighbouring emirate of Umm al Qaywayn.

*Potter v Broken Hill Pty Co Ltd*

60.    It is inevitable that any discussion of the justiciability of claims for infringement of foreign intellectual property rights must begin with the influential decision in *Potter v Broken Hill Pty Co Ltd* [1905] VLR 612, affd (1906) 3 CLR 479, which is generally (but not entirely accurately) regarded as based on an extension of the *Moçambique* rule to actions for infringement of patents. At a time when patents were granted by the several States in Australia, Potter obtained a patent in Victoria for the separation of metals from sulphide ores and a patent for the same process in New South Wales. Potter claimed that (as well as a threatened infringement of the Victorian patent in Victoria) the defendant company (now BHP Billiton) had infringed the New South Wales patent at its mine in New South Wales. Broken Hill denied novelty and utility, but also said that an action for the infringement in New South Wales of a New South Wales patent was not justiciable in the Victorian courts. The question of justiciability was argued as a preliminary matter before the Full Court of the Supreme Court of Victoria, which decided by a majority that the claim was not justiciable, and an appeal to the High Court of Australia was dismissed.

61.    As already mentioned, the decision is generally regarded as based on the *Moçambique* rule. Although the *Moçambique* rule is one of the elements in the conclusion of the High Court, an examination of the way in which the case was argued, and of the reasoning of the High Court, shows that it is a decision extending the act of state doctrine to foreign patents. There are four strands to the conclusions reached by the Full Court and the High Court of Australia. The first strand is in the judgment of Hodges J (with whom Hood J concurred) in the Full Court. That strand is based on that aspect of the *Moçambique* rule which turns on the distinction between local and transitory actions. He considered that the patent had a definite locality: Potter claimed in effect that in no building and on no land in New South Wales could the company use his invention. It was a claim made in respect of a defined area, the whole of which was outside the jurisdiction of the court in Victoria.

62.    The second strand is found only in the judgment of Hood J in the Full Court, but it finds an echo in later English decisions, and that is that the action was precluded by what became known as the first branch of the rule in *Phillips v Eyre* (1870) LR 6 QB 1, namely that an act done abroad was only actionable in England if it was actionable as a tort according to English law, that is, was an act, which if done in England, would be a tort. The rule as then understood showed what became the first limb of the rule as the second limb in these terms: "An act done in a foreign country is a tort if it is *both* (1) wrongful according to the law of the country where it was done, *and*, (2) wrongful according to English law, ie, is an act which, if done in England, would be a tort" (*Dicey, Conflict of Laws*, 1st ed (1896), Rule 175, p 659). Hood J considered that the rule was not satisfied because Potter could not show that, if the act had been committed in Victoria, it would have been actionable there, because infringement of a New South Wales patent in Victoria was not actionable in Victoria: the act of Broken Hill, " 'using and working' certain alleged inventions in New South Wales – even though it be wrong by the law of that State, would not be actionable if committed here" (at p 631).

63.    The third strand is found in the reliance on the *Moçambique* case by the High Court of Australia. Both Griffiths CJ and Barton J said that the question did not depend on the distinction between local and transitory actions. They (and the third member of the court, O'Connor J) took their inspiration from those parts of the speeches in the House of Lords, and of the dissenting judgment of Lord Esher MR in the Court of Appeal, which emphasised that rights in immovables were created by the exercise of the sovereign power of the State, and that controversies relating to such property could only be decided in that State. So also, they reasoned, the comity of nations required a similar rule for patents: especially (1906) 3 CLR 479, 495, 502.

64.     The appeal was first argued in November 1905, but the report shows (at p 486) that on 27 February 1906:

> "The matter was, at the desire of the Court, further argued on the point whether the Courts of one State can enquire into the propriety or validity of an attempted exercise of the sovereign power of another State."

65.     As a result there is a fourth, and decisive, strand in the decision, namely the act of state doctrine. The classic statement of the act of state doctrine was enunciated by Fuller CJ in the United States Supreme Court in *Underhill v Hernandez*, 168 US 250, 252 (1897):

> "Every sovereign State is bound to respect the independence of every other sovereign State, and the Courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

66.     This principle had its origin, as appears clearly from the decision of the lower court in that case, in the decision of the House of Lords in *Duke of Brunswick v Duke of Hanover* (1848) 2 HLC I, 17, in which it was said: "the courts of this country cannot sit in judgment upon an act of a sovereign, effected by virtue of his sovereign authority abroad ...": see *Underhill v Hernandez*, 65 F 577 (2d Cir 1895). As re-stated by the United States Supreme Court, the act of state doctrine was re-imported into English law in *Luther v Sagor* [1921] 3 KB 532 (CA).

67.     All three members of the High Court of Australia quoted and applied *Underhill v Hernandez* and it is the act of state doctrine, rather than the *Moçambique* rule, which is the essential foundation of the judgments in the High Court. Thus Griffith CJ said that if a government had granted a monopoly in respect of an alleged invention which was not new, the government must have been misled: at pp 498-499. Barton J thought that the whole subject matter of the action was excluded from the cognizance or competence of Victoria, and its courts could not sit in judgment to determine whether such rights were validly granted: at p 503. O'Connor J said that a court could not enquire into the validity of a patent, any more than it could enquire into the validity of a concession granted by the Czar: at p 513.

68.    Consequently the effect of the decision in *Potter v Broken Hill Pty Co Ltd* was to apply the *Moçambique* rule and, especially, the act of state doctrine to actions for patent infringement. It received no attention in the English case-law until it was mentioned by Lord Wilberforce in *Hesperides Hotels Ltd v Aegean Turkish Holidays Ltd* [1979] AC 508, 536 as authority for the proposition that the *Moçambique* rule applied in Australia. It was only from the 1980s that it came to be regarded as a significant authority in the field of transnational intellectual property litigation: *Def Lepp Music v Stuart-Brown* [1986] RPC 273; *Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75 (both copyright cases).

### Subsequent developments

69.    There have been major developments since the decisions in the *Moçambique* case and *Potter v Broken Hill Pty Co Ltd*, which have to a significant extent undermined them, and to which it is now necessary to turn.

70.    The questions to which these developments are relevant are these: (1) whether there is a distinction between actions to determine title and/or validity and actions for infringement of rights; (2) whether there is a distinction between actions for infringement which raise issues of title and/or validity and actions for infringement which do not; (3) whether there is a distinction between intellectual property rights which require registration or prior examination and those which do not, and in particular whether there is a relevant distinction between copyright and other intellectual property rights, especially patents; (4) whether the conflict of laws rules relating to tortious conduct abroad have undermined the older decisions; and (5) whether the act of state doctrine has any relevance to actions for infringement of intellectual property rights.

### The Moçambique rule

71.    To the extent that the principles in *Potter v Broken Hill Pty Co Ltd* were based on that part of the rule in the *Moçambique* case which precluded actions for damages for infringement of property rights (in that case damages for trespass), they have been fatally undermined so far as English law is concerned. That part of the rule was confirmed by the House of Lords in *Hesperides Hotels Ltd v Aegean Turkish Holidays Ltd* [1979] AC 508. The House of Lords not only refused an invitation to depart from that part of the rule, but also extended it by holding that it applied when no question of title was involved.  Lord Wilberforce said (at p 541) that questions of comity might well be involved, and it had to be for Parliament to change the law.

72.     That invitation was taken up, and that part of the *Moçambique* rule was abolished by section 30(1) of the Civil Jurisdiction and Judgments Act 1982, which came into force in 1982, and provides:

> "The jurisdiction of any court in England . . . to entertain proceedings for trespass to, or any other tort affecting, immovable property shall extend to cases in which the property in question is situated outside that part of the United Kingdom unless the proceedings are principally concerned with a question of the title to, or the right to possession of, that property."

73.     There was a parallel development in European law which also confirms, broadly, that the foreign land principle in the European Union is concerned only with actions to establish title. That development began with the Brussels Convention on jurisdiction and the enforcement of judgments in civil and commercial matters, which was signed in 1968 and came into force for the six original EEC Member States in 1973. The Brussels Convention was enacted into United Kingdom law by the 1982 Act and the relevant provisions came into force in 1987, and are now contained in the Brussels I Regulation (Council Regulation (EC) No 44/2001). The effect is that the *Moçambique* rule has been superseded, as regards land in other Member States, by what is now Article 22(1) of the Brussels I Regulation.

74.     Article 22(1) (formerly article 16(1)(a) of the Brussels Convention) provides that the courts of the Member State in which the property is situated have exclusive jurisdiction, regardless of domicile,

> "in proceedings which have as their object rights in rem in immovable property or tenancies of immovable property."

75.     The European Court has confirmed that what is now article 22(1) must not be given an interpretation broader than is required by its objective: and that actions for damages based on infringement of rights in rem or on damage to property in which rights in rem exist do not fall within its scope: Case C-343/04 *Land Oberösterreich v ČEZ as* [2006] ECR I-4557, para [26] et seq.

76.     The consequence is that in the United Kingdom the trespass aspect of the *Moçambique* rule has no application as regards land in other Member States, and (subject to the controversial question of the applicability of article 2) can only apply to land outside the Member States where a question of title is involved: see

*Dicey, Morris & Collins, Conflict of Laws*, 14th ed (2006), vol 2 paras 23-025─23-027.

*The rule in Phillips v Eyre*

77.    As has been seen, in *Potter v Broken Hill Pty Co Ltd*, in the Full Court of the Supreme Court of Victoria, Hood J considered that the action was precluded by the first branch of the rule in *Phillips v Eyre*, ie that Potter could not show that, if the act had been committed in Victoria, it would have been actionable there, because infringement of a New South Wales patent in Victoria was not actionable in Victoria. The effect of the first limb of the rule in intellectual property cases was expressed in *Dicey & Morris, Conflict of Laws,* 12th ed (1993) (the last edition before the law was changed), vol 2, at p 1516:

> "Nor can the holder of a French patent, trade mark or copyright sue in England for its infringement in France. Since the French patent, trade mark or copyright is territorial in its operation and the act complained of would not be a tort if committed in England, it cannot be brought within [the first limb of the rule in *Phillips v Eyre*]."

78.    In consequence it was held in *Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75 that it was not possible to bring an action in England for infringement (or, as in that case, an action for a declaration of non-infringement) of United States copyright. The first limb of the rule in *Phillips v Eyre* was also employed by Sir Nicolas Browne-Wilkinson V-C in *Def Lepp Music v Stuart-Brown* [1986] RPC 273 to deny a claim in England for breach of a United Kingdom copyright in the Netherlands, but a shorter answer to the claim would have been that United Kingdom copyrights are purely territorial and do not, by United Kingdom law, confer any rights abroad: see, eg *Norbert Steinhardt & Son Ltd v Meth* (1960) 105 CLR 440.

79.    But the rule in *Phillips v Eyre* was first eroded by case-law and then abolished by statute. Following the lead of Lord Wilberforce and Lord Hodson in *Boys v Chaplin* [1971] AC 356, in *Red Sea Insurance Co Ltd v Bouygues SA* [1995] 1 AC 190 the Privy Council decided that the first limb of the rule in *Phillips v Eyre* could be displaced so that an issue might be governed by the law of the country which with respect to that issue had the most significant relationship with the occurrence and with the parties. That exception was applied in *Pearce v Ove Arup Partnership Ltd* [2000] Ch 403, in which the Court of Appeal held that a claim in England for infringement of a Dutch copyright was not defeated by the first limb of the rule in *Phillips v Eyre*, because the issues had the most significant relationship with the Netherlands. Accordingly, the court held that Dutch law was

the applicable law and not the combination of English law and Dutch law required by *Phillips v Eyre*. In *KK Sony Computer Entertainment v Van Veen* (2006) 71 IPR 179 (High Court of New Zealand), MacKenzie J held (in reasoning which is not entirely clear) that, in a claim for infringement of United Kingdom and Hong Kong copyrights, the first limb of the rule in *Phillips v Eyre* was satisfied.

80.     The rule in *Phillips v Eyre* was abolished by the Private International Law (Miscellaneous Provisions) Act 1995. In principle the law of the place of infringement applies: 1995 Act, section 11(1). Consequently, so far as English proceedings are concerned, that basis for the decisions in *Potter v Broken Hill Pty Co Ltd*  and *Tyburn Productions Ltd v Conan Doyle* has disappeared, and the rule in *Phillips v Eyre* is no impediment to actions in England for infringement of foreign intellectual property rights.

*The act of state doctrine*

81.     In the United States the act of state doctrine has been used as a basis for non-justiciability of foreign trade mark and patent rights. The Court of Appeals for the Second Circuit held in *Vanity Fair Mills Inc v T Eaton Co Ltd*, 234 F 2d 633, 646 (2d Cir 1956), cert den, 352 US 871 (1956) that a United States federal court should not rule on the validity of a Canadian trade mark because (among other reasons) the act of state doctrine precluded determination of the acts of a foreign sovereign done within its own territory, and to rule on validity would create conflicts with Canadian administrative and judicial officers.

82.     The act of state doctrine was also invoked more recently in the United States as a ground for refusing to allow the addition of claims for infringement of parallel foreign patents to claims for infringement of United States patents, in litigation in which validity was in issue: *Voda v Cordis Corp*, 476 F 3d 887 (Fed Cir 2007). The majority of the court (Gajarsa CJ, Prost CJ concurring) said (at p 904):

> "the act of state doctrine may make the exercise of supplemental jurisdiction over foreign patent infringement claims fundamentally unfair. As "a *'principle of decision* binding on federal and state courts alike,' " the act of state doctrine "requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W S Kirkpatrick & Co, Inc v Envtl Tectonics Corp, Int'l,* 493 U.S. 400, 406, 409 … (1990) … In this case, none of the parties or amicus curiae have persuaded us that the grant of a patent by a sovereign is not an act of state. ... Therefore, assuming arguendo that the act of state doctrine applies,

the doctrine would prevent our courts from inquiring into the validity of a foreign patent grant and require our courts to adjudicate patent claims regardless of validity or enforceability."

83.    The act of state doctrine was held not to apply where, in a dispute arising out of a patent licence, the issue was one of interpretation of the patent, and not of validity: *Fairchild Semiconductor Corpn v Third Dimension (3D) Semiconductor Inc*, 589 F Supp 2d 84, 98 (D Me 2008).

84.    So also, in the case of copyright infringement, it has been held that the act of state doctrine has no application because there is no need to pass on the validity of acts of foreign government officials. In *London Film Productions, Ltd v Intercontinental Communications, Inc*, 580 F Supp 47, 49 (SDNY 1984) the District Court held that the plaintiff could sue for infringement of its foreign copyright in films. The court accepted Professor Nimmer's view that the act of state doctrine was not engaged: in adjudicating an infringement action under a foreign copyright law there was no need to pass upon the validity of acts of foreign governmental officials, since foreign copyright laws did not generally incorporate administrative formalities which had to be satisfied to create or perfect a copyright. In *Frink America, Inc v Champion Road Machinery Ltd,* 961 F Supp 398 (NDNY 1997) it was held that dismissal of a claim for infringement of Canadian copyright was not warranted because US and Canada were signatories to the Berne Convention, which bars administrative formalities, and therefore there was no question of passing on acts of foreign government. Contrast *ITSI TV Productions, Inc v California Authority of Racing Fairs, Inc*, 785 F Supp 854, 866 (ED Cal 1992).

85.    But in the Commonwealth *Potter v Broken Hill Pty Co Ltd* appears to stand alone in using the act of state doctrine as an impediment to actions for infringement of foreign intellectual property rights. In *Voda v Cordis Corpn*, above, Circuit Judge Newman, dissenting, rightly pointed out (at p 914) that not every governmental action and not every ministerial activity is an act of state. In *Mannington Mills, Inc v Congoleum Corpn,* 595 F 2d 1287, 1293–94 (3d Cir 1979) the Court of Appeals for the Third Circuit was "unable to accept the proposition that the mere issuance of patents by a foreign power constitutes … an act of state."

86.    It has been said that the grant of a national patent is "an exercise of national sovereignty" (Jenard Report on the Brussels Convention (OJ 1979 C59 pp 1, 36), and the European Court has emphasised that the issue of patents necessitates the involvement of the national administrative authorities (Case C-4/03 *Gesellschaft für Antriebstechnik mbH & Co KG (GAT) v Lamellen und Kupplungsbau Beteiligungs KG (LuK)* [2006] ECR I-6509, para [23]). But in England the foreign

act of state doctrine has not been applied to any acts other than foreign legislation or governmental acts of officials such as requisition, and it should not today be regarded as an impediment to an action for infringement of foreign intellectual property rights, even if validity of a grant is in issue, simply because the action calls into question the decision of a foreign official.

*European law and intellectual property rights*

87.    Two important developments in European law have undermined any argument that there is a substantial policy reason for the view that actions for infringement of intellectual property rights cannot be brought outside the State in which they are granted or subsist.

88.    First, article 22(4) of the Brussels I Regulation (formerly article 16(4) of the Brussels Convention) provides that, in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is deemed to have taken place, have exclusive jurisdiction irrespective of the domicile of the defendant. This is an exception to the general domicile rule of jurisdiction, and has to be construed strictly. It applies only to intellectual property rights which are required to be deposited or registered, and does not apply to infringement actions in which there is no issue as to validity.

89.    The European Court has emphasised that article 22(4) is only concerned with cases in which a question of validity arises. It has made the following points: the basis for article 22(4) is that the courts of the Contracting State in which the deposit or registration has been applied for or made are best placed to adjudicate upon cases in which the dispute itself concerns the validity of the patent or the existence of the deposit or registration; but it does not apply in proceedings which do not concern the validity of the intellectual property right or the existence of the deposit or registration and these matters are not disputed by the parties, for example, a patent infringement action, in which the question of the validity of the patent allegedly infringed is not called into question; it would apply if the question of validity were raised by way of defence in infringement proceedings; the concern for the sound administration of justice is all the more important in the field of patents since, given the specialised nature of this area, a number of Contracting States have set up a system of specific judicial protection, to ensure that these types of cases are dealt with by specialised courts; the exclusive jurisdiction is also justified by the fact that the issue of patents necessitates the involvement of the national administrative authorities: Case C-4/03 *Gesellschaft für Antriebstechnik mbH & Co KG (GAT) v Lamellen und Kupplungsbau Beteiligungs KG (LuK)* [2006] ECR I-6509, para [16] et seq.

90.     Article 22(4) does not in terms apply to intellectual property rights outside the Member States. It is not necessary for present purposes to delve into the question whether it may be applied by analogy (or "reflexively") to non-Member States. What it shows is that there is a fundamental distinction between intellectual property claims which involve the registration or validity of intellectual property rights which are required to be deposited or registered, and those which are not.

91.     The second relevant piece of European legislation does not apply to the present proceedings because it came into force only on 11 January 2009, but it also shows clearly that there is no European public policy against the litigation of foreign intellectual property rights. Regulation (EC) No 864/2007 of the European Parliament and of the Council on the law applicable to non-contractual obligations (Rome II) applies wherever in the world a tort was committed. It plainly envisages that actions may be brought in Member States for infringement of foreign intellectual property rights, including copyright. Recital (26) states:

> "Regarding infringements of intellectual property rights, the universally acknowledged principle of the lex loci protectionis should be preserved. For the purposes of this Regulation, the term 'intellectual property rights' should be interpreted as meaning, for instance, copyright, related rights, the sui generis right for the protection of databases and industrial property rights."

92.     As regards choice of law, article 8 provides:

> "*Infringement of intellectual property rights*
>
> 1. The law applicable to a non-contractual obligation arising from an infringement of an intellectual property right shall be the law of the country for which protection is claimed.
>
> 2. In the case of a non-contractual obligation arising from an infringement of a unitary Community intellectual property right, the law applicable shall, for any question that is not governed by the relevant Community instrument, be the law of the country in which the act of infringement was committed.
>
> …"

*Other proposals*

93.    These developments in European law are mirrored in proposals within the American Law Institute, which favour adjudication of foreign intellectual property rights, at least where issues of validity are not in issue. The American Law Institute's *Intellectual Property: Principles Governing Jurisdiction, Choice of Law, and Judgments in Transnational Disputes* (2008) apply to transnational civil disputes which involve (inter alia) copyrights, patents, trademarks, and other intellectual property rights (section 102) and note the controversy over the question of the justiciability of intellectual property rights (Reporters' Notes 4 and 5). Section 211 provides that the court must have subject-matter and personal jurisdiction. Comment *b* states:

> "There is substantial sentiment that issues regarding the validity of a registered right, particularly a patent right, should be adjudicated in the courts of the State in which the right is registered.   Only this State is competent to cancel the registration. … Nonetheless, the Principles do not include a blanket prohibition on the adjudication of matters involving a foreign State's registered rights, because separating adjudication of validity from infringement can have substantive ramifications. Separate resolutions can prevent a court from hearing all of the evidence relevant to the action and from using its understanding of how a technology is utilized to inform its decision on the scope of the right. Bifurcating validity and infringement can also increase the parties' costs."

94.    The draft Principles for Conflict of Laws in Intellectual Property, 2011, prepared by the European Union Max Planck Group on Conflict of Laws in Intellectual Property contain no specific provision for actions for infringement of foreign rights abroad, but it is implicit in the Principles that they envisage such actions: (a) the primary rule of jurisdiction in the Principles is habitual residence (Part 2, section 1), and (b) the primary law applicable to infringement is the law of the State for which protection is sought (Part 3, section 6).

### *The English and foreign authorities on justiciability of intellectual property claims*

95.    A number of distinguished judges have expressed the view that the English court cannot, or should not, exercise jurisdiction in claims for infringement of foreign intellectual property rights, such as patents (*Mölnlycke AB v Procter & Gamble Ltd* [1992] 1 WLR 1112, 1118, per Dillon LJ; *Plastus Kreativ AB v Minnesota Mining and Manufacturing Co* [1995] RPC 438, 447, per Aldous J) or trade marks (*LA Gear Inc Ltd* v *Gerald Whelan & Sons Ltd* [1991] FSR 670, 674, per Mummery J). But prior to the decision of the Court of Appeal in the present proceedings the only directly relevant decisions were the decisions of Vinelott J in

*Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75, of Laddie J in *Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch 33, and of the Court of Appeal in *Pearce v Ove Arup Partnership Ltd* [2000] Ch 403.

96.    In *Tyburn Productions Ltd v Conan Doyle* [1991] Ch 75 Vinelott J applied the *Moçambique* rule in the light of *Potter v Broken Hill Pty Co Ltd* to what was in effect a prospective negative declaration relating to potential copyright infringement in the United States. The action was by a television company for a declaration that the daughter of Sir Arthur Conan Doyle had no rights under the copyright, unfair competition, or trademark laws of the United States to prevent the company from distributing a Sherlock Holmes television film. It was conceded on behalf of the television company that no distinction could be drawn for the purpose of the case law between patents and other intellectual property rights including copyright. Vinelott J also supported his conclusion by reliance on the first limb of the rule in *Philips v Eyre*: infringement of an American copyright was not a tort in English law and the first limb could not be satisfied. In *R Griggs Group Ltd v Evans* [2004] EWHC 1088 (Ch), [2005] Ch 153, Vinelott J's decision was criticised by Mr Peter Prescott QC, sitting as a Deputy High Court judge, who distinguished it by applying the exception to the *Moçambique* rule whereby jurisdiction could be exercised if there were a contract or an equity between the parties: the judge allowed an amendment to a pleading on the basis that the court in the exercise of its equitable in personam jurisdiction could order a person who had acquired property situate abroad with sufficient notice of an earlier obligation to transfer the property to another to assign that property to its equitable owner, and that it would not be a breach of comity to adjudicate in personam on rights to foreign intellectual property (copyright) arising out of a contract.

97.    Patents were the subject of the decision of Laddie J in *Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch 33, in which he held that the court had no jurisdiction to try claims for infringement of German and Spanish patents for two reasons: the first was that the claims were not justiciable under the *Moçambique/Potter v Broken Hill Pty Co Ltd* principles. The second was that the claims were concerned with validity and within what is now article 22(4) of the Brussels I Regulation.

98.    In *Pearce v Ove Arup Partnership Ltd* [2000] Ch 403 Mr Pearce claimed that the defendants had infringed his English and Dutch copyrights in his drawings and plans for a town hall by copying them in designing the Kunsthal in Rotterdam. There was no issue about existence or validity of the copyrights. The sole factual question was whether his drawings and plans had been copied. On the question of the justiciability of the claim for infringement of the Dutch copyright, the court had personal jurisdiction over the defendants by virtue of their domicile in England (because they were additional parties for the purposes of what is now article 6(1) of the Brussels I Regulation). It was not suggested that what is now article 22(4)

applied, since the proceedings were for infringement of copyright and no question of deposit or registration arose. The effect of what is now article 22(1)) was that the *Moçambique* rule no longer applied within the Member States, and that where proceedings in relation to intellectual property fell outside what is now article 22(1), the general rules of jurisdiction applied, and there was no room for an objection of non-justiciability. The common law rule of choice of law applied because the relevant events occurred before section 11 of the Private International law (Miscellaneous Provisions) Act 1995 came into force in 1996, but (as mentioned above) the court disapplied the first limb of the rule in *Phillips v Eyre* in favour of the law of the country which with respect to that issue had the most significant relationship with the occurrence and with the parties, which was Dutch law.

*Foreign authorities*

99.    In the United States the local action rule has been used as a ground for refusal to add claims for infringement of foreign patents to a United States patent infringement action: *Voda v Cordis Corp*, 476 F 3d 887 (Fed Cir 2007), discussed above in connection with the act of state doctrine. The majority said (at pp 901-902):

> "the local action doctrine informs us that exercising supplemental jurisdiction in this case appears to violate our own norms of what sovereigns ordinarily expect. Courts derived the local action doctrine from the distinction between local and transitory actions beginning with *Livingston v Jefferson,* written by Justice John Marshall riding Circuit. 15 F. Cas. 660 (C.C.D.Va. 1811). … [T]he local action doctrine served to prevent courts from adjudicating claims for trespass or title to real property.

> The territorial limits of the rights granted by patents are similar to those conferred by land grants. A patent right is limited by the metes and bounds of the jurisdictional territory that granted the right to exclude. …

> Therefore, a patent right to exclude only arises from the legal right granted and recognized by the sovereign within whose territory the right is located. It would be incongruent to allow the sovereign power of one to be infringed or limited by another sovereign's extension of its jurisdiction. …"

100.   Claims for infringement of foreign copyright have been held in New Zealand and South Africa to be non-justiciable. In *Atkinson Footwear Ltd v Hodgskin International Services Ltd*, (1994) 31 IPR 186 (High Court of New Zealand) Tipping J followed the *Tyburn Productions Ltd* decision and in *Gallo Africa Ltd v Sting Music (Pty) Ltd* [2010] ZASCA 96, 2010 (6) SA 329 the Supreme Court of Appeal of South Africa applied the decision of the Court of Appeal in the present case. But in *KK Sony Computer Entertainment v Van Veen* (2006) 71 IPR 179 MacKenzie J in the High Court of New Zealand declined to follow *Atkinson Footwear* and held that a claim for infringement of foreign intellectual property rights (in that case breach of United Kingdom and Hong Kong copyright in PlayStation 2) was justiciable if no question of the existence or validity of those rights was in issue.

### Conclusions on the justiciability question

101.   The issue on this appeal is a very narrow one because the appellants do not take issue with the application of the *Moçambique* rule to intellectual property so far as it is limited to patents and other intellectual property rights dependent on the grant or authority of a foreign State, and to cases where what is in issue is the validity of the patent, as opposed to its infringement.

102.   As recorded by Mann J, the trial judge ([2008] EWHC 1878 (Ch), [2009] FSR 103, at [272]), the dispute relating to the United States copyright was as follows. The subsistence of copyright and ownership of all drawings was accepted by Mr Ainsworth, although the existence of some drawings was disputed. Infringement was denied so far as some drawings are concerned, on the footing that they were not copied, or not copied closely enough. Because three dimensional items were produced, it was argued that under United States law there was no infringement because copyright in the drawings would not be infringed by the production of a utilitarian or functional device. Lucasfilm claimed copyright in physical helmets and armour, which was disputed by Mr Ainsworth because they were said to be functional or utilitarian. According to the judge, at one stage it had also been suggested that if there was copyright it was vested in Mr Ainsworth and not in Lucasfilm, but this point was not ultimately persisted in.

103.   Although at trial the infringement arguments sometimes merged into a subsistence argument, the substantial dispute has always been about the ownership of the relevant copyrights and their infringement rather than about their subsistence.

104.   Were these claims justiciable? Mr Ainsworth argued that the principle behind the *Moçambique* rule (as extended in *Hesperides* to include actions in

which no issue of title arises) still subsists and applies to claims for infringement of all foreign intellectual property rights, including copyright, because such claims are essentially "local" and must be brought in the place where the rights have been created, irrespective as to whether there is any claim to title. But to describe the claims as "local" is simply to beg the question whether as a matter of law they must be brought in the place where the rights originate and are effective.

105.   We have come to the firm conclusion that, in the case of a claim for infringement of copyright of the present kind, the claim is one over which the English court has jurisdiction, provided that there is a basis for in personam jurisdiction over the defendant, or, to put it differently, the claim is justiciable. It is clear that much of the underpinning of the *Moçambique* rule and the decision in *Potter v Broken Hill Pty Co Ltd* has been eroded. All that is left of the *Moçambique* rule (except to the extent that it is modified by the Brussels I Regulation) is that there is no jurisdiction in proceedings for infringement of rights in foreign land where the proceedings are "principally concerned with a question of the title, or the right to possession, of that property." So also article 22(1) of the Brussels I Regulation does not apply to actions for damages for infringement of rights in land.

106.   The basis for what remains of the rule was said by the House of Lords in the *Moçambique* case to be that controversies should be decided in the country of the situs of the property because the right of granting it was vested in "the ruler of the country" and in the *Hesperides* case to be the maintenance of comity and the avoidance of conflict with foreign jurisdictions. It is possible to see how the rationale of the *Moçambique* rule can be applied to patents, at any rate where questions of validity are involved. For example the claims might touch on the validity of patents in sensitive areas, such as armaments, and that no doubt is part of the rationale for article 22(4) of the Brussels I Regulation. But it is very difficult to see how it could apply to copyright. It is true that copyright can involve delicate political issues. Thus in a very different context Brightman J had to deal with the international consequences for copyright protection of the *samizdat* circulation in the Soviet Union of Solzhenitsyn's *August 1914* without having been passed by the Soviet censor: *Bodley Head Ltd v Flegon* [1972] 1 WLR 680. But such cases can be dealt with by an application of the principles of public policy in appropriate cases.

107.   Nor do the additional matters relied on in *Potter v Broken Hill Pty Co Ltd* lead to any different conclusion. The rule in *Phillips v Eyre* has gone. There is no room for the application of the act of state doctrine in relation to copyright in this case, even if (contrary to the view expressed above) actions of officials involved with registration and grant of intellectual property rights were acts of state. The requirement to apply for copyright registration in the United States is limited to the "copyright in any United States work" which in practice means that published

works first published outside the United States are exempted from compliance with US registration provisions. In the present case the copyrights were treated as United States works and were registered. Registration is a pre-requisite to proceedings in the United States: United States Copyright Act, section 411. But the unchallenged evidence before the judge in this case was that registration was not a prerequisite to subsistence but only to suit, and it was possible to register at the time of suit. Consequently the provision is purely procedural. That has been confirmed recently by the United States Supreme Court, which has held that federal courts have subject matter jurisdiction to approve a class action settlement where some of the authors are not registered, because section 411 is not a jurisdictional rule: *Reed Elsevier Inc v Muchnick*, 130 S Ct 1237 (2010).

108.    There is no doubt that the modern trend is in favour of the enforcement of foreign intellectual property rights. First, article 22(4) of the Brussels I Regulation only assigns exclusive jurisdiction to the country where the right originates in cases which are concerned with registration or validity of rights which are "required to be deposited or registered" and does not apply to infringement actions in which there is no issue as to validity. This can rarely, if ever, apply to copyright. Second, the Rome II Regulation also plainly envisages the litigation of foreign intellectual property rights and, third, the professional and academic bodies which have considered the issue, the American Law Institute and the Max Planck Institute, clearly favour them, at any rate where issues of validity are not engaged.

109.    There are no issues of policy which militate against the enforcement of foreign copyright. States have an interest in the international recognition and enforcement of their copyrights, as the Berne Convention on the International Union for the Protection of Literary and Artistic Works shows. Many of the points relied on by the Court of Appeal to justify the application of the *Moçambique* rule in this case as a matter of policy would apply to many international cases over which the English court would have jurisdiction and would in principle exercise it, especially the suggestion that questions of foreign law would have to be decided. It was also said by the Court of Appeal that enforcement of foreign intellectual property law might involve a clash of policies such that a defendant may be restrained by injunction from doing acts in this country which are lawful in this country. But such an injunction will be granted only if the acts are anticipated to achieve fruition in another country, and there is no objection in principle to such an injunction. Nor is there any objection in principle, as the Court of Appeal thought, to a restraint on acts in another country. Extra-territorial injunctions are commonly granted here against defendants subject to the in personam jurisdiction. The Court of Appeal also thought that it was relevant that there was no international regime for the mutual recognition of copyright jurisdiction and of copyright judgments, but this is no reason for the English court refusing to take jurisdiction over an English defendant in a claim for breach of foreign copyright.

110.   It follows that *Tyburn Productions Ltd v Conan Doyle* was wrongly decided and that on this aspect the decision of the Court of Appeal in these proceedings cannot stand.

### The Owusu v Jackson point

111.   If the Court of Appeal was right to hold that the claim was in principle non-justiciable, a further question would arise whether nevertheless, in the light of the decision of the European Court in Case C-281/02 *Owusu v Jackson* [2005] ECR I-1383, the English court must grant a remedy against Mr Ainsworth, who is domiciled in England for the purposes of what is now Article 2 of the Brussels I Regulation. In *Owusu v Jackson* the European Court decided that an action in England arising out of events in Jamaica could not be stayed as against an English defendant in favour the Jamaican courts on the ground of forum non conveniens. That was because the English defendant was domiciled in a Member State for the purposes of article 2, and the assignment of jurisdiction to that State applied also as between Contracting and non-Contracting States (now Member and non-Member States).   In this case the Court of Appeal distinguished *Owusu v Jackson* on the basis that it did not apply to cases where the English court held that it had no subject-matter jurisdiction.

112.   Lucasfilm argues that it would be inconsistent with the *Owusu* principle for the English court to decline to decide a particular issue on the ground that it is not justiciable under English law, because (in particular) the Brussels I Regulation is concerned with subject-matter jurisdiction as well as personal jurisdiction; it is concerned with achieving the uniform application of common principles regarding jurisdiction across the European Community, and it would not be consistent with that object if national courts were able to decline jurisdiction on principles of non-justiciability. Although in argument it was stressed that the argument was one of lack of jurisdiction rather than non-justiciability, in substance the real point of the argument is that if Lucasfilm were right, then the Brussels I Regulation would require the English court to adjudicate on other matters which have hitherto been regarded as non-justiciable, such as "the transactions of foreign sovereign states" which were held to be non-justiciable in *Buttes Gas and Oil Co v Hammer (No 3)* [1982] AC 888, 931; and that to require the English court to so adjudicate would be contrary to international law (or, perhaps more accurately, put the United Kingdom in breach of international law).

113.   In view of the conclusion on the main point, this issue (on which a reference to the European Court might be required) does not arise and there is no need to express a view on it.

114.   We would therefore allow the appeal on the justiciability issue.


**LORD MANCE**


115.   For the reasons given by Lord Walker and Lord Collins in their combined judgment, I agree that the appeal fails on the first issue (sculpture) and succeeds on the second (justiciability of a claim for infringement of a foreign copyright). I express no view about the application or scope of the doctrine of act of state in relation to issues of validity of foreign intellectual property rights which (unlike copyright) may be said to depend upon state grant.

II

*(Non-legislative acts)*

# RULES OF PROCEDURE

**RULES OF PROCEDURE OF THE COURT OF JUSTICE**

**Table of Contents**

*Page*

**INTRODUCTORY PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Article 1    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Article 2    Purport of these Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**TITLE I - ORGANISATION OF THE COURT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    CHAPTER 1 - JUDGES AND ADVOCATES GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Article 3    Commencement of the term of office of Judges and Advocates General . . . . . . . . . . . . . . . 10

    Article 4    Taking of the oath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Article 5    Solemn undertaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Article 6    Depriving a Judge or Advocate General of his office . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Article 7    Order of seniority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    CHAPTER 2 - PRESIDENCY OF THE COURT, CONSTITUTION OF THE CHAMBERS AND DESIGNATION OF
    THE FIRST ADVOCATE GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Article 8    Election of the President and of the Vice-President of the Court . . . . . . . . . . . . . . . . . . . 10

    Article 9    Responsibilities of the President of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Article 10    Responsibilities of the Vice-President of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Article 11    Constitution of Chambers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Article 12    Election of Presidents of Chambers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Article 13    Where the President and Vice-President of the Court are prevented from acting . . . . . . . . . . 11

    Article 14    Designation of the First Advocate General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    CHAPTER 3 - ASSIGNMENT OF CASES TO JUDGE-RAPPORTEURS AND ADVOCATES GENERAL . . . . . . . . . 11

    Article 15    Designation of the Judge-Rapporteur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Article 16    Designation of the Advocate General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    CHAPTER 4 - ASSISTANT RAPPORTEURS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Article 17    Assistant Rapporteurs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    CHAPTER 5 - REGISTRY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Article 18    Appointment of the Registrar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Page*

Article 19    Deputy Registrar .................................................................    12

Article 20    Responsibilities of the Registrar ...............................................    12

Article 21    Keeping of the register ..........................................................    12

Article 22    Consultation of the register and of judgments and orders ...........................    13

CHAPTER 6 - THE WORKING OF THE COURT ......................................................    13

Article 23    Location of the sittings of the Court ............................................    13

Article 24    Calendar of the Court's judicial business .........................................    13

Article 25    General meeting .................................................................    13

Article 26    Drawing-up of minutes ...........................................................    13

CHAPTER 7 - FORMATIONS OF THE COURT ......................................................    13

Section 1.    Composition of the formations of the Court .....................................    13

Article 27    Composition of the Grand Chamber .............................................    13

Article 28    Composition of the Chambers of five and of three Judges ..........................    14

Article 29    Composition of Chambers where cases are related or referred back ...................    14

Article 30    Where a President of a Chamber is prevented from acting ..........................    14

Article 31    Where a member of the formation of the Court is prevented from acting ..............    14

Section 2.    Deliberations ..................................................................    14

Article 32    Procedures concerning deliberations .............................................    14

Article 33    Number of Judges taking part in the deliberations ................................    15

Article 34    Quorum of the Grand Chamber .................................................    15

Article 35    Quorum of the Chambers of five and of three Judges ..............................    15

CHAPTER 8 - LANGUAGES .....................................................................    15

Article 36    Language of a case ..............................................................    15

Article 37    Determination of the language of a case ..........................................    15

Article 38    Use of the language of the case .................................................    16

Article 39    Responsibility of the Registrar concerning language arrangements ...................    16

Article 40    Languages of the publications of the Court .......................................    16

Article 41    Authentic texts .................................................................    16

Article 42    Language service of the Court ...................................................    16

TITLE II - COMMON PROCEDURAL PROVISIONS ................................................    16

CHAPTER 1 - RIGHTS AND OBLIGATIONS OF AGENTS, ADVISERS AND LAWYERS .................    16

Article 43    Privileges, immunities and facilities .............................................    16

Article 44    Status of the parties' representatives .............................................    17

Article 45    Waiver of immunity .............................................................    17

Article 46    Exclusion from the proceedings ..................................................    17

*Page*

Article 47    University teachers and parties to the main proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

CHAPTER 2 - SERVICE    17

Article 48    Methods of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

CHAPTER 3 - TIME-LIMITS    18

Article 49    Calculation of time-limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 50    Proceedings against a measure adopted by an institution . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 51    Extension on account of distance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 52    Setting and extension of time-limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

CHAPTER 4 - DIFFERENT PROCEDURES FOR DEALING WITH CASES . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 53    Procedures for dealing with cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 54    Joinder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 55    Stay of proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

Article 56    Deferment of the determination of a case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

CHAPTER 5 - WRITTEN PART OF THE PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Article 57    Lodging of procedural documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Article 58    Length of procedural documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

CHAPTER 6 - THE PRELIMINARY REPORT AND ASSIGNMENT OF CASES TO FORMATIONS OF THE COURT    19

Article 59    Preliminary report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Article 60    Assignment of cases to formations of the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

CHAPTER 7 - MEASURES OF ORGANISATION OF PROCEDURE AND MEASURES OF INQUIRY . . . . . . . . .    20

Section 1.    Measures of organisation of procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Article 61    Measures of organisation prescribed by the Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Article 62    Measures of organisation prescribed by the Judge-Rapporteur or the Advocate General . . . . .    20

Section 2.    Measures of inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Article 63    Decision on measures of inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Article 64    Determination of measures of inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Article 65    Participation in measures of inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Article 66    Oral testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 67    Examination of witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 68    Witnesses' oath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 69    Pecuniary penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 70    Expert's report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 71    Expert's oath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 72    Objection to a witness or expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Article 73    Witnesses' and experts' costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

*Page*

Article 74   Minutes of inquiry hearings ................................................................ 22

Article 75   Opening of the oral part of the procedure after the inquiry .......................... 22

CHAPTER 8 - ORAL PART OF THE PROCEDURE ............................................ 22

Article 76   Hearing ...................................................................................... 22

Article 77   Joint hearing ................................................................................ 22

Article 78   Conduct of oral proceedings .............................................................. 22

Article 79   Cases heard in camera ..................................................................... 22

Article 80   Questions .................................................................................... 22

Article 81   Close of the hearing ........................................................................ 22

Article 82   Delivery of the Opinion of the Advocate General ..................................... 22

Article 83   Opening or reopening of the oral part of the procedure .............................. 22

Article 84   Minutes of hearings ........................................................................ 23

Article 85   Recording of the hearing ................................................................... 23

CHAPTER 9 - JUDGMENTS AND ORDERS .................................................. 23

Article 86   Date of delivery of a judgment ........................................................... 23

Article 87   Content of a judgment ..................................................................... 23

Article 88   Delivery and service of the judgment .................................................... 23

Article 89   Content of an order ........................................................................ 23

Article 90   Signature and service of the order ....................................................... 24

Article 91   Binding nature of judgments and orders ................................................ 24

Article 92   Publication in the Official Journal of the European Union ............................ 24

**TITLE III - REFERENCES FOR A PRELIMINARY RULING** .............................. 24

CHAPTER 1 - GENERAL PROVISIONS ...................................................... 24

Article 93   Scope ........................................................................................ 24

Article 94   Content of the request for a preliminary ruling ....................................... 24

Article 95   Anonymity ................................................................................... 24

Article 96   Participation in preliminary ruling proceedings ....................................... 24

Article 97   Parties to the main proceedings .......................................................... 24

Article 98   Translation and service of the request for a preliminary ruling ..................... 25

Article 99   Reply by reasoned order ................................................................... 25

Article 100  Circumstances in which the Court remains seised ..................................... 25

Article 101  Request for clarification ................................................................... 25

Article 102  Costs of the preliminary ruling proceedings ........................................... 25

Article 103  Rectification of judgments and orders ................................................... 25

Article 104  Interpretation of preliminary rulings .................................................... 25

*Page*

CHAPTER 2 - EXPEDITED PRELIMINARY RULING PROCEDURE ................................. 26

    Article 105    Expedited procedure ........................................................ 26

    Article 106    Transmission of procedural documents ........................................ 26

CHAPTER 3 - URGENT PRELIMINARY RULING PROCEDURE ................................... 26

    Article 107    Scope of the urgent preliminary ruling procedure ............................. 26

    Article 108    Decision as to urgency ...................................................... 26

    Article 109    Written part of the urgent procedure ........................................ 26

    Article 110    Service and information following the close of the written part of the procedure ......... 27

    Article 111    Omission of the written part of the procedure ................................. 27

    Article 112    Decision on the substance ................................................... 27

    Article 113    Formation of the Court ..................................................... 27

    Article 114    Transmission of procedural documents ........................................ 27

CHAPTER 4 - LEGAL AID ............................................................. 27

    Article 115    Application for legal aid .................................................... 27

    Article 116    Decision on the application for legal aid ...................................... 27

    Article 117    Sums to be advanced as legal aid ............................................ 28

    Article 118    Withdrawal of legal aid ..................................................... 28

**TITLE IV - DIRECT ACTIONS** ....................................................... 28

CHAPTER 1 - REPRESENTATION OF THE PARTIES ........................................ 28

    Article 119    Obligation to be represented ................................................ 28

CHAPTER 2 - WRITTEN PART OF THE PROCEDURE ...................................... 28

    Article 120    Content of the application .................................................. 28

    Article 121    Information relating to service ............................................... 28

    Article 122    Annexes to the application .................................................. 28

    Article 123    Service of the application ................................................... 29

    Article 124    Content of the defence ..................................................... 29

    Article 125    Transmission of documents .................................................. 29

    Article 126    Reply and rejoinder ....................................................... 29

CHAPTER 3 - PLEAS IN LAW AND EVIDENCE ........................................... 29

    Article 127    New pleas in law .......................................................... 29

    Article 128    Evidence produced or offered ............................................... 29

CHAPTER 4 - INTERVENTION .......................................................... 29

    Article 129    Object and effects of the intervention ........................................ 29

    Article 130    Application to intervene .................................................... 30

    Article 131    Decision on applications to intervene ......................................... 30

*Page*

Article 132    Submission of statements .................................................... 30

CHAPTER 5 - EXPEDITED PROCEDURE ............................................ 30

Article 133    Decision relating to the expedited procedure ................................. 30

Article 134    Written part of the procedure ............................................. 30

Article 135    Oral part of the procedure ............................................... 30

Article 136    Decision on the substance ................................................ 31

CHAPTER 6 - COSTS ........................................................... 31

Article 137    Decision as to costs .................................................... 31

Article 138    General rules as to allocation of costs ...................................... 31

Article 139    Unreasonable or vexatious costs ........................................... 31

Article 140    Costs of interveners .................................................... 31

Article 141    Costs in the event of discontinuance or withdrawal ............................ 31

Article 142    Costs where a case does not proceed to judgment ............................. 31

Article 143    Costs of proceedings ................................................... 31

Article 144    Recoverable costs ...................................................... 31

Article 145    Dispute concerning the costs to be recovered ................................ 31

Article 146    Procedure for payment .................................................. 32

CHAPTER 7 - AMICABLE SETTLEMENT, DISCONTINUANCE, CASES THAT DO NOT PROCEED TO JUDGMENT
             AND PRELIMINARY ISSUES .......................................... 32

Article 147    Amicable settlement .................................................... 32

Article 148    Discontinuance ....................................................... 32

Article 149    Cases that do not proceed to judgment ..................................... 32

Article 150    Absolute bar to proceeding with a case ..................................... 32

Article 151    Preliminary objections and issues .......................................... 32

CHAPTER 8 - JUDGMENTS BY DEFAULT ........................................... 32

Article 152    Judgments by default ................................................... 32

CHAPTER 9 - REQUESTS AND APPLICATIONS RELATING TO JUDGMENTS AND ORDERS ............. 33

Article 153    Competent formation of the Court ......................................... 33

Article 154    Rectification ......................................................... 33

Article 155    Failure to adjudicate ................................................... 33

Article 156    Application to set aside ................................................. 33

Article 157    Third-party proceedings ................................................. 33

Article 158    Interpretation ........................................................ 34

Article 159    Revision ............................................................ 34

CHAPTER 10 - SUSPENSION OF OPERATION OR ENFORCEMENT AND OTHER INTERIM MEASURES ...... 34

Article 160    Application for suspension or for interim measures ............................ 34

Article 161    Decision on the application .............................................. 35

*Page*

Article 162    Order for suspension of operation or for interim measures .......................... 35

Article 163    Change in circumstances .................................................... 35

Article 164    New application .......................................................... 35

Article 165    Applications pursuant to Articles 280 TFEU and 299 TFEU and Article 164 TEAEC ....... 35

Article 166    Application pursuant to Article 81 TEAEC ........................................ 35

**TITLE V -  APPEALS AGAINST DECISIONS OF THE GENERAL COURT** ........................ 35

CHAPTER 1 -  FORM AND CONTENT OF THE APPEAL, AND FORM OF ORDER SOUGHT .............. 35

Article 167    Lodging of the appeal ..................................................... 35

Article 168    Content of the appeal ..................................................... 35

Article 169    Form of order sought, pleas in law and arguments of the appeal ..................... 36

Article 170    Form of order sought in the event that the appeal is allowed ....................... 36

CHAPTER 2 -  RESPONSES, REPLIES AND REJOINDERS .......................................... 36

Article 171    Service of the appeal ..................................................... 36

Article 172    Parties authorised to lodge a response ........................................ 36

Article 173    Content of the response ................................................... 36

Article 174    Form of order sought in the response ......................................... 36

Article 175    Reply and rejoinder ...................................................... 36

CHAPTER 3 -  FORM AND CONTENT OF THE CROSS-APPEAL, AND FORM OF ORDER SOUGHT ........ 36

Article 176    Cross-appeal ........................................................... 36

Article 177    Content of the cross-appeal ................................................ 36

Article 178    Form of order sought, pleas in law and arguments of the cross-appeal ................ 37

CHAPTER 4 -  PLEADINGS CONSEQUENT ON THE CROSS-APPEAL ............................... 37

Article 179    Response to the cross-appeal ............................................... 37

Article 180    Reply and rejoinder on a cross-appeal ........................................ 37

CHAPTER 5 -  APPEALS DETERMINED BY ORDER .............................................. 37

Article 181    Manifestly inadmissible or manifestly unfounded appeal or cross-appeal ............... 37

Article 182    Manifestly well-founded appeal or cross-appeal .................................. 37

CHAPTER 6 -  EFFECT ON A CROSS-APPEAL OF THE REMOVAL OF THE APPEAL FROM THE REGISTER 37

Article 183    Effect on a cross-appeal of the discontinuance or manifest inadmissibility of the appeal .... 37

CHAPTER 7 -  COSTS AND LEGAL AID IN APPEALS ............................................ 37

Article 184    Costs in appeals ......................................................... 37

Article 185    Legal aid .............................................................. 38

Article 186    Prior application for legal aid ............................................... 38

Article 187    Decision on the application for legal aid ....................................... 38

Article 188    Sums to be advanced as legal aid ........................................... 38

*Page*

Article 189    Withdrawal of legal aid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

CHAPTER 8 -  OTHER PROVISIONS APPLICABLE TO APPEALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

Article 190    Other provisions applicable to appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

**TITLE VI -  REVIEW OF DECISIONS OF THE GENERAL COURT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

Article 191    Reviewing Chamber . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

Article 192    Information and communication of decisions which may be reviewed . . . . . . . . . . . . . . . .    39

Article 193    Review of decisions given on appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

Article 194    Review of preliminary rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

Article 195    Judgment on the substance of the case after a decision to review . . . . . . . . . . . . . . . . .    40

**TITLE VII - OPINIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

Article 196    Written part of the procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

Article 197    Designation of the Judge-Rapporteur and of the Advocate General . . . . . . . . . . . . . . . . .    40

Article 198    Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

Article 199    Time-limit for delivering the Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

Article 200    Delivery of the Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

**TITLE VIII - PARTICULAR FORMS OF PROCEDURE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

Article 201    Appeals against decisions of the arbitration committee . . . . . . . . . . . . . . . . . . . . . . . . .    40

Article 202    Procedure under Article 103 TEAEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

Article 203    Procedures under Articles 104 TEAEC and 105 TEAEC . . . . . . . . . . . . . . . . . . . . . . . . .    41

Article 204    Procedure provided for by Article 111(3) of the EEA Agreement . . . . . . . . . . . . . . . . . . .    41

Article 205    Settlement of the disputes referred to in Article 35 TEU in the version in force before the entry
into force of the Treaty of Lisbon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

Article 206    Requests under Article 269 TFEU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

**FINAL PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

Article 207    Supplementary rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

Article 208    Implementing rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

Article 209    Repeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

Article 210    Publication and entry into force of these Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

29.9.2012          EN          Official Journal of the European Union          L 265/9

# RULES OF PROCEDURE OF THE COURT OF JUSTICE

THE COURT OF JUSTICE

Having regard to the Treaty on European Union, and in particular Article 19 thereof,

Having regard to the Treaty on the Functioning of the European Union, and in particular the sixth paragraph of Article 253 thereof,

Having regard to the Treaty establishing the European Atomic Energy Community, and in particular Article 106a(1) thereof,

Having regard to the Protocol on the Statute of the Court of Justice of the European Union, and in particular Article 63 and the second paragraph of Article 64 thereof,

Whereas:

(1) Despite having been amended on several occasions over the years, the Rules of Procedure of the Court of Justice have remained fundamentally unchanged in structure since their original adoption on 4 March 1953. The Rules of Procedure of 19 June 1991, which are currently in force, still reflect the initial preponderance of direct actions, whereas in fact the majority of such actions now fall within the jurisdiction of the General Court, and references for a preliminary ruling from the courts and tribunals of the Member States represent, quantitatively, the primary category of cases brought before the Court. That fact should be taken into account and the structure and content of the Rules of Procedure of the Court adapted, in consequence, to changes in its caseload.

(2) While references for a preliminary ruling should be given their proper place in the Rules of Procedure, it is also appropriate to draw a clearer distinction between the rules that apply to all types of action and those that are specific to each type, to be contained in separate titles. In the interests of clarification, procedural provisions common to all cases brought before the Court should, therefore, all be contained in an initial title.

(3) In the light of experience gained in the course of implementing the various procedures, it is also necessary to supplement or to clarify, for the benefit of litigants as well as of national courts and tribunals, the rules that apply to each procedure. The rules in question concern, in particular, the concepts of party to the main proceedings, intervener and party to the proceedings before the General Court, or, in preliminary rulings, the rules governing the bringing of matters before the Court and the content of the order for reference. With regard to appeals against decisions of the General Court, a clearer distinction must also be drawn between appeals and cross-appeals in consequence of the service of an appeal on the cross-appellant.

(4) Conversely, the excessive complexity of certain procedures, such as the review procedure, has come to light on their implementation. Accordingly, they should be simplified by providing, inter alia, for a Chamber of five Judges to be designated for a period of one year to be responsible for ruling both on the First Advocate General's proposal to review and on the questions to be reviewed.

(5) Similarly, the procedural arrangements for dealing with requests for Opinions should be eased by aligning them with those that apply to other cases and by providing, in consequence, for a single Advocate General to be involved in dealing with the request for an Opinion. In the interests of making the Rules easier to understand, all the particular procedures currently to be found in a number of separate titles and chapters of the Rules of Procedure should also be brought together in a single title.

(6) In order to maintain the Court's capacity, in the face of an ever-increasing caseload, to dispose within a reasonable period of time of the cases brought before it, it is also necessary to continue the efforts made to reduce the duration of proceedings before the Court, in particular by extending the opportunities for the Court to rule by reasoned order, simplifying the rules relating to the intervention of the States and institutions referred to in the first and third paragraphs of Article 40 of the Statute and providing for the Court to be able to rule without a hearing if it considers that it has sufficient information on the basis of all the written observations lodged in a case.

(7) In the interests of making the Rules applied by the Court easier to understand, lastly, certain rules which are outdated or not applied should be deleted, every paragraph of the present Rules numbered, each article given a specific heading summarising its content and the terminology harmonised.

With the Council's approval given on 24 September 2012.

HAS ADOPTED THESE RULES OF PROCEDURE:

## INTRODUCTORY PROVISIONS

### Article 1

### Definitions

1. In these Rules:

(a) provisions of the Treaty on European Union are referred to by the number of the article concerned followed by 'TEU',

(b) provisions of the Treaty on the Functioning of the European Union are referred to by the number of the article concerned followed by 'TFEU',

(c) provisions of the Treaty establishing the European Atomic Energy Community are referred to by the number of the article concerned followed by 'TEAEC',

(d) 'Statute' means the Protocol on the Statute of the Court of Justice of the European Union,

(e) 'EEA Agreement' means the Agreement on the European Economic Area, (¹)

(f) 'Council Regulation No 1' means Council Regulation No 1 of 15 April 1958 determining the languages to be used by the European Economic Community. (²)

2.   For the purposes of these Rules:

(a) 'institutions' means the institutions of the European Union referred to in Article 13(1) TEU and bodies, offices and agencies established by the Treaties, or by an act adopted in implementation thereof, which may be parties before the Court,

(b) 'EFTA Surveillance Authority' means the surveillance authority referred to in the EEA Agreement,

(c) 'interested persons referred to in Article 23 of the Statute' means all the parties, States, institutions, bodies, offices and agencies authorised, pursuant to that Article, to submit statements of case or observations in the context of a reference for a preliminary ruling.

*Article 2*

**Purport of these Rules**

These Rules implement and supplement, so far as necessary, the relevant provisions of the EU, FEU and EAEC Treaties, and the Statute.

**TITLE I**

**ORGANISATION OF THE COURT**

Chapter 1

JUDGES AND ADVOCATES GENERAL

*Article 3*

**Commencement of the term of office of Judges and Advocates General**

The term of office of a Judge or Advocate General shall begin on the date fixed for that purpose in the instrument of appointment. In the absence of any provisions in that instrument regarding the date of commencement of the term of office, that term shall begin on the date of publication of the instrument in the *Official Journal of the European Union*.

*Article 4*

**Taking of the oath**

Before taking up his duties, a Judge or Advocate General shall, at the first public sitting of the Court which he attends after his appointment, take the following oath provided for in Article 2 of the Statute:

'I swear that I will perform my duties impartially and conscientiously; I swear that I will preserve the secrecy of the deliberations of the Court.'

*Article 5*

**Solemn undertaking**

Immediately after taking the oath, a Judge or Advocate General shall sign a declaration by which he gives the solemn undertaking provided for in the third paragraph of Article 4 of the Statute.

*Article 6*

**Depriving a Judge or Advocate General of his office**

1.   Where the Court is called upon, pursuant to Article 6 of the Statute, to decide whether a Judge or Advocate General no longer fulfils the requisite conditions or no longer meets the obligations arising from his office, the President shall invite the Judge or Advocate General concerned to make representations.

2.   The Court shall give a decision in the absence of the Registrar.

*Article 7*

**Order of seniority**

1.   The seniority of Judges and Advocates General shall be calculated without distinction according to the date on which they took up their duties.

2.   Where there is equal seniority on that basis, the order of seniority shall be determined by age.

3.   Judges and Advocates General whose terms of office are renewed shall retain their former seniority.

Chapter 2

PRESIDENCY OF THE COURT, CONSTITUTION OF THE CHAMBERS AND DESIGNATION OF THE FIRST ADVOCATE GENERAL

*Article 8*

**Election of the President and of the Vice-President of the Court**

1.   The Judges shall, immediately after the partial replacement provided for in the second paragraph of Article 253 TFEU, elect one of their number as President of the Court for a term of three years.

2.   If the office of the President falls vacant before the normal date of expiry of the term thereof, the Court shall elect a successor for the remainder of the term.

3.   The elections provided for in this Article shall be by secret ballot. The Judge obtaining the votes of more than half the Judges of the Court shall be elected. If no Judge obtains that majority, further ballots shall be held until that majority is attained.

---

(¹) OJ L 1, 3.1.1994, p. 27.
(²) OJ, English Special Edition 1952-1958 (I), p. 59.

4.    The Judges shall then elect one of their number as Vice-President of the Court for a term of three years, in accordance with the procedures laid down in the preceding paragraph. Paragraph 2 shall apply if the office of the Vice-President of the Court falls vacant before the normal date of expiry of the term thereof.

5.    The names of the President and Vice-President elected in accordance with this Article shall be published in the *Official Journal of the European Union*.

### Article 9

### Responsibilities of the President of the Court

1.    The President shall represent the Court.

2.    The President shall direct the judicial business of the Court. He shall preside at general meetings of the Members of the Court and at hearings before and deliberations of the full Court and the Grand Chamber.

3.    The President shall ensure the proper functioning of the services of the Court.

### Article 10

### Responsibilities of the Vice-President of the Court

1.    The Vice-President shall assist the President of the Court in the performance of his duties and shall take the President's place when the latter is prevented from acting.

2.    He shall take the President's place, at his request, in performing the duties referred to in Article 9(1) and (3) of these Rules.

3.    The Court shall, by decision, specify the conditions under which the Vice-President shall take the place of the President of the Court in the performance of his judicial duties. That decision shall be published in the *Official Journal of the European Union*.

### Article 11

### Constitution of Chambers

1.    The Court shall set up Chambers of five and three Judges in accordance with Article 16 of the Statute and shall decide which Judges shall be attached to them.

2.    The Court shall designate the Chambers of five Judges which, for a period of one year, shall be responsible for cases of the kind referred to in Article 107 and Articles 193 and 194.

3.    In respect of cases assigned to a formation of the Court in accordance with Article 60, the word 'Court' in these Rules shall mean that formation.

4.    In respect of cases assigned to a Chamber of five or three Judges, the powers of the President of the Court shall be exercised by the President of the Chamber.

5.    The composition of the Chambers and the designation of the Chambers responsible for cases of the kind referred to in Article 107 and Articles 193 and 194 shall be published in the *Official Journal of the European Union*.

### Article 12

### Election of Presidents of Chambers

1.    The Judges shall, immediately after the election of the President and Vice-President of the Court, elect the Presidents of the Chambers of five Judges for a term of three years.

2.    The Judges shall then elect the Presidents of the Chambers of three Judges for a term of one year.

3.    The provisions of Article 8(2) and (3) shall apply.

4.    The names of the Presidents of Chambers elected in accordance with this Article shall be published in the *Official Journal of the European Union*.

### Article 13

### Where the President and Vice-President of the Court are prevented from acting

When the President and the Vice-President of the Court are prevented from acting, the functions of President shall be exercised by one of the Presidents of the Chambers of five Judges or, failing that, by one of the Presidents of the Chambers of three Judges or, failing that, by one of the other Judges, according to the order of seniority laid down in Article 7.

### Article 14

### Designation of the First Advocate General

1.    The Court shall, after hearing the Advocates General, designate a First Advocate General for a period of one year.

2.    If the office of the First Advocate General falls vacant before the normal date of expiry of the term thereof, the Court shall designate a successor for the remainder of the term.

3.    The name of the First Advocate General designated in accordance with this Article shall be published in the *Official Journal of the European Union*.

### Chapter 3

ASSIGNMENT OF CASES TO JUDGE-RAPPORTEURS AND ADVOCATES GENERAL

### Article 15

### Designation of the Judge-Rapporteur

1.    As soon as possible after the document initiating proceedings has been lodged, the President of the Court shall designate a Judge to act as Rapporteur in the case.

2. For cases of the kind referred to in Article 107 and Articles 193 and 194, the Judge-Rapporteur shall be selected from among the Judges of the Chamber designated in accordance with Article 11(2), on a proposal from the President of that Chamber. If, pursuant to Article 109, the Chamber decides that the reference is not to be dealt with under the urgent procedure, the President of the Court may reassign the case to a Judge-Rapporteur attached to another Chamber.

3. The President of the Court shall take the necessary steps if a Judge-Rapporteur is prevented from acting.

### Article 16

### Designation of the Advocate General

1. The First Advocate General shall assign each case to an Advocate General.

2. The First Advocate General shall take the necessary steps if an Advocate General is prevented from acting.

### Chapter 4

### ASSISTANT RAPPORTEURS

### Article 17

### Assistant Rapporteurs

1. Where the Court is of the opinion that the consideration of and preparatory inquiries in cases before it so require, it shall, pursuant to Article 13 of the Statute, propose the appointment of Assistant Rapporteurs.

2. Assistant Rapporteurs shall in particular:

(a) assist the President of the Court in interim proceedings and

(b) assist the Judge-Rapporteurs in their work.

3. In the performance of their duties the Assistant Rapporteurs shall be responsible to the President of the Court, the President of a Chamber or a Judge-Rapporteur, as the case may be.

4. Before taking up his duties, an Assistant Rapporteur shall take before the Court the oath set out in Article 4 of these Rules.

### Chapter 5

### REGISTRY

### Article 18

### Appointment of the Registrar

1. The Court shall appoint the Registrar.

2. When the post of Registrar is vacant, an advertisement shall be published in the *Official Journal of the European Union*. Interested persons shall be invited to submit their applications within a time-limit of not less than three weeks, accompanied by full details of their nationality, university degrees, knowledge of languages, present and past occupations, and experience, if any, in judicial and international fields.

3. The vote, in which the Judges and the Advocates General shall take part, shall take place in accordance with the procedure laid down in Article 8(3) of these Rules.

4. The Registrar shall be appointed for a term of six years. He may be reappointed. The Court may decide to renew the term of office of the incumbent Registrar without availing itself of the procedure laid down in paragraph 2 of this Article.

5. The Registrar shall take the oath set out in Article 4 and sign the declaration provided for in Article 5.

6. The Registrar may be deprived of his office only if he no longer fulfils the requisite conditions or no longer meets the obligations arising from his office. The Court shall take its decision after giving the Registrar an opportunity to make representations.

7. If the office of Registrar falls vacant before the normal date of expiry of the term thereof, the Court shall appoint a new Registrar for a term of six years.

8. The name of the Registrar elected in accordance with this Article shall be published in the *Official Journal of the European Union*.

### Article 19

### Deputy Registrar

The Court may, in accordance with the procedure laid down in respect of the Registrar, appoint a Deputy Registrar to assist the Registrar and to take his place if he is prevented from acting.

### Article 20

### Responsibilities of the Registrar

1. The Registrar shall be responsible, under the authority of the President of the Court, for the acceptance, transmission and custody of all documents and for effecting service as provided for by these Rules.

2. The Registrar shall assist the Members of the Court in all their official functions.

3. The Registrar shall have custody of the seals and shall be responsible for the records. He shall be in charge of the publications of the Court and, in particular, the European Court Reports.

4. The Registrar shall direct the services of the Court under the authority of the President of the Court. He shall be responsible for the management of the staff and the administration, and for the preparation and implementation of the budget.

### Article 21

### Keeping of the register

1. There shall be kept in the Registry, under the responsibility of the Registrar, a register in which all procedural documents and supporting items and documents lodged shall be entered in the order in which they are submitted.

29.9.2012      EN      Official Journal of the European Union      L 265/13

2.    When a document has been registered, the Registrar shall make a note to that effect on the original and, if a party so requests, on any copy submitted for the purpose.

3.    Entries in the register and the notes provided for in the preceding paragraph shall be authentic.

4.    A notice shall be published in the *Official Journal of the European Union* indicating the date of registration of an application initiating proceedings, the names of the parties, the form of order sought by the applicant and a summary of the pleas in law and of the main supporting arguments or, as the case may be, the date of lodging of a request for a preliminary ruling, the identity of the referring court or tribunal and the parties to the main proceedings, and the questions referred to the Court.

### Article 22

### Consultation of the register and of judgments and orders

1.    Anyone may consult the register at the Registry and may obtain copies or extracts on payment of a charge on a scale fixed by the Court on a proposal from the Registrar.

2.    The parties to a case may, on payment of the appropriate charge, obtain certified copies of procedural documents.

3.    Anyone may, on payment of the appropriate charge, also obtain certified copies of judgments and orders.

### Chapter 6

THE WORKING OF THE COURT

### Article 23

### Location of the sittings of the Court

The Court may choose to hold one or more specific sittings in a place other than that in which it has its seat.

### Article 24

### Calendar of the Court's judicial business

1.    The judicial year shall begin on 7 October of each calendar year and end on 6 October of the following year.

2.    The judicial vacations shall be determined by the Court.

3.    In a case of urgency, the President may convene the Judges and the Advocates General during the judicial vacations.

4.    The Court shall observe the official holidays of the place in which it has its seat.

5.    The Court may, in proper circumstances, grant leave of absence to any Judge or Advocate General.

6.    The dates of the judicial vacations and the list of official holidays shall be published annually in the *Official Journal of the European Union*.

### Article 25

### General meeting

Decisions concerning administrative issues or the action to be taken upon the proposals contained in the preliminary report referred to in Article 59 of these Rules shall be taken by the Court at the general meeting in which all the Judges and Advocates General shall take part and have a vote. The Registrar shall be present, unless the Court decides to the contrary.

### Article 26

### Drawing-up of minutes

Where the Court sits without the Registrar being present it shall, if necessary, instruct the most junior Judge for the purposes of Article 7 of these Rules to draw up minutes, which shall be signed by that Judge and by the President.

### Chapter 7

FORMATIONS OF THE COURT

Section 1.  Composition of the formations of the Court

### Article 27

### Composition of the Grand Chamber

1.    The Grand Chamber shall, for each case, be composed of the President and the Vice-President of the Court, three Presidents of Chambers of five Judges, the Judge-Rapporteur and the number of Judges necessary to reach 15. The last-mentioned Judges and the three Presidents of Chambers of five Judges shall be designated from the lists referred to in paragraphs 3 and 4 of this Article, following the order laid down therein. The starting-point on each of those lists, in every case assigned to the Grand Chamber, shall be the name of the Judge immediately following the last Judge designated from the list concerned for the preceding case assigned to that formation of the Court.

2.    After the election of the President and the Vice-President of the Court, and then of the Presidents of the Chambers of five Judges, a list of the Presidents of Chambers of five Judges and a list of the other Judges shall be drawn up for the purposes of determining the composition of the Grand Chamber.

3.    The list of the Presidents of Chambers of five Judges shall be drawn up according to the order laid down in Article 7 of these Rules.

4.    The list of the other Judges shall be drawn up according to the order laid down in Article 7 of these Rules, alternating with the reverse order: the first Judge on that list shall be the first according to the order laid down in that Article, the second Judge shall be the last according to that order, the third Judge shall be the second according to that order, the fourth Judge the penultimate according to that order, and so on.

5.   The lists referred to in paragraphs 3 and 4 shall be published in the *Official Journal of the European Union*.

6.   In cases which are assigned to the Grand Chamber between the beginning of a calendar year in which there is a partial replacement of Judges and the moment when that replacement has taken place, two substitute Judges may be designated to complete the formation of the Court for so long as the attainment of the quorum referred to in the third paragraph of Article 17 of the Statute is in doubt. Those substitute Judges shall be the two Judges appearing on the list referred to in paragraph 4 immediately after the last Judge designated for the composition of the Grand Chamber in the case.

7.   The substitute Judges shall replace, in the order of the list referred to in paragraph 4, such Judges as are unable to take part in the determination of the case.

## Article 28

### Composition of the Chambers of five and of three Judges

1.   The Chambers of five Judges and of three Judges shall, for each case, be composed of the President of the Chamber, the Judge-Rapporteur and the number of Judges required to attain the number of five and three Judges respectively. Those last-mentioned Judges shall be designated from the lists referred to in paragraphs 2 and 3, following the order laid down therein. The starting-point on those lists, in every case assigned to a Chamber, shall be the name of the Judge immediately following the last Judge designated from the list for the preceding case assigned to the Chamber concerned.

2.   For the composition of the Chambers of five Judges, after the election of the Presidents of those Chambers lists shall be drawn up including all the Judges attached to the Chamber concerned, with the exception of its President. The lists shall be drawn up in the same way as the list referred to in Article 27(4).

3.   For the composition of the Chambers of three Judges, after the election of the Presidents of those Chambers lists shall be drawn up including all the Judges attached to the Chamber concerned, with the exception of its President. The lists shall be drawn up according to the order laid down in Article 7.

4.   The lists referred to in paragraphs 2 and 3 shall be published in the *Official Journal of the European Union*.

## Article 29

### Composition of Chambers where cases are related or referred back

1.   Where the Court considers that a number of cases must be heard and determined together by one and the same formation of the Court, the composition of that formation shall be that fixed for the case in respect of which the preliminary report was examined first.

2.   Where a Chamber to which a case has been assigned requests the Court, pursuant to Article 60(3) of these Rules, to assign the case to a formation composed of a greater number of Judges, that formation shall include the members of the Chamber which has referred the case back.

## Article 30

### Where a President of a Chamber is prevented from acting

1.   When the President of a Chamber of five Judges is prevented from acting, the functions of President of the Chamber shall be exercised by a President of a Chamber of three Judges, where necessary according to the order laid down in Article 7 of these Rules, or, if that formation of the Court does not include a President of a Chamber of three Judges, by one of the other Judges according to the order laid down in Article 7.

2.   When the President of a Chamber of three Judges is prevented from acting, the functions of President of the Chamber shall be exercised by a Judge of that formation of the Court according to the order laid down in Article 7.

## Article 31

### Where a member of the formation of the Court is prevented from acting

1.   When a member of the Grand Chamber is prevented from acting, he shall be replaced by another Judge according to the order of the list referred to in Article 27(4).

2.   When a member of a Chamber of five Judges is prevented from acting, he shall be replaced by another Judge of that Chamber, according to the order of the list referred to in Article 28(2). If it is not possible to replace the Judge prevented from acting by a Judge of the same Chamber, the President of that Chamber shall so inform the President of the Court who may designate another Judge to complete the Chamber.

3.   When a member of a Chamber of three Judges is prevented from acting, he shall be replaced by another Judge of that Chamber, according to the order of the list referred to in Article 28(3). If it is not possible to replace the Judge prevented from acting by a Judge of the same Chamber, the President of that Chamber shall so inform the President of the Court who may designate another Judge to complete the Chamber.

## Section 2. Deliberations

### Article 32

### Procedures concerning deliberations

1.   The deliberations of the Court shall be and shall remain secret.

29.9.2012    EN    Official Journal of the European Union    L 265/15

2.   When a hearing has taken place, only those Judges who participated in that hearing and, where relevant, the Assistant Rapporteur responsible for the consideration of the case shall take part in the deliberations.

3.   Every Judge taking part in the deliberations shall state his opinion and the reasons for it.

4.   The conclusions reached by the majority of the Judges after final discussion shall determine the decision of the Court.

### Article 33

### Number of Judges taking part in the deliberations

Where, by reason of a Judge being prevented from acting, there is an even number of Judges, the most junior Judge for the purposes of Article 7 of these Rules shall abstain from taking part in the deliberations unless he is the Judge-Rapporteur. In that case the Judge immediately senior to him shall abstain from taking part in the deliberations.

### Article 34

### Quorum of the Grand Chamber

1.   If, for a case assigned to the Grand Chamber, it is not possible to attain the quorum referred to in the third paragraph of Article 17 of the Statute, the President of the Court shall designate one or more other Judges according to the order of the list referred to in Article 27(4) of these Rules.

2.   If a hearing has taken place before that designation, the Court shall re-hear oral argument from the parties and the Opinion of the Advocate General.

### Article 35

### Quorum of the Chambers of five and of three Judges

1.   If, for a case assigned to a Chamber of five or of three Judges, it is not possible to attain the quorum referred to in the second paragraph of Article 17 of the Statute, the President of the Court shall designate one or more other Judges according to the order of the list referred to in Article 28(2) or (3), respectively, of these Rules. If it is not possible to replace the Judge prevented from acting by a Judge of the same Chamber, the President of that Chamber shall so inform the President of the Court forthwith who shall designate another Judge to complete the Chamber.

2.   Article 34(2) shall apply, *mutatis mutandis*, to the Chambers of five and of three Judges.

### Chapter 8

### LANGUAGES

### Article 36

### Language of a case

The language of a case shall be Bulgarian, Czech, Danish, Dutch, English, Estonian, Finnish, French, German, Greek, Hungarian, Irish, Italian, Latvian, Lithuanian, Maltese, Polish, Portuguese, Romanian, Slovak, Slovene, Spanish or Swedish.

### Article 37

### Determination of the language of a case

1.   In direct actions, the language of a case shall be chosen by the applicant, except that:

(a) where the defendant is a Member State, the language of the case shall be the official language of that State; where that State has more than one official language, the applicant may choose between them;

(b) at the joint request of the parties, the use of another of the languages mentioned in Article 36 for all or part of the proceedings may be authorised;

(c) at the request of one of the parties, and after the opposite party and the Advocate General have been heard, the use of another of the languages mentioned in Article 36 may be authorised as the language of the case for all or part of the proceedings by way of derogation from subparagraphs (a) and (b); such a request may not be submitted by one of the institutions of the European Union.

2.   Without prejudice to the provisions of paragraph 1(b) and (c), and of Article 38(4) and (5) of these Rules,

(a) in appeals against decisions of the General Court as referred to in Articles 56 and 57 of the Statute, the language of the case shall be the language of the decision of the General Court against which the appeal is brought;

(b) where, in accordance with the second paragraph of Article 62 of the Statute, the Court decides to review a decision of the General Court, the language of the case shall be the language of the decision of the General Court which is the subject of review;

(c) in the case of challenges concerning the costs to be recovered, applications to set aside judgments by default, third-party proceedings and applications for interpretation or revision of a judgment or for the Court to remedy a failure to adjudicate, the language of the case shall be the language of the decision to which those applications or challenges relate.

3.   In preliminary ruling proceedings, the language of the case shall be the language of the referring court or tribunal. At the duly substantiated request of one of the parties to the main proceedings, and after the other party to the main proceedings and the Advocate General have been heard, the use of another of the languages mentioned in Article 36 may be authorised for the oral part of the procedure. Where granted, such authorisation shall apply in respect of all the interested persons referred to in Article 23 of the Statute.

4.   Requests as above may be decided on by the President; the latter may, and where he wishes to accede to a request without the agreement of all the parties must, refer the request to the Court.

### Article 38

#### Use of the language of the case

1.   The language of the case shall in particular be used in the written and oral pleadings of the parties, including the items and documents produced or annexed to them, and also in the minutes and decisions of the Court.

2.   Any item or document produced or annexed that is expressed in another language must be accompanied by a translation into the language of the case.

3.   However, in the case of substantial items or lengthy documents, translations may be confined to extracts. At any time the Court may, of its own motion or at the request of one of the parties, call for a complete or fuller translation.

4.   Notwithstanding the foregoing provisions, a Member State shall be entitled to use its official language when taking part in preliminary ruling proceedings, when intervening in a case before the Court or when bringing a matter before the Court pursuant to Article 259 TFEU. This provision shall apply both to written documents and to oral statements. The Registrar shall arrange in each instance for translation into the language of the case.

5.   The States, other than the Member States, which are parties to the EEA Agreement, and also the EFTA Surveillance Authority, may be authorised to use one of the languages mentioned in Article 36, other than the language of the case, when they take part in preliminary ruling proceedings or intervene in a case before the Court. This provision shall apply both to written documents and to oral statements. The Registrar shall arrange in each instance for translation into the language of the case.

6.   Non-Member States taking part in preliminary ruling proceedings pursuant to the fourth paragraph of Article 23 of the Statute may be authorised to use one of the languages mentioned in Article 36 other than the language of the case. This provision shall apply both to written documents and to oral statements. The Registrar shall arrange in each instance for translation into the language of the case.

7.   Where a witness or expert states that he is unable adequately to express himself in one of the languages referred to in Article 36, the Court may authorise him to give his evidence in another language. The Registrar shall arrange for translation into the language of the case.

8.   The President and the Vice-President of the Court and also the Presidents of Chambers in conducting oral proceedings, Judges and Advocates General in putting questions and

Advocates General in delivering their Opinions may use one of the languages referred to in Article 36 other than the language of the case. The Registrar shall arrange for translation into the language of the case.

### Article 39

#### Responsibility of the Registrar concerning language arrangements

The Registrar shall, at the request of any Judge, of the Advocate General or of a party, arrange for anything said or written in the course of the proceedings before the Court to be translated into the languages chosen from those referred to in Article 36.

### Article 40

#### Languages of the publications of the Court

Publications of the Court shall be issued in the languages referred to in Article 1 of Council Regulation No 1.

### Article 41

#### Authentic texts

The texts of documents drawn up in the language of the case or, where applicable, in another language authorised pursuant to Articles 37 or 38 of these Rules shall be authentic.

### Article 42

#### Language service of the Court

The Court shall set up a language service staffed by experts with adequate legal training and a thorough knowledge of several official languages of the European Union.

#### TITLE II

#### COMMON PROCEDURAL PROVISIONS

#### Chapter 1

RIGHTS AND OBLIGATIONS OF AGENTS, ADVISERS AND LAWYERS

### Article 43

#### Privileges, immunities and facilities

1.   Agents, advisers and lawyers who appear before the Court or before any judicial authority to which the Court has addressed letters rogatory shall enjoy immunity in respect of words spoken or written by them concerning the case or the parties.

2.   Agents, advisers and lawyers shall also enjoy the following privileges and facilities:

(a) any papers and documents relating to the proceedings shall be exempt from both search and seizure. In the event of a dispute, the customs officials or police may seal those papers and documents; they shall then be immediately forwarded to the Court for inspection in the presence of the Registrar and of the person concerned;

(b) agents, advisers and lawyers shall be entitled to travel in the course of duty without hindrance.

29.9.2012          EN          Official Journal of the European Union          L 265/17

### Article 44

### Status of the parties' representatives

1.   In order to qualify for the privileges, immunities and facilities specified in Article 43, persons entitled to them shall furnish proof of their status as follows:

(a) agents shall produce an official document issued by the party for whom they act, who shall immediately serve a copy thereof on the Registrar;

(b) lawyers shall produce a certificate that they are authorised to practise before a court of a Member State or of another State which is a party to the EEA Agreement, and, where the party which they represent is a legal person governed by private law, an authority to act issued by that person;

(c) advisers shall produce an authority to act issued by the party whom they are assisting.

2.   The Registrar of the Court shall issue them with a certificate, as required. The validity of this certificate shall be limited to a specified period, which may be extended or curtailed according to the duration of the proceedings.

### Article 45

### Waiver of immunity

1.   The privileges, immunities and facilities specified in Article 43 of these Rules are granted exclusively in the interests of the proper conduct of proceedings.

2.   The Court may waive immunity where it considers that the proper conduct of proceedings will not be hindered thereby.

### Article 46

### Exclusion from the proceedings

1.   If the Court considers that the conduct of an agent, adviser or lawyer before the Court is incompatible with the dignity of the Court or with the requirements of the proper administration of justice, or that such agent, adviser or lawyer is using his rights for purposes other than those for which they were granted, it shall inform the person concerned. If the Court informs the competent authorities to whom the person concerned is answerable, a copy of the letter sent to those authorities shall be forwarded to the person concerned.

2.   On the same grounds, the Court may at any time, having heard the person concerned and the Advocate General, decide to exclude an agent, adviser or lawyer from the proceedings by reasoned order. That order shall have immediate effect.

3.   Where an agent, adviser or lawyer is excluded from the proceedings, the proceedings shall be suspended for a period fixed by the President in order to allow the party concerned to appoint another agent, adviser or lawyer.

4.   Decisions taken under this Article may be rescinded.

### Article 47

### University teachers and parties to the main proceedings

1.   The provisions of this Chapter shall apply to university teachers who have a right of audience before the Court in accordance with Article 19 of the Statute.

2.   They shall also apply, in the context of references for a preliminary ruling, to the parties to the main proceedings where, in accordance with the national rules of procedure applicable, those parties are permitted to bring or defend court proceedings without being represented by a lawyer, and to persons authorised under those rules to represent them.

### Chapter 2

### SERVICE

### Article 48

### Methods of service

1.   Where these Rules require that a document be served on a person, the Registrar shall ensure that service is effected at that person's address for service either by the dispatch of a copy of the document by registered post with a form for acknowledgement of receipt or by personal delivery of the copy against a receipt. The Registrar shall prepare and certify the copies of documents to be served, save where the parties themselves supply the copies in accordance with Article 57(2) of these Rules.

2.   Where the addressee has agreed that service is to be effected on him by telefax or any other technical means of communication, any procedural document, including a judgment or order of the Court, may be served by the transmission of a copy of the document by such means.

3.   Where, for technical reasons or on account of the nature or length of the document, such transmission is impossible or impracticable, the document shall be served, if the addressee has not specified an address for service, at his address in accordance with the procedures laid down in paragraph 1 of this Article. The addressee shall be so informed by telefax or any other technical means of communication. Service shall then be deemed to have been effected on the addressee by registered post on the 10th day following the lodging of the registered letter at the post office of the place in which the Court has its seat, unless it is shown by the acknowledgement of receipt that the letter was received on a different date or the addressee informs the Registrar, within three weeks of being informed by telefax or any other technical means of communication, that the document to be served has not reached him.

4.   The Court may, by decision, determine the criteria for a procedural document to be served by electronic means. That decision shall be published in the *Official Journal of the European Union*.

## Chapter 3

TIME-LIMITS

*Article 49*

### Calculation of time-limits

1.    Any procedural time-limit prescribed by the Treaties, the Statute or these Rules shall be calculated as follows:

(a) where a time-limit expressed in days, weeks, months or years is to be calculated from the moment at which an event occurs or an action takes place, the day during which that event occurs or that action takes place shall not be counted as falling within the time-limit in question;

(b) a time-limit expressed in weeks, months or years shall end with the expiry of whichever day in the last week, month or year is the same day of the week, or falls on the same date, as the day during which the event or action from which the time-limit is to be calculated occurred or took place. If, in a time-limit expressed in months or years, the day on which it should expire does not occur in the last month, the time-limit shall end with the expiry of the last day of that month;

(c) where a time-limit is expressed in months and days, it shall first be calculated in whole months, then in days;

(d) time-limits shall include Saturdays, Sundays and the official holidays referred to in Article 24(6) of these Rules;

(e) time-limits shall not be suspended during the judicial vacations.

2.    If the time-limit would otherwise end on a Saturday, Sunday or an official holiday, it shall be extended until the end of the first subsequent working day.

*Article 50*

### Proceedings against a measure adopted by an institution

Where the time-limit allowed for initiating proceedings against a measure adopted by an institution runs from the publication of that measure, that time-limit shall be calculated, for the purposes of Article 49(1)(a), from the end of the 14th day after publication of the measure in the *Official Journal of the European Union*.

*Article 51*

### Extension on account of distance

The procedural time-limits shall be extended on account of distance by a single period of 10 days.

*Article 52*

### Setting and extension of time-limits

1.    Any time-limit prescribed by the Court pursuant to these Rules may be extended.

2.    The President and the Presidents of Chambers may delegate to the Registrar power of signature for the purposes of setting certain time-limits which, pursuant to these Rules, it falls to them to prescribe, or of extending such time-limits.

## Chapter 4

DIFFERENT PROCEDURES FOR DEALING WITH CASES

*Article 53*

### Procedures for dealing with cases

1.    Without prejudice to the special provisions laid down in the Statute or in these Rules, the procedure before the Court shall consist of a written part and an oral part.

2.    Where it is clear that the Court has no jurisdiction to hear and determine a case or where a request or an application is manifestly inadmissible, the Court may, after hearing the Advocate General, at any time decide to give a decision by reasoned order without taking further steps in the proceedings.

3.    The President may in special circumstances decide that a case be given priority over others.

4.    A case may be dealt with under an expedited procedure in accordance with the conditions provided by these Rules.

5.    A reference for a preliminary ruling may be dealt with under an urgent procedure in accordance with the conditions provided by these Rules.

*Article 54*

### Joinder

1.    Two or more cases of the same type concerning the same subject-matter may at any time be joined, on account of the connection between them, for the purposes of the written or oral part of the procedure or of the judgment which closes the proceedings.

2.    A decision on whether cases should be joined shall be taken by the President after hearing the Judge-Rapporteur and the Advocate General, if the cases concerned have already been assigned, and, save in the case of references for a preliminary ruling, after also hearing the parties. The President may refer the decision on this matter to the Court.

3.    Joined cases may be disjoined, in accordance with the provisions of paragraph 2.

*Article 55*

### Stay of proceedings

1.    The proceedings may be stayed:

(a) in the circumstances specified in the third paragraph of Article 54 of the Statute, by order of the Court, made after hearing the Advocate General;

29.9.2012    EN    Official Journal of the European Union    L 265/19

(b) in all other cases, by decision of the President adopted after hearing the Judge-Rapporteur and the Advocate General and, save in the case of references for a preliminary ruling, the parties.

2.    The proceedings may be resumed by order or decision, following the same procedure.

3.    The orders or decisions referred to in paragraphs 1 and 2 shall be served on the parties or interested persons referred to in Article 23 of the Statute.

4.    The stay of proceedings shall take effect on the date indicated in the order or decision of stay or, in the absence of such indication, on the date of that order or decision.

5.    While proceedings are stayed time shall cease to run for the parties or interested persons referred to in Article 23 of the Statute for the purposes of procedural time-limits.

6.    Where the order or decision of stay does not fix the length of stay, it shall end on the date indicated in the order or decision of resumption or, in the absence of such indication, on the date of the order or decision of resumption.

7.    From the date of resumption of proceedings following a stay, the suspended procedural time-limits shall be replaced by new time-limits and time shall begin to run from the date of that resumption.

*Article 56*

**Deferment of the determination of a case**

After hearing the Judge-Rapporteur, the Advocate General and the parties, the President may in special circumstances, either of his own motion or at the request of one of the parties, defer a case to be dealt with at a later date.

Chapter 5

WRITTEN PART OF THE PROCEDURE

*Article 57*

**Lodging of procedural documents**

1.    The original of every procedural document must bear the handwritten signature of the party's agent or lawyer or, in the case of observations submitted in the context of preliminary ruling proceedings, that of the party to the main proceedings or his representative, if the national rules of procedure applicable to those main proceedings so permit.

2.    The original, accompanied by all annexes referred to therein, shall be submitted together with five copies for the Court and, in the case of proceedings other than preliminary ruling proceedings, a copy for every other party to the proceedings. Copies shall be certified by the party lodging them.

3.    The institutions shall in addition produce, within time-limits laid down by the Court, translations of any procedural document into the other languages provided for by Article 1 of Council Regulation No 1. The preceding paragraph of this Article shall apply.

4.    To every procedural document there shall be annexed a file containing the items and documents relied on in support of it, together with a schedule listing them.

5.    Where in view of the length of an item or document only extracts from it are annexed to the procedural document, the whole item or document or a full copy of it shall be lodged at the Registry.

6.    All procedural documents shall bear a date. In the calculation of procedural time-limits, only the date and time of lodgment of the original at the Registry shall be taken into account.

7.    Without prejudice to the provisions of paragraphs 1 to 6, the date on and time at which a copy of the signed original of a procedural document, including the schedule of items and documents referred to in paragraph 4, is received at the Registry by telefax or any other technical means of communication available to the Court shall be deemed to be the date and time of lodgment for the purposes of compliance with the procedural time-limits, provided that the signed original of the procedural document, accompanied by the annexes and copies referred to in paragraph 2, is lodged at the Registry no later than 10 days thereafter.

8.    Without prejudice to paragraphs 3 to 6, the Court may, by decision, determine the criteria for a procedural document sent to the Registry by electronic means to be deemed to be the original of that document. That decision shall be published in the *Official Journal of the European Union.*

*Article 58*

**Length of procedural documents**

Without prejudice to any special provisions laid down in these Rules, the Court may, by decision, set the maximum length of written pleadings or observations lodged before it. That decision shall be published in the *Official Journal of the European Union.*

Chapter 6

THE PRELIMINARY REPORT AND ASSIGNMENT OF CASES TO FORMATIONS OF THE COURT

*Article 59*

**Preliminary report**

1.    When the written part of the procedure is closed, the President shall fix a date on which the Judge-Rapporteur is to present a preliminary report to the general meeting of the Court.

2.    The preliminary report shall contain proposals as to whether particular measures of organisation of procedure, measures of inquiry or, if appropriate, requests to the referring court or tribunal for clarification should be undertaken, and as to the formation to which the case should be

assigned. It shall also contain the Judge-Rapporteur's proposals, if any, as to whether to dispense with a hearing and as to whether to dispense with an Opinion of the Advocate General pursuant to the fifth paragraph of Article 20 of the Statute.

3. The Court shall decide, after hearing the Advocate General, what action to take on the proposals of the Judge-Rapporteur.

### Article 60

#### Assignment of cases to formations of the Court

1. The Court shall assign to the Chambers of five and of three Judges any case brought before it in so far as the difficulty or importance of the case or particular circumstances are not such as to require that it should be assigned to the Grand Chamber, unless a Member State or an institution of the European Union participating in the proceedings has requested that the case be assigned to the Grand Chamber, pursuant to the third paragraph of Article 16 of the Statute.

2. The Court shall sit as a full Court where cases are brought before it pursuant to the provisions referred to in the fourth paragraph of Article 16 of the Statute. It may assign a case to the full Court where, in accordance with the fifth paragraph of Article 16 of the Statute, it considers that the case is of exceptional importance.

3. The formation to which a case has been assigned may, at any stage of the proceedings, request the Court to assign the case to a formation composed of a greater number of Judges.

4. Where the oral part of the procedure is opened without an inquiry, the President of the formation determining the case shall fix the opening date.

### Chapter 7

MEASURES OF ORGANISATION OF PROCEDURE AND MEASURES OF INQUIRY

Section 1. Measures of organisation of procedure

### Article 61

#### Measures of organisation prescribed by the Court

1. In addition to the measures which may be prescribed in accordance with Article 24 of the Statute, the Court may invite the parties or the interested persons referred to in Article 23 of the Statute to answer certain questions in writing, within the time-limit laid down by the Court, or at the hearing. The written replies shall be communicated to the other parties or the interested persons referred to in Article 23 of the Statute.

2. Where a hearing is organised, the Court shall, in so far as possible, invite the participants in that hearing to concentrate in their oral pleadings on one or more specified issues.

### Article 62

#### Measures of organisation prescribed by the Judge-Rapporteur or the Advocate General

1. The Judge-Rapporteur or the Advocate General may request the parties or the interested persons referred to in Article 23 of the Statute to submit within a specified time-limit all such information relating to the facts, and all such documents or other particulars, as they may consider relevant. The replies and documents provided shall be communicated to the other parties or the interested persons referred to in Article 23 of the Statute.

2. The Judge-Rapporteur or the Advocate General may also send to the parties or the interested persons referred to in Article 23 of the Statute questions to be answered at the hearing.

Section 2. Measures of inquiry

### Article 63

#### Decision on measures of inquiry

1. The Court shall decide in its general meeting whether a measure of inquiry is necessary.

2. Where the case has already been assigned to a formation of the Court, the decision shall be taken by that formation.

### Article 64

#### Determination of measures of inquiry

1. The Court, after hearing the Advocate General, shall prescribe the measures of inquiry that it considers appropriate by means of an order setting out the facts to be proved.

2. Without prejudice to Articles 24 and 25 of the Statute, the following measures of inquiry may be adopted:

(a) the personal appearance of the parties;

(b) a request for information and production of documents;

(c) oral testimony;

(d) the commissioning of an expert's report;

(e) an inspection of the place or thing in question.

3. Evidence may be submitted in rebuttal and previous evidence may be amplified.

### Article 65

#### Participation in measures of inquiry

1. Where the formation of the Court does not undertake the inquiry itself, it shall entrust the task of so doing to the Judge-Rapporteur.

29.9.2012          EN          Official Journal of the European Union          L 265/21

2.    The Advocate General shall take part in the measures of inquiry.

3.    The parties shall be entitled to attend the measures of inquiry.

### Article 66

#### Oral testimony

1.    The Court may, either of its own motion or at the request of one of the parties, and after hearing the Advocate General, order that certain facts be proved by witnesses.

2.    A request by a party for the examination of a witness shall state precisely about what facts and for what reasons the witness should be examined.

3.    The Court shall rule by reasoned order on the request referred to in the preceding paragraph. If the request is granted, the order shall set out the facts to be established and state which witnesses are to be heard in respect of each of those facts.

4.    Witnesses shall be summoned by the Court, where appropriate after lodgment of the security provided for in Article 73(1) of these Rules.

### Article 67

#### Examination of witnesses

1.    After the identity of the witness has been established, the President shall inform him that he will be required to vouch the truth of his evidence in the manner laid down in these Rules.

2.    The witness shall give his evidence to the Court, the parties having been given notice to attend. After the witness has given his evidence the President may, at the request of one of the parties or of his own motion, put questions to him.

3.    The other Judges and the Advocate General may do likewise.

4.    Subject to the control of the President, questions may be put to witnesses by the representatives of the parties.

### Article 68

#### Witnesses' oath

1.    After giving his evidence, the witness shall take the following oath:

'I swear that I have spoken the truth, the whole truth and nothing but the truth.'

2.    The Court may, after hearing the parties, exempt a witness from taking the oath.

### Article 69

#### Pecuniary penalties

1.    Witnesses who have been duly summoned shall obey the summons and attend for examination.

2.    If, without good reason, a witness who has been duly summoned fails to appear before the Court, the Court may

impose upon him a pecuniary penalty not exceeding EUR 5 000 and may order that a further summons be served on the witness at his own expense.

3.    The same penalty may be imposed upon a witness who, without good reason, refuses to give evidence or to take the oath.

### Article 70

#### Expert's report

1.    The Court may order that an expert's report be obtained. The order appointing the expert shall define his task and set a time-limit within which he is to submit his report.

2.    After the expert has submitted his report and that report has been served on the parties, the Court may order that the expert be examined, the parties having been given notice to attend. At the request of one of the parties or of his own motion, the President may put questions to the expert.

3.    The other Judges and the Advocate General may do likewise.

4.    Subject to the control of the President, questions may be put to the expert by the representatives of the parties.

### Article 71

#### Expert's oath

1.    After making his report, the expert shall take the following oath:

'I swear that I have conscientiously and impartially carried out my task.'

2.    The Court may, after hearing the parties, exempt the expert from taking the oath.

### Article 72

#### Objection to a witness or expert

1.    If one of the parties objects to a witness or an expert on the ground that he is not a competent or proper person to act as a witness or expert or for any other reason, or if a witness or expert refuses to give evidence or to take the oath, the matter shall be resolved by the Court.

2.    An objection to a witness or an expert shall be raised within two weeks after service of the order summoning the witness or appointing the expert; the statement of objection must set out the grounds of objection and indicate the nature of any evidence offered.

### Article 73

#### Witnesses' and experts' costs

1.    Where the Court orders the examination of witnesses or an expert's report, it may request the parties or one of them to lodge security for the witnesses' costs or the costs of the expert's report.

2.    Witnesses and experts shall be entitled to reimbursement of their travel and subsistence expenses. The cashier of the Court may make an advance payment towards these expenses.

3.    Witnesses shall be entitled to compensation for loss of earnings, and experts to fees for their services. The cashier of the Court shall pay witnesses and experts these sums after they have carried out their respective duties or tasks.

### Article 74

#### Minutes of inquiry hearings

1.    The Registrar shall draw up minutes of every inquiry hearing. The minutes shall be signed by the President and by the Registrar. They shall constitute an official record.

2.    In the case of the examination of witnesses or experts, the minutes shall be signed by the President or by the Judge-Rapporteur responsible for conducting the examination of the witness or expert, and by the Registrar. Before the minutes are thus signed, the witness or expert must be given an opportunity to check the content of the minutes and to sign them.

3.    The minutes shall be served on the parties.

### Article 75

#### Opening of the oral part of the procedure after the inquiry

1.    Unless the Court decides to prescribe a time-limit within which the parties may submit written observations, the President shall fix the date for the opening of the oral part of the procedure after the measures of inquiry have been completed.

2.    Where a time-limit has been prescribed for the submission of written observations, the President shall fix the date for the opening of the oral part of the procedure after that time-limit has expired.

### Chapter 8

#### ORAL PART OF THE PROCEDURE

### Article 76

#### Hearing

1.    Any reasoned requests for a hearing shall be submitted within three weeks after service on the parties or the interested persons referred to in Article 23 of the Statute of notification of the close of the written part of the procedure. That time-limit may be extended by the President.

2.    On a proposal from the Judge-Rapporteur and after hearing the Advocate General, the Court may decide not to hold a hearing if it considers, on reading the written pleadings or observations lodged during the written part of the procedure, that it has sufficient information to give a ruling.

3.    The preceding paragraph shall not apply where a request for a hearing, stating reasons, has been submitted by an interested person referred to in Article 23 of the Statute who did not participate in the written part of the procedure.

### Article 77

#### Joint hearing

If the similarities between two or more cases of the same type so permit, the Court may decide to organise a joint hearing of those cases.

### Article 78

#### Conduct of oral proceedings

Oral proceedings shall be opened and directed by the President, who shall be responsible for the proper conduct of the hearing.

### Article 79

#### Cases heard in camera

1.    For serious reasons related, in particular, to the security of the Member States or to the protection of minors, the Court may decide to hear a case *in camera*.

2.    The oral proceedings in cases heard *in camera* shall not be published.

### Article 80

#### Questions

The members of the formation of the Court and the Advocate General may in the course of the hearing put questions to the agents, advisers or lawyers of the parties and, in the circumstances referred to in Article 47(2) of these Rules, to the parties to the main proceedings or to their representatives.

### Article 81

#### Close of the hearing

After the parties or the interested persons referred to in Article 23 of the Statute have presented oral argument, the President shall declare the hearing closed.

### Article 82

#### Delivery of the Opinion of the Advocate General

1.    Where a hearing takes place, the Opinion of the Advocate General shall be delivered after the close of that hearing.

2.    The President shall declare the oral part of the procedure closed after the Advocate General has delivered his Opinion.

### Article 83

#### Opening or reopening of the oral part of the procedure

The Court may at any time, after hearing the Advocate General, order the opening or reopening of the oral part of the procedure, in particular if it considers that it lacks sufficient information or where a party has, after the close of that part of the procedure, submitted a new fact which is of such a nature as to be a decisive factor for the decision of the Court, or where the case must be decided on the basis of an argument which has not been debated between the parties or the interested persons referred to in Article 23 of the Statute.

### Article 84

### Minutes of hearings

1. The Registrar shall draw up minutes of every hearing. The minutes shall be signed by the President and by the Registrar. They shall constitute an official record.

2. The parties and interested persons referred to in Article 23 of the Statute may inspect the minutes at the Registry and obtain copies.

### Article 85

### Recording of the hearing

The President may, on a duly substantiated request, authorise a party or an interested person referred to in Article 23 of the Statute who has participated in the written or oral part of the proceedings to listen, on the Court's premises, to the soundtrack of the hearing in the language used by the speaker during that hearing.

### Chapter 9

### JUDGMENTS AND ORDERS

### Article 86

### Date of delivery of a judgment

The parties or interested persons referred to in Article 23 of the Statute shall be informed of the date of delivery of a judgment.

### Article 87

### Content of a judgment

A judgment shall contain:

(a) a statement that it is the judgment of the Court,

(b) an indication as to the formation of the Court,

(c) the date of delivery,

(d) the names of the President and of the Judges who took part in the deliberations, with an indication as to the name of the Judge-Rapporteur,

(e) the name of the Advocate General,

(f) the name of the Registrar,

(g) a description of the parties or of the interested persons referred to in Article 23 of the Statute who participated in the proceedings,

(h) the names of their representatives,

(i) in the case of direct actions and appeals, a statement of the forms of order sought by the parties,

(j) where applicable, the date of the hearing,

(k) a statement that the Advocate General has been heard and, where applicable, the date of his Opinion,

(l) a summary of the facts,

(m) the grounds for the decision,

(n) the operative part of the judgment, including, where appropriate, the decision as to costs.

### Article 88

### Delivery and service of the judgment

1. The judgment shall be delivered in open court.

2. The original of the judgment, signed by the President, by the Judges who took part in the deliberations and by the Registrar, shall be sealed and deposited at the Registry; certified copies of the judgment shall be served on the parties and, where applicable, the referring court or tribunal, the interested persons referred to in Article 23 of the Statute and the General Court.

### Article 89

### Content of an order

1. An order shall contain:

(a) a statement that it is the order of the Court,

(b) an indication as to the formation of the Court,

(c) the date of its adoption,

(d) an indication as to the legal basis of the order,

(e) the names of the President and, where applicable, the Judges who took part in the deliberations, with an indication as to the name of the Judge-Rapporteur,

(f) the name of the Advocate General,

(g) the name of the Registrar,

(h) a description of the parties or of the parties to the main proceedings,

(i) the names of their representatives,

(j) a statement that the Advocate General has been heard,

(k) the operative part of the order, including, where appropriate, the decision as to costs.

2. Where, in accordance with these Rules, an order must be reasoned, it shall in addition contain:

(a) in the case of direct actions and appeals, a statement of the forms of order sought by the parties,

(b) a summary of the facts,

(c) the grounds for the decision.

*Article 90*

**Signature and service of the order**

The original of the order, signed by the President and by the Registrar, shall be sealed and deposited at the Registry; certified copies of the order shall be served on the parties and, where applicable, the referring court or tribunal, the interested persons referred to in Article 23 of the Statute and the General Court.

*Article 91*

**Binding nature of judgments and orders**

1.    A judgment shall be binding from the date of its delivery.

2.    An order shall be binding from the date of its service.

*Article 92*

**Publication in the Official Journal of the European Union**

A notice containing the date and the operative part of the judgment or order of the Court which closes the proceedings shall be published in the *Official Journal of the European Union.*

**TITLE III**

**REFERENCES FOR A PRELIMINARY RULING**

Chapter 1

GENERAL PROVISIONS

*Article 93*

**Scope**

The procedure shall be governed by the provisions of this Title:

(a)  in the cases covered by Article 23 of the Statute,

(b)  as regards references for interpretation which may be provided for by agreements to which the European Union or the Member States are parties.

*Article 94*

**Content of the request for a preliminary ruling**

In addition to the text of the questions referred to the Court for a preliminary ruling, the request for a preliminary ruling shall contain:

(a)  a summary of the subject-matter of the dispute and the relevant findings of fact as determined by the referring court or tribunal, or, at least, an account of the facts on which the questions are based;

(b)  the tenor of any national provisions applicable in the case and, where appropriate, the relevant national case-law;

(c)  a statement of the reasons which prompted the referring court or tribunal to inquire about the interpretation or validity of certain provisions of European Union law, and the relationship between those provisions and the national legislation applicable to the main proceedings.

*Article 95*

**Anonymity**

1.    Where anonymity has been granted by the referring court or tribunal, the Court shall respect that anonymity in the proceedings pending before it.

2.    At the request of the referring court or tribunal, at the duly reasoned request of a party to the main proceedings or of its own motion, the Court may also, if it considers it necessary, render anonymous one or more persons or entities concerned by the case.

*Article 96*

**Participation in preliminary ruling proceedings**

1.    Pursuant to Article 23 of the Statute, the following shall be authorised to submit observations to the Court:

(a)  the parties to the main proceedings,

(b)  the Member States,

(c)  the European Commission,

(d)  the institution which adopted the act the validity or interpretation of which is in dispute,

(e)  the States, other than the Member States, which are parties to the EEA Agreement, and also the EFTA Surveillance Authority, where a question concerning one of the fields of application of that Agreement is referred to the Court for a preliminary ruling,

(f)  non-Member States which are parties to an agreement relating to a specific subject-matter, concluded with the Council, where the agreement so provides and where a court or tribunal of a Member State refers to the Court of Justice for a preliminary ruling a question falling within the scope of that agreement.

2.    Non-participation in the written part of the procedure does not preclude participation in the oral part of the procedure.

*Article 97*

**Parties to the main proceedings**

1.    The parties to the main proceedings are those who are determined as such by the referring court or tribunal in accordance with national rules of procedure.

2.    Where the referring court or tribunal informs the Court that a new party has been admitted to the main proceedings, when the proceedings before the Court are already pending, that party must accept the case as he finds it at the time when the Court was so informed. That party shall receive a copy of every procedural document already served on the interested persons referred to in Article 23 of the Statute.

29.9.2012    EN    Official Journal of the European Union    L 265/25

3.    As regards the representation and attendance of the parties to the main proceedings, the Court shall take account of the rules of procedure in force before the court or tribunal which made the reference. In the event of any doubt as to whether a person may under national law represent a party to the main proceedings, the Court may obtain information from the referring court or tribunal on the rules of procedure applicable.

### Article 98

### Translation and service of the request for a preliminary ruling

1.    The requests for a preliminary ruling referred to in this Title shall be served on the Member States in the original version, accompanied by a translation into the official language of the State to which they are being addressed. Where appropriate, on account of the length of the request, such translation shall be replaced by the translation into the official language of the State to which it is addressed of a summary of that request, which will serve as a basis for the position to be adopted by that State. The summary shall include the full text of the question or questions referred for a preliminary ruling. That summary shall contain, in particular, in so far as that information appears in the request for a preliminary ruling, the subject-matter of the main proceedings, the essential arguments of the parties to those proceedings, a succinct presentation of the reasons for the reference for a preliminary ruling and the case-law and the provisions of national law and European Union law relied on.

2.    In the cases covered by the third paragraph of Article 23 of the Statute, the requests for a preliminary ruling shall be served on the States, other than the Member States, which are parties to the EEA Agreement and also on the EFTA Surveillance Authority in the original version, accompanied by a translation of the request, or where appropriate of a summary, into one of the languages referred to in Article 36, to be chosen by the addressee.

3.    Where a non-Member State has the right to take part in preliminary ruling proceedings pursuant to the fourth paragraph of Article 23 of the Statute, the original version of the request for a preliminary ruling shall be served on it accompanied by a translation of the request, or where appropriate of a summary, into one of the languages referred to in Article 36, to be chosen by the non-Member State concerned.

### Article 99

### Reply by reasoned order

Where a question referred to the Court for a preliminary ruling is identical to a question on which the Court has already ruled, where the reply to such a question may be clearly deduced from existing case-law or where the answer to the question referred for a preliminary ruling admits of no reasonable doubt, the Court may at any time, on a proposal from the Judge-Rapporteur and after hearing the Advocate General, decide to rule by reasoned order.

### Article 100

### Circumstances in which the Court remains seised

1.    The Court shall remain seised of a request for a preliminary ruling for as long as it is not withdrawn by the court or tribunal which made that request to the Court. The withdrawal of a request may be taken into account until notice of the date of delivery of the judgment has been served on the interested persons referred to in Article 23 of the Statute.

2.    However, the Court may at any time declare that the conditions of its jurisdiction are no longer fulfilled.

### Article 101

### Request for clarification

1.    Without prejudice to the measures of organisation of procedure and measures of inquiry provided for in these Rules, the Court may, after hearing the Advocate General, request clarification from the referring court or tribunal within a time-limit prescribed by the Court.

2.    The reply of the referring court or tribunal to that request shall be served on the interested persons referred to in Article 23 of the Statute.

### Article 102

### Costs of the preliminary ruling proceedings

It shall be for the referring court or tribunal to decide as to the costs of the preliminary ruling proceedings.

### Article 103

### Rectification of judgments and orders

1.    Clerical mistakes, errors in calculation and obvious inaccuracies affecting judgments or orders may be rectified by the Court, of its own motion or at the request of an interested person referred to in Article 23 of the Statute made within two weeks after delivery of the judgment or service of the order.

2.    The Court shall take its decision after hearing the Advocate General.

3.    The original of the rectification order shall be annexed to the original of the rectified decision. A note of this order shall be made in the margin of the original of the rectified decision.

### Article 104

### Interpretation of preliminary rulings

1.    Article 158 of these Rules relating to the interpretation of judgments and orders shall not apply to decisions given in reply to a request for a preliminary ruling.

2.    It shall be for the national courts or tribunals to assess whether they consider that sufficient guidance is given by a preliminary ruling, or whether it appears to them that a further reference to the Court is required.

## Chapter 2

EXPEDITED PRELIMINARY RULING PROCEDURE

### Article 105

**Expedited procedure**

1.    At the request of the referring court or tribunal or, exceptionally, of his own motion, the President of the Court may, where the nature of the case requires that it be dealt with within a short time, after hearing the Judge-Rapporteur and the Advocate General, decide that a reference for a preliminary ruling is to be determined pursuant to an expedited procedure derogating from the provisions of these Rules.

2.    In that event, the President shall immediately fix the date for the hearing, which shall be communicated to the interested persons referred to in Article 23 of the Statute when the request for a preliminary ruling is served.

3.    The interested persons referred to in the preceding paragraph may lodge statements of case or written observations within a time-limit prescribed by the President, which shall not be less than 15 days. The President may request those interested persons to restrict the matters addressed in their statement of case or written observations to the essential points of law raised by the request for a preliminary ruling.

4.    The statements of case or written observations, if any, shall be communicated to all the interested persons referred to in Article 23 of the Statute prior to the hearing.

5.    The Court shall rule after hearing the Advocate General.

### Article 106

**Transmission of procedural documents**

1.    The procedural documents referred to in the preceding Article shall be deemed to have been lodged on the transmission to the Registry, by telefax or any other technical means of communication available to the Court, of a copy of the signed original and the items and documents relied on in support of it, together with the schedule referred to in Article 57(4). The original of the document and the annexes referred to above shall be sent to the Registry immediately.

2.    Where the preceding Article requires that a document be served on or communicated to a person, such service or communication may be effected by transmission of a copy of the document by telefax or any other technical means of communication available to the Court and the addressee.

## Chapter 3

URGENT PRELIMINARY RULING PROCEDURE

### Article 107

**Scope of the urgent preliminary ruling procedure**

1.    A reference for a preliminary ruling which raises one or more questions in the areas covered by Title V of Part Three of the Treaty on the Functioning of the European Union may, at the request of the referring court or tribunal or, exceptionally, of the Court's own motion, be dealt with under an urgent procedure derogating from the provisions of these Rules.

2.    The referring court or tribunal shall set out the matters of fact and law which establish the urgency and justify the application of that exceptional procedure and shall, in so far as possible, indicate the answer that it proposes to the questions referred.

3.    If the referring court or tribunal has not submitted a request for the urgent procedure to be applied, the President of the Court may, if the application of that procedure appears, prima facie, to be required, ask the Chamber referred to in Article 108 to consider whether it is necessary to deal with the reference under that procedure.

### Article 108

**Decision as to urgency**

1.    The decision to deal with a reference for a preliminary ruling under the urgent procedure shall be taken by the designated Chamber, acting on a proposal from the Judge-Rapporteur and after hearing the Advocate General. The composition of that Chamber shall be determined in accordance with Article 28(2) on the day on which the case is assigned to the Judge-Rapporteur if the application of the urgent procedure is requested by the referring court or tribunal, or, if the application of that procedure is considered at the request of the President of the Court, on the day on which that request is made.

2.    If the case is connected with a pending case assigned to a Judge-Rapporteur who is not a member of the designated Chamber, that Chamber may propose to the President of the Court that the case be assigned to that Judge-Rapporteur. Where the case is reassigned to that Judge-Rapporteur, the Chamber of five Judges which includes him shall carry out the duties of the designated Chamber in respect of that case. Article 29(1) shall apply.

### Article 109

**Written part of the urgent procedure**

1.    A request for a preliminary ruling shall, where the referring court or tribunal has requested the application of the urgent procedure or where the President has requested the designated Chamber to consider whether it is necessary to deal with the reference under that procedure, be served forthwith by the Registrar on the parties to the main proceedings, on the Member State from which the reference is made, on the European Commission and on the institution which adopted the act the validity or interpretation of which is in dispute.

2.    The decision as to whether or not to deal with the reference for a preliminary ruling under the urgent procedure shall be served immediately on the referring court or tribunal and on the parties, Member State and institutions referred to in

the preceding paragraph. The decision to deal with the reference under the urgent procedure shall prescribe the time-limit within which those parties or entities may lodge statements of case or written observations. The decision may specify the matters of law to which such statements of case or written observations must relate and may specify the maximum length of those documents.

3. Where a request for a preliminary ruling refers to an administrative procedure or judicial proceedings conducted in a Member State other than that from which the reference is made, the Court may invite that first Member State to provide all relevant information in writing or at the hearing.

4. As soon as the service referred to in paragraph 1 above has been effected, the request for a preliminary ruling shall also be communicated to the interested persons referred to in Article 23 of the Statute, other than the persons served, and the decision whether or not to deal with the reference for a preliminary ruling under the urgent procedure shall be communicated to those interested persons as soon as the service referred to in paragraph 2 has been effected.

5. The interested persons referred to in Article 23 of the Statute shall be informed as soon as possible of the likely date of the hearing.

6. Where the reference is not to be dealt with under the urgent procedure, the proceedings shall continue in accordance with the provisions of Article 23 of the Statute and the applicable provisions of these Rules.

## Article 110

### Service and information following the close of the written part of the procedure

1. Where a reference for a preliminary ruling is to be dealt with under the urgent procedure, the request for a preliminary ruling and the statements of case or written observations which have been lodged shall be served on the interested persons referred to in Article 23 of the Statute other than the parties and entities referred to in Article 109(1). The request for a preliminary ruling shall be accompanied by a translation, where appropriate of a summary, in accordance with Article 98.

2. The statements of case or written observations which have been lodged shall also be served on the parties and other interested persons referred to in Article 109(1).

3. The date of the hearing shall be communicated to the interested persons referred to in Article 23 of the Statute at the same time as the documents referred to in the preceding paragraphs are served.

## Article 111

### Omission of the written part of the procedure

The designated Chamber may, in cases of extreme urgency, decide to omit the written part of the procedure referred to in Article 109(2).

## Article 112

### Decision on the substance

The designated Chamber shall rule after hearing the Advocate General.

## Article 113

### Formation of the Court

1. The designated Chamber may decide to sit in a formation of three Judges. In that event, it shall be composed of the President of the designated Chamber, the Judge-Rapporteur and the first Judge or, as the case may be, the first two Judges designated from the list referred to in Article 28(2) on the date on which the composition of the designated Chamber is determined in accordance with Article 108(1).

2. The designated Chamber may also request the Court to assign the case to a formation composed of a greater number of Judges. The urgent procedure shall continue before the new formation of the Court, where necessary after the reopening of the oral part of the procedure.

## Article 114

### Transmission of procedural documents

Procedural documents shall be transmitted in accordance with Article 106.

## Chapter 4

LEGAL AID

### Article 115

### Application for legal aid

1. A party to the main proceedings who is wholly or in part unable to meet the costs of the proceedings before the Court may at any time apply for legal aid.

2. The application shall be accompanied by all information and supporting documents making it possible to assess the applicant's financial situation, such as a certificate issued by a competent national authority attesting to his financial situation.

3. If the applicant has already obtained legal aid before the referring court or tribunal, he shall produce the decision of that court or tribunal and specify what is covered by the sums already granted.

### Article 116

### Decision on the application for legal aid

1. As soon as the application for legal aid has been lodged it shall be assigned by the President to the Judge-Rapporteur responsible for the case in the context of which the application has been made.

2. The decision to grant legal aid, in full or in part, or to refuse it shall be taken, on a proposal from the Judge-Rapporteur and after hearing the Advocate General, by the Chamber of three Judges to which the Judge-Rapporteur is assigned. The formation of the Court shall, in that event, be composed of the President of that Chamber, the Judge-Rapporteur and the first Judge or, as the case may be, the first two Judges designated from the list referred to in Article 28(3) on the date on which the application for legal aid is brought before that Chamber by the Judge-Rapporteur.

3. If the Judge-Rapporteur is not a member of a Chamber of three Judges, the decision shall be taken, under the same conditions, by the Chamber of five Judges to which he is assigned. In addition to the Judge-Rapporteur, the formation of the Court shall be composed of four Judges designated from the list referred to in Article 28(2) on the date on which the application for legal aid is brought before that Chamber by the Judge-Rapporteur.

4. The formation of the Court shall give its decision by way of order. Where the application for legal aid is refused in whole or in part, the order shall state the reasons for that refusal.

### Article 117

#### Sums to be advanced as legal aid

Where legal aid is granted, the cashier of the Court shall be responsible, where applicable within the limits set by the formation of the Court, for costs involved in the assistance and representation of the applicant before the Court. At the request of the applicant or his representative, an advance on those costs may be paid.

### Article 118

#### Withdrawal of legal aid

The formation of the Court which gave a decision on the application for legal aid may at any time, either of its own motion or on request, withdraw that legal aid if the circumstances which led to its being granted alter during the proceedings.

### TITLE IV

### DIRECT ACTIONS

### Chapter 1

### REPRESENTATION OF THE PARTIES

### Article 119

#### Obligation to be represented

1. A party may be represented only by his agent or lawyer.

2. Agents and lawyers must lodge at the Registry an official document or an authority to act issued by the party whom they represent.

3. The lawyer acting for a party must also lodge at the Registry a certificate that he is authorised to practise before a court of a Member State or of another State which is a party to the EEA Agreement.

4. If those documents are not lodged, the Registrar shall prescribe a reasonable time-limit within which the party concerned is to produce them. If the applicant fails to produce the required documents within the time-limit prescribed, the Court shall, after hearing the Judge-Rapporteur and the Advocate General, decide whether the non-compliance with that procedural requirement renders the application or written pleading formally inadmissible.

### Chapter 2

### WRITTEN PART OF THE PROCEDURE

### Article 120

#### Content of the application

An application of the kind referred to in Article 21 of the Statute shall state:

(a) the name and address of the applicant;

(b) the name of the party against whom the application is made;

(c) the subject-matter of the proceedings, the pleas in law and arguments relied on and a summary of those pleas in law;

(d) the form of order sought by the applicant;

(e) where appropriate, any evidence produced or offered.

### Article 121

#### Information relating to service

1. For the purpose of the proceedings, the application shall state an address for service. It shall indicate the name of the person who is authorised and has expressed willingness to accept service.

2. In addition to, or instead of, specifying an address for service as referred to in paragraph 1, the application may state that the lawyer or agent agrees that service is to be effected on him by telefax or any other technical means of communication.

3. If the application does not comply with the requirements referred to in paragraphs 1 or 2, all service on the party concerned for the purpose of the proceedings shall be effected, for so long as the defect has not been cured, by registered letter addressed to the agent or lawyer of that party. By way of derogation from Article 48, service shall then be deemed to be duly effected by the lodging of the registered letter at the post office of the place in which the Court has its seat.

### Article 122

#### Annexes to the application

1. The application shall be accompanied, where appropriate, by the documents specified in the second paragraph of Article 21 of the Statute.

29.9.2012    EN    Official Journal of the European Union    L 265/29

2.    An application submitted under Article 273 TFEU shall be accompanied by a copy of the special agreement concluded between the Member States concerned.

3.    If an application does not comply with the requirements set out in paragraphs 1 or 2 of this Article, the Registrar shall prescribe a reasonable time-limit within which the applicant is to produce the abovementioned documents. If the applicant fails to put the application in order, the Court shall, after hearing the Judge-Rapporteur and the Advocate General, decide whether the non-compliance with these conditions renders the application formally inadmissible.

### Article 123

#### Service of the application

The application shall be served on the defendant. In cases where Article 119(4) or Article 122(3) applies, service shall be effected as soon as the application has been put in order or the Court has declared it admissible notwithstanding the failure to observe the requirements set out in those two Articles.

### Article 124

#### Content of the defence

1.    Within two months after service on him of the application, the defendant shall lodge a defence, stating:

(a)  the name and address of the defendant;

(b)  the pleas in law and arguments relied on;

(c)  the form of order sought by the defendant;

(d)  where appropriate, any evidence produced or offered.

2.    Article 121 shall apply to the defence.

3.    The time-limit laid down in paragraph 1 may exceptionally be extended by the President at the duly reasoned request of the defendant.

### Article 125

#### Transmission of documents

Where the European Parliament, the Council or the European Commission is not a party to a case, the Court shall send to them copies of the application and of the defence, without the annexes thereto, to enable them to assess whether the inapplicability of one of their acts is being invoked under Article 277 TFEU.

### Article 126

#### Reply and rejoinder

1.    The application initiating proceedings and the defence may be supplemented by a reply from the applicant and by a rejoinder from the defendant.

2.    The President shall prescribe the time-limits within which those procedural documents are to be produced. He may specify the matters to which the reply or the rejoinder should relate.

### Chapter 3

#### PLEAS IN LAW AND EVIDENCE

### Article 127

#### New pleas in law

1.    No new plea in law may be introduced in the course of proceedings unless it is based on matters of law or of fact which come to light in the course of the procedure.

2.    Without prejudice to the decision to be taken on the admissibility of the plea in law, the President may, on a proposal from the Judge-Rapporteur and after hearing the Advocate General, prescribe a time-limit within which the other party may respond to that plea.

### Article 128

#### Evidence produced or offered

1.    In reply or rejoinder a party may produce or offer further evidence in support of his arguments. The party must give reasons for the delay in submitting such evidence.

2.    The parties may, exceptionally, produce or offer further evidence after the close of the written part of the procedure. They must give reasons for the delay in submitting such evidence. The President may, on a proposal from the Judge-Rapporteur and after hearing the Advocate General, prescribe a time-limit within which the other party may comment on such evidence.

### Chapter 4

#### INTERVENTION

### Article 129

#### Object and effects of the intervention

1.    The intervention shall be limited to supporting, in whole or in part, the form of order sought by one of the parties. It shall not confer the same procedural rights as those conferred on the parties and, in particular, shall not give rise to any right to request that a hearing be held.

2.    The intervention shall be ancillary to the main proceedings. It shall become devoid of purpose if the case is removed from the register of the Court as a result of a party's discontinuance or withdrawal from the proceedings or of an agreement between the parties, or where the application is declared inadmissible.

3.    The intervener must accept the case as he finds it at the time of his intervention.

4.    Consideration may be given to an application to intervene which is made after the expiry of the time-limit prescribed in Article 130 but before the decision to open the oral part of the procedure provided for in Article 60(4). In that event, if the President allows the intervention, the intervener may submit his observations during the hearing, if it takes place.

*Article 130*

**Application to intervene**

1.    An application to intervene must be submitted within six weeks of the publication of the notice referred to in Article 21(4).

2.    The application to intervene shall contain:

(a) a description of the case;

(b) a description of the main parties;

(c) the name and address of the intervener;

(d) the form of order sought, in support of which the intervener is applying for leave to intervene;

(e) a statement of the circumstances establishing the right to intervene, where the application is submitted pursuant to the second or third paragraph of Article 40 of the Statute.

3.    The intervener shall be represented in accordance with Article 19 of the Statute.

4.    Articles 119, 121 and 122 of these Rules shall apply.

*Article 131*

**Decision on applications to intervene**

1.    The application to intervene shall be served on the parties in order to obtain any written or oral observations they may wish to make on that application.

2.    Where the application is submitted pursuant to the first or third paragraph of Article 40 of the Statute, the intervention shall be allowed by decision of the President and the intervener shall receive a copy of every procedural document served on the parties, provided that those parties have not, within 10 days after the service referred to in paragraph 1 has been effected, put forward observations on the application to intervene or identified secret or confidential items or documents which, if communicated to the intervener, the parties claim would be prejudicial to them.

3.    In any other case, the President shall decide on the application to intervene by order or shall refer the application to the Court.

4.    If the application to intervene is granted, the intervener shall receive a copy of every procedural document served on the parties, save, where applicable, for the secret or confidential items or documents excluded from such communication pursuant to paragraph 3.

*Article 132*

**Submission of statements**

1.    The intervener may submit a statement in intervention within one month after communication of the procedural documents referred to in the preceding Article. That time-limit may be extended by the President at the duly reasoned request of the intervener.

2.    The statement in intervention shall contain:

(a) the form of order sought by the intervener in support, in whole or in part, of the form of order sought by one of the parties;

(b) the pleas in law and arguments relied on by the intervener;

(c) where appropriate, any evidence produced or offered.

3.    After the statement in intervention has been lodged, the President shall, where necessary, prescribe a time-limit within which the parties may reply to that statement.

Chapter 5

EXPEDITED PROCEDURE

*Article 133*

**Decision relating to the expedited procedure**

1.    At the request of the applicant or the defendant, the President of the Court may, where the nature of the case requires that it be dealt with within a short time, after hearing the other party, the Judge-Rapporteur and the Advocate General, decide that a case is to be determined pursuant to an expedited procedure derogating from the provisions of these Rules.

2.    The request for a case to be determined pursuant to an expedited procedure must be made by a separate document submitted at the same time as the application initiating proceedings or the defence, as the case may be, is lodged.

3.    Exceptionally the President may also take such a decision of his own motion, after hearing the parties, the Judge-Rapporteur and the Advocate General.

*Article 134*

**Written part of the procedure**

1.    Under the expedited procedure, the application initiating proceedings and the defence may be supplemented by a reply and a rejoinder only if the President, after hearing the Judge-Rapporteur and the Advocate General, considers this to be necessary.

2.    An intervener may submit a statement in intervention only if the President, after hearing the Judge-Rapporteur and the Advocate General, considers this to be necessary.

*Article 135*

**Oral part of the procedure**

1.    Once the defence has been submitted or, if the decision to determine the case pursuant to an expedited procedure is not made until after that pleading has been lodged, once that decision has been taken, the President shall fix a date for the hearing, which shall be communicated forthwith to the parties. He may postpone the date of the hearing where it is necessary to undertake measures of inquiry or where measures of organisation of procedure so require.

29.9.2012    EN    Official Journal of the European Union    L 265/31

2.    Without prejudice to Articles 127 and 128, a party may supplement his arguments and produce or offer evidence during the oral part of the procedure. The party must, however, give reasons for the delay in producing such further arguments or evidence.

## Article 136

### Decision on the substance

The Court shall give its ruling after hearing the Advocate General.

## Chapter 6

COSTS

## Article 137

### Decision as to costs

A decision as to costs shall be given in the judgment or order which closes the proceedings.

## Article 138

### General rules as to allocation of costs

1.    The unsuccessful party shall be ordered to pay the costs if they have been applied for in the successful party's pleadings.

2.    Where there is more than one unsuccessful party the Court shall decide how the costs are to be shared.

3.    Where each party succeeds on some and fails on other heads, the parties shall bear their own costs. However, if it appears justified in the circumstances of the case, the Court may order that one party, in addition to bearing its own costs, pay a proportion of the costs of the other party.

## Article 139

### Unreasonable or vexatious costs

The Court may order a party, even if successful, to pay costs which the Court considers that party to have unreasonably or vexatiously caused the opposite party to incur.

## Article 140

### Costs of interveners

1.    The Member States and institutions which have intervened in the proceedings shall bear their own costs.

2.    The States, other than the Member States, which are parties to the EEA Agreement, and also the EFTA Surveillance Authority, shall similarly bear their own costs if they have intervened in the proceedings.

3.    The Court may order an intervener other than those referred to in the preceding paragraphs to bear his own costs.

## Article 141

### Costs in the event of discontinuance or withdrawal

1.    A party who discontinues or withdraws from proceedings shall be ordered to pay the costs if they have been applied for in the other party's observations on the discontinuance.

2.    However, at the request of the party who discontinues or withdraws from proceedings, the costs shall be borne by the other party if this appears justified by the conduct of that party.

3.    Where the parties have come to an agreement on costs, the decision as to costs shall be in accordance with that agreement.

4.    If costs are not claimed, the parties shall bear their own costs.

## Article 142

### Costs where a case does not proceed to judgment

Where a case does not proceed to judgment the costs shall be in the discretion of the Court.

## Article 143

### Costs of proceedings

Proceedings before the Court shall be free of charge, except that:

(a) where a party has caused the Court to incur avoidable costs the Court may, after hearing the Advocate General, order that party to refund them;

(b) where copying or translation work is carried out at the request of a party, the cost shall, in so far as the Registrar considers it excessive, be paid for by that party on the Registry's scale of charges referred to in Article 22.

## Article 144

### Recoverable costs

Without prejudice to the preceding Article, the following shall be regarded as recoverable costs:

(a) sums payable to witnesses and experts under Article 73 of these Rules;

(b) expenses necessarily incurred by the parties for the purpose of the proceedings, in particular the travel and subsistence expenses and the remuneration of agents, advisers or lawyers.

## Article 145

### Dispute concerning the costs to be recovered

1.    If there is a dispute concerning the costs to be recovered, the Chamber of three Judges to which the Judge-Rapporteur who dealt with the case is assigned shall, on application by the party concerned and after hearing the opposite party and the Advocate General, make an order. In that event, the formation of the Court shall be composed of the President of that Chamber, the Judge-Rapporteur and the first Judge or, as the case may be, the first two Judges designated from the list referred to in Article 28(3) on the date on which the dispute is brought before that Chamber by the Judge-Rapporteur.

L 265/32          EN                    Official Journal of the European Union                              29.9.2012

2. If the Judge-Rapporteur is not a member of a Chamber of three Judges, the decision shall be taken, under the same conditions, by the Chamber of five Judges to which he is assigned. In addition to the Judge-Rapporteur, the formation of the Court shall be composed of four Judges designated from the list referred to in Article 28(2) on the date on which the dispute is brought before that Chamber by the Judge-Rapporteur.

3. The parties may, for the purposes of enforcement, apply for an authenticated copy of the order.

## Article 146

### Procedure for payment

1. Sums due from the cashier of the Court and from its debtors shall be paid in euro.

2. Where costs to be recovered have been incurred in a currency other than the euro or where the steps in respect of which payment is due were taken in a country of which the euro is not the currency, the conversion shall be effected at the European Central Bank's official rates of exchange on the day of payment.

## Chapter 7

AMICABLE SETTLEMENT, DISCONTINUANCE, CASES THAT DO NOT PROCEED TO JUDGMENT AND PRELIMINARY ISSUES

### Article 147

### Amicable settlement

1. If, before the Court has given its decision, the parties reach a settlement of their dispute and inform the Court of the abandonment of their claims, the President shall order the case to be removed from the register and shall give a decision as to costs in accordance with Article 141, having regard to any proposals made by the parties on the matter.

2. This provision shall not apply to proceedings under Articles 263 TFEU and 265 TFEU.

### Article 148

### Discontinuance

If the applicant informs the Court in writing or at the hearing that he wishes to discontinue the proceedings, the President shall order the case to be removed from the register and shall give a decision as to costs in accordance with Article 141.

### Article 149

### Cases that do not proceed to judgment

If the Court declares that the action has become devoid of purpose and that there is no longer any need to adjudicate on it, the Court may at any time of its own motion, on a proposal from the Judge-Rapporteur and after hearing the parties and the Advocate General, decide to rule by reasoned order. It shall give a decision as to costs.

## Article 150

### Absolute bar to proceeding with a case

On a proposal from the Judge-Rapporteur, the Court may at any time of its own motion, after hearing the parties and the Advocate General, decide to rule by reasoned order on whether there exists any absolute bar to proceeding with a case.

## Article 151

### Preliminary objections and issues

1. A party applying to the Court for a decision on a preliminary objection or issue not going to the substance of the case shall submit the application by a separate document.

2. The application must state the pleas of law and arguments relied on and the form of order sought by the applicant; any supporting items and documents must be annexed to it.

3. As soon as the application has been submitted, the President shall prescribe a time-limit within which the opposite party may submit in writing his pleas in law and the form of order which he seeks.

4. Unless the Court decides otherwise, the remainder of the proceedings on the application shall be oral.

5. The Court shall, after hearing the Advocate General, decide on the application as soon as possible or, where special circumstances so justify, reserve its decision until it rules on the substance of the case.

6. If the Court refuses the application or reserves its decision, the President shall prescribe new time-limits for the further steps in the proceedings.

## Chapter 8

JUDGMENTS BY DEFAULT

### Article 152

### Judgments by default

1. If a defendant on whom an application initiating proceedings has been duly served fails to respond to the application in the proper form and within the time-limit prescribed, the applicant may apply to the Court for judgment by default.

2. The application for judgment by default shall be served on the defendant. The Court may decide to open the oral part of the procedure on the application.

3. Before giving judgment by default the Court shall, after hearing the Advocate General, consider whether the application initiating proceedings is admissible, whether the appropriate formalities have been complied with, and whether the applicant's claims appear well founded. The Court may adopt measures of organisation of procedure or order measures of inquiry.

EN    Official Journal of the European Union

4.    A judgment by default shall be enforceable. The Court may, however, grant a stay of execution until the Court has given its decision on any application under Article 156 to set aside the judgment, or it may make execution subject to the provision of security of an amount and nature to be fixed in the light of the circumstances; this security shall be released if no such application is made or if the application fails.

Chapter 9

REQUESTS AND APPLICATIONS RELATING TO JUDGMENTS AND ORDERS

*Article 153*

**Competent formation of the Court**

1.    With the exception of applications referred to in Article 159, the requests and applications referred to in this Chapter shall be assigned to the Judge-Rapporteur who was responsible for the case to which the request or application relates, and shall be assigned to the formation of the Court which gave a decision in that case.

2.    If the Judge-Rapporteur is prevented from acting, the President of the Court shall assign the request or application referred to in this Chapter to a Judge who was a member of the formation of the Court which gave a decision in the case to which that request or application relates.

3.    If the quorum referred to in Article 17 of the Statute can no longer be attained, the Court shall, on a proposal from the Judge-Rapporteur and after hearing the Advocate General, assign the request or application to a new formation of the Court.

*Article 154*

**Rectification**

1.    Without prejudice to the provisions relating to the interpretation of judgments and orders, clerical mistakes, errors in calculation and obvious inaccuracies may be rectified by the Court, of its own motion or at the request of a party made within two weeks after delivery of the judgment or service of the order.

2.    Where the request for rectification concerns the operative part or one of the grounds constituting the necessary support for the operative part, the parties, whom the Registrar shall duly inform, may submit written observations within a time-limit prescribed by the President.

3.    The Court shall take its decision after hearing the Advocate General.

4.    The original of the rectification order shall be annexed to the original of the rectified decision. A note of this order shall be made in the margin of the original of the rectified decision.

*Article 155*

**Failure to adjudicate**

1.    If the Court has failed to adjudicate on a specific head of claim or on costs, any party wishing to rely on that may, within a month after service of the decision, apply to the Court to supplement its decision.

2.    The application shall be served on the opposite party and the President shall prescribe a time-limit within which that party may submit written observations.

3.    After these observations have been submitted, the Court shall, after hearing the Advocate General, decide both on the admissibility and on the substance of the application.

*Article 156*

**Application to set aside**

1.    Application may be made pursuant to Article 41 of the Statute to set aside a judgment delivered by default.

2.    The application to set aside a judgment must be made within one month from the date of service of the judgment and must be submitted in the form prescribed by Articles 120 to 122 of these Rules.

3.    After the application has been served, the President shall prescribe a time-limit within which the other party may submit his written observations.

4.    The proceedings shall be conducted in accordance with Articles 59 to 92 of these Rules.

5.    The Court shall decide by way of a judgment which may not be set aside.

6.    The original of this judgment shall be annexed to the original of the judgment by default. A note of the judgment on the application to set aside shall be made in the margin of the original of the judgment by default.

*Article 157*

**Third-party proceedings**

1.    Articles 120 to 122 of these Rules shall apply to an application initiating third-party proceedings made pursuant to Article 42 of the Statute. In addition such an application shall:

(a) specify the judgment or order contested;

(b) state how the contested decision is prejudicial to the rights of the third party;

(c) indicate the reasons for which the third party was unable to take part in the original case.

2.    The application must be made against all the parties to the original case.

3.    The application must be submitted within two months of publication of the decision in the *Official Journal of the European Union*.

4.    The Court may, on application by the third party, order a stay of execution of the contested decision. The provisions of Chapter 10 of this Title shall apply.

5. The contested decision shall be varied on the points on which the submissions of the third party are upheld.

6. The original of the judgment in the third-party proceedings shall be annexed to the original of the contested decision. A note of the judgment in the third-party proceedings shall be made in the margin of the original of the contested decision.

### Article 158

### Interpretation

1. In accordance with Article 43 of the Statute, if the meaning or scope of a judgment or order is in doubt, the Court shall construe it on application by any party or any institution of the European Union establishing an interest therein.

2. An application for interpretation must be made within two years after the date of delivery of the judgment or service of the order.

3. An application for interpretation shall be made in accordance with Articles 120 to 122 of these Rules. In addition it shall specify:

(a) the decision in question;

(b) the passages of which interpretation is sought.

4. The application must be made against all the parties to the case in which the decision of which interpretation is sought was given.

5. The Court shall give its decision after having given the parties an opportunity to submit their observations and after hearing the Advocate General.

6. The original of the interpreting decision shall be annexed to the original of the decision interpreted. A note of the interpreting decision shall be made in the margin of the original of the decision interpreted.

### Article 159

### Revision

1. In accordance with Article 44 of the Statute, an application for revision of a decision of the Court may be made only on discovery of a fact which is of such a nature as to be a decisive factor and which, when the judgment was delivered or the order served, was unknown to the Court and to the party claiming the revision.

2. Without prejudice to the time-limit of 10 years prescribed in the third paragraph of Article 44 of the Statute, an application for revision shall be made within three months of the date on which the facts on which the application is founded came to the applicant's knowledge.

3. Articles 120 to 122 of these Rules shall apply to an application for revision. In addition such an application shall:

(a) specify the judgment or order contested;

(b) indicate the points on which the decision is contested;

(c) set out the facts on which the application is founded;

(d) indicate the nature of the evidence to show that there are facts justifying revision, and that the time-limits laid down in paragraph 2 have been observed.

4. The application for revision must be made against all parties to the case in which the contested decision was given.

5. Without prejudice to its decision on the substance, the Court shall, after hearing the Advocate General, give in the form of an order its decision on the admissibility of the application, having regard to the written observations of the parties.

6. If the Court declares the application admissible, it shall proceed to consider the substance of the application and shall give its decision in the form of a judgment in accordance with these Rules.

7. The original of the revising judgment shall be annexed to the original of the decision revised. A note of the revising judgment shall be made in the margin of the original of the decision revised.

### Chapter 10

SUSPENSION OF OPERATION OR ENFORCEMENT AND OTHER INTERIM MEASURES

### Article 160

### Application for suspension or for interim measures

1. An application to suspend the operation of any measure adopted by an institution, made pursuant to Article 278 TFEU or Article 157 TEAEC, shall be admissible only if the applicant has challenged that measure in an action before the Court.

2. An application for the adoption of one of the other interim measures referred to in Article 279 TFEU shall be admissible only if it is made by a party to a case before the Court and relates to that case.

3. An application of a kind referred to in the preceding paragraphs shall state the subject-matter of the proceedings, the circumstances giving rise to urgency and the pleas of fact and law establishing a prima facie case for the interim measure applied for.

4. The application shall be made by a separate document and in accordance with the provisions of Articles 120 to 122 of these Rules.

5. The application shall be served on the opposite party, and the President shall prescribe a short time-limit within which that party may submit written or oral observations.

6. The President may order a preparatory inquiry.

7.    The President may grant the application even before the observations of the opposite party have been submitted. This decision may be varied or cancelled even without any application being made by any party.

### Article 161

#### Decision on the application

1.    The President shall either decide on the application himself or refer it immediately to the Court.

2.    If the President is prevented from acting, Articles 10 and 13 of these Rules shall apply.

3.    Where the application is referred to it, the Court shall give a decision immediately, after hearing the Advocate General.

### Article 162

#### Order for suspension of operation or for interim measures

1.    The decision on the application shall take the form of a reasoned order, from which no appeal shall lie. The order shall be served on the parties forthwith.

2.    The execution of the order may be made conditional on the lodging by the applicant of security, of an amount and nature to be fixed in the light of the circumstances.

3.    Unless the order fixes the date on which the interim measure is to lapse, the measure shall lapse when the judgment which closes the proceedings is delivered.

4.    The order shall have only an interim effect, and shall be without prejudice to the decision of the Court on the substance of the case.

### Article 163

#### Change in circumstances

On application by a party, the order may at any time be varied or cancelled on account of a change in circumstances.

### Article 164

#### New application

Rejection of an application for an interim measure shall not bar the party who made it from making a further application on the basis of new facts.

### Article 165

#### Applications pursuant to Articles 280 TFEU and 299 TFEU and Article 164 TEAEC

1.    The provisions of this Chapter shall apply to applications to suspend the enforcement of a decision of the Court or of any measure adopted by the Council, the European Commission or the European Central Bank, submitted pursuant to Articles 280 TFEU and 299 TFEU or Article 164 TEAEC.

2.    The order granting the application shall fix, where appropriate, a date on which the interim measure is to lapse.

### Article 166

#### Application pursuant to Article 81 TEAEC

1.    An application of a kind referred to in the third and fourth paragraphs of Article 81 TEAEC shall contain:

(a) the names and addresses of the persons or undertakings to be inspected;

(b) an indication of what is to be inspected and of the purpose of the inspection.

2.    The President shall give his decision in the form of an order. Article 162 of these Rules shall apply.

3.    If the President is prevented from acting, Articles 10 and 13 of these Rules shall apply.

### TITLE V

### APPEALS AGAINST DECISIONS OF THE GENERAL COURT

#### Chapter 1

FORM AND CONTENT OF THE APPEAL, AND FORM OF ORDER SOUGHT

### Article 167

#### Lodging of the appeal

1.    An appeal shall be brought by lodging an application at the Registry of the Court of Justice or of the General Court.

2.    The Registry of the General Court shall forthwith transmit to the Registry of the Court of Justice the file in the case at first instance and, where necessary, the appeal.

### Article 168

#### Content of the appeal

1.    An appeal shall contain:

(a) the name and address of the appellant;

(b) a reference to the decision of the General Court appealed against;

(c) the names of the other parties to the relevant case before the General Court;

(d) the pleas in law and legal arguments relied on, and a summary of those pleas in law;

(e) the form of order sought by the appellant.

2.    Articles 119, 121 and 122(1) of these Rules shall apply to appeals.

3.    The appeal shall state the date on which the decision appealed against was served on the appellant.

4.    If an appeal does not comply with paragraphs 1 to 3 of this Article, the Registrar shall prescribe a reasonable time-limit within which the appellant is to put the appeal in order. If the appellant fails to put the appeal in order within the time-limit prescribed, the Court of Justice shall, after hearing the Judge-Rapporteur and the Advocate General, decide whether the non-compliance with that formal requirement renders the appeal formally inadmissible.

*Article 169*

**Form of order sought, pleas in law and arguments of the appeal**

1.    An appeal shall seek to have set aside, in whole or in part, the decision of the General Court as set out in the operative part of that decision.

2.    The pleas in law and legal arguments relied on shall identify precisely those points in the grounds of the decision of the General Court which are contested.

*Article 170*

**Form of order sought in the event that the appeal is allowed**

1.    An appeal shall seek, in the event that it is declared well founded, the same form of order, in whole or in part, as that sought at first instance and shall not seek a different form of order. The subject-matter of the proceedings before the General Court may not be changed in the appeal.

2.    Where the appellant requests that the case be referred back to the General Court if the decision appealed against is set aside, he shall set out the reasons why the state of the proceedings does not permit a decision by the Court of Justice.

Chapter 2

RESPONSES, REPLIES AND REJOINDERS

*Article 171*

**Service of the appeal**

1.    The appeal shall be served on the other parties to the relevant case before the General Court.

2.    In a case where Article 168(4) of these Rules applies, service shall be effected as soon as the appeal has been put in order or the Court of Justice has declared it admissible notwithstanding the failure to observe the formal requirements laid down by that Article.

*Article 172*

**Parties authorised to lodge a response**

Any party to the relevant case before the General Court having an interest in the appeal being allowed or dismissed may submit a response within two months after service on him of the appeal. The time-limit for submitting a response shall not be extended.

*Article 173*

**Content of the response**

1.    A response shall contain:

(a)  the name and address of the party submitting it;

(b)  the date on which the appeal was served on him;

(c)  the pleas in law and legal arguments relied on;

(d)  the form of order sought.

2.    Articles 119 and 121 of these Rules shall apply to responses.

*Article 174*

**Form of order sought in the response**

A response shall seek to have the appeal allowed or dismissed, in whole or in part.

*Article 175*

**Reply and rejoinder**

1.    The appeal and the response may be supplemented by a reply and a rejoinder only where the President, on a duly reasoned application submitted by the appellant within seven days of service of the response, considers it necessary, after hearing the Judge-Rapporteur and the Advocate General, in particular to enable the appellant to present his views on a plea of inadmissibility or on new matters relied on in the response.

2.    The President shall fix the date by which the reply is to be produced and, upon service of that pleading, the date by which the rejoinder is to be produced. He may limit the number of pages and the subject-matter of those pleadings.

Chapter 3

FORM AND CONTENT OF THE CROSS-APPEAL, AND FORM OF ORDER SOUGHT

*Article 176*

**Cross-appeal**

1.    The parties referred to in Article 172 of these Rules may submit a cross-appeal within the same time-limit as that prescribed for the submission of a response.

2.    A cross-appeal must be introduced by a document separate from the response.

*Article 177*

**Content of the cross-appeal**

1.    A cross-appeal shall contain:

(a)  the name and address of the party bringing the cross-appeal;

(b) the date on which the appeal was served on him;

(c) the pleas in law and legal arguments relied on;

(d) the form of order sought.

2.    Articles 119, 121 and 122(1) and (3) of these Rules shall apply to cross-appeals.

### Article 178

### Form of order sought, pleas in law and arguments of the cross-appeal

1.    A cross-appeal shall seek to have set aside, in whole or in part, the decision of the General Court.

2.    It may also seek to have set aside an express or implied decision relating to the admissibility of the action before the General Court.

3.    The pleas in law and legal arguments relied on shall identify precisely those points in the grounds of the decision of the General Court which are contested. The pleas in law and arguments must be separate from those relied on in the response.

### Chapter 4

PLEADINGS CONSEQUENT ON THE CROSS-APPEAL

### Article 179

### Response to the cross-appeal

Where a cross-appeal is brought, the applicant at first instance or any other party to the relevant case before the General Court having an interest in the cross-appeal being allowed or dismissed may submit a response, which must be limited to the pleas in law relied on in that cross-appeal, within two months after its being served on him. That time-limit shall not be extended.

### Article 180

### Reply and rejoinder on a cross-appeal

1.    The cross-appeal and the response thereto may be supplemented by a reply and a rejoinder only where the President, on a duly reasoned application submitted by the party who brought the cross-appeal within seven days of service of the response to the cross-appeal, considers it necessary, after hearing the Judge-Rapporteur and the Advocate General, in particular to enable that party to present his views on a plea of inadmissibility or on new matters relied on in the response to the cross-appeal.

2.    The President shall fix the date by which that reply is to be produced and, upon service of that pleading, the date by which the rejoinder is to be produced. He may limit the number of pages and the subject-matter of those pleadings.

### Chapter 5

APPEALS DETERMINED BY ORDER

### Article 181

### Manifestly inadmissible or manifestly unfounded appeal or cross-appeal

Where the appeal or cross-appeal is, in whole or in part, manifestly inadmissible or manifestly unfounded, the Court may at any time, acting on a proposal from the Judge-Rapporteur and after hearing the Advocate General, decide by reasoned order to dismiss that appeal or cross-appeal in whole or in part.

### Article 182

### Manifestly well-founded appeal or cross-appeal

Where the Court has already ruled on one or more questions of law identical to those raised by the pleas in law of the appeal or cross-appeal and considers the appeal or cross-appeal to be manifestly well founded, it may, acting on a proposal from the Judge-Rapporteur and after hearing the parties and the Advocate General, decide by reasoned order in which reference is made to the relevant case-law to declare the appeal or cross-appeal manifestly well founded.

### Chapter 6

EFFECT ON A CROSS-APPEAL OF THE REMOVAL OF THE APPEAL FROM THE REGISTER

### Article 183

### Effect on a cross-appeal of the discontinuance or manifest inadmissibility of the appeal

A cross-appeal shall be deemed to be devoid of purpose:

(a) if the appellant discontinues his appeal;

(b) if the appeal is declared manifestly inadmissible for non-compliance with the time-limit for lodging an appeal;

(c) if the appeal is declared manifestly inadmissible on the sole ground that it is not directed against a final decision of the General Court or against a decision disposing of the substantive issues in part only or disposing of a procedural issue concerning a plea of lack of competence or inadmissibility within the meaning of the first paragraph of Article 56 of the Statute.

### Chapter 7

COSTS AND LEGAL AID IN APPEALS

### Article 184

### Costs in appeals

1.    Subject to the following provisions, Articles 137 to 146 of these Rules shall apply, *mutatis mutandis*, to the procedure before the Court of Justice on an appeal against a decision of the General Court.

2.    Where the appeal is unfounded or where the appeal is well founded and the Court itself gives final judgment in the case, the Court shall make a decision as to the costs.

3.    When an appeal brought by a Member State or an institution of the European Union which did not intervene in the proceedings before the General Court is well founded, the Court of Justice may order that the parties share the costs or that the successful appellant pay the costs which the appeal has caused an unsuccessful party to incur.

4.    Where the appeal has not been brought by an intervener at first instance, he may not be ordered to pay costs in the appeal proceedings unless he participated in the written or oral part of the proceedings before the Court of Justice. Where an intervener at first instance takes part in the proceedings, the Court may decide that he shall bear his own costs.

### Article 185

### Legal aid

1.    A party who is wholly or in part unable to meet the costs of the proceedings may at any time apply for legal aid.

2.    The application shall be accompanied by all information and supporting documents making it possible to assess the applicant's financial situation, such as a certificate issued by a competent national authority attesting to his financial situation.

### Article 186

### Prior application for legal aid

1.    If the application is made prior to the appeal which the applicant for legal aid intends to commence, it shall briefly state the subject of the appeal.

2.    The application for legal aid need not be made through a lawyer.

3.    The introduction of an application for legal aid shall, with regard to the person who made that application, suspend the time-limit prescribed for the bringing of the appeal until the date of service of the order making a decision on that application.

4.    The President shall assign the application for legal aid, as soon as it is lodged, to a Judge-Rapporteur who shall put forward, promptly, a proposal as to the action to be taken on it.

### Article 187

### Decision on the application for legal aid

1.    The decision to grant legal aid, in whole or in part, or to refuse it shall be taken, on a proposal from the Judge-Rapporteur and after hearing the Advocate General, by the Chamber of three Judges to which the Judge-Rapporteur is assigned. In that event, the formation of the Court shall be composed of the President of that Chamber, the Judge-Rapporteur and the first Judge or, as the case may be, the first two Judges designated from the list referred to in Article 28(3) on the date on which the application for legal aid is brought before that Chamber by the Judge-Rapporteur. It shall consider, if appropriate, whether the appeal is manifestly unfounded.

2.    If the Judge-Rapporteur is not a member of a Chamber of three Judges, the decision shall be taken, under the same conditions, by the Chamber of five Judges to which he is assigned. In addition to the Judge-Rapporteur, the formation of the Court shall be composed of four Judges designated from the list referred to in Article 28(2) on the date on which the application for legal aid is brought before that Chamber by the Judge-Rapporteur.

3.    The formation of the Court shall give its decision by way of order. Where the application for legal aid is refused in whole or in part, the order shall state the reasons for that refusal.

### Article 188

### Sums to be advanced as legal aid

1.    Where legal aid is granted, the cashier of the Court shall be responsible, where applicable within the limits set by the formation of the Court, for costs involved in the assistance and representation of the applicant before the Court. At the request of the applicant or his representative, an advance on those costs may be paid.

2.    In its decision as to costs the Court may order the payment to the cashier of the Court of sums advanced as legal aid.

3.    The Registrar shall take steps to obtain the recovery of these sums from the party ordered to pay them.

### Article 189

### Withdrawal of legal aid

The formation of the Court which gave a decision on the application for legal aid may at any time, either of its own motion or on request, withdraw that legal aid if the circumstances which led to its being granted alter during the proceedings.

## Chapter 8

### OTHER PROVISIONS APPLICABLE TO APPEALS

### Article 190

### Other provisions applicable to appeals

1.    Articles 127, 129 to 136, 147 to 150, 153 to 155 and 157 to 166 of these Rules shall apply to the procedure before the Court of Justice on an appeal against decisions of the General Court.

2.    By way of derogation from Article 130(1), an application to intervene shall, however, be made within one month of the publication of the notice referred to in Article 21(4).

3.    Article 95 shall apply, *mutatis mutandis*, to the procedure before the Court of Justice on an appeal against decisions of the General Court.

## TITLE VI

### REVIEW OF DECISIONS OF THE GENERAL COURT

*Article 191*

### Reviewing Chamber

A Chamber of five Judges shall be designated for a period of one year for the purpose of deciding, in accordance with Articles 193 and 194 of these Rules, whether a decision of the General Court is to be reviewed in accordance with Article 62 of the Statute.

*Article 192*

### Information and communication of decisions which may be reviewed

1.    As soon as the date for the delivery or signature of a decision to be given under Article 256(2) or (3) TFEU is fixed, the Registry of the General Court shall inform the Registry of the Court of Justice.

2.    The decision shall be communicated to the Registry of the Court of Justice immediately upon its delivery or signature, as shall the file in the case, which shall be made available forthwith to the First Advocate General.

*Article 193*

### Review of decisions given on appeal

1.    The proposal of the First Advocate General to review a decision of the General Court given under Article 256(2) TFEU shall be forwarded to the President of the Court of Justice and to the President of the reviewing Chamber. Notice of that transmission shall be given to the Registrar at the same time.

2.    As soon as he is informed of the existence of a proposal, the Registrar shall communicate the file in the case before the General Court to the members of the reviewing Chamber.

3.    As soon as the proposal to review has been received, the President of the Court shall designate the Judge-Rapporteur from among the Judges of the reviewing Chamber on a proposal from the President of that Chamber. The composition of the formation of the Court shall be determined in accordance with Article 28(2) of these Rules on the day on which the case is assigned to the Judge-Rapporteur.

4.    That Chamber, acting on a proposal from the Judge-Rapporteur, shall decide whether the decision of the General Court is to be reviewed. The decision to review the decision of the General Court shall indicate only the questions which are to be reviewed.

5.    The General Court, the parties to the proceedings before it and the other interested persons referred to in the second paragraph of Article 62a of the Statute shall forthwith be informed by the Registrar of the decision of the Court of Justice to review the decision of the General Court.

6.    Notice of the date of the decision to review the decision of the General Court and of the questions which are to be reviewed shall be published in the *Official Journal of the European Union.*

*Article 194*

### Review of preliminary rulings

1.    The proposal of the First Advocate General to review a decision of the General Court given under Article 256(3) TFEU shall be forwarded to the President of the Court of Justice and to the President of the reviewing Chamber. Notice of that transmission shall be given to the Registrar at the same time.

2.    As soon as he is informed of the existence of a proposal, the Registrar shall communicate the file in the case before the General Court to the members of the reviewing Chamber.

3.    The Registrar shall also inform the General Court, the referring court or tribunal, the parties to the main proceedings and the other interested persons referred to in the second paragraph of Article 62a of the Statute of the existence of a proposal to review.

4.    As soon as the proposal to review has been received, the President of the Court shall designate the Judge-Rapporteur from among the Judges of the reviewing Chamber on a proposal from the President of that Chamber. The composition of the formation of the Court shall be determined in accordance with Article 28(2) of these Rules on the day on which the case is assigned to the Judge-Rapporteur.

5.    That Chamber, acting on a proposal from the Judge-Rapporteur, shall decide whether the decision of the General Court is to be reviewed. The decision to review the decision of the General Court shall indicate only the questions which are to be reviewed.

6.    The General Court, the referring court or tribunal, the parties to the main proceedings and the other interested persons referred to in the second paragraph of Article 62a of the Statute shall forthwith be informed by the Registrar of the decision of the Court of Justice as to whether or not the decision of the General Court is to be reviewed.

7.    Notice of the date of the decision to review the decision of the General Court and of the questions which are to be reviewed shall be published in the *Official Journal of the European Union.*

*Article 195*

**Judgment on the substance of the case after a decision to review**

1.    The decision to review a decision of the General Court shall be served on the parties and other interested persons referred to in the second paragraph of Article 62a of the Statute. The decision served on the Member States, and the States, other than the Member States, which are parties to the EEA Agreement, as well as the EFTA Surveillance Authority, shall be accompanied by a translation of the decision of the Court of Justice in accordance with the provisions of Article 98 of these Rules. The decision of the Court of Justice shall also be communicated to the General Court and, if applicable, to the referring court or tribunal.

2.    Within one month of the date of service referred to in paragraph 1, the parties and other interested persons on whom the decision of the Court of Justice has been served may lodge statements or written observations on the questions which are subject to review.

3.    As soon as a decision to review a decision of the General Court has been taken, the First Advocate General shall assign the review to an Advocate General.

4.    The reviewing Chamber shall rule on the substance of the case, after hearing the Advocate General.

5.    It may, however, request the Court of Justice to assign the case to a formation of the Court composed of a greater number of Judges.

6.    Where the decision of the General Court which is subject to review was given under Article 256(2) TFEU, the Court of Justice shall make a decision as to costs.

**TITLE VII**

**OPINIONS**

*Article 196*

**Written part of the procedure**

1.    In accordance with Article 218(11) TFEU, a request for an Opinion may be made by a Member State, by the European Parliament, by the Council or by the European Commission.

2.    A request for an Opinion may relate both to whether the envisaged agreement is compatible with the provisions of the Treaties and to whether the European Union or any institution of the European Union has the power to enter into that agreement.

3.    It shall be served on the Member States and on the institutions referred to in paragraph 1, and the President shall prescribe a time-limit within which they may submit written observations.

*Article 197*

**Designation of the Judge-Rapporteur and of the Advocate General**

As soon as the request for an Opinion has been submitted, the President shall designate a Judge-Rapporteur and the First Advocate General shall assign the case to an Advocate General.

*Article 198*

**Hearing**

The Court may decide that the procedure before it shall also include a hearing.

*Article 199*

**Time-limit for delivering the Opinion**

The Court shall deliver its Opinion as soon as possible, after hearing the Advocate General.

*Article 200*

**Delivery of the Opinion**

The Opinion, signed by the President, the Judges who took part in the deliberations and the Registrar, shall be delivered in open court. It shall be served on all the Member States and on the institutions referred to in Article 196(1).

**TITLE VIII**

**PARTICULAR FORMS OF PROCEDURE**

*Article 201*

**Appeals against decisions of the arbitration committee**

1.    An application initiating an appeal under the second paragraph of Article 18 TEAEC shall state:

(a) the name and permanent address of the applicant;

(b) the description of the signatory;

(c) a reference to the arbitration committee's decision against which the appeal is made;

(d) the names of the respondents;

(e) a summary of the facts;

(f) the grounds on which the appeal is based and arguments relied on, and a brief statement of those grounds;

(g) the form of order sought by the applicant.

2.    Articles 119 and 121 of these Rules shall apply to the application.

3.    A certified copy of the contested decision shall be annexed to the application.

29.9.2012          EN          Official Journal of the European Union          L 265/41

4.    As soon as the application has been lodged, the Registrar of the Court shall request the arbitration committee registry to transmit to the Court the file in the case.

5.    Articles 123 and 124 of these Rules shall apply to this procedure. The Court may decide that the procedure before it shall also include a hearing.

6.    The Court shall give its decision in the form of a judgment. Where the Court sets aside the decision of the arbitration committee it may refer the case back to the committee.

### Article 202

**Procedure under Article 103 TEAEC**

1.    Four certified copies shall be lodged of an application under the third paragraph of Article 103 TEAEC. The application shall be accompanied by the draft of the agreement or contract concerned, by the observations of the European Commission addressed to the State concerned and by all other supporting documents.

2.    The application and annexes thereto shall be served on the European Commission, which shall have a time-limit of 10 days from such service to submit its written observations. This time-limit may be extended by the President after the State concerned has been heard.

3.    Following the lodging of such observations, which shall be served on the State concerned, the Court shall give its decision promptly, after hearing the Advocate General and, if they so request, the State concerned and the European Commission.

### Article 203

**Procedures under Articles 104 TEAEC and 105 TEAEC**

Applications under the third paragraph of Article 104 TEAEC and the second paragraph of Article 105 TEAEC shall be governed by the provisions of Titles II and IV of these Rules. Such applications shall also be served on the State to which the respondent person or undertaking belongs.

### Article 204

**Procedure provided for by Article 111(3) of the EEA Agreement**

1.    In the case governed by Article 111(3) of the EEA Agreement, the matter shall be brought before the Court by a request submitted by the Contracting Parties which are parties to the dispute. The request shall be served on the other Contracting Parties, on the European Commission, on the EFTA Surveillance Authority and, where appropriate, on the other interested persons on whom a request for a preliminary ruling raising the same question of interpretation of European Union legislation would be served.

2.    The President shall prescribe a time-limit within which the Contracting Parties and the other interested persons on whom the request has been served may submit written observations.

3.    The request shall be made in one of the languages referred to in Article 36 of these Rules. Article 38 shall apply. The provisions of Article 98 shall apply *mutatis mutandis*.

4.    As soon as the request referred to in paragraph 1 of this Article has been submitted, the President shall designate a Judge-Rapporteur. The First Advocate General shall, immediately afterwards, assign the request to an Advocate General.

5.    The Court shall, after hearing the Advocate General, give a reasoned decision on the request.

6.    The decision of the Court, signed by the President, the Judges who took part in the deliberations and the Registrar, shall be served on the Contracting Parties and on the other interested persons referred to in paragraphs 1 and 2.

### Article 205

**Settlement of the disputes referred to in Article 35 TEU in the version in force before the entry into force of the Treaty of Lisbon**

1.    In the case of disputes between Member States as referred to in Article 35(7) TEU in the version in force before the entry into force of the Treaty of Lisbon, as maintained in force by Protocol No 36 annexed to the Treaties, the matter shall be brought before the Court by an application by a party to the dispute. The application shall be served on the other Member States and on the European Commission.

2.    In the case of disputes between Member States and the European Commission as referred to in Article 35(7) TEU in the version in force before the entry into force of the Treaty of Lisbon, as maintained in force by Protocol No 36 annexed to the Treaties, the matter shall be brought before the Court by an application by a party to the dispute. The application shall be served on the other Member States, the Council and the European Commission if it was submitted by a Member State. The application shall be served on the Member States and on the Council if it was submitted by the European Commission.

3.    The President shall prescribe a time-limit within which the institutions and the Member States on which the application has been served may submit written observations.

4.    As soon as the application referred to in paragraphs 1 and 2 has been submitted, the President shall designate a Judge-Rapporteur. The First Advocate General shall, immediately afterwards, assign the application to an Advocate General.

5.    The Court may decide that the procedure before it shall also include a hearing.

6.    The Court shall, after the Advocate General has delivered his Opinion, give its ruling on the dispute by way of judgment.

7. The same procedure as that laid down in the preceding paragraphs shall apply where an agreement concluded between the Member States confers jurisdiction on the Court to rule on a dispute between Member States or between Member States and an institution.

## Article 206

### Requests under Article 269 TFEU

1. Four certified copies shall be submitted of a request under Article 269 TFEU. The request shall be accompanied by any relevant document and, in particular, any observations and recommendations made pursuant to Article 7 TEU.

2. The request and annexes thereto shall be served on the European Council or on the Council, as appropriate, each of which shall have a time-limit of 10 days from such service to submit its written observations. This time-limit shall not be extended.

3. The request and annexes thereto shall also be communicated to the Member States other than the State in question, to the European Parliament and to the European Commission.

4. Following the lodging of the observations referred to in paragraph 2, which shall be served on the Member State concerned and on the States and institutions referred to in paragraph 3, the Court shall give its decision within a time-limit of one month from the lodging of the request and after hearing the Advocate General. At the request of the Member State concerned, the European Council or the Council, or of its own motion, the Court may decide that the procedure before it shall also include a hearing, which all the States and institutions referred to in this Article shall be given notice to attend.

## FINAL PROVISIONS

## Article 207

### Supplementary rules

Subject to the provisions of Article 253 TFEU and after consultation with the Governments concerned, the Court shall adopt supplementary rules concerning its practice in relation to:

(a) letters rogatory;

(b) applications for legal aid;

(c) reports by the Court of perjury by witnesses or experts, delivered pursuant to Article 30 of the Statute.

## Article 208

### Implementing rules

The Court may, by a separate act, adopt practice rules for the implementation of these Rules.

## Article 209

### Repeal

These Rules replace the Rules of Procedure of the Court of Justice of the European Communities adopted on 19 June 1991, as last amended on 24 May 2011 (*Official Journal of the European Union*, L 162 of 22 June 2011, p. 17).

## Article 210

### Publication and entry into force of these Rules

These Rules, which are authentic in the languages referred to in Article 36 of these Rules, shall be published in the *Official Journal of the European Union* and shall enter into force on the first day of the second month following their publication.

Done at Luxembourg, 25 September 2012.

**Exhibit P-09**
BMW AG v. Onesta IP, LLC
Case No. 6:35-cv-00581-ADA

C.I.L.F.I.T. v MINISTRY OF HEALTH

at issue are not strictly identical. However, it must not be forgotten that in all such circumstances national courts and tribunals, including those referred to in the third paragraph of Article 177, remain entirely at liberty to bring a matter before the Court of Justice if they consider it appropriate to do so.

5. The third paragraph of Article 177 of the EEC Treaty is to be interpreted as meaning that a court or tribunal against whose decisions there is no judicial remedy under national law is required, where a question of Community law is raised before it, to comply with its obligation to bring the matter before the Court of Justice, unless it has established that the correct application of Community law is so obvious as to leave no scope for any reasonable doubt. The existence of such a possibility must be assessed in the light of the specific characteristics of Community law, the particular difficulties to which its interpretation gives rise and the risk of divergences in judicial decisions within the Community.

In Case 283/81

REFERENCE to the Court under Article 177 of the EEC Treaty by the First Civil Division of the Corte Suprema di Cassazione [Supreme Court of Cassation] for a preliminary ruling in the proceedings pending before that court

Sʀʟ CILFIT — in liquidation — and 54 Others, Rome,

v

Mɪɴɪsᴛʀʏ ᴏғ Hᴇᴀʟᴛʜ, in the person of the Minister, Rome,

and

Lᴀɴɪғɪᴄɪᴏ ᴅɪ Gᴀᴠᴀʀᴅᴏ SᴘA, Milan,

v

Mɪɴɪsᴛʀʏ ᴏғ Hᴇᴀʟᴛʜ, in the person of the Minister, Rome,

on the interpretation of the third paragraph of Article 177 of the EEC Treaty,

3417

THE COURT

composed of: J. Mertens de Wilmars, President, G. Bosco, A. Touffait and O. Due (Presidents of Chambers), P. Pescatore, Lord Mackenzie Stuart, A. O'Keeffe, T. Koopmans, U. Everling, A. Chloros and F. Grévisse, Judges,

Advocate General: F. Capotorti
Registrar: P. Heim

gives the following

## JUDGMENT

## Facts and issues

I — Facts and procedure

By a summons served on the Italian Minister for Health on 18 September 1974, the plaintiffs in the main proceedings, which are textile firms, contended that since the adoption of Law No 30 of 30 January 1968 they had paid, by way of fixed health inspection levy, LIT 700 per quintal of imported wool, until the entry into force of Law No 1239 of 30 December 1970, which amended the levy, although they should have been required to pay only a sum of LIT 70 per quintal "according to the correct interpretation of the Law of 30 January 1968 and, in any event, according to the authentic interpretation of that law given by Law No 1239 of 1970".

After the Tribunal di Roma [District Court, Rome] had dismissed their applications by judgment of 27 October 1976, the plaintiffs in the main proceedings lodged an appeal based on the argument rejected by the Tribunale. They also contended that Law No 1968 was inapplicable as a result of the adoption of Regulation (EEC) No 827/68 of the Council of 28 June 1968 on the common organization of the market in certain products listed in Annex II to the Treaty (Official Journal, English Special Edition 1968 (I) p. 209).

By judgment of 12 December 1978, the Corte d'Appello [Court of Appeal], Rome, rejected all the submissions relied upon by the plaintiffs and accepted the Ministry of Health's argument concerning the compatibility of Law No 30 of 1968 with the aforesaid regulation.

C.I.L.F.I.T. v MINISTRY OF HEALTH

On 4 October 1979, the plaintiff in the main proceedings appealed against that judgment. In support of its submission that the appeal should be dismissed, the Ministry of Health, sharing the view held by the Court of Appeal, argued that since wool is not included in Annex II to the EEC Treaty, it is not subject to the common organization of the markets and cannot therefore come within the scope of the regulation in question.

The Ministry of Health urged the Court of Cassation to "decide the case along the lines suggested on the ground that the factual circumstances are so obvious as to rule out the possibility of their being capable of any other interpretation and that obviates the need to refer the matter for a preliminary ruling to the Court of Justice of the European Communities".

The Court of Cassation took the view that counsel for the Ministry of Health had raised a question concerning the interpretation of Article 177 of the Treaty in so far as he contended that that provision must be understood as meaning that the Court of Cassation, against whose decisions there is no judicial remedy under national law, is not obliged to refer a matter to the Court of Justice "when the solution of a question on the interpretation of acts performed by the Community institutions is so obvious as to preclude the very possibility of their being open to another interpretation".

Therefore the Court of Cassation, by order of 27 March 1981, stayed the proceedings and submitted to the Court of Justice a reference for a preliminary ruling on the following question:

"Does the third paragraph of Article 177 of the EEC Treaty, which provides that where any question of the same kind as those listed in the first paragraph of that article is raised in a case pending before a national court or tribunal against whose decisions there is no judicial remedy under national law that court or tribunal must bring the matter before the Court of Justice, lay down an obligation so to submit the case which precludes the national court from determining whether the question raised is justified or does it, and if so within what limits, make that obligation conditional on the prior finding of a reasonable interpretative doubt?"

The order making the reference was registered at the Court on 30 October 1981.

In accordance with Article 20 of the Protocol on the Statute of the Court of Justice of the EEC, written observations were submitted by the plaintiffs in the main proceedings, represented by G. Scarpa, G. Stella Richter, G. M. Ubertazzi and F. Capelli; by the Government of the Kingdom of Denmark, represented by its Legal Adviser, Laurids Mikaelsen, acting as Agent; by the Government of the Italian Republic, represented by S. Laporta, Avvocato dello Stato, and by A. Squillante, acting as Agent; and by the Commission of the European Communities, represented by G. Olmi, Deputy Director General, and Miss Mary Minch, a member of the Commission's Legal Department, acting as Agents.

On hearing the report of the Judge-Rapporteur and the views of the Advocate General, the Court decided to open the oral procedure without any preparatory inquiry.

3419

II — Observations submitted pursuant to Article 20 of the Protocol on the Statute of the Court of Justice

A — *Observations of the plaintiffs in the main proceedings*

The *plaintiffs in the main proceedings* define the problem raised in the question submitted by the national court and express the view that it is concerned solely with the following three points:

"Does the obligation to make a reference for a preliminary ruling depend on a decision of the court hearing the case which establishes that the question raised before it is concerned with the interpretation rather than the application of Community law?

Must the Court of Cassation seek a ruling on interpretation from the Court of Justice even though the matter is not in any doubt?

Irrespective of the clarity of the text, must the question of interpretation appear *prima facie* to be substantially justified, fair and plausible?"

(a) Questions concerning interpretation and questions concerning application

The plaintiffs observe that the EEC Treaty is concerned only with questions of interpretation; therefore, the courts referred to in the third paragraph of Article 177 are required to make a reference for a preliminary ruling only in respect of such questions. Thus it is for those courts to determine beforehand whether the question raised before them is concerned with interpretation or rather with application.

However, in disputes brought before them national courts must apply Community law and it is for that purpose that they may refer questions concerning its interpretation to the Court of Justice.

Thus any doubts concerning the application of Community law relate above all to its interpretation with the result that the court would have to look beyond the external appearance of the question raised by the parties regarding the application of Community law "and discover the underlying question of interpretation".

(b) Must the Court of Cassation seek a ruling on interpretation from the Court even though the matter is not in any doubt?

The plaintiffs consider, in the first place, that under national law the maxim *in claris non fit interpretatio* "does not authorize the court to confine itself to the apparent meaning of a provision, on the basis of its literal purport", but implies that "if a provision is clear and unequivocal and there is no possible scope for divergence between the letter and the spirit, then (and only then) is an interpretation other than that suggested by the wording of the provision prohibited".

Next, the plaintiffs maintain that the rules of interpretation of classical international law which enable the principle of the *acte clair* to be applied should not be followed in Community law on the ground that Community law is a legal system in evolution and should be interpreted in a sense "which transcends the wording of the various specific provisions" and is therefore teleological, thus ensuring that the system is effectively applied.

Furthermore, the expressions used in legislation are not sufficiently clear to eliminate the risk of differing interpretations, especially since in the case of Community law the national court has to

C.I.L.F.I.T. v MINISTRY OF HEALTH

overcome numerous difficulties resulting from the technical nature thereof, from the fact that the national court does not always have access to all the sources which make up the Community legal system and from the uncertainties "due to the sometimes complex interaction of national law and Community law".

In view of those difficulties, the courts referred to in the third paragraph of Article 177 are under an obligation to make a reference "whenever the interpretation of a Community provision is necessary, even though the meaning is apparently clear".

(c) Must the question of interpretation appear *prima facie* to be substantially justified, fair and plausible?

The last paragraph of Article 177 requires courts of last instance to bring a matter before the Court of Justice "if and only if 'a question' is raised before them".

The word "question" should be understood in the broad sense, that is to say not necessarily as referring to a disagreement between the parties but as meaning that an interpretative doubt in a case constitutes a necessary and sufficient condition for creating an obligation to make a reference to the Court of Justice.

However, the purpose of the question submitted by the Court of Cassation is not so much to ascertain the meaning of the term in question as to determine whether it is "reasonable" to use it. One answer may be obtained from the wording of the third paragraph of Article 177 "which makes no distinction between questions which are reasonable and those which are not".

A comparative study of the second and third paragraphs of Article 177 lends weight to that initial answer since both those provisions lead to the adoption of an interpretation designed to widen the obligation to make a reference, in other words to deprive the national court or tribunal referred to in the third paragraph of any discretion.

That argument is also supported by the objective of Article 177, which is to ensure the uniform application of Community law in the Member States, especially since that objective is constantly growing in importance and since the task of the Court of Cassation is, *inter alia,* to ensure "that the law is uniformly applied".

Moreover, the decisions of the Court of Justice are also consistent with a broad interpretation of Article 177; in particular in its judgment of 27 March 1953 in Joined Cases 28 to 30/62 *Da Costa en Schaake* [1963] ECR 31, the Court held that "the third paragraph of Article 177 unreservedly requires courts or tribunals of a Member State against whose decisions there is no judicial remedy under national law . . . to refer to the Court every question of interpretation raised before them".

That view is endorsed by leading academic lawyers and finally, as regards judicial policy, there would be a "serious risk" in allowing national supreme courts to determine whether questions raised before them are reasonable, inasmuch as they might inhibit or distort the process of integration between Community law and national law. To allow national supreme courts such a discretion would

3421

also involve "the risk of creating an atmosphere of tension between national courts and Community institutions" and might promote discord.

### B — Observations of the Italian Government

After outlining the facts of the case, the *Italian Government* observes that it stated before the Court of Cassation that there was in the present case "a factual circumstance so clear and so important as to preclude the very possibility of there being any interpretative doubt, thus making it unnecessary to refer the matter for a preliminary ruling to the Court of Justice of the European Communities".

The Italian Government considers that, in spite of the differences in the wording of the second and third paragraphs of Article 177, the third paragraph is no different "in scope and that consequently the purpose of that provision is not to deprive the national court of last instance of the power to determine whether a preliminary ruling is necessary".

The authors of the Treaty considered it appropriate to provide for a filter for questions of interpretation which might be submitted to the Court, as is shown by the retention of the ordinary procedure for making a reference to the Court even in proceedings before the national court of last instance.

Furthermore, when the Court of Justice stated in the *Da Costa en Schaake* judgment cited above that the obligation imposed by the third paragraph of Article 177 upon national courts or tribunals of last instance may be deprived of its purpose and emptied of its substance by the authority of an interpret-

ation given by the Court in an earlier preliminary ruling in a similar case, it recognized that a national court of last instance is empowered to define the scope of the proceedings and thus to disclaim jurisdiction over a question or problem of interpretation concerning Community law by relying on the answer given by the Court to the same question.

Since Community law forms part of the legal system of each of the Member States "it would be absurd to take the view that a national court is prohibited from interpreting a provision which it is nevertheless obliged to apply". That consideration disposes of the argument that the national court of last instance must confine itself to taking note of the existence of arguments put forward by the parties which are based on Community law and referring them to the Court of Justice for scrutiny. That court must therefore formulate a question which is capable of being referred to the Court of Justice and, to that end, it must determine whether an interpretative doubt actually exists; that is supported by the opinion of Mr Advocate General Lagrange in the *Da Costa en Schaake* case (cited above), in which he pointed out that "before the procedure of referring a question for a preliminary ruling on interpretation can be set in motion, there must clearly be a question".

Thus, according to the Italian Government, a provision may be described as "clear" not only when it has already been interpreted by the Court of Justice in connection with a related question but also "when it cannot reasonably have more than one meaning having regard to its letter and context".

In the Italian Government's opinion, it seems highly improbable that the national court of last instance has, in Community matters, been divested of

C.I.L.F.I.T. v MINISTRY OF HEALTH

some of its conventional instruments of interpretation and must therefore restrict itself exclusively to the letter of a provision in order to determine whether or not the meaning is obscure, whilst refraining *a priori* from considering any lingering doubts merely by comparing the results of a literal interpretation with those which a logical and systematic interpretation would yield.

Therefore it must be acknowledged that the provisions of Article 177 imply the need for an effective filter for the reference of questions of interpretation to the Court. It necessarily follows that the national court of last instance must give proper consideration to the question whether or not a genuine doubt exists.

It remains to define the limits of the court's discretion in this matter. The question is more complex in theory than it is in practice, at least at the present stage of development of Community law and given the degree of "Community awareness" attained in each of the Member States. Furthermore, the objective embodied in Article 177 of achieving a uniform interpretation of Community law and "the notion that any resistance will ultimately be overcome by the force of law" raise the question of the extent to which in practice a national court of last instance may deny in good faith the existence of a genuine preliminary question.

The Italian Government therefore proposes that the answer to the question submitted should be "that the EEC Treaty requires national courts of last instance to seek a preliminary ruling from the Court of Justice in cases in which, after due consideration, they recognize that the question of interpret-

ation raised before them is not manifestly unfounded".

C — *Observations of the Danish Government*

After describing the objective of Article 177 and the way in which it operates the *Danish Government* expresses the view that the third paragraph of that article "cannot be understood as meaning that a national court against whose decisions there is no judicial remedy must refer to the Court of Justice any question concerning the interpretation or validity of a provision of Community law merely because the parties wish it to do so".

Such an approach would transform that article into a remedy available to private individuals, which is by no means the purpose of that provision.

It is clear from the Court's judgment of 22 November 1978 in Case 93/78 *Mattheus* ([1978] ECR 2203) that "national courts are under an obligation to determine whether it is necessary to make a reference to the Court of Justice of the European Communities". Accordingly, it is for the national court to decide whether a doubt really exists which justifies referring a question to the Court of Justice for a preliminary ruling; that view is supported by the Court's judgment of 16 December 1981 in Case 244/80 *Foglia* v *Novello* ([1981] ECR 3045).

Next, the Danish Government, like the Italian Government, maintains that the decisions of the Court, in particular the *Da Costa en Schaake* judgment cited above, reaffirm that the obligation to make a reference to the Court of Justice for a preliminary ruling, as provided for

3423

by the third paragraph of Article 177, is not an absolute one.

The Danish Government observes that even where there are no previous decisions by the Court, the national court may none the less decide a point directly, without requesting a preliminary ruling, if the provision of Community law at issue does not give rise to any difficulties of interpretation.

With regard to the theory of the *acte clair,* the Danish Government recalls that the Commission, in reply to Written Question No 608/78 (Official Journal 1979, C 28 pp. 8 and 9) stated that the courts "may decline to make a reference and decide the matter themselves in cases where such questions are perfectly straightforward and the answer is obvious to any lawyer with a modicum of experience".

The Danish Government informs the Court that the above criterion is also applied by the Danish courts, including courts of last instance.

It observes that, in its opinion, "a theoretical interpretative doubt does not in itself justify systematic recourse to the procedure for obtaining a preliminary ruling. For that, there must be a genuine interpretative doubt".

If, however, the *acte clair* test is to be adopted it must be applied with caution and the national supreme court must take a number of factors into account, especially as the provisions of Community law are drafted in several languages and the aim of Article 177 is to ensure the uniform application of Community law. In conclusion, therefore, that national court may not, on its own authority, set aside a Community measure which it regards as unlawful; similarly, it may not discard an interpretation previously adopted by the Court of Justice.

The Danish Government therefore proposes that the Court should give the following answer to the question referred to it:

"National courts against whose decisions there is no judicial remedy are under an obligation to refer to the Court of Justice of the European Communities for a preliminary ruling questions on the validity or interpretation of Community law if they consider that a decision on the question is necessary to enable them to give judgment in a particular case. It is neither necessary nor sufficient, for the purposes of that obligation, for a party to make a request to that effect. However, a court against whose decisions there is no judicial remedy and whose authority is such that its decisions are capable of constituting precedents must, for reasons based on the need to apply Community law in a uniform manner, avoid resolving such questions itself wherever possible".

### D — Observations of the Commission

As a preliminary remark, the *Commission* expresses the view that the question submitted to the Court of Justice by the Italian Supreme Court of Cassation "is fundamental".

In the first place, the Commission relies on the theory of the *acte clair* which states that "there must be a genuine difficulty, raised by the parties or perceived by the Court itself, such as to insinuate a doubt into an alert mind"; it

C.I.L.F.I.T. v MINISTRY OF HEALTH

also refers to a similar concept which exists in Italy and in the Federal Republic of Germany regarding the obligation on the part of courts to refer to the constitutional court questions relating to the constitutionality of national legislation. The position in Italy and in the Federal Republic of Germany is that "a court is not obliged to refer a matter to the constitutional court if it considers that the grounds relied upon before it for declaring a measure unconstitutional are manifestly devoid of all substance".

Next, after examining the principal arguments for and against the view that a court of last instance has a margin of discretion in relation to Community law, the Commission considers that such a view is acceptable under Community law.

In this connection it recalls that in its reply to Written Question No 608/78 by Mr Krieg (Official Journal 1979 C 28) it has already stated that in its opinion:

"National courts are not required, under Article 177 of the EEC Treaty, to stay proceedings and systematically refer to the Court of Justice all questions concerning the interpretation of Community law which are submitted to them. They can decline to make a reference and decide the matter themselves in cases where such questions are perfectly straightforward and the answer is obvious to any lawyer with a modicum of experience."

After analysing the third paragraph of Article 177, the Commission expresses the conviction that its earlier standpoint is correct. It takes the view that before there can be an obligation to make a reference for a preliminary ruling a question must arise before the national court of last instance and that question must relate to the interpretation of a text. According to the Commission, the word "question" is synonymous with "problem" and the verb "to interpret" means to comprehend and explain the wording of a text or a speech, the meaning of which is obscure or which creates uncertainty".

If therefore a provision is quite unequivocal "no question can arise and there is no need to seek an interpretation".

Admittedly, it is true that interpretation is a continuing process, even in relation to provisions which are unequivocal and therefore immediately comprehensible, but "it is clear however that only genuine problems, intellectual difficulties which need to be overcome can form the subject-matter of the questions of interpretation referred to in the third paragraph of Article 177".

The discretion which the Commission thus attributes to the court hearing the case falls into the same category as the discretionary powers which have already been entrusted to it. National courts must therefore decide cases brought before them and apply Community law, whilst recognizing the jurisdiction of the Court of Justice to interpret Community law. The Court of Justice's recognition of the national court's margin of discretion "would bear witness to its confidence in national courts"; moreover, only in a spirit of mutual confidence can the procedures provided for by Article 177 be applied successfully.

Of course, mistakes may be made by national courts in interpreting a provision of Community law but, in the Court's opinion, the drawbacks which may result from such errors are limited and offset by the advantages, especially

3425

for the proper administration of justice, of not compelling the courts of last instance of the Member States to refer to the Court of Justice all questions concerning provisions of Community law".

However, the Commission wishes to "emphasize categorically that, in view of the peculiarities of Community law, the national court's discretion in relation to Community law must be exercised only with the greatest caution".

The Commission recalls in this regard that Community legislation is drafted in seven languages and frequently reflects political compromises with the result that "the exercise of a discretion by a national court in relation to Community legislation calls for much greater caution than recourse to the theory of the *acte clair* in a national context". Thus, before it exercises its discretion, a national court must first and foremost acquaint itself with the decisions of the Court of Justice and, if the slightest doubt exists, the supreme court must refer the matter to the Court of Justice for a preliminary ruling.

In the Commission's opinion, the result would be that "cases in which it is legitimate to refrain from referring a matter to the Court of Justice would in practice be very few".

The Commission therefore proposes that, the question referred to the Court of Justice for a preliminary ruling should be answered as follows:

"Under the third paragraph of Article 177 of the EEC Treaty courts against whose decisions there is no judicial remedy under national law must refer to the Court of Justice any question raised before them regarding the meaning of a provision of Community law, unless they have established that that provision does not give rise to any reasonable interpretative doubt."

## III — Oral procedure

At the sitting on 8 June 1982, the plaintiffs in the main action, represented by G. M. Ubertazzi and F. Capelli, the Italian Government, represented by S. Laporta, Avvocato dello Stato, and the Commission of the European Communities, represented by G. Olmi, Deputy Director General of its Legal Department, and by Miss Mary Minch, a member of its Legal Department, acting as Agents, presented oral argument and replied to the questions put to them by the Court.

The Advocate General delivered his opinion at the sitting on 13 July 1982.

# Decision

1  By order of 27 March 1981, which was received at the Court on 31 October 1981, the Corte Suprema di Cassazione [Supreme Court of Cassation] referred to the Court of Justice for a preliminary ruling under Article 177 of the EEC Treaty a question on the interpretation of the third paragraph of Article 177 of the EEC Treaty.

C.I.L.F.I.T. v MINISTRY OF HEALTH

2    That question was raised in connection with a dispute between wool importers and the Italian Ministry of Health concerning the payment of a fixed health inspection levy in respect of wool imported from outside the Community. The firms concerned relied on Regulation (EEC) No 827/68 of 28 June 1968 on the common organization of the market in certain products listed in Annex II to the Treaty (Official Journal, English Special Edition 1968 (I) p. 209). Article 2 (2) of that regulation prohibits Member States from levying any charge having an effect equivalent to a customs duty on imported "animal products", not specified or included elsewhere, classified under heading 05.15 of the Common Customs Tariff. Against that argument the Ministry for Health contended that wool is not included in Annex II to the Treaty and is therefore not subject to a common organization of agricultural markets.

3    The Ministry of Health infers from those circumstances that the answer to the question concerning the interpretation of the measure adopted by the Community institutions is so obvious as to rule out the possibility of there being any interpretative doubt and thus obviates the need to refer the matter to the Court of Justice for a preliminary ruling. However, the companies concerned maintain that since a question concerning the interpretation of a regulation has been raised before the Corte Suprema di Cassazione, against whose decisions there is no judicial remedy under national law, that court cannot, according to the terms of the third paragraph of Article 177, escape the obligation to bring the matter before the Court of Justice.

4    Faced with those conflicting arguments, the Corte Suprema di Cassazione referred to the Court the following question for a preliminary ruling:

"Does the third paragraph of Article 177 of the EEC Treaty, which provides that where any question of the same kind as those listed in the first paragraph of that article is raised in a case pending before a national court or tribunal against whose decisions there is no judicial remedy under national law that court or tribunal must bring the matter before the Court of Justice, lay down an obligation so to submit the case which precludes the national court from determining whether the question raised is justified or does it, and if so within what limits, make that obligation conditional on the prior finding of a reasonable interpretative doubt?"

3427

5    In order to answer that question it is necessary to take account of the system established by Article 177, which confers jurisdiction on the Court of Justice to give preliminary rulings on, *inter alia,* the interpretation of the Treaty and the measures adopted by the institutions of the Community.

6    The second paragraph of that article provides that any court or tribunal of a Member State *may,* if it considers that a decision on a question of interpretation is necessary to enable it to give judgment, request the Court of Justice to give a ruling thereon. The third paragraph of that article provides that, where a question of interpretation is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal *shall,* bring the matter before the Court of Justice.

7    That obligation to refer a matter to the Court of Justice is based on cooperation, established with a view to ensuring the proper application and uniform interpretation of Community law in all the Member States, between national courts, in their capacity as courts responsible for the application of Community law, and the Court of Justice. More particularly, the third paragraph of Article 177 seeks to prevent the occurrence within the Community of divergences in judicial decisions on questions of Community law. The scope of that obligation must therefore be assessed, in view of those objectives, by reference to the powers of the national courts, on the one hand, and those of the Court of Justice, on the other, where such a question of interpretation is raised within the meaning of Article 177.

8    In this connection, it is necessary to define the meaning for the purposes of Community law of the expression "where any such question is raised" in order to determine the circumstances in which a national court or tribunal against whose decisions there is no judicial remedy under national law is obliged to bring a matter before the Court of Justice.

9    In this regard, it must in the first place be pointed out that Article 177 does not constitute a means of redress available to the parties to a case pending before a national court or tribunal. Therefore the mere fact that a party contends that the dispute gives rise to a question concerning the interpretation of Community law does not mean that the court or tribunal concerned is compelled to consider that a question has been raised within the meaning of Article 177. On the other hand, a national court or tribunal may, in an appropriate case, refer a matter to the Court of Justice of its own motion.

C.I.L.F.I.T. v MINISTRY OF HEALTH

10    Secondly, it follows from the relationship between the second and third paragraphs of Article 177 that the courts or tribunals referred to in the third paragraph have the same discretion as any other national court or tribunal to ascertain whether a decision on a question of Community law is necessary to enable them to give judgment. Accordingly, those courts or tribunals are not obliged to refer to the Court of Justice a question concerning the interpretation of Community law raised before them if that question is not relevant, that is to say, if the answer to that question, regardless of what it may be, can in no way affect the outcome of the case.

11    If, however, those courts or tribunals consider that recourse to Community law is necessary to enable them to decide a case, Article 177 imposes an obligation on them to refer to the Court of Justice any question of interpretation which may arise.

12    The question submitted by the Corte di Cassazione seeks to ascertain whether, in certain circumstances, the obligation laid down by the third paragraph of Article 177 might none the less be subject to certain restrictions.

13    It must be remembered in this connection that in its judgment of 27 March 1963 in Joined Cases 28 to 30/62 *(Da Costa* v *Nederlandse Belastingadministratie* [1963] ECR 31) the Court ruled that: "Although the third paragraph of Article 177 unreservedly requires courts or tribunals of a Member State against whose decisions there is no judicial remedy under national law . . . to refer to the Court every question of interpretation raised before them, the authority of an interpretation under Article 177 already given by the Court may deprive the obligation of its purpose and thus empty it of its substance. Such is the case especially when the question raised is materially identical with a question which has already been the subject of a preliminary ruling in a similar case."

14    The same effect, as regards the limits set to the obligation laid down by the third paragraph of Article 177, may be produced where previous decisions of the Court have already dealt with the point of law in question, irrespective of the nature of the proceedings which led to those decisions, even though the questions at issue are not strictly identical.

3429

15    However, it must not be forgotten that in all such circumstances national courts and tribunals, including those referred to in the third paragraph of Article 177, remain entirely at liberty to bring a matter before the Court of Justice if they consider it appropriate to do so.

16    Finally, the correct application of Community law may be so obvious as to leave no scope for any reasonable doubt as to the manner in which the question raised is to be resolved. Before it comes to the conclusion that such is the case, the national court or tribunal must be convinced that the matter is equally obvious to the courts of the other Member States and to the Court of Justice. Only if those conditions are satisfied, may the national court or tribunal refrain from submitting the question to the Court of Justice and take upon itself the responsibility for resolving it.

17    However, the existence of such a possibility must be assessed on the basis of the characteristic features of Community law and the particular difficulties to which its interpretation gives rise.

18    To begin with, it must be borne in mind that Community legislation is drafted in several languages and that the different language versions are all equally authentic. An interpretation of a provision of Community law thus involves a comparison of the different language versions.

19    It must also be borne in mind, even where the different language versions are entirely in accord with one another, that Community law uses terminology which is peculiar to it. Furthermore, it must be emphasized that legal concepts do not necessarily have the same meaning in Community law and in the law of the various Member States.

20    Finally, every provision of Community law must be placed in its context and interpreted in the light of the provisions of Community law as a whole, regard being had to the objectives thereof and to its state of evolution at the date on which the provision in question is to be applied.

21    In the light of all those considerations, the answer to the question submitted by the Corte Suprema di Cassazione must be that the third paragraph of

C.I.L.F.I.T. v MINISTRY OF HEALTH

Article 177 of the EEC Treaty is to be interpreted as meaning that a court or tribunal against whose decisions there is no judicial remedy under national law is required, where a question of Community law is raised before it, to comply with its obligation to bring the matter before the Court of Justice, unless it has established that the question raised is irrelevant or that the Community provision in question has already been interpreted by the Court or that the correct application of Community law is so obvious as to leave no scope for any reasonable doubt. The existence of such a possibility must be assessed in the light of the specific characteristics of Community law, the particular difficulties to which its interpretation gives rise and the risk of divergences in judicial decisions within the Community.

Costs

22    The costs incurred by the Italian Government, the Danish Government and the Commission of the European Communities, which have submitted observations to the Court, are not recoverable.

As these proceedings are, in so far as the parties to the main action are concerned, in the nature of a step in the action pending before the Corte Suprema di Cassazione, the decision on costs is a matter for that court.

On those grounds,

THE COURT,

in answer to the question submitted to it by the Corte Suprema di Cassazione by order of 27 March 1981, hereby rules:

**The third paragraph of Article 177 of the EEC Treaty must be interpreted as meaning that a court or tribunal against whose decisions there is no judicial remedy under national law is required, where a question of Community law is raised before it, to comply with its obligation to bring the matter before the Court of Justice, unless it has established that the question raised is irrelevant or that the Community**

3431

provision in question has already been interpreted by the Court of Justice or that the correct application of Community law is so obvious as to leave no scope for any reasonable doubt. The existence of such a possibility must be assessed in the light of the specific characteristics of Community law, the particular difficulties to which its interpretation gives rise and the risk of divergences in judicial decisions within the Community.

|  |  |  |
|---|---|---|
| | Mertens de Wilmars | Bosco | Touffait |
| Due | Pescatore | Mackenzie Stuart | O'Keeffe |
| Koopmans | Everling | Chloros | Grévisse |

Delivered in open court in Luxembourg on 6 October 1982.

P. Heim

Registrar

J. Mertens de Wilmars

President

## OPINION OF MR ADVOCATE GENERAL CAPOTORTI
## DELIVERED ON 13 JULY 1982 [1]

Mr President,
Members of the Court,

The request for a preliminary ruling now before the Court concerns one of the provisions of the EEC Treaty relating to the powers of the Court, namely the third paragraph of Article 177. The Italian Corte Suprema di Cassazione [Supreme Court of Cassation] wishes to ascertain whether that provision lays down an obligation to submit a case to the Court of Justice which precludes the national court from determining whether the question raised is justified or whether, and if so within what limits, it makes that obligation conditional on the prior finding of a reasonable interpretative doubt.

I shall briefly summarize the facts of the case. In September 1974 a large number

1 — Translated from the Italian.