*Exhibit 5*



Reports of Cases

JUDGMENT OF THE COURT (First Chamber)

24 October 2024*

(Reference for a preliminary ruling – Intellectual and industrial property – Copyright – Directive 2001/29/EC – Articles 2 to 4 – Exclusive rights – Copyright protection for subject matter of applied art the country of origin of which is not a Member State – Berne Convention – Article 2(7) – Criterion of material reciprocity – Division of competences between the European Union and its Member States – Application by the Member States of the criterion of material reciprocity – First paragraph of Article 351 TFEU)

In Case C-227/23,

REQUEST for a preliminary ruling under Article 267 TFEU from the Hoge Raad der Nederlanden (Supreme Court of the Netherlands), made by decision of 31 March 2023, received at the Court on 11 April 2023, in the proceedings

**Kwantum Nederland BV,**

**Kwantum België BV**

v

**Vitra Collections AG,**

THE COURT (First Chamber),

composed of T. von Danwitz, Vice-President of the Court, acting as President of the First Chamber, A. Arabadjiev and I. Ziemele (Rapporteur), Judges,

Advocate General: M. Szpunar,

Registrar: C. Di Bella, Administrator,

having regard to the written procedure and further to the hearing on 20 March 2024,

after considering the observations submitted on behalf of:

– Kwantum Nederland BV and Kwantum België BV, by C. Garnitsch, R. Rijks and M. van Gerwen, advocaten,

– Vitra Collections AG, by S.A. Klos, A. Ringnalda, advocaten, and M.A. Ritscher, Rechtsanwalt,

---

* Language of the case: Dutch.

EN

ECLI:EU:C:2024:914                                                                                                                                1

– the Netherlands Government, by E.M.M. Besselink and M.K. Bulterman, acting as Agents,

– the Belgian Government, by P. Cottin and A. Van Baelen, acting as Agents, and by A. Strowel, avocat,

– the French Government, by R. Bénard and E. Timmermans, acting as Agents,

– the European Commission, by M. Afonso, O. Glinicka, P.-J. Loewenthal and J. Samnadda, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 5 September 2024,

gives the following

# Judgment

1 This request for a preliminary ruling concerns the interpretation of Articles 2 to 4 of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society (OJ 2001 L 167, p. 10), of Article 17(2) and Article 52(1) of the Charter of Fundamental Rights of the European Union ('the Charter'), read in the light of Article 2(7) of the Convention for the Protection of Literary and Artistic Works, signed in Berne on 9 September 1886 (Paris Act of 24 July 1971), as amended on 28 September 1979 ('the Berne Convention'), and of the first paragraph of Article 351 TFEU.

2 The request has been made in proceedings between Vitra Collections AG ('Vitra'), a company governed by Swiss law, on the one hand, and Kwantum Nederland BV and Kwantum België BV (together, 'Kwantum'), which operate, in the Netherlands and in Belgium, a chain of shops selling interior design articles, including furniture, on the other, on the ground that Kwantum marketed a chair which, according to Vitra, infringes copyright held by it.

**Legal context**

*International law*

*The Berne Convention*

3 Article 2(7) of the Berne Convention provides:

'Subject to the provisions of Article 7(4) of this Convention, it shall be a matter for legislation in the countries of the Union [established by this Convention] to determine the extent of the application of their laws to works of applied art and industrial designs and models, as well as the conditions under which such works, designs and models shall be protected. Works protected in the country of origin solely as designs and models shall be entitled in another country of the Union [established by this Convention] only to such special protection as is granted in that country to designs and models; however, if no such special protection is granted in that country, such works shall be protected as artistic works.'

4   Article 5(1) of that convention provides:

'Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union [established by this Convention] other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention.'

5   Article 7(8) of the Berne Convention is worded as follows:

'In any case, the term shall be governed by the legislation of the country where protection is claimed; however, unless the legislation of that country otherwise provides, the term shall not exceed the term fixed in the country of origin of the work.'

6   Article 14*ter*(2) of that convention provides:

'The protection provided by the preceding paragraph may be claimed in a country of the Union [established by this convention] only if legislation in the country to which the author belongs so permits, and to the extent permitted by the country where this protection is claimed.'

7   Article 19 of the Berne Convention provides:

'The provisions of this Convention shall not preclude the making of a claim to the benefit of any greater protection which may be granted by legislation in a country of the Union [established by this Convention].'

*The TRIPS Agreement*

8   Article 3 of the Agreement on Trade-Related Aspects of Intellectual Property Rights ('the TRIPS Agreement'), constituting Annex 1C to the Agreement establishing the World Trade Organization (WTO), signed in Marrakesh on 15 April 1994 and approved by Council Decision 94/800/EC of 22 December 1994 concerning the conclusion on behalf of the European Community, as regards matters within its competence, of the agreements reached in the Uruguay Round multilateral negotiations (1986-1994) (OJ 1994 L 336, p. 1), entitled 'National Treatment', provides:

'1.   Each Member shall accord to the nationals of other Members treatment no less favourable than that it accords to its own nationals with regard to the protection of intellectual property, subject to the exceptions already provided in, respectively, the Paris Convention (1967), the Berne Convention (1971), the Rome Convention or the Treaty on Intellectual Property in Respect of Integrated Circuits. In respect of performers, producers of phonograms and broadcasting organizations, this obligation only applies in respect of the rights provided under this Agreement. Any Member availing itself of the possibilities provided in Article 6 of the Berne Convention (1971) or paragraph 1(b) of Article 16 of the Rome Convention shall make a notification as foreseen in those provisions to the Council for TRIPS.

2.   Members may avail themselves of the exceptions permitted under paragraph 1 in relation to judicial and administrative procedures, including the designation of an address for service or the appointment of an agent within the jurisdiction of a Member, only where such exceptions are necessary to secure compliance with laws and regulations which are not inconsistent with the provisions of this Agreement and where such practices are not applied in a manner which would constitute a disguised restriction on trade.'

9    Article 9 of the TRIPS Agreement, entitled 'Relation to the Berne Convention', provides, in paragraph 1 thereof:

'Members shall comply with Articles 1 through 21 of the Berne Convention (1971) and the Appendix thereto. However, Members shall not have rights or obligations under this Agreement in respect of the rights conferred under Article 6*bis* of that Convention or of the rights derived therefrom.'

*The WCT*

10   The World Intellectual Property Organization (WIPO) Copyright Treaty ('the WCT'), adopted in Geneva on 20 December 1996, was approved on behalf of the European Community by Council Decision 2000/278/EC of 16 March 2000 (OJ 2000 L 89, p. 6).

11   Article 1 of the WCT, entitled 'Relation to the Berne Convention', provides, in paragraph 4 thereof:

'Contracting Parties shall comply with Articles 1 to 21 and the Appendix of the Berne Convention.'

**European Union law**

*Directive 2001/29*

12   Recitals 6, 9 and 15 of Directive 2001/29 state:

'(6)   Without harmonisation at Community level, legislative activities at national level which have already been initiated in a number of Member States in order to respond to the technological challenges might result in significant differences in protection and thereby in restrictions on the free movement of services and products incorporating, or based on, intellectual property, leading to a refragmentation of the internal market and legislative inconsistency. …

…

(9)   Any harmonisation of copyright and related rights must take as a basis a high level of protection, since such rights are crucial to intellectual creation. Their protection helps to ensure the maintenance and development of creativity in the interests of authors, performers, producers, consumers, culture, industry and the public at large. Intellectual property has therefore been recognised as an integral part of property.

…

(15)  The Diplomatic Conference held under the auspices of the [WIPO] in December 1996 led to the adoption of two new Treaties, the [WCT] and the "WIPO Performances and Phonograms Treaty"[, adopted in Geneva on 20 December 1996 and approved on behalf of the European Community by Decision 2000/278], dealing respectively with the protection of authors and the protection of performers and phonogram producers. … This Directive also serves to implement a number of the new international obligations.'

13  Article 1 of Directive 2001/29, entitled 'Scope', provides, in paragraph 1 thereof:

'This Directive concerns the legal protection of copyright and related rights in the framework of the internal market, with particular emphasis on the information society.'

14  Article 2 of that directive, entitled 'Reproduction right', provides:

'Member States shall provide for the exclusive right to authorise or prohibit direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part:

(a)  for authors, of their works;

…'

15  Article 3 of Directive 2001/29, entitled 'Right of communication to the public of works and right of making available to the public other subject matter', provides, in paragraph 1 thereof:

'Member States shall provide authors with the exclusive right to authorise or prohibit any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access them from a place and at a time individually chosen by them.'

16  Article 4 of that directive, entitled 'Distribution right', provides, in paragraph 1 thereof:

'Member States shall provide for authors, in respect of the original of their works or of copies thereof, the exclusive right to authorise or prohibit any form of distribution to the public by sale or otherwise.'

17  Article 5 of Directive 2001/29 lists the cases in which Member States may provide for exceptions and limitations to the exclusive rights provided for in Articles 2 to 4 of that directive.

18  Article 10 of that directive, entitled 'Application over time', provides, in paragraph 1 thereof:

'The provisions of this Directive shall apply in respect of all works and other subject matter referred to in this Directive which are, on 22 December 2002, protected by the Member States' legislation in the field of copyright and related rights, or which meet the criteria for protection under the provisions of this Directive or the provisions referred to in Article 1(2).'

*Directive 2001/84/EC*

19  Article 7 of Directive 2001/84/EC of the European Parliament and of the Council of 27 September 2001 on the resale right for the benefit of the author of an original work of art (OJ 2001 L 272, p. 32), entitled 'Third-country nationals entitled to receive royalties', provides, in paragraph 1 thereof:

'Member States shall provide that authors who are nationals of third countries and, subject to Article 8(2), their successors in title shall enjoy the resale right in accordance with this Directive and the legislation of the Member State concerned only if legislation in the country of which the author or his/her successor in title is a national permits resale right protection in that country for authors from the Member States and their successors in title.'

*Directive 2006/116/EC*

20   Article 7 of Directive 2006/116/EC of the European Parliament and of the Council of 12 December 2006 on the term of protection of copyright and certain related rights (OJ 2006 L 372, p. 12), entitled 'Protection vis-à-vis third countries', provides, in paragraph 1 thereof:

'Where the country of origin of a work, within the meaning of the Berne Convention, is a third country, and the author of the work is not a Community national, the term of protection granted by the Member States shall expire on the date of expiry of the protection granted in the country of origin of the work, but may not exceed the term laid down in Article 1.'

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

21   Vitra manufactures designer furniture, including chairs designed by the since-deceased spouses, Charles and Ray Eames, who were nationals of the United States of America, and holds intellectual property rights over those chairs.

22   One of the chairs manufactured by Vitra is the Dining Sidechair Wood ('the DSW chair'), which was designed by those spouses as part of a furniture design competition organised by the Museum of Modern Art in New York (United States) in 1948 and exhibited in that museum from 1950.

23   Kwantum operates, in the Netherlands and in Belgium, a chain of shops selling interior design articles, in particular home furniture.

24   In 2014, Vitra ascertained that Kwantum was marketing a chair called the 'Paris chair', in breach, according to Vitra, of the copyright which it held in the DSW chair.

25   Hearing an action brought by Vitra, the rechtbank Den Haag (District Court, The Hague, Netherlands) held that Kwantum was not infringing Vitra's copyright in the Netherlands or in Belgium and that it was not acting unlawfully by marketing the Paris chair. That court therefore dismissed Vitra's claims and largely upheld Kwantum's claims.

26   That judgment was set aside by the Gerechtshof Den Haag (Court of Appeal, The Hague, Netherlands), which held that, by marketing the Paris chair, Kwantum was infringing Vitra's copyright in the DSW chair in the Netherlands and in Belgium.

27   On appeal, the referring court, the Hoge Raad der Nederlanden (Supreme Court of the Netherlands), considers that the dispute concerns the applicability and the scope of the second sentence of Article 2(7) of the Berne Convention which, with respect to works protected in the country of origin solely as designs and models, provides, inter alia, that such works are to be entitled in another country of the Union established by that convention only to such special protection as is granted in that country to designs and models, thereby laying down a criterion of material reciprocity.

28   In that regard, the referring court notes, first, that, although the European Union is not a party to the Berne Convention, it has, through international treaties, undertaken to comply with Articles 1 to 21 of that convention. Moreover, it observes that EU legislation does not contain any provision relating to the criterion of material reciprocity referred to in the second sentence of Article 2(7) of that convention, with the result that the question arises as to whether the Member States may

themselves determine whether or not they will disapply that criterion with respect to a work the country of origin of which is a third country and the author of which is a national of a third country.

29  Second, the referring court states that copyright in a work of applied art is an integral part of the right to protection of intellectual property enshrined in Article 17(2) of the Charter. It considers that the judgment of 8 September 2020, *Recorded Artists Actors Performers* (C-265/19, EU:C:2020:677), whereby the Court of Justice interpreted a provision of the WIPO Performances and Phonograms Treaty, to which the European Union is a party, raises the question whether EU law, in particular Article 52(1) of the Charter, requires, with respect to the limitation on the exercise of copyright in a work of applied art by the criterion of material reciprocity referred to in the second sentence of Article 2(7) of the Berne Convention, that such a limitation be provided for by law, namely by means of a clear and precise rule. In that regard, the referring court observes that it could be inferred from that judgment that it is for the EU legislature alone, and not for the national legislatures, to determine whether, in the European Union, copyright in a work of applied art may be limited by the application of Article 2(7) of the Berne Convention in respect of a work of applied art which comes from a third country and the author of which is not a national of a Member State of the European Union, and, if so, to define that limitation clearly and precisely. In its view, as EU law currently stands, the EU legislature has not provided for such a limitation.

30  Third, it notes that Kwantum argued before the referring court that the criterion of material reciprocity referred to in the second sentence of Article 2(7) of the Berne Convention falls within the scope of the first paragraph of Article 351 TFEU. In the referring court's view, it is necessary to determine to what extent that provision is capable of affecting the application of the second sentence of Article 2(7) of that convention with regard to the claims relating to the Kingdom of Belgium.

31  In those circumstances, the Hoge Raad der Nederlanden (Supreme Court of the Netherlands) decided to stay the proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

'(1)  Does the situation at issue in these proceedings fall within the material scope of EU law?

Should the preceding question be answered in the affirmative, the following questions are also submitted.

(2)  Does the fact that copyright [in] a work of applied art forms an integral part of the right to protection of intellectual property enshrined in Article 17(2) of the Charter mean that EU law, in particular Article 52(1) of the Charter, in order to limit the exercise of copyright (within the meaning of Directive [2001/29]) [in] a work of applied art by application of the [criterion of] material reciprocity [provided for in] Article 2(7) [of the Berne Convention], requires this limitation to be provided for by law?

(3)  Must Articles 2, 3 and 4 of Directive [2001/29] and Articles 17(2) and 52(1) of the Charter, read in the light of Article 2(7) [of the Berne Convention], be interpreted as meaning that it is solely for the EU legislature (and not for national legislatures) to determine whether the exercise of copyright (within the meaning of Directive [2001/29]) in the European Union can be limited by application of the [criterion of] material reciprocity provided for in Article 2(7)

[of the Berne Convention] in respect of a work of applied art whose country of origin within the meaning of [that convention] is a third country and whose author is not a national of an EU Member State and, if so, to define that limitation clearly and precisely … ?

(4) Must Articles 2, 3 and 4 of Directive [2001/29], read in conjunction with Articles 17(2) and 52(1) of the Charter, be interpreted as meaning that[,] as long as the EU legislature has not provided for a limitation [on] the exercise of copyright (within the meaning of Directive [2001/29]) [in] a work of applied art by application of the [criterion of] material reciprocity [provided for in] Article 2(7) [of the Berne Convention], EU Member States may not apply that [criterion] in respect of a work of applied art whose country of origin within the meaning of [that convention] is a third country and whose author is not a national of an EU Member State?

(5) In the circumstances at issue in the present proceedings and given the time of the establishment of (the predecessor of) Article 2(7) [of the Berne Convention], are the conditions of the first paragraph of Article 351 TFEU satisfied for [the Kingdom of] Belgium, meaning that [that Member State] is therefore free to apply the [criterion of] material reciprocity provided for in Article 2(7) [of that convention], taking into account the fact that[,] in the present case[,] the country of origin acceded to the Berne Convention on 1 May 1989?'

**Consideration of the questions referred**

*Admissibility*

32   In the first place, Kwantum submits that the referring court has not explained how the 'situation at issue in these proceedings', an expression which that court uses in its first question without defining it, falls within the material scope of EU law and that the request for a preliminary ruling is not necessary to enable it to give judgment in the main proceedings, with the result that the questions referred by that court are hypothetical.

33   According to the Court's settled case-law, the procedure provided for in Article 267 TFEU is an instrument of cooperation between the Court and the national courts by means of which the Court provides the national courts with the points of interpretation of EU law which they need in order to decide the disputes before them (judgment of 27 April 2023, *Castorama Polska and Knor*, C-628/21, EU:C:2023:342, paragraph 25 and the case-law cited).

34   In that regard, it should be recalled that, in those proceedings, it is solely for the national court before which the dispute has been brought, and which must assume responsibility for the subsequent judicial decision, to determine, in the light of the particular circumstances of each case, both the need for a preliminary ruling in order to enable it to deliver judgment and the relevance of the questions which it submits to the Court. Consequently, where the questions submitted concern the interpretation of EU law, the Court is in principle bound to give a ruling. It follows that questions relating to EU law enjoy a presumption of relevance. The Court may refuse to rule on a question referred by a national court only where it is quite obvious that the interpretation of EU law that is sought bears no relation to the actual facts of the main action or its purpose, where the problem is hypothetical, or where the Court does not have before it the factual

or legal material necessary to give a useful answer to the questions submitted to it (judgment of 27 April 2023, *Castorama Polska and Knor*, C-628/21, EU:C:2023:342, paragraph 26 and the case-law cited).

35   It is also apparent from settled case-law that the need to provide an interpretation of EU law which will be of use to the referring court requires that court to define the factual and legislative context of the questions it is asking or, at the very least, to explain the factual circumstances on which those questions are based. The order for reference must also set out the precise reasons why the national court is unsure as to the interpretation of EU law and considers it necessary to refer a question to the Court for a preliminary ruling (judgment of 27 April 2023, *Castorama Polska and Knor*, C-628/21, EU:C:2023:342, paragraph 27 and the case-law cited).

36   In the present case, it is apparent from the considerations set out in paragraphs 28 to 30 of the present judgment that the referring court has clearly defined the legal and factual context of the dispute in the main proceedings, since the first question referred for a preliminary ruling seeks specifically to determine whether that dispute falls within the material scope of EU law. Furthermore, it is apparent from those paragraphs that that court has set out to the requisite legal standard the reasons why it is unsure as to the interpretation of certain provisions which it considers necessary in order to enable it to deliver its judgment, with the result that it cannot be held that the interpretation sought bears no relation to the purpose of the main action or that the problem raised is hypothetical. In those circumstances, the presumption of relevance referred to in paragraph 34 of the present judgment cannot be called into question.

37   In the second place, in their written observations, Kwantum and the Netherlands Government argue that the issues which it is for the referring court to resolve in the dispute in the main proceedings relate solely to Article 2(7) and Article 5(1) of the Berne Convention, such that there is no provision of EU law requiring interpretation by the Court of Justice.

38   Such an argument, which concerns, in essence, the need for the questions referred for a preliminary ruling in order to give judgment in the dispute in the main proceedings, cannot be accepted. As is apparent from the order for reference, the referring court asks the Court of Justice whether EU law, in particular Directive 2001/29, read in the light of the relevant provisions of the Charter, and Article 351 TFEU, precludes the national court from applying Article 2(7) of the Berne Convention in the dispute in the main proceedings.

39   That issue relates to the substance of the questions referred.

40   Furthermore, as the referring court has correctly pointed out, even if the European Union is not a contracting party to the Berne Convention, it is required to comply with Articles 1 to 21 of that convention under, first, Article 1(4) of the WCT, to which it is a party (judgments of 13 November 2018, *Levola Hengelo*, C-310/17, EU:C:2018:899, paragraph 38, and of 12 September 2019, *Cofemel*, C-683/17, EU:C:2019:721, paragraph 41 and the case-law cited), and, second, Article 9 of the TRIPS Agreement, with the result that that convention has indirect effects within the European Union (see, to that effect, judgments of 15 March 2012, *SCF*, C-135/10, EU:C:2012:140, paragraph 50, and of 18 November 2020, *Atresmedia Corporación de Medios de Comunicación*, C-147/19, EU:C:2020:935, paragraph 36) and that the Court may find it necessary to interpret its provisions (see, to that effect, judgments of 16 July 2009, *Infopaq International*, C-5/08, EU:C:2009:465, paragraph 34; of 16 March 2017, *AKM*, C-138/16, EU:C:2017:218, paragraphs 21 and 44; and of 12 September 2019, *Cofemel*, C-683/17, EU:C:2019:721, paragraph 42).

41   It follows that the questions referred for a preliminary ruling are admissible.

**Substance**

*The first question*

42   By its first question, the referring court asks whether the situation at issue in the main proceedings falls within the material scope of EU law.

43   In the present case, it is common ground that the dispute in the main proceedings concerns an action brought by Vitra before the Netherlands courts, by which that company claims copyright protection in the Netherlands and in Belgium for the DSW chair – designed by nationals of the United States of America and originating in that third country – in respect of which Kwantum allegedly marketed imitations.

44   In that regard, it should be recalled that, as is apparent from Article 1(1) of Directive 2001/29, that directive concerns the legal protection of copyright and related rights in the framework of the internal market.

45   As the Advocate General observed, in essence, in points 31 and 33 of his Opinion, the scope of that directive is defined not in accordance with the criterion of the country of origin of the work or of the nationality of its author, but by reference to the internal market, which equates to the territorial scope of the treaties as set out in Article 52 TEU. Subject to Article 355 TFEU, that territorial scope comprises the territories of the Member States (see, to that effect, judgment of 8 September 2020, *Recorded Artists Actors Performers*, C-265/19, EU:C:2020:677, paragraph 59 and the case-law cited).

46   Furthermore, in accordance with Article 10(1) of Directive 2001/29, the provisions of that directive, which harmonises certain aspects of copyright and related rights in the information society, are to apply in respect of all works and other subject matter referred to therein which, on the date laid down for its transposition, meet the criteria for protection under the provisions of that directive. It follows that Directive 2001/29 may be applicable to the dispute in the main proceedings.

47   In particular, the Court has previously held that Article 2(a) and Article 3(1) of Directive 2001/29 define a copyright holder's exclusive rights in the European Union of reproduction and communication to the public in unequivocal terms, those provisions forming a harmonised legal framework that ensures a high and even level of protection for the rights of reproduction and communication to the public and constituting measures of full harmonisation of the corresponding substantive law (see, to that effect, judgment of 29 July 2019, *Funke Medien NRW*, C-469/17, EU:C:2019:623, paragraphs 35 to 38). Furthermore, as regards Article 4(1) of Directive 2001/29, it is clear from its wording that that provision also defines in unequivocal terms the exclusive right of distribution to the public referred to therein, that measure constituting, like the abovementioned provisions, a measure of full harmonisation of the corresponding substantive law.

48   It should be added, as regards the question whether those provisions apply to a subject matter of applied art such as the DSW chair at issue in the main proceedings, that the Court has held that such subject matter may be classified as a 'work', within the meaning of Directive 2001/29, where

two cumulative conditions are satisfied. First, the subject matter concerned must be original in the sense that it is the author's own intellectual creation. Second, only something which is the expression of the author's own intellectual creation may be classified as a 'work' within the meaning of Directive 2001/29 (judgment of 13 November 2018, *Levola Hengelo*, C-310/17, EU:C:2018:899, paragraphs 35 to 37 and the case-law cited).

49   Where a subject matter of applied art has the characteristics described in the preceding paragraph of the present judgment and therefore constitutes a work, it must, as such, qualify for copyright protection, in accordance with that directive (see, to that effect, judgment of 12 September 2019, *Cofemel*, C-683/17, EU:C:2019:721, paragraph 35 and the case-law cited).

50   In those circumstances, it must be held that, provided that the substantive conditions laid down by Directive 2001/29 are satisfied and, in particular, that a subject matter of applied art such as that at issue in the main proceedings may be classified as a 'work' within the meaning of that directive, the provisions of that directive are applicable.

51   In the light of the foregoing considerations, the answer to the first question is that a situation in which a company claims copyright protection for a subject matter of applied art marketed in a Member State, provided that that subject matter may be classified as a 'work' within the meaning of Directive 2001/29, falls within the material scope of EU law.

   *The second to fourth questions*

52   According to settled case-law, in the procedure laid down by Article 267 TFEU providing for cooperation between national courts and the Court of Justice, it is for the latter to provide the national court with an answer which will be of use to it and enable it to determine the case before it. To that end, the Court should, where necessary, reformulate the questions referred to it. It is for the Court to extract from all the information provided by the national court, in particular from the grounds of the order for reference, the points of EU law which require interpretation, having regard to the subject matter of the dispute (judgment of 30 April 2024, *M.N. (EncroChat)*, C-670/22, EU:C:2024:372, paragraph 78 and the case-law cited).

53   As the Advocate General observed, in essence, in point 22 of his Opinion, it is apparent from the file before the Court that, in the dispute in the main proceedings, the conduct at issue consists in the marketing by Kwantum of objects, namely copies of a chair, in breach of the copyright held by Vitra, with the result that Article 2(a) and Article 4(1) of Directive 2001/29, which confer on the author of a work, respectively, the exclusive rights of reproduction and distribution of that work, are relevant. By contrast, it is not apparent from that file that that conduct is capable of constituting communication to the public of a work, within the meaning of Article 3(1) of that directive.

54   In those circumstances, it must be held that, by its second to fourth questions, which it is appropriate to examine together, the referring court asks, in essence, whether Article 2(a) and Article 4(1) of Directive 2001/29, read in conjunction with Article 17(2) and Article 52(1) of the Charter, must be interpreted as precluding Member States from applying the criterion of material reciprocity laid down in the second sentence of Article 2(7) of the Berne Convention in respect of a work of applied art the country of origin of which is a third country and the author of which is a national of a third country.

55  In order to answer those questions, it is necessary to determine, first, whether the abovementioned provisions apply to a work of applied art the country of origin of which is a third country or the author of which is a national of a third country, and, second, whether those provisions preclude the application, in national law, of the criterion of material reciprocity laid down in the second sentence of Article 2(7) of the Berne Convention.

56  As a preliminary point, it should be recalled that the terms of a provision of EU law which makes no express reference to the law of the Member States for the purpose of determining its meaning and scope must normally be given an autonomous and uniform interpretation throughout the European Union; that interpretation must take into account the wording of that provision, its context and the objectives pursued by the rules of which it forms part (judgment of 8 September 2020, *Recorded Artists Actors Performers*, C-265/19, EU:C:2020:677, paragraph 46 and the case-law cited).

57  In the first place, as regards the wording of Article 2(a) and Article 4(1) of Directive 2001/29, it should be noted that, according to those provisions, Member States are to provide authors with exclusive rights to authorise or prohibit, first, direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part, of their works, and, second, in respect of the original of their works or of copies thereof, any form of distribution to the public by sale or otherwise.

58  In that regard, it must be observed that those provisions do not expressly specify whether the concept of 'work' referred to therein covers a work of applied art originating in a third country, or whether the concept of 'author', within the meaning of those provisions, covers the author of such a work who is a national of a third country.

59  The fact remains that the Court has previously held, as has been recalled in paragraphs 48 and 49 of the present judgment, that, where a subject matter may be classified as a 'work' within the meaning of Directive 2001/29, it must, as such, qualify for copyright protection, in accordance with that directive which, moreover, does not lay down any condition relating to the country of origin of the work in question or to the nationality of the author of that work.

60  In the second place, as regards the context of those provisions, first, in the light of what is stated in paragraphs 44 and 45 of the present judgment, it must be observed that, in defining the scope of Directive 2001/29 by means of a territorial criterion, the EU legislature necessarily took into account all the works for which protection is sought in the territory of the European Union, irrespective of the country of origin of those works or the nationality of their author.

61  Second, it should be noted that certain instruments of the harmonised copyright legislation provide for a specific regime for works in respect of which the country of origin, within the meaning of the Berne Convention, is a third country and the author of which is not a national of a Member State. Thus, Directive 2006/116, in particular Article 7(1) thereof, provides that the copyright protection granted by the Member States to such works is to expire on the date of expiry of the protection granted in the country of origin of the work, but may not exceed the term laid down in that directive. As Vitra contends, such a regime, which specifically concerns the protection of the rights of authors and of works the country of origin of which is a third country, would serve no purpose if the protection of the works in question were not ensured under Directive 2001/29.

62   In the third place, the interpretation set out in paragraph 60 of the present judgment is consistent with the objectives pursued by Directive 2001/29.

63   In that regard, first, as is stated in recital 6 of that directive, the latter seeks, inter alia, to avoid significant differences in protection and thereby restrictions on the free movement of services and products incorporating, or based on, intellectual property, leading to a refragmentation of the internal market and legislative inconsistency, and any harmonisation of copyright must, according to recital 9 of that directive, take as a basis a high level of protection. Such an objective would be disregarded if Directive 2001/29 regulated, in the European Union, only copyright protection for works originating in a Member State or works the author of which is a national of a Member State.

64   Second, recital 15 of Directive 2001/29 states that that directive also serves to implement a number of the international obligations arising from the WCT. In that regard, in accordance with Article 9(1) of the TRIPS Agreement and Article 1(4) of the WCT, the European Union must comply, first, with Articles 1 to 21 of the Berne Convention, as stated in paragraph 40 of the present judgment, and, second, with the appendix to that convention. It is apparent from Article 5(1) of the Berne Convention that authors are to enjoy, in respect of works for which they are protected under that convention, in countries of the Union established by that convention other than the country of origin of the work, the rights which their respective laws do now or may hereafter grant to their nationals.

65   Thus, as the Advocate General observed in point 30 of his Opinion, it would be contrary to the international obligations of the European Union implemented by Directive 2001/29 in the field of intellectual property for that directive to harmonise copyright in respect of works the country of origin of which is a Member State or the author of which is a national of a Member State, while leaving it to the national law of the Member States to determine the legal regime applicable to works the country of origin of which is a third country or the author of which is a national of a third country.

66   Accordingly, it must be held that Article 2(a) and Article 4(1) of Directive 2001/29 apply to works of applied art originating in third countries or the authors of which are nationals of such countries.

67   With regard to whether those provisions preclude Member States from applying, in national law, the criterion of material reciprocity laid down in the second sentence of Article 2(7) of the Berne Convention in respect of a work of applied art the country of origin of which is a third country or the author of which is a national of a third country, it has been recalled in paragraph 57 of the present judgment that, according to Article 2(a) and Article 4(1) of Directive 2001/29, Member States are to provide authors with exclusive rights to authorise or prohibit the reproduction and distribution to the public of their works. Furthermore, as is apparent from the preceding paragraph of the present judgment, those provisions apply to works of applied art originating in third countries or the authors of which are nationals of such countries.

68   First, the application by a Member State of that criterion of material reciprocity would not only be contrary to the wording of those provisions, as the Advocate General stated in point 53 of his Opinion, but would also undermine the objective of that directive, which consists in the harmonisation of copyright in the internal market. Indeed, under that criterion, works of applied art originating in third countries might be treated differently in different Member States, by virtue of provisions of treaty law applicable bilaterally between a Member State and a third country.

69  Second, in any event, since the intellectual property rights referred to in paragraph 66 of the present judgment are protected under Article 17(2) of the Charter, any limitation on the exercise of those rights must, in accordance with Article 52(1) of the Charter, be provided for by law and respect the essence of those rights and freedoms.

70  In the present case, it must be held that the application, by a Member State, of the criterion of material reciprocity laid down in the second sentence of Article 2(7) of the Berne Convention may constitute such a limitation, inasmuch as that application is liable to deprive the potential holder of those rights of the enjoyment and exercise thereof in a part of the internal market, namely in the territory of the Member State applying that clause.

71  As is apparent from Article 52(1) of the Charter, such a limitation must be provided for by law.

72  In that regard, the Court has held that, where a rule of EU law harmonises copyright protection, it is for the EU legislature alone, and not the national legislatures, to determine whether the grant in the European Union of that copyright should be limited in respect of works the country of origin of which is a third country or the author of which is a national of a third country (see, to that effect, judgment of 8 September 2020, *Recorded Artists Actors Performers*, C-265/19, EU:C:2020:677, paragraph 88).

73  By adopting Directive 2001/29, the EU legislature is deemed to have exercised the competence previously devolved on the Member States in the field concerned. Thus, within the scope of that directive, the European Union must be regarded as having taken the place of the Member States, which are no longer competent to implement the relevant stipulations of the Berne Convention (judgment of 26 April 2012, *DR and TV2 Danmark*, C-510/10, EU:C:2012:244, paragraph 31 and the case-law cited).

74  In the present case, as the Advocate General observed, in essence, in point 40 of his Opinion, as EU law currently stands, neither Article 2(a) nor Article 4(1) nor any other provision of Directive 2001/29 contains a limitation such as that referred to in paragraph 70 of the present judgment.

75  Moreover, it is true that the objective of Directive 2001/29 is indeed to harmonise only certain aspects of copyright and related rights, of which a number of provisions also disclose the intention of the EU legislature to grant a degree of discretion to the Member States in the implementation of the directive (judgments of 29 July 2019, *Funke Medien NRW*, C-469/17, EU:C:2019:623, paragraph 34, and of 29 July 2019, *Spiegel Online*, C-516/17, EU:C:2019:625, paragraph 23 and the case-law cited).

76  That said, the Court has also held that the list of exceptions and limitations, contained in Article 5 of Directive 2001/29, to the exclusive rights provided for in Articles 2 to 4 of that directive is exhaustive, so as not to undermine the effectiveness of the harmonisation of copyright and related rights effected by that directive and the objective of legal certainty pursued, as well as the requirement of consistency in the implementation of those exceptions and limitations (see, to that effect, judgment of 29 July 2019, *Funke Medien NRW*, C-469/17, EU:C:2019:623, paragraphs 56, 62 and 63 and the case-law cited). As EU law currently stands, Article 5 of that directive does not contain any limitation similar to that of the criterion of material reciprocity referred to in the second sentence of Article 2(7) of the Berne Convention.

77  Thus, Directive 2001/29 may be distinguished in that respect from other instruments of copyright harmonisation that have been adopted by the EU legislature in accordance with the provisions of that convention.

78  In particular, that convention provides, inter alia, for limited exceptions relating to works of applied art, the term of protection and the resale right, by virtue of which the parties to that convention may apply a criterion of material reciprocity and, as such, are not required to apply national treatment, in accordance with Article 5(1) of that convention.

79  While the EU legislature has decided to apply a criterion of material reciprocity, first, to Article 7(1) of Directive 2006/116 as regards the term of protection, and, second, to Article 7(1) of Directive 2001/84 as regards the resale right, in accordance with Article 7(8) and Article 14*ter* (2) of the Berne Convention, that legislature has not, by contrast, included in Directive 2001/29 or in any other provision of EU law a limitation of the exclusive rights granted to authors by Article 2(a) and Article 4(1) of that directive in the form of a criterion of material reciprocity such as that laid down in the second sentence of Article 2(7) of the Berne Convention. In that regard, as has been stated in paragraph 72 of the present judgment, it is for the EU legislature alone, and not the national legislatures, in accordance with Article 52(1) of the Charter, to provide, by means of EU legislation, whether the grant in the European Union of the rights laid down in Article 2(a) and Article 4(1) of that directive should be limited (see, to that effect, judgment of 8 September 2020, *Recorded Artists Actors Performers*, C-265/19, EU:C:2020:677, paragraphs 88 and 91).

80  In the light of all the foregoing considerations, the answer to the second to fourth questions is that Article 2(a) and Article 4(1) of Directive 2001/29, read in conjunction with Article 17(2) and Article 52(1) of the Charter, must be interpreted as meaning that, as EU law currently stands, they preclude Member States from applying, in national law, the criterion of material reciprocity laid down in the second sentence of Article 2(7) of the Berne Convention in respect of a work of applied art the country of origin of which is a third country and the author of which is a national of a third country. It is for the EU legislature alone, in accordance with Article 52(1) of the Charter, to provide, by means of EU legislation, whether the grant in the European Union of the rights laid down in Article 2(a) and Article 4(1) of that directive should be limited.

*The fifth question*

81  By its fifth question, the referring court asks, in essence, whether the first paragraph of Article 351 TFEU must be interpreted as permitting a Member State to apply, by way of derogation from the provisions of EU law, the criterion of material reciprocity contained in the second sentence of Article 2(7) of the Berne Convention in respect of a work the country of origin of which is the United States of America.

82  According to the first paragraph of Article 351 TFEU, the rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, are not to be affected by the provisions of the Treaties.

83  As the Court has previously held, the Berne Convention displays the characteristics of an international agreement for the purposes of Article 351 TFEU (judgment of 9 February 2012, *Luksan*, C-277/10, EU:C:2012:65, paragraph 58).

84    The purpose of the first paragraph of Article 351 TFEU is to make clear, in accordance with the principles of international law, that application of the Treaty does not affect the commitment of the Member State concerned to respect the rights of third countries under an agreement preceding its accession and to comply with its corresponding obligations (judgment of 9 February 2012, *Luksan*, C-277/10, EU:C:2012:65, paragraph 61).

85    In that regard, in view of the answer given to the second to fourth questions, it must be held that the Member States may no longer avail themselves of the option of applying the criterion of material reciprocity referred to in the second sentence of Article 2(7) of the Berne Convention, even though that convention entered into force before 1 January 1958.

86    As is apparent from the case-law of the Court, when an international agreement that has been concluded by a Member State prior to its accession to the European Union allows – as is the case in this instance – but does not require a Member State to adopt a measure which appears to be contrary to EU law, the Member State must refrain from adopting such a measure (judgments of 28 March 1995, *Evans Medical and Macfarlan Smith*, C-324/93, EU:C:1995:84, paragraph 32, and of 9 February 2012, *Luksan*, C-277/10, EU:C:2012:65, paragraph 62).

87    Furthermore, in a situation where, because of a development in EU law, a legislative measure adopted by a Member State in accordance with the power offered by an earlier international agreement appears contrary to EU law, the Member State concerned cannot rely on that agreement in order to exempt itself from the obligations that have arisen subsequently from EU law (judgment of 9 February 2012, *Luksan*, C-277/10, EU:C:2012:65, paragraph 63).

88    It should be added that, in the present case, the first sentence of Article 2(7) of the Berne Convention grants discretion to the parties to that convention by providing, inter alia, that it is to be a matter for legislation in the countries of the Union established by that convention to determine the extent of the application of their laws to works of applied art and industrial designs and models, as well as the conditions under which such works, designs and models are to be protected.

89    As the Advocate General observed in points 59 to 62 of his Opinion, first, it is not apparent from the wording of that provision that it prohibits a State party to the Berne Convention from granting copyright protection to a work of applied art which, in the country of origin of that work, is protected only under a special regime as a design. Second, such a prohibition would run counter to the objective of that convention, reflected in the principle of 'national treatment' and of the minimum level of protection resulting from its substantive provisions, which is to ensure protection for authors outside the country of origin of a work. Third and lastly, it is in any event expressly stated in Article 19 of the Berne Convention that the provisions thereof are not to preclude the making of a claim to the benefit of any greater protection which may be granted by legislation in a State party to that convention.

90    In those circumstances, a Member State cannot rely on Article 2(7) of the Berne Convention in order to exempt itself from the obligations arising from Directive 2001/29.

91    In the light of the foregoing considerations, the answer to the fifth question is that the first paragraph of Article 351 TFEU must be interpreted as not permitting a Member State to apply, by way of derogation from the provisions of EU law, the criterion of material reciprocity contained in the second sentence of Article 2(7) of the Berne Convention in respect of a work the country of origin of which is the United States of America.

**Costs**

92  Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the referring court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (First Chamber) hereby rules:

1. **A situation in which a company claims copyright protection for a subject matter of applied art marketed in a Member State, provided that that subject matter may be classified as a 'work' within the meaning of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society, falls within the material scope of EU law.**

2. **Article 2(a) and Article 4(1) of Directive 2001/29, read in conjunction with Article 17(2) and Article 52(1) of the Charter of Fundamental Rights of the European Union,**

   **must be interpreted as meaning that, as EU law currently stands, they preclude Member States from applying, in national law, the criterion of material reciprocity laid down in the second sentence of Article 2(7) of the Convention for the Protection of Literary and Artistic Works, signed in Berne on 9 September 1886 (Paris Act of 24 July 1971), as amended on 28 September 1979, in respect of a work of applied art the country of origin of which is a third country and the author of which is a national of a third country. It is for the EU legislature alone, in accordance with Article 52(1) of the Charter of Fundamental Rights, to provide, by means of EU legislation, whether the grant in the European Union of the rights laid down in Article 2(a) and Article 4(1) of that directive should be limited.**

3. **The first paragraph of Article 351 TFEU must be interpreted as not permitting a Member State to apply, by way of derogation from the provisions of EU law, the criterion of material reciprocity contained in the second sentence of Article 2(7) of the Convention for the Protection of Literary and Artistic Works, signed in Berne on 9 September 1886 (Paris Act of 24 July 1971), as amended on 28 September 1979, in respect of a work the country of origin of which is the United States of America.**

[Signatures]